## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANDREW HANSON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-2256 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## ORDER

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Plaintiff's Motion for a Preliminary Injunction (ECF No. 8) is

**DENIED**.

**SO ORDERED.**

Dated:  April 20, 2023                                    RUDOLPH CONTRERAS
                                                                    United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANDREW HANSON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-2256 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Plaintiffs, four American citizens who reside in or spend time in the District of Columbia, challenge the constitutionality of D.C. law that bans possession of large-capacity magazines ("LCMs").  Plaintiffs own pistols and wish to equip them with LCMs for self-defense.  They claim this conduct is protected by the Second Amendment under the test set forth in the Supreme Court's recent decision, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  They now move for a preliminary (and permanent) injunction that enjoins Defendants, the District of Columbia and the Chief of the Metropolitan Police Department Robert J. Contee III (together, "the District"), from enforcing this law.  The Court held oral argument on the motion.  The matter is fully briefed and ripe for decision.  For the reasons described below, the Court concludes that the District's LCM ban is constitutional, and therefore Plaintiffs have not shown likelihood of success on the merits.  The Court will thus deny Plaintiffs' motion for a preliminary injunction.

## II.  BACKGROUND

### A.  Case Background

The sole object of Plaintiffs' constitutional challenge is D.C.'s LCM ban, which provides in full:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm.  For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.  The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b).  Violation of this provision carries a penalty of up to three years in prison and a fine of up to $12,500.  D.C. Code §§ 7-2507.06(a)(4); 22-3571.01(b)(6).

Some context is in order to understand the gun law at issue.  An ammunition feeding device, more commonly known as a magazine, "is a vehicle for carrying ammunition.  It can be either integral to the gun or detachable."  *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *4 (D.R.I. Dec. 14, 2022).  "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines."  *Id.* The magazine is simply "inserted into and removed from the frame of the firearm, much as an extra battery-pack gets swapped in and out of a battery-operated tool, like a leaf blower, for example."  *Id.*  Magazines come in different sizes and have different capacities.  Under D.C. law, a large-capacity magazine, or LCM, is simply a magazine that can hold more than ten bullets. "When a multiple-round device like an LCM is attached, a handgun becomes a 'semiautomatic'

weapon, meaning that it is capable of rapidly firing several bullets, one right after another. However, the gun still requires a trigger-pull for each round fired." *Id.*[1]

        Plaintiffs each hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department and they regularly carry firearms in D.C. *See* Hanson Decl. ¶ 2, ECF No. 8-2; Yzaguirre Decl. ¶ 2, ECF No. 8-3; Chaney Decl. ¶ 2, ECF No. 8-4; Klun Decl. ¶ 2, ECF No. 8-5. Each Plaintiff possesses LCMs outside D.C., and each Plaintiff claims that, but for D.C. law banning LCM possession in D.C., he would use LCMs for self-defense in D.C. Hanson Decl. ¶¶ 3–4; Yzaguirre Decl. ¶¶ 3–4; Chaney Decl. ¶¶ 3–4; Klun Decl. ¶¶ 3–4. In October 2022, Plaintiff Yzaguirre attempted to register a firearm with the Metropolitan Police Department but was denied because his firearm came with a 12-round LCM, in violation of D.C. law. Yzaguirre 2d Decl. ¶¶ 2–7, ECF No. 16-1.

        Plaintiffs brought suit on August 1, 2022, seeking: a declaratory judgment that D.C.'s LCM ban violates the Second and Fifth Amendments; a preliminary and permanent injunction preventing the District from enforcing this ban; damages; and other costs. *See* Compl. at 22–24, ECF No. 1. Plaintiffs then moved for a preliminary injunction on August 19, 2022. Pls.' Appl. for Prelim. Inj. ("Pls.' Mot."), ECF No. 8. A few days later, the District moved for an extension of time to respond and also to conduct limited discovery as to the facts underlying Plaintiffs' motion for a preliminary injunction. ECF Nos. 9, 10. The Court granted both motions on

---

[1] Both automatic and semi-automatic guns reload automatically; when fired, the force of a shot ejects the spent bullet casing while simultaneously pulling a fresh bullet from the magazine into the gun's chamber. *See* Tom Givens, *Concealed Carry Class* 113 (2019), Ex. C to Defs.' Opp'n, ECF No. 17-5. But whereas automatic guns fire continuously from a single pull of the trigger, semi-automatic guns fire only one bullet per pull of the trigger. *Id.*; *see, e.g.*, 1933 Ohio Laws 189, 189 ("Automatically . . . means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots.").

September 7, 2022.  Min. Order (Sept. 7, 2022).  On October 31, 2022, Plaintiffs supplemented

their motion for a preliminary injunction with leave of Court.  Min. Order (Oct. 31, 2022).  On

December 1, 2022, the Court permitted three nonprofit organizations, Brady, Gifford Law Center

to Prevent Gun Violence, and March for our Lives to jointly submit an amicus brief in support of

the District.  Min. Order (Dec. 1, 2022); *see* Amicus Brief, ECF No. 18-1.  Plaintiffs' motion for

a preliminary injunction was fully briefed as of January 23, 2022.  The Court heard oral

argument on the motion on April 13, 2023.  The motion is now ripe for decision.

### B.  Legal Background

The Second Amendment to the United States Constitution provides: "A well regulated

Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms shall not be infringed."  U.S. Const. amend. II.  Although short, this text is anything but

simple.  To understand and interpret this constitutional text, the Court looks to caselaw that is

relevant to the specific question at hand.  As it turns out, Plaintiffs are not the first to raise a

Second Amendment challenge to the District's LCM ban: a group of plaintiffs challenged the

same law over a decade ago in *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C.

Cir. 2011), which ultimately upheld the ban.  *Heller II* was decided in the wake of the Supreme

Court's seminal Second Amendment case, *District of Columbia v. Heller ("Heller")*, 554 U.S.

570 (2008).  The Supreme Court's decision in *Bruen* last year, however, soundly rejected how

the Courts of Appeals interpreted and applied *Heller*, and so calls into question the outcome of

*Heller II*.  Thus, although Plaintiffs' challenge to D.C.'s LCM ban is not entirely new, it

demands renewed analysis under the framework *Bruen* provides.

Understanding *Bruen* requires taking a few steps back, to *Heller*.  In *Heller*, the Supreme

Court held that the District's ban on handgun possession in the home violated the Second

Amendment.  554 U.S. at 572.  At the time, the District prohibited handgun registration, made it

a crime to carry an unregistered firearm, and required residents to keep any lawfully owned

firearms unloaded and dissembled.  *Id.* at 574.  In ruling for the plaintiffs and striking down D.C.

law, *Heller* established that the Second Amendment confers "the individual right to possess and

carry weapons in case of confrontation."  *Id.* at 592.  The Supreme Court explained in this

landmark decision that "the inherent right of self-defense has been central to the Second

Amendment right."  *Id.* at 628.

    *Heller* also cautioned that "[l]ike most rights, the right secured by the Second

Amendment is not unlimited."  *Id.* at 626.  Quoting Blackstone and other sources, the Supreme

Court stated that "the right was not a right to keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose."  *Id.*  Thus, the Second Amendment "does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.*

at 625.  And the Court did not "cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

places such as schools and government buildings, or laws imposing conditions and qualifications

on the commercial sale of arms."  *Id.* at 626–27.

    In the wake of *Heller*, the District passed the Firearms Registration Amendment Act of

2008 ("FRA"), which updated D.C.'s gun laws.  Of relevance here, the FRA added a new

provision that bans LCM possession—the same provision at issue in this case.  *See* D.C. Law 17-

372 § 3(n), Firearms Control Amendment Act of 2008,

https://code.dccouncil.gov/us/dc/council/laws/docs/17-372.pdf (adding "new subsection (b)" to

D.C. Code § 7-2506.01).  A group of plaintiffs once again sued the District, this time challenging

the constitutionality of, *inter alia*, the District's ban on assault weapons (in particular, semi-

automatic rifles) and its ban on LCM possession. *Heller II*, 670 F.3d at 1249.  In assessing the
plaintiffs' challenges to these laws, the D.C. Circuit followed the same framework that its sister
Courts of Appeals employed in Second Amendment challenges post-*Heller*.  Under this "two-
step approach," a court must "ask first whether a particular provision impinges upon a right
protected by the Second Amendment; if it does, then . . . go on to determine whether the
provision passes muster under the appropriate level of constitutional scrutiny." *Id.* at 1252.

As relevant here, *Heller II* applied this two-step approach to the plaintiffs' challenge to
D.C.'s LCM ban.  At the first step, the Circuit examined "whether the prohibited weapons are
'typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 1260 (quoting *Heller*,
554 U.S. at 625).  The Circuit found it was "clear enough in the record" that LCMs are in
common use and recognized that "fully 18 percent of all firearms owned by civilians in 1994
were equipped with magazines holding more than ten rounds, and approximately 4.7 million
more such magazines were imported into the United States between 1995 and 2000." *Id.* at
1261.  Still, the Circuit was not "certain" "based upon the record as it st[ood]" whether LCMs
were in common use *for lawful purposes*—that is, "whether these weapons are commonly used
or are useful specifically for self-defense or hunting" and thus "whether the
prohibitions . . . meaningfully affect the right to keep and bear arms." *Id.*  Ultimately, the Circuit
expressly declined to resolve the first step on the merits, instead assuming without deciding that
the first step was satisfied. *Id.*

At the second step of the analysis, *Heller II* applied intermediate scrutiny.  It stated that
this was the proper standard because given that "the plaintiffs present hardly any evidence that
semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred
for the purpose of self-defense or sport," it was "reasonably certain the prohibitions do not

impose a substantial burden upon t[he] right" to keep and bear arms under the Second

Amendment.  *Id.* at 1262.  Under the intermediate scrutiny standard, the Circuit found that the

LCM ban was "substantially related" to the District's "important interests in protecting police

officers and controlling crime."  *Id.*  The Circuit credited testimony that "high-capacity

magazines are dangerous in self-defense situations because 'the tendency is for defenders to keep

firing until all bullets have been expended, which poses grave risks to others in the household,

passersby, and bystanders'" and studies showing that attacks with LCMs "result in more shots

fired, persons wounded, and wounds per victim than do other gun attacks."  *Id.* at 1263–64.

Thus, the Circuit held that D.C.'s LCM ban "do[es] not violate the plaintiffs' constitutional right

to keep and bear arms."  *Id.* at 1264.

        Then came *Bruen*.  In *Bruen*, the Supreme Court reaffirmed *Heller* and held that the

Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside

the home."  142 S. Ct. at 2122.  *Bruen*, however, rejected the Courts of Appeals' two-step

framework for assessing Second Amendment challenges and announced that this framework was

inconsistent with *Heller*.  "*Heller*'s methodology centered on constitutional text and history" and

"did not invoke any means-end test."  *Id.* at 2128–29.  Thus, although "step one of the [Courts of

Appeals'] predominant framework [wa]s broadly consistent with *Heller*," step two "[wa]s one

step too many."  *Id.* at 2126–27.  *Bruen* declared that the proper analytical framework for

assessing Second Amendment challenges is as follows: "[1] When the Second Amendment's

plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

[2] The government must then justify its regulation by demonstrating that it is consistent with the

Nation's historical tradition of firearm regulation."  *Id.* at 2129–30 (brackets added).

With respect to the second part of *Bruen*'s test, the Supreme Court acknowledged that in some cases the "historical inquiry" will not be "straightforward." *Id.* at 2131. For "cases implicating unprecedented societal concerns or dramatic technological changes," courts should take "a more nuanced approach." *Id.* at 2132. In those situations, courts must conduct a "historical inquiry that . . . will often involve reasoning by analogy." *Id.* "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id.* *Bruen* provided two "metrics" for conducting this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original) (citation omitted). Analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphases in original).

*Bruen* then applied this standard to the facts of the case, which involved a challenge to New York State's public-carry licensing regime that required an applicant to show "proper cause" for self-defense. At the first step, the Supreme Court had "little difficulty" in concluding that the plaintiffs' desire to "carry[] handguns publicly for self-defense" was covered by the text of the Second Amendment. *Id.* at 2134. Thus, the Second Amendment "presumptively guarantee[d]" the plaintiffs the right to do so. *Id.* at 2135. *Bruen* then turned to the next step of

the inquiry, where New York State had the "burden" to "show that [its] proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* This New York could not do. After surveying history from the 12th through the 19th century, with particular emphasis on Founding-era regulations, *Bruen* concluded that "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. Thus, *Bruen* concluded that New York's "proper cause" licensing regime was unconstitutional. *Id.*

### III.  LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. "A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell*, 391 F.3d at 261 (D.C. Cir. 2004).[2]

---

[2] At this stage, the Court will consider all of the many exhibits and sources upon which the parties rely. In addition to providing declarations from their own experts, Plaintiffs provided five expert declarations filed in *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.), an ongoing case involving a Second Amendment challenge to a California law that, like the D.C. law at issue here, bans LCM possession. *See* Pls.' Reply at 2 n.1, ECF No. 24.

## IV.  ANALYSIS

The Court begins with standing.  "[T]he D.C. Circuit has declared in unequivocal terms that [a] party seeking a preliminary injunction must show a substantial likelihood of standing." *Angelo v. District of Columbia*, No. 22-cv-1878, 2022 WL 17974434, at *3 (D.D.C. Dec. 28, 2022) (cleaned up) (quoting *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022)). Plaintiffs breezed through the issue of standing in their briefing, and the District did not even bother to address standing at all.  Nonetheless, the Court finds that at least one Plaintiff, Tyler Yzaguirre, has demonstrated a substantial likelihood of standing because he was denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation of D.C.'s LCM ban.  *See generally* 2d Yzaguirre Decl.  That is a concrete injury, traceable to the allegedly unconstitutional law, which a court-issued injunction could redress.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *cf. Heller II*, 670 F.3d at 1249 (in recounting the plaintiffs' injuries, finding that "Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds").  And "because at least one Plaintiff has standing, the Court need not analyze whether other plaintiffs have standing."  *Williams v. Walsh*, No. 21-cv-1150, 2022 WL 17904227, at *11 n.7 (D.D.C. Dec. 23, 2022).

On the merits, *Bruen* governs.  Under *Bruen*, the Court must first determine whether "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct. at 2126.  If so, "the Constitution presumptively protects that conduct," and "the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation."  *Id.* Thus, the first question in this case is whether the Second Amendment covers LCM possession. If yes, the second question is whether the District's LCM ban is relevantly similar to a historical analogue.  The Court holds that the answer to the first question is no.  Although that alone

resolves the case for the District, the Court will nonetheless proceed to analyze the second

question and hold that in the alternative, the District's LCM ban is also consistent with this

country's historical tradition of firearm regulation.[3]

### A. Whether LCMs Are Covered by the Second Amendment

Under *Bruen*'s first step, the Court must determine whether the scope of the Second

Amendment covers LCM possession.  Notably, this first step is consistent with the first step of

Courts of Appeals' decisions pre-*Bruen*.  In other words, *Bruen* did not disturb the analysis

Courts of Appeals conducted under the first step of their framework.  *See* 142 S. Ct. at 2127

("Step one of the [Courts of Appeals'] predominant framework is broadly consistent

with *Heller*[.]").  The Court will therefore still discuss these now-abrogated cases in this section

and accord their step-1 analysis persuasive weight to the extent they are instructive.  At the first

step in this case, the parties raise two primary disputes.  First, they disagree whether LCMs are

"arms" within the meaning of the Second Amendment.  Second, they disagree whether LCMs are

typically possessed by law-abiding citizens for lawful purposes.  The Court will examine each in

turn.

#### 1.  Whether LCMs Are "Arms" Under the Second Amendment

The parties dispute whether LCMs are "arms" under the Second Amendment.  Recall that

the Second Amendment protects an individual right to "keep and bear *Arms*" for self-defense.

U.S. Const. amend. II (emphasis added).  *Heller* interpreted this term as follows:

> The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons
> of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th
> ed.) (reprinted 1978) (hereinafter Johnson).  Timothy Cunningham's important

---

[3] Because the Court concludes that the District's LCM ban is constitutional and that
Plaintiffs have "little likelihood of succeeding on the merits," the Court "[h]as no need to address
the other preliminary injunction factors."  *Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249,
1253 (D.C. Cir. 2006) (citations omitted).

> 1771 legal dictionary defined "arms" as "any thing that a man wears for his
> defence, or takes into his hands, or useth in wrath to cast at or strike another." 1
> A New and Complete Law Dictionary; *see also* N. Webster, American Dictionary
> of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

*Heller*, 554 U.S. at 581.

At least three Courts of Appeals have concluded that LCMs are "arms" within the meaning of the Second Amendment.  *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey ("ANJRPC")*, 910 F.3d 106, 116 (3d Cir. 2018); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020).[4]  In *ANJRPC*, the plaintiffs challenged the constitutionality of a New Jersey law that, as with the D.C. law in this case, made it illegal to possess a magazine capable of holding more than ten rounds of ammunition.  910 F.3d at 110.  The Third Circuit specifically addressed "the question [of] whether a magazine is an arm under the Second Amendment" and concluded "[t]he answer is yes."  *Id.* at 116.  It reasoned that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."  *Id.*

Likewise, a panel of the Fourth Circuit in *Kolbe* reasoned that because the Second Amendment plainly covers firearms, "there must also be an ancillary right to possess the magazines necessary to render those firearms operable."  813 F.3d at 175.  At issue in that case was a Maryland law that banned assault weapons like the AR-15 as well as detachable LCMs. *Id.* at 169–70.  The panel in *Kolbe* found "strong historical support" for the notion that magazines constitute "arms" because "magazines and the rounds they contain are used to strike

---

[4] At least two Courts of Appeals have noted this question but declined to address it.  *See Worman v. Healey*, 922 F.3d 26, 33 n.3 (1st Cir. 2019); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 n.127 (2d Cir. 2015).

at another and inflict damages" and early American provisions protecting gun rights "suggest[]

'arms' should be read to protect all those items necessary to use the weapons effectively." *Id.* at

175 (citation omitted).

Finally, in *Duncan*, a panel of the Ninth Circuit considered the constitutionality of

California's ban on LCM possession and concluded at the outset that "[f]irearm magazines are

'arms' under the Second Amendment." 970 F.3d at 1146. The Ninth Circuit reasoned that

"[w]ithout a magazine, many weapons would be useless" and therefore "there must be some

corollary . . . right to possess the magazines necessary to render those firearms operable." *Id.*

(citation omitted).

*ANJRPC*, *Kolbe*, and *Duncan* all recognized that the Second Amendment covers not just

possession of a firearm, but the sorts of things that make a firearm operable. *See Bruen*, 142 S.

Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to

its historical understanding, that general definition covers modern instruments that *facilitate*

armed self-defense." (emphasis added)). The same logic prevails in other Second Amendment

contexts as well. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (finding

that city's ban on firing ranges implicated the Second Amendment because "[t]he right to possess

firearms for protection implies a corresponding right to acquire and maintain proficiency in their

use; the core right wouldn't mean much without the training and practice that make it

effective").[5]

_____

[5] Although *Kolbe* and *Duncan* were both subsequently vacated by en banc decisions in
those circuits, the respective en banc decisions did not cast doubt on the panels' analysis of this
specific question. *See Kolbe v. Hogan*, 849 F.3d 114, 137 n.12 (4th Cir. 2017) (en banc)
(explaining that because it found LCMs "most useful in military service" and "not
constitutionally protected," it would not reach the question whether LCMs were "arms" under
the Second Amendment); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021) (en banc)

13

The District, however, argues that LCMs are not "arms" but rather "accoutrements" (*i.e.*, accessories).  Defs.' Opp'n to Pls.' Appl. for Prelim. Inj. ("Defs.' Opp'n") at 9–11, ECF No. 17. According to the District, the term "arms" at the Founding did not encompass accoutrements such as ammunition or cartridges that stored such ammunition.  *Id.* at 10.  And the District argues that even if the Second Amendment covers accessories which are integral to the operation of a firearm, LCMs are not one of them because Plaintiffs could still use their existing firearms with magazines that carry ten bullets or less, and in fact, currently carry these smaller magazines on their firearms.  *Id.* at 11–12; *see also Ocean State Tactical*, 2022 WL 17721175, at \*11 (finding similar arguments persuasive in holding that LCMs are not "arms" under the Second Amendment).

The Court is unpersuaded by the District's exacting standard.  Its position contradicts the conclusions that *ANJRPC*, *Kolbe*, and *Duncan* reached on this question.  In *ANJRPC*, for example, the Third Circuit found that LCMs are "arms" under the Second Amendment because "magazines *feed* ammunition into certain guns, and ammunition is necessary for such a gun to function as intended."  910 F.3d at 116 (emphasis added).  The District's logic, by contrast, would allow it to ban *all* magazines (not just LCMs)—a result even the District does not endorse here—because a firearm technically does not require *any* magazine to operate; one could simply fire the single bullet in the firearm's chamber.  *See Ocean State Tactical*, 2022 WL 17721175, at \*12 (noting that "a firearm can fire bullets without a detachable magazine").  The Court will therefore follow the persuasive reasoning of *ANJRPC*, *Kolbe*, and *Duncan* in concluding that LCMs are "arms" within the meaning of the Second Amendment.

---

("assuming, without deciding, that California's law implicates the Second Amendment" and not discussing the question of whether LCMs are "arms" under the Second Amendment).

2. Whether LCMs Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes

Even though LCMs are "arms" within the meaning of the Second Amendment, they must still satisfy another inquiry to fall within the amendment's scope. The next question under step one of *Bruen* is whether LCMs are "typically possessed by law-abiding citizens for lawful purposes." *Heller II*, 670 F.3d at 1260 (quoting *Heller*, 554 U.S. at 625). In *Heller II*, the D.C. Circuit noted in passing that the record in that case showed that "magazines holding more than ten rounds are indeed in 'common use.'" *Id.* at 1261. As evidence, it observed that "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Id.*; *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo ("NYSRPA")*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*.").

Plaintiffs seize on this observation as if it alone decides the question of whether LCMs are covered by the Second Amendment. It does not. *Heller II*'s comment was dicta because the Circuit ultimately assumed, without deciding, that LCMs were covered by the Second Amendment. 670 F.3d at 1261. More importantly, *Heller II* recognized that whether LCMs are "in common use" is merely the beginning of the analysis. The full inquiry is "whether the prohibited weapons are 'typically possessed . . . *for lawful purposes*.'" *Heller II*, 670 F.3d at 1260 (emphasis added) (quoting *Heller*, 554 U.S. at 625). On *that* critical question, *Heller II* expressed uncertainty: "based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically *for self-defense*[.]" *Id.* at 1261 (emphasis added). That is the question this Court must now resolve.

The parties unsurprisingly stake divergent positions.  Plaintiffs maintain that LCMs "are overwhelmingly used for lawful purposes" such as self-defense.  Pls.' Mem. of P. & A. in Reply to Opp'n to Appl. for Prelim. Inj. ("Pls.' Reply") at 12, ECF No. 24.[6]  The District disagrees; it argues that LCMs are not in common use for self-defense for two reasons.  First, it claims that LCMs' military characteristics make them a poor fit for self-defense and take them outside the scope of the Second Amendment.  Second, the District claims that law-abiding individuals do not use LCMs for self-defense because incidents where a civilian actually expends more than ten bullets in self-defense are "vanishingly rare."  Defs.' Opp'n at 18.  The Court agrees with the District on both arguments.

### a. Whether LCMs are Most Useful in Military Service

*Heller* specifically contemplated that "weapons that are most useful in military service" fall outside of Second Amendment protection.  554 U.S. at 627; *see NYSRPA*, 804 F.3d at 256 ("*Heller* expressly highlighted 'weapons that are most useful in military service,' such as the fully automatic M–16 rifle, as weapons that could be banned without implicating the Second Amendment."); *Duncan*, 19 F.4th at 1102 (en banc) (noting in dicta "significant merit" to the plaintiffs' argument that because "large-capacity magazines have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting," they are not covered by Second Amendment).  Plaintiffs counter that "the Supreme Court's precedents do not withhold

---

[6] Plaintiffs also argue that LCMs are commonly used for lawful purposes such as training and competition.  Pls.' Reply at 11–12.  But given that "individual self-defense is 'the *central component*' of the Second Amendment right," it is unclear whether a weapon that is *not* typically possessed for self-defense may nonetheless be covered by the Second Amendment on the ground that it is typically possessed for sporting.  *Bruen*, 142 S. Ct. at 2118 (emphasis in original) (citation omitted).  The Court has no occasion to address that novel question here, because the Complaint and the motion for a preliminary injunction focus on Plaintiffs' right of self-defense.  *See* Compl. ¶¶ 27–36; Pls.' Mot. at 7–14.  Indeed, Plaintiffs' counsel agreed at oral argument that *Heller* and its progeny focus on self-defense.

protection from arms merely because they are useful in militia service."  Pls.' Reply at 15.  That may be true, but it is beside the point.  *Heller* established that weapons that are "*most* useful in military service" are excluded from Second Amendment protection.  554 U.S. at 627 (emphasis added).  "Most" is a superlative.  A weapon may have *some* useful purposes in both civilian and military contexts, but if it is *most* useful in military service, it is not protected by the Second Amendment.

Here, in passing the LCM ban, D.C. lawmakers took the position that LCMs were not suitable for civilian self-defense.  The D.C. Council's Committee on Public Safety and the Judiciary, which referred this legislation for approval, favorably referenced D.C. Chief of Police's observation that "magazines holding[] over 10 rounds are more about firepower than self-defense."  Council of the District of Columbia Committee on Public Safety and the Judiciary, Committee Report at 9, https://perma.cc/YN6H-2U9M.  That view is shared by judges, too.  The Fourth Circuit's en banc decision in *Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017), held that LCMs are unprotected by the Second Amendment because they are most useful in military service.  In *Kolbe*, the plaintiffs challenged the constitutionality of a Maryland law that banned assault weapons like the AR-15 as well as detachable LCMs.  *Id.* at 120.  After describing the many "difficult questions" that *Heller* raised concerning what the Second Amendment protects, the court remarked that *Heller* offers "a dispositive and relatively easy inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?"  *Id.* at 136.  The "line that *Heller* drew," the court stated, was "between weapons that are most useful in military service and those that are not."  *Id.* at 137.  The court then found that "[t]he answer to that dispositive and relatively easy inquiry is plainly in the affirmative."  *Id.*

at 136.  It held that "[w]hatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines prohibited . . . are unquestionably most useful in military service."  *Id.* at 137.  Turning to LCMs in particular, the court found that they "are particularly designed and most suitable for military and law enforcement applications" because of their "ability to reload rapidly," "hit multiple human targets very rapidly," and "deliver extraordinary firepower."  *Id.* (citations omitted).  *Kolbe* did not limit its analysis of LCMs as they are used in assault weapons—to the contrary, it found that the "uniquely military feature[]" of LCMs' rapid-fire capacity also applied to "other firearms to which they may be attached"—for example, the handguns that Plaintiffs in this case carry.  *Id.*; *cf. Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("We know . . . that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines.").

*Kolbe* is no outlier.  The en banc Ninth Circuit cited *Kolbe* approvingly for the proposition that "[large-capacity] magazines likely are 'most useful in military service,' at least in an ordinary understanding of that phrase."  *Duncan*, 19 F.4th at 1102.  The Ninth Circuit found that "[e]vidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier: 'the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries.'"  *Id.* at 1105.  *Duncan* also cited two reports by the Bureau of Alcohol, Tobacco, Firearms and Explosives (a federal agency) which concluded that "large capacity magazines are indicative of military firearms," in part because they "provide[ ] the soldier with a fairly large ammunition supply" and that "detachable large capacity magazine[s] [were] originally designed and produced for . . . military assault rifles."  *Id.* at 1105–06.  *See also Or.*

18

*Firearms Fed'n, Inc. v. Brown*, No. 22-cv-01815, 2022 WL 17454829, at *10–11 (D. Or. Dec. 6, 2022) (favorably citing *Kolbe* and *Duncan* en banc decisions and finding that evidentiary record showed that LCMs "are often used in law enforcement and military situations").

If *Kolbe* and other courts are correct that LCMs are most useful in military service, one would expect to find support for this in history. Exactly so. The District's historical evidence in this case shows that LCMs' lethality was popular in military settings, and indeed many of them were designed specifically for military (and law enforcement) use. The District's expert, Brian DeLay, who has a Ph.D. in history and has extensively studied the history of firearms and arms trades, found that in the United States, "high-capacity firearms went almost exclusively to military buyers through the early 1870s and . . . very few were in the hands of private persons." Delay Decl. ¶ 23, ECF No. 17-9. Mr. DeLay further concluded that "in the 1860s and 1870s . . . [d]etachable magazines were still decades away from practical success, and would be produced for militaries long before they made their way into civilian markets in meaningful quantities." *Id.* ¶ 25. This trend continued into the 20th century. *See, e.g.*, Pauly Decl. ¶ 77, ECF No. 17-8 (expert with a Ph.D. in history explaining that the first Lugers, which were semiautomatic pistols with a pistol-grip magazine, "w[ere] adopted by the German army in 1908"); Paul M. Barrett, *Glock: The Rise of America's Gun* 6–11 (2012) (explaining that in 1980, Glock, the founder of the popular pistol many Americans own, designed a pistol for the Austrian military that could hold more than eight rounds); Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 270–75 (2003) (explaining that Switzerland firm SIG developed the SIG-Sauer P226 in 1983 which could accept a 15-round magazine, and was used by the U.S. Navy SEALs as well as police and military organizations in Europe, and that the 1989 SIG-Sauer P228 and P229, which contain 13 and 12 round-magazines, "earned universal reputations as

highly reliable and accurate weapons for military and police use"); Roth Decl. ¶ 48, ECF No. 17-11 (observing that semi-automatic weapons with LCMs such as the M-16 rile "were designed for offensive military applications rather than individual self-defense" and "emerged from technologies developed for military use during the Cold War").

Even Plaintiffs' experts seem to believe that LCMs are best suited for military and law enforcement use. *See, e.g.*, Murphy Decl. ¶ 9, ECF No. 24-6 (acknowledging that "magazines holding more than 10 rounds are most useful in the military or in a law enforcement context"); Harnish Decl. ¶ 7, ECF No. 24-7 ("The Beretta M9 [which has a 15-round magazine] was adopted by the United States Armed Forces as the official service pistol in 1985."); *id.* ¶ 9 ("Pistols with the capacity to hold ten rounds, or more than ten rounds . . . [are] selected by law enforcement and military agencies in the United States for the practicality and performance they provide to the organization, but more importantly the capability they provide to the end user."). Thus, the Court concludes that LCMs are not covered by the Second Amendment because they are most useful in military service.

### b. Whether LCMs Are in Fact Used for Self-Defense

The District also argues that LCMs are not covered by the Second Amendment because they are not "in fact used for th[e] purpose" of self-defense. Defs.' Opp'n at 18. As support, it relies on a study of the National Rifle Association's ("NRA") "Armed Citizen Stories" website which concluded that law-abiding citizens on average fire only *two* bullets in self-defense situations and virtually never more than ten. *Id.* This study, which assessed data from the years 1997 – 2001, was actually conducted by one of Plaintiffs' experts, Claude Werner. Mr. Werner is a retired U.S. Army officer who has experience in competitive shooting, self-defense, and firearms instruction. Werner Decl. ¶¶ 2–5, 7, ECF No. 24-8. In his study, titled "Analysis of

Five Years of Armed Encounters (With Data Tables)," Mr. Werner explained that he reviewed a total of 482 reports in that time period from the NRA's database.  *See* https://perma.cc/QTL7-U8EM.  Upon collecting and organizing the data from these reports, Mr. Werner concluded that the average number of shots a civilian fired in a self-defense incident in this time period was 2.2. *Id.*

Courts and scholars alike have relied on the findings of this study, specifically the 2.2 bullets per incident figure.  *See, e.g.*, Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020); *Kolbe*, 849 F.3d at 127 (en banc) ("[T]he State's evidence substantiates 'that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.'  Studies of 'armed citizen' stories collected by the National Rifle Association, covering 1997-2001 and 2011-2013, found that the average number of shots fired in self-defense was 2.2 and 2.1, respectively." (citations omitted)); *Duncan*, 19 F.4th at 1105 (en banc) ("[T]he record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home." (emphasis in original)); *cf. Heller II*, 670 F.3d at 1262 ("[T]he plaintiffs present hardly any evidence that . . . magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport.").

Plaintiffs raise primarily two arguments in response.  First, they try to back away from the findings of the 1997 – 2001 study that their own expert conducted.  Mr. Werner claims that his 1997 – 2001 timeframe is "dated."  Werner Decl. ¶ 7, ECF No. 24-8.  To the contrary, the 2.2 figure has remained exceptionally stable over time.  NERA Economic Consulting ("NERA"), a reputable economic consulting firm, reviewed 736 reports from the same NRA Armed Citizen

database in the *2011 – 2017 period* and concluded that the average number of shots a civilian

fired in a self-defense incident in this time period was 2.1.  *See* Amicus Brief at 19 & n.70; Decl.

of Lucy P. Allen ("Allen Decl.") ¶ 8, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*,

No. 3:18-cv-10507, 2018 WL 4688345 (D.N.J. Sept. 28, 2018), ECF No. 31-2.  The NERA

study tracked essentially the same metrics from the NRA Armed Citizen database over a more

recent time period and arrived at a virtually identical data point.[7]  Tellingly, one of Plaintiffs'

other experts concedes that "the average amount of rounds fired in self-defense is usually less

than 10, generally only two or three."  Murphy Decl. ¶ 8.[8]

      Mr. Werner next argues that his study is flawed because it is heavily skewed toward

"positive outcomes"—that is, successful self-defense incidents that are reported.  Werner Decl.

¶ 8; Ellifritz Decl. ¶¶ 14–16, ECF No. 24-7 (same).  Selection bias is no doubt a legitimate

concern in any statistical inquiry.  The problem for Plaintiffs is that Mr. Werner does not provide

any studies, arguments, or even logic that remotely suggests that were the study able to properly

capture negative outcomes, the average number of bullets fired in self-defense would somehow

*skyrocket* to 11 or more bullets.  The best Mr. Werner can say is that "[w]e don't know how may

[bullets] have been fired in non-positive outcomes."  Werner Decl. ¶ 8.  But if no one knows,

how does this support the idea that LCMs are commonly used for self-defense?

---

[7] In addition to studying the NRA Armed Citizen database from 2011 – 2017, NERA performed another study of self-defense (in the home only) in the 2011 – 2017 timeframe based on "comprehensive search of published news stories" online and concluded that the average number of shots fired per incident was 2.34—again, a substantially similar figure.  *See* Allen Decl. ¶¶ 12–17 (explaining methodology and findings).

[8] The Complaint attempts to describe six self-defense incidents in the country that involved firing more than ten rounds.  But amicus correctly points out that *five* out of these incidents were "officer involved" shootings, Compl. ¶¶ 28–33, and the sole example of civilian self-defense involved a "[f]amed Los Angeles watch shop owner," Compl. ¶ 30—hardly representative of ordinary civilian self-defense incidents.

Finally, Mr. Werner points out that his study had "very little data as to the ammunition capacity of the citizen employed firearm." *Id.* ¶ 9. He reasons that although "a substantial number of citizen defenders would have used plus 10 magazines" in these incidents, "i[f] we were doing the study today using current data, the percentage of citizens using plus 10 magazines would be even higher." *Id.* This argument actually undermines Plaintiffs' position. If civilians only fired a few bullets on average *despite* using an LCM-equipped firearm, it was not for a lack of ammunition. The data shows that they simply did not need the extra ammunition in the LCM for self-defense.

Perhaps realizing that their own expert's study has backfired, Plaintiffs try a different tack: they claim that a law-abiding citizen nonetheless "uses" a LCM for self-defense even when he does not necessarily expend double-digit bullets in a self-defense incident. *See* Pls.' Reply at 13 ("If a citizen fires two rounds out of a 15 round magazine to save his life, he nevertheless uses the 15 round magazine for self-defense."). That is a creative argument, but the Court is unconvinced. The dictionary defines "use" as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing *for the purpose for which it is adapted*, as distinguished from a possession and employment that is merely temporary or occasional." *Use*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *cf. Voisine v. United States*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently define the noun 'use' to mean the 'act of employing' something."). Here, LCMs are best suited for a military "purpose" and are poorly "adapted" for self-defense. As the Ninth Circuit en banc put it, civilians do not "use" LCMs for self-defense, because "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has [virtually n]ever been realized in self-defense." *Duncan*, 19 F.4th at 1105 (en banc); *see* Allen Decl. ¶ 10 ("Out of 736 incidents [in

the Armed Citizen database between 2011 – 2017], there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets."); *Or. Firearms Fed'n*, 2022 WL 17454829, at *11 (finding record showed that "large-capacity magazines are rarely used by civilians for self-defense").

Plaintiffs protest that the District's reasoning would allow it to "justify a ban on all firearms able to fire more than two or three shots" because "on average, only 2.2 shots are fired by defenders." Pls.' Reply at 13. But no such ban exists anywhere in the country, and the Court doubts that the District will see this as an invitation to go down Plaintiffs' slippery slope. Recall that the studies show that two bullets is merely the *average* amount of bullets fired in self-defense situations; thus, a law that restricts magazine capacity to say, five or six bullets, might meaningfully hinder the common and lawful usage of magazines for self-defense. In any event, this is not a case that requires the Court to delineate the constitutional limits of a hypothetical restriction. It suffices to say that the District's LCM ban, which limits magazine capacity to ten bullets, enables law-abiding people in D.C. to possess magazines with ample ammunition to defend themselves.[9]

In conclusion, the Court finds that the Second Amendment does not cover LCMs because they are not typically possessed for self-defense. LCMs fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense. Given that the District prevails at step one of *Bruen*'s framework, the

---

[9] The District's magazine capacity limit (10) also prevents civilians from maintaining greater firepower than law enforcement. Law enforcement in the District routinely carry 15- and 17-round magazines. Parsons Decl. ¶¶ 14–16, ECF No. 17-7. The District's LCM ban keeps the advantage police have over armed civilians who may be suspects or engaged in criminal activity. *Id.* ¶¶ 17–18.

Court finds that D.C.'s LCM ban is constitutional.  Nonetheless, to round out the analysis, the Court will consider *Bruen*'s second step in the alternative.

**B. Whether the Ban Is Consistent with this Nation's Tradition of Firearm Regulation**

Even were LCMs covered by the scope of the Second Amendment, the Court finds that D.C.'s ban is constitutional for the independent reason that the District has shown that it is consistent with this country's historical tradition of firearm regulation.  "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  *Bruen*, 142 S. Ct. at 2132.  *Bruen* provides two "metrics" for conducting this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132–33.  "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry."  *Id.* at 2133 (emphasis in original).

Although the burden is on the government to identify a historical analogue, *Bruen* stressed that this is not an impossible standard.  *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.").  *Bruen* acknowledged that in today's world, centuries after the ratification of the Second Amendment, it is not unusual to see "modern regulations that were unimaginable at the founding."  *Id.* at 2132.  Thus, "cases implicating unprecedented societal concerns or dramatic technological changes" require "nuanced" consideration.  *Id.* at 2131–32.  For that reason, analogical reasoning is not "a regulatory straitjacket": it "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* at

2133 (emphases in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* After all, "the Constitution, can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132; *see id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 415 (1819), for the principle that the Second Amendment was "intended . . . to be adapted to the various crises of human affairs").

### 1. Whether a Nuanced Approach to History Applies Here

Although D.C.'s LCM ban has yet to be tested under step two of *Bruen*'s framework, the Court is not the first in the country to apply *Bruen* to this kind of regulation. In *Oregon Firearms Federation*, a federal district court employed *Bruen*'s test to a substantially similar challenge to Oregon's LCM ban. 2022 WL 17454829 (D. Or. Dec. 6, 2022). That case analyzed the constitutionality of Measure 114, a ballot initiative passed by Oregon voters in November 2022 which outlawed the use and sales of LCMs. *Id.* at *2. The ballot measure provided limited exceptions, such as allowing existing owners of LCMs to continue to use them on their property or for recreation, and giving firearms manufacturers a 180-day grace period to fulfill existing contracts to out-of-state buyers. *Id.* at *4. The plaintiffs, gun owners and users of LCMs, brought suit and sought a temporary restraining order "aimed primarily" at the LCM ban. *Id.* at *5. The court first held that under *Bruen*, LCMs are not covered by the Second Amendment. *Id.* at *8–11. Then, "[a]ssuming for the sake of argument that the Second Amendment's plain text covers large-capacity magazines," the court "next consider[ed] whether Measure 114 is consistent with the Nation's historical tradition of firearm regulation." *Id.* at *12.

*Oregon Firearms Federation* answered this second question in the affirmative. The court observed that LCMs are "a dramatic change in firearms technology" because although some

multi-shot firearms existed before the Founding era, they were "experimental, designed for military use, rare, defective, or some combination of these features," and the evidence showed that "semi-automatic weapons did not become 'feasible and available' until the beginning of the twentieth century." *Id.* at *12 & n.17. The court also found that "large-capacity magazines implicate unprecedented societal concerns" because of their frequent use in recent mass shootings. *Id.* at *13. Turning to historical analogues, *Oregon Firearms Federation* observed that "in the 1800s, states often regulated certain types of weapon, such as Bowie knives, blunt weapons, slungshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense." *Id.* The court also found a historical tradition of banning private military organizations as evidence that "demonstrates the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Id.* at *14. The court found that Oregon's LCM ban was "comparably justified" with these historical regulations because just as the historical regulations were rooted in public safety concerns, the LCM ban "consider[ed] the public safety concerns of today" in "the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines." *Id.* And Oregon's ban placed a "comparable burden" as the historical regulations on the right to self-defense: the burden was "minimal," the court explained, because "in over seven hundred self-defense incidents, less than one half of a percent involved more than ten shots." *Id.*

In this case, the District's evidence also shows that LCMs are the object of "dramatic technological changes" and implicate "unprecedented societal concerns," and thus its ban requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132. First, with respect to the technological pedigree of LCMs, Mr. DeLay explained that while "firearms with ammunition

capacity in excess of 10 rounds date back to the 1500s," "such weapons amounted to little more than experimental curiosities" and that "[m]ost never advanced beyond proof of concept." DeLay Decl. ¶ 7.  The airgun, "the only high-capacity weapons from the [founding] period that enjoyed even experimental military use" was "so rare that owners could charge people to see them."  *Id.* ¶¶ 14–16; *see* "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792 (Ex. B to DeLay Decl.).  Based on his twelve years of studying the arms trade in the Founding era, Mr. DeLay found zero "evidence in primary sources that large-capacity firearms were anything other than exotic curios in this era." *Id.* ¶ 19; *cf.* Sweeney Decl. ¶¶ 15, 31, ECF No. 17-15 (expert with Ph.D. in history observing that review of 1,170 newspaper ads and reports in the 18th century shows that "repeating firearms in eighteenth-century America" "were extraordinarily rare"); *Friedman*, 784 F.3d at 410 (observing that assault weapons and LCMs, which city ordinance banned, "were not common in 1791" and that "[s]emi-automatic guns and large-capacity magazines are more recent developments").  Against this backdrop, statements such as "magazines of more than ten rounds are older than the United States" are misleading and grossly exaggerate the state of affairs at the Founding.  *See* David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) (hereinafter "Kopel"); Pls.' Mot. at 14–15 (relying on Mr. Kopel's "heavy lifting" research).  Even some of Plaintiffs' experts concede this point.  *See, e.g.*, Helsley Decl. ¶ 8, ECF No. 24-2 (acknowledging that multi-shot weapons like the Giradoni air rifle were "complex, likely unreliable, and fragile" and only "a window into the future"); Hlebinsky Decl. ¶ 23, ECF No. 24-3 (acknowledging it is "typical" to find "one-off examples" of multi-shot weapons at the Founding era).

High-capacity firearms became more common in military settings in the second half of the 19th century, but they were still rare.  DeLay Decl. ¶ 22.  The "Henry" rifle in 1860 could

fire sixteen rounds without reloading, and the "Winchester Model 1866" also became an iconic

high-capacity rifle. *Id.* But these "high-capacity firearms went almost exclusively to military

buyers through the early 1870s," and "constituted less than 0.2% of all firearms in the United

States in the late 1860s and early 1870s." *Id.* ¶¶ 23–24 (describing production numbers); *see*

*also* Pauly Decl. ¶ 62 ("Henry rifles were developed by the start of the American Civil War but

were quite expensive—exorbitantly priced for regular rank-and-file troops—and did not see

much combat.  By the end of the hostilities, the War Department had only officially bought

1,731 of the guns.").  Moreover, these rifles did not resemble the semiautomatic weapons of

today: they had fixed magazines, and "[u]sers of these 'lever-action' weapons were still required

to pull a lever between shots, slowing the firing rate to about one shot every three seconds."

Defs.' Opp'n at 23 (citing Pauly Decl. ¶ 61); *see* Rivas Dec. ¶¶ 29–30, ECF No. 17-12 (same,

from expert with Ph.D. in history).  Only near the "turn of the [20th] century" were "[t]he

semiautomatic firearm and its detachable box magazine . . . invented."  Kopel at 857; *see* Rivas

Decl. ¶ 29 ("The semi-automatic weapons with which twenty-first century Americans associate

large capacity magazines were either not in existence or not manufactured in large numbers until

the twentieth century.").[10]  It would take yet even more time for these inventions to "improve[]

and become more affordable."  Pls.' Reply at 11 (citing Kopel at 857–64, which describes

firearms in the 20th century).  "[T]he first handheld firearm that both (a) had a detachable

---

[10] Mr. Kopel nevertheless claims that weapons such as the multi-shot flintlock rifle, "Pepperbox" pistols, Colt multi-shot revolver, and 1873 Winchester rifle were common in the 1800s.  Kopel at 853–57.  In view of the record, the Court joins *Oregon Firearms Federation* in concluding that "those firearms were experimental, designed for military use, rare, defective, or some combination of these features."  2022 WL 17454829 at 12 & n.17; *see also* Amicus Brief at 12–15 (analyzing firearms Plaintiffs identified in this era and concluding that "no firearm capable of firing more than ten rounds without reloading achieved widespread commercial success prior to ratification of the Fourteenth Amendment" (emphasis omitted)).

magazine holding more than ten rounds and (b) was commercially available to civilians in the

United States was the Thompson submachine gun, introduced to the market in the 1920s."

DeLay Decl. ¶ 25; *see also* Kopel at 851 ("Handgun magazines of more than ten rounds would

become popular in the 1930s.").  As this history shows, LCMs reflect "dramatic technological

changes" in comparison to the weapons of the Founding era.  *Bruen*, 142 S. Ct. at 2132.

 Second, the record also shows that LCMs implicate "unprecedented societal concerns."

*Id.*  The District claims that "[t]he proliferation of modern semiautomatic arms, coupled with the

availability of LCMs, directly correlates with the contemporary problem of mass shootings in

America today."  Defs.' Opp'n at 26.  The District's expert, Randolph Roth, has a Ph.D. in

history and has spent decades studying homicide and mass violence data.  Roth Decl. ¶¶ 9–10.

He found that "the development of semiautomatic rifles and handguns dramatically increased the

number killed and wounded in mass shootings from 1966 to the present."  *Id.* ¶ 53.[11]  Mr. Roth

claims that "with extended magazines, semiautomatic rifles [in this period] cause an average of

299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184

percent more than regular firearms."  *Id.* ¶ 55.  He concluded that "[i]n combination,

semiautomatic firearms and extended magazines are extraordinarily lethal."  *Id.*; *see also* Amicus

Brief at 17 ("[A]s of July 2020, LCMs were used in the ten deadliest mass shootings of the prior

decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62 percent higher

---

 [11] Mr. Roth defined "mass shooting" as "a multiple homicide incident in which four or
more victims are murdered with firearms not including the offender(s) within one event, and at
least some of the murders occurred in a public location or locations in close geographical
proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not
attributable to any other underlying criminal activity or commonplace circumstance (armed
robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  *Id.* ¶ 53 n.103.
This is similar, although not identical, to the FBI's definition of "mass murder."  Cramer Decl. ¶
3 n.1, ECF No. 24-14.

death toll compared to those that did not involve an LCM."); *Or. Firearms Fed'n*, 2022 WL 17454829, at \*13 ("Every mass shooting since 2004 resulting in fourteen or more deaths involved large-capacity magazines with ten or more bullets."); *Worman*, 922 F.3d at 39 (observing that semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history"); *Duncan*, 19 F.4th at 1096 (en banc) ("About three-quarters of mass shooters possess their weapons and large-capacity magazines lawfully.  In the past half-century, large-capacity magazines have been used in about three-quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or more deaths, and more than twice as many people have been killed or injured in mass shootings that involved a large-capacity magazine as compared with mass shootings that involved a smaller-capacity magazine."); *NYSRPA*, 804 F.3d at 263–64 ("Large-capacity magazines are disproportionately used in mass shootings, like the one in Newtown, in which the shooter used multiple large-capacity magazines to fire 154 rounds in less than five minutes.  Like assault weapons, large-capacity magazines result in 'more shots fired, persons wounded, and wounds per victim than do other gun attacks'").[12]

Small wonder that in recent years, numerous state legislatures—at least nine so far—have banned LCMs.  *See ANJRPC*, 910 F.3d at 110 & n.1 (citing regulations and observing that they responded to the fact that "[a]ctive shooting and mass shooting incidents have dramatically

---

[12] Plaintiffs' expert, Clayton Cramer, claims that "individual mass murder" is not "particularly modern" and gives examples of mass murders committed by axes or by drowning in prior centuries.  Cramer Decl. ¶¶ 19, 23.  But this is consistent with the District's claim that individual mass *shootings* and the lethality associated with LCMs are a uniquely contemporary problem.  Furthermore, Plaintiffs' expert Gary Kleck concedes that "mass shooters who used LCMs inflicted more casualties than those who did not."  Kleck Decl. ¶ 17, ECF No. 24-15. Although Mr. Kleck challenges any inference of causality, the Court need not resolve that debate here.  That this is a hotly contested issue only reinforces the fact that LCMs are the subject of unprecedented societal concerns today.

increased during recent years," and that "[i]n addition to becoming more frequent, these shootings have also become more lethal"); *see also, e.g.*, *Kolbe*, 849 F.3d at 120 (en banc) ("In response to Newtown and other mass shootings, the duly elected members of the General Assembly of Maryland saw fit to enact the State's Firearm Safety Act of 2013 (the "FSA"), which bans the AR-15 and other military-style rifles and shotguns (referred to as "assault weapons") and detachable large-capacity magazines."); *Duncan*, 19 F.4th at 1095 (en banc) ("In response to mass shootings throughout the nation and in California, the California legislature enacted Senate Bill 1446, and California voters adopted Proposition 63.").

Because LCMs implicate "unprecedented societal concerns" and are the object of "dramatic technological changes," the Court's analysis of historical analogues to modern LCM bans requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132. In what follows, the Court examines one such historical analogue that the District has proffered: numerous states' high-capacity weapon bans during the Prohibition Era.

### 2. Whether Prohibition-Era Bans Are Historically Analogous

"Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s . . . these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time." Spitzer Decl. ¶ 22, ECF No. 17-10 (expert with Ph.D. in government); Tbl. 1 to Spitzer Decl. (listing states). These regulations largely banned the mere possession of a gun that was capable of holding a certain number of rounds without reloading. Plaintiffs attempt to dismiss these regulations as "restrictions on machine guns," and claim that what makes a machine gun worthy of regulation is "its ability to fire automatically, not [its ability to] accept detachable magazines of more than 10 rounds." Pls.' Reply at 25 & n.17. But it is wrong to characterize these laws as only regulating

automatic weapons and their magazine capacity.  At least five states in this era, plus the District

of Columbia, defined "machine gun" in their statutes *to include semi-automatic weapons* capable

of shooting a certain number of bullets without reloading.  *See* Act of July 8, 1932, ch. 465, §§ 1,

8, 47 Stat. 650, 650, 652 (District of Columbia); 1927 Mass. Acts 413, 413-14 (Massachusetts);

Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 (Minnesota); Act of Apr. 8, 1933, no.

64, 1933 Ohio Laws 189, 189 (Ohio); 1927 R.I. Pub. Laws 256, 256 (Rhode Island); Act of Mar.

7, 1934, ch. 96, 1934 Va. Acts 137, 137 (Virginia).[13]  Indeed, D.C.'s ban—which Congress

passed—was modeled heavily after the Uniform Act, "a model law" that the National Rifle

Association endorsed.  Spitzer Decl. ¶¶ 12–13; *compare* Act of July 8, 1932, ch. 465, §§ 1, 8, 47

Stat. 650, 650, 652, *with* Report of Firearms Committee, Handbook of the National Conference

on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting (1928) (attached

as Ex. P to Defs.' Opp'n).  The D.C. statute defined "machine gun" as "any firearm which shoots

automatically *or semiautomatically more than twelve shots without reloading*," and it prohibited

the possession of any machine gun within D.C.  *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat.

650, 650, 654 (emphasis added).  As these regulations demonstrate, "[r]estrictions on fully

automatic and semi-automatic firearms were closely tied to restrictions on ammunition

magazines or their equivalent."  Spitzer Decl. ¶ 19.  Like fully automatic weapons, semi-

automatic weapons "utilize the same fundamental firearms technology: an action that

---

[13] These statutes are reproduced in Appendix 3 to the Spitzer Decl.  In addition to these six jurisdictions, Michigan banned the possession of "any firearm which can be fired more than sixteen times without reloading" without specifying whether such a firearm was considered a machine gun.  Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929.
    These seven jurisdictions capped capacity as follows: D.C. (12); Massachusetts (any); Michigan (16); Minnesota (12); Ohio (18); Rhode Island (12); Virginia (16).  *See* App'x 3 to Spitzer Decl.

automatically loads a new round into the chamber after each shot is fired . . . and is capable of firing numerous rounds without reloading." *Id.* ¶ 17. By defining "machine gun" broadly, these regulations revealed a widespread tradition dating back to the 1920s and 1930s of regulating high-capacity weapons that could fire rapidly without reloading.

These Prohibition-era bans closely resemble D.C.'s ban today. It is therefore no surprise that the "how" and "why" of D.C.'s LCM ban is analogous to that of the Prohibition-era regulations. Consider the "how," or the "comparable burden," first. *Bruen*, 142 S. Ct. at 2133. The District's LCM ban is similar to the Prohibition-era regulations in that the burden it places on an individual's right of self-defense is relatively light. Recall that studies show that an individual expends on average two bullets in a self-defense incident where she fires her weapon. *See supra* at subsection IV.A.2.b. Similar to the regulations from a century ago, the District's ban does *not* prohibit individuals from obtaining magazines with capacities of ten or less rounds. Magazines with capacities of ten or less are plentiful. *Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014) (citing evidence that LCMs make up minority of all magazines owned). And it appears that these smaller-capacity magazines can readily replace an LCM in a firearm: every Plaintiff in this case admits that the firearms he currently carries— "even those for which the standard magazine is an LCM"— "are all equipped with magazines that are not LCMs." Defs.' Opp'n at 12 (citing Plaintiffs' declarations and Ex. A, Pls.' Answers to Interrogs. at 7–10). Furthermore, like the regulations from a century ago, D.C. law does not prohibit an individual from possessing multiple guns, or multiple magazines. Thus, the burden that the District's ban imposes on ordinary individuals is commensurate to that of the Prohibition-era regulations, and not at all onerous.

Similarly, with respect to the "why," D.C.'s LCM ban is "comparably justified" with the Prohibition-era regulations.  The Prohibition era witnessed the growth of gangster and criminal organizations who availed themselves of the enhanced firing capacity of these new technologies.  Spitzer Decl. ¶¶ 12–18.  In response, numerous states enacted sweeping bans on high-capacity semi-automatic and automatic weapons during this era that applied to *all individuals*, not just a certain subset of the population such as gangsters or criminals.  *Id.*  This shows that the states confronted the public safety issues of their time with vigor; indeed, these regulations were at the time "obviously uncontroversial" from a constitutional perspective.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69 (2017) (hereinafter "Spitzer, *Gun Law History*").  Likewise, the District's ban seeks to promote public safety by limiting the number of rounds in one magazine that an individual may lawfully carry for self-defense in an attempt to mitigate the carnage of mass shootings in this country.[14]  Just as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now.  *See supra* subsection IV.B.1 (describing mass shootings with LCMs as an "unprecedented societal concern").

Plaintiffs raise three main counterarguments to this analysis, but none is persuasive.  First, Plaintiffs argue that under *Bruen*, "20th century laws do not establish a historical tradition."  Pls.' Reply at 26.  But *Bruen* said no such thing.  *Bruen* merely stated that "when it comes to interpreting the Constitution, not all history is created equal."  142 S. Ct. at 2136.  Because "[c]onstitutional rights are enshrined with the scope they were understood to have when

---

[14] Whether LCM bans empirically increase public safety is again not an issue for the Court to resolve.  These policy decisions are appropriate for the legislature to consider.

the people adopted them," the years leading up to 1791 (the adoption of the Second Amendment) and 1868 (the adoption of the Fourteenth Amendment) are particularly important touchstones of constitutional meaning.  *Id.* at 2136 (emphasis omitted; citation omitted).  Outside these windows, "post-ratification adoption or acceptance of laws" are insignificant to the extent that they are "*inconsistent* with the original meaning of the constitutional text."  *Id.* at 2137 (emphasis added) (cleaned up).  Thus, in *Bruen*, the Supreme Court paid little heed to 19th and 20th-century evidence because "it contradict[ed] earlier evidence" in that case.  *Id.* at 2154 & n.28.  That result, however, is not a directive to discard 20th century history in *every* case.  *Bruen* left open the possibility that in an appropriate case, 20th century history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality.  *Cf. Bruen*, 142 S. Ct. at 2136 (citing James Madison for the interpretive principle that "'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution" (citation omitted)).  The 20th century, after all, began over a hundred years ago, and that is no inconsequential length of time.  *Cf. Heller II*, 670 F.3d at 1253 ("*Heller* tells us 'longstanding' regulations are 'presumptively lawful.'" (citation omitted)).

In this case, it is appropriate to apply 20th century history to the regulation at issue.  The historical tradition of high-capacity regulations in the 1920s and 1930s—over a hundred years ago—does not contradict any earlier evidence, and it supports the constitutionality of the District's LCM ban.  To reiterate, *Bruen* had no occasion to consider 20th century history because while "handguns . . . had gained a fairly secure footing in English culture" leading up to the Founding era, there was no evidence that public carry was limited "only to those who demonstrate some special need for self-protection" like New York's proper cause regime.  142 S. Ct. at 2142.  *Bruen* then ventured into the 18th century, where it found that "the history reveals a

consensus that States could *not* ban public carry altogether."  *Id.* at 2146 (emphasis in original). By contrast, in this case, the 1920s and 1930s regulations do not contradict any earlier evidence. That is so because semiautomatic and high-capacity weapons were *not* technologically feasible and commercially available in meaningful quantities until the early 1900s.  *See supra* subsection IV.B.1; Amicus Brief at 16 ("[C]rucially, when multi-shot firearms did begin to gain widespread civilian use, states across the country passed laws limiting access to these weapons." (emphasis omitted)).  Unlike the handguns at issue in *Bruen*, the weapons here did not gain a "secure footing" in American society prior to the 1900s.  142 S. Ct. at 2142.  Accordingly, they did not pose "a general societal problem that has persisted since the 18th century," and it would make no sense to divine constitutional significance from non-existent legislation concerning non-existent problems.  *Id.* at 2131.  States do not "regulate for problems that do not exist"; instead, they "adopt laws to address the problems that confront them."  *McCullen v. Coakley*, 573 U.S. 464, 481 (2014); *see also McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change[.]").

　　To flesh this principle out a little more, consider personal jetpacks, an "expensive and experimental curiosity" that are unregulated today despite the obvious safety issues and dangers they pose.  DeLay Decl. ¶ 21.  "A future historian (or jurist) discovering evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest, could conclude that the absence of public regulation reflected an ideological disposition against regulating jetpacks.  But the simpler and more accurate explanation would be that jetpacks remained too rare to attract regulatory attention in 2022."  *Id.*

Second, Plaintiffs attempt to dismiss the Prohibition-era regulations as "irrelevant outliers." Pls.' Reply at 25. But unlike "only three restrictions on public carry" that the government could produce in *Bruen*, which the Supreme Court "doubt[ed] . . . could suffice to show a tradition of public-carry regulation," 142 S. Ct. at 2142, the District here has pointed to no less than *six states plus D.C.* that regulated semi-automatic and automatic weapons based on their high firing capacity. *See supra* subsection IV.B.2.[15] Of particular significance, the D.C. law that the Court has discussed above was passed by Congress (a nationwide body) and drew heavily from the Uniform Act (a model law). Like D.C., Massachusetts, Michigan, Minnesota, and Rhode Island all banned mere possession. *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; 1927 R.I. Pub. Laws 256, 256. Plaintiffs try to distinguish the Ohio and Virginia laws as outliers because the former permitted *licensed* carry and the latter permitted defensive uses of these weapons. Pls.' Reply at 26. But Ohio's licensing law in 1933 required one to post $5,000 bond—today's equivalent of over $115,000—effectively "prevent[ing] law-abiding citizens with ordinary self-defense needs from carrying" these weapons. *Bruen*, 142 S. Ct. at 2150.[16] As for Virginia, although it prohibited possession of a machine gun only "for offensive and aggressive purpose," it "*presumed*" this purpose whenever the weapon was possessed outside the home. Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137,

---

[15] Actually, that number could be potentially as high as ten jurisdictions, if one reads three ambiguous state statutes in favor of the District. *See* Spitzer, *Gun Law History* at 69 (describing statutory ambiguity in machine gun bans from Illinois, Louisiana, and South Carolina).

[16] *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator, at https://www.bls.gov/data/inflation_calculator.htm (last visited April 20, 2023).

137 (emphasis added).  In short, Plaintiffs cannot avoid the conclusion that there is a historical

tradition of severe restrictions, if not outright bans, on these high-capacity weapons.

Accordingly, the District's law is at the very least "analogous enough to pass constitutional

muster." *Bruen*, 142 S. Ct. at 2133.

Third, Plaintiffs argue that the subsequent repeal of some of these state regulations

undercuts the District's reliance on this history.  Pls.' Reply at 26.  But Plaintiffs do not explain

why the decision of some states to "devise solutions to social problems that suit local needs and

values" is anything more than permissible "experimentation with reasonable firearms

regulations . . . under the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742,

785 (2010).  Take Rhode Island, for example.  Although it eventually repealed its 1927 statute

banning possession of machine guns (defined, by the way, to include "any weapon which shoots

more than twelve shots semiautomatically without reloading"), Rhode Island changed course in

2022 "[i]n the wake of recent mass shootings" and amended its law to "specifically ban LCMs,"

*Ocean State Tactical*, 2022 WL 17721175, at *4.  And other jurisdictions, like D.C., made

modifications to its law without ever repealing it.  *See* Kopel at 874 ("The District of Columbia

ban, with modifications, is still in effect.").  The Second Amendment gives states space to

experiment, and that is what Rhode Island and D.C. have done.  *Bruen* did contemplate that state

regulations that were "rejected on constitutional grounds" can "provide some probative evidence

of [a similar modern regulation's] unconstitutionality."  142 S. Ct. at 2131.  But Plaintiffs have

not suggested that any repeal was related to constitutional infirmity.  The Court has conducted

independent research on this question and did not find anything suggesting this was the reason,

either.  Thus, the Court is satisfied that the District has met its burden to produce a historical

analogue justifying its LCM ban.[17]

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is

denied.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.


Dated:  April 20, 2023                                      RUDOLPH CONTRERAS
                                                            United States District Judge

---

[17] The parties also dispute whether other potential historical analogues that the District
introduced are relevantly similar to the ban at issue here.  These include regulations on
gunpowder, trap guns, and dangerous weapons such as Bowie knives.  Defs.' Opp'n at 28–32,
35–39.  Because the Court holds that the District has adequately identified a historical analogue
in the Prohibition-era regulations, it has no occasion to consider additional examples.