ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7061

# In the United States Court of Appeals for the District of Columbia Circuit

ANDREW HANSON, ET AL.,

*Plaintiffs-Appellants*,

v.

THE DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*,

## INITIAL BRIEF OF APPELLANTS

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-Cv-02256-Rc)

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
1929 Biltmore Street, NW
Washington, DC 20009
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Dennis W. Polio
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES**

**Parties and Amici:** The Appellants, each of whom were Plaintiffs before the district court, are Andrew Hanson, Tyler Yzaguirre, Eric Klun, and Nathan Chaney. The Appellees, each of whom was Defendants before the district court, are the District of Columbia and Metropolitan Police Department Chief Robert J. Contee, III. Chief Contee has since resigned his position and has been replaced by Asham M. Benedict. Amici before the district court included March for Our Lives, the Giffords Law Center to Prevent Gun Violence, and Brady.

**Rulings Under Review:** The ruling under review is the district court's Memorandum Opinion dated April 20, 2023 (App. at _ [ECF No. 28]) and Order (App. at _ [ECF No. 27]) of the same date, which denied the Plaintiffs' motion for a preliminary injunction.

**Related Cases:** There are no related cases pending in this Court or before the U.S. District Court for the District of Columbia. Cases involving the same issues raised in this case are pending in the First Circuit (*Ocean State Tactical, LLC v. Rhode Island*, Case No. 23-1072), the Third Circuit (*Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety and Homeland Security,* Case No. 23-1641), the Fourth Circuit (*Bianchi v. Frosh*, Case No. 21-1255), and the Seventh Circuit (*Barnett v. Raoul*, Case No. 21-1255). In addition, cases raising the same issues as this case are pending in the Southern District of California (*Duncan*

*v. Bonta*, Case No. 17-cv-1017); Northern District of Illinois (*National Association for Gun Rights v. Highland Park,* Case No. 1:22-cv-04774); the District of Hawaii, (*Abott v. Lopez*, Case No. 1:20-cv-00360 and *National Association for Gun Rights v. Lopez*, Case No. 1:22-cv-00404); the District Court of New Jersey, (*Association Of New Jersey Rifle & Pistol Clubs, Inc., v. Platkin,* Case No 18-cv-10507); the District of Oregon (*Oregon Firearms Federation v. Brown*, Case No. 2022-cv-1815); and the Western District of Washington (*Sullivan v. Ferguson,* 22-cv-05403).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES....................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE & FACTS ................................................3

    I.    THE DISTRICT OF COLUMBIA HAS ENACTED SERIATIM RESTRICTIONS ON FIREARMS, BUT COURTS HAVE CONSISTENTLY ROLLED BACK THOSE RESTRICTIONS AS UNCONSTITUTIONAL. ...................................................3

    II.    THE DISTRICT COURT ERRONEOUSLY DECLINED TO ENJOIN THE MAGAZINE CAPACITY CAP....................................................................7

SUMMARY OF THE ARGUMENT .......................................................12

STANDARD OF REVIEW ...................................................................15

ARGUMENT ......................................................................................15

    I.    THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR SECOND AMENDMENT CHALLENGE TO THE DISTRICT'S MAGAZINE CAPACITY CAP. .......................................................................................18

        A.    Plus-Ten Magazines are "arms" for purposes of the Second Amendment....................................................................19

        B.    Plus-Ten Magazines are commonly possessed for lawful purposes. ................................................................20

        C.    Plus-Ten Magazines owned by law-abiding citizens are normally used for lawful purposes............................................25

        D.    The District cannot show that the Nation has historically regulated the number of rounds a gun may hold. .....................32

            1.    Plus-Ten Magazines have existed for centuries and have been in common use during (and long after) the adoption of the Second Amendment. .............................................34

            2.    Laws restricting magazine capacity are scarce, and of too recent vintage to inform the metes and bounds of the Second Amendment.......................................................44

II.   THE PLAINTIFFS HAVE SATISFIED THE OTHER CRITERIA FOR ISSUANCE OF A PRELIMINARY INJUNCTION. ................................................................53

III.  THE COURT SHOULD DIRECT THE DISTRICT COURT TO ENTER A PERMANENT INJUNCTION IN FAVOR OF PLAINTIFFS. .............................54

CONCLUSION ........................................................................................55

CERTIFICATE OF COMPLIANCE ......................................................57

CERTIFICATE OF SERVICE .............................................................58

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*A. Uberti and C. v. Leonardo*,
892 P.2d 1354 (Ariz. 1995) ............................................................. 42

*\*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ................................................................. 8, 12, 22

*Citizens for a Safer Community v. City of Rochester*,
627 N.Y.S. 2d 193 (N.Y. Sup. 1994) ............................................... 42

*Couplin v. State*,
378 A.2d 197 (Md. App. 1977) ...................................................... 42

*Curtis 1000 v. Suess*,
24 F.3d 941 (7th Cir. 1994) ............................................................ 54

*Davis v. District of Columbia*,
158 F.3d 1342 (D.C. Cir. 1998) ...................................................... 53

*\*District of Columbia v. Heller*,
554 U.S. 570 (2008) .... 3, 8, 9, 10, 12, 13, 14, 16, 17, 18, 19, 21, 23, 24, 25, 28, 31, 32, 34, 45, 48, 50, 52, 53

*Drumond v. Robinson*,
9 F.4th 217 (3rd Cir. 2021) ............................................................. 12

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) ..................................................... 22, 27

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020) ............................................. 19, 27, 34

*Espinoza v. Montana Dep't of Revenue*,
140 S. Ct. 2246 (2020) ................................................................... 48

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .......................................................... 12

*FTC v. H.J. Heinz Co.*,
246 F.3d 708, 713 (D.C. Cir. 2001) ................................................ 15

*FTC v. Whole Foods Mkt.*,
548 F.3d 1028, 1034 (D.C. Cir. 2008) ............................................ 15

*Fyock v. City of Sunnyvale*,
25 F. Supp. 3d 1267 (N.D. Cal. 2014) ....................................... 21, 29

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ........................................................ 53

\*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ...................................... 5, 8, 10, 20, 21, 24, 52

*Jackson v. City & Cnty. of S.F.*,
    746 F.3d 953 (9th Cir. 2014) ........................................................ 19

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ........................................................ 53

*Kirkland v. District of Columbia*
    70 F.3d 629 (D.C. Cir. 1995) ........................................................ 40

\*Kolbe v. Hogan*,
    813 F.3d 160 (4th Cir. 2016) .................................................... 19, 22

*Konigsberg v. State Bar of Cal.*,
    366 U.S. 36 (1961) ........................................................ 16

\*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .................................................... 15, 16, 18

*United States v. Miller*,
    307 U.S. 174 (1939) .................................................... 12, 32

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ........................................................ 54

*Morris v. District of Columbia*,
    38 F. Supp. 3d 57 (D.D.C. 2014) ........................................................ 54

\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) . 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 23, 24, 25, 27, 29, 32, 33, 34, 45, 46, 49, 50, 52

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ........................................................ 21

*Ass'n of N.J. Rifle & Pistol Clubs v. N.J. Attorney General.*
    910 F.3d 106 (3rd Cir. 2018) ........................................................ 20

*Palmer v. District of Columbia*,
    59 F. Supp. 3d 173 (D.D.C. 2014) ........................................................ 3

*People v. Brown*,
    235 N.W. 245 (1931) ........................................................ 45

*Potter v. United States*,
   167 Ct. Cl. 28 (Ct. Cl. 1964) ............................................................ 41

*State v. Duke*,
   42 Tex. 455 (1874) ................................................................. 45, 46

*Sturm, Ruger & Co. v. Arcadia Mach. & Tool Inc.*,
   1988 U.S. Dist. LEXIS 16451 (C.D. Cal. 1988) ............................. 42

*United States v. Fisher*,
   353 F.2d 396 (5th Cir. 1965) ........................................................... 41

*United States v. Olson*,
   1995 U.S. App. LEXIS 36973 (9th Cir. 1995) ................................. 41

*United States v. Precise Import Corp.*,
   458 F.2d 1376 (Cust. & Pat. App. 1972) ........................................ 41

*Wrenn v. District of Columbia*,
   864 F.3d 650 (D.C. Cir. 2017) ........................................... 4, 15, 54

**Statutes**

18 U.S.C. § 922 ....................................................................... 25

28 U.S.C. § 1292 ....................................................................... 1

28 U.S.C. § 1331 ....................................................................... 1

42 U.S.C. § 1983 ....................................................................... 1

1927 Mich. Laws 887 ................................................................. 45

1927 Mass. Acts 413, 413-14 ....................................................46

Conn. Gen. Stat. § 53-202w ...................................................... 51

Col. Rev. Stat. § 18-12-302 ........................................................51

D.C. Code § 7-2502.01 .............................................................. 26

D.C. Code § 7-2502.02 ................................................................ 3

D.C. Code § 7-2502.03 ......................................................... 26, 27

D.C. Code § 7-2506.01 ................................................................ 4

D.C. Code § 7-2507.06 ................................................................ 4

D.C. Code § 22-3571.01 .............................................................. 4

D.C. Code § 22-4506 ................................................................... 4

Haw. Rev. Stat. § 134-8 ............................................................ 51

Mass. Gen. Laws ch. 140, §§ 121, 131 ...................................................... 51

Minn. Laws 231, 232 .............................................................................. 47

Va. Code § 18.2-288 ............................................................................... 47

## Other

2014 STANDARD CATALOG OF FIREARMS (Jerry Lee ed. 2013) ......39, 40, 41, 42, 43

BRUCE N. CANFIELD, COMPLETE GUIDE TO THE M1 GARAND AND THE M1
    CARBINE (2d ed. 2010) ................................................................. 41

Clayton E. Cramer & Joseph Olson,
    *Pistols, Crime, and Public Safety in Early America*,
    44 Willamette L. Rev. 699 (2008) ................................................ 35

David B. Kopel,
    *The History of Firearm Magazines and Magazine Prohibitions*,
    78 Alb. L. Rev. 849 (2015) ............................................................ 38

David B. Kopel & Joseph Greenlee,
    *The History of Bans on Arms Before 1900*,
    50 J. Legis. __ (forthcoming 2024) .............................................. 33

DWIGHT B. DEMERITT, JR.,
    MAINE MADE GUNS & THEIR MAKERS 294-95 (rev. ed.) (Friends of the Maine
    State Museum, 1997) ..................................................................... 39

GUN DIGEST 24TH ANNIVERSARY DELUXE EDITION (John T. Amber ed. 2014) .... 42

GUN DIGEST 34TH ANNIVERSARY DELUXE EDITION (Ken Warner ed., 1979) ....... 43

HAROLD WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST (1952) ..... 37

JACK DUNLAP,
    AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS (1964) ........... 36

JAY KIMMEL, SAVAGE AND STEVENS ARMS (5th ed. 1990) .................................. 41

JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION (2012) ..................... 35

JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945 (1976) ................................... 40

JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER,
    TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM (2013) .................... 35

JOHN PLASTER,
    THE HISTORY OF SNIPING & SHARPSHOOTING (2008) ........................................ 35

LARRY RUTH,
    WAR BABY COMES HOME: THE U.S. CALIBER.30 CARBINE (1993) ................. 41

LEWIS WINANT,
    FIREARMS CURIOSA (2009) ...................................................................... 34, 39

LEWIS WINANT,
    PEPPERBOX FIREARMS (2001) ............................................................ 36

LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST
    (1985) ............................................................................................... 37

NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS
    AND THEIR VALUES (9th ed. 2007) ............................................ 35, 36, 37, 38, 39

PATRICK SWEENEY,
    GUN DIGEST BOOK OF THE AR-15 (2005) ........................................ 42

R.L. WILSON,
    THE WINCHESTER: AN AMERICAN LEGEND (1991) ........................... 37

ROY MARCOT,
    REMINGTON, AMERICA'S OLDEST GUN MAKER (1998) .................... 40

SHOOTER'S BIBLE TREASURY REPRODUCTION (1960) ..................... 40, 41

William English,
    *2021 National Firearms Survey: Updated Analysis Including Types of Firearms
    Owned* (May 13, 2022) .......................................................... 5, 21, 22

x

## STATEMENT OF JURISDICTION

Because the Plaintiffs-Appellants sued under 42 U.S.C. § 1983 to vindicate their federal constitutional rights, the district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court denied the Plaintiffs-Appellants' motion for a preliminary injunction on April 20, 2023. *See* App. at _, _ [ECF Nos. 27, 28]. On May 16, 2023, the Plaintiffs-Appellants filed a timely notice of appeal. *See* App. at _ [ECF No. 30]. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Are magazines capable of holding more than ten rounds of ammunition "arms" for purposes of the Second Amendment?

2.      Are magazines capable of holding more than ten rounds of ammunition in common use?

3.      Did the district court err by adding to its Second Amendment analysis the additional step of examining historical analogues to the District's Magazine Capacity Cap?

4.      Should the district court have granted Plaintiffs-Appellants' Motion for Preliminary Injunction?

5.      Should this Court permanently enjoin the District's Magazine Capacity Cap as violative of the Second Amendment?

## STATEMENT OF THE CASE & FACTS

**I.     THE DISTRICT OF COLUMBIA HAS ENACTED SERIATIM RESTRICTIONS ON FIREARMS, BUT COURTS HAVE CONSISTENTLY ROLLED BACK THOSE RESTRICTIONS AS UNCONSTITUTIONAL.**

For roughly two-score years, the District of Columbia has done its level best to rid firearms entirely from within its borders by imposing some of the most egregious—and unconstitutional—restrictions in the Nation. In 1976, the District banned the possession of nearly all handguns by first making it a crime to possess a firearm without registering it, and then prohibiting the registration of handguns. Eventually, the U.S. Supreme Court struck down this prohibition on the basis that it violated the core right of self-defense enshrined in the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 636 (2008).

Having been rebuffed by *Heller*, the District got creative. It combined one restriction—that "no persons or organization in the District shall possess or control any firearm, unless the persons or organization holds a valid registration certificate for the firearm," D.C. Code § 7-2502.02(a)(4)—with another that forbade handgun registration for use other than "self-defense within that person's home," *Id*. § 7-2502.02(a)(4). In so doing, the District effectively attempted to ban the carrying of all firearms *outside* the home. This provision, however, was held unconstitutional in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 184 (D.D.C. 2014).

3

Undeterred, the District then passed a regulation limiting the concealed carry of handguns outside the home to those who could convince the Metropolitan Police Chief that he or she had a "good reason to fear injury to [his or her] person or property" or "any other proper reason for carrying a pistol." D.C. Code § 22-4506(a)-(b). This "may issue" rule, predictably, resulted in the issuance of very few (only 123) concealed-carry licenses in the District. This Court rightly struck *that* provision in *Wrenn v. District of Columbia*, 864 F.3d 650, 668 (D.C. Cir. 2017), because it infringed the Second Amendment.

Despite consistent reprimands by this Court and others, the District persists. Unable to (1) ban all handguns, (2) ban all handguns outside the home, or (3) exercise unbridled discretion over who may carry handguns outside the home, the District now attempts to regulate the *types* of arms that can be possessed by prohibiting the possession of extraordinarily common arms possessed and used for lawful purposes. Here, the District has banned the sale, possession, or transfer of any so-called "large capacity ammunition feeding device," ("Magazine Capacity Cap"), which it defines as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." D.C. Code § 7-2506.01(b) ("Plus-Ten Magazines"). Violations are a felony and can result in three-years' imprisonment or a $12,500.00 fine. *Id*. §§ 7-2507.06(a)(4); 22-3571.01(b)(6).

4

As the district court recognized, most "semi-automatic firearms," including the Nation's more popular self-defense handguns, "use detachable box magazines," which are "vehicle[s] for carrying ammunition." App. at _ [ECF No. 28 at 2]. And this Court has already once noted that "fully 18 percent of *all firearms*"—not just semi-automatic handguns—"owned by civilians in 1994 were equipped with Plus-Ten Magazines holding more than ten rounds, and approximately 4.7 million more of such magazines were imported into the United States between 1995 and 2000." *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011). Current estimates place the number of Plus-Ten Magazines in circulation in the United States at more than 500 million. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2, 20, 24-25 (May 13, 2022).[1]

Indeed, of the top-selling semi-automatic pistols last year, *all but one* are sold with magazines that hold between twelve and eighteen rounds. Gun Genius, one of the larger online gun and ammunition e-commerce platforms in the world, released a comprehensive list of the best-selling firearms of 2022.[2] Five handguns were listed among the top ten best-selling firearms. Four out of those five—the Sig Sauer P320,

---

[1] Available https://ssrn.com/abstract=4109494 (last visited Aug. 21, 2023).

[2] *See* https://freerangeamerican.us/best-selling-guns/ (last visited Aug. 21, 2023).

5

Sig Sauer P365, Smith & Wesson M&P 9, and Glock 19—come standard issue with Plus-Ten Magazines from the factory. All four models are marketed for lawful self-defense.

Notably, Sig Sauer, Smith & Wesson, and Glock list all four models under "home defense," and all four models are consistently ranked among the best firearms for that purpose.[3] National Interest called the Glock 19 the "perfect choice" for "home or personal defense."[4] Firearms News said that although typical self-defense scenarios will not require more than five to seven rounds, increased domestic and global uncertainty makes the Sig Sauer P365's extended (twelve-round) magazine capacity a "huge selling point."[5] Reviews for handguns across every website and periodical are nearly identical in what they aspire to accomplish: effectiveness and reliability for self-defense. Increasingly, Plus-Ten Magazines have become a crucial aspect of what citizens look for in self-defense arms.

---

[3] *See* https://us.glock.com/en/Pistols?filter=homedef (last visited Aug. 21, 2023); https://www.smith-wesson.com/products/home-defense (last visited Aug. 21, 2023); https://www.sigsauer.com/firearms/pistols/defense.html (last visited Aug. 21, 2023).

[4] *See* https://nationalinterest.org/blog/buzz/smith-wesson-mp-m20-best-handgun-home-defense-158876 (last visited Aug. 21, 2023).

[5] *See* https://www.firearmsnews.com/editorial/sigsauer-p365-review/453063#:~:text=Keeping%20in%20mind%20just%20how,smooth%20with%20a%20clean%20break (last visited Aug. 21, 2023).

In other words, the District has set an arbitrary cap on the number of rounds an individual may carry in his or her self-defense pistol, even though many (if not the vast majority of) self-defense pistols are sold to law-abiding citizens for lawful purposes with magazines that exceed the District's arbitrary Magazine Capacity Cap.

## II.    THE DISTRICT COURT ERRONEOUSLY DECLINED TO ENJOIN THE MAGAZINE CAPACITY CAP.

Each of the four Plaintiffs has a D.C. Metropolitan Police Department ("MPD") issued concealed-carry pistol license, and all regularly carry a pistol while in the District. Compl. ¶¶ 1-4 (App. at _ [ECF No. 1]). Every one of them owns Plus-Ten Magazines but store them outside the District. *Id.* One of the Plaintiffs—Tyler Yzaguirre—tried to register a firearm with a twelve-round magazine (a Sig Sauer P365, one of the top-three-selling self-defense pistols in the United States), but he was denied based on D.C.'s Magazine Capacity Cap. App. at _ [ECF No. 28 at 10].

On August 1, 2022, Plaintiffs sued the District of Columbia and MPD Chief Robert J. Contee III. Their two-count complaint alleged that D.C.'s Magazine Capacity Cap violated (1) the Second Amendment, as explained in *N.Y. State Rifle & Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022), and (2) the Fifth Amendment's Due Process Clause as both arbitrary and irrational. Roughly two-weeks later, the Plaintiffs moved for a preliminary injunction based on their Second

7

Amendment Claim. App. at _ [ECF No. 8]. The district court, however, denied it on

April 20, 2023. App. at _ [ECF No. 28].

      The district court erred in its analysis under *Heller* and *Bruen*. At the outset

of its denial order, the district court correctly noted that, in *Heller II*, this Court found

that Plus-Ten Magazines "are in common use." App. at _ [ECF No. 28 at 6] (quoting

*Heller II*, 670 F.3d at 1261). That finding should have been the end of the analysis,

as *Heller* unambiguously explained that arms commonly possessed and used for

lawful purposes receive Second Amendment protection. 554 U.S. at 624-25, 627-

28. As the Supreme Court put it in *Bruen*:

> The Second Amendment guaranteed to "all Americans" the right to
> bear commonly used arms in public subject to certain reasonable, well-
> defined restrictions. *Heller*, 554 U.S. at 581 . . . . Those restrictions, for
> example, limited the intent for which one could carry arms, the manner
> by which one carried arms, or the exceptional circumstances under
> which one could not carry arms, such as before justices of the peace and
> other government officials. Apart from a few late-19th-century outlier
> jurisdictions, *American governments simply have not broadly
> prohibited the public carry of commonly used firearms for personal
> defense.*

142 S. Ct. at 2156 (emphasis added). *Bruen* stressed that commonly possessed arms

are protected. *Id.* at 2123, 2143 2144 & 2153; *see also Caetano v. Massachusetts,*

577 U.S. 411, 417, 420 (2016) (Alito, J. concurring). Thus, the only questions

relevant to the district court's analysis were: (1) Are Plus-Ten Magazines arms that

the Second Amendment presumptively protects? And if so, (2) are they in common

use for lawful purposes?

Instead, the district court erroneously added an additional step to its analysis. Specifically, it formulated its analysis as follows: "[T]he first question in this case is whether the Second Amendment covers . . . possession" of Plus-Ten Magazines, and, "[i]f yes, the second question is whether the District's" Magazine Capacity Cap "is relevantly similar to a historical analogue." App. at _ [ECF No. 28 at 10]. Although the first element of the district court's analysis is broadly consistent with the Supreme Court's guidance, the second element is not because *Heller* and *Bruen* unambiguously state that commonly owned arms receive Second Amendment protection. This is because the Supreme Court has already conducted the historical analysis as to which arms receive protection, and it concluded that commonly possessed arms are protected while those that are "highly unusual in society at large" are not. *Heller,* 554 U.S. at 627-28.[6]

As for *Bruen's* first question, the district court made some correct determinations and some incorrect determinations—but ultimately decided the question incorrectly. First, the district court correctly determined that Plus-Ten Magazines are indeed "arms" for purposes of the Second Amendment. App. at _ [ECF No. 28 at 14]. Next, the district court correctly observed that Plus-Ten

---

[6] *See also Heller*, 554 U.S. at 625-26 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right . . . .").

9

Magazines are in common use. App. at _ [ECF No. 28 at 15]. Nevertheless, the district court quizzically concluded that Plus-Ten Magazines are *not* "typically possessed by law-abiding citizens for lawful purposes." App. at _ [ECF No. 28 at 15]. The district court accomplished this feat of logical gymnastics by first reasoning that Plus-Ten Magazines are "most useful in military service," and even if "[a] weapon . . . ha[s] *some* useful purposes in both civilian and military contexts, . . . if it is *most* useful in military service, it is not protected by the Second Amendment." App. at _ [ECF No. 28 at 17] (emphases in original). The district court then doubled down on its logic by parroting an age-old justification for unconstitutional arms control: "civilians . . . simply d[o] not need" that much "ammunition . . . for self-defense." App. at _ [ECF No. 28 at 23]. To support this analysis, the Court cited the since-abrogated *Heller II* decision repeatedly—but not once did it cite *Bruen*.

"[T]o round out [its] analysis," the district court then incorrectly engaged in an extra step—considering whether the District's Magazine Capacity Cap "is consistent with this Nation's tradition of firearm regulation." App. at _ [ECF No. 28 at 25]. But in so doing, the district court ignored that *Heller* and *Bruen* have already concluded that commonly owned arms cannot be banned. Instead, the district court glommed onto stray language from *Bruen* noting that, when conducting any historical analysis, "'cases implicating unprecedented societal concerns or dramatic technological changes' require 'nuanced' consideration." App. at _ [ECF No. 28 at

10

25] (quoting *Bruen*, 142 S.Ct. at 2131–32). The district court then reasoned that (1) a purported uptick in mass shootings constituted an unprecedented societal concern, and (2) because the detachable box magazine was not invented until the turn of the twentieth century, Plus-Ten Magazines constituted "a dramatic technological change." App. at _ [ECF No. 28 at 30]. Applying a "nuanced consideration," App. at _ [ECF No. 28 at 32], and based on laws of only *six* states and the District (roughly 12 percent of jurisdictions) in the 1930s (i.e., one-hundred-forty years since the ratification of the Second Amendment and sixty-years since the ratification of the Fourteenth) that only arguably (not definitively) had some limits on magazine capacity of semi-automatic firearms, the district court concluded that there existed "a widespread tradition . . . of regulating high-capacity weapons that could fire rapidly without reloading." App. at _ [ECF No. 28 at 34]. On those alternative grounds, it doubled down on its conclusion that the District's Magazine Capacity Cap survived Second Amendment scrutiny. App. at _ [ECF No. 28 at 40].

At bottom, the district court determined that "[t]he Second Amendment gives states space to experiment, and that is what . . . D.C. ha[s] done." App. at _ [ECF No. 28 at 39]. Accordingly, it denied the Plaintiffs' motion for a preliminary injunction without addressing the other preliminary-injunction prongs. *See* App. at _ [ECF No. 28]. Plaintiffs timely appealed on May 16, 2023. App. at _ [ECF No. 30].

## SUMMARY OF THE ARGUMENT

*Heller* unquestionably instructs that the Second Amendment presumptively protects all bearable arms. 554 U.S. at 582; *see also Caetano,* 577 U.S. at 411. The Second Amendment's presumptive protection can be rebutted by showing that a bearable arm is not commonly possessed for lawful purposes. 554 U.S. at 624-25. This is the distinction *Heller* explained between arms in common use that cannot be banned, and dangerous and unusual arms that may be banned. "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano,* 577 U.S. at 417 (Alito, J. and Thomas, J., concurring).

Although the district court correctly determined that Plus-Ten Magazines are bearable arms that are commonly possessed, the court otherwise botched its analysis by: (1) limiting the analysis to "common use for self-defense" rather than common possession for lawful purposes generally;[7] (2) limiting self-defense "use" to actually firing a weapon in self-defense rather than possessing or carrying the weapon with

---

[7] *See Heller*, 554 U.S. at 624-25 ("We therefore read [*United States v.*] *Miller*[, 307 U.S. 174 (1939)] to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right . . . ."). For example, the district court ignored evidence that the banned magazines are predominately used in self-defense training courses, *see* App. at _ [ECF Nos. 24-4, 24-5, 24-6, 24-7 and 24-8]. Self-defense training, in and of itself, is a key component of the core right of self-defense. *See, e.g., Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011) (range training protected under the Second Amendment.); *accord Drumond v. Robinson,* 9 F.4th 217 (3d Cir. 2021).

12

a Plus-Ten Magazine "in case of confrontation" (*Heller,* 554 U.S. at 592); and (3) holding that Plus-Ten Magazines are not "used" in self-defense because generally civilians often fire fewer than ten rounds during self-defense incidents (despite record evidence of various instances where civilian defenders did indeed fire more than ten rounds in self-defense). *See* App. at _, _ [ECF No. 1 at 10; ECF No. 24-10].

Corollary to the district court's mistaken analysis was its determination that Plus-Ten Magazines are unprotected because they are most useful in a military or law enforcement context. This amounted to a gross misreading of *Heller's* explanation that dangerous and unusual weapons are unprotected even though such weapons would, under *Miller,* contribute to an effective militia and military. *Heller* explained that such arms may be banned not because they are most useful to the military but because they are "highly unusual in society at large." 554 U.S. at 628. Thus, arms commonly possessed for lawful purposes, such as the Plus-Ten Magazines at issue, are protected even though they are used in military service.

Its separate analysis of Plus-Ten Magazine's usefulness to the military was an unnecessary—and erroneous—step, which the district misapplied anyway. *Heller's* analysis is controlling, and so Plus-Ten Magazines, as bearable arms in common use for lawful purposes, are protected by the Second Amendment. Nothing in *Bruen* casts doubt on *Heller's* common-possession-and-use test. *See Bruen,* 142 S. Ct. at

13

2143 ("[D]rawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," rather than those that "are highly unusual in society at large'" (citing *Heller*, 554 U.S. at 627)).

The district court nevertheless incorrectly proceeded under the guise of a "nuanced approach" to conduct an interest-balancing analysis. It concluded that these commonly possessed and used arms are unprotected, and that Plus-Ten Magazines represent a "dramatic technological change" (despite more than a 200-year existence of firearms able to fire more than ten rounds without reloading). App. at _ [ECF No. 28 at 30]. The district court further concluded that the District's Magazine Capacity Cap aligned with the Nation's tradition of firearms regulation by reference only to 20th century Prohibition-era restrictions that mostly applied to fully automatic machine guns. *See* App. at _ [ECF No. 28 at 32–40]. But *Bruen* made it clear that arms restrictions must be justified by reference to Founding-era analogues. *See Bruen*, 142 S. Ct. at 2131 (citation omitted). Nothing in *Bruen's* discussion of a "more nuanced approach" invites courts to depart from Founding-era analogues. And nothing in *Bruen* suggests that a "nuanced" approach can justify banning arms in common use.

For these reasons, the Court should reverse the district court's denial of the preliminary injunction requested by Plaintiffs. Moreover, because Plus-Ten

14

Magazines are commonly possessed and used for lawful purposes, this Court should direct the district court on remand to enter an order permanently enjoining the District's Magazine Capacity Cap. *See Wrenn,* 864 F.3d at 667.

## STANDARD OF REVIEW

This Court reviews a district court's denial of an injunction for abuse of discretion and will only set aside the district court's factual findings if they are "clearly erroneous." Fed. R. Civ. P. 52(a); *FTC v. Whole Foods Mkt.*, 548 F.3d 1028, 1034 (D.C. Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001). However, if this Court's review of the district court's decision "reveals that it rests on an erroneous premise as to the pertinent law, [this Court] must examine the decision in light of the legal principles [it] believe[s] proper and sound," applying "de novo review to the district court's conclusions of law." *FTC v. H.J. Heinz Co.*, 246 F.3d at 713 (internal citations omitted) (cleaned up).

## ARGUMENT

After more than ten years of watching circuit courts dilute its proclamation that "the right to keep and bear arms" is indeed enshrined "among those fundamental rights necessary to our system of ordered liberty," *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010), the Supreme Court recently tripled-down on its holding that the Second Amendment "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense.'" *Bruen*, 142 S. Ct.

15

at 2118 (quoting *Heller*, 554 U.S. at 635). In so doing, the Court spurned as "[il]legitimate" any tendency among judges to "'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise' in the field." *Id*. (quoting *McDonald*, 561 U.S. at 790–91). For that reason, the Court rejected the use of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id*. at 2129 (quoting *McDonald*, 561 U.S. at 790-91; *Heller*, 554 U.S. at 634).

The rule from *Bruen* preferences the preexisting right of self-defense reflected in the Second Amendment. Thus, "when the Second Amendment's plain text covers an individual's conduct," i.e., possession of arms for self-defense, "the Constitution *presumptively* protects that conduct." *Id*. at 2169 (emphasis added). If the government wants to restrict such conduct, it "may not simply posit that the regulation promotes an important interest." *Id*. Instead, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the government cannot do so, then the conduct remains protected by "the Second Amendment's 'unqualified command.'" *Id*. (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

16

Precious little of the district court's preliminary-injunction order faithfully applied *Bruen,* or *Heller* for that matter. The *Bruen* Court saw this coming. It warned that when a court examines whether "a regulation is consistent with this Nation's historical tradition of firearm regulation," it may have to reason by analogy, but *it may not* "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*. at 2132, 2133 n.7. *Bruen* also warned that courts are forbidden from "making . . . empirical judgments regarding firearm regulations" that often result in "defer[ral] to the determinations of legislatures." *Id*. at 2131. This is so because "the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id*. at 2129 (quoting *Heller*, 554 U.S. at 634). Indeed, "'[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.'" *Id*. (quoting *Heller*, 554 U.S. at 634).

The district court flouted every one of these admonitions. It took it upon itself to determine whether Plus-Ten Magazines are "useful[]," for self-defense, and it concluded that, because they are "a poor fit" for that job, they are "outside the scope of the Second Amendment." App. at _ [ECF No. 28 at 16]. It drew "empirical judgments regarding" the District's Magazine Capacity Cap, which led it to conclude that "law-abiding citizens do not use" Plus-Ten Magazines "because incidents where

17

a civilian actually expends more than ten bullets in self-defense are 'vanishingly rare.'" App. at _ [ECF No. 28 at 16]. And it reasoned that "[t]he Second Amendment gives states space to experiment," even though that premise is at loggerheads with the Supreme Court's proclamation that the Second Amendment "*restricts* experimentation and local variations," since "[t]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" *McDonald*, 561 U.S. at 790 (quoting *Heller*, 554 U.S. at 636) (emphasis added).

## I.    THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR SECOND AMENDMENT CHALLENGE TO THE DISTRICT'S MAGAZINE CAPACITY CAP.

*Bruen* is unambiguous. "[T]he Second Amendment's plain text covers" the possession and use of Plus-Ten Magazines because they are "arms" for purposes of the Second Amendment. *Heller* makes this crystal clear. "[T]he Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms . . . ." 554 U.S. at 582. Thus, their use and possession are "presumptively protect[ed]" by the Constitution, meaning that the District's ban must be enjoined unless the District can show that the "regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2126. And the District cannot possibly meet this test because *Heller* has already definitely held that the Nation's historical tradition (and thus the Second Amendment) protects arms commonly possessed and used for lawful purposes. 554 U.S. at 624-25 & 627. *See also Bruen*, 142 S. Ct. at 2128, 2143 & 2156. Hundreds of millions of Plus-Ten Magazines are possessed and

18

used for lawful purposes by law-abiding citizens—including self-defense, self-defense training, and sporting (e.g., hunting, target practice, and competition shooting). Plus-Ten Magazines enjoy Second Amendment protection, which is why this Court must reverse the district court's denial of a preliminary injunction and direct the entry of a permanent injunction.

### A.     Plus-Ten Magazines are "arms" for purposes of the Second Amendment.

Starting with *Heller*, the Supreme Court has considered "arms" to be "[w]eapons of offence, or armour of defence," 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978), or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," 1 A New and Complete Law Dictionary; *see also* N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) ("Webster") (similar). And courts around the Nation agree that the right to possess "arms" includes a corollary right to possess the tools needed to use them.[8] Thus, "[b]ecause magazines feed ammunition into certain

---

[8] *See Duncan*, 970 F.3d at 1146 ("Firearm magazines are "arms" under the Second Amendment. Magazines enjoy Second Amendment protection for a simple reason: Without a magazine, many weapons would be useless, including "quintessential" self-defense weapons like a handgun." (Citations omitted)); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) ("[T]he right to possess firearms for protection implies a corresponding right to possess component parts necessary to make firearms operable." (Citation omitted)); *see also Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be

guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.* ("*ANJRPC*"), 910 F.3d 106, 116 (3rd Cir. 2018).

The district court at least got this part of its analysis correct, despite the District's argument that magazines are firearm "accoutrements." App. at _ [ECF No. 17 at 9–11]. "Accoutrements" cannot be something that, if missing from a firearm, renders the firearm virtually inoperable. As the district court noted, "[t]he District's logic . . . would allow it to ban all magazines," which is a "result even the District does not endorse." App. at _ [ECF No. 28 at 14]. For that reason, this Court should conclude, as it implicitly did in *Heller II,* 670 F.3d at 1260, that Plus-Ten Magazines are indeed "arms" for purposes of the Second Amendment.

The only question left in the inquiry, then, is: are Plus-Ten Magazines commonly owned for lawful purposes?

## B.    Plus-Ten Magazines are commonly possessed for lawful purposes.

There can be little debate that Plus-Ten Magazines are common. Indeed, this Court concluded as much more than ten years ago: "fully 18 percent of *all firearms*"—not just semi-automatic handguns—"owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7

---

meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose.").

million more such magazines were imported into the United States between 1995 and 2000." *Heller II*, 670 F.3d at 1261. Again, other courts agree with this conclusion.[9]

Lest there be any doubt, the number of Plus-Ten Magazines possessed by lawful Americans has continued to swell. A 2021 research paper from the Georgetown McDonough School of Business estimates that there are some 542 million Plus-Ten Magazines currently in circulation in this Nation. *See* William English, *supra*, at 2, 20, 24-25. In other words, there are almost two Plus-Ten Magazines for every man, woman, and child in America. That study is particularly relevant because respondents were asked their reasons for owning Plus-Ten Magazines: 62.4 percent cited home defense, 41.7 percent cited defense outside the home, 64.3 percent cited recreational target practice, 47 percent cited hunting, and 27.2 percent cited competitive shooting sports. *Id.* at 23. Equally revealing, the 16,000-plus respondents were asked if they had ever been in a situation where having a Plus-Ten Magazine would have been useful for defensive purposes. *Id.* at 26-28.

---

[9] *See, e.g.,* N.*Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, . . . large-capacity magazines at issue are "in common use" as that term was used in Heller."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014) ("The court finds that magazines having a capacity to accept more than ten rounds are in common use and are therefore not dangerous and unusual. Magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned.").

Around 550 respondents gave an affirmative response, with most sketching out details of the encounter. *Id.* at 28. Many examples are provided in the report. *Id.* at 28-33. The study thus refutes the conclusion of the district court that circumstances requiring a Plus-Ten Magazine are rare. *See* App. at _ [ECF No. 28 at 16]. Any suggestion that Plus-Ten Magazines are not owned and used for lawful purposes is therefore unsupported.

The reason so many of these magazines exist is simple: they come standard with most of the popular handguns and long guns sold in America. This is a fact that other courts have explicitly recognized. Plus-Ten Magazines "are commonly kept by American citizens, as there are more than 75 million such magazines in circulation in the United States," which means they "are so common that they are standard." *Kolbe*, 813 F.3d at 174. Indeed, "on a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds." *Id*.[10] Given that 200,000 stun guns was enough to meet the "common use" test, *see Caetano*, 577 U.S. at 420 (Alito, J., concurring), little more needs to be shown to satisfy this prong.

---

[10] *See also Duncan v. Bonta*, 19 F.4th 1087, 1140 (9th Cir. 2021) (Bumatay, J., dissenting) ("The state bans magazines that can carry over ten rounds—a firearm component with a long historical lineage commonly used by Americans for lawful purposes, like self-defense. Indeed, these magazines are lawfully owned by millions of people nationwide and come standard on the most popular firearms sold today.").

22

The fact that Plus-Ten Magazines are commonly possessed, which neither the District nor the district court dispute, should end the *Bruen* inquiry here. Importantly, under *Heller* and *Bruen,* defendants bear the burden of showing that Plus-Ten Magazines are unprotected. *See Teter v. Lopez,* Case No. 20-15948, slip op. at 21 (9th Cir. Aug. 7, 2023). In *Heller*, the Supreme Court wrestled with what types of weapons receive Second Amendment protection. *See Heller*, 554 U.S. 570 at 624–25. The Supreme Court stated that weapons in "common use at the time" were protected under the Second Amendment and only those not typically possessed by ordinary citizens, such as short-barreled shotguns, were not protected. *Id.* Later, in *Bruen*, the Supreme Court again affirmed this holding: "The Second Amendment protects the possession and use of weapons that are in 'common use at the time.'" *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Full stop.

The district court's frolicking detour into whether "common use" means "common lawful use" (which it then somehow transmogrified into "common use for purposes of self-defense and no other lawful purpose," and then restricted the word "use" to actually firing shots) has absolutely no basis in *Bruen*.[11] Indeed, when the

---

[11] If actually firing rounds in self-defense were the test, then handguns themselves arguably would not receive Second Amendment protection nor ammunition, because in the overwhelming number of defensive gun uses defenders never fire a shot. *See, e.g.,* Matthew Maruster, *No Shots Fired in 9 of 10 Defensive Gun Uses (DGUs)*, ConcealedCarry.com     (Feb.     22,     2022),     available     at

district court noted that "[t]he next question under step one of *Bruen* is whether Plus-Ten Magazines are "typically possessed by law-abiding citizens for lawful purposes," App. at _ [ECF No. 28 at 15], the district court did not cite *Bruen*. Instead, it cited *Heller II*, a case that applied the now-defunct means-ends balancing test that *Bruen* instructed courts *not* to use because "'[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.'" *Bruen*, 142 S. Ct. at 2129 (quoting *Heller*, 554 U.S. at 634). Naturally, the district court's analysis spun off the rails from then on.

For this reason, the Court should hold that the district court committed reversible error at this point in the analysis. The Second Amendment protects the possession and "carrying of weapons that are . . . 'in common use at the time,'" which covers Plus-Ten Magazines. *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). By grafting another inquiry onto the straightforward test articulated by *Bruen*, the district court watered down the Second Amendment's protection that *Bruen* explicitly sought to reinforce.

---

https://www.concealedcarry.com/training-2/no-shots-fired-in-9-of-10-defensive-gun-uses/ (last visited Aug. 21, 2023).

**C.    Plus-Ten Magazines owned by law-abiding citizens are normally used for lawful purposes.**

Even if the district court had accepted that Plus-Ten Magazines are "typically possessed by law-abiding citizens," it further erred in its application of the *Bruen* analysis. It beggars all belief to conclude that hundreds of millions of Plus-Ten Magazines are mainly being used for *unlawful* purposes, and the District, which had the burden of proof on this issue, failed to carry it. The contrary conclusion requires little more than the application of logic and reason—but the district court decided to instead focus on the minutiae of the expert reports that the District and its Amici trotted out. Plus-Ten Magazines come standard with most of the top-selling self-defense and sporting pistols and long guns. Their widespread use among law-abiding civilians for self-defense and sport is exactly what the Supreme Court had in mind in *Heller*, 554 U.S. at 627.

That these commonly owned magazines are indeed used for "lawful purposes" is bolstered by the limits imposed on the purchase of a handgun. For example, federal law forbids transfers of firearms to: (1) persons with criminal violations (including felonies and domestic violence misdemeanors), (2) persons with serious mental disorders resulting in involuntary commitment, (3) persons dishonorably discharged from the military, (4) persons subject to a domestic abuse restraining order, (5) fugitives from justice, (6) illegal drug users, and (7) certain nonresident aliens. *See* 18 U.S.C. § 922. The District of Columbia is even more restrictive. All firearms

25

kept in the District must be registered with MPD. D.C. Code § 7-2502.01; D.C. Code § 7-2502.03. And to register a weapon in the District, a would-be firearm owner must demonstrate that he or she is not likely to use that firearm for anything *but* a lawful purpose. For instance, no person can register a firearm unless the individual shows that he or she:

- Has not been convicted of a weapons offense (but not an infraction or misdemeanor violation under § 7-2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07) or a felony in this or any other jurisdiction (including a crime punishable by imprisonment for a term exceeding one year);

- Is not under indictment for a crime of violence or a weapons offense;

- Has not been convicted within 5 years prior to the application of any:

  o Violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug;

  o A violation of § 22-404, regarding assaults and threats, or § 22-407, regarding threats to do bodily harm, or a violation of any similar provision of the law of another jurisdiction;

  o Two or more violations of § 50-2201.05(b), or, in this or any other jurisdiction, any law restricting driving under the influence of alcohol or drugs;

  o Intrafamily offense punishable as a misdemeanor, including any similar provision in the law of another jurisdiction;

  o Misdemeanor violation pursuant to § 7-2507.02 or § 7-2507.06;

  o Violation of § 22-3133; or

  o Violation of an extreme risk protection order pursuant to § 7-2510.11.

26

D.C. Code § 7-2502.03. And perhaps most relevant here, a would-be firearm registrant must "demonstrate satisfactorily, in accordance with a test prescribed by the Chief, a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, . . . the responsibilities regarding storage, and the requirements for transport." *Id*. To this end, he or she must "complete[] a firearms training and safety class provided free of charge by the Chief" or show that such training was conducted in another jurisdiction or through the U.S. military. *Id*.

Based on these requirements, it makes sense to conclude that Plus-Ten Magazines "come standard in Glocks, Berettas, and other handguns *that are staples of self-defense*," *Duncan v. Becerra*, 970 F.3d 1133, 1141 (9th Cir. 2020) (emphasis added). "[T]hese magazines are *lawfully owned* by millions of people nationwide." *Duncan v. Bonta*, 19 F.4th 1087, 1140 (9th Cir. 2021) (Bumatay, P., dissenting) (emphasis added). And to lawfully possess *any* weapon in the District, an individual must affirm, and prove through training and tests, that he or she is *only* going to use that firearm for "lawful purposes." D.C. Code § 2502.03. But rather than accept this proposition, the district court opted to "'make difficult empirical judgments' about 'the costs and benefits of'" the Magazine Capacity Cap—i.e., one of the inquires the *Bruen* Court explicitly instructed lower courts to avoid, "given their 'lack [of] expertise' in the field." *Bruen*, 142 S. Ct. at 2131. In doing so, the district court made two fundamental errors.

*First*, the district court asked whether magazines that hold more than ten rounds are "most useful in military service," which would mean (in its erroneous view) that such magazines "fall outside of the Second Amendment protection." App. at _ [ECF No. 28 at 16]. This, however, entirely misconstrued *Heller*, which held only that "weapons that are most useful in military service" might not be covered by the Second Amendment if they are "highly unusual in society at large." *Heller*, 554 U.S. at 627. That plainly is not the case for the magazines at issue here. As has been discussed, every court to address the issue of Plus-Ten Magazines has concluded that they are anything *but* "highly unusual in society at large."

In any event, the district court made no attempt to explain how a weapon's utility in miliary service renders it outside the protection of the Second Amendment, even though the same weapon has "useful purposes in" the "civilian . . . context[]." App. at _ [ECF No. 28 at 17]. By that logic, the government could ban *all* weapons (including pocket-knives) because the nature of military engagement necessarily means that *every* weapon (even a pointy stick) will be more useful in that context than as a part of civilian life. It also bears noting that virtually all modern firearms have a military heritage. For example, the highly popular Glock handgun was originally developed for the Austrian military, and the Beretta 92F was adopted as the standard handgun of the U.S. military in the 1980s (replacing the Colt Model 1911, which in turn replaced revolvers). By the district court's logic, all of these

"military" firearms could be banned, even though they are among the most popular self-defense firearms in the Nation. *See* Part I(D), *infra*, at 37-38.

*Second*, the district court tried to figure out whether Plus-Ten Magazines "are in fact used for self[-]defense"—meaning, in the district court's view, whether civilians regularly fire more than ten shots in engagements with violent criminals. App. at _ [ECF No. 28 at 20]. This sort of empirical bean-counting is precisely what *Bruen* forbade. 142 S. Ct. at 2131. Moreover, this cramped view of "use" makes no sense. But even meeting the district court on these terms, its conclusion was in error.

"Use" of a firearm does not mean that it must be fired. And use of a magazine does not mean that all rounds contained in it must be fired, or even that *any* rounds must be fired from it. Magazines are "used" every time they are carried in a firearm or possessed for home defense. At least one court has explicitly recognized this point: "By invoking the phrase 'common use,' the Supreme Court simply meant that arms must be commonly kept for lawful self-defense." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014). This makes sense, given common parlance. "Use" is defined as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." Use, Black's Law Dictionary (11th ed. 2019).

29

During the COVID-19 pandemic, for example, the Centers for Disease and Control ("CDC") released a four-step guide titled "How To Use Your N95." The guide included these steps: (1) "Wash your hands"; (2) "Check your N95"; (3) "Put on the N95"; and (4) "Keep Your N95 Snug."[12] By the government's own reason, then, "use" of an N95 occurs far more often than the moments when respiratory droplets of COVID-19 are stopped from spreading among the population (the ultimate purpose for the mask). Equally relevant, use of a mask during the pandemic provided a sense of security and preparation—allowing the person to interact with others and the world with less fear of infection. Therefore, a mask's utility includes its potential to protect a person even where the spread of COVID-19 is less likely (e.g., outdoor gatherings where the participants have all tested negative).

Consider another example, which confirms that whether something is in common does not depend on the number of times it satisfies its ultimate purpose. Because of universal traffic laws, seatbelts are installed in vehicles and are required to be worn to protect drivers and passengers in the event of a crash. Even so, car accidents arise during a miniscule fraction of the total automobile journeys that take

---

[12] Available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/use-n95-respirator.html#:~:text=Place%20the%20N95%20under%20your,your%20neck%2C%20below%20your%20ears (last visited Aug. 21, 2023).

place each day.[13] For every car accident, more than 70,000 car trips are completed free of incident. Still, 90 percent of those drivers use their seat belts.[14] By the district court's logic, therefore, the "use" of seat belts would be "astonishingly rare."

These examples make clear that Plus-Ten Magazines are commonly used for lawful purposes—even if the guns to which they are attached are not actually fired. Much like seatbelts and N95 masks, these magazines provide preparedness and security in the unlikely and unfortunate event that they become necessary. As the Supreme Court explained in *Heller,* the purpose of the Second Amendment was to allow persons to be armed and ready in the event of confrontation. *See* 554 U.S. at 584. Under the district court's cramped view of "use," a firearm would not be used

---

[13] Of the more than 400 billion annual car trips taken in the United States, 5.25 million result in accidents. *See* Bureau of Transportation Statistic, *National Household Travel Survey Daily Travel Quick Facts* (May 31, 2017) https://www.bts.gov/statistical-products/surveys/national-household-travel-survey-daily-travel-quick-facts (last visited Aug. 21, 2023); Christina Bieber, Car Accident Statistics For 2023, Forbes (Jan. 23, 2023) https://www.forbes.com/advisor/legal/car-accident-statistics/#:~:text=Car%20accidents%20are%20a%20fact,course%20of%20a%20single%20year (last visited Aug. 21, 2023).

[14] *See* National Highway Traffic Safety Administration, *Seat Belts* (available at https://www.nhtsa.gov/risky-driving/seat-belts#:~:text=One%20of%20the%20safest%20choices,estimated%2014%2C955%20lives%20in%202017); National Highway Traffic Safety Administration, *Proper Seatbelt Use* (available at https://www.nhtsa.gov/sites/nhtsa.gov/files/seatbeltuse.pdf).

31

for self-defense unless it is actually fired. That is inconsistent with how the Supreme

Court has approached the Second Amendment.

> **D.      The District cannot show that the Nation has historically
> regulated the number of rounds a gun may hold.**

The above makes clear that, under *Heller* and *Bruen*, the District's Magazine

Capacity Cap is unconstitutional because it bans arms in common use. As *Bruen*

noted:

> [W]e found it "fairly supported by the historical tradition of prohibiting
> the carrying of 'dangerous and unusual weapons'" that the Second
> Amendment protects the possession and use of weapons that are "'in
> common use at the time.'" *Id.,* at 627,128 S. Ct. 2783 (first citing 4 W.
> Blackstone, Commentaries on the Laws of England 148-149 (1769);
> then quoting *United States v. Miller,* 307 U.S. 174, 179 (1939)).

142 S. Ct. at 2128; *see also Heller*, 554 U.S. at 581 ("The Second Amendment

guaranteed to 'all Americans' the right to bear commonly used arms in public subject

to certain reasonable, well-defined restrictions."). Both *Bruen* and *Heller* identified

only one aspect of the Nation's history and tradition that is sufficiently analogous

to—and therefore capable of justifying—a ban on arms: the tradition, dating back to

the Founding, of restricting "dangerous and unusual weapons" that are not "in

common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of

arm is in common use, there is by definition no historical tradition of banning it.

Thus, for the type of restriction here, the Supreme Court has already analyzed the

relevant historical tradition and established its scope: "dangerous and unusual"

weapons may be subject to a ban, but arms "in common use at the time" may not. *Id.*

Nevertheless, the district court incorrectly concluded that a "nuanced" consideration was required, because it concluded the District's evidence "shows that [large capacity magazines] are the object of 'dramatic technological changes' and implicate 'unprecedented societal concerns.'" App. at _ [ECF No. 28 at 27], citing *Bruen*, 142 S.Ct. at 2132. Nothing in *Bruen'*s discussion of a "nuanced approach," however, supports a departure from the Nation's historical tradition of protecting arms in common use, like the magazines at issue.

Significantly, the district court failed to point to any historical analogue from either the Founding period or around the time of reconstruction to support a ban on common arms. App. at _ [ECF No. 28 at 32-40]. For good reason, since the Nation's historical tradition does not support bans on commonly possessed arms. Given the utter dearth of any historical tradition supporting such prohibitions,[15] the District's

---

[15] *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Arms Before 1900,* 50 J. Legis. (forthcoming 2024) (available at https://davekopel.org/2A/LawRev/The%20History%20of%20Bans%20on%20Typ es%20of%20Arms%20Before%201900.pdf). The abstract of the article states that it examined all American state, territorial, and colonial laws that prohibited possession or sale of any type of arm. *See* App. at _ [ECF No. 26 at 2]. Among the arms studied were handguns, repeating guns, Bowie knives, daggers, slungshots, blackjacks, brass knuckles, and cannons. *Id.* Besides describing prohibitory laws, the article detailed other types of regulation, such as forbidding concealed carry, forbidding all carry, restricting sales to minors, licensing dealers, or taxing possession. *Id.* The article claims to be the first

Magazine Capacity Cap must fail. The district court's contrary conclusion—based on seven short-lived, Prohibition-era, semi-relevant laws—was wrong in its analysis, defies *Heller* and *Bruen,* and should be reversed.

1. **Plus-Ten Magazines have existed for centuries and have been in common use during (and long after) the adoption of the Second Amendment.**

Despite the District's best attempt to muddy the historical record, "[f]irearms with greater than ten round capacities existed even before our Nation's founding, and the common use of [such magazines] for self-defense is apparent in our shared national history." *Duncan*, 970 F.3d at 1147. The first known firearm able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580 that used "superimposed" loads (each round stacked on top of the other). LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009) (1st pub. 1954). Multi-shot guns continued to develop over the next few decades, and by 1658, the British army was

---

comprehensive study of historic American laws about knives, swords, and blunt weapons, and the first comprehensive study of the types of arms for which colonies and states required ownership by militiamen, by some men not in the militia, and by some women. *Id*.

The abstract further states that arms regulation laws and cases of the 19th century were examined in the context of the century's advances in firearms. *Id*. The Article concludes that prohibitions on semiautomatic rifles and magazines lack foundation in American legal history. *Id*. In contrast, other regulations, such as restricting the purchase of certain arms by minors, have a stronger historic basis. *Id*.

34

issuing them to its soldiers. Clayton E. Cramer & Joseph Olson, Pist*ols, Crime, and Public Safety in Early America*, 44 Willamette L. Rev. 699, 716-18 (2008). One of the more successful of the early designs was the "Puckle Gun," which used pre-loaded cylinders of eleven charges and fired a separate charge with each pull of the trigger, much like a modern revolver. *Id.* at 717.

By the late 1700s, guns with twenty- and twenty-two-shot magazines were in circulation. JOHN PLASTER, THE HISTORY OF SNIPING & SHARPSHOOTING 69-70 (2008). One such firearm was the Girandoni air rifle, which was invented around 1779 for use in European armies. JIM SUPICA, DOUG WICKLUND & PHILIP SCHREIER, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013). By the early nineteenth century, however, that rifle was being used outside the military context. For example, Merriweather Lewis famously carried one on the Lewis & Clark expedition. JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 91-103 (2012).

Firearm technology progressed steadily in the 19th Century. For instance, the Jennings multi-shot flintlock rifle was introduced in 1821. Borrowing the superimposed projectile design from centuries before, the Jennings rifle could fire twelve shots before reloading. NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007). Meanwhile, in the 1830s, manufacturers began marketing "pepperbox" pistols that had multiple

35

barrels capable of firing sequentially. *See* LEWIS WINANT, PEPPERBOX FIREARMS (2001) (1st pub. 1952). Some models had twelve independently-firing barrels and there were even models with eighteen or twenty-four. JACK DUNLAP, AMERICAN, BRITISH AND CONTINENTAL PEPPERBOX FIREARMS 148-49, 167 (1964) Pepperboxes were commercially successful, and it took some years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.

The decades leading into the Civil War saw many different firearm designs intended to increase ammunition capacity. For example, the Bennet & Haviland Rifle (which was a rifle version of the pepperbox with twelve manually rotated chambers) began circulating in 1838. FLAYDERMAN, *supra*, at 711. This model allowed the carrier to bring a new chamber—pre-loaded with powder and shot—into the breach, ready to be fired. *Id.* Meanwhile, in the 1850s, Alexander Hall and Colonel Parry W. Porter each created rifles with magazine capacities greater than ten. *Id.* at 713. Hall's design had a fifteen-shot rotating cylinder (similar to a revolver), while Porter's design used a thirty-eight-shot canister magazine. *Id.* at 716. Although the District and the district court questioned the efficacy of these early firearms, *see* App. at _ [ECF No. 28 at 29 n.10], the key point is that they existed from the Founding through the adoption of the 14th Amendment. Thus, the suggestion that firearms able to fire more than ten shots without reloading represent a "dramatic technological change" is wrong. Throughout the 19th Century the

firearms industry evolved on a steady course similar to other industries with notable breakthroughs including Samuel Colt's use of standardized interchangeable parts and Daniel Wesson's and Oliver Winchester's invention of the metallic cartridge (which contained gunpowder, primer, and ammunition all in one place).

The metallic cartridge was particularly suited to the lever-action mechanism also developed during this time. This innovation was introduced to the public in 1855, in the form of the lever-action rifle produced by the Volcanic Repeating Arms Company. HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 13, 25 (1952). The rifle had up to a thirty-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock. The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots. FLAYDERMAN, *supra*, at 304-06.

The Volcanic rifle later evolved into the Model 1866 Winchester repeating rifle. The Model 1866 was designed for defense against "sudden attack, either from robbers or Indians," and became wildly popular in the United States. R.L. WILSON, THE WINCHESTER: AN AMERICAN LEGEND 11, 32 (1991), *and see* FLAYDERMAN, *supra*, at 306 (noting that around 170,000 of the model were produced). According to advertising, the Model 1866 could "be fired thirty times a minute," which made for a versatile and highly marketable firearm. LOUIS A. GARAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 128-29 (1985). "[I]n terms of large-

37

scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015).

Next came the Winchester Model 1873, "the gun that won the West." The Model 1873 (and its successor, the Model 1892)[16] were lever actions holding twelve to seventeen rounds in tubular magazines. Over 720,000 copies of the Model 1873 were produced from 1873 to 1919, while more than a million copies of the Model 1892 were produced from 1892 to 1941. FLAYDERMAN, *supra*, at 307-12. These Winchester models competed with the equally iconic pump action Colt Lightning rifle, which held up to fifteen rounds in calibers of .32-20, .38-40, and .44-40. *Id.* at 122-23 (noting that 89,000 copies of the Colt Model were produced between 1887 and 1904). Meanwhile, the Evans Repeating Rifle—which had a rotary helical magazine in the buttstock holding thirty-four rounds—was also commercially

---

[16] The Winchester Model 1892 is the rifle featured in the TV series, *The Rifleman*. The opening sequence of the show had Chuck Connors rapidly firing twelve shots from the rifle in five seconds. *See* https://www.youtube.com/watch?v=5Rl-FGETfS4. That commonly owned rifle, still sold today, cannot be possessed in the District of Columbia due to its magazine capacity. *See* https://www.sportsmans.com/shooting-gear-gun-supplies/rifles/winchester-model-1892-satin-walnut-lever-action-rifle-44-40-winchester-24in/p/1786543?msclkid=67152a8b59a01118e5044e6fafc0b23f&utm_source=bing&utm_medium=cpc&utm_campaign=Bing%20-%20DSA%20-%20Category%20Pages&utm_term=shooting%20&utm_content=Range%20Gear

successful. *See* DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 294-95 (rev. ed.) (Friends of the Maine State Museum, 1997); FLAYDERMAN, *supra*, at 694 (noting that over 12,000 copies of the model were produced).

Aside from rifles, the first handgun to use a detachable box magazine was the ten round Jarre harmonica pistol (which was patented in 1862). WINANT, FIREARMS CURIOSA, *supra*, at 244-45; SUPICA, *supra*, at 33. Around the same time, pin-fire revolvers with capacities of up to twenty-one rounds entered the market and became popular in Europe and the United States. WINANT, FIREARMS CURIOSA, *supra*, at 60-61, 63, 67-71; SUPICA, *supra*, at 48-49. Revolvers with other firing mechanisms also included models with more than seventeen rounds. WINANT, FIREARMS CURIOSA, *supra*, at 207-08 (showcasing the Enouy "Ferris wheel" revolver, which had forty-two shots in seven cylinders). The Josselyn belt-fed chain pistol introduced in 1866, and various other chain pistols, had even greater capacity. *See id.* at 204-08 (highlighting the Guycot 25-shot chain pistol and one-hundred-shot chain rifle).

By the eve of the 20th century, manufacturers were producing semi-automatic pistols with a capacity of more than ten rounds. For example, Mauser's C96 semi-automatic pistol (which had a magazine of six, ten, or twenty rounds) began circulation in 1896 and was very successful. *See* 2014 STANDARD CATALOG OF

39

FIREARMS 708-09 (Jerry Lee ed. 2013).[17] Likewise, the Luger semi-automatic pistol (which used a magazine containing seven, eight, or thirty-two rounds) was introduced in 1899. *See* JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA, *supra*, at 86.

The 20th century also saw the introduction of various firearms capable of holding more than ten rounds. One example was the Savage Repeating Arms Company's bolt action Model 1911, a twenty-shot repeater with a tubular magazine in .22 caliber. JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945, at 191-92 (1976). Similarly, the Remington Model 12B Gallery Special (introduced in 1910) had an optional extended magazine that held twenty-five rounds. ROY MARCOT, REMINGTON, AMERICA'S OLDEST GUN MAKER 149 (1998). And in 1927, the Auto Ordinance Company introduced their semi-automatic rifle that used thirty-round magazines. *See* 2014 STANDARD CATALOG OF FIREARMS, *supra*, at 84.

By the 1930s, manufacturers were producing many tubular magazine rifles in .22 caliber. Based on firearms catalogs from 1936 to 1971, more than 20 different firearm models with magazines of sixteen to thirty rounds were marketed and in circulation throughout the United States. *See* SHOOTER'S BIBLE TREASURY REPRODUCTION 108-09, 112, 123, 124, 126, 127, 140 (1960); BROWNELL

---

[17] This annually published guide was relied on by *Kirkland v. District of Columbia, 70 F.3d* 629, 635 n.3 (D.C. Cir. 1995) (citing the 1995 5th edition).

INDUSTRIES INC., THE GUNSMITH MART NO. 2 at 212, 214, 216, 218 (1950); THE "SHOOTER'S BIBLE" NO. 50 at 80, 87, 91, 101, 103 (1959); JAY KIMMEL, SAVAGE AND STEVENS ARMS 49, 53, 79, 102, 165, 167-68, 177 (5th ed. 1990).[18] Meanwhile, in 1935, Browning introduced the Hi-Power pistol (which was sold with a thirteen-round detachable magazine). The pistol is still in production today. *See* 2014 STANDARD CATALOG, *supra*, at 182-83, 432-33.

The advent of World War II saw the production of the M-1 carbine—designed specifically for the citizen solder—remaining a popular rifle for civilians ever since. LARRY L. RUTH, WAR BABY COMES HOME: THE U.S. CALIBER .30 CARBINE (1993); BRUCE N. CANFIELD, COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163, 165, 167, 206-08, 279 (2d ed. 2010). Starting in 1963, the federal government's Civilian Marksmanship Program (an initiative created by Congress) put nearly a quarter-million of these rifles into the hands of law-abiding citizens. *See* Civilian Marksmanship Program, *About Us* (available at https://thecmp.org/about/); M1 Carbines Inc., *Post WWII Commercially Manufactured M1 Carbines* (available at

---

[18] Several courts have relied on *The Shooter's Bible*. *See United States v. Olson*, 1995 U.S. App. LEXIS 36973 (9th Cir. Dec. 15, 1995) (book was properly used as a source for ATF agent's expert opinion); *United States v. Precise Import Corp.*, 458 F.2d 1376, 1377 (Cust. & Pat. App. 1972) (record reflects district court's admission of pages from the 1967 edition as an exhibit); *United States v. Fisher*, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (noting that experts had relied on the book); *Potter v. United States*, 167 Ct. Cl. 28, 80 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms).

http://www.m1carbinesinc.com/). The M1 carbine uses standard detachable box magazines of fifteen and thirty rounds.

The most popular rifle in American history, however, is the AR-15. The model was brought to market in 1963 with a then-standard magazine capacity of twenty rounds (the thirty-round standard magazine was developed shortly thereafter). PATRICK SWEENEY, GUN DIGEST BOOK OF THE AR-15 104 (2005).[19] By 1969, there were many other firearms on the market with magazines holding twenty or thirty rounds—including the Armalite-180 (twenty-round optional magazine), the J&R 68 carbine (thirty rounds), and the Eagle Apache carbine (thirty rounds). GUN DIGEST 24TH ANNIVERSARY 1970 DELUXE EDITION 294 (John T. Amber ed. 2014). Then, in 1974, Springfield Armory introduced the M1A semi-automatic rifle (which uses a twenty-round detachable box magazine). 2014 STANDARD CATALOG, *supra*, at 1102. The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard five-, ten-, or twenty-round detachable magazines. *Id.* at 1173. Both the M1A and the Mini-14 are popular to this day.

---

[19] Several courts have relied on issues of the *Gun Digest*. *See A. Uberti and C. v. Leonardo*, 892 P.2d 1354, 1364 (Ariz. 1995); *Citizens for a Safer Community v. City of Rochester*, 627 N.Y.S. 2d 193, 203 n.5 (N.Y. Sup. 1994); *Sturm, Ruger & Co. v. Arcadia Mach. & Tool Inc.*, 1988 U.S. Dist. LEXIS 16451 (C.D. Cal. 1988); *Couplin v. State*, 378 A.2d 197 205 n.2 (Md. App. 1977).

Finally, of recent note is the Beretta Model 92, which entered the market in 1976. The 9mm pistol with a fifteen-round magazine has been a tremendous commercial success in the last forty years. In various configurations (currently the Beretta 92FS), the Beretta is one of the more popular of all modern handguns. *Id.* at 121-26. Indeed, in 1985, the M9 version of this pistol became the standard U.S. military issue sidearm. *See* Marine Corps Association, *Last Line Of Defense: A History Of The Beretta M9*.[20] Also coming on the market around the same time were handguns such as the Browning Double Action (fourteen rounds), the L.E.S. P-18 (eighteen rounds), and the Heckler & Koch VP 70Z (eighteen rounds). GUN DIGEST 34TH ANNIVERSARY 1980 DELUXE EDITION 297-98 (Ken Warner ed., 1979). The Glock pistol in various configurations became popular in the United States in the 1980s for self-defense and recreational shooting. *See generally* Paul Barrett, *Glock: The Rise of America's Gun*, ISBN 978-0-307-71995-9 (1st paperback ed., 2012)*.* Owing to its widespread adoption by local police and federal law enforcement agencies, it became one of the top-selling civilian self-defense pistols and earned the nickname of "America's Gun." *Id.* Most Glock models come standard with

---

[20] Available at https://mca-marines.org/blog/leatherneck/last-line-of-defense-a-history-of-the-beretta-m9/#:~:text=45%2Dcaliber%20pistol%2C%20left%2C,of%20the%20U.S.%20Armed%20Forces. The M9 has now been replaced with the Sig Sauer P320, which as mentioned above is one of the four top selling civilian self-defense pistols.

43

magazines capable of holding more than ten rounds, including the top-selling Model

Glock 19.[21]

> 2.     **Laws restricting magazine capacity are scarce, and of too recent vintage to inform the metes and bounds of the Second Amendment.**

As detailed above, guns capable of firing more than ten rounds predate the

Second Amendment by some two-hundred-years and have been in use throughout

the Nation's history. The widespread sale and possession of such firearms

throughout the 19th and 20th centuries (at times at the behest of the federal

government) explains the dearth of laws regulating magazine capacity. Indeed, the

only laws the district court offered as analogies to the District's Magazine Capacity

Cap include a smattering of Prohibition-era laws designed to regulate machine guns,

all since repealed *except the District's own*, enacted some one-hundred-fifty years

after the Second Amendment's adoption). *See* App. at _ [ECF No. 28 at 32-34].[22]

---

[21] *See, e.g.,* Glock 17 (9mm, seventeen rounds), Glock 19 (9mm, fifteen rounds), Glock 20 (10mm, fifteen rounds), Glock 21 (.45 ACP, thirteen rounds), Glock 22 (.40 S&W, fifteen rounds), Glock 23 (.40 S&W, thirteen rounds), Glock 25 (.380 cal., fifteen rounds), Glock 31 (.357 Sig., fifteen rounds), Glock 32 (.357 Sig. thirteen, rounds).

[22] The district court did not substantively discuss, and thus did not rely upon, the District's proffered regulations from the colonial period, the Founding period, and the later 19th century. App. at _ [ECF No. 28 at 40 n.17]. Those laws involved regulations on powder storage, prohibitions on setting "trap guns," and restrictions on concealed carry of handguns, blunt weapons and Bowie knives. The Plaintiffs explained in detail why these regulations did not support the District's Magazine Capacity Cap. *See* App. at _ [ECF No. 24 at 26-32]. The powder laws were fire-

44

Specifically, the district court relied on the laws of six jurisdictions: Massachusetts, Michigan, Minnesota, Ohio, Rhode Island, Virginia, and the District of Columbia. All appear directed toward machine guns, though some defined a machine gun to include firearms with semiautomatic functioning as well.

In 1927, for example, Michigan prohibited "machine gun[s] or firearm[s] which can be fired more than sixteen times without reloading." 1927 Mich. Laws 887, 888. That statute is silent as to whether it was intended to apply only to fully automatic weapons or was a general capacity restriction. There appears only one case considering the constitutionality of the statute and that case, *People v. Brown*, 235 N.W. 245 (1931), upheld the statute as to blackjacks. Significantly, the court explained its view that the statute did not prohibit "ordinary guns . . . or other weapons usually relied upon by good citizens for defense or pleasure." *Id.,* 235 N.W. at 247. And the court quoted from *State v. Duke*, 42 Tex. 455, 458 (1874), cited in *Heller,* that:

---

prevention regulations and thus dissimilar to the District's law in question. *Id.* at 27-28. The trap gun laws did not ban any arm, but prohibited a particular use of a firearm that is extraordinarily dangerous to innocent persons. *Id.* at 28. And the concealed-carry restrictions of various arms with rare exceptions neither prohibited possession nor carry but regulated the method of carry. *Id.* at 28-31. If these regulations were insufficient to restrict possession of handguns, *see Heller,* 554 U.S. 570, or the carrying of handguns in public, *see Bruen,* 142 S. Ct. 2111, these laws are plainly insufficient to restrict the possession of the Plus-Ten Magazines at issue here.

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are *commonly kept, according to the customs of the people,* and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State.

*Duke*, 42 Tex. at 458 (emphasis added). It appears no court ever construed whether this law actually applied to firearms other than fully automatic weapons.

In 1927, Rhode Island also enacted a law that was similar to Michigan's. *See* R.I. Acts 1927, ch. 1052 § 1 (twelve-shot limitation). Around the same time, Ohio required licensing firearms capable of firing more than eighteen shots without reloading (later modified to a limit of thirty-one rounds). 1933 Ohio Laws, No. 166, § 12819-3, at 189. It bears emphasizing that Michigan, Rhode Island, and Ohio's laws were repealed in 1959, 1975, and 2014, respectively. *See* Act of July 16, 1959, No. 176, § 224, at 250; 1975 R.I. Pub. Laws, ch. 278, § 11-47-2, at 738; H.R. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014). The repeal of those laws is significant because, as the Supreme Court explained in *Bruen*, state regulations that were later rejected can "provide some probative evidence of [a similar modern regulation's] unconstitutionality." 142 S. Ct. at 2131.

Meanwhile, the Massachusetts statute on which the District and the district court relied (1927 Mass. Acts 413, 413-14) was not an ammunition capacity restriction at all, and did not even prohibit possession of fully automatic machine

guns. Instead, it was a licensing statute. It thus cannot support the District's law.[23]

Likewise, the Minnesota statute cited by the district court applied principally to fully automatic weapons. *See* Minn. Laws 231, 232. It did not apply to semi-automatic firearms unless they had been altered or modified to increase their ammunition capacity from their original design. Finally, as the district court acknowledged, the Virginia statute (1934 Va. Acts 137-39) did not prohibit possession of what it defined as a machine gun. And the law was superseded when Virginia adopted the Uniform Machine Gun Act, *see* Va. Code § 18.2-288 *et seq.* That law defines a machine gun as "any weapon which shoots or is designed to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* § 18.2-288(1). Virginia does not prohibit possession if the machine gun is registered with the state police, and Virginia has no limitation on the possession of magazines based on their capacity.

Nor can the District turn to its own history with magazine regulation. In 1932, Congress passed a D.C. law prohibiting the possession of semiautomatic firearms that can shoot " more than 12 shots without reloading." Act of July 8, 1932, ch. 465, §§ 1, 8 (47 Stat. 650, 650-52). In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to

---

[23] For the Court's convenience the statute is included in the statutory addendum.

impose no restrictions on magazines. Act of June 26, 1934, ch. 757 (48 Stat. 1236). When the District achieved home rule in 1975, the Council did not repeal the 1932 law, but instead promptly enacted the bans on handguns and on self-defense with any gun in the home, which were later ruled unconstitutional in *Heller*. *See* Firearms Control Regulations Act of 1975, Law 1-85 (23 D.C.R. 2464). The D.C. government interpreted the law so that it outlawed all magazines and all semi-automatic handguns. *See* Vivian Chu, Cong. Res. Svc., DC Gun Laws and Proposed Amendments (2011). As it were, D.C. stands alone in its historically heavy-handed restriction of magazines.

Even if the laws of these six states and the District could be credited as analogues for the Magazine Capacity Cap at issue, they do not show a historical tradition. *See, e.g., Espinoza v. Montana Dep't of Revenue,* 140 S. Ct. 2246, 2258-59 (2020) (the Court held that "more than 30" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions lacked grounding in Founding-era practice); *Firearms Policy Coalition v. McGraw*, Case No. 4:21-cv-01245, slip op. at 18-19 (N.D. Tex. Aug. 25, 2022) (finding that age-based restrictions on gun use and possession enacted "between 1856 and 1899 [in] approximately 20 jurisdictions (of the then 45 states)" failed to establish a historical tradition of restricting the public carry of weapons by 18 to 20-year-olds).

48

Moreover, even if the laws the district court cited were sufficient to show a historical tradition in the Prohibition-era, those laws must be disregarded because they conflict with Founding-era tradition (a matter that the district court denied, but never substantively addressed). *See* App. at _ [ECF No. 28 at 36]. Again, the district court got it wrong. These since-repealed Prohibition-era laws stand out in comparison to the utter lack of laws at the Founding or through the end of the 18th century purporting to ban possession of commonly owned arms.

Perhaps the District could rejoin that in the Prohibition-era, Plus-Ten Magazines and guns employing them could not be considered commonly owned, (though the evidence dating back to the 1600s is to the contrary).[24] But even if that were true, it would make no difference, since today these arms are undoubtedly in common use. In fact, *Bruen* specifically addressed this question in the context of New York's reliance on colonial-era statutes. The Court said:

---

[24] Plaintiffs agree that machine guns were not commonly owned when these laws were enacted, and they are arguably not commonly owned today. As *Heller* explained, these firearms would *not* enjoy Second Amendment protection because of this fact. *See* 554 U.S. at 627.

49

[E]ven if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns today. At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. *See* 554 U.S. at 627, 128 S. Ct. 2783. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the time," as opposed to those that "are highly unusual in society at large." *Ibid*. (internal quotation marks omitted). Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id.*, at 629, 128 S. Ct. 2783. *Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.*

*Bruen,* 142 S. Ct. at 2143 (emphasis added). Since Plus-Ten Magazines are "unquestionably in common use today," they cannot be banned. *Id.*

The only widespread restriction on magazine capacity the District could arguably point to is the 1994 federal ban on *new* Plus-Ten Magazines. The law was in effect for only ten years, at which point Congress allowed it to sunset. Pub. L. 103-322, Title XI, § 110105(2) (108 Stat. 2000). The effects of this law, however, were studied extensively by Dr. Christopher Koper, who reported on the law's efficacy in 2004. Critically, in his view, "the ban has not yet reduced the use of [such magazines] in crime." Christopher Koper, Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003 at 2 (2004). Dr. Koper was critical of the notion that laws limiting magazine capacity

50

could reduce criminal activity—observing that "[b]ecause offenders can substitute non-banned guns and small magazines for banned [guns and magazines], there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." *Id*. at 81. Dr. Koper also noted that state-level firearm bans have likewise not altered crime. *Id*. at 81, n.95.

The District supports its Magazine Capacity Cap by pointing to a few states that have recently enacted restrictions on magazines. If anything, however, those laws emphasize the severity of the District's restriction. Hawaii and New York, for example, prohibit the possession of all magazines over a certain capacity—but Hawaii's law applies only to handguns. Haw. Rev. Stat. § 134-8(c); N.Y. Penal L. § 265.00(23). Maryland, meanwhile, prohibits sales of such magazines, but does not ban possession or importation. Md. Code Ann., Crim. L. § 4-305. Then there is Colorado (which bans magazines capable of holding fifteen rounds or more) and Connecticut (which bans new and unregistered Plus-Ten Magazines); these states allow current owners to retain possession. Col. Rev. Stat. § 18-12-302(2)(a); Conn. Gen. Stat. § 53-202w(e)(5). Finally, Massachusetts' ban grandfathers all magazines manufactured before September 1994, and allows for new acquisitions if the citizen has a certain license. Mass. Gen. Laws ch. 140, §§ 121, 131.

In any event, the above examples should not be afforded any weight because they are far removed (one-hundred-fifty years or more) from the policies and

practices in effect during the framing of the Second Amendment. As the Supreme Court recently explained, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S. Ct. at 2136. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," laws not in effect in the years leading up to 1791 (the adoption of the Second Amendment) and perhaps 1868 (the adoption of the Fourteenth Amendment) have little probative value. *Id.* at 2136. Accordingly, the laws relied on by the District are not "longstanding and thereby deserving of a presumption of validity." *Heller II*, 670 F.3d at 1260.

The District failed to establish a long-standing, historical tradition of prohibiting Plus-Ten Magazines. In fact, as the survey discussed above demonstrates, firearms capable of holding or shooting more than ten rounds without reloading have remained unregulated for the vast majority of American history. The District's magazine ban cannot be reconciled with *Heller*'s rejection of a ban on handguns, the "vast majority of [which] today are semiautomatic," and which "have not traditionally been banned and are in common use by law-abiding citizens." *Heller II*, 670 F.3d at 1286-87 (Kavanaugh, J. dissenting). Accordingly, the district court's decision should be reversed.

## II.    THE PLAINTIFFS HAVE SATISFIED THE OTHER CRITERIA FOR ISSUANCE OF A PRELIMINARY INJUNCTION.

Although the district court declined to address the other preliminary-injunction criteria, the Plaintiffs satisfy them. This Court has long affirmed that "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Because the Second Amendment itself emerges from interest balancing by the people and leaves no room for the third branch of government to determine whether the rights it protects are "*really* worth insisting upon," *Heller*, 554 U.S. at 634 (emphasis in original), the balance of the equities tilts decidedly for the Plaintiffs. And, because "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon*, 721 F.3d at 653; *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("enforcement of an unconstitutional law vindicates no public interest"), the public interest compels the conclusion that a preliminary injunction should issue.

53

### III.   THE COURT SHOULD DIRECT THE DISTRICT COURT TO ENTER A PERMANENT INJUNCTION IN FAVOR OF PLAINTIFFS.

The Federal Rules of Civil Procedure permit a court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary[-]injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000 v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)). This Court employed this procedure in *Wrenn. See* 864 F.3d at 667; *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). As in *Moore*, here "[t]he constitutionality of the challenged statutory provision does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact exist, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here. That court remanded the case to the district court for entry of a declaration of unconstitutionality and a permanent injunction. *See Moore*, 702 F.3d at 942. This Court should likewise direct the district court to enter final judgment and put an end to the District's Magazine Capacity Cap.

54

## CONCLUSION

For these reasons, the Court should reverse the district court's denial of the Plaintiffs' motion for a preliminary injunction, and remand with instructions to (1) enter the Plaintiffs' request for a preliminary injunction and (2) enter final judgment for Plaintiffs.

Dated: August 25, 2023                     Respectfully submitted,

*/s/ George L. Lyon, Jr.*                  */s/ Edward M. Wenger*
GEORGE L. LYON, JR.                        Edward M. Wenger
1929 Biltmore Street, NW                   Dennis W. Polio
Washington, DC 20009                       Mateo Forero-Norena
                                           Zachary D. Henson
(202) 669-0442 (phone)                     HOLTZMAN VOGEL BARAN
(202) 483-9267 (facsimile)                  TORCHINSKY & JOSEFIAK PLLC
*gll@bergstromattorneys.com*               2300 N Street NW, Suite 643A
                                           Washington, DC 20037
                                           (202) 737-8808 (phone)
                                           (540) 341-8809 (facsimile)
                                           *emwenger@holtzmanvogel.com*

                    *Counsel for Plaintiffs-Appellants*

56

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 13,000 words.

2.     This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
Edward M. Wenger

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 28th day of August, 2023, a true copy of the Initial Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
Edward M. Wenger

58