[ORAL ARGUMENT NOT YET SCHEDULED]
No. 23-7061

# United States Court of Appeals
## for the District of Columbia Circuit

———————————

ANDREW HANSON, ET AL.,
*Plaintiffs-Appellants*,

*v.*

DISTRICT OF COLUMBIA, ET AL.,
*Defendants-Appellees*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (NO. 22-CV-2256-RC)

———————————

**BRIEF FOR AMICI CURIAE MASSACHUSETTS, NEW JERSEY,
CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAIʻI,
ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, OREGON,
NEVADA, NEW YORK, PENNSYLVANIA, RHODE ISLAND, VERMONT,
AND WASHINGTON IN SUPPORT OF APPELLEES AND AFFIRMANCE**

———————————

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*
Jeremy M. Feigenbaum
  *Solicitor General*
Angela Cai
  *Deputy Solicitor General*
25 Market St, PO Box 080
Trenton, NJ 08625
(862) 350-5800

ANDREA JOY CAMPBELL
  *Attorney General of Massachusetts*
Robert Toone, D.C. Cir. No. 56109
  *Chief, Government Bureau*
One Ashburton Place
Boston, MA 02108
(617) 963-2178
robert.toone@mass.gov

*(Additional counsel on signature page)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) **Parties and Amici:** Except for *Amicus Curiae* United States Conference of Mayors and *Amici Curiae* Massachusetts, New Jersey, California, Connecticut, Colorado, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Rhode Island, Pennsylvania, Vermont, and Washington, all parties, intervenors, and *amici* appearing before the District Court and in this Court are listed in the Brief for Appellees, Doc. No. 2022818.

(B) **Rulings Under Review:** References to the rulings at issue appear in the Brief for Appellants, Doc. No. 2014295, and the Brief for Appellees, Doc. No. 2022818.

(C) **Related Cases:** Counsel for the *Amici* States is unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................... iii

GLOSSARY....................................................................................ix

INTERESTS OF THE AMICI STATES ....................................................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT ....................................................................................4

    I.     To Promote the Safety and Well-Being of Our Residents, States Impose a Range of Restrictions, Including Prohibitions, on Dangerous Accessories and Weapons Not Commonly Used for Self-Defense. ........................................................................4

    II.    The District's Restriction on Magazine Capacity Comports with the Second Amendment. ........................................................8

          A.    The Second Amendment Does Not Protect Large-Capacity Magazines. ..................................................8

          B.    The District's Magazine Capacity Restriction Is Analogous to the Historical Practices of Regulating the Storage of Ammunition and Imposing Restrictions on New, and Distinctly Dangerous, Forms of Weaponry.............14

CONCLUSION ..................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**<u>Cases</u>**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*,
  910 F.3d 106 (3d Cir. 2018) ...................................................................26

*Aymette v. State*,
  21 Tenn. 154 (1840) .............................................................................23

*Beauharnais v. Illinois*,
  343 U.S. 250 (1952) .............................................................................18

*Brumback v. Ferguson*,
  No. 22-cv-03093, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ....................10

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ...................................................................5

*Chiafalo v. Washington*,
  140 S. Ct. 2136 (2020) .........................................................................16

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  __F.Supp.3d__, No. 22-951,
  2023 WL 2655150 (D. Del. Mar. 27, 2023) ................................................ 12-13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .........................................2, 4, 9, 11, 13-15, 17, 19, 21-22, 25

*Duncan v. Bonta*,
  83 F.4th 803 (9th Cir. 2023) ...................................................................13

*Duncan v. Bonta*,
  No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) .........................13

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ................................................................. 15-16

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015)...............................................12, 13, 17, 27

*Guedes v. ATF*,
   920 F.3d 1 (D.C. Cir. 2019) .................................................................5

*Hanson v. District of Columbia*,
   __F.Supp.3d__, 2023 WL 3019777,
   (D.D.C. Apr. 20, 2023)........................................................... 3, 9-12, 18

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ................................. 3, 12, 13, 22, 24-27

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) (en banc)......................................... 26-27

*Luis v. United States*,
   578 U.S. 5 (2016))................................................................................10

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ....................................................................... 18-19

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) .............................................................................2

*Nat'l Ass'n for Gun Rights v. Lamont*,
   __F.Supp.3d__, No. 22-cv-1118,
   2023 WL 4975979 (D. Conn. Aug. 3, 2023).........................................13

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) .....................................2-4, 8-17, 19-21, 25-27

*New York State Rifle & Pistol Ass'n v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015))..............................................................27

*NLRB v. Noel Canning*,
   573 U.S. 513 (2014) ...........................................................................16

iv

*Ocean State Tactical, LLC v. State of Rhode Island*,
  646 F.Supp.3d 368 (D.R.I. 2022) ...............................................9, 10, 13

*Oregon Firearms Fed'n, Inc. v. Brown*,
  644 F.Supp.3d 782 (D. Or. 2022) ........................................................13

*Oregon Firearms Fed'n v. Kotek*,
  __F.Supp.3d__, No. 22-cv-01815,
  2023 WL 4541027 (D. Or. July 14, 2023) ...........................................13

*Roth v. United States*,
  354 U.S. 476 (1957) ....................................................................... 17-18

*State v. Reid*,
  1 Ala. 612 (1840)...................................................................................26

*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011) ..................................................................17

*United States v. Morrison*,
  529 U.S. 598 (2000) ...............................................................................1

*United States v. Salerno*,
  481 U.S. 739 (1987) ...............................................................................1

*United States v. Stevens*,
  559 U.S. 460 (2010) .............................................................................17

*United States v. White*,
  401 U.S. 745 (1971) .............................................................................13

*Williams-Yulee v. Florida Bar*,
  575 U.S. 433 (2015) .............................................................................19

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019) ..................................................................26

## Constitutional Provisions and Statutes

U.S. Const. amend. I ........................................................................ 17-18

U.S. Const. amend. II .............................................................. 1-4, 8-20, 27

U.S. Const. amend. XIV ................................................................. 15-16

Public Safety and Recreational Firearms Use Protection Act,
  Pub. L. No. 103-322, 108 Stat. 1998 (1994) ........................................5, 7

National Firearms Act of 1934,
  Pub. L. No. 73-474, 48 Stat. 1236 (1934) ............................................24

18 U.S.C. § 921(a) (2000)..............................................................5, 7

18 U.S.C. § 922(v) (2000) ...............................................................7

18 U.S.C. § 922(w) (2000)...............................................................5

1837 Ala. Laws 7, ch. 77, § 2 ..........................................................23

1839 Ala. Laws 67, ch. 77, § 1 ........................................................23

W. Ball, Revised Statutes of the State of Arkansas, Adopted
  at the October Session of the General Assembly of Said State,
  A.D. 1837, § 13, 280 (1838)..........................................................23

1881 Ark. Acts 191, no. 96, § 3 .......................................................23

1832 Conn. Acts 391, ch. 25 ...........................................................21

1933 Cal. Stat. 1169..................................................................24

An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other
  Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat.
  650 (1932) ..........................................................................24

D.C. Code § 7-2506.01(b)................................................................3

1838 Fla. Laws 36, no. 24, § 1 ....................................................................23

1837 Ga. Acts. 90, § 1 ................................................................................23

An Act to Regulate the Sale, Possession and Transportation of Machine Guns,
    1931 Ill. Laws 452, no. 18, §§ 1-2 ........................................................24

1819 Ind. Acts 39 .......................................................................................23

1932 La. Acts 336, no. 80, § 1 ....................................................................24

1821 Maine Laws 98, ch. 25 .......................................................................21

1771-72 Mass. Province Laws 167, ch. 9 ...................................................21

1782 Mass. Acts 119, ch. 46 .......................................................................20

1882 Mass. Acts 212, ch. 269 .....................................................................21

An Act to Regulate and License the Selling, Purchasing, Possessing and
    Carrying of Certain Firearms, 1927 Mich. Pub. Acts 888, no. 372, § 3 .............24

1933 Minn. Laws 231, ch. 190, § 1 ............................................................24

1825 N.H. Laws 73, ch. 61 .........................................................................21

1772 N.Y. Laws 682, ch. 1549 ...................................................................21

1784 N.Y. Laws 627, ch. 28 .................................................................. 20-21

1927 R.I. Pub. Laws 256, ch. 1052, §§ 1, 4 ...............................................24

1821 Tenn. Acts 15, ch. 13 .........................................................................23

1837-38 Tenn. Acts 200, ch. 137 ...............................................................23

1852 Tenn. Acts 246, ch. 169 .....................................................................21

vii

1879 Tenn. Acts 135, ch. 96 ....................................................................23

1923 Vt. Acts and Resolves 930, ch. 235, § 5711 ...................................24

1838 Va. Acts 76, ch. 101 .......................................................................23

1934 Va. Acts 137, ch. 96 ........................................................................24

## Rules and Regulations

Fed. R. App. P. 29(a)(2) .............................................................................1

## Miscellaneous

J. Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP.
  PROBS. 400 (1934) ..................................................................................26

S. Cornell & N. DeDino, *A Well Regulated Right: The Early American
  Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004)............................20, 22

H.R. Rep. No. 103-489 (1994)..............................................................3, 26

R. Spitzer, *Gun Law History in the United States and Second Amendment
  Right*, 80 LAW & CONTEMP. PROBS. 55 (2017) ....................................20

C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741 (1993)...........19, 20

## <u>GLOSSARY</u>

LCM             Large-capacity magazine or "large capacity ammunition
                feeding device," as defined in D.C. Code § 7-2506.01(b).

## INTERESTS OF THE AMICI STATES

The *Amici* States—Massachusetts, New Jersey, California, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Rhode Island, Pennsylvania, Vermont, and Washington—have compelling governmental interests in public safety and crime prevention. In furtherance of those interests, and pursuant to Fed. R. App. P. 29(a)(2), we submit this brief to explain why the District of Columbia's limitation on the size of ammunition magazines that may be purchased and possessed within its borders is wholly consistent with the Second Amendment to the United States Constitution.

There are few interests more paramount to state governments than protecting public safety, and especially "the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *see also United States v. Salerno*, 481 U.S. 739, 755 (1987). The *Amici* States bear the solemn responsibility of ensuring the safety of the public and private spaces—the schools, grocery stores, houses of worship, and commercial centers—that make up the fabric of daily life in a free and democratic society. We work every day to promote our residents' health, welfare, and security, including by taking steps to curb the threats of mass shootings and other forms of gun violence that harm our residents and inhibit their exercise of constitutionally protected freedoms.

Exercising our police powers in service of these goals, the *Amici* States have adopted a range of measures that regulate weapons and weapon accessories, while ensuring that our residents have access to weapons for individual self-defense. Although our regulations differ in substance, we share the firm conviction that our Constitution allows States to address gun violence in a manner that is adapted to individual States' needs and consistent with our Nation's historical traditions. In accordance with these objectives, the *Amici* States urge this Court to affirm the District Court's conclusion that the District of Columbia's limitation on the size of ammunition magazines comports with the Constitution.

## SUMMARY OF THE ARGUMENT

The Second Amendment is "'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Recognizing that "reasonable firearms regulations" can coexist comfortably with the Second Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality op.), the States have adopted a variety of restrictions on weapons and accessories that are not in common use for self-defense. This case concerns one such law: the District of Columbia prohibits the possession and sale of ammunition magazines capable of holding more than ten rounds of ammunition, referred to here as "large-capacity

magazines" or "LCMs." D.C. Code § 7-2506.01(b). Like similar laws around the country that impose restrictions on certain types of accessories, ammunition, and weapons themselves, the District's LCM provision preserves the right of law-abiding, responsible citizens to use firearms for self-defense. *See Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*"), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111 (District's LCM law "does not effectively disarm individuals or substantially affect their ability to defend themselves"). The law, which does not limit access to firearms or magazines that can hold ten or fewer rounds, regulates only those large-capacity magazines that "make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent," so that "a single person with a single [semiautomatic] weapon can easily fire literally hundreds of rounds within minutes." H.R. Rep. No. 103-489, at 19 (1994).

Employing the framework set forth in *Bruen*, the District Court correctly concluded that the Plaintiffs-Appellants' Second Amendment challenge to the District's law is not likely to succeed on the merits. *Hanson v. District of Columbia*, __F.Supp.3d__, 2023 WL 3019777 (D.D.C. Apr. 20, 2023). That conclusion should be affirmed. Large-capacity magazines are not "Arms" under the plain text of the Second Amendment because they are not commonly used, nor are they useful, for self-defense. And historical understandings of the term "Arms" did not encompass

container accessories such as large-capacity magazines. Moreover, the District's law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. From the early days of our Nation, governments have restricted the manner in which ammunition may be stored and used, effectively imposing limits on firepower, and have restricted novel forms of weaponry that pose unique dangers to public safety. These analogous traditions amply justify the District's measured restriction on magazine capacity today.

## ARGUMENT

**I.  To Promote the Safety and Well-Being of Our Residents, States Impose a Range of Restrictions, Including Prohibitions, on Dangerous Accessories and Weapons Not Commonly Used for Self-Defense.**

The Supreme Court has long been clear that the Second Amendment "extends only to certain types of weapons." *Heller*, 554 U.S. at 623-25. States and the federal government retain latitude to regulate categories of weapons and accessories, including by restricting public carry, possession, and sale of weapons that are not commonly used for self-defense and that pose a threat to our communities. Indeed, the Court has recognized the constitutionality of laws banning categories of weapons—among them, "short-barreled shotguns" and "M-16 rifles and the like"— because certain "type[s] of weapon[s]" are simply "not eligible for Second Amendment protection." *Id.* at 621-22, 625, 627 (emphasis removed).

Consistent with that guidance, States have adopted a range of laws that impose restrictions, including prohibitions, on certain categories of weapons and

4

accessories. Laws like the District's, which restrict accessories that cannot by themselves be used for offensive or defensive purposes, but nevertheless enhance the lethality of weapons, dot the national landscape. Fourteen States and the District of Columbia restrict the size of ammunition magazines that may be used with semiautomatic weapons, while allowing for possession and sale of smaller-capacity magazines.[1] While 11 of these jurisdictions set a capacity limit at 10 rounds, others set a higher capacity limit.[2] Eighteen jurisdictions and the federal government ban bump stocks, trigger cranks, binary triggers, rapid-fire trigger activators, or other devices used to approximate an automatic rate of fire with a semiautomatic weapon.[3] Silencers or suppressors, used to muffle the sound of a gun when it fires, are banned in eight States and the District of Columbia[4] and subject to restrictions or registration requirements by the federal government and 20 more States.[5]

---

[1] *See* Appendix Table 1. From 1994 to 2004, the federal government also banned handgun and long-gun magazines capable of holding more than 10 rounds. *See* Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1998-2000, codified at 18 U.S.C. §§ 921(a), 922(w) (2000).

[2] *See id.*

[3] *See* Appendix Table 2. Courts have split on the lawfulness of the federal regulations construing the statutory term "machine gun" to include bump stocks. *See Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *cert. petn. pending*, No. 22-976; *Guedes v. ATF*, 920 F.3d 1 (D.C. Cir. 2019) (per curiam), *cert. denied*, 140 S. Ct. 789 (2020).

[4] *See* Appendix Table 3.

[5] *See* Appendix Table 4.

States and the federal government also restrict the type and size of ammunition that can be purchased or possessed. While all States allow for robust access to ammunition, at least 26 jurisdictions prohibit especially dangerous forms of ammunition. Twenty-one jurisdictions and the federal government prohibit the possession or sale of bullets designed to penetrate metal or armor.[6] Nine prohibit ammunition designed to explode, detonate, or segment upon impact.[7] Multiple jurisdictions prohibit certain large-caliber ammunition, usable with .50- or .60-caliber weapons[8]; hollow-point bullets, designed to expand in their target on impact[9]; and Flechette shells, expelled from guns as pieces of metal wire or dart-like projectiles.[10] Others ban certain forms of shotgun ammunition: "Dragon's breath" shells, used to simulate a flamethrower by making shotguns spew fireballs or columns of flames, and bolo shells, designed as two or more metal balls connected by a metal wire.[11]

States and the federal government also prohibit possession of certain types of weapons that are not useful for or commonly used in self-defense. Like the federal

---

[6] *See* Appendix Table 5.

[7] *See* Appendix Table 6.

[8] *See* Appendix Table 7.

[9] *See* Appendix Table 8.

[10] *See* Appendix Table 9.

[11] *See* Appendix Table 10.

government from 1994 to 2004,[12] nine States and the District of Columbia prohibit the purchase or possession of semiautomatic assault weapons.[13] Although state definitions of the prohibited class of weapons differ, they typically encompass weapons like AR-15 and AK-47-style rifles that inflict catastrophic injuries and have distinct combat capabilities, rendering them ubiquitous and uniquely devastating in mass shootings.[14] Thirteen jurisdictions ban automatic-fire machine guns, subject to limited exceptions,[15] while 26 States and the federal government ban machine guns manufactured after May 19, 1986, require registration of machine guns owned before that date, or impose other restrictions.[16] Nine States and the District of Columbia also prohibit short-barreled shotguns or rifles,[17] while the federal government and 22 other States impose restrictions on those weapons.[18] Four jurisdictions prohibit high-caliber rifles,[19] five prohibit guns hidden in canes and other covert weapons,[20] and 19 jurisdictions and the federal government ban

---

[12] Public Safety and Recreational Firearms Use Protection Act, Pub. L. No. 103-322, 108 Stat. 1996-2010, codified at 18 U.S.C. §§ 921(a), 922(v) (2000).

[13] *See* Appendix Table 11.

[14] *See id.*

[15] *See* Appendix Table 12.

[16] *See* Appendix Table 13.

[17] *See* Appendix Table 14.

[18] *See* Appendix Table 15.

[19] *See* Appendix Table 16.

[20] *See* Appendix Table 17.

grenades, rocket launchers, or other hand-held destructive devices.[21]

All told, across our country today, States and the federal government impose restrictions, including prohibitions, on a diverse array of weapons, accessories, and ammunition. The District of Columbia's law restricting magazine capacity is of a piece with this tapestry of regulation and, as discussed below, a long history of governmental efforts to deter violence and promote public safety.

## II. The District's Restriction on Magazine Capacity Comports with the Second Amendment.

The District's choice to limit magazine capacity to ten bullets is constitutional. Under *Bruen*, courts must evaluate Second Amendment challenges by making two inquiries. First, courts must ask if the Second Amendment right is implicated—*i.e.*, whether its "plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. If it does not, "the regulated activity is categorically unprotected." *Id.* Second, if the conduct is protected, courts ask if the restriction nevertheless accords with "the Nation's historical tradition of firearm regulation." *Id.* Under either step, the District's law is valid.

### A. The Second Amendment Does Not Protect Large-Capacity Magazines.

Plaintiffs-Appellants cannot meet their threshold burden of showing that their proposed conduct—to possess magazines that can hold more than 10 rounds—is

---

[21] *See* Appendix Table 18.

8

protected by the Second Amendment. The Second Amendment's "plain text" does not protect using LCMs because under the Amendment's "normal and ordinary meaning" when it was ratified, LCMs are not bearable arms, and because LCMs are not "common[ly] use[d] today for self-defense." *Bruen*, 142 S. Ct. at 2126-27, 2134 (internal quotation marks omitted).

### i.    Large-Capacity Magazines Are Not Arms.

The Second Amendment protects the right to "bear Arms." But LCMs are historically understood as accessories, not arms.

As *Heller* explained, arms were defined at the Founding as "weapons" that could be used "to cast at or strike another." 554 U.S. at 581 (internal quotation marks and citations omitted). Magazines—storage containers for bullets—cannot be so used: "they generally have no use independent of their attachment to a gun[,] and you can't hurt anybody with one unless you hit them over the head with it." *Ocean State Tactical v. Rhode Island*, 646 F.Supp.3d 368, 386-87 (D.R.I. 2022) (cleaned up), *appeal pending*, No. 23-1072 (1st Cir.).

That magazines are not bearable arms is more than common-sense intuition. As the District's linguistics expert explains, historically, the term "Arms" was reserved for weapons like blades and firearms. ECF No. 17-4, *Hanson v. District of Columbia*, 22-cv-2256 (D.D.C.) (hereinafter ECF.[Docket Number]) (Baron Decl. ¶10); *see also Ocean State Tactical*, 646 F.Supp.3d at 387. And its meaning did not

encompass the separate concept of accessories like cartridge boxes, scabbards, and flint, which were historically referred to as "accoutrements." ECF.17-4 (Baron Decl. ¶¶10, 29-66). Just as bullet-holders like cartridge boxes were considered accoutrements and not arms historically, the same is true for bullet-holders like LCMs now.

In dismissing the arms-accoutrements distinction, the District Court mistakenly conflated bullets with magazines. *See Hanson*, 2023 WL 3019777, at *7. No one disputes that as "instruments … facilitat[ing] armed self-defense," *Bruen*, 142 S. Ct. at 2132, bullets that are commonly used or useful for self-defense fit within the Second Amendment. So "[w]ithout *bullets*, a firearm would be useless. But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful." *Ocean State Tactical*, 646 F.Supp.3d at 386 (emphasis in original). Using LCMs— accessories, not arms—is simply not an act "necessary" to bearing arms. *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment).

The original public meaning of "Arms" excludes accessories like LCMs. *See Ocean State Tactical*, 646 F.Supp.3d at 386-87; *Brumback v. Ferguson*, No. 22-cv-03093, 2023 WL 6221425, at *8-9 (E.D. Wash. Sept. 25, 2023). Because the Second Amendment's plain text does not cover the use of LCMs, the District's limit on that use is constitutional.

### ii.    Large-Capacity Magazines Are Not Commonly Used for Self-Defense.

Even if this Court were to assume that LCMs are arms rather than accoutrements, the Second Amendment does not protect their use for another, independent reason: LCMs are not "'in common use' today for self-defense." *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627).

Relying on reams of record evidence, the District Court rightly concluded that LCMs were not and are not commonly used for self-defense. *Hanson*, 2023 WL 3019777, at *8-12. In fact, they are "most useful in military service," like "M-16 rifles and the like," which "may be banned." *Heller*, 554 U.S. at 627. As the District's unrebutted historical expert evidence demonstrates, from the Founding through Reconstruction, "high-capacity firearms went almost exclusively to military buyers." ECF.17-9 (DeLay Decl. ¶23). By the 1870s, "detachable magazines were still decades away from practical success." *Id.* (DeLay Decl. ¶25). And even today, as Plaintiffs-Appellants' own expert concedes, "magazines holding more than 10 rounds are most useful in the military … context." ECF.24-6 (Murphy Decl. ¶9).

The data agree: LCMs are not normally used for self-defense. Plaintiffs-Appellants' own experts *agree* with defense experts that the average number of rounds fired in self-defense incidents is fewer than 3. *See* ECF.24-8 (Werner Decl. ¶10); ECF.24-6 (Murphy Decl. ¶8). Indeed, the record "shows that [civilians] simply did not need the extra ammunition in … LCM[s] for self-defense." *Hanson*, 2023

11

WL 3019777, at *11. Historically and empirically, LCMs are military instruments—not those "that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132.

Ignoring that conclusion, Plaintiffs-Appellants focus on only half the equation. LCMs, they claim, are commonly owned. *See* Appellants' Br. at 20-21. But this Court has never held—nor have Plaintiffs-Appellants shown—that they "are commonly used or are useful *specifically for self-defense*." *Heller II*, 670 F.3d at 1261 (emphasis added). And "self-defense" is the Second Amendment's "*central component*." *Bruen*, 142 S. Ct. at 2133 (emphasis in original) (citation omitted). Without offering evidence on this central constitutional component, Plaintiffs-Appellants have not met their burden to establish that LCMs are constitutionally protected "Arms".

Nor can Plaintiffs-Appellants transform an assertion of common ownership into constitutional protection. If the government limits a particular handgun the moment it hits the market, the resulting scarcity of that handgun would not make prohibiting its use constitutional. *See Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) ("[I]t would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."). Conversely, the widespread ownership of machine guns would not make prohibiting their use unconstitutional. *See Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, __F.Supp.3d__, No. 22-951, 2023 WL 2655150,

at \*5 (D. Del. Mar. 27, 2023), *appeal pending*, No. 23-1633 (3d Cir.). Holding otherwise "would be a startling reading" of the Second Amendment, because "weapons that are most useful in military service … may be banned." *Heller*, 554 U.S. at 624, 627. At bottom, "relying on how common a weapon is at the time of litigation [is] circular." *Friedman*, 784 F.3d at 409.[22] Instead, as this Court recognized in *Heller II*, 670 F.3d at 1261, courts must consider the "nature" of a weapon's use as an instrument of self-defense. *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F.Supp.3d 782, 800 n.13 (D. Or. 2022).

The District Court rightly held that the nature of LCMs is not to facilitate self-defense. In doing so, it joined a host of other courts post-*Bruen* that have come to the same conclusion. *See, e.g.*, *Ocean State Tactical*, 646 F.Supp.3d at 390; *Kotek*, 2023 WL 4541027, at \*34; *Nat'l Ass'n for Gun Rights v. Lamont*, __F.Supp.3d__, No. 22-cv-1118, 2023 WL 4975979, at \*19-26 (D. Conn. Aug. 3, 2023), *appeal pending*, No. 23-1162 (2d Cir.); *but see Duncan*, 2023 WL 6180472, at \*10-12.

---

[22] Similarly, it cannot suffice that many own LCMs "with the subjective intention of using [them] for self-defense." *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at \*12 (S.D. Cal. Sept. 22, 2023), *stay granted pending appeal*, 83 F.4th 803 (9th Cir. 2023). Otherwise, it would be enough for Americans to *believe* that machine guns are tools of self-defense, even when they are not in fact so used. Subjective expectations alone do not dictate the parameters of constitutional rights. *See Oregon Firearms Fed'n v. Kotek*, __F.Supp.3d__, No. 22-cv-01815, 2023 WL 4541027, at \*30-32 (D. Or. July 14, 2023), *appeal pending*, No. 23-35479 (9th Cir.) (collecting cases). After all, "[o]ur expectations … are in large part reflections of laws that translate into rules the customs and values of the past and present." *United States v. White*, 401 U.S. 745, 786 (1971) (Harlan, J., dissenting).

\* \* \*

The Second Amendment does not protect the use of LCMs. As accessories unnecessary to the functioning of any weapon, LCMs are accoutrements, not "Arms," as that term was historically understood. And even if they were "Arms," the record clearly shows that they are not commonly used for self-defense. This Court can and should affirm on these grounds.

**B.    The District's Magazine Capacity Restriction Is Analogous to the Historical Practices of Regulating the Storage of Ammunition and Imposing Restrictions on New, and Distinctly Dangerous, Forms of Weaponry.**

Should this Court nevertheless assume that large-capacity magazines are protected "Arms," it should affirm the District Court's alternate conclusion that there exists a longstanding tradition of restrictions that is relevantly similar to the District's present-day enactment.

1. Restrictions on protected arms are constitutional if the government can demonstrate that such restrictions are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.  While the Supreme Court has left open the question whether a court should "primarily" look to Founding-era or Reconstruction-era history in evaluating the Nation's traditions, *id.* at 2138, *Bruen* and *Heller* compel the conclusion that courts must consider the broad sweep of our country's history—including nineteenth- and twentieth-century history—when reviewing the constitutionality of a state law.

14

In both *Heller* and *Bruen*, the Court thoroughly examined eighteenth- and nineteenth-century statutes and case law in assessing the constitutionality of the challenged laws. *See Bruen*, 142 S. Ct. at 2142-56; *Heller*, 554 U.S. at 600-19. The Court made clear that post-ratification history is not only relevant, but a "critical tool of constitutional interpretation" that elucidates "the public understanding of a legal text in the period after its enactment or ratification." *Heller*, 554 U.S. at 605 (emphasis removed); *see Bruen*, 142 S. Ct. at 2136 (same). *Heller* conducted an extensive review of post-ratification sources from 1803 to 1891, *see* 554 U.S. at 605-19, and *Bruen* did likewise through 1890, *see* 142 S. Ct. at 2145-54.

This comprehensive approach accords with governing first principles. States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment," ratified in 1868, "not the Second" Amendment, ratified in 1791. *Bruen*, 142 S. Ct. at 2137. The public understanding of the scope of constitutional rights shared by those who adopted the Fourteenth Amendment must therefore carry significant weight in the historical analysis. *See Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Courts recognize that, "when state- or local-government action is challenged, … the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir.

2011). And it would make little constitutional sense for a different rule to apply to firearm restrictions enacted by the District. *Cf. Bruen*, 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government.").

Bruen also explained that "'a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases' in the Constitution." 142 S. Ct. at 2136 (quoting *Chiafalo v. Washington*, 140 S. Ct. 2136, 2326 (2020)). A governmental practice not directly contrary to the text of the Constitution may thus "'guide [a court's] interpretation of an ambiguous constitutional provision,'" particularly where the practice "'has been open, widespread, and unchallenged since the early days of the Republic.'" *Id.* at 2137 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment)). *Bruen* itself offered an example of such liquidation: while the Second Amendment's text does not speak directly to the constitutionality of laws prohibiting firearms in sensitive places, the Court was "aware of no disputes regarding the lawfulness of" such enactments during the eighteenth and nineteenth centuries, so the Court "assume[d] it settled that" governments can constitutionally prohibit firearms in certain sensitive places. 142 S. Ct. at 2133.

Twentieth-century history bears on the historical inquiry for the same reason.

While twentieth-century history that "contradicts earlier evidence" is not probative, *Bruen*, 142 S. Ct. at 2154 n.28, the Supreme Court has relied on twentieth-century history in its Second Amendment rulings. In *Heller*, the Court characterized laws that originated in the twentieth century—among them, laws banning people with felony convictions or mental illness from possessing weapons—as "longstanding" and "presumptively lawful." 554 U.S. at 626-27 & n.26; *see United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) ("[T]he modern federal felony firearm disqualification law … is firmly rooted in the twentieth century."). Similarly, "*Heller* deemed a ban on private possession of machine guns to be obviously valid," but "states didn't begin to regulate private use of machine guns until 1927." *Friedman*, 784 F.3d at 408. The presumptive lawfulness of these twentieth-century measures was reaffirmed by a majority of the Court in *Bruen*. *See* 142 S. Ct. at 2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.).[23]

---

[23] In addressing the scope of the Second Amendment, *Bruen* and *Heller* also "repeatedly compared the right to keep and bear arms" to the right to free speech, noting that "the government must generally point to *historical* evidence about the reach of the First Amendment's protections." *Bruen*, 142 S. Ct. at 2130 (citing *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)) (emphasis in original). When analyzing whether categories of speech fall outside the scope of the First Amendment, the Supreme Court has looked beyond Founding-era history to laws and practices that predominated in the nineteenth and twentieth centuries. *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 484-85 (1957) (looking to "the international agreement of over 50 nations," "the obscenity laws of all of the 48 States," and "the
(footnote continued)

Furthermore, as the District Court perceived, twentieth-century history can be uniquely probative in cases involving emergent weapons that did not become widely publicly available until the last century. *Hanson*, 2023 WL 3019777, at *16. The absence of eighteenth- and nineteenth-century legislative enactments addressing such weapons cannot mean there exists no historical tradition of comparable regulation, because there would have been scant reason for States to regulate the weapons during those eras. This case is a prime example: in the eighteenth century, firearms that could accept more than 10 rounds were "little more than experimental curiosities," and in the nineteenth, those weapons "went almost exclusively to military buyers," such that "very few were in the hands of private persons who might use them in ways that attracted regulatory attention." ECF.17-9 (DeLay Decl. ¶¶7, 23-25). Just as "[t]he First Amendment does not require States to regulate for problems that do not exist," neither does the Second Amendment impose such a non-sensical burden. *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citation omitted). Moreover, the Constitution does not require States to legislate to the zenith of their authority by, for example, restricting curio weapons that have yet to pose a public-safety problem; rather, the Constitution allows States the flexibility to "adopt laws

---

20 obscenity laws enacted by the Congress from 1842 to 1956" in holding obscene speech unprotected); *Beauharnais v. Illinois*, 343 U.S. 250, 254-56 (1952) (focusing on contemporary criminal codes of the States as well as colonial-era criminal codes and legal developments in the decades after ratification in concluding that libel is not protected speech).

to address the problems that confront them." *Id.*; *see also Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("A State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns.").

This Court thus may, and should, consider nineteenth- and twentieth-century practice in assessing Second Amendment challenges to state and municipal laws.

2. Laws that restrict magazine capacity derive from a long tradition of regulating uniquely dangerous weapons, accessories, gunpowder, and ammunition that posed an inordinate public safety risk upon their emergence in the commercial market.

To determine whether a challenged statute is consistent with a historical tradition of firearms regulation, courts must reason by analogy. *Bruen*, 142 S. Ct. at 2131-32. Cases like this that implicate "unprecedented societal concerns or dramatic technological changes" demand a "nuanced" approach to analogical reasoning, one that looks to whether, over the course of history, there have existed "relevantly similar" analogues. *Id.* at 2132 (citing C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). While the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar," it made clear that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (stressing that "individual self-defense is the *central component* of the Second

Amendment right" (quotation marks omitted)). In applying these metrics, courts must bear in mind that the analogical inquiry is not a "regulatory straightjacket," and a modern-day regulation need not be a "dead ringer for historical precursors" to be "analogous enough to pass constitutional muster." *Id.* at 2133.[24]

From the colonial period through the nineteenth century, States and municipalities adopted measures that, like the District's present-day law, limited the amount of gunpowder or ammunition that could be kept in one place or one container. *See* S. Cornell & N. DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 511 (2004) ("Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds."); R. Spitzer, *Gun Law History in the United States and Second Amendment Right*, 80 LAW & CONTEMP. PROBS. 55, 80-81 (2017) (summarizing gunpowder storage laws). A 1783 Massachusetts law imposed a fine on "any Person" who "shall take into any [house or building] within the Town of Boston, any … Fire-Arm, loaded with, or having Gun-Powder." 1782 Mass. Acts 119, ch. 46. In 1784, New York required separating gunpowder in the home "into four stone jugs or tin cannisters, which shall not contain more than seven pounds

---

[24] That nuanced approach accords with how analogical reasoning is described in the scholarly sources upon which *Bruen* relied. *See* 142 S. Ct. at 2132. For example, as Cass Sunstein's study explained, analogical reasoning is similar to common-law reasoning, with "the important advantage of allowing a large degree of openness to new facts and perspectives." Sunstein, *supra*, at 782.

each." Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627, 627. Throughout the 1780s, Pennsylvania laws "required that gunpowder be stored on the highest story of the home" in certain towns. *Heller*, 554 U.S. at 686 (Breyer, J., dissenting). Similar laws were adopted well into the nineteenth century, and the *Amici* States are not aware of court decisions invalidating them. *E.g.*, 1882 Mass. Acts 212, ch. 269 (requiring registration of gunpowder in excess of one pound stored in buildings); 1771-72 Mass. Province Laws 167, ch. 9 (requiring gunpowder imported into Massachusetts to be stored in public magazines); *see also* 1832 Conn. Acts 391, ch. 25; 1825 N.H. Laws 73, ch. 61; 1821 Maine Laws 98, ch. 25; 1772 N.Y. Laws 682, ch. 1549; 1852 Tenn. Acts 246, ch. 169.

These gunpowder storage antecedents are relevantly similar to the District's magazine-capacity limit in how and why they burden the right to armed self-defense. With respect to *how*: both sets of laws limit the quantity of ammunition that may be kept in one location or one type of container, thereby restricting the amount of firepower that can be generated, but do not ban an entire class of arms or effectively prohibit citizens from carrying firearms for self-defense. *Contra Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S. at 628. The District's magazine restriction is, in fact, *less* restrictive than many of these antecedents, because it limits only the number of rounds in any single magazine, not the amount of ammunition or the number of magazines a gun owner may possess.

21

The gunpowder-storage laws and the District's magazine-capacity limitation are also relevantly similar in *why* they burden the right to armed self-defense: they seek to forestall tragedy wrought by aggregations of ammunition far in excess of what is needed for self-defense. *See* Cornell & DeDino, *supra*, at 512 (the gunpowder storage laws "were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal"); *Heller II*, 670 F.3d at 1263-64 (District's LCM ban enacted because LCMs "greatly increase the firepower of mass shooters," "are dangerous in self-defense situations," and "pose a danger to innocent people and particularly to police officers"). Reflecting the measured nature of these enactments, the Supreme Court has recognized that gunpowder-storage laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns," *Heller*, 554 U.S. at 632, and this Court has similarly explained that laws banning LCMs—including the very law at issue here— do "not effectively disarm individuals or substantially affect their ability to defend themselves," *Heller II*, 670 F.3d at 1262.

The District's magazine-capacity restriction is also relevantly similar to the longstanding practice of regulating novel, and unusually dangerous, weapons and accessories that contribute to crime without a corresponding utility for self-defense. This tradition followed a predictable pattern: first, new weapons technologies were developed; second, they spread into society and created a public safety threat; and

22

third, governments enacted regulations to dampen weapons-related criminality and violence. In the early nineteenth century, States increasingly began imposing restrictions on weapons like Bowie knives[25] and pocket pistols[26] that were contributing to rising murder rates. *See* ECF.17-10 (Spitzer Decl. ¶¶42-56); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (in upholding law banning sale and concealed carry of Bowie knives, distinguishing between protected weapons and "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin"). Many of the laws prohibited concealed carry of these weapons, and some, like Arkansas's and Tennessee's postbellum statutes regulating pocket pistols, likewise banned sales. *See* An Act to Prevent the Sale of Pistols, ch. 96, § 1, 1879 Tenn. Acts 135-36; 1881 Ark. Acts 191, no. 96, § 3.

During the 1920s and 1930s, the Nation witnessed a new wave of regulation of emergent weapons that threatened public safety. During this era, "at least 32 states enacted anti-machine gun laws" which prohibited or regulated automatic-fire weapons. ECF.17-10 (Spitzer Decl. ¶12). Similarly, Congress enacted the first

---

[25] *See, e.g.*, 1837 Ga. Acts. 90, § 1; Ch. 77, § 2, 1837 Ala. Laws 7, 7; No. 24 § 1, 1838 Fla. Laws 36, 36; Ch. 137, §§ 1-2, 1837-38 Tenn. Acts 200; Ch. 101, § 1, 1838 Va. Acts 76, 76; Ch. 77, § 1, 1839 Ala. Laws 67, 67.

[26] *See, e.g.*, 1819 Ind. Acts 39; 1821 Tenn. Acts ch. 13, p. 15; W. Ball, Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837, § 13, 280 (1838); Ch. 101, § 1, 1838 Va. Acts 76, 76.

nationwide firearms regulation statute, the National Firearms Act of 1934, to restrict machine guns, short-barreled shotguns, and other dangerous weapons. *Id.* ¶14; Pub. L. No. 73-474. During these decades, a number of jurisdictions also banned or otherwise restricted high-capacity semiautomatic weapons shortly after they began to proliferate, typically in the same legislation that established the accepted tradition of banning machine guns. ECF.17-10 (Spitzer Decl. ¶17); *see also Heller II*, 670 F.3d at 1270 (Kavanaugh, J., dissenting) (machine guns "have traditionally been banned").[27] In the same era, regulations limiting magazine capacity were also common: twenty-three States imposed some limitation, typically restricting the number of rounds to between five and eighteen.[28]

This tradition of regulating unusually dangerous weapons and accessories is relevantly similar to the District's large-capacity magazine law in how and why the enactments burden the right to armed self-defense. With respect to how: both types of measures regulate specific dangerous weapons or accessories used for criminal

---

[27] *See* An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, no. 372 § 3, 1927 Mich. Pub. Acts 888, 888-89; Ch. 1052 §§ 1, 4, 1927 R.I. Pub. Laws 256, 256-57; An Act to Control the Possession, Sale, Transfer, and Use of Pistols and Other Dangerous Weapons in the District of Columbia, Pub. L. No. 72-275, 47 Stat. 650, 650 (1932); Ch. 190, § 1, 1933 Minn. Laws 231, 232; Ch. 96, 1934 Va. Acts 137-40.

[28] *See, e.g.*, 1933 Cal. Stat. 1169, 1170; No. 80, § 1, 1932 La. Acts 336, 337; An Act to Regulate the Sale, Possession and Transportation of Machine Guns, no. 18, §§ 1-2, 1931 Ill. Laws 452-53; An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, ch. 235, § 5711, 1923 Vt. Acts and Resolves 930.

and other violent purposes, rather than standard weapons of self-defense. Unlike the laws at issue in *Heller* and *Bruen*, the enactment at issue here, like its historical antecedents, does not amount to a ban on an entire class of arms or effectively prohibit citizens from carrying firearms for self-defense. *Contra Bruen*, 142 S. Ct. at 2156; *Heller*, 554 U.S. at 628; *see Heller II*, 670 F.3d at 1261-62 (District's LCM ban does "not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun" (quoting *Heller*, 554 U.S. at 629)).

The analogical reasoning prescribed by *Bruen* does not require that a historical tradition be the same "type" of regulation as the modern one, nor does it suggest that the only analogue for a weapon-specific ban is another weapon-specific ban. Rather, *Bruen* and *Heller* both relied on the *degree* of burden when evaluating proposed historical analogues. *See Bruen*, 142 S. Ct. at 2145 (examining whether analogues imposed a comparably "substantial burden"); *Heller*, 554 U.S. at 632 (similar). And, as this Court has held, the District's law imposes, at most, a modest burden on the right to self-defense. *Heller II*, 670 F.3d at 1262 (LCM bans "impose only modest burdens [b]ecause they do leave open ample alternative channel[s]" for self-defense). Indeed, as the record below establishes, large-capacity magazines are virtually never used for self-defense. *See supra*, at 11-14. In the same way, the tradition of regulating specific and particularly dangerous weapons used for criminality likewise did not meaningfully burden self-defense capabilities.

25

The purpose of the District's law is also relevantly similar to the purpose of this tradition of regulation: to enhance public safety in the face of new weapon technology that has threatened, or already inflicted, significant harm on American citizens. The Bowie-knife restrictions of the early 1800s, for example, were intended "to promote personal security, and to put down lawless aggression and violence." *State v. Reid*, 1 Ala. 612, 617 (1840). And the early twentieth-century regulation of machine guns and semiautomatic weapons stemmed from concern over the "growth of armed gangsterism [that] resulted in the use of more deadly weapons by criminals." J. Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400, 405 (1934). Modern-day laws restricting magazine capacity are likewise a response to the proliferation of these accessories in a contemporary form of lawlessness and violence: mass public shootings. *See* H.R. Rep. No. 103-489, at 19 (1994); *Heller II*, 670 F.3d at 1263-64. Courts have widely recognized that because large-capacity magazines were designed for military use and to inflict exceptionally high mortality rates and rates of injury, they have been the "weapons of choice in many of the deadliest mass shootings in recent history." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *accord Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of New Jersey*, 910 F.3d 106, 118 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 126-27 (4th Cir. 2017) (en banc), *abrogated on other grounds by*

*Bruen*, 142 S. Ct. 2111; *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 262-63 (2d Cir. 2015), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Friedman*, 784 F.3d 411; *Heller II*, 670 F.3d at 1262-64.

In choosing to restrict the capacity of magazines within its borders, the District of Columbia acted to prevent these harms, without correspondingly burdening the right to self-defense. Its choice is consistent with a long tradition of relevantly similar historical antecedents, and it comports fully with the Second Amendment.

## CONCLUSION

For the foregoing reasons, this Court should affirm the order of the District Court.

Respectfully submitted,

MATTHEW J. PLATKIN
*Attorney General of New Jersey*

Jeremy Feigenbaum
*Solicitor General*
Angela Cai
*Deputy Solicitor General*
(862) 350-5800

Date: October 26, 2023

ANDREA JOY CAMPBELL
*Attorney General of Massachusetts*

Robert E. Toone, D.C. Cir. No. 56109
*Chief, Government Bureau*
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2718
robert.toone@mass.gov

27

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
100 West Randolph Street
Chicago, IL 60601

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin
  Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

MICHELLE A. HENRY
*Attorney General*
*Commonwealth of Pennsylvania*
Strawberry Square, 16th Floor
Harrisburg, PA 17120

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

## <u>CERTIFICATION OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

/s/ Robert E. Toone
Robert E. Toone
Chief, Government Bureau
Massachusetts Attorney General's Office

Dated: October 26, 2023

**<u>CERTIFICATION OF SERVICE</u>**

On October 26, 2023, the undersigned caused this brief to be filed with the Clerk of the United States Court of Appeals for the District of Columbia Circuit via electronic filing. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Robert E. Toone
Robert E. Toone
Chief, Government Bureau
Massachusetts Attorney General's Office

Dated: October 26, 2023

## APPENDIX

## Table 1: Laws Restricting Magazine Capacity

The following jurisdictions restrict the quantity of rounds able to be fired from a single magazine as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
| --- | --- |
| **California** | Cal. Penal Code §§ 16740, 32310. |
| **Colorado** | Colo. Rev. Stat. §§ 18-12-301, 302, 303. |
| **Connecticut** | Conn. Gen. Stat. § 53-202w(a)(1). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1468, 1469(a). |
| **District of Columbia** | D.C. Code § 7-2506.01(b). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1.10. |
| **Maryland** | Md. Code Ann., Crim. Law § 4-305(b). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j). |
| **New York** | N.Y. Penal Law § 265.02(8). |

| | |
|---|---|
| **Oregon** | 2022 Oregon Ballot Measure 114, § 11. |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3. |
| **Vermont** | Vt. Stat. Ann. Tit. 13, § 4021. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(22), 9.41.370. |

## Table 2: Laws Banning Rate-of-Fire Enhancing Devices

The following jurisdictions ban the possession of bump stocks, trigger cranks, trigger activators, and other devices designed to artificially increase the rate of fire for semi-automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b); 27 C.F.R. 447.11, 478.11, 479.11. |
| **California** | Cal. Penal Code § 32900. |
| **Connecticut** | Conn. Gen. Stat. § 53-206g. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(6), (b)(2). |
| **District of Columbia** | D.C. Code Ann. § 22-4514(a). |
| **Florida** | Fla. Stat. § 790.222. |

| | |
|---|---|
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8.5. |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(14). |
| **Iowa** | Iowa Code § 724.29. |
| **Maryland** | Md. Code Ann., Crim. Law §§ 4-301, 4-305.1(a). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| **Michigan** | Mich. Comp. Laws § 750.224e. |
| **Minnesota** | Minn. Stat. § 609.67. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.274. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(ee)-(ff), 2C:39-3(*l*). |
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Oregon** | Or. Rev. Stat. § 480.070. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(3), (19), 11-47-8(d), 11-47-8.1. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4022. |

| Virginia | Va. Code Ann. § 18.2-308.5:1. |
|---|---|
| Washington | Wash. Rev. Code §§ 9.41.010(5), 9.41.220. |

## Table 3: Laws Banning Silencers

The following jurisdictions ban the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| California | Cal. Penal Code § 33410. |
| Delaware | Del. Code tit. 11, §§ 1444(a)(3), (b)(1). |
| District of Columbia | D.C. Code Ann. § 22-4514(a). |
| Hawaii | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(6). |
| Massachusetts | Mass. Gen. Laws ch. 269, § 10A. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(g), 2C:39-3(c). |
| New York | N.Y. Penal Law § 265.02(2). |
| Rhode Island | R.I. Gen. Laws § 11-47-20. |

## Table 4: Laws Restricting Silencers

The following jurisdictions restrict the possession of silencers, suppressors, and other accessories designed to mitigate the sound of discharging a weapon as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
|---|---|
| **Federal** | 18 U.S.C. § 921(a)(3); 26 U.S.C. §§ 5841(a), 5845(a)(7), 5861. |
| **Alaska** | Alaska Stat. §§ 11.61.200(a)(3), (c), (h)(1)(B). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(ii), 13-3102(A)(3), 17-251. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Georgia** | Ga. Code Ann. §§ 16-11-121(7), 16-11-122. |
| **Iowa** | Iowa Code § 724.1B. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(4). |
| **Michigan** | Mich. Comp. Laws §§ 750.224(1)(b), (3)(c). |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(c). |
| **Montana** | Mont. Code Ann. § 45-8-337. |

| | |
|---|---|
| **Nevada** | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-05-01. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(5), 2923.17(A), (C)(5). |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. § 908. |
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (17), 22-14-6. |
| **Vermont** | Vt. Stat. Ann. tit. 13, § 4010. |
| **Washington** | Wash. Rev. Code § 9.41.250(1)(c). |
| **Wisconsin** | Wis. Stat. § 941-298. |

## Table 5: Laws Banning Armor-Piercing Ammunition

The following jurisdictions ban the possession of ammunition designed to penetrate body armor or vehicle armor as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(17)(B)-(C), 922(a)(7)-(8). |

| | |
|---|---|
| **Alabama** | Ala. Code § 13A-11-60(a). |
| **California** | Cal. Penal Code §§ 16660, 30315, 30320. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(1), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(i), 7-2506.01(a)(3). |
| **Florida** | Fla. Stat. §§ 790.31(1)(a), (2)(a)-(c). |
| **Hawaii** | Haw. Rev. Stat. Ann. § 134-8(a). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
| **Indiana** | Ind. Code Ann. § 35-47-5-11.5. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(6). |
| **Kentucky** | Ky. Rev. Stat. Ann. §§ 237.060(7), 237.080. |
| **Louisiana** | La. Rev. Stat. Ann. §§ 40:1810-40:1812. |
| **Maine** | Me. Rev. Stat. Ann. tit. 17-A, § 1056. |
| **Michigan** | Mich. Comp. Laws § 750.224c. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.273. |

| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(gg), 2C:39-3(f). |
| --- | --- |
| North Carolina | N.C. Gen. Stat. § 14-34.3. |
| Oklahoma | Okla. Stat. tit. 21, §§ 1289.19-1289.22. |
| Rhode Island | R.I. Gen. Laws § 11-47-20.1. |
| South Carolina | S.C. Code Ann. § 16-23-520. |
| Texas | Tex. Penal Code §§ 46.01(12), 46.05(a)(2). |
| Virgin Islands | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 6: Laws Banning Explosive Ammunition

The following jurisdictions ban the possession of high-explosive incendiary ammunition designed to explode or impart energy upon contact via a charge as part of their firearm safety laws.

| Jurisdiction | Jurisdictional Law |
| --- | --- |
| California | Cal. Penal Code § 30210. |
| Florida | Fla. Stat. §§ 790.31(1)(b), (2)(a)-(c). |
| Hawaii | Haw. Rev. Stat. Ann. § 134-8(a). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-3.1(a)(6). |

| Iowa | Iowa Code §§ 724.1(1)(f), 724.3. |
|------|----------------------------------|
| **Missouri** | Mo. Rev. Stat. § 571.020(1.4). |
| **New York** | N.Y. Penal Law § 265.01(7). |
| **Tennessee** | Tenn. Code Ann. § 39-17-1304(b). |
| **Virgin Islands** | V.I. Stat. tit. 14, §§ 2256(b)-(c). |

## Table 7: Laws Banning Large-Caliber Ammo

The following jurisdictions ban the possession of large-caliber ammunition as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|----------------|----------------------|
| **California** | Cal. Penal Code § 18735. |
| **Connecticut** | Conn. Gen. Stat. §§ 53-202*l*(a)(2), (b)-(c). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(13A)(A)(iii), 7-2506.01(a)(3). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(11), 5/24-1.9(a)(6), (b), (c) (possession ban effective Jan. 1, 2024). |

**Table 8: Law Banning Hollow-Point Bullets**

The following state bans the possession of hollow-point and other ammunition designed to expand on impact as part of its firearm safety laws.

| State | State Law |
|---|---|
| **New Jersey** | N.J. Stat. Ann. § 2C:39-3(f). |

**Table 9: Laws Banning Flechette Ammo**

The following states ban the possession of flechette shells, or other ammunition that can be fired in a firearm and that expels two or more pieces of fin-stabilized solid metal wire or two or more solid dart-type projectiles, as part of their firearm safety laws.

| State | State Law |
|---|---|
| **California** | Cal. Penal Code §§ 16570, 30210. |
| **Florida** | Fla. Stat. §§ 790.31(1)(f), (2)(a)-(c). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |

**Table 10: Laws Banning Dragon's Breath and Bolo Shells**

The following states ban the possession of "Dragon's Breath" shells, ammunition that when fired produces sparks and flames simulating a flamethrower, and bolo shells, ammunition containing two or more large lead balls connected by a wire, that when used may sever a target's limb, as part of their firearm safety laws.

| State | State Law |
|---|---|
| **Florida** | Fla. Stat. §§ 790.31(1)(d)-(e), (2)(a)-(c). |

| Illinois | 720 Ill. Comp. Stat. 5/24-2.1, 5/24-2.2. |
|---|---|
| Iowa | Iowa Code §§ 724.1(1)(f), 724.2, 724.3. |

## Table 11: Assault Weapon Bans

The following jurisdictions ban the possession or sale of assault weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| California | Cal. Penal Code §§ 30500-30515, 30600, 30605. |
| Connecticut | Conn. Gen. Stat. §§ 53-202a-202c. |
| Delaware | Del. Code tit. 11, §§ 1465-1466(a). |
| District of Columbia | D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.01, 7-2502.02(a)(6). |
| Hawaii | Haw. Rev. Stat. Ann. §§ 134-1, 134-4, 134-8(a). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1.9. |
| Maryland | Md. Code Ann., Crim. Law §§ 4-301, 4-303. |
| Massachusetts | Mass. Gen. Laws ch. 140, §§ 121, 131M. |
| New York | N.Y. Penal Law §§ 265.00(22), 265.02(7). |

| Washington | Wash. Rev. Code §§ 9.41.0001, 9.41.010(2), 9.41.240 (2023 Wash. Sess. Laws, ch. 162, § 1). |
|---|---|

## Table 12: Laws Banning Automatic Weapons

The following jurisdictions ban automatic weapons as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| California | Cal. Penal Code § 32625. |
| Colorado | Colo. Rev. Stat. § 18-12-102. |
| Delaware | Del. Code tit. 11, §§ 1444(a)(5), (b)(1). |
| District of Columbia | D.C. Code Ann. §§ 7-2501.01(10), 7-2502.01, 7-2502.02(a)(2). |
| Hawaii | Haw. Rev. Stat. Ann. § 134-8(a). |
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(7)(i). |
| Iowa | Iowa Code §§ 724.1(a), 724.3. |
| Louisiana | La. Rev. Stat. Ann. §§ 40:1751 to 40:1752. |
| Massachusetts | Mass. Gen. Laws ch. 140, §§ 121, 131(o); Mass. Gen. Laws ch. 269, § 10(c). |
| Minnesota | Minn. Stat. § 609.67. |

| | |
|---|---|
| **New York** | N.Y. Penal Law § 265.02(2). |
| **Rhode Island** | R.I. Gen. Laws § 11-47-8(a). |
| **Wisconsin** | Wis. Stat. § 941.26(1g)(a). |

### Table 13: Laws Requiring Registration of Pre-1986 Automatic Weapons

The following jurisdictions require that all automatic weapons manufactured before 1986 be registered with a licensing agency as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(24), 922(o); 26 U.S.C. § 5845(b). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(C). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53-202. |
| **Florida** | Fla. Stat. §§ 790.001(9), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(2), 16-11-122, 16-11-124(4). |
| **Indiana** | Ind. Code Ann. §§ 35-47-5-8 to 35-47-5-8-10. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |

44

| Maine | Me. Rev. Stat. Ann. tit. 17-A, §§ 1051-1052. |
|---|---|
| Maryland | Md. Code Ann. §§ 4-401 to 4-405. |
| Michigan | Mich. Comp. Laws §§ 750.224(1)(a), (3)(c). |
| Missouri | Mo. Rev. Stat. § 571.020(1.6)(a). |
| Montana | Mont. Code Ann. §§ 45-8-302 to 45-8-304. |
| Nebraska | Neb. Rev. Stat. § 28-1203. |
| Nevada | Nev. Rev. Stat. Ann. § 202.350(1)(b). |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| North Carolina | N.C. Gen. Stat. § 14-288.8. |
| North Dakota | N.D. Cent. Code § 62.1-05-01. |
| Ohio | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| Oregon | Or. Rev. Stat. § 166.272. |
| Pennsylvania | 18 Pa. Cons. Stat. Ann. § 908. |
| South Carolina | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |

| | |
|---|---|
| **South Dakota** | S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6. |
| **Tennessee** | Tenn. Code Ann. §§ 39-17-1302(a)(3), (d). |
| **Texas** | Tex. Penal Code §§ 46.01(9), 46.05(a)(1)(B). |
| **Virginia** | Va. Code §§ 18.2-288 to 18.2-298. |
| **Washington** | Wash. Rev. Code §§ 9.41.010(29), 9.41.190. |
| **West Virginia** | W. Va. Code § 61-7-9. |

### Table 14: Laws Banning Short-Barreled Shotguns or Rifles

The following jurisdictions ban possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 33210, 33215. |
| **Colorado** | Colo. Rev. Stat. § 18-12-102. |
| **Delaware** | Del. Code tit. 11, §§ 1444(a)(4), (b)(1). |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(15), (17), 7-2502.01, 7-2502.02(a)(1), (a)(3). |
| **Hawaii** | Haw. Rev. Stat. Ann. §§ 134-1, 134-8(a). |

| | |
|---|---|
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(7)(ii). |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 121; Mass. Gen. Laws ch. 269, § 10(c). |
| **Minnesota** | Minn. Stat. § 609.67. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(o), 2C:39-3(b). |
| **Rhode Island** | R.I. Gen. Laws §§ 11-47-2(15) to 11-47-2(16), 11-47-8(b). |

## Table 15: Laws Restricting Short-Barreled Shotguns or Rifles

The following jurisdictions restrict the possession of short-barreled shotguns or short-barreled rifles as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **Federal** | 18 U.S.C. §§ 921(a)(6), 921(a)(8), 922(a)(4). |
| **Alaska** | Alaska Stat. Ann. §§ 11.61.200(a)(3), (h)(1)(D). |
| **Arizona** | Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iv), 13-3102(A)(3). |
| **Connecticut** | Conn. Gen. Stat. § 53a-211. |
| **Florida** | Fla. Stat. §§ 790.001(10)-(11), 790.221. |
| **Georgia** | Ga. Stat. §§ 16-11-121(4)-(5), 16-11-122, 16-11-124(4). |

| | |
|---|---|
| **Iowa** | Iowa Code § 724.1C. |
| **Kansas** | Kan. Stat. Ann. § 21-6301(a)(5). |
| **Michigan** | Mich. Comp. Laws § 750.224b. |
| **Missouri** | Mo. Rev. Stat. § 571.020(1.6)(b). |
| **Montana** | Mont. Code Ann. § 45-8-340. |
| **Nebraska** | Neb. Rev. Stat. § 28-1203. |
| **Nevada** | Nev. Rev. Stat. Ann. § 202.275. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(i), 2C:39-5(a), 2C:39-9(a). |
| **North Carolina** | N.C. Gen. Stat. § 14-288.8. |
| **North Dakota** | N.D. Cent. Code § 62.1-02-03. |
| **Ohio** | Ohio Rev. Code Ann. §§ 2923.11(K)(1), 2923.17. |
| **Oregon** | Or. Rev. Stat. § 166.272. |
| **Pennsylvania** | 18 Pa. Cons. Stat. Ann. § 908. |
| **South Carolina** | S.C. Code Ann. §§ 16-23-230 to 16-23-250. |

| South Dakota | S.D. Codified Laws §§ 22-1-2(8), (46), 22-14-6. |
|---|---|
| **Texas** | Tex. Penal Code §§ 46.01(10), 46.05(a)(1)(C). |
| **Washington** | Wash. Rev. Code §§ 9.41.010(41)-(42), 9.41.190. |
| **Wisconsin** | Wis. Stat. § 941-28. |

### Table 16: Laws Banning 50-Caliber and Other High-Caliber Rifles

The following jurisdictions ban possession of rifles designed to shoot 50-Caliber and other High-Caliber ammunition.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 30530, 30600, 30610. |
| **District of Columbia** | D.C. Code Ann. §§ 7-2501.01(8A), 7-2502.01, 7-2502.02(a)(7). |
| **Illinois** | 720 Ill. Comp. Stat. 5/24-1(a)(15)-(16), 5/24-1.9. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(c)(3), (5), 2C:39-3(a). |

### Table 17: Laws Banning Covert Weapons

The following jurisdictions ban possession of covert and hidden firearms as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|

49

| | |
|---|---|
| **Alabama** | Ala. Code § 13A-11-54. |
| **California** | Cal. Penal Code § 24410. |
| **Massachusetts** | Mass. Gen. Laws ch. 140, § 131N. |
| **New Jersey** | N.J. Stat. Ann. §§ 2C:39-1(hh), 2C:39-3(m). |
| **New York** | N.Y. Penal Law § 265.02(6). |

## Table 18: Laws Banning Destructive Devices

The following jurisdictions ban the possession of grenades, rocket launchers, bombs, and other destructive devices as part of their firearm safety laws.

| *Jurisdiction* | *Jurisdictional Law* |
|---|---|
| **California** | Cal. Penal Code §§ 16460, 18710. |
| **Colorado** | Colo. Rev. Stat. § 18-12-109(2)(a). |
| **Connecticut** | Conn. Gen. Stat. § 53-80(a). |
| **Delaware** | Del. Code Ann. tit. 11, §§ 1444(a)(1), (b)(1). |
| **District of Columbia** | D.C. Code § 22-4515a. |
| **Florida** | Fla. Stat. §§ 790.001(4), 790.161. |

| Hawaii | Haw. Rev. Stat. Ann. § 134-8(a). |
|---|---|
| Illinois | 720 Ill. Comp. Stat. 5/24-1(a)(7)(iii). |
| Iowa | Iowa Code §§ 101A.1(2A), 724.1(1)(c), 724.3. |
| Massachusetts | Mass. Gen. Laws ch. 266, § 102(c). |
| Minnesota | Minn. Stat. § 609.668. |
| New Jersey | N.J. Stat. Ann. §§ 2C:39-1(c)(1), 2C:39-3(a). |
| New York | N.Y. Penal Law § 265.02(2). |
| Oregon | Or. Rev. Stat. § 480.070. |
| Pennsylvania | 18 Pa. Cons. Stat. Ann. §§ 908(a), (c). |
| Rhode Island | R.I. Gen. Laws §§ 11-47.1-21. |
| Utah | Utah Code Ann. § 76-10-306(3). |
| Virginia | Va. Code Ann. § 18.2-85. |
| Wisconsin | Wis. Stat. § 941.26(2)(c). |