NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 23-7061

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANDREW HANSON, *et al.*,

*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA, *et al.*,

*Defendants-Appellees.*

On Appeal from an Order of the United States District Court
for the District of Columbia

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
DEFENDANTS-APPELLEES AND AFFIRMANCE**

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8201
psen@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

# COMBINED CERTIFICATES

## Certificate as to Parties, Rulings, and Related Cases

*A. Parties and Amici.* Except for Everytown for Gun Safety ("Everytown") and any other amici who had not yet entered an appearance in this case as of the filing of the Brief for Appellees, all parties, intervenors, and amici appearing before the district court and this Court are listed in the Brief for Appellees.

*B. Rulings Under Review.* References to the rulings under review appear in the Brief for Appellees.

*C. Related Cases.* Reference to any related cases pending before this Court appears in the Brief for Appellees.

## Statement Regarding Separate Briefing

Under Circuit Rule 29(d), Everytown states that it is aware of at least one other planned amicus brief in support of affirmance. The filing of a separate brief is nonetheless necessary because no other brief will set forth Everytown's unique perspective on the proper interpretation of the Second Amendment. Everytown has devoted substantial resources to researching and developing expertise in historical firearms legislation and has drawn on that expertise to file more than 90 amicus briefs in Second Amendment and other firearms cases, offering historical and doctrinal analysis that might otherwise be overlooked. Everytown's perspective is distinct from and independent of the interests of other amici in this case. Accordingly, this brief offers the Court an additional perspective that is not duplicative of other amicus briefs in support of Defendants-Appellees and of affirmance.[1]

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to its filing. *See* Fed. R. App. P. 29(a)(2).

## Corporate Disclosure Statement

Everytown is a gun-violence prevention organization. Everytown has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

Dated: October 26, 2023        <u>/s/ Priyanka Gupta Sen</u>
                                        *Counsel for amicus curiae*
                                        *Everytown for Gun Safety*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................1

ARGUMENT .......................................................................................2

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct .......................2

    II.    The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations ...........5

        a.    The Proper Focus for Historical Analysis Is 1868 Rather Than 1791 ...................................................................6

        b.    The Court Should Also Consider Consistent Later History .....16

    III.    This Court Should Reject Any Effort To Dismiss the District's Historical Analogues as "Outliers" .........................................21

CONCLUSION .....................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Davenport v. Wash. Educ. Ass'n*,
  551 U.S. 177 (2007) ......................................................................23

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
  No. 1:22-cv-00951, 2023 WL 2655150 (D. Del. Mar. 27, 2023), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023) ...................20

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................2, 8, 17, 21, 23

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022) ...................................................................24

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ...........................................................9

*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ..........................................................23

*Gould v. Morgan*,
  907 F.3d 659 (1st Cir. 2018) ...........................................................9

*Heller v. District of Columbia* (*Heller II*),
  670 F.3d 1244 (D.C. Cir. 2011) ......................................................18

*Kennedy v. Bremerton School District*,
  142 S. Ct. 2407 (2022) ....................................................................4

*Kipke v. Moore*,
  No. 1:23-cv-01293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) .......................10

*Maryland Shall Issue, Inc. v. Montgomery Cnty.*,
  No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023) .................................10

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ..................................................................8, 23

*Medina v. Whitaker*,
  913 F.3d 152 (D.C. Cir. 2019) ........................................................14

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023).....................................4, 7, 19, 20

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*,
No. 21-12314, 2023 WL 4542153 (July 14, 2023) ...........................................10

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ...1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023) .................................................................................................3, 5

*Or. Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) ...... 4-5, 19

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) .............................................................................3

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) .............................................................................9

*United States v. Meyer*,
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023).......................15

*United States v. Rowson*,
No. 1:22-cr-00310, 2023 WL 431037 (S.D.N.Y. Jan. 27, 2023) .......................20

*We the Patriots, Inc. v. Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023).................. 10-11

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998)..........15

Br. for Indep. Inst. as Amicus Curiae, *N.Y. State Rifle & Pistol Ass'n v. Bruen*,
No. 20-843 (U.S.) .......................................................................................16, 22

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ..............................................................16, 22

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ....................................................................................................12

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010).........11, 13

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ......................................................................13, 15, 16

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) .......................12

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ................................................................12

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ................................................................................................12

Tr. of Oral Arg., *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) ..........................................................................................11

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The District of Columbia's restrictions on large-capacity magazines are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the District's brief, Doc. 2022818 ("District Br."). Everytown submits this amicus brief to expand on three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that large-capacity magazines are protected "arms" within the meaning of the Second

Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation. Although not directly implicated here, given the robust historical record before the Court, Everytown highlights that point in case the Court chooses to address it.

## ARGUMENT

### I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is an "arm" that is "'in common use' today for self-defense," and "whether the 'proposed course of

2

conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2134-35). If so, the court proceeds to consider whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See*, *e.g.*, *Alaniz*, 69 F.4th at 1128 (describing step one as a "threshold inquiry" and explaining that "[i]f the first step is satisfied, we proceed to *Bruen* step two"); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 390 (D.R.I. 2022) (denying preliminary injunction against large-capacity magazine prohibition and noting that, "[b]ecause … [large-capacity magazines] are neither 'Arms' within the meaning of the Second Amendment's text, nor weapons of 'self-defense,'" historical inquiry is unnecessary), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

Contrary to Plaintiffs' apparent contention, *see* Pls.' Br. 23, 25, the burden to satisfy the initial, textual inquiry is on the party challenging a law.[1] *Bruen* makes

---

[1] As the District notes, Plaintiffs did not dispute in the district court that they had the burden at the text step or that "common use" is part of the textual inquiry. District Br. 18 n.7. In this Court, however, Plaintiffs appear to suggest that the

this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said so. Placing the initial burden on the plaintiff also accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421. Accordingly, multiple courts have read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text covers their conduct. *See, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) (holding that "*Bruen* and *Heller* make clear that [p]laintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are '"in common use" today for self-defense' and are typically possessed by law-abiding citizens for that purpose"), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5

---

District bears the burden at least as to "common use." *See* Pls. Br. 25.

4

n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication"), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.); *Ocean State Tactical*, 646 F. Supp. 3d at 385 (explaining that "it is [plaintiffs'] burden to show that large-capacity magazines fall within the purview of the Second Amendment"). This Court should do the same here.

For the reasons set out by the District, Plaintiffs have failed to satisfy their burden to establish that large-capacity magazines are "arms" and are "in common use for self-defense" under *Bruen*'s textual inquiry. *See* District Br. 17-22. Accordingly, this Court may, and should, affirm without proceeding to a historical analysis.

## II.  The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

Plaintiffs' claim fails under *Bruen*'s textual inquiry, and that should end the case. However, if the Court proceeds to inquire whether the District's large-capacity magazine restriction is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2129-30, it may confront the question of whether the most relevant time period for that inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or

the founding era, and the ratification of the Second Amendment in 1791, *id*. at 2138 (reserving the question for a future case). The District has demonstrated that its restriction is entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. But if the Court finds it necessary to decide the question, it should conclude that the most relevant time period for that inquiry centers around 1868 in cases involving federal and D.C. laws, just as in cases involving state laws. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—to encompass consistent later restrictions, given the "dramatic technological changes" and "unprecedented societal concerns" present in this case. *See id*. at 2132.

### a. The Proper Focus for Historical Analysis Is 1868 Rather Than 1791

As the District has explained, its restrictions are entirely consistent with the American tradition of firearms regulation regardless of whether this Court considers 1868 or 1791 the most relevant period. Historical tradition—from the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—is consistent in demonstrating the constitutionality of restrictions on "dangerous and unusual" weapons "relevantly similar" to the large-capacity magazine restrictions challenged here. *See, e.g.*, District Br. 35-47.[2]

---

[2] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the District's

Where, as here, the inquiry into the public understanding in 1791 and 1868 yield the same result, the court need not resolve the issue of the correct time period. *See Bruen*, 142 S. Ct. at 2138 (declining to resolve the timeframe question because the relevant history was consistent between 1791 and 1868); *see also, e.g., Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *30 n.46 (same). Nevertheless, if this Court reaches the question, it should hold that the inquiry centers on 1868—including in challenges, like this one, to D.C. laws or federal laws.

While *Bruen* left open the question of whether founding- or Reconstruction-era history should be the focus of the historical analysis, it made clear that the answer is the same regardless of whether a case involves a state or federal regulation: "[The] individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137. To understand why the 1868 understanding establishes the scope of the right to keep and bear arms in cases challenging the District's laws, it is necessary first to understand why that is correct in cases challenging state laws.

In a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the

---

evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 17-21.

right at the time of its adoption? The U.S. Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; after all, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen*

opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").[3]

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the

---

[3] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Gould*, 907 F.3d at 668 (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27. *Bruen* removed means-ends scrutiny from the analysis but confirmed that the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains sound and consistent with originalist principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*. As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), the later-enacted provision controls to the extent it conflicts with the earlier-enacted provision .… The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations adopted) (citations and quotation marks omitted); *see also Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, No. 1:23-cv-01293, 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8

(D.N.M. Oct. 11, 2023) ("[T]he Court agrees with the Eleventh Circuit [in *Bondi*] … and the district court in *Maryland Shall Issue* that historical sources from the period of the ratification of the Fourteenth Amendment in 1868 are more probative of the scope of the Second Amendment's right to bear arms than those from the Founding Era.").

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the National Rifle Association's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position of leading originalist scholars. *See, e.g.*, Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal

location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").[4] In sum, originalist analysis

---

[4] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintained (pre-*Bruen*) that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government.

compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

The pertinent question in this case, of course, is whether the 1868 understanding should also control in challenges to the District's gun laws, to which the Second Amendment applies directly rather than through the Fourteenth Amendment. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must

---

*See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 14-17.

justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*.[5] But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and

---

[5] Indeed, prior to *Bruen*, this Court assumed that 1791 was the relevant historical touchpoint for reviewing a federal firearm restriction. *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("The Second Amendment was ratified in 1791, so we look to the public understanding of the right at that time to determine if a convicted felon would fall outside the scope of its protection."). At that time, however, it remained an open question whether the Second Amendment standard had to apply uniformly across state and federal governments. By clarifying that the Second Amendment's prohibitions apply equally against the state and federal governments, *see* 142 S. Ct. at 2137, *Bruen* tasked courts with considering a *different* question from the one they considered before: what is the correct temporal focus in *all* Second Amendment challenges, against federal or D.C. laws and state laws alike? Thus, with the benefit of the Supreme Court's commitment to equivalent state and federal standards, this Court can now consider that question on a blank slate.

Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar,

*The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T.

Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15,

2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=376

6917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*,

No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting

that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to

the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was

ratified, then-contemporary understandings of incorporated rights could transform

their meaning not only against the states, but also as to the federal government and

the District. *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular

principle in the Bill of Rights may change its shape in the process of absorption

into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being

absorbed into the Fourteenth Amendment, various rights and freedoms of the

original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing

that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the

federal government"). More recently, Professor Lash wrote—as quoted in *Bruen*—

"When the people adopted the Fourteenth Amendment into existence, they

readopted the original Bill of Rights, and did so in a manner that invested those

original 1791 texts with new 1868 meanings." 142 S. Ct. at 2138 (quoting Lash, manuscript, at 2). On this view, too, 1868 meanings bind the states, the federal government, and the District.

The 1868 view is also consistent with *Bruen*'s instruction on historical methodology through the example of restrictions on firearms in sensitive places. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)— an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[6]

### b.  The Court Should Also Consider Consistent Later History

In addition to concluding that 1868, rather than 1791, should be the focus of the historical analysis, this Court should also recognize that 1868 is not a cutoff,

---

[6] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

and that consistent later history is also highly relevant.[7] Indeed, *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory

_____

[7] Nor is 1868 a starting line for the inquiry. Both *Heller* and *Bruen* examined history preceding even 1791. *See Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45. And the District correctly points to such history in its brief. *See, e.g.*, District Br. 36-38.

authority) settle the meaning of the Second Amendment right and demonstrate that the challenged law is constitutional.[8]

Furthermore, *Bruen* counsels that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the

---

[8] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to conclude that 1791 is the correct focus for historical analysis. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding. Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137.

time period a court is examining, then self-evidently there will be no historical

laws addressing the development or concern to be found in that period.

Plaintiffs suggest that this Court should disregard the wealth of 20th-century

laws that operated just as the challenged laws do. *See* Pls.' Br. 44-52. But that

approach is profoundly mistaken. As the District explains, and the district court

recognized, the challenged measure was adopted in response to the exponential

increase in the lethality of firearms and magazines—*i.e.*, "dramatic technological

changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[],"

*id.*, that followed, namely, an epidemic of mass shootings. *See* District Br. 15, 30-

35; D. Ct. Dkt. 28, at 27; *see also, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at

*36-39 (finding that "modern-day [large-capacity magazines] represent a dramatic

technological change from the Founding and Reconstruction-era firearms" and that

"mass shootings related to [large-capacity magazines] are an unprecedented

societal concern"); *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *29 (reaching

same conclusion in denying plaintiffs' preliminary injunction motion as to

Connecticut assault weapon large-capacity magazine laws). A "more nuanced

approach" to history, *Bruen*, 142 S. Ct. 2132, and "a broader search for historical

analogies" is thus fully warranted, *United States v. Rowson*, No. 1:22-cr-00310,

2023 WL 431037, at *24 (S.D.N.Y. Jan. 27, 2023).

Here, state and local laws from the period beginning around Reconstruction and continuing into the Prohibition era and later—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the District's laws. *See* District Br. 40-47 (discussing late 19th- and early 20th-century regulation of weapons and weapon capacity, which were consistent with earlier laws restricting access to weapons and weapon features associated with crime); *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *26, *31-33 (upholding Connecticut's laws restricting assault weapons and large-capacity magazines because they "pose a comparable burden to relevantly similar historical analogues for comparably justified reasons," and, in doing so, relying on both late 19th- and early 20th-century weapons laws); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951, 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023) (relying on consistent 20th-century history to uphold similar Delaware laws), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023). And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like the District's.

**III.  This Court Should Reject Any Effort To Dismiss the District's Historical Analogues as "Outliers"**

Challengers in this and other recent Second Amendment cases have sought to dismiss historical regulations as too few in number to establish a historical tradition under *Bruen*. *See, e.g.*, Pls.' Br. 44-49 (arguing that a "smattering of Prohibition-era laws designed to regulate machine guns" are insufficient to establish a historical tradition). Even if that position were correct, it is not implicated in this case, given the robust and extensive record of historical laws. *See, e.g.*, District Br. 36-43. But to the extent this Court wishes addresses the issue, to guide judges in cases with less extensive records, it should observe that a small number of laws can establish a tradition in light of *Bruen*'s discussion of the historical laws justifying sensitive places.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen*

(No. 20-843).[9] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[10] Under *Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient to establish this nation's tradition of firearm regulation, at least so long as there is not overwhelming affirmative evidence of an enduring tradition to the contrary.[11]

---

[9] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, 142 S. Ct. at 2133.

[10] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 23-24 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[11] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to possess large-capacity magazines.

Concluding that a small number of state and local laws can demonstrate a "public understanding" of a limitation on the Second Amendment right is also consistent with bedrock federalism principles that entitle a state to effectuate the policy choice of its citizens within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly,

while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[12]

## CONCLUSION

The Court should affirm the district court's decision.

Dated: October 26, 2023

Respectfully submitted,

/s/ Priyanka Gupta Sen
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Eleuthera O. Sa
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8201
psen@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

*Counsel for amicus curiae*
*Everytown for Gun Safety*

---

[12] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,142 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

/s/ Priyanka Gupta Sen
Priyanka Gupta Sen
*Counsel for amicus curiae*
*Everytown for Gun Safety*


## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Priyanka Gupta Sen
Priyanka Gupta Sen
*Counsel for amicus curiae*
*Everytown for Gun Safety*