[ORAL ARGUMENT NOT YET SCHEDULED]
No. 23-7061

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

ANDREW HANSON, *et al.*,

*Plaintiffs-Appellants*,

v.

THE DISTRICT OF COLUMBIA, et al.,

*Defendants-Appellees.*

————————

On Appeal from the United States District Court,
District of Columbia
No. 22-cv-2256

————————

## BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

————————

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

October 30, 2023

Timothy C. Hester
    *Counsel of Record*
Daniel Weltz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com
dweltz@cov.com

*Counsel for Amici Curiae*

(*Additional Counsel Listed on Inside Cover*)

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

## <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

(A) **Parties and Amici:** Except for *Amicus Curiae* United States Conference of Mayors, *Amicus Curiae* Everytown for Gun Safety and *Amici Curiae* Massachusetts, New Jersey, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont and Washington, all parties, intervenors and *amici* appearing before the district court and in this Court are listed in the Brief for Appellees. Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, and March for Our Lives have moved to participate as *amici*.

(B) **Rulings Under Review:** References to the rulings under review appear in the Brief for Appellees.

(C) **Related Cases:** References to any related cases pending before this Court appear in the Brief for Appellees.

### TABLE OF CONTENTS

CERTIFICATION PURSUANT TO RULE 29(a)(4)(E) ........................................ 1

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION ................................................................................................ 1

I.    THE CHALLENGED LAW DOES NOT IMPLICATE THE
      SECOND AMENDMENT BECAUSE LCMS ARE NOT IN
      COMMON USE FOR LAWFUL SELF-DEFENSE. .................................. 2

      A.    The Second Amendment Right Articulated in *Bruen* and *Heller*
            Is Based on Lawful "Self-Defense." .................................... 2

      B.    Plaintiffs Make No Showing That LCMs Are In Common Use
            for Lawful Self-Defense. ...................................................... 5

II.   THE CHALLENGED LAW IS CONSISTENT WITH THE
      HISTORICAL TRADITION OF FIREARM REGULATION. .................... 8

      A.    *Bruen* Requires a "More Nuanced Approach" to Historical
            Analysis in Light of "Dramatic Technological Change" or
            "Unprecedented Societal Concerns." ................................... 9

      B.    Modern Firearms Capable of Firing Repeatedly Without
            Reloading Reflect "Dramatic Technological Change" Requiring
            a "More Nuanced Approach" Under *Bruen*. ..................... 10

            1.    Firearms capable of firing repeatedly without reloading
                  were not widespread among civilians until at least the
                  late 19th century. ...................................................... 10

            2.    Modern firearms capable of firing repeatedly without
                  reloading reflect "dramatic technological change"
                  resulting in "unprecedented societal concerns." ..................... 20

      C.    The Challenged Law Is "Relevantly Similar" to Early 20th
            Century Laws Restricting Weapons Capable of Firing
            Repeatedly Without Reloading. ........................................ 23

USCA Case #23-7061    Document #2024325    Filed: 10/30/2023    Page 5 of 46

D.    The Challenged Law Is Relevantly Similar To 18th and 19th Century Historical Laws and Thus Is Constitutional. ........................ 26

CONCLUSION ..................................................................................... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. State*,
　　50 Tenn. 165 (1871)............................................................26

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New
　　Jersey*,
　　910 F.3d 106 (3d Cir. 2018) ................................................5

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New
　　Jersey*,
　　974 F.3d 237 (3d Cir. 2020) ..............................................12

*Bevis v. City of Naperville*,
　　No. 22-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023).........................25, 28

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety &
　　Homeland Sec.*,
　　No. 22-cv-951-RGA, 2023 WL 2655150 (D. Del. Mar. 27,
　　2023) ...............................................................4, 22, 23, 25, 26, 28

*District of Columbia v. Heller*,
　　554 U.S. 570 (2008).........................................2, 3, 4, 5, 8, 9, 28

*Duncan v. Bonta*,
　　19 F.4th 1087 (9th Cir. 2021) ..............................................5

*English v. State*,
　　35 Tex. 473 (1871)..............................................................26

*Hanson v. District of Columbia*,
　　No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20,
　　2023) ...........................................................4, 5, 7, 23, 25, 26

*Heller v. District of Columbia* (*Heller II*),
　　670 F.3d 1244 (D.C. Cir. 2011)...........................................24

*Herrera v. Raoul*,
　　No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ........................22

iv

*Hill v. State*,
    53 Ga. 472 (1874) ................................................26

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...................................5

*Nat'l Ass'n for Gun Rights v. Lamont*,
    No. 3:22-1118, 2023 WL 4975979 (D. Conn. Aug. 3,
    2023) ....................................................5, 8, 22, 23, 24, 28

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct. 2111 (2022)............ 1, 2, 3, 4, 5, 7, 8, 9, 10, 21, 22, 23, 25, 26, 28, 29,

*Ocean State Tactical, LLC v. State of Rhode Island*,
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022)........4, 5, 7, 8 10, 22

*Oregon Firearms Fed'n v. Kotek*,
    No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14,
    2023) ....................................................4, 5, 7, 23, 26, 28

*Rocky Mountain Gun Owners v. Polis*,
    467 P.3d 314 (Colo. 2020) ......................................5, 6

*State v. Jumel*,
    13 La. Ann. 399 (1858).........................................26

*State v. Langford*,
    10 N.C. 381 (1824) .............................................26

*State v. Misch*,
    214 Vt. 309 (2021)............................................5, 6

*State v. Mitchell*,
    3 Blackf. 229 (Ind. 1833)......................................26

*State v. Reid*,
    1 Ala. 612 (1840) .............................................26

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ...................................4

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019).....................................5, 6

**Statutes**

Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130...............................24

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256 ......................................24

Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887.........................................24

Act of July 8, 1932, Pub. L. No. 72-275 47 Stat. 650 .............................................24

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245.......................................25

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189 ..................................................25

D.C. Code Section 7-2506.01(b)...............................................................................1

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236........................25

**Other Authorities**

@NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, TWITTER
(Oct. 21, 2018, 9:01 AM), https://perma.cc/6H68-TF7Y ...................................11

*Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF ...........................6

*Bennett & Havilland Revolving Rifle*, Fandom: Military Wiki,
https://perma.cc/D68U-MSGU ........................................................................15

*Chain Guns—I*, Firearms History, Technology & Development Blog
(July 23, 2014), https://perma.cc/MT7P-JP5L .................................................18

Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques
& Collectibles, https://perma.cc/E3K8-W3LH .................................................13

Chip Lohman, *The History of Colt*, NRA (Jan. 17, 2017),
https://perma.cc/TV6L-HSMV .........................................................................13

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd
Amendment Was Written*, Wash. Post (June 13, 2016),
https://perma.cc/H6X5-C2NL ..........................................................................20

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns
Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM ...........................6

*Colt Paterson Revolver, Called The "Texas Colt"*, The Bryan
 Museum, https://perma.cc/2AG4-MCMM ..........................................14

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*,
 Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M .....................21

Dan Zimmerman, *Is the 48-Shot Enouy the Most Unusual Revolver in
 History?*, The Truth About Guns (Oct. 18, 2015),
 https://perma.cc/6FW9-J27J ..................................................16

Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co.
 (Jan. 16, 2019), https://perma.cc/2ERY-26CX....................................13

Declaration of Brian DeLay, *Sullivan v. Ferguson*, No. 3:22-cv-05403
 (W.D. Wash. Sept. 1, 2023) (ECF No. 128)................................10, 19

Declaration of Edward Troiano, *Ocean State Tactical, LLC v. State of
 Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No.
 19-3)........................................................................7

Declaration of James W. Johnson, *Kolbe v. O'Malley*, No. 1:13-cv-
 02841 (D. Md. Feb. 14, 2014) (ECF No. 44-3)...................................7

Declaration of Lucy P. Allen, *Sullivan v. Ferguson*, No. 3:22-cv-
 05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1) ........................6

Declaration of Michael Vorenberg, *Ocean State Tactical, LLC v. State
 of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF
 No. 19-2)...................................................................10

Declaration of Randolph Roth, *Nat'l Ass'n for Gun Rights v.
 Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No.
 21-9)....................................................................21, 27

Declaration of Robert Spitzer, *Nat'l Ass'n for Gun Rights v.
 Campbell*, 1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-
 10) ................................................... 11, 12, 13, 16, 19, 25

Declaration of Robert Spitzer, *Sullivan v. Ferguson*, No. 3:22-cv-
 05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1) ..................24, 25, 27

Declaration of Roger Pauly, *Oregon Firearms Federation, Inc.*, No.
 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120).........................21

*Enouy's Percussion Revolver*, Firearms Curiosa,
https://perma.cc/2RJ7-2G2S ............................................................16

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS ..............................................................................................20

*Firearms History and the Technology of Gun Violence*, UC Davis
Library, https://perma.cc/YHZ6-8QPG ............................................20

Forgotten Weapons, *Harmonica Pinfire Pistols*, YouTube (Sept. 2, 2014), https://www.youtube.com/watch?v=y-N1MRFnByQj ..........17

Forgotten Weapons, *Porter Turret Rifle (2nd Variation) - Unsafe in Any Direction*, YouTube (March 7, 2018),
https://www.youtube.com/watch?v=Wm_1Ny6r6zg. .......................15

Frank Jardim, *Wonder Gun That Never Was*, Guns Magazine,
https://perma.cc/NJY7-HTFR...............................................................11

Giffords Law Center, *Large Capacity Magazines*, Giffords,
https://perma.cc/3DKL-ZJMS .............................................................22

*'Harmonica' Pistol From The 1860s Stars In Our Weekly Pick of Five Auction Highlights*, Antiques Trade Gazette,
https://perma.cc/Y35T-UY7G ..............................................................16

Ian McCollum, *RIA: Porter Turret Rifle, Forgotten Weapons* (Feb. 7, 2016), https://perma.cc/N5J5-R93H...............................................15

*Jarre Model: Harmonica Gun*, Genitron.com,
https://perma.cc/KW8Y-SY89...............................................................16

John Paul Jarvis, *Bennett & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain* (Apr. 3, 2012), https://perma.cc/6FLX-AE5G ..............................................................................................14

John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure* (Mar. 15, 2011), https://perma.cc/57AB-X2BE ................................12

John Sammon, *The Case for Caselessness: The Volcanic Rifle* (April 19, 2011), https://perma.cc/462K-M6TA ........................................16

viii

*Josselyn Revolver—Patent Protype*, FLicense Blog (Sept. 23, 2014),
    https://perma.cc/8CRB-7XH7 ....................................................................18

*Lot 1099: Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock
    Island Auction Co., https://perma.cc/43X5-EKSG. ...........................15

*Lot 1318: A. Jarre Harmonica Pistol 7 mm pinfire*, Rock Island
    Auction (Sept. 12, 2014), https://perma.cc/Q47Q-3MQB ................17

*Old West Firearms—Weapons Locker*, writeups.org,
    https://perma.cc/RHY4-7GX4 ...................................................................18

*Original U.S. Civil War French M1854 Lefaucheux Cavalry Model
    12mm Pinfire Revolver with Round*, Int'l Military Antiques,
    https://perma.cc/58KW-PHS7 ...................................................................18

*Pistol Harmonica (Harmonica Pistol)*, Top War (Feb. 6, 2014),
    https://perma.cc/RA2P-7ACR ...................................................................17

*POTD: Very Rare Hall 15 Round Percussion Revolving Rifle*, All
    Outdoor (June 18, 2021),
    https://www.alloutdoor.com/2021/06/18/potd-rare-hall-revolving-
    rifle/.............................................................................................................15

*Rare Alexander Hall Percussion Revolving Rifle*, Cowan's,
    https://perma.cc/T4F3-49KM; .....................................................................15

*Rare 20-Shot Lefaucheux "High Capacity" Pin Fire Revolver*,
    College Hill Arsenal, https://perma.cc/TNY6-8PTL.............................17

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right
    to Keep Arms in Early America: The Legal Context of the Second
    Amendment*, 25 Law & Hist. Rev. 139 (2007) ...................................27

Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube
    (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-
    CSTCwo........................................................................................................12

Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020),
    https://perma.cc/7STW-8WMS ...............................................................19

Seth Isaacson, *The Colt Paterson and Its Predecessors*, Rock Island
    Auction Company (Aug. 19, 2022), https://perma.cc/ZFH3-6G62....................14

Waheed UK, *Puckle Gun: A Machine Gun Built 70 Years Before the 2nd Amendment*, Blade City: Blog, https://perma.cc/8Q9S-5NYN ...................11

*Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62 ..............................13

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN ..............................................................19

## <u>GLOSSARY</u>

LCM                Large-capacity magazine.

NRA                National Rifle Association.

## CERTIFICATION PURSUANT TO RULE 29(a)(4)(E)

Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici curiae* certify that (a) no party's counsel authored this brief in whole or in part, (b) no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and (c) no person other than *amici*, its members, and its counsel contributed money that was intended to fund preparing or submitting the brief.

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are national gun violence prevention organizations. Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action. Giffords Law Center to Prevent Gun Violence, a national organization founded more than 30 years ago, promotes and defends the laws and policies proven to reduce gun violence. March for Our Lives is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies.

## INTRODUCTION

D.C. Code Section 7-2506.01(b) (the "Challenged Law"), which prohibits certain large-capacity magazines ("LCMs") capable of accepting more than ten rounds of ammunition, is constitutional under the Second Amendment because LCMs are not "'in common use' today for self-defense." *New York State Rifle &*

1

*Pistol Association v. Bruen*, 142 S. Ct. 2111, 2134 (2022) (*quoting District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). *See* Part I, *infra*.

Beyond that fundamental and dispositive point, the Challenged Law is also constitutional because it is "relevantly similar" to restrictions on firearms capable of firing repeatedly without reloading, which proliferated in the early 20th century once civilians began to gain widespread access to these weapons. *See* Part II.C, *infra*. The Challenged Law is also "relevantly similar" to 18th and 19th century regulations that limited *what* weapons could lawfully be possessed, *where* firearms could be carried, and the *manner* in which firearms could be carried. *See* Part II.D, *infra*.

## **ARGUMENT**

## I.   THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE LCMS ARE NOT IN COMMON USE FOR LAWFUL SELF-DEFENSE.

Plaintiffs make no showing that LCMs are "in common use" for lawful self-defense, *Bruen*, 142 S. Ct. at 2134, nor could they. Accordingly, as the district court correctly recognized, the Challenged Law raises no Second Amendment issue, and Plaintiffs' claims should be rejected at the threshold, as a matter of law, for failure to demonstrate that LCMs are commonly used for lawful self-defense.

### A.   The Second Amendment Right Articulated in *Bruen* and *Heller* Is Based on Lawful "Self-Defense."

Plaintiffs assert that "[t]he Second Amendment protects the possession and use of weapons that are in common use at the time," and that if LCMs are

2

"commonly possessed" this "should end the *Bruen* inquiry," regardless of whether LCMs are commonly used for lawful self-defense.  Initial Brief of Appellants 23 ("Br.") (quotations omitted).

Plaintiffs flatly misstate the scope of the Second Amendment as articulated in *Bruen* and *Heller*.  *Bruen* defines the Second Amendment as "protect[ing] an individual right to keep and bear arms ***for self-defense***."  142 S. Ct. at 2125.[1]  The Court's analysis in *Bruen* revolved around the "individual right to ***armed self-defense***," *id*. at 2128, and "whether modern and historical regulations impose a comparable burden on the right of ***armed self-defense***."  *Id*. at 2133.  And it broadly recognized "[t]he constitutional right to bear arms in public ***for self-defense***."  *Id*. at 2156.  Justice Alito made the point plainly: "All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home ***for self-defense***."  *Id*. at 2159 (Alito, J., concurring).

Plaintiffs (Br. 23) quote a phrase out of context in *Bruen*, where the Court, quoting from *Heller*, stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"  142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).  In context, the Court was referring to weapons "in common use" ***for self-defense***.  The phrase Plaintiffs quote appears in a paragraph in which the Court restates *Heller*'s holding "that the Second Amendment

---

[1] All emphases added unless otherwise noted.

3

protected an individual right *to armed self-defense*." *Id*. And the following paragraph ends with a quote—also from *Heller*—that "the Second Amendment did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans *for self-defense* in the home.'" *Id*. (quoting *Heller*, 554 U.S. at 629); *see also id.* at 2125 ("In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*.").

As the trial court found, the "critical question" under *Bruen* is whether LCMs "are commonly used or are useful specifically *for self-defense*." *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777, *7 (D.D.C. Apr. 20, 2023), *appeal docketed*, No. 23-7061 (D.C. Cir. May 17, 2023). *See also United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) ("*Bruen* step one involves a threshold inquiry" into "whether the weapon at issue is '"in common use" today *for self-defense*'"); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, No. 22-cv-951-RGA, 2023 WL 2655150, *4 (D. Del. Mar. 27, 2023), *appeal docketed*, No. 23-1633 (3d Cir. Apr. 7, 2023) ("the Second Amendment extends only to bearable arms that are in common use for *self-defense* today" (quotations omitted)). *Accord Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, *11 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35479 (9th Cir. July 17, 2023); *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022

WL 17721175, *11 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023); *Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-1118, 2023 WL 4975979, *16 (D. Conn. Aug. 3, 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023).

Plaintiffs are therefore wrong in suggesting that the Second Amendment right extends to all firearms that are "commonly possessed." Br. 23. The Second Amendment, as *Bruen* and *Heller* establish, applies only to "commonly used firearms ***for self-defense***." *Bruen*, 142 S. Ct. at 2138.

## B. Plaintiffs Make No Showing That LCMs Are In Common Use for Lawful Self-Defense.

Plaintiffs have made no showing that LCMs are in common use today for lawful self-defense—nor could they. Empirical research, thoroughly examined by numerous courts,[2] establishes that LCMs are not in common use for self-defense— and in fact are almost never used for this purpose—because the ability to fire more than ten rounds without reloading is empirically unnecessary for self-defense. A

---

[2] *See Lamont*, 2023 WL 4975979, *21; *Ocean State Tactical, LLC*, 2022 WL 17721175, *16; *Hanson*, 2023 WL 3019777, *10-12; *Kotek*, 2023 WL 4541027, *32-33; *Duncan v. Bonta*, 19 F.4th 1087, 1104-05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *State v. Misch*, 214 Vt. 309, 356-57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).

database maintained by the National Rifle Association ("NRA") of "armed citizen" accounts demonstrates that the use of more than ten rounds of ammunition for self-defense is "extremely rare."[3]   Studies of this database establish that the average number of shots fired by civilians in self-defense was about *two*.[4]   Of 736 self-defense incidents from January 2011 to May 2017 reflected in the NRA database, the defender was reported to have fired more than ten bullets in only "*two* incidents (0.3% of all incidents)."[5]

Numerous court rulings have found no evidence that firing more than ten bullets without reloading is necessary for self-defense.  *See*, *e.g.*, *Worman*, 922 F.3d at 37 ("not one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired"); *Duncan*, 19 F.4th at 1104-05 ("The use of more than ten bullets in defense of the home is *'rare,'* or *non-existent*." (citations omitted)); *Rocky Mountain Gun Owners*, 467 P.3d at 331 ("[I]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." (quotations and citation omitted)); *Misch*, 214 Vt. at 356

---

[3] Declaration of Lucy P. Allen at 2-3, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1) [hereinafter "Allen Decl."]; *see also Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF.

[4] *See* Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM (average of 2.2 defensive shots fired per incident from 1997 to 2001); Allen Decl., *supra* note 3, at 3-4 (same, from January 2011 to May 2017).

[5] Allen Decl., *supra* note 3, at 4.

("it appears from the available data that . . . the large-capacity magazine . . . is **almost never used for self-defense**").

Experts have similarly testified that the ability to fire more than ten rounds without reloading is unnecessary and almost unheard of for self-defense. *See* Declaration of Edward Troiano ¶ 10, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3) ("I am unaware of **any incident** in which a civilian has **ever** fired as many as 10 rounds in self-defense."); Declaration of James W. Johnson ¶¶ 30-31, *Kolbe v. O'Malley*, No. 1:13-cv-02841 (D. Md. Feb. 14, 2014) (ECF No. 44-3) (then-Baltimore County Police Chief testifying that he was "**unaware of any self-defense incident**" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense").

Courts evaluating LCM restrictions since *Bruen*, including the trial court in this case, have repeatedly held that LCMs are not commonly used for self-defense, and therefore that restrictions on LCMs do not implicate the Second Amendment. *See Hanson*, 2023 WL 3019777, *12 ("the Second Amendment does not cover LCMs because they are not typically possessed for self-defense"); *Kotek*, 2023 WL 4541027, *33 ("the Second Amendment's plain text does not cover LCMs" because "Plaintiffs have not shown that LCMs are commonly employed for self-defense").

*Accord Lamont*, 2023 WL 4975979, *2; *Ocean State Tactical, LLC*, 2022 WL 17721175, *14.

In short, Plaintiffs do not and cannot demonstrate that LCMs are needed or are commonly used for "armed self-defense," and accordingly have failed to show that the Challenged Law implicates their Second Amendment rights as articulated in *Bruen* and *Heller*. This Court need go no further than this dispositive point to affirm the judgment of the district court.

## II.    THE CHALLENGED LAW IS CONSISTENT WITH THE HISTORICAL TRADITION OF FIREARM REGULATION.

Because Plaintiffs have not shown that LCMs are in common use for lawful self-defense, and where there is ample evidence they are not, the burden never shifts to the government under the second prong of *Bruen* to demonstrate that the Challenged Law is "consistent with this Nation's historical tradition of firearm regulation," 142 S. Ct. at 2126. That analogical step is only pertinent in evaluating restrictions that implicate the Second Amendment. *Id.* at 2134.

But even if the Court reaches *Bruen*'s second prong, the Challenged Law is "relevantly similar," *id.* at 2132, to historical laws that regulated arms without unduly burdening armed self-defense. As *Bruen* recognized, "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," *id.* at 2138.

8

"Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

**A.    *Bruen* Requires a "More Nuanced Approach" to Historical Analysis in Light of "Dramatic Technological Change" or "Unprecedented Societal Concerns."**

*Bruen* instructed courts to adopt a "more nuanced approach" to historical analysis when confronted with cases "implicating unprecedented societal concerns or dramatic technological change," because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. at 2132. This analysis asks whether challenged regulations are "relevantly similar" to historical analogues, based on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2132-33. It "requires only that the government identify a well-established and representative historical ***analogue***, not a historical ***twin***. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133 (emphases in original).

9

**B.    Modern Firearms Capable of Firing Repeatedly Without Reloading Reflect "Dramatic Technological Change" Requiring a "More Nuanced Approach" Under *Bruen*.**

Modern firearms capable of firing repeatedly without reloading reflect the kind of dramatic technological change that *Bruen* held requires a "more nuanced approach" to historical analysis.

**1.    *Firearms capable of firing repeatedly without reloading were not widespread among civilians until at least the late 19th century.***

No firearm capable of firing ten rounds or more without reloading was broadly available to civilians in the United States before at least the late 19th century. Such firearms "constituted less than 0.002% of all firearms in the United States as late as 1872." Declaration of Brian DeLay ¶ 58, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 128) [hereinafter "DeLay Decl."]. Furthermore, legal possession of such firearms before the late 19th century "was limited almost exclusively to U.S. soldiers and civilian law enforcement officers." Declaration of Michael Vorenberg ¶ 43, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-2).

Without any record support, Plaintiffs misleadingly assert that "[f]irearms with greater than ten round capacities ***existed*** even before our Nation's founding." Br. 34 (quotations omitted). However, these experimental firearms were not widely available to civilians prior to at least the late 19th century, and were generally of

10

almost no practical use for any purpose, much less lawful self-defense. Plaintiffs'
reliance on these impractical and generally unavailable weapons demonstrates the
weakness of their position:

- **Wheel-lock firearm (1580).** Plaintiffs claim (Br. 34) that "[t]he first
  known firearm able to fire more than ten rounds without reloading was a
  sixteen-shooter created around 1580." However, this wheel-lock firearm
  was "anything but common," *see* Declaration of Robert Spitzer ¶ 38, *Nat'l
  Ass'n for Gun Rights v. Campbell*, 1:22-cv-11431 (D. Mass. Jan. 31, 2023)
  (ECF No. 21-10) [hereinafter "Spitzer *Campbell* Decl."], and according to
  the NRA "might have been affordable only [to] kings and nob[i]lity."[6]

- **Puckle gun (1658).** Plaintiffs assert (Br. 34-35) that "[o]ne of the more
  successful of the early designs [for multi-shot guns] was the 'Puckle
  Gun.'" However, the Puckle gun barely made it out of the prototype phase
  as a result of mechanical problems,[7] and was so heavy it could not be

---

[6] @NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, Twitter (Oct. 21,
2018, 9:01 AM), https://perma.cc/6H68-TF7Y.

[7] Waheed UK, *Puckle Gun: A Machine Gun Built 70 Years Before the 2nd
Amendment*, Blade City: Blog, https://perma.cc/8Q9S-5NYN.

carried by a single person.[8]  Only two Puckle guns were ever known to have been built (they were both sold to a British duke).[9]

- **<u>Girandoni air rifle (1779).</u>**  Plaintiffs claim (Br. 35) that the Girandoni air rifle was used by European armies in the late 18th century and "was being used outside the military context" by the early 19th century.  But in reality, the Girandoni air rifle was a military firearm that was impractical for civilian use because it required a wagon-mounted pump filled with water to sustain the pressure needed to operate; without the pump, the rifle required nearly 1,500 manual hand pumps to restore power.[10]  Only 1,500 or so were ever built.  Spitzer *Campbell* Decl. ¶ 42.

- **<u>Jennings multi-shot flintlock (1821).</u>**  Plaintiffs cite the Jennings multi-shot flintlock rifle (Br. 35-36) as an example of 19th century "technolog[ical] progress[]."  However, "[t]echnical challenges" limited the viability of the Jennings rifle."  *Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 255 (3d Cir. 2020), *judgment vacated on other grounds*, 142 S. Ct. 2894 (2022) (Matey, J.,

---

[8]  Frank    Jardim,    *Wonder    Gun    That    Never    Was*,    Guns    Magazine, https://perma.cc/NJY7-HTFR (describing the firearm as "really, a small cannon").
[9] *Id*.
[10]  John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (Mar. 15, 2011), https://perma.cc/57AB-X2BE.

dissenting). Just 521 were ever produced (for use by the New York militia), and the weapon was considered to be "anything but a common firearm."[11]

- **Pepperbox-style pistol (1830s).** Plaintiffs claim (Br. 35-36) that manufacturers in the 1830s began marketing "pepperbox" pistols capable of firing as many as 24 rounds, and that "Pepperboxes were commercially successful." However, Pepperbox pistols could generally fire just five or six rounds without reloading.[12] Although a Belgian Pepperbox pistol with 24 different barrels was manufactured, it was "monstrously unwield[y]."[13] Moreover, Pepperbox pistols were notorious for their shortcomings: the pistol's accuracy did not extend "much beyond the width of a poker table"[14]; its firing power was extremely modest[15]; and it was so unreliable that at times all of its barrels would fire at the same time (a dangerous

---

[11] Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo.

[12] Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques & Collectibles, https://perma.cc/E3K8-W3LH.

[13] *Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62; Worman, *supra* note 12.

[14] Worman, *supra* note 12.

[15] Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX.

13

defect known as "chain-firing").[16]    Pepperbox pistols were not "commercially successful" and faded from view in the early 19th century because they were "heavy, lumpy, and impractical."  Spitzer *Campbell* Decl. ¶ 45 (citations omitted).

- **Colt revolvers (1830s).**  Plaintiffs claim that Colt revolvers (Br. 36) were invented in the 1830s and surpassed Pepperbox pistols in the marketplace. However, the first Colt revolver, the Paterson (patented in 1836), could hold just six rounds.[17]  Moreover, the Paterson suffered from numerous shortcomings:  it was prone to jamming, was expensive to manufacture, and required the shooter to cock the hammer between each round (unlike modern semi-automatic firearms).[18]  The Paterson also suffered from a "lack of firepower" as the "gun was not strong enough to inflict wounds sufficiently heavy to take an enemy combatant out of the fight."[19]  Colt's company went bankrupt six years after the Paterson was patented due to its significant "design flaws."[20]

---

[16] *Id.*

[17] Chip Lohman, *The History of Colt*, NRA (Jan. 17, 2017), https://perma.cc/TV6L-HSMV.

[18] Seth Isaacson, *The Colt Paterson and Its Predecessors*, Rock Island Auction Company (Aug. 19, 2022), https://perma.cc/ZFH3-6G62.

[19] *Colt Paterson Revolver, Called The "Texas Colt"*, The Bryan Museum, https://perma.cc/2AG4-MCMM.

[20] Isaacson, *supra* note 18.

14

- **<u>Bennet and Haviland Rifle (1838).</u>** Plaintiffs refer to the Bennet & Haviland Rifle (Br. 36), which they claim began circulating in 1838. However, the weapon's design was "inherently unsafe" for the gunman; using the rifle was known to be as "safe as juggling chainsaws."[21] The rifle "could potentially fire backwards, forwards and to either side," which meant that "if a chain fire did occur (which was not unheard of)" it could result in severe injury or death for the gunman.[22] Experts estimate that fewer than ten of these rifles were made before it "faded into obscurity."[23]

- **<u>Hall and Porter rifles (1850s).</u>** Plaintiffs cite rifles invented by Alexander Hall and Colonel Parry W. Porter (Br. 36). However, like the Bennet and Haviland rifle, the Porter rifle was inherently unsafe for the gunman.[24] The rifle had "radial chambers" with at least one chamber pointing back at the shooter[25]—"the notion of having a loaded chamber pointing at your face was less than appealing to most people."[26] Only approximately 1,250

---

[21] John Paul Jarvis, *Bennett & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain*, Guns.com (Apr. 3, 2012), https://perma.cc/6FLX-AE5G.

[22] *Id.*

[23] *Bennett & Havilland Revolving Rifle*, Fandom: Military Wiki, https://perma.cc/D68U-MSGU.

[24] Ian McCollum, *RIA: Porter Turret Rifle, Forgotten Weapons* (Feb. 7, 2016), https://perma.cc/N5J5-R93H.

[25] *Id.*

[26] *Id.*

Porter rifles were ever produced.[27]  The Hall rifle was also "extremely scarce"[28] and had the same "giant flaw" as the Bennet and Haviland rifle and Porter rifle because it could shoot the user.[29]

- **Volcanic Arms lever-action rifle (1855).**  Plaintiffs refer to the lever-action rifle produced by the Volcanic Repeating Arms Company (Br. 37). However, the rifle was "[u]npopular because of its unreliability"—"it suffered from design defects including gas discharge around the breech and misfires."[30]  Volcanic rifles were "few, flawed, and experimental," and as a result of their "radical defects" only 3,200 were ever produced.  Spitzer *Campbell* Decl. ¶ 43 (citation omitted).

- **Enouy Ferris wheel revolver (1855).**  Plaintiffs refer to a 42-round Enouy "Ferris wheel" revolver (Br. 39).  However, this revolver was "very impractical" because the firearm was "incredibly weighty even when

---

[27] Forgotten Weapons, *Porter Turret Rifle (2nd Variation) - Unsafe in Any Direction*, YouTube (March 7, 2018), https://www.youtube.com/watch?v=Wm_1Ny6r6zg.

[28] *Rare Alexander Hall Percussion Revolving Rifle*, Cowan's, https://perma.cc/T4F3-49KM; *see also Lot 1099: Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock Island Auction Co., https://perma.cc/43X5-EKSG.

[29] *POTD: Very Rare Hall 15 Round Percussion Revolving Rifle*, All Outdoor (June 18, 2021), https://www.alloutdoor.com/2021/06/18/potd-rare-hall-revolving-rifle/ ("if all chambers of the cylinder start going boom on their own you can just as well say "bye-bye arm!")

[30] John Sammon, *The Case for Caselessness: The Volcanic Rifle*, Guns.com (Apr. 19, 2011), https://perma.cc/462K-M6TA.

unloaded" and "the balance of the weapon was completely put off by the positioning of the wheel."[31]  There are no records of this firearm ever being manufactured or sold commercially.[32]

- **Jarre harmonica pistol (1862).**  Plaintiffs refer to the Jarre harmonica pistol (Br. 39).  The Jarre pistol was "short-lived"[33] and "rare"[34] because it had significant flaws:  the cartridges could easily become damaged and malfunction; rounds could be discharged inadvertently when the firearm was handled; and it was "awkward" to operate because of its unique design (the firearm resembled a harmonica).[35]  The Jarre pistol was also "clumsy" and "difficult to carry,"[36] and was considered "far too cumbersome for a defensive pistol."[37]  As a result, the Jarre pistol never gained popularity.[38]

---

[31] *Enouy's Percussion Revolver*, Firearms Curiosa, https://perma.cc/2RJ7-2G2S.

[32] Dan Zimmerman, *Is the 48-Shot Enouy the Most Unusual Revolver in History?*, The Truth About Guns (Oct. 18, 2015), https://perma.cc/6FW9-J27J.

[33] *Jarre Model: Harmonica Gun*, Genitron.com, https://perma.cc/KW8Y-SY89.

[34] *'Harmonica' Pistol From The 1860s Stars In Our Weekly Pick of Five Auction Highlights*, Antiques Trade Gazette, https://perma.cc/Y35T-UY7G.

[35] Forgotten Weapons, *Harmonica Pinfire Pistols*, YouTube (Sept. 2, 2014), https://www.youtube.com/watch?v=y-N1MRFnByQj; *Pistol Harmonica (Harmonica Pistol)*, Top War (Feb. 6, 2014), https://perma.cc/RA2P-7ACR.

[36] Forgotten Weapons, *supra* note 35.

[37] *Lot 1318: A. Jarre Harmonica Pistol 7 mm pinfire*, Rock Island Auction (Sept. 12, 2014), https://perma.cc/Q47Q-3MQB.

[38] Forgotten Weapons, *supra* note 35.

17

- **<u>Pin-fire revolvers (1862).</u>**  Plaintiffs state that in 1862 "pin-fire revolvers with capacities of up to twenty-one rounds entered the market and became popular in Europe and the United States" (Br. 39).  However, pin-fire revolvers most commonly had a capacity of five or six rounds.[39]  Although pin-fire revolvers capable of holding as many as twenty rounds did exist, they were "extraordinarily large and unwieldy."[40]  The pin-fire revolver "was not a success" in the United States, in part because "accidental discharge of the cartridges before being loaded into the weapon became a serious problem."[41]

- **<u>Josselyn Belt-Fed Chain Pistol</u> (1866)**:  Plaintiffs refer to the Josselyn belt-fed pistol (Br. 39).  But this pistol had an "odd" design consisting of a loop of chambers linked in a chain,[42] which caused it to "fail . . . commercially,"[43] "possibly because of the inconvenience of carrying one around."[44]  In addition, the design meant that "bringing the

---

[39] *Rare 20-Shot Lefaucheux "High Capacity" Pin Fire Revolver*, College Hill Arsenal, https://perma.cc/TNY6-8PTL.

[40] *Id*.

[41] *Original U.S. Civil War French M1854 Lefaucheux Cavalry Model 12mm Pinfire Revolver with Round*, Int'l Military Antiques, https://perma.cc/58KW-PHS7.

[42] *Josselyn Revolver—Patent Prototype*, FLicense Blog (Sept. 23, 2014), https://perma.cc/8CRB-7XH7.

[43] *Id*.

[44] *Chain Guns—I*, Firearms History, Technology & Development Blog (July 23, 2014), https://perma.cc/MT7P-JP5L.

18

chain's next chamber into position isn't a rapid endeavour."[45]    The weapon's shortcomings led it to become a "mechanical curiosity," and it does not "appear to have been produced in significant quantities."[46]

- **Winchester repeating rifles of 1866, 1873 and 1892.**  Plaintiffs (Br. 37-38) cite the Winchester repeating rifles of 1866, 1873 and 1892 as purported evidence that "rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified."  However, experts have estimated that by 1872 (four years after ratification of the Fourteenth Amendment) fewer than 800 Winchester rifles had been sold to civilians in the United States.  *See* DeLay Decl. ¶ 57. The 1866 Winchester rifle also had significant flaws:  its exposed magazine was open to dirt and debris, which made it susceptible to jamming; the barrel become dangerously hot after firing; it suffered from poor accuracy and was very heavy when loaded; and it required the shooter to manually manipulate a lever in between each shot (unlike modern semi-automatic firearms).[47]    Sales of the 1873 and 1892 Winchester rifles

---

[45] *Old West Firearms—Weapons Locker*, writeups.org, https://perma.cc/RHY4-7GX4.

[46] *Id.*

[47] *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN; *see also* Spitzer *Campbell* Decl. ¶ 48.

entirely postdated ratification of the Fourteenth Amendment in 1868, and the Winchester did not become popular with civilians until at least the late 19th or early 20th century.  Spitzer *Campbell* Decl. ¶ 48.

Plaintiffs also identify more than a dozen multi-shot firearms invented after ratification of the Fourteenth Amendment, up through the 1980s.  Br. 39-44.  But these later-introduced firearms directly contradict Plaintiffs' position because when these weapons became broadly available to civilians—well after ratification of the Fourteenth Amendment—states across the country passed laws limiting access to them.  *See* Part II.C, *infra*.

### 2. *Modern firearms capable of firing repeatedly without reloading reflect "dramatic technological change" resulting in "unprecedented societal concerns."*

Modern firearms capable of firing more than ten rounds without reloading reflect dramatic technological changes compared to Founding and Civil War Era examples.  For example, unlike the typical Revolutionary-era musket, a modern AR-15 (i) holds 30 rounds (30 times more than a typical musket at the time of the Founding), (ii) fires approximately 45 rounds per minute (15 times more), (iii) shoots accurately from approximately 600 yards (11 times further), (iv) attains a muzzle velocity of over 3,000 feet per second (3 times faster), and (v) can be stored loaded and immediately fired (unlike Founding-era muskets, which were stored

empty because of gunpowder degradation).[48] Modern firearms also incorporate advanced ballistics that make rounds far more deadly than their historical predecessors.[49]

Even the most advanced firearms of the Civil War era were a far cry from modern firearms. For example, the 1866 Winchester rifle, discussed above, had a maximum effective range of approximately 100 yards (about one-sixth of an AR-15) and a muzzle velocity of 1,100 feet per second (roughly one-third of an AR-15).[50] These dramatic technological changes have made the modern repeating firearm "a significantly different weapon than it was at the time of the founding of the republic" and in a "distinctly different class of lethality." *See* Declaration of Roger Pauly ¶¶ 100-03, *Oregon Firearms Federation, Inc.*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120).

These dramatic technological changes in firearms have given rise to "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132. Modern LCMs pose

---

[48] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL; *see also Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG (describing the "complicated process" of loading muskets used by soldiers during the Civil War).

[49] *See, e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS (AK-47 rounds have "a tiny surface area at the bullet tip, [so that] it can easily break through your skin . . . ripping a hole through blood vessels, muscle, and potentially vital organs.").

[50] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M.

a risk of far greater carnage than was imaginable during the Founding or Reconstruction eras.  As a result, the frequency and lethality of mass shootings have surged in modern times.  *See* Declaration of Randolph Roth ¶¶ 54-60, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-9) [hereinafter "Roth Decl."].  As of July 2020, LCMs were used in all of the ten deadliest mass shootings of the past decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62% higher death toll than those not involving LCMs.[51]

As one federal district court recently found, "the record supports the conclusion that mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem . . . [that] has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *Lamont*, 2023 WL 4975979, *29.  *Accord Ocean State Tactical, LLC*, 2022 WL 17721175, *20; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *10-11.

Courts considering the issue since *Bruen*, including the trial court in this case, have overwhelmingly held that modern LCMs reflect the sort of "dramatic technological change" that *Bruen* held requires a more "nuanced approach" to

---

[51]  Giffords Law Center, *Large Capacity Magazines*, Giffords, https://perma.cc/3DKL-ZJMS.

historical analysis.  *See Hanson*, 2023 WL 3019777, *13-14; *see also Lamont*, 2023 WL 4975979, *27-29; *Kotek*, 2023 WL 4541027, *36-38; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *10-11; *Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799, *7 (N.D. Ill. Apr. 25, 2023), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023).

### C.     The Challenged Law Is "Relevantly Similar" to Early 20th Century Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.

Under *Bruen*, although the historical analysis centers around the ratification of the Second Amendment in 1791 and the Fourteenth Amendment in 1868, earlier and later dates nevertheless remain constitutionally relevant to the analysis.  *See Bruen*, 142 S. Ct. at 2135-36, 2145.  Historical law and practice before 1791 may shed light on the public understanding of the Second Amendment when it was ratified, and historical analogues through the 21st century may "settle" the meaning of the Second Amendment, *id.* at 2136, provided they do not "contradict[] earlier evidence."  *Id.* at 2154 n.28.

Historical analogues from the 20th century are particularly relevant when courts are confronted with "dramatic technological change" or "unprecedented societal concerns" and therefore must engage in a "nuanced" historical analysis under *Bruen*.  *Id.* at 2132.  After all, it would be meaningless to search for specific restrictions on LCMs during the Founding or Reconstruction Eras, when the

technology did not exist in its current form and virtually no citizens possessed firearms capable of firing repeatedly without reloading. *See* Part II.B.1, *supra*. As the trial court reasoned in this case, "it would make no sense to divine constitutional significance from non-existent legislation concerning non-existent problems." *Hanson*, 2023 WL 3019777, *16; *see also Lamont*, 2023 WL 4975979, *29.

Once firearms capable of firing repeatedly without reloading began to circulate widely among civilians in the early 20th century, Congress and a majority of states responded by passing laws limiting access to these weapons. *See generally* Declaration of Robert Spitzer at 36-42, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1) [hereinafter "Spitzer *Sullivan* Decl."]. For example, in 1923, Vermont prohibited persons engaged in hunting from possessing "an automatic rifle of military type with a magazine capacity of over six cartridges."[52] In 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[53] That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[54] In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots

---

[52] Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130.

[53] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[54] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

automatically or semiautomatically more than twelve shots without reloading"—a prohibition that has existed in some regulatory form ever since.[55]  In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[56]  In 1934, Congress passed a law regulating fully automatic weapons nationwide.[57]

In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[58] and at least 22 states plus the District of Columbia restricted ammunition magazines or similar feeding devices, and/or imposed round capacity limits.  *See* Spitzer *Sullivan* Decl. at 36-42.  "Regulations concerning removable magazines and magazine capacity were . . . common as early as the 1920s" and "were adopted by nearly half of all states."  *Id*. at 42.

---

[55] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

[56] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[57] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236.

[58] Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons.  Spitzer *Campbell* Decl. ¶ 10.

As the trial court held, the Challenged Law is "relevantly similar," *Bruen*, 142 S. Ct. at 2132-33, to these early 20th century laws. *Hanson*, 2023 WL 3019777, *15 (The District's LCM ban "is similar to the Prohibition-era regulations in that the burden it places on an individual's right of self-defense is relatively light."). *Accord Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *12-14; *Bevis v. City of Naperville*, No. 22-4775, 2023 WL 2077392, *12-16 (N.D. Ill. Feb. 17, 2023), *appeal docketed* (7th Cir. Feb. 23, 2023). The trial court also found that the Challenged Law has a "comparabl[e] justifi[cation]" to these early 20th century laws, *Bruen*, 142 S. Ct. at 2132-33, because like these laws it addresses the growing threat of mass shootings with negligible effect on lawful armed self-defense. *Hanson*, 2023 WL 3019777, *15 ("Just as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now."). *Accord Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *13; *Kotek*, 2023 WL 4541027, *45.

### D.    The Challenged Law Is Relevantly Similar To 18th and 19th Century Historical Laws and Thus Is Constitutional.

Even putting aside the "more nuanced analysis" based on 20th century analogues, the Challenged Law is also "relevantly similar" to 18th and 19th century laws. Since the Founding Era, states have regulated firearms and other dangerous weapons, and courts have consistently upheld laws that imposed no meaningful burden on self-defense. These include laws restricting where and when firearms

could be carried or discharged, *see Hill v. State*, 53 Ga. 472, 474, 482-83 (1874), laws prohibiting certain particularly dangerous weapons, *see State v. Langford*, 10 N.C. 381, 383-84 (1824); *English v. State*, 35 Tex. 473, 474, 477 (1871); *Andrews v. State*, 50 Tenn. 165, 171, 188-89 (1871), and laws regulating the manner in which arms could be carried, *see State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 614, 621 (1840); *State v. Jumel*, 13 La. Ann. 399, 399-400 (1858).

For example, in the 18th century, Philadelphia, New York and Boston prohibited the discharge of firearms within their cities, and New Hampshire, Connecticut, Georgia, North Carolina and Rhode Island restricted the discharge of firearms after dark.[59]  New Jersey prohibited the setting of "gun traps" that fired automatically if triggered by a device such as a tripwire,[60] and numerous states banned the possession of certain blunt weapons deemed particularly dangerous, *see* Spitzer *Sullivan* Decl. at 12-17.

In the 19th century, states responded to a nationwide surge in homicides by passing laws severely restricting access to certain dangerous weapons.  *See* Roth Decl. ¶¶ 28-32.  For example, beginning in the 1830s and continuing through the early 20th century, every state plus the District of Columbia (except for New

---

[59] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007).
[60] *Id.*

Hampshire) passed laws restricting Bowie knives, a distinctive long-bladed knife commonly used in violent crime. *See* Spitzer *Sullivan* Decl. at 5-11. At least 43 states passed laws restricting the concealed carry of certain arms, most commonly pistols and various types of knives and clubs. *See id.* Several additional states also passed laws banning "trap guns" during the 19th century. *Id.* at 16-17.

The Challenged Law is "relevantly similar" to these 18th and 19th century laws because, like these analogues, it does not meaningfully burden armed self-defense. *See* Part I.B, *supra*. Moreover, the Challenged Law is "comparably justified" because it was enacted in response to a dramatic rise in gun violence and to protect the public. *See* Part II.B.2, *supra*.

Courts that have considered the issue since *Bruen* have consistently held that modern laws banning LCMs are "relevantly similar" to these 18th and 19th century laws. *See Kotek*, 2023 WL 4541027, *39-46; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150; *Bevis*, 2023 WL 2077392, *10-16; *Lamont*, 2023 WL 4975979, *31-32.

## CONCLUSION

The Challenged Law does not violate the Second Amendment because (1) applying the standards of *Bruen* and *Heller*, LCMs are not protected by the plain text of the Second Amendment because LCMs are not in common use for lawful self-defense, (2) LCMs reflect "dramatic technological change" resulting in

28

"unprecedented societal concerns" and are subject to a "more nuanced approach" to historical analysis, *Bruen*, 142 S. Ct. at 2132, (3) the Challenged Law is consistent with the country's 20th century history of regulating firearms that can fire repeatedly without reloading, and such historical laws are proper analogues because they were enacted when such arms began to circulate widely among civilians, and (4) the Challenged Law is "relevantly similar" to 18th and 19th century laws that imposed restrictions on firearms without burdening "the right of armed self-defense," *id*. at 2132-33.

Dated: October 30, 2023                    Respectfully submitted,


*Of Counsel:*                              /s/ Timothy C. Hester

Douglas N. Letter                          Timothy C. Hester
Shira Lauren Feldman                          *Counsel of Record*
BRADY CENTER TO PREVENT GUN VIOLENCE       Daniel Weltz
840 First Street, NE Suite 400             COVINGTON & BURLING LLP
Washington, DC 20002                       One CityCenter
(202) 370-8100                             850 Tenth Street, NW
dletter@bradyunited.org                    Washington, DC 20001
sfeldman@bradyunited.org                   (202) 662-6000
                                           thester@cov.com
Esther Sanchez-Gomez                       dweltz@cov.com
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE                                   *Counsel for Amici Curiae*
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, none of the *amici curiae* has a parent corporation and no publicly held corporation holds 10% or more of the membership or ownership interests of any *amici*.

Dated: October 30, 2023                    Respectfully submitted,

 /s/ Timothy C. Hester
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,484 words, excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman and 14-point font.

Dated: October 30, 2023                    Respectfully submitted,


 /s/ Timothy C. Hester
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2023, an electronic copy of the foregoing *Amici Curiae* Brief was filed with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's *CM-ECF* system and was served electronically by the Notice of Docket Activity upon registered *CM-ECF* participants.

Dated: October 30, 2023                    Respectfully submitted,


 /s/ Timothy C. Hester
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*