ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7061

# In the United States Court of Appeals for the District of Columbia Circuit

---

ANDREW HANSON, ET AL.,

*Plaintiffs-Appellants*,

v.

THE DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*,

---

## REPLY BRIEF OF APPELLANTS

---

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-CV-02256-RC)

---

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
4000 Legato Road, 11th Floor
Fairfax, Virginia 22030
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Erielle R. Davidson
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ i

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION & SUMMARY OF THE ARGUMENT....................................1

ARGUMENT ...........................................................................................2

    I.    THE SECOND AMENDMENT PROTECTS PLUS-10 MAGAZINES. ...............2

        A.    "Arms" include Plus-10 Magazines............................................3

        B.    Plus-10 Magazines are commonly used for lawful purposes. ....5

    II.    THE DISTRICT CANNOT CURE THE LOWER COURT'S ERROR BY CONTORTING THE PHRASE "DANGEROUS AND UNUSUAL" INTO "UNUSUALLY DANGEROUS." ..................................................................9

        A.    "Dangerous and unusual" does not mean "unusually dangerous." ...............................................................................10

        B.    The popularity of Plus-10 Magazines does not make them unconstitutionally "dangerous."................................................12

    III.    THE NATION'S GUN-REGULATION HISTORY CONFIRMS THAT THE DISTRICT'S MAGAZINE-CAPACITY BAN MUST FALL...............................13

        A.    The absence of any magazine-capacity bans before Plus-10 Magazines became popular means that Plus-10 Magazines receive Second Amendment protection. ...................................14

        B.    *Bruen*'s "historical analogue" leeway is not a blank check for the District to cite any example of arms regulation in support of its magazine-capacity ban. ......................................................15

        C.    A half-dozen short-lived Prohibition Era laws that incidentally regulated firearm capacity cannot salvage the District's prohibition on Plus-10 Magazines. ...........................................19

        D.    Neither the attention paid toward mass shootings nor *Bruen*'s "nuanced approach" language justifies loosening the history-and-tradition test set out in *Bruen*.............................................23

    IV.    THE PLAINTIFFS HAVE SATISFIED THE OTHER PRELIMINARY-INJUNCTION CRITERIA................................................................................................24

CONCLUSION.......................................................................................27

CERTIFICATE OF COMPLIANCE..........................................................30

CERTIFICATE OF SERVICE ................................................................31

# TABLE OF AUTHORITIES[*]

**Cases**                                                                 **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*,
  910 F.3d 106 (3d Cir. 2018) .......................................................... 7

*Bevis v. City of Naperville*,
  No. 23-1353, 2023 U.S. App. LEXIS 29332 (7th Cir. Nov. 3, 2023) .......... 8

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .................................................................. 14

*State v. Reid*,
  1 Ala. 612 (1840) ...................................................................... 17

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) ................................................... 28

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................ 4, 5, 11, 12, 14, 15, 16, 27

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .......................................................... 21

*Duncan v. Becerra*,
  970 F.3d 1133 (9th Cir. 2020) ...................................................... 3

*Duncan v. Bonta*,
  No. 17-cv-1017-BEN,
  2023 U.S. Dist. LEXIS 169577 (S.D. Cal. Sept. 22, 2023) ....................... 9

*FEC v. Wis. Right to Life, Inc.*,
  551 U.S. 449 (2007) .................................................................. 15

*Fyock v. City of Sunnyvale*,
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) ........................................... 5

*Heller v. District of Columbia*,
  670 F.3d 1244 (D.C. Cir. 2011) ................................................... 5

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ..................................................... 28

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

ii

*Kolbe v. Hogan*,
   813 F.3d 160 (4th Cir. 2016) ........................................................ 3

*\*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ............................................................. 5, 30

*Miller v. Bonta*,
   No. 19-cv-01537, 2023 U.S. Dist. LEXIS 188421 (S.D. Cal. Oct. 19, 2023) 9

*\*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ................ 4, 5, 12, 14, 16, 17, 20, 21, 22, 23, 24, 27

*Presser v. Illinois*,
   116 U.S. 252 (1886) ................................................................. 25

*Staples v. United States*,
   511 U.S. 600 (1994) ............................................................ 11, 12

*United States v. Cruikshank*,
   92 U.S. 542 (1875) ................................................................. 25

*United States v. Miller*,
   307 U.S. 174 (1939) ................................................................. 4

**Statutes**

1927 Mass. Acts Ch. 326 ............................................................ 20

1927 Mich. Laws No. 372 at 887–89 ............................................ 20

1933 Minn. Laws 231–33 .......................................................... 23

1934 Va. Acts 137–39 ............................................................... 20

1975 R.I. Pub. Laws 738, 738–39, 742 ........................................ 21

Va. Code Ann. § 18.2-288 ......................................................... 21

**Rules**

Fed. R. App. P. 27(d) ............................................................... 33

Fed. R. App. P. 32(f) ............................................................... 33

**Other**

ATF FOIA Response to Mr. Jeffrey E. Folloder,
2016-0003/AP-2015-05939 (Feb. 24, 2016) ...................................................... 9

Paul Barrett, *Glock: The Rise of America's Gun* (2012) .................................... 8

Theresa Waldrop, *What We Know About the Armed Bystander Who Killed the
Shooter at an Indiana Mall*, CNN (Jul. 19, 2022) ........................................... 27

## INTRODUCTION & SUMMARY OF THE ARGUMENT

Despite the District's obfuscation, the issue is straightforward. "[T]he Second Amendment protects the possession and use of weapons that are '"in common use."'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (citing, in turn, 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148–49 (1769); and quoting *United States v. Miller*, 307 U.S. 174, 179 (1939))). Plus-10 Magazines come standard with most popular self-defense pistols, and roughly 500 million Plus-10 Magazines are possessed by law-abiding American gun owners. *See* I.B. 5. It follows that the Second Amendment protects the right of law-abiding citizens to possess Plus-10 Magazines, and the District's magazine-capacity ban must fall.

The District's lamentations fall into broad tranches; none can be squared with *Bruen* or *Heller*. Although the District prefers pre-*Bruen* means-end scrutiny, "*Heller* and *McDonald* expressly rejected the application of any judge-empowering interest-balancing inquiry," *Bruen*, 142 S. Ct. at 2129 (cleaned up). The District's decision to trot out *Heller II* roughly ten times is thus futile. Similarly ineffective is the District's loose language: "dangerous and unusual" does not mean "unusually dangerous," "common use" does not mean "common number of rounds typically fired during a self-defense encounter," and a history of "regulation" or "registration" is not synonymous with a tradition of "prohibition." *See* A.B. 36. Each attempt to

shoehorn new limitations on the Second Amendment into the governing standards through linguistic contortions violates controlling law. Finally, fearmongering is no substitute for applying binding Supreme Court law to undisputed fact—particularly when the scare tactics the District deploys have little-to-no basis in the record.

Plus-10 Magazines are, in every sense, commonly possessed by law-abiding gun owners. They are not unusual, and the District's cynical attempt to prove otherwise by gesturing to the specter of mass shootings does not—and cannot—carry its burden. For these reasons, *Heller* and *Bruen* mandate that the ban must be stricken. But even if the Court conducts its own historical analysis, it will find no analogue to the arbitrary ban the District concocts, and none that can justify the District's latest attempt to gut this fundamental right. At bottom, the district court's contrary order should be reversed.

## ARGUMENT

### I. THE SECOND AMENDMENT PROTECTS PLUS-10 MAGAZINES.

The Supreme Court has thrice emphasized that the Second Amendment presumptively enshrines the right to bear all common arms. *Bruen*, 142 S. Ct. at 2128; *McDonald v. City of Chicago*, 561 U.S. 742, 767–68 (2010); *Heller*, 554 U.S. at 582. Only dangerous and unusual weapons—defined as "highly unusual in society"—fall outside the Second Amendment's spacious umbrella. *Heller*, 554 U.S. at 627. Because the Second Amendment enshrines a fundamental right, one

preexisting the Constitution itself, courts must err on the side of safeguarding its ample reach. The district court's failure to do so compels reversal.

## A.    "Arms" include Plus-10 Magazines.

Despite its other missteps, the district court rightly (like every other circuit to consider the issue)[1] concluded that Plus-10 Magazines constitute "arms" for purposes of the Second Amendment. Revealing its cramped view of the Second Amendment, the District insists the district court should have found that magazines are mere "firearm accessor[ies]" or "accoutrements"—i.e., unprotected by the Second Amendment. Nonsense.

*All* modern semi-automatic firearms—including *every one* of the top-selling self-defense pistols—require a magazine to fire more than one round without reloading. In other words, none of these commonly possessed weapons work correctly without a magazine. Or, as the district court put it, "magazines feed ammunition into certain guns and ammunition is necessary for such a gun to function

---

[1] *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.* ("*ANJRPC*"), 910 F.3d 106, 116 (3rd Cir. 2018); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) (subsequent history omitted); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *rev'd on other grounds*, 849 F.3d 114 (4th Cir. 2017) (en banc).

as intended." App. at _ [ECF No. 28 at 12] (quoting *Ass'n of N.J. Rifle & Pistol Clubs* ("*ANJRPC*") *v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018)).

Because guns typically don't function as intended without magazines, logic compels that magazines are "arms" under the Second Amendment. Because magazines are "arms," they are protected if they are commonly used for lawful purposes. And because Plus-10 Magazines are indeed commonly used for lawful purposes, *see infra* at 5–9, Plus-10 Magazines enjoy Second Amendment protection, and the District cannot ban them.

The District has no answer to this. To be certain, if magazines aren't "arms," then the District would have the authority to cap self-defense weapons at a single shot, a position the District has acknowledged would be a bridge too far. *See* A.B. 21. Conspicuously absent, however, is any attempt by the District to distinguish between its ability to cap magazine capacity at one round, three, or five (which it says it cannot do) and its decision to cap it at ten (which it says it can do because, in its view, magazines are not arms). The District's limiting principle (the number of rounds a magazine can hold) is completely unmoored from its argument favoring the constitutionality of a categorical magazine ban.

Although the District suggests the Court should distinguish between Plus-10 Magazines and "magazines as a category," A.B. 20, that flouts *Bruen*, *McDonald*,

and *Heller*. Because magazines are arms, the question is whether Plus-10 Magazines are in common use.[2] If they are, then the Second Amendment protects them.

## B.     Plus-10 Magazines are commonly used for lawful purposes.

Whether the District likes it or not, the record is clear. As this Court once recognized, Plus-10 Magazines are ubiquitous.[3] Every man, woman, and child in America could have one of the millions currently circulating among the public—and most could have two. *See* I.B. 21. Under *Heller* and *Bruen*, that is dispositive.

Rather than applying unambiguous Supreme Court precedent to these straightforward facts, the district court wrongly bobbled between irrelevant inquiries. That was patent error, which the District reiterates here.

*First*, the district court wrongly pegged self-defense as establishing the metes and bounds of the Second Amendment's coverage. To be certain, *Heller*, *McDonald*,

---

[2] This same point renders specious the strawman peppered throughout the District's brief—i.e., that the Plaintiffs want to possess one-hundred-round magazines. To be certain, the Plaintiffs' position is that the District may not prohibit Plus-10 Magazines that are indisputably in common use—e.g., those that hold anywhere from sixteen to twenty-one rounds and that come standard in a full-size self-defense pistol, and not the gimmicky and fanciful one-hundred round magazines featured throughout the District's alarmist brief. "There may well be some capacity above which magazines are not in common use," but "that capacity surely is not ten" and certainly not, e.g., the seventeen round magazine that come standard with the Glock 17 handgun. *Heller II*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). The District's chronic difficulty with the "common use" concept should not lead this Court astray from the gravamen of the Plaintiffs' claims.

[3] *See e.g.*, *Heller II*, 670 F.3d at 1261; *accord Kolbe*, 813 F.3d at 174; *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014).

and *Bruen* dealt with claims relating to gun possession for self-defense purposes. But each of these cases (and others decided post-*Bruen*) have found that the Second Amendment protects firearm possession for *lawful purposes*—a point that covers self-defense *and* "other" legal activities "like hunting, sporting, and target shooting," *Miller v. Bonta*, No. 19-cv-01537, 2023 U.S. Dist. LEXIS 188421, at *16 (S.D. Cal. Oct. 19, 2023), each of which typically involves magazines with capacities that exceed the District's arbitrary ten-round cap.

*Second*, even assuming the Second Amendment's protection ends at guns used for self-defense, "use" is not synonymous with "firing." This flawed logic inappropriately melds the "bear[ing]" of arms (which implies use in the moment of combat) and the "keep[ing] of arms" (which implies mere possession). Both are protected, and both *Heller* and *Bruen* implicitly draw this distinction by analyzing the right to *possess* firearms for self-defense purposes, instead of the right to *fire* them in self-defense.[4] "Indeed, the Second Amendment does not say that the right of the People to *keep* only such firearms as they actually shoot, shall not be infringed." *Duncan v. Bonta*, No. 17-cv-1017-BEN, 2023 U.S. Dist. LEXIS 169577, at *23 (S.D. Cal. Sept. 22, 2023) (emphasis added). At bottom, the relevant question

---

[4] *See Heller*, 554 U.S. at 573 ("We consider whether a District of Columbia prohibition on the *possession* of usable handguns in the home violates the Second Amendment to the Constitution.") (emphasis added); *accord Bruen*, 142 S. Ct. at 2143.

remains whether it is "highly unusual" for the citizenry to *possess* Plus-10 Magazines for lawful purposes, and because it is profoundly *common* for law-abiding citizens to do so, the Second Amendment protects them.

These points render immaterial the District's extensive reliance on figures suggesting that, during most self-defense shootings, fewer than three rounds are discharged. And both the court below and the District here eschew the importance of self-defense *training* for responsible, lawful gun ownership. Neither offers any response to the Plaintiffs' showing that Plus-10 Magazines are uniquely well-suited for such training (i.e., the sort that the District should be encouraging, since it decreases the likelihood of tragic mistakes). App. at _ [ECF No. 24, Exhibits 4–8].

*Third*, the Second Amendment applies even if a weapon might be thought "most useful" in the military (and would that not include militia service?). Such a limitation does not (and as a matter of common sense, cannot) mean that it lacks Second Amendment protection. The job of the military is to prepare for, and if necessary, engage in, armed, deadly combat. *Any* item that could be used as a weapon, from Gatling guns to throwable rocks, will necessarily enjoy greater use in the military than in civilian life. If the Second Amendment's protections wither for any weapon that a soldier might use more often than a civilian, then the Second Amendment would protect precisely nothing. And because *Heller*, *McDonald*, and

*Bruen* each sought to revitalize and enshrine the right of law-abiding citizens to bear arms, the military/civilian line the district court drew is untenable.

A careful read of *Heller* demonstrates how badly the district court erred on this point. Read faithfully, *Heller* observed that weapons *not* commonly possessed may be restricted for civilian use, even though such dangerous and unusual weapons might have unique military value. *See Heller*, 554 U.S. at 627. In other words, the inquiry remains whether an arm is commonly possessed. By inverting *Heller*'s language (i.e., by using military value to inform whether an arm is commonly used, rather than simply inquiring as to whether an arm is in fact commonly used), the district court gutted the revitalization of the Second Amendment that *Heller* accomplished and *Bruen* fortified.[5] Indeed, the Glock pistol was invented specifically for use by the Austrian army. Yet it is the most popular civilian handgun in the United States. *See* Paul Barrett, *Glock: The Rise of America's Gun* (2012).

*Fourth*, the District's comparison of machine guns to Plus-10 Magazines misses the mark. Fully automatic weapons have never been widely possessed by civilians for lawful purposes, like self-defense or hunting. *See, e.g.*, *Staples v. United States,* 511 U.S. 600, 612 (1994). Indeed, since 1934, fully automatic weapons (along with short-barrel rifles and shotguns) fall under the auspices of the National

---

[5] So too did the Seventh Circuit in *Bevis v. City of Naperville*, No. 23-1353, 2023 U.S. App. LEXIS 29332 (7th Cir. Nov. 3, 2023).

Firearms Act, and the Supreme Court has long recognized that weapons *not* regulated by the National Firearms Act (like Plus-10 Magazines) "traditionally have been widely accepted as lawful possessions." *Id*. Adding *Staples* to *Heller* means that the District cannot constitutionally ban Plus-10 Magazines. And lest there be any doubt, the few-hundred thousand automatic weapons cited in the District's brief are owned mainly by collectors or are registered to law-enforcement agencies.[6]

## II. THE DISTRICT CANNOT CURE THE LOWER COURT'S ERROR BY CONTORTING THE PHRASE "DANGEROUS AND UNUSUAL" INTO "UNUSUALLY DANGEROUS."

The heart of the District's argument is that Plus-10 Magazines are "unusually dangerous," and therefore the District may ban them. *See* A.B. 36–39. The problem for the District is that *Bruen* and *Heller* countenance no such blanket exception for arms that, in the government's view, are "unusually dangerous." Because the keystone of the Second Amendment inquiry is whether an arm is "in common use at the time," only "dangerous *and* unusual" arms can be prohibited. *Heller*, 554 U.S. at 627 (emphasis added); *see also Bruen*, 142 S. Ct. at 2143.

The District's sleight of hand matters tremendously. Its warping of the phrase "dangerous *and* unusual" contravenes Supreme Court precedent because it (1) amalgamates the two adjectives in a way that gives it unfettered discretion to ban

---

[6] *See* ATF FOIA Response to Mr. Jeffrey E. Folloder, 2016-0003/AP-2015-05939 (Feb. 24, 2016), available at https://www.nfatca.org/pubs/MG_Count _FOIA_2016.pdf (64 percent of federally registered machine guns were manufactured after 1986 and thus cannot be possessed by civilians).

weapons as it sees fit, and (2) concocts an unworkable definition of "dangerous" that violates Supreme Court precedent.

### A.      "Dangerous and unusual" does not mean "unusually dangerous."

The District insists "dangerous and unusual" means "unusually dangerous," arguing the phrase should be merged into a single expression, like "cruel and unusual." *See* A.B. 36. Doing so, however, transmutes the meaning of the phrase entirely, and in a way that advantages the District while hobbling the Second Amendment's robust span. "Dangerous and unusual" weapons *can* be prohibited, because "unusual" is the opposite of "common," and (at the risk of redundancy), *Heller* and *Bruen* each reiterate that common weapons *cannot* be prohibited. The District's transmogrification of "dangerous and unusual" into "unusually dangerous" would, if blessed by this Court, bloat the District's ability to trample on the Second Amendment, mostly because the District's preferred contortion excises the most important limitation on its ability to ban certain arms—i.e., whether the weapon is "commonly used" or "unusual." Even worse, by insisting that it may ban any weapon it deems "unusually dangerous," the District is attempting to resurrect discretion that *Bruen* took pains to constrain.

Reason dictates that the District has it wrong. *Bruen*—the case in which the phrase "dangerous and unusual" appears most often—underscores the District's error. Indeed, *Bruen* can be understood only as mandating that courts assess

10

"unusual" and "dangerous" as two distinct requirements, both of which the District must satisfy to survive Second Amendment scrutiny. It "explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627). And it doubled down in a footnote that addressed an East Jersey statute regulating pocket pistols, by stating, "[e]ven assuming that pocket pistols were, as East Jersey in 1686 deemed them, 'unusual or unlawful,' it appears that they were commonly used at least by the founding." *Bruen*, 142 S. Ct. at 2144 n.13. Lest there be any residual doubt, Justice Alito has since clarified that "dangerous and unusual" is "a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual," and "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring).

The District's longing to defang the term "unusual" is understandable. But the problem for the District is that it can't wish away Supreme Court precedent that craters its litigating position. Simply put, Plus-10 Magazines are not "unusual" in any conceivable sense of the word. Commonality has, since *Heller*, mattered more than any other factor for purposes of the Second Amendment. Indeed, *Heller* premised its watershed holding on the notion that handguns are the "quintessential"

self-defense weapon: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

### B.    The popularity of Plus-10 Magazines does not make them unconstitutionally "dangerous."

Further pushing its litigating position off the rails, the District takes its homespun "unusually dangerous" test and applies it in a way that cannot be squared with controlling caselaw or common sense. Twice, the District suggests that the more *common* an arm becomes in society, the more *unusually dangerous* it becomes as well, meaning that the more a weapon is in common use, the less it enjoys protection under the Second Amendment.[7]

That "heads I win, tails you lose" approach to adjudicating a constitutional right cannot be correct. *See FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 471 (2007). And naturally, *Heller* held the opposite. So did *Bruen*. The district court didn't bite. And because it defies all logic to suggest that the protection of a fundamental,

---

[7] *See* A.B. 52 ("As soon as large capacity firearms began to circulate in society in the early 20th century and became associated with criminal activity, states began to restrict that capacity, typically in the same legislation that established the now widely accepted tradition of banning machine guns."); *id.* at 57 ("As just discussed, there is a longstanding American tradition—from the colonial era to the early 20th century—whereby a weapon is introduced into society, proliferates to the point where its use threatens public safety, and is then regulated by the government to curb violence and protect the public.").

constitutional right *decreases* as the number of people exercising those right increases, this Court should summarily reject the District's argument.

### III. THE NATION'S GUN-REGULATION HISTORY CONFIRMS THAT THE DISTRICT'S MAGAZINE-CAPACITY BAN MUST FALL.

The record is unassailable. Plus-10 Magazines are "arms" in "common use." Under *Bruen* and *Heller*, if a type of arm is in common use, then it is not "dangerous and unusual" and, therefore, the Nation has no history of banning that type of arm. *See Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 581. Because *Heller* performed the requisite historical analysis, its holding that a weapon cannot be banned unless it is both dangerous and unusual means Plus-10 Magazines cannot be banned because they are not dangerous and unusual—and indeed are instead *exceedingly* common. The Court can thus end its inquiry here.

Despite this bright line, the District insists that *Bruen* requires a separate historical assessment as to whether the remarkably common Plus-10 Magazine (recall, *500 million* are possessed by Americans for lawful purposes, *see* I.B. 5) is nevertheless so unusual and dangerous that there is a history of banning it (or an analogue of it). Even assuming the Court might entertain the District's contradiction-in-terms inquiry, the District has not satisfied, and cannot satisfy, its own fabricated test.

A.     **The absence of any magazine-capacity bans before Plus-10 Magazines became popular means that Plus-10 Magazines receive Second Amendment protection.**

In our initial brief, we showed guns capable of firing more than ten rounds without reloading existed long before and during the ratification years and became increasingly popular in lockstep with the Nation's adoption of the Fourteenth Amendment. *See* I.B. 34–43. Bans on such weapons did not exist during these eras. In the District's view, none of this history matters because guns capable of firing more than ten rounds without reloading weren't as common as they are today. In its view, "governments had no reason to act" before these arms comprised nearly all of those possessed by civilians for lawful purposes. The District (without citing any meaningful authority) proclaims "the Constitution does not require States to regulate for problems that do not exist." A.B. 35. This argument is antithetical to *Heller*'s and *Bruen*'s common use test.

The District's reasoning does not merely shift the *Bruen* goalposts; it inverts them entirely. Once an arm is in common use for lawful purposes, it enjoys Second Amendment protection. Full stop. The ability of government to prohibit or restrict arms that are "dangerous and unusual" does in fact mean the government must restrict such arms while they are "dangerous and unusual." Once such arms become commonly possessed and used for lawful purposes, they can no longer be restricted. *Bruen*, 142 S. Ct. at 2143–44, 2144 n.13.

14

This really isn't hard. The Second Amendment protects *all* arms in common use. Plus-10 Magazines are common—*strikingly* common. *See* I.B. 5. To demonstrate that a prohibition on Plus-10 Magazines accords with the Second Amendment, the District would need to show a history and tradition of prohibiting them *before* they became exceedingly common and that they are not commonly possessed for lawful purposes *now*. Any other rule would be at loggerheads with both *Bruen* and *Heller*, which means the District's failure to offer a shred of relevant history in support of its magazine-capacity ban renders its magazine-capacity ban unconstitutional. Although the District would prefer that this Court ignore *Heller's* and *Bruen's* commonality test, the Court may do no such thing.

**B.     *Bruen*'s "historical analogue" leeway is not a blank check for the District to cite *any* example of arms regulation in support of its magazine-capacity ban.**

Although *Bruen* stopped short of requiring a "historical twin" to support a contemporary gun restriction, it made plain that a state cannot define its analogue at such a high level of generality that *any* historical gun restriction can justify *any* current one. The District has, apparently, overlooked this point. In its view, it can ban Plus-10 Magazines because "governments, from pre-Founding English history

15

to the early 20th century, have restricted, and even prohibited, dangerous and unusual weapons and accessories when they have threatened public safety." A.B. 35.

An obvious point bears making explicit. Weapons, by definition, are dangerous. Weapons threaten public safety when they are possessed by individuals who intend to break the law. This is true of the handguns people keep in their houses, and it is true of the handguns people carry concealed in public. Despite their danger and although they can threaten public safety if wielded by the wrong people, the Supreme Court held the Second Amendment protects the former (in *Heller*) and the latter (in *Bruen*).

It is not enough to gesture toward the Nation's history of regulating *other* weapons that have no resemblance to Plus-10 Magazines. And to be sure, the District readily admits that the examples it offers "name different weapons." *See* A.B. 35. The "clear through-line" between, e.g., the historic prohibition on "hagbuts" and "demy hakes," and the District's current magazine capacity ban, is farcical. *See* I.B. 44–52. This chimerical "through-line," however, is all the District can muster.

Indeed, many of the "analogies" the District offered are prohibitions on weapons *other than* firearms. *See* A.B. 37 (citing to a colonial law on trap guns, laws on clubs, and concealed carry restrictions on blunt weapons). Under *Bruen*, those aren't relevant. "To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must

demonstrate that the regulation is consistent with this Nation's historical tradition of *firearm regulation*." *Bruen,* 142 S. Ct. at 2126 (emphasis added).

It gets worse. The District cites nineteenth century regulations on gunpowder storage, which, according to the District, were designed to protect the public "by quelling the risk of catastrophic fire and explosion inherent to the possession of gunpowder in large quantities." A.B. 38. The potential for fires and explosions, however, has nothing at all to do with the concerns the District raises regarding Plus-10 Magazines: i.e., the ability of people to shoot without pausing to reload. This conflation of regulatory design with regulatory effect is the kind of loose analogical reasoning *Bruen* warned against. *See Bruen*, 142 S. Ct. at 2133.

Finally, consider the District's point about state laws regulating the sale and taxation of Bowie knives (again irrelevant under *Bruen*), or the carry regulations on pocket pistols in states like Tennessee and Arkansas. A.B. 29. Those historical examples amount to "time, place, and manner" restrictions that did not wholly ban the possession and use of those weapons (as the District has done with Plus-10 Magazines).[8] Those regulatory schemes imposed vastly different burdens on gun ownership than the outright ban on Plus-10 Magazines. They are plainly not

---

[8] *Cf. State v. Reid*, 1 Ala. 612, 616–17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.").

analogous for *Bruen*'s history-and-tradition test even it they rose to the level of "well-established" examples, which they don't. *See* 142 S. Ct. at 2133.

*Bruen* is clear; When identifying an appropriate analogue for a challenged regulation, precision matters. "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Bruen*, 142 S. Ct. at 2133 (alteration in original) (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). The District glosses over that instruction by insisting the Second Amendment is not a "regulatory straightjacket." *See* A.B. 35. But *Bruen* made clear that analogical reasoning under the history-and-tradition analysis is also not the "regulatory blank check" the District prefers. *See Bruen*, 142 S. Ct. at 2133.

Under *Bruen*, the Court must determine whether a modern gun-control measure and a purported historical analogue are either "distinctly similar" or "relevantly similar." *Id.* at 2131–32. And under *Heller* and *McDonald*, there are "at least two metrics" for determining the requisite similarity: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. *How* means "whether modern and historical regulations impose a comparable burden on the right of armed self-defense." *Id. Why* means "whether that burden is comparably justified." *Id.* This second metric prevents historic, burdensome laws

18

that were enacted for one purpose from being used as a pretext to impose burdens for others. *Id.* at 2132–33.

The District makes no real attempt to satisfy either metric. Nor could it. There is no meaningful or relevant history of a sovereign (either Britain, the federal government, or one of our states) enacting laws restricting the number of rounds that can be fired from a gun without reloading. That is the relevant inquiry, and because there is no history of such restrictions before the paltry Prohibition Era examples (discussed below), the District has failed to carry its burden. Nor is there any relevant well-established historical analogue prohibiting the possession of commonly owned firearms.

### C.    A half-dozen short-lived Prohibition Era laws that incidentally regulated firearm capacity cannot salvage the District's prohibition on Plus-10 Magazines.

As a final Hail Mary, the District offers as analogues a smattering of short-lived, Prohibition Era laws intended to regulate machine guns. *See* A.B. 40–42. *Bruen's* emphasis on tradition belies the relevancy of such ephemeral statutes. Despite the Supreme Court's conclusion that late 19th and 20th century laws do not illuminate the original meaning of the Second Amendment, *see* 142 S. Ct. at 2154 & n.28, the District insists that purported ammunition-capacity limits in six States (Massachusetts, Michigan, Minnesota, Ohio, Rhode Island, and Virginia) support the ban here. A.B. 40. That is wrong.

19

Most of those laws did not obviously cap the number of rounds that can be included in a magazine. For example, Michigan's law was unclear as to whether its sixteen round cap applied only to fully automatic weapons or was a general magazine-capacity restriction (like the District's ban). *See* 1927 Mich. Laws No. 372, at 887–89. The Massachusetts law addressed only machine guns, and it wasn't a prohibition at all, nor did it limit the number of rounds any gun could hold. 1927 Mass. Acts Ch. 326. Instead, it required that the owner of a machine gun license it with the State, which is wholly and qualitatively different from an outright ban. *Id.*

Ohio's law, now repealed, was a licensing statute that initially set an eighteen-round limit. It was later amended to cap capacity at a more reasonable thirty rounds (more than any common standard-capacity pistol magazine) and allowed the possession of higher capacity magazines as long as they were not inserted into a firearm. The Minnesota machine gun statute did not apply to semi-automatic firearms using standard capacity magazines; it only applied to such firearms if they were altered to increase capacity beyond their manufactured limit. 1933 Minn. Laws 231–33. The Virginia statute may have included some semi-automatic firearms in its definition of machine gun, but it did not prohibit possession of machine guns as defined by the statute. 1934 Va. Acts 137–39. Virginia's modern successor statute, passed in the 1950s, limited the definition of a machine gun to a fully automatic

20

weapon, and it does not prohibit possession of one (so long as it is registered federally and with the state police). Va. Code §§ 18.2-288 *et seq.* Finally, the Rhode Island statute was amended almost fifty years ago to cover only fully automatic weapons. 1975 R.I. Pub. Laws 738, 738–39, 742.

Accordingly, the Court need not accept the patently false suggestion that the Nation has a "widely accepted tradition of banning machine guns" (it doesn't), which somehow justifies a magazine-capacity ban for semi-automatic handguns (it can't). As the Supreme Court warned in *Bruen*, that loose kind of analysis is improper because at a high enough level of generality, "everything is similar in infinite ways to everything else." 142 S. Ct. at 2132 (cleaned up) (citation omitted). *Bruen*'s history-and-tradition test requires something more precise; it calls for a "metric enabling the analogizer to assess which similarities are important and which are not." *Id.* (citation omitted). The District has come up dismally short.

Even if those Prohibition Era laws did paint some kind of *historical* "through-line" as the District suggests (a concept alien to *Bruen*)*,* it would be improper for this Court to afford them any weight. Six (at the very best) states aren't much when looking for a well-trodden history of gun regulation relevantly analogous to the District's magazine capacity ban. Machine guns, which have never been in common use, *see supra* at 8–9, raise different, and more serious concerns than Plus-10 Magazines. And in any event, these laws were left judicially undisturbed because,

during the Prohibition Era, the Second Amendment (like virtually every other provision of the Bill of Rights) had not yet been incorporated as applicable to the states.

In *United States v. Cruikshank*, the Supreme Court held that the Second Amendment was not a constraint on state law. 92 U.S. 542, 553 (1875). In its brief treatment of the Second Amendment, the *Cruikshank* Court stated the Second Amendment "is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *Id.* It emphasized that the Second Amendment "has no other effect than to restrict the powers of the national government." *Id. Cruikshank* was reaffirmed in *Presser v. Illinois*, 116 U.S. 252, 265 (1886), which means that, until *McDonald*, the states had free rein to enact firearms regulations without a Second Amendment firewall.

For that reason, state laws after *Cruikshank* cannot serve as evidence of Second Amendment compliant firearms restrictions because the Second Amendment did not prevent states from doing whatever they pleased regarding firearms until the *McDonald* decision. For this reason, the few states that regulated machine guns (and incidentally regulated ammunition capacity) during the Prohibition Era tell us nothing about the Second Amendment's reach now, because those laws were enacted (and subsequently repealed) in the absence of any Second Amendment constraint.

In the end, the District's arguments under the history-and-tradition analysis of *Bruen* crumble once subjected to scrutiny. This highlights the point that the district court missed. Because Plus-10 Magazines are arms in common use, no historical analysis exists that could justify their prohibition under *current* Second Amendment jurisprudence.

### D.     Neither the attention paid toward mass shootings nor *Bruen*'s "nuanced approach" language justifies loosening the history-and-tradition test set out in *Bruen*.

*Bruen*'s "nuanced approach" language appears to be where the district court most went astray. At the District's urging, the district court justified its reliance on the 20th century machine-gun laws to uphold the magazine-capacity ban as a "nuanced approach" to the "unprecedented societal concern" of mass killings and the "dramatic technological change" represented by semi-automatic detachable magazine fed firearms. *See* App. at _ [ECF No. 28 at 27]. The District continues to rely on this "nuanced approach" here. *See* A.B. 30.

That reliance is mistaken. *Bruen*, read faithfully, never endorsed the notion that fearmongering by an overzealous attorney general can justify deviation from the "commonly possessed" test *Heller* established and *Bruen* confirmed. In fact, *Bruen*'s "nuanced approach" discussion reiterated that Second Amendment protection applies "prima facie, to all instruments that constitute bearable arms, even those that

23

were not in existence at the time of the founding." 142 S. Ct. at 2132 (quoting *Heller,* 554 U.S. at 582).

Every unjust shooting is a tragedy, and mass shootings often leave entire communities fractured. But even granting the very real concerns that well-meaning people have regarding the apparent increase in multi-victim shootings, neither *Bruen*, *McDonald*, or *Heller* suggested, particularly under the guise of a "nuanced approach," that such concededly valid societal concerns can justify erosion of the preexisting right to keep and bear commonly possessed arms that the Second Amendment enshrined as fundamental. Were it otherwise, the lack of any limiting principle means a government could ban all semiautomatic firearms, including handguns, on the ground they are the weapon of choice for mass killings. Or it could limit magazine capacity to three or four rounds. Because allowing a "nuanced approach" to water down the Second Amendment runs contrary to the spirit of *Bruen*, *McDonald*, and *Heller*, the District's position must be rejected, and the district court's order must be reversed.

## IV.   THE PLAINTIFFS HAVE SATISFIED THE OTHER PRELIMINARY-INJUNCTION CRITERIA.

In a last-ditch effort, the District suggests Plaintiffs have failed to satisfy the other criteria for issuance of a preliminary injunction. *See* A.B. 47. Not so.

**A.** This Court's caselaw is unambiguous. "Suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not

ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (cleaned up) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). The District's magazine-capacity ban abrogates the Plaintiffs' ability to exercise their fundamental constitutional right to possess and use commonly owned arms. Each passing day is another in which the Plaintiffs' injury ossifies into irreparability.

Beyond the irreparable nature of any constitutional injury, recall the purpose of the right the Plaintiffs wish to exercise. Each wants to be ready if the unthinkable occurs. Each knows that a substantial portion of the American population will be victimized by violent crime. Each is well-trained in the law and has acquired the proper skills to handle an imminent threat of death or grave bodily harm. Each is aware criminals often work in groups to gain an advantage over their victims. And each wants the peace of mind that accompanies the knowledge that, if the unfathomable arises, they have done everything they can to ensure they will still make it home. Because each understands that a day may come when the District's magazine-capacity ban proves insufficient, the District's ban on Plus-10 Magazines will truly be irreparable if the unthinkable does indeed occur.

**B.** The public interest counsels in favor of enjoining the District's magazine-capacity cap. Despite the mass-shooting alarmism permeating the District's argument, the District has offered nothing to bolster its apparent position that,

without the magazine-capacity cap, mass-shootings will eclipse the violence already plaguing the District. Nor could it.

Throughout this litigation, the District has seemed content to ignore the upshot of its own laws. Lost on it, then, is that no person can lawfully possess *any* firearm in the District without demonstrating he or she in fact is eligible to possess a gun, knows how to do so safely, and has no intention of using it for illicit purposes. *See* I.B. 26–27. Gun owners need to provide these same assurances no matter how many rounds the owner's preferred weapon can hold. In other words, the District already has in place measures to assure itself that individuals desiring to possess Plus-10 Magazines will do so for lawful purposes only. Because fewer gun-related crimes are committed by individuals with valid concealed carry licenses, the only thing the District has accomplished is ensuring *unlawful* gun possessors are likely to have an advantage over lawful gun owners.

For this reason, the public interest tilts toward the Plaintiffs. The law of self-defense in all fifty states presumes that every person has the preexisting, fundamental right to meet unlawful force with the amount of proportionate force necessary to stop the threat. If a non-law-abiding citizen has a weapon with a magazine exceeding the District's magazine cap, and the District has shown they often do, then the innocent gun owner is at a tactical disadvantage because of the

District's law. And if the non-law-abiding criminal has non-law-abiding friends, the likelihood ten rounds will suffice dwindles.

Put differently, the District and its residents are not likely to experience any harm if this Court enjoins the magazine cap. In contrast, the Plaintiffs (and the public at large) will experience ever increasing risk that, someday, in the District, a lawful gun owner will have to, e.g., engage a threat in a crowded area like Elisjsha Dicken did when a rifle-wielding individual fired roughly two-dozen rounds at an Indianapolis mall food court.[9] That shooting, along with many others, demonstrates that the unthinkable does happen. And because it does, the public interest is served by an injunction helping to ensure that a good guy like Mr. Dicken isn't handicapped if he needs to bring lawful force to stop unlawful force.

## CONCLUSION

"The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald*, 561 U.S. at 780). The district court's order depreciated the Plaintiffs' Second Amendment rights. Because the Supreme Court has tasked courts with protecting the fundamental right enshrined in the Second Amendment, this Court should reverse the denial of the

---

[9] Theresa Waldrop, *What We Know About the Armed Bystander Who Killed the Shooter at an Indiana Mall*, CNN (Jul. 19, 2022), https://www.cnn.com/2022/07/19/us/eli-dicken-indiana-mall-shooting-bystander/index.html.

Plaintiffs' motion for a preliminary injunction and remand with instructions to (1) grant the Plaintiffs' request for a preliminary injunction and (2) enter final judgment for them.

Dated: November 16, 2023

Respectfully submitted,

*/s/ George L. Lyon, Jr.*
George L. Lyon, Jr.
BERGSTROM ATTORNEYS
4000 Legato Road,
11th Floor
Fairfax, VA 22030
(202) 669-0442 (phone)
(202) 483-9267 (facsimile)
*gll@bergstromattorneys.com*

*/s/ Edward M. Wenger*
Edward M. Wenger
Erielle Davidson
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street NW,
Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)
*emwenger@holtzmanvogel.com*

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume and word-count limits of Federal Rule of Appellate Procedure 27(d) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,491 words.

2.    This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
Edward M. Wenger

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 16th day of November, 2023, a true copy of the Reply Brief was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
Edward M. Wenger

31