ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7061

# In the United States Court of Appeals for the District of Columbia Circuit

ANDREW HANSON, ET AL.,

*Plaintiffs-Appellants,*

v.

THE DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees,*

## JOINT APPENDIX

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-CV-02256-RC)

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
4000 Legato Road, 11th Floor
Fairfax, Virginia 22030
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Erielle R. Davidson
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

|  | Page Numbers |
|---|---|
| Docket Sheet, *Andrew Hanson et al. v. District of Columbia*, US. District Court for the District of Columbia No. 1:22-cv-02256 | APP. 1 - APP.8 |
| Complaint for Declaratory and Injunctive Relief and Damages | APP. 9 - APP. 32 |
| Plaintiffs' Motion for Preliminary Injunctive Relief | APP. 33 - APP 73 |
| Defendants' Opposition to Preliminary Injunctive Relief | APP. 74- App. 124 |
| Exhibits Attached to Defendants' Opposition to Preliminary Injunctive Relief | |
| Ex. A: Plaintiffs' Answers and Objections to Defendants' First set of Interrogatories | APP. 125 - APP. 138 |
| Ex. B: Declaration of Dennis Baron | APP. 139 - APP. 161 |
| Ex. C: Excerpt of Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics* (2019) | APP. 162 - APP. 179 |
| Ex. D: Declaration of Stephen Amodeo | APP. 180 - APP. 185 |
| Ex. E: Declaration of Leslie Parsons | APP. 186 - APP. 212 |
| Ex. F: Declaration of Roger Pauly | APP. 213 - APP. 245 |
| Ex. G: Declaration of Brian Delay | APP. 246 - APP. 261 |
| Ex. H: Declaration of Robert Spitzer | APP. 262 - APP. 444 |
| Ex. I: Declaration of Randolph Roth | APP. 445 - APP. 478 |
| Ex. J: Declaration of Brennan Rivas | APP. 479 - APP. 502 |
| Ex. L: Excerpt of Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (2003) | APP. 503 - APP. 520 |
| Ex. M: Declaration of Kevin M. Sweeney | APP. 521 - APP. 541 |
| Ex. O: Declaration of Daniel W. Webster | APP. 542 - APP. 551 |
| Ex. P: Report of Firearms Committee, *Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting* (1928) | APP. 552 - APP. 563 |

i

Exhibits Attached to Plaintiffs' Reply in Support of
Preliminary Injunctive Relief

| | |
|---|---|
| Declaration of Mark Hanish | APP. 564 - APP. 645 |
| Declaration of Stephen Helsely | APP. 646 - APP. 662 |
| Declaration of Ashley Hlebinsky | APP. 663 - APP. 709 |
| Declaration of Tom Givens | APP. 710 - APP. 714 |
| Declaration of Brett Harnish | APP. 715 - APP. 718 |
| Declaration of John Murphy | APP. 719 - APP. 722 |
| Declaration of Greg Ellifritz | APP. 723 - APP. 743 |
| Declaration of Claude Werner | APP. 744 - APP. 747 |
| Examples of marketing of guns with magazines in excess of 10 rounds for self-defense | APP. 748 - APP. 751 |
| Declaration of Amy Swearer | APP. 752 - APP. 765 |
| Testimony of Massad Ayoob | APP. 766 - APP. 864 |
| Kopel, Bowie Knife Statutes | APP. 865 - APP. 878 |
| Virginia Historic machine gun statute | APP. 879 - APP. 882 |
| Declaration of Clayton Cramer | APP. 883 - APP. 934 |
| Declaration of Gary Kleck | APP. 935 - APP. 985 |
| Transcript of Motion Hearing, April 13, 2023, Case No. 1:22-cv-02256 | APP. 986 - APP. 1018 |
| Order Denying Plaintiffs' Motion for a Preliminary Injunction, April 20, 2023 | APP. 1019 |
| Memorandum Opinion Denying Plaintiffs' Motion for a Preliminary Injunction | APP. 1020 - APP. 1059 |
| Joint Motion to Stay Proceedings Pending Appeal | APP. 1060 - APP. 1065 |
| Notice of Appeal | APP. 1066 - APP. 1067 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02256-RC

| | |
|---|---|
| HANSON et al v. DISTRICT OF COLUMBIA et al | Date Filed: 08/01/2022 |
| Assigned to: Judge Rudolph Contreras | Jury Demand: None |
| Case in other court: USCA, 23-07061 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**ANDREW HANSON**                    represented by **George L. Lyon , Jr.**
BERGSTROM ATTORNEYS
1929 Biltmore Street, NW
Washington, DC 20009
202-669-0442
Fax: 202-483-9267
Email: gll@bergstromattorneys.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TYLER YZAGUIRRE**                    represented by **George L. Lyon , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATHAN CHANEY**                    represented by **George L. Lyon , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERIC KLUN**                    represented by **George L. Lyon , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**                    represented by **Andrew J. Saindon**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 Sixth Street, NW
Suite 10100
Washington, DC 20001-2703
202-724-6643
Email: andy.saindon@dc.gov
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

USCA Case #23-7061        Document #2028785        Filed: 11/27/2023        Page 5 of 1070

**Richard P. Sobiecki**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
Civil Litigation Division, Equity Section
400 Sixth Street, NW
Suite 10100
Washington, DC 20001
202-805-7512
Email: richard.sobiecki@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
OFFICE OF THE ATTORNEY GENERAL
District of Columbia
400 Sixth Street NW
District of Columbia, DC 20001
(202) 735-7520
Fax: (202) 741-0665
Email: helen.rave@dc.gov
*ATTORNEY TO BE NOTICED*

**Mateya Beth Kelley**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 Sixth Street, NW
Suite 10100
Washington, DC 20001-2703
202-724-7854
Email: Mateya.Kelley@dc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT J. CONTEE, III**                    represented by    **Andrew J. Saindon**
(See above for address)
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mateya Beth Kelley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**APP. 2**

**BRADY** represented by **Timothy Channing Hester**
COVINGTON & BURLING
850 Tenth Street, N.W.
Washington, DC 20001-4956
202-662-5324
Fax: 202-778-5324
Email: thester@cov.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**GIFFORDS LAW CENTER TO**          represented by **Timothy Channing Hester**
**PREVENT GUN VIOLENCE**                          (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**MARCH FOR OUR LIVES**          represented by **Timothy Channing Hester**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2022 | 1 | COMPLAINT against ERIC KLUN, ANDREW HANSON, NATHAN CHANEY, TYLER YZAGUIRRE ( Filing fee $ 402 receipt number ADCDC-9409010) filed by ERIC KLUN, ANDREW HANSON, NATHAN CHANEY, TYLER YZAGUIRRE. (Attachments: # 1 Civil Cover Sheet Cover Sheet, # 2 Summons Bowser, # 3 Summons OAG, # 4 Summons Contee)(Lyon, George) (Entered: 08/01/2022) |
| 08/03/2022 | | NOTICE OF ERROR re 1 Complaint; emailed to gll@bergstromattorneys.com, cc'd 2 associated attorneys -- The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsb, ) (Entered: 08/03/2022) |
| 08/03/2022 | 2 | ERRATA by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE re 1 Complaint, filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. (Lyon, George) (Entered: 08/03/2022) |
| 08/05/2022 | 3 | SUMMONS (3) Issued Electronically as to All Defendants, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachment: # 1 Notice and Consent)(zmrl) (Entered: 08/05/2022) |
| 08/08/2022 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 8/8/2022. ( Answer due for ALL D.C. DEFENDANTS by 8/29/2022.) (Lyon, George); Modified text on 8/9/2022 (ztth). (Entered: 08/08/2022) |
| 08/08/2022 | 5 | NOTICE of Appearance by Andrew J. Saindon on behalf of All Defendants (Saindon, Andrew) (Entered: 08/08/2022) |
| 08/08/2022 | | Case Assigned to Judge Rudolph Contreras. (zsb) (Entered: 08/08/2022) |
| 08/08/2022 | 6 | NOTICE of Appearance by Helen Marie Rave on behalf of All Defendants (Rave, Helen) (Entered: 08/08/2022) |

**APP. 3**

| 08/15/2022 | 7 | NOTICE of Appearance by Mateya Beth Kelley on behalf of All Defendants (Kelley, Mateya) (Entered: 08/15/2022) |
|---|---|---|
| 08/19/2022 | 8 | MOTION for Preliminary Injunction by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit 1, Hanson Declaration, # 3 Exhibit Exhibit 2, Yzaguirre Declaration, # 4 Exhibit Exhibit 3, Chaney Declaration, # 5 Exhibit Exhibit 4, Klun Declaration, # 6 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/19/2022) |
| 08/23/2022 | 9 | MOTION for Extension of Time to *Oppose Application for Preliminary Injunction* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rave, Helen) (Entered: 08/23/2022) |
| 08/23/2022 | 10 | MOTION to Expedite *Discovery* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Exhibit A - Proposed Interrogatories)(Rave, Helen) (Entered: 08/23/2022) |
| 08/23/2022 | 11 | Memorandum in opposition to re 9 Motion for Extension of Time to filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/23/2022) |
| 08/23/2022 | 12 | Memorandum in opposition to re 10 Motion to Expedite *Discovery* filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Exhibit Exhibit 1, # 2 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/23/2022) |
| 08/24/2022 | 13 | REPLY to opposition to motion re 9 MOTION for Extension of Time to *Oppose Application for Preliminary Injunction* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Rave, Helen) (Entered: 08/24/2022) |
| 08/24/2022 | 14 | REPLY to opposition to motion re 10 MOTION to Expedite *Discovery* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Rave, Helen) (Entered: 08/24/2022) |
| 09/07/2022 | | MINUTE ORDER: On August 19, 2022, Plaintiffs filed a motion for preliminary injunction. ECF No. 8. Under Local Rule 65.1(c), Defendants' response was due on August 26, 2022. Defendants have filed a motion for an 89-day extension of time to respond to Plaintiffs' motion. ECF No. 9. Plaintiffs consent to a 30-day extension but ask that they also be given 30 days to reply. ECF No. 11. Due to the need to ensure that the record in this case is properly developed, it is hereby ORDERED that 9 Defendants' Motion for Extension of Time to Oppose Application for Preliminary Injunction is GRANTED. Defendants shall respond to Plaintiffs' motion before or on November 23, 2022, and Plaintiffs shall file any reply before or on December 23, 2022. It is FURTHER ORDERED that Defendants' deadline to respond to Plaintiffs' Complaint shall be HELD IN ABEYANCE until a decision is issued on Plaintiffs' motion. It is FURTHER ORDERED that 10 Defendants' Motion to Expedite Discovery is GRANTED. The Court finds that limited discovery at this stage is "reasonable[]" "in light of all of the surrounding circumstances." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (quotation marks omitted). Plaintiffs shall respond to Defendants' Interrogatories, filed at ECF No. 10-3, before or on September 21, 2022, subject to any particular objections Plaintiffs may raise. The parties shall inform the Court of any discovery disputes in accordance with the Local Rules prior to filing any discovery motions. SO ORDERED. Signed by Judge Rudolph Contreras on 9-7-2022. (lcrc3) (Entered: 09/07/2022) |
| 10/04/2022 | 15 | NOTICE of Appearance by Richard P. Sobiecki on behalf of All Defendants (Sobiecki, Richard) (Entered: 10/04/2022) |
| 10/31/2022 | 16 | Consent MOTION for Leave to File *Supplement to Preliminary Injunction Application* by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. |

**APP. 4**

USCA Case #23-7061          Document #2028785          Filed: 11/27/2022          Page 8 of 1070

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration of Tyler Yzaguirre, # 2 Memorandum in Support, # 3 Text of Proposed Order Proposed Order)(Lyon, George) (Entered: 10/31/2022) |
| 10/31/2022 | | MINUTE ORDER granting 16 Plaintiffs' Consent Motion for Leave to File: It is hereby ORDERED that Plaintiffs may supplement their application for a preliminary injunction with the declaration of Tyler Yzaguirre attached at ECF No. 16-1. SO ORDERED. Signed by Judge Rudolph Contreras on 10-31-2022. (lcrc3) (Entered: 10/31/2022) |
| 11/23/2022 | 17 | Memorandum in opposition to re 8 Motion for Preliminary Injunction, filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit List, # 3 Exhibit A (Interrogs.), # 4 Exhibit B (Baron), # 5 Exhibit C (Givens excerpt), # 6 Exhibit D (Amodeo MPD), # 7 Exhibit E (Parsons MPD), # 8 Exhibit F (Pauly), # 9 Exhibit G (DeLay), # 10 Exhibit H (Spitzer), # 11 Exhibit I (Roth), # 12 Exhibit J (Rivas), # 13 Exhibit K (Barrett excerpt), # 14 Exhibit L (Kinard excerpt), # 15 Exhibit M (Sweeney), # 16 Exhibit N (Sadowski excerpt), # 17 Exhibit O (Webster), # 18 Exhibit P (model law 1928), # 19 Exhibit Q (Charles excerpt), # 20 Exhibit R (Smithsonian excerpt))(Kelley, Mateya) (Entered: 11/23/2022) |
| 11/30/2022 | 18 | MOTION for Leave to File *Amicus Curiae Brief* by BRADY, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES. (Attachments: # 1 Amicus Curiae Brief, # 2 Proposed Order)(Hester, Timothy) (Entered: 11/30/2022) |
| 12/01/2022 | | MINUTE ORDER granting 18 Motion for Leave to File Amicus Brief: It is hereby ORDERED that the Motion is GRANTED; and it is FURTHER ORDERED that the Amicus Curiae brief attached to the Motion at ECF No. 18-1 is deemed filed with this Court upon entry of this Order. SO ORDERED. Signed by Judge Rudolph Contreras on 12-1-2022. (lcrc3) (Entered: 12/01/2022) |
| 12/01/2022 | 19 | Consent MOTION for Leave to File Excess Pages , Consent MOTION for Extension of Time to File *and Memorandum in Support* by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 12/01/2022) |
| 12/02/2022 | | MINUTE ORDER granting 19 Plaintiffs' Motion for Leave to File Excess Pages and Motion for Extension of Time: It is hereby ORDERED that the page limit for Plaintiffs' reply is increased to 35 pages and Plaintiffs' reply shall be filed on or before January 23, 2023. SO ORDERED. Signed by Judge Rudolph Contreras on 12-2-2022. (lcrc3) (Entered: 12/02/2022) |
| 12/08/2022 | 20 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Oregon Firearms Federation, Inc. v. Brown Opinion and Order)(Rave, Helen) (Entered: 12/08/2022) |
| 12/22/2022 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Ocean State Tactical, LLC et al v. Rhode Island et al Memorandum and Order)(Rave, Helen) (Entered: 12/22/2022) |
| 01/10/2023 | 22 | ENTERED IN ERROR.....Consent MOTION for Scheduling Order by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George); Modified on 1/11/2023 (ztth). (Entered: 01/10/2023) |
| 01/11/2023 | 23 | WITHDRAWAL of Motion by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE re 22 Consent MOTION for Scheduling Order filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON . (Lyon, George) (Entered: 01/11/2023) |

**APP. 5**

USCA Case #23-7061      Document #2028785           Filed: 11/27/2023      Page 9 of 1070

| 01/23/2023 | 24 | REPLY to opposition to motion re 8 MOTION for Preliminary Injunction filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Declaration Ex. 1 Hanish Declaration, # 2 Declaration Ex. 2 Helsley Declaration, # 3 Declaration Ex. 3 Hlebinsky Declaration, # 4 Declaration Ex 4 Givens Declaration, # 5 Declaration Ex. 5 Harnish Declaration, # 6 Declaration Ex. 6 Murphy Declaration, # 7 Declaration Ex. 7 Ellifritz Declaration, # 8 Declaration Ex. 8 Werner Declaration, # 9 Exhibit Ex. 9 Examples of marketing of guns with magazines in excess of 10 rounds for self-defense, # 10 Declaration Ex. 10 Swearer Declaration, # 11 Exhibit Ex 11 Testimony of Massad Ayoob, # 12 Exhibit Ex, 12 Kopel,Bowie knife statutes, # 13 Exhibit Ex. 13 Virginia historic machine gun statute, # 14 Declaration Ex. 14 Cramer Declaration, # 15 Declaration Ex, 15 Kleck Declaration)(Lyon, George) (Entered: 01/23/2023) |
|---|---|---|
| 01/24/2023 | | RESOLVED...NOTICE of Provisional/Government Not Certified Status re 24 REPLY to opposition to motion re 8 MOTION for Preliminary Injunction filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Declaration Ex. 1 Hanish Declaration, # 2 Declaration Ex. 2 Helsley Declaration, # 3 Declaration Ex. 3 Hlebinsky Declaration, # 4 Declaration Ex 4 Givens Declaration, # 5 Declaration Ex. 5 Harnish Declaration, # 6 Declaration Ex. 6 Murphy Declaration, # 7 Declaration Ex. 7 Ellifritz Declaration, # 8 Declaration Ex. 8 Werner Declaration, # 9 Exhibit Ex. 9 Examples of marketing of guns with magazines in excess of 10 rounds for self-defense, # 10 Declaration Ex. 10 Swearer Declaration, # 11 Exhibit Ex 11 Testimony of Massad Ayoob, # 12 Exhibit Ex, 12 Kopel,Bowie knife statutes, # 13 Exhibit Ex. 13 Virginia historic machine gun statute, # 14 Declaration Ex. 14 Cramer Declaration, # 15 Declaration Ex, 15 Kleck Declaration)(Lyon, George). <br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal. <br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 1/31/2023. (zbaj) Modified on 2/3/2023 (zbaj). (Entered: 01/24/2023) |
| 03/21/2023 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear before the Court on April 13, 2023 at 10:00 a.m. in Courtroom 23 for oral argument on 8 Plaintiffs' Motion for a Preliminary Injunction. The parties are advised that the procedures set forth in Local Civil Rule 65.1(d) shall govern this hearing. SO ORDERED. Signed by Judge Rudolph Contreras on 3-21-2023. (lcrc3) (Entered: 03/21/2023) |
| 03/31/2023 | | Set/Reset Hearings: Motion Hearing set for 4/13/2023 at 10:00 AM in Courtroom 23A- In Person before Judge Rudolph Contreras. (tj) (Entered: 03/31/2023) |
| 04/06/2023 | 25 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety and Homeland Security Memorandum Opinion) (Rave, Helen) (Entered: 04/06/2023) |
| 04/08/2023 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE (Attachments: # 1 Exhibit The History of Bans on Types of Arms Before 1900)(Lyon, George) (Entered: 04/08/2023) |
| 04/13/2023 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 4/13/2023 re 8 MOTION for Preliminary Injunction filed by TYLER YZAGUIRRE, |

**APP. 6**

USCA Case #23-7061    Document #2028185    Filed: 11/27/2023    Page 10 of 1070

| | | |
|---|---|---|
| | | ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. Oral argument heard, and the court takes the motion under advisement. (Court Reporter: Nancy Meyer) (tj) (Entered: 04/13/2023) |
| 04/20/2023 | 27 | ORDER denying 8 Plaintiffs' Motion for a Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 4-20-2023. (lcrc3) (Entered: 04/20/2023) |
| 04/20/2023 | 28 | MEMORANDUM OPINION denying 8 Plaintiffs' Motion for a Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 4-20-2023. (lcrc3) (Entered: 04/20/2023) |
| 05/03/2023 | 29 | Joint MOTION to Stay *Proceedings Pending Appeal* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 05/03/2023) |
| 05/04/2023 | | MINUTE ORDER granting 29 Joint Motion to Stay Proceedings Pending Appeal: It is hereby ORDERED that this matter is STAYED until further order of the Court. SO ORDERED. Signed by Judge Rudolph Contreras on 5-4-2023. (lcrc3) (Entered: 05/04/2023) |
| 05/16/2023 | 30 | NOTICE OF APPEAL TO DC CIRCUIT COURT by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. Filing fee $ 505, receipt number ADCDC-10072470. Fee Status: Fee Paid. Parties have been notified. (Lyon, George); Modified on 5/17/2023 to add docket entry relationships. (ztth). (Entered: 05/16/2023) |
| 05/17/2023 | 31 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 30 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 05/17/2023) |
| 05/17/2023 | | USCA Case Number 23-7061 for 30 Notice of Appeal to DC Circuit Court, filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. (znmw) (Entered: 05/17/2023) |
| 07/23/2023 | 32 | TRANSCRIPT OF MOTION HEARING before the Honorable Rudolph Contreras held on 04/13/2023. Page Numbers: 1-33. Date of Issuance: 07/23/2023. Stenographic Court Reporter: Nancy J. Meyer. Telephone Number: 202-354-3118. Email: nancymeyercourtreporter@gmail.com. Transcripts may be ordered by going to www.dcd.uscourts.gov (left-hand side under Transcript Requests). For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats (multi-page, condensed, CD, or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have 21 days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 8/13/2023. Redacted Transcript Deadline set for 8/23/2023. Release of Transcript Restriction set for 10/21/2023.(Meyer, Nancy J.) (Entered: 07/23/2023) |
| 07/28/2023 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. Attorney Andrew J. Saindon terminated. (Saindon, Andrew) (Entered: 07/28/2023) |

**APP. 7**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/27/2023 06:10:12 | | | |
| **PACER Login:** | emwenger50 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02256-RC |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON** ) | |
| **TYLER YZAGUIRRE** ) | |
| **NATHAN CHANEY** ) | |
| **ERIC KLUN** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 22-cv-2256 |
| ) | |
| **DISTRICT OF COLUMBIA**, ) | |
| Serve: Mayor Muriel Bowser ) | |
| 1350 Pennsylvania Avenue, NW ) | |
| Washington, DC 20004 ) | |
| ) | |
| c/o Office of Attorney General ) | |
| 1 Judiciary Square ) | |
| 441 4th Street, N.W., 6th Fl. South ) | |
| Washington, D.C. 20001 ) | |
| ) | |
| and ) | |
| ) | |
| **ROBERT J. CONTEE III** ) | |
| Metropolitan Police Department ) | |
| 300 Indiana Avenue, N.W. ) | |
| Washington, DC 20004 ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
## AND DAMAGES

COME NOW the Plaintiffs, Andrew Hanson, Tyler Yzaguirre, Nathan Chaney, and Eric

Klun, by and through their undersigned counsel, and file this complaint for declaratory, injunctive

relief with respect to DC Code Section 7-2506.01(b) and damages for the enforcement of that code

section against Plaintiffs.

1

**APP. 9**

**THE PARTIES**

1.      Plaintiff Andrew Hanson is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

2.      Plaintiff Tyler Yzaguirre is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

3.      Plaintiff Nathan Chaney is a natural person and a citizen of the United States and of the Commonwealth of Virginia. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would

**APP. 10**

possess such magazines within the District of Columbia for all lawful purposes including self-defense.

4.      Plaintiff Eric Klun is a natural person and a citizen of the United States and of the State of Maryland. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess such magazines within the District of Columbia for all lawful purposes including self-defense.

5.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

6.      Defendant Robert J. Contee III is the Chief of the District of Columbia's MPD. Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs, and practices against Plaintiffs, and is in fact presently enforcing the challenged laws, customs, and practices against Plaintiffs. Defendant Contee is sued in both his individual and official capacities.

**JURISDICTION AND VENUE.**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988. Plaintiffs' claims for declaratory and

**APP. 11**

injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS.**

**The Second Amendment.**

9.      The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

10.     The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* 597 U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*"); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (per curiam) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

11.     Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

12.     The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1.

**APP. 12**

**The statutory scheme.**

13.    This action challenges the constitutionality of DC Code Section 7-2506.01(b). This Section outlaws the possession of so-called large capacity ammunition feeding devices. Specifically, this section provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

14.    Pursuant to DC Code Section 7-2507.06(a)(4) possession of what the District defines as a large capacity feeding device is a felony carrying a penalty of up to three years in prison. In addition, conviction can result in the imposition of a fine of up to $12,500. DC Code Section 22-3571.01(b)(6).

15.    The term "large capacity feeding device" as used in the Code is not a technical term used in the firearms industry or community. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that come standard with magazines holding more than 10 rounds, and which are owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the District's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Magazines" shall have the same meaning as the term "large capacity feeding device" in section DC Code Section 7-2506.01(b).

**APP. 13**

**DC Code Section 7-2506.01(b) infringes Plaintiffs' right to keep and bear arms.**

16.     Pursuant to the Supreme Court's decisions in *Bruen, supra,* and *District of Columbia v. Heller*, *supra*, and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to keep firearms in common use in the home and to carry a handgun in public for self-protection. A necessary component of the right to own or carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment). Likewise in order to employ ammunition in a firearm, it is necessary to possess and use ammunition feeding devices such as the Banned Magazines.

17.     Plaintiffs currently own and possess Banned Magazines outside the District. Plaintiffs desire to possess the Banned Magazines in the District for all lawful purposes including self-defense. Moreover, they wish to acquire more Banned Magazines and use their Banned Magazines for all lawful purposes, including self-defense.

18.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller,* 554 U.S. at 627. The D.C. Circuit addressed this commonly owned issue with respect to the Banned Magazines in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*")*.* There the majority opinion stated, "As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Id.* at 1261.

**APP. 14**

19.     Inasmuch as the decision in *Heller II,* upholding the ban on magazines holding in excess of 10 rounds was based on an application of so-called intermediate scrutiny, that decision has been abrogated by *Bruen,* slip op. at 13-15, which specifically rejected the application of means/ends balancing tests like intermediate scrutiny to firearms regulations in favor of the text, history and tradition approach favored by the dissenting opinion of then judge, now Justice Kavanaugh. *See Heller II,* 670 F.3d at 1269-96.

20.     Similarly, the 4th Circuit in Kolbe v. Hogan addressed the commonly owned issue. 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra.* In his dissent (which, after *Bruen,* likely represents the correct interpretation of the law), Judge Traxler stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

Id., 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted).

21.     Law-abiding citizens own literally tens of millions of Banned Magazines such as those owned and possessed by Plaintiffs. The District's prohibition on the possession of the Banned Magazines owned by Plaintiffs violates the Second Amendment because it prohibits the possession of a commonly owned component of an arm protected by the Second Amendment..

22.     There is an actual and present controversy between the parties. The District infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of magazines commonly possessed by millions of Americans for lawful purposes. Plaintiffs desire a judicial declaration that DC Code Section 7-2506,01(b), facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to

**APP. 15**

choose between risking criminal prosecution and exercising their constitutional rights. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

23.     Plaintiffs are injured by Defendants' enforcement of the DC Code Section 7-2506.01(b) as this provision violates Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will continue to enforce this provision in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Though Plaintiffs seek damages for the violation of their Second Amendment rights, damages appear indeterminate or unascertainable beyond a nominal amount and, in any event, would not fully redress the harm Plaintiffs are suffering.

24.     Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate, consistent with the nation's historical tradition of firearms regulation, the manner of keeping and carrying arms, and may prohibit certain arms in narrowly defined sensitive places, prohibit the keeping and carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and others, such laws are invalid unless supported by the text of the Second Amendment or by historical analogues existing at the time of, or in close proximity to, the founding. *Bruen, slip op.* at 13.

**APP. 16**

25.    Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

26.    The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection.

27.    The prohibiting on the Banned Magazines places Plaintiffs at risk in the event of a deadly force criminal attack by limiting the number of rounds Plaintiffs may rapidly bring to bear to protect their lives. There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Indeed, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

28.    Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by

**APP. 17**

causing sufficient trauma and blood loss so that the attacker loses the ability to cause harm. Handgun bullets, however, are rather weak for this purpose as has been proven by numerous officer involved and civilian shootings.

29.     For example, Jacksonville Police Officer Jared Reston fired 14 shots in attempting to stop a shoplifter who carried a handgun chambered in .45 caliber, one of the larger caliber pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight only with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/. In a video where Reston goes into detail concerning the incident, he states that if he had had to reload, he would have been killed. Reston, Winning an Armed Encounter, Speech Delivered at McHenry County College (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.[1]

30.     Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun
> battles with armed robbers, winning every one. In one of those incidents, he had to

---

[1] Reston explained, "I am a huge capacity person. A good workable caliber with capacity. If I were to have like a single stack 1911 or any single stack gun at that point, I would have had to reload in to there somewhere and that reload would have probably cost me my life." *Id.* at 17:47-18:07. "I'm a pretty good reloader and I can do it under two seconds, but that's almost 50 percent of damn gun fight itself I would have wasted reloading." *Id.* at 18:09-18:17.T

fire 19 rounds before the last of his multiple opponents was out of the fight. Some
bad guys can soak up an unbelievable amount of lead, and the cunning ones run
and use cover, making them harder to hit and requiring more shots to stop them.

A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He
pulled over a heavily armed suspect who came out shooting, and the fight was on.
In just under a minute, the perpetrator was finally down and dead. During that time,
Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and
hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits
were in what most of us would call "vital zones," but the fight wasn't over until
Gramins finally had the opportunity for brain shots. During that fight the suspect
had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14,

2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-

debunked-massad-ayoob/.

31.     Wisconsin officer Brian Murphy was shot 15 times by a mass murdering white

supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the

face, throat, both hands, both arms, and both legs. Despite these grievous injuries, he survived. *See*

Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at

https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

32.     In commenting on another incident in which a suspect was shot 17 times with both

.40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and

was still struggling with police as he was being handcuffed, a report of the FBI's Defensive

Systems Unit – Ballistic Research Facility, FBI Academy, stated,  "Determined individuals can

sustain many gunshot wounds in areas that produce great pain and continue to fight a long time,

even without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always

the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at

https://info.publicintelligence.net/FBIAAROfficerShooting.pdf. In that gun fight, two officers

**APP. 19**

fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

33.     Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

34.     These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds will be sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[2] In his video presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter*, supra, at 23;50-24:24, available at

---

[2] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

**APP. 20**

https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

35.     Reloading a firearm takes precious seconds that a victim may not have during a criminal attack. SWAT officer Jared Reston may be able to reload his pistol in two seconds, but the average citizen gun owner is much slower. Moreover, there may be circumstances where reloading is impossible. Reloading a semi-automatic handgun requires the use of two hands. That might not be possible under certain circumstances. For example, a person attempting to fend off an attacker in physical contact with him or her, likely will not have both hands free to reload an empty gun. Likewise, a homeowner awakened at night by the sound of a break in will likely have a firearm in one hand and flashlight in the other, and no room for a second magazine. The Chief's rule thereby imposes a severe and substantial infringement on the ability of Plaintiffs to use their self-defense firearms for the lawful protection of themselves and others. This is especially the case in which a licensed concealed carrier or armed District homeowner might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.   (The   Ayoob   Files)*   (2003),   available   at

13

**APP. 21**

https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot out.+(The+Ayoob...-a099130342.

36.     We note that District police officers are mandated to carry 52 rounds for their self-defense when on duty with their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds, and two additional full 17 round magazines.[3] What is good for MPD officers, however, is forbidden to the D.C. residents and out of state persons who D.C. concealed pistol license holders. Yet, those license holders have undergone rigorous training and background checks which are among the most demanding in America.

**SECTION 7-2506.01(b) LACKS ANY HISTORIC ANALOGUE**.

37.     Plaintiffs are unaware of any founding era limitations on the capacity of firearms a person could own or carry to defend himself from an assailant. The District of Colorado recently addressed a similar magazine ban in *Rocky Mountain Gun Owners v. Town of Superior,* Case No. 22-cv01685. There Judge Raymond P. Moore issued a Temporary Restraining Order against the town's ordinance which, inter alia, banned magazines like the Banned Magazines at issue in this case. Applying the test the Supreme Court articulated in *Bruen,* Judge Moore stated, "the Court is unaware of historical precedent that would permit a government entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes whether in an individual's home or in public." *Id.* Doc. 18 at 10.

---

[3] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008). Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). *See Duncan v. Bonta,* Case No. 21-1194, Petition for Writ of Certiorari (February 28, 2022), cert. granted, vacated and remanded, 597 U.S. __ (June 30, 2022).

**APP. 22**

38.     Prior cases involving bans on magazines, such as the Banned Magazines at issue in this case, failed to elicit any historical justification as required by *Bruen. See generally Heller II,* 650 F.3d 1244; *Kolbe v. Hogan,* 849 F.3d 114; *Duncan v. Bonta*, No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; mandate stayed in part pending petition for certiorari Dec. 20, 2021), cert granted, vacated and remanded (June 30, 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), cert. denied, 141 S. Ct. 109 (2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. ("ANJRPC")*, 910 F.3d 106 (3d Cir. 2018).; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("NYSRPA"), 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

39.     Firearms with ammunition capacity in excess of 10 rounds date back to the 1500s. Professor David Kopel has done the heavy lifting researching the history of firearm ammunition capacity and restrictions. *See* Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) (hereinafter "Kopel"). He reports the first known firearm able to fire more than ten rounds without reloading was a 16-shot gun created around 1580. *Id.* at 852. Another early design was the 11-round "Defence Gun," patented in 1718 by inventor James Puckle. *Id.*

40.     Professor Kopel further explains that when the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 22-shot magazine capacity. *Id.* at 853. Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition. *Id.* One shot from that gun could penetrate a one-inch-thick wood plank or take down an elk. *Id.*

41.     Firearm technology progressed rapidly in the 1800s as manufacturers sought to produce reliable firearms with greater ammunition capacities for consumers. *Id.* 1821 saw the introduction of the Jennings multi-shot flintlock rifle, which could fire 12 shots before reloading.

**APP. 23**

*Id.* "Pepperbox" pistols began to be produced in America in the 1830s. *Id.* at 853-54. These pistols had multiple barrels that would fire sequentially. *Id.* at 854. Although most were produced as five or six shot models, 12 shot, 18 shot and 24 shot models were produced. *Id.* Pepperboxes were eventually supplanted by revolvers. *Id.*

42.     A variety of other firearms having a capacity in excess of 10 rounds were invented in the antebellum years, including the Bennett and Haviland Rifle (12 shot); and rifles invented by Alexander Hall (15 shots) and by Colonel Parry W. Porter (38 shot). *Id.*

43.     Daniel Wesson and Oliver Winchester produced the first metallic cartridges similar to modern ammunition. *Id.* They also invented a lever action firearm that employed these cartridges. *Id.* In 1855, they introduced the Volcanic rifle, with up to a 30-round tubular magazine under the barrel. *Id.* at 855. In 1862, the Volcanic evolved into the 16-round capacity Henry lever action rifle. *Id.* The Henry rifle further evolved into the Winchester repeating rifle, Model 1866. *Id.* According to advertising, the M1866 could be fired 30 times a minute or with 17 rounds in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." *Id.* Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a 15-round capacity. *Id.* at 856. The Evans Repeating Rifle came on the market in 1873 with a rotary helical magazine in the buttstock that held 34 rounds. *Id.*

44.     Pin-fire revolvers with capacities of up to 20 or 21 rounds entered the market in the 1850s. *Id.* For revolvers with other firing mechanisms, there were some models with more than 17 rounds. *Id.* The 20-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. *Id.*

45.     The semiautomatic firearm with a detachable magazine was invented before the turn of the 20th century. *Id.* at 857. In 1896, Germany's Mauser introduced the C96 "broomhandle"

**APP. 24**

pistol, which remained in production until the late 1930s. *Id.* It has capacities ranging from a low of six to a high of 20 rounds. *Id.* The Luger semiautomatic pistol was brought to the market in 1899. *Id.* The most common magazines were seven or eight rounds, but there was also a 32-round drum magazine. *Id*

46.     The 20th Century saw a variety of rifles with magazines capable of holding more than 10 rounds, ranging from various .22 plinking rifles to the M-1 carbine introduced in 1927 to the AR-15 introduced in 1963, followed by such rifles as the Springfield M1A and the Ruger mini-14. *Id.* at 857-60.

47.     Firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. *Id.* at 861. In 1935, Browning introduced the Hi-Power pistol. *Id.* This handgun was sold with a 13-round detachable magazine and is still in production. *Id.* The Beretta model 92, a nine-millimeter pistol with a 16-round magazine, entered the market in 1976. *Id.* Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action). *Id.* Also coming on the market at that time were European handguns such as Austria's L.E.S. P-18 (18 rounds) and Germany's Heckler & Koch VP 70Z (also 18 rounds). *Id.* at 861-62. And the Austrian manufactured Glock 17 pistol (17 round magazine), now standard issue for a majority of law enforcement agencies in the United States, was introduced into the country in the 1980s. *See* Barrett, Glock: The Rise of America's Gun (2012).

48.     When the Second Amendment was adopted no laws restricted ammunition capacity. Kopel at 864. The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. *Id.* In 1927, Michigan prohibited

**APP. 25**

firearms which could be fired more than 16 times without reloading. *Id.* That same year Rhode Island banned semi-automatic firearms which could fire more than 12 shots without re-loading. *Id.*

49.     In 1959 Michigan repealed its ban and Rhode Island amended its limit to 14 shots, excluding .22 caliber rimfire guns. *Id.* at 864-65. Rhode Island repealed its limit in 1975. *Id.* at 865. Neither statute covered a bare magazine that was not inserted into a firearm. *Id.*

50.     Ohio enacted a 1933 law requiring a special permit for possession or sale of a semiautomatic firearm with an ammunition capacity of greater than 18 rounds. *Id.* In 1971, the state exempted .22 caliber firearms, and raised the limit for other calibers to 32 or more rounds. *Id.* The Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *Id.* With or without the permit, one could buy a 60-round magazine in Ohio. *Id.* The licensing law was repealed in 2014. *Id.*

51.     The only statute continuously in effect from the prohibition era limiting magazine capacity is the District's. *Id.* at 866.[4] In 1932, Congress prohibited the possession in the District of a firearm that "shoots automatically or semiautomatically more than 12 shots without reloading." *Id.* Prior to the *Heller* decision, the District interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. *Id.* The District stands alone in its historical restriction of magazines, and the law in question is not of founding era pedigree. *Id. See Bruen, slip op.* at 57 (finding that a Texas 1873 law and a West Virginia 1900 restricting public carry of handguns were outliers). Moreover, *Bruen, slip op.* at 58 n.28 specifically rejected 20th Century firearm restrictions as historical evidence, stating, "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-

---

[4] *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

**APP. 26**

century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

52.     The only widespread restriction on magazine capacity came in 1994 when Congress banned new magazines holding more 10 ten rounds. *Id.* The law sunset in 2004. *Id.* The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. *Id.* The final report concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury ...." *Id.* at 866-87[5] Further, "the ban has not yet reduced the use of [such magazines] in crime ...." *Id.* Doctor Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* As discussed above, *Bruen* renders the 1994 Congressional act historically irrelevant.

53.     Professor Kopel observes that of the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being "longstanding" or part of American history and tradition. *Id.* at 883-84. The opinion in *Bruen* requires a historical analogue to have been well-established. *Bruen, slip op.* at 21 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.") *Bruen* in fact found insufficient New York's reliance on the laws of  "a handful of late-19th-century jurisdictions" to justify its restrictive firearm carry regime. *Bruen, slip op.* at 29. It is clear from the discussion above that Ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Kopel at 884.

---

[5] Quoting Koper, et al., An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

**APP. 27**

54.     In sum, no regulations from around the time of the adoption of the Second or 14th

Amendments limited the ammunition capacity of a firearm. Firearms with ammunition capacity in

excess of 10 rounds have been available since well before the Second Amendment was adopted.

Restrictions on ammunition capacity being  of only recent vintage are not supported by reference

to the nation's historical regulation of firearms.

55.     Certain 20th Century hunting regulations generally do restrict the number of

shotgun shells or rifle rounds allowable in a hunting weapon. However, these are conservation

regulations designed to prevent overhunting and are obviously not of founding era pedigree as

*Bruen* requires. As one commentator has explained it,

> At the behest of […] hunters, laws were passed to better regulate hunting in the
> United States. Laws created bag limits, possession limits, sectioned off certain plots
> of land as refuges for birds. This is also where we got laws banning the sale of wild
> game meat (if you have a source of venison that you purchase, it is from a farm).
>
> One set of game laws that rose out of that early movement was magazine capacity
> limits. The idea was that a recreational hunter would only kill one or two birds out
> of a flock, it wasn't considered sporting to blast dozens of ducks out of the water.
> Limiting shotguns to 10 gauge and smaller with only few shells played a big part
> in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the
> 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal
> law restricting waterfowl hunters to three shots was enacted. As it happened,
> waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3,

2021),                available                at                https://backfire.tv/why-shotguns-have-

plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depe

nding%20on%20the%20gauge%20and%20magazine%20length.

56.     Plainly, these types of modern hunting regulations have no nexus to the Second

Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen*

20

**APP. 28**

requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).") Since no historical analog for limiting the capacity of firearm magazines exists, the District's limitation as set forth in DC Code Section 7-25506.01(b) fails Second Amendment scrutiny. *See Bruen, slip op.* at 67.

57.     In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

58.     Accordingly, it would be error for the Court to evaluate the regulation at issue under some type of the means-end tiers of scrutiny approach *Bruen* specifically rejects. *Id.* at 15. The appropriate test is the text of the Second Amendment and the nation's historical tradition of firearms regulation. The D.C. magazine ban fails this test. Because there is no historic tradition in this nation of limiting firearm magazine capacity, the District's prohibition on possession of

**APP. 29**

magazines having a capacity in excess of 10 rounds is unconstitutional as violative of the Second Amendment.

**FIRST CLAIM FOR RELIEF: U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS.**

59.    DC Code Section 7-2506.01(b)'s prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is not supported by the nation's historical tradition of firearms regulation. As such the law violates Plaintiffs' Second Amendment rights.

60.    DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against DC Code Section 7-206.01(B), and damages for the violation of their Second Amendment rights.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

61.    DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to keep and bear arms for self-defense.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

**APP. 30**

1. Enter a declaratory judgement that the DC Code Section 7-2506.01(b) is arbitrary and unreasonable under the Second and Fifth Amendments to the United States Constitution;

2. Enter a declaratory judgement that DC Code Section 7-2506.01(b) violates the Second Amendment to the United States Constitution;

3. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DC Code Section 7-2506.01(b) within the District of Columbia;

4. Enter an order awarding Plaintiffs damages in an amount to be determined at trial;

5. Enter an order awarding Plaintiffs their costs of suit, including attorneys fees and costs pursuant to 42 U.S.C. §1988; and

6. Enter an order providing any other and further relief that the court deems just and appropriate.

**APP. 31**

Respectfully submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 1, 2022

**APP. 32**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON, ET AL.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Civil Action No. 22-cv-2256 RC |
| | ) |
| **DISTRICT OF COLUMBIA, ET AL.** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## APPLICATION FOR PRELIMINARY INJUNCTION

Plaintiffs move this court to enter a preliminary injunction, enjoining Defendants from enforcing the provisions of DC Code Section 7-2506.01(b). Submitted concurrently herewith is a Memorandum of Points and Authorities in support of this application and a proposed order. Counsel for Defendants has been asked the Defendants' position on this application and has indicated that the Defendants do not consent to entry of the requested injunction.

Respectfully submitted

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 19, 2022


### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing

document on all counsel of record for Defendants through the court's ECF system, this 19th day of

August, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 34**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON, ET AL.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-2256 RC |
| | ) |
| **DISTRICT OF COLUMBIA, ET AL.** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  August 19, 2022

# TABLE OF CONTENTS

Table of Authorities ……………………………………………………………………... ii

I.      Plaintiffs have standing to bring this action ……………………………………… 1

II.     Plaintiffs are entitled to a preliminary injunction …………………...………………… 2

        A.      Plaintiffs are likely to prevail on the merits …………………………...……… 3

                1.   The Second Amendment …………………………………….................... 3

                2.   The statutory scheme …………………………...…………………….. 4

                3.   DC Code Section 7-2506.01(b) infringes Plaintiffs' right
                     to keep and bear arms ……………………………………………… 5

                     a.   The Banned Magazines are commonly owned weapons
                          components ……………………..……………………………... 5

                     b.   DC Code Section 7-2506.01(b) is more than a de minimis burden on
                          Plaintiffs' Second Amendment right of self-defense ………………… 7

                     c.   DC Code Section 7-2506.01(b) lacks any historical analogue ……... 14

        B.      Plaintiffs will continue to suffer irreparably harm in the absence
                of preliminary relief ………………………………………………………… 21

        C.   The balance of equities tips overwhelmingly in Plaintiffs' favor ……………..…… 23

        D.   An injunction is in the public interest ………………………………………… 23

III.    The court should waive the bond requirement or set a nominal bond because
        Defendants will suffer no harm from a preliminary injunction …………………..…… 24

IV.     The court should enter final judgment for plaintiffs ……………………………… 26

V.      Conclusion ………………………………………………………………...…… 27

Exhibit 1, Declaration of Andrew Hanson

Exhibit 2, Declaration of Tyler Yzaguirre

Exhibit 3, Declaration of Nathan Chaney

Exhibit 4, Declaration of Eric Klun

**APP. 36**

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama,*
      742 F.3d 1023 (D.C. Cir. 2014) ……………………………………..…………..… 2, 3

*Ark. Best Corp. v. Carolina Freight Corp.,*
      60 F.Supp.2d 517 (W.D.N.C. 1999) …………………………………….…………… 24

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
      910 F.3d 106 (3d Cir. 2018) …………………………………………………….….. 14

*Berg v. Glen Cove City School District,*
      853 F.Supp. 651 (E.D.N.Y. 1994) …………………………………………….………… 22

*Caetano v. Massachusetts,*
      577 U.S. 411 (2016) …………………………………………………………………… 3, 8

*Chaplaincy of Full Gospel Churches v. England,*
      454 F.3d 290 (D.C. Cir. 2006) …………………………………………….……… 21, 23

*Curtis 1000, Inc. v. Suess,*
      24 F.3d 941 (7th Cir. 1994) …………………………………….…………………… 26

*Davis v. District of Columbia,*
      158 F.3d 1342 (D.C. Cir. 1998) …………………………………………………… 22

*\*District of Columbia v. Heller,*
      554 U.S. 570 (2008) …………………………………………………….……….. passim

*Doe v. Shenandoah County School Board,*
      737 F.Supp. 913 (W.D.Va. 1990) …………………………………………….………… 22

*Duncan v. Bonta,*
      No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; *mandate stayed
      in part pending petition for certiorari* Dec. 20, 2021), Case No. 21-1194,
      *cert granted, vacated and remanded*, 597 U.S. __ (June 30, 2022) ………………... 13, 14

*Elrod v. Burns,*
      427 U.S. 347 (1976) …………………………………………………………………… 22

*Ezell v. Chicago,*
      651 F.3d 684 (7th Cir. 2011) ……………………………………….…………….. 5, 22, 23

**\*Denotes principal cases relied upon**

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ……………………………………………………… 14

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ………………………………………….. 21, 22, 23

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) …………………………………..……........ 5, 6

*Heller v. District of Columbia*,
    801 F.3d 264 (D.C. Cir. 2015) …………………………………..…………….. 8

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ……………………….………………………… 24

*Joynes v. Lancaster*,
    553 F.Supp. 809 (M.D.N.C. 1982) ……………………………………..…… 22

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ………………………………………………… 23

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ……………………………………………… 6, 14

*Konigsberg v. State Bar of California*,
    366 U.S. 36 (1961) ………..……………………………………………….. 21

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ………………………………………………..……… 1

*McDonald v. Chicago*,
    561 U.S. 742 (2010) …………………………………………………… 3

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) *reh'g en banc denied*,
    708 F.3d 901 (7th Cir. 2013)…………………………………………… 26, 27

*Morris v. District of Columbia*,
    38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………………... 26

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. __, Case No. 20-843, *slip op.* (June 23, 2022) ………………………… passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) …………………………………………………... 14

iii

**APP. 38**

*Palmer v. District of Columbia,*
   59 F.Supp.3d 173 (D.D.C. 2014) …………………………………………….... 3, 8

*Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.,*
   50 F.3d 1168 (2d Cir. 1995) …………………………………………………….. 25

*Rocky Mountain Gun Owners v. Town of Superior,*
   Case No. 22-cv-01685, Doc. 18 …………………………………………………… 14

*SEC v. Dowdell,*
   Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 (W.D. Va., Oct. 11 , 2002) ….. 24

*Temple Univ. v. White,*
   941 F.2d 201 (3d Cir. 1991), *cert. denied* 502 U.S. 1032 (1992) ………………………. 25

*The Truth About Obama v. Federal Election Commission,*
   575 F.3d 342 (4ᵗʰ Cir. 2009), *remanded other grounds* 130 S.Ct. 237 (2010) ………..… 2

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
   249 F. Supp.2d 98, 128 (D. Mass. 2003) …………………………………………... 25

*Winter v. National Resources Defense Fund,*
   555 U.S. 7 (2008) ……………………………………………………..……… 2, 21

*Worman v. Healey,*
   922 F.3d 26 (1st Cir. 2019), *cert. denied* 141 S. Ct. 109 (2020) ……………………….. 14

*\*Wrenn v. District of Columbia,*
   864 F.3d 650 (D.C. Cir. 2017) ………………………...……………………….………… passim

## Statutes and Rules

Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652 ………………………. 18

DC Code Section 7-2506.01(b) ……………………………………………………….. passim

DC Code Section 7-2507.06(a)(4) ………………………………………………...….....… 4

DC Code Section 22-3571.01(b)(6) ……………………………………………………… 4

Fed. R. Civ. P. 65(a) …………………………………………………..……….…... 26

Fed. R. Civ. P. 65(c) …………………………………………………..…………… 24

U.S. Const. Amend. II ……………………………………………………………… passim

**APP. 39**

## Other authorities

1 A New and Complete Law Dictionary (1771) ……………………………………….…… 3

1 Dictionary of the English Language 107 (4th ed.) ……………………………………….………3

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/ …………………………………………………………………... 10, 15

Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/ ……………………………………………………………………………….. 11

Ayoob, *Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* (2003), available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shootout.+(The+Ayoob...-a099130342 …………………………………………………………… 13

Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/ ……..… 10

Barrett, *Glock: The Rise of America's Gun* (2012) …………………………………………….. 17

FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf ................................................ 11

Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death ……………….. 12

Klaus, *Carjacking, 1993-2002, National Crime Victimization Survey* (July 2004), available at https://bjs.ojp.gov/content/pub/pdf/c02.pdf ................................................................................ 13

Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) ……………………………………………………………… 15, 1, 17, 18, 19

Koper, et al., *An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003*, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ........................................................ 18, 19

Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017) ……………….... 11

MPD General Order RAR-901.01 (June 12, 2008) …………………………………………... 13

**APP. 40**

Purkiss, *Locked Back, Lessons from Jared Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/ ……………………………………………………………………….. 9

Reston, *Winning an Armed Encounter* (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU ………………………………………… 9, 12

*Samson, 4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison,  Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall* …………………………………… 12, 13

Seagraves, *Carjackings in DC Spark Anger, Frustration Among Residents* (January 31, 2022), available at https://www.nbcwashington.com/news/carjackings-in-dc-spark-anger-frustration-among-residents/2955523/ ………………………………………………………………... 13

Than, *Gunshot Wound Head Trauma (undated), available at https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-Head-Trauma* ………………………………………………………………………………... 11

Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html ..... 9

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length ……………………………... 20

**APP. 41**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON, ET AL.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-2256 RC |
| | ) |
| **DISTRICT OF COLUMBIA**, **ET AL.** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION

Plaintiffs submit this memorandum of points and authorities in support of their application to preliminarily enjoin enforcement of DC Code Section 7-2506.01(b). In support, the following is shown:

## I.    *Plaintiffs have standing to bring this action.*

To show standing, Plaintiffs must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be both fairly traceable to the challenged action of the Defendants and redressable by the court. *Id*. at 560-61. Plaintiffs plainly meet this standard.

Plaintiffs here are suffering an immediate and continuing injury because the Defendants by enforcement of DC Code Section 7-2506.01(b) restrict Plaintiffs from employing the firearm magazines banned by that provision which Plaintiffs would use in exercising their right under the Second Amendment to keep and carry firearms for personal protection within the District and for all other lawful purposes.

Each Plaintiff has been issued a license to carry handguns in public in the District pursuant to District law. *See* Exhibit 1 (Declaration of Andrew Hanson); Exhibit 2 (Declaration of Tyler

**APP. 42**

Yzaguirre); Exhibit 3 (Declaration of Nathan Chaney); Exhibit 4 (Declaration of Eric Klun). Plaintiffs would employ the banned magazines when carrying firearms outside their homes for personal protection. Moreover, Plaintiffs Hanson and Yzaguirre, as District residents, would employ the banned magazines for home protection as well. However, DC Code Section 7-2506.01(b) prohibits Plaintiffs' possession of the Banned Magazines within the District thereby restricting the amount of ammunition immediately available to Plaintiffs in the event of a lethal force attack upon them. This limitation restricts the ability of Plaintiffs to exercise their Second Amendment right to keep and carry firearms for personal protection in a way that is not consistent with the nation's historical tradition of firearms regulation. It is therefore invalid under the test the Supreme Court announced in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. __, Case No. 20-843, *slip op.* (June 23, 2022) (hereinafter "*Bruen*").

A decision by this court invalidating the District regulation in question and granting the relief requested in Plaintiffs' Complaint will redress the injury Plaintiffs are suffering as it will allow the Plaintiffs to possess the Banned Magazines and employ them in the event of a lethal force attach upon them. As such they have standing to maintain this action to enjoin DC Code Section 7-2506.01(b).

## II. *Plaintiffs are entitled to a preliminary injunction.*

A plaintiff seeking a preliminary injunction must establish four factors: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. National Resources Defense Fund,* 555 U.S. 7 (2008); *The Truth About Obama v. Federal Election Commission,* 575 F.3d 342 (4th Cir. 2009), remanded other grounds, 130 S.Ct. 237 (2010) (subsequent history omitted). *See also Aamer v. Obama*, 742 F.3d

**APP. 43**

1023, 1038 (D.C. Cir. 2014). Each of these factors supports grant of Plaintiffs' application for a preliminary injunction.

### A.    *Plaintiffs are likely to prevail on the merits.*

As we show below, Plaintiffs are likely to prevail on the merits of their claims because DC Code Section 7-2506.01(b) violates their Second Amendment rights.

### 1.    *The Second Amendment.*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Bruen, supra*; *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (per curiam) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1.

**APP. 44**

### 2. *The statutory scheme.*

This action challenges the constitutionality of DC Code Section 7-2506.01(b). This Section outlaws the possession of so-called large capacity ammunition feeding devices. Specifically, this section provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

Pursuant to DC Code Section 7-2507.06(a)(4) possession of what the District defines as a large capacity feeding device is a felony carrying a penalty of up to three years in prison. In addition, conviction can result in the imposition of a fine of up to $12,500. DC Code Section 22-3571.01(b)(6).

The term "large capacity feeding device" as used in the Code is not a technical term used in the firearms industry or community. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that come standard with magazines holding more than 10 rounds, and which are owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the District's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Magazines" shall have the same meaning as the term "large capacity feeding device" in DC Code Section 7-2506.01(b).

**APP. 45**

     **3.** ***DC Code Section 7-2506.01(b) infringes Plaintiffs' right to keep and bear arms.***

Pursuant to the Supreme Court's decisions in *Bruen, supra, and District of Columbia v. Heller*, *supra*, and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to keep firearms in common use in the home and to carry a handgun in public for self-protection. A necessary component of the right to own or carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment). Likewise in order to employ ammunition in a firearm, it is necessary to possess and use ammunition feeding devices such as the Banned Magazines.

Plaintiffs currently own and possess Banned Magazines outside the District. Plaintiffs desire to possess their Banned Magazines in the District for all lawful purposes including self-defense. Moreover, they wish to acquire more Banned Magazines and use their Banned Magazines for all lawful purposes, including self-defense.

     ***a.*** ***The Banned Magazines are commonly owned weapons components.***

The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller,* 554 U.S. at 627. The D.C. Circuit addressed this commonly owned issue with respect to the Banned Magazines in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) (hereinafter "*Heller II*")*.* There the majority opinion stated, "As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some

**APP. 46**

capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Id.* at 1261.

Inasmuch as the decision in *Heller II,* upholding the ban on magazines holding in excess of 10 rounds was based on an application of so-called intermediate scrutiny, that decision has been abrogated by *Bruen,* slip op. at 13-15, which specifically rejected the application of means/ends balancing tests like intermediate scrutiny to firearms regulations in favor of the text, history and tradition approach favored by the dissenting opinion of then judge, now Justice Kavanaugh. *See Heller II,* 670 F.3d at 1269-96.

Similarly, the 4th Circuit in *Kolbe v. Hogan* 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra,* addressed the commonly owned issue.. In his dissent (which, after *Bruen,* likely represents the correct interpretation of the law), Judge Traxler stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

Id., 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted).

Law-abiding citizens own tens of millions of Banned Magazines such as those owned and possessed by Plaintiffs. The District's prohibition on the possession of the Banned Magazines owned by Plaintiffs violates the Second Amendment because it prohibits the possession of a commonly owned component of an arm protected by the Second Amendment.

There is an actual and present controversy between the parties. The District infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of magazines commonly possessed by millions of Americans for lawful purposes.

**APP. 47**

Plaintiffs desire a judicial declaration that DC Code Section 7-2506.01(b), facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

### b.   DC Code Section 7-2506.01(b) is more than a de minimis burden on Plaintiffs' Second Amendment right of self-defense.

Plaintiffs are injured by Defendants' enforcement of the DC Code Section 7-2506.01(b) as this provision violates Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will continue to enforce this provision in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Though Plaintiffs seek damages for the violation of their Second Amendment rights, damages appear indeterminate or unascertainable beyond a nominal amount and, in any event, would not fully redress the harm Plaintiffs are suffering.

Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate, consistent with the nation's historical tradition of firearms regulation, the manner of keeping and carrying arms, and may prohibit certain arms in narrowly defined sensitive places, prohibit the keeping and carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and others, such laws are invalid unless supported by the text of the

**APP. 48**

Second Amendment or by historical analogues existing at the time of, or in close proximity to, the founding. *Bruen, slip op.* at 13.

Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection.

The prohibiting of the Banned Magazines places Plaintiffs at risk in the event of a deadly force criminal attack by limiting the number of rounds Plaintiffs may rapidly bring to bear to protect their lives. There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Indeed, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

**APP. 49**

Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by causing sufficient trauma and blood loss so that the attacker loses the ability to cause harm. Handgun bullets, however, are rather weak for this purpose as has been proven by numerous officer involved and civilian shootings.

For example, Jacksonville Police Officer Jared Reston fired 14 shots in stopping a shoplifter who tried to kill him. The suspect carried a handgun chambered in .45 caliber, one of the larger caliber pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight only with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/. In a video in which Reston goes into detail concerning the incident, he states that if he had had to reload, he would have been killed. Reston, *Winning an Armed Encounter*, Speech Delivered at McHenry County College (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.[1]

---

[1] Reston explained, "I am a huge capacity person. A good workable caliber with capacity. If I were to have like a single stack 1911 or any single stack gun at that point, I would have had to reload in to there somewhere and that reload would have probably cost me my life." *Id.* at 17:47-18:07. "I'm a pretty good reloader and I can do it under two seconds, but that's almost 50 percent of damn gun fight itself I would have wasted reloading." *Id.* at 18:09-18:17.

**APP. 50**

Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.

> A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

Wisconsin officer Brian Murphy was shot 15 times by a mass murdering white supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms, and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report of the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated, "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even

**APP. 51**

without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf. In that gun fight, two officers fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds will be sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[2] In his video

---

[2] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. *See* Than, *Gunshot Wound Head Trauma* (undated), available at https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-Head-Trauma.  By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

11

**APP. 52**

presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter*, supra, at 23:50-24:24, available at https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

Reloading a firearm takes precious seconds that a victim may not have during a criminal attack. SWAT officer Jared Reston may be able to reload his pistol in two seconds, but the average citizen gun owner is much slower. Moreover, there may be circumstances where reloading is impossible. Reloading a semi-automatic handgun quickly requires the use of two hands. That might not be possible under certain circumstances. For example, a person attempting to fend off an attacker in physical contact with him or her, likely will not have both hands free to reload an empty gun. Likewise, a homeowner awakened at night and wearing night clothes or no clothes by the sound of a break in will likely have a firearm in one hand and flashlight in the other, and no room for a second magazine. The statute thereby imposes a severe and substantial infringement on the ability of Plaintiffs to use their self-defense firearms for the lawful protection of themselves and others.

This is especially the case in which a licensed concealed carrier or armed District homeowner might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4*

**APP. 53**

*arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.    (The    Ayoob    Files)*    (2003),    available    at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot out.+(The+Ayoob...-a099130342.

One crime often involving multiple assailants is car jackings. Car jackings have recently become a particular problem nationwide and in the District. In 2019, there were 142 carjackings reported in the city. More than 400 carjackings were reported in the District in 2021, however. *See* Seagraves,  *Carjackings in DC Spark Anger, Frustration Among Residents* (January 31, 2022), available   at   https://www.nbcwashington.com/news/carjackings-in-dc-spark-anger-frustration-among-residents/2955523/. The latest Department of Justice data on carjacking unfortunately dates back to 2002; however, that data is still illuminating.  56 percent of carjackings involve two suspects or more. 74 percent involved armed offenders. And 24 percent involved injuries to the victims. Klaus, *Carjacking, 1993-2002, National Crime Victimization Survey* (July 2004), available at https://bjs.ojp.gov/content/pub/pdf/c02.pdf.

We note that District police officers are mandated to carry 52 rounds for their self-defense when on duty with their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds, and two additional full 17 round magazines.[3] What is good for MPD officers, however, is forbidden to

---

[3] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008). Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). *See Duncan v. Bonta,* Case No. 21-1194, petition for writ of certiorari (February 28, 2022), *cert. granted, vacated and remanded*, 597 U.S. __ (June 30, 2022).

**APP. 54**

the D.C. residents and out of state persons with D.C. concealed pistol license holders. Yet, those license holders have undergone rigorous training and background checks which are among the most demanding in America.

### c.   DC Code Section 7-2506.01(b) lacks any historic analogue.

Plaintiffs are unaware of any founding era limitations on the capacity of firearms a person could own or carry to defend himself from an assailant. The U.S. District Court for Colorado recently addressed a similar magazine ban in *Rocky Mountain Gun Owners v. Town of Superior,* Case No. 22-cv01685. There Judge Raymond P. Moore issued a Temporary Restraining Order against the town's ordinance which, inter alia, banned magazines like the Banned Magazines at issue in this case. Applying the test the Supreme Court articulated in *Bruen,* Judge Moore stated, "the Court is unaware of historical precedent that would permit a government entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes whether in an individual's home or in public." *Id.* Doc. 18 at 10.

Prior cases involving bans on magazines, such as the Banned Magazines at issue in this case, failed to elicit any historical justification as required by *Bruen. See generally Heller II,* 650 F.3d 1244; *Kolbe v. Hogan,* 849 F.3d 114; *Duncan v. Bonta*, No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; *mandate stayed in part pending petition for certiorari* (Dec. 20, 2021), *cert granted, vacated and remanded* (June 30, 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 109 (2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

Firearms with ammunition capacity in excess of 10 rounds date back to the 1500s. Professor David Kopel has done the heavy lifting researching the history of firearm ammunition

**APP. 55**

capacity and restrictions. *See* Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) (hereinafter "Kopel"). He reports the first known firearm able to fire more than ten rounds without reloading was a 16-shot gun created around 1580. *Id.* at 852. Another early design was the 11-round "Defence Gun," patented in 1718 by inventor James Puckle. *Id.*

Professor Kopel further explains that when the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 22-shot magazine capacity. *Id.* at 853. Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition. *Id.* One shot from that gun could penetrate a one-inch-thick wood plank or take down an elk. *Id.*

Firearm technology progressed rapidly in the 1800s as manufacturers sought to produce reliable firearms with greater ammunition capacities for consumers. *Id.* 1821 saw the introduction of the Jennings multi-shot flintlock rifle, which could fire 12 shots before reloading. *Id.* "Pepperbox" pistols began to be produced in America in the 1830s. *Id.* at 853-54. These pistols had multiple barrels that would fire sequentially. *Id.* at 854. Although most were produced as five or six shot models, 12 shot, 18 shot and 24 shot models were produced. *Id.* Pepperboxes were eventually supplanted by revolvers. *Id.*

A variety of other firearms having a capacity in excess of 10 rounds were invented in the antebellum years, including the Bennett and Haviland Rifle (12 shot); and rifles invented by Alexander Hall (15 shots) and by Colonel Parry W. Porter (38 shot). *Id.*

Daniel Wesson and Oliver Winchester produced the first metallic cartridges similar to modern ammunition. *Id.* They also invented a lever action firearm that employed these cartridges. *Id.* In 1855, they introduced the Volcanic rifle, with up to a 30-round tubular magazine under the barrel. *Id.* at 855. In 1862, the Volcanic evolved into the 16-round capacity Henry lever action

**APP. 56**

rifle. *Id.* The Henry rifle further evolved into the Winchester repeating rifle, Model 1866. *Id.* According to advertising, the M1866 could be fired 30 times a minute or with 17 rounds in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." *Id.* Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a 15-round capacity. *Id.* at 856. The Evans Repeating Rifle came on the market in 1873 with a rotary helical magazine in the buttstock that held 34 rounds. *Id.*

Pin-fire revolvers with capacities of up to 20 or 21 rounds entered the market in the 1850s. *Id.* For revolvers with other firing mechanisms, there were some models with more than 17 rounds. *Id.* The 20-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. *Id.*

The semiautomatic firearm with a detachable magazine was invented before the turn of the 20th century. *Id.* at 857. In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s. *Id.* It has capacities ranging from a low of six to a high of 20 rounds. *Id.* The Luger semiautomatic pistol was brought to the market in 1899. *Id.* The most common magazines were seven or eight rounds, but there was also a 32-round drum magazine. *Id*

The 20th Century saw a variety of rifles with magazines capable of holding more than 10 rounds, ranging from various .22 plinking rifles to the M-1 carbine introduced in 1927 to the AR-15 introduced in 1963, followed by such rifles as the Springfield M1A and the Ruger mini-14. *Id.* at 857-60.

Firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. *Id.* at 861. In 1935, Browning introduced the Hi-Power pistol. *Id.* This handgun was sold with a 13-round detachable magazine and is still in production. *Id.* The Beretta model 92,

**APP. 57**

a nine-millimeter pistol with a 16-round magazine, entered the market in 1976. *Id.* Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action). *Id.* Also coming on the market at that time were European handguns such as Austria's L.E.S. P-18 (18 rounds) and Germany's Heckler & Koch VP 70Z (also 18 rounds). *Id.* at 861-62. And the Austrian manufactured Glock 17 pistol (17 round magazine), now standard issue for a majority of law enforcement agencies in the United States, was introduced into the country in the 1980s. *See* Barrett, *Glock: The Rise of America's Gun* (2012).

When the Second Amendment was adopted no laws restricted ammunition capacity. Kopel at 864. The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. *Id.* In 1927, Michigan prohibited firearms which could be fired more than 16 times without reloading. *Id.* That same year Rhode Island banned semi-automatic firearms which could fire more than 12 shots without re-loading. *Id.*

In 1959 Michigan repealed its ban and Rhode Island amended its limit to 14 shots, excluding .22 caliber rimfire guns. *Id.* at 864-65. Rhode Island repealed its limit in 1975. *Id.* at 865. Neither statute covered a bare magazine that was not inserted into a firearm. *Id.*

Ohio enacted a 1933 law requiring a special permit for possession or sale of a semiautomatic firearm with an ammunition capacity of greater than 18 rounds. *Id.* In 1971, the state exempted .22 caliber firearms, and raised the limit for other calibers to 32 or more rounds. *Id.* The Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *Id.* With or without the permit, one could buy a 60-round magazine in Ohio. *Id.* The licensing law was repealed in 2014. *Id.*

**APP. 58**

The only statute continuously in effect from the prohibition era limiting magazine capacity is the District's. *Id.* at 866.[4] In 1932, Congress prohibited the possession in the District of a firearm that "shoots automatically or semiautomatically more than 12 shots without reloading." *Id.* Prior to the *Heller* decision, the District interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. *Id.* The District stands alone in its historical restriction of magazines, and the law in question is not of founding era pedigree. *Id. See Bruen, slip op.* at 57 (finding that a Texas 1873 law and a West Virginia 1900 restricting public carry of handguns were outliers). Moreover, *Bruen, slip op.* at 58 n.28 specifically rejected 20th century firearm restrictions as historical evidence, stating, "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."

The only widespread restriction on magazine capacity came in 1994 when Congress banned new magazines holding more 10 rounds. *Id.* at 866. The law sunset in 2004. *Id.* The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. *Id.* The final report concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury ...." *Id.* at 866-87[5] Further, "the ban has not yet reduced the use of [such magazines] in crime ...." *Id.* Doctor Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* As

---

[4] *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

[5] Quoting Koper, et al., An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

**APP. 59**

discussed above, *Bruen* renders the 1994 Congressional act historically irrelevant given its late vintage.

Professor Kopel observes that of the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being "longstanding" or part of American history and tradition. *Id.* at 883-84. The opinion in *Bruen* requires a historical analogue to have been well-established. *Bruen, slip op.* at 21 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.") *Bruen* in fact found insufficient New York's reliance on the laws of "a handful of late-19th-century jurisdictions" to justify its restrictive firearm carry regime. *Bruen, slip op.* at 29. It is clear from the discussion above that ammunition capacity limits such as DC's magazine ban are far outside the norm of the traditional exercise and regulation of Second Amendment rights. *See* Kopel at 884.

In sum, no regulations from around the time of the adoption of the Second or for that matter the 14th Amendments limited the ammunition capacity of a firearm. Firearms with ammunition capacity in excess of 10 rounds have been available since well before the Second Amendment was adopted and continuing through this day. Restrictions on ammunition capacity being of only recent vintage are not supported by reference to the nation's historical tradition of firearms regulation.

Certain 20th Century hunting regulations generally do restrict the number of shotgun shells or rifle rounds allowable in a hunting firearm. However, these are conservation regulations designed to prevent overhunting and are obviously not of founding era pedigree as *Bruen* requires. As one commentator has explained it,

> At the behest of [...] hunters, laws were passed to better regulate hunting in the United States. Laws created bag limits, possession limits, sectioned off certain plots of land as refuges for birds. This is also where we got laws banning the sale of wild game meat (if you have a source of venison that you purchase, it is from a farm).

**APP. 60**

> One set of game laws that rose out of that early movement was magazine capacity limits. The idea was that a recreational hunter would only kill one or two birds out of a flock, it wasn't considered sporting to blast dozens of ducks out of the water. Limiting shotguns to 10 gauge and smaller with only few shells played a big part in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal law restricting waterfowl hunters to three shots was enacted. As it happened, waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length.

Plainly, these types of modern hunting regulations have no nexus to the Second Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen* requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).") Since no historical analog for limiting the capacity of firearm magazines exists, the District's limitation as set forth in DC Code Section 7-2506.01(b) fails Second Amendment scrutiny. *See Bruen, slip op.* at 67.

In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

**APP. 61**

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

Accordingly, it would be error for the Court to evaluate the regulation at issue under some type of the means-end tiers of scrutiny approach *Bruen* specifically rejects. *Id.* at 15. The appropriate test is the text of the Second Amendment and the nation's historical tradition of firearms regulation. The D.C. magazine ban fails this test. Because there is no historic tradition in this nation of limiting firearm magazine capacity, the District's prohibition on possession of magazines having a capacity in excess of 10 rounds is unconstitutional as violative of the Second Amendment. As such, Plaintiffs are likely to prevail on the merits in this action.

> **B.     Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.**

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. at 22. The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask, "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (hereinafter *"Chaplaincy"*). Plainly here, Plaintiffs are suffering irreparable injury.

Where the defendant's actions violate the plaintiff's constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*,

**APP. 62**

721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (hereinafter *"Gordon"*) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346). *See also Berg v. Glen Cove City School District,* 853 F.Supp. 651 (E.D.N.Y. 1994); *Doe v. Shenandoah County School Board,* 737 F.Supp. 913 (W.D.Va. 1990); *Joynes v. Lancaster,* 553 F.Supp. (M.D.N.C. 1982).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of another Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d at 699 (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id.* Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id.* Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id.*

For these reasons, law-abiding citizens like Plaintiffs suffer irreparable harm each day they are subjected to the restrictions of DC Code 7-2506.01(b). The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that the defendants' magazine restriction will "chill" their exercise of constitutionally

22

**APP. 63**

protected conduct, *see Chaplaincy*, 454 F.3d at 299, they have satisfied this requirement by declaring that, but for the challenged provision, they would regularly possess and carry the Banned Magazines if it were legal to do so. *See* Exhibits 1-4.

Each day that the unconstitutional regulation continues in force, Plaintiffs risk physical injury because they are unable to fully exercise their Second Amendment right to self-defense using arms with sufficient capacity of their choice. For example, each day DC Code Section 7-2506.01(b) remains in effect, Plaintiffs lack the security of knowing they have available an effective self-defense tool with sufficient ammunition to handle an assault by multiple attackers. Of course, that injury cannot be compensated adequately through money damages. *See Ezell*, 651 F.3d at 699.

### C.   *The balance of equities tips overwhelmingly in Plaintiffs' favor.*

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. Any interest the District may have in enforcing this regulation is entirely speculative. Moreover, the Second Amendment itself is the product of interest balancing by the People and leaves no room for the third branch of government to determine whether the rights it protects are "*really* worth insisting upon." *Heller,* 554 U.S. at 634 (emphasis in original).

### D.      *An injunction is in the public interest.*

For similar reasons, an injunction is also in the public interest. The courts have acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653; *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of DC Code Section 7-2506.01(b) is by definition contrary

**APP. 64**

to the public interest if it is likely unconstitutional, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity effectively to defend themselves from attack, not by perpetuating an unconstitutional and ineffective restriction on that right.

### III.   *The Court should waive the bond requirement or set a nominal bond because Defendants will suffer no harm from a preliminary injunction.*

Plaintiffs request the court set the bond amount at zero. Federal Rule of Civil Procedure 65(c) provides in relevant part:

> Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court has the discretion to set the bond amount "in such sum as the court deems proper." Fed. R. Civ. P. 65(c). Consequently, the district court may set the bond amount at zero or a nominal amount "[w]here [it] determines that the risk of harm is remote, or that the circumstances otherwise warrant it. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 41 1, 421, n.3 (4th Cir. 1999) (remanding case to district court for determination of appropriate bond amount).

Courts have set a nominal bond or waived the requirement altogether where, for example:

(l) the risk of harm to the defendant is remote or nonexistent, *SEC v. Dowdell*, Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 at (W.D. Va., Oct. 11, 2002) (setting nominal $100.00 bond after concluding that the risk of harm to the defendants was minimal);

(2)   the plaintiff has made a strong showing of likelihood of success on the merits, *Ark. Best corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 518 (W.D.N.C. 1999) (requiring nominal

$100.00 security bond where plaintiffs made a strong showing of likelihood of success on the merits);

(3)     the balance of hardships weighs overwhelmingly in favor of the plaintiff, *Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991), *cert. denied* 502 U.S. 1032 (1992) (requiring no bond in non-commercial case where the balance of hardships that each party would suffer as the result of a preliminary injunction weighs overwhelmingly in favor of the party seeking the injunction); and

(4)     the case involves enforcement of a public interest, *Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs*., 50 F.3d 1 168, 1 174 (2d Cir. 1995) (concluding that "an exception to the bond requirement has been crafted for cases involving the enforcement of public interests arising out of 'comprehensive federal health and welfare statutes'"); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp.2d 98, 128, 129 (D. Mass. 2003) (waiving bond requirement where plaintiffs submitted affidavits indicating their financial inability to post a security bond and where plaintiffs were seeking to preserve their rights to free expression and free exercise of religion).

Plaintiffs request the court set the bond requirement at zero because Defendants cannot demonstrate they will suffer any harm from grant of a preliminary injunction. This is a civil rights case, not commercial litigation. Even if Defendants were ultimately to prevail here, they would suffer no monetary damage. Indeed, by not enforcing the ordinances at issue, Defendants would avoid otherwise necessary public expenditure. In fact, Plaintiffs have demonstrated they will suffer irreparable harm if preliminary relief is not granted. The bond requirement should be waived because Plaintiffs' enforcement of important constitutional rights serves the public interest. *See Westfield High Sch. L. I. F. E. Club,* 249 F.Supp.2d at 129 (waiving bond requirement after

**APP. 66**

concluding that plaintiffs' suit to enforce their right to freedom of expression and free exercise of religion served the public interest). For these reasons, Plaintiffs respectfully request the court set the bond amount at zero.

## IV.    *The court should enter final judgment for Plaintiffs.*

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia,* 38 F.Supp.3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir. 1994)). The D.C. Circuit employed this procedure in *Wrenn. See* 864 F.3d at 667.

Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support the provisions at issue *and* that the regulation is supported by the nation's historical tradition of firearms regulation, a permanent injunction is appropriate now. In that regard the court should require the District to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, the final outcome of this case will not depend on any facts presented at trial, and no "genuine uncertainty [exists] at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945.

Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore v. Madigan,* "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact

**APP. 67**

exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting Illinois's motion to dismiss. *See Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's limitation on the amount of ammunition a concealed carry license holder may carry on his person.

## V.    *Conclusion.*

Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from DC Code Section 7-2506.01(b). They have shown the balance of equities weighs in their favor. They have shown that the public interest favors granting an injunction. And they have shown that they are entitled to a permanent injunction now. For the foregoing reasons, the court should preliminarily and permanently enjoin the defendants from enforcing DC Code Section 7-2506.01(b).

**APP. 68**

Respectfully submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 19, 2022

## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants through the court's ECF system, this 19th day of August, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 69**

# DECLARATION UNDER PENALTY OF PERJURY OF ANDREW HANSON

Andrew Hanson, under penalty of perjury, deposes and states as follows:

1. My name is Andrew Hanson. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm outside the home in the District of Columbia.

3. I own outside the District magazines for a licensed firearm capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines for protection inside my home and when I am carrying a firearm outside the home for personal protection. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August __19__, 2022

_____
Andrew Hanson

**DECLARATION UNDER PENALTY OF PERJURY OF TYLER YZAGUIRRE**

Tyler Yzaguirre, under penalty of perjury, deposes and states as follows:

1. My name is Tyler Yzaguirre. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm outside the home in the District of Columbia.

3. I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines for protection inside my home and when I am carrying a firearm outside the home for personal protection. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 18, 2022

_Tyler Yzaguirre_
_____
Tyler Yzaguirre

**APP. 71**

### DECLARATION UNDER PENALTY OF PERJURY OF NATHAN CHANEY

Nathan Chaney, under penalty of perjury, deposes and states as follows:

1. My name is Nathan Chaney. I am a resident of the Commonwealth of Virginia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm in the District of Columbia.

3. I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines when I am carrying a firearm for personal protection within the District of Columbia. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 17, 2022

_____

Nathan Chaney

### DECLARATION UNDER PENALTY OF PERJURY OF ERIC KLUN

Eric Klun, under penalty of perjury, deposes and states as follows:

1. My name is Eric Klun. I am a resident of the State of Maryland.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm in the District of Columbia.

3. I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines when I am carrying a firearm for personal protection within the District of Columbia. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 17, 2022

Eric Klun

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**APPLICATION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    I.   The Second Amendment Framework ........................................................... 2

    II.  The Challenged Law ..................................................................................... 4

    III. Procedural Background ................................................................................. 5

LEGAL STANDARD ......................................................................................................... 7

    I.   Preliminary Injunctive Relief ...................................................................... 7

    II.  Federal Rule of Civil Procedure 65 ............................................................. 7

    III. Facial And As-Applied Challenges ............................................................. 7

ARGUMENT ...................................................................................................................... 8

    I.   Plaintiffs Are Unlikely To Succeed On The Merits Because They Fail To Show That The Second Amendment Protects Large Capacity Magazines ....................................................... 8

        A.   LCMs are not "Arms" under the Second Amendment. ................................................. 9

        B.   Even if LCMs are "Arms," they are not protected by the Second Amendment because they are not in common use for self-defense. ........................................ 13

    II.  Plaintiffs Are Unlikely To Succeed On The Merits Because The District's Law Regulates Unusually Dangerous Devices, In Keeping With American Tradition. ................................... 20

        A.   The District need only show that the Law is "relevantly similar" to regulations of dangerous and unusual weapons ............................................. 21

        B.   Regulations of dangerous and unusual weapons are ubiquitous in American history. 27

        C.   These historical regulations are relevantly similar to the District's Law. .................. 34

    III. Plaintiffs Do Not Satisfy The Other Criteria For A Preliminary Injunction. ..................... 39

    IV. Any Injunction Should Be Limited To Plaintiffs' As-Applied Challenge. ........................ 42

    V.  Defendants Would Be Prejudiced By Consolidation With The Merits. ............................. 43

CONCLUSION .................................................................................................................. 45

**APP. 75**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018)........ 40

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ................................................................................................................. 18, 36

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................................. 32, 35

*Brown v. Maryland*, 25 U.S. 419 (1827) ............................................................... 29, 36

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..................................................................... 8

*Caetano v. Massachusetts,* 577 U.S. 411 (2016) ........................................................ 14

*Citizens United v. FEC*, 558 U.S. 310 (2010) ............................................................ 42

*Cockrum v. State*, 24 Tex. 394 (1859) ....................................................................... 32

*Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657 F.2d 124 (7th Cir. 1981) ........................................................................................................... 44

*District of Columbia v. Heller (Heller I)*, 554 U.S. 570 (2008) ........................... passim

*District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ........ passim

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ........................................ 16, 18, 36, 42

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ....................... 14, 16

*In re Sealed Case*, 936 F.3d 582 (D.C. Cir. 2019) .................................................. 8, 42

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ........................................................ 33

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ........................................... 8

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ....................................................... passim

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ...................................... 43

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................... 40

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................ 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............................................. 35, 39

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ....................................... 27

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ................................................... 3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .............. 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)............ passim

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 7

*People v. Persce*, 97 N.E. 877 (N.Y. 1912) ................................................................ 31

ii

*Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) ...................................... 28

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ........................................... 7, 40

*State v. Wilburn*, 66 Tenn. 57 (1872) ............................................................. 31

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) .................................... 12

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) ............ 12

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ...................... 8, 43

*United States v. Salerno*, 481 U.S. 739 (1987) .................................... 7, 8, 42

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ................................... 7, 44

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ............ 7, 8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................... 7, 40

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ..................................... 14, 18

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). .................... 3, 20

## Constitutional Provisions

U.S. Const. amend. II ................................................................... 2

## Statutes

1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn ............................... 29

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73 .................... 30

1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4 ............................... 29

1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844 ...................... 29

42 U.S.C. § 1983 ....................................................................... 6

A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57 ................................................... 29

An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, https://tinyurl.com/mtxbn4nd ................................................... 31

D.C. Code § 7-2506.01(b) ........................................................... passim

## Rules

Federal Rule of Civil Procedure 65(a)(2) ........................................... 6, 7

## Other Authorities

Bennett & Haviland Many Chambered Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd ................................................... 23

iii

**APP. 77**

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021* 16 (2021), https://tinyurl.com/3aff4bft ................................. 14

Christopher S. Koper et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ................................................... 37

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020) .................................... 37

Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj ........................................... 24

Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008 (Comm. Rep.), https://tinyurl.com/mryzvuuc .................................................................................. 5

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ........................................................................................................ 24

David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) .............................................................................................................................. 23

Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754 (2019), https://tinyurl.com/4hmw3szk..... .......................................................................................................................... 38, 41

Matthew Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa 41

Michael Siegel et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html ........................................... 38

Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331 (2020). ............................................................................................................................ 18

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) ................................................................................................ 34

S. Rep. No. 72-575 (1932) ............................................................................................................ 34

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ................................................................................ 21

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf. ....................................................... 38

William R. Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017), https://tinyurl.com/mpjzkfsj ................................................................................................ 32

**APP. 78**

## INTRODUCTION

In an emergency posture, Plaintiffs ask this Court to break new ground as the first to declare a constitutional right to possess large capacity magazines (LCMs), a gun accessory responsible for the deadliest mass shootings in history.  As concealed carry licensees who already publicly carry semi-automatic pistols for their personal protection, Plaintiffs now wish to enhance their firing capacity with LCMs.  The Court should reject Plaintiffs' novel assertion of a constitutional right to continually fire their semi-automatic pistols more than ten times without reloading, and instead heed the Supreme Court's repeated instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).  Particularly at this early stage of the case, the Court should resist Plaintiffs' invitation to unleash dramatically augmented firing capacity on the public through the extraordinary remedy of a preliminary injunction.  Such a ruling would be premature, endanger residents and law enforcement officers, and imperil public safety—all contrary to the legislature's considered judgment, as well as history and tradition.

First, Plaintiffs have demonstrated no likelihood of success on their Second Amendment claim under the test recently articulated in *Bruen*.  To start, Plaintiffs have failed to show that LCMs are "arms" within the Second Amendment's text.  LCMs are firearm *accessories*, which, since the Founding, have always been considered outside the scope of the Second Amendment.  The military-style enhancement that they provide—allowing continual fire of large amounts of ammunition without reloading—is not integral to the operation of a firearm and is neither necessary nor commonly used for self-defense.

Even if LCMs did fall within the scope of the Second Amendment's text, Plaintiffs would not demonstrate a likelihood of success because the District's prohibition on LCMs is entirely consistent with the Nation's tradition of regulating dangerous and unusual weapons.  Even in this preliminary posture, the historical record establishes that the District's law is one in a long line of government restrictions on weapons and enhancements that endanger the public.  As such, it constitutes a permissible legislative response both to dramatic technological developments in firing capacity and to the devastating societal consequences of those technological advances, neither of which existed at the adoption of the Second or Fourteenth Amendments.

Even if this case were a closer call on the merits, Plaintiffs would still not be entitled to a preliminary injunction.  They have failed to show that such an injunction is necessary to save them from irreparable injury, let alone that the balance of equities and public interest favor immediate relief.  Indeed, those factors weigh strongly *against* issuing an injunction at this early stage, as Plaintiffs' desire to possess LCMs pales in comparison to the public interest in preventing violence and mass murder.  Finally, Plaintiffs' premature invitation for the Court to *permanently* enjoin the District's law lacks merit.  Such a move would significantly prejudice Defendants and is an inappropriate way to decide a complicated Second Amendment claim that requires time-intensive historical research.

The Court should thus deny Plaintiffs' requests across the board and allow Defendants to conduct the discovery necessary for this Court to properly resolve the issues in this case.

## BACKGROUND

### I.   The Second Amendment Framework

The Second Amendment ensures that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  This provision codified the right of "ordinary,

2

**APP. 80**

law-abiding," and "responsible" persons to own and carry common firearms for self-defense and
other lawful purposes.  *See Bruen*, 142 S. Ct. at 2122, 2131, 2135, 2156.  It does not, however,
entitle persons "to keep and carry any weapon whatsoever in any manner whatsoever and for
whatever purpose."  *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).

　　　In the wake of the Supreme Court's decision in *Heller I*, courts of appeals developed a
two-step framework to analyze Second Amendment claims.  *See id.* at 2126.  The first step asked
whether a challenged law regulated conduct outside the scope of the Amendment, as defined by
its "text" and "historical limitations."  *District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244,
1252–53 (D.C. Cir. 2011).  A number of Second Amendment challenges failed at this threshold
step.  *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 157–60 (D.C. Cir. 2019) (holding that
convicted felons fell outside the category of "law-abiding and responsible" persons protected by
the Second Amendment).  For those claims that survived, however, courts typically applied some
form of means-end scrutiny at step two, the strictness of which depended on how onerously the
challenged law burdened a "core" Second Amendment right.  *Wrenn v. District of Columbia*, 864
F.3d 650, 664–68 (D.C. Cir. 2017).

　　　In *Bruen*, the Supreme Court declined to adopt the courts of appeals' method of analysis
and clarified the test laid out in *Heller I*.  142 S. Ct. at 2127.  While the Court rejected means-
ends scrutiny, it endorsed the first step of the above framework, noting that it is "rooted in the
Second Amendment's text" and "history."  *Id.* at 2125–27.  To satisfy their initial burden,
plaintiffs must show that the challenged restriction regulates conduct covered by "the Second
Amendment's plain text."  *Id.* at 2129.  The Court indicated that the plaintiffs' threshold burden
would entail both a textual and historical showing, given that "the right secured by the Second

**APP. 81**

Amendment is not unlimited" and "the historical understanding of the Amendment" serves "to demark the limits on the exercise of that right." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).[1]

Even when plaintiffs fit their claim within the Second Amendment's text, however, the government can still prevail by showing that its law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.  To satisfy this standard, the challenged regulation need not be "a dead ringer for historical precursors." *Id*. at 2118.  Rather, where a modern firearm regulation addresses "unprecedented societal concerns or dramatical technological changes," it will pass "constitutional muster" when it is "relevantly similar" to a historical regulation. *Id*. at 2133.  A "well-established and representative historical *analogue*"—which need not be "a historical *twin*"—is one that "impose[s] a comparable burden on the right of armed self-defense" and is "comparably justified." *Id.* at 2133.

## II.    **The Challenged Law**

The challenged regulation (the "Law"), D.C. Code § 7-2506.01(b), bars the possession, sale, or transfer of devices that feed ammunition into firearms if they have a capacity larger than ten rounds of ammunition.  These devices are commonly called "large capacity magazines," or LCMs.  Borrowing language from other state and federal laws, the Law was intended "to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload."  Council of the District of Columbia, Committee on Public Safety and the Judiciary,

---

[1]      The Court's reasoning in *Bruen* abrogated holdings that relied on means-end scrutiny, including the D.C. Circuit's decision in *Heller II* affirming that the District's prohibition on LCMs was constitutional.  Still, these courts' surveys of the historical record are consistent with the *Bruen* framework and remain good law.  Moreover, their factual findings, based on voluminous records, remain relevant, and this brief cites their decisions for that limited purpose.

**APP. 82**

Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008

(Comm. Rep.) at 2, https://tinyurl.com/mryzvuuc.[2]  It provides as follows:

> No person in the District shall possess, sell, or transfer any large capacity
> ammunition feeding device regardless of whether the device is attached to a
> firearm.  For the purposes of this subsection, the term "large capacity ammunition
> feeding device" means a magazine, belt, drum, feed strip, or similar device that has
> a capacity of, or that can be readily restored or converted to accept, more than 10
> rounds of ammunition.  The term "large capacity ammunition feeding device" shall
> not include an attached tubular device designed to accept, and capable of operating
> only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b).  In recommending the Law, the Committee explained that

"magazines holdings over 10 rounds are more about firepower than self-defense" and that

"[l]imiting fire power" was warranted "especially given homeland security issues in the

District."  Comm. Rep. at 9.  In 2011, the D.C. Circuit upheld the prohibition on LCMs, finding

it "does not effectively disarm individuals or substantially affect their ability to defend

themselves."  *Heller II*, 670 F.3d at 1247–48, 1260–64 (surviving intermediate scrutiny).

### III.   <u>Procedural Background</u>

Plaintiffs are residents of the Washington, D.C.-metropolitan area who have licenses to

carry concealed handguns and who want to "possess and use" LCMs "within the District of

Columbia."  Compl. [2] ¶¶ 1–4.  Each Plaintiff regularly carries a concealed pistol in the District

of Columbia and possesses, outside of the District, magazines capable of holding more than ten

rounds.  Decl. of Andrew Hanson [8-2] ¶¶ 2–3; Decl. of Tyler Yzaguirre ¶¶ [8-3] 2–3; Decl. of

Nathan Chaney [8-4] ¶¶ 2–3; Decl. of Eric Klun [8-5] ¶¶ 2–3.  Plaintiffs do not seek to possess

LCMs for use with firearms other than pistols.  *Id.* at ¶¶ 2–4 (same in each); Ex. A, Pls.'

---

[2]      All cited electronic materials were last accessed on November 22, 2022.  All citations are
to ECF or .pdf pagination.

Answers and Objections to Defs.' First Set of Interrogs. at 7–10.  Each Plaintiff contends that,

but for the Law, they would carry firearms equipped with LCMs in the District of Columbia;

Plaintiffs Hanson and Yzaguirre would also use firearms equipped with those magazines for

protection inside their residences.  Hanson Decl. ¶ 4; Yzaguirre Decl. ¶ 4; Chaney Decl. ¶ 4;

Klun Decl. ¶ 4.  On October 18, 2022, Plaintiff Yzaguirre applied to register a Sig Sauer P365

with a 12-round magazine with the District of Columbia Metropolitan Police Department

(MPD), but his application was refused.  Declaration of Tyler Yzaguirre [16-1] ¶¶ 2, 6.

Plaintiffs filed this suit on August 3, 2022.  They bring two claims under 42 U.S.C.

§ 1983, alleging that D.C. Code § 7-2506.01(b) violates both the Second Amendment and the

Fifth Amendment Due Process Clause.  Compl. ¶¶ 59–61.  On August 19, 2022, Plaintiffs filed

their Application for a Preliminary Injunction (the "Motion"), seeking to enjoin enforcement of

the Law, facially or as-applied, based on their Second Amendment claim alone.[3]  *See* Pls.' Mem.

at 8, 10, 14.  Plaintiffs also requested that the Court consolidate consideration of their Motion

with a trial on the merits and grant permanent relief under Fed. R. Civ. P. 65(a)(2).  *Id.* at 33.

---

[3]     Although Plaintiffs purport to bring both a facial and an as-applied challenge to Section
7-2506.01(b), Pls.' Mem. at 7; Compl. ¶ 22, Plaintiffs make no attempt to establish standing for
or support any argument related to the District's prohibition on the "sell[ing]" or "transfer" of
LCMs.  D.C. Code § 7-2506.01(b).  Accordingly, the District understands Plaintiffs' challenge to
refer only to the prohibition on "possess[ion]."  *Id.*; *see Heller II*, 670 F.3d at 1249 (similarly
limiting plaintiffs' challenge and citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), for
the proposition that "standing doctrine 'requires federal courts to satisfy themselves that the
plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his
invocation of federal-court jurisdiction,' and the plaintiff 'bears the burden of showing that he
has standing for each type of relief sought'").

**APP. 84**

## LEGAL STANDARD

### I.   Preliminary Injunctive Relief

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  Plaintiffs must prove that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm," that "the balance of equities" favors such extraordinary relief, and "that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the last two factors merge when the government opposes an injunction).

### II.   Federal Rule of Civil Procedure 65

Under Rule 65(a)(2), upon hearing a motion for preliminary injunction, "the [C]ourt may advance the trial on the merits and consolidate it with the hearing."  But this practice is disfavored:  "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

### III.   Facial And As-Applied Challenges

Litigants may attack the constitutionality of a law in two ways:  A facial challenge, which alleges that the law is unconstitutional in all its applications, and an as-applied challenge, which alleges that the law is unconstitutional as applied to the particular facts of their case.  Plaintiffs bear a "heavy burden" in bringing a facial challenge.  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (explaining why facial challenges are "disfavored").  They cannot merely suggest that constitutional problems may arise when the law is applied to some "conceivable set of circumstances."  *Salerno*, 481 U.S. at 745.  Rather, they must affirmatively "establish that *no* set

7

**APP. 85**

of circumstances exists under which the Act would be valid." *Id*. (emphasis added).  Where a

statute has a "plainly legitimate sweep," a facial challenge must fail.  *Wash. State Grange*, 552

U.S. at 449; *see In re Sealed Case*, 936 F.3d 582, 588–89 (D.C. Cir. 2019).  And, although the

"occasional case" may require a court to entertain a facial challenge, the court should "neither

want nor need to provide relief to nonparties when a narrower remedy will fully protect the

litigants."  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (citing

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)).

## ARGUMENT

I.   <u>**Plaintiffs Are Unlikely To Succeed on the Merits Because They Fail To Show that the Second Amendment Protects Large Capacity Magazines.**</u>

Plaintiffs have failed to carry their burden of demonstrating that "the Second

Amendment's plain text" protects their possession of LCMs.  *Bruen*, 142 S. Ct. at 2129–30.

"Under [the Supreme] Court's precedents, a plaintiff bears certain burdens to demonstrate an

infringement of his rights under the [Constitution]," and only "[i]f the plaintiff carries these

burdens" does "the focus then shift[ ] to the defendant to show that its actions were nonetheless

justified."  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (emphasizing

plaintiffs' threshold burden in the First Amendment context); *Burdick v. Takushi*, 504 U.S. 428,

434 (1992) (same in the election law context); *see also Bruen*, 142 S. Ct. at 2130 ("This Second

Amendment standard accords with how we protect other constitutional rights.").

To make this showing under the Second Amendment, a plaintiff must demonstrate that

the "textual elements" of the Second Amendment's operative clause are applicable to the

conduct being restricted.  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller I*, 554 U.S. at 592).  Thus, in

*Bruen*, before turning to whether New York's restriction was "consistent with the Nation's

historical tradition of firearm regulation," *id*. at 2135, the Court confirmed that the plaintiffs

**APP. 86**

were "part of 'the People' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense," *id*. at 2134 (quoting *Heller I*, 554 U.S. at 627, and citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).  A plaintiff must therefore prove both that the regulated instrument, device, or weapon fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense purposes, *id*. at 2128.

Plaintiffs do not dispute that they bear this textual burden.  But their efforts to meet it consist of only a threadbare claim that LCMs are "instruments that constitute bearable arms" and evidence that LCMs are a "commonly *owned* weapons component[ ]."  *See* Pls.' Mem. at 3, 5 (emphasis added).  Plaintiffs' arguments are insufficient and, ultimately, incorrect.  The Second Amendment only reaches "Arms," and only those "Arms" that are not just commonly owned, but "in 'common *use*' for self-defense."  *Bruen*, 142 S. Ct. at 2143 (quoting *Heller I*, 554 U.S. at 627) (emphasis added).  LCMs are neither.

### A.  LCMs Are Not "Arms" Under the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited" and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller I*, 554 U.S. at 636).  Although not cabined to the types of arms "in existence at the time of the founding," the right extends only to "arms" as that term was historically understood.  *Id*. at 2132 (quoting *Heller I*, 554 U.S. at 582) (internal quotation marks omitted).  LCMs do not fall within this scope.  Rather, since the Founding, bullet storage containers—whether Founding-era cartridge boxes or modern detachable magazines—have been recognized as accessories or "accoutrements," a category distinct from "arms."  And while some accessories may be so integral to the operation of a

**APP. 87**

firearm that the Second Amendment might be read to extend to them, LCMs, a capacity-based subset of ammunition magazines, are not among them.

### 1.   LCMs Are Accessories, Which Are Distinct from Arms.

The "object" of an individual's Second Amendment right is "Arms." *Heller I*, 554 U.S. at 581.  But LCMs are not "Arms" as that term was understood either at the Founding or at the ratification of the Second or Fourteenth Amendments.  *See id.* ("The 18th-century meaning is no different from the meaning today."); *Bruen*, 142 S. Ct. at 2132 ("[T]he Second Amendment's definition of 'arms' is fixed according to its historical understanding.").

The term "arms" historically referred *only* to weapons, typically swords, knives, rifles, and pistols.  Ex. B, Decl. of Dennis Baron ¶ 10.  An analysis of the patterns in the meaning and usage of words from the Founding and Reconstruction Eras confirms as much.  *See generally id.* ¶¶ 12–24 (discussing methodology in the field of corpus linguistics).  "Arms" did not encompass parts of weapons or weapons accessories, such as ammunition, ammunition containers, flints, scabbards, or holsters.  *Id.* ¶ 10.  Rather, these items were separately identified as "accoutrements"—"ancillary equipment associated with soldiering, or service in the military," *id.* ¶¶ 10, 28.  These terms identified distinct categories and were used in contrast with one another.  *See id.* ¶¶ 43, 46 ("arms and accoutrements are separate categories"); *id.* ¶ 64 (finding "no data" that the term "arms" includes "accoutrements").

Cartridge boxes or cartridge cases, in which bullets were historically kept at the Founding, were an "accoutrement."  *Id.* ¶¶ 26–27 ("[T]hese bullet storage containers were part of the general category of military accoutrements, not arms.").  "[M]agazines," including LCMs, are the descendants of, and thus "analogous" to, cartridge boxes or cartridge cases.  *Id.*; *see* D.C. Code § 7-2506.01(b) (defining an LCM as a "belt, drum, feed strip, or similar device . . . t[hat]

**APP. 88**

accept[s] . . . rounds of ammunition").  They therefore also fall within the category of

"accoutrements."  Baron Decl. ¶¶ 26–27; *id*. ¶ 64 (finding "no data" that the term "arms"

includes "magazines").  Indeed, even today, firearms sellers list magazines under the

"accessories" sections of their websites.  *Compare* Firearms, Guns.com,

https://www.guns.com/firearms (listing handguns, rifles, and shotguns for sale), *with*

Accessories, Guns.com, https://www.guns.com/accessories (listing magazines for sale); *see also*,

*e.g.*, Ex. C, Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics*

113 (16 of .pdf) (Gun Digest 2019) ("The magazine is not a part of the pistol, it is a feeding

device for the pistol.").  LCMs are therefore properly categorized as "accoutrements" or

accessories.  They are not "arms," as the term was understood when the Second and Fourteenth

Amendments were ratified.

### 2.   LCMs Are Not Integral to the Operation of a Firearm.

An LCM is also not an "arm" because even if that term included accessories that are

integral to the operation of a firearm, an LCM is not such an accessory.  *Cf. Heller I*, 554 U.S. at

630 (holding that "the District's requirement . . . that firearms in the home be rendered and kept

inoperable at all times . . . makes it impossible for citizens to use them for the core lawful

purpose of self-defense and is hence unconstitutional").  Ammunition magazines, or ammunition

feeding devices, hold ammunition and attach to weapons.  When used, these devices enable a

shooter to fire without reloading until the capacity of the magazine is spent.  Magazines come in

a variety of sizes, and the LCMs barred by the District's regulation are merely a capacity-based

*subset* of these devices.  Magazines holding ten rounds or fewer remain legal in the District, are

widely available, and are compatible with a range of semiautomatic firearms—including

handguns.  *See* Ex. D, Decl. of Stephen Amodeo ¶¶ 4, 12, 14, 16, 18, 19, 23–27.

Because the District's regulation limits only the capacity of the magazine that an individual may possess, it has no effect on whether the firearm is operable. Plaintiffs, for example, can operate all of their registered firearms in the District. Indeed, Plaintiffs state that the firearms they currently carry are all equipped with magazines that are not LCMs, even those for which the standard magazine is an LCM. *See* Hanson Decl. [8-2]; Yzaguirre Decl. [8-3]; Chaney Decl. [8-4]; Klun Decl. [8-5]; Ex. A, Pls.' Answers to Interrogs. at 7–10.

Plaintiffs' argument that a magazine of *some* sort is necessary "in order to employ ammunition in a firearm," Pls.' Mem. at 5, is therefore beside the point. The District's regulation restricts only the use of *large* capacity magazines, leaving gun owners free to use any number of magazines with a capacity of ten rounds or fewer to operate their firearms. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (examining a similar prohibition and noting that "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds").

Because LCMs are a firearm enhancement that do not affect the functioning of the firearm, they are most akin to silencers, which federal courts of appeals have held do not fall within the scope of the Second Amendment. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).[4] Regulation of LCMs is thus "categorically unprotected," and Plaintiffs' challenge to the District's Law fails. *Bruen*, 142 S. Ct. at 2126.

---

[4]      Although these cases predate *Bruen*, *Bruen* did not abrogate their reasoning about what instruments qualify as protected arms. *See* 142 S. Ct. at 2157 (Alito, J., concurring) (*Bruen* did not "decide anything about the kinds of weapons [or accessories] that people may possess").

**B.  Even if LCMs Are "Arms," They Are Not Protected by the Second Amendment Because They Are Not in Common Use for Self-Defense.**

Even if the Court determines that LCMs are bearable "arms," they are not the sort of "arms" protected by the Second Amendment because they are not "'in common use' . . . for lawful purposes like self-defense."  *Heller I*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134 (discussing whether handguns are "weapons 'in common use' today for self-defense" as part of the test for whether they are protected by the plain text of the Second Amendment).  This "important limitation on the right to keep and carry arms" remains a critical part of the Second Amendment following *Bruen*.  *See id.* at 2162 (Kavanaugh, J., concurring).

As the phrase "in common *use* . . . for self-defense" suggests, the Second Amendment does not protect a weapon merely because it is commonly bought or sold—though, of course, to be commonly used the weapon must also be commonly possessed.  Rather, in determining whether a weapon is commonly *used* for self-defense, both the Supreme Court and the D.C. Circuit consider the suitability of the weapon for self-defense and the frequency with which it is actually used for that purpose.  In *Heller I*, for example, the Supreme Court specifically examined the "*reasons* that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police."  554 U.S. at 629 (emphasis added).  And in *Bruen*, the Court reiterated that the weapon must be both suitable for use in self-defense and in practice be "commonly used" for that purpose.  142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)).

Conversely, the Court made clear that there is no Second Amendment protection for weapons that are "most useful in military service," even if they are sufficiently popular.  *Heller I*

13

**APP. 91**

at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017).  For example, there are more

than 700,000 machine guns registered in the United States.  *See* Bureau of Alcohol, Tobacco,

Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update

2021* 16 (2021), https://tinyurl.com/3aff4bft.  But even though there are more registered machine

guns than, for example, the number of stun guns discussed in Justice Alito's concurrence in

*Caetano*, 577 U.S. at 420, the Court in *Heller I* explained that the Second Amendment does not

protect such weapons because they are "not typically possessed by law-abiding citizens for

lawful purposes," 554 U.S. at 625.  The Court labelled "startling" the idea that "restrictions on

machine guns . . . might be unconstitutional."  *Id*. at 624; *see Friedman v. City of Highland Park*,

784 F.3d 406, 408 (7th Cir. 2015) (noting Tommy guns were "all too common" before being

federally prohibited and that the "popularity" of such dangerous military weapons doesn't mean

they have "constitutional immunity").

Similarly, in *Heller II*, the D.C. Circuit expressly rejected the idea that common

ownership of LCMs is sufficient to establish that they are protected by the Second Amendment.

After crediting evidence in the record indicating that magazines with capacities of more than ten

were commonly "owned"—and therefore were "in 'common use'" in that respect—the court

declined to resolve whether the Second Amendment's text encompasses LCMs because, on the

record before it, the court could not "be certain whether [LCMs] are commonly used or are

useful *specifically* for self-defense."  *Heller II*, 670 F.3d at 1261 (emphasis added); *cf. id.*

(acknowledging that there may also "be some capacity above which magazines" are not

commonly owned).  Other federal courts of appeals are in accord.  *See Friedman*, 784 F.3d at

409 ("[R]elying on how common a weapon is at the time of litigation would be circular.");

*Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (calling measuring "common use" by the

**APP. 92**

sheer number of weapons lawfully owned "somewhat illogical"); *cf. Kolbe*, 849 F.3d at 141

(explaining that under a popularity test, manufacturers would need only "flood[ ] . . . the market

prior to any governmental prohibition in order to ensure [the weapon] constitutional protection").

     Plaintiffs here have likewise built no record that LCMs are "commonly used or are useful

specifically for self-defense." *Heller II*, 670 F.3d at 1261. Although they acknowledge that the

Second Amendment protects only their right "to own weapons in common use by law-abiding

citizens for lawful purposes," Pls.' Mem. at 5, they point to no evidence showing that LCMs are

commonly used for self-defense (or any other lawful purposes). Instead, they argue that LCMs,

in unspecified capacities, are commonly owned and offer a single relevant anecdote about their

use, involving a civilian who fired 19 rounds during a gunfight. *See* Pls.' Mem. at 6–7 (citing the

statistics recited in *Heller II* and the dissent in *Kolbe* to support the assertion that "[l]aw-abiding

citizens own tens of millions of Banned Magazines"), 10 (referring to a store owner who "fir[ed]

19 rounds"). They have thus failed to carry their burden of demonstrating that LCMs fall within

the category of arms protected by the Second Amendment and are therefore not entitled to

preliminary injunctive relief for that reason alone.[5] *Bruen*, 142 S. Ct. at 2126. Nor *could* they

carry that burden: Even at this early stage, it is clear that LCMs are not in common use for self-

defense, as they are neither suitable for nor actually used for that purpose.

### 1. LCMs Are Not Suited for Self-Defense.

     LCMs are not in common use for self-defense because they are not suitable for that

purpose. Rather, their basic characteristics—the ability to fire without reloading and the

---

[5]     At a minimum, Plaintiffs offer no evidence that 30-, 40-, or 50-round magazines are even
commonly *owned*, let alone commonly used for self-defense. Indeed, none of the Plaintiffs
themselves own such devices. Ex. A, Pls.' Answers to Interrogs. at 7–10. Nor are they used by
MPD with pistols, Ex. E, Decl. of Leslie Parsons ¶ 16, even though law enforcement has
different, higher capacity needs, *id*. ¶¶ 17–18.

15

**APP. 93**

resulting heightened lethality—serve specific combat-oriented purposes.

Courts recognize the fact that a weapon is commonly used for military purposes or is designed to be similar to such weapons is a permissible basis for prohibiting that weapon for civilian use. In *Heller I*, the Court made clear that "M-16 rifles and the like"—that is, "weapons that are most useful in military service"—may be banned. 554 U.S. at 627. Courts of appeals, in portions of decisions not abrogated by *Bruen*, have applied this reasoning to uphold prohibitions on other weapons and accessories, including LCMs, that are "like" automatic firearms. *See, e.g.*, *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)). The en banc Ninth Circuit, for instance, analogized between LCMs and military weapons, noting that such magazines are likely "most useful in military service" because they "provide significant benefits in a military setting." *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021) (vacated).

Those benefits include the ability to continually fire without reloading—a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137; *see Friedman*, 784 F.3d at 409. Indeed, the first detachable, interchangeable LCMs made available to U.S. civilians were designed during World War I for use with a "one-man, hand held machine gun" (or "trench broom"), later commonly known as a "Tommy gun." *See* Ex. F, Decl. of Roger Pauly ¶¶ 81–83; Ex. G, Declaration of Brian DeLay ¶ 25; Ex. H, Decl. of Robert Spitzer ¶ 11; Ex. I, Decl. of Randolph Roth ¶¶ 43–46. LCMs for pistols—including the ones Plaintiffs seek to possess—were also specifically designed for military use. Ex. J, Decl. of Brennan Rivas ¶ 40; Ex. K, Excerpts of Paul M. Barrett, *Glock: The*

**APP. 94**

*Rise of America's Gun* 7, 9–11 (2012) (3–5 of .pdf); Ex. L, Excerpt of Jeff Kinard, *Pistols: An Illustrated History of the Their Impact* 270–275 (10–12 of .pdf) (2003).

        The ability to continually fire without reloading is valuable in battlefield situations, but it renders LCMs dangerously ill-suited for civilian self-defense.  *See, e.g.*, *Heller II*, 670 F.3d at 1263–64 ("[T]he tendency is for defenders [using an LCM] to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders."); Ex. C, Givens at 31, 35 (8, 12 of .pdf) (explaining that shooters who do not have sufficient cool, or practice, "when suddenly confronted with a shooting situation . . . panic, stick the gun out in front of them and empty it as fast as they can"); Ex. E, Decl. of Leslie Parsons  ¶¶ 25–27 (stating 16 children killed in District this year alone by gunfire).

        This design function results, as intended, in exceptional lethality that is suitable only for military purposes.  Outside of the military context, it has been taken advantage of for criminal ends—specifically mass murder.  Attacks with LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks."  *Heller II*, 670 F.3d at 1263 (cleaned up).  Unsurprisingly, semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history."  *Worman*, 922 F.3d at 39; *see* Roth Decl. ¶¶ 53–55 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns.").  And handguns equipped with LCMs were used in mass shootings at Virginia Tech (32 dead and 17 wounded); Fort Hood, Texas (13 killed and over 30 wounded); Binghamton, New York (13 killed and four wounded); and Tucson, Arizona (six killed and 13 wounded).  *Kolbe*, 849 F.3d at 120.

        **2.  LCMs Are Not Commonly Used in Self-Defense.**

LCMs are also not in common use for self-defense because they are not in fact used for that purpose.  *See Heller II*, 670 F.3d at 1262 (pointing to the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport").  As federal courts of appeals reviewing voluminous records have noted, examples of a civilian firing more than ten rounds in self-defense (let alone needing to do so without pause) are vanishingly rare—if they exist at all.  For example, the First Circuit has noted that "not one of the plaintiffs or their six experts could identify . . . even a single example of a self-defense episode in which ten or more shots were fired."  *Worman*, 922 F.3d at 37.  And recently, the Ninth Circuit has noted that "the record here, as in other cases does not disclose whether" the "benefit" of "being able to fire more than ten bullets in rapid succession . . . has *ever* been realized in self-defense in the home."  *Duncan*, 19 F.4th at 1105; *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018) ("The record reflects that most homeowners only use two to three rounds of ammunition in self-defense."); *Kolbe*, 849 F.3d at 127 (explaining that "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has . . . needed to fire more than ten rounds[ ] to protect herself" and concluding that such circumstances are "rare").  Indeed, a study of the National Rifle Association's database revealed that between 1997 and 2001, before the federal government's high-capacity magazine ban, the average number of shots fired in self-defense was only 2.2.  *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020).  That number has remained relatively stable since the federal ban was lifted—the average number of shots fired in self-defense from 2011 to 2013 was 2.1.  *Id.*

18

**APP. 96**

In response, Plaintiffs assert that "[o]ne can never know how many rounds will be sufficient to stop a determined opponent" and "[r]eloading a firearm takes precious seconds that a victim may not have during a criminal attack."  Pls.' Mem. at 11–12.  But those statements have no limiting principle and would require that any conceivable form of self-defense be permitted—an endless arms race, to the detriment of the public.  In any event, missing from Plaintiffs' filing is any support that, in practice, personal self-defense is aided by the ability to "rapidly bring to bear" more than ten rounds of ammunition using an LCM.  Pls.' Mem. at 8. Plaintiffs' Motion mentions a single anecdote of a civilian firing "19 rounds" to protect his business from "armed robbers," Pls.' Mem. at 10, without any suggestion that such circumstances are common or even precedented.[6]  Indeed, Plaintiffs' own evidence suggests that when LCMs *are* used, it is for criminal purposes—several of Plaintiffs' anecdotes illustrate civilian attacks on law enforcement using heightened firing capacity.  *See* Pls.' Mem. at 8 (describing a suspect who "proceeded to fire 11 more rounds" at an officer after the initial shot), 10 (mentioning an officer "shot 15 times by a mass murdering white suprem[ac]ist").

Plaintiffs' handful of anecdotes involving *police* use of LCMs is wholly irrelevant.  There is no constitutional right to be as well-armed as professional peacekeepers.  As the D.C. Circuit has observed, the Second Amendment right applicable to Plaintiffs "enables self-defense at least against the level of threat *generally* faced by those covered by the Amendment: responsible and

---

[6]     It is not clear from the article Plaintiffs cite that an LCM was even used in this incident. A separate article by the same author states that the "19 shots" were fired from three separate firearms.  Massad Ayoob, *The Ayoob Files: An Urban Gunfighter—The Lessons of Lance Thomas* (Mar. 1, 2002), https://tinyurl.com/4t5fb4na.  In their discovery responses, Ex. A, Pls.' Answers to Interrogs. 3–7, Plaintiffs cite two additional anecdotes, one of which has similar deficiencies.  *See* Massad Ayoob, *The Ayoob Files: Lead and Diamonds: The Richmond Jewelry Store Shootout* (May 1, 2003), https://tinyurl.com/u3jz76zc (detailing that the 30 shots came from two defenders and at least six firearms).  The District allows gun owners to possess multiple firearms and multiple magazines.

law-abiding citizens."  *Wrenn*, 864 F.3d at 664; *cf. Heller I*, 554 U.S. at 595 (explaining that the

Second Amendment does not "protect the right of citizens to carry arms for *any sort* of

confrontation").  Those threats are readily distinguishable from the threats faced by professional

law enforcement, like SWAT officers and FBI agents, when they are intervening in the

commission of violent felonies.  *See* Pls.' Mem. at 9–12; Parsons Decl ¶¶ 17–18.  And although

Plaintiffs express their own concern about being "set upon by multiple assailants," Pls.' Mem. at

12, they make no showing that this is a "level of threat generally faced" by the public or a

"common level[ ] of risk."  *Wrenn*, 864 F.3d at 664.

Because Plaintiffs have failed to show that LCMs are "in common use" for self-defense,

their challenge to the District's Law fails.  They are not entitled to preliminary injunctive relief.

The analysis may end here.

## II.   Plaintiffs Are Unlikely To Succeed on the Merits Because the District's Law Regulates Unusually Dangerous Devices, in Keeping with American Tradition.

Even if LCMs are "arms" within the meaning of the Second Amendment, Plaintiffs have

still failed to carry their burden to show that they are likely to succeed on the merits.  Plaintiffs

rest their argument on the claim that they are "unaware" of any limit on the "ammunition

capacity of a firearm at the time of the adoption of the Second or . . . [Fourteenth] Amendments,"

Pls.' Mem. at 14, 19.  But because the Law regulates technology that did not exist, and that

would have been "unimaginable at the founding," *Bruen*, 142 S. Ct. at 2132, the District is not

required to identify a "historical *twin*," only a "well-established and representative historical

*analogue*."  *Id*. at 2133 (emphasis in original).  Plaintiffs offer neither argument nor evidence to

explain why they would prevail under this appropriate framework.  Nor could they.

Even at this early stage, the information available shows that the Nation's tradition of

regulating dangerous and unusual weapons is "'relevantly similar'" to the District's Law, such

**APP. 98**

that it can act as "a proper analogue." *Id.* at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)).  The Supreme Court has, of course, not defined the phrase "dangerous and unusual," *id.* at 2128 (quoting *Heller I*, 554 U.S. at 627), and there are some disputes over its origin and meaning.[7]  But its substance can be discerned by examining the pattern over time of restrictions on certain weapons (including weapons accessories and configurations) considered to be particularly susceptible to criminal misuse or to pose significant dangers to the public.  From the regulation of such weapons in pre-founding England through the founding of the United States and the antebellum and postbellum periods, and continuing into the 20th century, governments have regulated specific weapons, accessories, and associated conduct deemed uniquely dangerous to the public, leaving available other weapons for constitutionally protected use.  The District's Law is part of that tradition.  *See id.* at 2133 (holding that a regulation is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors and is "comparably justified").

### A. The District Need Only Show that the Law Is "Relevantly Similar" to Regulations of Dangerous and Unusual Weapons.

The District's Law requires the Court to employ the "more nuanced approach" of reasoning by analogy because it implicates both "dramatic technological changes" *and* "unprecedented societal concerns."  *Id.* at 2132 (indicating that *either* factor would require this

---

[7]    As the Fourth Circuit has pointed out, the Supreme Court's citation to Blackstone referred to the crime of carrying "dangerous *or* unusual weapons."  *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148–49 (1769)).  And the phrase may be better understood as a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper," which involve "two terms, separated by a conjunction, [that] are melded together to form a single complex expression."  Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016).  If viewed as a hendiadys, "dangerous and unusual" would be read as "unusually dangerous," which accurately describes LCMs for the reasons discussed *infra*.

mode of analysis). LCMs would not exist without a dramatic change in firearms technology—indeed, without *several* dramatic changes—between 1791 and today. The ability to fire a few rounds in one *minute* at the founding has become the ability to fire 30 rounds in five *seconds*, and those rounds go farther, fly straighter, and inflict more damage. The growing availability of LCMs has also sparked unprecedented societal concerns, namely, the advent of a lone individual being able to commit mass murder. Because the regulation at issue here is the product of these distinctly modern circumstances, Plaintiffs' reliance on a "straightforward historical inquiry"—whether an identical regulation existed at the founding—is inapposite. *Id*. at 2131.

### 1.   "Dramatic Technological Changes"

The particularly lethal LCM technology regulated by the Law simply did not exist when the Second or Fourteenth Amendments were ratified. *See* Delay Decl. ¶¶ 13, 19, 25; Ex. M, Decl. of Kevin M. Sweeney ¶¶ 4, 5, 14, 15, 32. In the founding era, most arms were flintlock muzzleloaders capable of firing a single lead ball. *See* Sweeney Decl. ¶¶ 4, 5, 12, 13; Pauly Decl. ¶¶ 29, 30, 32; Roth Decl. ¶ 17. In favorable conditions, such guns could take half a minute to load (or reload). *Id.* ¶ 17.[8] They were the only ones "the vast majority of people ever owned, used or encountered." DeLay Decl. ¶ 19. There is "[no] evidence in primary sources" that guns with the capacity to fire repeatedly "were anything other than exotic curios in this era." *Id*. ¶ 19; *see* Sweeney Decl. ¶15 (based on probate inventories and newspaper references, "repeating

---

[8]      The limits of flintlock technology also made these firearms poor instruments of homicide. They could not be stored loaded for long periods of time, and because the gun had to be loaded manually before use, it could not be used impulsively. *See* Roth Decl. ¶¶ 17–19.

firearms in eighteenth-century America . . . were extraordinarily rare"). They were, to put it simply, "militarily and commercially irrelevant." DeLay Decl. ¶ 19.[9]

By the 1860s, not much had changed for ordinary Americans. The Henry Model 1860 and the Winchester 1866 rifles mentioned by Plaintiffs, *see* Pls.' Mem. at 15–16, were both expensive and rare: They were sold almost exclusively to military buyers through the early 1870s, and "very few" were in the hands of private persons in 1868. *See* DeLay Decl. ¶¶ 22–25 (these firearms were a "tiny percentage," or 0.2%, of those in circulation); Pauly Decl. ¶¶ 57–63 (discussing the firearms' development and use). They were also relatively slow to fire: Users of these "lever-action" weapons were still required to pull a lever between shots, slowing the firing rate to about one shot every three seconds. Pauly Decl. ¶ 61. And unlike modern LCMs, the magazines of the time were a fixed part of the gun. *Id.* To reload, soldiers had to individually insert each new cartridge. Rivas Decl. ¶ 30.[10]

Not until closer to the turn of the 20th century could weapons fire bullets in rapid succession and be efficiently reloaded with interchangeable magazines. These innovations made

---

[9]    The examples Plaintiffs provide circa 1791 (or before), existed only as concept pieces or curiosities. *See* DeLay Decl. ¶¶ 6, 7, 10–19, 21; Sweeney Decl. ¶¶ 15–32; Spitzer Decl. ¶¶ 24–34. Historians widely agree that repeating arms were not practical, functional weapons until at least the 1830s. Before that, they tended to explode at the shooter rather than the target. *See* DeLay Decl. ¶ 11; Sweeney Decl. ¶¶ 16 n.21, 19, 23, 24, 26 (describing some early repeaters as basically "pipe bomb[s]"), 31; Pauly Decl. ¶¶ 27, 28, 42–46.

[10]    Plaintiffs point to several other firearms capable of firing more than 10 rounds without reloading between 1791 and 1868, Pls.' Mem. at 15, but these are inapt comparators. Pepperbox pistols were "heavy, lumpy, and impractical" and "had a nasty habit of discharging all their barrels at once." Spitzer Decl. ¶ 33. Fewer than ten of the Bennett and Haviland, and only around 1,250 of the Porter Rifle, were produced. *See* Bennett & Haviland Many Chambered Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd; David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 n.42 (2015). Similarly, chain pistols "did not win much market share, perhaps in part because the large dangling chain was such an impediment to carrying the gun." Kopel at 856–57. Volcanic repeaters were "few, flawed, and experimental," Spitzer Decl. ¶ 31, and "suffered from an exceptionally low muzzle velocity," Pauly Decl. ¶ 59, and thus had very little power.

firearms far more deadly.  *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022).  The magnitude of this change is illustrated by an index devised for the U.S. Army, which assessed the relative "lethality" of various weapons (defined as the number of people who could be killed in one hour by a particular weapon, taking into account a weapon's range, accuracy, rate of fire, reliability, and other metrics).  *Id.* at 2597–98.  The lethality of a founding-era flintlock muzzleloader was 43; that of a Civil-War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was *495*—"a ten-fold increase over the flintlock musket."  *Id*. at 2507–08.  (And that manually re-loaded rifle did *not* even have an LCM—it carried only a five-round clip-magazine.  Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj.)

Interchangeable magazines capable of holding more than ten rounds, closer to the LCMs at issue here, did not appear for civilian use in America until the early 1920s.  They were used with submachine guns, which allowed for the ammunition to be loaded "automatically" into a gun's chamber from a magazine without the manual intervention of the shooter.  DeLay Decl. ¶ 25; Spitzer Decl. ¶ 11; Roth Decl. ¶¶ 43–46; Pauly Decl. ¶¶ 69–74, 83.  Handguns (pistols) using the same automated reloading technology—though called "semi-automatic," because the trigger has to be pulled after each round to reload the chamber —appeared about two decades before that but were not capable of accepting LCMs.  Pauly Decl. ¶¶ 75–78.

Handguns capable of accepting LCMs did not penetrate the U.S. market or society until *the 1980s*.  *See* Spitzer Decl. ¶¶ 61–62; Roth Decl. ¶ 50; Rivas Decl. ¶¶ 41–43; Pauly Decl. ¶ 78.  For example, not until 1985 did the U.S. military adopt a 15-round magazine instead of the 7-round magazine chosen in 1911.  Ex. K, Kinard at 263 (7 of .pdf).  Police, too, favored 6- or 7-shot revolvers "well into the second half" of the 20th century.  *Id*. at 256–57 (4 of .pdf).  Only in

**APP. 102**

the 1980s and 90s, when "a new generation of high-powered, high-magazine capacity pistols"
made with "advanced construction techniques and materials" became available, did police adopt
"military-style automatics." *Id.* at 256–57 (4 of .pdf); Ex. N, Robert Sadowski, *9MM: Guide to
America's Most Popular Caliber* 6–8 (Gun Digest 2018). Civilian buyers followed. Ex. K,
Barrett at 18–19 (9 of .pdf) (explaining the "American civilian gun-buying population tends to
gravitate to what professionals carry" and followed police toward Glocks); Ex. N, Sadowski at 7,
28–29 (9–10 of .pdf) (describing 9MM semiautomatic pistol in 1980s, 90s culture). Today, a
Glock 17 handgun can be purchased for less than $200 and is capable of firing 30 rounds in five
seconds. Roth Decl. ¶ 49. And such modern firearms are much more deadly than their 1791 or
1868 counterparts, not only because of this increased rate of fire, but also due to increased
accuracy and firepower (*i.e.*, bullets that fly faster and straighter and dig deeper). *See* Pauly
Decl. ¶¶ 8; 34–40; 64, 65; Ex. R, Graeme Rimer, et al., *Smithsonian Firearms* 302–08 (2014).

### 2. "Unprecedented Societal Concerns"

The District's Law also responds to "unprecedented societal concerns," *Bruen*, 142 S. Ct.
at 2132, which similarly did not emerge until the turn of the 20th century and were driven by the
technological advances discussed above. From the colonial period into the 1900s, mass murder
in the United States was almost always perpetrated by groups of individuals, because
technological limitations impaired the ability of a single person to kill multiple individuals at
once. Roth Decl. ¶¶ 40–42 (citing examples, including Nat Turner's rebellion). In 1791, for
example, firing 30 rounds in five seconds, which a single Glock 17 can accomplish, would have
required mustering 15 individuals, each with 2 firearms.

With the development of reliable rapid fire, including detachable magazines and
semiautomatic and fully automatic firearms, the "character of mass murder began to change" in

**APP. 103**

the late 19th and early 20th centuries.  These weapons dramatically increased the number of

persons who could be killed or wounded by a lone person during criminal activity.  *See id*. ¶ 43.

Markedly different from the firearms technology in use at the Founding or during the 1860s,

such firearms enabled individuals to wreak havoc on communities.  Spitzer Decl. ¶ 11

(describing the transition of these weapons from military use to civilian circulation and their use

in infrequent but highly publicized killings, such as the St. Valentine's Day massacre); Roth

Decl. ¶ 45 (similar).  The proliferation of modern semiautomatic arms, coupled with the

availability of LCMs, directly correlates with the contemporary problem of mass shootings in

America today.  *See* Roth Decl. ¶¶ 50–55 & figs. 1, 2 (describing how the problem of mass

shootings "is a modern phenomenon" and that "[t]he danger [semiautomatic weapons] pose is

intrinsically different from past weaponry," particularly when paired with LCMs); Spitzer Decl.

¶ 8 (describing contemporary efforts to restrict LCMs as beginning with school shooting in

1989); *cf*. Google, Ngram Viewer, https://books.google.com/ngrams/, Query: "shooting=>mass".

### 3.   The Lack of an Express "Founding-Era" Limitation on the Capacity of Firearms Is Irrelevant.

These dramatic technological changes and unprecedented societal concerns readily

explain why Plaintiffs are "unaware" of any limits on the "ammunition capacity of a firearm at

the time of the adoption of the Second or . . . [Fourteenth] Amendments."  Pls.' Mem. at 14, 19;

*see id*. at 21 (citing a lack of "limit[s] [on] firearm magazine capacity").  The District's

prohibition on LCMs, implemented in response to the rise of this dangerous new technology and

its public consequences, is a quintessential "modern regulation[ ] . . . unimaginable at the

founding."  *Bruen*, 142 S. Ct. at 2132.  The failure of the Founders or the ratifiers of the

Fourteenth Amendment to regulate for a degree of firing capacity that *did not exist*, let alone

have any appreciable presence or impact on civil society, is thus easily explained.  "States adopt

**APP. 104**

laws to address the problems that confront them" at the current moment. *McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014). The Constitution does not "require States to regulate for problems that do not exist." *Id.*; *cf.* DeLay Decl. ¶ 21.

Nor can the fact the Founders did not regulate yet-to-be-invented technologies mean that states are precluded from adopting new laws to address changing circumstances. As Justice Scalia observed in the free speech context, "[q]uite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is ipso facto unconstitutional, or else modern election laws . . . would be prohibited, as would (to mention only a few other categories) modern antinoise regulation . . . and modern parade-permitting regulation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 372 (1995) (Scalia, J., dissenting). The Court in *Bruen*, too, took care to emphasize that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132 (citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)). Because the District's Law addresses a dramatic development in firearms technology and responds to the unprecedented societal consequences of that technology being adopted for crime and mass murder, reasoning by analogy is appropriate and necessary.

## B. Regulations of Dangerous and Unusual Weapons Are Ubiquitous in American History.

Notwithstanding that LCMs are of only recent vintage, their regulation is part of a longstanding tradition whereby governments, from pre-founding English history to the early 20th century, restrict and even prohibit the use of weapons and weapons enhancements that threaten public safety. *See id.* at 2145 (noting a pattern of early state statutes that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"). Both the reasoning for and the timing of such restrictions are consistent in each era: Governments adopt restrictions on new firearms technologies not when those technologies are first invented or introduced, but as they begin to

**APP. 105**

circulate widely in society and present "a safety, violence, or criminological problem or threat."

Spitzer Decl. ¶ 23.  Though these restrictions may include different weapons and address

different concerns, there is a clear through-line—they target weapons that are susceptible to

criminal misuse or that pose special dangers to the public, while leaving available a variety of

options for self-defense.

### 1.  Medieval and Pre-Founding English History

The tradition of government regulation of particularly dangerous weapons is deeply

rooted, stretching back to pre-founding English history.  *See Bruen*, 142 S. Ct. at 2136

(explaining that such evidence is helpful when it "survived to become our Founders' law").

English monarchs historically had the power to restrict possession of arms that they designated

as threats to public safety and order.  *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–32

(9th Cir. 2016) (en banc) (reviewing English prohibitions on the carrying of certain arms in the

16th and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  For example,

Richard II prohibited possession of the launcegay, a 10- to 12-foot-long lightweight lance,

because it was "generally worn or carried only when one intended to engage in lawful combat or

. . . to breach the peace."  *Bruen*, 142 S. Ct. at 2140.  Similarly, Henry VIII prohibited "little

short handguns, and little haquebuts," which he identified as a source of "continual feare [*sic*]

and danger of the king[']s loving subjects."  Ex. Q, Patrick J. Charles, *Armed in America: A

History of Gun Rights from Colonial Militias to Concealed Carry* 62 (5 of .pdf) (2018).  Thus,

the Second Amendment right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127

(quoting *Heller I*, 554 U.S. at 599), permitted government regulation of weapons that were

particularly dangerous or susceptible to criminal misuse.

### 2.  Colonial and Early National history:  Laws Enacted Around the Time of the Ratifications of the Second Amendment.

**APP. 106**

Throughout the colonial and founding eras, the government acted to protect the public by restricting dangerous types, uses, or configurations of weapons.  Indeed, governments frequently imposed regulations on weapons and accessories that posed a heightened threat to public safety.  Gunpowder, for example, was highly regulated throughout the colonies.  Concerned about protecting the public from the threat of fire and explosion, governments frequently set up communal magazines and required that individuals store their gunpowder in those locations.  *See*, *e.g.*, 1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844.  Massachusetts went even further, prohibiting the possession of loaded firearms inside the home in recognition of the serious threat posed by the unintended discharge of such arms.  1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4.  Individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished; because munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them.  *See Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains … with the States."), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

Colonial governments also restricted the carrying of particular weapons that would induce "great fear and quarrels" among the public.  Spitzer Decl. ¶ 56; *see also Bruen*, 142 S. Ct. at 2143 (discussing "colonial legislatures['] . . .  prohibit[ion] [on] the carrying of 'dangerous and unusual weapons'").  For example, New Jersey enacted a law against wearing weapons as early as 1686, and Massachusetts, North Carolina, and Virginia followed.  Spitzer Decl. ¶ 56.  These

29

**APP. 107**

laws generally targeted the carrying of firearms in crowded places and groups of armed people, *id*., situations in which the danger of firearms possession were particularly heightened.

There were also widespread restrictions on the ownership and use of "trap guns," or firearms that (through the use of string or other devices) were configured to fire remotely when triggered. *Id*. ¶¶ 57, 60. Trap guns were frequently used for lawful purposes, including protection of personal and commercial property. *Id*. ¶ 58. However, governments recognized that these sorts of modifications to firearms were nonetheless "most dangerous," since their uncontrolled lethality raised the risk of harm to innocent bystanders to unacceptable levels. 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73. Sixteen states ultimately enacted anti-trap gun laws. Spitzer Decl. ¶ 60, Ex. B (listing years of enactment of trap gun laws); *id*., Ex. F (providing text of trap gun restrictions).

### 3.  Antebellum and Postbellum history: Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

Regulations from throughout the antebellum and postbellum periods reflect a continuing pattern of state regulation of weapons that were especially dangerous, associated with criminal activity, or both.[11] These laws were passed in response to the most pressing threat to public safety at the time they were enacted: the frequent use of concealable weapons in assaults and homicides. *See* Spitzer Decl. ¶ 44 (quoting a grand jury, "the pistol dirk or club is immediately

---

[11]    The Court in *Bruen* did not have occasion to resolve whether courts should "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id*. at 2138. So too here as to dangerous and unusual weapons. *See id*. at 2136 ("[A] regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." (cleaned up) (quoting James Madison)).

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens"); *see also People v. Persce*, 97 N.E. 877, 878–79 (N.Y. 1912) (finding specified weapons "are ordinarily used for criminal and improper purposes" and "are not amongst those ordinary legitimate weapons of defense and protection").  Twelve states adopted broad restrictions on any concealed weapon, while dozens of others passed restrictions on specific types, including "bludgeons," "billies," "clubs," "slungshots," and "sandbags."  Spitzer Decl. Ex. C.  Several states also restricted the sales of "pocket pistols," a subclass of the Colt six-shooter designed to be concealed from public view and associated with criminal activity.  Rivas Decl. ¶¶ 21, 25, 44.  These sorts of regulations were designed to address *concealable* arms in particular, leaving other arms available for self-defense—for example, although both Tennessee and Arkansas restricted the sale and public carry of pocket pistols, they continued to allow the carry of larger "army or navy" pistols "in the hand."  *Id*. ¶ 18; *see State v. Wilburn*, 66 Tenn. 57, 61 (1872); An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, https://tinyurl.com/mtxbn4nd.  By the end of the 19th century, almost every state in the country regulated the concealed carry of guns and other specified weapons in an effort to ensure public safety.  Spitzer Decl. ¶ 38; *cf. Bruen*, 142 S. Ct. at 2147 n.20 (noting that both Arkansas and Tennessee "tolerated the prohibition of all public carry of handguns except for military-style revolvers").

Bowie knives were also considered to be an especially dangerous weapon and prone to criminal misuse.  *See* Spitzer Decl. ¶ 44.  They were equipped with long blades designed for fighting rather than for hunting or general utility, and they included features like crossguards and clip points that were designed to facilitate cutting or stabbing.  *Id*.; *see also* William R. Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017),

31

https://tinyurl.com/mpjzkfsj.  As one court noted, Bowie knives were distinguishable from guns, pistols, or swords, the types of weapons with which "men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill."  *Cockrum v. State*, 24 Tex. 394, 402 (1859).  In contrast, the Bowie knife was, "in its device and design . . . *the instrument of almost certain death*."  *Id.* (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin").[12]

Noting the unique risk Bowie knives posed to the public, states began to pass targeted laws restricting them.  In the 1830s, six states enacted laws barring the carrying of Bowie knives specifically.  Spitzer Decl. ¶ 47.  In the years that followed, forty-nine states and the District of Columbia enacted similar prohibitions, addressing Bowie knives either by name or as part of a broader restriction on dangerous knives.  *Id.*  As the Tennessee Supreme Court held, these restrictions fell comfortably within the government's historical "right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens."  *Aymette*, 21 Tenn. at 159.  Thus, while antebellum state-court decisions "evidence[d] a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, states retained broad police powers to regulate particular weapons in the public interest.

### 4.  Twentieth Century

Evidence of similar regulations from the 20th century reaffirm the longstanding tradition

---

[12]     The *Heller I* Court criticized *Aymette*'s narrow reading of the Second Amendment as "odd."  554 U.S. at 613.  Nevertheless, the case remains valuable as an articulation of Tennessee's reasons for prohibiting the carrying of Bowie knives and other dangerous weapons.

of government restriction of particularly dangerous weapons and accessories.[13]  Most notably,

state governments in this period adopted a variety of regulations targeting automatic and

semiautomatic firearms as those weapons came into widespread use for criminal activity.  Spitzer

Decl. ¶¶ 11–14.  An early example of this regulation targeted the Tommy gun, a machine gun

capable of holding up to 100 rounds.  *Id.* ¶ 12.  Guns like the Tommy gun could exact a

devastating toll when used by criminals and garnered extensive national attention.  *Id*. ¶ 11.

Responding to the growing availability and the extreme threat posed by these weapons, 32 states

banned them entirely in the 1920s and 30s.  *Id*. ¶ 12.

Indeed, a number of restrictions on firing capacity—the number of rounds that could be

fired without reloading—were enacted between 1927 and 1934, including the District's.  *See id*.

¶¶ 19–22, tbl. 1 (detailing numerous regulations "adopted by nearly half of all states,

representing approximately 58% of the American population at that time"); Roth Decl. ¶ 46.

These regulations were "closely tied to the enhanced firing capacity" of widely available

weapons and "the attractiveness (and use) of these weapons by criminals at the time."  Spitzer

Decl. ¶ 18; *see generally* ¶¶ 12–18.[14]  In 1934, the federal government passed the National

Firearms Act, which tightly regulated machine guns (including the Tommy gun) and sharply

---

[13]     Though the Supreme Court cautioned that 20th century evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 142 S. Ct. at 2153 n.28, the consistency of such evidence with earlier regulations can illustrate the continuation of an American tradition.

[14]     Plaintiffs point out that some of these laws were later amended or repealed.  Pls.' Mem. at 17–18.  But where, as here, a regulation is consistent with historical tradition, legislatures are free to experiment to strike the right balance between effective intervention and the preference of the people.  *See Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905) (explaining that when a regulation is an exercise of the police power, "what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not").  If that preference changes, legislatures should be able to repeal the regulation without fear that such an action would alter the scope of permissible regulation in the future.

limited their availability to the public. *Id.* ¶ 14 (citing National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236). And in 1968, Congress banned the transfer or possession of new machine guns altogether. Pub. L. Nos. 90-618 and 99-308 (1968). The regulation of dynamite followed this same pattern. Roth Decl. ¶¶ 44–46.

Early 20th century regulations of semi-automatic weapons were considered "obviously uncontroversial" exercises of states' police powers. Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69 (2017). Indeed, restricting this kind of firepower was so well-accepted that, in 1928, the National Conference on Uniform State Laws promulgated a model law for national use. *See* Ex. P, Model Law: Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting 422, 428 (5, 11 of .pdf) (1928) (prohibiting possession of "any firearm which shoots more than twelve shots semiautomatically without reloading"). And the National Rifle Association endorsed the District of Columbia semiautomatic firing capacity law, stating that "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union." S. Rep. No. 72-575, at 5–6 (1932); *see also* Spitzer Decl. ¶ 13.

**C. These Historical Regulations Are Relevantly Similar to the District's Law.**

The District's Law is "relevantly similar" to the above analogues. *Bruen*, 142 S. Ct. at 2132–33. The limited burden it imposes on self-defense is comparable to that imposed by earlier regulations: It is a narrow restriction targeted at a particularly dangerous weapons enhancement that is susceptible to criminal misuse, leaving available a wide variety of other options for self-defense. And the justification for this regulation follows the same pattern as in prior eras. The

**APP. 112**

District crafted its regulation in response to a particularly dangerous threat to public safety—the growing use of LCMs to facilitate crime and, specifically, to perpetrate mass murder.

### 1.  Comparable Burdens

Akin to its historical analogues, the Law restricts only a type of particularly dangerous enhancement that has been widely adopted for criminal activity:  the ability to fire more than 10 rounds continuously, a feature that has facilitated gun violence and mass murder.  This presents a comparably limited burden on the right to keep and bear arms because it preserves the right of individuals to act in self-defense.  *See McDonald v. City of Chicago*, 561 U.S. 742, 786–87 (2010) (plurality op.) (noting that the right to keep and bear arms is not an "intrinsic" right, valued for its own sake, but "instrumental"—a means to the end of enabling armed self-defense).

As discussed above, the regulations enacted throughout Anglo-American history targeted certain weapons considered uniquely dangerous and susceptible to criminal use.  *See* Section II.B.  The Bowie knife, for example, was designed for maximum lethality and was labeled "efficient only in the hands of the robber and the assassin."  *Aymette*, 21 Tenn. at 158.  When states passed regulations to respond to this threat, they did so specifically—indeed, a majority of states passed regulations restricting Bowie knives by name.  Spitzer Decl. ¶ 47.  The District's regulation is similarly targeted.  It does not ban any class of firearms, nor does it ban all magazines.  Instead, it restricts only the particular *subclass* of magazines that is strongly correlated with criminal attacks and mass shootings, and which is unsuited to self-defense.

This pattern of targeted regulation ensures that individuals retain access to firearms for constitutionally protected purposes.  When Tennessee and Arkansas banned the public carrying of a range of knives, blunt weapons, and pistols, for example, they included an explicit exception for large army and navy pistols so long as they were carried openly in the hand.  *See* Rivas Decl.

**APP. 113**

¶ 18.  Despite the limited nature of this exception, courts held that it left the right to self-defense sufficiently intact and upheld the laws.  *See id*. ¶ 20.  The same approach can be seen in other regulations of dangerous gun accessories, particularly ammunition.  While these early laws could be restrictive—some states required that gunpowder be stored in a communal magazine, and at least one state flatly prohibited the possession of loaded firearms in the home, *see* Section II.B.2—they were regarded as appropriate exercises "of the police power" to protect the public from a weapons accessory known to be volatile and dangerous, *Brown*, 25 U.S. at 443.  The District's regulation presents an even lesser burden than these historical analogues.

Indeed, the District's regulation is closer to the prohibitions on trap guns enacted at the Founding, which regulated only the *manner* in which firearms could be configured and did not prevent gun owners from using those firearms for self-defense.  Like trap gun laws, the District's regulation prohibits a particular gun enhancement, one that enables these weapons to fire without pause for more than ten rounds and heightens the risk to innocent bystanders.  Beyond the narrow restriction on magazine capacity, however, gun owners are free to use their weapons and possess lawful ammunition.  *See* Section I.A.2.  The Law requires only that the shooter pause to change magazines every ten rounds, which significantly reduces the risk of injury from violent confrontation and mass murders.  *See*, *e.g.*, *Duncan*, 19 F.4th at 1109–10 (noting that an expert "described the period after a shooter has exhausted the current magazine as 'precious down-time' that 'affords those in the line of fire with a chance to flee, hide, or fight back'" and citing examples of "people fleeing, hiding, or fighting back during a shooter's pause"); *see ANJRPC*, 910 F.3d at 119 (similar); *Kolbe*, 849 F.3d at 128 (similar).  Nothing suggests that gun owners' ability to defend themselves is, in practice, at all burdened by the regulation.  *See* Section I.B.

## 2.   Comparable Justifications

36

The District's Law is also justified by the same reasoning that has driven governmental regulation of weapons (including weapons accessories and configurations) throughout history: The state's responsibility to protect the public from the increased danger caused by weapons that pose a particular threat to public safety. As the historical analogues make clear, governments have long regulated weapons associated with rising crime rates and other salient societal dangers, and these regulations have targeted specific weapons with dangerous attributes, susceptibility to criminal misuse, or both. The District's Law follows this tradition, addressing a particularly lethal form of firearms technology that has driven the rise of mass murder in this country.

LCMs have been linked to crime and mass shootings since the late 1980s, an association that led to their inclusion in the Federal Assault Weapons Ban in 1994. "LCMs are used in crime much more often than [assault weapons] and accounted for 14% to 26% of guns used in crime prior to the [federal] ban." Christopher S. Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* 2 (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf. Since the sunset of that law, the criminal misuse of LCMs has only increased. Criminals frequently take advantage of the lethal capacity of LCMs to fire without pause, with devastating results. Recent studies suggest that firearms equipped with LCMs are involved in somewhere between half and two-thirds of public mass shootings and mass murders that result in six or more fatalities. Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020); *see* Ex. O, Decl. of Daniel W. Webster ¶¶ 9, 12.

**APP. 115**

And shootings tend to be more fatal when LCMs are involved:  The total number of victims killed and wounded are two to three times higher when LCMs are used.  *Id.* at 152. Attacks with assault weapons or other semiautomatic guns equipped with LCMs "result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms."  Koper 2004 at 3; *see also* Webster Decl. ¶¶ 10–12.  From Newtown to Las Vegas, Parkland to Tucson, Orlando to Uvalde, LCMs have enabled the most horrific mass shootings of our time.  *See* Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf.

Contrary to Plaintiffs' assertions, *see* Pls.' Mem. at 19, LCM prohibitions effectively target this threat, reducing the frequency and lethality of mass shootings.  *See* Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754, 1754 (2019), https://tinyurl.com/4hmw3szk; *see also* Michael Siegel, et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347, 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html (explaining that bans on LCMs are associated with fewer fatalities and nonfatal injuries in mass public shootings).  States that enacted such restrictions experienced fewer mass shootings and, when they occur, fewer deaths and injuries in those shootings.  *See* Webster Decl. ¶ 15 (discussing Klarevas, *supra*, at 1758; Daniel W. Webster, et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Pub. Policy 171, 188 (2020), https://tinyurl.com/y64ebzxd).

As discussed above, a similar rationale has justified firearms regulations throughout Anglo-American history.  Governments have always used their police powers to protect their

**APP. 116**

populations, particularly from weapons linked with crime or with especially dangerous features.

In the colonial period, governments strictly controlled the storage of gunpowder because of the

extraordinary risk of fire or explosions.  And as the homicide rate began to rise in the antebellum

period, states adopted restrictions on the type of concealable weapons most frequently used in

assaults.  Weapons like pocket pistols and Bowie knives, which were designed to be highly lethal

and were often put to criminal misuse, were specifically targeted for regulation.  This pattern was

repeated in the 20th century, when automatic and semiautomatic firearms proliferated.  The

reason for these laws mirrors the reasoning behind the District's Law.[15]

\* \* \*

Governments have long exercised their powers to regulate the possession, use, and

storage of unusually dangerous weapons and accessories in order to protect their residents.  And

even at this early stage, the uniformity of the available historical evidence makes clear that the

District's prohibition on LCMs is part of this unbroken tradition and therefore constitutional

under the Second Amendment.  Plaintiffs are thus unlikely to succeed on the merits.

## III.    Plaintiffs Do Not Satisfy the Other Criteria for a Preliminary Injunction.

Plaintiffs' claims of injury are based on the alleged denial of their constitutional rights.

But because their claims fail on the merits, Plaintiffs are not entitled to preliminary injunctive

---

[15]    Plaintiffs' exclusive focus on an alleged insufficient "handful" of regulations that "limit[ ] firearm magazine capacity" is doubly mistaken.  *See* Pls.' Mem. at 19, 21.  *First*, this is the wrong metric, as the District's prohibition on LCMs is a quintessential "modern regulation[ ] . . . unimaginable at the founding."  *Bruen*, 142 S. Ct. at 2132; *see* Section II.A.  *Second*, the number of states that restrict LCMs today is not a historically grounded approach for determining what laws are consistent with the Second Amendment.  Laws satisfy *Bruen*'s standard where they are "consistent with this Nation's *historical tradition* of firearm regulation."  *Id.* at 2126 (emphasis added).  The right to keep and bear arms accommodates state and local variation in "devis[ing] solutions to social problems that suit local needs and values."  *McDonald*, 561 U.S. at 784 (plurality opinion).  "[A]nalogical reasoning under the Second Amendment" is not a "regulatory straightjacket."  *Bruen*, 142 S. Ct. at 2133.

relief.[16]  Nor have Plaintiffs met the remaining factors necessary for a preliminary injunction.

Contrary to Plaintiffs' assertions, Pls.' Mem. at 22, the mere "allegation" of a Second Amendment violation it is not enough to show irreparable injury.  *See Winter*, 555 U.S. at 21–22. Instead, Plaintiffs must demonstrate that such a deprivation is actually "likely."  *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (emphasis added). Otherwise, anyone fearing a perceived rights-infringement would enjoy a presumption of irreparable injury when seeking equitable relief.  That is not the law.  *See Winter*, 555 U.S. at 22 (rejecting the "possibility" of irreparable harm).  Because Plaintiffs' constitutional claims fail, *see* Sections I and II, they cannot demonstrate that they will be injured, let alone irreparably so, in the absence of an injunction.

Moreover, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  "Any time [the District] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up)).   Furthermore, "[t]he equities and public interest . . . generally weigh in favor of enforcing duly enacted state laws."  *Strange v. Searcy*, 135 S. Ct. 940, 940 (Feb. 9, 2015) (Thomas, J., dissenting).

These principles hold extra force here given the public's paramount interest in restricting the use of deadly firearm accessories.  Plaintiffs' interest in possessing LCMs in anticipation of

---

[16]     The D.C. Circuit has not yet decided whether the "sliding-scale approach" remains valid after *Winter*, *see Sherley*, 644 F.3d at 393, and Plaintiffs do not argue that that approach should apply here.  However, the D.C. Circuit *has* made clear that it reads *Winter* to "suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Id*. (citing *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

needing to fire more than 10 rounds without reloading—a circumstance so rare that Plaintiffs

offer only stray or irrelevant anecdotes in support of it—pales in comparison to the District's

interest.  Large-capacity magazines have been illegal in the District of Columbia since 2009.  If

the Court were to enter Plaintiffs' requested injunction, individuals who have been prevented

from acquiring large-capacity magazines for nearly 15 years will be able to lawfully possess

them.  Significant numbers of large-capacity magazines could flood into the District, hobbling

enforcement even if the prohibition is later upheld on appeal.  That risk is tangible.  *See* Matthew

Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During*

*Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa; Parsons

Delc. ¶¶ 10–13.  Such an influx could also have devastating consequences for the public, as

"LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality

mass shootings."  Klarevas, *supra*, at 1758; *see* Section II.C.2.

The societal interest in preventing grievous injuries to and deaths of innocent civilians

and law enforcement caused by the use of LCMs is paramount.  Use of LCMs increases the

likelihood of indiscriminate fire that can strike a home, storefront, or bystander, especially in

urban environments like the District.  Parsons Decl. ¶ 25.  These bullets can and do travel

through walls and car doors.  *Id.*  Stray (and spray) gunfire is already a very real danger in the

District; in July 2022, for example, MPD recording devices documented discharge of 50 rounds

in 5.5 seconds.  *Id.* ¶ 23.  And allowing the use of LCMs risks multiplying the already tragic

number of deaths—including deaths of children—caused by errant bullets.  *Id.* ¶¶ 25–27.

Plaintiffs cannot demonstrate that it is in the public interest to enjoin a duly enacted law designed

to protect public safety and reduce gun violence and gun-related crime.  Indeed, invalidating the

District's prohibition on LCMs would remove a valuable tool from the hands of law

enforcement, making it more difficult to ensure the security of the Nation's Capital and to protect the safety of officers and members of the public. *Id.* ¶ 29.

## IV.    Any Injunction Should Be Limited to Plaintiffs' As-Applied Challenge.

Even were the Court to find that Plaintiffs have established some entitlement to injunctive relief, Plaintiffs have not met the "heavy burden" to show that the District's prohibition on LCMs violates the Second Amendment's guarantee under *every* circumstance—the requirement for any facial challenge. *Salerno*, 481 U.S. at 745; *see Duncan*, 19 F.4th at 1101 (explaining that, to succeed on a facial challenge to an LCM prohibition, plaintiffs "must show that no set of circumstances exists under which [it] would be valid."). The District's prohibition applies to a wide variety of LCMs—stick magazines, drum magazines, 30-round versions, and even 100-round versions. *See* D.C. Code § 7-2506.01(b). Yet Plaintiffs make no effort to show that a 30-, 50-, or 100-round magazine is in common use for self-defense—nor could they. *See supra* Section I.B; *cf. Heller II*, 670 F.3d at 1261 (even assuming magazines holding 10 rounds are commonly owned, "[t]here may well be some capacity above which" they are not).[17]

Thus, any injunctive relief should redress *only* the injuries alleged (1) by Plaintiffs, and (2) as to the magazines they have offered evidence that they would use. The Supreme Court has recognized the "general rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the

---

[17]    Nor do Plaintiffs make any argument with respect to the Law's prohibition on the "sell[ing]" or "transfer" of LCMs. D.C. Code § 7-2506.01(b). Thus, Plaintiffs' challenge is the "sort of 'separate attack on a defined subset of the statute's applications' [that] is better read as an as-applied challenge." *In re Sealed Case*, 936 F.3d at 588 n.4 (quoting *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010)); *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (describing the distinction between facial and as-applied challenges as "both instructive and necessary, for it goes to the breadth of the remedy employed by the Court"). And, in any event, Plaintiffs could not bring a facial challenge to the entire law because they lack standing as to the sale and transfer provisions. *Cf. supra* n.3.

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotations and citation omitted). And here, "a narrower remedy [would] fully protect [Plaintiffs]" and avoid prematurely resolving constitutional questions raised by other applications of the Law. *Nat'l Treasury Emps. Union*, 513 U.S. at 477–78.

Plaintiffs have offered no evidence that they currently own magazines with a capacity larger than 21 rounds, would seek to buy or use such magazines, or would be harmed if the injunction did not reach these larger magazines. Although each Plaintiff filed a declaration in support of the Motion explaining that they seek to possess magazines holding more than 10 rounds while in the District, none mention any interest in possessing magazines with a capacity of more than 21. *See generally* [8-2]–[8-5]. To the contrary, Plaintiffs aver only that they "would employ" magazines that *they already own* but keep outside the District. *See id.* at ¶¶ 3, 4 (in each); *see, e.g.*, *id.* [8-3] at ¶¶ 3–4 ("I possess outside the District magazines . . . holding in excess of 10 rounds" and "I would employ these magazines"). None of those magazines have a capacity over 21 bullets.[18] An injunction limited to the Plaintiffs and to LCMs with a capacity of 21 rounds would thus "fully protect" the Plaintiffs from the injuries they allege as part of their as-applied challenge. *Nat'l Treasury Emps. Union*, 513 U.S. at 478.

Thus, if the Court finds that Plaintiffs are entitled to some form of preliminary relief— which they are not—the injunction should be limited exclusively to the Plaintiffs and should allow them (and only them) to possess LCMs with no more than 21 rounds of ammunition.

### V.   <u>Defendants Would Be Prejudiced by Consolidation with the Merits.</u>

---

[18]    In response to a discovery request, Plaintiff Yzaguirre stated he possesses a 20-round magazine; Plaintiff Chaney has a 21-round magazine; and Plaintiff Klun has a 15-round magazine. Ex. A at 7–10. Plaintiff Hanson has not specified the capacity of magazines he already owns, though he does state that two of the three firearms he normally carries (or would use for home defense) come "standard issue" with magazines of 17 and 15 rounds. *Id.*

**APP. 121**

In addition to denying the preliminary injunction, this Court should also decline

Plaintiffs' invitation to permanently enjoin the District's Law at this early stage of the case.

Such a move under Rule 65 is "generally inappropriate." *Camenisch*, 451 U.S. at 395.  And

doing so here would "deprive [Defendants] of a full opportunity to discover and present all of

their evidence." *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657

F.2d 124, 126 (7th Cir. 1981).

The law Plaintiffs challenge addresses "unprecedented societal concerns or dramatic

technological changes," which demands a "nuanced approach." *Bruen*, 142 S. Ct. at 2132.

Specifically, assuming LCMs fall within the Second Amendment's scope, it requires that

Defendants and their experts undertake a complex survey of historical state and municipal laws

and additional primary-source research on the Nation's tradition of regulation of firearms and

other dangerous weapons.  Defendants began their research by consulting the text of easily

accessible historical state and local laws, but despite working diligently since Plaintiffs' Motion

was filed, Defendants have not yet had the opportunity to fully explore all the relevant areas of

inquiry.  Such an effort would require time-intensive projects, like a deeper canvass compiling

these laws, that are voluminous and unfinished.  There are also many unexplored primary source

materials that contextualize how these laws were understood and enforced, including official

reports, manuscripts, newspaper articles, and archival records.  *See* Rivas Decl. ¶¶ 9, 46, 47.

Analysis of these primary source materials could also help identify historical traditions of

restricting the availability and use of dangerous weapons through non-statutory means and could

shed light on the historical development of arms designed and intended for civilian self-defense

use.  Defendants are not aware of existing secondary literature on these topics.  Original work

will be time-consuming.  *See Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C. filed

June 30, 2022), Declaration of Zachary Schrag [18-13].  Defendants should be permitted time to

conduct the research—including original archival research—necessary to provide comprehensive

insight on these issues before this Court issues a sweeping constitutional ruling.

Not only have Defendants not yet developed a complete account of this American

tradition of regulation, given the breadth and complexity of the historical analysis that *Bruen*

now requires, but Plaintiffs have not yet even *responded to it*.  And if Plaintiffs *do* respond to the

District's extensive survey of historical laws in their reply brief, Defendants will have had no

opportunity to address any issues Plaintiffs raise.  Defendants should have the opportunity to

fully develop the record on these factors, and to depose the Plaintiffs or to test at all the other

evidence on which they rely in their Complaint and Motion, before the Court makes a final

determination on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Date: November 23, 2022.                                Respectfully Submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Mateya B. Kelley*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
HELEN M. RAVE[*]

45

**APP. 123**

Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-7854
Email: mateya.kelley@dc.gov

*Counsel for Defendants*

*Bar number pending

APP. 124

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANDREW HANSON, ET AL.**              )
                                        )
            Plaintiffs,                 )
                                        )
v.                                      ) Civil Action No. 22-cv-2256 RC
                                        )
**DISTRICT OF COLUMBIA, ET AL.**        )
                                        )
            Defendants.                 )
_____     )

## PLAINTIFFS' ANSWERS AND OBJECTIONS
## TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs hereby tender their answers and objections to Defendants' First

Set of Interrogatories.

**Interrogatories.**

1.      Since obtaining your concealed-carry license from MPD, have you (or

any family member) been subject to a specific threat of death or serious bodily harm,

or a theft of property? If so, identify each such incident and describe it in detail.

**Answer as to all Plaintiffs**: Objection, irrelevant, not likely to lead to the

discovery of relevant and admissible evidence. This case is a challenge to the

District's ban on the possession of magazines and other ammunition feeding devices

capable of holding more than 10 rounds of ammunition. The irreparable harm to

Plaintiffs alleged here is being subject to an unconstitutional infringement on their

**APP. 126**

**Answer as to all Plaintiffs:** Irrelevant, immaterial, not likely to lead to the discovery of relevant admissible evidence. This is perhaps interesting, but likewise irrelevant to the injury Plaintiffs face here, which is being subject to an unconstitutional infringement on their right to keep and bear arms. Dick Heller did not have to prove he had used a gun to defend himself in order to challenge DC's handgun prohibition. Nor did Brian Wrenn have to prove that he used a firearm for self-defense to challenge DC's may issue concealed carry regulation. Again, the answer to this interrogatory is irrelevant and immaterial to the constitutional challenge at issue here.

Subject to the objection, the following individual responses are provided:

Andrew Hanson: No.

Tyler Yzaguirre: No.

Nathan Chaney: No.

Eric Klun: No.

3.     Are you aware of any incidents in the District of Columbia, Maryland, or Virginia in which someone fired more than ten rounds in self-defense of him or herself, or another? If so, identify each incident and describe it in detail, including the date and location of the incident, the identity and contact information of the person(s) involved and their relation to you, if any, and how many rounds were fired. This interrogatory is not meant to include any incident

**APP. 127**

that occurred while the shooter was on active military duty or serving in any law enforcement capacity.

**Answer as to all Plaintiffs:** Objection to limiting the interrogatory to law enforcement or active military and to limiting the interrogatory to Maryland, Virginia and the District of Columbia. Moreover, whether Plaintiffs are or are not aware of these incidents is not relevant to the District's constitutional violation.

Subject to the objection, Plaintiffs state: This interrogatory appears directed at the question whether magazines holding more than 10 rounds are in fact necessary for self-defense, asking whether Plaintiffs are aware of more than 10 rounds having been fired in Virginia, DC, or Maryland in self-defense by civilians. Why the District limits its inquiry to Virginia, DC and Maryland is far from clear and biases the results as does the exclusion of law enforcement incidents. Of course DC has had its magazine ban in effect since the 1930s so it is unlikely to be many such non law enforcement cases in the District where civilians fire more than 10 shots. Maryland also has a lesser magazine restriction that unnecessarily biases the results of such an inquiry as well.

Nonetheless, Plaintiffs pointed to several such cases involving both civilians and law enforcement in their preliminary injunction application. ECF Doc 8-1, pp. 16-18. Presumably District counsel read that document. In one incident cited at ECF Doc 8-1, p. 20, more than 30 rounds were fired by store owners and staff in defending

against an armed robbery of a Richmond, Virginia area jewelry store. *See Ayoob, Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* American Handgunner (2003), *available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shootout.+(The+Ayoob... a099130342.* Here is another case where more than 10 rounds were fired in self-defense. Ayoob, *With A Gun To Your Head: The Larry Goldstein Incident,* American Handgunner (2020), available at https://americanhandgunner.com/our-experts/with-a-gun-to-your-head-the-larry-goldstein-incident/. *See also* English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, Expanded Report, pp. 28-33 (May 13, 2022) (detailing situations where respondents stated that having magazines holding in excess of 10 rounds would have been useful for self-defense). Whether Plaintiffs are or are not aware of these incidents is not relevant to the District's constitutional violation.

Subject to the objection the following individual responses are provided:

Andrew Hanson: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense. However, I would reiterate the following. The majority of instances where I have been threatened/accosted while living in the District of Columbia have involved groups of four or more

**APP. 129**

persons threatening me on the street or on a sidewalk. Granted, such incidents are unusual as I am generally thought of as friendly and – at a minimum – respectful to people I encounter/meet. That said, the groups of young men I encountered in these incidents were unknown to me, and I to them. In short, these incidents – though rare – generally occur when I am vastly outnumbered.

Tyler Yzaguirre: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense. I note that published reports of the many self-defense incidents do not generally state the number of rounds fired by the defender(s). I do note that in the recent mall active shooter attack in Indiana, the good guy with a gun fired 10 rounds in order to stop the mass killer. Consider what he would have needed if there had been more than one mass murderer at that mall. Mass shootings sometimes involve more than one assailant.

Nathan Chaney: According to FBI statistics, the average number of rounds fired by assisting officers responding to the scene of a victim officer in 2017 was 28.2. This is in addition to the average 4.1 rounds fired by the victim officer themself. *See* Table 106, Law Enforcement Officers Assaulted and Injured with Firearms, Knives, or Other Cutting Instruments; Use of Firearm(s) During Incident by the Victim Officer, Assisting Officers, and Offenders, 2008–2017. Electronic copy available at: https://ucr.fbi.gov/leoka/2017/tables/table-106.xls

**APP. 130**

"For law-abiding Americans, firearms are tools of recreation and self-defense. Defensive uses of firearms can preserve human life. Americans use firearms with magazine capacities of 10 to 30 rounds for the same reason law enforcement officers do: because they are effective tools for defensive use. For this reason alone, magazine restrictions should be understood as restrictions on weapons themselves and should thus be taken as seriously and subject to as much scrutiny as restrictions directly on firearms." Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions By Matthew Larosiere, Cato Institute. July 17, 2018. Electronic copy available at: https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions

Eric Klun: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense.

4.    Identify each firearm for which you possess a concealed-carry license and state the maximum number of rounds each firearm may be loaded with, with and without the use of a large-capacity magazine.

**Answer as to all Plaintiffs:** Objection, the interrogatory calls for information already within the possession of the District. The District already has information for all of the Plaintiffs' registered firearms, including the number of rounds those guns may be loaded with using currently legal District

11    **APP. 131**

magazines. As to the number of rounds such guns can be loaded with using larger capacity magazines, it depends on the available larger capacity magazines. For example, a subcompact Glock 26 can be loaded with a 10 round District legal magazine for a total of 11 rounds, a 12 round standard capacity magazine (13), a 15 round Glock 19 standard capacity magazine (16), and a 17 round Glock 17 standard capacity magazine (18). In addition there are 20 and 32 round aftermarket magazines that will fit that gun. On information and belief, the District has that information as well.

Moreover, as asked, the answer is none since concealed carry licenses in DC are not issued for specific firearms; they are issued to persons to carry handguns. Construing the question as requesting information as to registered handguns that Plaintiffs are authorized by their DC Carry licenses to carry in public, subject to the objection, the answers are:

Andrew Hanson: The majority of handguns I own are for collectors' purposes and have never been fired outside the context of factory testing. However, the three main handguns I carry for target shooting and self-protection are:

1. Sig Sauer 229, 9mm, DC-compliant magazine holds 10 rounds for a total of 11 including the round in the chamber. I understand it will accept a 15

APP. 132

round magazine (standard issue), though higher capacity variants may be commercially-available as well.

2. Sig Sauer 320, 9mm, DC-compliant magazine holds 10 rounds for a total of 11 in the gun. My understanding is that it comes standard with 17 round magazines. Sig has magazines as large as 30 rounds for this firearm.

3. Glock 43, 9mm (sub-compact), 6 round magazine capacity and thus 7 total in the gun. I believe that larger magazines are commercially available for this firearm.

I own several additional semi-automatic pistols, but they are for collection purposes and I do not at this time plan to employ them for home or personal protection. Most of them can accept magazines capable of holding more than 10 rounds and of those most come standard (outside the District) with magazines holding more than 10 rounds. However, all magazines for these collectors' items are DC-compliant.   I also own several revolvers, all of which are either five or six shot firearms. They cannot be made to accept more rounds than that. I do not use any of those firearms for personal or home protection. I note that my attorney has a complete list of my handguns and their magazine capacities as does the MPD Firearms Registration Unit.

Tyler Yzaguirre:  Ruger P95, 10 round magazine allowable in DC plus one in the chamber; I also possess outside DC a 20 round magazine for the gun

**APP. 133**

(21 rounds). I understand it comes standard with a 15 round magazine (16 rounds) and up to 30 round magazines are available for the firearm (31). Ruger LCP six plus 1. I am unaware that larger magazines are available for it but they may exist.

Nathan Chaney: Sig Sauer P320, maximum number of rounds: 31 (30+1 in the chamber). Typically carried with 21 round magazine (+1 in the chamber). However, Sig Sauer does have 30 round extended capacity magazines available.

Sig Sauer P365, maximum number of rounds: 16 (15+1 in the chamber).

Smith & Wesson M&P Shield, maximum number of rounds: 11 (10 +1 in the chamber).

Ruger LCP 2 maximum number of rounds (with factory magazines): 8 (7 +1 in the chamber).

Eric Klun: I carry a Glock 43x with magazine capacity of 15 in the magazine and 1 round in the chamber for a total of 16 rounds. I also carry a Glock 23c with 13 rounds in the magazine and 1 round in the chamber for a total of 14 rounds. I am aware of magazines with greater capacity for these firearms than I own as set forth above. When carrying in the District of Columbia I am forced to use 10 round magazines for these guns.

APP. 134

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that their respective foregoing answers are true and correct to the best of their knowledge, information and belief.

_____
Andrew Hanson

_____
Tyler Yzaguirre

_____
Nathan Chaney

_____
Eric Klun

## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants via email, this 13th day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 135**

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that

their respective foregoing answers are true and correct to the best of their

knowledge, information and belief.

_____

Andrew Hanson

_____

Tyler Yzaguirre

_____

Nathan Chaney

_____

Eric Klun

## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants via email, this 13th day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 136**

The undersigned Plaintiffs in this action, state under penalty of perjury that their respective foregoing answers are true and correct to the best of their knowledge, information and belief.

_____
Andrew Hanson

_____
Tyler Yzaguirre

_____
Nathan Chaney

_____
Eric Klun

## CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants via email, this 13th day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 137**

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that their respective foregoing answers are true and correct to the best of their knowledge, information and belief.

_____

Andrew Hanson

_____

Tyler Yzaguirre

_____

Nathan Chaney

_____

Eric Klun

## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants via email, this 13th day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 138**

# EXHIBIT B

**APP. 139**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF DENNIS BARON</u>

Pursuant to 28 U.S.C. § 1746, I, Dennis Baron, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I am a Research Professor of English and Linguistics at the University of Illinois. I have been retained by the District of Columbia to provide expert opinions in the above-captioned matter.

3.      I am an expert in the field of linguistics with a special emphasis on historical language usage.  Attached hereto is my curriculum vitae, Exhibit A.

4.      I have been retained by the District of Columbia to perform original historical language and Corpus Linguistics research in this case at a rate of $350.00 per hour.  I hold all opinions expressed herein to a reasonable degree of professional certainty.

## BACKGROUND AND QUALIFICATIONS

5.      I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the

Department of English and the Department of Linguistics since 1975. I served as Head of the

Department of English for six years and before that as Director of Rhetoric at the university for

11 years. I earned my Ph.D. in English language and literature from the University of Michigan

in 1971, with a dissertation on historical aspects of the English language from Old English to

Present-Day English, and I continue to publish widely on matters of historical language use, and

on topics related to language and law. I am a life member of the Linguistic Society of America,

the American Dialect Society, and the Modern Language Association, as well as a member of the

National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a

National Endowment for the Humanities Fellowship, for work on a book on language and law,

and, most recently, a Guggenheim Fellowship, for work on my latest book on language and law.

I have also published books on language reform, on usage, and on gender in language.

6.      Most relevant for this report, I published two books on language and law: *The

English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You

Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press,

January 2023). In addition, I served as lead author on what came to be called "the Linguists

Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia

in his opinion in the case, and by Justice Stevens in his dissent. I was a co-author on another

brief by professors of linguistics and corpus linguistics in *New York State Rifle and Pistol Assn.

v. Bruen*, 142 S.Ct. 2111 (2022), which Justice Breyer cited in his dissent. In that dissent, Justice

Breyer also quoted directly from my essay *Corpus evidence and the meaning of "bear arms,"

Hastings Constitutional Law Quarterly,* 46.3 (2019). I have spoken about historical meaning and

the Second Amendment at the Federalist Society at the University of Chicago Law School, at the

Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young

2

University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law.  I've also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*.  And I have been an expert consultant on historical meaning and legal interpretation of the Second Amendment for the State of California Department of Justice.  In the past twenty years I have been an expert consultant in perhaps a dozen cases involving document interpretation.

7.     My forthcoming essay, *Look It Up in Your* Funk and Wagnalls*: How Courts Define the Words of the Law*, an analysis of how courts incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, will appear in the next issue of the academic journal of the Dictionary Society of North America, *Dictionaries.*

8.     This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large, digitized corpora consisting of many millions of words.

## OPINIONS

### I.     Assignment

9.     I have been asked to analyze the historical use of the terms *arms* and *accoutrements* in order to show that large capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

### II.     Summary of Conclusions

10.     Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition,

**APP. 142**

ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements.*  Nor does *arms* refer to *parts* of weapons.  For example, *arms* does not refer to the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets.  Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition*; *arms and accoutrements*; or *arms, ammunition, and accoutrements.*  A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier's or militia member's kit or equipment.  For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on).  When the term *accoutrements* occurs alone, as in *the accoutrements of a soldier*, it may include both arms and accessories.  But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories.  And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

11.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks).  And they often specified, separately, the different accessories that officers and the rank-and-file soldiers were also required to have.

### III.     Theory and Methodology

12.     Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text.  Initial work in corpus linguistics did not typically involve legal issues.  Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers.  Scholars

4

**APP. 143**

plotted the frequency of words and phrases in order to develop a picture of an author's style, and

to determine authorship of a particular work when the provenance was in doubt.  Soon, in

addition to solving literary mysteries, the methodologies developed by corpus linguists were

successfully applied in a number of criminal cases in the U.S. and in England involving, for

example, the authorship of a ransom note or an email.

13.     Lexicographers, who began compiling large analog databases of text in the late

19th century, began to digitize their libraries of paper data and to add to that material,

assembling computerized databases of historical and contemporary text and, more recently, of

spoken language as well, in order to arrive at more precise definitions of the multiple senses of

words and phrases.

14.     As a graduate student at the University of Michigan in 1970, I coded analog texts

from the *Oxford English Dictionary* files to help build the computerized database for the

Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to

the language of the Founding Era.  Today, major dictionaries like the *Oxford English Dictionary*

and the Merriam-Webster suite of dictionaries rely on public databases of oral and written

language, as well as their own proprietary databases, in order to revise older definitions and to

track the spread of new words and meanings.  The great dictionary makers of Europe use similar

databases in their own work.

15.     Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a

subset of Corpus Linguistics.  LCL involves the analysis of digitized corpora of current and

historical English to establish meaning—often referred to as Original Public Meaning (OPM)—

in statutes and in the Constitution.  The promise of LCL attracted jurists as well as scholars with

a specific interest in language and law.  In *Muscarello v. United States*, 524 U.S. 125, 126–27

**APP. 144**

(1998), where the Supreme Court held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or trunk of a car," can be deemed to be within the scope of the statutory phrase "carries a firearm," Justice Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon, see id.* at 129–30.  In her dissent, Justice Ginsburg expressed skepticism that either dictionary evidence, or Justice Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question.  *Id.* at 142–43.  Her critique did not deter courts from performing other computerized data searches to determine legal meaning.  In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute.  Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean "shelter," as the government claimed, but rather "hide, conceal from view," as he felt it must mean in the context of the statute.  *United States v. Costello*, 666 F.3d 1040, 1044–45 (7th Cir. 2012).  Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean "provide shelter" as well as the narrower sense, "hide someone from the authorities."  But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so, even though using more rigorous parameters showed that Judge Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

16.     More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee of the Utah Supreme Court, a long-time champion of corpus linguistics, together

**APP. 145**

with the legal scholar Stephen Mouritsen, published *Judging Ordinary Meaning*, 127 Yale L. J. 788 (2018), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity.  Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning.  LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary,* as well, allowing a more precise interpretation of historical text data.

17.    In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers.  As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth federal Circuit Courts of Appeals, as well as a comment by Justice Alito in his concurrence in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1174–75 (2021), where he suggested that LCL may one day provide a useful supplement to the canons of interpretation.  Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

18.    Several large databases have come online in the past few years that facilitate LCL research.  They have proved invaluable to me in compiling this report.  Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799.  BYU's Corpus of Early Modern English (COEME),

**APP. 146**

covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words.  For the 19th century, the Corpus of Historical American English (COHA), which was initially developed at BYU as well but is now independent of that institution, currently contains 475 million words of text from 1820–2020.  The size of these databases continues to grow as more works are digitized, coded, and added to the corpora.

19.     Critics of LCL have complained that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora.  It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers, and although ordinary people are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge.  A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, *Adult Literacy in America* (U.S. Department of Education, 1993), the average American today tends to have a seventh-grade reading level.  In order to counter any "elite" bias that may be found in databases like COFEA COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment.  Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early 19th century, when the Industrial Revolution drastically changed print technology.  The first printing press was

**APP. 147**

adapted by Gutenberg from the design of the traditional wine press, and printing was a slow and labor-intensive process.  As a result, newspapers in the founding era were small, averaging four to eight pages.  Papers tended to appear weekly or semi-weekly, rather than daily.  Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news.  Even though newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

20.     The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large and inexpensive rolls of newsprint, led to a revolution in print technology.  This led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day.  This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the U.S. and Europe that tracked the industrial revolution and the subsequent rise in universal public education.  By the end of the Civil War, there were more readers than ever, and they demanded more reading material.

21.     As for the question of "elites," as the principal means of communicating news and information, the newspapers of the 18th and 19th centuries embodied much of the language of the "ordinary people" who read them.  Newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

22.     Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans.  Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

23.     The newspaper databases I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (digitized by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com.  For this report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

24.     All the databases contain some duplicates.  COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not.  Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary.  Jurists from Learned Hand to Felix Frankfurter and from Frank Easterbrook to Richard Posner have warned their colleagues not to make a fortress of the dictionary.  The corpora are by necessity incomplete.  LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

**APP. 149**

### IV.   The Meaning of *Arms* and *Accoutrements* in the Databases

25.     I was asked to look at the meaning of *arms* and *accoutrements*, along with the phrase *arms and accoutrements*, in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment, focusing on whether the word *accoutrements* may be considered analogous to the present-day use of the term *magazine* in reference to firearms.

26.     In the 18th and 19th centuries, *magazine* was a word that meant "storehouse, depot."  A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits.  The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the 19th century, and the term was relatively rare until the 1920s.  Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms.*

27.     The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges*, *cartridge boxes* and later, *magazines*, are not arms in and of themselves.

28.     The *Oxford English Dictionary* (*OED*), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

11

**APP. 150**

29.      *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxedos, and other formal attire).  But, in the military sense, *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers.  The example given by the *OED* to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813:  "In order to collect the wounded and their arms and accoutrements."  Here, Wellington, recognized by all as a consummate soldier and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements*.

30.      The term *accoutrement-maker*, though not defined separately by the *OED*, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated:

> The crowd was so great in the Rue de Richelieu … especially about the gunsmiths and accoutrement shops in the vicinity of the Palais Royal. [*United Service Jrnl.*  i. 325]

31.      The *OED* definitions are instructive.  But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora.  A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates).  A similar search of COEME returned 126 hits, the earliest from 1656.  I determined that the two search terms, *arms* and *accoutrements*, often appear together as a single phrase, *arms and accoutrements,* typically in military contexts having to do with an army or militia unit.  *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,* though when *ammunition* is

**APP. 151**

not listed separately, the term *accoutrements* will generally include *ammunition*.  *Accoutrements* sometimes occurs in a list alongside *clothing*, suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms).  But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where the term usually refers to clothing associated with particular professions or activities).  In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms*.

32.     But English usage is never simple.  As linguists often say, "all grammars leak"— which is to say, there are *always* a few counterexamples in the data.  The existence of counterexamples does not invalidate the data or undercut an interpretation:  It simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military *accoutrements*, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston.  [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

33.     This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that *arms* may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements provided by the militia law.

13

34.     But besides a handful of exceptions, in literally hundreds and hundreds of cases *arms* and *accoutrements* are treated as separate items of military gear.  Here are some typical examples from the Founding Era:

**1776**:  Fire arms and accoutrements

**1780**:  arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments.

**1795**:  you will march … with arms and accoutrements in good order. If any volunteer should want arms and ammunition, bring them forward, and they shall be supplied as well as possible. [COEME; the other examples are from COFEA]

**1798**: To hold his powder and his ball, his gun, accoutrements and all …. [This example rhymes because it's from a poem, indicating that the idiomatic phrase *arms and accoutrements* has become part of the general language available not just to military specialists but also to poets and novelists.]

35.     A second COFEA search, for *accoutrements* alone, returned 1,235 hits.  COEME yields 771 hits.  These searches add a number of non-military contexts, where *accoutrements* refers to religious gear (robes, mitres, and so on) as well as other sorts of fancy or special clothing.  These non-military examples do not reference weapons, ammunition, or other military equipment.

36.     I supplemented my COFEA search with a search of the newspaper database, newspapers.com, for the Founding Era period, 1750–1800.  The newspaper databases do not permit the kind of collocate searches that COFEA, COEME, and COHA allow.  Entering two search terms returns results in which either one or both terms occur on the same page, though not necessarily in the same sentence, or even in the same article, and not necessarily as linked terms.  There are 1,392 hits for *accoutrements*.  There are 692 matches for the exact phrase *arms and accoutrements*.

37.     Here's a mid-18th century British example from the newspapers.com corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:  "This Militia shall

14

**APP. 153**

receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury,* 1756.

38.     Similarly, there's this "ploughshares into swords" example of a Cambridge University library to be converted to a military barracks:

> [T]he new Building intended for a publick Library … may be converted into a Barrack, and be supplied with Provisions, Arms, and Accoutrements, at the Expence of the University.  1756

39.     A search of the Readex database of America's Historical Newspapers returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880.  This early example from the colonial period appeared in the *Boston Evening Post* in 1750.  It distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger.

40.     This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that *arms* and *accoutrements* are distinct categories in the new nation as well:

> The militia … must be considered as the palladium of our security … .  The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States.

41.     The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal* in 1790.  It confirms the Founding-Era sense that *arms*, *ammunition*, and *accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state … whose duty it shall be to … report[] the actual situation of their arms, accoutrements, and ammunition. … Every non-commissioned officer or private … for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents.

**APP. 154**

42.     And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts … the following Arms, &c., will be sold: 10,699 rifled and smooth-bore Muskets … ; 261 Carbines … ; 305 Sabres … ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c.

43.     The newspaper data parallels that of COFEA:  The phrase *arms and accoutrements* is almost always military.  The phrase sometimes occurs alongside *ammunition* as a separate list item.  *Accoutrements,* when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than "equipment" (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations.  In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

44.     It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase in both England and America.  English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*.  Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random).  *Eggs and bacon* is rarer than *bacon and eggs*.  And it would be unusual to find *battery and assault*.  Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in *breaking and entering*) to prevent anyone from reversing the order.

45.     The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

16

**APP. 155**

46.     There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the U.S., *arms* and *accoutrements* are separate categories.  Here is one example from Gloucestershire, England, dated 1868:

> [A] letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot.

47.     A similar cite from Iowa in 1868:  "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property."

48.     And this, from Stroudsburg, PA, also in 1868:  "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana."

49.     The circa-1868 data confirmed the Founding Era data that *accoutrements* is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the terms refer to separate categories of equipment.

50.     One final note on *accoutrements.*  The Supreme Court in *Bruen* references *North Carolina v. Huntley*, 25 N.C. 418 (1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328.  *Bruen*, 142 S.Ct. at 2145–46.  In *Huntley*, the court states, "A gun is an 'unusual weapon,' wherewith to be armed and clad.  No man amongst

17

us carries it about with him, as one of his everyday accoutrements—as a part of his dress … ."
*Huntley*, 25 N.C. at 422.

51.     In the citation above, *accoutrements* does not refer to weaponry, but to the more general category of "everyday attire, or clothing."  It may be normal to wear a shirt, or a belt, or shoes, but it's not normal, the court is saying, to wear a gun in North Carolina in 1843.  It's legal—the court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it's not *normal* or typical to do so.  In affirming Huntley's conviction, the court noted that his purpose in carrying a shotgun was not a legal one.

## V.     Historical Notes on the Use of the Word *Magazine*

52.     Since the technology of arms and ammunition was changing by the mid-19th century, I also searched for new uses of the term *magazine* in relation to *arms* and *accoutrements.*  With advances in the design and manufacture of guns and ammunition, by the mid-19th century, the term *magazine* starts to appear in the sense "ammunition container" (replacing the earlier *cartridge box* or *cartridge case*).  According to the *OED,* in the 18th and early 19th centuries, *magazine* referred generally to "a storehouse," and in military contexts it referred specifically to a storehouse for gunpowder.  (The sense of "storehouse" also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of "depot, warehouse," is cognate with the French word *magasin*, "a shop or store").

53.     Although most uses of the word *magazine* refer to printed periodicals, during the 19th century one sense of the term *magazine* narrows, referring more and more to an "ammunition container," a primary sense of the word in reference to firearms today.  The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle,

18

**APP. 157**

machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

54.     COFEA and COEME do not cover the period past 1800.  COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s.  Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses.  Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals.  *Magazines* meaning "devices for holding bullets" form only a very small subset of these citations.  It took some thirty to forty years for the "bullet holder" sense of the word *magazine* to become more common, and even then, text references to ammunition magazines often appear, not in general discourse, but in legislation restricting their size or use.

55.     Most militia laws and regulations from the Founding Era specify minimum requirements for soldiers' weapons, ammunition, and accoutrements.  Most laws regulating weapons in the mid-19th century restrict or ban specific kinds of weapons, often enumerating them, sometimes in terms we find colorful today but which were common at the time (Arkansas toothpicks, Bowie knives, slung shots, swords in canes, pistols capable of being concealed in a pocket).  Occasionally these laws further identified such weapons as those used by "brawlers," thieves, robbers, or others bent on illegal activities.  Other weapons restrictions follow the English tradition of limiting possession of weapons by social class, nationality, or race.

56.     Although militia laws do specify weapons and other required accoutrements or pieces of military equipment, including horses for the officers, those laws that prohibit certain

19

kinds of weapons during the two critical periods (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one exception from a 1776 Maryland statute: "Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being." [1776 Md. Laws 146].

57.     I surveyed the gun regulations in the Duke Historical Database from the early medieval period through 1885 to see what terminology was used. None of the laws that prohibit weapons, aside from the Maryland statute above, specifies a gun part or ammunition case or accoutrements of any kind. Although many present a list of banned or prohibited weapons—usually without defining them (the assumption is that the reader knows what they refer to), none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons.

58.     Later, however, in the decades after the introduction of *magazines* as "carriers or holders of bullets," laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: "No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests."

59.     Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

20

60.     A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

61.     Finally, the National Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms:

(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

62.     The Act also provides a specific definition of "machine gun":  "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

**VI.    Conclusion**

63.     In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms.  In non-military contexts this does not apply:  The *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

64.     But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

65.     In addition, "bullet holders," whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

**APP. 160**

66.     To repeat, there is no data that I have found showing that *arms* includes

*accoutrements*, *magazines*, or any other *parts* of weapons.

_____

Dennis Baron, Ph.D.
Date: November 22, 2022

22

# EXHIBIT C



**Gun**Digest® PRESENTS

# CONCEALED CARRY CLASS

## THE ABCs OF SELF-DEFENSE TOOLS AND TACTICS



## TOM GIVENS

Copyright © 2019 Caribou Media Group, LLC

All rights reserved. No portion of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a critical article or review to be printed in a magazine or newspaper, or electronically transmitted on radio, television, or the Internet.



Gun Digest® Books,  an imprint of Caribou Media Group, LLC
Gun Digest Media
5600 W. Grande Market Drive, Suite 100
Appleton, WI  54913
www.gundigest.com

To order books or other products call 920.471.4522 ext. 104
or visit us online at **www.gundigeststore.com**

CAUTION: Technical data presented here, particularly technical data on handloading and on firearms adjustment and alteration, inevitably reflects individual experience with particular equipment and components under specific circumstances the reader cannot duplicate exactly. Such data presentations therefore should be used for guidance only and with caution. Caribou Media accepts no responsibility for results obtained using these data.

ISBN-13: 978-1-946267-95-5

Cover Design by Gene Coo
Interior Design by Dave Hauser
Edited by Chuck Smock
Photos by Yamil Sued (unless otherwise noted)

Printed in the United States of America

10  9  8  7  6  5  4  3  2  1

**APP. 164**

# Introduction

**W**hy another book on shooting? There are lots of books about guns and shooting, but darn few about fighting with the gun to save your life or that of a loved one. In this book I have tried to go beyond the basics of how a handgun works, and how to shoot it, and get into how to integrate that handgun into your overall personal security program. Skill with a handgun is needed, but that skill is useless without an understanding of the dynamics of fighting, and the commitment to take control of one's own fate.

Why consider my advice on the subject? That's a fair question, since bad advice on personal-defense matters could be very costly. I consider myself a lifelong serious student of defensive weaponcraft, and as a serious student, I continually strive to learn more about my field. I have found teaching a subject is the best way to truly learn it, and I have been teaching weaponcraft for some 44 years, full time for the past 23 years. I have been carrying a gun professionally in one form or another for 49 years at this writing. Before I became a full-time instructor, I spent 25 years in various aspects of law enforcement and specialized security work, including stints in street patrol and investigations, and I have arrested scores of armed and dangerous criminals. I have been involved in armed confrontations both as a police officer and as a private citizen, and I have seen firsthand that decent people, with proper training, can fight back and overcome criminal attacks.



**APP. 165**

I owned and operated my own firing range and training center for more than 18 years. During that time, I oversaw the firing of about 1.5 million handgun rounds each year, with all types of handguns. During those years I trained about 2,500 students each year, from private citizens to security personnel and police officers to military police, intelligence units and Special Forces detachments. I also teach on the road, all over the United States and in Europe. Over the years, scores of my military students have used the skills we teach successfully in combat, and at this writing we have had more than 65 private-citizen students involved in defensive gunplay in the United States. These are just the ones I know of, who have reported back to me or been reported to me through law-enforcement channels. Thus, we have a lot of feedback on, and validation of, our training techniques.

In addition, I have actively competed with a handgun for many years, allowing me to continually evaluate guns and related gear in simulated armed conflicts. I not only got to see how my gear worked, I got to observe hundreds of other competitors using their guns and accessories in at least somewhat realistic conditions and under a fair bit of stress. I shot on the rifle team in high school, and I shot in Police Pistol Combat early in my law enforcement career. Back in the day, I held a Class A rating in IPSC, when that was the highest rating available. I also won several state and regional championships in the 1970s and 1980s in that game. I was involved in helping set up the International Defensive Pistol Association (IDPA), with a member number A00008. I also spent two years on the board of directors during IDPA's early formative years. I hold a Master rating in three IDPA divisions: CDP, ESP and SSP. I



**APP. 166**

have won several state and regional championships in IDPA competitions. All of this gives me a pretty broad perspective on the competitive shooting side of the handgun world.

I also hunt with a handgun, having harvested a number of deer and wild hogs while using a service type handgun.

Over the years I have done a fair bit of work as an expert witness in court cases involving firearms and firearms training. I've been accepted as an expert witness in federal courts in Alaska, Kansas, Tennessee and Illinois. I have been accepted as an expert by state courts in Illinois, Alaska, Ohio, Mississippi and Tennessee. My personal reference library contains more than 300 books on firearms and firearms training. This is my fifth published textbook on the subject, and I've written more than 100 magazine articles in SWAT Magazine, Combat Handguns, Handguns, American Handgunner, Soldier of Fortune and other publications.

It has been said that a book like this is 95-percent plagiarism and 5-percent opinion (I stole that line from fellow trainer John Mattera). Very few of us invent anything new in this business. What we do is observe each other's techniques, listen to each other's explanations, take each other's training, and attempt to adopt what works and discard the rest. In this I have been most fortunate, as over the years I have

**The author was involved in helping set up the International Defensive Pistol Association (IDPA), with a member number A00008. He also spent two years on the board of directors during IDPA's early formative years. He holds a Master rating in three IDPA divisions and has won several state and regional championships in IDPA competitions.**



trained with a virtual Who's Who in the firearms training industry. This has given me exposure to a broad range of training styles, tactical techniques and instructional methods, and I have combined and distilled these into my curriculum. My sincere thanks go out to these dedicated teachers, who have taught me so much of what I'm trying to pass on to you in this book. These instructors include Jeff Cooper, Chuck Taylor, Ken Hackathorn, Jim Higginbotham, Clint Smith, Dennis Tueller, John Farnam, Dave Grossi, Southnarc, Ernest Langdon, Jeff Gonzales, Massad Ayoob, Wayne Dobbs, Todd Green and many others. I attended an advanced 499 course at Gunsite all the way back in 1980. I have attended the NRA's Law Enforcement Firearms Instructor Schools for handgun, shotgun and Tactical Shooting Instructor, and I have been through the FBI police firearms instructor school. Truthfully, I have learned something of value in

every single class I've taken over the past four decades, and I am deeply indebted to all the trainers who have allowed me to get to this point. This book is intended as a sort of conduit for wisdom from all of these assorted sources to you.

I sincerely hope this book will make you think about your personal security and how to achieve it. The mental skills involved in gun fighting are more important than the physical skills, and mental skills require personal effort, just like learning physical skills. The end result of this effort is, of course, peace of mind, which is well worth the time and effort invested.

Finally, I would like to thank Yamil Sued and Tamara Keel, who took the photographs used to illustrate this work. Also, a big thanks to Ken Campbell and the staff at Gunsite, who let us use some of their equipment and one of their ranges for some of the photography.



**APP. 168**

4

# PRINCIPLES OF PERSONAL DEFENSE

**S**ome years ago, Jeff Cooper wrote an excellent booklet entitled *Principles of Personal Defense*. This brief work outlined seven principles that, according to Jeff, lay the groundwork for all successful self-defense efforts. This little book is available from several online sources and should be required reading for anyone interested in personal security.

I have taken the liberty of listing the seven key words Jeff used in enumerating these principles and adding my own perspective to them. I truly believe mastery of these principles, as your standard operating procedure, is the key to personal safety. Many of us concentrate too much on hardware (specific gun model, caliber or type of ammunition, etc.) when it is this type of software issue that really decides who wins. The seven keywords used by Jeff Cooper to enumerate his Principles of Personal Defense are used here by permission of Jeff and the publisher, Paladin Press.

APP. 169

## ALERTNESS

This one trait is the cornerstone of all physical security. You cannot defend yourself against something you don't know is there. You must learn habits of alertness and awareness, so you are always in tune with your environment.

Elsewhere in this text we cover some of the important facets of observation skills, but you must grasp the importance of this principle. If you know who is around you and what they are up to, you are in control. Always be on the lookout for people, behavior, or activity that is out of place or out of context. When you see something like that, question it. Ask yourself, "why…?" If you don't get a satisfactory answer, treat this as a danger signal.

## DECISIVENESS

You are going to have to select a course of action and implement it, right now! No one is going to be there to tell you what to do. You're on your own. This is especially difficult for us these days because all decisions are made by committee, and no one likes to sign off on anything anymore. See the chapter on mental imaging to learn how to prepare to make crucial tactical decisions quickly. Always, do something, immediately.

## AGGRESSIVENESS

This is another principle that is difficult for the average person, as aggressiveness is systematically being bred out of us. You have been taught all of your life that fighting is bad, human life is sacred and you should play nice. The trouble is you might be up against someone who shares none of these sentiments.

To a degree, we do a disservice to our students when we harp continually on the defensive nature of the pistol. The pistol is defensive in concept, but not in



**Running a timed drill during a competition helps you develop quickness in the presentation of your pistol from the holster and your firing stroke.**

**APP. 170**





Jeff Cooper wrote an excellent booklet entitled Principles of Personal Defense. This brief work outlined seven principles that, according to Jeff, lay the groundwork for all successful self-defense efforts. The author teaches these principles in his classes and adds his own perspective to them in this chapter. (File photo)

# "Speed is the defining element of any form of fighting."

use. Gun fighting is just a form of fighting, and any type of fighting is, by definition, an aggressive activity. You cannot win any type of fight by being passive. Imagine yourself in a fistfight where all you do is block punches, but never throw any of your own. Going to win? The same goes for armed conflict. If I have to defend my life with a firearm, I will use it vigorously, with all of the violence, aggressiveness and commitment I can muster, because my life is at stake!

When a fight starts, failing to respond aggressively is the same as surrender. If you let evil people do evil things to you, guess what will happen? You have a duty to resist evil. You owe this duty to your family, to society and to yourself. If attacked, attack right back!

**APP. 172**

## SPEED

Speed is the defining element of any form of fighting. Whoever moves faster wins. You must develop quickness in your presentation of your pistol from the holster and your firing stroke. This comes only through structured, careful, frequent practice. You also must develop quickness in your ability to assess developing situations and make sound decisions. Again, this comes from prior preparation. Play the "what if…" game to develop responses in advance of need. The time to debate strategy is not while someone is trying to kill you.

## COOLNESS

If attacked, you must keep your wits about you and do what you have to do to win. You must concentrate on the task at hand, and in our context, the task at hand is to focus on the front sight and press the trigger. Invariably, when I discuss this with a group of new students, some of them look incredulous and say something like, "how am I supposed to keep cool when someone a few steps away is trying to kill me?" The answer to that is simple – every day a large number of people have to do this. I personally know a very large group of people who have done this successfully. The key is in prior mental preparation. You must consider the possibility of an armed conflict and be prepared mentally to deal with it.

Part of the answer is practice. Practice builds skill. Skill builds confidence. Confidence prevents panic. If your mind knows that you have a fair degree of skill, your confidence in that skill will help you remain calm. Police officers in this country have an average hit ratio of around 20 percent. That means in the field they hit with 20 out of every 100 shots they fire. This is due to several factors. First is startle response – from not being mentally prepared for an attack and being caught completely off guard, which, as always, is a training issue. The second is infrequent and poor practice. One major East Coast agency, for instance, fired 1,293 shots on the street in 1996, and hit only 64 bad guys! They also hit 11 bystanders. This agency gets one day of live-fire training per year, and you can bet some of the officers never touch their weapons and practice on their own time, and never do any homework. As a result, when suddenly confronted with a shooting situation they panic, stick the gun out in front of them and empty it as fast as they can. This is called the "spray and pray" method, and it almost always results in two things: an empty gun and a pissed-off bad guy.

Over a period of 18 years, the school I ran in Memphis trained some 45,000 students, and a fair number of them have been involved in shootings. As far as I

can tell, they have about a 95-percent hit ratio. The very few misses that have occurred have been under very unusual circumstances. This extremely high hit rate occurs because they came here on their own time, and spent their own money, and then spent the time and effort it takes to achieve and retain basic proficiency with their weapons.

Do your homework. Repetition is the mother of all physical skill. Make time to get to the range. By constantly repeating the motions involved in your presentation and your firing stroke, you burn a neural pathway from your brain to your fingertips, eventually ingraining the proper response into your muscle memory. Sports physiologists will tell you it takes between 2,500 and 5,000 correct repetitions of any complex motor skill to automate it. To automate the skill means to be able to do it reflexively, without conscious thought or effort and this is the goal. You must concentrate your mental effort on the evolving tactical situation, not on marksmanship, and this is how you remain in control and hit under stress. Your mind must be free to work on the tactical situation, not on marksmanship.

Get some practice shooting under stress. Engage in competition shooting, like IDPA matches. Having to shoot an unfamiliar drill or scenario, under time and scoring pressure and with the peer pressure of having other shooters watching you is an excellent way to get some stress inoculation as well as some experience running your equipment under pressure. Hunt deer, wild hogs or similar game with your pistol and learn to control "buck fever." In training and practice, push yourself always to be better.

All shooters experience a degradation of skill under the extreme stress involved in a real life-and-death shooting confrontation. The more skill you have, however, the less you will lose when placed under sudden stress. The reason for this is simple. To get a higher degree of skill you had to do the work. You put in the repetitions both on the range and in dry work and have automated your physical skills. On the other hand, someone with a low skill level will drop even more skill under duress, simply because they have not driven those skills into the unconscious or automated level.

## RUTHLESSNESS

To many, this seems an odd word in the context of self-defense, but in reality, ruthlessness is a vital element of fighting to stay alive. In our context, ruthlessness means absolute single-mindedness of purpose. Once the fight starts, there are absolutely no considerations other than winning. It doesn't matter why he chose you. It doesn't matter why he's a

criminal. All that matters is winning. Bear in mind, in our context losing can mean dying. Hit him fast, hit him hard, hit him with everything you have, then assess and if needed, hit him some more.

**SURPRISE**

Surprise is put last in this list deliberately, because surprise is the first element of offensive combat.

Surprise comes in two forms: strategic surprise and tactical surprise. Strategic surprise is what the bad guy plans on. I recently got my hands on a captured copy of a bad guy's training manual, and when I opened it, I found only this: sneak up on them and jump on them. That is his entire strategy. Surprise is the only true advantage he has over you. He is typically not as smart, as well armed, or as well-trained, but if he surprises you the advantage is entirely his. How, then do we neutralize this advantage? Simple. Be alert. If he cannot surprise you, he probably cannot harm you. This is a loop that goes right back to the beginning of this chapter. Be alert and aware so you cannot be surprised.

The other form of surprise is tactical surprise, and that is your advantage. If attacked, do something he does not expect. Action is faster than reaction. Make him react to you, not you to him. You

# "Surprise comes in two forms: strategic surprise and tactical surprise."



APP. 174



Frequent and deliberate practice at the shooting range helps build and maintain the muscle-memory skills needed to draw and fire a handgun safely. Sports physiologists will tell you it takes between 2,500 and 5,000 correct repetitions of any complex motor skill to automate it.

accomplish this by doing what he least expects, which is a violent, explosive counterattack.

He is just as culturally indoctrinated as anyone else. When he attacks what he believed to be a helpless victim, what does he expect that person to do? Whimper, whine, belly up and do whatever he is told. Think about it. If he points a gun at you and tells you to do something, what does he expect you to do? Comply, of course. The reason he didn't shoot you was because he believes you will comply. If you do something else, he has to process that information, decide what to do and only then can he act. It's over by then.

This would be a good time to mention the OODA Cycle. This was a development by Col. John Boyd (USAF, Ret.) who was a fighter pilot, a fighter-pilot instructor, a researcher and inventor and a true genius. OODA is the acronym for Observe, Orient, Decide, Act. That is the cycle the human mind goes through in order to react to something in our environment. This applies to us as well as to the other side. Whether someone's IQ is 40 or 140 his mind has to work through this sequence before any deliberate action can take place. Let's look at it in detail.

## OBSERVE

For the 10th time now, you cannot do anything about a problem until you detect it. Get your head up, open your eyes and look around. Bad guys do not beam down out of the mother ship and materialize next to you, despite what violent crime victims would have you believe. Remember, you're looking for anything in your immediate environment that looks suspicious because it is out of place, out of character or out of context.

## ORIENT

This means to turn your attention to the person or circumstance



that caught your eye. Assess the person as a potential threat. Evaluate your tactical position. Consider your options for dealing with the threat. Start playing the "what-if" game to determine your options.

### DECIDE

Action is needed. Select a course of action to fix the problem.

### ACT

Physical action in self-defense is needed. This can only occur after you have gone through the first three stages. You cannot act until you detect the threat, evaluate it and select an option for dealing with it. The time it takes to process this information and act is reduced greatly by being alert and having practiced emergency responses before the crisis.

This same OODA Cycle applies to the opposition.

When he tells you to do something, do something else. He will have to observe that action, realize it is not what he told you to do (orient to it), decide what to do about it (run, shoot, etc.) and only then can he act. By being alert and having preplanned tactical responses, you can short-circuit his reaction process.

If he is in the act stage while you are entering the observe stage, you probably have lost. Be alert. The same works in reverse. If you are acting while he is looking, you should be finished before he can move through the orientation, decision and action phases.

**Practicing your shooting skills with the added pressure of shooting in a competitive match is an excellent way to get some stress inoculation as well as some experience running your equipment under pressure. Pictured here, Lynn Givens, the author's wife, (foreground) competes one-on-one against another shooter. (Photo by Tamara Keel)**

**APP. 176**



### SEMI-AUTO PISTOLS

This brings us to the semi-auto pistol. The media would have you believe semi-auto pistols are some evil, modern inventions that have only been around a few years. This is simply not true. The first workable semi-auto pistols were developed in the late 1800s. The Mauser Model of 1896, for instance, was first used in the battle of Omdurman in the Sudan by a young Winston Churchill in 1896. The Swiss Army adopted the Luger pistol in 1903 and the German Army adopted it in 1908. In 1911, the U.S. military adopted the Colt .45 semi-auto, which is often today simply referred to as a 1911.

Before we get into specific types, there are some general features all semi-auto pistols have in common. First, the revolver is a manually operated handgun. The energy that rotates the cylinder, cocks the hammer and fires the revolver all comes from the shooter's trigger finger. In a semi-auto pistol, part of the energy that propels the bullet out of the gun and to the target also causes the slide to move to the rear, ejecting the spent case out of the gun, then as the

slide moves forward under spring pressure it strips a fresh round from the magazine and feeds it into the chamber ready to be fired. The archaic term for the semi-auto pistol is the "self-loading pistol," referring to this action of loading itself by using the energy supplied by the fired cartridge.

All semi-auto weapons, whether handgun, rifle or shotgun, fire only one shot with each press of the trigger. To fire another shot, the trigger must be re-set and then pressed again. In an automatic weapon, such as a submachinegun or a machine gun, the gun will continue to fire as long as the trigger is held to the rear until either the trigger is released, or the gun runs out of ammunition.

Semi-auto pistols have only one chamber, unlike the revolver. On a semi-auto pistol, the chamber is an integral part of the barrel. The semi-auto pistol uses ammunition that is housed in a detachable magazine. The magazine is not part of the pistol, it is a feeding device for the pistol. The whole purpose of the detachable magazine is to be able to carry spare magazines on your person, already loaded. This makes reloading the pistol a very simple and very quick process.

**Single-action semi-autos are intended to be carried with the hammer cocked and a manual safety engaged. This type of semi-auto will not fire if the hammer is all the way down in its un-cocked position.**

To reload a semi-auto pistol, one only has to push the magazine release button and let the empty magazine fall out and insert a new magazine into the magazine well. Magazines can be single column and have a single row of cartridges stacked one atop another, or they can be double column, with two rows of cartridges somewhat staggered in a fatter magazine. This allows higher magazine capacity, but tends to make the grip frame larger.

Semi-auto pistols have undergone a bit of evolution over their 130 years of existence. At present, we have essentially four mechanical families of semi-auto pistols available to us. They all operate essentially the same in that they use a magazine and a slide that reciprocates back and forth to eject the empty cartridges and load new cartridges into the chamber. The difference lies in how the trigger action of the gun operates during the firing cycle.

**APP. 178**



**The 9mm, .40 S&W and .45 Auto calibers are readily available and there is a wide variety of good, modern, effective defensive ammunition available for them.**

just simply cannot stand the sight of that cocked hammer on a single-action auto such as the 1911. The fact that the 1911 has a passive-grip safety and a manual-thumb safety doesn't mollify some people who are just terrified of that cocked hammer. If this describes you, that's probably not the right gun for you. Others are not comfortable carrying a striker-fired pistol like a Glock or M&P that has a fairly light, short trigger pull and no manual safety. This is especially true of shooters who carry their gun in the appendix position, which can point the gun at various body parts, like their own thigh, when seated. Choose an action type with which you personally are comfortable.

Of course, there's the consideration of caliber. We'll get into ammunition more deeply later on, but for now let's limit our consideration to pistols chambered for 9mm (9X19, 9mm Luger), .40 S&W and .45 Auto. These are readily available calibers and there is a wide variety of good, modern, effective defensive am-munition available for them. The 9mm is the smallest of these cartridges, and therefore offers the highest magazine capacity. This cartridge is available in very compact pistols or in service-size pistols that hold as many as 17 or 18 rounds. The .45 Auto is an older cartridge, is quite a bit larger and therefore maga-zine capacity will be somewhat limited. There are .45s with double-column magazines that hold as many as 10 to 13 cartridges, however, unless you have very large hands, they will be difficult to handle well. The typical .45 Auto only holds eight to nine rounds. The .40 Smith & Wesson is a compromise cartridge that is larger than the 9mm and smaller than the .45. Typical .40 caliber handguns hold anywhere from 12 to 16 shots.

If a particular handgun is not as common others, there might be a reason. Also, the more common mainstream handguns, particularly those in wide-spread law-enforcement use, will have a lot more holsters and accessories readily available.

APP. 179

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

### <u>DECLARATION OF STEPHEN AMODEO</u>

Pursuant to 28 U.S.C. § 1746, I, Stephen Amodeo, declare as follows:

1.      I am over the age of 18 and competent to render the testimony contained herein based upon my personal knowledge, information provided to me by other District of Columbia employees, and documents that I have reviewed.

2.      I have been employed by the District of Columbia Metropolitan Police Department (MPD) since 2009.  I am currently a lieutenant assigned to the Records Division, a position I assumed in June 2022.  My duties include operation and supervision of the Firearms Registration Branch, including all staffing, firearm registration application procedures, and concealed-carry license procedures.  Prior to this assignment, I served as a patrol sergeant in MPD's First and Seventh Districts and as a patrol officer in MPD's Second District.

3.      In preparing this declaration, I reviewed Plaintiffs' firearm registration records and the relevant firearms specifications.

4.      Currently, Plaintiff Andrew Hanson has six firearms registered with the District of Columbia that have restricted capacity magazines (10 round maximum) but are sold in other

**APP. 181**

jurisdictions with a standard capacity magazine of more than 10 rounds.  Each of these guns uses 9mm caliber bullets.

5.     Mr. Hanson has registered two Browning Hi Power pistols which each have a standard magazine capacity of 13 rounds.

6.     Mr. Hanson has registered a Sig Sauer P229 pistol which has a standard magazine capacity of 12 rounds.

7.     Mr. Hanson has registered a Beretta 92 FS pistol which has a standard magazine capacity of 15 rounds.

8.     Mr. Hanson has registered a Sig Sauer P320 pistol which has a standard magazine capacity of 17 rounds.

9.     Mr. Hanson has registered a Glock 17L pistol which has a standard magazine of 17 rounds.

10.     Extended capacity and/or drum magazines are commercially available for each of these firearms.

11.     For example, 30 round magazines are commercially available for use with the Sig Sauer P320 pistol.  Below is a photo of a Sig Sauer P320 equipped with a 30-round magazine.



12.     Mr. Hanson has also registered a number of handguns that have a standard capacity of 10 rounds or less, including a Glock 43 handgun that has a standard capacity of six rounds.

2

**APP. 182**

13.     Plaintiff Tyler Yzaguirre has registered a Ruger P95 and a Ruger LCP with the District of Columbia.

14.     Mr. Yzaguirre registered his Ruger P95 pistol with a D.C. compliant 10-round magazine.  The standard magazine size for a Ruger P95 pistol is 15 rounds.  Ruger P95 pistols use 9mm caliber bullets.

15.     Extended magazines, such as the 32-round magazine pictured below, are commercially available for the Ruger P95 pistol.



16.     Ruger LCP pistols come standard with a 6-round magazine and use .380 caliber bullets.

17.     32-round drum magazines, such as the one pictured below, are commercially available for the Ruger LCP pistol.  The drum magazine pictured below weighs one and a half pounds.



18.     Plaintiff Nathan Chaney has registered a Sig Sauer P320, a Sig Sauer P365, a Smith & Wesson M&P Shield, and a Ruger LCP II with the District of Columbia.

APP. 183

19.     Mr. Chaney registered his Sig Sauer P320 with a D.C. compliant 10-round magazine.

20.     Sig Sauer P365 pistols come standard with a 10-round magazine and use 9mm caliber bullets.

21.     50-round magazines, such as the one pictured below, are commercially available for the Sig Sauer P365.  The magazine pictured below is seven inches wide, fourteen and a half inches tall and three and a half inches deep.



22.     The Smith & Wesson M&P Shield comes standard with an 8-round magazine and uses 9mm caliber bullets.

23.     Ruger LCP II pistols currently come standard with a 10-round magazine and use .380 caliber bullets.  Mr. Yzaguirre registered his Ruger LCP II pistol with a 7-round capacity.

24.     Plaintiff Eric Klun has registered a Glock 43x, a Glock 23c, and a Ruger LCP with the District of Columbia.

25.     The Glock 43x pistol comes standard with a 10-round magazine and use 9mm caliber bullets.

26.     The Glock 23c comes standard with a 13-round magazine and has a .40 caliber.  Mr. Klun registered his Glock 23c with a D.C. compliant 10-round magazine.

27.    Magazines with capacities of 10 rounds or less are available for each of Plaintiffs' guns.  Each of these firearms is fully functional when used with a magazine with a capacity of 10 rounds or less.

28.    50-round magazines, such as the one pictured below, are commercially available for several models of Glock pistols.



29.    100-round drum magazines, such as the one pictured below, are commercially available for some models of Glock pistols, including the Glock 17.



I declare under penalty of perjury that the foregoing is true and correct.

Executed on   22 November 2022

STEPHEN AMODEO

5

**APP. 185**

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>        **Plaintiffs,**<br><br>        **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>        **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF LESLIE PARSONS</u>

Pursuant to 28 U.S.C. § 1746, I, Leslie Parsons, declare and state as follows:

1.       I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information, including information provided to me by other District of Columbia employees in the course of my official duties.  The views I state herein are drawn from my professional experience.

2.       I am the Assistant Chief of Police for the Investigative Services Bureau at the Metropolitan Police Department (MPD), a position I have held since January 2021.  In that role, I am responsible for managing the Criminal Investigations Division, including the Homicide Branch, the Violent Crime Suppression Division, the Evidence Control Division, and the Crime Scene Investigations Division.

3.       I began my law enforcement career with the Metropolitan Police Department in 1999 as a recruit and then served as a patrol officer.  In 2005, I became a crime scene search officer in the Crime Scene Investigations Division, where I collected evidence including DNA and latent prints, and documented crime scenes with written reports and photographs.

4.      In December 2005, I was promoted to the rank of sergeant and assigned to the Fifth District as a patrol supervisor.  In April 2008, I returned to the Crime Scene Investigations Division (CSID).  At CSID, I supervised both Crime Scene Search and Mobile Crime Technicians, reviewing case jackets for accuracy and completion, and coordinating investigative efforts with detectives, among other duties.

5.      I was promoted to lieutenant in 2014 and initially assigned to the Seventh District. Later that year, I was transferred to the Narcotics and Special Investigations Division where I served as the commanding officer of the Gun Recovery Unit (GRU).  During my time at GRU, I managed the day-to-day operations of the unit, worked on strategic briefings, and coordinated investigations with federal agencies.  In 2016, I was promoted to captain and assigned to the Criminal Investigations Division where I managed detectives conducting district-level investigations.  That same year, I was promoted to commander of the Criminal Investigations Division where I oversaw investigative units such as the Homicide Unit, Sexual Assault Unit, and the District Detective Units.

6.      I understand that Plaintiffs in this lawsuit are challenging a District law which bans the civilian possession of large-capacity magazines (LCMs) holding 10 or more rounds.

7.      In my nearly 23 years of law-enforcement experience, I have never fired my weapon on duty.

8.      I have worked in the District of Columbia my entire career, and I believe that LCMs pose a particular danger in urban environments.  Gun violence is probably the single biggest issue currently facing urban law enforcement.  I have seen, firsthand, the devastating effects of gun violence on families and communities.

**APP. 188**

9.      During my tenure as Assistant Chief, MPD is continuing its long-running efforts to get illegal guns off the street and, so far this year, has recovered more than 2,700 illegal guns (and more than 2,300 in each of the last two years).

10.     I have noticed that firearms recovered recently from homicides and other crime scenes are more dangerous and lethal than in previous years and include growing numbers of guns with large capacity magazines designed for use with pistols, such as the drum magazine pictured here, which was recovered in September 2022 with 40 rounds in the magazine:



11.     This LCM is attached to a privately made firearm (PMF), which, if registered and carried by a licensed user (without the LCM), could be legally carried concealed on one's person in the District.  This magazine accessory, however, cannot be legally carried because of the law Plaintiffs have challenged in this case.

12.     In just the past few months, many more guns that could otherwise be legally carried have been recovered with illegal LCMs, including many in stick form that extend below the grip.  For example, the LCM pictured here, attached to a Glock 17, was recovered this month

**APP. 189**

after a suspect attempted to hide it in the bushes on N Street SE (with one 9mm round in the

chamber and 24 9mm rounds in the 31-round extended magazine):



13.     I have also attached to this declaration, as Exhibit A, a document prepared by

members of my team that shows some of the LCMs recovered in the District since July 2022.

Most of the arms also pictured could be legally carried—the ones that look like the Glock above.

14.     MPD officers are issued Glock 17s, 19s, and 26s as everyday-carry duty pistols,

which are equipped with 17-, 15-, and 10-round magazines, respectively.  MPD officers are

required to carry three magazines, meaning that they are carrying 52 rounds (for a Glock 17), 46

rounds (for a Glock 19), or 31 rounds (for a Glock 26).

15.     MPD officers issued firearms are trained extensively in the Academy on the use

of their issued service firearm, including trigger discipline, grip, stance, and sight adjustment.

**APP. 190**

MPD officers issued firearms must qualify twice a year through range training and use of force training.

16.     MPD officers do not use magazines on pistols that carry more than 17 rounds, such as the extended stick or drum magazines pictured above.  MPD's equipment policies are similar to those of law enforcement in other jurisdictions.

17.      Law enforcement officers are more likely to face situations requiring them to fire more than 10 rounds of ammunition than law-abiding civilians.  For example, law enforcement officers may need to pursue armed suspects, enter buildings or similarly unfamiliar environments in order to conduct lengthy and dangerous searches for an unknown number of suspects, or directly confront criminals who are actively shooting.

18.     The primary role of law enforcement officers is to protect the general public, prevent crime, and track and apprehend criminals.  LCMs are appropriate for these law enforcement purposes.

19.     LCMs are also used for criminal purposes.  The most obvious example during my tenure as Assistant Chief was the Van Ness shooting on April 22, 2022, when a single shooter fired at least 239 rounds from a sniper's nest, injuring four people including a 12-year-old girl. Nineteen (19) LCMs were recovered from the scene.

20.     MPD also sees the use of LCMs on the streets of our city with the ShotSpotter system, an "acoustic surveillance technology" which uses sensors placed throughout the District "to detect, locate and alert law enforcement agencies of potential gunfire incidents in real time." *See* https://mpdc.dc.gov/publication/shotspotter-data-disclaimer-and-dictionary.

21.     ShotSpotter's software applies tags such as "High Capacity" and "Full Auto" to shooting incidents that indicate LCMs and fully automatic gun fire, respectively.  Fully

**APP. 191**

automatic gun fire—a continual spray of bullets until the trigger is released, ammunition is exhausted, or the gun malfunctions—can occur through the use of a "Glock switch." The Glock switch, also called a "giggle switch," is a small device that can be easily attached to an otherwise legal semi-automatic handgun and enables the shooter to fire continuously with one pull of the trigger (automatic fire) instead of having to pull the trigger to fire each time (semi-automatic fire).

22.     Automatic gun fire is extremely difficult to control, even for trained shooters, because the force of that many explosions causes a powerful recoil effect. In untrained hands, it inevitably results in a loose or uncontrolled spray of bullets.

23.     Examples of shooting incidents that ShotSpotter tagged as "High Capacity" and/or "Full Auto" in 2022 include:

   a.   March 24, 2022, 15:21:39 hours, 2513 Alabama Avenue SE (PSA 702), 26 rounds in 5.14 seconds ("High Capacity");

   b.   July 19, 2022, 18:22:27 hours, 2428 14th Street NE (PSA 505), 36 rounds in 7.333 seconds ("High Capacity");

   c.   July 27, 2022, 22:26:42 hours, 4347 4th Street SE (PSA 708), 50 rounds in 5.526 seconds ("High Capacity" and "Full Auto");

   d.   October 1, 2022, 21:28:33 hours, 240 60th Street NE (PSA 608), 29 rounds in 3.485 seconds ("High Capacity" and "Full Auto");

   e.   October 9, 2022, 17:45:41 hours, 1401 7th Street NW (PSA 308), 27 rounds in 3.455 seconds ("High Capacity" and "Full Auto").

24.     LCMs enable a shooter to fire many more rounds without having to reload, which may reduce the frequency of pauses during shootings, significantly increase a shooter's ability to

**APP. 192**

quickly injure or kill large numbers of people, and further reduce opportunities for law enforcement or the public to intervene to save lives. Any delay, no matter how slight, in reloading introduces a disadvantage to the criminal.

25.    Use of LCMs (with or without Glock switches) also increases the likelihood of indiscriminate fire resulting in a hit (or multiple hits) to a victim, especially in urban environments like the District. These bullets can and do travel through walls and car doors.

26.    Sixteen (16) juveniles have been killed by gunfire in the District this year alone.

27.    The more LCMs there are on the street, the more likely it is that unintended targets, including children, will be killed here in the District by stray bullets.

28.    As a law enforcement officer, my immediate concern is to protect the public. Moreover, the safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously.

29.    In my professional opinion, the District's LCM ban aids MPD's efforts to prevent violent crime, ensures the security of the Nation's Capital, and protects the safety of law enforcement officers and members of the public. Invalidating the District's LCM ban would remove a valuable tool from law enforcement.

Executed on _11_/_22_/_2022_

LESLIE PARSONS

7

**APP. 193**

# EXHIBIT A

Excellence is **Transferrable**

# Violent Crime Suppression Division
## Gun Recoveries with Extended Magazines

### Commander Ramey Kyle
### Inspector LaShay Makal

### November 3, 2022

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE   DCPOLICEDEPT   OFFICIALDCPOLICE

# VCSD Gun Recoveries with Extended Magazines



**1160 First Street, NE (PSA 501)**
**Recovered 11/3/2022**



**319 18th Street, NE (PSA 507)**
**Recovered:  11/3/2022**




# VCSD Gun Recoveries with Extended Magazines



**2730 Bruce Place, SE (PSA 702)**
**Recovered:  11/3/2022**



**1400 Saratoga Avenue, NE (PSA 505)**
**Recovered:  10/28/2022**

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE   DCPOLICEDEPT  OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 197**

# VCSD Gun Recoveries with Extended Magazines



**2128 H Street, NE (PSA 507)**
**Recovered:  10/20/2022**



**4020 Minnesota Avenue, NE (PSA 602)**
**Recovered:  10/14/2022**




# VCSD Gun Recoveries with Extended Magazines





**2306 Raynolds Place, SE (PSA 702)**
**Recovered:  10/13/2022**

**2826 Q Street, SE (PSA 607)**
**Recovered:  10/08/2022**



DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE   DCPOLICEDEPT   OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 199**

# VCSD Gun Recoveries with Extended Magazines



**800 Southern Avenue, SE (PSA 706)**
**Recovered: 9/23/2022**



**2304 2nd Street, NE (PSA 501)**
**Recovered: 7/17/2022**

     

# VCSD Gun Recoveries with Extended Magazines



**2929 Nelson Place, SE (PSA 605)**
**Recovered: 9/21/2022**



**280 37th Street, SE (PSA 603)**
**Recovered: 9/19/2022**

 DCPOLICEDEPT  DCPOLICEDEPT  DCPOLICE  DCPOLICEDEPT OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 201**

# VCSD Gun Recoveries with Extended Magazines



**600 Morton Street, NW (PSA 409)**
Recovered:  9/16/2022



**2121 1st Street, SW #364 (PSA 105)**
Recovered:  9/14/2022

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE  DCPOLICEDEPT  OFFICIALDCPOLICE


Excellence is Transferrable

**APP. 202**

# VCSD Gun Recoveries with Extended Magazines



**1608 Kenilworth Avenue, NE (PSA 601)**
Recovered:  9/13/2022



**1528 Butler Street, SE (PSA 701)**
Recovered:  9/10/2022



# VCSD Gun Recoveries with Extended Magazines



**138 Michigan Avenue, NE (PSA 405)**
**Recovered:  9/12/2022**



**138 Michigan Avenue, NE (PSA 405)**
**Recovered:  9/12/2022**

Excellence is Transferrable.

   

# VCSD Gun Recoveries with Extended Magazines



**4100 Block of 4ᵗʰ Street, SE (PSA 706)
Recovered:  9/4/2022**



**2311 14th Street, NE (PSA 505)
Recovered:  8/29/2022**



# VCSD Gun Recoveries with Extended Magazines



**1321 5th Street, NW (PSA 308)**
**Recovered:  8/26/2022**



**2315 15th Street, NW (PSA 505)**
**Recovered:  8/09/2022**

*Excellence is Transferrable*

**APP. 206**

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE  DCPOLICEDEPT   OFFICIALDCPOLICE

# VCSD Gun Recoveries with Extended Magazines



**1521 Benning Road, NE (PSA 507)**
Recovered:  8/07/2022



**1521 Benning Road, NE (PSA 507)**
Recovered:  8/07/2022



# VCSD Gun Recoveries with Extended Magazines



**1521 Benning Road, NE (PSA 507)**
Recovered: 8/07/2022



**2923 MLK Avenue, SE (PSA 707)**
Recovered: 7/28/2022

   
*Excellence is Transferrable*

APP. 208

# VCSD Gun Recoveries with Extended Magazines



**2923 MLK Avenue, SE (PSA 707)**
Recovered:  7/28/2022



**1724 North Capitol Street, NE (PSA 501)**
Recovered:  7/19/2022

 DCPOLICEDEPT    DCPOLICEDEPT    DCPOLICE   DCPOLICEDEPT   OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 209**

# VCSD Gun Recoveries with Extended Magazines



**1724 North Capitol Street, NE (PSA 501)**
**Recovered: 7/19/2022**



Excellence is Transferrable.

# VCSD Gun Recoveries with Extended Magazines

| District | Gun Recoveries with Extended Magazines |
|----------|----------------------------------------|
| 1D | 1 |
| 2D | 0 |
| 3D | 1 |
| 4D | 3 |
| 5D | 12 |
| 6D | 5 |
| 7D | 7 |
| Total | 29 |

***It should be noted that the Power Point does not represent ALL of the recoveries of guns which possessed Extended Magazines – the numbers are a breakdown of the districts in the Power Point Only***

  




# EXCELLENCE IS TRANSFERRABLE

APP. 212

# EXHIBIT F

APP. 213

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

## <u>DECLARATION OF ROGER PAULY</u>

Pursuant to 28 U.S.C. § 1746, I, Roger Pauly, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters

contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Associate Professor in the Department of History at the University of

Central Arkansas, where I have taught for the last twenty years.  I received my B.A. from St.

Olaf College (1988), my M.A. from Villanova University (1992) and my Ph.D. from the

University of Delaware (2000), all in History.  A true and correct copy of my curriculum vitae is

attached as **Exhibit A** to this declaration.

3.      I am also personally interested in antique firearms and firearms history.  I own a

Remington Model 870 shotgun and a Marlin Model 60 target rifle.  These were treasured gifts to

me from my father and son respectively.  More pertinent to history, I also own reproduction

models of an 1853 Enfield Rifled Musket and an 1859 Sharps Infantry Model Rifle.  These are

working firearms based upon nineteenth century designs, but they were built in the past few

decades.  I have handled and fired a variety of other modern arms, including a Beretta 9mm

semi-automatic pistol, a .38 caliber Smith and Wesson revolver, several civilian-model AK-47s

**APP. 214**

and a similar model AR-15.  I have also fired a Korean-War-Era Model M-1 'Garand' Rifle, as well as a Lee-Enfield Pattern Mark IV Rifle, a K98 German Mauser, and US M1-Carbine.  The last three of these were World War II era weapons.

4.      I am the author of *Firearms: The Lifestory of a Technology*, first issued in 2004 by Greenwood Publishing Group and again in 2008 by The Johns Hopkins University Press. *Firearms* was first in a series of works published by Greenwood that aimed to explore the holistic backgrounds of critical inventions.  I have also presented a variety of lectures on the subject, including a lecture on the role firearms technology played in the Civil War, available here: https://www.c-span.org/video/?301223-1/state-house-museum-civil-war-symposium.  I was similarly hired as a consultant and appeared on the British ITV documentary program *Groundwar: Warrior Weapons*, which premiered in the United States on 2010 on PBS Television.  I also appeared in 12 out of 13 episodes of the documentary series *American Guns: A History of US Firearms*, which premiered in 2017 on Amazon Prime.

5.      The Office of the Attorney General for the District of Columbia contacted me to render expert opinions in this case, relating to the history of firearms technology.  This declaration is essentially a very abbreviated version of my book on firearms, composed of selected highlights.  I did not include footnotes, or endnotes, in my book or this declaration, but I have attached the bibliography for my book as **Exhibit B**.  I have completed my work at no charge.

### Introduction

6.      Over approximately nine centuries so far, the development of an archetypical entity known simply as the "firearm" has been a gradual and uneven process much like the growth of an individual.  Thus, early human missile weapons like spears, slings, and bows

**APP. 215**

represent the distant ancestors of the gun.  The crossbow could probably be identified as a more immediate parent, with its telltale lock mechanism and its stock-like tiller.  Another parent might well be a medieval Chinese flamethrower known as a "firelance" that used gunpowder as an incendiary.  The earliest hand-cannons of Asia and Europe illustrate the gun's childhood, while the diverse weaponry of the sixteenth and seventeenth centuries is perhaps reflective of the rapid developments in adolescence.  In the nineteenth century new industrial techniques allowed the firearm to surge into a state of adulthood as metallic cartridges, revolvers, breechloaders, and repeating rifles appeared.  On the eve of the twentieth century, the recognition that gas and recoil from a shot could be used to drive a gun's reloading mechanism resulted in the rise of both semi- and fully automatic weapons that still predominate today.

       7.      Like a human, this growth was uneven and erratic.  It was not marked by steady progress, but rather through periods of intense development and changes followed by episodes of slowing or stagnation.  Often future gun designs were anticipated well in advance of the necessary technological maturation, by decades and even by centuries, much like a child dreams about a future career well before she is capable of piloting a jet fighter.

       8.      While the whole life story of the firearm might appear erratic and unpredictable, some consistent logic lay behind most of the process.  No matter what type of missile weapon one is considering, it has to address certain demands or meet certain needs.  First, it must be able to hit its target.  Small arms manufacturers have thus logically, consistently concerned themselves with promoting accuracy.  Linked to this is range—the potential to hit objects at far distances.  Second, it does no good to hit an enemy with a projectile that does no damage.  Therefore, the power and strength with which a projectile crashes into its target are important too.  A third ingredient to these two factors is rate of fire.  Poor accuracy or weak power can be

3

**APP. 216**

offset to some extent with a weapon that discharges many shots in a short period of time.  Thus, the common imperatives of accuracy, power, and rate of fire has guided firearm development at each stage of its lifecycle.

### The First Five Hundred Years

9.     The firearm's exact birthdate is largely unknown.  We can estimate that a very simple version was on the scene in China by the end of the thirteenth century.

10.     The basic formula of saltpeter, sulphur and charcoal that formed the basis for gunpowder was devised by Chinese alchemists probably by the ninth century CE although earlier, weaker versions were almost certainly experimented with much earlier.  Upon ignition, gunpowder undergoes a chemical change that turns it from a solid into a gas of nitrogen and carbon dioxide that expands incredibly fast.  This rapid expansion is a visually spectacular burst of smoke and flame, and it is what gives gunpowder its power.

11.      This material was first employed in a device known as a firelance, which was based on a simple tube design (and which would eventually be transformed into a "barrel").  One end of the tube was sealed, and the hollow cylinder was filled with gunpowder.  In combat, a soldier would light a fuse at the open end of the tube, which would ignite the gunpowder, and then sparks and fire would shoot violently back out of the open end.

12.     At some point, someone recognized that the potential to cause harm from projectiles flying out of the firelance was far greater than any accompanying sparks.  To accomplish this, a "touchhole" was drilled into the closed, rear end of the tube (or "breech"), and a burning fuse was run to the powder through the touchhole.  Projectiles were loaded into the other, open, "muzzle" end of the tube.

**APP. 217**

13.     No one can say for certain when the first metal gun was constructed, but a weapon found at the site of a battle that took place in Manchuria in 1288 features essentially a short bronze tube with a touchhole in the breech.  The oldest evidence of a similar weapon in Europe appears in two separate written sources composed in 1326.

14.     At some point in the fourteenth century, a new technique of manufacturing gunpowder was developed, known as corning.  The new form was significantly more powerful and explosive.  Some contemporaries estimate it had three times the explosive potential, and, at last, a bullet propelled by this stuff could consistently punch through most armor.

15.     By the end of the fourteenth century, larger artillery was also developed, and the terms "hand gun" and "handcannon" came into use to distinguish the smaller pieces.

16.     By the early fifteenth century, weapons appeared that are clearly recognizable as firearms.  They used the explosion of gunpowder to fire projectile bullets.  Each one had a metal barrel and most models sported very simple version of a stock, which was a long, wooden structure set below and behind the barrel.  This stock allowed for better handling of the weapon and insulated the shooter's hands from the barrel, which could become exceptionally hot after firing.  Some of these were even built with gun sights very similar to those still used for many open-sighted firearms today.

17.     The term "arquebus" became a fairly standard appellation for most hand-held guns by the end of the fifteenth century.  "Muskets," in contrast, were particularly heavy arms, weighing as much as 20 pounds and sporting 4.5 foot-long barrels.  They often rested on a crude sort of tripod and came with a ramrod to push the bullet down the barrel into the breech.

18.     Also in the fifteenth century, the task of lighting a match to a fuse was mechanized through the use of a component known as a "matchlock."  The most common

5

**APP. 218**

version of this device featured a metal C-shaped arm, with the open part of the letter facing the shooter.  On the side of the stock near the breech was a flat piece of metal called a lockplate.  The upper end of the "C" arm held a smoldering match (a cord covered in saltpeter, sometimes called "match cord"), while the lower extremity was attached to a metal leaf-spring mechanism hidden behind the plate.  A metal spring held the "C" in place, and when a large barlike trigger was squeezed, the "C" moved downward toward a small basinlike structure.  This was the aptly named "flashpan," which was fitted to the outside of the touchhole and filled with a small amount of gunpowder.  (This small amount of powder, at some point, came to be called "priming powder," as distinguished from the main charge in the barrel.)  If everything went right, the match at the top of the "C" would ignite the powder in the flashpan, the ignition would then travel through the touchhole, then down into the barrel, and in turn set off the main powder charge.[1]  The intricate components of the "C," the trigger, and the leaf-spring reminded people of similarly sophisticated metallic locks that could fix the door to a room or the lid of a chest firmly in place.  The word "lock" began to be used to describe the complex firing mechanisms of these weapons.

19.     By the early sixteenth century, simple handcannons had evolved to include all three key components of archetypical firearms:  locks, stocks, and barrels.

### The Sixteenth & Seventeenth Centuries

20.     In the sixteenth and seventeenth centuries, a variety of new ignition systems were created, with one—the flintlock—dominating the field across the world by the end of the period.

---

[1]     The origin of the old expression "just a flash in the pan" to describe a disappointing or unfulfilled event arose from cases in which things did not go quite this way.

6

**APP. 219**

21.     Pistols also appeared in noticeable numbers this period.  Although some matchlock pistols are known to have been produced, the development of pistols was largely dependent upon the advent of a new kind of ignition, known as the "wheel lock."  Written references to wheel lock weapons began to appear in the early sixteenth century.

22.     The idea was for a wheel to spin in place while its serrated edge ran against a flint, a device like the modern lighter.  The stone was held in a jawlike clamp attached to a hinged arm, known as a "doghead."  The shooter prepared the lock by using a wrench to wind a lug fixed to the axis of the wheel.  This action wrapped a very short chain around the wheel as it turned.  After being cranked, the whole thing was held in place by the nose of a metal sear, which popped into a hole drilled in the side of the wheel.  As the shooter prepared to fire, the cover was pushed away from the flashpan, and the hinged doghead was manually swung down against the top of the wheel.  When the trigger was pulled, it allowed the mainspring to reassert itself and pull out the chain that, in turn, spun the wheel.  The wheel rotated, with its serrated edge spinning against the flint.  The resulting shower of sparks set off the priming powder and main charge.

23.     The wheel lock system was complicated, delicate, and prone to breakage.  They also demanded more craftsmanship to make and more money to produce than matchlocks.  They therefore were not used in huge numbers by common troops in Europe or elsewhere.  Matchlock weapons remained most common for foot soldiers throughout the fifteenth, sixteenth, and seventeenth centuries.

24.     That said, a wheel lock pistol had no troublesome, smoldering match cord to kept lit and could hang from a belt or a saddle, ready for firing at a moment's notice.  These arms uniquely provided mounted troops of the time with the means to shoot back at the arquebusiers

7

**APP. 220**

and musketeers who were wreaking so much havoc on their ranks—although they had only a very short firing range.  It has been estimated that cavalry may have had to close to within five paces of the enemy in order for their wheel lock pistols to work at full effect.

25.     If a person could afford a pistol, wheel lock pistols also had some role to play in the realm of self-defense.  The wheel lock mechanism could stay at rest for a long time and still be ready to fire at a moment's notice, and when attached to a pistol was much easier to carry and conceal than a matchlock musket.  (Imagine trying to walk around town with a smoldering matchlock concealed under one's cape or hooked to a belt, or with a four-foot-long gun.)

26.     Near the very end of the seventeenth century, the major powers of Europe began switching from their matchlock arms to arms with a "flintlock" ignition device.

27.     "True" flintlocks first appeared in France between 1610 and 1620.  The device worked rather like a wheel lock, in that it had a doghead—by now known as a "cock" instead, for its beak-like appearance—holding a piece of flint, which the shooter would pull upward and backward and lock into an upright position prior to firing.  Pulling the trigger caused the cock to fall down and forward; the attached flint would then strike an L-shaped device, which contained both a "battery" (a stationary piece of iron) and a flashpan cover.  The falling action would simultaneously cause the flashpan cover to open and create sparks by striking the battery, thus igniting the exposed priming powder, which would, in turn, ignite the main charge through a touchhole in the breech.

28.     Flintlock ignitions dominated firearm technology until a new system, the percussion-cap, prevailed in the mid-nineteenth century.

29.     The prototypical example of an eighteenth-century musket, a British model widely known as the "Brown Bess," used flintlock ignition.  The design was fairly simple:  It had

8

**APP. 221**

a 46-inch-long barrel fixed to a walnut stock, with brass furniture (that is, functional niceties like the trigger-guard). Most models also came with an iron ramrod.  It did not have a rear sight, a testament to the gun's lack of long-range accuracy.  It has been said that 120 yards was the average distance at which fired projectiles would strike the ground due to a rapid loss of velocity.  Most firearms of this age were accurate at less than 80 yards.  The muskets of the time, such as the Brown Bess, were not really built with an eye to individual marksmanship.  The idea was for dozens of these weapons to be fired at once at mass formations of troops.

30.     The musket was also (relatively) easy to shoot and reload.  By this time, individual paper cartridges, containing both pre-measured portions of gunpowder and round lead bullets, known as balls, were in wide use.  The paper cartridge was opened with one's teeth, and a small portion of the charge was poured in the gun's pan to prime the weapon.  The rest of the powder went down the barrel with the ball.  The paper tube could be rammed to pack the charge more tightly, or simply discarded.  Troops could carry anywhere from 20-40 of these lightweight paper cartridges in a leather purse (or "cartridge box").  Loaded this way, the musket could be fired approximately three times per minute.

31.     Flintlocks were simple to use and service (much more so than wheel locks), but they had a high incidence of misfire.  It has been estimated that in wet or humid weather, for example, as many as 50% of the flintlocks in a line of muskets might fail to fire properly.

32.     The flintlock musket enjoyed a widespread reign as the world's predominant gun design for about a century and a half.

### The Nineteenth Century

33.     Firearm technology saw a relative profusion of innovations in the nineteenth century that, especially when employed together, produced exponential changes in accuracy,

**APP. 222**

power, and rate of fire, as well as in firearms' reliability.  Two of the firearm's vital components, the barrel and the lock, would drastically change.  "Rifled," as opposed to smoothbore, barrels came into wide use, increasing arms' accuracy many times over.  Lock systems changed, dramatically increasing arms' reliability and usefulness across a variety of conditions.  By the end of the century, these developments—coupled with advances in manufacturing technology, in general, and in cartridge and even gunpowder design—produced firearms radically more capable of killing both animals and people efficiently and effectively.

### Rifling & Expanding Bullets ("Minie Balls")

34.      The manner through which a quarterback throws a football offers a good analogy to explain the concept of rifling.  The quarterback grasps the ball with his or her fingers on one side and thumb on the other.  If the throw is made properly, the thumb will release first, followed by the other four fingers, which roll more gradually off the ball as the arm swings forward.  This rolling motion will cause the ball to spin in midair, increasing the range and accuracy of the throw.  The ball performs better due to its spinning action—masters can make throws of mind-boggling precision.

35.      Similarly, probably around the end of the fifteenth century, a gunsmith once cut grooves in a curved, spiraling manner inside a barrel, and it was discovered that lead balls shot from such barrels traveled in a far more accurate fashion.

36.      The technique came to be known as "rifling."  And it could not have been easy; forging a plain smoothbore barrel was long and arduous work, let alone making one with spiral grooves cut into its inside surfaces.  Economical mass production, therefore, would await a few centuries for advances in manufacturing techniques.  Rifles were also very slow to load— requiring approximately three minutes per shot or "round" (the term is from the shape of the

**APP. 223**

bullet)—because, in order to get the projectile to spin, the bullet had to grip the grooves. Therefore, it needed to be slightly larger than the bore (or diameter) of the barrel.  Loading such a bullet was a challenge as it had to be jammed into and down the barrel, often with the assistance of a wooden mallet.  For this and other reasons, rifles were mostly slow-loading, expensive weapons that remained in the hands of a wealthy elite in the sixteenth and seventeenth centuries.

37.     Although much of the firearm's story is linked to warfare, in the sixteenth and seventeenth centuries, the rifle did find an important role in the field of hunting, especially in America.  Rate of fire is not a particularly important factor while pursuing most game.  A hunter was likely to only get one shot at a swift stag, and therefore, the difficulty of loading a rifle was worth the improved odds of hitting the animal on the first shot.  Although hunting was largely the preserve of the landed classes in Europe, in the New World hunting was customary for both the indigenous populations and the European settlers.  Rifles, known first as "Pennsylvania rifles," then as "Kentucky rifles," were popular and refined for these ends on the American frontier across the seventeenth and eighteenth centuries.

38.     Rifling could also be employed in this period for pistols for "civilian" usage. Like the musket, speed of reloading was considered essential in a military pistol.  But pistols with rifled barrels could be employed in target shooting, for self-defense, and in the nefarious fashion of dueling.  In these situations, fast reloading was less important or practical than an accurate initial shot.

39.     Rifling was not widely used in the military context, however, until advances in bullet technology enabled faster reloading and increased rate of fire.   Around 1850, a handful of attempts settled into a solution that came to be called a "minie-ball" (after one of its inventors,

11

**APP. 224**

Claude-Etienne Minie).  The Minie ball was closer to the non-familiar "bullet" shape, rather than the older, (actually round) "ball."  It had a hollow cavity at the base of the bullet which nestled against the powder charge when loaded.  The force of the charge would push into this cavity and expanded the rear of the bullet, driving its sides into the rifled grooves.  Since these minie-balls expanded upon firing, they could be made with a slightly *smaller* diameter than the barrel bore, and this greatly sped up loading time.

40.     Soon thereafter, enormous numbers of rifles were produced for military purposes, such as those for the British military at the Royal Small Arms Factory at Enfield, informally known as the Enfield Rifled Musket.  These arms significantly increased range and accuracy over the Brown Bess:  In one test, a large target could be repeatedly hit at a range of 800 yards, and even moderately skilled shooters could consistently hit man-sized targets at 200 yards.

41.     About a half million Enfields were ultimately imported to the United States for use in the Civil War.  The Union built nearly 1.5 million more of similar, American-made models, loosely known as "Springfields."

**Percussion Locks**

42.     Around the turn of the nineteenth century, a Scotsman, Alexander John Forsyth, discovered that highly volatiles substances, called fulminates, could be stabilized by mixing them with charcoal, sulphur, and other materials; and that striking a minute amount directly with a hammer regularly triggered a small but intense explosion.  Using this discovery, he devised a new rather complex lock, the percussion lock, named after its manner of ignition.  Forsyth's percussion lock was similar to the flintlock, except that a hammer-hitting-fulminate mechanism replaced the flint-hitting-steel one.

12

**APP. 225**

43.     This work eventually led to something called the percussion cap.  A touch of mercury fulminate compound was set inside a tiny, cheap copper or brass cup-like structure called a "cap," perhaps due to its similar appearance to headwear.  In a typical percussion lock, the cap was slipped over the top of a small cylindrical "nipple" that had a tiny hole drilled through it lengthwise.  The nipple's hollow center led directly into the closed touchhole.  When the hammer snapped down on the top of the cap, the fulminate exploded, and with nowhere else to go, the flame burned down the touchhole into the main powder charge.  This system of percussion was exceptionally simple to construct and replaced Forsyth's more complicated version.

44.     Digging around in one's pocket or "cap box" for a cap was not always quick or convenient, and the caps would sometimes explode, hazarding the shooter's eyes with a shower of metal fragments.  But the percussion cap lock system was far less prone to misfire than was the flintlock.  Being almost entirely enclosed, it was also much more resistant to foul weather.  Thus, when only 50% of flintlock musket line might actually fire in wet weather, 99% of percussion-cap guns would discharge.  By 1840, the United States, Britain and France had all adopted the lock for new military arms.

**Repeating Arms: Revolvers**

45.     Like so many other modern "innovations," the revolver was actually a much older concept, predating the famous American, Samuel Colt, by centuries.  One Venetian matchlock version with three rotating barrels, for example, has been dated to the 1540s.  The concept of a repeating arm with just one barrel, but rotating breech chambers—a "cylinder"— also dates to at least the sixteenth century.  But these early revolvers had to be turned by hand and reprimed after each shot.  And, like most early breechloaders in general, there was a problem with expanding

13

**APP. 226**

gas leaking through from ill-fitting parts.  Loose machinery work could also allow stray sparks from the chamber being fired to find their way into other loaded chambers with disastrous results.  In the best cases, these loose parts resulted in a loss of propulsion for the bullet; in the worst cases, after just a few shots early breechloaders tended to explode in the shooter's face.  It would take the precision manufacturing of the nineteenth-century's early industrial age to make this design workable.

46.     The new percussion lock system offered the opportunity to re-visit the revolver design and this is exactly what Samuel Colt did.  Colt's particular application, patented in 1836, was so successful that countless later enthusiasts credited the gunsmith with actually inventing the revolver.  Colt's basic system simply fixed a percussion nipple onto a slight recess at the rear of each individual cylinder chamber.  The enclosed nature of the percussion-cap ignition along with the recessed nipples greatly reduced the chance of other cylinder chambers accidentally discharging.  He also added a mechanism that rotated the cylinder automatically and lined up a new chamber each time the hammer was cocked.  The pistol chambers were loaded individually through the front along the side of the cylinder, initially as loose powder and shot, and later in premade paper cartridges.[2]

47.     This effective "cap and ball" revolver significantly increased firearms' rate of fire—whereas single-shot flintlock arms might be discharged about three times a minute, a Colt Revolver could now fire six aimed shots in under twenty seconds or even less time.  Reloading

---

[2]     Colt was also very good at precision manufacturing:  across the middle of the nineteenth century, his facilities used the most modern industrial equipment and production techniques available at the time, and he achieved an exceptionally high degree of standardization in firearm parts.

14

APP. 227

was a considerably slower process, involving at least 18 steps and some many minutes (despite the few seconds' time we see in the movies).

### Breech-loading Rifles

48.      If nineteenth-century gunsmiths were capable of mass-producing gastight revolvers, they certainly could revisit other old firearms experiments of the past.  One of the more successful efforts toward this end was the revival of the breechloader.  The basic idea was to have a section of the rear of the barrel (or "breech") open, thus allowing a cartridge to be more-easily inserted into the base of the barrel.  This would alleviate the burden of ramming a tight-fitting bullet and greatly ease the loading process.  This approach actually had been around since the late Middle Ages, but, like the early revolvers, the designs tended to leak excessive gas and/or explode.

49.      Gunmakers like the American, John Hall, began developing somewhat-safer breechloaders by the 1830s, but these were still less reliable than the older muzzle-loaders and received a cool reception from the military.  In 1853, fellow-American, Christian Sharps, significantly improved upon existing designs by creating a special breech seal.  This consisted of a movable metal ring about the diameter of the barrel, which was recessed into a sliding block of metal at the rear of the barrel called a "breechblock."  When the gun fired, gas from the charge itself was forced under the edges of the ring and drove it against the rear of the barrel.  The force of the expanding gas essentially helped seal the force of the expanding gas.

50.      Breechloading indeed significantly increased rate of fire, even as used with just single-shot guns.  A report from the U.S. secretary of war in 1859, for example, estimated that "[w]ith the best breech-loading arm, one skillful man would be equal to two, probably three armed with the ordinary muzzle-loading guns."

15

**APP. 228**

51.     It has been estimated that over 100,000 (single-shot) Sharps breechloading rifles saw action in the Civil War, mostly by cavalry.  Most infantry continued to use older styled weapons.

## The Self-Contained Metal Cartridge

52.     Around the same time Sharps' breechloaders came into being, John Forsyth's work with fulminates was being put to new use in America in metallic self-primed cartridges patented by Horace Smith and Daniel Wesson.

53.     Forsyth's work actually inspired this design decades earlier.  By about 1810, Samuel Johannes Pauly of Switzerland, impressed by Forsyth's work, recognized that Forsyth's fulminate did not have to rest in the lock but rather could be fixed to the actual cartridge itself.  Pauly devised several types of ammunition utilizing metal casings fitted to the rear of a larger paper cartridge.  A small bit of fulminate was fixed in a miniature pan on the center back of the metallic casing and ignited by means of a new lock using an internal metal spring-driven "firing pin" instead of a side-mounted percussion hammer.  Pauly's work was not cost-effective at the time and never gained popularity in his lifetime.  It was decades before the metallic center-fire cartridge he had devised were rediscovered.[3]

54.     Like Pauly's, Smith and Wesson's similar design removed the need for a separate percussion cap and eliminated an extra loading step.  Unlike Pauly's, Smith and Wesson's design

---

[3]     Pauly's work was also taken up and modified by one of his assistants, Johann Nikolaus von Dreyse.  Von Dreyse, working in his native Prussia, set the fulminate primer inside the cartridge, but between the bullet and the powder charge.  He also modified the lock, changing Pauly's firing pin into a firing needle, to reach deeper inside the cartridge, and devising around it a breechloading lock that came to be known as the "bolt-action" lock.  This technology was widely adopted across Europe in the nineteenth century, and eventually in the U.S. as well, which switched to bolt-action rifles around the turn of the century.

**APP. 229**

was cost-effective, and successfully and widely employed.  As a result, the firearm was about to take another major leap forward in rate of fire.[4]

55.     In 1871, for example, the Colt Company produced its first breech-loading metallic cartridge firing pistol modeled heavily on its earlier cap and ball revolvers.  This particular gun was not a commercial success, but Colt's next effort, the Single Action Army Model of 1873, would go on to become one of the most famous and distinct revolvers of all time.  Forty-five caliber cartridges were loaded one by one through a hinged feed slot or "gate" in the rear of the cylinder.  (The colloquial term "forty five" caliber comes from the diameter of the bullet, in this case, .45 inches.  Similarly, a "thirty-eight" would use a .38 inch-wide bullet while a "twenty-two" bullet was a petite .22 inches in width.)  The Model 1873 could be rid of its empty .45 cartridges in a reverse loading-motion with the assistance of an ejector rod.  This model of revolver was purchased in large numbers all over the country and overseas.  The weapon earned a number of nicknames, including the "equalizer" and the "peacekeeper."

56.     In its Navy Model 1889, Colt offered an even faster system.  This pistol had the front of its cylinder fitted to a hinged arm or "crane."  After firing, the entire cylinder swung out to the side of the revolver, away from the frame.  All six cartridges could then be simultaneously pushed out using an ejector rod mechanism similar to that found in contemporary models made by the American firm of Smith and Wesson.

**Repeating Arms: Rifles**

---

[4]     Smith and Wesson patented a "rimfire" design, in which the fulminate primer circled the rear edge of the cartridge, rather than sitting in the middle.  This was thought to be a better ammunition type to build a revolver around because in this type of weapon the striking edge of the hammer was traditionally located closer to the edge of the cartridge than its center-rear.  By the early 1870s, there was a general movement back toward center-fire cartridges because the larger caliber rimfires tended to tear themselves apart when firing.

57.     The innovations in breechloading and metallic cartridges just discussed produced large gains in rate-of-fire in and of themselves.  They also quickly enabled yet another large leap—the repeating rifle.

58.     Like so many other weapons of the nineteenth century, the repeating rifles that appeared were similar to much older, but never perfected designs.  A seventeenth-century Danish marvel known as the Kalthoff gun, for example, used a cylindrical tube mounted under the barrel that held multiple balls.  This remarkable wheel lock also had a powder magazine in a hollowed section of the stock butt, and the whole gun could be primed and loaded by pivoting the trigger guard.  As brilliant as the design was, it was expensive and reportedly a bit delicate.

59.     A likewise frail pistol designed in the United States in 1848 by Walter Hunt, called the "Volitional Repeater," and later renamed the "Volcanic," used some similar elements. It employed a tubular spring-loaded bullet magazine under the barrel that fed ammunition into the breech chamber with a finger-lever.  The Volcanic was plagued by gas leakage, and its unique ammunition (like a minie ball, but with the hollow space filled with powder) only contained a very small powder charge.  The end result was that the Volcanic Repeater was not at all "volcanic" and suffered from an exceptionally low muzzle velocity—it was about half the speed of a Sharps gun, for example, which had a muzzle velocity of 950 to 1000 feet per second. (That is, it fired bullets moving at 950 to 1000 feet per second when first leaving the barrel.)

60.     Within a few years, by 1860, Benjamin Tyler Henry modified the Volcanic and its ammunition to create an effective repeating rifle with a larger and more powerful cartridge. Henry's new cartridge had a longer metal jacket that allowed for much greater powder capacity. The weapon also used a trigger lever that could be worked by the entire hand, rather than one finger, which eased the reloading process.  Because it was a long rifle, it was able to sport a

18

**APP. 231**

much longer tube magazine that could hold *fifteen* of the Henry cartridges (plus one in the chamber).  The bullet was much smaller than that used in other rifles, but when fired from the weapon Henry built for it, the projectile had a muzzle velocity of 1,125 feet per second, a relatively high speed.

61.     Not only did the Henry rifle's bullet move relatively quickly, but when compared to other contemporary firearms, the gun had an unheard-of rate of fire.  By simply shoving the trigger-guard lever down and forward, a spent casing from the gun's barrel was ejected through the top of the breech, a fresh cartridge slid into the lifting mechanism, and the hammer was cocked back in a firing position.  Snapping the lever back into place pushed the new cartridge up and into the breech, ready to be fired.  This lever-action design prepared a bullet for firing with one smooth and simple motion, requiring no cartridge biting, no ramrods, and no fumbling for percussion caps.  Unlike the three shots a minute that might be hoped for from an exceptionally quick infantryman armed with a Springfield, trials demonstrated that an average shooter could discharge a Henry rifle once every 3 seconds.

62.     Henry rifles were developed by the start of the American Civil War but were quite expensive—exorbitantly priced for regular rank-and-file troops—and did not see much combat.  By the end of hostilities, the War Department had only officially bought 1,731 of the guns.

63.     A similar repeating weapon that saw much more use in that conflict was the Spencer rifle, also patented in 1860.  The Spencer likewise employed a magazine tube, but this feature was set in a different location, behind the lock hidden in the butt of the gunstock.  The shorter space of the butt and the larger bore/cartridge size only allowed seven cartridges to be loaded at a time.  Officially, the War Department bought almost 100,000 Spencer carbines and almost 12,500 rifles for use in the Civil War.

**APP. 232**

**Smokeless Powder**

64.    In 1884, Paul Vielle of France developed a new propellant that would quickly replace the basic gunpowder formula that had been pushed down gun barrels for nearly 600 years.  The new material, which he called "Powder B," came to be known as "smokeless" powder.  And because it was lighter in color than the older, charcoal-based powder, people began to refer to the older powder as "black powder."  Smokeless powder produced significantly less smoke than older gunpowders and was also a more efficient propellant.  The new powder was mixed at the molecular level, which meant its ignition was much faster, it burned more thoroughly, and it left less powder residue in the barrel.

65.    A cartridge made with smokeless powder could be blown down a barrel at a much faster rate than one made with the old "black" powder.  The force that a projectile has on an object when it impacts with it is a combination of both mass and speed.  Gunmakers knew that a small bullet travelling at a relatively higher velocity would be just as capable of inflicting a similar level of injury as a large bullet travelling slower.  Cartridges filled with smokeless powder could thus employ smaller caliber bullets, but these travelled significantly faster (over 2,000 feet per second muzzle velocity) and thus tended not to drop as much in flight.  This would make a new generation of these "high-powered" rifles more accurate in the hands of the average shooter.

**Machine Guns**

66.    Like so many nineteenth-century firearm developments already discussed, the machine gun had much older ancestors that were intended to accomplish similar tasks or to work upon similar principles.  The late fifteenth century saw the advent of "organ guns," so called because of their visual similarity to church organs.  These devices consisted of multiple barrels

fixed to a single stock, or more often to a wheeled carriage. They were made so that a single

ignition traveled through passages cut in the rears of the barrels, firing each in succession. Some

employed a "roman candle" technique. These devices must have been as cumbersome to employ

and as slow to reload as they were spectacular to watch when fired.

67. In 1861, Richard Gatling patented a hand-cranked, revolving, rapid-fire weapon

that is widely credited as the first really successful "machine gun." The term "machine gun"

generally refers to a relatively complex (hence "machine") weapon capable of very rapid fire.

Richard Gatling's gun employed a revolver mechanism for a grouping of a half dozen barrels

each with its own breech mechanism, all supported by a large-wheeled carriage. The first

Gatling Guns used a loose ammunition hopper, but this was later replaced with a detachable

magazine system set above the breech. These were of various shapes, including a round "drum"

design and a flat curved "banana clip" magazine anticipating those found on later assault rifles.[5]

As each barrel revolved past the magazine, it picked up a cartridge that was then fired at the

bottom of the rotation cycle. The Gatling could be fired as fast as the handle could be cranked

and empty magazines could be replaced. One version, the Model 1883, was capable of firing as

many as 1,500 shots per minute.

68. The Gatling, however, and other similar models like it, would be pushed aside in

a few short years by more automated versions. Rather than relying upon cranks or handles to

drive the firing system the next generation would be fully automatic. Simply pressing a trigger

caused the gun to spit out a rapid, continuous spray of bullets.

---

[5]     These were not, however, the first detachable magazines. Those appeared in a bolt-action
rifle known as the Lee-Metford, adopted by the British military in 1888, which used detachable
8-shot box magazines.

69.     These newer machine guns accomplished this task through somewhat different principles.  In each method, a by-product of the cartridge's explosion drove the mechanism of the gun.

70.     Perhaps the most lasting and revolutionary firearm of the late-nineteenth century was a machine gun developed by American, Hiram Maxim.  In the early 1880s, he began trying to develop an automatic firearm after reportedly being advised that the best way to get rich quick was to invent something to allow Europeans to kill each other more easily.

71.     When the propellant in a cartridge is ignited, the explosion does not travel exclusively down the barrel, but initially pushes outward in all different directions.  The metal barrel and the breechblock redirects much of this power to drive the bullet toward the muzzle.  Some of this energy travels in the opposite direction, however, shoving the gun backwards into the shoulder of the firer.  This recoil is an old but highly unwelcome feature of most firearms.

72.     In 1885, Maxim perfected a machine gun in which the firing action was driven by each shot's recoil.  The backward thrust of a shot pushed both the barrel and the breechblock slightly backward, opening the latter long enough to allow the empty cartridge to fling itself out of the gun.  Fresh ammunition was fixed and ready to be fed into the side of the breechblock by means of a cloth ammunition belt.  Besides throwing open the breechblock, the force of the Maxim Gun's initial shot also operated a mechanism that pulled the belt into the breechblock and lined up a fresh round.  After the first empty cartridge was flung clear, a recoil spring helped push the breechblock back in place, driving a second cartridge from the belt into the breech and firing it too.  This process repeated itself as long as the weapon's trigger was held down. The Maxim could fire at a rate of about 500-600 rounds per minute.

APP. 235

73.     As popular as recoil-operated Maxims became and would continue to be, a second machine gun using a different system of automation made an appearance at the close of the century.  Instead of relying on the simple recoil power of the shot, American inventor John Browning tapped into the expansion power of the gas created when the cartridge's propellant ignited.  The end result was the Colt Model 1895 Automatic Machine Gun.  Browning's gun provided a relatively low rate of fire, only about 400 rounds per minute, but was lighter and more portable than other machine guns.

74.     Most new successful firearms of the twentieth century would employ some variation or combination of these recoil and/or gas operation systems, or a combination of the two, known as a "blowback" system.

**Turn of The Twentieth Century: Semi-Automatic Pistols**

75.     The pistol continued to be an object of experimentation and a new class of handguns that could keep firing without being cocked after each shot was developed around the turn of the twentieth century.  Because the trigger still had to be pulled for every round fired, these new handguns were not considered fully automatic like a machine gun, but rather semi-automatic.

76.     In 1893, German inventor, Hugo Borchardt designed an innovative gun for the firm Ludwig Leowe that contained some of the key elements found in modern semiautomatic pistols.  In particular, the weapon had a clever detachable magazine system hidden in the pistol grip.  Up to 8 cartridges were stacked up with one on top of the other and pushed upwards into the breechblock by a spring, much like other magazine-fed rifles.  In this case, however, the shooter was relieved of the duty of rechambering each shot as required in a lever-action or bolt-action gunlock.  This job was instead performed by a heavy spring mechanism set in a

23

**APP. 236**

semicircular housing in the rear of the pistol behind the magazine. This was fixed to the bolt by a hinged arm or "toggle" designed to bend in an upward motion. The recoil from the first shot drove back the breech block, recocked the firing pin, and threw out the empty cartridge, all before the rear spring reasserted itself and pushed the bolt back forward. As it reclosed, it picked up a fresh cartridge from the magazine and drove it into the firing chamber. In many ways, the system was very similar to that used in the Maxim, except the shooter had to pull the trigger after each shot.

77. The Borchardt was a little delicate for field use and clumsy to handle. Still, it was successful enough to drive a flurry of competitors into designing similar guns, including a variant produced by the Mauser Company in 1896, and another model made by Leowe but designed by George Luger, which was officially named the "Parabellum," but famously came to be known as the "Luger." Luger kept the hinged toggle arm and the pistol-grip magazine of the Borchardt but changed most other elements of the gun. He also modified the pistol to use a slightly larger, 9mm, cartridge. The weapon was adopted by the German army in 1908.

78. In the late 1890s, John Browning began putting together his own prototypes for semi-automatic pistols. The guns used the detachable magazine system set in the pistol grip like the original Borchardt. But the main recoil spring was not behind the bolt but rather ran alongside the barrel. One of these designs, the Colt Model 1911, chambered for a large .45-caliber cartridge (larger than the 9mm), would remain the standard U.S. Army service pistol right into the 1980s. Most new semiautomatic pistols today, whether made by FN, Colt, Beretta, or Glock, use a firing action design not far removed from Browning's originals. (Magazine capacity, however, expanded drastically in the late twentieth and early twenty-first century with semi-automatic pistols now capable of holding fifteen cartridges or more in their magazines.)

### Twentieth Century: Submachine Guns

79.     Before and particularly throughout World War I, considerable efforts were made to produce a lighter, more portable, yet durable machine gun.  Fully automatic versions of both the Colt Model 1911 and Luger were experimented with, for example.  In the latter case, a special Luger pistol was designed for artillery personnel to use for close defense.  These were fitted with an 8-inch barrel, a carbine shoulder stock, and a special thirty-two-shot snail-shaped drum magazine that extended out below the handgrip.  This "artillery Luger" was not particularly effective when converted to fire in a fully automatic manner.  Like most machine guns, the recoil of one shot tended to spoil the aim of the next.  In a heavy, fixed weapon like the Maxim this was less of a problem, but the lightweight experimental Luger machine gun/pistol tended to spray bullets all over the place.  This phenomenon of "muzzle rise" has in fact been an ongoing challenge to designers of lightweight automatic weapons, one that has never been completely addressed.

80.     A more satisfactory firearm was developed in 1916, by a designer for the Theodor Bergmann Armament Company.  The gun cleverly used the same 9mm cartridge and snail magazine as did the artillery Luger.  It was also designed as a two-handed weapon from the ground up which allowed for better automatic-fire control.  The firearm was designated "Machine Pistol 18, I," when adopted by the German military in 1918, but came to be known simply as the "Bergmann."

81.     As with semiautomatic pistols, American designers were separately developing light machine guns around the same time.  During World War I, retired U.S. Army general John Thompson privately put together a team of engineers to develop a lightweight automatic weapon for use in the war.  He originally envisioned a larger caliber rifle, but when his designers advised

25

**APP. 238**

using pistol cartridges Thompson reportedly stated:  "Very well! We shall put aside the rifle for now and instead build a little machine gun.  A one-man, hand held machine gun.  A trench broom!"  Thompson subsequently coined the term "submachine" for his gun.

82.     Although the gun came to be widely manufactured by Colt in 1921, the US Army initially showed little interest in it.  Though it retailed for $200 in the 1920s, the new gun managed to find a civilian "niche market," as organizations of illegal alcohol dealers began using them in distribution disagreements with each other.  As a result, the "tommy gun" or "Chicago typewriter" made a big splash in the U.S. popular imagination.  Eventually the army adopted limited numbers of the gun as well.

83.     The Tommy gun differed from its continental cousins in a few notable respects.  Like the M1911, it used a larger, .45 caliber cartridge, rather than the 9mm preferred in Europe.  It was more rugged and dependable.  Nor did it use a single-piece carbine-like wooden stock, but instead had a metal frame with a separate wooden pistol grip and buttstock.  There was also a second pistol-type grip set closer to the muzzle for the shooter's other (non-trigger finger) hand.  The double pistol grips were intended to improve fire control.  Between these handholds, under the breech was a port that could accept several different magazines including fifty- and 100-round drum and twenty- and thirty-round straight box magazines.

84.     Experimentation continued with submachines guns for military use after and through World War II, resulting in many new and successful models.  Nevertheless, as successful as these compact automatic weapons had been, they would not predominate on the battlefield for long.  In spite of their television and cinema fame, in the second half of the century submachine guns like these were increasingly resigned to use by specialized military personnel, police, and more contemporary distributors of controlled substances.  Most regular line soldiers

**APP. 239**

were not issued guns like these. Despite popular images, even in World War II most soldiers were dragging around bolt-action rifles that were little changed from the late nineteenth century, largely because submachine guns used pistol ammunition, which lacked the long-range accuracy and hitting power offered by longer-barreled rifles with more powder-charge in their cartridges.

85.     The weapon causing the demise of both the long-range bolt-action rifle and the speedy submachine gun was the automatic or "assault" rifle that came to incorporate many of the best features of both.

### Conclusion

86.     What's next in the lifestory of the firearm? The American army is trying to revisit the ancient issue of accuracy in order to improve the firearm's potency. A variety of high-tech optical scopes with range-finders and other features have been experimented with toward this end. Some firms are seeking to increase a gun's power by including an option to fire explosive ammunition that does not even need to directly hit the enemy to inflict casualties.

87.     It seems unlikely, at present, that any groundbreaking designs will emerge. The idea of blasting a projectile down a tube may stay around for a while, but we will need a radically different chemical propellant or even *type* of reaction if the basic potential of the firearm is to be significantly changed. At the moment, it is hard to imagine the sudden appearance of anything dramatically futuristic like a ray gun, a phaser, or an explosive bolter. On the other hand, the flintlock system had remained predominate for well over a century before Forsyth created an entirely new ignition system while trying to weatherproof a simple duck-hunting gun. This kind of breakthrough made by a Forsyth, or a Vielle, or a Maxim has happened in the past and could occur again. A period of great firearms innovation must certainly have seemed less likely in 1800 than it did in 2000. Furthermore, the ancient imperatives of

**APP. 240**

accuracy, power, and rate of fire remain as compelling as ever.  As long as people retain their

desire to inflict harm at a distance, some version of the firearm will likely be around to perform

that notorious service.




Executed on <u>11/22/2022</u> at <u>Conway, Arkansas</u>

_____

ROGER PAULY

28

# EXHIBIT B

162   Glossary

**Smokeless powder.** These propellants were first developed in the nineteenth century based upon nitrocellulose. Technically speaking they do produce smoke, but not to the degree of older black powders.

**Smoothbore.** This can refer either to a barrel with no rifling or to a gun fitted with such a barrel.

**Snap-lock.** An early version of the flintlock firing mechanism. Like the flintlock, it too used the principle of flint striking steel to set off a powder charge.

**Stock.** The part of a firearm that is designed to be held and handled by the shooter. In more traditional firearms, the stock was often made from a single piece of wood, but in later weapons it might be composed of synthetic materials and be of a variety of designs. It often consists of a separate buttstock and fore stock.

**Submachine gun.** A two-handed firearm capable of automatic fire. Typically designed to use lower powered pistol ammunition. Sometimes called a machine pistol.

**Tiller.** The part of the crossbow that is grasped by the archer and that the bow is set perpendicular to. An important predecessor of the gunstock.

**Touchhole.** A hole drilled through the breech of the barrel through which an ignition travels in order to set off the main charge.

**Trajectory.** The path on which a bullet or other projectile travels through the air. Gun developers have typically tried to build weapons that fire with as "flat" or straight a trajectory as possible.

**Trigger.** The device on a firearm that ultimately causes it to discharge when pulled by a finger or otherwise engaged.

**Trigger guard.** A strip or band of metal that is fixed around the trigger in order to protect it from being damaged or accidentally pulled.

**Wheel lock.** An early modern ignition system that used a piece of flint set against a spinning metal wheel to set off a powder charge.

**Windage.** This refers to the difference between a projectile's diameter and the bore of a barrel. Expanding gases can slip through this gap past the bullet, similar to the co-viative principle. The term can also refer to the effect of wind on a projectile's trajectory.

# Bibliography

Albaugh, William, III, and Edward Simmons. *Confederate Arms.* Harrisburg, PA: Stackpole, 1957.

Anderson, Jervis. *Guns in American Life.* New York: Random House, 1984.

Armstrong, David. *Bullets and Bureaucrats: The Machine Gun and the United States Army, 1861–1916.* Westport, CT: Greenwood, 1982.

"Arquebuse and Matchlock Musket Page." http://www.geocities.com/Yosemite/Campground/8551/ (accessed February 21, 2004).

Aydon, David. *Gunpowder and Firearms in the Mameluk Kingdom: A Challenge to Medieval Society.* London: Valentine and Mitchell, 1956.

Barker, A. J., and John Walter. *Russian Infantry Weapons of World War II.* New York: Arco Publishing Company, 1971.

Batchelor, Peter, and Keith Krause. *2003 Small Arms Survey.* Oxford: Oxford University Press, 2003.

Black, Jeremy. *European Warfare, 1660–1815.* New Haven, CT: Yale University Press, 1994.

Blackmore, Howard. *Firearms.* London: Dutton Vista, 1964.

Boothroyd, Geoffrey. *The Handgun*, part 2. New York: Crown Publishers, 1970.

Bradley, Joseph. *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia.* De Kalb: Northern Illinois University Press, 1990.

Brophy, Williams S. *The Krag Rifle.* Highland Park, NJ: Gun Room Press, 1985.

Brown, M. L. *Firearms in Colonial America*. Washington, DC: Smithsonian Institution Press, 1980.

Butler, David. *United States Firearms: The First Century*. New York: Winchester Press, 1971.

"C93 Borchardt Accessories." http://www.landofborchardt.com/C93_acc.html# MA (accessed February 21, 2004).

Chapel, Charles. *Guns of the Old West*. New York: Coward-McCann, 1961.

Childs, George. *Warfare in the Seventeenth Century*. London: Cassell, 2001.

Chinn, George. *The Machine Gun: Design and Analysis of Automatic Firing Weapons Systems*, vol. 4. Washington, DC: U.S. Government Printing Office, 1956.

Crosby, Alfred. *The Columbian Exchange*. Westport, CT: Greenwood Press, 1972.

———. *Throwing Fire: Projectile Technology through History*. New York: Cambridge University Press, 2002.

Croxall, Ian. "Snider Rifle 1867." http://www.britishempire.co.uk/forces/army armaments/rifles/sniderhistory.htm (accessed February 21, 2004).

Davis, William. *The Fighting Men of the American Civil War*. New York: Smithmark, 1991.

Diamond, Jared. *Guns, Gems, and Steel*. New York: Norton, 1997.

Diaz, Bernal. *The Conquest of New Spain*. Translated by J. M. Cohen. Harmondsworth, UK: Penguin Books, 1963.

Doyon, Keith. "Military Rifles in the Age of Transition." http://militaryrifles. com/ (accessed February 21, 2004).

Dupuy, Trevor. *The Evolution of Weapons and Warfare*. Indianapolis, IN: Bobbs-Merrill, 1980.

Edwards, William. *Civil War Guns*. Harrisburg, PA: Stackpole, 1962.

———. *The Story of Colt's Revolver*. Harrisburg, PA: Stackpole, 1953.

Ellacott, S. E. *Guns*. New York: Roy Publishers, 1966.

Ellis, John. *Cavalry: The History of Mounted Warfare*. New York: G. P. Putnam's Sons, 1978.

———. *The Social History of the Machine Gun*. Baltimore: Johns Hopkins Press, 1986.

"Firearms: Muskets, Rifles and Carbines." http://www.researchpress.co.uk firearms/ firearms.htm (accessed February 21, 2004).

Freemantle, T. F. *Evolution of Guns and Rifles*. Washington, DC: Arkanss, 1965.

Fuller, Claud. *The Breechloader in Service 1816–1917: A History of All Standard and Experimental U.S. Breechloading and Magazine Shoulder Arms*. New Milford, CT: Flayderman and Company, 1965.

Given, Brian. *A Most Pernicious Thing: Gun Trading and Native Warfare in the Early Contact Period*. Ottawa: Carleton University Press, 1994.

Gluckman, Arcadi. *United States Muskets, Rifles, and Carbines*. Buffalo, NY: Otto Ulbrich Company, 1948.

Gorshkov, Nikolai. "Russian Producer Wins Kalashnikov Rights." *BBC News* world edition, June 2, 2001. http://news.bbc.co.uk/2/hi/europe/2021173.stm (accessed February 22, 2004).

Greener, W. W. *The Gun and Its Development*. New York: Bonanza Books, 1967.

"Gunpowder and Weapons of the Late Fifteenth Century." http://xenophongroup .com/montjoie/gp_wpns.htm (accessed February 21, 2004).

*Guns and Gunfighters*. New York: Bonanza Books, 1982.

"Guns of the Austrian Firm Steyr." http://trans.voila.fr/ano?anolg=6354& anourl=http%3A//users.skynet.be/HL-Editions/rodi/rodi1.htm (accessed February 21, 2004).

Hallahan, William. *Misfire: The History of How America's Small Arms Have Failed Our Military*. New York: Scribner's, 1994.

Hamilton, Douglas. *Cartridge Manufacture*. New York: Industrial Press, 1916.

"Handgonnes and Matchlocks: A Preliminary Essay in the History of Firearms to 1500." http://homepages.ihug.com.au/~disparter/handgonnes.htm (accessed February 21, 2004).

Hardy, Robert. *Longbow: A Social and Military History*. London: Bois d'Arc, 1992.

Hatch, Alden. *Remington Arms in American History*. New York: Rinehart and Company, 1956.

Haven, Charles, and Frank Belden. *A History of the Colt Revolver*. New York: Bonanza Books, 1940.

Headrick, Daniel. *The Tools of Empire: Technology and European Imperialism in the Nineteenth Century*. New York: Oxford University Press, 1981.

Held, Robert. *The Age of Firearms*. Northfield, IL: Gun Digest, 1970.

Hefner, William. *The Gun That Made the Twenties Roar*. London: MacMillan Company, 1969.

Hicks, James. *U.S. Firearms 1776–1956: Notes on Ordnance*, vol. 1. Beverly Hills, CA: Fadco Publishing Company, 1957.

———. *What the Citizen Should Know about Our Arms and Weapons*. New York: W. W. Norton, 1941.

Hobart, F.W.A., ed. *Jane's Infantry Weapons 1975*. London: Jane's Yearbooks, 1975.

Hogg, Ian. *The Story of the Gun*. New York: St. Martin's Press, 1996.

Hughes, B. P. *Firepower: Weapons Effectiveness on the Battlefield*. New York: Sarpedon, 1997.

Huntington, Roy. *Hall's Breechloaders*. York, PA: George Shumway, 1972.

Kaiser, Robert. "The Medieval English Longbow." *Journal of the Society of Archer-Antiquaries* 23 (1980). http://www.student.utwente.nl/~sagi/artikel/long bow/longbow.html (accessed February 22, 2004).

Keegan, John. *A History of Warfare*. New York: Vintage, 1994.

Keen, Maurice, ed. *Medieval Warfare: A History*. New York: Oxford University Press, 1999.

Kennedy, Paul. *The Rise and Fall of the Great Powers: Economic Change and Military Conflict from 1500 to 2000*. New York: Random House, 1987.

Lazenby, David. "Cannons: That Diabolic Instrument of War." 1999. http://www.middelaldercentret.dk/english/cannon2.htm#exemplarer (accessed February 21, 2004).

Lenk, Torsten. *The Flintlock: Its Origin and Development.* Translated by G. A. Urquart. Edited by J. F. Hayward. New York: Bramhall House, 1965.

Leseman, Jeff. "History and Development of the M1911/M1911A1 Pistol." http://www.sightm1911.com/lib/history/hist_dev.htm (accessed February 21, 2004).

Lugs, Jaroslav. *A History of Shooting.* Feltham, UK: Spring Books, 1968

"M16A2 5.56mm Semiautomatic Rifle." http://www.fas.org/man/dod-101/sys/land/m16.htm (accessed February 22, 2004).

Machianelli, Niccólo. *The Seven Books on the Art of War* 1520. Transcribed into HTML by Steven Thomas for the University of Adelaide Library, 2003. http://etext.library.adelaide.edu.au/m/m149A/ (accessed February 23, 2004).

"Machinepistole 18, 1." http://www.cruffler.com/historic-july00.html (accessed February 22, 2004).

Marcot, Roy. *Spencer Repeating Arms.* Irvine, CA: Northwood Heritage Press, 1983.

Martin, Paul. *Armour and Weapons.* London: Herbert Jenkins, 1967.

McNeil, William H. *The Pursuit of Power.* Chicago: University of Chicago Press, 1982.

Neal, W. Keith, and D.H.L. Back. *The Mantons: Gunmakers.* New York: Walker and Company, 1966.

Needham, Joseph. *Science and Civilization in China,* vol. 5. New York: Cambridge University Press, 1986.

Newman, James. *The Tools of War.* New York: Doubleday, Duran and Co., 1942.

North, Anthony, and Ian Hogg. *The Book of Guns and Gunsmiths.* London: Quarto, 1977.

O'Connor, Jack. *The Rifle Book.* New York: Alfred Knopf, 1964.

Owen, J.I.H., ed. *Brassey's Infantry Weapons of the World, 1950–1975.* New York: Bonanza, 1975.

Pacey, Arnold. *Technology in World Civilization.* Cambridge, MA: MIT Press, 1990.

Parker, Geoffry. *The Cambridge Illustrated History of Warfare.* New York: Cambridge University Press, 1995.

———. *The Military Revolution.* New York: Cambridge University Press, 1988.

Partington, J. R. *A History of Greek Fire and Gunpowder.* Baltimore, MD: Johns Hopkins University Press, 1999.

Perrin, Noel. *Giving up the Gun: Japan's Reversion to the Sword.* Boulder, CO: Shambhala, 1980.

Peterson, Harold. *Pageant of the Gun.* Garden City, NY: Doubleday, 1967.

Peterson, Harold, and Robert Elman. *The Great Guns.* New York: Grosset and Dunlap, 1971.

"Photogallery of World War 2, Vapenmenu." http://ww2photo.mimerswell.com/ (accessed February 22, 2004).

Pope, Dudley. *The Great Gunsmiths.* New York: Spring Books, 1969.

Poperker, Max. "Modern Firearms and Ammunition." http://world.guns.ru/main-e.htm (accessed February 21, 2004).

"Pyrotechnics, Explosives and Fireworks." http://www.everonsite.net/typro.html (accessed February 21, 2004).

Reid, William. *Arms through the Ages.* New York: Harper and Row, 1976.

———. *The Lore of Arms: A Concise History of Weapons.* New York: Facts on File, 1984.

"REME: The Corps of the Royal Electrical and Mechanical Engineers Museum of Technology Weapons Collection." http://www.rememuseum.org.uk/arms/armindex.htm (accessed February 21, 2004).

Ross, Steven. *From Flintlock to Rifle.* London: Associated University Press, 1979.

Ruffell, Wally. "The Gun: Rifled Ordnance." 1997. http://riv.co.nz/rnza/hist/gun/rifled1.htm (accessed January 28, 2004).

Russell, Carl. *Guns on the Early Frontiers.* Berkeley: University of California Press, 1957.

Shepard, G. A. *A History of War and Weapons, 1660 to 1918.* New York: Thomas Crowell, 1972.

"The Smith and Wesson Story." http://www.smith-wesson.com/custsupport/story.htm (accessed February 21, 2004).

Smith, Graham, ed. *Military Small Arms.* London: A Salamander Book, 1996.

Smith, Merritt Roe. *Harpers Ferry Armory and the New Technology: The Challenge of Change.* Ithaca, NY: Cornell University Press, 1977.

Sunnall, Al. "The Colt Model 1895 Automatic Machine Gun." http://www.spanamwar.com/Coltmachinegun.htm (accessed February 21, 2004).

Taller, Frank. *War and Society in Early Modern Europe.* New York: Routledge, 1992.

Taylor, Chuck. "The M-1 Garand." *SWAT Magazine* (November 1982). http://www.pattonlog.com/garand.html (accessed February 22, 2004).

Thornton, John. *Warfare in Atlantic Africa, 1500–1800.* London: UCL Press, 1999.

Trenk, Richard. "The Plevna Delay: Winchesters and Peabody-Martinis in the Russo-Turkish War." *Man at Arms Magazine* (August 1997). http://www.militaryrifles.com/Turkey/Plevna/ThePlevnaDelay.html (accessed February 21, 2004).

Wahl, Paul, and Donald Toppel. *The Gatling Gun.* New York: Arco Publishing Company, 1965.

Warder, Bill, and Jill Loux. "History of Armor and Weapons Relevant to Jamestown." 1995. http://www.nps.gov/colo/Jthanout/HisArmur.html (accessed February 21, 2004).

Wilkinson, Frederick. *Firearms.* London: Camden House Books, n.d.

———. *Flintlock Pistols: An Illustrated Reference Guide to Flintlock Pistols from the 17th to the 19th Century.* London: Arms and Armour Press, 1976.

Williamson, Harold. *Winchester: The Gun That Won the West.* Washington, DC: Combat Forces Press, 1952.

Young, Peter. *The Fighting Man: From Alexander the Great's Army to the Present Day.* New York: Rutledge Press, 1981.

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>     **Plaintiffs,**<br><br>     v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>     **Defendants.** | <br><br><br>**Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF BRIAN DELAY</u>

Pursuant to 28 U.S.C. § 1746, I, Brian DeLay, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Associate Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley.

3.      I have been retained by the Office of the Attorney General for the District of Columbia to render expert opinions in this case.  I have reviewed Plaintiffs' Complaint, and I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

4.      I received my B.A. from the University of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University.  My first book, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (Yale University Press, 2008), won best book prizes from several scholarly organizations.  Since 2010, I have been working on three interrelated projects about the historic arms trade: a monograph about the arms trade in the era of

**APP. 247**

American Revolutions (under contract with W.W. Norton and scheduled to be published in

2025); a second monograph about guns, freedom, and domination in the Americas from 1800-

1945 (also under contract with W.W. Norton); and a database tracking the global trade in arms

and ammunition between the end of the Napoleonic Wars and start of World War I.  These

projects are grounded in primary-source research in archives in the United States, England,

Spain, and Mexico.

5.      I have delivered around three dozen presentations on my arms trade research at

universities in the U.S. and abroad, including Harvard University, the University of Chicago,

Stanford University, Oxford University, Cambridge University, the University of Melbourne,

Doshisha University in Kyoto, Japan, and the Zentrum für Interdisziplinäre Forschung (ZIF), in

Bielefeld, Germany.  My research on the history of firearms has been supported by grants from

the American Philosophical Society, the British Academy, the American Council of Learned

Societies, and the Stanford Humanities Center, among other organizations.  In 2019, I was

awarded a Guggenheim fellowship.  A true and correct copy of my curriculum vitae is attached

as **Exhibit A** to this declaration.

## PURPOSE AND SUMMARY

6.      I have been asked to provide my understanding of the history of high-capacity

firearms in the United States, with an emphasis on the years surrounding 1791 and 1868.  For the

purposes of this declaration, I use high-capacity firearms to mean hand-held arms with a capacity

greater than ten rounds.  Below I explain: (a) that high-capacity firearms were merely

experimental and, consequently, vanishingly rare in 1791, and (b) that they accounted for less

than 0.2% of guns in the United States in 1868.

2

**APP. 248**

## OPINIONS

I.    **High-capacity firearms were still an experimental technology and, consequently, vanishingly rare in the United States when the Second Amendment was ratified.**

7.      In their Complaint, Plaintiffs state that "firearms with ammunition capacity in excess of 10 rounds date back to the 1500s." That is true. Inventive gunsmiths spent centuries working on firearms capable of shooting multiple rounds without reloading. Evidence for their efforts can be found in personal and public archives, in patent records, and, very occasionally, in actual weapons still preserved in museums and private collections today. But such weapons amounted to little more than experimental curiosities prior to the mid-nineteenth century. Most never advanced beyond proof of concept. Only a small minority of high-capacity inventions ever moved past the design or prototype stage, and fewer still resulted in military contracts or private market share—and even those enjoyed only the most modest and temporary successes before the 1860s.

8.      This centuries-long history of inventive failure has a context, one that ought to be borne in mind when evaluating claims about the historic regulation of firearms—or lack thereof. Europeans began engaging with gunpowder and its potential military applications in the thirteenth century. By then, European states had long been in competition with one another for military and economic advantage. As the design and efficacy of artillery, bombs, and handheld firearms improved, and as these improvements forced leaders to reconsider venerable military traditions, states began spending more and more on their militaries. Intensifying competition between sovereigns created powerful incentives for craftspeople and inventors to improve on existing military technology.[1]

---

[1]      Geoffrey Parker, *The Military Revolution: Military Innovation and the Rise of the West, 1500-1800*, 2nd ed. (Cambridge University Press, 1996).

**APP. 249**

9.      Sovereign competition fueled innovation.  Three of the most important

innovations in the seventeenth and eighteenth centuries were: (a) gradual improvements in

gunpowder corning, a process that made powder burn more evenly and enabled producers to

better modulate its power; (b) the substitution of the cumbersome matchlock ignition system for

the more reliable flintlock system in the late seventeenth century; and (c) the development of the

socket bayonet (also in the late seventeenth century), which, for the first time, enabled infantry to

act both as musketeers and pikemen.  All three breakthroughs had significant consequences for

the development and use of firearms around the world.  Still, most improvements to firearms

technology were incremental during the Renaissance and early modern era.  Meaningful

breakthroughs were very rare.

10.      Repeat fire was perhaps the most elusive of all hoped-for technological advances,

but not for lack of trying.  Potential solutions came into view long ago.  For example, a revolving

breech matchlock firearm was invented in Germany in the early sixteenth century.  A Scot took

the opposite approach a century later and built a gun with a single, fixed breech and fifty barrels

arrayed around an axis.  Yet another approach, the so-called superposed load or stacked charge,

relied on complex innovations in the design of locks and barrels so that a single gun could be

loaded with and successively fire multiple rounds.  Experimentation along these and other lines

continued in multiple countries for centuries.[2]

11.      Notwithstanding often brilliant work on these and other approaches, no high-

capacity firearm design worked well enough to enjoy anything close to widespread use before

the nineteenth century.  The ideas were simply too far ahead of their times.  To be durable,

---

[2]      M. L Brown, *Firearms in Colonial America: The Impact on History and Technology, 1492-1792* (Washington: Smithsonian Institution Press, 1980), 50 (Germany), 100 (Scotland), 104 (superposed).

4

reliable, and—crucially—affordable enough to catch on, models that featured moving breeches or rotating barrels required metallurgical techniques and a level of machine precision unknown until well into the nineteenth century.  And while the idea behind superposed loads prefigured some later firearms technologies, multiple powder charges in a single barrel always proved too dangerous and unreliable for real-world use.  Not until the nineteenth-century advent of percussion-cap ignition and metal-jacketed ammunition would repeating firearms become practical weapons worthy of mass production, widespread military adoption, and commercial popularity.  Neither the hustling arms inventors looking to make a fortune nor the military and political leaders looking for battlefield advantage knew that, of course.  Hope sprung eternal, on both sides.[3]

12.     That is why numerous historic designs for high-capacity firearms exist.  Consider Joseph G. Chambers of Pennsylvania, who believed he had a "Genius for the Diabolical Arts of making havoc of the human species."  Chambers wrote to Secretary of State Thomas Jefferson in 1792 with a musket design for a superposed load that, he claimed, could fire twenty rounds. [4] "Every nation desiring to possess the means of destroying the greatest number possible of their enemies," Jefferson responded enthusiastically and continued, "your discovery, if found effectual

---

[3]     For a summary of the basic technological hurdles and how they were finally overcome in the nineteenth century, see Joseph Bradley, *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia* (DeKalb, Ill.: Northern Illinois University Press, 1990), 12–19.

[4]     To Thomas Jefferson from Joseph G. Chambers, 13 August 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0274. [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John Catanzariti. Princeton: Princeton University Press, 1990, pp. 290–293.]

APP. 251

in experiment, will not want patronage anywhere."[5]  Put differently, if Chambers could deliver,

the inventor would become a very wealthy and influential man.  But, like so many who came

before (and after) him, Chambers was unable to convince Jefferson or others in the U.S.

government that his firearm was "effectual in experiment."[6]

13.     Plaintiffs contend in their Complaint that "firearms with ammunition capacity in

excess of 10 rounds have been available since well before the Second Amendment was adopted."

Again, it is true that they existed, and they were, in that sense, available before 1791.  By that

time, European workshops had developed various prototypes of such weapons, and a few of the

most successful of these prototypes enjoyed minor, experimental, and temporary adoption by

specialized units in a few European armies.  However, officials with the U.S. War Department,

U.S. merchants, and U.S. consumers would not have had experience with and reliable access to

such weapons before or around 1791.  Thus, if Plaintiffs intend to suggest that people in the

United States who wanted high-capacity firearms could get them "well before the Second

Amendment was adopted," or around that time, that is *not* true.

14.     Given the technical challenges afflicting repeat-fire gunpowder weapons, it stands

to reason that one of the only high-capacity weapons from the period that enjoyed even

experimental military use wasn't a true firearm, but rather an air-gun.  Using highly compressed

air as the propellant, rather than gunpowder, eliminated many of the problems that had long

---

[5]     From Thomas Jefferson to Joseph G. Chambers, 5 November 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0539. [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John Catanzariti. Princeton: Princeton University Press, 1990, p. 580.]

[6]     For Chambers's proposal in context, see Andrew Fagal, "The Promise of American Repeating Weapons, 1791-1821," published online at *Age of Revolutions,* Oct. 20, 2016, https://ageofrevolutions.com/2016/10/20/the-promise-of-american-repeating-weapons-1791-1821/, accessed Nov. 6, 2021.

**APP. 252**

bedeviled the quest for repeating arms.  It was a relatively simple enhancement to attach a fixed tubular magazine to the underside of the air-gun's barrel, and to feed balls into the chamber (using gravity), one-by-one with a lever.  The shooter could then fire as many rounds as the magazine would hold before needing to reload the fixed magazine.  Depending on the size and pressure of the compressed air reservoir, the shooter could empty the magazine more than once before needing to refill the propellant.

15.     The most impressive air-gun of the period was developed in Vienna by Bartholomäus Girandoni in the 1780s.  His multi-shot air-rifles saw service in the Austrian military.  Experts estimate that Girandoni produced around 1500 of these weapons.  Why so few?  Because in addition to being very expensive, difficult to repair, and onerous to prime (requiring 1500 strokes of a pump to achieve optimal pressure), the rifles were unreliable.  Like most of his contemporaries, Girandoni did not yet have the materials or tools necessary to build the critical components of his design durably and with precision.[7]

16.     These finicky limitations help explain why air-guns were exceedingly rare in eighteenth-century America.  Indeed, they were so rare that owners could charge people to see them.  Two months after the Second Amendment was ratified, a museum proprietor in New York named Gardiner Baker took out ads in the city's newspapers to promote his latest acquisition: "an air gun, made by a young man, a native of Rhode-Island."  According to its new owner, the gun would "do execution twenty times, without renewing the charge," suggesting that it was a

---

[7]     For background on the Girandoni Air Rifle, see the learned essay by Robert D. Beeman, "New Evidence on the Lewis and Clark Air Rifle – an "Assault Rifle" of 1803," http://www.beemans.net/lewis-assault-rifle.htm, accessed Nov. 7, 2022.  For the weapon's weak points (mainly its leather gaskets and inadequate threading connecting the butt-stock reservoir to the rest of the gun), see John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure, accessed Nov. 7, 2022.

single-shot weapon capable of firing twenty individually loaded rounds before needing to renew the compressed air supply.  Baker explained that he had purchased the gun "at a very considerable price, with a view eventually to make it the property of the American museum."  In order to recoup his investment, he announced that he would "exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence."[8]

17.     Meriwether Lewis brought a Girandoni Air Rifle on his famous expedition across the continent with William Clark.  He did so not because these guns had become common, but because they remained so uncommon.  Lewis hoped a weapon that would fire multiple times without powder, flash, smoke, or much noise, would impress Native Peoples.  It did.  He happily reported that it "excite[d] great astonishment," which is itself a testament to the weapon's novelty.[9]  But Indigenous people weren't the only ones fascinated with this exotic gun.  At the very outset of the expedition near Pittsburg, "some gentlemen" asked for a demonstration.  Lewis obliged, firing the air-gun seven times.  But when one of the men took hold of the weapon, he accidentally squeezed off an eighth shot that hit a woman forty yards away, in the head.  To his great relief, Lewis found the woman's "wound by no means mortal, or even dangerous."[10]  That the gun's eighth round inflicted only a minor wound at forty yards suggests it lost pressure rapidly and might not have actually been able to fire more than ten effective rounds (our criteria for a "high-capacity firearm").

---

[8]     "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792. A copy of this article is attached as Exhibit B.

[9]     April 18, 1806 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.jrn.1806-04-18#lc.jrn.1806-04-18.01, accessed Nov. 7, 2022.

[10]     August 30, 1803 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.mult.1803-08-30kloefkorn, accessed Nov. 7, 2022.

18.     Air-guns remained exotic curiosities elsewhere in the U.S. in the early nineteenth century.  Just a few months before Lewis and Clark set out, the museum in Connecticut's State House advertised an air-gun as one of its three prime attractions (the others being a wampum cloak and a sixteen-foot-long snake skin from South America).  In no sense were these weapons in common use at the time.[11]

19.     In sum, notwithstanding the great desire of states for military advantage, the great incentives that they held out for inventors who could deliver it, and the centuries of skillful effort that went into chasing those incentives, large-capacity firearms remained militarily and commercially irrelevant throughout the eighteenth and early nineteenth centuries.  I've spent the past twelve years studying the international arms trade in the Age of Revolutions (1763-1825).  I have never come across any evidence in primary sources that large-capacity firearms were anything other than exotic curios in this era.  Few alive at the time had ever laid eyes on one.  Single-shot muzzle-loading smoothbore muskets, rifles, and pistols remained the only handheld firearms that the vast majority of people ever owned, used, or encountered in the late-eighteenth and early-nineteenth centuries.

20.     In my judgement, that fact must be borne in mind when assessing the absence of laws restricting ammunition capacity at the time the Second Amendment was adopted.  It is always difficult for historians to explain why something *didn't* happen.  But in this case, the simplest and most obvious explanation for the absence of such regulations is that high-capacity firearms were too rare to attract regulatory attention in 1791.

---

[11]     "James Steward's advertisement "Museum," in *The Connecticut Courant*, April 27, 1803. A copy of this advertisement is attached as Exhibit C.

21.     An appropriate modern-day analogy might be personal jetpacks.  Much as high-capacity firearms did during the eighteenth-century, personal jetpacks have held appeal both for militaries and private consumers for more than a hundred years.  That appeal has generated competition in research and development.  But jetpacks remain an expensive and experimental curiosity to this day, because of stubborn technological, safety, and practical challenges, including cost.  A future historian (or jurist) discovering evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest, could conclude that the absence of public regulation reflected an ideological disposition against regulating jetpacks.  But the simpler and more accurate explanation would be that jetpacks remained too rare to attract regulatory attention in 2022.[12]

## II.    While more common in 1868 than they had been in 1791, high-capacity firearms still only accounted for less than 0.2% of firearms in the United States when the Fourteenth Amendment was ratified.

22.     Firearms technology underwent dramatic changes in the years between the ratifications of the Second and Fourteenth Amendments.  By 1868, most of the material and technical challenges that had long prevented high-capacity firearms from working well and being embraced by militaries and consumers had finally been solved.  Oliver Winchester's New Haven Arms Company developed the world's first reliable high-capacity firearm in 1860.  The "Henry," named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen

---

[12]     Anthony Quinn, "The Fall and Rise of Jetpacks," Aug. 16, 2022, Royal Aeronautical Society Website, https://www.aerosociety.com/news/the-fall-and-rise-of-jetpacks/#:~:text=The%20concept%20of%20a%20jetpack,never%20built%20or%20even%20prototyped, accessed Nov. 5, 2022

from an attached, tubular magazine).  Refinements to the Henry resulted in an even better gun:

the Winchester Model 1866.  While other gunmakers at the time produced iconic and successful

multi-fire weapons (most famously Colt revolvers and Spencer repeating rifles), none of the

viable alternatives fired more than ten rounds in the 1860s.  Practically speaking, then, to ask

how many high-capacity firearms were in circulation in the United States in 1868 is to ask how

many Henrys and 1866 Winchesters were in circulation in 1868.

      23.     Tom Hall, longtime curator of the Winchester Museum (now the Cody Firearms

Museum) researched production runs for Henrys and Model 1866s by year.  Combined, he

concluded that there were 74,000 of these guns produced between 1861 and 1871.[13]  Winchester

exported the large majority of them to foreign militaries.  The Ottoman Empire alone purchased

50,000 Model 1866s, and another 14,706 went to military purchasers in Europe, Latin America,

and Japan during these years.[14]  Based on Hall's production figures, that would have left only

9,294 high-capacity firearms for domestic consumption in the United States before 1872.  8,500

of those were Henrys purchased by or issued to Union soldiers during the Civil War.  These

figures suggest (a) that high-capacity firearms went almost exclusively to military buyers

through the early 1870s, and (b) that very few were in the hands of private persons who might

use them in ways that attracted regulatory attention.[15]

---

[13]     11k Henrys from 1861-March, 1863; 3k rifles with King's improvements, but without
company name, from April 1866-March 1867; and 60k M1866 between 1866-1871. Tom Hall to
D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms
Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[14]     Export numbers are drawn from Herbert G. Houze, *Winchester Repeating Arms
Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004),
21, 36–41, 51, 59, 65–66, 71, 73, 75.

[15]     For Henrys used in the Civil War, see Pamela Haag, *The Gunning of America: Business
and the Making of American Gun Culture* (New York: Basic Books, 2016), 81.

24.     The figures also tell us that even a few years after the ratification of the

Fourteenth Amendment, high-capacity firearms constituted a tiny percentage of firearms in the

United States.  How tiny?  Some numbers offer perspective.  In 1859, on the eve of the Civil

War, the U.S. Ordnance Department counted 610,262 shoulder arms in federal arsenals.

Combined, the arsenals of individual states likely contained hundreds of thousands more.

Domestic producers made 2.5-3 million firearms for the Union during the war, while Union

purchasing agents imported 1,165,000 European muskets and rifles.[16]  The Confederacy

imported several hundred-thousand firearms as well.  The scale of private gun ownership

involves more guesswork, though the U.S. may have had the most heavily armed civilian

population in the world in 1868.  All told, there were certainly more than five million firearms in

the U.S. when the Fourteenth Amendment was ratified—probably far more.  But even with the

implausibly low figure of five million, that would have meant that high-capacity firearms

constituted less than 0.2% of all firearms in the United States in the late 1860s and early 1870s.

25.     Like their competitors in the 1860s and 1870s, the Henry and the Winchester

Model 1866 had *fixed* magazines.  Detachable magazines were still decades away from practical

success, and would be produced for militaries long before they made their way into civilian

markets in meaningful quantities.  The first successful firearm with a detachable magazine was

developed by James Paris Lee in the 1880s.  Britain adopted a version of this weapon (the Lee-

Metford) as its standard service rifle in 1888.  In 1895, Britain replaced it with the Lee-Enfield,

which had been designed to accommodate new smokeless powder rounds.  Neither weapon

meets our criteria for a high-capacity firearm, however, because their detachable magazines held

---

[16]     Carl L Davis, *Arming the Union; Small Arms in the Civil War* (Port Washington, N.Y:
Kennikat Press, 1973), 39, 64, 106.

fewer than eleven rounds. Indeed, even as late as 1910, neither the United States Army nor any European army used high-capacity firearms as standard service weapons.[17]  To my knowledge, the first handheld firearm that both (a) had a detachable magazine holding more than ten rounds and (b) was commercially available to civilians in the United States was the Thompson submachine gun, introduced to the market in the 1920s.  This firearm was regulated by the U.S. government little more than a decade after its arrival, in the 1934 National Firearms Act.

26.     In sum, then, notwithstanding centuries of failed experimentation, high-capacity firearms only became practical battlefield or consumer items in the 1860s.  The arrival of these fixed-magazine weapons coincided with an unprecedented increase in firearms in the United States on account of the Civil War.  Once the war ended, the country was awash in guns, and virtually none of them were high-capacity firearms.  Consequently, it would take decades before high-capacity firearms enjoyed significant market share in the U.S., or became conspicuous tools for private violence and crime, or began to attract regulatory attention from state authorities.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on __11/22/2022_____

_____
BRIAN DELAY

---

[17]     In the ninth edition of his authoritative treatise *The Gun and its Development* (London: Cassell & Co., 1910), W.W. Greener compared the standard service arms of nineteen countries. Only four (Turkey, Switzerland, Great Britain, and Belgium) employed arms with detachable magazines.  See table on pp. 736-37.

**Exhibit B**



## To the CURIOUS.

AN AIR GUN, made by a young man, a native of Rhode-Island, but now resident in this city, and which has been purchased by the subscriber, at a very considerable price, with a view eventually to make it the property of the American Museum but wishes to reimburse himself in the following manner, viz.

He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six pence.

This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13. Maiden-lane, every day in the week, from ten to twelve o'clock in the forenoon, and from three to five in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum.

GARDINER BAKER,

February 11, 1792.      *Keeper of the Museum.*

Exhibit C

## MUSEUM.

JOSEPH STEWARD, respectfully informs the public that he still continues to make additions to his collection in the State House in Hartford. Among which are several entertaining paintings. One large historic painting containing fourteen figures.

Among the natural curiosities is the skin of a large snake, from South America, 16 feet in length.

A curious savage Priest's cloak, wrought with wampum and bells after their manner.

An air-gun, shot with great force by air instead of powder.

The attention of gentlemen sailing to foreign parts, is requested, to collect curiosities, and every attention of this kind will be gratefully received and suitably rewarded.

*Portrait Painting* performed by said Steward as usual, at the Museum, and every attention paid to render it agreeable.

Hartford, April 11th, 1803.                    94

# EXHIBIT H

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>　　**Plaintiffs,**<br><br>　　**v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>　　**Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

### DECLARATION OF ROBERT SPITZER

Pursuant to 28 U.S.C. § 1746, I, Robert Spitzer, declare and state as follows:

1.　　I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.　　I have been asked by the District of Columbia to render an opinion on the history of firearms restrictions enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices (such as the large-capacity magazines (LCMs) challenged in this case), and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

3.　　I have been retained by the District of Columbia to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

### BACKGROUND AND QUALIFICATIONS

4.　　I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for

**APP. 263**

thirty years, I earned my Ph.D. in Government from Cornell University.  I reside in

Williamsburg, Virginia.  A copy of my curriculum vitae is attached as Exhibit A to this

Declaration.

5.      I have been studying and writing about gun policy for over thirty years.  My first

publication on the subject appeared in 1985.  Since then, I have published six books and over one

hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun

laws, gun policy in American politics, and related historical, legal, political, and criminological

issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in

1995.  It examines firearms policy in the United States through the lenses of history, law,

politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge

Publishers.  My two most recent books on gun policy, *Guns Across America* (Oxford University

Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with

the study of historical gun laws.  I am frequently interviewed and quoted in the national and

international media on gun-related matters.  For over twenty years, I have been a member of the

National Rifle Association and of the Brady Campaign (formerly, the Brady Campaign to

Prevent Gun Violence).

6.      I have provided written testimony as an expert witness in *Worman v. Healey*, No.

1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts'

restrictions on assault weapons.  I have co-authored amicus briefs in numerous cases, including

*Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq

et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S.

Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh

**APP. 264**

Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme

Court, No. 08 CR 12069 (2012).

7.    I have also presented written testimony to the U.S. Congress on "The Second

Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee,

Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington,

D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to

the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights,

U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to

Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on

Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and

Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

## OPINIONS

### I.    Introduction

8.    The current controversy surrounding legislative efforts to restrict large capacity

magazines and semi-automatic assault weapons would seem to be a purely contemporary matter,

responding to the modern phenomenon of mass shootings.  The effort to restrict such weapons

was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when

a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.

Later that year, California enacted the first assault weapons ban in the country.  Five years later,

Congress enacted a limited ten-year ban that was also a response to a sharp spike in gun crime

and homicide in the late 1980s and early 1990s, driven in no small measure by the introduction

of more deadly firearms, as discussed later in this document.[1]  This recent governmental

---

[1]    Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25–26,
205–11.

**APP. 265**

response follows a pattern very similar to other examples discussed in this document from prior

decades and centuries.  As of this writing, eight states plus the District of Columbia have similar

bans in place.[2]  These jurisdictions represent approximately 89 million people, or approximately

26.8% of the U.S. population.[3]  Twelve states plus the District of Columbia restrict LCMs.[4]

These jurisdictions represent more than 103 million individuals, or approximately 31.2% of the

U.S. population.[5]  And in 2022, the U.S. House of Representatives passed a renewed nationwide

assault weapons ban with LCM restrictions.[6]

      9.      But these recent efforts to restrict assault weapons and LCMs are simply the latest

chapter in a centuries-long effort to protect the public from harm and to dampen weapons-related

---

[2]      Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14–15.  The nine American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  Notably, the U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware recently enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[3]      See U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates).  The total population in these jurisdictions is estimated to be 88,976,315 out of a U.S. total of 331,501,080.

[4]      Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The thirteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, New York, Rhode Island, Vermont, and Washington.  With two exceptions, all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law, and Hawaii's restrictions apply to only handguns.

[5]      U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates).  The total population in these jurisdictions is estimated to be 103,503,256 out of a U.S. total of 331,501,080.

[6]      H.R. 1808, 117th Cong. (2022).

**APP. 266**

criminality.  The pattern of criminal violence and concerns for public safety leading to weapons

restrictions is not new; in fact, it can be traced back to the Nation's beginnings.  While the

particular weapons technologies and public safety threats have changed over time, governmental

responses to the dangers posed by certain weapons have remained constant.  Current restrictions

on assault weapons and detachable ammunition magazines are historically grounded.  They are

part of a pattern in America's history of legislative restrictions on particular weapons stretching

back centuries.

## II      Regulatory History of Fully Automatic and Semi-Automatic Firearms (Early Twentieth Century)

10.     A clear example of this historical pattern is provided by early twentieth-century

restrictions related to fully automatic firearms.  While weapons capable of firing rounds in rapid

succession can be traced to guns of the late nineteenth and early twentieth centuries, like the

hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[7] it and

its successors were military weapons designed to be used in combat and fired from a tripod or

similar supporting apparatus, owing to the Gatling gun's size and weight.  Strictly speaking, guns

like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets

while depressing a gun trigger.  The development of a fully automatic machine gun for

battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger

pull, came to fruition during World War I, and to devastating effect, with tripod-mounted

---

[7]     The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

**APP. 267**

machine guns on the battlefield, like the Maxim, which initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[8]

11.    Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon:  the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I, it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[9]  The Tommy gun was initially unregulated after World War I and made available for civilian purchase, typically with either a 20–30 round stick magazine or a 100-round drum magazine.  (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[10])  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[11] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[12]  Before the early 1920s, these weapons were

---

[8]    Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[9]    Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[10]    John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149–52.

[11]    Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?"  *The National Interest,* July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[12]    Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203. William J. Helmer confirms the number of 3000 guns sold by

**APP. 268**

unregulated for the obvious reason that they did not exist or were not circulating widely in

society.  When they did begin to circulate, however, their uniquely destructive capabilities

rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of

the 1920s.  Another automatic weapon developed for World War I was the Browning Automatic

Rifle (BAR).  It fired a .30-06 caliber round, could receive a 20-round box magazine, and could

fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[13]  It, too,

made its way into civilian life and found favor among criminals and gangsters in the 1920s and

early 1930s.[14]  Guns like the Tommy gun and the BAR were actually used relatively infrequently

by criminals generally, but when they were used, they exacted a devastating toll and garnered

extensive national attention, such as their use in the infamous St. Valentine's Day massacre in

Chicago in 1929.[15]

### A.   State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

12.    In response to the wider availability of firearms like the Tommy gun and the

BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws; eight of these

laws were passed in 1927 alone (see Appendices 1 and 3).  These state (and eventual federal)

---

1925: *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 74.

[13]    Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[14]    Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[15]    Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

enactments were anticipated, justified, and promoted by the National Conference of

Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-

partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical

areas of state statutory law."[16]  (Today, the organization is known as the Uniform Law

Commission.)  In 1923, the Commission organized a special committee to draft a "Uniform Act

to Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law calling for the

prohibition of the possession of "any firearm which shoots more than twelve shots semi-

automatically without reloading."[17]  In 1930, it issued a model firearms act focusing on "guns of

the pistol type."  In 1932, it issued a model act "intended not only to curb the use of the machine

gun, but to make it unwise for any civilian to possess one of the objectionable type."  The

Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to

monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a

partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun

becoming most popular. . . ."[18]

13.     Congress enacted a machine gun ban for the District of Columbia in 1932 which

included as a machine gun "any firearm which shoots automatically or semiautomatically more

than twelve shots without reloading."[19]  The National Rifle Association endorsed D.C.'s ban,

---

[16]     Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[17]     Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[18]     "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[19]     "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[20]   In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation.  We are responsible for the uniform firearms act. . . . in the District of Columbia.  It is on the books now."[21]

14.      In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun.  The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities.  Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[22]  The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun could go through a 100-round drum magazine in four seconds.  Later versions fired 600 to 700 rounds per minute."[23]

15.      In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from
> State to State, has created a situation which is giving concern to all who are

---

[20]      S. Rep. No. 72-575, at 5–6 (1932).

[21]      "Hearings Before the Committee on Ways and Means," 36.

[22]      48 Stat. 1236.

[23]      Moss, "From Gangland to the Battlefield."

interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[24]

16.    To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns this way: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[25]  The final version of the bill limited restrictions to fully automatic firearms.  Contemporary assault weapons that fire semi-automatically, like AR-platform rifles, were excluded from the National Firearms Act.

17.    In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as eleven states, enacted laws restricting semi-automatic weapons (see Appendix 1).[26]  The reason for restricting semi-automatic firearms is not hard to discern.  With the exception of the District of Columbia's restrictions on semi-automatic weapons, these restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology:  an action that automatically loads a new round into the

---

[24]    "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that appears on page 1 of the Hearings had this definition of machine gun:  "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

[25]    Ibid., 52.

[26]    *See also* Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68–71.  The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[27]

18.    As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, regulatory efforts proliferated.

### B.    State Regulation of Ammunition Feeding Devices

19.    Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.  As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

20.    Magazine firing limits were imposed in three categories of state laws (see Table 1 below):  twelve states plus the District of Columbia regulating semi-automatic and fully

---

[27]    Spitzer, *The Gun Dilemma*, 32–33.  In 1913, Florida enacted this measure:  "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns."  While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

automatic weapons (California, District of Columbia, Louisiana, Massachusetts, Michigan,

Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Carolina, South Dakota, and

Virginia);[28] nine states regulated fully automatic weapons only, where the regulation was defined

by the number of rounds that could be fired without reloading or by the ability to receive

ammunition feeding devices (Illinois, Minnesota, New Jersey, North Dakota, Oregon,

Pennsylvania, Texas, Vermont, and Wisconsin);[29] and four states restricted all guns that could

receive any type of ammo feeding mechanism or round feeding device and fire them

continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington

State).[30]

---

[28]     1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading."  1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917.  1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[29]     1931 Ill. Laws 452–53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1–2; 1927 N.J. Laws 180–81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1–2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1–2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; 1933 Tex. Gen. Laws 219–20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1–4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[30]     1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917–1934[31]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Louisiana (8 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Carolina (8 rounds; 1934)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

*See* Appendix 3 for statutory text.

21.    A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber *in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.*[32]

---

[31]    Including the District of Columbia.  Note that California, Minnesota, and New Jersey appear twice in this table.  The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934.  See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

[32]    1927 Cal. Stat. 938 (emphasis added).

22.     The other three states in this category (Hawaii, Missouri, Washington)[33] utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).  Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality—as these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.[34]

### C.     Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices in the Early Twentieth Century

23.     The lesson from this sequence of events early in the twentieth century demonstrates that changes in gun policy followed a series of steps that respond to developments in firearms technologies and their use in crime, each dependent on the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point.  *Third*, it may then be developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  New gun laws are not enacted when firearm technologies are invented or conceived.  They are enacted when those technologies

---

[33]     1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[34]     U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

24.    This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.  For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[35]  Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[36]  Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[37]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[38]

---

[35]    David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 851 (2014–2015).

[36]    Ibid., 852–54.

[37]    Ibid., 849.

[38]    Ibid., 871–72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century").

25.     Kopel's and similar arguments[39] fail for two sets of reasons.  First, as explained in the following section, this sort of narrative misrepresents the availability and capabilities of these early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[40]  The firearms and firearm feeding devices regulated in the early twentieth century represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

**III**.     **The History of Pre-Twentieth Century Firearms Technologies**

26.     As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  Kopel's example of a firearm from the late 1500s that could fire up to sixteen rounds is drawn from a book titled, *Firearms Curiosa*.  But this book's very title indicates why this narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is rare or unusual.  As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[41]  That is, they were anything but common, ordinary, or

---

[39]     Declaration of Ashley Hlebinsky in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, Southern District of California, filed September 27, 2019.

[40]     Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3–4.

[41]     Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

found in general circulation.  Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[42]  A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[43]  In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited.  Winant concludes:  "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[44]

27.     An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the early twentieth century or modern era).  The patent drawing of this weapon shows it sitting on a tripod on the ground.[45]  It was not a hand-held weapon.  In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[46]  It was indeed a military weapon, as Winant says:  "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun.  It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated

---

[42]     Ibid., 168.

[43]     Ibid., 166.

[44]     Ibid., 166.

[45]     Ibid., 220.

[46]     Ibid., 219.

machine guns." Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[47] A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[48] although there are claims to the contrary. A contemporaneous poet, commenting on 'Puckle's Machine Company,' wrote 'Fear not, my friends, this terrible machine. They're only wounded who have shares therein.'"[49] This weapon "never advanced beyond the prototype stage."[50]

28.      In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense. As this account confirms, it was likely never even manufactured beyond perhaps a prototype or two. It was a failed effort, even though later gun inventors learned from its failure.

29.      Kopel also cites the example of the Jennings multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading.[51] Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[52] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some

---

[47]      Ibid., 219-20.

[48]      Ellis, *The Social History of the Machine Gun,* 13.

[49]      Winant, *Firearms Curiosa*, 219–21. See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[50]      Rasenberger, *Revolver*, 3.

[51]      Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[52]      Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

**APP. 280**

practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[53]

30.     Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed for crack shots in the Austrian army that was capable of firing up to 20 rounds.  One of these was taken along on the Lewis and Clark expedition of 1804–1806.[54]  But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than about 1,500.[55]  In fact, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use.  To wit:  "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers, but this negated one of the key features—mobility.  The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon.  The reservoirs

[53]     Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[54]     David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.  The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered.  Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed.  See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[55]     Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

APP. 281

were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[56]  It was pulled from military service by 1815.[57]

31.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[58]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[59]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[60] dubbed "radical defects" by Winchester himself.[61]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[62]

32.     Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle . . . generally attributed to be the first semi-automatic rifle."[63]  Yet this "development" was initially a

---

[56]     John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[57]     Markowitz, "The Girandoni Air Rifle."

[58]     Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6.

[59]     Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51–52.

[60]     "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[61]     Quoted in Haag, *The Gunning of America,* 56.

[62]     Haag, *The Gunning of America*, 60.

[63]     Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8.

failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[64]  The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[65]

33.     The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason:  pepperboxes were "heavy, lumpy, and impractical."[66]  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[67]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[68]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[69] although it took decades for this and similar revolvers to catch on.

34.     Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in

---

[64]     Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[65]     Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom*, July 2022, 32–39.

[66]     Rasenberger, *Revolver*, 54.

[67]     Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[68]     Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms*, 32.

[69]     Rasenberger, *Revolver*, 401.

APP. 283

the Civil War.[70]  Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[71]

35.     As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[72]  Even then, Colt did not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public.  The government, in fact, dismissed such firearms as mere "novelties."[73]  After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[74]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s. The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[75]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a

---

[70]     Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112–13.

[71]     Snow and Drew, *From Lexington to Desert Storm*, 90.  As Civil War historian James M. McPherson noted, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war." *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

[72]     Rasenberger, *Revolver*, 3-5, 401.

[73]     Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[74]     Rasenberger, *Revolver*, 136.

[75]     Ibid., 390.

**APP. 284**

single shot pistol."[76]  It took the Colt's use during the Civil War to finally spur the post-Civil

War proliferation of the Colt-type revolver and similar firearms into society.[77]

36.     While inventor Benjamin Henry claims credit for developing the first practical,

lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the

Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the

way for Winchester's dominance.[78]  The Winchester rifle could fire up to fifteen rounds without

reloading.  Yet the widely known Winchester 1873, "was designed for sale to the Government as

a military arm."[79]  A gun whose legendary status wildly outdistanced its actual production and

impact, it was nevertheless an important firearm in the late nineteenth century, although this

"quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity

biography backdated its diffusion and even its popularity."[80]  In fact, the slogan stating that the

Winchester "won the West" was invented by a Winchester executive as a marketing ploy in

1919.[81]  Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action

rifle that required the shooter to manipulate a lever in a forward-and-back motion before each

shot.  And when the gun was emptied, it had to be manually reloaded, one round at a time.[82]  The

Winchester Model 1905, then called a "self-loading" rifle, was a true semi-automatic firearm.  It

could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000

---

[76]     Kennett and Anderson, *The Gun in America*, 91.

[77]     Haag, *The Gunning of America,* 34–37, 46–64.  As Haag said, "the Civil War saved" the gun industrialists (65).

[78]     Haag, *The Gunning of America*, 96.

[79]     Koller, *The Fireside Book of Guns*, 112.

[80]     Haag, *The Gunning of America,* 179.

[81]     Ibid., 353.

[82]     Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

23

of the guns were made.  Even in World War I, soldiers primarily used bolt-action one-shot rifles that could fire about twelve rounds per minute.[83]

37.     With all this, the Winchester was by no means universally embraced by long gun users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[84]  According to A.C. Gould, writing in 1892, single-shot rifles were:  "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[85]

38.     The rise in the circulation of multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions (see Appendices 1-4), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[86]  By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[87]  It was only in the post-World War I era when

---

[83]     Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[84]     Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[85]     Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.

[86]     Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218–19.

[87]     Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63–67.

multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

39.     As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold:  they misrepresent the actual past of the weapons cited and, even more importantly, fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

40.     First, a new gun or gun technology is invented.  Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution, and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[88]  And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[89]  Third, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.  Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[90]  Fourth, some military-designed weapons may then spill over into, or be

---

[88]     Winant, *Firearms Curiosa*, 36.

[89]     Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[90]     Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs.  These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War.  Knives and clubs are far simpler technologically compared to firearms

25

adapted to, civilian markets and use.  Fifth, if such weapons then circulate sufficiently to pose a

public safety or criminological problem or threat, calls for government regulation or restriction

then may lead to gun policy/law changes.  This general sequence is echoed in works like the

*Buyer's Guide to Assault Weapons.*[91]

  41. Again, to simply assert or assume that past firearms design/development,

invention, or patenting equals commonality, viability, or a measurable presence or impact on

society, is a leap in logic without historical foundation.  It would be as logical to reject modern

governmental regulation of electric power through such government agencies as state power

commissions and the Federal Energy Regulatory Commission because no such regulation was

enacted around the time of Benjamin Franklin's experiments with electricity in the mid-

eighteenth century.  The fact that inventors worked on new firearm designs and modifications

tells us nothing about the *consequences* of such designs for society and public policy.  And the

existence of such designs does not equal general availability, much less societal circulation and

use of these weapons.  Other weapons subject to government restriction in our history further

illustrate these principles.

## IV. Historical Hardware Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns in the Eighteenth and Nineteenth Centuries

  42. Similar to government regulation of certain types of firearms and ammunition

feeding devices in the early twentieth century, which occurred only after the weapons

technologies matured, entered the civilian market, and threatened the public through criminal

---

(and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[91] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4–7.

use, government regulation of other weapons typically followed a version of this trajectory around the time of the ratification of the Fourteenth Amendment in the 1860s and even earlier.

### A.   Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives

43.   The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[92]  Bowie died at the Alamo in 1836.

44.   The "Bowie knife" rapidly became known in the 1830s for the distinctive type of long-bladed single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named.  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo), and the knife's distinctive features, encouraged its proliferation,[93] referred to by one historian as "the craze for the knives."[94]  As was true of other knives with long, thin blades,[95] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[96]  Indeed, such

---

[92]   "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77).

[93]   Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[94]   Davis, *Three Roads to the Alamo*, 583.

[95]   Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[96]   Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

knives were known as "fighting knives"[97] that were "intended for combat."[98]  In the early

nineteenth century "guns and knives accounted for a growing share of the known weapons that

whites used to kill whites."[99]  In 1834, for example, a grand jury in Jasper County, Georgia

deplored

> the practice which is common amongst us with the young the middle aged and the
> aged to arm themselves with Pistols, dirks knives sticks & spears under the
> specious pretence of protecting themselves against insult, when in fact being so
> armed they frequently insult others with impunity, or if resistance is made the
> pistol dirk or club is immediately resorted to, hence we so often hear of the
> stabbing shooting & murdering so many of our citizens.[100]

45.    Homicide rates increased in the South in the early nineteenth century, as did laws

restricting concealed weapons carrying.  Dueling also persisted during this time, even as the

practice was widely deplored by religious and other groups, in newspapers, by anti-dueling

societies and political leaders.[101]  Bowie knife expert Norm Flayderman provides abundant and

prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of

contemporaneous newspaper and other accounts, and providing references to literally hundreds

of additional articles and accounts attesting to the widespread use of Bowie knives in fights,

duels, brawls and other criminal activities.[102]  Flayderman concludes that, as early as 1836,

"most of the American public was well aware of the Bowie knife."[103]  (Very much like

---

[97]     Roth, *American Homicide*, 218.

[98]     Flayderman, *The Bowie Knife*, 59.

[99]     Roth, *American Homicide*, 218.

[100]    Quoted in Roth, *American Homicide*, 218–19.

[101]    Baugh, *Rendezvous at the Alamo*, 51.

[102]    Flayderman, *The Bowie Knife*, 25–64; 495–502.

[103]    Ibid., 43.

contemporary assault weapons,[104] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[105])  All this led to widespread enactment of laws prohibiting dueling in the states.[106]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[107]  Both pistols and knives were prominently used in such affairs.[108]

46.     In the 1840 case of *Aymette v. State*—a decision cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008)—the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[109]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private

---

[104]     Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[105]     Flayderman, *The Bowie Knife*, 46.

[106]     A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[107]     H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[108]     Roth, *American Homicide*, 180–83, 210–17.

[109]     *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

broils, and which are efficient only in the hands of the robber and the assassin."[110]  The court

continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons

dangerous to the peace and safety of the citizens. . . ."[111]  Further, the court added that the state

law existed "to preserve the public peace, and protect our citizens from the terror which a wanton

and unusual exhibition of arms might produce, or their lives from being endangered by

desperadoes with concealed arms. . . ."[112]

47.     The ubiquity of the concern about the criminological consequences of carrying

Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws

barring or restricting these weapons.[113]  In the 1830s, at least six states enacted laws barring the

carrying of Bowie knives by name.[114]  From then to the start of the twentieth century, every state

plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie

knives:  a total of at least 42 states (including the District of Columbia) barred or restricted

Bowie knives by name; and another 8 states enacted laws barring the category or type of knife

embodied by the Bowie knife but without mentioning them by name (see Appendices 2 and 4)

totaling 49 states plus the District of Columbia.[115]  Several states banned the possession of

Bowie knives outright, and others imposed taxes on the ability for individuals to acquire or

---

[110]    Ibid., 156.

[111]    Ibid., 157.

[112]    Ibid.

[113]    The near-immediate effort in the states to restrict Bowie knives was noted, for example,
in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[114]    A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels
that would have included the Bowie knife in an 1836 law.  See Appendix 4.

[115]    Initial bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 10 states;
1860s: 13 states; 1870s: 18 states; 1880s: 20 states; 1890s: 19 states; 1900s: 12 states.  See
Appendices 2 and 4.

possess them.  *See* Appendix 4.  The desirability and utility of concealed-carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

### B.   Historical Restrictions on Clubs and Other Blunt Weapons

48.   Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons.  See Appendices 2 and 4.  Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[116]  As the table in Appendix 2 shows, at least six distinct types of clubs and blunt objects were regulated in the United States.  Notably, every state in the nation had laws restricting one or more types of clubs.  According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[117]  Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[118]  They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[119]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[120]  These club-type blunt objects compose a family of objects

---

[116]   E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[117]   Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.

[118]   Ibid., 2.

[119]   Ibid.

[120]   Ibid.

used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[121]

49.     Among the six types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[122]  The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

50.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[123] usually made of wood, plastic, or metal,[124] that is traditionally carried by police, often called a nightstick or baton.[125]  As noted similarly in *Fouts v. Bonta*, "[a]lthough the word 'baton' is not included in the statutory language, it has long been held that the statute encompasses a variety of bludgeoning instruments."[126]  Blunt object expert Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police

---

[121]     Ibid., 1.

[122]     https://www.merriam-webster.com/dictionary/bludgeon.

[123]     Some versions were made to have some flexibility to increase their striking power.  See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[124]     https://www.merriam-webster.com/dictionary/billy%20club.  Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118.  One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[125]     Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.

[126]     *Fouts v. Bonta,* 561 F.Supp.3d 941, 944 (2021).

32

armed with batons,"[127] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[128] followed by a New York law in 1866.[129]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

51.     At least 14 states barred the carrying of "clubs" more generically, without specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

52.     Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[130] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[131]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to

---

[127]     Escobar, *Saps, Blackjacks and Slungshots,* 105.

[128]     C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[129]     Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

[130]     Escobar, *Saps, Blackjacks and Slungshots*, 228.

[131]     See https://www.merriam-webster.com/dictionary/slungshot.  Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions. The use as a criminal weapon continued at least up until the early 1920s."[132]  Robert Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[133]

53.     In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[134]

54.     These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

55.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-

---

[132]     "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[133]     Escobar, *Saps, Blackjacks and Slungshots*, 86.

[134]     Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[135] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacted such laws—7 in the 1800s and 7 in the early 1900s.  Only 4 states did not have any prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[136]

### C.   Historical Restrictions on Pistol Carrying

56.    Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."  Massachusetts followed in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, 43 states joined the list; 3 more did so in the early 1900s (see Appendix 1).  The eighteenth-century laws generally restricted more general carrying of firearms, usually if done in crowded places, or in groups of armed people.

---

[135]    https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22.  Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[136]    Up to 2010, New Hampshire had this law on the books:  "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

The laws of the nineteenth century forward generally restricted concealed weapons carrying. Among the earliest laws criminalizing the carrying of concealed weapons was that of Louisiana in 1813. Concealed carry laws normally targeted pistols as well as the types of knives and various types of clubs discussed here (*see* Appendix 4 for text of most such laws).

### D.    Historical Restrictions on Trap Guns

57.    Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present. Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire when tripped.[137] This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[138]

58.    Also sometimes referred to as "infernal machines,"[139] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders. Unlike the other weapons restrictions examined here, opinion was more divided on the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it

---

[137]    See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[138]    1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

[139]    E.g. 1901 Utah Laws 97–98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1–3.

coming,[140] though the weight of opinion seemed mostly against such devices.[141]  Those who set

gun traps typically did so to defend their places of business, properties, or possessions.  This

1870 newspaper account from an incident in New York City provides an example where a

burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted:  "As there is a

statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino."  After the verdict the man continued to be held under

$2,000 bail.[142]

59.     Inevitably, however, the traps wound up hurting or killing innocents, even

including the person who set the trap.  For example, this 1891 newspaper account from

Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50

under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but

his wife was the first person to visit the crib and on opening the door was shot dead."[143]

60.     In all, at least 16 states had anti-trap gun laws (see Appendices 1 and 5).  The

earliest such law encountered was the 1771 New Jersey law (above).  Nine laws were enacted in

---

[140]     For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870:  "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

[141]     This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[142]     "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Appendix 6.

[143]     "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk. See Appendix 6.

**APP. 299**

the 1700s–1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

## V.    **Recent Developments**

61.    A profound change in firepower occurred in the U.S. in the 1980s, when semi-automatic handguns, and a new generation of more expensive and more deadly guns, entered the criminal market.[144]  According to criminologists Alfred Blumstein and Richard Rosenfeld, writing in the 1990s about the period from 1985-1993 and the dramatic rise in gun crime and homicides during that period, "[o]ver the last decade the weapons involved in settling juveniles' disputes have changed dramatically from fists or knives to handguns, with their much greater lethality."[145]  More specifically, Blumstein attributed this deadly crime spike in the 1980s to "the advent of crack cocaine, semiautomatic handguns and gangs" which "sparked the surge in killings by teen-agers."[146]  Blumstein noted that "[b]eginning in 1985, there was steady growth in the use of guns by juveniles in committing murder, leading to a doubling in the number of juvenile murders committed with guns, with no shift in the number of non-gun homicides."[147]

---

[144]    The prevailing crime handguns of the 1970s and early 1980s were so-called "Saturday night specials," cheap, smaller caliber, short-barreled, easily concealable revolvers that accounted for much gun crime. "Hot Guns," *Frontline,* PBS, aired June 3, 1997, https://www.pbs.org/wgbh/pages/frontline/shows/guns/etc/script.html; also Interview with Garen Wintemute, "Hot Guns," PBS, https://www.pbs.org/wgbh/pages/frontline/shows/guns/interviews/wintemute.html.

[145]    Alfred Blumstein and Richard Rosenfeld, "Explaining Recent Trends in U.S. Homicide Rates," *Journal of Criminal Law and Criminology* 4 (Summer 1998): 1191, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6976&context=jclc.

[146]    Fox Butterfield, "Guns Blamed for Rise in Homicides by Youths in 80's," *New York Times,* December 10, 1998, https://www.nytimes.com/1998/12/10/us/guns-blamed-for-rise-in-homicides-by-youths-in-80-s.html.

[147]    Alfred Blumstein, "Violence by Young People: Why the Deadly Nexus?" *National Institute of Justice Journal,* August 1995, 5, https://www.ojp.gov/pdffiles/nijj_229.pdf

These "young people are less likely to exercise the restraint necessary to handle dangerous weapons, particularly rapid-fire assault weapons."[148]

62.    This shift to greater firepower is consistent with the fact that "from 1973 to 1993, the types of handguns most frequently produced" were "pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993."[149]  Pistols "generally contain cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered"[150] whereas a revolver is defined as a "handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges. . . ."[151]

63.    In testimony before Congress on what became the assault weapons ban of 1994, law enforcement representatives discussed the rise in criminal firepower they witnessed in the 1980s.  For example, the executive vice president of the National Association of Police Organizations, Tony Loizzo, offered this testimony:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased. . . dramatically. . . . The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[152]

---

[148]    Blumstein, "Violence by Young People," 5.

[149]    Marianne W. Zawitz, "Guns Used in Crime," *Bureau of Justice Statistics,* July 1995, 3, https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[150]    Zawitz, "Guns Used in Crime," 2.

[151]    Zawitz, "Guns Used in Crime," 2.

[152]    H.R. Rep. No. 103-489, at 32 (1994).

**APP. 301**

64.     John Pitta, executive vice president of the Federal Law Enforcement Officers Association testified similarly with respect to the 1994 bill: "[t]he TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals.  Cities across the country confiscate more TEC–9s than any other assault pistol."[153]  The ultimate result was congressional enactment of a ten-year restriction on assault weapons and also on ammunition magazines capable of holding more than ten rounds.[154]

## CONCLUSION

65.     Contemporary restrictions among the States pertaining to large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.  Gun ownership is as old as the country.  But so are gun and other dangerous weapons laws, which have adapted to changes in threats to public safety.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on  Nov. 22, 2022                    *Robert J. Spitzer*
                                              ROBERT SPITZER

---

[153]    H.R. Rep. No. 103-489, at 32 (1994).

[154]    Spitzer, *The Politics of Gun Control*, 205–11.

# APPENDIX 1

## FIREARM HARDWARE RESTRICTIONS TABLE
### (YEARS OF ENACTMENT)[1]

| STATE[2] | TRAP GUNS[3] | CONCEALED CARRY[4] | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | | | |
| Alaska | | 1896 | | | |
| Arizona | | 1889 | | | |
| Arkansas | | 1820,1837 | | | |
| California | | 1850, 1864 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | |
| Connecticut | | 1890, 1923 | | | |
| Delaware | | 1852 | 1931 | | |
| District of Columbia | | 1857, 1871 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1913[5], 1933 | | |
| Georgia | | 1837 | | | |
| Hawaii | | 1913 | 1933 | | 1933 |
| Idaho | | 1909 | | | |

[1] Further research may yield additional laws regulating firearm hardware.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

[3] Sometimes trap guns were also referred to as "infernal machines."

[4] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[5] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

| Illinois | | 1881 | 1931 | 1931[†] | 1931 |
|---|---|---|---|---|---|
| Indiana | | 1820 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | 1927 | | |
| Kansas | | 1901 | 1933 | | |
| Kentucky | | 1812, 1813 | | | |
| Louisiana | | 1813 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | |
| Maryland | 1910 | 1872 | 1927 | | |
| Massachusetts | | 1751 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | 1933 | 1933 | 1933 |
| Mississippi | | 1878 | | | |
| Missouri | 1891[6] | 1873 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | |
| Nebraska | | 1881 | 1929 | | |
| Nevada | | 1881, 1925 | | | |
| New Hampshire | 1915 | | | | |
| New Jersey | 1771 | 1686 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | |
| New York | 1870[7] | 1891 | 1931, 1933 | | |

---

[6] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

[7] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured

**APP. 304**

| | | | | |
|---|---|---|---|---|
| North Carolina | | 1792 | | | 1917 |
| North Dakota | 1891, 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | | | |
| Oregon | 1925 | 1853 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | | | |
| Texas | | 1870 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | | | |
| Vermont | 1884, 1912 | 1895, 1897 | 1923 | | 1923 |
| Virginia | | 1794, 1838 | 1934 | 1934 | 1934 |
| Washington | 1909 | 1881 | 1933 | | 1933 |
| West Virginia | | 1870 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1933 | | |
| Total Laws | 16 | 50 | 31 | 8–11 | 23 |

SOURCE:  Duke Law, Duke Center for Firearms Law, Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository/search-the-repository/

[†]Ambiguous law that could apply to semi-automatic in addition to automatic firearms.

---

Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

## APPENDIX 2

## DANGEROUS WEAPONS RESTRICTIONS
## (YEARS OF ENACTMENT)[1]

| STATE[2] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | 1797 | | | | 1852 | |
| District of Columbia | 1871 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,[†]1838 ,1847,1868 ,1893[†] | | 1888 | | 1868, 1888 | | 1887 | |

[1] Further research may yield additional laws regulating dangerous weapons.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

**APP. 306**

| State | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864[†]1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884[†] | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836[†] | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

2

**APP. 307**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852†1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

3

**APP. 308**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1895[†] | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 128 | 25 | 44 | 17 | 79 | 21 | 64 | 24 |

SOURCE:   https://firearmslaw.duke.edu/repository/search-the-repository/

[†] States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

**APP. 309**

# APPENDIX 3

## MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

### CALIFORNIA:

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

**DELAWARE:**

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

**DISTRICT OF COLUMBIA:**

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

**APP. 311**

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

**APP. 314**

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,

machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

**APP. 315**

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## FLORIDA:

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

**APP. 316**

## HAWAII:

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.

Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. ""Person" as used in this Act includes

8

**APP. 317**

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

**APP. 318**

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

## INDIANA:

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

**APP. 319**

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

**IOWA:**

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

**KANSAS:**

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

**APP. 320**

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

**APP. 321**

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

**APP. 322**

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.

§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

**APP. 325**

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

**APP. 326**

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

18

**APP. 327**

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.

That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.

§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .

§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.

On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

**APP. 330**

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

**APP. 331**

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.
§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

**APP. 332**

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

**APP. 336**

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## TEXAS:

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

29

**APP. 338**

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**<u>VIRGINIA:</u>**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely: murder, manslaughter, kidnapping, rape, . . .

30

**APP. 339**

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

31

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## **WEST VIRGINIA:**

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b. It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b. (b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.

No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## **WYOMING:**

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.

§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.

§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

APP. 345

# APPENDIX 4

## DANGEROUS WEAPONS LAWS[1]

## __ALABAMA__

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up

---

[1] Further research may yield additional laws regulating firearm hardware.

the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.

Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be

3

**APP. 348**

fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

4

**APP. 349**

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.

That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## <u>ARIZONA</u>

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.

If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

5

**APP. 350**

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.

It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.

§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.

§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

**APP. 351**

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or
any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal
knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and
upon conviction thereof, in the county in which said offense shall have been
committed, shall be fined in any sum not less than twenty-give nor more than one
hundred dollars, to be recovered by presentment or indictment in the Circuit Court,
or before any Justice of the Peace of the county wherein such offense shall have
been committed; Provided, That nothing herein contained shall be so construed as
to prohibit any person wearing or carrying any weapon aforesaid on his own
premises, or to prohibit persons traveling through the country, carrying such
weapons while on a journey with their baggage, or to prohibit any officer of the
law wearing or carrying such weapons when engaged in the discharge of his
official duties, or any person summoned by any such officer to assist in the
execution of any legal process, or any private person legally authorized to execute
any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap.
XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon,
any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks,
razor, or any pistol of any kind whatever, except such pistols as are used in the
army or navy of the United States, shall be guilty of a misdemeanor. . . . Any
person, excepting such officers or persons on a journey, and on his premises, as are
mentioned in section one of this act, who shall wear or carry any such pistol as i[s]
used in the army or navy of the United States, in any manner except uncovered,
and in his hand, shall be guilty of a misdemeanor.

## CALIFORNIA

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other
offensive weapon, with intent to assault any person, every such person, on
conviction, shall be fined not more than one hundred dollars or imprisoned in the
county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of
the Legislature of a Public and General Nature, Now in Force, Passed at the
Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of

8

**APP. 353**

Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | California | 1853

Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

9

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

**APP. 355**

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

11

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

12

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

13

**APP. 358**

Government of the United States, and the Rules and Order of Business Page 100,
Image 101 (1877) available at The Making of Modern Law: Primary Sources.
Offenses Affecting Streets and Public Property, § 9.
If any person or persons, within the corporate limits of Georgetown, shall be found
carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or
other deadly weapon, such person shall, on conviction thereof, be fined in a sum
not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without
Warrant—Jurisdiction of Justice, § 248. (1881)
No person, unless authorized so to do by the chief of police of a city, mayor of a
town or the sheriff of a county, shall use or carry concealed upon his person any
firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling
shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369,
Image 370 (1886) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Colorado | 1886
City of Denver, Slung Shot – Brass Knuckles, § 10.
Whenever there shall be found upon the person of anyone who is guilty of a breach
of the peace, or of conduct calculated to provoke a breach of the peace, any slung
shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence
shall be adduced proving that such weapons were in the possession or on the
person of anyone while in the act of commission of the acts aforesaid, such person
shall upon conviction be fined not less than twenty-five dollars nor more than three
hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven,
Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890)
available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or
any slung shot, stiletto or weapon of similar character, or shall carry any weapon
concealed on his person without permission of the Mayor or Superintendent of
Police in writing, shall, on conviction, pay a penalty of not less than five, nor more
than fifty dollars for every such offense.

14

APP. 359

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

15

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons | | 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.
An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

16

**APP. 361**

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover


Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

APP. 362

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]
Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## **GEORGIA**

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Georgia | 1816
Offences Against the Public Peace, (1816) § 19.

18

**APP. 363**

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided,

19

**APP. 364**

nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.
[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places
No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

20

**APP. 365**

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law,
who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-
gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than
Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of
payment of such fine, to imprisonment of a term not exceeding one year, nor less
than three months, upon conviction for such offense, unless good cause be shown
for having such dangerous weapon; and any such person may be immediately
arrested without warrant by the high sheriff, or any sheriff, policeman, or other
officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho
354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit
or other instrument or tool, with intent feloniously to crack and enter into any
dwelling-house, store, shop, warehouse, or other building containing valuable
property, or shall be found in the aforesaid buildings with intent to steal any
money, goods and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the Territorial prison for a term not less than one year nor more
than five years; and if any person shall have upon him or her any pistol, gun, knife,
dirk, bludgeon, or other offensive weapon, with intent to assault any person, every
such person, on conviction, shall be fined not more than one hundred dollars, or
imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894
Page 118-119, Image 119-120 (1894) available at The Making of Modern Law:
Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer,
who shall carry or wear within the incorporated limits of Boise City, Idaho, any
bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or
other dangerous or deadly weapons, concealed, unless such persons be traveling or
setting out on a journey, shall, upon conviction thereof before the city magistrate of
said Boise City, be fined in any sum not exceeding twenty-five dollars for each

21

offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## **ILLINOIS**

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other

**APP. 367**

General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources. Disorderly Conduct: Disturbing the Peace, § 56.

Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. Misdemeanors, § 39.

No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]

Deadly Weapons: Selling or Giving to Minor. § 54b.

Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.

Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## <u>INDIANA</u>

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife,

24

APP. 369

dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

**APP. 370**

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing

26

APP. 371

or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.


## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be

27

**APP. 372**

found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887

**APP. 373**

Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act E ntitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

29

**APP. 374**

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).

Carrying Weapons | Louisiana | 1842

[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.

Subject(s): Sensitive Places and Times

[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.

Post-Civil War State Constitutions | Louisiana | 1879

A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

**APP. 376**

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.
Prevention of Crimes, § 10.
Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1809If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.
Carrying Weapons | Maryland | 1872
It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

**APP. 377**

Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court

33

of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1886

Concealed Weapons, § 30.

Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1.

That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## **MASSACHUSETTS**

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be

**APP. 380**

killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

APP. 381

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

Dangerous or Unusual Weapons | Michigan | 1927

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

Dangerous or Unusual Weapons | Michigan | 1929

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.

Concealed Weapons – License, § 1.

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of

38

said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor.
Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## **MISSISSIPPI**

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

40

**APP. 385**

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government,

41

from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from

APP. 387

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving

43

**APP. 388**

the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## **MONTANA**

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.

If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

APP. 390

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The
Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or
other offensive weapon with intent to assault any person, every such person, on
conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County,
Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law:
Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and
Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it
shall be, and it is hereby declared to be unlawful for any person to carry, openly or
concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk,
sword cane, billy slung shot, brass or other metallic knuckles, or any other
dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb;
Provided, that nothing herein contained shall prevent the carrying of such weapon
by a civil or military officer, or by a soldier in the discharge of his duty, nor by any
other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska,
Embracing All Ordinances of a General Nature in Force April 1, 1890, Together
with the Charter for Metropolitan Cities, the Constitution of the United States and
the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at
The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about
his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles
of lead, dirk, dagger, or any knife resembling a bowie knife, or any other
dangerous or deadly weapon within the corporate limits of the city of Omaha. Any
person guilty of a violation of this section shall, on conviction, be fined not
exceeding one hundred ($100) dollars for each and every offense; nothing in this
section, however, shall be so construed as to prevent the United States Marshals
and their deputies, sheriffs and their deputies, regular or special police officers of
the city, from carrying or wearing such weapons as may be deemed necessary in
the proper discharge of their duties. Provided, however, If it shall be proved from

46

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2. Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## <u>NEVADA</u>

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not

less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## **NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to

be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources, 1799.
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2. And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be

found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

50

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.

And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or

other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.
That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.
§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.

That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).

Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887

§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | New York | 1664

Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a

**APP. 401**

term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any

instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911

Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

APP. 403

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.


1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.


1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.

Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## **NORTH DAKOTA**

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be

**APP. 407**

fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Ohio | 1859

An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.

§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec.

§ 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Ohio | 1880

Offences Against Public Peace, § 6892.

Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## **OKLAHOMA**

1890 Okla. Laws 495, art. 47

63

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## OREGON

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.

Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.

Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one

year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## **RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.
No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.
Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893
§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

APP. 414

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.
§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908
§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the

70

APP. 415

blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## **TENNESSEE**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.

That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.

That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.

**APP. 417**

That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

73

**APP. 418**

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources.

Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other

74

**APP. 419**

public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

**APP. 420**

A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas: Williamson S. Oldham & George W. White, comp., 1859)

Texas, Chapter 3, Act of August 28, 1856

Art. 493. If any person shall assault another with intent to murder, he shall be punished by confinement in the Penitentiary, not less than two years, nor more than seven years. If the assault be made with a bowie-knife, or dagger, the punishment shall be doubled. Page 520

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances which would otherwise render the homicide a case of manslaughter, the killing shall nevertheless be deemed murder, and punished accordingly. [emphasis in original] Page 534

https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552&q1=bowie%20knife

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided

further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).

Art. 163.

If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.

1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)

Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk,

APP. 422

dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.

Brandishing | Texas | 1899

Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.

If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

**APP. 423**

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14. Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah). § 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

## VERMONT

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## **VIRGINIA**

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | Virginia | 1792

[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.

§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.

If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## **WASHINGTON**

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall

81

on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956,

**APP. 427**

Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

83

**APP. 428**

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.

If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1897

Carrying Concealed Weapons, § 7084.

If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

85

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

APP. 431

## WISCONSIN

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

## WYOMING

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.

Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.

If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Wyoming | 1893

Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding

87

section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# APPENDIX 5

## TRAP GUN RESTRICTIONS[1]

**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

**APP. 434**

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891:  "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

2

**APP. 435**

## NEW HAMPSHIRE:

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

## NEW JERSEY:

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

## NEW YORK:

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870:  "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . .  A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter.  The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino.  As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

3

**APP. 436**

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

## NORTH DAKOTA:

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

**APP. 437**

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.


## RHODE ISLAND:

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

## SOUTH CAROLINA:

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

**APP. 438**

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

**SOUTH DAKOTA:**

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

**UTAH:**

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901
§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.
§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.
§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

## VERMONT:

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884
A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

7

**APP. 440**

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.

## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

8

**WISCONSIN:**

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1. Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

**APP. 442**

Case 1:22-cv-02256-RC Document 17-10 Filed 11/23/22 Page 182 of 187
Newspapers.com Case #23-7061 Document #2028785 Filed: 11/27/2023 Page 446 of 1070
by ancestry The Buffalo Commercial (Buffalo, New York) Tue Nov 1 1870 Page 4
https //www newspapers com/ mage/264632378 Down oaded on Aug 8 2022



gentleman will now be brought to a summary conclusion.

## THE MAN TRAP.

### Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.

*From the N. Y. Standard, Oct. 29th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning.

AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO'S gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JoSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $3,000 bail.

HOW THREE NAILED ICE GATHERS

Copyr ght © 2022 Newspapers com A R ghts Reserved

Newspapers™

APP. 443

Newspapers
by ancestry
https //www newspapers com/ mage/513456592

Case 1:22-cv-02256-RC Document 17-10 Filed 11/23/22 Page 183 of 187
USCA Case #23-7061 Document #2028785 Filed: 11/27/2023 Page 447 of 1070
The Sou h Bend Tribune (Sou h Bend, Indiana) Wed Feb 11 1891 Page 3

Down oaded on Aug 8 2022



**Shot by a Trap-Gun.**

CHILLICOTHE. Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyr ght © 2022 Newspapers com A R ghts Reserved


Newspapers

# EXHIBIT I

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, <br><br>     **Plaintiffs**, <br><br>     **v.** <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br>     **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF RANDOLPH ROTH</u>

Pursuant to 28 U.S.C. § 1746, I, Randolph Roth, declare and state as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.    I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.

3.    I have been retained by the Office of the Attorney General for the District of Columbia to render expert opinions in this case. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $250 per hour.

### BACKGROUND AND QUALIFICATIONS

4.    I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field prize for the outstanding dissertation in the Humanities and the George Washington Eggleston prize for the outstanding dissertation in American history. I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and

the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

5.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Prize from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present.  I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline.  And in 2022, I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

6.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID 1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present.  The pilot project on Ohio has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality

---

[1]      See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2]      See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

**APP. 447**

files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports, death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and Columbus, obituaries, and newspaper accounts.

7.      I have published numerous essays on the history of violence and the use of firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240

(https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708

(https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021)

(https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in _the_United_States).

8.      I am also co-founder and co-director of the Historical Violence Database.  The web address for the Historical Violence Database is:

http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration draws are available through the Historical Violence Database.  The Historical Violence Database is a collaborative project by scholars in the United States, Canada, and Europe to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present.  The project is described in Randolph Roth et al., "The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime

**APP. 448**

and Violent Death." *Historical Methods* (2008) 41: 81-98

(https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

98?casa_token  PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-

L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).

9.      Compilation, and estimation, of historical homicide data is a time-consuming

process.  The only way to obtain reliable historical homicide estimates is to review every scrap

of paper on criminal matters in every courthouse (indictments, docket books, case files, and

judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article

in every issue of a number of local newspapers, every entry in the vital records, and every local

history based on lost sources, local tradition, or oral testimony.  That is why it takes months to

study a single rural county, and years to study a single city.[3]  I have spent decades of my life on

this and related work.

10.      My work on data collection and my research for *American Homicide*, together

with the research I have conducted for related essays, has helped me gain expertise on the causes

of homicide and mass violence, and on the role technology has played in changing the nature and

incidence of homicide and mass violence.  I have provided expert witness testimony in *Miller v.*

*Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.).

---

[3]      It is also essential, in the opinion of historians and historical social scientists involved in
the HDV, to use capture-recapture mathematics, when multiple sources are available, to estimate
homicide rates where gaps exist in the historical record.  See Randolph Roth, "American
Homicide Supplemental Volume: Homicide Estimates" (2009)
(https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child
Murder in New England," *Social Science History* (2001) 25: 101-147
(https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M.
Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly*
86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-
Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings."  *Social*
*Science History* 25 (2001): 67-91
(https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

**APP. 449**

## OPINIONS

### I.    Summary of Opinions

11.    I have been asked to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

12.    For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States    which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century    became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building.  High homicide rates among unrelated adults    friends, acquaintances, strangers    coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our catastrophic failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

13.    Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more lethal than they were in colonial and

---

[4]    See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token dkP_nZZxCaY AAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwi RWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random.  They reveal deep patterns that are causal.

**APP. 450**

Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.  The evidence also shows that, over centuries, public officials have regulated the use or ownership of dangerous technologies   firearms, fertilizers, airplanes   in response to real, rather than imagined threats to public safety, public officials, and law enforcement.

14.    My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state but Vermont by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I   a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

**APP. 451**

## II.  **Government Regulation of Firearms in Response to Homicide Trends**

### A.  **Homicide and Firearms in the Colonial Era (1688-1763)**

15.    In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

16.    Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.[8]  Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[9]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low   never more than 10 to 15 percent.[10]

---

[5]    Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016).  Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id 2759961.

[6]    Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63.

[7]    Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016 an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era   was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8]    Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9]    Roth, "Why Guns Are and Aren't the Problem," 116.

[10]    Ibid., 116-119.

**APP. 452**

17.   Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era.[11]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[12]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[13]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[14]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[15]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[16]  The firing mechanism also had to be readied, often with a fresh flint.[17]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[18]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather

---

[11]    Ibid., 117.

[12]    Ibid.

[13]    Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[14]    Roth, "Why Guns Are and Aren't the Problem," 117.

[15]    Ibid.

[16]    Ibid.

[17]    Ibid.

[18]    Ibid.

**APP. 453**

could do damage.[19]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[20]

18.    The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides    most of which were caused by abuse or fights between family members that got out of control    were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[21]  It did not matter whether the type of homicide was rare, like family and intimate homicides, or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[22]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[23]

19.    When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[24] so the proportion of homicides committed with firearms was at that time forty percent and rose even higher in contested areas on the frontier.[25]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so three-fifths of homicides of Native Americans by European Americans in New England were committed with firearms.[26]  And slave

---

[19]    Ibid.

[20]    Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[21]    Roth, "Why Guns Are and Aren't the Problem," 117.

[22]    Ibid.

[23]    Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

[24]    Roth, "Why Guns Are and Aren't the Problem," 118-119.

[25]    Ibid., 116-117.

[26]    Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

**APP. 454**

catchers and posses kept their firearms at the ready, so ninety percent of runaway slaves who were killed in Virginia were shot.[27]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[28]  That is why firearms had a modest impact on homicide rates among colonists.

**B.   The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

20.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[29]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[30] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and

---

[27]     Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[28]     Ibid., 118-119.

[29]     Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[30]     Roth, "Why Guns Are and Aren't the Problem," 119-120.

**APP. 455**

Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.

Only New York City stood out, at 6 per 100,000 adults per year.[31] And the proportion of

domestic and nondomestic homicides committed with firearms was correspondingly low

between 0 and 10 percent   because people once again generally refrained, as they had from the

Glorious Revolution through the French and Indian War, from going about armed, except to

hunt, control vermin, or serve in the militia.[32]

21.    The keys to these low homicide rates and low rates of gun violence in New

England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and

the degree to which the promise of the democratic revolution was realized.  Political stability

returned, as did faith in government and a strong sense of patriotic fellow feeling, as the

franchise was extended and political participation increased.[33]  And self-employment   the

bedrock of citizenship, self-respect, and respect from others   was widespread.

22.    That is why there was little interest among public officials in the North in

restricting the use of firearms during the Early National period, except in duels.  They took a

strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the

practice posed for the nation's democratic polity and the lives of public men.[34]

---

[31]    Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[32]    For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[33]    Roth, *American Homicide*, 180, 183-186.

[34]    Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article 1884&context vlr).

**APP. 456**

23.    Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[35] where violence among citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[36]  During this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[37]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana    wherever Southerners settled in the early national period.[38]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[39]

24.    Citizens and public officials in these states recognized that concealable weapons    pistols, folding knives, dirk knives, and Bowie knives    were used in an alarming proportion of the era's murders and serious assaults.[40]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious

---

[35]    Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[36]    Roth, *American Homicide*, 180, 199-203.

[37]    Ibid., 182, 199-203.

[38]    Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[39]    Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[40]    Roth, *American Homicide*, 218.

**APP. 457**

pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[41]

The justices of the Louisiana Supreme Court echoed these sentiments    "unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[42]  These concealed weapons laws were notably difficult to enforce.  Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

25.     The pistols of the early national period represented a technological advance.  Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[43]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[44]

26.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia

---

[41]     Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[42]     Roth, *American Homicide*, 219.

[43]     Roth, "Why Guns Are and Aren't the Problem," 117.

[44]     Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

APP. 458

between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols — large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[45]

27.    Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[46]

---

[45]    Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects  dangerous-or-unusual-weapons, accessed September 9, 2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms.  That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[46]    Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order — 10 Essays* (Lincoln: University of Nebraska Press, 1970),

(continued…)

**APP. 459**

C.   **Homicide, Concealable Weapons, and Concealable Weapons Regulations
from the Mexican War through the Early Twentieth Century (1846-1920s)**

28.     By the early twentieth century, every state except Vermont either banned concealed firearms or placed severe restrictions on their possession.[47]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[48]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became   and remains today   by far the most murderous affluent society in the world.[49]

29.     The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[50]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century   the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities   the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by

---

1-22.  Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836.

[47]     Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.

[48]     Roth, *American Homicide*, 297-300.

[49]     Ibid., 297-300.

[50]     Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

**APP. 460**

anger and distrust.[51]  Law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[52]

30.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[53] Because the pistols, muskets, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[54]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[55]  They retained some of the limitations of earlier firearms, because their rotating cylinders   two of which came with each revolver   had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an

---

[51]    Roth, *American Homicide*, 299-302, 384-385.  See also Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token dkP_nZZxCaY AAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwi RWPEom7M).

[52]    Ibid., 299-302, 332, 337, 354.

[53]    Roth, "Why Guns Are and Aren't the Problem," 116-117.

[54]    Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[55]    Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

**APP. 461**

attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[56]

32.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[57]  And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[58]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[59]

------------------------------------

[56]     Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[57]     Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[58]     Ibid., 38-57.

[59]     Ibid., 39.

**APP. 462**

33.      Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[60]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[61]

34.      These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[62]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[63]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.[64]  Ominously, too, firearms

---

[60] Ibid., 38-57.

[61] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[62] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[63] Ibid., 124-125.

[64] Ibid., 125-127.

**APP. 463**

invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults    something that had never happened before in America's history.[65]  That is why the proportion of homicides committed with firearms    overwhelmingly, concealed revolvers in the homicides I have studied    reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[66]  And that is why every state in the Union except one restricted the right to carrying certain concealable weapons.  The lone holdout was Vermont, the state with the lowest homicide rate.[67]

35.    It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June 1865 to June 1868,[68] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[69] and it followed in

---

[65]    Ibid., 125.

[66]    Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[67]    Roth, *American Homicide*, 184; and Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000).

[68]    Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[69]    Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf).  "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be

(continued…)

**APP. 464**

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[70]  These laws

_____

deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63.  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019).

[70]      Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be

(continued…)

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[71]

36.    California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[72] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[73]

---

punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

71    Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.

72    Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183.  On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

73    Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id 2599851).

**APP. 466**

37.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[74]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit   ordinances that they enforced.[75]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[76]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[77]

38.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[78]

The burden of proof remained with the person who carried the concealed weapon.

---

[74]     Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[75]     Ibid., 11.

[76]     Ibid., 11-13.

[77]     Ibid., 13-15.

[78]     Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

**APP. 467**

39.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

## III.  Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Revolution into the Early Twentieth Century

40.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[79]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles   weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans or irregular warfare among citizens seeking political power.[80]  But from the 1830s into the early twentieth century, mass killings were common.

---

[79]     On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[80]     For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)].  For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

23

**APP. 468**

41.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.  Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[81]

42.     The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[82]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example,

---

[81]     David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[82]     Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

**APP. 469**

an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[83]  And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[84]

## IV.  Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Early Twentieth Century to the Present

43.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time.  These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers.  The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the submachine gun, invented by General John T. Thompson in 1918.

44.    The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable

---

[83]      Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[84]      On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

APP. 470

of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[85]

45.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens.  In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, when a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[86]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[87]  Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St.

---

[85]     Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[86]     Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.  The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange %24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[87]     Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today    potentially hundreds of thousands of dollars    because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

**APP. 471**

Valentine's Day Massacre and the Kansas City Massacre.[88]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[89]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[90]

46.    Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[91] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[92]  And the

---

[88]    William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[89]    Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[90]    For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[91]    Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[92]    The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[93]

47.　　Since 1970, public officials have continued to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[94]  And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks.  It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[95]

48.　　In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines.  These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War.  The signature military firearm of that era    the M-16 rifle

---

[93]　　The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[94]　　Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007.  Accessed August 31, 2022.

[95]　　*New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

APP. 473

with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[96]   was capable

of firing 750 to 900 rounds per minute when set on fully automatic.  But the M-16 was used

more often in combat    and more accurately, effectively, and sustainably as a weapon for

inflicting mass casualties    when set on semiautomatic, which was standard military procedure.

That is why the U.S. Army defines "rapid fire" as 45 rounds per minute, not 750 to 900.[97]  And

that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully

automatic" switch with a three-round burst    an alteration that slows the potential rate of fire,

conserves ammunition, and improves accuracy.[98]

49.     The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower

than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological

advances have increased the speed at which semiautomatic handguns can be fired.  An expert can

fire an entire 30-round clip from a Glock 17 handgun in five seconds.[99]  And they are affordable.

A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-

round magazine for less than $15.[100]

50.     It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire

semiautomatic handguns and rifles with large capacity magazines that poured onto the domestic

---

[96]     Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[97]     Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016).  Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[98]     See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

[99]     See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v  1H5KsnoUBzs), accessed September 1, 2022.

[100]    See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange  Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

**APP. 474**

market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.

51.     Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*   a modification that doubles the rate at which semiautomatic weapons can be fired.[101]

52.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15   the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[102]

53.     The threat to public safety and law enforcement posed by semiautomatic rifles with or without dangerous modifications    is a modern phenomenon that has a direct correlation

---

[101]     Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[102]     See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v PVfwFP_RwTQ), accessed October 4, 2022.

with mass murder and mass shootings. The danger these firearms pose is intrinsically different from past weaponry. In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.[103]

---

[103]     The data are from the Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022. The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms    not including the offender(s)    within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project database provides information on the weapons used in the shootings. It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons. Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2

(continued…)

54.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

55.     Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms.  In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.[104]

56.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene   usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before

_____

AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, that fit the Violence Project's definition of a mass shooting.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded).

[104]     The data are from the Violence Project.

**APP. 477**

bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[105]

## V.    Conclusion

57.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations.  And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century.  Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.


I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed on ___11/23/2022_____

*Randolph Roth*
Randolph Roth (Nov 23, 2022 12:08 EST)
_____
RANDOLPH ROTH

---

[105]    "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

# EXHIBIT J

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF BRENNAN RIVAS</u>

Pursuant to 28 U.S.C. § 1746, I, Brennan Rivas, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia to render an opinion on the history of firearms restrictions enacted in the mid- and late nineteenth century, especially as it relates to large-capacity magazines (LCMs) as defined in D.C. Code § 7-2506.01(b).  I have also been asked when ammunition feeding devices capable of holding more than 10 rounds first became commercially available in the United States, widely or at all.

3.      I have been retained by the District of Columbia to render expert opinions in this case.  I am being compensated at a rate of $175 per hour for research and $200 per hour for my work on this declaration.

**APP. 480**

**BACKGROUND AND QUALIFICATIONS**

4.      I am an Historian and Independent Scholar. From 2021 until earlier this year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University.  Before that, I was a graduate student in history who conducted research and administrative tasks on behalf of my professors, taught undergraduate survey courses, and worked at my university library.  My educational background includes a Ph.D. in History from TCU, where my Thesis was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

5.      My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript, based upon my dissertation research.

6.      I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); and *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.).

7.      A true and correct copy of my current curriculum vitae is attached as Exhibit A.

**OPINIONS**

8.      The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more

2

and better scholarship on the subject.  My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to the District of Columbia's restrictions on large-capacity magazines.  Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of multi-shot revolvers and other pistols which people of the time associated with criminal activity.

9.      My research as an historian began with an exploration of a public carry law enacted in Texas in 1871; I examined its legislative history, socio-political context, and the ways in which it was amended over the ensuing decades.  For my dissertation, I expanded upon that project, tracing the weapon-related laws and bills debated in the Texas legislature from 1836 to the 1930s.  Even though my work has focused on a state-level case study (a methodological approach that is needed within this historical subfield), I placed Texas within the larger context of national and regional regulatory traditions.  Along the way I conducted additional research on late-nineteenth-century public carry and sales restrictions from Arkansas and Tennessee—two states whose gun laws Texan policymakers had clearly followed and considered emulating.  The years-long endeavor of uncovering the history of weapon regulations in Texas and the greater southwest forms the basis of my expertise in historical gun regulations.  This is a relatively young and small field for historians, and much work remains to be done to bring the landscape of nineteenth-century weapon regulations into a clearer view.

10.      My research into the history of nineteenth- and early twentieth-century gun laws demonstrates that the proliferation of public carry laws and sales regulations during that time grew out of Americans' concerns about rising levels of gun crime.  Technological developments in the design and production of firearms made them more lethal and more widely available in the decades following the Civil War, which led to the country's first encounter with rampant gun violence.  The first impulse of the American people, from the purported "wild west" to the seemingly refined metropolitan centers was to reduce the number of guns circulating in public by restricting access to them.  Importantly, these restrictions did not flatly ban the carry or

3

**APP. 482**

possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

11.   In addition to the research I have conducted on gun laws, I have examined the availability of certain types of firearm magazines in the early twentieth century.  The core of this project has been a research trip to the McCracken Research Library[1] and access to significant firearm publications from the twentieth century, particularly *Gun Digest*.  Though it is still a work in progress, the research conducted so far indicates that semi-automatic firearms available for civilian purchase in the United States generally did not feature detachable clip magazines with a capacity of more than ten rounds until the late twentieth century; even through the mid-twentieth century, such firearms remained the rarity within a sizable market of semi-automatic weapons.

## I.   Brief History of the Colt Revolver and the Spread of Handgun Violence in the Nineteenth Century

12.   The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

13.   The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and

---

[1]   The McCracken Research Library houses the archives of the Winchester Repeating Arms Company in addition to numerous other gun-related materials; its collection of firearm history books is unparalleled.  The library is affiliated with the Buffalo Bill Center of the West in Cody, Wyoming.

**APP. 483**

functionality of ammunition meant that later models of Colt's could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

14.     Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his company struggled to reach its potential.  The expiration of Colt's patent in 1857 opened the door for other manufacturers to enter the market without having to endure the same decades-long startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect of war gave Colt what he had always wanted—substantial government patronage.  Southern states ordered as many revolvers as they could in the lead-up to Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose orders for pistols like Colt's revolver skyrocketed during the course of the Civil War.[2]  Wartime production by Colt, in addition to the new entrants into the market (like Smith & Wesson), created an unprecedented infrastructure to manufacture staggeringly large quantities of pistols. As production capacity increased and the U.S. military demobilized, more of these weapons became available to and affordable for American consumers; by the 1870s, the net result was more and cheaper pistols spread throughout the country,[3] introducing the United States to its first experience with rampant gun violence.

15.     The Civil War Era, making up the central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide

---

[2]     On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[3]     Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://bit.ly/3VeUhHo.

APP. 484

in comparison to other Western nations.  Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[4]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined.  That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.  In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence suffered primarily by Black Americans and their political allies.  The disruption of war, occupation, and frequent changes in state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process.  Rates of violence and homicide remained quite high in the southern states across the nineteenth century.[5]  The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American

---

[4]      On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[5]      Roth, *American Homicide*, 411-434.

communities rendered the interpersonal conflicts that erupted as a result of urbanization,

Reconstruction, economic hardship, and social dislocation all the more deadly.

## II.   <u>Governmental Responses to the Rise in Handgun Violence</u>

16.    The response to this gun violence varied across the United States.  The most

popular approach was the enactment or strengthening of public carry laws.  Jurisdictions that did

not already have such laws were likely to enact them, and those using the older mechanism of

sureties to keep the peace were likely to transition toward the implementation of criminal statutes

mandating fines and/or jail time for violators.[6]  These public carry regulations targeted

concealable items like pistols, sword canes, and daggers that were used in the commission of

crimes and generally referred to as deadly weapons.  The closing third of the nineteenth century

saw a flurry of this activity as states and municipalities tried new penalties, added new weapons

to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable

weapons from the public sphere.[7]

17.    Another strategy employed by state governments to reduce gun violence and gun

crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law

that applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting

cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five

dollars per place of business.[8]  In 1907, the Texas legislature placed a fifty-percent sales tax

upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's

---

[6]      The Repository of Historical Gun Laws, a database maintained by the Duke Center for
Firearms Law, reflects that American state and local governments enacted statutes and
ordinances specifically relating to "carrying weapons" in large numbers during the period from
the close of the Civil War in 1865 through the end of the nineteenth century.  See
https://firearmslaw.duke.edu/repository/search-the-repository/.

[7]      In the second half of the nineteenth century, items like metal knuckles and razor blades
became targets for proscription alongside bowie knives, pistols, and sword canes.

[8]      Acts of the General Assembly of the State of Georgia (1894) available online from the
Digital Library of Georgia; see https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and
https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%
5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there were likely many more
occupation taxes, though they have not been comprehensively indexed as of yet.

office on a quarterly basis.[9]  Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally. Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[10]

18.    Arkansas and Tennessee, for example, adopted a two-pronged approach that displayed attributes of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public carrying of pistols.[11]  Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[12]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

---

[9]    An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[10]    *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

[11]    See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[12]    *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

8

19.     Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

20.     When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute that, "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[13]  It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand.  The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.  Arkansas's replacement statute was similar to that of Tennessee.[14]  The Tennessee

---

[13]     1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[14]     1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

Supreme Court upheld that state's replacement statute against constitutional challenge.[15]   The revised Arkansas statute received no notable challenge.

21.     The second prong which these states employed was a prohibition on the sale of certain pistols.   Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[16]   Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well.   "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[17]

22.     Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[18]   Condemnations of such behavior and calls for regulations rang out across the country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.   Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse of their counterparts elsewhere.   The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do

---

[15]     *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[16]     1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[17]     Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[18]     For example, see Patrick Charles, *Armed in America* (New York: Promethus Books, 2018), 152 (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

their bloody work."[19]  After the 1875 statute went into effect in Arkansas, news editors began

praising it as "about the best law that has ever been enacted in this state," and one that, had it

been in effect since statehood in 1836, "would have saved the lives of thousands of good men

who have fallen victim to the vice of carrying deadly weapons, or from the results and natural

consequences thereof."[20]  Some judges in Tennessee began handing down penalties of a fifty-

dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that]

county."[21]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who

viewed it as a social benefit that in Tennessee "men who for years converted themselves into

walking arsenals discover that they can pursue their ordinary vocations without fear that they

may at any moment be called upon to defend their persons against assault."[22]  From their

perspective, the distrust of one's fellow community members that went along with habitual gun-

toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public

sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly

weapons was not honorable, and that such behavior should be stopped.[23]

---

[19]     "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[20]     *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[21]     The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'"  *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[22]     *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[23]     For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

23.     To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[24]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

24.     Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened;[25] during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

---

[24]     On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[25]     See note 24, above.

25.     Finally, the third kind of pistol available was the "pocket pistol."  These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[26]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[27]  These cheap revolvers could be had for a few dollars, with used ones selling for even less.[28]

26.     It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood.  A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear.  In response, state legislatures enacted regulations targeting the dangerous weapons that were the source of that problem.  These regulations remained in force well into the twentieth century.

---

[26]     For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[27]     See note 24, above.

[28]     Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

13

**APP. 492**

27.     Previous scholarship addressing these statutes has cast them as racially motivated.[29]  Those articles did not investigate deeply the primary sources of the time.  My research shows that these accounts have misrepresented the Tennessee and Arkansas statutes, which were enacted as a public safety measure rather than an attempt to disarm Black residents. The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[30]  Civil War soldiers on both sides of the conflict were unlikely to be issued a revolver unless they were officers, cavalry, or artillery; a great number of enlisted soldiers who possessed revolvers during the conflict had purchased them on their own, and at times their carrying of the weapons caused sufficient trouble within the ranks that officers confiscated them.  Others discarded heavy and seemingly unnecessary pistols on long, grueling marches.[31]  Confederate service did not automatically correlate to white possession of an exempted pistol.

28.     Rather than impute racism to these laws simply because of their occurrence during Reconstruction, we should embed them within their appropriate political and cultural context.  The fact that Tennessee's legislature amended the public carry law so swiftly to add the army/navy exception could indicate to the casual observer that white residents were dissatisfied with the original statute; however, when the statutes and their constitutional challenges are placed in chronological order and interpreted in light of the other primary sources of the era

---

[29]     For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

[30]     Tahmassebi, "Gun Control and Racism," 74-75.

[31]     On pistols and other arms issued during the Civil War, see Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside House, 1989).

14

(particularly newspapers and the widespread social contempt for publicly carrying deadly weapons), it is clear that racism was not behind the army/navy exemption. Instead, it represented the best effort of Tennessee lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[32] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*. The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand. Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

### III.   The Recent Emergence of Large-Capacity Magazines

29.   As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently. The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century. Nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

30.   In the decades following the Civil War, lever-action rifles became commercially available to American consumers for the first time. Lever-action rifles permitted the user to fire

---

[32]   Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." *General Laws of Texas*, ch. XXXIV, §1 (1871). The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception. See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

multiple shots without reloading.  The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm.  While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[33] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber.  And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

31.     In fact, developments in cartridge design in the second half of the nineteenth century led to a shift toward smaller, not larger, magazine capacities, to accommodate larger and more powerful cartridges. The Winchester 1883 Hotchkiss Repeater was chambered for the newer 45-70 US Government cartridge and featured a magazine in the butt stock that held 6 rounds.[34]  And the Winchester Model 1894 Repeating Rifle was chambered for various center-fire cartridges and its maximum magazine capacity was only 8 rounds.[35]

32.     Around the turn of the twentieth century, John M. Browning began working on the design of a semi-automatic firearm that functioned through a "blowback" method in which "[t]he recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[36]  This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic;" it was also referred to as "auto-loading" or "self-loading."

---

[33]     Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

[34]     Henshaw, *Winchester Firearms*, 23-24. On cartridges, see Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97.

[35]     Henshaw, *Winchester Firearms*, 41.

[36]     "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

APP. 495

33.     Shortly after Browning's developments, Winchester released its Model 1903 Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine for .22 caliber cartridges.  According to its product description, "…all that is necessary to do to shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[37] Winchester did not release a semi-automatic sporting rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column.[38]  The next semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round detachable box magazine.

34.     A major rival of Winchester at the time was Marlin Firearms, a company that became a highly popular producer of lever-action rifles.  Marlin did not begin manufacturing semi-automatic rifles until 1931 when the company (under new leadership) released the "22 Caliber Autoloading Rifle," also called the Model 50 / 50E.[39]  It came with a six-round detachable clip magazine.[40]

35.     As the twentieth century wore on, both Marlin and Winchester featured semi-automatic rifles as a part of their regular lineup of sporting firearms, though lever-action, pump action, and bolt action designs tended to be more popular.[41]  The magazine capacities of their semi-automatic models with detachable magazines remained at or below 10 rounds with very few exceptions.  In 1948, Marlin released the Model 89C chambered for .22 caliber long rifle rounds, which was sold with a standard 7-shot clip magazine.  Beginning in 1953, new models

---

[37]     "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[38]     Henshaw, *Winchester Firearms*, 61-62.

[39]     William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300-301.

[40]     Brophy, *Marlin Firearms*, 301.

[41]     See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

APP. 496

were sold with two 5-shot clip magazines.  In 1957, that changed once again when standard magazines for new manufactures was a 12-shot clip magazine.[42]  The last year in which Marlin featured the Model 89C was 1961; for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[43]

36.     Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[44]  For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle.  These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wish to purchase magazines holding 10 or 15 rounds had to do so as accessories.[45]

37.     Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently.  In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[46]

38.     The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol.  A German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape

---

[42]     Brophy, *Marlin Firearms*, 306-307.

[43]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[44]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[45]     Henshaw, *Winchester Firearms*, 174.  Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[46]     See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

prevented it from being the financial success its manufacturers wanted.[47]  The company

commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[48]

Meanwhile, the American gun designer, John Moses Browning, developed various semi-

automatic pistol designs.  One, which promised US military contracts, was purchased by

Colt's.[49]  The company's developments began with a series of handguns chambered for .38

Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[50]

Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the

standard-issue sidearm for American armed forces until the 1980s, which featured a magazine

capacity of seven rounds.

39.     Browning's other semi-automatic pistol design was purchased by Fabrique

Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer.  The FN Browning M1900

was released at the turn of the twentieth century and sold quite successfully in Europe.  It was

chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven

rounds.  These "Browning pistols" were associated with tremendous rises in crimes, accidents,

and deaths related to firearms, and particularly the anarchist movement that carried out numerous

assassinations on the Continent.[51]  Like its closest European competitor, the Luger 9mm

handgun, its magazine capacity remained below ten rounds.

40.     FN subsequently approached Browning to design another semi-automatic

handgun that might be purchased in large numbers by the French army.  One of the requirements

for consideration was that the firearm have a magazine capacity greater than ten rounds.

---

[47]     Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119-120.

[48]     The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN).  See Gorenstein, *The Guns of John Moses Browning*, 128.

[49]     Gorenstein, *The Guns of John Moses Browning*, 123-125.

[50]     Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205-207, 209, 210-213.

[51]     Gorenstein, *The Guns of John Moses Browning*, 130-133.

**APP. 498**

Browning was initially reluctant to participate in the endeavor but soon changed his mind. An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[52] The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[53] The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018. When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[54]

41.     Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them. Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[55] Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten. Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

42.     By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[56] and by 1944 the inaugural issue of Gun Digest (which published advertisements for the best-selling American handguns) did not feature one.[57] By 1951, Gun

---

[52]     Gorenstein, *The Guns of John Moses Browning*, 209-210.

[53]     Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.

[54]     Stebbins, Shay, and Hammond, *Pistols*, 139-140.

[55]     Gorenstein, *The Guns of John Moses Browning*, 130-133.

[56]     Haven and Belden, *A History of the Colt Revolver*, 219-225.

[57]     *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett

Digest included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[58]  The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[59]  By 1969, the selection of handguns featured in Gun Digest had grown substantially, but only two models had a capacity of more than ten rounds.[60]

43.     The production history of mainstream American companies (like Colt's and Smith & Wesson) in addition to the enthusiasts' literature of the time shows that most semi-automatic handguns from the late-nineteenth and early twentieth centuries did not typically have magazine capacities larger than ten.  Even though the technology existed, American producers did not manufacture them in significant numbers until the post-World War II period.  And even then, the vast majority of handguns available for purchase (including semi-automatic pistols) had a magazine capacity of less than ten rounds.

## CONCLUSIONS

44.     An important lesson that the study of history shows us is that nineteenth-century Americans confronted a gun violence problem, and their solution was the enactment of state and local regulations that might limit the number of pistols in circulation.  These took the form of

---

Publishing Company, 1944, repr. 1963), 155-127.

[58]     John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131-132.

[59]     These were the Ranger 22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots.  See Amber, ed., *The Gun Digest: 5th Edition*, 146-147.

[60]     The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine).  All other handguns maxed out at 10 round magazine capacities.  See John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294-306.  That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds.  The Luger 22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds.  See Amber, ed., *Gun Digest 1969*, 345, 344-351.

**APP. 500**

public carry laws, prohibitive taxes, and other sales restrictions. These states targeted pocket pistols and other types of weapons that, due to their concealability, were associated with forms of criminal activity that were threatening the public at that time.

45.    These restrictions on pocket pistols provide historical precedent for the District's restrictions on large-capacity magazines. As explained above, large-capacity magazines as we understand them today only became commercially available for the first time in the later parts of the twentieth century and earlier parts of the twenty-first. Sources pertaining to the development of semi-automatic firearms and detachable box magazines also indicate that through much of the twentieth century, most semi-automatics were sold to civilians with magazine capacities at or below ten rounds. There are a few outliers in the historical record, but most semi-automatic rifles, shotguns, and handguns available in the United States were sold with magazines housing anywhere from three to ten rounds. Some fixed, tubular magazines for rifles had a magazine capacity greater than ten rounds, but the operation and reloading of these firearms makes them qualitatively different from the detachable box magazines which Americans currently associate with semi-automatic weapons.

46.    As with any historical research project, my work on this subject remains ongoing. There is significant research and analysis to be done on the drafting and enforcement of the pistol sales restrictions in Arkansas and Tennessee, as well as the attitudes of residents toward them as time wore on. Very little research that is based upon primary sources, other than the review of case law and historical statutes, has yet been conducted into the history of these statutes.

47.     Additional research is also required to develop a complete timetable for the introduction of magazines holding more than ten rounds and evaluate their production numbers, sales, and market penetration. But this short overview is sufficient to draw a general conclusion that most semi-automatic weapons, at least through the mid-twentieth century, were not designed for or sold to civilians with magazine capacities larger than ten rounds.

**APP. 501**

I declare under penalty of perjury under the laws of the United States and the State of

Washington that the foregoing is true and correct.

SIGNED this 22 day of _November_ 2022 at Fort Worth, Texas.

_Brennan Nicole Rivas_
<small>Brennan Nicole Rivas (Nov 22, 2022 13:33 CST)</small>

BRENNAN NICOLE RIVAS, Ph.D.

**APP. 502**

USCA Case #23-7061   Document #2028785   Filed: 11/27/2023   Page 506 of 1070

# EXHIBIT L

Other Titles in ABC-CLIO's
## WEAPONS AND WARFARE SERIES
Spencer C. Tucker, Series Editor

Air Defense, *Shannon A. Brown*

Aircraft Carriers, *Hedley Paul Wilmott*

Ancient Weapons, *James T. Chambers*

Artillery, *Jeff Kinard*

Ballistic Missiles, *Kev Darling*

Battleships, *Stanley Sandler*

Cruisers and Battle Cruisers, *Eric W. Osborne*

Destroyers, *Eric W. Osborne*

Helicopters, *Stanley S. McGowen*

Machine Guns, *James H. Willbanks*

Medieval Weapons, *James T. Chambers*

Military Aircraft in the Jet Age, *Justin D. Murphy*

Military Aircraft, 1919–1945, *Justin D. Murphy*

Military Aircraft, Origins to 1918, *Justin D. Murphy*

Rifles, *David Westwood*

Submarines, *Hedley Paul Wilmott*

Tanks, *Spencer C. Tucker*

# PISTOLS

## AN ILLUSTRATED HISTORY
## OF THEIR IMPACT

## Jeff Kinard

A B C ● C L I O

Santa Barbara, California      Denver, Colorado      Oxford, England

**APP. 504**

Copyright 2003 by Jeff Kinard

All rights reserved. No part of this publication may be reproduced, stored in a
retrieval system, or transmitted, in any form or by any means, electronic,
mechanical, photocopying, recording, or otherwise, except for the inclusion of brief
quotations in a review, without prior permission in writing from the publishers.

Library of Congress Cataloging-in-Publication Data
Kinard, Jeff, 1954-
Pistols : an illustrated history of their impact / Jeffrey Kinard.
p. cm.—(Weapons and warfare series)
Includes bibliographical references and index.
ISBN 1-85109-470-9 (hardback : alk. paper)—ISBN 1-85109-475-X
(e-book) 1. Pistols—History. I. Title. II. Series.

TS537.K54 2004
623.4'432'   09—dc22
2004020415

07 06 05 04 03 02    10 9 8 7 6 5 4 3 2 1
This book is also available on the World Wide Web as an e-book.
Visit abc-clio.com for details.

ABC-CLIO, Inc.
130 Cremona Drive, P.O. Box 1911
Santa Barbara, California 93116–1911

This book is printed on acid-free paper.
Manufactured in the United States of America

# CONTENTS

*Introduction to Weapons and Warfare Series,*
Spencer C. Tucker   VII

*Acknowledgments*   IX

CHAPTER ONE
Introduction   1

CHAPTER TWO
The Match, the Wheel, the Flint, and Steel   5

CHAPTER THREE
The Percussion System   49

CHAPTER FOUR
The Metallic Cartridge and the Modern Revolver   105

CHAPTER FIVE
The Semiautomatic Pistol   171

CHAPTER SIX
Post–World War II Developments   255

INDIVIDUAL PISTOL MODELS   283

*Glossary*   375

*Bibliography*   381

*Index*   383

APP. 505

## CHAPTER 6

# Post–World War II Developments

THE COLD WAR—the decades-long confrontation between the United States and the Soviet Union following 1945—saw both superpowers consolidating their respective spheres of influence. In 1949 the United States was instrumental in the formation of the North Atlantic Treaty Organization (NATO) to counter the Soviets in Europe. The Soviet Union responded in 1955 with the Warsaw Pact, a forced alliance of formerly independent Eastern European nations that fell under Soviet domination at the close of World War II.

Both the Eastern and the Western military establishments quickly recognized the potential logistical problems posed by these rapidly imposed alliances. NATO and the Warsaw Pact thus moved to standardize weapon types and calibers among their respective allies to ensure interchangeability. The Warsaw Pact nations and, by extension, the People's Republic of China and its satellites thus adopted the Soviet 7.62mm Tokarev TT33 pistol as their standard military sidearm. As a result, the arsenals of the previously independent Eastern nations suspended the production of native designs and retooled to manufacture domestic versions of the Soviet weapon.

NATO's signatories were, especially concerning the question of caliber, less than unanimous in their choice of both military pistols and calibers. Nearly all European nations had made the transition from revolvers to semiautomatics before World War II and had adopted the 9mm Parabellum cartridge (9x19mm NATO) as the

255

**APP. 506**

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 5 of 18
USCA Case #23-7061    Document #2028785    Filed: 11/27/2023    Page 510 of 1070

ideal front-line combat loading. With the most notable exception of West Germany's post–World War II Walther P38, the P1, most European NATO members adopted John Browning's Model 1935 High Power or a variation of its basic design. The United States, for its part, remained firmly committed to another of Browning's creations: the tried-and-true caliber .45 ACP Colt Model 1911A1.

Lighter caliber weapons also retained popularity for use by officers, some police forces, and secondary or specialized military personnel. The 7.65mm Browning cartridge (.32 ACP), disdained by most U.S. agencies as being too anemic for practical use, remained the loading of choice for many European police forces and higher-ranking military officers. A leading factor in the longevity of the caliber .32 ACP cartridge was its suitability for use with the simplest semiautomatic operating principle—the blowback mechanism. Another rationale behind the retention of caliber .32 weapons for police was based on their use in the closer confines of European cities (the light caliber .32 bullet is less likely to pass through the intended target and strike an innocent bystander). The 9mm Short (.380 ACP) cartridge, however, had rapidly gained in popularity in the postwar years owing to its marked lethality over the .32 and its easy accommodation in blowback weapons.

U.S. police and security forces continued to favor revolvers well into the second half of the twentieth century. Their preference was grounded not only in a traditional affection for the reliable six-shooter but the revolver's inherent structural strength. More concerned with the man-stopping capabilities of their sidearms, U.S. lawmen typically holstered weapons chambered for the potent .357 Magnum cartridge or, to a lesser extent, the even more powerful .44 Magnum—cartridges that are too powerful for the standard semiautomatic to safely chamber. The 1980s and 1990s, however, saw the rapidly escalating acceptance in the U.S. law enforcement community of military-style semiautomatics. The new trend grew out of the availability of a new generation of high-powered, high magazine–capacity pistols and a number of new cartridges, most notably the .40 Smith & Wesson. The .40 S&W offered a logical compromise between the caliber 9mm Parabellum and the .45 ACP, being more powerful than the former but having less recoil than the latter.

During this period U.S. manufacturers lost significant ground as European manufacturers such as SIG-Sauer, Heckler & Koch, and Glock set higher standards for military handgun design. The new

pistols offered the multiple advantages of high magazine capacities, advanced construction techniques and materials, and the ability to be carried safely with a cartridge in the chamber yet capable of instant use. The U.S. companies' loss of prominence is no better illustrated than by the controversial choice of an Italian pistol, the 9mm NATO Beretta 92, as a replacement for the venerable caliber .45 ACP Colt Model 1911A1.

## SOVIET UNION/RUSSIA

### Makarov PM

The Soviet Union and a number of other Warsaw Pact countries officially replaced the Tokarev TT33 in 1951 with the 9x18mm Pistolet Makarova (PM). The new pistol was intended to be easier to control than the Tokarev, but, as typical of many Soviet-made weapons, it is more awkward to handle and has a much worse trigger pull than comparable Western handguns. The Makarov is a fixed-barrel, double-action, blowback pistol that externally resembled the Walther PP. Although pulling the hinged trigger guard downward also disassembled the Makarov, it lacked a loaded indicator pin and differed from the Model PP in a number of internal details. The magazine has a capacity of eight rounds and was released by a catch on the bottom of the grip. The safety switch was mounted on the left rear of the slide. The Makarov also chambered a new caliber 9x18mm cartridge that in size and power place it between the .380 Browning (9mm *kurz*) and 9mm NATO. The caliber 9mm Makarov cartridge, although very similar to a caliber 9x18mm Police cartridge introduced in Western Europe, would not chamber correctly in western pistols.

### PSM

In 1980 a number of Soviet security forces began issuing the PSM (Pistolet Samosarjadnij Malogabaritnij, "self-loading small pistol"). Designed by Lev Koulikov, Tikhon Lashnev, and Anatoliy Simarin, the PSM is a blowback weapon designed for easy concealment. Its most notable feature is its unique 5.45x18mm bottlenecked cartridge capable of considerable penetration against body armor. The

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 6 of 18
USCA Case #23-7061   Document #2028785   Filed: 11/27/2023   Page 511 of 1070

PSM is 160mm (6.3") in overall length and has an 85mm (3.35") barrel. Magazine capacity is eight cartridges.

### Stetchkin Machine Pistol (APS)

The Automaticheskia Pistolet Stetchkina (APS) shares the appearance and basic blowback mechanism of the Makarov but is somewhat larger and capable of selective fire. A selector mounted on the left rear slide indicates safe in its lower position, semiautomatic in the middle, and full automatic in the top position. The Stechkin utilizes a 20-round magazine and was issued with a wood shoulder stock/holster very similar to that of the Mauser Model 1896. Its cyclic rate of fire on full-automatic mode is approximately 750 rounds per minute. The Stechkin's main fault lies in that it is too large to be a practical handgun and too light to be controlled effectively as a submachine gun. It was eventually phased out and replaced by the Makarov.

## CZECHOSLOVAKIA

### CZ Model 1950 and Model 1970

The postwar Model 1950 was the product of the Kratochvil brothers' design team at CZ (_eska Zbrojovká) and, chambered in caliber 7.65mm (.32 ACP), was intended for use by the Czech police. Although much more modern in appearance than earlier Czech pistols, the Model 1950 is of a conventional blowback design, with an external hammer and many features apparently derived from the Walther PP. It differs from the Model PP in that the loaded indicator pin is located on the side of the slide rather than above the hammer, a catch on the side of the frame allows dismantling, and the safety is located on the frame rather than slide. CZ later modernized the Model 1950 to produce the Model 1970 for issue to police personnel and higher-ranking military officers.

### CZ Model 1952

Immediately following World War II Czechoslovakia followed other Soviet bloc nations in issuing Soviet weapons, including the

7.63mm Tokarev TT33. In the early 1950s CZ began production of an excellent new domestic pistol to replace the aging Tokarevs. The CZ Model 1952 was fitted with an external hammer and accepted an eight-round magazine; a unique clip arrangement rather than the typical screw secures its composition grips. Its recoil-operated mechanism relied on a roller-locking system derived from the German MG-42 machine gun. This arrangement was necessary owing to the pistol's highly potent 7.62mm Czech Model 48 cartridge, a loading based on the Soviet 7.62mm Type P cartridge but with 20 percent more propellant. The resultant impressive ballistics of the Model 1952, combined with its easy handling and sleek lines, made it a popular sidearm among those receiving it. The Model 1952 was manufactured between 1953 and 1970 and was eventually phased out of front-line Czech service and relegated to reserve units.

### CZ75 and CZ85

As a member of the Warsaw Pact, Czechoslovakia was required to issue weapons chambered to accept cartridges interchangeable with those of the Soviet Union. The 9mm Parabellum (NATO) CZ75 was thus initially not accepted for Czech service but released as an export pistol. Its debut on the international market in 1975 won the CZ75 instant acclaim as one of the finest military-style pistols to appear in the post–World War II years.

Its basic mechanism and appearance are of the traditional Browning High Power type but exhibit some characteristics found in the SIG P220 and other significant improvements. Constructed of high-grade materials with superior craftsmanship, the CZ75 is a double-action weapon with either plastic (for civilian use) or walnut (military issue) grips and accepts a 15-round magazine. The CZ85 followed in 1985 and is essentially a CZ75 with the addition of ambidextrous safety and slide stops. Both models were manufactured in selective-fire versions with somewhat longer barrels and a provision to use a spare magazine as a forward grip. In 1984 the Swiss firm Sphinx Engineering SA of Porrentruy began offering its AT-2000S, a modification of the CZ75 design.

### CZ82 and CZ83

The CZ82 (CZ8-3 in its civilian form) appeared in 1984 and is a

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 7 of 18
USCA Case #23-7061   Document #2028785   Filed: 11/27/2023   Page 512 of 1070

blowback-operated, double-action pistol similar in purpose and operation to the Walther PP and Soviet Makarov. It has an ambidextrous safety, slide lock, and magazine release controls, a firing-pin locking safety, and a large trigger guard to accommodate a gloved finger. The civilian CZ83 is available chambered in 7.65mm (.32 ACP) and 9mm Short (.380 ACP), with the military CZ82 being chambered for the 9mm Short or 9mm Makarov cartridge. Magazine capacity is 15 rounds for 7.65mm models and 13 rounds for 9mm pistols. Caliber 9mm Makarov-chambered pistols also differ from the other models in that they are bored with polygonal rifling rather than traditional lands and grooves.

## POLAND

### Model 65 and 64

As a Soviet satellite, Poland adopted the 9x18mm (9mm Makarov) P65, a domestically manufactured variation of the Makarov. It also issued the double-action, 9x18mm P64, a Polish design that shares characteristics of both the larger Makarov and the Walther PPK. The select-fire 9x18mm Model 63 Machine Pistol also shows considerable Soviet influence and in a number of ways resembles the Soviet Stechkin. It is a blowback weapon and accepts either 15- or 20-round magazines.

## PEOPLE'S REPUBLIC OF CHINA

### Type 51

Before World War II, the Chinese government and various warlords armed their forces with a large variety of imported pistols such as the Mauser Model 1896, the Browning Model 1900, and the FN High Power. In addition, small domestic shops and larger factories fabricated many thousands of copies of foreign pistols. The Chinese also acquired huge numbers of Japanese arms from the Soviets, who captured them in Manchuria, as well as U.S. weapons taken from the Nationalists during the civil war. The Communist Chinese government later began a gradual move toward standardization based

on Soviet weapons with the Type 51 Pistol, a reasonably accurate copy of the 7.62mm Soviet Tokarev TT33.

### Type 64 and Type 67

Adopted in 1964, the blowback-operated Chinese Type 64 is a uniquely diabolical weapon with an integral silencer designed specifically for assassinations. The rubber baffles and extremely fine wire mesh within the tubular silencer effectively muzzle the report of its special subsonic 7.65x17mm rimless Type 64 cartridge—a loading similar in appearance to the .32 ACP but interchangeable in no other weapon. A latch on the side of the pistol also locks the slide to prevent the mechanical noise and rear escape of the report that accompanies a semiautomatic pistol. A mechanical safety is located on the left side of the pistol above the grip. The magazine capacity is nine rounds. In 1968 Communist China put into service an improved and more compact assassination pistol, the Type 67. The Type 67 features a more streamlined and efficient silencer and a cross bolt to lock the slide to the barrel. Although in many respects similar to the Type 64, the Type 67 is chambered for yet another unique cartridge, the 7.62x17mm Type 67.

## NORTH KOREA
## (DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA)

### Type 64

North Korea originally armed its forces with a mix of captured Japanese, foreign imports, and Soviet and Chinese weapons. The country's first domestically manufactured service pistol, the Type 64, is a relatively direct copy of the Browning Model 1900 Old Model in 7.65mm (.32 ACP). A limited number were also manufactured with a shortened slide that exposed a length of barrel sufficient to attach a silencer.

### Type 68

The North Korean Type 68 was a significantly modified Tokarev

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 8 of 18
USCA Case #23-7061     Document #2028785     Filed: 11/27/2023   Page 513 of 1070

TT33 design that locks in a manner similar to the Browning High Power. It retains the Tokarev's 7.62mm chambering but is somewhat shorter, with the magazine release located in the base of the grip rather than the button type behind the trigger guard found on Soviet weapons.

## Type 70

The Type 70 is a blowback-operated 7.65mm weapon of conventional design. Its main distinguishing feature is a large star insignia on the upper portion of the grip panels.

## UNITED STATES

The decision to join its NATO allies in a sidearm chambered for the standard 9x19mm NATO (9mm Parabellum) cartridge proved particularly traumatic for the U.S. military. The United States flirted with the idea during the Korean War but abandoned the transition as uneconomical considering the vast numbers of caliber .45 Model 1911A1s then in service. That those Model 1911A1s were perfectly serviceable and proven combat veterans further strengthened the Army's decision to retain them for the indefinite future.

## Colt General Officer Model Pistol, M15

Colt again broached the subject on a limited scale during the Vietnam War. In 1969 the company offered a modified version of its 9mm Commander as a replacement for the older model pistols then issued to general officers. The Army, for its part, declined Colt's submission in favor of a more sophisticated version of the caliber .45 ACP 1911A1. Originally manufactured at the government's Springfield Arsenal and later the Rock Island Arsenal, the new pistol entered service in 1972 as the Caliber .45 General Officer Model Pistol, M15. The M15 was somewhat more compact than the Model 1911A1 and was fitted with select-grade walnut grips with a brass insert engraved with the owner's name. It also exhibited a much superior finish to standard-issue weapons. To further distinguish it from the pistols issued to the rank and file, its slide also bears, in script, the legend "GENERAL OFFICER MODEL" and "RIA," indicating its manufacturer. The M15 issue package includes a two-magazine pouch and flapless holster.

## Beretta M9 (Model 92FS)

In 1977 new small-arms studies undertaken at the U.S. Air Force Armaments Laboratory at Elgin Air Force Base reignited the 9mm transition debate. The Florida laboratory's initial findings indicated that government inventories contained not only thousands of Model 1911A1s but also a bewildering variety of various caliber .38 revolvers. The Air Force quickly reached the obvious conclusion: The U.S. military faced a pressing need to restandardize its handgun issues. The Air Force findings soon found their way to the other services, as well as Congress, with predictable results. By 1979 the standardization issue and 9mm transition debate were embroiled in a bureaucratic quarrel complete with the requisite committees and government tests. In 1981 the government at last announced its decision to finally join its allies in adopting the 9x19mm NATO chambering and called on various foreign and domestic manufacturers for test pistols.

To the dismay of many, only one U.S.-made pistol—a Smith & Wesson—reached the final testing stages. It faced entries by Beretta, Fabrique Nationale, Heckler & Koch, and SIG-SACO Defense Systems. After seemingly interminable delays, in 1985 the U.S. government officially announced its decision to replace the caliber .45 ACP Colt Model 1911A1 with the Italian entry: the Beretta 92FS.

Designated the M9 in U.S. service, the new Beretta was manufactured in Italy and now in the United States by Beretta USA Corp. of Accokeek, Maryland. Beretta's concession to manufacture the pistol in the United States and its relatively low cost were major factors in the decision to adopt the foreign-designed weapon. In the wake of the military's action, numerous police departments followed its lead, phasing out traditional revolvers in favor of the Model 92. The M9 is a double-action weapon and accepts a 15-round magazine. It is equipped with a trigger-disconnect safety, is coated in a durable matte Bruniton finish, and fitted with a lanyard ring and chrome-lined barrel. The forward trigger-guard strap is also recurved to accommodate a two-hand grip.

Inevitably, the adoption of Beretta by the U.S. government prompted a considerable ongoing debate as to the military effectiveness of the pistol and its 9mm cartridge. Its proponents continue to argue the advantage that they more conform to U.S. allies' issues. They further press that the 9mm cartridge produces less recoil than the caliber .45 ACP and is thus more suited for use by the growing number of women entering the U.S. military. Both the pistol and its cartridge, however, have found some of their greatest opposition among U.S. combat veterans who witnessed enemies sustain multiple wounds from 9mm ammunition and still continue an attack. The critics' resistance has been further strengthened by reports from Kuwait, Afghanistan, Iraq, and other recent arid battlegrounds: A number of troops involved in those actions have complained that the Beretta requires frequent maintenance to maintain reliability and does not stand up well in harsh combat conditions.

In a scenario hauntingly reminiscent of the Philippines in the early 1900s, many U.S. soldiers locked away their government-issue pistols in favor of more powerful caliber .45 weapons. Adding to the irony, many U.S. troops still prefer the supposedly obsolescent Colt Model 1911A1 to the advanced M9, while others holster pistols manufactured by SIG, Heckler & Koch, and Smith & Wesson. In addition to the issue of personal weapons, in 1996 the U.S. Special Operations Command (USSOCOM) adopted the caliber .45 ACP Heckler & Koch Mark 23 mod 0 for issue to certain elite units. At the beginning of the twenty-first century the United States is no closer to standardization than it was in 1900.

### Smith & Wesson Model 39, Model 59, and Model 459

The Model 459, Smith & Wesson's entry in the government trials, was based on designs the company had introduced in the 1950s. The company began production of the double-action, eight-round Model 39 and its 14-round counterpart, the Model 59, in 1954. The two pistols marked something of a breakthrough in the U.S. handgun industry, as both were chambered for the 9mm Parabellum cartridge so popular in Europe but as yet relatively untried in the United States. The two pistols have seen service with the U.S. Navy, Air Force, and Army Special Forces (Green Berets). The Model 459 was essentially an updated version of the Model 59

with improved sights. Despite its loss in the U.S. government trials, it is an excellent weapon and has seen some use by U.S. forces. During the 1990s Smith & Wesson continued to expand its semiautomatic offerings with its Third Generation series and the Sigma, a high magazine–capacity pistol utilizing modern polymers in its construction.

### GERMANY

#### Walther P1

Its original facilities devastated and lost to the Soviets in the final days of World War II, Walther eventually established a new factory at Ulm/Donau in the early 1950s and renewed production of the P38 in 1957. That year the new German Federal Republic Army, the Bundeswehr, adopted the pistol as the Pistole 1, or P1. The P1 differs from the earlier P38 only in its lighter alloy frame, slight changes in its safety and extractor, and a matte-black finish and black plastic checkered grips. The P1 was also adopted at various times by the armed forces of Austria, Norway, and Portugal, as well as Sweden, its initial contractor. The company also manufactured a more meticulously finished model for the civilian market and sold it, in addition to the standard caliber 9mm Parabellum, in calibers .22 Long Rifle and 7.65 Parabellum. Shorter-barreled versions, the P38K and the P4, were also manufactured for police use in the 1970s but were soon discontinued.

#### Walther P5

In 1975 Walther introduced the caliber 9mm NATO P5 in response to changing German police requirements for a high magazine–capacity, double-action sidearm that could be safely carried and quickly put into action. Externally the P5 is a sleek, modern-looking pistol with a slide enclosing all but the muzzle of the barrel. Its locking system, however, is essentially the same tilting wedge as that of the P38. The P5 also shares the same eight-round magazine capacity of its predecessor, as well as its trigger mechanism.

Although the P5's basic mechanics harken to the 1930s, its safety features are much more advanced. A large lever on the left side of

Case 1:22-cv-02256-RC    Document 17-14    Filed 11/23/22    Page 10 of 18
USCA Case #23-7061    Document #2028785    Filed: 11/27/2023    Page 515 of 1070

the frame acts as both a safety and decocking switch that safely lowers the exposed hammer. In addition, a spring maintains the firing pin itself in a position out of alignment with the hammer's striking surface. Only when the trigger is deliberately pulled does this spring allow the pin to shift into firing position. A number of police organizations in Germany and other countries adopted the P5, as did the Portuguese Army. Walther followed the basic P5 in 1988 with the shorter P5 Compact and later the improved-safety P1A1. Although an excellent pistol, the P5 series was destined for rapid obsolescence owing to its relatively small magazine capacity and outmoded locking system.

### Walther P88

In 1988 Walther combined the best features of the P5 with a modified Browning locking system to offer the P88, a cost-efficient, 15-round capacity, double-action pistol suitable for police and military use. The P88 thus shares the excellent trigger and safety mechanisms of the P5, as well as an ambidextrous decocking lever. It does, however, abandon the tilting wedge for a system similar to that of the Glock, SIG-Sauer, and other new and popular pistols. The tilting barrel, combined with its method of locking into the ejection port, allowed for much more efficient machining, with a resultant positive effect on the pistol's overall cost. In 1996 Walther discontinued the P88 in favor of the less bulky P88 Compact.

### Heckler & Koch Model HK 4/ P 11

In the 1950s Heckler & Koch GmbH began operations at the site of the former Mauser factory in Oberndorf/Neckar, the old Mauser machinery having been confiscated by French forces. Alex Seidel, formally of Mauser, was a cofounder of the new firm and reintroduced the Mauser HSc as the Heckler & Koch HK 4. The blowback HK 4, known as the P11 in German service, is manufactured with a stamped steel rather than the earlier machined steel slide and an aluminum alloy frame. It differs externally in its basic lines and black plastic checkered grips molded with a more comfortable thumb rest. A catch on the base of the grip releases the magazine.

Heckler & Koch designed the HK4 to be easily converted to a variety of calibers. By switching barrels, magazines, and recoil spring,

the pistol can chamber 6.35mm (.25 ACP), 7.65mm (32 ACP), and 9mm *kurz* (.380 ACP) cartridges. The breechblock is also fitted with a faceplate that can be rotated 180 degrees to convert the pistol to the more economical rimfire caliber .22 Long Rifle cartridge. The HK4 was manufactured from 1967 to 1984 and issued to the Zollpolizei (Customs Police) among other military and police units.

### Heckler & Koch Model P7 (PSP)

The 9mm NATO Model P7 was introduced in the early 1970s as a police weapon (thus its alternate designation, Polizei Selbstlade Pistole, or PSP). The P7 introduced a unique cocking and decocking device on the front grip strap activated by squeezing the pistol grip. The pistol is also unusual in that it incorporates the gas-delayed blowback principle. This system relies on a small hole drilled in the barrel that siphons off a portion of the ignition gasses to operate a piston attached to the slide. The pressure exerted by the gas thus delays the opening of the breech until the bullet leaves the barrel.

Heckler & Koch first offered the improved P7 M8 and P7 M13 pistols in 1983. These pistols feature ambidextrous magazine releases and enlarged trigger guards. The P7 M13 also offers the advantage of a 13-round staggered-row magazine. Other variants in the series include the blowback-operated P7 K3 in caliber .22 Long Rifle and 9mm Short and the P7 M10 in caliber .40 S&W. Some units of the Bundeswehr adopted the P7, as did various police agencies, including the federal Bundesgrenzschutz (GSG9) and the state police departments of Baden-Wurttemberg, Bavaria, and Lower Saxony.

### Heckler & Koch Model P9 and Model P9S

Manufactured between about 1972 and 1984, the Heckler & Koch Model P9 and its military and police-type counterpart, the P9S, incorporate numerous modern synthetic components. The civilian Model P9 differs primarily from the P9S in that it is a single-action rather than double-action weapon and is fitted with adjustable rear sights. Both pistols were offered in 9mm Parabellum (NATO) and 7.65 Parabellum (.30 Luger). The company introduced a caliber .45 ACP model in 1977. The pistols operate on the delayed blowback system and lock and unlock by means of rollers that engage the slide and two-piece breechblock, an arrangement used in the company's

G-3 rifle. Typical slide markings are "HK MOD P9S HECKLER & KOCH OBERNDORF/N," with the "HK" initials also appearing on the lower grip panels.

The P9 and P9S are fitted with a thumb-operated lever to cock and decock the internal hammer, as well as a loaded indicator pin. A manual safety is positioned on the left rear of the slide, and a durable black polymer finish protects the metal parts. Later versions of the P9S were manufactured with a reverse-curve front trigger guard to accommodate a more comfortable two-handed grip. The P9 and P9S also incorporate an advanced polygonal bore that, unlike conventional rifling, presents a smoother internal surface that discourages fouling and provides twist without overly deforming bullets as they pass through. The P9S was adopted a number of police organizations, including the Saarland state police.

### Heckler & Koch Model VP70

Heckler & Koch intended its Model VP70 as a compact selective-fire combat pistol for modern military and police use. Manufactured from about 1970 to 1984, it incorporates a largely polymer frame and enclosed striker. Its sophisticated blowback, fixed-barrel design allows it to efficiently chamber 9mm NATO ammunition, an achievement that had long eluded earlier manufacturers. A special shock-absorbing system helps reduce recoil and thus aids control while in full-automatic mode. Cartridge capacity is an impressive 18 rounds and is accomplished with a double-row magazine that does not overly widen the grips. Disassembly is easily accomplished by pulling down a catch within the trigger guard on the bottom of the frame. Optional equipment for the VP70 includes a push-through safety behind the trigger guard and a detachable shoulder stock. The VP70 A1 is equipped with a three-shot burst feature; the VP70 Z was offered in semiautomatic only. European police and border guards have used it extensively.

### Heckler & Koch USP Series

In 1993 Heckler & Koch debuted its Universal Selbstlade Pistole (Universal Self-Loading Pistol, or USP) series in calibers 9mm NATO and .40 S&W. A caliber .45 ACP model, intended primarily for sales in the United States, appeared in 1995. All ... pistols are designed to accommodate both standard military cartridges as well as the more powerful +P loadings. Intended as highly versatile military and police weapons, the USP pistols incorporate the most advanced manufacturing techniques and materials available. The basic USP models are the Standard, Compact, Match, Expert, and Tactical. The Standard was adopted by the Bundeswehr as the P8 and the Compact by German police as the P10. Both the P8 and P10 are chambered for the 9mm NATO cartridge.

The USP series is based on a modified Browning locking design assisted by an original Heckler & Koch recoil reduction system to ease handling. Truly modern weapons, the USP pistols are manufactured with steel-reinforced, high-strength polyamide frames capable of withstanding extreme temperatures, wear, and corrosion. Barrels are polygonal-bored cold-hammer forged chromium steel; the slides are of machined steel. To withstand corrosion, external metal parts are treated in a nitro-gas carburized and black oxide coating, with internal parts receiving a protective Dow-Corning antifriction treatment. As a result of such advanced technologies and exacting Heckler & Koch craftsmanship, the USP has proved one of the most accurate, powerful, and defect-free handguns ever manufactured.

Heckler & Koch also designed the USP as a highly versatile, good-handling weapon capable of filling a variety of roles and needs. Grooves cast in the frame allow the attachment of either a laser aiming module (LAM) or tactical light.

The combined safety and decocking lever is mounted on the frame above the trigger and can be easily moved from one side to the other for either right- or left-handed use. The magazine release, protected by the trigger guard, allows the magazine to drop free of the pistol and is also designed for ambidextrous use. Caliber 9mm and .40 S&W magazines are constructed of a stainless steel–reinforced translucent polymer; caliber .45 ACP magazines are of steel. The nonslip polymer grips are ergonomically slanted for comfortable aiming. A wide variety of trigger and control-lever options also give USP pistols nine potential combinations of safety as well as single- and double-action modes.

### Heckler & Koch Mark 23 mod 0

In 1991 USSOCOM, the overall command for special operations, awarded contracts to Heckler & Koch and to Colt Manufacturing Co. to submit test pistols for a new Offensive Handgun Weapon

System (OHWS). As the name of the system suggests, the new pistol was not to perform in a traditional defensive role but as a specialized offensive weapon for special operations. The government intended to issue the new weapons to elite organizations such as the Army's Special Forces (Green Berets) and Rangers, Special Operations Aviation, the Navy SEALS, and the Air Force Special Operations Wings. The new weapon system required chambering for the caliber .45 ACP cartridge, a sound and flash suppressor, and a LAM. More powerful than the general-issue 9mm NATO Beretta M9, the OHWS was to be the first caliber .45 ACP government pistol since the Colt Model 1911A1. After extensive testing, USSOCOM awarded the final contract to Heckler & Koch; the first pistols were delivered on 1 May 1996.

Although larger and heavier, the winning design, designated the Mark 23 mod 0, shares many design features of the H&K caliber .45 USP, including its locking system, steel-reinforced polymer components, and advanced anticorrosion coatings. The polygonal bore is also chrome-plated to resist wear and corrosion. The trigger guard is recurved at the front for two-handed use, and the magazine release and safety are ambidextrous. Unlike the USP, the decocking lever is a separate component to allow the silent lowering of the hammer in close or covert combat situations. Frames are grooved for the attachment of the LAM, and the muzzle is threaded to accept a silencer supplied by Knight's Manufacturing USA. Magazine capacity is 12 rounds.

The Mark 23 mod 0 is possibly the most thoroughly tested handgun ever built and exceeded all government specifications during trials. The issue pistol achieves match-grade accuracy and operates almost flawlessly in the most extreme environments.

## GERMANY/SWITZERLAND

### SIG-Sauer

Following World War II the Swiss firm Schweizerische Industrie Gesellschaft (SIG) negotiated an agreement with Germany's J. P. Sauer & Sohn to develop and manufacture pistols in Germany. This arrangement was made necessary by Switzerland's strict nonexportation laws against firearms—a restriction not imposed in Germany. The collaboration between SIG and            has produced a series of

semiautomatics universally hailed as some of the finest, most advanced combat handguns ever manufactured.

### Swiss SIG P210/P49

SIG began development of the single-action P210 during the 1940s to replace the obsolescent Lugers still in service at that time. Known as the P210 in its civilian form and the Pistole 49 (designating the year it was accepted by the Swiss military), the new SIG exhibited the superb materials, craftsmanship, and accuracy typical of Swiss arms. The design originated in 1937 when France's SACM negotiated an agreement with the Swiss firm SIG to manufacture a modified Petter-designed Mle 1935 in that country. After a number of improvements SIG developed the SIG SP47/8 (Self-Loading Pistol M1947—eight-round magazine) and, after more modifications, introduced the P49. Denmark also adopted the P49 for its military, as did West Germany's Bundesgrenzpolizei (Border Patrol).

The P49 is a locked-breech, recoil-operated modified Browning design and is fed by an eight-round magazine. Unlike the earlier designs, the slide of the SIG rides on rails inside rather than outside the frame. The P49 is equipped with both a frame-mounted safety and a magazine safety, preventing the pistol from firing without the magazine in place. It is chambered for the 9mm NATO cartridge rather than the earlier caliber 7.65 Parabellum of the Model 1900 Swiss Lugers. The pistol is, however, easily converted to the caliber 7.65 cartridge by simply changing the barrel and to the caliber .22 Long Rifle with a conversion kit. Military pistols are finished in a dull matte finish and plastic grips, with civilian versions usually receiving a blue finish and wood grips.

Although Switzerland adopted the P49, export military sales suffered—the precise machining tolerances and quality of materials used in the P49, as in all SIG products, made it a prohibitively expensive weapon for general issue. Switzerland replaced the P49 in 1975 with the SIG-Sauer Pistole 75.

### SIG-Sauer P220/Pistole 75

Designated the P220 in its civilian version and P75 for military use, SIG-Sauer's next pistol was originally designed as a double-action,

**APP. 514**

less-expensive replacement for the Swiss P49. It quickly gained a reputation as one of the finest combat pistols ever made. Available in a number of calibers, the new pistol was adopted in 9mm NATO by Switzerland as the P75 and later by the Japanese Defense Forces. The P220 locking system is a great improvement both in efficiency and manufacturing costs over earlier pistols. Rather than rely on a series of complicated links or machining processes, the P220 barrel is machined with a single large lug that locks into the ejection port.

A number of other features found on the P220/75 had appeared earlier on the Sauer 38H. Sauer-designed components include the P220/75's double-action mechanism and cocking and decocking lever. Unlike the 38H, the P220/75 is fitted with an external hammer. Original P220/75s were manufactured with aluminum alloy frames and Sauer's machined breechblock pinned to the interior of stamped steel slides. The P220/75 is not equipped with a manual safety owing to the very effective hammer and firing-pin lock. This mechanism prevents the pistol from firing unless the trigger is deliberately pulled. A slide stop is located above the left grip. The magazine holds eight caliber 9mm cartridges (seven .45 ACP) and is released by a catch at the rear base of the grip on European pistols. Those exported to the United States are fitted with a button-type magazine release behind the trigger guard.

The P220/75 is also a highly accurate combat handgun. Sights are of the patented Stavenhagen type, with white-highlighted rear and front sights to facilitate more precise aiming in dim conditions. The front trigger guard is also reverse-curved and grooved to allow a steadier two-hand grip.

### SIG-Sauer P225 (P6)

In 1980 SIG-Sauer lightened the P220/75 design and reduced its length to offer a more compact weapon, the 9mm NATO P225. It was adopted by the West German military and various state police agencies as the P6 and saw extensive police use in other European countries.

### SIG-Sauer P226

In 1983 SIG-Sauer modified the basic P220 design to accept a high-capacity magazine (15 9mm NATO or 12 caliber .40 S&W or

.357 SIG cartridges). The caliber .40 S&W cartridge is a recent development by the U.S. firm Smith & Wesson, and the caliber .357 SIG is essentially a necked-down version of the Smith & Wesson cartridge. Although the new pistol, designated the P226, failed to win the U.S. government trials to replace the Colt Model 1911A1, the U.S. Navy SEALs, as well as some police and military organizations in Europe, adopted it for issue.

### SIG-Sauer P228 and P229

Introduced in 1989, the P228 is a compact version of the P226 and mechanically is virtually identical. It is constructed with an aluminum alloy frame with a machined steel block pinned inside the stamped steel slide. The magazine holds 13 caliber 9mm NATO cartridges. The U.S. Army adopted the P228 in 1992 as the M11 for issue to aircrews and military police personnel; it is also issued to the Army's Criminal Investigation Division.

The P229 shares the same internal mechanism and aluminum alloy frame as the P228. It is, however, chambered for the more potent caliber .40 S&W and .357 SIG cartridges and as a result is fitted with a sturdier machined-steel slide. The P229 magazine capacity is 12 rather than the P228's 13 owing to its larger cartridge size. Both the P228 and P229 earned universal reputations as highly reliable and accurate weapons for military and police use. U.S. government organizations issuing the P229 include the FBI; the Secret Service; the Bureau of Alcohol, Tobacco, and Firearms; and the Drug Enforcement Agency. The P229 also offers the added versatility of interchangeable .40 S&W, .357 SIG, and 9mm NATO barrels. A Sig-Sauer subsidiary, SIGArms, manufactures the P229 in the United States.

## AUSTRIA

### Glock

Gaston Glock founded the small firm of Glock GmbH in Deutsch-Wagram near Vienna in 1963. During its first 17 years the company manufactured an array of products for the Austrian Army, including fighting knives, entrenching tools, machine-gun ammuni-

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 14 of 18
USCA Case #23-7061      Document #2028785       Filed: 11/27/2023      Page 519 of 1070

tion links, and practice grenades. Glock made his first foray into the handgun field in 1980 when the Austrian Army announced that it was accepting submissions for a new service pistol. Gaston Glock had little experience in firearms but approached the project with a combination of originality and logic. He first consulted a number of weapons experts to determine the features most desirable in a combat handgun and then applied his own engineering experience to the problem. Following a six-month whirlwind of research and development Glock revealed his new pistol: the Glock 17, a revolutionary combination of the best existing technology and Glock's innovative application of polymers to firearm construction.

The Austrian Army adopted the recoil-operated, 9mm NATO Glock 17 in 1983 as the P80 and was soon joined by the armed forces of the Netherlands, Norway, the Philippines, Sweden, and Thailand. The pistol quickly became the weapon of choice worldwide among military and police organizations. In the United States the Glock played a major role during the transition from revolvers to semiautomatics as the preferred police sidearm. In the process the previously tiny Glock GmbH grew to become an international arms giant. The appearance of the Glock initially sparked a frenzy among some members of the press and antigun lobbyists, who feared that its polymer components would make it undetectable by airport security scanning devices and thus be an ideal terrorist weapon. These concerns were unfounded in that the Glock barrel and slide, as well as numerous other components, are of high-grade steel and are thus easily detectable by metal detectors and x-ray machines. Above all, Glock pistols have won a reputation for accuracy and reliability in all types of combat conditions.

### Glock 17

Gaston Glock gained instant recognition by pioneering the use of high tensile-strength polymers in the Glock 17. The frames, with the exception of integral steel guide rails for the slide, are of a molded polymer that has a stronger resistance to shock damage than aluminum and most steels. The polymer frame offers the triple advantages of reduced costs in fabrication, imperviousness to corrosion, and light weight. The slide is milled from a single piece of steel and treated with an extremely hard and corrosion-resistant Tenifer heat treatment. The pistol is rugged, accurate, compact, and lightweight. It also easily dismantles for cleaning and incorporates only 33 components in its construction.

The Glock 17 shares with SIG-Sauer the sophisticated modified Browning tilting-barrel locking principle in which a single lug on the top of the barrel locks into the ejection port. The bore of the 4.5-inch barrel, however, is of a hexagonal type, in contrast to the lands and grooves of conventional pistols and the polygonal SIG-Sauer bores. The Glock Safe Action trigger mechanism is also a significant improvement over earlier systems and is designed for instant yet safe use under combat conditions. It is based on two molded polymer triggers (a large outer trigger that protects a smaller middle trigger from accidental activation); there is no external safety switch. The pistol can thus be fired only with a deliberate finger-pull on the center of the trigger arrangement. Pulling the trigger first disengages the internal safety mechanism and then moves the striker from half-cock to full-cock and then releases it to strike the cartridge primer. The action of the slide then returns the striker to the half-cock position.

The only external controls other than the trigger are the slide stop and magazine release button, both mounted on the left of the frame. The standard polymer magazine has a capacity of 17 9mm NATO cartridges. Nineteen- and 31-round magazines that extend below the grip are also available, as is a 10-round model for civilian sales. The Glock accepts a laser sight attachment as well as a special amphibious kit that permits underwater firing at very close range. Although rather boxy in appearance, the Glock 17 is well-balanced and ergonomically designed, with a raked grip with finger grooves on the front for comfortable and instinctive aiming. A recurved front trigger guard also aids two-handed use.

In 1986 the company offered the Glock 18, a select-fire version of the original model. The Glock 18 is fitted with a slightly extended barrel with dorsal compensator cuts and a selector switch on the left rear of the slide. Other variations of the Glock 17 include two more compact pistols: the Glock 19 in 9mm NATO, and the Glock 23 in .40 Smith & Wesson. The Glock 20 was offered in 1990 and is chambered in the new 10mm Auto cartridge and was followed by the Glock 21 in caliber 1.45 ACP and the Glock 22 in .40 Smith & Wesson.

### Steyr Pi18 and GB80

The Austrian army's choice of the Glock was a disappointment to that country's long-established Steyr dynasty. In 1981 Steyr-Daimler-Puch AG (later Steyr-Mannlicher AG) pinned its hopes for the Army's upcoming trials on its double-action 9mm NATO Steyr

282   PISTOLS

ics that it marketed as the New Nambu. The New Nambu Model 57A, as considered for adoption by the Self-Defense Forces, is a modified Browning-Colt design chambered for the caliber 9mm NATO cartridge. The company also produced the smaller caliber 7.65mm (.32 ACP) blowback Type 57B, also a modified Browning design.

## SOUTH AFRICA

### Vektor Z-88 and SP1

The Republic of South Africa initially issued FN Browning High Powers to its forces. Imports ended, however, with a United Nations–mandated ban on arms shipments in response to the country's policy of apartheid. The embargo, in turn, prompted the country to initiate its own domestic arms industry in the late 1960s and early 1970s. The first South African–manufactured pistol was the Vektor Z-88, a licensed copy of the 9mm NATO Beretta Model 92. In 1992 Lyttleton Engineering Company of Pretoria began production of the Vektor SP1 for issue to the South African Defence Force. The caliber 9mm NATO SP1 incorporates a Walther-type tilting-wedge locking system in combination with a number of more modern features. It is a double-action weapon constructed with a machined steel slide and aluminum alloy frame with checkered polymer grips. It is fitted with a firing-pin safety, an ambidextrous manual safety, and a magazine release easily positioned on either side of the frame. Magazine capacity is 15 rounds.

The Vektor SP2 differs from the SP1 in that it is chambered in caliber .40 S&W and is fitted with an 11-round magazine. Lyttleton offers a conversion kit that allows the SP2 to fire 9mm ammunition. The SP-1 and SP-2 General Officer's Pistols are scaled-down versions of the original models intended for use by higher-ranking officers.

# Individual Pistol Models

## EARLY PISTOLS

Appearing in the fifteenth century, the earliest pistols incorporated the matchlock principle, relying on a smoldering length of cord for ignition. Their vulnerability to damp conditions and general unreliability, however, made them impractical combat weapons and relatively few saw actual use. The wheel lock appeared in about 1500 and, although relatively delicate and expensive to manufacture, finally provided a suitable weapon for mounted troops. The wheel lock relied on sparks from a spring-activated serrated steel wheel spinning against iron pyrites to ignite its priming. This innovation eliminated the need for a smoldering match and provided a firearm that could safely be carried loaded and ready to fire from horseback. The wheel lock was instrumental in making the pistol an integral part of the cavalryman's arsenal and helped lead to the obsolescence of the mounted knights' traditional lances and swords. By the mid-1500s firearms designers began abandoning the wheel lock mechanism in favor of systems relying on the striking of flint against steel for ignition. Handgun evolution subsequently produced such types as the snaphaunce, dog lock, and miquelet before culminating in the true flintlock in about 1630. Relatively simple and rugged, the flintlock remained in wide use until the first half of the nineteenth century.

**APP. 517**

The Matchlock: circa early fifteenth to
   centuries   294
The Wheel Lock: circa fifteenth to early seventeenth centuries
   294
English Lock: early seventeenth century   295
French Lock: circa 1610 to nineteenth century   295
Scottish Pistol: seventeenth to eighteenth centuries   296
Queen Anne Pistol: seventeenth to eighteenth centuries   296
Dueling Pistol: eighteenth to nineteenth centuries   297
Duck Foot Pistol: eighteenth to early nineteenth centuries   298

## PERCUSSION PISTOLS

In 1807 the Reverend Alexander Forsyth of Belhelvie, Scotland patented the use of fulminate powder for firearms ignition. Highly explosive when struck a sharp blow, fulminates made possible the elimination of the complex flintlock priming procedure and introduced the percussion ignition system. Within fifteen years other inventers devised a method of containing fulminates in a small metal cup—the percussion cap—and quickly rendered all earlier firearms obsolete. During the 1840s and 1850s all major powers began manufacturing percussion pistols and converted thousands of the older flintlocks to the new system. In 1836 the American Samuel Colt patented the first practical percussion revolver, thus initiating a worldwide revolution in firearms manufacturing and technological innovation. The percussion revolver was the standard sidearm of the American Civil War and saw wide use by other nations until it was eventually phased out in the 1870s in favor of metallic cartridge weapons.

The Pepperbox: late 1830s–early 1860s   300
United Kingdom: Adams Percussion Revolver, 1851–1860s   300
United Kingdom: Tranter Percussion Revolver, 1853–1860s   301
United Kingdom: Webley Percussion Revolver,
   circa 1853–1860s   301
United States: Colt Paterson Revolver, circa 1838–1840   302
United States: Colt Walker Model, 1847   302

United States: Colt Model 1851 Navy Revolver, 1850–1873   303
United States: Colt Model 1860 Army Revolver, 1860–1873   304
United States: Remington New Model Army Revolver, circa
   1863–1875   304
United States: LeMat Two-Barrel Revolver,
   circa 1856–1865   303
United States: Starr Revolver, double-action circa 1858–c. 1863;
   single–action circa 1863–1865   305
United States: Savage Revolving Firearms Company Navy Model
   Revolver, circa 1861–1865   305

## CARTRIDGE REVOLVERS

The self-contained metallic cartridge offers the advantages of speed in reloading and resistance to moisture. In the 1850s designers combined the metallic cartridge with the bored-through cylinder to create the first modern breech-loading revolvers. Primitive forms of metallic cartridges had appeared in Europe during the early years of the nineteenth century; in about 1836 the Frenchman Casimir Lefaucheux introduced the pinfire system. The pinfire cartridge utilized a small metal pin that extended from the side of the cartridge base and protruded through a notch in the rear of the revolver's cylinder. The strike of the pistol's hammer on the pin forced it against the priming within the cartridge base, thus detonating the cartridge. Although popular in Europe during the mid-nineteenth century, the pinfire cartridge proved liable to accidental detonation and reached obsolescence by the 1870s.

In 1857 the Americans Horace Smith and Daniel B. Wesson combined the bored-through cylinder patented by Rollin White with a small, caliber .22 cartridge of their own invention containing its priming in the cartridge base's rim. Their caliber .22 Model No.1 Revolver was the first mass-produced rimfire pistol and the partners' venture proved so successful that both the firm of Smith & Wesson and various forms of their cartridge survive into the twenty-first century. Later innovations included the larger caliber centerfire cartridge offering the twin advantages of being easily reloaded and a lethality suited to military weapons. By the 1880s metallic cartridge revolvers

had replaced the muzzle-loading percussion system and continue to see worldwide usage in the present day.

Italy: Model 1889   308
Japan: Type 26, 1893   308
Russia/Soviet Union: Nagant Model 1895   308
United Kingdom: Webley .45 WG, 1889   309
United Kingdom: Webley Mark IV, 1899   309
United Kingdom: Webley .455 Mark VI Revolver, 1915   310
United Kingdom: Webley .38 Mark IV, 1929   311
United Kingdom: Webley Mark V, 1929   311
United Kingdom: Enfield Pistol, Revolver, No. 2 Mk1 and Mk1*,
    1931   312
United Kingdom: Smith & Wesson .38 Pistol, circa 1940   312
United States: Colt Model 1873 Single Action Army Revolver,
    1872–1940   313
United States: Smith & Wesson .44 Pistol, 1873–1878   313
United States: Colt New Navy, Army, and Marine Revolvers, 1889
    314
United States: Colt New Service Double Action Revolver,
    1898–1944   315
United States: Colt New Service Revolver, Military Model 1917,
    World War I Issue   316
United States: Smith & Wesson Military & Police 10, 1905   317
United States: Smith & Wesson New Century Hand Ejector,
    1908   317
United States: Smith & Wesson .38/200 British Service,
    circa 1940   318
United States: Colt Python, 1953   318
United States: Ruger Security Six, 1968   320
United States: Ruger Speed-Six, 1968   320
United States: Colt Lawman, 1969   319
United States: Ruger GP 100, 1987   320

## SEMIAUTOMATICS

Semiautomatic—or self-loading—pistols fire once with each pull of the trigger and mechanically reload and ~~~ck themselves by divert-

ing a portion of the energy from their discharge. Semiautomatics offer numerous advantages over revolvers in their ease of reloading, expanded cartridge capacities, and higher rate of fire. Appearing at the end of the nineteenth century, semiautomatics soon replaced revolvers in the arsenals of the major military powers and are issued universally at the present time. Although Germany at first led the world in semiautomatic developments it was soon challenged by other nations, most notably the United States. In 1896 Peter Paul Mauser introduced the Model 1896, the first mass-produced autoloading pistol that saw worldwide military usage. The P08, another German development by Georg Luger, was essentially a refinement of an earlier design by Hugo Borchardt. The most prolific and successful of all pistol designers, however, was an American, John Browning. Browning's Model 1900, manufactured by Colt, became the model for countless other designs throughout the world. His greatest fame came from his celebrated caliber .45 ACP Colt Models 1911 and 1911A1, the United States' primary sidearms from WWI through the Vietnam War. The legacy of Browning continues in the widespread incorporation of his ideas by others—the vast majority of modern semiautomatics still utilize the basic Browning principles established over a century ago.

Argentina: Ballester Molina, circa 1930   322
Austria: Roth-Steyr Model 1907   322
Austria: Steyr Model 1912   323
Austria: Steyr Pi18, 1974   322
Austria: Glock 17, adopted by Austria 1983   324
Austria: Steyr GB, 1981   323
Austria: Steyr M Series, 2000   323
Belgium: FN Model 1900   325
Belgium: FN Model 1903   325
Belgium: FN Model 1910   325
Belgium: FN Model 1922   326
Belgium: FN Browning GP-35 High Power, 1935   327
Belgium: FN BDA 9, 1993   328
Belgium: FN Five-seveN, 1998   329
China: Type 64, 1964   330
China: Type 67, 1967   330
Czechoslovakia: CZ 22, 1922   330
Czechoslovakia: CZ 24, 1924   330

had replaced the muzzle-loading percussion system and continue to see worldwide usage in the present day.

Italy: Model 1889   308
Japan: Type 26, 1893   308
Russia/Soviet Union: Nagant Model 1895   308
United Kingdom: Webley .45 WG, 1889   309
United Kingdom: Webley Mark IV, 1899   309
United Kingdom: Webley .455 Mark VI Revolver, 1915   310
United Kingdom: Webley .38 Mark IV, 1929   311
United Kingdom: Webley Mark V, 1929   311
United Kingdom: Enfield Pistol, Revolver, No. 2 Mk1 and Mk1*, 1931   312
United Kingdom: Smith & Wesson .38 Pistol, circa 1940   312
United States: Colt Model 1873 Single Action Army Revolver, 1872–1940   313
United States: Smith & Wesson .44 Pistol, 1873–1878   313
United States: Colt New Navy, Army, and Marine Revolvers, 1889   314
United States: Colt New Service Double Action Revolver, 1898–1944   315
United States: Colt New Service Revolver, Military Model 1917, World War I Issue   316
United States: Smith & Wesson Military & Police 10, 1905   317
United States: Smith & Wesson New Century Hand Ejector, 1908   317
United States: Smith & Wesson .38/200 British Service, circa 1940   318
United States: Colt Python, 1953   318
United States: Ruger Security Six, 1968   320
United States: Ruger Speed-Six, 1968   320
United States: Colt Lawman, 1969   319
United States: Ruger GP 100, 1987   320

## SEMIAUTOMATICS

Semiautomatic—or self-loading—pistols fire once with each pull of the trigger and mechanically reload and recock themselves by divert-ing a portion of their energy from their discharge. Semiautomatics offer numerous advantages over revolvers in their ease of reloading, expanded cartridge capacities, and higher rate of fire. Appearing at the end of the nineteenth century, semiautomatics soon replaced revolvers in the arsenals of the major military powers and are issued universally at the present time. Although Germany at first led the world in semiautomatic developments it was soon challenged by other nations, most notably the United States. In 1896 Peter Paul Mauser introduced the Model 1896, the first mass-produced autoloading pistol that saw worldwide military usage. The P08, another German development by Georg Luger, was essentially a refinement of an earlier design by Hugo Borchardt. The most prolific and successful of all pistol designers, however, was an American, John Browning. Browning's Model 1900, manufactured by Colt, became the model for countless other designs throughout the world. His greatest fame came from his celebrated caliber .45 ACP Colt Models 1911 and 1911A1, the United States' primary sidearms from WWI through the Vietnam War. The legacy of Browning continues in the widespread incorporation of his ideas by others—the vast majority of modern semiautomatics still utilize the basic Browning principles established over a century ago.

Argentina: Ballester Molina, circa 1930   322
Austria: Roth-Steyr Model 1907   322
Austria: Steyr Model 1912   323
Austria: Steyr Pi18, 1974   322
Austria: Glock 17, adopted by Austria 1983   324
Austria: Steyr GB, 1981   323
Austria: Steyr M Series, 2000   323
Belgium: FN Model 1900   325
Belgium: FN Model 1903   325
Belgium: FN Model 1910   325
Belgium: FN Model 1922   326
Belgium: FN Browning GP-35 High Power, 1935   327
Belgium: FN BDA 9, 1993   328
Belgium: FN Five-seveN, 1998   329
China: Type 64, 1964   330
China: Type 67, 1967   330
Czechoslovakia: CZ 22, 1922   330
Czechoslovakia: CZ 24, 1924   330

# EXHIBIT M

APP. 521

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>   **Plaintiffs**,<br><br>   **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>   **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF KEVIN M. SWEENEY</u>

Pursuant to 28 U.S.C. § 1746, I, Kevin M. Sweeney, declare and state as follows:

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.     I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.  I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts dating from the 1600s, 1700s, and early 1800s.  My current research on seventeenth and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts.  This project, which has been going on for over a decade, has produced academic papers given at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and two published essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and Militias in Seventeenth- and

Eighteenth-Century England and America" (2019).  My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

3.      I have been retained by the District of Columbia to provide an expert opinion on repeating firearms in eighteenth-century America.  I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $50 per hour.

4.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single-shot, muzzle-loading, flintlock firearms.  As Harold Peterson stated in his classic 1956 book—*Arms and Armor in Colonial America, 1526-1783*—"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons.  In 1783, almost a hundred years later, the period ended with the same weapons still supreme, and without even any notable improvements in their design or construction."[1]  Peterson continued "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[2]

5.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications.  First, these weapons described by Peterson were still "supreme" in 1800 and probably as late as 1810.  Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets.  Finally, it would more accurate to say that repeaters had *occasionally*

---

[1]      Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[2]      Ibid, 221.

**APP. 523**

appeared on the scene and not "frequently" as Peterson believed.  Here, he was probably misled

by the preference that private collectors and institutional collections had (and still have) for

obtaining rare examples of unusual or innovative firearms.

## I.   Firearms Owned by Eighteenth Century Americans

6.     Today, we tend to refer to any muzzle-loading eighteenth-century gun as a

musket, and this is what Peterson did in the statement quoted above.  However, Peterson knew

better, as did Ben Franklin.  In the mid-1740s, Franklin informed the readers of his Philadelphia

newspaper that a "Musket" was "the Name of a particular Kind of Gun."[3]  An eighteenth-century

musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about

an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for

attaching a bayonet.  It weighed about 10 to 11 pounds and was .69 caliber in its bore if French

or .75 caliber if English, with an average barrel length of 44 inches.[4]  Because of this fact,

colonial governments and later state governments had to scramble to obtain enough muskets to

arm troops raised during the French and Indian War (1754-1763) and the Revolutionary War

(1775-1783).  The British Ordnance Office loaned colonial governments 22,000 muskets to arm

provincial troops raised during the French and Indian War, and at least 100,000 European

muskets—most of them French—were imported during the American War for Independence.[5]

---

[3]      "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[4]      Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121–141.

[5]      De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120–123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484–485.

**APP. 524**

7.      As a rule, American colonists preferred lighter firearms that were better suited

than muskets for pest control, birding, or hunting.  Especially popular in New England were

locally made or imported smoothbore fowlers and fusils that weighed only 6 to 7 pounds and had

narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[6]  The narrower

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced

the weight of the lead ammunition one carried.[7]

8.      Many residents living in the colonies stretching from New York to Virginia

owned "trade guns."  These were cheap, muzzle-loading, single-shot, smooth-bore firearms

originally designed and produced for trade with Native Americans.  Some of these guns weighed

as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[8]

Because of these features, they were much easier to handle than a musket and employed about

half the weight of lead and powder that a musket did for each shot.

9.      In the backcountry of Pennsylvania and the colonies further south there was a

distinct minority of men who owned more expensive locally made long rifles.  As a rule, these

firearms weighed from 7 to 8 pounds, had .58 to .62 bores—though some were even smaller—

barrels averaging 42 inches in length, and fired projectiles weighing much less than musket

---

[6]      Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150–166.

[7]      Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121–122; Neumann, *Battle Weapons of the American Revolution*, 206–210.

[8]      M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 202–205.

**APP. 525**

balls.[9]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload and reloading became harder as gunpowder residue built up in the grooves of the barrel's rifling.[10]

10.     Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[11]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and because of this fact, they were often made in pairs "so that the owner might have two shots at his command."[12]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[13]  As it was, period pistols were discharged in close proximity to their targets, because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[14]

---

[9]     Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215–225.

[10]     John W. Wright, "The rifle in the American Revolution*," American Historical Review* Vol. 29, No. 2 (January 1924), 293–299.

[11]     Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[12]     Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[13]     For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd. e.d (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[14]     Douglas D. Scott, et al, "Colonial Era Firearm Bullet Performance: Alive Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

11.     Civilian officials and military officers generally had a low opinion of these popular firearms, including the period's long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[15]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian Trade," and not muskets.[16]  Later, George Washington referred to such smoothbore long arms as "trash or light arms."[17]  Over the course of the Revolutionary War, he and his officers also phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[18]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen, as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[19]

12.     Data drawn from the probate inventories of 3178 males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners.  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms.  Even cursory

---

[15]     "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265–266.

[16]     "Blair Report," 171.

[17]     General George Washington to Gentlemen, Morris Town, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[18]     Wright, "Rifle in the American Revolution," 297–298.

[19]     Thomas Jefferson, *Notes on the State of Virginia*, edited by William Pedue (New York: W. W. Norton, 1982), 88.

**APP. 527**

descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single-shot muzzle-loading firearm.  Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor was usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, guns clearly identified as muskets and rifles constituted a minority of such weapons.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 0.2% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 485 | 39.9% | 0.3% | 0.8% | 5.6% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 435 | 63.2% | 2.9% | 0.9% | 20.0% |

**Sources: The sources for the probate inventories used is this table can are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds.,** *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* **(Washington, D.C.: Smithsonian Press, 2019), 70-71.**

13.     The more expensive guns found in these 3178 eighteenth-century probate inventories were also likely to be some type of muzzle-loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was two or three times the cost of common muzzle-loading

7

**APP. 528**

smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, were the period's more realistic provision for being able to readily discharge more than one shot.  Even more rare were references to custom-made firearms such as a left-handed gun.  Nothing found in the almost 3200 probate inventories contained in the database used to construct Table 1 can be identified as a repeating firearm.

II.    **References to Repeating Arms in Eighteenth Century Media**

14.    Information drawn from 1170 eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5000 newspapers—tells much the same story.[20]  The search turned up 480 different newspaper advertisements for wholesalers and retailers which indicate the types of firearms that were available for purchase.  Another 132 personal advertisements for lost, stolen, or found guns and 96 notices of public auctions provide further insight into the kinds guns that residents actually possessed.  News reports of 233 accidents describe firearms that were used and abused while hunting, attending militia musters, shooting vermin, and engaging in reckless horse play with guns that unexpectedly turned out to be loaded.  Tragically, these reports also recount accidental discharges of loaded guns that were stored or left lying about inside eighteenth-century homes.  Reports on 167 homicides and attempted homicides and on 62 robberies reveal the types of firearms employed in activities considered to be criminal.  All told, these 1170 newspaper sources contained 1648 references to firearms.

15.    So, how common were repeating firearms in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Among the 1648

---

[20]    *America's Historical Newspapers* (Chester, VT: Readex, 2004).

8

references to guns uncovered in the 1170 eighteenth-century newspaper advertisements and news reports on crime only 6 contained references to repeating firearms.  To this total can be added 3 more news reports that mentioned repeating firearms that were not related to criminal activities and were therefore not included in the total of 1170.  To this information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777.  This makes a total of 10 references to eighteenth-century repeaters in period sources.

16.     What do these period references to repeating firearms tell us about their features and practicality, how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America?  The earliest newspaper reference to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723:  "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once.  This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730.  This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty.  There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[21]

---

[21]     John Pimm's 1715 revolver with a hand rotated cylinder and flint ignition system bears an apparent resemblance to a modern Smith and Wesson .38 caliber revolver.  Brown, *Firearms in Colonial America*, 255–256.  Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed.  The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint.  The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel.  He then pulled back the hammer by hand.  Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball.  To fire again, the

9

17.     The next newspaper reference is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*.  It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading."  This advertisement also makes clear the novelty of such a repeating firearm. Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—about the equivalent of a day's wage for unskilled labor—to see it fired. Basically, this gun was being used in an eighteenth-century version of a sideshow.  There is no indication that Miller was producing or selling such firearms.

18.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson (1674-1762) advertised for sale a gun capable of firing 9 bullets in rapid succession.  It was "A handy Gun of 9 pounds and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle of the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun."  The advertisement provides a

---

shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above.  Primm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530.  Brown, *Firearms in Colonial America*, 50.  However, they remained rare, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously. Brown, *Firearms in Colonial, America*, 50–51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56.  The revolver patented by Samuel Colt in 1836 and produced in his factory in Patterson, New Jersey employed percussion caps in its priming system and remains the first practical revolver to enter production.  The cylinder rotated when the gun was cocked and fired when the trigger was pulled.  However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory.  See Peterson, *Treasury of the Gun*, 211.

APP. 531

spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Amouries Museum in Leeds, and the Victoria and Albert Museum in London that were produced sometime around 1690 by John Cookson, an English gunsmith.[22]  These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges

19.     Cookson's English repeater employed what was known as the Lorenzoni breech-loading system.[23]  This system placed at the end of the barrel a complex and delicate gun lock operated by a handle or lever attached to the left side of the lock.  Separate tubes in the stock of the firearm were filled with gunpowder for each charge and 9 to 11 balls.  The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough priming powder to set off the charge in the barrel when the trigger was pulled.  To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger.  However, if the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flames might leak back and explode the powder stored in the butt.  Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing and fitting together the parts needed to prevent malfunctions caused by errant sparks.

---

[22]     Brown, *Firearms in Colonial America*, 144–146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June, 2022), 43–63.

[23]     Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot.  His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon innovations by two German gunsmiths, Peter and Mathias Kaltoff.  Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun,* 229-231.  Today this type of repeating firearm it is generally identified as employing the Lorenzoni system by English and American collectors and curators.

11

20.    Sometime before 1701, John Cookson moved to Boston.[24]  Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston.  There are no surviving eighteenth-century, American-made Cookson repeaters.[25]  This is actually not surprising that given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[26]  Authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[27]  The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[28]

21.    The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records of the Continental Congress.  English gunsmith and inventor Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid to discharge eight balls one after another, in eight, five or three seconds of time."[29]  He also claimed that his gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[30]  Despite a congressional resolution to purchase Belton's weapon,

---

[24]    Weaver and Godwin, "John Cookson, gunmaker," 51–56, 59–61.

[25]    Ibid., 56, 60.  Weaver and Goodwin make clear that the firearm identified as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was actually made in the late 1600s by John Shaw, a London gunsmith.

[26]    Ibid., 55.

[27]    Ibid., 60.

[28]    Ibid., 56-57.

[29]    Quoted in Brown, *Firearms in Colonial America*, 317.

[30]    Ibid.

none are known to have been produced or delivered.  It appears that Belton and Congress failed

to agree on a price.  The fate of Belton's repeater underscores two reasons why such weapons

were not popular with civilians and even had a hard time winning a military contract:  they were

expensive and they expended a lot of powder and lead with each discharge.

      22.     If the arm that Belton demonstrated in Philadelphia in 1777 resembled to any

degree the repeating firearm that he produced in England in 1786, it was also heavy and

challenging to handle.  Belton returned to London in 1784 where he entered into a partnership

with London gunsmith William Jover (active 1750-1810).  In 1786, they produced a smoothbore

repeating fire arm with a sliding firelock and replaceable metal magazine containing seven

projectiles.  With each cock of the hammer and pull of the trigger, a single projectile could be

discharged.  There are two examples of the Jover and Belton repeating firearm in the collection

of the Royal Armouries, National Firearms Center in Leeds, England.  It weighs 10 pounds

unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the

Keeper of Firearms and Artillery at the Firearms Center observes in an on-line video that

managing the weapon is "a bit of a three-handed job."[31]

      23.     Another disadvantage associated with eighteenth-century repeating firearms arose

from their reliance on large charges of black powder as an explosive propellant for discharging

bullets.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from

Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and philosophic Mr.

Chambers of Mercersburg in Pennsylvania."  This was Joseph Gaston Chambers (1756-1829).

According to the news report, this firearm "discharged six balls in succession, with only one

---

[31]     Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-
OmUM40G2U.  Accessed online 11/6/2022 at 4:00 P.M.

**APP. 534**

loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger."  A drawing of this firearm is attached as Exhibit B.

24.     This unusual firearm employed what is today referred to as a superposed or superimposition system that set off a series of charges in a single barrel.  This approach to achieving a basically uncontrolled discharge of a succession of bullets had been tried as early as 1580 by a German gunsmith working in London.[32]  Today, early flintlock pistols that used a superposed loading system are sometimes referred to as the "Roman candle pistol," because it employed "the same principle as the firework" that involved setting off "a chain reaction of multiple discharges."[33]  Other writers also liken such firearms that used a superposed system of multiple charges to a "Roman candle."[34]  In the 1820s, the "complexity and inherent dangers" of superposed systems such as that employed by Chambers "led to their wholesale abandonment."[35]

25.     Chambers's specific version of the system employed two gun locks:  one near the front of the barrel and the other in the usual location at the barrel's breech.  First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech.  This was the reserve shot.  Next a succession of eight cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel.  Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle which fired the first cylindrical projectile.  A hole in the next projectile carried the charge though

---

[32]     Peterson, *Treasury of the Gun*, 195.

[33]     Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara*, CA: ABC-CLIO, 2004), 37.

[34]     Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[35]     Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" accessed online 10/25/2022 at 4:55 P.M, page 2 of 6.  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**APP. 535**

it and down its conical tail which ignited the charge which propelled the second cylindrical charge and so on.  Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[36]

26.     The inventor's initial efforts to win government support and a patent for his invention were unsuccessful.  A demonstration in May of 1793 failed to impress the War Department.  Later in 1813, he did secure a patent to supply the U. S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[37]  The Navy's use of these weapons attracted the attention of the British and Dutch governments.  However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government.  His guns did work, but they could also produce devastating malfunctions.  As historian Andrew Fagal has pointed out, cramming the gun's barrel with projectiles and gunpowder produced what was potentially a pipe bomb.[38]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[39]  With Chambers's particular system, an explosion would actually be guaranteed if a shooter accidently first pulled the trigger nearest the breech.

27.     A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use gunpowder.  There are two advertisements—one for a demonstration and one for an auction—that contained references to guns. The February 10, 1792 issue of New York

---

[36]     For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821," pages 2–3 of 6.

[37]     Peterson, *Treasury of the Gun*, 197.

[38]     Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[39]     Peterson, *Treasury of the G*un, 198.

City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, although in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.

28.     This particular air gun appears to have resembled or possibly could have been an actual example of the European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun also had a magazine with a capacity of 20 balls, each of which was propelled by discharges of compressed air from a cannister of compressed air carried in the gun's stock.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

29.     However, someone at this time does appear to have been selling air guns.  An announcement for a public auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot."  This air gun appears to be a repeating gun because of its reference to a "Magazine."  However, one should not automatically assume that all eighteenth-century air guns

**APP. 537**

were repeaters.  Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single-shot air guns, though some erroneously assume that they were repeaters like Girardoni's air rifle.[40]

30.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers. One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia."  However, this particular news report has been dismissed as a fabrication.[41] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina.  It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries.  Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular "could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

31.     Ransier appears to be describing imported Belgian or French-made Seglas pistols which had four rifled barrels.  These were small pistols that had a box lock and a swiveling breech attached to a cluster of four separate barrels:  two upper barrels placed on top of two lower barrels.  The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels.  Each barrel was

---

[40]     Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West, accessed online on 10/31/2022, at 10:40 A.M.  On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[41]     Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability as does the fact that it was immediately followed by a news report on a Sea Monster. An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report. Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

17

loaded separately at the muzzle with powder and ball.  The two upper barrels could be fired one

at a time by pulling each of the individual triggers in succession or fired simultaneously by

pulling both triggers at once (which could be risky).  After discharging the two upper barrels, the

shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's

trigger guard.  Once rotated to the upper position, the two barrels formerly in the lower position

could now be fired when the triggers were pulled individually or simultaneously.  However, as

experts have pointed out:  "All revolvers, and other multibarrel guns, of the muzzle-loading type

were at risk from a dangerous chain reaction, in which firing one chamber could accidently set

off all the others."[42]  If this happened, the gun would explode in the shooter's hand.

32.     In summary, period probate inventories and newspapers indicate that repeating

firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were

regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in

Joseph Belton's repeating flintlock, and in 1813 the United States Navy purchased 200 muskets

and 100 pistols produced by Joseph Gaston Chambers.  Lewis and Clark and their "Corps of

Discovery" consisting of soldiers carried a Girardoni air rifle to the Pacific Ocean and back.

However, well into the 1800s, the American government armed the overwhelming majority of its

soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army

made only limited use of the much more reliable repeating firearms made by the Spencer Arms

Company and the New Haven Arms Company, which was owned by Oliver Winchester and

produced a repeater designed by Benjamin Henry.

33.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century

Americans is really not surprising given the colonists' demonstrated preferences for inexpensive,

---

[42]     Rimer, *Smithsonian's Firearms,* 56.

light firearms that used less powder and lead than did muskets. By contrast, most of the period's repeating arms were heavy, more expensive, and required greater expenditures of gunpowder and lead. Because repeating firearms contained multiple charges of explosive black powder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile. Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb. As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[43] For these reasons, eighteenth-century advertisements and homes were still filled with muzzle-loading, single-shot firearms.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on _11/22/2022_          _Kevin M. Sweeney (signature)_
                                KEVIN M. SWEENEY

---

[43]     Peterson, *Treasury of the Gun*, 233.

**APP. 540**

**Exhibit B**



# EXHIBIT O

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF DANIEL W. WEBSTER</u>

Pursuant to 28 U.S.C. § 1746, I, Daniel W. Webster, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.  I am Co-Director of the Johns Hopkins Center for Gun Violence Solutions and served as either Director or Co-director of Policy and Research and previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.

3.      I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health, and I have devoted most of my research since then to gun-related violence and its prevention.  I have a Master of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health.  This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

4.     Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (D.C.) Hospital Center.  I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of Health Policy and Management.  I teach graduate courses on violence prevention. Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program in Health and Public Policy, and served on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health.

5.     I have directed numerous studies related to gun violence and its prevention.  I have published 147 scientific articles and nine invited commentaries in academic peer-reviewed journals, the vast majority of these addressed some aspect of violence and/or firearm injuries and their prevention.  I am the lead editor of a book entitled *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* by Johns Hopkins University Press (2013), and I am the lead author for two chapters and co-author on three other chapters in this book.  In addition, I recently served as special editor or co-editor of three special issues on gun violence for top tier public health journals.  My curriculum vitae, detailing these publications, is attached as Exhibit 1 to this Declaration.

6.     I have been asked by the Attorney General's Office for the District of Columbia to provide information about current research on gun violence and its prevention, particularly as it relates to large capacity magazines.  I have provided this declaration without charge.

7.     There are data that indicate that design and capabilities of firearms can potentially affect the likelihood that an intended target or bystander at a shooting will be wounded as well as the severity of wounds resulting from criminal shootings.  Particularly relevant is the capacity of a firearm's ammunition feeding device.  In comparison to other magazines which feed

**APP. 544**

ammunition to semi-automatic firearms, large capacity magazines (LCMs)—often defined as those that hold more than 10 rounds—increase the number of rounds that can be fired without the shooter having to take the time to reload.

8.      Assault weapons have been defined in laws as semi-automatic firearms capable of accepting LCMs in addition to one or more deemed useful in military or criminal applications, especially mass shootings.  These include pistol grips on rifles, folding rifle stocks (to make rifles more concealable), threaded barrels for attaching silencers, and barrel shrouds on pistols.

9.      There is evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings.  When mass shootings occur in public, especially shootings that take place in public places, the shooter often selects an assault weapon or another firearm with an LCM.  Data on 15 public mass shootings in the U.S. from 1984 to 1993 collected by Gary Kleck revealed that six (40%) involved assault weapons or other firearms equipped with LCMs.[1,2]  A collection of data by Mother Jones magazine on 62 mass shootings in public places by lone shooters from 1982 through 2012 found that 33 perpetrators (53.2%) used firearms or LCMs that were or would have been banned by the federal ban of assault weapons and LCMs.[3]

10.      Reviewing data on fatal mass shootings (4 or more victim fatalities) compiled by Everytown for Gun safety for the period 2009-2020, an assault weapon was used in at least 30 of

---

[1]      Kleck, Gary. Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter, pp. 124-126 (1997).

[2]      Koper, Christopher S. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. Philadelphia: University of Pennsylvania. p. 14 (2004).

[3]      Mother Jones Magazine, US Mass Shootings, 1982-2012.  Data from Mother Jones' Investigation, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (2014).

**APP. 545**

these events involving 347 deaths (25% of all victims killed in mass shootings) and 719 individuals with nonfatal gunshot wounds (76% of the total). Fatal mass shootings during this time period that were carried out with an assault weapon accounted for 6 times as many people shot as fatal mass shootings committed with other firearms.[4] In these same data, a total of 42 fatal mass shootings were committed with firearms with an LCM the resulted in 422 deaths and an additional 710 with nonfatal gunshot wounds. In comparison with the 34 fatal mass shootings in which there was information indicating that the firearm did not have an LCM, the average number of people shot was 4.4 times higher in shootings with firearms with LCMs (26.6 vs. 6.0).

11.    Similarly, Professor Christopher Koper's re-analysis of data from Mother Jones magazine's study of public mass murders with firearms (1982-2012) revealed that mass shootings with assault weapons, compared with mass shootings with other firearms, involved more fatalities per incident (a mean of 10.4 vs. 7.4) and more victims with nonfatal gunshot wounds (mean of 13.5 vs. 6.4).[5]  Dillon (2013) also reported that, compared with assaults carried out with firearms that did not have LCMs, mass shootings in which firearms with LCMs were used had 60% more fatalities on average (a mean of 10.19 vs. 6.35) and more than 3 times as many persons with nonfatal gunshot wounds (12.39 vs. 3.55).  These findings are consistent with those from a study of criminal shootings in Jersey City, NJ, which found that, compared to

---

[4] Everytown Research & Policy. Mass Shootings in America.
https://everytownresearch.org/maps/mass-shootings-in-america/#mass-shootings-involving-assault-weapons-or-high-capacity-magazines-were-far-deadlier

[5]    Dillon, Luke, Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012, Thesis for Master of Arts in Criminology, Law and Society, George Mason University, September 2013; Koper, Christopher S., Supplemental affidavit submitted on January 6, 2014 in *Shew v. Malloy*, Civil Action No. 3:13-CV-00739-AVC (D. Conn).

APP. 546

shootings with revolvers, shootings with semi-automatic pistols—which tend to hold significantly more bullets than revolvers—had more shots fired and more victims wounded.[6]

12.     A study led by criminologist Christopher Koper and colleagues gather a variety of kinds of data from law enforcement agencies on the use of LCMs and assault weapons in various types of crime.  Firearms with LCMs accounted for 15 to 36% of firearms recovered by law enforcement across ten cities with detailed data on firearm characteristics between 2001 and 2014, 40.6% of firearms used to murder police nationally between 2009 and 2013, and as much as 57.4% of firearms used in mass shootings involving 4 or more victim deaths for the period 2009-2015.[7]   In this same study, Dr. Koper and his colleagues reported that assault weapons accounted for between 2.6 and 8.5% of firearms recovered by 10 large city police departments between 2001 and 2014, 13.2% of murders of police involving firearms, and up to 35.7% of fatal mass shootings nationally 2009-2015.[7]   In a separate study published in *Criminology & Public Policy* in 2019 that drew upon a wider set of data on fatal mass shootings, Dr. Koper found that about half of all firearms used in fatal mass shootings[8] and two-thirds of the most deadly shootings were committed with semiautomatic firearms with LCMs.[9]   When details on the

---

[6]     Reedy, Darin C., and Christopher S. Koper, Impact of handgun types on gun assault outcomes:  a comparison of gun assaults involving semiautomatic pistols and revolvers, *Injury Prevention* 9:151-155 (2003).

[7]     Koper, Christopher S., William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources. *Journal of Urban Health* (2017), DOI 10.1007/s11524-017-0205-7

[8]     Koper, Christopher S. Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms. *Criminology & Public Policy*. 19(1): 147-170 (2020), https://doi.org/10.1111/1745-9133.12485

[9]     Klarevas, Louis. *Rampage Nation: Securing America from Mass Shootings*. Amherst, NY: Prometheus Books (2016).

weapons used in fatal mass shootings was available, just over one quarter involved the use of an assault weapon.[10]

13.　　As a point of comparison, it is estimated that assault weapons accounted for about 3 percent of all firearms in civilian hands in 2013.  Thus, semiautomatic firearms with LCMs and assault weapons specifically are used in crime, lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than would be by chance or if weapon features played no role in these acts of violence.  A study using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.[11]  These findings are consistent with the thesis that design features of assault style firearms, including LCMs, are attractive to those who are most likely to use firearms in crime.

14.　　Available evidence indicates that bans of LCMs and assault weapons reduce the incidence of fatal mass shootings and the number of people shot in such shootings.  In a study that I led that was published in *Criminology & Public Policy* (a journal of the American Society of Criminology) my team analyzed data on fatal mass shootings by state over the period 1984-2017 to assess independent associations between state and federal firearm laws and the incidence of fatal mass shootings.  Using regression analyses to control for other factors in addition to

---

[10] Koper (2019) and Klarevas (2016) in footnotes 8 and 9.
[11] Wintemute, Garen J, Mona A Wright, Carrie A Parham, Christiana M Drake, and James J Beaumont. (1998) Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32(1):44-50. doi.org/10.1016/S0196-0644(98)70098-8

**APP. 548**

firearm laws, we found that state bans on LCMs were associated with a statistically significant 48 percent lower incidence of fatal mass shootings when contrasted with state-years in which there was no LCM ban.[12]  Our statistical models also indicated that LCM bans were associated with 70% fewer deaths from fatal mass shootings per capita; however, there was a wide confidence interval around that estimate.  Another study, using similar data and methods also published in 2020 likewise found that LCM bans were associated with significantly lower rates of fatal mass shootings.[13]  Dr. Louis Klarevas led a study published in the American Journal of Public Health 2019 using data from 1990-2017 and reported that the incidence of high-fatality mass shootings (6 or more victim deaths) in non-LCM ban states was more than double the rate in LCM ban states; the annual number of deaths from these shootings per capita was more than 3 times higher.  Statistical models also found a significant association between LCM bans and lower rates of high-fatality mass shootings.[14]  From the available research evidence, I conclude that state bans of LCMs are associated with lower rates of fatal mass shootings and mass shooting deaths.

15.    I have also conducted and synthesized research on the estimated effects of bans of assault weapons on fatal mass shootings.  First, there is evidence that the federal ban of assault weapons and LCMs reduced the incidence of the criminal use of banned guns.  Christopher

---

[12]    Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa Doll Booty, and Elizabeth A. Stuart. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. *Criminology & Public Policy*, 19:171–212 (2020), doi.org/10.1111/1745-9133.12487.

[13]    Siegel M, Goder-Rieser M, Duwe G, Rocque M, Fox JA. The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018. *Law and Human Behavior*. 44(5): 34t-360 (2020), http://dx.doi.org/10.1037/lhb0000378

[14]    Klarevas, Louis, A Conner, David Hemenway. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *American Journal of Public Health*. 109(12):1754-1761 (2019), doi: 10.2105/AJPH.2019.305311

**APP. 549**

Koper and colleagues' study of the federal ban that used a variety of data revealed about a one third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons.[15]

16.    The study that I led on firearm laws and fatal mass shootings estimated the independent association between state assault weapons bans and fatal mass shootings.  Our point estimates suggested that assault weapon bans were associated with a 29 to 36% lower rate of fatal mass shootings after controlling for the effects of LCM bans and other firearm laws. However, there was significant uncertainty surrounding those estimates and they were not statistically significant.  In a study of public fatal mass shootings during 1982-2011 and the association with federal and state assault weapon bans, economist Mark Gius found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.[16]

17.    A recent study used the most comprehensive data collected to date on fatal mass shootings in public places[17] to assess the effects of the federal ban on assault weapons and LCMs and the sunsetting of that law in 2004.  Philip Cook and John Donohue found that fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired.  From 2015 to 2019, five of the top ten deadliest mass public shootings in

---

[15]    Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003," National Institute of Justice, US Department of Justice (June 2004).

[16]    Mark Gius. The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings. *Applied Economics Letters* 22(2):281–284 (2015).

[17]    Violence Project. Mass shooter database: version 5.0. https://www.theviolenceproject.org/mass-shooter-database/

**APP. 550**

U.S. history occurred and each was committed with an assault weapon.  The number of fatalities

resulting from mass public shootings with other weapons has remained relatively flat.[18]

 I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___November 22, 2022_        _____

        DANIEL W. WEBSTER

---

[18] Cook, Philip J. and John J. Donohue. Regulating Assault Weapons and Large-Capacity Magazines for Ammunition. *JAMA.* 2022;328(12):1191-1192 (2022), doi:10.1001/jama.2022.17120

**APP. 551**

# EXHIBIT P

## REPORT OF FIREARMS COMMITTEE

*To the National Conference of Commissioners on Uniform State Laws:*

The report of this committee at Buffalo last year showed that following the publication of the Uniform Firearms Act as approved by the Conference and the Bar Association at Denver in July, 1926, some objections raised by the Police Commissioner of New York City through Governor Whitman induced the Executive Committee of the Conference in January, 1927, to recommend to the Conference the withholding of the act from presentation to the states, and the recommitment of the matter to the Firearms Committee for further study and report. (Handbook, 1927, p. 866.) In view of this action of the Executive Committee of the Conference the Executive Committee of the American Bar Association took under reconsideration the approval of the act, this action being approved at the Buffalo meeting. (Bar Assn. Reports, No. 52, 1927, p. 223.)

The Firearms Committee reported at the Buffalo meeting, outlining its efforts to cooperate with the National Crime Commission, which through a subcommittee had drafted and presented to the legislatures the so-called Crime Commission Bill on the subject of firearms regulation. The text of this was printed in display with the text of the Uniform Act. It was pointed out that the Crimes Commission had taken the Uniform Act as the basis of its work, adopting a great deal of it, but with the addition of some new matters, and the change of some of the principles of the Uniform Act. (Handbook, 1927, pp. 866-914.) These matters were also adverted to by President Young in his opening address. (*Ibid.*, p. 453.) In accordance with the recommendations of the committee the Conference voted as follows (*Ibid.*, pp. 267-268, 914):

419

" 1. That in accordance with action already taken by the Executive Committee the Uniform Firearms Act be withheld from presentation to the legislatures until further action of the Conference.

" 2. That the committee on the Uniform Firearms Act be continued for the purpose of giving further consideration to the objections thereto, for further study of other proposed legislation, for further conferences with the committee of the National Crime Commission, and for further report as to whether or not it is desirable that the act be amended or retained in its present form, or as to what definite disposition should be made thereof."

With the Uniform Act thus back for consideration various meetings have been held during the year between members of the undersigned committee and members of the subcommittee of the National Crime Commission. The final joint meetings were in Washington on April 26-27, 1928, at which were present on behalf of your committee Judge Ailshie and Messrs. O'Connell and Imlay, and on behalf of the subcommittee of the Crime Commission General J. Weston Allen and Mr. J. E. Baum, of the American Bankers Association.

As a result of these meetings and the separate attention given to these matters by your own committee, both in personal conference in Washington, and in an exchange of views by letter, your committee has formulated a proposed revision, printed herewith, of the Uniform Act, incorporating some of the new matter of the Crime Commission Bill, but retaining the basic features of the Uniform Act. In notes accompanying each section, which should be studied in connection with the parallel references in the two acts as printed in last year's report (Handbook, 1927, pp. 878-889), an attempt has been made to indicate the changes. Some of the matters of major importance may be summarized as follows:

1. The revision incorporates the new matter of the Crime Commission Bill on machine guns. Most of the firearms legislation passed in the current year has been on the subject of machine guns, e. g., General Laws of California of 1927, Ch. 552; Acts and Resolves of Mass., 1927, Ch. 326; Mich. Public Acts of 1927, No. 372; N. J. Public Laws 1927, Ch. 95, p. 180. There has been recent legislation on the subject also in Iowa.

2. The revision retains the principle of forbidding the carrying of concealed weapons with strict regulations for identification, but does not require a license to purchase as does the Crime Commission Bill. This constitutes the basic difference between the two acts. Upon this point your committee and the subcommittee of the Crime Commission have been unable to agree.

3. The revision retains the method of the Uniform Act in providing a general penalty section (S. 19) rather than, as in the other act, placing penalty clauses within the various sections.

4. The revision, like the original act, does not fix mandatory sentences, the matter of sentences being left open for the exercise of discretion by the courts.

Upon the basic difference between the two acts mentioned above your committee has bestowed much careful thought. The form of regulation contained in the Uniform Act was adopted by the Conference advisedly. That form is consistent with the forms of regulation which have always obtained and now obtain in the states generally, as the analysis of the subject in the second report of this committee shows. (Handbook, 1925, pp. 854-898.) The system of license to purchase has been for many years the law of New York. It was adopted in Michigan in 1925, being reenacted in the 1927 act mentioned above: it was also adopted in Massachusetts in 1926. (Acts of 1926, Ch. 395.) Beyond those states it has not gone, so far as this committee is advised.

This committee reaffirms the position heretofore taken on this subject, that such a provision is not only out of line with legislative precedents and experience, but is unenforceable. It would make criminals out of law-abiding citizens, and would not be obeyed by the lawless.

A bill drawn very much along the lines of this proposed revision, was introduced into the United States Senate April 16, 1928, by Senator Capper (S. 4086, 70th Cong.) as a local law for the District of Columbia: the same bill was introduced into the House of Representatives a few days later by Representative Frederick J. Zihlman of Maryland, a member of the District of Columbia Committee (No. 13211). The bills are now under consideration before the respective Committees on the District of Columbia of the two houses.

Your committee presents this revision for the consideration of the Conference and recommends its adoption as an act which preserves the results achieved in the work heretofore done on the Uniform Act, and incorporates valuable new material from the Crime Commission Act.

Respectfully submitted,

JOSEPH F. O'CONNELL, *Chairman,*
JAMES F. AILSHIE,
CHARLES V. IMLAY,
J. O. SETH,
L. C. SPIETH,
D. A. McDOUGAL,
GEORGE B. MARTIN,
HARRY L. CRAM.

## A UNIFORM ACT TO REGULATE THE SALE AND POSSESSION OF FIREARMS

AN ACT REGULATING THE SALE, TRANSFER AND POSSESSION OF CERTAIN FIREARMS, PRESCRIBING PENALTIES AND RULES OF EVIDENCE, AND TO MAKE UNIFORM THE LAW WITH REFERENCE THERETO

1  SECTION 1. (*Definitions.*) "Pistol," as used in this act,
2  means any firearm with a barrel less than twelve inches in
3  length.
4  "Machine gun," as used in this act, means any firearm
5  which shoots automatically and any firearm which shoots
6  more than twelve shots semi-automatically without reloading.
7  "Person," as used in this act, includes firm, association or
8  corporation.
9  "Sell" and "purchase" and the various derivatives of
10  such words, as used in this act, shall be construed to include
11  letting on hire, giving, lending, borrowing, and otherwise
12  transferring.
13  "Crime of violence," as used in this act, means any of the
14  following crimes or an attempt to commit any of the same,
15  namely: Murder, manslaughter, rape, mayhem, assault to do
16  great bodily harm, robbery, larceny, burglary, and house-
17  breaking.

422

*Note:* The words "or revolver" are omitted in the first definition and at other places where they occur in the Uniform Act, as in the Crime Commission Act, for greater simplicity.

The new definition of "machine gun" is substantially that of the Crime Commission Act.

The new definitions of "person" and "sell and purchase" are substantially those of the Crime Commission Act.

1   SECTION 2. (*Committing Crime When Armed.*) If any
2   person shall commit a crime of violence when armed with or
3   having readily available any pistol or other firearm, he may
4   in addition to the punishment provided for the crime be
5   punished also as provided by this act.

*Note:* The words "or having readily available" and "or other firearm" are added from the Crime Commission Act.

1   SECTION 3. (*Being Armed Prima Facie Evidence of In-*
2   *tent.*) In the trial of a person for committing a crime of
3   violence the fact that he was armed or had readily available
4   a pistol, and had no license to carry the same, or was armed
5   with or had readily available any other firearm having a total
6   length of less than twenty-six inches, or any machine gun,
7   shall be *prima facie* evidence of his intention to commit such
8   crime of violence.

*Note:* The words "or had readily available" are added from the Crime Commission Act: the words "or was armed with, etc.," are adopted from that act, to include firearms longer than twelve inches capable of being concealed on the person and machine guns.

1   SECTION 4. (*Persons Forbidden to Possess Certain Fire-*
2   *arms.*) No person who has been convicted in this state or
3   elsewhere of a crime of violence shall own a pistol or have one
4   in his possession or under his control.

*Note:* This section is substantially the same as that of the original Uniform Act and of the Crime Commission Act, except that the latter specifies a punishment which in this proposed revision as in the original Uniform Act is left for a general section.

1   SECTION 5. (*Carrying Pistol.*) No person shall carry a
2   pistol in any vehicle or concealed on or about his person, ex-
3   cept in his dwelling house or place of business or on other

423

4  land possessed by him, without a license therefor issued as
5  hereinafter provided.

*Note:* This section is the same as that of the original Uniform Act except that it incorporates the language of the corresponding Section 11 of the Crime Commission Act in making the prohibition against carrying pistols in vehicles absolute.

1    SECTION 6. (*Exceptions.*) The provisions of the preced-
2  ing section shall not apply to marshals, sheriffs, prison or
3  jail wardens or their deputies, policemen or other duly ap-
4  pointed law-enforcement officers, or to members of the army,
5  navy, or marine corps of the United States or of the national
6  guard or organized reserves when on duty, or to the regu-
7  larly enrolled members of any organization duly authorized
8  to purchase or receive such weapons from the United States
9  or from this state, provided such members are at or are going
10  to or from their places of assembly or target practice, or to
11  officers or employees of the United States duly authorized to
12  carry a concealed pistol, or to any person engaged in the busi-
13  ness of manufacturing, repairing, or dealing in firearms or
14  the agent or representative of any such person having in his
15  possession, using, or carrying a pistol in the usual or ordinary
16  course of such business, or to any person while carrying a
17  pistol unloaded and in a secure wrapper from the place of
18  purchase to his home or place of business or to a place of
19  repair or back to his home or place of business or in moving
20  goods from one place of abode or business to another.

*Note:* This section remains the same as that of the original Uniform Act with a few modifications introduced from the corresponding Section 12 of the Crime Commission Act.

1    SECTION 7. (*Issue of Licenses to Carry.*) [The justice
2  of a court of record, the chief of police of a city or town, and
3  the sheriff of a county or the persons authorized by any of
4  them] shall, upon the application of any person having a
5  bona fide residence or place of business within the jurisdic-
6  tion of said licensing authority or of any person having a
7  bona fide residence or place of business within the United
8  States and a license to carry a pistol concealed upon his per-
9  son issued by the lawful authorities of any state or subdivi-

424

10   sion of the United States, issue a license to such person to
11   carry a pistol within this state for not more than one year
12   from date of issue, if it appears that the applicant has good
13   reason to fear injury to his person or property or has any
14   other proper reason for carrying a pistol and that he is a
15   suitable person to be so licensed. The license shall be in tripli-
16   cate in form to be prescribed by the [Secretary of State] and
17   shall bear the name, address, description, photograph, and
18   signature of the licensee and the reason given for desiring a
19   license. The original thereof shall be delivered to the licensee,
20   the duplicate shall within seven days be sent by registered
21   mail to the [Secretary of State] and the triplicate shall be
22   preserved for six years by the authority issuing said license.

*Note:* This section remains substantially as in the original Uniform Act
and as in Section 10 of the Crime Commission Act.

1   SECTION 8.   (*Selling to Minors and Others.*)   No person
2   shall sell any pistol to a person who he has reasonable cause
3   to believe is not of sound mind, or is a drug addict, or is a
4   person who has been convicted in the District of Columbia or
5   elsewhere of a crime of violence, or, except when the relation
6   of parent and child or guardian and ward exists, is under
7   the age of eighteen years.

*Note:* This section has been expanded to include in addition to infants
the other disqualified persons named in the corresponding Section 7 of the
Crime Commission Act.

1   SECTION 9.   (*Transfers Regulated.*)   No seller shall de-
2   liver a pistol to the purchaser thereof until forty-eight hours
3   shall have elapsed from the time of the application for the
4   purchase thereof, and, when delivered, said pistol shall be
5   securely wrapped and shall be unloaded. At the time of ap-
6   plying for the purchase of a pistol the purchaser shall sign
7   in triplicate and deliver to the seller a statement containing
8   his full name, address, occupation, color, place of birth, the
9   date and hour of application, the caliber, make, model, and
10   manufacturer's number of the pistol to be purchased and a
11   statement that he has never been convicted in this state or
12   elsewhere of a crime of violence. The seller shall within six

425

13  hours after such application sign and attach his address and
14  forward by registered mail one copy of such statement to the
15  chief of police of the city or town or the sheriff of the county
16  of which the seller is a resident; the duplicate the seller shall
17  within seven days send with his signature and address to the
18  [Secretary of State]; the triplicate he shall retain for six
19  years. This section shall not apply to sales at wholesale.

*Note:* This section has been modified to require forty-eight instead of
twenty-four hours to elapse from the time of application till the time of
delivery of a weapon. A provision is also inserted for a more immediate
notice to the police.

1  SECTION 10. (*Dealers to be Licensed.*)  No retail dealer
2  shall sell or expose for sale or have in his possession with in-
3  tent to sell any pistol without being licensed as hereinafter
4  provided.

*Note:* This section remains in substance the same as in the original
Uniform Act except that with the new matters of definition adopted from
the Crime Commission Act it conforms in language to Section 6 thereof.

1  SECTION 11. (*Dealers' Licenses, by Whom Granted and
2  Conditions Thereof.*)  The duly constituted licensing authori-
3  ties of any city, town, or political subdivision of this state
4  may grant licenses in form prescribed by the [Secretary of
5  State] effective for not more than one year from date of issue,
6  permitting the licensee to sell pistols at retail within this
7  state subject to the following conditions in addition to those
8  specified in Section 9 hereof, for breach of any of which the
9  license shall be subject to forfeiture and the licensee subject
10  to punishment as provided in this act:

11  1. The business shall be carried on only in the building
12  designated in the license.

13  2. The license or a copy thereof, certified by the issuing
14  authority, shall be displayed on the premises where it can
15  easily be read.

16  3. No pistol shall be sold (a) if the seller has reasonable
17  cause to believe that the purchaser is not of sound mind or
18  is a drug addict or has been convicted in this state or else-
19  where of a crime of violence or is under the age of eighteen

426

20 years, or (b) unless the purchaser is personally known to
21 the seller or shall present clear evidence of his identity.

22   4. A true record in triplicate shall be made of every pistol
23 sold, said record to be made in a book kept for the purpose,
24 the form of which may be prescribed by the [Secretary of
25 State] and shall be personally signed by the purchaser and
26 by the person effecting the sale, each in the presence of the
27 other, and shall contain the date of sale, the caliber, make,
28 model, and manufacturer's number of the weapon, the name,
29 address, occupation, color, and place of birth of the purchaser,
30 and a statement signed by the purchaser that he has never
31 been convicted in this state or elsewhere of a crime of vio-
32 lence. One copy of said record shall within six hours be sent
33 by registered mail to the chief of police of the city or town
34 or the sheriff of the county of which the dealer is a resident;
35 the duplicate the dealer shall within seven days send to the
36 [Secretary of State]; the triplicate the dealer shall retain for
37 six years.

38   5. No pistol or imitation thereof or placard advertising the
39 sale thereof shall be displayed in any part of said premises
40 where it can readily be seen from the outside.

41   No license to sell at retail shall be granted to anyone except
42 as provided in this section.

*Note:* This section remains substantially the same as the original
Section 11 and Section 6 of the Crime Commission Act, except that it
incorporates, like Section 9 hereof, a provision for a more immediate notice
by the dealer to the police.

1   SECTION 12.   (*False Information Forbidden.*)  No person
2 shall, in purchasing a pistol or in applying for a license to
3 carry the same, give false information or offer false evidence
4 of his identity.

*Note:* This section remains practically the same as the same section in
the original Uniform Act and as Section 13 of the Crime Commission Act,
except that the latter makes special mention therein of 'a penalty.

1   SECTION 13.   (*Alteration of Identifying Marks Pro-*
2 *hibited.*)  No person shall change, alter, remove, or obliterate
3 the name of the maker, model, manufacturer's number, or other
4 mark of identification on any pistol.  Possession of any pistol

427

5   upon which any such mark shall have been changed, altered,
6   removed, or obliterated shall be *prima facie* evidence that the
7   possessor has changed, altered, removed, or obliterated the
8.   same.

*Note:* This section remains the same as in the original Uniform Act and in the corresponding Section 18 of the Crime Commission Act.

1   SECTION 14. (*Existing Licenses Revoked.*) All licenses
2   heretofore issued in this state permitting the carrying of
3   pistols shall expire at midnight of the —— day of ———,
4   19—.

*Note:* This section remains the same as in the original Uniform Act and in Section 23 of the other act.

1   SECTION 15. (*Exceptions.*) This act shall not apply to
2   antique pistols unsuitable for use as firearms and possessed
3   as curiosities or ornaments.

*Note:* This section is the same in substance as in the original act, but it adopts from the corresponding Section 22 of the other act the words "and possessed as curiosities or ornaments."

1   SECTION 16. (*Pawning of Pistols Prohibited.*) No per-
2   son shall make any loan secured by mortgage, deposit, or
3   pledge of a pistol.

*Note:* This is a new section, adopting the substance of Section 8 of the Crime Commission Act.

1   SECTION 17. (*Machine Guns.*) No person shall possess
2   any machine gun. This section shall not apply to any foreign
3   government nor to members of the army, navy, or marine
4   corps of the United States, or of the national guard or organ-
5   ized reserves when on duty, nor to the Post Office Department
6   or its employees when on duty, nor to duly appointed law-
7   enforcement officers, nor to banking institutions established
8   under the laws of the United States, nor to public carriers
9   who are engaged in the business of transporting mail, money,
10   securities, or other valuables.

*Note:* This is a new section, incorporating the provisions of Sections 14 and 15 of the Crime Commission Act.

1   SECTION 18. (*Act Supersedes Local Laws.*) The provi-
2   sions of this act shall be effective and controlling throughout

428

**APP. 562**

3  this state, notwithstanding the provisions of any local law
4  or ordinance.

*Note:* This section remains the same as Section 16 of the original act and is the same in substance as Section 26 of the Crime Commission Act.

1  SECTION 19.  (*Penalties.*)  Any violation of any provi-
2  sion of this act shall constitute an offense punishable by a
3  fine of not more than [$———] or imprisonment for not more
4  than [———] or both, or by imprisonment in the peniten-
5  tiary for not less than [———] nor more than [———].

1  SECTION 20.  (*Constitutionality.*)  If any part of this act
2  is for any reason declared void, such invalidity shall not af-
3  fect the validity of the remaining portion of this act.

1  SECTION 21.  (*Short Title.*)  This act may be cited as
2  "Uniform Firearms Act."

1  SECTION 22.  (*Effective Date.*)  This act shall take effect
2  on the ——— day of ———, 19—.

1  SECTION 23.  (*Certain Acts Repealed.*)  All laws or parts
2  of laws inconsistent herewith are hereby repealed.

*Note:* The above sections remain the same as Sections 17-21 in the original Uniform Act. Section 25 of the Crime Commission Act adopts Section 20. Section 24 of that act has a provision for a general penalty where none is otherwise specified, but as penalties are generally specified throughout the Crime Commission Act, Section 24 thereof differs from Section 19 hereof, which declares penalties for the whole act. This method was adopted advisedly by the Conference, as a more scientific way to deal with the subject of penalties.

429

C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>                    Plaintiffs,<br><br>        v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>                    Defendant. | Case No:  17-cv-1017-BEN-JLB<br><br>**DECLARATION OF MARK HANISH IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBITS 2-7** |

1

I, Mark Hanish, declare as follows:

1.    I am a firearm industry senior executive with over two decades worth of experience building indoor shooting ranges, running domestic and international sales and marketing departments for firearms, ammunition, and accessory companies, along with designing products with various engineering departments for the commercial, law enforcement, and military markets. I have also spent over 25 years as a professional shooter, holding several world, national and state level titles, using the firearms technologies that are relevant to this case.

2.    I have been retained by the plaintiffs in this matter to provide a well-rounded industry perspective on firearms technology and the marketplace over the last twenty years, specifically as it relates to semi-automatic firearms with detachable magazines that are capable of holding over ten rounds. This report has been prepared for the supplemental briefing that was ordered following the 9th Circuit's remand in Virginia Duncan, et al. v. Rob Bonta. I have been retained to write a declaration at the rate of $300/hour.

**Background and Qualifications**

3.    I have spent the last twenty years as a firearms, ammunition, and defense industry executive. In addition to my role in the firearms industry, I have also been a professional shooter, competing in domestic and international matches in practical pistol and 3-gun for over 25 years.[1]  I have a Bachelor of Science Degree in Entrepreneurship and Business Management from the W.P. Carey School of Business at Arizona State University. Through the Barrett Honors College, I wrote an Honor's Thesis for the basis of my first firearms training and supply business, whose growth led to the conceptualization of a luxury indoor shooting range. My partners and I founded the Scottsdale Gun Club, which at the time of the facility

---

[1] 3 Gun is a speed and accuracy sport, where the athlete uses the three platforms of semi-automatic firearms – rifles, pistols, and shotguns – all with what were considered large capacity magazines.

opening (2004) was the world's largest and most luxurious public indoor range, creating a new market segment.

4.      While developing the Scottsdale Gun Club, my partners and I operated The Armory gun store, which focused on self-defense and tactical products and training. My position was Founder and Vice President of Sales and Marketing for the Scottsdale Gun Club and at the time we created an entirely new model of high-end shooting and retail facilities. In addition to my sales and marketing roles, I was responsible for our product selection and purchasing. The Scottsdale Gun Club retained its tactical firearms and training roots and was nationally known as the leader in that category. We were doing such high volume in those categories we started a firearms and ammunition distribution business to resell products to other gun stores. Prominent firearms manufacturers would consult with me on their potential expansions into tactical market segments. Notably, we also launched a manufacturing brand, U.S. PALM, that developed and produced a line of high-tech polymer 30rd magazines for AK pattern rifles. These magazines are still manufactured and distributed nationwide.

5.      In 2010, I transitioned from the dealer and distributor side of the industry into sales for FNH USA, LLC (later becoming FN America, LLC), which is a subsidiary of Fabrique Nationale out of Herstal, Belgium. In the South Carolina manufacturing facility FN has produced a multitude of arms for the US Military to include the M4, M16, M249, M240, and MK19. FN also began developing a robust commercial presence of which I was a part. Over six years, I rose to the position of Senior Director of Commercial Sales. I also was on the FNH USA professional shooting team. During my tenure at FN, I contributed to many aspects of the commercial business for US operations, including sales, product management, production forecasting, and marketing. At FN America we produced and marketed both pistol and rifle lines, almost all were sold with "large capacity" magazines as the standard offering. I have first-hand knowledge of the changes within the firearms

industry market over the past several decades and I have been able to create consistent growth of the core business even in unstable market conditions. I worked closely with the production and engineering side of the company. With those departments, I principally directed the design for most models in the FN-15 line, working to define the market position and models for the consumer, which included both Law Enforcement and Commercial markets. The FN-15 is the company's AR-15 style line of rifles. Additionally, I conceptualized and worked with the team to design a high-end collector line of firearms, known as the Military Collector Series. These firearms included semi-automatic versions of American military issue firearms: the M4, the M16, and the M249 which generated over $10million in revenue the first year of production.

6. In 2016, I became the Vice President of Sales and Marketing for Surefire, LLC, a company that specializes in tactical illumination devices, firearm suppressors, and "large capacity" magazines for AR-15 style rifles for the civilian, law enforcement, and military markets. At Surefire, I managed US commercial and law enforcement business. Internationally, I managed commercial, law enforcement and military markets. In 2019, I became the President of Global Sales and Marketing for Ammo Inc. and in just over 3 years sales increased from $4M to $240M. I was responsible for all sales, marketing, and product development activities including the design and development of specialty cartridges for US Special Operations Command. I successfully competed for and won several government contracts in a short period of time. AMMO acquired GunBroker.com, the largest internet marketplace for the firearms industry in 2021.In 2022, I joined the team at Timney Triggers as their Vice President of Sales, thanks in large part to my rich and well-rounded knowledge of the firearms industry. Due to my high-profile positions in a range of companies that directly impact the conversation about firearms technology available to the public and the military, as well as the ammunition side of the market. I am uniquely qualified to discuss this matter.

7.     As I have previously stated, not only is my experience in the industry as an executive, but as a shooter and collector. I have personal experience purchasing and using "large capacity magazines" prior to 1994 and continuing both throughout the entire 10 years of the federal ban. I also have an extensive background of practical application as a professional shooter. I have held multiple world, national, and state shooting titles across disciplines for over 25 years. Notably, I was a part of the 3 Gun National Pro Tour for six years, as a regular finalist and 2012 overall runner up. 3 Gun Nation was a television show that aired on NBC Sports and Sportsman Channel promoting the practical shooting use of semi-automatic rifles, pistols, and shotguns with "large capacity" magazines.

8.     Due to my professional background within the firearms industry, I have served on the Board of the American Suppressor Association and have regularly appeared as an on-camera expert for the National Shooting Sports Foundation, the Outdoor Channel's Gun Stories with Joe Mantegna, and Gallery of Guns TV. I have also been an industry guest speaker for college students at institutions such as the School of the Art Institute of Chicago and the W.P. Carey School of Business' MBA Program.

**Scope of Work**

9.     I have been asked to write this statement as a direct response to assertions made in Ryan Busse's declaration for the supplemental briefing that was ordered following the 9th Circuit's remand in Virginia Duncan, et al. v. Rob Bonta. In this document, I will provide a general statement on the popularity of AR-15 style and similar rifles and their popularization on the firearms market, with a specific emphasis on limitations in advertising and other avenues that contributed to this robust market. I will then discuss the importance of magazines to the fundamental operation of a semi-automatic firearm, as well as address their extensive use before and after 1994 and the ways in which manufacturers have responded to the changing

1  in legislation. I will conclude on a discussion surrounding the 1911 style semi-
2  automatic pistol and its waning popularity in a defensive handgun market.

3        10.    For the purposes of this report, I will use the terms "high capacity"
4  magazine and "large capacity magazine" and the abbreviation "LCM"
5  interchangeably to reference magazines capable of holding more than ten rounds. I
6  use the terms as they relate to the ways in which Busse categorizes them in his
7  declaration and the way they are defined in the Violent Crime Control and Law
8  Enforcement Act (1994).

9  **AR-15 and Civilian Popularity**

10       11.    The demand for AR-15s and similar rifles grew steadily since their
11  inception and continued through the 1994-2004 federal "Assault Weapons Ban"
12  (AWB). The Colt AR-15 first became available on the commercial market in 1964.
13  In addition to the domestic production, throughout the 1970s and 1980s, semi-
14  automatic rifles with "large capacity magazines", similar in style and function, were
15  imported into the United States for sale to the commercial market.  These
16  comparable rifles followed an overarching trend in firearms design towards smaller
17  calibers with larger magazine capacities. A few notable examples of these were
18  manufactured by Beretta, Daewoo, FN, HK, IMI, SIG, STEYR, as well as several
19  AK pattern rifles. The importation of these foreign made rifles however was
20  restricted in 1989. Domestic manufacturers such as Colt, Bushmaster, Olympic
21  Arms, Pac-West Arms, Eagle Arms / Armalite, and DPMS that were previously
22  building AR-15 style rifles continued, for the most part, with production of slightly
23  modified rifles to comply with the new federal regulations.  These rifles increased
24  exponentially in popularity as more consumers became aware of them, as they have
25  many benefits for a multitude of applications including personal defense, target
26  shooting, competition, and hunting. The AR-15 style of rifle is lightweight, has low
27  recoil, is relatively easy to learn how to use, can be customized by the consumer, and
28  is easily adjustable to fit most users of varying sizes and physical abilities. During

6

DECLARATION OF MARK HANISH

1   the AWB period, many companies were discouraged from investing in production

2   capacity to enter the AR-15 style rifle market due to legislative uncertainty. In the

3   years following the sunset of the AWB more recognizable brands such as Smith &

4   Wesson, Ruger, Sig Sauer, FN, and Remington were willing to invest the capital and

5   enter the market. These well-known and trusted brands responded to market demand

6   for AR-15 style rifles manufactured by established companies.

7       12.   There is a lot of debate surrounding the effectiveness of advertising and

8   its impact on the consumer. In terms of firearms marketing, however, it is important

9   to note that there are significant limitations on the manufacturer due to the nature of

10  the product which must be considered when analyzing how successful and how

11  much of an impact firearms industry marketing has actually had on consumer

12  decision making.

13          Marketing and Advertising Limitations and Considerations

14      13.   As a Senior Executive at one of the larger firearms manufacturers in the

15  world, I have been responsible for determining the firearms product mix and

16  production quantities based on the marketplace. Most manufacturers forecast their

17  future sales, and corresponding production, to match the products and quantities

18  their customers are demanding rather than the other way around. Its common sense

19  to manufacture and deliver what your customers are asking to purchase. Beyond

20  those core product sales, companies introduce new products to market that are either

21  a variation of a core product, a direct response to new customer demand, or a totally

22  new concept product. Consumer demand for the AR-15 style and similar rifles,

23  along with "high capacity" magazines for both rifles and pistols, has been the market

24  driver for the increased production and sales.

25      14.   In Ryan Busse's declaration, he asserts that the gun industry is

26  responsible for collectively pushing AR-15 style rifles and "high capacity"

27  magazines onto the market – a notion that fails to consider the myriad of factors that

28  influence consumer purchasing behavior. There are many fine marketing

7

DECLARATION OF MARK HANISH

1  professionals in the industry capable of creating innovative campaigns, but they still
2  are forced to compete for consumer attention without access to most standard
3  marketing avenues. Marketing is severely restricted and companies in the firearms
4  industry are prohibited or limited when using typical services to sell to the
5  consumers through means of television, Google Ads, e-commerce platforms,
6  merchant payment processing services and mainstream social media (Facebook,
7  Instagram, YouTube, etc). Without the ability to advertise via most technology,
8  industry does its best to respond to consumer demand with antiquated feedback
9  channels. Most firearms industry advertising is limited to endemic periodicals,
10 limited cable television channels such as the Outdoor Channel, and websites visited
11 directly by consumers or found through organic search results.

12    15.    While firearms manufacturers have had restrictions imposed upon on
13 their abilities to market, there are other factors to consider for the proliferation and
14 popularity of the AR-15 and similar rifles that were completely outside of the scope
15 of the industry. For example, the Global War on Terror (GWOT) starting in 2001
16 produced images and video of American service members with their rifles and
17 tactical gear, which was broadcast across major media outlets. In the early years of
18 the war, the televised GWOT exposed the entire American consumer market to the
19 likeness of the iconic Colt and FN M4/M16 fueling awareness of the semi-automatic
20 commercial AR-15 style rifle. The War on Terror has continued for decades, and a
21 generation of consumers, including service members, now desired to own AR-15
22 style semi-automatic rifles.  There is a long history of service rifles becoming
23 familiar to the generation that used them in conflict, and the resulting desire to bring
24 those rifles home from service and onto the shooting range and into the field for
25 sporting uses.

26    16.    However, the Hughes Amendment, a portion of the Firearm Owners'
27 Protection Act of 1986, which essentially banned the civilian ownership of machine
28 guns made after 1986, prevents this practice in some form from continuing. The

military issued machine guns are no longer allowed to be transferred, but the desire to own and use the issued rifles has not subsided.  While in my role at FN America, I directed the design and sales for most of the commercial FN15 model rifles. Additionally, I was instrumental in creating and launching the Military Collector Series consisting of the FN15 M4 (attached as **Exhibit 2**), FN15 M16 (**Exhibit 3**), and FN M249s (**Exhibit 4**). This Military Collector Series was comprised of semi-automatic replicas of the government issued M4, M16, and M249.  These rifles were exceptionally well received by general commercial customers and service members desiring a replica of their issued rifle. The consumer demand for these rifles was driven mainly by the customer's familiarity with the designs either through service or media exposure.

17.    Today the AR-15 style rifle is one of the most popular rifles in America. However, that popularity was not just engineered by the firearms industry, who have limited advertising channels. Rather, the popularity of this firearm has more to do with the design's features, benefits, and adaptability to be well suited for a wide array of legitimate uses. To quantify the acceptance and widespread adoption of these rifles, it is of note that according to the 2021 National Firearms Survey (expanded May 2022) about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.[2]

**"Large Capacity Magazines" and the Firearms Market**

18.    In Busse's declaration, he asserts that "large capacity magazines" (LCM) are only recently popular, which is a specious argument. In 1993, the year prior to the 1994 federal ban, semi-automatic pistols accounted for 80% of handguns produced in the US.[3] According to Christopher S. Koper in his 2004 Updated

---

[2] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494 (**Exhibit 5**)

[3] (Zawitz, 1995, p. 3) (**Exhibit 6**).

9

DECLARATION OF MARK HANISH

Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003 report "*Approximately 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM"*.[4] This study clearly illustrates the significance of large capacity magazines on the market even before the Federal Assault Weapons Ban. Today, that trend continues to grow. The 2021 National Firearms Survey (expanded May 2022) reported:

> 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.[5]

19.     As far as I am aware, the legal concept at the federal level of using the arbitrary quantity of greater than 10 rounds to define a magazine as a "large capacity ammunition feeding device" first appeared in the Violent Crime Control and Law Enforcement Act of 1994. Since the inception of magazine fed firearms, designers explored magazine designs and manufacturing methods to maximize intended functionality and reliability of their firearms without arbitrary capacity limitations. It wasn't until restrictions were legally mandated did engineers modify or alter their designs to conform to a random capacity limit. In order to comply with capacity laws, manufacturers were compelled to redesign or modify existing standard capacity magazines to limit their capacity to hold no more than 10rds, with severe consequences if an 11th round can still be forced in the magazine. Often the regulations are left ambiguous and subject to court interpretation after the fact as to what constitutes a permanent modification preventing the magazine from being

---

[4] https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf
[5] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494 (**Exhibit 5**)

considered readily convertible back to standard capacity. Manufacturers make every effort to avoid exposing themselves and their customers to this legal risk. Reducing the standard capacity of a magazine to hold 10 or fewer rounds has been accomplished through a variety of methods, some of which result in a less than optimal magazine design while potentially introducing a higher risk of failure, increased costs, and often adding unnecessary complexity. Some of the methods used to reduce capacity include:

i. Narrowing of the internal width down the entire length of the magazine, altering the internal geometry from the original design intent.

ii. Creating indentations in the side of the magazine designed to limit the downward travel of the follower in the magazine tube. This method is sometimes coupled with weakening cuts made to the remainder of the circumference of the magazine tube adjacent to the indentations. In this design the magazine spring usually extends to the baseplate and is at risk of catching or hanging up on the indentations, impeding normal operation.

iii. Shortening the magazine tube in conjunction with designing a novel base pad that extends upward into the firearm to connect with and complete the magazine assembly. These base pads with magazine tube extender pieces are more complicated to use, costly to manufacture, and their increased complexity invites a possible reduction in structural integrity.

iv. Inserting an object into the magazine to limit follower travel and permanently attaching the base pad to encapsulate the object in the magazine tube.

v. Installing a pin or rivet through the exterior of the magazine body to limit the travel of the follower.

20.     The burden on the manufacturers to produce these 10rd or less magazines was reduced with the sunset of the AWB in 2004. The few states

remaining with their own capacity limits require manufacturers to continue to modify their products as described above to comply with the restrictions. This increases costs for manufacturers to design or redesign magazines, producing lower quantities of the restricted magazines that potentially don't reach the manufacturing amounts required to realize volume savings. Manufacturers may also choose not to offer the affected models for sale to the residents of the restrictive state, reducing the options for those residents to select from.

### Magazines are an Integral Part of a Firearm

21.     Magazine fed firearms are systems with many parts that must function together in order to operate properly, and the ammunition feeding device is critical to the overall performance and success of the firearm. To this day, especially in modern handguns, the magazine is often the cornerstone of the pistol design. Unless designing a new pistol to utilize an existing magazine, engineers will start a new pistol project with designing the magazine first. The ammunition feeding device must be optimized to reliably deliver cartridges into the operating system. The engineers must consider the dimensions of the cartridge, with specific attention to the cartridge case being either a straight wall or a tapered case, and angles at which the magazine presents cartridges to the action.  The manner in which the magazine and action interface is critical.  The remainder of the firearm design builds upon the foundation laid by the magazine's form.  Many, if not most, modern pistols are built around a magazine designed to hold more than 10 rounds. Pistols designed for defensive use balance maximizing the number of rounds carried for personal protection within a size constraint of the pistol to perform its intended function. Even though subcompact pistols are designed primarily for concealment and safety while carrying, designers also attempt to maximize magazine capacity as well. Pistols designed for recreation, sport, and competition are usually designed to maximize capacity, accuracy, and reliability with few constraints on size.

DECLARATION OF MARK HANISH                    **APP. 575**

22.     As an integral part of the firearm, magazines are required for proper function. While firearms are one of the few consumer items designed for several lifetimes of service, their magazines are an item that can degrade with use. In addition to the routine maintenance of replacing springs and worn followers, feed lips of magazines which hold the next round in position to be presented to the action, may both wear and crack from the cycling of the action.  Magazines and their feed lips are also susceptible to bending, cracking, denting, or deforming and being rendered unserviceable when dropped during normal use. This is not uncommon, and therefore, not an exceptionally rare occurrence that would only affect high volume shooters.[6]  Shooters run the risk of damaging a magazine every time they practice a reload and eject a magazine onto the ground.

23.     A prudent firearms owner will purchase enough magazines to sustain the use of their firearm as intended over the remainder of their lifetime, accounting for damaged and worn-out magazines along the way. Many handguns and rifles have proprietary magazines that are specific to the manufacturer, product family, and many times the specific model. Replacement magazines may not be available in the future as there is no guarantee the manufacturer will be in business to support the platform, and there is no guarantee that an aftermarket company will produce that specific magazine. A firearm without a functional magazine is of little use to an owner, and of little value to another consumer. There is less risk for consumers that possess firearms capable of accepting a magazine with a somewhat standardized interface.  These firearms are generally older legacy designs that were used in rifles and pistols adopted by militaries.  Magazines for the AR-15 style rifles, AK pattern rifles, and model 1911 pistols fall into this category. Busse also asserts that one may simply purchase a kit to refurbish a previously owned magazine. This option has effectively been nullified as the possible enforcement of CA Penal Code Section

---

[6] Busse Decl., ¶10.

13

DECLARATION OF MARK HANISH

32311 regulating "conversion kits" has limited retailers from selling magazine repair kits.[7] During the 1994-2004 AWB period, individual manufacturers would not sell consumers all the magazine components required to build a new magazine. Many would designate a single component of the magazine as their control item and refuse to sell that item to consumers. Any consumer needing to repair a legally owned pre-ban magazine was out of luck if they had broken or damaged the restricted part.

24. As previously stated, magazines are so critical to the firearm, engineers often start the design of a new firearm around the magazine. Magazines are a highly specialized item to manufacture, whether they are stamped and welded from steel or aluminum, injection molded from an advanced polymer, or a combination of stamped feed lip and mag catch parts over-molded into a polymer body.  These specific manufacturing processes require specialized equipment, skillsets, and sometimes stabilized environments not found in most firearms manufacturing facilities. Firearms manufacturers choose to utilize the services of highly skilled outside vendors to deliver a superior product built to their design specifications precisely because of the importance of the magazine in the overall system. As an added benefit to all commercial, law enforcement, and military customers, these specialized magazine companies have grown and matured and are far more capable to produce significantly higher quality products for the entire marketplace. Magazines built today are some of the most advanced magazines in history and as a result, are structurally safer and more reliable for the end user. Gun barrels and other critical components are also routinely outsourced to specialized manufacturers. For example, a firearm manufacturer may specify a hammer forged barrel to meet safety

_____

[7] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=PEN&sectionNum=32311. *(b) For purposes of this section, a "large capacity magazine conversion kit" is a device or combination of parts of a fully functioning large-capacity magazine, including, but not limited to, the body, spring, follower, and floor plate or end plate, capable of converting an ammunition feeding device into a large-capacity magazine.*

14

DECLARATION OF MARK HANISH

and performance standards, and it would be absurd to contend the mere act of outsourcing somehow reduces the importance of the barrel.

25.     The magazine is correctly considered an integral part of the firearm, not merely an accessory. It is considered such a vital part of the firearm that the magazine's value is included in the cost of the firearm for calculation of the Firearms and Ammunition Excise Tax (FAET) paid by the manufacturer or importer.[8] It is only additional magazines that are treated as non-taxable extra parts. To contrast, accessories, even if included with the firearm, are not subject to FAET. Typical examples of accessories include holsters, cleaning kits, gun locks, optics, and other accoutrement not critical to the function of the firearm.

**Consumer Demand and Defensive Pistol Selection**

26.     In Busse's declaration he focuses heavily on the 1911 design as the basis for his claims that 7 or 8 rounds of .45 ACP is more than adequate for a pistol. This limited perspective is understandable given his career at one of the larger manufacturers of 1911 style pistols. However, there are a multitude of shortcomings with the anecdotal statements he employs to support his position. There are many pistols that are more effective for self-defense while offering a superior balance of reliability, affordability, and capacity. It is widely understood that most of the less expensive models of 1911s, and even many of the mid-level price point pistols in the $1000-$1500 range from companies like Colt and Kimber may require an additional investment in gunsmithing services to make them suitably reliable for defensive use. Many people cannot afford one of the higher priced 1911 pistols he espouses, nor can everyone handle the recoil of the .45 ACP and have the confidence to defend themselves with the 7 or 8 rounds Busse advocates. Persons of a smaller stature and/or having reduced strength may select a 1911 design pistol in 9mm for its reduced recoil, but in turn they are accepting the accompanying risk of using single

---

[8] https://www.ttb.gov/images/pdfs/presentations/FAET-Return-Walkthrough.pdf

DECLARATION OF MARK HANISH

1  stack 9mm magazines which are inherently less reliable due to the tapered case of

2  the 9mm cartridge. The century old 1911 design is also less intuitive and requires

3  more familiarity and training for novice shooters to master. For these and other

4  reasons, many of the leading firearms trainers in the country recommend a multitude

5  of superior modern design pistol options for self-defense firearms.

6      27.    Busse also claims the 1911 to be "still one of the most widely sold guns

7  in the United States". This claim might be referring to a wide geographic territory as

8  the defining standard of sales, as the "high volumes" of the past cannot be favorably

9  compared to current modern pistol sales. In comparing aggregated data on broad

10  categories of self-defense pistols, the BATF&E's 2020 Annual Firearms

11  Manufacturing and Export Report does not give specific model information, but

12  rather we can make inferences from the pistol category, which is broken down into

13  caliber ranges. We find there were just shy of 3.9 million 9mm and .380 pistols

14  manufactured in 2020, and in comparison, just over 705,000 pistols comprise the up

15  to .50 caliber category.[9] This category includes all pistols chambered in .45 ACP, not

16  just 1911s, as well as additional designs and calibers such as the .40 S&W, making

17  the 1911 production somewhere below that ceiling. With further examination of the

18  manufacturer's individual reporting data, it is evident the market clearly indicates

19  significantly higher demand for modern pistols in calibers smaller than .45 ACP.

20      28.    Busse goes on to state that based on his experience, "a large-capacity

21  magazine is not necessary to use a firearm effectively for self-defense or other

22  sporting purpose, like hunting."  However, the 2021 National Firearms Survey

23  (expanded May 2022) provides contrary information regarding the carry and use of

24  firearms for self-defense. According to the Survey:

25      31.1% of gun owners, or approximately 25.3 million adult Americans,
       have used a gun in self-defense. Gun owners engage in approximately
26      1.67 million defensive uses of firearms per year. Handguns are the

27

28      [9] 2022.06.10_afmer_2020_cover_sheet_508 (1) (**Exhibit 7**).

1
2
3
firearm most commonly used in defensive incidents (65.9%) The majority of defensive gun uses take place outside of the home (74.8%). About half of defensive gun uses involve more than one assailant (51.2%).

4
5
6
7
8
9
10
11
12



13    29.    Conclusions drawn in the survey state that "presumably, it would be

14    advantageous to have a firearm with a larger capacity magazine if one needed to

15    engage more than one assailant, which these responses suggest is indeed common.

16    Although in most defensive gun uses the gun was not fired (81.9%), we can further

17    analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in

18    which a gun was fired in self-defense, multiple rounds were fired."[10]

19    **Conclusion**

20    30.    In this report, I have addressed several statements made in Ryan

21    Busse's declaration. It is my findings, as an industry expert with a range of

22    backgrounds in the tactical firearms market and culture, that several factors

23    contributed to the popularity of the AR-15 style and comparable rifles starting in the

24    1960s and that this phenomenon is not solely the result of an industry marketing

25
26
27
28

[10] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract=4109494 or http://dx.doi.org/10.2139/ssrn.4109494 (**Exhibit 5**)

17

DECLARATION OF MARK HANISH

1   scheme. Furthermore, I conclude that large capacity magazines have been popular

2   since well before their 1994 regulation and rebut the assertion that these magazines

3   are not ubiquitous. Additionally, I provided a perspective on the importance of a

4   magazine to firearms design as well as ways in which the industry have improved

5   these magazines to be of superior technology ultimately being fundamentally safer. I

6   finish the report with an analysis on the proliferation of self defense handguns that

7   have far surpassed the production and popularity of the 1911 style design in today's

8   gun ownership community.

9          I declare under penalty of perjury that the foregoing is true and correct.

10  Executed within the United States on _November 30th, 2022_.

11

12                                        Mark Hanish

13                                        Declarant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

18

DECLARATION OF MARK HANISH

# EXHIBIT 2

# FN 15™ M4 MILITARY COLLECTOR

## THE WORLD'S MOST BATTLE-PROVEN FIREARMS™

CARBINES

FN 15™ SERIES



### FN 15™ M4 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 6.6 LBS. | 30.5"-34.2" | 16" |
|---|---|---|---|---|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series brings to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4 -profile 16 and 20-inch 1:7" RH, button broached and chrome-lined barrels, respectively.  Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

### PRIMARY FEATURES

Knights Armament M4RAS Adapter rail w/ rail adapter covers

Ambidextrous safety lever

### RECEIVER

Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

### BARREL

16" Button-broached, chrome-lined

A2-style compensator (Permanently attached)

1:7" RH twist

### STOCK

Collapsible, 6-position with sling mount

M4 with pistol grip

### MAGAZINE

Aluminum body, Low friction follower, AR-style 30 round capacity

### OPERATING CONTROLS

Ambidextrous safety lever

Ergonomic magazine release

Forward assist

### ACCESSORIES



FN UNIVERSAL TACTICAL SLING

FN PREMIUM COLD HAMMER-FORGED AR-15 BARRELS

| Product | Designation | Product Type | UPC |
|---|---|---|---|
| 36318 | FN 15™ M4 Military Collector | Consumer | 845737006211 |
| 36318-02 | FN 15™ M4 Military Collector LE | Law Enforcement | TBD |

FOR MORE INFORMATION, CONTACT YOUR LOCAL FIREARMS RETAILER OR VISIT FNAMERICA.COM

**APP. 583**

# EXHIBIT 3

# FN 15™ M16 MILITARY COLLECTOR

**THE WORLD'S MOST BATTLE-PROVEN FIREARMS™**

CARBINES

FN 15™ SERIES



### FN 15™ M16 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 8.2 LBS. | 39.5" | 20" |
|---|---|---|---|---|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series M4 and M16 bring to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4 -profile 16 and 20-inch 1:7″ RH, button broached and chrome-lined barrels, respectively.  Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

## PRIMARY FEATURES
Knights Armament M5RAS Adapter rail w/ rail adapter covers

Ambidextrous safety lever

## RECEIVER
Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

## BARREL
20″ Button-broached, chrome-lined

A2-style compensator

1:7″ RH twist

## STOCK
Fixed, A2 Rifle Butt-Stock

M16 with pistol grip

## OPERATING CONTROLS
Ambidextrous safety lever

Ergonomic magazine release

Forward assist

## MAGAZINE
Aluminum body, Low friction follower, AR-style 30 round capacity

## ACCESSORIES



FN UNIVERSAL TACTICAL SLING



FN PREMIUM COLD HAMMER-FORGED AR-15 BARRELS

| Product | Designation | Product Type | UPC |
|---|---|---|---|
| 36320 | FN 15™ M16 Military Collector | Consumer | 845737005061 |
| 36320-02 | FN 15™ M16 Military Collector LE | Law Enforcement | TBD |

FOR MORE INFORMATION, CONTACT YOUR LOCAL FIREARMS RETAILER OR VISIT FNAMERICA.COM

**APP. 585**

# EXHIBIT 4

# FN M249S®



**FN M249S**
Standard Black

**FN M249S**
Standard FDE

**FN M249S**
Para Black

**FN M249S® STANDARD**

| | | | |
|---|---|---|---|
| **5.56x45mm** | **30/200 Rd.** | **17.2 LBS.** | **18.5"** |
| CALIBER | CAPACITY | WEIGHT | BARREL LENGTH |
| | | **40.7"** | |
| | | LENGTH | |

**FN M249S® PARA**

| | | | |
|---|---|---|---|
| **5.56x45mm** | **30/200 Rd.** | **16.9 LBS.** | **16.1"** |
| CALIBER | CAPACITY | WEIGHT | BARREL LENGTH |
| | | **31.5-37"** | |
| | | LENGTH | |

**OPERATION:** SEMI-AUTOMATIC, CLOSED BOLT

**FINISH:** BLACK OR FDE

**SIGHTS:** STEEL, ADJUSTABLE TO 1,000 METERS

RIFLE

FN M249S®



**FN M249S**
Para FDE

## PRIMARY FEATURES

Semi-automatic, closed-bolt operation

Primary sights graduated to 1000 meters with MIL-STD 1913 rail system for optics

Quick change barrel and integral steel bipod

## RECEIVER

Formed steel frame with magazine well for alternate feed

Fixed, pivoting ejector for robust ejection

Top cover integrated MIL -STD 1913 mounting rail for sighting systems

## BARREL

Changeable barrel

Cold hammer-forged steel

Chrome-lined bore and chamber

Heat shield and carry handle included

## STOCK

**STANDARD** - Highly ergonomic polymer butt-stock assembly with hydraulic recoil buffer system and non-slip buttplate

**PARA** - Rotating, telescoping buttstock with hydraulic recoil buffer and non-slip buttplate

## OPERATING CONTROLS

Crossbolt safety

Curved trigger for improved finger position and control

Non-reciprocating charging handle

## FEED SYSTEM

Standard disintegrating link belt-fed

Under-mounted polymer ammunition container helps keep ammunition cleaner for reduced wear and added reliability

| Product | Designation | UPC |
|---|---|---|
| 46-100169 | M249S Standard Black | 845737015077 |
| 46-100170 | M249S Standard FDE | 845737015091 |
| 46-100171 | M249S Para Black | 845737015084 |
| 46-100172 | M249S Para FDE | 845737015107 |

The FN M249S Standard and Para, semi-automatic versions of the M249 SAW light machine gun, originally developed by FN Herstal as the FN MINIMI® and adopted by the U.S. Military in 1988. Features the signature FN cold hammer-forged, chrome-lined barrel and operates from a closed bolt position. Chambered in 5.56x45mm NATO, the rifle will accept both magazine and linked belt ammunition.

**APP. 587**

# EXHIBIT 5

# 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned

## William English, PhD

## Georgetown University

## Expanded Report: May 13, 2022

### Abstract

This report summarizes the findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date. This online survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners who were, in turn, asked in-depth questions about their ownership and their use of firearms, including defensive uses of firearms.

Consistent with other recent survey research, the survey finds an overall rate of adult firearm ownership of 31.9%, suggesting that in excess of 81.4 million Americans aged 18 and over own firearms. The survey further finds that approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and it estimates that guns are used defensively by firearms owners in approximately 1.67 million incidents per year. Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and in most defensive incidents (81.9%) no shot was fired. Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property. About one out of ten (9.1%) defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.

A majority of gun owners (56.2%) indicate that they carry a handgun for self-defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency. We estimate that approximately 20.7 million gun owners (26.3%) carry a handgun in public under a "concealed carry" regime; and 34.9% of gun owners report that there have been instances in which they had wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

The average gun owner owns about 5 firearms, and handguns are the most common type of firearm owned. 48.0% of gun owners – about 39 million individuals – have

Electronic copy available at: https://ssrn.com/abstract=4109807

**APP. 589**

owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and 30.2% of gun owners – about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). Demographically, gun owners are diverse. 42.2% are female and 57.8% are male. Approximately 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms. In total, Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

# 1  Introduction

This report summarizes the main findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date.

Before this survey, the most authoritative resource for estimating details of gun ownership in the U.S. has been the "Comprehensive National Survey on Firearms Ownership and Use" conducted by Cook and Ludwig in 1994 (Cook and Ludwig, 1996), and the most authoritative resource for estimating defensive gun use in the U.S. has been the "National Self-Defense Survey" conducted by Kleck and Gertz in 1993 (Kleck and Gertz, 1995, 1998). While valuable resources, they are both now a quarter century old, and no surveys of similar scope and depth have documented firearms ownership and use in more recent years.

Hepburn et al. (2007) conducted a more limited survey to ascertain the "gun stock" in 2004, a version of which was repeated in 2015 (Azrael et al., 2017). However, as they explain in introducing their latter survey, data sources on firearms ownership and use remain scarce:

> Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the number of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms

**APP. 590**

Electronic copy available at: https://ssrn.com/abstract=4206879

in civilian hands are derived from two national surveys dedicated to producing detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994, the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007).

Miller, Zhang, and Azrael conducted an expanded survey in 2021 of 5,932 gun owners with a focus on characterizing the demographics of those who acquired firearms for the first time during the COVID-19 Pandemic, based on a sub-sample of 447 individuals who fit this criterion (Miller et al., 2022). This team also described their survey as a "2021 National Firearms Survey," and it is helpful to clarify that their survey was distinct from the survey reported here.

Richer survey data on firearms ownership and use has been collected by industry associations such as the National Shooting Sports Foundation (NSSF).[1] However, these surveys generally aim at assessing industry trends and market segmentation and are not necessarily designed to be nationally representative. In 2017, the Pew Research Center conducted one of the most recent and detailed surveys of the demographics of gun ownership (Brown, 2017).[2] Although it did not ask detailed questions concerning defensive use of firearms and the types of firearms owned, this recent Pew survey serves as a helpful benchmark for corroborating the general ownership estimates of the present survey.

Advances in survey research technologies make it possible to reach large, representative respondent populations today at a much lower cost than a quarter century ago. One of the limitations of the Cook and Ludwig survey, which sought to be nationally representative, was that the survey sample was relatively small, with about 2,500 respondents of whom only about 600, or (24.6%), owned a firearm when the survey was administered. As the investigators noted in their report, some sub-questions were not sufficiently well powered to make confident inferences, particularly concerning the defensive use of firearms. Similarly, Kleck and Gertz's survey was limited to 4,977 respondents, and the more recent surveys by Pew, Hepburn, and Azrael are all based on less than 4,000 respondents.

---

[1] See https://www.nssf.org/research/

[2] See Pew Research Center, June 2017, "America's Complex Relationship With Guns" https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2017/06/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

**APP. 591**

Electronic copy available at: https://ssrn.com/abstract=4209697

Today, professional survey firms like Centiment[3] cultivate large pools of survey respondents, enabling representative sampling, and have techniques that encourage high response and completion rates while also ensuring the integrity of responses.[4]  The online survey summarized here was presented to a nationally representative sample (excluding residents of Vermont who had already responded to a pilot version of this survey) of 54,244 individuals aged 18 or over who completed an initial questionnaire that included an indirect question indicating whether they owned a firearm (respondents were presented with a list of items commonly owned for outdoor recreational purposes, including firearms, and were asked to select all items that they own).

This question identified 16,708 individuals as gun owners, who were then transferred to the main survey, which then asked detailed questions about their ownership and use of firearms.  Given the length and detail of the survey, there was a slight amount of attrition, as 7.5%, or 1,258 individuals, did not make it through all questions to the end of the survey. However, 92.5% of the responding firearms owners (15,450) did proceed through all of the survey questions.

This survey thus contains what we believe is the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States.  This survey was approved by Georgetown University's Institutional Review Board. Of note, this survey was conducted just after a period of widespread social unrest across the U.S. and a contentious presidential election, which background check data suggests led to record gun sales (approximately 39.7 million in 2020, up 40% from the prior year).[5]  It is thus a comprehensive and timely assessment of the state of firearms ownership and use in the United States.  Finally, the extraordinarily large size of this sample enables us to make well-powered, statistically informative inferences within individual states, which considerably extends the value of this data.

The initial sample of respondents achieved excellent demographic representation across

---

[3]See https://www.centiment.co/

[4]See https://help.centiment.co/how-we-safeguard-your-data

[5]See McIntyre, Douglas A. "Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January" https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/

**APP. 592**

Electronic copy available at: https://ssrn.com/abstract=4209697

all 49 states and DC, excluding Vermont (see Appendix A and B). For the purpose of estimating firearms ownership rates for the general U.S. population we employed raked weighting on gender, income, age, race, and state of residence. Note that there was a brief period in the first two days after the soft launch of the survey that comprehensive demographic data was not collected from those respondents who did not indicate firearms ownership, and thus did not proceed to the main survey (approximately 300 respondents). Although the survey company, Centiment, maintained demographic data on these panel respondents, it was determined that this data was not as comprehensive as the data collected by the survey, at which point the demographic questions were moved to the front of the survey, and asked of all respondents, including those who did not indicate firearms ownership. For the purpose of calculating statistics on national firearms ownership rates, we exclude the entire sample of both firearms owners and non-firearms owners from these first two days (410 respondents), leaving us with 53,834 respondents after this date for whom we have comprehensive demographic data. Firearms-owning respondents from the first two days are included in subsequent analysis of firearms owners, and we do possess comprehensive demographic information for these individuals.

Appendix B contains tables reporting the demographic sampling rates and the Census demographics used for raked weighting of the national survey. Note that the overall effect of weights is minimal given the high representativeness of the initial sample. For the purposes of analyzing responses within the sub-sample of firearms owners, we do not employ weighting schemes, in part because the "true" demographics of gun ownership are not knowable from an authoritative source analogous to the U.S. Census Bureau. However, as a robustness exercise, using weights based on estimates derived from the larger survey response rates yields results that are substantially identical for the analysis of responses from firearms owners.

One of the challenges in asking questions about firearms is eliciting truthful responses from firearms owners who may be hesitant to reveal information about practices that are associated with public controversy. The "tendency to respond to questions in a socially acceptable direction" when answering surveys is often referred to as "social desirability bias" (Spector, 2004), and there is evidence that it can influence survey responses to questions regarding firearms. For example, when Rafferty et al. (1995) conducted a telephone survey

**APP. 593**

Electronic copy available at: https://ssrn.com/abstract=4206879

of Michigan residents who had purchased a hunting license or registered a handgun, only 87.3 percent of the handgun registrants and 89.7 percent of hunting license holders reported having a gun in their household. Similarly, Ludwig et al. (1998) have documented a large gender gap in reporting of firearms ownership, finding that "in telephone surveys, the rate of household gun ownership reported by husbands exceeded wives' reports by an average of 12 percentage points." Asking questions via an anonymous survey instrument on the internet is likely to cause less concern or worry than traditional phone-based questionnaires with a live person on the other end or during face-to-face interviews, which is how the General Social Survey – one of the most prominent national surveys that regularly asks about firearm ownership – is conducted.[6] Even when presented in the more impersonal setting of a computer interface, however, a survey must be worded thoughtfully so as to assure anonymity, and not give respondents reason to worry about answering truthfully.

This survey employs five common devices to encourage more truthful responses. First, it uses an indirect "teaser" question to pre-screen respondents in order to select those who own firearms. The initial question prompt presents the survey as concerned with "recreational opportunities and related public policies" and asks respondents if they own any of the following items, presented in a random order: Bicycle, Canoe or Kayak, Firearm, Rock Climbing Equipment, None of the Above. Only those who select "Firearm" are then presented the full survey. We also ask demographic questions at the outset, which allows us to assess the representativeness of the sample, including those who do not indicate firearms ownership. Second, the survey was carefully phrased so as to not suggest animus towards gun owners or ignorance of firearms-related terminology. Third, the survey assures respondents of anonymity. Fourth, in order to ensure that respondents are reading the survey questions carefully, and then responding with considered answers thereto, a "disqualifying" question (sometimes referred to as a "screening" question) was embedded a little over half of the way through the survey instructing respondents to select a particular answer for that question, which only those who read the question in its entirety would understand. Anyone registering an incorrect answer to this question was disqualified from the survey and their responses to

---

[6]For a description of the methods of the General Social Survey see: `https://www.nsf.gov/pubs/2007/nsf0748/nsf0748_3.pdf`

**APP. 594**

Electronic copy available at: https://ssrn.com/abstract=4209607

any of the survey questions were neither considered nor tallied.

Finally, while responses were required for basic demographic questions, if questions of a sensitive nature were left blank, the software would first call attention to the blank response and prompt the respondent to enter a response. However, if a respondent persisted in not responding and again tried to progress, rather than kick them out of the survey, they would be allowed to progress to the next section in the interest of obtaining the maximum amount of information that they were willing to share. Respondents were not made aware of this possibility in advance, and in practice such "opting out" of a particular question was seldom done (less than 1% of responses for the average question). This is the reason that small variations are sometimes observed in the total number of respondents for certain questions.

A pilot version of this survey was first fielded in Vermont as part of a research project aimed at documenting firearms ownership and firearms use rates in that specific state. The Vermont survey served as a proof of concept for the national version, demonstrating that this survey is a viable instrument for eliciting responses from firearms owners with both high response rates and low disqualification rates. The results of the Vermont survey are presented separately in Appendix A of this report and closely mirror national results.

This report focuses on providing descriptive statistics of answers to the major questions asked in the survey. Future research will examine responses, and relationships between them, in more detail. The report proceeds as follows: the next (second) section summarizes national firearms ownership estimates and demographics; the third section examines defensive uses of firearms; the fourth section examines question regarding carrying for self-defense; the fifth section summarizes ownership statistics, and the sixth section concludes.

# 2   Gun Ownership Demographics

- About a third of adults in the U.S. report owning a firearm, totaling about 81.4 million adult gun owners.

- 57.8% of gun owners are male, 42.2% are female.

- 25.4% of Blacks own firearms.

7

Electronic copy available at: https://ssrn.com/abstract=4206697

- 28.3% of Hispanics own firearms.

- 19.4% of Asians own firearms.

- 34.3% of Whites own firearms.

With raked weighting employed for gender, state, income, race, and age we find that 32.5% of US adults age 21 and over own a firearm (95% Confidence Interval, 32.1 - 32.9%). Expanding the sample population to include those age 18-20, who are restricted in some states from purchasing firearms, 31.9% of US adults age 18 and over own firearms (95% Confidence Interval, 31.5% - 32.3%). This is slightly above, but consistent with, the most recent in-depth survey of firearms ownership conducted by Pew in 2017 before the Covid-19 pandemic, which found that 30% of adults in America own a firearm (Brown, 2017). It is also consistent with recent Gallup polling in 2020 and 2021, which found that 32% and 31% of adults personally own a firearm (Gallup, 2021).

As a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership, we can also compare ownership rates of other items reported by respondents for this question. We find 52% of respondents indicating owning a bicycle, which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014.[7]

The distribution of gun owners surveyed by state is illustrated in Figure 1, and ranges from 1,287 in California and 1,264 in Texas to 26 in Washington, DC and 24 in North Dakota.

Table 1 shows the proportion of the population in each state estimated to own a firearm. Massachusetts, Hawaii, Rhode Island, and New Jersey have the lowest rates of ownership with less than 20% of the adult population owning firearms, while Kentucky, Montana, West Virginia, and Idaho have the highest rates of ownership with more than 45% of the adult population owning firearms.

With regard to the demographics of gun ownership, we find that 57.8% of gun owners are male and 42.2% are female, the average age of gun owners is 46-50 years old, and the average annual household income is $80,000-$90,000. Approximately 18% of gun owners do not identify as White (alone). Overall, approximately 10.6% of gun owners identify as Black,

---

[7]See   https://www.pewresearch.org/fact-tank/2015/04/16/car-bike-or-motorcycle-depends-on-where-you-live/

**APP. 596**

Electronic copy available at: https://ssrn.com/abstract=4206947

Figure 1: Distribution of Firearms Owners Surveyed

3.6% identify as Asian, 1.6% identify as American Indian, .2% identify as Pacific Islander, 82.0% identify as White, and 2.0% identify as Other. When analyzed within racial groups, we find that 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms.

According to the latest (2019) census estimates, there are approximately 255,200,373 individuals age 18 and over in the U.S., which implies that there are about 81.4 million adult gun owners.[8] Note that this figure does not include those under the age of 18 who may use or possess firearms for purposes such as hunting or shooting sports.

In sum, firearms ownership is widespread, and firearms owners are diverse.

# 3 Defensive Use of Firearms

- 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a gun in self-defense.

- In most cases (81.9%) the gun is not fired.

- Gun owners engage in approximately 1.67 million defensive uses of firearms per year.

- The majority of defensive gun uses take place outside of the home (74.8%).

---

[8]Census date is available at `https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-syasexn.xlsx`

9

Electronic copy available at: https://ssrn.com/abstract=4209657

**APP. 597**

| State | Proportion of adult population estimated to own firearms | 95% Confidence Interval |
|---|---|---|
| Alabama | 39.6% | 35.2% − 44.1% |
| Alaska | 33.4% | 25.7% − 42.1% |
| Arizona | 32.0% | 28.8% − 35.4% |
| Arkansas | 36.6% | 31.1% − 42.5% |
| California | 25.5% | 24.0% − 27.0% |
| Colorado | 33.6% | 29.8% − 37.7% |
| Connecticut | 20.2% | 16.8% − 24.1% |
| Delaware | 24.7% | 18.9% − 31.6% |
| District of Columbia | 23.9% | 15.6% − 34.9% |
| Florida | 30.3% | 28.5% − 32.2% |
| Georgia | 37.1% | 34.5% − 39.9% |
| Hawaii | 16.4% | 10.6% − 24.5% |
| Idaho | 54.5% | 45.5% − 63.1% |
| Illinois | 26.5% | 24.3% − 28.9% |
| Indiana | 40.3% | 36.6% − 44.1% |
| Iowa | 33.2% | 28.1% − 38.8% |
| Kansas | 42.8% | 37.4% − 48.3% |
| Kentucky | 46.7% | 42.6% − 50.8% |
| Louisiana | 32.8% | 28.0% − 38.0% |
| Maine | 35.9% | 29.7% − 42.6% |
| Maryland | 21.7% | 18.5% − 25.2% |
| Massachusetts | 15.8% | 13.4% − 18.6% |
| Michigan | 34.7% | 32.0% − 37.5% |
| Minnesota | 32.5% | 28.4% − 36.8% |
| Mississippi | 39.5% | 33.5% − 45.8% |
| Missouri | 39.7% | 36.2% − 43.4% |
| Montana | 48.4% | 38.7% − 58.3% |
| Nebraska | 37.2% | 29.8% − 45.2% |
| Nevada | 38.0% | 32.8% − 43.4% |
| New Hampshire | 24.1% | 18.4% − 30.9% |
| New Jersey | 19.3% | 16.9% − 22.0% |
| New Mexico | 33.8% | 25.9% − 42.7% |
| New York | 22.7% | 21.3% − 24.2% |
| North Carolina | 37.3% | 34.5% − 40.2% |
| North Dakota | 42.6% | 29.9% − 56.4% |
| Ohio | 33.7% | 31.1% − 36.4% |
| Oklahoma | 40.5% | 36.2% − 45.0% |
| Oregon | 38.3% | 32.7% − 44.2% |
| Pennsylvania | 30.3% | 28.1% − 32.6% |
| Rhode Island | 16.9% | 11.4% − 24.2% |
| South Carolina | 40.7% | 36.5% − 45.1% |
| South Dakota | 39.2% | 32.4% − 46.4% |
| Tennessee | 43.0% | 39.5% − 46.6% |
| Texas | 36.0% | 34.1% − 38.0% |
| Utah | 42.8% | 36.1% − 49.8% |
| Virginia | 30.6% | 27.6% − 33.7% |
| Washington | 32.8% | 29.3% − 36.4% |
| West Virginia | 53.0% | 45.6% − 60.2% |
| Wisconsin | 33.3% | 29.9% − 36.9% |
| Wyoming | 42.7% | 34.5% − 51.2% |

Table 1: Proportion of the population estimated to own a firearm in each state.

- About half of defensive gun uses involve more than one assailant (51.2%).

- Handguns are the firearm most commonly used in defensive incidents (65.9%), followed

**APP. 598**

Electronic copy available at: https://ssrn.com/abstract=4206867

by shotguns (21.0%) and rifles (13.1%).

Defensive use of firearms was assessed through a series of questions that asked for increasingly detailed information from those who indicated that they had used a firearm in self-defense.

First, all gun owners were asked, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard." About a third (31.1%) answered in the affirmative, and they were then asked how many times they defended themselves with a firearm (from "once" to "five or more times"). As Figure 2 shows, a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion.



Figure 2: Defensive Gun Use: 31.1% of firearms owners have defended themselves of their property with a gun, and a majority have done so more than once.

Both men and women report having used firearms in self-defense at high rates, with 33.8% of male gun owners indicating they have defensively used a gun, and 27.3% of female gun owners indicating they have defensively used a gun. Table 2 further breaks down reports of

11

**APP. 599**

Electronic copy available at: https://ssrn.com/abstract=4109597

defensive use of firearms by categories of race and ethnic ancestry, illustrating that defensive gun use rates are higher in some minority groups.

| Demographic Group | Proportion of Gun Owners Who Used Gun Defensively | 95% Confidence Interval |
|---|---|---|
| White | 29.7% | 29.0% − 30.5% |
| Black | 44.3% | 41.2% − 47.5% |
| Asian | 26.0% | 21.7% − 30.9% |
| Native American | 47.7% | 42.7% − 52.7% |
| Pacific Islander | 37.1% | 26.0% − 49.7% |
| Other Ethnic Ancestry | 36.2% | 30.3% − 42.7% |
| Hispanic (any ancestry) | 39.3% | 36.0% − 42.8% |
| Male | 33.8% | 32.8% − 34.8% |
| Female | 27.3% | 26.2% − 28.4% |

Table 2: Demographics of defensive gun use.

Given that 31.1% of firearms owners have used a firearm in self-defense, this implies that approximately 25.3 million adult Americans have defended themselves with a firearm. Answers to the frequency question suggest that these gun owners have been involved in a total of approximately 50 million defensive incidents. Assuming that defensive uses of firearms are distributed roughly equally across years, this suggests at least 1.67 million defensive uses of firearms per year in which firearms owners have defended themselves or their property through the discharge, display, or mention of a firearm (excluding military service, police work, or work as a security guard).[9]

---

[9]This is calculated by taking the total number of defensive incidents represented by the survey responses (50 million) and dividing by the number of adult years of the average respondent, which is 30. According to U.S. Census data, the average age of U.S. adults (i.e. the average age of those in the set of everyone 18 years or older) is 48, which also matches our survey data. Thus, the average respondent of the survey has 30 years of adult experience (48 years - 18 years = 30 adult years), over which the defensive incidents captured in this survey are reported.

Note that this estimate is inherently conservative for two reasons. First, it assumes that gun owners possessed firearms, or had access to firearms, from the age of 18. In so far as firearms were only first ac-

**APP. 600**

Electronic copy available at: https://ssrn.com/abstract=4206997



Figure 3: How Guns are Employed in Self-defense: In most defensive incidents no shots are fired.

Gun owner respondents were asked to answer detailed questions regarding each defensive

quired/accessed by some respondents in later years, this would reduce the number of adult firearms owning years represented by the survey responses and result in a higher estimate of the number of defensive incidents per year. Second, this figure only captures defensive gun uses by those currently indicating firearms ownership. According to Kleck and Gertz (1995), only 59.5% of respondents who reported a defensive gun use personally owed a gun (p.187). This would suggest that the true number of defensive gun uses, if those who do not personally own firearms are included in the estimate, could be substantially higher - perhaps as high as 2.8 million per year.

This approach is also robust to critiques that have been made by Hemenway (1996) and others who argue that defensive gun use estimates from surveys can be exaggerated due to recollection bias when respondents are asked to recount incidents within a limited time period. The intuition behind these critiques is that if respondents are asked, for example, if they used a gun defensively within the last year, there is a possibility that people will respond affirmatively if they used a gun in self-defense in recent memory, even if that incident wasn't strictly within the last 12 months. This could lead to inflated "per year" estimates of defensive gun uses, which would only be further magnified when extrapolated out to total defensive gun uses over many years. However, the approach of this survey is not vulnerable to this critique because the survey asks about defensive gun use at any time, not simply those within the last year or some other short time horizon. We thus do not engage in the exercise of extrapolating out estimates from potentially biased measures of comparatively rare events in a restricted window of time. Rather our approach asks questions about defensive gun use in the manner that is most methodologically sound for eliciting unbiased estimates.

Finally, note that our overall approach assumes that children are not employing firearms for self-defense

13

**APP. 601**

Electronic copy available at: https://ssrn.com/abstract=4206697

incident that they reported. As Figure 3 shows, in the vast majority of defensive gun uses
(81.9%), the gun was not fired. Rather, displaying a firearm or threatening to use a firearm
(through, for example, a verbal threat) was sufficient. This suggests that firearms have a
powerful deterrent effect on crime, which, in most cases, does not depend on a gun actually
being fired or an aggressor being injured.

Figure 4 shows where defensive gun uses occurred. Approximately a quarter (25.2%) of
defensive incidents took place within the gun owner's home, and approximately half (53.9%)
occurred outside their home but on their property. About one out of ten (9.1%) of defensive
gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.



Figure 4: The Location of Defensive Incidents: Most take place outside the home.

For each incident, respondents were asked to indicate what sort of firearm was used.
Figure 5 show the distribution of types of firearms employed in defensive incidents. Handguns
were the most commonly used firearm for self-defense, used in nearly two-thirds (65.9%) of
defensive incidents, followed by shotguns (21.0%) and rifles (13.1%).

Respondents were also asked to indicate how many assailants were involved in each de-

with any meaningful frequency. However, for the purpose of sensitivity analysis, if we lower the age used
for calculating defensive incident frequency to assume that children as young as 12 years old are commonly
possessing and using firearms for self-defense (and no non-firearms owning adults used firearms for self-
defense), this would still imply 1.39 million defensive uses of firearms per year (48 years - 12 years = 36 years
over which 50 million defensive incidents took place).

14

**APP. 602**

Electronic copy available at: https://ssrn.com/abstract=4109697



What sort of firearm did you use during this incident? (%)

Figure 5: Type of Gun Used for Defense: Handguns are the most common type of firearm used in defensive encounters, followed by shotguns and rifles.

fensive incident. As Figure 6 illustrates, about half of defensive encounters (51.2%) involved more than one assailant. Presumably, part of the value of using a firearm in self-defense is that it serves as a force multiplier against more powerful or more numerous assailants. Survey responses confirm that encountering multiple assailants is not an infrequent occurrence in defensive incidents. 30.8% of defensive incidents involved two assailants, and 20.4% involved three or more, while slightly less than half (48.8%) involved a single assailant.

Finally, after respondents answered these detailed questions about each defensive incident, which all flowed from their initial affirmative answer to the question, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed?", all gun owners were asked, "Separate from any incident in which you directly used a gun to defend yourself, has the presence of a gun ever deterred any criminal conduct against you, your family, or your property?" This question was meant to capture incidents that did not involve active self-defense, but for which individuals believed that the presence of a firearm helped deter predatory behavior. For example, a situation in which a combative customer calmed down after noticing that shop owner had a handgun on his or her hip, or a situation in which a trespasser cooperatively left a property when questioned by a landowner who had a rifle slung over his or her shoulder, or a situation in which a friend showed up with a firearm

15

**APP. 603**

Electronic copy available at: https://ssrn.com/abstract=4109697



Figure 6: Distribution of the Number of Assailants Involved in a Defensive Incident: Multiple assailants are common.

to help diffuse a dangerous situation, could fall into this category. Respondents answering in the affirmative could indicate how many times such deterrence occurred, from once to five or more occasions. As Figure 7 illustrates, separate from the self-defense incidents summarized earlier, 31.8% of gun owners reported that the mere presence of a gun has deterred criminal conduct, and 40.2% of these individuals indicated that this has happened on more than one occasion. Extrapolated to the population at large, this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime.

# 4   Carry Outside of the Home

- A majority of gun owners (56.2%) indicate that there are some circumstances for which they carry a handgun for self-defense.

- Approximately 26.3% of gun owners, or 20.7 million individuals, carry handguns for defensive purposes under a "concealed carry" regime.

- About a third of gun owners (34.9%) have wanted to carry a handgun for self-defense

16

Electronic copy available at: https://ssrn.com/abstract=4109567



Figure 7: Frequency with which Firearms Deter Crime: 31.8% of firearms owners report that the presence of a firearm has deterred criminal conduct against them, often on more than one occasion.

in a particular situation but local rules prohibited them from doing so.

As Figure 8 illustrates, a majority of gun owners (56.2%), or about 45.8 million, indicate that there are some circumstances in which they carry a handgun for self-defense (which can include situations in which no permit is required to carry, such as on their own property); and about 35% of gun owners report carrying a handgun with some frequency (indicating that they carry "Sometimes," "Often," or "Always or almost always."). Moreover, as Figure 9 summarizes, 34.9% of gun owners report that there have been instances in which they wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

Assessing the number of people who carry a concealed handgun in public is complicated due, in part, to the proliferation of so-called "constitutional carry" or "permitless carry" states in recent years. These states - about 18 at the time this survey was conducted - generally allow adults in good legal standing (often restricted to those age 21 and older) to

Electronic copy available at: https://ssrn.com/abstract=4209697

**APP. 605**



Figure 8: Frequency of Defensive Carry: Carrying a handgun for self-defense is common.



Figure 9: Prohibition of Carry: About a third of gun owners have wanted to carry a handgun for self-defense in a particular situation but local rules prohibited them from doing so.

carry a concealed weapon without a permit. Most of these states previously had a permitting process for concealed carry and required permits to be renewed at regular intervals in order to remain valid. Under constitutional carry, law abiding adults in these states are permitted to carry concealed without an official "permit." However, most of these states continue to issue permits to residents who desire them because such permits can be useful for reciprocal carry benefits in other states. For example, a person acquiring a Utah carry permit would be entitled to carry a handgun in a number of other states such as neighboring Colorado and

18

**APP. 606**

Electronic copy available at: https://ssrn.com/abstract=4209697

Nevada.[10] Thus, while basically all gun owners age 21 and over are "permitted" to carry a handgun for self-defense in constitutional carry states, many individuals may also possess a "permit," even though it is redundant for in-state carry.

Unsurprisingly, when asked "Do you have a concealed carry permit?" gun owning residents of many constitutional carry states respond in the affirmative at high rates. Also complicating this question about concealed carry permits is the fact that many states refer to such permits by different names, the fact that the right to carry a handgun can be conferred in certain circumstances by hunting or fishing licenses in some states,[11] and the existence of other related permits, some of which do not license concealed carry (e.g. standard pistol permits in North Carolina or New York, eligibility certificates in Connecticut) and some of which do (most License To Carry permits required for handgun ownership in Massachusetts, state pistol permits in Connecticut, and LEOSA permits available to current and retired law enforcement officers nationwide). Finally, it is also possible for individuals to obtain concealed carry permits in states other than the one in which they reside.

In order to provide a robust but conservative estimate of those who actually carry in public, we code as "public carriers" those individuals who indicated both that they have a concealed carry permit and that they carry a handgun for self-defense at least "sometimes." We also restrict analysis and population estimates to those age 21 and over given that most states restrict those under 21 from carrying concealed in public.

Using this simple definition, we find that 26.3% of gun owners are "public carriers," which translates to approximately 20.7 million individuals who carry handguns in public under a concealed carry regime. Note that this could include current and former law enforcement officers who may be represented in the survey. However, the number of active law enforcement officers in the U.S. is well under a million (approximately 700,000 in 2019).[12]

---

[10]See https://bci.utah.gov/concealed-firearm/reciprocity-with-other-states/

[11]For example, a number of states such as California, Georgia, and Oregon allow those with a hunting or fishing license to carry concealed while engaged in hunting or fishing or while going to or returning from an expedition. See: https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/cfl2016.pdf, https://law.justia.com/codes/georgia/2010/title-16/chapter-11/article-4/part-3/16-11-126/, https://codes.findlaw.com/or/title-16-crimes-and-punishments/or-rev-st-sect-166-260.html

[12]See https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-74

19

**APP. 607**

Electronic copy available at: https://ssrn.com/abstract=4209697

# 5    Types of Firearms and Magazines Owned

- 82.7% of gun owners report owning a handgun, 68.8% report owning a rifle, and 58.4% report owning a shotgun.

- The average gun owner owns about 5 firearms. The median gun owner owns 3.

- 29.0% of gun owners own only one firearm.

- 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.

- 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.

- Overall, Americans own in excess of 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

## 5.1    Rifles, Shotguns, and Handguns

Respondents were asked to indicate the number of rifles, shotguns, and handguns that they owned. 82.7% of gun owners report owning a handgun (95% CI 82.0% - 83.3%), 68.8% reported owning a rifle (95% CI 68.1% - 69.6%), and 58.4% report owning a shotgun (95% CI 57.6% - 59.2%). Note that using survey weights based on in-survey demographics of firearms ownership has no substantive effect on these estimates: Handgun, 83.7% (82.9% - 84.4%), Rifle, 68.6% (67.7% - 69.6%), Shotgun 58.6% (57.6% - 59.6%).

Approximately 99.8% of respondents indicated owning fewer than 100 firearms of each type, and approximately 97.2% indicated owning fewer than 10 firearms of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 firearms in any category in the analysis that examines average numbers of guns owned. Also, 1.5% of respondents entered zero for each category of firearms ownership. While ostensibly inconsistent with having earlier indicated ownership of a firearm, there are a number of plausible explanations for this discrepancy including a reluctance to

20

**APP. 608**

Electronic copy available at: https://ssrn.com/abstract=4206697



Percentage of gun owners reporting ownership of at least one firearm in the indicated category.

Figure 10: Percent of gun owners who own each type of firearm.

provide this level of detailed information, having use of a firearm in one's household which one does not personally own, or owning a firearm that technically does not fall into one of these three categories. We exclude these response in analyzing ownership rates below. However, including them has no significant effect on estimates.

On average, gun owners owned 5.1 firearms, consisting of 1.8 rifles, 1.2 shotguns, and 2.1 handguns. Figure 11 plots histograms of the number of firearms owned by respondents. Unsurprisingly, these are skewed right, indicating that most gun owners own a small number of guns, while a smaller portion of gun owners own a large number of guns. The median gun owner owned 3 firearms. 29.0% of firearms owners owned only one firearm.[13] Among those who only own one firearm, handguns are the most commonly owned type of gun (64.7%), followed by rifles (22.5%) and shotguns (13.3%).

Overall, these estimates imply that Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

---

[13]An earlier draft had estimated that 21.9% of gun owners owned only one firearm, but the denominator for that calculation mistakenly included respondents who did not provide an answer to this question. The estimate of 29.0% properly incorporates all information provided by respondents.

21

**APP. 609**

Electronic copy available at: https://ssrn.com/abstract=4109567



(a) Histogram of number of rifles owned

(b) Histogram of number of shotguns owned

(c) Histogram of number of handguns owned

(d) Histogram of total number of guns owned

Figure 11: Histograms showing the distributions of gun ownership.

## 5.2   Magazine Ownership

The survey asked respondents whether they have ever owned a magazine that holds more than 10 rounds. Those who answered in the affirmative were then asked to indicate the purposes for which they owned such magazines and to estimate how many magazines of different types they owned.

48.0% of gun owners (95% CI 47.2%-48.7%) responded yes to the question, "Have you ever owned a handgun or rifle magazine that holds more than 10 rounds? (You can count magazines that you may keep in another state if there are local restrictions against ownership.)" indicating that they had owned such magazines. Note that, again, using survey

22

Electronic copy available at: https://ssrn.com/abstract=4206597

weights based on in-survey demographics of firearms ownership has no substantive effect on this estimate (47.4%, CI 46.5%-48.4%). This suggests that approximately 39 million adults in the U.S. have owned magazines that hold more than 10 rounds.



Percentage indicating each factor was a reason for ownership.

Figure 12: Purposes indicated for owning 11+ capacity magazines.

Figure 12 shows the percentage of respondents who indicated that they owned magazines that can hold more than 10 rounds for the following purposes: defense outside the home (41.7%), home defense (62.4%), competitive shooting sports (27.2%), recreational target shooting (64.3%), hunting (47.0%), and other (3.9%). Note that respondents could choose multiple purposes for which they owned such magazines. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

Respondents who indicated that they had owned magazines that can hold more than 10 rounds were also asked to estimate the number of pistol and rifle magazines they owned of particular sizes. Numerical responses were unbounded. Approximately 99.8% of respondents indicated owning fewer than 100 magazines of each type, and approximately 96.5% indicated owning fewer than 10 magazines of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 magazines

**APP. 611**

Electronic copy available at: https://ssrn.com/abstract=4206687

in a category.



Average number of handgun magazines owned by capacity.

Figure 13: About how many handgun magazines of each type would you estimate you have owned?

Figure 13 shows the average number of handgun magazines of each type reported by respondents in this section: 10 rounds or less (3.1 magazines), 11-15 rounds (2.5 magazines), more than 15 rounds (4.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 10 handgun magazines, and more than two-thirds of these magazines hold more than 10 rounds. Note that the question asked whether respondents have ever owned such magazines and how many such magazines they have owned, so these estimates should be interpreted as an upper bound on current ownership given that some magazines may have been resold. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 269 million handgun magazines that hold over 10 rounds.

Figure 14 shows the average number of rifle magazines of each type reported by respondents in this section: 10 rounds or less (2.4 magazines), 11-15 rounds (1.8 magazines), over 15 rounds (5.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 9.6 rifle magazines, and about three-quarters of these magazines hold more than 10 rounds. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 273 million rifle magazines that

**APP. 612**

Electronic copy available at: https://ssrn.com/abstract=4206897

hold over 10 rounds.



Average number of rifle magazines owned by capacity.

Figure 14: About how many rifle magazines of each type would you estimate you have owned?

These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds. Finally, note that these questions about the types of magazines owned were only asked of those who indicated that they had owned a magazine that holds more than 10 rounds, and thus we do not know how many magazines up to 10 rounds are owned by the 52.0% of gun owners who are not in this category.

Table 3 shows the breakdown of ownership of magazines that hold over 10 rounds across different demographic segments.

Table 4 shows the percentage of gun owners in each state who indicated that they have owned magazines that hold more than 10 rounds. Note that this question explicitly instructed respondents that "You can count magazines that you may keep in another state if there are local restrictions against ownership." This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such magazines. It's also possible that those answering in the affirmative possess magazines that were grandfathered in because they were acquired before such bans or that some respondents have gotten rid of magazines that they owned in the past.

Another dynamic that likely contributes to such differences in ownership rates derives

25

**APP. 613**

Electronic copy available at: https://ssrn.com/abstract=4203597

| Demographic Group | Proportion Owned 11+ Mags | 95% Confidence Interval |
|---|---|---|
| White | 47.0% | 46.1% – 47.8% |
| Black | 55.2% | 52.2% – 58.2% |
| Asian | 50.0% | 44.8 – 55.2% |
| Native American | 52.6% | 47.7% – 57.4% |
| Pacific Islander | 59.1% | 47.4% – 69.9% |
| Other Ethnic Ancestry | 59.6% | 53.3% – 65.6% |
| Hispanic (any ancestry) | 61.6% | 58.3% – 64.7% |
| Male | 57.7% | 56.7% – 58.7% |
| Female | 34.1% | 33.0% – 35.3% |

Table 3: Demographics of ownership of magazines that hold more than 10 rounds.

from the fact that in states with low rates of firearms ownership, such as DC and Hawaii, those few individuals who do own guns are presumably more likely to be gun enthusiasts. Indeed, analysis of the survey data reveals that states with higher rates of firearms ownership are associated with slightly lower rates of ownership of magazines that own over 10 rounds, and this difference is statistically significant (coef = -0.36, p=.03).

Given that such a large percentage of gun owners indicated that they owned magazines that hold over ten rounds for defensive purposes, we further analyze the potential value of these magazines for defense. Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired.

As part of the self-defense section of the survey, respondents were invited to answer an open response question that asked: "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes

26

**APP. 614**

Electronic copy available at: https://ssrn.com/abstract=4109697

| State | Owned 11+ cap. mags | 95% Confidence Interval |
|---|---|---|
| Alabama | 48.1% | 42.7% − 53.6% |
| Alaska | 52.7% | 39.6% − 65.4% |
| Arizona | 47.5% | 42.3% − 52.8% |
| Arkansas | 50.7% | 44.1% − 57.3% |
| California | 53.8% | 51.0% − 56.5% |
| Colorado | 51.4% | 45.3% − 57.4% |
| Connecticut | 42.6% | 34.4% − 51.3% |
| Delaware | 50.6% | 39.8% − 61.5% |
| District of Columbia | 69.2% | 49.5% − 83.8% |
| Florida | 46.9% | 43.9% − 49.8% |
| Georgia | 52.4% | 48.7% − 56.2% |
| Hawaii | 59.3% | 40.3% − 75.8% |
| Idaho | 45.4% | 36.7% − 54.4% |
| Illinois | 51.5% | 47.3% − 55.6% |
| Indiana | 46.5% | 41.8% − 51.2% |
| Iowa | 35.4% | 28.0% − 43.6% |
| Kansas | 42.2% | 35.4% − 49.4% |
| Kentucky | 43.7% | 38.5% − 49.0% |
| Louisiana | 47.4% | 41.1% − 53.8% |
| Maine | 37.9% | 28.7% − 48.0% |
| Maryland | 50.8% | 43.7% − 57.8% |
| Massachusetts | 53.3% | 45.7% − 60.8% |
| Michigan | 37.1% | 33.2% − 41.1% |
| Minnesota | 39.8% | 34.0% − 46.0% |
| Mississippi | 44.6% | 37.3% − 52.2% |
| Missouri | 50.6% | 45.8% − 55.5% |
| Montana | 52.6% | 39.8% − 65.1% |
| Nebraska | 45.5% | 35.9% − 55.3% |
| Nevada | 61.0% | 52.8% − 68.5% |
| New Hampshire | 43.9% | 31.6% − 56.9% |
| New Jersey | 52.2% | 46.5% − 57.8% |
| New Mexico | 49.2% | 36.9% − 61.5% |
| New York | 54.9% | 51.8% − 58.0% |
| North Carolina | 43.9% | 39.9% − 47.9% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 42.0% | 38.4% − 45.7% |
| Oklahoma | 47.5% | 41.7% − 53.4% |
| Oregon | 49.8% | 42.9% − 56.6% |
| Pennsylvania | 39.6% | 36.0% − 43.2% |
| Rhode Island | 55.3% | 39.5% − 70.1% |
| South Carolina | 42.8% | 37.7% − 48.0% |
| South Dakota | 50.0% | 40.2% − 59.8% |
| Tennessee | 44.1% | 39.5% − 48.7% |
| Texas | 54.1% | 51.3% − 56.8% |
| Utah | 46.8% | 38.2% − 55.6% |
| Virginia | 47.5% | 42.7% − 52.4% |
| Washington | 53.1% | 47.8% − 58.4% |
| West Virginia | 44.8% | 37.7% − 52.1% |
| Wisconsin | 33.6% | 28.5% − 39.0% |
| Wyoming | 63.0% | 51.4% − 73.3% |

Table 4: Percent of gun owners who have indicated that they have ever owned magazines that hold over 10 rounds by state. Note that this includes magazines that an owner holds in other states if there are local ownership restrictions.

**APP. 615**

Electronic copy available at: https://ssrn.com/abstract=4206697

to have a firearm with a magazine capacity in excess of 10 rounds?  If so, please briefly describe that situation."  Approximately 550 respondents gave a affirmative response with most sketching out details of the encounter.  Examples of these responses (reported verbatim) include:

- I got jumped by multiple people in a carjacking in front of our apartments with my wife and children.

- Yes. I was robbed on a street 1 time by a group of about 6 people that at least 1 was armed and I wasn't. It took about 6 hours of emergency surgery to gat my bones in face jaws and skull back in place form being beaten in the head face kicked all over. Damn near killed me.

- Yes, a man broke into our apartment, high. He was approx 6'4, 300 pounds & threw a friend of ours around the living room like a rag doll. Beat her repeatedly.

- Yes. The first incident I mentioned. Three men attempted to rob me outside my home, with the intention of entering my home thereafter. My wife and child were inside the home at the time. That was in California with a magazine that only held 7 shots. I am a great shot, prior military and other firearms training, but I hate to only have 7 shots with three people. In such a situation, very well trained people, pumped up with adrenalin can and do miss their target. Thank you.

- Yes, absolutely. I am mobility challenged and was walking my dog one day. Three men ambushed me from behind, but luckily my dog chased them away. My dog actually bit one of the men.

- On the farm, we have had mountain lions killing our calves so a larger animal could require more rounds

- When two people attacked my company's warehouse

- Yes, I was alone with my son and 3 large men were trying to break in, I was unable to reload, thank goodness they realized and left.

28

**APP. 616**

Electronic copy available at: https://ssrn.com/abstract=4206597

- I was charged by a bear. It was very scary in the moment I panicked and rattled over multiple shots. Most missed but some hit home and eventually stopped him.

- Yes. I went in but into a store and 4 thugs approached me telling me to give them money. I produced my handgun at my side and they left. If this had been a shooting with multiple bad guys with guns a 15 round magazine is best.

- When I was a teenager 4 guys did a home invasion at our house. I could easily see needing a 20 to 30 round clip would be necessary.. we didnt have weapons and my mom and dad were hurt pretty bad. Dad was stabbed 4 times and they had a gun too. Thats when I decided when I was on my own that I would have protection.

- About 20 coyotes attacked some of my livestock. It took two 30 round magazines to repel the animals and then only after killing 10 of them.

- Yes. I was surrounded by would-be assailants in a perking lot. I was able to escape unharmed, but if they had rushed me, I would most certainly had to lay down a rapid field of fire, alternately in various directions. In that scenario, I probably would have missed the targets and needed multiple, rapid follow-up shots to hit or at least dissuade the attackers from pressing forward. Only a firearm with 10 or more round magazine would offer that kind of defensive capability.

- Had several people trespass on my property doing something illegal and when I called the police said it would be a while before they could come out so when I asked the people to leave they threatened to kill me but after they seen that I was open carry the left if the situation went a different way I dont know if I would have been about to protect myself with as many of them as there was

- The time when there were 4 people in my home and I was fearful of being hurt and my concern was do I have enough rounds to protect myself what if I missed if I had to fire the weapon .

- Yes. Been stalked by a pack of coyotes while hiking with my children

29

**APP. 617**

Electronic copy available at: https://ssrn.com/abstract=4209697

- Yes when I had more than one person trying to break into my car. I live out in the country so I do not have time to wait for police to get to me I have to act fast and protect myself and my family.

- Yes, I ran into a situation where there were numerous criminals breaking the law and rioting at a public venue during an annual festival event. They were blocking my self and my friends, two of which were females, from leaving the area as well as preventing the police from reaching us. I was very glad that I had multiple magazines that had more then a 10 round capacity.

- 2 men broke into my home while I was sleeping. I woke up and heard them breaking stuff downstairs. I grabbed my gun and ran down stairs and confronted them. I pointed my gun at them and told them to get out. They ran off.

- I was stopped at a red light. Car in front of me backed up and the car behind me pulled up to my bumper. Both drivers got out and approached both sides of my car. Light turned green. I gassed it pushing the car in front of me out of the way. They had bats to break my windows. Would've robbed me I think. Was under a overpass.

- Twice it was people attempting to break into my home I was alone age 64 and 4 burly men thought no one was home as I had been napping. They learned quickly this old lady was not without protection. They saw the gun and quickly left. I called 911 and they were apprended they had been robbing homes for 6 weeks in the area. Those home who had guns they left and went elsewhere. Another time people a group wanted a big party came to the wrong road half were drunk or stoned. I had small children. There was finally someone sober enough to see I had a gun and that I meant business it was the middle of the night and they wanted to party but had the wrong road. The sane person got them to all leave and they never came back. We had no phone at that time. The third time was a cougar attacking my livestock. It ran off but had killed 4 goats. We called the game warden they had a special hunt and killed it as we had been the 4th place hit it had killed livestock. We have had cougar on our property in our yard 3 times since once my son shot one stalking him and his dog the other time

30

**APP. 618**

Electronic copy available at: https://ssrn.com/abstract=4209687

it ran off before he could get his gun ready.

- yes, but not at home, we were camping in prescott arizona and several men came up and wanted to harass and steal from our family. We all felt very threatened and if another couple of people had not shown up with their guns the people would have over ran us and my family would have been hurt.

- It could have helped during a robbery at my residence where 4 intruders entered my home

- I was a small business owner before I became disabled. I would often carry large amounts of cash. On more than 1 occasion I was faced with pulling my weapon or lose my cash

- I was walking a long distance through Philadelphia to get to a restaurant and was approached by 3 men who demanded to know why I thought I could go through their neighborhood. I told them I did not want any trouble and tried to continue walking but one stood in my way and asked if I actually thought I was going to leave without answering them. I began to wonder if I was going to be robbed or assaulted when they first approached and at this point it seemed like they would prevent me from leaving. I lifted my shirt and placed my hand on a pistol I was legally able to conceal carry and said yes I would be leaving. They backed away from me but continued to yell things at me as I left the area. I never pulled the gun out, but them knowing I had it and may use it to stop them was enough to escape unharmed. Having less than 10 rounds against 3 attackers, especially if they were also armed, would have put me at a disadvantage if I was unable to accurately hit my targets initially and they continued to Pursue me.

- Yes, I was in Illinois, which does not honor Indiana concealed carry. I had to leave my firearm at home. This was truly the only time in my life I felt I needed to actually use a firearm, but almost was killed. 4 men (3 with guns displayed and 1 with a knife in his hand) were walking up to me fast in a parking lot screaming stop and give me everything you have. The parking lot was near empty, and dark outside. I was able

31

**APP. 619**

Electronic copy available at: https://ssrn.com/abstract=4209697

to unlock my car while running, start the car and speed off. Just as I got in the car, I had just enough time to lock the door before the 3 men pointed there guns at the car and the other was stabbing the window with a knife. They intended to rob and kill me. I couple rounds were fired as I sped off. I would have needed minimally 10 rounds if I had discharged given their distancing. I almost died because of Illinois law and my street smarts and luck was the only thing that saved me

- Yes An incident occurred when a man was drunk and crashed his car in front of me while I was carrying my 2 small children. A large group of his friends tried to get the drunk away before the police arrived. A fight started with them punching my elderly dad and threatened my elderly mother with violence.

- I was confronted then attacked by a group of about 12 teens when I was a teenager. They kicked me and caused a sever head injury and fractured ribs. I was defenseless. Being able to brandish a weapon with the capacity to take on a group of that size would have deterred their next step of physically assaulting me

- The two large males that attempted to break into my home. Much larger than myself. A 9mm would take several shots to slow down either and/or both.

- Yes. I am a 5'2" disabled female. I was stalked by a homeless drug addict. He was detained 4-5 times due to red behavior because he was high on methamphetamine. This person could have potentially done great harm to me. Meth addicts don't always go down easy. Sometimes it takes numerous rounds to get them down.

- My brother and I were robbed at gun point when ione of the men got in the car with me after my brother got out of the car. The man had already told my brother that he wanted his money and that there were other people watching across the parking lot in case he had any problems with us. So when my brother got out, that man got in with a gun and stuck it right into my right side. He told me not to look at him and to give him all my money. With the other men standing in different positions in the parking lot my brother could have tried to shoot them (or at them) to try and scare them off

32

**APP. 620**

Electronic copy available at: https://ssrn.com/abstract=4209697

and if he could have had a larger capacity magazine he could have been able to fire more rounds at them to keep them away while we tried to get help from someone.

Finally, it is worth noting that, although a majority of these scenarios involve the prospect of defending against criminal aggression, a number involve defending against animals. The pilot survey in Vermont similarly documented a number of incidents involving animals (see Appendix A). This is a phenomenon that has been largely neglected in the scholarly literature examining the value of firearms for self-defense, and it would be helpful for future research to evaluate the frequency with which firearms are employed in defense against animal threats.

## 5.3   Ownership of AR-15 and similarly styled rifles

All gun owners were asked, "Have you ever owned an AR-15 or similarly styled rifle? You can include any rifles of this style that have been modified or moved to be compliant with local law." 30.2% of gun owners, about 24.6 million people, indicated that they have owned an AR-15 or similarly styled rifle. Using survey weights based on in-survey demographics of firearms ownership has no effect on this estimate. Respondents were then asked to indicate how many of such rifles they have owned. Approximately 99.7% indicated owning under 100 and 98.4% under 10. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we disregard the 0.3% that indicate owning over 100 in calculating average ownership numbers. Among those who indicate having owned AR-15 and similarly styled rifles, they indicate having owned an average of 1.8, with the median owner having owned 1. This suggest that up to 44 million AR-15 styled rifles have been owned by U.S. gun owners. Note, again, that this estimate is based on a question that asks whether someone has ever owned such a rifle, so this estimate should be interpreted as an upper bound on current ownership given that some rifles may have been resold.

Figure 15 shows the percentage of respondents who indicated that they owned AR-15 styled rifles for the following purposes: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). Note that respondents could choose multiple purposes for which

**APP. 621**

Electronic copy available at: https://ssrn.com/abstract=4095447



Percentage indicating each factor was a reason for ownership.

Figure 15: Purposes indicated for owning AR-15 styled rifles.

they owned such firearms. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

| Demographic Group | Proportion Owned AR-15 Styled Rifle | 95% Confidence Interval |
|---|---|---|
| White | 29.6% | 28.9% – 30.4% |
| Black | 34.0% | 31.0% – 37.1% |
| Asian | 29.2% | 24.6% – 34.2% |
| Native American | 35.4% | 30.8% – 40.3% |
| Pacific Islander | 48.4% | 36.3% – 60.7% |
| Other Ethnic Ancestry | 34.6% | 28.8% – 41.1% |
| Hispanic (any ancestry) | 38.3% | 35.0% – 41.8% |
| Male | 36.4% | 35.5% – 37.4% |
| Female | 21.3% | 20.3% – 22.3% |

Table 5: Demographics of ownership of AR-15 styled rifles.

Table 5 shows the breakdown of ownership of AR-15 styled rifles across different demographic segments. As this table demonstrates, AR-15 styled rifles are commonly owned at

34

**APP. 622**

Electronic copy available at: https://ssrn.com/abstract=4206697

high rates across many different demographic groups.

Table 6 shows the percentage of gun owners in each state who indicated that they have owned AR-15 styled rifles. Note that this question explicitly instructed respondents that "You can include any rifles of this style that have been modified or moved to be compliant with local law." Thus, as with magazines, these answers can include firearms that are kept in other states, as well as firearms that were grandfathered in or modified to be compliant with local law, or respondents who have since sold or disposed of such guns. This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such firearms.

# 6    Conclusion

This report summarizes the main findings of the most comprehensive survey of firearms ownership and use conducted in the United States to date. While many of its estimates corroborate prior survey research in this area, it also provides unique insights that are relevant to timely public policy debates, particularly regarding the defensive use of firearms and the ownership and use of AR-15 styled rifles and magazines that hold over 10 rounds.

This survey finds firearms ownership rates slightly above those documented before the Covid-19 pandemic, which is consistent with other recent scholarly research finding a large surge in firearms purchases during the pandemic, particularly among first time buyers (Crifasi et al., 2021; Miller et al., 2022).

In sum, about 31.9% of U.S. adults, or 81.4 million Americans, own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns. About 24.6 million individuals have owned a up to 44 million AR-15 and similarly styled rifles, and 39 million individuals have owned up to 542 million magazines that hold over 10 rounds. Approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and guns are used defensively by firearms owners in approximately 1.67 million incidents per year. A majority of gun owners (56.2%) indicate that they carry a handgun for self- defense in at least some cir- cumstances, and about 35% of gun owners report carrying a handgun with some frequency.

**APP. 623**

Electronic copy available at: https://ssrn.com/abstract=4206807

| State | Owned AR-15 Style Rifle | 95% Confidence Interval |
|---|---|---|
| Alabama | 28.9% | 24.1% − 34.3% |
| Alaska | 37.0% | 24.4% − 51.6% |
| Arizona | 28.8% | 24.2% − 34.0% |
| Arkansas | 35.0% | 28.7% − 41.8% |
| California | 37.5% | 34.8% − 40.2% |
| Colorado | 33.3% | 27.7% − 39.5% |
| Connecticut | 21.8% | 15.3% − 30.2% |
| Delaware | 20.3% | 12.6% − 30.9% |
| District of Columbia | 30.0% | 14.1% − 52.7% |
| Florida | 28.1% | 25.5% − 30.9% |
| Georgia | 31.4% | 27.9% − 35.1% |
| Hawaii | 34.6% | 19.1% − 54.3% |
| Idaho | 31.0% | 23.3% − 40.0% |
| Illinois | 32.6% | 28.7% − 36.7% |
| Indiana | 30.8% | 26.5% − 35.5% |
| Iowa | 27.1% | 20.4% − 35.1% |
| Kansas | 28.4% | 22.4% − 35.4% |
| Kentucky | 29.9% | 25.2% − 35.1% |
| Louisiana | 27.5% | 22.0% − 33.7% |
| Maine | 22.0% | 14.6% − 31.6% |
| Maryland | 29.9% | 23.7% − 36.9% |
| Massachusetts | 33.8% | 26.9% − 41.4% |
| Michigan | 24.9% | 21.5% − 28.6% |
| Minnesota | 20.7% | 16.1% − 26.3% |
| Mississippi | 30.4% | 23.8% − 38.0% |
| Missouri | 28.0% | 23.8% − 32.7% |
| Montana | 26.8% | 16.8% − 39.8% |
| Nebraska | 22.4% | 15.3% − 31.8% |
| Nevada | 42.4% | 34.6% − 50.6% |
| New Hampshire | 23.2% | 14.0% − 36.0% |
| New Jersey | 30.7% | 25.7% − 36.2% |
| New Mexico | 29.5% | 19.4% − 42.1% |
| New York | 37.8% | 34.8% − 41.0% |
| North Carolina | 25.6% | 22.2% − 29.4% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 25.9% | 22.7% − 29.4% |
| Oklahoma | 29.3% | 24.1% − 35.0% |
| Oregon | 25.6% | 20.0% − 32.2% |
| Pennsylvania | 24.4% | 21.3% − 27.8% |
| Rhode Island | 29.7% | 17.3% − 46.1% |
| South Carolina | 25.3% | 21.0% − 30.2% |
| South Dakota | 35.8% | 26.8% − 45.9% |
| Tennessee | 28.9% | 24.8% − 33.3% |
| Texas | 36.0% | 33.3% − 38.7% |
| Utah | 24.8% | 17.9% − 33.2% |
| Virginia | 26.0% | 21.9% − 30.6% |
| Washington | 35.3% | 30.3% − 40.6% |
| West Virginia | 27.4% | 21.3% − 34.5% |
| Wisconsin | 19.7% | 15.6% − 24.6% |
| Wyoming | 36.1% | 25.9% − 47.8% |

Table 6: Percent of gun owners who have indicated that they have ever owned an AR-15 styled rifle by state. Note that this includes rifles that an owner holds in other locations if there are local ownership restrictions and rifles modified to be compliant with local laws.

36

**APP. 624**

Electronic copy available at: https://ssrn.com/abstract=4206697

Finally, the demographics of firearms ownership and defensive use are diverse, with different demographic groups commonly owning and using firearms at substantial rates.

**APP. 625**

Electronic copy available at: https://ssrn.com/abstract=4209697

# References

Deborah Azrael, Lisa Hepburn, David Hemenway, and Matthew Miller. The stock and flow of us firearms: results from the 2015 national firearms survey. *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5):38–57, 2017.

Anna Brown. *America's Complex Relationship With Guns: An In-depth Look at the Attitudes and Experiences of US Adults*. Pew Research Center, 2017.

Philip J Cook and Jens Ludwig. *Guns in America: results of a comprehensive national survey on firearms ownership and use*. Police Foundation Washington, DC, 1996.

Cassandra K Crifasi, Julie A Ward, Emma E McGinty, Daniel W Webster, and Colleen L Barry. Gun purchasing behaviours during the initial phase of the covid-19 pandemic, march to mid-july 2020. *International review of psychiatry*, 33(7):593–597, 2021.

Gallup. *In Depth: Topics, Guns*. https://news.gallup.com/poll/1645/guns.aspx , https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx, 2021.

David Hemenway. Survey research and self-defense gun use: an explanation of extreme overestimates. *J. Crim. L. & Criminology*, 87:1430, 1996.

Lisa Hepburn, Matthew Miller, Deborah Azrael, and David Hemenway. The us gun stock: results from the 2004 national firearms survey. *Injury prevention*, 13(1):15–19, 2007.

Gary Kleck and Marc Gertz. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J. Crim. L. & Criminology*, 86:150, 1995.

Gary Kleck and Marc Gertz. Carrying guns for protection: results from the national self-defense survey. *Journal of Research in Crime and Delinquency*, 35(2):193–224, 1998.

Jens Ludwig, Philip J Cook, and Tom W Smith. The gender gap in reporting household gun ownership. *American Journal of Public Health*, 88(11):1715–1718, 1998.

Matthew Miller, Wilson Zhang, and Deborah Azrael. Firearm purchasing during the covid-19 pandemic: results from the 2021 national firearms survey. *Annals of internal medicine*, 175(2):219–225, 2022.

**APP. 626**

Electronic copy available at: https://ssrn.com/abstract=4209697

Ann P Rafferty, John C Thrush, Patricia K Smith, and Harry B McGee.  Validity of a
household gun question in a telephone survey. *Public Health Reports*, 110(3):282, 1995.

Paul Spector.  Social desirability bias.  *The SAGE encyclopedia of social science research
methods*, 2004.

**APP. 627**

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix A: Vermont Pilot Survey

An initial version of this survey was fielded in Vermont. We report below the top line results from the Vermont survey, which closely mirror the results of the national survey.

In sum, 572 Vermont residents were surveyed, of which 163 indicated owning firearms. The survey sample represented the demographics of Vermont well on all dimensions except gender, as women were over represented and comprised 65.2% of respondents. Thus, weights were employed for gender.

With weighting employed, we find that 30% of Vermont residents own a firearm. Given that the adult population of Vermont is approximately 486,000, this suggest that there are over 145,600 firearms owners in Vermont. 42.1% of Vermont firearms owners are estimated to be female and 57.9% male.

As Figure 16 illustrates, almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property (not counting incidents that were due to military service, police work, or work as a security guard). In nearly half of these defensive gun uses (45.9%), respondents reported facing multiple assailants. 85.8% of all incidents were resolved without the firearm owner having to fire a shot (e.g. by simply showing a firearm or verbally threatening to use it).



Figure 16: Proportion of gun owners in Vermont who have use a firearm in self-defense and number of assailants involved.

**APP. 628**

Electronic copy available at: https://ssrn.com/abstract=4209697

Sample of Vermont responses to open ended question prompt of "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?":

- in the first incident it was five to one. I was outnumbered. three rounds per person if needed

- The time I was assaulted by 10 individuals.

- Yes. We have bear that frequently come to our home. They've attempted to get into my truck, they have come onto our porch thru the dog door (XL size) they have been in our chicken coops and in our garage. They have damaged many items, destroyed gas grills and threatened my dogs and children. Sometimes a warning shot isn't enough. And if, God forbid, the bear turned and started to attack us multiple bullets would be needed to stop him.

- About 6 individuals broke into my house one night. I locked myself in my room and they tried to break my door down. I threatened them with use of deadly force, but they kept trying. One of them was outside and broke my bedroom window and I aimed my shotgun at him and he ran off. I threatened again with the sound of charging my shotgun that they knew I wasn't bluffing and they all fled. Had they entered with the intent to kill my family and I, then we would have been out numbered. If there was an exchange of gun fire, I wouldn't want to have the restriction of reloading within the time I needed to protect my family and myself. Outgun the enemy or the enemy will surely outgun you. Limiting everyone's right to weapons is not the answer, and clearly this attempt to ban high capacity magazines is just the catalyst to a government gun grab for easier totalitarian control of the population.

- Yes, i had two run ins with a mountain lion.

- We had a home invasion two times in a month

- Yes. We live in VT. Every time I fired my gun in defense of my property it was to deter bears from damaging my property. It takes more than 1 shot to scare a bear. If

41

**APP. 629**

Electronic copy available at: https://ssrn.com/abstract=4209697

it charges you or your family it'll definitely take a bunch of shots to stop the bear.

- Yes.  Just because there are 10 rounds in a magazine does not mean all will be on target during a self defense incident.  In 2012 while I was in college in Connecticut, I got jumped by 4 people in Hartford ct.  I had nothing on me to defend myself.  The men all threatened me with knives and handguns.  I wish I was able to carry a firearm at that point.

**APP. 630**

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix B: Sampling Proportions With and Without Weights for National Survey

| Gender | Initial Sample Proportions | Census Based Weighted Proportions |
|--------|---------------------------|-----------------------------------|
| Male   | 49.32%                    | 49.23%                            |
| Female | 50.68%                    | 50.77%                            |

| Age Range | Initial Sample Proportions | Census Based Weighted Proportions |
|-----------|---------------------------|-----------------------------------|
| 18-20     | 7.89%                     | 5.04%                             |
| 21-25     | 8.11%                     | 8.58%                             |
| 26-30     | 7.30%                     | 9.24%                             |
| 31-35     | 11.67%                    | 8.67%                             |
| 36-40     | 12.66%                    | 8.44%                             |
| 41-45     | 8.49%                     | 7.70%                             |
| 46-50     | 6.46%                     | 8.09%                             |
| 51-55     | 6.37%                     | 8.13%                             |
| 56-60     | 7.39%                     | 8.52%                             |
| 61-65     | 7.67%                     | 7.87%                             |
| 66-70     | 8.03%                     | 6.59%                             |
| 71-75     | 5.07%                     | 5.13%                             |
| 76-80     | 1.94%                     | 3.50%                             |
| Over 80   | 0.93%                     | 4.49%                             |

**APP. 631**

Electronic copy available at: https://ssrn.com/abstract=4209697

| Annual Household Income | Initial Sample Proportions | Census Based Weighted Proportions |
| --- | --- | --- |
| Less than $10,000 | 8.87% | 3.40% |
| $10,000-20,000 | 8.95% | 4.89% |
| $20,000-30,000 | 9.69% | 6.26% |
| $30,000-40,000 | 8.78% | 7.06% |
| $40,000-50,000 | 7.44% | 7.21% |
| $50,000-60,000 | 7.72% | 6.96% |
| $60,000-70,000 | 6.00% | 6.96% |
| $70,000-80,000 | 6.37% | 6.37% |
| $80,000-90,000 | 4.51% | 5.76% |
| $90,000-100,000 | 5.89% | 5.76% |
| $100,000-150,000 | 17.67% | 19.11% |
| Over $150,000 | 8.12% | 20.23% |

**APP. 632**

Electronic copy available at: https://ssrn.com/abstract=4209697

| State of Residence | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Alabama | 1.83% | 1.52% |
| Alaska | 0.39% | 0.22% |
| Arizona | 2.10% | 2.16% |
| Arkansas | 1.10% | 0.91% |
| California | 9.75% | 11.95% |
| Colorado | 1.59% | 1.75% |
| Connecticut | 1.23% | 1.09% |
| Delaware | 0.56% | 0.30% |
| District of Columbia | 0.27% | 0.21% |
| Florida | 7.29% | 6.51% |
| Georgia | 3.67% | 3.24% |
| Hawaii | 0.36% | 0.44% |
| Idaho | 0.44% | 0.56% |
| Illinois | 4.14% | 3.87% |
| Indiana | 2.13% | 2.05% |
| Iowa | 0.91% | 0.96% |
| Kansas | 0.92% | 0.89% |
| Kentucky | 1.61% | 1.36% |
| Louisiana | 1.23% | 1.41% |
| Maine | 0.51% | 0.41% |
| Maryland | 1.67% | 1.87% |
| Massachusetts | 1.88% | 2.13% |
| Michigan | 3.21% | 3.05% |
| Minnesota | 1.36% | 1.73% |
| Mississippi | 0.83% | 0.90% |
| Missouri | 1.93% | 1.86% |
| Montana | 0.25% | 0.33% |
| Nebraska | 0.53% | 0.59% |
| Nevada | 0.90% | 0.94% |
| New Hampshire | 0.40% | 0.42% |
| New Jersey | 2.97% | 2.81% |
| New Mexico | 0.36% | 0.64% |
| New York | 8.09% | 6.11% |
| North Carolina | 3.18% | 3.16% |
| North Dakota | 0.13% | 0.24% |
| Ohio | 4.13% | 3.57% |
| Oklahoma | 1.32% | 1.20% |
| Oregon | 1.05% | 1.28% |
| Pennsylvania | 4.30% | 3.93% |
| Rhode Island | 0.33% | 0.33% |
| South Carolina | 1.68% | 1.55% |
| South Dakota | 0.48% | 0.27% |
| Tennessee | 2.18% | 2.09% |
| Texas | 6.91% | 8.81% |
| Utah | 0.56% | 0.99% |
| Virginia | 2.43% | 2.61% |
| Washington | 2.03% | 2.33% |
| West Virginia | 0.71% | 0.54% |
| Wisconsin | 1.83% | 1.78% |
| Wyoming | 0.32% | 0.17% |

**APP. 633**

Electronic copy available at: https://ssrn.com/abstract=4209697

| Race | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| White | 81.26% | 76.30% |
| Black | 9.85% | 13.40% |
| Asian | 3.98% | 5.90% |
| Native American | 2.19% | 1.30% |
| Pacific Islander | 0.49% | 0.20% |
| Other | 2.22% | 2.90% |

**APP. 634**

Electronic copy available at: https://ssrn.com/abstract=4209697

# EXHIBIT 6

**U.S. Department of Justice**
Office of Justice Programs



July 1995, NCJ-148201

# Bureau of Justice Statistics
# Selected Findings

*Firearms, crime, and criminal justice*

# Guns Used in Crime

By Marianne W. Zawitz
BJS Statistician

## How often are guns used in violent crimes?

According to the National Crime Victimization Survey (NCVS), almost 43.6 million criminal victimizations occurred in 1993, including 4.4 million violent crimes of rape and sexual assault, robbery, and aggravated assault. Of the victims of these violent crimes, 1.3 million (29%) stated that they faced an offender with a firearm.*

In 1993, the FBI's *Crime in the United States* estimated that almost 2 million violent crimes of murder, rape, robbery, and aggravated assault were reported to the police by citizens. About 582,000 of these reported murders, robberies, and aggravated assaults were committed with firearms. Murder was the crime that most frequently involved firearms; 70% of the 24,526 murders in 1993 were committed with firearms.

## How do we know about the guns used by criminals?

No national collection of data contains detailed information about all of the guns used in crimes. Snapshots of

## Highlights

● Although most crime is not committed with guns, most gun crime is committed with handguns. *pages 1 & 2*
● Although most available guns are not used in crime, information about the 223 million guns available to the general public provides a context for evaluating criminal preferences for guns. *page 2*
● By definition, stolen guns are available to criminals. The FBI's National Crime Information Center (NCIC) stolen gun file contains over 2 million reports; 60% are reports of stolen handguns. *page 3*
● In 1994, the Bureau of Alcohol, Tobacco and Firearms (ATF) received over 85,132 requests from law enforcement agencies for traces of guns used in crime. Over three-quarters of the guns traced by the ATF in 1994 were handguns (mostly pistols), and almost a third were less than 3 years old. *page 4*
● Surveys of inmates show that they prefer concealable, large caliber guns. Juvenile offenders appear to be more likely to possess guns than adults. *page 5*
● Studies of the guns used in homicides show that large caliber revolvers are the most frequent type of gun used in homicides, but the number of large caliber semiautomatic guns used in murders is increasing. *page 5*
● Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted. *page 6*

information about the guns used by criminals are available from—
● official police records concerning the guns recovered in crimes and reports gathered from victims
● surveys that interview criminals
● surveys that interview victims of crime.

From these sources, we know how often guns are involved in crime, how guns are used in crime, what general categories of firearms are most often used in crime, and, to a limited extent, the specific types of guns most frequently used by criminals.

---

\* See note on page 7.

**APP. 636**

## What are the different types of firearms?

### Types

| | | |
|---|---|---|
| **Handgun** | | A weapon designed to fire a small projectile from one or more barrels when held in one hand with a short stock designed to be gripped by one hand. |
| | Revolver | A handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges, each within a separate chamber. Before a revolver fires, the cylinder rotates, and the next chamber is aligned with the barrel. |
| | Pistol | Any handgun that does not contain its ammunition in a revolving cylinder. Pistols can be manually operated or semiautomatic. A semiautomatic pistol generally contains cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered. |
| | Derringer | A small single- or multiple-shot handgun other than a revolver or semiautomatic pistol. |
| **Rifle** | | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger. |
| **Shotgun** | | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger. |

### Firing action

| | | |
|---|---|---|
| Fully automatic | | Capability to fire a succession of cartridges so long as the trigger is depressed or until the ammunition supply is exhausted. Automatic weapons are considered machineguns subject to the provisions of the National Firearms Act. |
| Semiautomatic | | An autoloading action that will fire only a single shot for each single function of a trigger. |
| Machinegun | | Any weapon that shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot without manual reloading by a single function of the trigger. |
| Submachinegun | | A simple fully automatic weapon that fires a pistol cartridge that is also referred to as a machine pistol. |

### Ammunition

| | | |
|---|---|---|
| Caliber | | The size of the ammunition that a weapon is designed to shoot, as measured by the bullet's approximate diameter in inches in the United States and in millimeters in other countries. In some instances, ammunition is described with additional terms, such as the year of its introduction (.30/06) or the name of the designer (.30 Newton). In some countries, ammunition is also described in terms of the length of the cartridge case (7.62 × 63 mm). |
| Gauge | | For shotguns, the number of spherical balls of pure lead, each exactly fitting the bore, that equals one pound. |

Sources: ATF, *Firearms & Explosives Tracing Guidebook,* September 1993, pp. 35-40, and Paul C. Giannelli, "Ballistics Evidence: Firearms Identification," *Criminal Law Bulletin,* May-June 1991, pp. 195-215.

### Handguns are most often the type of firearm used in crime

- According to the Victim Survey (NCVS), 25% of the victims of rape and sexual assault, robbery, and aggravated assault in 1993 faced an offender armed with a handgun. Of all firearm-related crime reported to the survey, 86% involved handguns.
- The FBI's Supplemental Homicide Reports show that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns, and 5% with firearms where the type was unknown.
- The 1991 Survey of State Prison Inmates found that violent inmates who used a weapon were more likely to use a handgun than any other weapon; 24% of all violent inmates reported that they used a handgun. Of all inmates, 13% reported carrying a handgun when they committed the offense for which they were serving time.

### What types of guns do criminals prefer?

Research by Wright and Rossi in the 1980's found that most criminals prefer guns that are easily concealable, large caliber, and well made. Their studies also found that the handguns used by the felons interviewed were similar to the handguns available to the general public, except that the criminals preferred larger caliber guns.

### What types of guns are available generally?

The Bureau of Alcohol, Tobacco and Firearms (ATF) estimates that from 1899 to 1993 about 223 million guns became available in the United States, including over 79 million rifles, 77 million handguns, and 66 million shotguns. The number of guns seized, destroyed, lost, or not working is unknown.

The number of new handguns added to those available has exceeded the number of new shotguns and rifles in recent years. More than half of the guns added in 1993 were handguns.

Over 40 million handguns have been produced in the United States since 1973.

Since over 80% of the guns available in the United States are manufactured here, gun production is a reasonable indicator of the guns made available. From 1973 to 1993, U.S. manufacturers produced —
- 6.6 million .357 Magnum revolvers
- 6.5 million .38 Special revolvers
- 5.4 million .22 caliber pistols
- 5.3 million .22 caliber revolvers
- 4.5 million .25 caliber pistols
- 3.1 million 9 millimeter pistols
- 2.4 million .380 caliber pistols
- 2.2 million .44 Magnum revolvers
- 1.7 million .45 caliber pistols
- 1.2 million .32 caliber revolvers.

During the two decades from 1973 to 1993, the types of handguns most frequently produced have changed. Most new handguns are pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993.

The number of large caliber pistols produced annually increased substantially after 1986. Until the mid-1980's, most pistols produced in the United States were .22 and .25 caliber models. Production of .380 caliber and 9 millimeter pistols began to increase substantially in 1987, so that by 1993 they became the most frequently produced pistols. From 1991 to 1993, the last 3 years for which data are available, the most frequently produced handguns were —
- .380 caliber pistols (20%)
- 9 millimeter pistols (19%)
- .22 caliber pistols (17%)
- .25 caliber pistols (13%)
- .50 caliber pistols (8%).

## Stolen guns are a source of weapons for criminals

All stolen guns are available to criminals by definition. Recent studies of adult and juvenile offenders show that many have either stolen a firearm or kept, sold, or traded a stolen firearm:
- According to the 1991 Survey of State Prison Inmates, among those inmates who possessed a handgun, 9% had acquired it through theft, and 28% had acquired it through an illegal market such as a drug dealer or fence. Of all inmates, 10% had stolen at least one gun, and 11% had sold or traded stolen guns.
- Studies of adult and juvenile offenders that the Virginia Department of Criminal Justice Services conducted in 1992 and 1993 found that 15% of the adult offenders and 19% of the juvenile offenders had stolen guns; 16% of the adults and 24% of the juveniles had kept a stolen gun; and 20% of the adults and 30% of the juveniles had sold or traded a stolen gun.
- From a sample of juvenile inmates in four States, Sheley and Wright found that more than 50% had stolen a gun at least once in their lives and 24% had stolen their most recently obtained handgun. They concluded that theft and burglary were the original, not always the proximate, source of many guns acquired by the juveniles.

## How many guns are stolen?

The Victim Survey (NCVS) estimates that there were 341,000 incidents of firearm theft from private citizens annually from 1987 to 1992. Because the survey does not ask how many guns were stolen, the number of guns stolen probably exceeds the number of incidents of gun theft.

The FBI's National Crime Information Center (NCIC) stolen gun file contained over 2 million reports as of March 1995. In 1994, over 306,000 entries were added to this file including a variety of guns, ammunition, cannons, and grenades. Reports of stolen guns are included in the NCIC files when citizens report a theft to law enforcement agencies that submit a report to the FBI. All entries must include make, caliber, and serial number. Initiated in 1967, the NCIC stolen gun file retains all entries indefinitely unless a recovery is reported.

### Most stolen guns are handguns

Victims report to the Victim Survey that handguns were stolen in 53% of the thefts of guns. The FBI's stolen gun file's 2 million reports include information on —
- 1.26 million handguns (almost 60%)
- 470,000 rifles (22%)
- 356,000 shotguns (17%).



**From 1985 to 1994, the FBI received an annual average of over 274,000 reports of stolen guns**

Number of stolen gun entries into NCIC

Source: FBI, National Crime Information Center, 1995.

## How many automatic weapons are stolen?

Under the provisions of the National Firearms Act, all automatic weapons such as machine guns must be registered with the ATF.  In 1995, over 240,000 automatic weapons were registered with the ATF.  As of March 1995, the NCIC stolen gun file contained reports on about 7,700 machine guns and submachine guns.

## What types of handguns are most frequently stolen?

Most frequently reported handguns in the NCIC stolen gun file

| Percent of stolen handguns | Number | Caliber | Type |
|---|---|---|---|
| 20.5% | 259,184 | .38 | Revolver |
| 11.7 | 147,681 | .22 | Revolver |
| 11.6 | 146,474 | .357 | Revolver |
| 8.8 | 111,558 | 9 mm | Semiautomatic |
| 7.0 | 87,714 | .25 | Semiautomatic |
| 6.7 | 84,474 | .22 | Semiautomatic |
| 5.4 | 68,112 | .380 | Semiautomatic |
| 3.7 | 46,503 | .45 | Semiautomatic |
| 3.3 | 41,318 | .32 | Revolver |
| 3.1 | 39,254 | .44 | Revolver |
| 1.5 | 18,377 | .32 | Semiautomatic |
| 1.3 | 16,214 | .45 | Revolver |

## Upon request, the ATF traces some guns used in crime to their origin

The National Tracing Center of ATF traces firearms to their original point of sale upon the request of police agencies.  The requesting agency can use this information to assist in identifying suspects, providing evidence for subsequent prosecution, establishing stolen status, and proving ownership.  The number of requests for firearms traces increased from 37,181 in 1990 to 85,132 in 1994.

Trace requests represent an unknown portion of all the guns used in crimes.  ATF is not able to trace guns manufactured before 1968, most surplus military weapons, imported guns without the importer's name, stolen guns, and guns missing a legible serial number.

Police agencies do not request traces on all firearms used in crimes.  Not all firearms used in crimes are recovered so that a trace could be done and, in some States and localities, the police agencies may be able to establish ownership locally without going to the ATF.

## Most trace requests concern handguns

Over half of the guns that police agencies asked ATF to trace were pistols and another quarter were revolvers.

| Type of gun | Percent of all 1994 traces |
|---|---|
| Total | 100.0% |
| Handgun | 79.1 |
| Pistol | 53.0 |
| Pistol Revolver | 24.7 |
| Pistol Derringer | 1.4 |
| Rifle | 11.1 |
| Shotgun | 9.7 |
| Other including machinegun | 0.1 |

While trace requests for all types of guns increased in recent years, the number of pistols traced increased the most, doubling from 1990 to 1994.

## What are the countries of origin of the guns that are traced?

Traced guns come from many countries across the globe.  However, 78% of the guns that were traced in 1994 originated in the United States and most of the rest were from —
- Brazil (5%)
- Germany (3%)
- China (3%)
- Austria (3%)
- Italy (2%)
- Spain (2%).

## Almost a third of the guns traced by ATF in 1994 were 3 years old or less

| Age of traced guns | Traces completed in 1994 | |
|---|---|---|
| | Number | Percent |
| Total | 83,362 | 100% |
| Less than 1 year | 4,072 | 5 |
| 1 year | 11,617 | 14 |
| 2 years | 6,764 | 8 |
| 3 years | 4,369 | 5 |

### What crimes are most likely to result in a gun-tracing request?

| | | Percent of traces by crime type | | | | | | |
| | | | Handgun | | | | | |
| Crime type | Percent of all 1994 traces | Total | Total | Pistol | Pistol Derringer | Pistol Revolver | Rifle | Shotgun |
|---|---|---|---|---|---|---|---|---|
| Weapons offenses | 72% | 100% | 81% | 55% | 1% | 25% | 10% | 9% |
| Drug offenses | 12 | 100 | 75 | 50 | 2 | 23 | 14 | 11 |
| Homicide | 6 | 100 | 79 | 49 | 1 | 29 | 11 | 10 |
| Assault | 5 | 100 | 80 | 50 | 1 | 28 | 10 | 11 |
| Burglary | 2 | 100 | 57 | 34 | 1 | 22 | 24 | 19 |
| Robbery | 2 | 100 | 84 | 53 | 1 | 29 | 7 | 10 |
| Other | 2 | 100 | 76 | 54 | 1 | 21 | 14 | 10 |

Note:  Detail may not add to total because of rounding.
Source:  ATF, unpublished data, May 1995.

### What guns are the most frequently traced?

The most frequently traced guns vary from year to year. The ATF publishes a list of the 10 specific guns most frequently traced annually. The total number of traced guns on the top 10 list was 18% of the total traced from 1991 to 1994. Most of the top 10 guns were pistols (over 30% were .25 caliber pistols), although a number of revolvers and a few shotguns and rifles were also included. The most frequently traced gun was a Smith and Wesson .38 caliber revolver in 1990, the Raven Arms P25 (a .25 caliber pistol) from 1991 through 1993, and the Lorcin P25 in 1994.

**10 most frequently traced guns in 1994**

| Rank | Manufacturer | Model | Caliber | Type | Number traced |
|------|--------------|-------|---------|------|---------------|
| 1 | Lorcin | P25 | .25 | Pistol | 3,223 |
| 2 | Davis Industries | P380 | .38 | Pistol | 2,454 |
| 3 | Raven Arms | MP25 | .25 | Pistol | 2,107 |
| 4 | Lorcin | L25 | .25 | Pistol | 1,258 |
| 5 | Mossburg | 500 | 12G | Shotgun | 1,015 |
| 6 | Phoenix Arms | Raven | .25 | Pistol | 959 |
| 7 | Jennings | J22 | .22 | Pistol | 929 |
| 8 | Ruger | P89 | 9 mm | Pistol | 895 |
| 9 | Glock | 17 | 9 mm | Pistol | 843 |
| 10 | Bryco | 38 | .38 | Pistol | 820 |

Source: ATF, May 1995.

### What caliber guns do criminals prefer?

In their 1983 study, Wright, Rossi, and Daly asked a sample of felons about the handgun they had most recently acquired. Of the felons sampled—
- 29% had acquired a .38 caliber handgun
- 20% had acquired a .357 caliber handgun
- 16% had acquired a .22 caliber handgun.

Sheley and Wright found that the juvenile inmates in their 1991 sample in four States preferred large caliber, high quality handguns. Just prior to their confinement—
- 58% owned a revolver, usually a .38 or .357 caliber gun
- 55% owned a semiautomatic handgun, usually a 9 millimeter or .45 caliber gun
- 51% owned a sawed-off shotgun
- 35% owned a military-style automatic or semiautomatic rifle.

### Do juvenile offenders use different types of guns than adult offenders?

A study of adult and juvenile offenders by the Virginia Department of Criminal Justice Services found that juvenile offenders were more likely than adults to have carried a semiautomatic pistol at the crime scene (18% versus 7%).

They were also more likely to have carried a revolver (10% versus 7%). The same proportion of adults and juveniles (3%) carried a shotgun or rifle at the crime scene.

### Some studies of guns used in homicides provide information about caliber

McGonigal and colleagues at the University of Pennsylvania Medical Center studied firearm homicides that occurred in Philadelphia: 145 in 1985 and 324 in 1990. Most of the firearms used in the homicides studied were handguns: 90% in 1985 and 95% in 1990. In both years, revolvers were the predominant type of handgun used; however, the use of semiautomatic pistols increased from 24% in 1985 to 38% in 1990. The caliber of the handguns used also changed:

| In Philadelphia, handguns most often used: | | | |
|-------------------------------------------|--|-------------------------------------------|--|
| In 1985, of 91 homicides | | In 1990, of 204 homicides | |
| 44% | .38 caliber revolver | 23% | 9 mm pistol |
| 19% | .25 caliber pistol | 18% | .38 caliber revolver |
| 14% | .22 caliber revolver | 16% | .357 caliber revolver |
| 14% | .32 caliber revolver | 16% | .22 caliber revolver |
| 3% | 9 mm pistol | 10% | .32 caliber revolver |
| 2% | .357 caliber revolver | 6% | .380 caliber pistol |

The Virginia Department of Criminal Justice Services studied 844 homicides that occurred in 18 jurisdictions

from 1989 through 1991. Firearms were identified as the murder weapon in 600 cases. Over 70% of the firearms used were handguns. Of those handguns for which the caliber and firing action could be identified, 19% were .38 caliber revolvers, 10% were .22 caliber revolvers, and 9% were 9 millimeter semiautomatic pistols.

The Hawaii Department of the Attorney General, Crime Prevention Division, studied 59 firearm-related homicides in Honolulu from 1988 to 1992. Handguns were used in 48 homicides (over 80%) including 11 handguns of 9 millimeter caliber, 10 of .357 caliber, 10 of .38 caliber, and 5 of .25 caliber.

### What caliber guns are used in the killings of law enforcement officers?

From 1982 to 1993, of the 687 officers who were killed by firearms other than their own guns, more were killed by .38 caliber handguns than by any other type of weapon.

| Type of firearm | Percent of law enforcement officers killed with a firearm |
|-----------------|-----------------------------------------------------------|
| .38 caliber handgun | 25.2% |
| .357 Magnum handgun | 12.1 |
| 9 millimeter handgun | 9.5 |
| 12 gauge shotgun | 7.4 |
| .22 caliber handgun | 5.4 |
| .22 caliber rifle | 4.4 |

## How often are assault weapons used in crime?

Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted.

In general, assault weapons are semiautomatic firearms with a large magazine of ammunition that were designed and configured for rapid fire and combat use. An assault weapon can be a pistol, a rifle, or a shotgun. The Federal Violent Crime Control and Law Enforcement Act of 1994 bans the manufacture and sale of 19 specific assault weapons identified by make and manufacturer. It also provides for a ban on those weapons that have a combination of features such as flash suppressors and grenade launchers. The ban does not cover those weapons legally possessed before the law was enacted. The National Institute of Justice will be evaluating the effect of the ban and reporting to Congress in 1997.

In 1993 prior to the passage of the assault weapons ban, the Bureau of Alcohol, Tobacco and Firearms (ATF), reported that about 1% of the estimated 200 million guns in circulation were assault weapons. Of the gun-tracing requests received that year by ATF from law enforcement agencies, 8% involved assault weapons.

### Assault weapons and homicide

A New York State Division of Criminal Justice Services study of homicides in 1993 in New York City found that assault weapons were involved in 16% of the homicides studied. The definition of assault weapons used was from proposed but not enacted State legislation that was more expansive than the Federal legislation. By matching ballistics records and homicide files, the study found information on 366 firearms recovered in the homicides of 271 victims. Assault weapons were linked to the deaths of 43 victims (16% of those studied).

A study by the Virginia Department of Criminal Justice Services reviewed the files of 600 firearm murders that occurred in 18 jurisdictions from 1989 to 1991. The study found that handguns were used in 72% of the murders (431 murders). Ten guns were identified as assault weapons, including five pistols, four rifles, and one shotgun.

### Assault weapons and offenders

In the 1991 BJS Survey of State Inmates, about 8% of the inmates reported that they had owned a military-type weapon, such as an Uzi, AK-47, AR-15, or M-16. Less than 1% said that they carried such a weapon when they committed the incident for which they were incarcerated. A Virginia inmate survey conducted between November 1992 and May 1993 found similar results: About 10% of the adult inmates reported that they had ever possessed an assault rifle, but none had carried it at the scene of a crime.

Two studies indicate higher proportions of juvenile offenders reporting possession and use of assault rifles. The Virginia inmate survey also covered 192 juvenile offenders. About 20% reported that they had possessed an assault rifle and 1% said that they had carried it at the scene of a crime. In 1991, Sheley and Wright surveyed 835 serious juvenile offenders incarcerated in 6 facilities in 4 States. In the Sheley and Wright study, 35% of the juvenile inmates reported that they had owned a military-style automatic or semiautomatic rifle just prior to confinement.

### Sources

Assault Weapons and Homicide in New York City, Office of Justice Systems Analysis, New York State Division of Criminal Justice Services, May 1994.

Bureau of Alcohol, Tobacco and Firearms, ATF Facts, November 1994.

Bureau of Alcohol, Tobacco and Firearms, Firearms & Explosives Tracing Guidebook, September 1993.

Bureau of Alcohol, Tobacco and Firearms, unpublished data.

BJS, Criminal Victimization 1993, Bulletin, NCJ-151658, May 1995.

BJS, Guns and Crime, Crime Data Brief, NCJ-147003, April 1994.

BJS, National Crime Victimization Survey, 1992, unpublished data.

BJS, Survey of State Prison Inmates, 1991, NCJ-136949, March 1993.

"Crimes Committed with Firearms in the State of Hawaii, 1983-1992," Crime Trends Series, Department of the Attorney General, Crime Prevention Division, Vol. 2, Issue 1, April 1994.

Federal Bureau of Investigation, Crime in the United States 1993, October 4, 1994.

Federal Bureau of Investigation, Law Enforcement Officers Killed and Assaulted, annually 1987 to 1992.

Federal Bureau of Investigation, National Crime Information Center, unpublished data.

Giannelli, Paul C., "Ballistics Evidence: Firearms Identification," Criminal Law Bulletin, May-June 1991.

Guns and Violent Crime, Criminal Justice Research Center, Commonwealth of Virginia, Department of Criminal Justice Services, January 1994 with updated data for homicide study.

McGonigal, Michael D., MD, John Cole, BS, C. William Schwab, MD, Donald R. Kauder, MD, Michael R. Rotondo, MD, and Peter B. Angood, "Urban Firearm Deaths: A Five-year Perspective," The Journal of Trauma, Vol. 35, No. 4, October 1993, pp. 532-37.

Sheley, Joseph F., and James D. Wright, "Gun Acquisition and Possession in Selected Juvenile Samples," National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention, Research in Brief, NCJ-145326, December 1993.

Wright, James D., and Peter H. Rossi, Armed and Considered Dangerous (New York: Adline de Gruyter) 1986.

Wright, James D., Peter H. Rossi, and Kathleen Daly, Under the Gun: Weapons, Crime, and Violence in America (New York: Adline de Gruyter) 1983.

**Note**

Data in this report from the 1993 National Crime Victimization Survey are the first released on this topic since the survey was redesigned. Because of changes in the methodology, direct comparisons with BJS's victim survey data from prior years are not appropriate. Additional information about the survey's redesign can be obtained from the Bureau of Justice Statistics Clearinghouse at 1-800-732-3277.

The Bureau of Justice Statistics is the statistical arm of the U.S. Department of Justice. Jan M. Chaiken, Ph.D., is director.

BJS Selected Findings summarize statistics about a topic of current concern from both BJS and non-BJS datasets.

Substantial assistance in preparing this document was provided by Roy Weise and Gary Boatman of the Criminal Justice Information Systems Division of the FBI; Edward Troiano, Emmett Masterson, Gerald Nunziato, Gary Kirchoff, and Kris Denholm of the Bureau of Alcohol, Tobacco and Firearms; Jim McDonough of the Virginia Department of Criminal Justice Services; Henry Brownstein and Kelly Haskin-Tenenini of the New York State Division of Criminal Justice Services; and Larry Greenfeld, Thomas Hester, and Michael Rand of the Bureau of Justice Statistics. Verification and publication review were provided by Yvonne Boston, Ida Hines, Rhonda Keith, and Priscilla Middleton of the Bureau of Justice Statistics.

July 1995, NCJ-148201

*Guns Used in Crime* is the first of a series of reports on firearms and crime that will become part of a longer document, *Firearms, Crime, and Criminal Justice.* Other topics to be covered in this series include weapons offenses and offenders, how criminals obtain guns, and intentional firearm injury. The full report will focus on the use of guns in crime, trends in gun crime, consequences of gun crimes, characteristics of offenders who use guns, and sanctions for offenders who use guns. This report will not cover the involvement of firearms in accidents or suicides.

# EXHIBIT 7

# ANNUAL FIREARMS MANUFACTURING AND EXPORT REPORT





**YEAR 2020 Final***

## MANUFACTURED

| *PISTOLS* | | *REVOLVERS* | |
|---|---|---|---|
| TO .22 | 678,967 | TO .22 | 597,015 |
| TO .25 | 195,992 | TO .32 | 4,124 |
| TO .32 | 56,887 | TO .357 MAG | 152,921 |
| TO .380 | 659,899 | TO .38 SPEC | 181,585 |
| TO 9MM | 3,211,775 | TO .44 MAG | 27,151 |
| TO .50 | 705,663 | TO .50 | 30,282 |
| **TOTAL** | **5,509,183** | **TOTAL** | **993,078** |

| | |
|---|---|
| *RIFLES* | 2,760,392 |
| *SHOTGUNS* | 476,682 |
| *MISC. FIREARMS* | 1,324,743 |

## EXPORTED

| | |
|---|---|
| *PISTOLS* | 382,758 |
| *REVOLVERS* | 19,264 |
| *RIFLES* | 99,454 |
| *SHOTGUNS* | 17,874 |
| *MISC. FIREARMS* | 9,788 |

\* FOR PURPOSES OF THIS REPORT ONLY, "PRODUCTION" IS DEFINED AS: FIREARMS, INCLUDING SEPARATE FRAMES OR RECEIVERS, ACTIONS OR BARRELED ACTIONS, MANUFACTURED AND DISPOSED OF IN COMMERCE DURING THE CALENDAR YEAR.

PREPARED BY LED 03/10/2021
REPORT DATA AS OF 03/10/2021

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF MARK HANISH IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBITS 2-7**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

---

CERTIFICATE OF SERVICE

**APP. 645**

17cv1017

1  C.D. Michel – SBN 144258
2  Sean A. Brady – SBN 262007
   Anna M. Barvir – SBN 268728
3  Matthew D. Cubeiro – SBN 291519
   MICHEL & ASSOCIATES, P.C.
4  180 E. Ocean Boulevard, Suite 200
   Long Beach, CA 90802
5  Telephone: (562) 216-4444
   Facsimile: (562) 216-4445
6  Email: abarvir@michellawyers.com

7  Attorneys for Plaintiffs

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11 VIRGINIA DUNCAN, et al.,                Case No:  17-cv-1017-BEN-JLB

12                      Plaintiffs,         **DECLARATION OF STEPHEN
                                            HELSLEY IN SUPPORT OF
13              v.                          PLAINTIFFS' SUPPLEMENTAL
                                            BRIEF; EXHIBIT 10**
14 XAVIER BECERRA, in his official
   capacity as Attorney General of the State
15 of California,

16                      Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

                                 1

### DECLARATION OF STEPHEN HELSLEY

1.      I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

2.      I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For well over two decades, I was first a state liaison and, then later, a consultant to the National Rifle Association, where I was heavily involved in "assault weapon" and magazine legislative issues. For the past ten years I have also served as the historian for the London-based company, John Rigby & Co. (Gunmakers, Ltd.). Rigby is the oldest continuously operating gun maker in the English-speaking world, having been established in 1775.

3.      I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

4.      Finally, I am a collector of firearm-related books—of which I have thousands. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944.  It is a standard resource that is

widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

5.     Attached hereto as **Exhibit 10** is a true and correct copy of my signed expert witness report previously submitted in this matter. Exhibit 10 contains my opinions and analysis relevant to this matter.

6.     While I was unable to fully update my work in time to reflect post-2017 research, I can confirm that I stand by my prior report. I have also made some limited additional findings, which will now be discussed in the remainder of this declaration.

7.     During my 35-years of involvement in the "assault weapon" issue, I have heard innumerable times that the "founding fathers" never envisioned higher capacity firearms than the single shot musket of their day and that the Second Amendment was never intended to offer protection for such arms. Such a notion is preposterous. Among the Founders, George Washington and John Adams were personally involved in the consideration to purchase for the Continental Army 100 Belton 8-shot firearms, which were repeating muskets with detachable magazines. (Washington had been encouraged by Benjamin Franklin to consider the "Belton flintlock.)

8.     The Belton flintlock was one of a number of multi-shot firearms (including the Giradoni air rifle and the Lorenzoni among others) that were beginning to appear at the end of the 18th century. Such weapons were complex, likely unreliable, and fragile, but they were also a window into the future. The Belton purchase never materialized – primarily because of cost – but prescient men like the Founders surely understood that it would only be a matter of time before such arms were practical, affordable, and reliable. In the absence of government interest, private citizens would be clients for such arms, and the Founding generation imposed no restrictions to stop them.

9.     The State also argues that magazines capable of holding more than 10 rounds do not warrant Second Amendment protection because they are "accoutrements" (accessories) and not necessary to the functioning of the firearm for

DECLARATION OF STEPHEN HELSLEY         **APP. 648**

17cv1017

which they are designed. The State also argues that if the weapon can function in the absence of the magazine, then the magazine is an accessory. As a single-shot, that is correct, it could function – but not as intended. Consider such logic applied to a pickup truck. If a rear tire is removed, the truck can still be driven, but not as intended. A Glock pistol requires only the slide and barrel to fire a round, but that would not make the Glock's frame a mere accessory. The Glock is just one example of many firearms that doesn't require all of its parts to be present to discharge a cartridge. An expansive definition of "accessory" is thus a serious threat to Second Amendment rights. If by designating a part an "accessory" it can be banned, taxed, or otherwise restricted, there is no protection for the complete firearm.

10.     An expert for the defense (Ryan Busse) makes the related point that large capacity magazines are not typically manufactured by the same company that produces the firearm itself and therefore magazines should be considered an accessory. Again, I am the historian for a British company whose two main product lines were developed and patented in the third quarter of the 19th century. Do we produce all the key parts of those guns and rifles? – no. Could we? – yes. Some key parts, including the receiver, are precision machined by a specialty manufacturer for us. That does not mean our receivers are mere "accessories". The use of outside vendors is simply a good business practice to produce the best possible product in the most cost-effective manner.

11.     AR-type magazines have been manufactured for over 60 years. Production totals aren't known but given the number of rifles and pistols that accept AR or other magazines capable of holding over ten rounds, it certainly wouldn't be unreasonable to put the total between 500 million and 1 billion. They are undoubtedly in common use by millions of Americans for lawful purposes including self-defense, sports shooting, competitions, hunting, and other similar purposes.

/ / /

/ / /

DECLARATION OF STEPHEN HELSLEY   APP. 649

17cv1017

12.    I have received no remuneration for any work done in this matter.


I declare under penalty of perjury that the foregoing is true and correct.
Executed within the United States on November 30, 2022.

Stephen Helsley

# EXHIBIT 10

## Expert Witness Report of Stephen Helsley
*Duncan, et al. v. Becerra, et al.*
United States District Court (S.D. Cal.)
Case No: 3:17-cv-01017-BEN-JLB
November 30, 2022

## I.    INTRODUCTION

Counsel for plaintiffs in *Duncan v. Becerra* (E.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.    BACKGROUND & QUALIFICATIONS

I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For the past 24 years, I was first a state liaison and, then later, a consultant to the National Rifle Association.

I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

Finally, I am a collector of firearm-related books—of which I have approximately three thousand. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

1

**APP. 652**

The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies.

I have qualified as an expert in both criminal and civil matters.

## A.    Published Articles

In the past ten years, I have written or contributed to the following published articles and opinion editorials:

### 1.    Articles

- *Of Birmingham and* Belgium, Double Gun Journal, vol. 18, iss. 2 (2007).
- *The .470 Nitro Express*, Sports Afield (June/July 2007).
- *Readings on the Roots of* the .410, Shooting Sportsman, Nov./Dec. 2007.
- *Hunting in Wales*, Hunting and Fishing (Russia), Dec. 2007.
- *A Pair for a Pair of Friends*, Shooting Sportsman, March/April 2008.
- *A Welsh Fantasy*, Shooting Sportsman, July/Aug. 2008.
- *A Maine Gun Goes Home*, Shooting Sportsman, Sept./Oct. 2008.
- *The Pin Fire Comes Home*, Libby Camps Newsletter, Winter 2008.
- *John Rigby & Co.*, Hunting and Fishing (Russia), July 2008.
- *The All-American Double Rifle*, Safari, Sept./Oct. 2008.
- *Eastern Oregon Odyssey*, Shooting Sportsman, Nov./Dec. 2008.
- *Rigby Marks 275th Anniversary*, Safari, Nov./Dec. 2009.
- *Finding* Papa's Guns, Shooting Sportsman, March/April 2010.
- *The Searcy Stalking Rifle*, Safari, May/June 2010.
- *The Ruggs Riders*, Shooting Sportsman, July/Aug. 2010.
- *Searcy Brings Back the Rising-Bite*, Shooting Sportsman, Sept./Oct. 2010.
- *John Rigby & Co.*, African Hunting Gazette, Fall 2010.
- *The Ageless .416 Rigby*, Safari, Nov./Dec. 2012.
- *J. P. Clabrough*, Shooting Sportsman, March/April 2015.
- *The Mystery of Hemingway's Guns*, Friends and Neighbors, Summer 2015.
- *The Enigma of Hemingway's Guns*, Master Gun (Russia), Sept. 2015.
- *The Mystery of Hemingway's Guns*, CRPA Firing Line, Sept./Oct. 2015.
- *Pistols at Dawn*, CRPA Firing Line, Jan./Feb. 2016.
- *The Silver Star*, CRPA Firing Line, Jan./Feb. 2016.
- *Women Guns & Politics*, CRPA Firing Line, March/April 2016.
- *Hunting the Big Mouse*, CRPA Firing Line, Sept./Oct. 2016.
- *Do Guns Make Heroes? The Congressional Medal of Honor*, CRPA Firing Line, Nov./Dec. 2016.
- *Thumbs-Up Guns*, Shooting Sportsman, Jan./Feb. 2017.
- *Is Your Gun Safely Stored? (Part 1)*, Friends and Neighbors, Summer 2017.
- *History of William Powell and His Patents*, Master Gun (Russia), Aug. 2017.

**APP. 653**

- *Guns from San Francisco and Birmingham*, Master Gun (Russia), Oct. 2017.
- *Is Your Gun Safely Stored? (Part 2)*, Friends and Neighbors, Autumn 2017.

## 2.   Opinion Editorials

- *It's About Time: State has Eroded Gun Owner's Rights*, Sac. Bee (July 4, 2010).
- *Nevada Views: Is Gun Registration Worth Cost?*, Nev. Rev. J. (Sept. 16, 2012).
- *Gun Roundup Program Has Too Many Flaws*, Sac. Bee (May 3, 2013).

### B.   Expert Witness History

In the past four years, I have not been deposed in or testified at trial as an expert witness.

## III.   COMPENSATION

I am not being compensated for my work on this report.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the historical existence and prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition and the reasons law-abiding Americans, including law enforcement and private citizens, so often select such items.

Counsel has also asked that I provide opinion on the utility of firearm magazines with the ability to accept more than ten rounds of ammunition in self-defense, as well as the impact of ten-round magazine limitations on law-abiding citizens.

## V.   OPINIONS & ANALYSIS

*1.   Magazines over ten rounds are, and have historically been, a common choice for self-protection for use in both rifles and handguns.*

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59  (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92

**APP. 654**

(15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12-shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.

Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.

In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed. During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster—and by extension concealed carry for self-defense.

In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10-rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI—the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both increased after the war as a result of the training "doughboys" received before going to France. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of

**APP. 655**

other makes that followed—CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000, while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf. The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. The clear majority of California law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under California Penal Code section 32310.

The home-owner and the concealed weapon permit holder want a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one—to increase his or her chances of staying alive. For virtuous citizens buy their guns to protect themselves from the same criminals that police carry guns to protect the citizens, the public, and themselves from. For this reason, armed citizens have historically modeled their choice of firearms on what police carry.

> 2. *Limiting the law-abiding citizen to a magazine of ten rounds limits their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.*

Based on my experience with and understanding of the customs and practices of citizens licensed to carry guns in public, individuals often carry *only*

**APP. 656**

the gun, without spare ammunition or magazines. Similarly, most plainclothes police officers do not find it practical to carry multiple handguns.

Likewise, the average homeowner who keeps a defensive firearm is unlikely to have time to gather spare ammunition or magazines. Rather, they are generally limited to one firearm and its magazine capacity. For the homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally prohibits the gathering of multiple firearms or magazines. Ideally, one hand would be occupied with the handgun and the other with a telephone to call the police. Assuming an individual even had time for a magazine change, most people do not sleep with firearms or magazines attached to their bodies or wearing clothing that would allow them to stow spare magazines or ammunition on their person. They would have only what was in the firearm.

The off-duty officer and the private law-abiding citizen are thus unlikely to have much, if any, spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a spare, loaded rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

Uniformed police officers who are traditionally armed against the same criminals, on the other hand *are* normally wearing body armor. They generally have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car. And they will have instant radio access to dispatch and fellow officers if backup help is needed. Further, they will generally have both a loaded gun *and* two additional magazines. Each of those magazines would generally hold 17 rounds of 9mm or 15 rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to allowing the officer to survive a gunfight with armed criminals.

What's more, the average citizen is not trained like law enforcement personnel and is generally not as readily prepared for combat with an armed criminal. As noted, they are likely to have a single firearm loaded with a single magazine available, and they are more susceptible to the psychological effects that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots.

For these reasons, having a magazine over ten rounds at one's disposal certainly could make a difference in self-defense situations, and likely would during home invasions or when facing armed attackers. In my opinion, law-abiding citizens will thus be at a disadvantage in such situations if California enforces its ban on the possession of magazines over ten rounds.

Criminals bent on causing harm, on the other hand, are not likely to be meaningfully affected by California's magazine restrictions. Even assuming they were impeded from obtaining magazines over ten rounds by Penal Code section 32310, they could simply arm themselves with multiple weapons and/or magazines, and they often do. Criminals have time to assess and plan shootings, whereas victims do not. Indeed, it is the attacker who chooses when, where, how, and whom to attack. So, the attacker is not as burdened by the surprise and shock that the victim is and is generally prepared for the confrontation with several firearms and a substantial amount of ammunition.

The virtuous citizen cannot practically be expected to have accessible multiple guns, magazines, or spare ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

Supporters of the magazine capacity limitation may point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting, and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer or the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

Finally, it is worth noting that it is difficult to say exactly how many private citizens have fired more than ten rounds in a self-defense shooting, because the number of rounds fired in such cases is very often an omitted fact in written accounts of such defensive gun uses. Often the accounts just say, "multiple shots fired." That could mean more or less than ten. This does not seem to be the case with shootings involving police officers, for which, the number of shots fired is generally documented. In my experience researching such shootings, officers often fire more than ten rounds. And cases where an individual officer fired less than ten rounds, but where multiple officers were shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the same criminals the police are armed to deal with.

3.   *A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so.*

Gunfights frequently involve a lot of "missing." This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard

**APP. 658**

pressed to find someone who had been in a gunfight that complained about having too much ammunition.

Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers' hand or—if things got really serious—let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

The notion that a bullet can "knock-down" a person is a largely Hollywood-inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states—"For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as "stopping power." A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance, but placement is still the most critical factor.

A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See, e.g.*, *The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (October 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

"Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't "knocked down") and then bouncing another round off my spine that exited my right leg. From a prone position, I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4—where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach

**APP. 659**

my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have "fought on" if more ammunition had been available. A total of 18 rounds were fired.

Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him—both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss—whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident I was awarded the department's Medal of Valor.

The "take away" from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

## VII.   REFERENCES

Silvio Calabi, Steve Helsley & Roger Sanger, *The Gun Book for Boys* 56-57 (Shooting Sportsman Books 2012).

United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/ 050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf.

*The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984).

APP. 660

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

## VIII.  CONCLUSION

It is clear to me from my collective experiences and from the analysis described above that firearms and magazines with ammunition capacities exceeding ten rounds have existed and have been in use since at least the 18th Century.

It is also clear that Americans commonly choose and use magazines capable of holding more than ten rounds of ammunition for lawful purposes, including self-defense.

Dated: October 6, 2017

Stephen Helsley

10

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 10**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov


    I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

---

CERTIFICATE OF SERVICE

**APP. 662**

17cv1017

1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Facsimile: (562) 216-4445
   Email: abarvir@michellawyers.com
6
7  Attorneys for Plaintiffs

8

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,          Case No:  17-cv-1017-BEN-JLB

12                  Plaintiffs,       **DECLARATION OF ASHLEY
                                      HLEBINSKY IN SUPPORT OF
13         v.                         PLAINTIFFS' SUPPLEMENTAL
                                      BRIEF; EXHIBIT 1**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the
   State of California,
16
17                  Defendant.

18

19

20

21

22

23

24

25

26

27

28

I, Ashley Hlebinsky, declare as follows:

1. I am a firearms historian and public educator, specializing in material culture studies, as well as a firearms and ammunition-related museum consultant, expert witness, freelance writer, and guest lecturer. I conduct my business through a single-member LLC, The Gun Code. I also am the Co-Founder and Senior Fellow for the University of Wyoming College of Law's Firearms Research Center (2022).

2. I have been retained by the plaintiffs in this matter to provide historical testimony on firearms technology, with an emphasis on the history of technology in relation to repeaters and magazine-fed repeaters, some with capacities greater than ten rounds. I will also provide a brief look into the laws that existed at the time of the United States' Founding and Second Founding Eras to provide reference for any possible analogous comparisons to modern magazine restrictions as defined in the *New York State Rifle and Pistol Association, Inc. v Bruen* (henceforth to be referred to as *Bruen*) ruling by the Supreme Court. This report has been prepared for the supplemental briefing that was ordered following the 9th Circuit's remand in *Virginia Duncan, et al. v. Rob Bonta.* I have been retained to write a declaration at the rate of $450/hour.

**Background and Qualifications**

3. I have spent the last fifteen years immersed in the study of firearms history, technology, and culture. I earned both Bachelor's and Master's Degrees in American History from the University of Delaware, during which I studied firearms history and culture and instructed undergraduate students about military weaponry throughout history. Much of my work since then focuses heavily on material culture surrounding the macro-history of firearms and how their developments have affected industry, culture, and society for centuries. I have been fortunate to work in some of the largest collections in the United States, beginning my career as a researcher and fellow in the Smithsonian Institution's National Firearms Collection housed in the National Museum of American History.

2

DECLARATION OF ASHLEY HLEBINSKY

4.      Additionally, I spent a decade working with and running the only accredited firearms museum in the United States, the Cody Firearms Museum (henceforth to be referred to as the CFM). During my tenure, I also served as Project Director of the museum's full-scale multimillion-dollar renovation. With the aid of my team, I was responsible for all facets of the renovation including but not limited to concept, content, fundraising, and collections management. The resulting museum, which reopened July 2019, provides a more interpretive space to facilitate productive dialogue on firearms and their roles in history. Throughout this museum, terminology and definitions play a significant role in educating both visitors not familiar with firearms and those who consider themselves aficionados. My team, a panel of experts, and I were responsible for dedicating an entire gallery at the front of the museum to understanding the basics of firearms past and present, their features, ammunition, and safety.

5.      During my time at the CFM and through my consulting business, I have become nationally known and sought after to provide a material culture perspective on firearms history that is often lacking in much of modern, academic, and legislative discussions on firearms. I guide museums as well other non- and for-profit organizations and government entities on the interpretation and understanding of that history. In May 2021, I testified in front of the Senate Judiciary Subcommittee on the Constitution's Hearing regarding "Ghost Guns," for which I researched and discussed the long history of privately made firearms and evolution of arms technology from the colonies through the 1960s. Because I have worked in several national collections that have upwards of 10,000 firearms each – collections that range from the earliest through most recent technology – I have developed a broad understanding of how firearms have evolved. Additionally, I have had the opportunity to work with, see, study and handle many of the firearms referenced in this declaration.

3

DECLARATION OF ASHLEY HLEBINSKY

6.      In addition to my historical scholarship, I also have played a role in public education around firearms. I have been responsible for the education of tens of thousands of students from elementary through college levels, teaching not only firearms safety and basics, but the historical and technical evolution of the firearm. In 2017, I developed the first full-scale symposium in the United States dedicated to the study of firearms as material culture, which reoccurs annually. These symposia were organized to bring together firearms scholars from around the world to discuss their collections but also to create metrics to analyze the quality of scholarship that already has been done in the field. The study of firearms is a complicated one, especially since much of the information about the objects themselves have traditionally been conducted by well-known firearms researchers and collectors. However, not all those people fall under traditional definitions of academic scholarship. On the other side, because of limitations in the study of firearms, academic research often has flaws in terms of a general understanding of the firearms themselves. We have worked to lessen that gap to create more balanced scholarship. To continue that mission, I sit on the Editorial Board for the recently revived, peer-reviewed arms journal, *Armax*, and I co-founded the University of Wyoming College of Law's Firearms Research Center in 2022. Despite its location in the College of Law, this new center intends to encourage research of all types related to arms and ammunition.

7.      Currently as a museum consultant, I am in the process of building several museums with heavy emphasis on firearms collections. I also conduct workshops on firearms, survey collections, and curate exhibitions at institutions such as the Houston Museum of Natural Science, CM Russell Museum & Complex, and the Mob Museum. I have served as a scholar and a panelist for the National Park Service and the Organization of American Historians on a forthcoming Coltsville National Historic Site. I am also an expert witness, freelance writer, guest lecturer, on-camera firearms historian, and television producer. A current copy of my

Curriculum Vitae summarizing my education and experience is attached at the end of this document as **Exhibit 1.**

8.     **Prior Expert Witness Testimony**

Ocean State Tactical et al v Rhode Island, October 2022

Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost Guns, May 2021

Franklin Armory et al v Bonta, February 2021

FN Herstal v Sturm, Ruger & Co, January 2021

Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020

Guedes v BATFE, June 2019

Miller v Becerra (Bonta), November 2019

-     Evidentiary Hearing Testimony October 2020

-     Deposition January 2021

Regina (Nova Scotia) v Clayton, January 2019

Garrison v Sturm, Ruger & Company, Inc. 2018

-     Deposition November 2018

9.     **Scope of Work**

This report has been prepared for *Virginia Duncan, et al. v. Rob Bonta.* Firstly, the report will provide a brief statement on the long history of the interconnectivity between military and civilian arms. It will address how the advancement of technology often was driven by the civilian market; the multi-purpose use of early arms for civilians and the military; the private acquisition of firearms to be used on the battlefield; and the postwar weapons surpluses that have flooded and continue to flood the civilian market. Secondly, it will provide a history of repeaters and/or magazine-fed repeaters, including firearms with capacities over ten rounds, as well as an overview of some relevant laws during the times in which they were invented and/or used. The second section will be loosely organized into two subsections: the Founding and the Second Founding Eras, with related

5

DECLARATION OF ASHLEY HLEBINSKY

contextual histories, in chronological order, which also happens to be the order of relevancy to constitutional law as defined in *Bruen*.

10.    According to *Heller v District of Columbia* and reiterated in *Bruen* "not all history is created equal…Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*."[1] Under *Bruen*, the most relevant time frame in consideration regarding the constitutionality of modern regulations is the Founding Era - when the Second Amendment was ratified. *Bruen* does acknowledge that the period surrounding the creation of the Fourteenth Amendment, known as the Second Founding Era, can be useful, although, as with the Bruen case, it is not necessarily relevant when discussing the historical pedigree of regulation.[2] Subsequent time frames can provide insight, albeit far less significant if relevant at all, including the timeframe leading up to the ratification of the Second Amendment, the time in between the Second and Fourteenth Amendments, and least significant, the twentieth-century.[3]

11.    Important though to consider is "[guarding] against giving post enactment history more weight than it can rightly bear."[4] *Bruen* does provide further guidelines for when each era in history can inform the understanding of the Second Amendment. It also provides guidance for how to determine a historical *analogue*.

---

[1] The following two paragraphs are summarized from an analysis of relevant history and historical analogues found in Johnson, Nicholas, Kopel, David B., Mocsary, George A, Wallace, E Gregory, & Donald Kilmer. *Firearms Law and the Second Amendment Regulation, Rights and Policy* (3rd ed. 2021) 2022 Supplement (August 2022), pg. 86 – 88

[2] Ibid pg. 86

[3] Ibid pg. 86 According to Johnson et al: some time periods can be used to provide the context of what was available leading up to the formation of the Second Amendment as well. For example, those periods can possibly provide context for the mindset of the Founding Fathers when the Second Amendment was ratified. Additionally, the period directly after can provide insight "to determine *the public understanding* of a legal text in the period after its enactment or ratification." The late nineteenth century history is helpful in instances when it affirms what has been established by earlier history. The same can be said about twentieth century history, although significantly less relevant than the other periods. These times do not necessarily provide insight if it contradicts earlier evidence

[4] Ibid, pg. 86

6

DECLARATION OF ASHLEY HLEBINSKY

While the law does not have to be a twin of a past law, there is some guidance to consider as "courts should not 'uphold every modern law that remotely resembles a historical analogue."[5]

12.     For this report, please note that I will make a distinction between repeater and magazine-fed repeater. A magazine is a vital part of the firearm; it is a container, detachable or fixed, that holds ammunition while it feeds into a repeating firearm. In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating cylinder that is as important and integral as a magazine is in order to fire a gun. When I am discussing a repeater that has a magazine, I will qualify it as such. Additionally, I will use capacity to refer specifically to the number of rounds of ammunition that can be held within a firearm. When I am discussing magazine capacity, I will qualify it as such.

**General Statement of the Interconnectivity of Sport and War**

13.     The expression *weapon of war* is used a lot in modern and historical discussions surrounding firearms. Today, it is used as an umbrella term to describe a range of different firearms that people perceive as being useful to warfare, regardless of whether they were actually used on or designed for the battlefield. How the expression is used today implies a distinct line between firearms made for the military and firearms made for the civilian market. However, that line for seven hundred years has always been blurred.

14.     Once firearms were developed, technology often advanced too quickly for common battlefield use, finding popularity in the civilian market. Military firearms in a general sense were limited by tactics, government bureaucracy, and

---

[5] Johnson et al., pg. 88 According to the authors: "the analogue must be relevantly similar." One measure of these laws to consider according to *Heller and McDonald v. Chicago* (2012) is through "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed defense." The how is defined as "whether modern and historical regulations impose comparable burden on the right of armed self-defense." The why is defined as "whether that burden is comparably justified."

expense, while civilian arms until recently were predominantly limited by individual budget. Additionally, civilian arms can be employed for far greater number of uses, including hunting, self-defense, and target shooting. The earliest firearms technology appeared on the battlefield by the thirteenth century. The hand cannon, or handgonne, was little more than the name suggests, a cannon for your hands. The user utilized a touchhole and external fire source to ignite powder and fire the gun. This primitive technology may not have been designed for a sporting purpose, but once it was designed, inventors pushed the boundaries, capabilities, and usages of firearms into the future. And while the hand cannon specifically may not have been used for sport, other military weapons of the time such as longbows and crossbows were popularly used for target shooting competitions in fairs during the Middle Ages.

     15.    The first true ignition system, the matchlock, was developed around 1400. This firearm, which utilized a burning match cord, was a popular military arm used for centuries around the world. By the end of the 1400s, however, matchlocks and subsequent ignition systems also began appearing in early target shooting competitions.[6] Another example of a firearm being adopted for civilian use dates a century after the matchlock. In the first decade of the 1500s, a highly advanced handgun was developed, the wheel-lock. This gun, developed for use on horseback, was operated by the turning of a spring-loaded wheel. While it saw some battlefield use, it was expensive and difficult to repair. As a result, it was used for specialized purpose on the battlefield in Europe, but not as much in the colonies. However, the technology was considered so advanced, some European countries made and used wheel-locks for sport into the 1800s. Another example of superior technology being used by civilians rather than military is rifling. Rifling, the boring out of the inside

---

[6] Matchlocks and wheel-locks can be seen depicted in period imagery and in medals for shooting competitions

DECLARATION OF ASHLEY HLEBINSKY    **APP. 670**

1   of a barrel with spiral lands and grooves to spin a projectile, thus making it more

2   accurate, was developed at the turn of the sixteenth century and appeared

3   predominantly in civilian arms, with a few military exceptions from the American

4   Revolution, until just before the turn of the twentieth century when military tactics

5   finally caught up to the technology.[7]

6        16.    Before the ability to mass manufacture firearms, guns were privately

7   made by gunsmiths. Although two armories did exist in the United States around the

8   time of the Founding Era, many guns for the battlefield were made by individuals.[8]

9   It is estimated that 2,500-3,000 gunsmiths worked in the colonies alone.[9] They, as

10  private citizens, were responsible for making guns for both the military and civilians.

11  While the standard infantry arm during the American Revolution was a smoothbore

12  (no rifling) musket, there were some regiments during the War that used a common

13  civilian firearm at the time, the American longrifle. The longrifle was a modified

14  design from the German Jaeger (Hunting) Rifle that tended to have a longer barrel

15  and a smaller caliber than its German counterpart. The rifle was the superior firearm

16  in terms of accuracy compared to the inaccurate smoothbore musket. However,

17  because of the type of projectile employed at the time – a round musket ball – the

18  process to load was slower for rifles because the ball had to fit snugly within the

19  lands and grooves of the rifling. There was a trade off in terms of effectiveness for

20

21

22  _____

23  [7] Examples of rifled matchlocks do exist. Rifled wheel-locks are far more
    common as they were so often used for hunting. This timeline provides a decent
24  overview of early technological developments: Gun Timeline. PBS History
    Detectives. <https://www.pbs.org/opb/historydetectives/technique/gun-
25  timeline/index.html> Accessed 10/22/2022
    [8] Springfield Armory was the first armory that began production in 1794
26  <https://www.nps.gov/spar/learn/historyculture/index.htm> Accessed 10/25/2022.
    The second armory was Harpers Ferry Armory and Arsenal, which began
27  construction in 1799 < https://www.nps.gov/hafe/learn/historyculture/harpers-ferry-
    armory-and-arsenal.htm> Accessed 10/25/2022
28  [9] Moller, George D. *American Military Shoulder Arms: Volume 1.* University of
    New Mexico Press, 2011. P.107

9

DECLARATION OF ASHLEY HLEBINSKY

specific purposes.[10] The longrifle in the colonies served as a multi-purpose tool. It was capable of being used for hunting, self-defense, and target shooting. Important to note though that unless being made for large-scale military adoption, such as the smoothbore musket, and/or produced with the use of parts kits ordered from overseas, many civilian arms were made at the behest of individuals or in small runs.

17.    Target shooting was a part of American culture before the formation of the United States with colonists taking part in competitions known as "Rifle Frolics."[11] This tradition has continued throughout American history, especially after the Civil War. For example, the National Rifle Association may have been founded by Union officers in 1871, but its core purpose was "to promote and encourage rifle shooting on a scientific basis." What resulted was the proliferation of international shooting competitions.[12] Another example is the Olympic sport of Biathlon, a sport which involves both skiing and target shooting, dating to 1767 in Europe. It was initially created for government use in places like Norway. That purpose persisted for centuries, even after becoming an international sport. In the 1930s, Finnish troops still used skis and rifles for patrol. Until recently, the firearms used in Biathlon and other disciplines of the shooting sports, often used modified versions of

---

[10] Until the development of a successful conically shaped bullet (rather than a round musket ball) by Claude Etienne Minie and modified by James Burton at Harpers Ferry, rifling was expensive and slow to load. For a round ball to effectively spin in rifling, it had to fit perfectly which slowed the loading process. However, it was perfect for target shooting as well as hunting and specialized military use. Since tactics by the military were still shoulder-to-shoulder fighting, accuracy was not of prime importance, so militaries used smoothbore (unrifled) barrels for their standard equipment.

[11] This is a tradition kept alive by several historic sites including, Fort Boonesborough Living History Museum and Bardstown, KY's Colonial Days <<https://fortboonesboroughlivinghistory.org/html/rifle_frolic.html> Accessed 10/25/2022 <https://www.prlog.org/11271548-rifle-frolics-18th-century-market-fair-military-drills-displays-and-daniel-boone.html> Accessed 10/25/2022

[12] The National Rifle Association of America was founded after the National Rifle Association in the United Kingdom (1859). <https://home.nra.org/about-the-nra/> Accessed 10/25/2022

10

DECLARATION OF ASHLEY HLEBINSKY

center-fire NATO cartridge firearms.[13] By the nineteenth century, progress on manufacturing processes allowed more firearms of more varieties to be available to the US government as well as civilians. Many of the repeaters of all sorts produced during this century came in specific models indicating sporting vs military variants.[14]

18.    The line between military and civilian arms was certainly blurred at the founding of the country and thereafter, as was the role of the civilian and the soldier. In the colonies and in early America, certain citizens were required to serve in their militias with firearm and ammunition requirements and some soldiers carried their personal firearms into battle. By the American Civil War, it was not unheard of for soldiers to privately purchase firearms that the US government had not adopted or did not issue to them for use in battle. After the war, even issued weapons that were used *in* war were often sold on the civilian market. After the Civil War, soldiers could buy their firearms and many dealers and distributors sold the surplus in mass in their catalogs or at stores for even lower prices. According to Springfield Armory National Historic Site, "many thousands [of] cheap surplus weapons were released into private hands through General Orders 101, providing rifles, pistols, carbines, and muskets that found their ways into the hands of Americans in the decades following the Civil War."[15] The tradition of selling military arms to civilians continues today with firearms such as the Springfield Model 1903 bolt action rifle

---

[13] An example of a centerfire modified firearm can be found in the Cody Firearms Museum. Here is a succinct summary of the history of the biathlon <https://minnesotabiathlon.com/about-biathlon/the-history-of-biathlon/> 10/25/2022

[14] Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms...and their Values*. 9th Ed (2019). This book is considered the gold standard in the evaluation of antique American made firearms. It provides not only firearms organized by manufacturer but also by type, such as repeater, military etc. Here is just one example: pgs. 694-695

[15] Springfield Armory details this information here <https://www.nps.gov/spar/learn/historyculture/a-springfield-rifle-musket.htm> Accessed 10/24/22

11

DECLARATION OF ASHLEY HLEBINSKY                    **APP. 673**

and even with semi-automatics such as the M1 Garand rifle and the Model 1911 pistol.[16]

19.     There has always been an ebb and flow of civilian and military firearms for centuries, some with clearer lines than others. However, the assertion that a gun, especially during the Founding and Second Founding Eras, could be completely understood as *only* for war in a time when there was such interchangeability, is presentist at best.

**The Founding Era**

20.     In today's understanding of historical relevance, *Bruen* affirms that the most crucial time for consideration of the constitutionality of modern regulations falls under the Founding Era defined as the time around the ratification of the Second Amendment. By this era, repeating, including magazine-fed, firearms had been around for a long time. Additionally, repeaters, including those with magazines, could have capacities of over ten rounds at least a century before and during the ratification of the Second Amendment. Despite the invention of these technologies, firearms laws during this time were primarily focused on restricting access to enslaved, Native, and free Black peoples as well as other people of color.

*Repeaters*

21.     The concept of a repeating firearm dates to the earliest technology of firearms. Hand cannons even came in repeating variations.[17] While some repeaters were employed or simply attempted on the battlefield, repeating technology would not be widely popular for use in war until the late nineteenth century. That did not mean however that innovation in repeating technology was stymied. In fact, it was quite the opposite. Without the confines of wartime tactics and budget, many

---

[16] Today, postwar weapon surplus guns including several semi-automatic firearms such as the M1 Garand are sold through the Civilian Marksmanship Unit <https://thecmp.org/sales-and-service/1911-information/> <https://thecmp.org/sales-and-service/services-for-the-m1-garand/> Accessed 11/25/2022

[17] An example can be found in the Cody Firearms Museum Collection

12

DECLARATION OF ASHLEY HLEBINSKY

repeating firearms were commissioned by civilians who utilized them. The simplest method of producing arms capable of firing more than one round at a time initially was to fit a firearm with more than one barrel. However, due to weight limitations, gunmakers began experimenting with other means of producing repeating arms during the sixteenth century. One of the first methods attempted involved superimposed loads, which were successive charges of powder and ball on top of each other that were separated by wadding or the projectile itself in one barrel. They were fitted with locks that either had multiple cocks and pans or a single lock that could slide upon a rail. One such example was a sixteen-shot firearm made in 1580.[18]

22.    By the 1630s, a Dutch gun making family, Kalthoff, began experimenting with a design that allowed up to fifteen shots to be fired in rapid succession. It utilized a tubular magazine located in a pistol's butt or a fowling piece's stock to hold powder and balls.[19] This system was so innovative it was reproduced and modified for over 150 years. Also, by the mid-seventeenth century in Italy, magazine-fed repeaters were being developed. According to the Royal Armouries (Leeds), the earliest example can be found at the Musée de l'Armée which was made by Giacomo Berselli of Bolognia in the late 1660s.[20] However, more well-known and relevant to the Founding Fathers, is Michele Lorenzoni of Florence. He developed a magazine-fed repeater, in pistol and rifle form, known as the Lorenzoni system. This design was copied and modified by numerous designers after its invention with various configurations and magazine

---

[18] This firearm was on display at the National Firearms Museum's location in Missouri. Winant, Lewis. "A 16-Shot Wheel Lock," *America's 1st Freedom* (2014).

[19] Some of this research was compiled by the late historian, Herbert G. Houze and was featured in the Houston Museum of Natural Science's *The Art of the Hunt: Decorated European Sporting Arms from 1500-1800* (2019).

[20] For more information, visit: https://royalarmouries.org/stories/our-collection/the-christmas-connection-to-captain-souths-lorenzoni-pistol-our-collection/ Accessed 10/24/2022

13

DECLARATION OF ASHLEY HLEBINSKY    APP. 675

17cv1017

capacities. One such firearm was designed by British gunsmith, John Cookson in the late seventeenth century. A gunmaker in Boston, also named John Cookson – it is not clear if this person was the same Cookson from England, a relative, or a coincidence – published an ad in the *Boston Gazette*, in 1756, advertising a nine-shot repeating firearm. Around the same time a Cookson-type twelve-shot repeater was made by gunmaker John Shaw.[21] Another example from the 1750s in America is the Belton repeating fusil. This gun was invented by Joseph Belton around 1758. Not a magazine repeater like the Lorenzoni, the Belton utilized superimposed loads. Notably, he petitioned the Continental Congress during the American Revolution to adopt his firearm. In 1776, he wrote Congress saying he designed a firearm that could fire eight shots in three seconds. Benjamin Franklin wrote to George Washington in support of the idea.[22] Washington ordered one hundred Belton firearms for use in the Continental Army. However, this order was canceled because, as this report has previously stated, cost is often an impediment to battlefield adoption. It is alleged that Belton then sold his firearms to the public.[23] A few decades later around 1779, the Girardoni (also spelled Girandoni) air rifle was developed. It was a repeating arm that could fire twenty-two rounds from a tubular

---

[21]An example of this firearm can be found in the National Firearms Museum <https://www.nramuseum.org/the-museum/the-galleries/the-road-to-american-liberty/case-22-the-paper-cartridge/cookson-volitional-repeating-flintlock.aspx> It is also discussed here: < http://firearmshistory.blogspot.com/2014/02/the-cookson-repeater.html> Accessed 10/24/22

[22] These letters can be found here: <https://founders.archives.gov/documents/Washington/03-05-02-0311> Accessed 10/22/22

[23] What is believed to be the patent prototype of the Belton fusil is in the Smithsonian Institution's National Firearms Collection:< https://americanhistory.si.edu/collections/search/object/nmah_440031> Accessed 10/22/2022. Additionally, Rock Island Auctions, who has sold recently several reproduction Beltons provides a great overview of this history <https://www.rockislandauction.com/riac-blog/assault-weapons-before-the-second-amendment#:~:text=The%20Belton%20%22Roman%20candle%22%20fusil%20is%20the%20first,a%20chained%20charge%20much%20like%20a%20Roman%20candle> Accessed 10/22/2022

14

DECLARATION OF ASHLEY HLEBINSKY

magazine.[24] This design also was copied by gunmakers around the world.[25] The actual Girardoni was used by Meriweather Lewis on the Lewis and Clark Expedition (1804-1806). This air rifle had also been in service with the Austrian military, but light weight examples were produced in sporting variations.[26]

23.     The above text serves merely as an example of the numerous types of repeating firearms, utilizing a range of technologies including magazines, which existed leading up to and at the time of the ratification of the Second Amendment and in some cases had direct ties to Founding Fathers. While these repeaters can be criticized as "one-off examples" or in some cases unsuccessful by modern and/or historic standards, it is important to keep in mind that this was typical as they were often made by private gunsmiths and sometimes individually commissioned. Additionally, just because some firearms designs had flaws, imperfections, or issues, does not mean the technology ceases to exist or can be expunged from history. As manufacturing processes advanced, these concepts evolved into repeaters produced in greater and more standard quantities.

/ / /

/ / /

---

[24] Kopel, David. "The History of Firearms Magazines and Magazine Prohibitions." Albany Law Review, Vol. 88, 2015, pg. 853

[25] An example of a Russian copy of a Girardoni Rifle can be found in the Cody Firearms Museum

[26] For more information on Lewis and Clark and the Girardoni, the most comprehensive research on the Girardoni air rifle was done by scholar Michael Carrick. His research is footnoted in this summary article of the Lewis and Clark firearms that can be found here:
<http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf> Accessed 10/22/22 Additionally, Ian McCollum, one of the foremost authorities on firearms technology in the United States, has done several videos and articles about the firearm. This is one article he did
<https://www.forgottenweapons.com/rifles/girardoni-air-rifle/> Accessed 10/22/2022. A surviving example of a Girardoni can be found:
<https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-clark.aspx> Accessed 10/22/22 Rock Island sold a sporting variation in 2018:
<https://www.rockislandauction.com/detail/75/3293/girandoni-system-repeating-air-gun > Accessed 10/22/22

15

DECLARATION OF ASHLEY HLEBINSKY

*Laws and Relevance*

24.    In the colonial period, the bulk of firearms laws were centered on restricting access to certain people rather than firearms themselves. Therefore, even if a firearm or weapon was specifically mentioned in a law, the type of weapon is not necessarily relevant, as other civilians were still permitted to own them even if some people were restricted. Each colony developed their own policies. In 1640, Virginia law stated, "that all such free Mulattoes, Negroes and Indians…shall appear without arms."[27] South Carolina also had similar bans in 1712.[28] It is generally understood that early laws were largely motivated by race.[29]

25.    The British government also used regulation to control the colonists through access to gunpowder by seizing public powder houses, also referred to as "magazines." Although it is not to be confused or conflated with the mechanical devices discussed throughout this declaration. They achieved this because, due to fire hazard, large stocks of black powder were kept in a communal powder house, which was a repository for both individuals and merchants to store their powder. It also provided powder for people who were unable to afford it.[30] In one instance of disarmament, Royal Governor Thomas Gage, in 1774, seized remaining powder in Charleston, causing a flurry of responses, known as the Powder Alarm, from the

---

[27] One of the best resources to search all firearms laws is the Duke Center for Firearms Law. <https://firearmslaw.duke.edu/> Accessed 10/25/2022. However, a concise summary of these laws is also broken down by: Ekwall, Steve. *The Racist Origins of US Gun Control.* <https://www.sedgwickcounty.org/media/29093/the-racist-origins-of-us-gun-control.pdf> Accessed 10/22/22 Here he references: 7 The Statues at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, p. 95 (W.W. Henning ed. 1823) (GMU CR LJ, p. 67)

[28] Eckwall, 7 Statutes at Large of South Carolina, p. 353-54 (D.J. McCord ed. 1836-1873). (GMU CR LJ, p. 70)

[29] The abstract of Cramer, Clayton E. "Colonia Firearms Regulation" (April 6, 2016) puts it fairly succinctly: "Firearms regulation in Colonial America was primarily focused on encouraging gun ownership for defense against external threats (Indians, pirates, non-British European powers) and internal threats (slave rebellions)"

[30] Johnson et al. Firearms Law and Second Amendment Regulation, Rights, and Policy (3rd ed. 2021), pg. 271

16

DECLARATION OF ASHLEY HLEBINSKY

1    colonists that was considered preparation for the Battles of Lexington and

2    Concord.[31] Shortly thereafter, King George III enacted a restriction to "prohibit the

3    Exportation of Gunpowder."[32] As a result, Revolutionary leaders, such as Paul

4    Revere, required possession of arms and ammunition by militiamen and many

5    required powder and projectiles in quantities greater than ten pounds and rounds

6    respectively.[33]

7        26.    While the ownership of gunpowder was outright encouraged by the

8    soon-to-be states of America, there were still very real concerns about the instability

9    of gunpowder. It is important to note that modern gunpowder is far more stable than

10    historic black powder. Even so, it is still recommended to be stored separately from

11    firearms in the home even today.[34] As a result of instability, fire prevention laws

12    were enacted, not to disarm individuals but to provide them a safe place to store their

13    powder while also reducing the potential for fire within communities. Philadelphia

14    in 1725 enacted a law "for the better securing of the city of Philadelphia from the

15    Danger of Gunpowder." Under this Act, safety was also defined as the distance of

16    beyond two miles outside of town limits. [35] Similarly, Boston in 1783 also made a

17    storage law citing the instability of black powder. "In the houses of the town of

18    Boston, [it] is dangerous to the lives of those who are disposed to exert themselves

19    when a fire happens to break out in town."[36] The idea of a required distance in which

20

21    _____

22    [31] Johnson, et al., pg. 271
      [32] Ibid, pg. 272
      [33] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1150 (S.D. Cal. 2019)

23    [34] According to the Sporting Arms and Ammunition Manufacturer's Institute,
      "ammunition should be stored in a cool, dry location away from solvents and other

24    chemical heat sources, or open flames…ammunition should be stored separately
      from firearms" < https://saami.org/wp-

25    content/uploads/2018/01/SAAMI_AmmoStorage.pdf> Accessed 10/25/22

26    [35] 1725 Pa. Laws 31, An Act for the Better Securing of the City of Philadelphia
      from the Danger of Gunpowder <https://firearmslaw.duke.edu/laws/1725-pa-laws-
      31-an-act-for-the-better-securing-of-the-city-of-philadelphia-from-the-danger-of-

27    gunpowder-%c2%a7-2/> Accessed 10/25/22

28    [36] Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of
      Boston <https://firearmslaw.duke.edu/laws/thomas-wetmore-commissioner-the-
      charter-and-ordinances-of-the-city-of-boston-together-with-the-acts-of-the-

17

DECLARATION OF ASHLEY HLEBINSKY        **APP. 679**

17cv1017

it was safe to use black powder for firearms and also for fireworks, was echoed in these laws. While in the above example it considered distance within town limits, some places legislated a safe distance from the powder house itself. For example, in 1762, Rhode Island enacted "that no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house."[37] Additionally, Rhode Island in 1798, provided guidance on how to safely store powder in the home. They also provided a safe space to store anything over twenty-eight pounds [38] These laws strongly focused on safety from a perspective of fire prevention rather than a position of regulating the amount of powder one could have since powder houses were built for large quantities of chemically unstable and combustible material.

27.     In summary, at the time of the Founding Era, laws about firearms restriction were regularly directed towards groups of people rather than the firearms themselves. Within these laws, repeating and firing capacity are not mentioned. In some cases, the militia required arms and ammunition to be in civilian possession partially due to British attacks on public powder houses. Additionally, laws concerning the private possession of gunpowder were centered around fire prevention within and near town's limits or proximity to a powder house.

**The Second Founding Era**

28.     According to *Bruen,* under certain circumstances the Second Founding Era, surrounding the Fourteenth Amendment, can be used to provide insight into historical analogues. As mentioned in the previous section, repeaters, including magazine-fed firearms, were known, and becoming increasingly popular at the time of the Fourteenth Amendment. Capacities over ten rounds existed before and during

---

legislature-relating-to-the-city-page-142-143-image-142-1834-available-at-the-making-of/> Accessed 10/25/2022

[37] 1762 R.I. Pub. Laws 132 <https://firearmslaw.duke.edu/laws/1762-r-i-pub-laws-132/> Accessed 10/25/22

[38] 1798-1813 R.I. Pub Laws 85 < https://firearmslaw.duke.edu/laws/1798-1813-r-i-pub-laws-85-an-act-relative-to-the-keeping-gun-powder-in-the-town-of-providence-%c2%a72/> Accessed 10/25/22

18

DECLARATION OF ASHLEY HLEBINSKY

this time. Laws yet again did not concern capacity. They continued to center around restrictions against groups of people. They also centered around carry. Ironically, though some firearms regulated in carry laws were still legal, despite having the same or even greater capacity, as long as they were physically larger in size, or in some cases more expensive.

### Repeaters

29.     The period before and after ratification of the Fourteenth Amendment saw changes in the landscape of design and technology outside of just firearms. The transition of firearms being made by private gunmakers began shifting to factories by the mid-nineteenth century. Inline manufacturing, interchangeable parts, and mass production impacted not only the types of firearms that were available, but also quantity and quality. Prior to the American Civil War, there were many makers and manufacturers of repeating firearms, however, the tradition of individual gunmakers was still prominent. While repeating firearms, magazine-fed or not, exceeded ten-rounds centuries prior, the number of distinct types of repeaters by the middle of the nineteenth century was staggering. It is important to note that while this report references the ceiling of ten rounds, that number is historically arbitrary as it is unfair to assume that a person during that time would make a distinction between capacities under and over ten rounds, especially considering to my knowledge, the federal government itself did not until the 1990s.[39]

30.     After the ratification of the Second Amendment, repeating technology continued to evolve as it had for centuries. During this time frame, especially leading up to the Industrial Revolutions and standardization of interchangeability and in-line manufacturing processes, designs were very much a trial-and-error

---

[39] This date is referencing the Public Safety and Recreational Firearms Use Protection Act (1994). Additionally, there are many resources that can showcase the number of repeaters available in this time frame in the United States, but the place that aggregates them the best is Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms…and their Values*. 9th Ed.

process. One such repeater was designed in 1821 and was known as the Jennings

repeating flintlock. It was capable of firing twelve rounds before having to reload.[40]

Pepperbox pistols, a revolving pistol with multiple barrels that were manually

rotated on a central axis, were popular in the United States by the 1830s, some were

even taken out west with California gold miners. One maker of pepperboxes alone,

Ethan Allen, between the 1840s and 1850s made over forty variations of this style of

firearm.[41] While many pepperbox pistols typically fired four to six shots, some were

capable of firing twelve, eighteen, or twenty-four rounds.[42] It becomes difficult to

quantify the number of repeaters on the market though because makers were so

plentiful. In 1836, a year before Samuel Colt's first patent in England of his

revolving mechanism, the patent process was standardized through the United States

Patent Act. That year, Samuel Colt took out two patents for five or six-shot

revolving rifles and pistols. As a result, he owned the legal right to produce,

essentially the revolver, until it expired in the mid-1850s. This Act created a flurry

of production, innovation, and design especially towards repeaters and magazines to

varying degrees of success. The fact though that so many people were trying to

design the next great repeater shows the desire to capitalize on this technology.[43]

31.     It has been cited and challenged that the Winchester Model 1866 was

the first magazine-fed repeater that held more than ten rounds to achieve commercial

success.[44] The Winchester Model 1866 lever action rifle was the first firearm sold

using the Winchester name. Between 1866 and 1898, approximately 170,101 Model

1866s, in .44 Rimfire, were produced. Of that model alone, around ten variations

---

[40] Flayderman, Pg 683

[41] Ibid pg. 56-61

[42] Kopel, pg. 854. Additionally, pinfire pistols and long guns can be found in museum collections with capacities greater than ten rounds.

[43] Examples of these patented repeaters include Volcanic lever actions, the Jarre Harmonica pistol and rifle, Porter and Genhart turret rifles, Josselyn Chain Revolvers etc. More successfully were revolvers and repeaters by Smith & Wesson, Remington, Merwin & Hulbert, Henry, Winchester etc.

[44] Kopel, pg. 869

20

DECLARATION OF ASHLEY HLEBINSKY

existed. It was hoped that the Winchester Model 1866 would see successful adoption by the US military, however, it did not. Only a small percentage, roughly 1/3 of total production, were made ultimately for use by foreign militaries.[45] According to another statistic, between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with approximately 56,000 going to foreign governments.[46] This number, even with the inclusion of other models, still is only 1/3 of all sales. In reference to his Model 1866, Oliver Winchester referred to it as "one of [the company's] best sporting guns" in a letter, dating 1871, to prominent gunmaker R.S. Lawrence.[47] In a Winchester testimonial from 1865, W.C. Dodge, Late Examiner of the US Patent Office, boasted that Winchester's "Magazine Rifle, with the recent improvement, is superior to any other arm ever presented to the public."[48] In the beginning, Winchester did lean into its previous involvement with the Henry rifle as a marketing tool because it was a known commodity, however, within a decade after the company's founding, Winchester catalogs detailing their sporting models and diverse product lines were interspersed with testimonies from hunters and civilians about their love of the technology.[49]  The categories for their 1875 catalog reads: "Winchester's Repeating Fire-Arms, Rifled Muskets, Carbines, Hunting and Target

---

[45] Flayderman's also provides the number of Mexican contract firearms there were. The records are not complete for the Model 1866. The Records can be found in the Cody Firearms Museum's Records Office. Here is a breakdown of what has survived through the Winchester collector.
https://winchestercollector.org/models/model-1866/ This article also provides a breakdown of other military contracts. < https://www.americanrifleman.org/content/winchester-lever-actions-go-to-war/> Accessed 10/22/22

[46] Michael Vorenberg Decl., pg. 28, note 32.

[47] Oliver F. Winchester's letter to R.S. Lawrence, dated 10 February 1871. McCracken Research Library, MS20, Box 51, Folder 6

[48] Dodge is most likely referencing the 1865 King's Patent Improvement which incorporated a side loading gate to improve the speed of loading the firearm. Winchester's Repeating Fire-Arms Rifled Muskets, Carbines, Hunting, and Target Rifles, &c…Metallic Cartridges of all Kinds, manufactured by the Winchester Repeating Arms Company." Catalogues Vol. 1 (1865-1881). McCracken Research Library TS 533.5.W5431991v1c2

[49] Ibid

DECLARATION OF ASHLEY HLEBINSKY    APP. 683
17cv1017

Rifles, &c…"[50] One such testimonial was from famous performer, William F. Cody, who proclaimed, "I have tried and used nearly every kind of gun made in the United States, and for general hunting or Indian fighting, I pronounce your improved Winchester the *boss.*"[51] Despite the ways that Winchester chose to frame and market their firearms though, it should be noted that while advertising can influence a consumer, a consumer also has agency to purchase and use the product they want for their own purposes.

32.    While Winchester would provide the United States smaller runs of their firearms designs modified for military service around the turn of the twentieth century, Winchester would not truly be seen as a full-scale military manufacturer until their involvement in World War I when government owned armories could no longer meet the demand for military arms. Winchester and other manufacturers such as Remington stepped in initially producing firearms – not even associated with their brands - invented by other designers, companies, and/or armories, such as the British Pattern 1914 Enfield and the American version, the U.S. Model 1917. These military contracts however would ultimately be the financial demise of the company as it went into receivership in 1931. [52]

33.    Outside of those early small contracts, Winchester continued designing guns for the civilian market. The Winchester Model 1873 boasted a production of around 720,610 manufactured in at least twelve variations, including almost 20,000 in .22 caliber rimfire – a caliber used for target shooting and varmint hunting. Model 1873 rifles were chambered in .32-20, .38-40, .44-40, and .22 caliber. The Model 1876 had a manufacturing run of 63,871 firearms with around fifteen variations.

---

[50] McCracken Research Library TS 533.5.W5431991v1c
[51] Ibid, pg. 28-29
[52] This information can be found in pretty much any book about Winchester. The author also knows this information for the decade she spent running the Cody Firearms Museum, formerly known as the Winchester Museum, which is home to Winchester's firearms collection as well as archives from the company

22

DECLARATION OF ASHLEY HLEBINSKY

This Model was a larger version of the Model 1873 and chambered in heavier calibers (.40-60, .45-60, .45-75, .50-95), which made the firearm more desirable for hunters, including President Theodore Roosevelt.[53] At one point, they produced an exclusive line of high-level sporting arms of the Models 1873 and 1876 known as the "1 of 100" and "1 of 1,000" models. Between the start of the company until 1898, Winchester released fourteen repeating models – not all lever actions. Those models would eventually be produced in over one hundred variations, chambered for around thirty different cartridges.[54] Winchester continued mass producing repeating firearms throughout the rest of the nineteenth century and beyond. Considering the diversity within models, variations and especially calibers, these guns were developed for specific and sometimes divergent purposes and cannot not be reduced into one category of simply being a Winchester repeater. There is more nuance than that.

34.    During this same time, other companies were producing competitive repeaters, such as the Evans Repeating Rifle, which was made between 1873 and 1879. Approximately, 12,200 were made and they came in three variations, Sporting (approximately 4,350 made), Military (approximately 3,200), and Carbine (not specified as either sporting or military, approximately 4,700 made). The Evans held magazine capacities at twenty-eight, thirty-four, and thirty-eight rounds.[55] The Evans as well as other companies such as the Spencer Repeating Rifle, Fogerty Repeating Rifle, Adirondack Firearms, Bullard Repeating Arms, Burgess Gun, and the Whitney Arms Companies were making repeaters. However, they are lesser known, partially because Winchester realized the value in their designs and the threat of

---

[53] Flayderman, pg 309
[54] Ibid pg 306-322.
[55] Ibid pg. 694-695

23

DECLARATION OF ASHLEY HLEBINSKY

them as a competitor so they acquired the companies.[56] Other major manufacturers, such as Marlin, quickly popped up as well by the 1880s as a direct competitor to Winchester. In all, there were over one hundred manufacturers or makers in the United States alone producing some type of repeating firearm leading up to and decades after the Civil War.[57]

35.    As plentiful as variations in Winchester firearms are though, the above information does not take into account the gargantuan amount of ammunition Winchester manufactured. In general, not enough is said about Winchester's innovation in cartridge design and the fact that ammunition production was responsible for much of the financial success of the company. According to David Kowalski, author of the *Standard Catalog of Winchester: The Most Comprehensive Price Guide Ever Published*, "cartridges played a larger role in the business operations of the Winchester Repeating Arms Company (W.R.A. Co.) than most collectors realize. Because ammunition is a high-volume, high profit product, it literally carried the W.R.A. Co. for most of its existence."[58] Their cartridge designs were so popular that other companies, such as Colt, would offer variations of their iconic firearms, such as the Colt Single Action Army revolver, to accommodate Winchester developed cartridges, such as the .44-40. Ammunition production was so vital to Winchester that the company who bought them out of receivership, the Olin Corporation, was their ammunition competitor. Today, the only surviving thread of the company is Olin's Winchester Ammunition. The various firearms brands that

---

[56] An entire exhibit at the Cody Firearms Museum is dedicated to the many repeating arms companies that Winchester acquired. Examples are archived in the Winchester Arms Collection.

[57] Flayderman, Chapters V: A-F pages 50-299; Chapter VII: A, B, C Pages 351-387; Chapter VIII: A Pg458-524; Chapter XIII pages 691-697; Chapter XV: pages 709-733

[58] Kowalski, David D. Ed. Standard Catalog of Winchester: The Most Comprehensive Price Guide Ever Published. Krause Publications 2000, pg. 159.

1  bear the Winchester name, are produced by companies that license the name from

2  Olin.

3      *Magazines*

4      36.    In addition to the developments in repeating innovation, magazines

5  began to be patented as well. Even though tubular magazines existed long before,

6  the tubular magazine was first patented in the US in the 1840s, notably with the

7  Hunt Volitional Rifle, the oldest direct ancestor to the Winchester rifle. Magazines

8  though came in many shapes and sizes and became prevalent around this time. For

9  example, the Spencer repeating rifle utilized a detachable tubular magazine from the

10  buttstock capable of holding seven rounds. A speed loader even existed for that

11  magazine. In the 1850s, the Genhart turret rifle had a detachable circular magazine

12  with an externally visible shot/round counter. Between 1859 and 1862, the Jarre

13  Harmonica Pistol and Rifle received several patents. This gun has a horizontally

14  seated magazine that slides after each round is fired like a typewriter. It is also

15  detachable.

16      37.    In terms of box magazines specifically, early ones were patented by

17  designers including Rollin White in 1855.[59] A detachable version was patented in

18  1864 by Robert Wilson.[60] A vertically stacked box magazine was patented by James

19  Paris Lee in 1879 which was applied to several rifles including the Mannlicher

20  Model 1886 rifle.[61] In terms of early semi-automatic pistols, the Mauser C-96 had a

21  fixed magazine and the Borchardt C-93 had a detachable one. Semi-automatic

22  models of Winchester utilized various types of magazines, including the Winchester

23  Model 1907, a centerfire rifle capable of firing up to twenty rounds from a box

24  magazine and the Winchester Model 1903 which was also fixed with a lesser-known

25  Sabo ninety-six round detachable magazine. By the end of the nineteenth century,

26

27

28

---

[59] White, Rollin. US Patent No 12648 (1855)
[60] Wilson, Robert. US Patent No 45105 (1864)
[61] Lee, James Paris US Patent No 221328 (1879)

25

DECLARATION OF ASHLEY HLEBINSKY

the earliest versions of semi-automatic pistols such as the Borchardt C-93 contained eight rounds from a detachable magazine (1893) and the Mauser C-96 had a ten round magazine (1895) but also came in configurations as high as twenty rounds.[62] Even certain Luger semi-automatic pistols in the early 1900s had the option of thirty-two round snail drum magazines.[63]

### *Laws and Relevance*

38.     Racial firearm bans continued into the nineteenth century. States including but not limited to Louisiana, South Carolina, Florida, Delaware, Maryland, North Carolina, and Mississippi enacted race bans between ratification and the American Civil War.[64] Some states, for a time, would permit African Americans to carry guns with court approval, but they were eventually repealed.[65] Several laws upheld their justification for race-based regulation on the fact that Black people were not considered citizens, which was upheld in the 1857 case of *Dred Scott v Sandford.*

39.     During this period in between ratifications of the Second and the Fourteenth Amendments, some laws emerged restricting carry by any person. According to Professor of Sociology at Wake Forest University David Yamane, one of the earliest examples was in Kentucky in 1813. The General Assembly of the Commonwealth stated: "That any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or a sword cane, concealed as a weapon…shall be fined in any sum, not less than one hundred dollars." However, nine years later in 1822, the Kentucky Supreme Court ruled that ban violated their

---

[62] Kopel, 857 referencing *Standard Catalog of Firearms.* (2014), Gun Digest Books, pg. 708-709
[63] A version of this section on magazines was initially completed by author for Miller et al v Bonta
[64] Ekwall
[65] Ibid, referring to Act of Nov. 17, 1828, Sec. 9, 1828 Fla. Laws 174, 177; Act of Jan. 12, 1828, Sec. 9, 1827 Fla. Laws 97, 100; Referring to Act of Jan. 1831, 1831, Fla. Laws 30

DECLARATION OF ASHLEY HLEBINSKY         APP. 688
17cv1017

1792 Constitution.[66] Other states adopted similar carry regulations, some still only

for certain groups of people.

40.    Despite the abolition of slavery, discriminatory laws that included

firearms regulation continued. One such way that could be legally achieved was

through the Black Codes. While there were many aspects of discrimination in the

various state "Codes," many included challenges to Black Second Amendment

rights. For example, Alabama in 1866 not only banned Blacks from owning firearms

and other weapons, but also made it illegal to lend or sell to a black person.[67] The

Civil Rights Act of 1866, the Fourteenth Amendment and the Second Freedmen's

Bureau Act in 1866 attempted to dispel a variety of these issues.[68] In February 1866,

the House of Representatives amended the Second Freedmen's Bureau Act to

explicitly state that people had the "full and equal benefit of all laws and

proceedings for the security of person and estate *including the constitutional right to

bear arms.*"[69] Following the passage of these acts, however, southern states then

passed laws, known as Army/Navy Laws, in which certain firearms, such as Colt

Army and Navy model revolvers were permitted while cheaper versions were not

legal.[70] Prohibiting the proliferation of inexpensive handguns on the market, whether

intentionally or unintentionally imposed a classist restriction on those who could no

longer afford to arm themselves– a trend that has continued well into the modern

era.

41.    The Enforcement Acts of 1870 and 1871 were meant to protect the

rights of free men under the Fourteenth and Fifteenth Amendments. Yet these

---

[66] Yamane, David. *Concealed Carry Revolution: Expanding the Right to Bear Arms in America*. A New Press (2021), pg. 17-18. David Yamane is a Sociology Professor at Wake Forest. This book was just a small portion of his larger research on gun culture that he calls, "Gun Culture 2.0." More of his research can be found at gunculture2point0.com

[67] Ekwall

[68] A detailed explanation of this can be found in: Johnson et. al pg. 465-471

[69] *Ibid,* pg. 466

[70] Eckwall

DECLARATION OF ASHLEY HLEBINSKY    **APP. 689**

17cv1017

seemingly positive changes were short lived. During the 1872 election for Louisiana governor, President Ulysses S. Grant sent troops to support the Republican candidate. In response, a group of white supremacists began harassing Black and White Republicans. These tensions culminated in Black and White Republicans taking up defense in a local courthouse in Colfax, LA. In 1873, 150 white men surrounded the courthouse and at one point, would fire a cannon at the building. Note: White Republicans were given the opportunity to leave before the massacre ensued. Black Republicans were left to fight with inferior weaponry. In the end, Black Republicans would surrender to the mob, led by a man named William Cruikshank. After surrender, somewhere between sixty to one hundred and fifty African Americans were killed.[71] Although Cruikshank and around ninety-six white vigilantes were charged for violating the Enforcements, only a few were convicted.[72] Even then, the Supreme Court, in *United States v Cruikshank* (1875), overturned the conviction ruling that the federal government could not prevent private citizens, in this case KKK members, from disarming Blacks and that the matter must be relegated to the states.[73]

42.      Another example concerning disarmament of a group of people occurred leading up to the American Civil War. Violent confrontations broke out in Kansas, known as Bleeding Kansas, between 1854 and 1859. At one point an anti-slavery movement of "Free Soilers" decided to arm themselves with single-shot Sharps rifles by smuggling them into the territory. However, the pro-slavery segments, under the command of a deputy federal marshal, attempted to disarm these settlers, most notably during the Sacking of Lawrence.[74] In response to the

---

[71] Johnson et al, pg. 471
[72] Ibid, pg. 471 as well as summarized in <https://www.smithsonianmag.com/smart-news/1873-colfax-massacre-crippled-reconstruction-180958746/> Accessed 10/25/22
[73] Ibid, pg. 471
[74] Ibid, pg. 456

DECLARATION OF ASHLEY HLEBINSKY

situation in Kansas, abolitionist Charles Sumner gave his famous speech on the floor of the United States Senate on May 19, 1856, "The Crime Against Kansas." During which, South Carolina Senator A.P. Butler, supposedly stated that the people of Kansas should no longer possess their arms. During Sumner's speech, he attacked Butler and affirmed the right of individuals to bear arms:

> "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector…Never was this efficient weapon [referring to the single shot Sharps Rifle] more needed in self-defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached…"[75]

This speech culminated in violence against Sumner, who was beaten with a cane on the Senate floor for advocating against disarmament. Yet, even after a Civil War and thirty-five years later government disarmament would lead to the largest mass murder in American history. On December 29, 1890, Colonel James Forsyth, commander of the 7th Cavalry, ordered the Lakota to surrender their firearms leading up to their removal from the land they inhabited. It is debated exactly what happened to pull the trigger on the slaughter, but in the end, hundreds of Lakota were killed.[76]

    43.    After a long history of government related violence as well as private vigilantism, Black people, particularly in the South, called for their personal armament to protect themselves. Much research has been done focusing on violence against people of color as a justification for firearms restrictions, however, less explored is the fact that Black people used and relied on firearms for protection *from* violence. These two ideologies conflict with one another. On one side, it is argued that restrictive laws would reduce violence, specifically on marginalized communities. On the other, it is argued that gun ownership allows those communities the best ability to protect themselves. In this circumstance, a restriction

---

[75] Johnson et. al, pg. 456

[76] Utley, Robert M. *The Last Days of the Sioux Nation.* 2nd Ed. Yale University Press, pg. 211

29

DECLARATION OF ASHLEY HLEBINSKY

would take away rights of the latter, putting them again at risk of violence. This desire to protect oneself with the best technology available was echoed amongst the Black community in the late nineteenth century through prominent leaders. For example, John R. Mitchell, Jr., Vice President of the National Colored Press Association, encouraged Black people to buy Winchesters to protect their families from the 'two-legged animals…growling around your home in the dead of the night."[77] Ida B Wells, an activist and journalist in the South, wrote in 1892, "that a Winchester rifle should have a place of honor in every black home, and it should be used for the protection which the law refuses to give."[78] These activists also encouraged Black Americans to move to Oklahoma where they formed self-defense organizations. One Black journalist reported that in Oklahoma he "found in every cabin [he] visited a modern Winchester oiled and ready for use.'"[79]

44.     To summarize: in Kansas, pro-slavery government backed officials sought to disarm Free Soilers of their high-quality single-shot Sharps rifles. Sumner denounced this effort and started a fight with Senator Butler, who himself would backtrack and claim he never supported disarmament. In the Colfax massacre, Black Republicans were outgunned by a mob with superior weapons. The Wounded Knee Massacre started because of a government sanctioned disarmament of the Lakota, who had in some cases, superior weaponry. The firearms confiscated at Wounded

_____

[77] Johnson et al., p 521 referencing Giddings, Paula J. *Ida: A Sword Among Lions* (2008), pg. 153-154

[78] Johnson et al., pg. 521 referencing Wells, Ida B. *Southern Horrors.* N.Y. Age June 25, 1892. Reprinted in Wells, Ida B. *The Light of Truth: Writings of an Anti-Lynching Crusader*, pg. 84

[79] While this reference is obviously anecdotal for the number of Winchesters in circulation in a given area, Vorenberg's declaration claims as little as 8,000 Winchesters were in circulation in the post-Civil War South. However, this number is based on an order of 6,000 from Governor Scott for the South Carolina Militia, 1,000 for the Metropolitan Police Force in Louisiana, and 1,000 potentially stolen firearms. It has been stated though that the government was slow to adopt this technology, despite still being produced into the hundreds of thousands. Therefore, it is misleading to infer these orders would be the only way to measure the number of Winchesters in the South at that time. The footnoted quote is from: Johnson et al., p 521 referencing Giddings, pg. 198

30

DECLARATION OF ASHLEY HLEBINSKY

Knee included Winchester rifles, though it did not serve them any good considering what transpired. And Black southerners particularly sought to have the best weapons available for a government they believed was not there to protect them.

45.     Some scholars argue that the passage, despite the repeal in many instances, of state laws regulating the carry of specific types of weapons serve as sufficient evidence to support a modern magazine ban. However, it is important to reiterate that these regulations regarding specific types of weapons have occurred in some cases to take away the rights of some but not others. For laws that did include everyone, weapons typically on that list had some sort of larger counterpart, as in the Army/Navy laws, which would have at least equal capacity or were still permitted via licensure. Furthermore, these laws did not explicitly concern themselves with capacity or magazines but more often the size and/or other criteria of concealment. Other laws during this period, had more to do with whether or not the government could protect you and your rights resulting in unfortunate outcomes. In the case of disarmament and the need for defense, it seems that citizens often affected by these tragedies were less concerned about a discourse on the morality of firearms technology, but instead protecting themselves with the best technology available.

**Conclusion**

46.     According to *Bruen,* time frames outside of the Founding and Second Founding Eras can be considered informative, providing context for the mindset and knowledge behind designs and legal decisions, although it does not hold the same weight. This report has provided an outline of repeaters and magazine-fed repeaters with a capacity of over ten rounds in the previous two sections establishing the existence and use of these types of firearms. The proliferation of such technology in the twentieth and twenty-first centuries is astounding. As such and coupled with the tertiary importance according to *Bruen*, I will not dive into a comprehensive look at all repeaters developed into the modern era.

DECLARATION OF ASHLEY HLEBINSKY

47. This report has looked at two timeframes relevant to this case as it pertains to *Bruen*. It has provided a snapshot account of several repeaters and magazine-fed repeaters of capacities over ten rounds throughout history. It has also examined corresponding laws from those time periods rebutting similarities to twentieth and twenty-first century legislation on capacity. It has stated that innumerable magazine-fed repeaters have been developed since the 1600s. At the time of the Founding Era repeaters and magazine-fed firearms, with a capacity over ten rounds had been in existence for over a century. To my knowledge, there are no laws during this period that restrict access to firearms magazines or strict firing capacity. By the time of the Second Founding Era, there were exponentially more repeaters and magazine-fed firearms with capacities greater than ten. According to scholarship outside of this declaration, the first laws referencing capacity, primarily for machine guns, only date to the 1920s, and all except one implemented during this period were repealed. Laws regulating detachable magazines date to the last decade of the twentieth century, and the ten round magazine limit was imposed through federal law for the first time in 1994, making the relevant conversation in this case much more recent history rather than the historical precedent *Bruen* requires.

I declare under penalty of perjury that the foregoing is true and correct.
Executed within the United States on __November 30, 2022__.



Ashley Hlebinsky
Declarant

DECLARATION OF ASHLEY HLEBINSKY

# EXHIBIT 1

# EXHIBIT 1: HLEBINSKY CURRICULUM VITAE

**Ashley Hlebinsky Curriculum Vitae**
Ashley Hlebinsky, President, The Gun Code, LLC
2124 E Kerry Lane, Phoenix, AZ 85024
Email: theguncode@gmail.com
Phone: 412-491-2493

**Education:**

Master of Arts, American History, University of Delaware, 2013

Bachelor of Arts, American History, University of Delaware, 2011

**Recent Honors/Awards:**

Second Amendment Foundation's Defender of the Constitution, 2022

National Shooting Sports Foundation and Women's Outdoor Media Association's Top Five Finalist, Top Woman of the Gun Industry, 2022

National Shooting Sports Foundation's SHOT Business's Top 40 under 40, 2020

Wyoming Business Report's Top 40 Under 40, 2017

National Shooting Sports Foundation & Professional Outdoor Media Association's Shooting Sports Communicator of the Year Award, 2017

Wyoming's Non-Profit Woman of the Year Nominee, 2017

**Selected Professional Experience:**

Co-Founder and Senior Fellow, University of Wyoming College of Law's Firearms Research Center, Laramie, WY, 2020 (Current)

Consulting Director, Craig Boddington Wildlife and Firearms Museum, Independence, KS, 2022 (Current)

Consulting Curator, LA Police Museum, Pasadena, 2021 (Current)

EXHIBIT 1

APP. 696
17cv1017

Senior Consulting Specialist. Cowan's Auctions, Cincinnati, OH, 2021 (Current)

Consultant, National Museum of Law Enforcement and Organized Crime (Mob Museum), Las Vegas, NV, 2016 (Current)

Guest Curator, C.M. Russell Museums and Complex, Great Falls, MT 2021 (Current)

Adjunct Scholar of Firearms History, Technology & Culture, Firearms Policy Coalition, 2020-2021

Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, Buffalo Bill Center of the West, 2020 – 2021.

Robert W. Woodruff Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2015-2020

Project Director, Cody Firearms Museum Renovation, Buffalo Bill Center of the West, Cody, WY, 2015-2019

Consulting Curator, Houston Museum of Natural Sciences, 2018

Consultant. Adirondack Experience. November 2019

Consultant. Winchester Mystery House, August 2019.

Consulting Scholar. National Park Service & Organization of American Historians, March 2019.

Consultant/Curator. Daniel Defense, Black Creek, Georgia. 2017

Associate & Acting Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2015

Guest Curator. C.M. Russell Museums and Complex, 2015-2016

Guest Curator. Cody Firearms Experience, 2015

Assistant Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody, WY, 2013-2014

Teaching Assistant, The Jewish Holocaust: 1933-1945, University of Delaware, 2013

EXHIBIT 1

APP. 697
17cv1017

Teaching Assistant, Introduction to Military History, University of Delaware, 2012

Teaching Assistant, History Education, University of Delaware, 2011

Researcher/Fellow, National Museum of American History, Smithsonian Institution, 2010-2013

Archival Assistant, University of Delaware Special Collection, 2010-2011

Firearm Intern, Soldiers and Sailors National Memorial Hall, 2008

**Expert Witness Testimony:**

Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost Guns, May 2021

Franklin Armory et al v Bonta, February 2021

FN Herstal v Sturm, Ruger & Co, January 2021

Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020

Guedes v BATFE, June 2019

Miller v Becerra (Bonta), November 2019

    1. Evidentiary Hearing Testimony October 2020

    2. Deposition January 2021

Regina (Nova Scotia) v Clayton, January 2019

Garrison v Sturm, Ruger & Company, Inc. 2018

    1. Deposition November 2018

**Selected Media Work:**

Writer/Producer. Mountain Men: Ultimate Marksman. History Channel, May 2022 (Current)

EXHIBIT 1

APP. 698

17cv1017

Regular Contributor. *Our American Stories* Podcast, 2022 (Current)

Co-Host. History Unloaded Podcast. Various platforms with Wyoming Public Media, 2018-2022, 6 seasons (Current)

Producer & On Camera Expert. *Gun Stories with Joe Mantegna*, Outdoor Channel, 2015-2022, 8 seasons (Current)

Producer & On Camera Expert. *Man vs History*, History Channel & Matador Productions, 2020 (aired 2021)

Co-Host. *Master of Arms*, Discovery Channel & Matador Productions, 2018. 1 season

Consulting Producer. *Brothers in Arms*. History Channel, 2018. 1 season.

On Camera Expert. *Rob Riggle: Global Investigator*. Discovery Channel, 2020.

Recurring Expert. *Mysteries at the Museum.* Travel Channel. 2017-2019

Casting Consultant. *Gun Shop Project,* Vice Media & Cineflix Productions, 2020

On Camera Expert. *American Genius Colt V. Wesson*. National Geographic. 2015

*Also appears on:* Public Broadcasting Service, National Public Radio, Travel Channel, National Geographic, Popculture.com, Media, Entertainment, Arts, World Wide (MEAWW), Women's Outdoor News, Outdoor Life, Shooting USA, Gun Talk Media, National Shooting Sports Foundation, various firearms related podcasts.

*Has been profiled by: The Bourbon Review, Recoil Magazine, Outdoor Life Magazine, Guns.com, Blue Press Magazine, and others*

**Selected Lectures/Panels:**

Guest Speaker. Gun Rights Policy Conference, October 2022

Guest Speaker. Second Amendment Foundation Legal Scholars Forum, September 2022

Guest Lecturer and Panelist. AmmCon. Second Amendment Foundation, October 2021

EXHIBIT 1

APP. 699

17cv1017

Guest Lecturer. Armed for Revolution. Royal Armouries, September 2021

Guest Speaker. Preserving Firearms Heritage. Gun Rights Policy Coalition, 2020

Guest Lecturer. Art of Collecting. Nevada Museum of Art. January 2020

Panelist. Firearms and Museums in the 21st Century. National Council for Public History. March 2019.

Scholars Roundtable. Coltsville National Historic Site. Organization of American Historians & National Park Service, March 2019.

Forum Speaker. The Art of the Hunt: Embellished Sporting Arms in America. New Orleans Antique Forum, August 2018

Guest Lecturer. Unloading the Gun: Firearms, History, and Museums. Yakima Valley Museum, June 2018

Guest Lecturer. Perpetrators and Protectors: The Mob, The Law and Firearms, National Museum of Law Enforcement and Organized Crime (Mob Museum), September 2017

Organizer. Arsenals of History: Firearms and Museums in the 21st Century, Buffalo Bill Center of the West, July 2017

Lecturer. The Cody Firearms Museum, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Moderator. Addressing the Press: Firearms and the Media, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Moderator. Forming an Association: Legitimizing Firearms in Academic Study, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

Guest Lecturer. Displaying the "Politically Incorrect," C.M. Russell Museums and Complex, May 2017

Guest Lecturer. Displaying the "Politically Incorrect," Blackhawk Museum, March 2017

Panelist. Curator Roundtable, Firearms and Common Law Symposium, Aspen Institute, September 2016

EXHIBIT 1

Guest Lecturer. Displaying the "Politically Incorrect," Canadian Guild of Antique Arms Historians, April 2016

Guest Lecturer. The Cody Firearms Museum Renovation, American Society of Arms Collectors, September 2016

Guest Lecturer. From Protector to Perpetrator: Demystifying Firearms in History, Art Institute of Chicago, November 2015

Guest Lecturer. Winchester '73: The Illusion of Movie Making, Winchester Arms Collectors Association, July 2014

Guest Lecturer. Unloading the Six Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts, Buffalo Bill Center of the West, 2011

**Selected Firearms Exhibitions:**

Curator/Project Director. *Cody Firearms Museum Renovation*. Buffalo Bill Center of the West. 2019

Co-Curator. *The Art of the Hunt: Embellished Sporting Arms from 1500-1800.* Houston Museum of Natural Sciences. March 2019

Curator. *Glock Makes History: The Birth of the Polymer Handgun Market*. Buffalo Bill Center of the West. June 2016

Guest Curator. *Designing the American West: The Artist and the Inventor*. C.M. Russell Museum & Complex. February 2016

Curator. *The Greatest Gun Designer in History: John Moses Browning.* Buffalo Bill Center of the West. December 2015

Curator. *Journeying West: Distinctive Firearms from the Smithsonian Institution.* Buffalo Bill Center of the West. December 2015

Curator. *The Forgotten Winchester: Great Basin National Park*. Buffalo Bill Center of the West. June 2015

Curator. Western Firearms Gallery, including *Shoot for the Stars: The Tradition of Cowboy Action Shooting*. Buffalo Bill Center of the West. April 2015.

EXHIBIT 1

Curator. *Steel Sculptures: Engraving Individuality from Mass Production*. Buffalo Bill Center of the West. Winter 2014.

**Certifications:**

Certified Firearms Instructor, Basic Pistol, 2016

Certified Firearms Instructor, Personal Protection Inside the Home, 2016

Well Armed Woman Instructor Certification, 2016

Museum Studies Certification, University of Delaware, 2013

**Grants:**

National Endowment for the Humanities, 2017

Institute of Museum and Library Services, 2017

Gretchen Swanson Family Foundation, 2015, 2016, 2017, 2018, 2019, 2020

Kinnucan Arms Chair Grant, 2012

**Fellowships:**

Firearms Curatorial Resident, Buffalo Bill Center of the West, 2013

Edward Ezell Fellowship, University of Delaware, 2012

Buffalo Bill Resident Fellowship, Buffalo Bill Center of the West, 2011

**Committees and Memberships:**

Board Member – Walk the Talk America

Founding President – Association of Firearms History and Museums
- Academic association for the study of firearms history in United States

EXHIBIT 1

APP. 702
17cv1017

Founder – Arsenals of History Symposia Series

- First international symposia series on the academic study of firearms

Spokesperson – NSSF/AFSP Suicide Prevention and Project ChildSafe Programs
American Alliance of Museums – Member

American Society of Arms Collectors – Member

Winchester Arms Collectors Association – Honorary

Remington Society of Arms Collectors – Member

Weatherby Collector's Association –Life Member

**Publication History**

Editorial Board – Armax Journal

**Selected Articles:**

Author. "Guns and Mental Health." *Recoil Magazine,* Upcoming

Author. "Colt Single Actions and Safety." *Armax Journal,* October 2021

Author. "Guns and Partisan Politics." *Recoil Magazine*, January 2021

Author. "Feminism & Firearms." *Recoil Magazine*, Summer 2020

Author. "Burton Light Machine Rifle." *Recoil Magazine*. October, 2019

Founder/Editor/Author. Arsenals of History Journal, Annual Publication, 2018 - Present

Author. "It's Complicated: The Short Answer to Firearms, Museums and History. *Journal of the Early Republic – The Panorama*, September 2018.

Contributor. "Firearms Curator Roundtable" *Technology & Culture Journal*, August 2018

EXHIBIT 1

Author. "Displaying the 'Politically Incorrect.'" *CLOG X Guns*: Chicago, IL, September 2017

Author. "Does History Repeat Itself? The Smith & Wesson LadySmith." *CLOG X Guns:* Chicago, IL, September 2017

Author. "Renovating the Cody Firearms Museum." *International Committee of Museums and Collections of Arms and Military History Magazine.* Issue 17, May 2017. Pg. 38 - 41

Author. "Renovating the Cody Firearms Museum." *American Society of Arms Collectors Journal*. Fall 2016.

Author. "Glock Exhibit Opening." *Glock Magazine.* Bang Media. Annual 2017

Author. "The 28 Most Notable Guns from Remington's 200-Year History." *Outdoor Life Magazine*. Bonnier Corporation, 2016

Author. "Cassie Waters: Businesswoman of the Old West." *Guns of the Old West.* Harris Publications, Spring 2016

Author. "Making History: GLOCK Pistols at the Cody Firearms Museum" *Glock Magazine.* Harris Publications. Annual 2016

Author. "Pocket Pistols: 10 Seminal Guns from the Past 300 Years." *Pocket Pistols.* Harris Publications. 2016

Author. "The Gun that Won the Western and the Unforeseen Stars of *Winchester '73*" *Guns of the Old West.* Harris Publications.

Author. "Frontier Profile: Jedediah Strong Smith" *American Frontiersman*. Harris Publications

Author. "Frontier Legend John Johnston." *American Frontiersman.* Harris Publications

Author. "The Guns of John Johnston." *American Frontiersman.* Harris Publications

Author. "Annie Oakley VS Lillian Smith: A Female Sharpshooter Rivarly." *Guns of the Old West.* Harris Publications, Spring 2015

Author. "Icons and Has-beens." *American Handgunner*. FMG Publications, 2014

EXHIBIT 1

Author. "Triggering Memory: American Identity in *Cowboys and Aliens*." *Points West.* Spring 2012

Author. "Unloading the Six-Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts." *Points West*, Fall 2011.

**Columns:**

Author. Old School Series. *Recoil Magazine*

Author. Flashback. *Concealment Magazine*

Author/Brand Ambassador. *The Bourbon Review.*

Author. *American Association for State and Local History*. Summer 2019

Author. "Weird West: Fact or Fiction" *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications)

1st Assault Rifle

Colt VS Winchester Revolver

Did Winchester Really Win the West?

Oliver Winchester's Lever Action Shotgun

Remington Cane Gun

Author. "Cowboy Action Round Up." SHOT Show New Products. *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications). 2015, 2016, 2017

**Reviews:**

Reviewer: Edited by Jonathan Obert, Andrew Poe, and Austin Sarat. Oxford: Oxford UniversityPress, 2018. *Journal of Technology & Culture*, Fall 2019

Author. "Everybody Loves an Outlaw: Taylor's Outlaw Legacy Revolver Series." *Guns of the Old West.* Harris Publications

EXHIBIT 1

APP. 705
17cv1017

Reviewer: Richard Rattenbury. *A Legacy in Arms: American Firearms Manufacture, Design and Artistry, 1800-1900. Chronicle of Oklahoma*, Spring 2016


**Selected Blogs & Vlogs:**

Recoil Magazine

Weekly video series beginning October 2017 to Present

Dillon Precision
                    Historical Videos on Ammunition (Upcoming)

Outdoor Life
            Top 10 Guns in American History
            Guns of the Old West: 10 Iconic Firearms and the Legendary Men (and Women) Who Shot Them
            13 of the Biggest Gun Fails in Recent Firearms History
            Gun of the Week:
            John Martz Luger
            Apache Revolver
            German Frei Pistol
            King Louis XV Embellished Blunderbuss
            Armalite AR-17 Shotgun
            Getting the Christmas Goose with a Goose Rifle & Cutaway Suppressor
            Mossberg Brownie
            Wesson & Leavitt Belt Revolver
            William Harnett and the Faithful Colt 1890
            Winchester Model 1894 Lever Action Rifle
            Ruger Semi-Automatic Pistol, 1 of 5,000
            Herb Parson's Winchester Model 71 Lever Action Rifle
            Lincoln Head Hammer Gun
            American Trap Gun
            Browning Brother's Single Shot Rifle Patent
            Feltman Pneumatic Machine Gun
            U.S. Springfield-Allin Conversion Model 1866 Trapdoor Rifle
            Winchester Wetmore-Wood Revolver
            Webley-Fosbery Automatic Revolver
            Hopkins & Allen XL3 Double Action Revolver
            DuBiel Modern Classic Rifle
            Colt Model 1877 "Thunderer" Double Action Revolver
            Tom Tobin's Colt Model 1878 Frontier Revolver

EXHIBIT 1                                                    APP. 706

17cv1017

Walch 10-Shot Double Hammers Pocket Revolver

Winchester Model 1887, Serial No. 1

Deringer vs Derringer

The Forgotten Winchester 1873 of Great Basin National Park

Range 365

To the One Who Got Away

Gun Review: New Glock 19 Gen 5

Ain't She a Pistol? 10 Historic Gun Ads Featuring Women

National Shooting Sports Foundation

The Gun Vault:

Winchester 1873 Found in Great Basin National Park

Col. Jeff Cooper's Colt MK IV Series 80

500+ Year Old Firearms, Matchlocks, Flintlocks

U.S. Presidents Guns

Cross Dominance Shotgun

Herb Parson's Winchester Model 71 Rifle

Audie Murphy's Colt Bisley Revolver

4 Gauge Winchester Wildfowler

Pocket Pistols

Henry Ford's Winchester Model 1887 Lever Action Shotgun

Tom Knapp's First Gun

Buffalo Bill Cody's Winchester 1873

Colt Model 1861 Navy Serial No. 1

Cassie Waters' Hopkins & Allen XL3 Revolver

Glock 17

The Truth About Guns

Presidential Presentation Rifles

Factory Cut-Away M16A1

1854 Smith & Wesson Repeating Rifle (Serial Number 8)

Winchester World's Fair Model 1866 Deluxe Sporting Rifle

Raymond Wielgus Collection

Gastinne-Renette Muzzleloading Percussion Target Pistols

Oliver Winchester's Jennings Repeater

Henry Ford's Winchester Model 1887

Winchester Model 1866 Musket in .44 Rimfire

English Wheellock

Southern Belle American Longrifle

Annie Oakley's Model 1892 Smoothbore Rifle

Catherine the Great of Russia's Blunderbuss Gift to King Louis XV of France

Color Case-Hardened GLOCK 43: Merging the Old West with the New

Buffalo Bill Center of the West – Unloading the Myth

EXHIBIT 1                                    APP. 707
17cv1017

The Cody Firearms Museum – Yesterday, Today, and Tomorrow
Guns of the Week – Christmas List
Guns of the Week: December 15-19
Guns of the Week – The Cody Firearms Museum
Guns of the Week – German Firearms
Guns of the Week – Scheutzenfest
Guns of the Week – Air Guns
Guns of the Week – Early Firearms Law
Guns of the Week – October 13-17
Guns of the Week – Ingenious Engineering
Guns of the Week – Remington – Smoot
Guns of the Week – September 22-26; 15-19; 8-12
CSI: Firearms Museum Edition
Confessions of a Gun Historian
Art Guns: Aesthetics Over Function?
What Good's a Gun Without a Firing Pin?
Gun Installations, Trials & Tribulations
A True Test of Marital Trust and Love
Remembering Tom Knapp
Cody Firearms Museum Goes Hollywood
When Will My Firearms Go On Display
What's Your Cody Firearms Museum
To Vlog or Not to Vlog
We Don't Just Have Old Guns in Our Museum: SHOT Show 2014
Taking a Staba at Displaying More Guns
"Hi Yo Silver" Cook Away! Lone Ranger Display
The Shooting Wire
Winchester's 150th Anniversary Website
Remington's 200th Anniversary Website

EXHIBIT 1
APP. 708
17cv1017

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF ASHLEY HLEBINSKY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 1**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

**APP. 709**

**DECLARATION UNDER PENALTY OF PERJURY OF TOM GIVENS**

Tom Givens, under penalty of perjury, deposes and states as follows:

1. My name is Tom Givens. I am giving this declaration in support of the Plaintiffs' reply to the District of Columbia's opposition to application for preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. Since 1996 I have operated Rangemaster, a firearms training company. I began teaching defensive firearms use in 1975 on a part-time basis, and began teaching full time in 1996.

3. Doing business as Rangemaster, I conduct training all over the United States. In 2022, I conducted courses in Pennsylvania, Texas, Arkansas, South Carolina, Georgia, Tennessee, Florida, West Virginia, North Carolina, Iowa, Louisiana, and Ohio.

4. I have been retained as a Firearms Expert in cases in Federal Courts in Alaska, Kansas, Tennessee, and Illinois. I have served as an Expert Witness in these matters in state courts in Illinois, Alaska, Ohio, Mississippi, and Tennessee.

5. I have been paid by the government to conduct training for the FBI Firearms Training Unit at the FBI Academy in Quantico, VA; for the Drug Enforcement Administration's firearms instructor cadre for South Florida; for the US Marine Corps High Risk Personnel program's cadre; and for multiple military units.

6. I have graduated from numerous defensive firearms training courses, including
NRA Law Enforcement Firearms Instructor School
NRA Law Enforcement Tactical Shooting Instructor School

**APP. 710**

FBI Police Firearms Instructor School
Gunsite, API 499
And many others.

7. I have been asked to provide my opinion concerning the utility for lawful purposes of what the District of Columbia refers to as high-capacity ammunition feeding devices, defined as an ammunition feeding device with a capacity in excess of 10 rounds. This designation is not a standard firearms term, however, as discussed below.

8. A "standard capacity magazine" is the magazine the firearm was designed to use, and which originally was shipped in place in the firearm when the factory shipped the firearm to a dealer. In the case of handguns designed for personal defense, some examples would include:
The Glock 17, originally designed and shipped with 17 round magazines;
The Glock 19, originally designed and shipped with 15 round magazines;
The Smith & Wesson M&P, originally designed and shipped with 17 round magazines,
The SIG P365 Macro, a very compact self defense pistol, originally designed and shipped with 17 round magazines;
The Springfield Armory Prodigy, originally designed and shipped with a 17 round magazine;
The Wilson Combat SFT9, originally designed and shipped with a 15 round magazine;
The Walther PDP, originally designed and shipped with 18 round magazines;
and the Springfield Armory XD-M, originally designed and shipped with 16 round magazines.
There are many others, but the point is that these are the standard capacities for these handguns, all of which are 9mm pistols designed for personal defense.

9. In these listed examples, the pistol is shipped from the factory with one of these "standard capacity" magazines inserted in the pistol, plus one or more additional magazines in the same box/case.

10. Magazines for one of those listed pistols, with a capacity less than that original design, are properly referred to as "reduced capacity magazines". A 17 round magazine for a handgun designed to function with a 17 round magazine, is not a "high capacity magazine", it is a "standard capacity magazine".

11. In the case of the self defense pistols listed above, there are available 10 round magazines. In my observation and experience in watching thousands of rounds fired through these magazines in classes I have taught or attended, these reduced capacity magazines are not nearly as reliable as the originally designed standard capacity magazine. To fit into the pistol, lock in place, and feed, these reduced capacity magazines have to remain the same dimensions externally. Thus, capacity is reduced by blocking the inside of the magazine. I have seen numerous reliability issues with these reduced capacity magazines. Since the self defense pistol is an emergency piece of life saving equipment, compromising its reliability compromises the user's survivability.

12. The days of law enforcement officers routinely shooting fleeing suspects are long over in this country. At present, in law enforcement the pistol is seen as a last ditch emergency piece of life saving equipment, deployed to defend against a potentially lethal assault by a criminal suspect/assailant. Therefore, virtually every law enforcement agency in the US, including the District of Columbia, issues/authorizes pistols with magazines that hold 15-18 rounds of ammunition. The private citizen faces these exact same suspects/assailants, but without the luxury of body armor, direct radio contact with back-up officers, a long gun in a car rack, and armed partner(s). The armed citizen is truly on his/her own.

**APP. 712**

13.     The purpose of the standard capacity magazine is not to allow the user to shoot more. It's purpose is to sustain the user with an operable pistol long enough to get to the end of the incident without having to reload. Using regular concealed carry equipment and clothing, even a highly skilled and highly trained shooter needs around 3 seconds to reload an empty semiautomatic pistol, utilizing a pre-loaded spare magazine. In a close range defensive shooting, having an empty, thus inoperable, handgun for 3 seconds is essentially the same as being unarmed. In that 3 second time period, the defender cannot fire his weapon. In that same 3 second time period, the attacker can fire numerous shots or close the distance and strike with an impact or bladed weapon. The purpose of the standard capacity magazine is not to let one shoot more, it is to have to reload less.

14.     In my book, <u>Concealed Carry Class,</u> the statement that the magazine is not part of the pistol has been taken out of context by the District of Columbia. I was trying to have the reader understand that magazines are a consumable, non-permanent part of the pistol. To practice defensive shooting , a user needs multiple magazines. Magazines wear as they are used, and at some point become unserviceable. At that point they must be replaced. The user should have magazines that are dedicated to defensive use/carry, to ensure their reliability, and other magazines dedicated to training and practice, where they will sustain more wear.

15.     The magazine is the only part of the pistol that is routinely removed by the user. It is removed from the pistol every time the handgun is unloaded or reloaded. It is however, still very much a part of the pistol, as the pistol cannot function without the magazine. This is why every major manufacturer ships the pistol with a magazine in place in the magazine well of the pistol. The semiautomatic pistol is not really fully assembled without a magazine in place, so it is shipped with a magazine in place. There may be one or more additional magazines in the box/case with the handgun, but there will be a magazine in the handgun when it is shipped for sale. All promotional photographs of handguns in catalogs, print advertising,

and other media will show a magazine in place in the pistol, so that the consumer can see the fully assembled, ready for action state of the handgun.

16.     As stated earlier, the standard capacity magazine does not allow one to shoot more, it allows one to continue defending himself if more than a few shots are required. In my observation of many, many private citizen self defense shootings, hits to non-involved parties are very rare. Private citizen self defense shootings are not the running gun battles, with suspects and officers moving and maneuvering while firing at each other, that produce a lot of misses. Private citizen self defense shootings, however, often do involve two or even more armed assailants, and those assailants may include gang members, mentally unstable persons, and persons heavily under the influence of alcohol or illicit drugs. These factors make more rounds in the self defense pistol extremely desirable, and perhaps the difference between life and death. This is why common self defense pistols are supplied by the factory with 15-18 round magazines.

17.     In sum, magazines holding in excess of 10 rounds have been in use for almost one hundred years. They are commonly possessed and used by private citizens and law enforcement officers alike. They are an integral part of an emergency life saving equipment system. Without the magazine the pistol was designed to use, its utility and value as an emergency piece of life saving equipment is diminished, placing the user at higher risk of injury or death in a self defense event.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

Dated:   December 11, 2022                    *Tom Givens*

                                            Tom Givens

## DECLARATION UNDER PENALTY OF PERJURY OF BRETT HARNISH

Brett Harnish, under penalty of perjury, deposes and states as follows:

1. My name is Brett Harnish. I am composing this declaration in support of Plaintiffs' reply to the District of Columbia's opposition to the application for a preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. My relevant background. I served approximately six years active duty in the United States Marine Corps, and approximately two additional years of service in the Active Reserves. I served as an enlisted Marine in the infantry and as a commissioned officer in artillery. I then worked as a United States Border Patrol Agent for approximately six years. Following that I worked as a police officer for the Town of Herndon, Virginia, for approximately seven years. I currently work for a federal government law enforcement agency as a firearms instructor. I've held that position for almost four years. I have almost twenty-five years of professional firearms experience.

3. Since 2020 I have operated Justified Defensive Concepts, LLC (JDC). JDC provides safe, effective, professional firearms training to law abiding United States citizens looking for legitimate defensive firearms training. JDC offers training for safety, performance, competition, hunting, and legally justified use of firearms for self-defense. JDC is incorporated in Virginia as a limited liability company.

4. Prior to my founding of JDC, I worked as the lead firearms instructor for Green Ops, another firearms training company located in Northern Virginia. I worked for Green Ops for more than five years. Between JDC and Green Ops, I have provided realistic and safe firearms training to thousands of law-abiding United States citizens without incident. During my work for the government, I have trained thousands of law enforcement and military personal. A common thread through all my employment is that I have earned and worked in the job classification of firearms instructor in all the above listed work experiences (this includes the Marine Corps, the Border Patrol, Herndon Police Department, and my current employment). In sum, I have more than twenty years of experience as an operational firearms instructor for law enforcement and military professionals as well as for conscientious and diligent private individuals.

**APP. 715**

5. I have been asked to provide my opinion regarding the utility for lawful purposes, including self-defense, of what the District of Columbia refers to as "high-capacity ammunition feeding devices, defined as ammunition feeding devices with a capacity to hold in excess of 10 rounds of ammunition. That designation is not a standard firearms term, as referenced below.

6. There are standard capacity magazines, which are the magazines manufacturers supply with a new firearm. These standard capacity magazines often are capably of holding significantly more rounds than ten rounds. In fact, many of the bestselling pistols today can hold fifteen or more rounds of ammunition. This has been true for quite a significant amount of time. The Browning High Power Pistol has been in the United States commercial market since 1954 and has a capacity of fifteen rounds. The Mauser C96 Broomhandle which had an ammunition feeding device of ten rounds was commercially available in the United States in 1901. Variants of that firearm had the capability of accepting magazines holding in excess of 10 rounds. Capacity is not the driving force in firearm manufacture and selection. Technology and capability are and will remain so. Capability and capacity, however, go hand in hand as additional capacity positively reflects on capability. If technology could facilitate larger capacity magazines in common sized pistols, it would happen. The widespread market acceptance of the Sig Sauer P365 is a prime example of this. Sig Sauer was able to design a relatively small size pistol with significant capacity. The small size of the pistol allows for more easily concealing the firearm, yet provides significantly more ammunition capacity than comparably sized guns. End users wisely want more capability, including capacity. Technology has been the engine of change through the history of firearms development.

7. The Beretta  M9 was adopted by the United States Armed Forces as the official service pistol in 1985. The Beretta M9 or commercially the Beretta 92 has a standard capacity of fifteen rounds in the magazine. Many other popularly sold pistols in the United States have offerings in defensive use pistols that are at least fifteen rounds of ammunition capacity or more. Glock, Sig Sauer, Smith & Wesson, Walther, Heckler & Koch, and Ruger are but some of the quality manufactures that sell pistols in the United States with standard capacities of fifteen, seventeen, or more rounds.

8. A consideration about utility. Pistols are not generally great stoppers of the human body, particularly the human body of a violent criminal actor

**APP. 716**

performing an illegal act of extreme violence amped up on adrenaline, alcohol, drugs, or rage. More than often, it will take several well-placed shots to stop a violent criminal actor from furthering their determined act of illegal interpersonal violence. Legal use of force is permitted for self-defense or defense of others. Force is applied to stop threats. One threat is not necessarily stopped by one bullet. It can and often does require several well-placed shots to put a stop to a violent criminal actor's potentially lethal or seriously harmful assault. That is just one threat. Several threats of violent criminal actors can be involved simultaneously. A firearm with the capacity to address multiple threats is certainly prudent; it may even be downright necessary to effectively stop multiple violent criminal actors. Criminals can, and certainly do work in pairs or even larger groups to achieve their illicit objectives. News reports are awash concerning such incidents.

9. Pistols with the capacity to hold ten rounds, or more than ten rounds, have been common for well over sixty years. That type of pistol is selected by law enforcement and military agencies in the United States for the practicality and performance they provide to the organization, but more importantly the capability they provide to the end user. When faced with a life threatening violent attack, good people want and deserve a good option to stop a criminal act of deadly violence. Pistols holding more than ten rounds in their ammunition feeding device are in common use in this country for self-defense and other lawful purposes. This type of pistol with this type of ammunition feeding device has been in common use in the United States for more than seven decades. The reason why is obvious. A quality reliable pistol with more than fifteen rounds of ammunition in it is 1) a strong deterrent, and 2) an effective tool to stop a violent criminal attack.

10. Law enforcement agencies and the Armed Forces of the United States have made weapon acquisitions on the criteria mentioned above for at least the last thirty-seven years. Why wouldn't a prudent and well-informed law-abiding United States citizen do the same? In my experience as a certified firearms instructor and law-abiding business owner, they do. The most often used pistols in my classes are Glock, Smith & Wesson, Sig Sauer, Heckler & Koch pistols chambered in 9mm and having ammunition capacities of at least fifteen rounds. The Glock 19 (fifteen round standard magazine capacity) and the Glock 17 (seventeen round standard magazine capacity) are by far the most popular firearms I see in my classes.

11. In conclusion, pistol magazines (or ammunition feeding devices) of capacity that exceed ten rounds are both common and extremely practical for

**APP. 717**

legitimate self-defensive purposes. In my experience magazines of fifteen rounds or more are extremely common and are in general widespread use. Those uses are for far more than just lawful self-defense. Competition, hunting, and recreation activities drive millions of Americans to regularly use firearms. In 2021, more than 18 million firearms and billions of rounds of ammunition were legally sold in the United States in legitimate interstate commerce. This commerce benefits the preservation of wildlife through the Pittman-Robertson Act. One of the bestselling pistols is the Glock 19. The Glock 19 has a standard magazine capacity of fifteen rounds. Pistols that have ammunition feeding devices are not merely popular for the ammunition capacity, but more so for the significant capability they provide to the individual user.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information, and belief.

Dated: _January 3rd, 2023_          _Brett Harnish_

                                     Brett Harnish

4

**APP. 718**

**DECLARATION UNDER PENALTY OF PERJURY OF JOHN MURPHY**

John Murphy, under penalty of perjury, deposes and states as follows:

1. My name is John Murphy. I am giving this declaration in support of the Plaintiffs' reply to the District of Columbia's opposition to application for preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. My background is as follows. I served 10 years in the United States Marine Corps as an infantryman, security specialist and intelligence analyst. After that I was employed by the Defense Intelligence Agency for 15 years, serving as terrorist weapons and tactics analyst.

3. Since 2007 I have operated FPF Training providing defensive firearms training to the public. And since retiring from the government, FPF Training has been my full-time vocation. FPF Training offers training in handguns, shotguns, and emergency medical treatment of traumatic injuries, including injuries one might receive in a criminal assault.

4. Although FPF Training is headquartered in Virginia, I provide training throughout the United States. Beside various courses in Virginia, I currently have courses scheduled for the first half of the 2023 in the following states: Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Maine, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Texas and Utah. For a detailed listing of courses available through FPF Training, please see our website: www.fpftraining.com. I also host some of the Nation's top firearm instructors at our Northern Virginia locations, including Tom Givens, Massad Ayoob, Cecil Burch, Wayne Dobbs, Greg Ellifritz, John Hearne, Tim Kelly, Karl Rehn and Tatiana Whitlock.

5. I have been asked to provide my opinion concerning the utility for lawful purposes of what the District of Columbia refers to as high-capacity ammunition feeding devices, defined as ammunition feeding devices with a capacity in excess of 10 rounds. That designation is not a standard firearms term, however, as discussed below.

**APP. 719**

6. There are standard capacity magazines, which are the magazines that manufacturers supply with a new firearm. For example, the extremely popular Glock 19 compact handgun comes standard with 15 round magazines. The full-size Glock 17 handgun, standard issue to DC Police, comes standard issue with 17 round magazines. There are also what is often called California compliant magazines, which are limited to 10 rounds and are thus legal within the District of Columbia. There are also magazines produced capable of holding more rounds than those magazines normally supplied with a stock firearm. An example might be the 30 round stick magazine made by ETS for the Glock 9 mm series, including the Glock 19 and 17 discussed above. Similarly, AR-15 variant rifles come standard with 30 round magazines. However, AR-15 compliant magazines holding 40, 60 or even 100 rounds are available, though often having reliability issues. The District nonetheless restricts the handful of citizens who legally own AR-15s to 10 rounds.

7. Standard capacity magazines, including those holding more than 10 rounds, are used and useful for a variety of legal purposes. From my experience and observation they are overwhelmingly used by my students and students in classes I have attended in the course of self-defense training. In a typical class most students will come with a firearm capable of holding more than 10 rounds. In our classes we will have students shoot several hundred rounds a day. Having adequate capacity allows students to train at a high pace without having to spend substantial downtime reloading magazines. Additionally, while some students will come to class with many magazines, other students may have only the two or three magazines that come with the firearm. Restricting firearm owners to magazines holding only 10 rounds thus adversely affects their ability to train at their maximum capable level. Similarly, my experience and observation is that magazines holding in excess of 10 rounds are routinely used for target shooting and marksmanship training at public ranges.

8. From my experience and observation, magazines holding more than 10 rounds are widely carried in public for self-defense by licensed concealed carriers. I agree with noted firearms instructor Tom Givens that the *minimum* magazine size for concealed carry should be 10 rounds and that larger capacity magazines are to be preferred. I carry a Glock 48 equipped with a 15 round capacity magazine.  This is because based on my study of the subject, criminal

2

**APP. 720**

assaults often are conducted by multiple assailants, assailants fortified by alcohol and stimulants such as cocaine and PCP, and increasingly assailants are wearing body armor. Pistol bullets have limited stopping power compared to rifle rounds and shotgun ammunition.  There are documented instances of criminal assailants taking multiple hits and continuing their attack. Although the average amount of rounds fired in self-defense is usually less than 10, generally only two or three, we cannot prudently assume that the situation we find ourselves in will comport with the average. Additional rounds in the gun are an important insurance policy in the event of multiple attackers, chemically fortified attackers and attackers using body armor. Where lives are at risk in a criminal assault, it is not the odds that are important, it is the stakes.

9.  The idea that magazines holding more than 10 rounds are most useful in the military or in a law enforcement context does not imply they are not useful for civilian self-defense. The assailant a citizen faces in a criminal attack is the same person law enforcement is tasked to arrest. Moreover, with respect to the military, most soldiers and marines do not even carry handguns, but rather fully automatic machine guns, such as the M-16 rifle or the M-4 carbine. In any event, as the preamble to the Second Amendment makes clear, a primary byproduct, if not purpose, of an armed populace is protection of freedom from external and internal threats. So such magazines are certainly useful for the maintenance of an armed citizenry available for militia service in the event needed to assist in combating an invasion or insurrection. Although the core of the Second Amendment is individual self-protection, the preamble to the amendment makes clear this civic purpose as well.

10. Having multiple magazines, although a good idea, is not a substitute for adequate magazine capacity. One of the reasons for that is that persons often get shot in the hand or arm in the course of a gun fight. Once they have lost the use of a hand or arm, reloading one handed is a time consuming process, assuming the victim has even learned to perform one-handed reloads. Every second his or her gun is out of action is a time when he or she is rendered defenseless while being shot, stabbed, bludgeoned, stomped, or stuck by an assailant or group of assailants. Even if both hands are functional, reloading could be problematic if the victim is physically entwined with his or her attacker(s) as will often be the case in a robbery, rape or beatdown.

**APP. 721**

11. This is an especially important issue for home defense. A homeowner awakened at night needs several pieces of equipment, including the firearm, telephone and a flashlight. That is already three items for two hands. Adding a fourth item such as a spare magazine becomes problematic. The homeowner is likely to be wearing night clothes with no pockets, or even less. There is likely not going to be a place where he or she is going to be able to carry spare ammunition.

12. Moreover, many persons who carry guns for self-protection do not carry spare magazines or cannot easily access a spare magazine. Think of the lady wearing a dress needing to carry her firearm in a separate compartment of her purse. Digging around for a spare magazine after having expended the capacity of her firearm could be a serious problem.

13. Standard capacity magazines and larger capacity magazines are also often used in shooting competition matches, such as those put on by the International Defensive Pistol Association and the United States Practical Shooting Association. These competitions help instill skills that are beneficial to keeping people alive in the event of a criminal assault.

14. There are other lawful uses for magazines in excess or 10 rounds, including for varmint control on farms and ranches, admittedly not something of high relevance to the District of Columbia, but nonetheless a widespread and lawful use of such items.

15. In sum, magazines holding in excess of more than 10 rounds are used and useful for self-defense and other lawful purposes. My experience and observation is that they are widely possessed and used for these lawful purposes by firearm owners throughout the Nation.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

Dated: *12 Dec 2022*

John Murphy

4

**APP. 722**

**DECLARATION UNDER PENALTY OF PERJURY OF GREG ELLIFRITZ**

Greg Ellifritz, under penalty of perjury, deposes and states as follows:

1.     My name is Greg Ellifritz. I am making this declaration for submission in Case Number 22-cv-2256, *Hanson v. District of Columbia* (D.D.C.).

2.     I am a retired police officer, having served 25 years with the Upper Arlington, Ohio police department.  During my tenure, I spent 13 years as the full-time tactical training officer for the department.  In that training position, I was responsible for developing and instructing all of the in-service training for our 55-officer agency.  In addition to the training position, I also served as patrol officer, firearms armorer, bike patrol officer, bike patrol coordinator, sniper, and field training officer during the course of my career.

3.     I also instructed classes at the Tactical Defense Institute for 17 years and served as a lead instructor for TDI's ground fighting, knife fighting, active shooter, impact weapons, and extreme close quarters shooting classes.

4.     I hold instructor, master instructor, or armorer certifications in more than 80 different weapons systems, defensive tactics programs, and law enforcement specialty topics.  In addition to these instructor certifications, I have successfully completed more than 4,000 hours of documented formal training with the leading firearms, empty hand fighting, and edged weapons instructors in the country. My training resume is attached herewith as Exhibit A and my CV is attached herewith as Exhibit B.

5.     Additionally I served as an adjunct instructor for the Ohio Peace Officer's Training Academy, teaching firearms, defensive tactics, bike patrol, knife defense, and physical fitness topics.  I have also taught firearms and self defense classes at the national and international level through The American Society of Law Enforcement Trainers, The International Association of Law Enforcement Firearms Instructors, The Rangemaster Tactical Conference, and The Ohio Association of Chiefs of Police.

6.     I have a master's degree in Public Policy and Management with a research focus on criminal justice policy issues. I have written for several publications and websites including: "*The Firearms Instructor,*" "*Ohio Police Chief,*" "*Combat Handguns,*" Survivalblog.com," "*Concealed Carry Magazine,*" Primedia's "*Personal & Home Defense Annual,*" "*Recoil Magazine,*" and "*American Handgunner.*"

**APP. 723**

7.     Currently, I am a full time citizen defensive trainer, teaching classes across the country

8.     I have previously testified as an expert witness in the following cases:

> State of Ohio v. Sgt. Aaron Bolton (Erie County Ohio Court of Common Pleas)
>
> State of Ohio v. Officer Peter Burke (Cleveland Municipal Court)
>
> Summit County Ohio Metroparks v. Ranger Jeff Axner (administrative action)
>
> Wauseon PD v. Sgt, Kaleb Torbet (administrative action)

9.     I am also the author of the Amazon best-selling book *Choose Adventure- Safe Travel in Dangerous Places.*

10.     I have been asked to comment on certain matters raised in the Hanson case including citation to my 2011 article on handgun stopping power.

11.     ECF page 31 of the amicus brief submitted by the Brady organization cites my study that concluded that on average all defensive caliber ammunition required two rounds to incapacitate an assailant. From this statement Brady concludes that more than 10 rounds are not necessary for self-defense. Brady's conclusion poorly interprets the data in my study.  My study only tracked hits, meaning rounds that impacted the assailant.  It is true that most attackers stopped aggression after between two and three total hits. However, I did not track how many rounds the defenders fired to get those hits.

12.     A widely accepted statistic is that current police officers only hit with 30 percent of the bullets they fire.  No one tracks the percentage of hits achieved by armed citizens. Some think the citizen hit rate is a little better than police because the encounters generally happen at closer distances than police gunfights.  Others think that citizen hit rates are not as good as those of the police because they usually have less firearms training.

13.     If we held that the police and armed citizens hit at the same rate, the defender in my study likely fired an extra 2-3 rounds for each hit..  If we do the math, two hits plus 4-6 likely misses quickly depletes a 10-round magazine.  We know that almost half of violent attacks involve more than one

**APP. 724**

attacker. Mathematically, a person firing at this rate would run out of ammunition in a 10-round magazine before the second attacker is incapacitated.

14.    Brady also (at ECF page 28) discusses a study of incidents reported in the NRA's Armed Citizens columns conducted by firearms instructor Claude Warner reporting that few incidents involved more than 10 rounds fired by the armed citizen. I am familiar with that study and would suggest that selection bias is a factor as it relates to any conclusion as to the need for more than 10 rounds for defensive carry.

15.    The Armed Citizen column is a compilation of short summaries of news incidents reported in the media. To keep the incident descriptions brief enough for the article format, it is likely that the editors of that column had to exclude any gunfights that are complex or difficult to describe. Those gunfights would likely have had more rounds fired.

16.    In addition, reference to the Armed Citizen column will show that almost all of the armed citizen reports are of armed citizen "wins." Very few bad outcomes are ever cited. Thus, we don't know how many rounds the losers of those gunfights fired. More evidence of selection bias.

17.    In my career as a firearms instructor, I have taught an estimated 728 civilian firearms classes with thousands of students, ranging from introductory classes to advanced classes. Based upon my observation, with the exception of revolver classes where magazines are not employed, the majority of my students use magazines holding in excess of 10 rounds. So the assumption that magazines holding in excess of 10 rounds are not used or useful for armed self-defense is simply false.

18.    In addition, from my personal observation and experience magazines holding more than 10 rounds are widely used for other lawful purposes including target practice and competition.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: _12/15/22_                     _____
                                      (Greg Ellifritz)

Exhibit A

# TRAINING BY TYPE

"*" *DENOTES INSTRUCTOR-LEVEL TRAINING*

## FIREARMS AND TACTICS (LIVE FIRE)

Ohio Peace Officers Training Academy

- Firearms Instructor (Revolver, Semi-Auto pistol and Shotgun) *

- Carbine/Assault Weapon Instructor *

Singleton International

– Benelli Shotgun Instructor *

- MP-5 /UMP /Colt SMG /M-4 /M-16 Instructor *

Glock- Firearms Instructor Certification *

Strike Tactical (Henk Iverson)- Close Quarter Gunfight Survival Instructor *

Tactical Defense Institute

- Level 2 Handgun

- Level 3 Handgun

- Tactical Rifle I

- Tactical Rifle II

- Partners Tactics Class

- Precision Rifle I

- Concealed Carry Handgun


Defense Training International (John Farnam)

- Basic Defensive Handgun

- One-Handed Defensive Shooting

- Close Contact Fighting


Practical Shooting Academy (Ron Avery)

- Advanced Handgun Skills

- Tactical Handgun Skills


ASLET- Post-Shooting Procedures

**APP. 726**

Front Site- Introduction to the Submachinegun

Suarez International- Urban Combative Carbine

NRA LE Division- Tactical Shooting from Unconventional Positions

Columbus Police Department

- Basic SWAT School
- Police SWAT Sniper Course

Lethal Force Institute (Massad Ayoob)- Wounded Officer Return Fire

ASAA (Chuck Taylor)- Advanced Handgun Tactics

ATSA- National Tactical Invitational and Conference

Sigarms/Langdon Tactical- Handgun Performance Under Stress

Hoffner's Training Division- Ultimate Shotgun Training

Dave Spaulding's Handgun Combatives Training

Rob Leatham's Handgun Speed Shooting (repeated 2 times)

Shivworks- Extreme Close Quarters Concepts Levels 1-2

Trident Concepts (Jeff Gonzales)- Shooting on the Move

Chuck Klein- Instructing Instinctive Shooting Techniques *

Mike Janich- Point Shooting Progressions

LouKa Tactical- Understanding and Training the Female Shooter *

Northeastern Tactical (Michael de Bethencourt) - Secrets of the Concealed Carry Snub

Handgun Combatives- Optimal Snubby Skills with Ed Lovette

Sentinel Concepts (Steve Fisher)- Essential Carbine Employment

Keepers Concealment- AIWB Skills

TMACS (Pat MacNamara)- TAPS Pistol/Carbine-

Rangemaster

- Instructor Development Certification*
- Advanced Pistol Instructor*
- Defensive Shotgun
- Master Instructor Certification*

KR Training- Historical Handgun

Tactical Response Surgical Speed Shooting Summit*

FPF Training Street Encounter Skills and Tactics

**APP. 727**

**FIREARMS AND TACTICS (CLASSROOM)**

ASLET

- Current Issues in Firearms Training

- Gun Fitting for Female Officers

- Current Issues in Firearms Training

- Forensic Analysis of FBI Miami Gunfight

- Tactical Anatomy For Firearms Instructors

OPOTA

- Weapon Training and Requalification Instructor-*

- School Shooting Response

- School Shootings Prevention, Response, and Mitigation

Defense Training International

- Training Challenging Shooters

- Current Trends in Equipment and Firearms Training

Police Policy Studies Council

- Questionable Police Shootings

- Concealed Carry Instructor Development *

FBI- Advanced Firearms Instructor Training *

FAA- LE Flying While Armed Instructor *

CPD SWAT- Quick Action Deployment (Repeated 3 times)

Anchorage, AK Police Dept.- Analysis of Anchorage Sniper Shootings

FCSO- Wound Ballistics Workshop

Blauer Tactical Systems- SPEAR System as Related to the Gunfight

Strategos International- Prevailing in Low Light Conditions

Portland PD- Street Level Officer Rescues

Lasermax- Laser Sights for Liability Reduction

DEA- Active Vehicle Containment Measures

Westerville PD- Wound Ballistics Workshop

Shaykhet- "Shoot the bad guy while you dodge the bullet"

FLETC- Preparing Officers for the Aftermath of a Shooting

Rangemaster

    -How and Why Our Students Continually Win Fights

    - Active Killers

OPS- Tactical Eclecticism

ATK Ammunition- Wound Ballistic Workshop

KR Training

    - Handgun Shooting and Human Performance Factors

    - Correcting Common Shooting Errors

Firearms Safety LLC- Designing Partner Training Drills

Shivworks- Experiential Learning Lab (Repeated 3 times)

FPF Training- Street Encounter Skills

Agile Tactical- Ammunition Selection for Short-Barreled Handguns

Hardwire Tactical- "What Really Matters"

Vortex- All About Optics

Trident Concepts- Reducing Range Risk

Tim Herron Shooting- Throttle Control and Shot Calling


**<u>DEFENSIVE TACTICS</u>**

Columbus Police Department

    - Controlled Force

    - LAPD Arrest and Control System


OPOTA

    - Weapon Retention/Shot Avoidance

    - Defensive Tactics Instructor *

    - Defensive Tactics Instructor Groundfighting Update Workshop *


Modern Warrior

    - Tactical Jaw and Limb Control (Repeated 3 times)

    - Firearms Retention and Disarming


**APP. 729**

- Confronting Multiple Assailants
- Firearms Alternative Survival Tactics

Krav Maga

- Combatives, Gun Retention and Disarming Instructor *
- Gun Defenses and Third Party Protection

Scientific Fighting Congress -

- Close Quarter Combat Seminar
- Gun Arm Grappling

RAD Systems- Basic Physical Defense Instructor *

TCM

- SPEAR Defensive Tactics
- The Human Weapon and the Economics of Violence
- Confined Space Combatives

ASLET- CLAMP Defensive Control Technique

TDI- Close Quarters Personal Control (Repeated 3 times)

NLETC- Lateral Vascular Neck Restraint Certification

ACM- Drawn Handgun Control Tactics

Strategos- Physical Conflict Resolution

FCSO- Cell Extraction Training

ApplePitt- Critical Combative Concepts

ARMA- Handcuffing Tactics and Liabilities

Shivworks- Managing Unknown Contacts (repeated 4 times)

Sharp Defense

- Weapon Retention and Disarms
- Multiple Opponents

Aprill Risk Consulting- Open Source Weapons Disarms (3X)

Immediate  Action Combatives

- Surviving the Knock Out Game
- Combative Use of the Choke

**APP. 730**

**GROUND FIGHTING**

Armor Holdings- Master Ground Defense Instructor *

Modern Warrior- Tactical Groundfighting Instructor *

RRB- Ground Stalling Tactics for Law Enforcement

Gracie Jiu-Jitsu (Royce Gracie)

- Law Enforcement Ground Fighting

- Advanced Ground Fighting

ASLET- Comprehensive Ground Defense Training

SODCS (Frank Shamrock)- Ground Control for Law Enforcement

1-on-1 Control- Cold Weather Ground Fighting

Krav Maga- Groundfighting and Edged Weapon Defense

FVTC- Enhanced Ground Handgun Retention

Danger Zone (Dan Severn)- LE Ground Fighting Seminar

OPOTA- Downed Officer Groundfighting Instructor-*

Relson Gracie- JiuJitsu Streetfighting Self Defense Seminar

Chitwood Brothers- Street Groundfighting


**EDGED WEAPONS**

American Bando Association (Dr. Gi) - Emergency Knife Defense

West Coast Academy (Steve Tarani)- Edged Weapons I

Tactical Defense Institute- Defensive Knife Class (Repeated 3 times)

Spyderco (Bram Frank) - Defensive Folding Knife

COMTECH (James Keating)- Defensive Knife Training

USA BANDO (Kevin Martin)- Knife Defense Class (Repeated 2 times)

COBD- Law Enforcement Knife Defense

Mike Janich    - Counter Blade Concepts Seminar

                    - Basic Defensive Knife

Shivworks      - In Extremis Knife

                    - Edged Weapons Overview

**APP. 731**

Kelly Worden- Wortac Knife Seminar

Steve Moses- Developing Defensive Knife Skills for Female Students

MDTS- Practical Small Knife Skills


**<u>INTERMEDIATE WEAPONS</u>**

OPOTA

- Individual Chemical Repellant Instructor *

- Specialty Impact Munitions Instructor *

- Distraction Devices Instructor *

- Conducted Energy Device Instructor *

ASP- Tactical Baton Instructor *

Taser International- Advanced Taser Instructor *

Spyderco MBC- Martial Stickcraft

Taser International M-26 and X-26 and X-26C Taser Instructor *

 FNH- FN 303 Less Lethal Launcher Instructor *

ASLET

- Current Issues with Non-Lethal Alternatives

- Less-Lethal Panel of Experts

Pro-Systems- Mini Baton Instructor *

Martial Bladecraft- Self Defense with Improvised Weapons

Talon Group- Close Quarter Impact Weapon Instructor *

CTS- Flashbang and Stingball Instructor *

TASER- Taser Training and Product Update

SABRE- Law Enforcement O.C. Instructor *

Modern Warrior- High Efficiency Low Profile Baton Instructor *

UAPD- X2 Taser Operator Training

Point-Driven Training- Saps and Jacks

**GENERAL INSTRUCTIONAL SKILLS**

OPOTA-

- Instructor Training Course *

- Confrontation Simulations Training Instructor *

ASLET

- Training and Equipping Female Officers

- Preventing Training Injuries and Death

- "Affective" Law Enforcement Training

- Understanding Gender Physiological Differences in Training

RedMan Training- Red Man 101 Instructor Certification *

LSE- Use of Force Instructor Training Symposium *

ILEETA- Deadly Force Training Expert Panel Discussion

Ohio EMA- Exercise Controller Training

CPD- Instructor Update Training *

GTS- Safe Dryfire Instructor *

FLETC- Designing Stress Exposure Training

Firearms Safety LLC- Tactical Decision Making Exercises for Armed Citizens

DVC Targets- Performance Under Fire: Myths, Realities, and Optimization (Repeated 2 times)

Citizens Safety Academy- Effective Assistant Instructors


**TERRORISM, ACTIVE KILLERS, and EMERGENCY RESPONSE**

OPOTA

- Police Response to Weapons of Mass Destruction

- Terrorism Overview

- Weapons of Mass Destruction Awareness


Ohio Attorney General's Conference-

- Ohio Homeland Security Issues

- Terrorism and Weapons of Mass Destruction

**APP. 733**

ASLET

- Responding to Terrorism

- Tactical Emergency Medicine for Terrorist Incidents

- Counter-Terrorism for Patrol Officers

Columbus Police Department.

- Domestic Terrorism Response

- Responding to the Suicide Bomber

- Understanding the Terrorist Threat


New Mexico Tech EMRTC-

- Response to Terrorist Bombings Instructor *

- Understanding and Planning for School Bomb Incidents

- Prevention and Response to Suicide Bombings Instructor*


Archangel Group-

- Responding to School Violence- Beslan School Incident Debrief

- Multiple Terrorist Doctrine Training

- Terrorist Attack Strategies


Kentucky Dept. of Public Health-

- Bioterrorism Awareness Training

- Introduction to Terrorism


ILEETA-

- Fighting Terrorism on the 4th Generation Battleground

- Terrorism Intelligence and the Role of Law Enforcement

- Active Threat Response- Lesson from Mumbai

- Preparing for the Coming Terrorist Threat

- Preventing/Surviving a Large Disturbance

Loveland PD- Terrorism Identification and Interdiction


**APP. 734**

FBI National Academy- Fundamentals of Terrorism

Explosive Devices Technology- Bombs, Bomb Threats, and Explosive Devices

MSA- Gas Mask Fit Testing

OCPA- Terrorism Awareness and Prevention Train-the-Trainer *

Defense Intelligence Agency- Lessons Learned in the War on Terrorism

SUNY Albany- Terrorism, Preparedness, and Public Health

Triple Canopy- Techniques and Tactics of International Terrorists

State of Ohio- Ohio Homeland Security Symposium

OACP- Managing Crisis- Lessons Learned from the Amish School Shooting

LSU- Prevention and Deterrence of Terrorist Acts Instructor *

Team One- Disaster Survival Planning for Instructors *

OTOA- "Active Assailants" Conference

Last Resort Training- Active Killer Response

- Riot and Protest Survival- Repeated 2x

FBI

- Terrorism on the Street

- School Violence Threat Assessments

ASERO- Emerging Trends in Suicide Bombing

Sageman Inc.- The Terrorist Neo-Jihad in the West

UAFD- Protective Respirator Fit Testing Instructor *

ARMA Training- Dynamic Breaching Instructor *

Seal-Tac- Terrorist Methodology and Interdiction Tactics

Rangemaster

- The Active Shooter in the USA

- Surviving the Extreme Event

Dr. Martin Topper- Urban Terrorism

DIA- Global Jihadist Trends

**APP. 735**

**ARMORER TRAINING**

Glock- Glock Armorer Training (Repeated Four Times)

Smith and Wesson- Basic Autopistol Armorer

BenelliUSA- Benelli Shotgun Armorer Training (Repeated 2 times)

Colt- M-16, AR-15, and SMG Armorer (Repeated 2 times)

Springfield Armory- XD Pistol Armorer

FNH- FN 303 Less Lethal Launcher Armorer

Remington- 870 Shotgun and M700 Rifle Armorer

ILEETA- Maintaining and Upgrading AR-15/M-16 Rifles

Remington- Model 700 Rifle Armorer

Smith and Wesson- M&P Armorer

Rangemaster- Inspection and Maintenance of Weapons and Support Gear

AGI- Glock Armorer's Course


**OFFICER SAFETY AND SURVIVAL**

Calibre Press- Street Survival

Calibre Press- The Win

OPOTA- Police Involved Shootings

Killology Research Group- The Bulletproof Mind

ASLET- Behavioral Science and Officer Survival

Modern Warrior- Thinking Like a Cop Killer

H&K- Successful Female Officer Survival Training

ASLET- I'm Shot! Lessons Learned

NRA LEAD- Finish The Fight!

US Secret Service- Characteristics of Armed Individuals

FSRC- Dynamics of Police Shootings

ILEETA- Officer Safety Training for the Future

Agile Training- Excited Delirium

**APP. 736**

## LEGAL TOPICS

Ohio CLE- OMVI Law

ASLET- Preparing to be an Expert Witness

Ohio AG Office- Conference on Law Enforcement

OPOTA- Legal Update Seminar

    - Concealed Weapons Legal Overview

    - Civil Liability for Police Officers

CPD- Terry Stops and Fourth Amendment Issues

LAAW- Legal Parameters of Intermediate Force

Ohio Ethics Commission- Ohio Ethics Law Update (Repeated 2 times)

State of Ohio- OVI Legal Update Training

UA City Attorney- Legal Update Training (Repeated 6 times)

ILEETA- Legal Aftermath of Police Use of Deadly Force

Means LLP- Best Practices in Law Enforcement Training

Ohio Ethics Commission- Ohio Ethics Laws

Massad Ayoob Training Group

    - Lessons Learned from Recent Cases- Repeated 4x

    - Expert Witness Testimony

    - Unconventional Wisdom: Why Some Defenses Fail

    - Explaining Controversial Acquittals

    - Deadly Force Instructor*

Rangemaster- Traveling Under the LEOSA and HR 218

ATSA- Legal Justification and Training Models

Force Science- Force Science Analyst Course

## GENERAL SUBJECT MATTER

OPOTA

- Intro to Criminal Occult Activity-
- Special Issues in Domestic Violence Investigations
- Companion Animal Encounters
- Procedural Justice and Police Legitimacy
- 21st Century Policing
- Arrestee DNA Data Collections
- "Blue Courage"
- Responding to Missing Children

ASLET
- Lessons from the Diallo Tragedy
- Outlaw Motorcycle Gangs

Ohio Law Enforcement Training Center- IPMBA Police Cyclist

FCSO- Domestic Violence Update Training

UAPD- Ohio Basic Jailer Certification

ACIM- Missing Children Response for Patrol Officers

OSU- Crime Prevention through Environmental Design

OAG Conf- Lethality Assessment in Domestic Violence Cases

FCMC- Strangulation in Domestic Violence Incidents

On Point Tactical- Forensic Tracking

Covey- 7 Habits of Highly Effective Police Officers

Ontario Police College- Preventing Sudden In-Custody Deaths

FSRC- Current Use of Force Research

FCSO- Adult Gang Education Seminar

MCTFT- Body Language and Interview Techniques

ILEETA- Rapid Threat Recognition

Zulawski- Criminal Interview and Interrogation

Firearms Safety Training- Developing a Family Protection Plan

Bluff Dale Academy- Setting up a Church Security Program

LockSport- Basic Lock Picking Class

Reid Inc. Criminal Interview and Interrogation

**APP. 738**

Aprill Risk Consulting

- Fatal Choices- What We Know about Victim Selection (Repeated 3 times)

- The Five Ws of Risk

- Psychological Survival for Hostages

- Developing a Personal Risk Assessment Plan

Prepper Depot- Preparing for Things other than Violence

KR Training- Historical Handgun Trends


## CULTURAL DIVERSITY AND HUMAN RELATIONS

PATC- Street Spanish

CITY OF UA- Cultural Diversity Training

NCTC- Spanish for Law Enforcement Level I

Command Spanish- Spanish, Building Bridges, Saving Lives

UAPD- Project Lifesaver Certification

OPOTA

- Financial Exploitation of the Elderly

- Fraud against Seniors

- Awareness of Human Trafficking

- Responding to Human Trafficking

- De-escalating Mental Health Crises

- Victim's Rights Training

- Helping the Victim through Understanding Trauma

- Understanding Islam

- Trauma Informed Policing

TEDX- Smart and Simple Ideas for Building Community

BRC- Human Energetic Connection Workshop

Caliber Press- "De-Escalation for Public Safety"

DIA- Personal Security During Foreign Travel

FSI/Lexipro- De-escalation- When and How to Make it Work

Lexipol- "Responding to Suicidal Subjects" webinar

**APP. 739**

Citizens Safety Academy- The Changing Face of the Firearms Industry

Jay Co- LE De-escalation for Civilians- 1 hour

## FITNESS AND HEALTH

OPOTA

    - Physical Fitness Specialist *

    - Managing Law Enforcement Stress

STT- Peak Performance Training

UMBC- Basic Critical Incident Stress Management

Ohio Attorney General's Conference- Managing Police Stress

ASLET- Fitness and Nutrition for Law Enforcement

LouKa Tactical- Sports Vision Training Exercises

Coretactix- Exercise Selection, Workout Structure, and Stretching Techniques

Velocity Fitness- Practical Police Kinesiology Instructor *

Tactical Strength Inc- Tactical Joint Mobility Exercises

Tactical Athlete Training- Functional Kettlebell Training

SETCAN- Tactical Fitness Instructor *

KBC- Level One Fitness and Kettlebell Instructor *

Crossfit- Level 1 Fitness Instructor *

Chad Waterbury- Strength, Muscle, and Power Training

## MEDICINE

Team Spartan- Emergency Trauma Management Instructor *

Gables Group

    - Tactical Law Enforcement First Aid Instructor *

    - Prevention and Treatment of Police Training Injuries

    - Best Practices for LE Emergency Medical Training

**APP. 740**

TDI- Field Emergency Medicine Training (repeated 5 times)

DEA Emergency Self-Aid and Buddy Care for Instructors

Rangemaster

      - Combat Trauma Care for First Responders

      - Immediate Trauma Care for Fight Injuries

Lone Star Medics

      -   Field and Tactical Medicine Conference- (2x)

      -   Preparing for Medical Emergencies on the Range

      -   Emergency Airways

Techline Trauma- Tom Maniken Trauma Lab

The People's Dentist

      - Disaster Dentistry

      -Improvised Trauma Care

Patriot Nurse- Medical Preparations

IPICD- Recognizing Agonal Breathing and Other Breathing Problems

The Human Path- Plant Medicine and Herbal First Aid

SpiritQuest Sanctuary- Amazonian Plant Medicine- 32 hours

                         -Andean Plant Medicine- 32 hours (2X)

ETS Consulting- Foot and Ankle Injuries

PEP- Medical Intensive Cadaver Lab (2x)

Optimum Vision- Dealing With Eye Injuries

FEMA- "You are the help until help arrives" training

ART- "Lend a Paw" Pet First Aid (4X)

SUNY Public Health- Preparedness and Response to Pandemics

Medical Corps- Medical Care in Hostile Environments Class

UAFD- CPR and AED Certification (multiple times)

OPOTA- Naloxone Administration Certification

Herbal Medics Academy- Botany for Herbal Medicine

The Laceration Course- Comprehensive Laceration Management

**TRAFFIC LAW ENFORCEMENT**

FCSO DWI Detection and SFST

OSHP Electronic Speed Measuring Devices

LEC- BAC Data Master Senior Operator

ODPS- Hardcore Drunk Drivers' Summit (2X)

LEMVI- Mobile Videotaping

EMS- Professional Traffic Stops Instructor *

OPOTA- Pursuit Intervention Techniques

NHTSA- SFST Refresher Training

Stop Stick- Tire Deflation Device Instructor *

OLC- LTI Ultralight Laser Update

OPOTA- New OH-1 Crash Reporting Guidelines

**COMPUTERS**

New Horizons- Beginning Excel

OPOTA- Internet Child Sexual Exploitation

City of UA- Armada Computer Software Train the Trainer *

Visionair- Paperless Reporting Software Training

Deadline Online- Using the Internet for Investigations

UAPD

      - Internet Predator Awareness Training

      - Livescan Fingerprint Computer Software Operator

VanBroklin- Officers on the Information Superhighway

Nighthawk Training- Using Modern Technology to Enhance Personal Security

BeKnow- Computer Security Threats

**DRUGS**

FCSO- Street Smart Drug Trends Training

OPOTA- Designer Drug Update for Patrol Officers

OSU- Drug Selling Among High School Students Seminar

SARNCO- Substance-Related Sexual Assault

Street Training Group- Recognizing Rave and Street Drugs

Project GHB- Current Drug Trends

FCSO- Project Street Smart Drug Recognition

OPOTA- Drug Identification and Field Testing

BRC- Navigating Altered States

Zendo- Psychedelic Harm Reduction Strategies


**FEMA EMERGENCY MANAGEMENT TRAINING**

FEMA- IS-003- Radiological Emergency Management

FEMA- IS-15- Special Events Contingency Planning

FEMA- IS-100- Incident Command for Law Enforcement

FEMA- IS-200- Incident Command for Initial Action Incidents

FEMA- IS-230 Principles of Emergency Management

FEMA- IS-235- Emergency Planning

FEMA- IS 239- Training Exercise Design

FEMA- IS-240- Leadership and Influence

FEMA- IS-241- Decision Making and Problem Solving

FEMA- IS-242- Effective Communications

FEMA- IS-244- Developing and Managing Volunteers

FEMA- IS-301- Radiological Emergency Response

FEMA- IS-362- Multi-Hazard Emergency Planning for Schools

FEMA-  IS-700- National Incident Management Systems

FEMA- IS-800- The National Response Plan

FEMA- IS-00907- Active Shooter

**APP. 743**

## DECLARATION UNDER PENALTY OF PERJURY
## OF CLAUDE WERNER

Claude Werner, under penalty of perjury, deposes and states as follows:

1.      My name is Claude Werner. I am making this declaration in support of Plaintiffs' reply to opposition submissions made to Plaintiffs' application for preliminary injunction in the case of *Hanson v. District of Columbia,* Case No. 22-cv-2256 (D.D.C.).

2.      I am a retired U.S. Army officer, having served in Airborne, Ranger, Special Forces, and Mechanized Infantry units, including commanding a Special Forces A-Team and Bradley Infantry Company. I served in Special Forces for some 10 years.

3.      I trained in firearms instruction for seven years at the elite Rogers Shooting School and subsequently served as Chief Instructor at Rogers for five years. The Rogers Shooting School is known as one of if not the top firearms training school in the nation. I hold NRA instructor certifications in Basic Pistol, Rifle, and Shotgun; Personal Protection In The Home; Refuse To Be A Victim; and Home Firearms Safety. I operate a firearms training company, Firearms Safety Training LLC, the focus of which is on concealed carry and home defense training. I have presented at many self-defense training conferences including the annual Rangemaster Tactical Conference and the Mid-Atlantic Tactical Conference. My CV is attached to this declaration.

4.      I have written extensively on self-defense topics, including five books: Concealed Carry Skills and Drills; Indoor Range Practice Sessions; Shooting Your Black Rifle; Serious Mistakes Gun Owners Make and Real Shootouts of the LAPD. Via my website, *The Tactical Professor*, I write on various self-defense topics, including police and citizen self-defense incidents.

5.      I was formerly an active competitive shooter. I hold International Defensive Pistol Association ("IDPA") Master ratings in Stock Service Revolver, Stock Service Pistol, Enhanced Service Pistol, and Custom Defensive Pistol. I served as IDPA Area Coordinator for Georgia and Alabama and as match director for Georgia State Championship in years 2000, 2001 and 2002.

**APP. 744**

6.     A brief submitted by the Brady organization suggests that plus 10 magazines are not used (perhaps they mean useful) for self-defense because the average number of rounds fired by a citizen defender when a citizen defender fires a gun in response to a criminal attack is two rounds. That conclusion is at least partly based on my study of reports from the NRA Armed Citizens column. A number of logical flaws pervades Brady's assertion.

7.     First, my study was conducted of 1997-2001 reports contained in the Armed Citizens column. So the first issue is that the study is dated. Crime patterns have increased in the meantime, the number of persons carrying firearms for personal protection in public has increased substantially, and it is likely that citizen/criminal engagements patterns have changed as well.  One example, would be the number of multiple assailant attacks. My analysis showed 36 percent of incidents reported in the Armed Citizen column during the period involved multiple assailants, ranging from two to seven. Data I am familiar with indicates some 50 percent of criminal assaults now involve multiple assailants.

8.     Second, as I stated in my analysis, the Armed Citizens column by its nature focuses on positive outcomes; my analysis therefore did not present a view of the totality of armed self-defense in that non-positive outcomes were not available for inclusion in the database. We don't know how many rounds may have been fired in non-positive outcomes.

9.     Third, beyond the type of firearm used by the citizen for his or her defense, i.e., revolver, pistol, shotgun or rifle, there was very little data as to the ammunition capacity of the citizen employed firearm presented in the Armed Citizen reports. Therefore there is little we can say as to the number of rounds that were actually in the citizen's gun when he or she was faced with a criminal assault. If we assume a distribution of firearms and magazines used by the citizens in those incidents was proportional to the distribution of firearms and magazines within the U.S. civilian population, which would be a reasonable and logical assumption, a substantial number of citizen defenders would have used plus 10 magazines. If we were doing the study today using current data, the percentage of citizens using plus 10 magazines would be even higher due to the increase of the number of such magazines since 1997.

**APP. 745**

10.     Fourth, that on average two rounds were fired to stop the attack in the reported incidents, says absolutely nothing about the use (or usefulness) of plus 10 magazines for self-defense. Brady's view that magazines with capacity greater than 10 rounds are not used for self-defense because in the average self-defense incident only two rounds are fired, is fallacious. The average citizen defensive gun use involves *no rounds* fired. Using Brady's logic one could conclude that it is not necessary to have any ammunition capacity at all to use a gun for self-defense; unloaded guns would be good enough for almost all situations. By that logic one could conclude that ammunition is not protected by the Second Amendment because it is not necessary for self-defense. That conclusion is absurd on its face because there are in fact situations where shots need to be fired to stop a criminal attack. Likewise, as noted in my study there were situations where citizens fired more than 10 rounds and incidents where citizens needed to reload their firearms.

11.     Besides instances of self-defense, plus 10 magazines are used and useful for other lawful purposes, such as training and shooting sports. At the Rogers Shooting School we supplied all the equipment to students in our Basic/Intermediate handgun classes. The pistols we supplied to students had the standard capacity magazines that came stock with the pistols. These were plus 10 round magazines. We did so to allow them to train at the high pace our classes required. In our intermediate/advanced classes, where students brought their own firearms, students overwhelmingly brought and used plus 10 magazines.

12.     From my extensive experience in IDPA matches, students in the pistol class competitions also overwhelmingly used standard capacity magazines holding more than 10 rounds, and in many cases magazines holding rounds in excess of the standard capacity magazine supplied with their pistols.

13.     I am personally familiar with most of the top civilian firearm instructors in the U.S. I know of no instructor who encourages his or her students to use magazines of 10 rounds or fewer, or who discourages the use of standard capacity magazines holding more than 10 rounds.

14.     The District of Columbia asserts in its brief that plus 10 magazines are most useful for police and military, that assertion suggesting that such magazines are not therefore useful for citizen self-defense. Even if the predicate to that statement is true, and that is not at all clear, the District's conclusion is another

**APP. 746**

logical fallacy. That something is most useful for one purpose, does not imply it is not useful for another purpose. The use of the word "most" belies the implication that such magazines are not used and useful for self-defense. My experience is that they are. From a military perspective most the soldier's primary weapon is his or her rifle, overwhelmingly being a select-fire automatic weapon such as an M-16 rifle or M-4 carbine. The average soldier is not even issued a handgun. The average citizen defender on the other hand overwhelmingly used a handgun in the incidents I studied from the Armed Citizens column and in instances I have reviewed since I wrote that article.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.


Dated: <u>January 8, 2023</u>                    *Claude Werner*
                                    _____
                                            Claude Werner

**APP. 747**



# METAL MEETS 2022.



# NEW S&W® CSX™ PISTOL

**The New CSX Micro-9 Pistol Brings the Feel of All Metal** and 12+1 capacity. Our flat faced trigger ensures consistent finger placement for accuracy and repeatability. CSX – the ultimate in everyday carry.



**Smith & Wesson®**

**EMPOWERING AMERICANS™**

**smith-wesson.com**

©2022 Smith & Wesson, Inc. All Rights Reserved.

APP. 748



# RUGER MAX-9


**9MM LUGER**
Caliber


**10+1 12+1**
Capacity


**3.20"**
Barrel Length

**18.4 OZ.**
Weight



The MAX-9™ is Your Next Handgun™. Whether you're new to firearms ownership, or you've been an enthusiast for years, the versatile MAX-9™ is sure to meet your personal protection needs. Comfortable enough to conceal in an inside the waistband holster or pocket holster, this micro-sized pistol has it all - without compromising on capacity or features. Rugged, reliable, affordable - the Ruger® MAX-9™.

**COLION NOIR,**
Firearms Enthusiast

**RUGER®**
RUGER.COM/MAX-9



# DEFENDING YOUR FAMILY.
# DEFENDING YOUR HOME.™

**Protecting loved ones and neighbors is a high calling.** Over the last few years, men and women of all walks of life have chosen to exercise their Second Amendment rights as first-time gun owners. Through education and training, families and communities are empowered to protect themselves and those around them. At Daniel Defense, we advocate for the individual's right to bear arms. That's why we manufacture the highest quality, 100% American-made firearms backed with a lifetime warranty.



WORLD-CLASS FIREARMS
DESIGNED & MANUFACTURED
IN BLACK CREEK, GEORGIA, USA

DANIELDEFENSE.COM



DANIEL DEFENSE®
» FREEDOM. PASSION. PRECISION. «



## DECLARATION UNDER PENALTY OF PERJURY OF AMY SWEARER

Amy Swearer, under penalty of perjury, deposes and states as follows:

1.      My name is Amy Swearer. I am a Legal Fellow at the Heritage Foundation, where I run the organization's Defensive Gun Use Database. The bulk of my scholarship in recent years has focused on the Second Amendment and gun policy. I am giving this declaration in support of the application for preliminary injunction filed by Plaintiffs in the case of *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256 (D.D.C.).

2.      On November 30, 2022, a conglomerate of gun control groups filed a brief as *amici curiae* before the court in *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256, in support of defendants' opposition to plaintiff's application for a preliminary injunction.[1] In this brief, hereinafter referred to as the "Brady Brief," the gun control groups reference two recent articles I authored as part of a monthly series on defensive gun use that has been published by *The Daily Signal*, the multi-media arm of the Heritage Foundation, since 2019. The brief states, in relevant part, that:

> Even advocates of the permissive use of firearms have acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for defensive purposes. For example, recent compilations by The Heritage Foundation's *The Daily Signal* of national reports on defensive gun use cases reflect that **none** involved the use of anywhere close to ten rounds of ammunition.[2]

3.      At best, the Brady Brief's characterization of my monthly articles on defensive gun use is recklessly lazy and wrongly attributes to myself and my employer, the Heritage Foundation, a policy position that neither of us holds. At worst, it constitutes an intentional effort to deceive the federal court with blatantly misleading claims about my defensive gun use research at the Heritage Foundation. I strongly condemn this attempt by prominent gun control groups to misconstrue our

---

[1] Brief of Amici Curiae Brady et al., In Support Of Defendants' Opposition to Plaintiffs' Application For A Preliminary Injunction, *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256 (D. D.C. Nov. 30, 2022).

[2] *Id*. at 21.

**APP. 752**

policy position on the civilian need for standard capacity magazines and to perpetuate falsehoods about my research.

4.      Far from having "acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for defensive purposes," my research on the whole shows that civilians—just like the law enforcement officers who are universally exempt from these restrictions, including while off-duty—sometimes need more than ten rounds of ammunition to successfully defend themselves. While such cases likely do not constitute a majority of defensive gun uses, either by civilians or law enforcement officers, in those cases where more than 10 rounds are needed, the ability to fire those rounds without the need to reload can be the difference between life and death or serious injury. Those cases often involve a defensive gun user who is outnumbered by multiple armed assailants, or who is engaged in a sustained gunbattle with a heavily armed assailant.

5.      Importantly, my monthly articles provide nothing close to a comprehensive accounting of every defensive gun use that occurs in a given month—a point that is made quite clear in the articles themselves, which remind readers that almost every study on the issue has found that Americans use their firearms between 500,000 and 2.5 million times a year. The series is intended to provide a snapshot of the thousands of cases in our Defensive Gun Use Database, and highlights at most only a fraction of the media-verified cases compiled in any given month.[3] Cases for these monthly articles are chosen to a large extent based on aesthetic factors, like ensuring that featured cases are somewhat evenly spaced throughout a given month and are geographically diverse.

6.      It is in no way reasonable to conclude that if one of my monthly articles does not include an example in which a defensive gun user fired more than ten rounds, then no such cases occurred. Ironically, the September 2022 article to which the Brady Brief cites perfectly illustrates this point. Missing from that article (which covers cases from August 2022) is an August 19, 2022, defensive gun use in Williamsport, Pennsylvania, by a concealed carry permit holder who fired

---

[3] *See Defensive Gun Uses in the U.S.*, THE HERITAGE FOUNDATION (updated Dec. 12, 2022), https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us/.

**APP. 753**

"approximately 18 rounds" at an armed robber.[4] This defensive gun use was not highlighted in the monthly roundup, but it was included in the Heritage Foundation's interactive database and featured on the database's official twitter account.[5]

7.     The Heritage database does not currently track specific features like the number of rounds fired defensively, and my experience with compiling media-verified defensive gun uses in general is that media reports rarely include such specific information. However, even after only a cursory review of our database to find examples of where that information is provided or can be inferred, it is clear the Williamsport case is far from the only instance in which a defensive gun use involving more than ten defensive rounds being fired did not make it into the monthly highlight article. In my March 2022 article, for example, I did not highlight a February 22, 2022, defensive gun use in Richmond, Kentucky, in which a man fired at least 19 rounds during a shootout with an intruder who had just killed the man's daughter.[6]

8.     The authors of the Brady Brief also apparently assume that if a media report (or my summary of the media report) does not explicitly state that a defensive gun user fired more than ten rounds, then it could not have occurred. True, it is sometimes evident from the broader context that fewer than ten rounds were fired, or at least that such an event was unlikely. Other times, however, this assumption is entirely unwarranted. This includes two cases featured in the articles to which the Brady Brief cites, which the brief far too easily dismissed as involving "nowhere close" to the firing of ten rounds in self-defense.

9.     In the August 16, 2022, case in Lexington, South Carolina—featured in my September 2022 article—both the assailant and the defensive gun user sustained multiple gunshot wounds during an exchange of gunfire inside the defensive gun

---

[4] John Beauge, *Pa. Man Shoots Teen Multiple Times After Having Gun Drawn on Him: Police*, PENN LIVE (Aug. 21, 2022, 10:05 p.m.), https://www.pennlive.com/crime/2022/08/pa-man-shoots-teen-multiple-times-after-having-gun-drawn-on-him-police.html.

[5]     @DailyDGU,     TWITTER     (Aug.     24,     2022,     10:02     AM), https://twitter.com/DailyDGU/status/1562440111274729475.

[6] Krista Johnson & Hayes Gardner, *Jordan Morgan's Death: Suspect Shannon Gilday Arrested in Madison County*, COURIER JOURNAL (Updated Feb. 28, 2022, 1:23 p.m. ET), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/.

**APP. 754**

user's home.[7] As far as I can discern, law enforcement did not release details to the public concerning the number of rounds fired during the shootout. The broader context of this defensive gun use, however, is one in which it is more than plausible for the defensive gun user to have fired more than ten rounds. Much like the defensive gun user in the Richmond, Kentucky case mentioned above, the defensive gun user here was involved in what appears to have been an intense gunbattle with a heavily armed opponent, where both parties would have had ample opportunity for defensive cover.

     10.    Similarly, a June 16 incident in Hopkinsville, Kentucky (featured in the July 2022 article cited by the Brady Brief) includes language and circumstances making it entirely plausible for the defensive gun user to have fired more than ten rounds. That elderly homeowner was involved in a shootout with three armed intruders who fired at him first, and the most detailed articles I can find says merely that the homeowner "returned shots."[8] Unless the authors of the gun control brief have information to which neither I nor the original journalists are privy, there is no reasonable basis to conclude that the homeowner could not have, or in fact did not, fire more than ten rounds in self-defense in a gunfight with multiple assailants.

     11.    This type of scenario—and indeed, scenarios in which it is almost certain that the defensive gun user fired more than 10 rounds—are so commonly featured in the monthly articles that the authors of the Brady Brief must have gone out of their way to ignore any articles that did not fit the misleading narrative they wished to convey. For example, my May 2022 article featured a Florida gun owner who used three different firearms to defend himself during an April shootout.[9] While

---

[7] *Man Was Justified In Killing Man Who Broke Into His Lexington Home, Prosecutors Determine*, WLTX NEWS 19 (Updated Aug. 23, 2022, 6:13 PM EDT), https://www.wltx.com/article/news/local/mallard-lakes-lexington-sc-shooting-death-update/101-5a68bf5e-7c4c-46f6-8a33-57555e9bb6fb; Jordan Lawrence, *Man Killed In Invasion of His Sister's Lexington Home*, LEXINGTON CHRONICLE (Aug. 16, 2022, 4:56 pm), https://www.lexingtonchronicle.com/stories/man-killed-in-lexington-home-invasion,25581.

[8] John Godsey, *Third Suspect in June 16 Home Invasion Taken Into Custody*, WKDZ RADIO (June 30, 2022), https://www.wkdzradio.com/2022/06/30/third-suspect-in-hopkinsville-home-invasion-taken-into-custody/news-edge/.

[9] Thomas Mates, *Man Arrested After Shootout In Melbourne Neighborhood*, WKMG NEWS 6 ORLANDO (Apr. 20, 2022, 10:37 AM), http://thf-legal.s3.amazonaws.com/DGU/April%202022/04.08.22_Melbourne_FL.pdf; Amy Swearer, *11 Examples of Defensive Gun Use Dispel NYC Mayor's Concern on Public Carry*, DAILY SIGNAL

**APP. 755**

his first firearm appears to have jammed, it is reasonable to assumed that he moved to his third firearm because he expended all of the ammunition in his second firearm—an AR-15 rifle that commonly comes with 30-round magazines (which are unrestricted in Florida). The odds are therefore very high that this defensive gun user cumulatively fired more than 10 rounds from those three firearms. And during a September 2022 defensive gun use from Chicago featured in my October 2022 article, a concealed carry permit holder in Chicago shot back at gunmen who opened fire on a birthday celebration.[10] While reports do not say for certain how many rounds were fired by either the gunmen or the defensive gun user, so many were fired in total that one witness described initially thinking the gunshots were fireworks.[11]

12.    As with cases explicitly involving more than 10 rounds fired in self-defense, the monthly articles have also omitted plenty of cases where it was statistically probable that the defensive gun users fired more than 10 rounds. Consider a February 2022 incident in Maple Falls, Washington, in which a civilian gun owner fired an entire magazine's worth of ammunition at a gunman while providing covering fire for two wounded sheriff's deputies who were pinned down, allowing them to move to safety and likely saving their lives.[12] While the few readily available media reports on this shootout do not appear to include any information on the defensive gun user's magazine capacity, the prevalence of semi-automatic handguns that use magazines capable of holding more than 10 rounds—as well as the lawful nature of their possession in Washington—make it entirely unreasonable to conclude that the defensive gun user could not have or did not in fact fire more than 10 rounds. Meanwhile, a July 2022 case from Philadelphia involved at least 40

---

(May 17, 2022), https://www.dailysignal.com/2022/05/17/11-examples-of-defensive-gun-use-dispel-nyc-mayors-concerns-on-open-carry/.

[10] Amy Swearer, *Yes, Democrats, Sometimes A 'Good Guy With A Gun' Does 'Stop the Bad Guys.' Here's Proof.* DAILY SIGNAL (Oct. 7, 2022), https://www.dailysignal.com/2022/10/07/12-cases-that-prove-good-guys-with-guns-theory-far-from-over/.

[11] Evelyn Holmes, *Mother Speaks Out After 13-Year-Old Shot In Head In 'Random' SW Side Shooting*, ABC 7 CHICAGO (Sept. 16, 2022), https://abc7chicago.com/chicago-shooting-heart-of-boy-shot-cpd/12234454/.

[12] AJ Janavel, *'I Drop An Entire Magazine': Neighbor Shares Story About Saving Whatcom Co. Deputies*, FOX 13 SEATTLE (Feb. 15, 2022), https://www.q13fox.com/news/i-drop-an-entire-magazine-fox-13-news-talks-to-man-who-helped-save-whatcom-co-deputies.

**APP. 756**

rounds fired between the victim and his three assailants, only one of whom was clearly portrayed in media reports as being armed.[13] It is statistically reasonable, if not highly probable, for the victim to have fired more than 10 of those rounds under the circumstances.

13.    Finally, sometimes the monthly articles include summaries of defensive gun uses that unintentionally omitted relevant information on the number of rounds fired in self-defense. This happened, for example, in the very first article of the series, which was published in January 2019. The summary for a January 20 incident simply noted that a homeowner killed three of four intruders but, likely for purposes of brevity, left out the detail that he fired dozens of rounds during that gunbattle.[14] Similarly, the December 2021 article featured a November 20, 2021, shooting in Philadelphia in which an Uber driver shot and wounded two of three armed robbers, but did not note that video of the shootout indicates that he probably fired more than 10 rounds.[15] As the primary purpose of this monthly article series never has been to compile and showcase every single time a defensive gun user fires more than 10 rounds, it is likely that other articles in this series also contain case summaries inadvertently glossing over such information.

14.    Along those same lines, neither the article series nor the Defensive Gun Use Database provide insight into the number of times that defensive gun uses prove unsuccessful—or are rendered significantly less successful—precisely because a

---

[13] *Cobbs Creek Shootout Leaves Security Guard, Teen Injured; At Least 40 Shots Fired*, 6 ABC ACTION NEWS (Apr. 28, 2022), https://6abc.com/philadelphia-shooting-cobbs-creek-58th-street-baltimore-avenue-shootout-shopping-center/11799170/.

[14] Amy Swearer & Peyton Smith, *The Latest Crime News Provides Evidence In Favor Of Armed Citizens*, DAILY SIGNAL (Feb. 1, 2019), https://www.dailysignal.com/2019/02/01/a-month-of-crime-news-provides-evidence-in-favor-of-armed-civilians/; Travis Fedschun, *Texas Homeowner Shoots, Kills 3 Men and Injures 2 During Home Invasion, Officials Say*, FOX NEWS (Jan. 21, 2019), https://www.foxnews.com/us/texas-homeowner-shoots-kills-3-men-and-injures-2-during-home-invasion-officials-say.

[15] Amy Swearer, *These 12 Incidents of Defensive Gun Use Prove Armed Civilians Make Situations Safer*, DAILY SIGNAL (Dec. 22, 2021), https://www.dailysignal.com/2021/12/22/these-12-incidents-of-defensive-gun-use-prove-armed-civilians-make-situations-safer/; *Uber Driver Shoots 2 During Attempted Robbery In Mayfair, Police Say*, FOX 29 PHILADELPHIA (Updated Nov. 20, 2021 6:19PM), https://www.fox29.com/news/police-attempted-armed-robbery-victim-shoots-suspects-leaving-2-critical-in-mayfair; Active Self Protection, *Uber Driver Absolutely Delivers In Defensive Gun Use*, YOUTUBE (Dec. 7, 2021), https://www.youtube.com/watch?v=UspezjeLN_k.

gun owner is killed or sustains serious injury because he or she was limited to fewer than 10 rounds. Such cases would be equally difficult to research using available media reports for the same reason as cases involving more than 10 rounds fired defensively, but they do clearly occur and would be equally relevant to the policy conversation.[16] And, of course, there are cases that predate the current scope of the Defensive Gun Use Database, which right now only includes cases that occurred on or after January 1, 2019.[17]

15.    In sum, I categorically reject any assertion that I have at any point "acknowledged" that civilians do not sometimes need more than 10 rounds of ammunition to adequately defend themselves. My position, consistent with the research and my experience in compiling defensive gun use cases for the Heritage Foundation, is that bans on the civilian possession of standard capacity magazines can have devastating effects on law-abiding gun owners who find themselves outnumbered, outgunned, or otherwise at a severe disadvantage when defending themselves against criminal elements. It is neither constitutional nor prudent for the government to tie one hand behind the backs of peaceable gun owners, especially when it exempts itself from that same prohibition in a tacit acknowledgement that standard capacity magazines can be incredibly useful and necessary tools when facing criminal threats in a civilian context.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

Dated: January _11_, 2023

_Amy E. Swearer_
Amy Swearer

---

[16] Gary Detman, *Argument Spawns Round of Beers and Gunfire at Florida Bar, 1 Dead*, CBS 12 NEWS (May 4, 2022) (explaining, in the imbedded video, that the victim was fatally shot while reloading his revolver during a gunfight with his assailant), https://cbs12.com/news/local/argument-round-beers-gunfire-haines-city-joshua-badillo-florida-bar-murder-grady-judd.

[17] *See, e.g.*, Garrett Pelican, *Deputies: 30 Rounds Fired From AR-15 In Deadly Florida Home Invasion*, NEWS 4 JACKSONVILLE (Apr. 17, 2018), https://www.news4jax.com/news/2018/04/17/deputies-30-rounds-fired-from-ar-15-in-deadly-florida-home-invasion/; Hailey Winslow & Harrison Barras, *Dozens of Shots Fired At Westchase Apartments*, NEWS 4 JACKSONVILLE (Mar. 13, 2015), https://www.news4jax.com/news/2015/03/13/dozens-of-shots-fired-at-westchase-apartments/.

**APP. 759**

Appendix A

Non-Exhaustive Review of Defensive Gun Uses Likely Involving More Than 10
Defensive Rounds

| Date | Location | Context |
|---|---|---|
| 11/25/2022 | Chickasha, OK | Based on the number of shell casings found inside the home, an armed resident appears to have fired at least 12 rounds at an intruder.[18] |
| 08/19/2022 | Williamsport, PA | A concealed carry permit holder fired "approximately 18 rounds" in self-defense during an armed robbery.[19] |
| 07/11/2022 | Jonesboro, GA | A homeowner investigating suspected prowlers outside of his home engages in brief gunfight with armed assailants. It is difficult to tell from the video exactly how many rounds the homeowner fires based on sound alone, but he fires one warning shot, then fires rapidly an unknown number of times as he backs away, before clearly firing 4 additional rounds. Based on the video evidence of recoil during the rapid burst, it is likely that the homeowner fired more than 10 rounds in total.[20] |
| 04/27/2022 | Philadelphia, PA | An off-duty security guard exchanged fire with three would-be robbers, only one of whom was clearly |

---

[18] Kaylee Douglas & Natalie Clydesdale, *Chickasha Police: Homeowner Shoots, Kills Man Attempting to Enter House*, KFOR (Updated Nov. 15, 2022 10:13 PM), https://kfor.com/news/local/police-investigate-homicide-at-chickasha-home/.

[19] John Beauge, *Pa. Man Shoots Teen Multiple Times After Having Gun Drawn on Him: Police*, PENN LIVE (Aug. 21, 2022, 10:05 p.m.), https://www.pennlive.com/crime/2022/08/pa-man-shoots-teen-multiple-times-after-having-gun-drawn-on-him-police.html.

[20] Eric Perry, *Video Surveillance Captures Homeowner, Burglar Suspects In Shootout In Clayton County*, FOX 5 ATLANTA (Updated July 12, 2022 7:32 PM), https://www.fox5atlanta.com/news/video-surveillance-captures-homeowner-burglar-suspects-in-shootout-in-clayton-county.

| | | identified as armed. Over 40 shell casings were found at the scene.[21] |
|---|---|---|
| 04/08/2022 | Melbourne, FL | A gun owner used three different firearms—including two AR-15 rifles, which presumptively had standard capacity magazines—to defend himself during a shootout with an assailant. While the defensive gun user's handgun jammed, it is likely that he switched to his third firearm because his second firearm ran out of ammunition, and that he fired more than 10 rounds in his own defense.[22] |
| 02/22/2022 | Richmond, KY | A man fired at least 19 rounds from two different handguns [and specifically 11 rounds from the first handgun] during a gunfight with a heavily armed intruder who had just killed his daughter.[23] |
| 02/10/2022 | Maple Falls, WA | An armed civilian fired an entire magazine of ammunition at a gunman while laying down covering fire for two wounded sheriff's deputies, enabling them to get to safety and likely saving their lives.[24] Given the prevalence of handguns with standard capacity magazines and their lawful status in Washington, this likely meant the civilian fired more than 10 rounds. |

---

[21] *Cobbs Creek Shootout Leaves Security Guard, Teen Injured; At Least 40 Shots Fired*, 6 ABC ACTION NEWS (Apr. 28, 2022), https://6abc.com/philadelphia-shooting-cobbs-creek-58th-street-baltimore-avenue-shootout-shopping-center/11799170/.

[22] Thomas Mates, *Man Arrested After Shootout In Melbourne Neighborhood*, WKMG NEWS 6 ORLANDO (Apr. 20, 2022, 10:37 AM), https://www.clickorlando.com/news/local/2022/04/20/man-arrested-after-shootout-in-melbourne-neighborhood/.

[23] Krista Johnson & Hayes Gardner, *Jordan Morgan's Death: Suspect Shannon Gilday Arrested in Madison County*, COURIER JOURNAL (Updated Feb. 28, 2022, 1:23 p.m. ET), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/.

[24] AJ Janavel, *'I Drop An Entire Magazine': Neighbor Shares Story About Saving Whatcom Co. Deputies*, FOX 13 SEATTLE (Feb. 15, 2022), https://www.q13fox.com/news/i-drop-an-entire-magazine-fox-13-news-talks-to-man-who-helped-save-whatcom-co-deputies.

| 11/20/2021 | Philadelphia, PA | An armed Uber driver defended himself against 3 armed carjackers, shooting two of the suspects "several times" each. A surveillance camera captured the incident, and while it is difficult to determine from the audio exactly how many shots the defensive gun user fired (the audio does not appear to match up with the muzzle flashes), a reasonable listener could discern more than 10 rounds, which is consistent with the number of gunshot wounds suffered by the suspects.[25] |
| --- | --- | --- |
| 11/21/2021 | Des Moines, IA | An armed homeowner exchanged gunfire with two intruders, and audio from nearby security cameras indicates at least 15 rounds were fired. Given that the two suspects were injured and fled while the homeowner was unharmed, it is reasonable to conclude that most of those rounds may have been fired by the homeowner.[26] |
| 06/22/2021 | Decatur, GA | When a gunman fatally shot a man in a targeted attack, some of the victim's friends engaged the gunman in a shootout, killing him in what police deemed lawful self-defense. According to reports, more than 50 rounds were fired from four guns, making it likely that at least one defensive gun user fired more than 10 rounds.[27] |
| 05/01/2021 | St. Paul, MN | Two concealed carry permit holders defended themselves against three armed assailants in a |

---

[25] *Uber Driver Shoots 2 During Attempted Robbery In Mayfair, Police Say*, FOX 29 PHILADELPHIA (Updated Nov. 20, 2021 6:19PM), https://www.fox29.com/news/police-attempted-armed-robbery-victim-shoots-suspects-leaving-2-critical-in-mayfair; Active Self Protection, *Uber Driver Absolutely Delivers In Defensive Gun Use*, YOUTUBE (Dec. 7, 2021), https://www.youtube.com/watch?v=UspezjeLN_k.

[26] *Homeowner, Des Moines Police Fire At Armed Robbery Suspects*, KIRO 7 (Nov. 22, 2021 3:54 pm), https://www.kiro7.com/news/local/homeowner-des-moines-police-fire-armed-robbery-suspects/HROO4ZCU3JE4HBD2INX46EG6WI/.

[27] Marc Teichner, *DeKalb County Gas Station Gunfire Leaves 2 Dead, 2 Injured*, FOX 5 ATLANTA (June 23, 2021), https://www.fox5atlanta.com/news/gas-station-gunfire-leaves-2-dead-2-injured.

**APP. 762**

| | | |
|---|---|---|
| | | gunfight from which police recovered "dozens of shell casings," indicating a high likelihood that at least one of the defensive gun users fired more than 10 rounds.[28] |
| 02/20/2021 | Metairie, LA | Nearly 100 rounds were exchanged between an active shooter and seven gun store employees before the gunman was fatally shot. Investigators said the gunman fired 32 rounds, meaning defensive gun users cumulatively fired over 60 rounds. The timeline is not entirely clear but the best available information seems to indicate that the bulk of those rounds were fired by only three or four employees.[29] |
| 02/05/2021 | Summerville, SC | An armed resident of an apartment complex fired 13 rounds at multiple armed suspects who shot at him from the parking lot.[30] |
| 01/18/2021 | Hesperia, CA | A homeowner engaged an armed would-be intruder in a sustained gunfight for 45 seconds. While it is unclear exactly how many rounds are fired, the video evidence and sheer length of the engagement indicates a high probability that more than 10 |

---

[28] Kristi Belcamino, *Seven Injured By Gunfire During A Night Of Shootouts Across St. Paul*, TWIN CITIES PIONEER PRESS (Updated May 3, 2021 12:15 p.m.), https://www.twincities.com/2021/05/02/seven-shot-and-injured-in-st-paul-in-night-of-shoot-outs/.

[29] Neil Vigdor & Christine Hauser, *Gunman Who Killed 2 At Louisiana Gun Store Fired 32 Rounds, Sheriff Says*, NY TIMES (Feb. 22, 2021), https://www.nytimes.com/2021/02/22/us/new-orleans-shooting-joshua-williams.html; Victoria Cristina, *Watch: Surveillance Video Shows Before, During Shootout At Metairie Gun Store*, WGNO (Updated Feb. 23, 2021 8:08 AM CST), https://wgno.com/news/local/watch-live-sheriff-lopinto-provides-update-on-metairie-gun-store-shooting/.

[30] Ray Rivera, *Police Continuing Investigation Into Gun Battle At Summerville Apartment Complex*, LIVE NEWS 5 WCSC (Feb. 8, 2021 10:13 PM), https://www.live5news.com/2021/02/09/police-continuing-investigation-into-gun-battle-summerville-apartment-complex/.

**APP. 763**

| | | defensive rounds were fired.[31] Importantly, the possession of standard capacity magazines was still perfectly lawful on this date, as long as they qualified under a then-existing grandfathering provision. |
|---|---|---|
| 04/29/2020 | Yoder, CO | A hemp farmer engaged in a gunbattle with four armed assailants who likely mistook the farmer's lawful business for an illegal (and often cash-heavy) marijuana operation. Hundreds of shell casings were reportedly found around the home, and while it is unclear exactly how many of these rounds were fired by the hemp farmer in self-defense, the single media report on the incident states that, at the very least, he "emptied an entire magazine" from his handgun.[32] |
| 04/22/2020 | Las Vegas, NV | A concealed carry permit holder fired 11 rounds at an assailant who, seemingly at random, opened fire on the permit holder and another person as they sat eating fast food in a shopping center parking lot.[33] |
| 11/25/2019 | Miami, FL | A concealed carry permit holder living in a van with his girlfriend and son fired "at least 14 rounds" at a man who threatened the family with an AK-47 rifle.[34] |
| 05/14/2019 | Tallahassee, FL | An armed homeowner engaged in a shootout with four armed intruders who broke into his home after |

---

[31] Jose Quintero, *Hesperia Shootout Suspect Pleads Not Guilty to 5 Felonies*, VICTORVILLE DAILY PRESS (Jan. 22, 2021), https://www.vvdailypress.com/story/news/2021/01/22/hesperia-shootout-suspect-pleads-not-guilty-5-felonies/6663407002/.

[32] Liz Henderson, *El Paso County Hemp Grower Reports Gunbattle With Invaders Who Might Have Mistaken Plants for Marijuana*, THE GAZETTE (Updated July 1, 2020), https://gazette.com/news/el-paso-county-hemp-grower-reports-gunbattle-with-invaders-who-might-have-mistaken-plants-for/article_f2f4083e-8bff-11ea-8f8d-83c959f9e23d.html.

[33] Glenn Puit, *DA: Fatal Shooting In Parking Lot Was 'Clear Case of Self-Defense'*, LAS VEGAS REVIEW-JOURNAL (May 4, 2020), https://www.reviewjournal.com/crime/homicides/da-fatal-shooting-in-parking-lot-was-clear-case-of-self-defense-2020768/.

[34] WPLG Local 10, *Man Explains How He Shot, Killed Gunman In Miami*, YOUTUBE (Nov. 25, 2019), https://www.youtube.com/watch?v=wvI-00hGtrA.

**APP. 764**

| | | earlier stealing his keys. The homeowner fired at least 25 rounds from an AR-15 rifle in self-defense.[35] |
|---|---|---|
| 01/20/2019 | Houston, TX | A homeowner armed with a "fully loaded AK-47" almost certainly fired more than 10 rounds in self-defense when he fatally shot 3 of 4 intruders who broke into his home. Dozens of rounds were exchanged and only two of the intruders were clearly armed.[36] At least one media report explicitly states that the homeowner fired "dozens" of those rounds himself.[37] |

---

[35] *Police: Tallahassee Homeowner Shot 2 Out Of 4 Home Invasion Suspects, All 4 Charged*, ABC 27 WTXL (Updated May 24, 2019), https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery.

[36] Emily Reaux & Matt Dougherty, *3 Suspects Dead, Another Injured After Homeowner Opens Fire During East Houston Break-In*, KHOU 11 (Jan. 19, 2019), https://www.khou.com/article/news/crime/3-suspects-dead-another-injured-after-homeowner-opens-fire-during-east-houston-break-in/285-29b21dcb-0f08-43bb-8d1e-6bd7d8b559e2.

[37] Travis Fedschun, *Texas Homeowner Shoots, Kills 3 Men and Injures 2 During Home Invasion, Officials Say*, FOX NEWS (Jan. 21, 2019), https://www.foxnews.com/us/texas-homeowner-shoots-kills-3-men-and-injures-2-during-home-invasion-officials-say.

**APP. 765**

1                    THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
2

Civil Action No. 13-CV-1300-MSK-MJW
3

COLORADO OUTFITTERS ASSOCIATION,
4    COLORADO FARM BUREAU,
     NATIONAL SHOOTING SPORTS FOUNDATION,
5    MAGPUL INDUSTRIES,
     COLORADO YOUTH OUTDOORS,
6    USA LIBERTY ARMS,
     OUTDOOR BUDDIES, INC.,
7    WOMEN FOR CONCEALED CARRY,
     COLORADO STATE SHOOTING ASSOCIATION,
8    HAMILTON FAMILY ENTERPRISES, INC.,
     d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
9    DAVID STRUMILLO,
     DAVID BAYNE,
10   DYLAN HARRELL,
     ROCKY MOUNTAIN SHOOTERS SUPPLY,
11   2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
     BURRUD ARMS INC. D/B/A JENSEN ARMS,
12   GREEN MOUNTAIN GUNS,
     JERRY'S OUTDOOR SPORTS,
13   SPECIALTY SPORTS & SUPPLY,
     GOODS FOR THE WOODS,
14   JOHN B. COOKE,
     KEN PUTNAM,
15   JAMES FAULL,
     LARRY KUNTZ,
16   FRED JOBE,
     DONALD KRUEGER,
17   STAN HILKEY,
     DAVE STONG,
18   PETER GONZALEZ,
     SUE KURTZ,
19   DOUGLAS N. DARR,

20        Plaintiffs,

21   vs.

22   JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23        Defendant.
     _____
24
                          REPORTER'S TRANSCRIPT
25                    TRIAL TO COURT - DAY TWO
     _____

**APP. 766**

1          Proceedings before the HONORABLE MARCIA S. KRIEGER,

2     Judge, United States District Court for the District of

3     Colorado, continuing at 8:37 a.m., on the 1st day of April,

4     2014, in Courtroom A901, United States Courthouse, Denver,

5     Colorado.

6

7                            **APPEARANCES**

8          RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
      at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9     Denver, Colorado, 80202, appearing for the Plaintiffs.

10         DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
      555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11    for the Plaintiffs.

12         MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
      P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13    appearing for the Plaintiffs.

14         ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
      Street, Castle Rock, Colorado, 80104, appearing for the
15    Plaintiffs.

16         DAVID BENJAMIN KOPEL, Attorney at Law, Independence
      Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17    appearing for the Plaintiffs.

18         MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
      SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19    General, Colorado Attorney General's Office, Ralph L. Carr
      Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20    80203, appearing for the Defendant.

21

22

23

24              THERESE LINDBLOM, Official Reporter
              901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | *THE COURT:*  We are reconvened in Case No. 13-cv-1300. |
| 3 | This is the second day of trial. |
| 4 | Could I have entries of appearance, please. |
| 5 | *MR. WESTFALL:*  Good morning, Your Honor.  Richard |
| 6 | Westfall, Peter Krumholz on behalf of the disabled shooters, |
| 7 | the nonprofit plaintiffs in the case. |
| 8 | *THE COURT:*  Good morning. |
| 9 | *MR. KOPEL:*  Good morning, Your Honor.  David Kopel on |
| 10 | behalf of David Strumillo, John Cooke, Ken Putnam, James Faull, |
| 11 | Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey, Dave |
| 12 | Stong, Peter Gonzalez, Sue Kurtz, and Douglas Darr.  Thank you. |
| 13 | *THE COURT:*  Good morning.  Thank you. |
| 14 | *MR. ABBOTT:*  Good morning, Your Honor.  I am Doug |
| 15 | Abbott on behalf of plaintiffs Magpul and National Shooting |
| 16 | Sports Foundation. |
| 17 | And I just want to note that Mr. Colin expects to |
| 18 | arrive at about the morning break this morning. |
| 19 | *THE COURT:*  Good morning.  Thank you. |
| 20 | *MR. FABIAN:*  Good morning, Your Honor.  Anthony Fabian |
| 21 | on behalf of Colorado State Shooting Association and Hamilton |
| 22 | Family Enterprises. |
| 23 | *THE COURT:*  Good morning. |
| 24 | *MR. GROVE:*  Matthew Grove, along with Kit Spalding, |
| 25 | LeeAnn Morrill, and Stephanie Scoville on behalf of the |

```
 1              (MASSAD AYOOB, PLAINTIFFS' WITNESS, SWORN)

 2              COURTROOM DEPUTY:  Please be seated.

 3              Please state your name and spell your first and last

 4    name for the record.

 5              THE WITNESS:  Certainly.  My name is Massad Ayoob,

 6    first name is spelled M-A-S-S A-D, last name spelled,

 7    A-Y-O-O-B.

 8              MR. COLIN:  Thank you.

 9                         DIRECT EXAMINATION

10    BY MR. COLIN:

11    Q.  Good morning, Mr. Ayoob.

12    A.  Good morning, Mr. Colin.

13    Q.  Mr. Ayoob, you are a retained expert in this case; is that

14    accurate?

15    A.  I am.

16    Q.  And you charge for your services?

17    A.  I do.

18    Q.  Can you advise the Court as to the cost of your services.

19    A.  The same as I charge to teach, $2,500 a day and expenses.

20    Q.  Is that what you're charging the plaintiffs in this case?

21    A.  It is.

22    Q.  All right.  Can you describe for the Court your background,

23    training, and experience, please.

24    A.  Certainly.  As relates to this case, I've been a firearms

25    instructor since 1972 for police and since 1981 for private
```

APP. 769

1   citizens.

2   Q.  And can you describe what you instruct police and private

3   citizens in with regard to firearms, please.

4   A.  We begin with safety, the responsibility that comes with

5   the weapon; the operation of the gun; the efficient use of the

6   gun, in terms of accuracy, speed, sustainability of gunfire;

7   the tactics that accompany it, since the emphasis is on

8   self-defense.  So that will include movement, that will include

9   finding cover, that is, something that could stop opposing

10  gunfire.

11  Q.  And you mentioned that at least some of the training I

12  think you just described is in the context of self-defense; is

13  that accurate?

14  A.  That is virtually all in the context of self-defense.

15  Q.  Can you expand on that and explain what you mean, this

16  training is in the context of self-defense.

17  A.  Sure.  We don't teach how to win a bull's-eye target pistol

18  match.  We're teaching the police officer who is carrying the

19  gun as a tool of protection.  And the private citizen who is

20  carrying a very similar gun for a similar function,

21  essentially, the -- we teach the private citizen to think of

22  himself as a first responder and that his gun should be an

23  analog to a fire extinguisher.

24        The gun, like a fire extinguisher, is a symbol of a

25  public safety professional.  We remind them that possession of

 1   that symbol does not make them a public safety professional,

 2   does not mean that they don't need public safety professionals.

 3   We make it clear that the gun, like the fire extinguisher, is

 4   an emergency rescue tool to cut a lane of safety for you and

 5   others until the designated professionals can get there to deal

 6   with the crisis.

 7   Q.  Overall, does the self-defense training that you're

 8   describing involve the dynamics of violent encounters?

 9   A.  Oh, it absolutely does.  And the techniques that we teach

10   are built from extensive research and study of dynamics of

11   violent encounters, things such as flight-or-fight response,

12   human action/reaction paradigms, things of that nature.

13   Q.  I'd like to explore your teaching experience for a moment,

14   if I could.  How long have you been engaged specifically in the

15   instruction of self-defense with firearms and dynamics of

16   violent encounters?

17   A.  Forty-two years, sir.

18   Q.  Can you describe your teaching experience.  What is the

19   context in which you have instructed individuals in those

20   areas?

21   A.  Certainly.  I began teaching a local police department in

22   1972, Hooksett, New Hampshire, H-O-O-K-S E-T-T.  Shortly

23   thereafter, I was retained to teach weapons and chemical agents

24   for the advanced police training program of New Hampshire in

25   Nashua, New Hampshire.  Began teaching civilians in 1981 after

Massad Ayoob – Direct

1   a pilot program at the Chapman Academy of Practical Shooting in

2   Columbia, Missouri.  And in October of that year, founded

3   Lethal Force Institute.  That organization was geared to

4   provide training to private citizens on a law enforcement level

5   in terms of safety, competence, and responsibility in

6   self-defense with firearms.  Within a year, that became pretty

7   much my full-time occupation, and has been ever since.

8   *Q.* Are you still involved in the Lethal Force Institute?

9   *A.* No, sir.  I left there in 2009 and now teach through Massad

10   Ayoob Group.

11   *Q.* Can you explain briefly the nature of that change.

12   *A.* Strictly a business decision.

13   *Q.* Are you a member of any committees, training councils, and

14   the like, either nationally or international?

15   *A.* Yes, sir.  I've spent –- I've been a member for many years

16   of the International Association of Law Enforcement Firearms

17   Instructors.  I've taught for them at local, regional,

18   national, and two international seminars.  For 19 years, I was

19   chair of the firearms committee for the American Society of Law

20   Enforcement Trainers.  For the last eleven years, I've been on

21   the advisory board for the International Law Enforcement

22   Educators and Trainers Association.  That's where I came from

23   this week, in fact, having taught there last week.

24   *Q.* Do you participate in the National Law Enforcement Training

25   Center in any way?

APP. 772

Massad Ayoob - Direct

1   A.  Yes, sir.  The National Law Enforcement Training Center is

2   headquartered in Kansas City, Missouri.  It's an institution

3   that focuses on teaching -- well, my side of it, at least, was

4   teaching gun retention and disarming, teaching how to take the

5   gun away from another person, from an offender.  And gun

6   retention is the corollary science to that, how to defeat the

7   man who is trying to take your gun away from you with felonious

8   purpose.

9        I began as an instructor -- certified by them as an

10  instructor in 1980 and as a -- what they called a national

11  instructor, meaning I trained and certified other instructors.

12  I was certified for that in 1990, and I've done a great deal of

13  that over the years.

14  Q.  So you've been teaching other instructors how to teach for

15  20 years or more?

16  A.  Yes, sir.  Well, for at least that.  I've also done that in

17  the baton training discipline with the PR24 baton, but I didn't

18  think that was relevant to the case at bar.

19  Q.  Specifically, you've been engaged in instructing law

20  enforcement and civilians in defensive tactics involving

21  firearms use for the last 40 years; is that fair to say?

22  A.  Forty-two, I think.

23  Q.  Okay.  You touched upon the training that you have given.

24  Can you touch upon the training that you have received,

25  specific to the areas that you've just been speaking to.

1   A.   Certainly.  At Chapman Academy, I took the advanced pistol

2   course, became involved with them, did our pilot project for

3   armed citizens in 1981.  And until the late 1980s, their head

4   instructor, Ray Chapman, the world pistol champion, he and I

5   taught for the Police Marksman Association, going around the

6   country doing what they called an advanced officer survival

7   program for various police agencies.

8          Let's see.  My own training, six or seven times

9   through Smith & Wesson academy and various instructor or

10  instructor enhancement programs.

11         In the 19 years with American Society of Law

12  Enforcement Trainers, I attended all but two of the five or six

13  day-long annual seminars, and have attended all 11 of the

14  IOEETA seminars, many of the seminars at the International

15  Association of Law Enforcement Firearms Instructors.  1980 or

16  so, I went through the officer safety and survival program at

17  the Federal Law Enforcement Training Center in Brunswick,

18  Georgia.  Numerous other seminars over the years around the

19  country.

20         On the homicide investigation side, the basic and

21  advanced officer-involved investigation school, taught by the

22  commanders and members of the LAPD officer-involved shooting

23  investigation unit.  The advanced homicide school -- advanced

24  homicide investigative school taught by Vernon Geperth,

25  G-E-P-E-R-T-H, the author of the authoritative text in the

1   field.  And the medical, legal investigation of death course

2   taught at what was then the Metro Dade Medical Examiner's

3   Office.  Twice attended and twice taught at the International

4   Homicide Investigators seminar as well.

5   Q.  Have you been published in the area specific to the

6   expertise that we're discussing now, the areas of self-defense

7   and use of firearms, defensive gun uses, dynamics of gun

8   encounters?

9   A.  Yes, I am.

10  Q.  Can you advise the Court of the nature of those

11  publications, please.

12  A.  Certainly.  The first article in a gun magazine was 1971.

13  Became more extensively involved in writing after that for

14  various law enforcement professional journals, martial arts

15  journals, and gun magazines.  For 30 some years now I've been

16  the law enforcement editor for *American Handgunn*er magazine.

17  My duties there include occasional feature articles, in every

18  issue, the Cop Talk column, which is basically focused on law

19  enforcement handgun trends and training issues.  Also each

20  issue I do a series called Ayoob Files, where we dissect an

21  actual gunfight and determine what lessons were learned from

22  that that could prevent tragedy in the future.

23          I've been handgun editor for *Guns Magazine* for, again,

24  30 some years.  Many of those articles focus on self-defense,

25  though the occasional one will focus on sport or gun

1    collecting.

2           I've been firearms editor for *Backwoods Home Magazine*

3    since about 1996.  My column there is sometimes self-defense,

4    sometimes recreation or hunting or gun safety.

5           I write in every issue of *Guns & Weapons for Law*

6    *Enforcement* the first responder column, which is geared to the

7    first officer who arrives at the scene, who is often the only

8    one who is there long enough to contain a fast-breaking scene.

9           For many years I've also done the self-defense and the

10   law column for *Combat Handguns Magazine*.  And my work has

11   appeared in various other periodicals over the years.

12          There have also been several books, a dozen or

13   fifteen -- I'd have to count them up -- all of them related in

14   some way to weapons or self-defense.

15   *Q.*  Can you identify a few of these dozen or so books that

16   you've written that focus specifically on the area of defensive

17   use of firearms and the dynamics of violent encounters?

18   *A.*  Certainly.  One would be *In the Gravest Extreme*, subtitled

19   *The Role of the Firearm in Personal Protection*.  That came out

20   in 1980 and has probably been my best seller.  Some were kind

21   enough to call it an authoritative text.

22          Others that would -- there was two in the Stressfire

23   series.  Stressfire is what I named the shooting system we

24   teach, because -- we found most training had been based on the

25   instructors going to the shooting range, timing each other, and

1   scoring their targets, and figuring whatever worked best is the

2   most accurate on the range, we would teach to the officers.

3   And we had found that would break down in the field because it

4   had not taken into account human factors of stress, shaking

5   hands, tunnel vision, and all of that.  So what we attempted to

6   do there was to study what happened to the human being in a

7   near-death experience and backspace developing techniques

8   around that.

9        That led to the *Stressfire Pistol Book* in early 1980s,

10  *Stressfire Shotgun* in the late 1980s.  Other books out today,

11  two editions of the *Gun Digest Book of Combat Handgunnery*,

12  *Ayoob on Combat Shooting*, two editions now of *Gun Digest Book*

13  *of Concealed Carry*, and most recently a book dedicated to

14  firearm safety.

15  *Q.*  Let's move on to training films.  Do you produce or are you

16  involved in the production of training films associated with

17  training civilians and law enforcement how to engage in

18  defensive gun uses in violent encounters?

19  *A.*  Yes, sir.

20  *Q.*  And can you describe for the Court the nature of those

21  training films, please.

22  *A.*  One is titled *Physio-Psychological Aspects of Violent*

23  *Encounters*.  And it explains phenomena such as tunnel vision,

24  auditory exclusion, or tunnel hearing, tachypsychia --

25  T-A-C-H-Y-P-S-Y-C-H-I-A -- the sense of things going into slow

APP. 777

Massad Ayoob – Direct

1    motion.  We explain also what some of the physiological effects

2    are as heart rate increases, vasoconstriction occurs, physical

3    strength increases, but dexterity decreases.

4            Other films in the Stressfire series, we had

5    *Stressfire I*, for the handgun; *Stressfire II*, for the shotgun;

6    and *Stressfire III*, for the semiautomatic rifle and fully

7    automatic weapon.  More recently, Panteao Productions,

8    P–A–N–T–E–A–O, has released my film on home protection and

9    self-defense and a training film on concealed carry.  There are

10   others out there.  For eight seasons I was on Personal Defense

11   TV, touching on self-defense topics of various kinds.

12   *Q.*  How long were you on Personal Defense TV?

13   *A.*  That was eight years.  The series ended early this year.  I

14   don't believe it's going to be renewed for the late 2014

15   season.

16   *Q.*  With regard to the publications that you listed, have you

17   written any articles that deal specifically with the use of

18   firearms by disabled or otherwise infirm, handicapped

19   individuals?

20   *A.*  Yes, I've written a few that touch on that and –– a few

21   that were devoted to that and many that touched on that.

22   *Q.*  Are you familiar with the Wounded Warrior Project?

23   *A.*  Yes, I am.

24   *Q.*  And what is your involvement, if any, in publishing for the

25   Wounded Warrior Project?

**APP. 778**

Massad Ayoob - Direct

1  A.  I don't publish for Wounded Warrior.  I have written about

2  the programs they have as it relates to firearms.

3       While Wounded Warrior does not advertise it, there are

4  several gun clubs that have, essentially, done benefit shoots

5  for soldiers and Marines who come back from the current

6  conflict seriously injured or as amputees.  It gives them a

7  chance to shoot firearms, something that, you know, most of

8  them identified with based on their careers.  Let them know,

9  yeah, you can get back into hunting, you can get back into

10 target shooting, and here is how to adapt.

11 Q.  Does the training also include how to adapt for defensive

12 gun use purposes?

13 A.  Mine does.  I'm not sure Wounded Warrior goes that far into

14 the tactics.

15 Q.  All right.  Have you ever been retained previous to today

16 to provide expert testimony in any court proceedings?

17 A.  Yes.  I've been an expert witness in weapon-related and

18 deadly force related cases since 1979.

19 Q.  Can you estimate how many cases that involved?

20 A.  It's in the dozens.  I don't know the exact number.

21 Q.  When you say "in the dozens," a couple dozen, more than

22 that?

23 A.  It would be 40 or 50 where I've given sworn testimony; a

24 great many more that I've consulted on and did not take the

25 case; and many were, we would do a report, and it ended in

1   settlement or dismissal.

2   *Q.*   Thanks for the clarification.  Did any of those cases in

3   which you have rendered expert testimony involve persons with

4   injuries, disabilities, infirmities of some kind that were

5   relevant to the litigation?

6   *A.*   There were none exactly like this case that resulted in

7   legislation that became the focus of the legislation.  Some --

8   there were more than one disparate impact case of female law

9   enforcement officers who have been fired for failure to

10  qualify.  And there were physiological aspects involved,

11  typically, hands that were too small for the male-oriented guns

12  that they had been issued.

13          There have been self-defense cases where injury

14  inflicted on the individual who shot in self-defense had

15  created a disparity of force element that needed to be

16  explained to the juries.  There were -- I can think of at least

17  one case where the victim was a 63-year-old handicapped female,

18  violently attacked by a 1.8 percent blood alcohol 240-pound

19  male and was charged with either murder two or manslaughter

20  because she fired three bullets into an unarmed man, and that

21  needed to be explained.

22  *Q.*   What were you originally asked to evaluate in connection

23  with this case?

24  *A.*   Primarily, the disparate impact of a magazine limit on

25  handicapped individuals in terms of firearms kept for

Massad Ayoob – Direct

1    self-defense and home defense, whether carried on the street or

2    whether with a gun permit or whether kept in the home and

3    deployed in the home.

4    Q.  You've given us an overall general description of much of

5    your training and experience in the area of firearms defensive

6    gun uses and the dynamics of violent encounters.  Can you tell

7    us what specific training and experience you have that

8    qualifies you to render opinions regarding the impact of

9    magazine limitations on both able and disabled bodied

10   individuals?

11   A.  Sure.  From the beginning when I started teaching cops in

12   1972, while they were all able-bodied, except for the

13   occasional case, we'd have the injured officer on light duty

14   who still had to qualify on the range, one of the things that

15   we had to look at was, the very fact that the officer needed to

16   shoot meant he was likely in a gunfight.  He might well be

17   seriously  wounded and might often have been wounded at the

18   very beginning of the fight if he was ambushed.  So we have to

19   look at what I called wounded officer response techniques.

20   What do you do if one hand, one arm has been rendered

21   inoperable?  What do you do if the effect of the first couple

22   of shots have put you on your back, or you started in the

23   patrol car, can't get out of the patrol car because a bullet

24   has broken your hip?  Those techniques served very well in the

25   '80s, when I started teaching civilians, and started getting

1   students who were physically handicapped to various degrees.

2        There was a great deal of crossover.  There was some

3   things that did not cross over, and we simply analyzed their

4   situation and reached out to others who had dealt with

5   handicapped shooters and worked on finding the most efficient

6   ways to deal with them, both in terms of techniques and in

7   terms of mechanics, in terms of guns that in one way or another

8   might make up for their physical disability.

9   *Q.*  Did the training that you provided to these able-bodied and

10  disabled individuals, whether they were law enforcement or

11  civilians, include defensive tactics in the use of --

12  apologize, poorly phrased.  Did it include the use of firearms

13  in defensive gun use situations, both inside the home and

14  outside the home?

15  *A.*  Yes.  The -- virtually all of the training I've done has

16  been focused on the firearm as a defensive instrument, as

17  opposed to a recreational tool or an instrument of sport.

18  *Q.*  Is there any difference to the training that you provide to

19  civilians, whether able-bodied or disabled, as to defensive

20  tactics inside the home versus outside the home?

21  *A.*  Yes, there would be.  Situationally, if you're outside the

22  home, by definition, if you're resorting to a firearm, that

23  means you're licensed to carry a gun, and you have one either

24  on your person or immediately within reach.  So we'll work with

25  them on drawing the gun from discreet concealment and being

APP. 782

Massad Ayoob - Direct

 1  able to reload.  We strongly emphasize that we feel anyone

 2  carrying a gun without spare ammunition is carrying a temporary

 3  gun.  So we teach them how to carry a spare magazine or a spare

 4  speed loader, if they're carrying a revolver.  But in the home,

 5  there are relatively few people who keep their gun on all the

 6  time when they're in their own domicile.

 7  Q.  You mean on their person when you say "keep the gun on"?

 8  A.  No.  What I'm saying is, most people do not keep their gun

 9  on when they're at home.  They will typically when they're in

10  their domicile have it stored in one or another fixed, static

11  location.  Perhaps a quick-release gun safe; perhaps a home

12  where you don't have to worry about children running around,

13  simply in the nightstand.

14          For them it's not a matter, when danger comes on them

15  suddenly to simply reach under their coat.  They may have to go

16  into another room to get at where the gun is, they may have to

17  go down the hall to get at where the gun is.  So now their

18  mobility becomes a much more critical factor in their ability

19  to defend themselves.  If when the alarm goes off, or the door

20  kicks off, or the window breaks, every second that they're

21  trying to get the wheelchair down the hall to where the gun is,

22  is going to be more vulnerability.  So we tell them, once they

23  have been able to get their hand on the gun, things are going

24  to be happening fast.  They're going to have to be -- hopefully

25  with a Bluetooth if they have one on already -- communicating

 1   with the police.  But mostly, one hand is going to be occupied

 2   with some sort of telephone communication device.

 3        They're not going to have time to strap on a gun belt

 4   with an ammunition pouch, and they're not going to have time to

 5   grab a spare magazine or speed loader.  Essentially, what they

 6   have in that gun is going to be probably all they're going to

 7   have from the beginning to the end of fight that occurs.  So we

 8   tell them, for the home defense gun in particular, it makes

 9   sense to have higher cartridge capacity than some other

10   applications.

11   Q.  And the comparison, then, to defensive gun use outside the

12   home, how is your training or -- how is the advice that you

13   give to able-bodied and disabled shooters different, if it is?

14   A.  Well, again, in terms of the magazines and such, we would

15   be advising the person in the wheelchair, for example, to have

16   a higher-capacity gun.  The reason is, the ambulatory person --

17        If I may stand for a moment to demonstrate.

18   Q.  Sure.

19   A.  The ambulatory person can be almost like a uniformed police

20   officer.  If you look at the next cop you see on the street,

21   the duty belt is going to have gear all the way around it, all

22   the stuff they have to carry.  You'll see a lot of people -- a

23   lot of ordinary folks will carry their pager behind their belt

24   or something else behind their belt.  Your guy in a wheelchair

25   is very restricted on that, particularly if he's paralyzed from

1   the waist down, and most particularly if he's paralyzed from

2   the chest up.

3          If I lean back now against some hard object that is

4   behind my hip --

5   Q.  Mr. Ayoob, I'm really not getting into wheelchair-bound

6   individuals right now.  I'd like you to respond to the question

7   about any difference in the training that you give to students

8   for defensive gun uses outside the home versus inside the home.

9   You had spoken to larger firearms magazines, availability and

10  those kinds of things.  Is that any different in terms of

11  outside the home?

12  A.  Well, outside the home, yes, because he's probably going

13  to -- if they're in the wheelchair, again, they're going to

14  have limitations.  There is only so much you can get in that

15  very small space that you're taking around with you.  And as I

16  was saying, you can't put any of it behind your backs.  You've

17  got to put all of it in the front.

18          If you found room for the gun -- that's not that tough

19  to do.  Finding room for the gun and spare ammunition is much

20  more difficult in the more limited waist space.  What I was

21  trying to get at is, that would be one more reason for them,

22  we'd be suggesting they get a higher-capacity gun.  They will

23  have much more difficulty reloading in the wheelchair than

24  would an ambulatory person, as well.

25  Q.  Thank you.  Do students bring their own firearms to your

1   classes?

2   A.   The students normally will bring their own firearms,

3   correct.

4   Q.   And do you give them direction on what firearms to bring to

5   class, or do they select those on their own?

6   A.   Unless they ask, we simply tell them to bring the guns they

7   use for personal protection.

8   Q.   Have the -- has the equipment or the firearms that have

9   been most popular with your students changed over the years?

10  A.   Yes, they have.

11  Q.   Can you describe that, please.

12  A.   Over the last ten, twenty years, we've seen a much stronger

13  trend towards semiautomatic pistols and, particularly, the

14  pistols with relatively higher magazine capacity.

15  Q.   When did that take place?

16  A.   We started seeing it in the 1980s, and it was actually kind

17  of concurrent with the law enforcement switch from the old

18  service revolver to the semiautomatic service pistol.  And we

19  saw it more still in the '90s.  And today, the polymer-framed

20  pistol, usually 9 millimeter, occasionally larger calibers, is

21  by far the most popular type that we'll see in a civilian

22  course.

23  Q.   Can you estimate the percentage of students annually that

24  bring semiautomatic pistols to your class these days, in the

25  last ten years?

Massad Ayoob - Direct

1   *A.*  If we cover all semiautomatics, it would be in the high

2   90th percentile.  We do see the occasional revolver, but in

3   many classes there's not a revolver on the firing range.

4   *Q.*  Does the shift that you just described, the change in

5   popularity of handguns from revolvers to semiautomatics, affect

6   your training?

7   *A.*  We have to put more emphasis on avoiding what is called

8   colloquially spray and pray.  When someone suddenly goes from a

9   six-shot gun to an eighteen-shot gun, it's -- particularly if

10  fire power was the reason for the decision, it's real easy to

11  get the idea that the fire power was the *raison d'être*.  And

12  that means, if I ever have to pull this thing out, I better

13  hose all 18 rounds and hope something sticks; hence, spray and

14  pray.

15          And we told them, no, shoot it as if you had the

16  old-fashioned six shooter and you just have a greater reservoir

17  of ammunition.  The reservoir of ammo is not to hose the area;

18  it's to allow you to stay in the fight longer if the fight gets

19  particularly complicated and ugly.

20  *Q.*  Can you provide examples of the most commonly used firearms

21  brought by civilians and law enforcement officers to your

22  training classes in the last ten years.

23  *A.*  Yeah.  Some of the most popular brands will be the Glock,

24  the Smith & Wesson military and police semiautomatic, and to a

25  slightly lesser extent, but I'm seeing it increase, the

**APP. 787**

1   Springfield Armory XD series.

2   *Q.* As to the Glock series, can you identify the most popular

3   Glock model that you see in your classes.

4   *A.* The most popular I see in the class is the Glock 17.  It's

5   their service-sized 9-millimeter pistol with 17-round magazine.

6   *Q.* You also mentioned the M&P, the military and police?

7   *A.* Yes, sir.

8   *Q.* How many rounds is that?

9   *A.* Again, 9 millimeter, that would be a 17-round magazine.

10  *Q.* And then you also mentioned the Springfield XD series.

11  *A.* Yes, the original XD, full-sized service pistol with the 15

12  or 16 -- I'd have to go back and look.  What we're seeing more

13  is the updated version of that gun, the XDM, which in full size

14  is a 19-shot magazine, in the 9 millimeter.  Of course, all of

15  them would have one more cartridge in the firing chamber when

16  kept loaded.

17  *Q.* What percentage of students these days, in the past ten

18  years, bring revolvers to self-defense class?

19  *A.* It's tiny percent.  As I've said, I see classes where there

20  is not a revolver in sight.  I think in the last year, the most

21  revolvers I ever saw in a class was three or four, in classes

22  of 20 to 40 people.

23  *Q.* I want to move into some mechanical discussions regarding

24  the differences between a semiautomatic firearm or handgun and

25  a revolver.  All right.

1          Your Honor, we have brought some dummy firearms into

2    the courtroom.  I'd like the clerk to provide those to the

3    witness at this time for this demonstration.

4          THE COURT:  Have they been marked as demonstrative

5    exhibits?

6          MR. COLIN:  They have not at this time, Your Honor.

7    We brought them in this morning, didn't --

8          THE COURT:  Well, let's get them marked.

9          MR. COLIN:  We'll do that.  I think we're at 93.

10          There is a semiautomatic you want to use?

11          THE WITNESS:  The blue one.

12          MS. MORRILL:  Your Honor, we have not seen this

13    demonstrative.  We'd ask to see it before it is handed to the

14    witness.

15          THE COURT:  I'm sorry?

16          MS. MORRILL:  We have not seen this demonstrative

17    exhibit before.  We would like to see it before it is handed to

18    the witness.

19          MR. COLIN:  Sure.

20          THE COURT:  Fine, you can see it.

21          MR. COLIN:  The blue revolver and the blue

22    semiautomatic.

23          THE WITNESS:  Yes, I think there is only one revolver,

24    should be blue, as I recall, blue semiautomatic.

25          THE COURT:  Mr. Keech, would you present those to

1   defense counsel, please, so that they can see them.

2       *COURTROOM DEPUTY:* Yes, Your Honor.

3   *BY MR. COLIN:*

4   *Q.* Okay. Can you describe how semiautomatic firearms,

5   semiautomatic handguns in specific, are similar to or different

6   from a revolver, mechanically.

7   *A.* Certainly. The dummy here in my left hand is apparently

8   produced by Odin Press, O-D-I-N. But they're designed

9   originally for handgun retention and disarming instruction, for

10  obvious safety reasons.

11      This is a cast dummy of the gun in battery. When I

12  say "in battery," the parts are in alignment for firing.

13  Because it's cast, there are, obviously, no moving parts. So

14  bear with me, because that compounds the difficulty of the

15  demonstration.

16      Once the gun is loaded, the part I'm indicating here

17  is the cylinder. Essentially, a rotary drum that rotates on an

18  axis. The pulling of the trigger straight back over a long

19  pull that would go from the at-rest position I'm indicating

20  here to the back of the trigger guard will inside the gun cause

21  a part called the cylinder hand to engage a ratchet inside the

22  gun at the back of the cylinder. That will turn the cylinder,

23  rotating it. As the mechanism brings the hammer back, the

24  hammer -- which I'm indicating here -- will rise before it

25  falls. The next cartridge in the cylinder, which in this sized

Massad Ayoob - Direct

1    gun there would be six chambers with six cartridges, will

2    rotate under that hammer.  When the trigger pull is completed,

3    the hammer falls, the firing pin strikes the primer and the

4    cartridge, and the bullet is propelled through -- out of the

5    chamber through the barrel and toward the target.

6             To unload the gun, the part I'm indicating here, the

7    cylinder release latch, would have to be pressed in a certain

8    direction.  This is a dummy copy of a Smith & Wesson combat

9    magnum, and that brand is pressed forward.

10            Simultaneously, the other hand or some force has to

11   push the cylinder to the left to bring it out of the frame.

12   The cylinder assembly will now swing out and will be located

13   where I'm indicating here to the Court with my hand.  The

14   ejector rod of -- the stick-like projection in front of the

15   frame that I'm indicating here, is a part of the cylinder

16   assembly and will swing out with it.

17            To eject the spent -- the six spent empty casings that

18   will be in the chamber located at the back of the cylinder,

19   that rod has to be pressed or struck toward the cylinder.  The

20   ejector star, which is part of the ratchet, now comes back out

21   of the cylinder and drives those cartridges out, and they'll

22   fall to the ground.

23            So get it reloaded, visualize the cylinder was still

24   outside the frame.  If we had just loose ammunition in a pouch,

25   most people would have to reload one cartridge at a time,

1    chamber per chamber, so six separate complicated motions of

2    getting the -- a small, narrow cartridge into the chamber.  A

3    dexterous, experienced shooter can load them two at a time.

4            There is a device called a speed loader, which holds

5    all six cartridges in a circle, that allows them to be loaded

6    at once.  Because it's the diameter of the cylinder, it's very

7    bulky and relatively few people find they can comfortably,

8    discreetly carry them concealed.

9            Once those are in, if it's a speed loader, the loader

10   has to be released, and it will then be allowed to fall away.

11   The firing hand will come back to the grip, and the other hand

12   will close the cylinder of the revolver.  And as we've noted,

13   it's a fairly complicated procedure.

14           The semiautomatic pistol, demonstrated here with a

15   Ring's brand, R-I-N-G apostrophe S, blue gun.  This one is cast

16   with polymer.  The primary parts will be the frame -- which I'm

17   indicating here -- in which the magazine -- which I'm

18   indicating here -- would be housed.  The barrel would be inside

19   the slide -- which I'm indicating here -- riding on a spring

20   guide rod with a recoil spring inside the gun.  The trigger --

21   which I'm indicating here -- is pulled, the pistol fires.  The

22   recoil force of that shot going off will drive this whole slide

23   assembly back on the frame.  The extractor -- which I'm

24   indicating here -- is a hook that will catch the inside edge of

25   the cartridge, the spent casing, and drag it back until it is

1  punched out through the eject port -- which I'm indicating

2  here -- by the ejector, which is a little stub that is inside

3  the gun.  In other words, the cartridge is dragged back by this

4  by the extractor hook and is then bumped by the fixed ejector

5  to kick it out.

6         At that point, the slide will have reached its

7  rearward point of movement.  It will no longer be blocking the

8  spring-loaded magazine in which the remaining cartridges are

9  stacked, and the spring will now drive the next cartridge up in

10  front of the slide.  As the recoil spring does its reciprocal

11  movement, brings the slide back forward, it will carry that

12  cartridge back into the firing chamber.  It happens in an

13  instant, and the gun is ready to fire.  If you watch it happen,

14  most people can't actually see the slide moving; they just see

15  the spent casing sticking out of the gun.

16       To unload -- to reload once it's run empty, most

17  pistols will usually lock their slides to the rear when they're

18  empty to signal to the shooter that it's time to reload.

19       To -- may I stand?

20       THE COURT:  Sure.

21       THE WITNESS:  Okay.  To get the -- we have to do what

22  we did with the revolver, get the old empty stuff out and the

23  new fresh stuff in.  With the semiautomatic, we now have an

24  empty magazine that will be released by pressing the magazine

25  release button.  This, as in most guns, it's in the form of a

1   button behind the left side of the trigger guard.  The magazine

2   will now fall away, or if it's stuck, the shooter will flip it

3   out.  The shooter will grasp a fresh magazine, insert it in one

4   motion.  The difference is, here, we were inserting six tiny --

5   six exact size objects into six exact size holes, and with a

6   speed loader, trying to do it all simultaneously.  Here, it's

7   more of a gross motor skill than a fine motor skill.  We have

8   one relatively larger object going into one relatively larger

9   area.

10         The magazine is inserted until it clicks and seats.

11  If the slide is locked to the rear, either tugging back on it

12  will release it forward, or just coming up with the thumb and

13  touching the part I'm indicating here, the slide release lever,

14  will allow the slide to close, chamber the round, and complete

15  the reloading cycle.

16         The difference would be, reloading the revolver would

17  look in sequence like this.  Reloading the semiautomatic would

18  be a much simpler sequence that would look like this.

19  *BY MR. COLIN:*

20  *Q.*  During the course of your comparative testimony, you

21  mentioned trigger pull and trigger distance with regard to the

22  revolver, but not the semiautomatic.  Are they the same between

23  the two?

24  *A.*  No.  There are two different issues, and they do tend to be

25  different between the two types of guns.

1    *Q.*  What are the differences on those?

2    *A.*  On the revolver, we have a long, heavy pull.  The reason

3    is, mechanically, the index finger, the trigger finger,

4    bringing the trigger back is performing multiple functions.

5    It's driving the cylinder hand upward to rotate the cylinder

6    against resistance; it's bringing the hammer back against the

7    resistance of a very strong main string that will be located

8    inside the grip frame.  And, typically, your double-action

9    service revolver will have a trigger pull weight of 9 to

10   12 pounds.  I've seen some that ran 14 pounds.  It's also a

11   longer stroke, because to get all of that mechanical work done,

12   basically, we need some distance for the lever-shaped trigger

13   to move.

14          With the semiautomatic, it -- you can get -- most

15   designs will have a lighter, easier trigger pull, at least for

16   most shots.  In this pistol, the M&P, it's striker fired, so

17   there is no hammer that needs to be raised and lowered.  It's a

18   much shorter trigger stroke that tends to be lighter.  The

19   factory spec for trigger pull weight on this gun for a duty or

20   defense pistol is 6.5 pounds.

21   *Q.*  You've done a demonstration for us, you've given us a

22   mechanical description of the differences between a revolver

23   and firearm, have you performed any tests to determine which

24   is -- which can be reloaded more quickly and efficiently?

25   *A.*  Yes.

1   Q.  And can you describe those for the Court, please.

2   A.  Yeah, over the years, I've lost count of how many thousands

3   of people I've observed reloading both revolvers and

4   semiautomatics in 40 some years of shooting competition and

5   shooting training.  It is inarguable that the same individual

6   is going to be able to reload the semiautomatic faster than he

7   is the revolver.  It's simply a less complicated task with

8   fewer movements involved.

9   Q.  Why does the amount of time required for reload matter?

10  A.  Because it -- assuming real world and not sport, every

11  second the defender cannot fire is a second of absolute

12  helplessness.  The longer the reload process takes, the longer

13  they are helpless against an armed opponent.

14        That becomes magnified in a situation where the hands

15  are trembling, fine motor skill is being lost.  The revolver is

16  more dependent on fine motor skill than is the semiautomatic.

17  And, overall, when you're reloading, you're vulnerable.

18        I think the easiest way to explain it is, if it was a

19  boxing match, if someone said for X numbers of seconds you have

20  to lower your arms and not punch or block while your opponent

21  is allowed to punch, you would have just turned into a punching

22  bag, and for that period of seconds would take blow after blow

23  until they finally got the knockout blow, and you are going to

24  be unconscious on the mat.

25        That same -- that same dynamic occurs in the reloading

1   process.  While you're unable to fire the gun, since it's not

2   been reloaded yet, you are the equivalent of the boxer with his

3   hands at the side.  The opponent does now have you turned into

4   a target instead of a threat to flee.  And with impunity, he

5   can be sending his blows with a gun or knife at you until he

6   gets the knockout blow that leaves you dead.

7        *MR. COLIN:*  Thank you.  Your Honor, this would be a

8   good time for the noon break.

9        *THE COURT:*  All right.  Then we'll stand in recess,

10  and we'll stand in recess until 1:30 this afternoon.

11       Is there anything we need to take up before our noon

12  break?

13       *MR. COLIN:*  No.  Not from the plaintiff.

14       *THE COURT:*  Okay.  All right.  Then we'll stand in

15  recess until 1:30.

16       (Recess at 11:56 a.m.)

17       (Hearing continued at 1:33 p.m.)

18       *THE COURT:*  Please resume.

19       *MR. COLIN:*  Thank you, Your Honor.

20  *BY MR. COLIN:*

21  *Q.*  Mr. Ayoob, we've gone through your knowledge of the

22  mechanical functioning of both revolver and semiautomatic

23  pistol.  I'd like to move now on to how that's applied.

24       Do you teach civilian shooters and law enforcement

25  officers, both able-bodied and not, how to perform magazine

Massad Ayoob - Direct

1  exchanges swiftly, efficiently?

2  A.  We do.

3  Q.  For how long have you been providing that kind of

4  instruction?

5  A.  For 42 years.

6  Q.  Can you estimate how many students you've taught how to do

7  tactical, standard, or any other kind of magazine exchanges

8  involving semiautomatic firearms?

9  A.  Countless thousands.

10  Q.  And did you say law enforcement since 1970 something, and

11  civilians after that?

12  A.  Law enforcement since '72; private citizens since '81.

13  Q.  Based upon that experience, can you tell us how long it

14  take an average shooter, able-bodied, to perform a magazine

15  exchange?

16  A.  With some proper training fresh in their mind, they'll

17  probably average around four to six seconds.  Of the more

18  dexterous, the more expert, the naturals, if you will, the ones

19  with more experience, will probably go two to three seconds.

20  Q.  Can you provide an average time for disabled shooters?

21  A.  We cannot.  The reason is the range of disabilities is

22  simply too far to figure out an average.

23  Q.  Describe what kind of considerations you have to take into

24  account when dealing with developing a training program for a

25  disabled shooter to effect a magazine exchange swiftly and

1    effectively.

2    *A.*   Sure.  The first thing that we have to do is analyze what

3    the shooter's disabilities are, and just as important, what

4    abilities he or she still has.  The disabilities may range from

5    the guy who is palsied due to age or neurological problems or

6    nerve damage.  The very rapid insertion of the magazine that

7    would be easy for an able-bodied person sitting in here becomes

8    a nightmare for him, because both the feeding hand and the

9    receiving hand are shaking.  It's going to take him much

10   longer, and proportionately longer still with the revolver,

11   with smaller cartridges going into smaller receptacles.

12           Overall, we look at, where is the disability?  The

13   upper body disabilities, the upper limbs, whether it's hands,

14   arms, upper body strength issues, I see that when I'm

15   teaching the shooting of the gun, use of the guns, as a

16   profound disability in that respect.

17           The other element we have to look at is the lower

18   body, disabled knees, ankles, perhaps someone who has no

19   feeling at all in their legs.  That becomes an issue of

20   tactical mobility.  We can --

21   *Q.*  Before we get to that, I want to -- I certainly want to

22   speak to that issue.  I want to get there by laying foundation

23   before we can talk about it.

24           I'd like you to explain why -- if we're only talking

25   about two to three seconds for an expert or four to six seconds

APP. 799

1   for a typical civilian, an average civilian shooter -- if we're

2   only talking about two to six seconds, what is the big deal?

3   Why does it make a difference?

4   *A.*   Remember, we're teaching them on the range to operate

5   life-saving emergency rescue equipment.  When they actually

6   need the skill, it will be during an ongoing attack.  Every

7   second that they are unable to respond is a second of absolute

8   total helplessness.  We often -- when we're looking at time on

9   one side, we always have to look at time on the other.  The

10   opponent is up and running.  It has been well established in

11   firearms training literature for decades now that the average

12   person can pick up one of these guns -- here, I'm holding the

13   dummy revolver.  And even with its long trigger stroke back and

14   its long stroke forward to reset, if you start timing from the

15   first shot, the average person can fire four shots in about --

16   four shots in about one second.

17          The semiautomatic pistol, the majority of models which

18   have the shorter trigger stroke, like this M&P I'm now

19   demonstrating with, shorter back, shorter forward, less

20   distance equals less time and more output.  The average

21   person -- not the expert, not the master, the average person,

22   will get off five shots in the first second.  Some people if

23   they're fast will get off six.  That means the other person has

24   six chances to kill you or six chances to kill the people

25   you're protecting if you are unable to stop them.

1          If, instead of having to take that -- that, whether

2     it's two-second, four-second, or ten-second reload, if you had

3     enough cartridges in the gun that it had not run dry, that you

4     could simply keep shooting, average break time -- that is, the

5     elapsed time between shots -- is going to be a fourth to a

6     fifth of a second.  So we're balancing several seconds,

7     multiple whole seconds of vulnerability for you and those

8     within the mantle of your protection against the ability to

9     return a shot and hopefully end the danger in a quarter of a

10    second.

11    Q.  Now I want to get to the area you were about to speak to

12    with regard to upper and lower body disabilities if we could.

13    You have instructed, have you not, over the last 40 years,

14    individuals with both kinds of disabilities, meaning upper body

15    disabilities and lower?

16    A.  I have.

17    Q.  Can you tell us how many physically challenged, disabled,

18    infirm shooters that you have instructed over the last 40

19    years?

20    A.  It will go maybe one out of twenty with what I would

21    consider a profound disability in terms of shooting, the really

22    severe tremors in the hands, an arm that does not work, missing

23    digits from the hands, missing whole fingers from the hands,

24    and the occasional missing hand or missing arm.

25    Q.  Is --

Massad Ayoob – Direct

1  A.  It's at least twice that for the lower body disabilities.

2  A few times a year, every year, in civilian classes, we'll have

3  someone who is in a wheelchair.  There are many more whose

4  lower body disabilities don't show up until I ask them to shoot

5  from a cover position.  And most of the cover positions are

6  low, such as a kneeling position or a deep-cover crouch.  The

7  guy who you don't notice any disability when he's just walking

8  around casually, now in his bad knee, his replacement hip, his

9  fused ankle, whatever come into play, he can't do it.  He can't

10  get down behind that cover.  He doesn't have that protective

11  place, that safe harbor, that safe haven where he's going to

12  have the few seconds to reload the gun.  He may be caught in

13  the open, and the only thing he can stop the opposing fire with

14  is his own return fire.

15  Q.  So it sounded to me like you have two categories of

16  disabilities, at least in your mind.  You used the term

17  "profoundly disabled."

18  A.  From my perspective as a firearms instructor, yeah.  I'm

19  not looking at what a doctor would call profoundly disabled;

20  I'm looking at what me teaching the student this particular

21  skill is a profound handicap to overcome.

22  Q.  And you said, roughly 5 percent of your students over the

23  last 40 years have fallen into that category?

24  A.  Roughly 5 percent, yeah.

25  Q.  And then you said there is another category.  Can you give

Massad Ayoob – Direct

1   us an estimate of how many students fall into this other

2   disability category.

3   A.  What I would call the tactically disabled.  The people who

4   move very slowly, the people who may not be able to move at all

5   if they're in a manually operated wheelchair, or the people

6   with lower limb injuries or disabilities that are in positions

7   where they cannot take cover behind something like an engine

8   block or a heavy stove during a home invasion or something like

9   that.  And that would be about twice as many.

10  Q.  So another 5 to 10 percent?

11  A.  Probably, yeah.

12  Q.  Okay.  Do you provide separate training classes for

13  disabled shooters, infirm shooters?

14  A.  I do not.  The reason is, there is such a wide range of

15  disabilities, there is no one curriculum that will fit them

16  all.  So we integrate them often with special needs assistance

17  into our regular programs.

18  Q.  In the regular programs in which you allow disabled

19  shooters to participate, is there training to able-bodied

20  students in those classes that is similar to the training that

21  is received by these disabled folks?

22  A.  Yes.  In the first level in police training and the second

23  level in our civilian training, we'll get into the wounded

24  defender techniques.  The situation where you walked into the

25  thing able-bodied, a gunshot went off, now one of your arms no

APP. 803

Massad Ayoob – Direct

1  longer works, now your leg has crumpled under you and no longer

2  works.  How do you transition from this hand to that hand,

3  let's say, for the police officer?  How do you shoot from the

4  ground and stabilize the shot, whether you're on your butt, on

5  your back, on your side, whatever?  If you only have one hand

6  to shoot back with, how do you maximize your ability to deliver

7  accurate rapid fire when 50 percent of your upper shooting

8  platform has just been shot away?

9  Q.  Am I accurately hearing that your training, then, for the

10  disabled shooter is pretty much the same as the training that

11  you give to able-bodied citizens on how to deal with injuries

12  during a gunfight?

13  A.  There is a lot of crossover, but it's not identical.  For

14  example, shooting from a seated position.  If we had a police

15  officer who's ambushed from the front, and he's seat-belted

16  into his cruiser, the car is in park, there is no time to

17  escape, he's literally got to shoot through the windshield.

18  From his seated position -- I will be visible from your

19  perspective -- he could jackknife his upper body forward, get

20  his upper body weight under the gun, and deliver very accurate

21  rapid fire, recovering from the recoil almost as quickly as he

22  can reset the trigger.

23       The person in the wheelchair very often will not be

24  able to do that.  The reason is, if you jackknife forward from

25  the hips, your legs become V springs that are holding your

Massad Ayoob – Direct

1    upper body upright as your upper body weight goes forward.  The

2    paraplegic, particularly the paraplegic who is paralyzed from

3    the chest down -- I've seen some who have to be strapped into

4    the wheelchairs.  If they try to lean their upper bodies

5    forward, it's going to overbalance, and they fall out of the

6    chair.  So we teach them different techniques.

7           For example, I teach them, since they're going to have

8    to lean back to stay in the chair, to shoot with what is called

9    the Weaver stance.  It's an isometric position in which both

10   elbows are bent, the gun hand pushes, the support hand pulls.

11   That allows recoil to -- it, essentially, turns the arms into

12   tense skeletomuscular shock absorbers.  The recoil is forced

13   between the gun and torso.  If they had tried to shoot in the

14   more modern technique that the officer could do jackknifed

15   forward, the locked arms will become levers.  The first shot

16   may go through the windshield.  The second shot will go into

17   the roof, unless they consciously take time to bring the gun

18   back down, which would greatly slow their rate of return.  So

19   in areas like that, there might be some difference.

20          In many of the others, we teach them exactly the same,

21   because so many wheelchair victims, when they're mugged, the

22   attacker's first thing is to tip them out of the wheelchair on

23   the ground, thinking they're going to be helpless like an

24   upside down turtle.  We emphasize with the wheelchair students

25   how to shoot from the ground a little more than we would with

APP. 805

Massad Ayoob – Direct

1    the average civilian student.

2    Q.   Okay.  I'd like you to describe for the Court the process

3    that you use when a disabled individual comes to you, somebody

4    with an infirmity, a handicap of some kind.  Describe the

5    process that you use to develop training that will allow them

6    to overcome that disability.

7    A.   Sure.  Well, we'll start with, at the risk of repeating

8    from the last question, assessing, what is their disability?

9    What are their abilities?  We know now what they can't do;

10   let's see what they can do.  It may be more important for them

11   than for a perfectly able-bodied shooter to have a gun that

12   perfectly fits their hand.  And lets them apply maximum

13   mechanical damage to compensate for any upper body weakness

14   they might have.  We may have to place the gun differently.

15   Most people, police or civilian, who carry concealed handguns

16   will carry on or just behind the strong side hip.

17            If I may stand for one more moment.

18            It's a natural, easy place for the dominant hand to

19   simply come back to and access the gun.  If we have someone in

20   a wheelchair, it's going to be much more difficult.  The gun

21   tends to be pinned between the arm of the wheelchair and the

22   torso of the patient.  And as they reach down here, they've

23   about run out of range of movement, so they're going to have to

24   rock significantly to the side.  So people like that, we'll

25   suggest, you know, may be a little slower for the standing guy,

1   but we'll have you place your gun cross body.  That would be

2   the opposite hip, but forward.  Gives them much better range of

3   movement across the body, and we just show them how to safely

4   do it on the firing range in a way not to cross any other

5   shooter so they can practice and build their skills.

6          We will try to adapt the gun.  The person who is going

7   to have particular difficulty reloading for whatever reason is

8   obviously that much more a candidate for a gun that has a

9   higher reservoir of ammunition.

10  Q.  All right.  So you analyze the disability, you address how

11  they might carry it, where they might carry it, where they

12  might carry ammunition, drawing and aiming the weapon?

13  A.  Right.

14  O.  Is there any identification -- and maybe that's what you

15  were getting to a moment ago with regard to mechanical changes

16  that might be made to the firearm itself.  So, do you study the

17  mechanical operation of the firearm in conjunction with the

18  disability to try to figure out how the mechanical function of

19  the firearm might be modified or how the shooter might modify a

20  more typical approach in firing?

21  A.  We do.  A classic example of that would be the person with

22  very short fingers.  We have a lot of people, particularly in

23  foreign countries, that have had industrial farming accidents,

24  so they're missing a fingertip or something.  I had one student

25  who was a Thalidomide baby in adulthood, and all of his fingers

 1   were about as long as the median joints are of mine here.  One

 2   of the things you want is going to be a pistol with shorter

 3   trigger reach.  The trigger reach dimension on the gun is

 4   measured from the back strap under the grip tag, of the part

 5   that I'm indicating here, to the center of the face of the

 6   trigger, which I'm indicating here.

 7          On the hand, it would be measured from the center, the

 8   web of the hand, in line with the long bones of the forearm,

 9   from this point I'm indicating here, to the contact point on

10   the trigger finger.

11          Someone with one digit shorter than what my finger is

12   here is barely going to be able to touch the trigger, but will

13   not have the left leverage to pull it.  My finger only went to

14   here on a longer trigger gun.  If you've got something with a

15   shorter trigger reach, as you can see here, they'll be able to

16   get at least -- where the joint -- with the distal joint of my

17   finger sits here, is where their fingertip will sit, and they

18   will be able to operate the gun effectively.

19   Q.  You've gotten into -- a little ahead of us in terms of the

20   missing shortened finger issue.

21   A.  I'm sorry.

22   Q.  I want to walk through the methodology you apply when

23   attempting to develop what I'm going to call the work-around or

24   a method by virtue of which someone with a disability can

25   overcome that disability.  And what I understood you to say,

1  you start out by figuring out what the disability is, figuring

2  out what aspects of carrying, firing, reloading a firearm those

3  disabilities are going to affect; is that a fair beginning?

4  A.  Correct.

5  Q.  And then what's the next step in the process?

6  A.  The next step in the process is get the student out

7  actually shooting, and, basically, diagnose, how is he hitting?

8  How is his hand interfacing with the firearm?  What's his speed

9  of recoil control, et cetera?  And we adapt accordingly in

10  terms of technique and equipment.

11  Q.  So you develop ways for the disabled, injured, or infirm

12  shooter, whether able-bodied or not, to overcome whatever the

13  disability or injury presents?

14  A.  Correct.

15  Q.  Is that fair?

16  A.  Yes.

17  Q.  All right.

18  A.  Whether by technique or equipment or combination of both.

19  Q.  Can you advise the Court regarding the impact of upper body

20  disabilities on a shooter's ability to reload.  And whether

21  it's a disability or injury, let us know if there is a

22  difference.  Otherwise, if the same is true for able-bodied

23  injured shooters as it might be to a disabled person with a --

24  an extremity that is either missing or rendered useless,

25  paralyzed?

1   A.   Sure.  You have to take each of them, basically, as they

2   come.  For every student who is going to have the super short

3   fingers or the hand injury or partial or complete amputation,

4   you're going to have several who are my age.  The age is

5   getting along, you're seeing arthritis manifestations in the

6   hand, and they don't have the range of movement that they might

7   have had when they were 20 or 30 or 40.

8          I'm kind of losing track here -- repeat the question.

9   Q.   Sure.  I'm asking you to explain how the ability to reload

10  is adversely affected by a disability.

11  A.   Thank you.  Let's say that I had a shortened thumb, and we

12  are reloading the semiautomatic pistol.  With an average length

13  thumb, it's no problem for me, being right-handed, to simply

14  press this button inward and dump the magazine.  If my thumb

15  only came to where my median joint is, I would have to turn my

16  hand on the gun, bring the proximal joint of my index finger

17  under the grip tag, which would somewhat weaken my grasp of the

18  pistol, to get that part of the thumb -- where my median joint

19  is would be the tip of his stump, basically -- to make that

20  press.

21         Or we could simply have him do it with the other hand,

22  but that's going to slow him down too.  Because the

23  conventional reload, the shooting hand is dumping the magazine

24  simultaneously with the support hand grabbing a fresh magazine

25  to reload.  Now, with the left hand, in my case, doing the

1  right hand's job, that support hand is going to get much later

2  to the spare magazine and will slow down the reload and

3  lengthen that window of absolute helplessness.

4  Q.  You anticipated my next question.  I was going to ask why

5  time was a problem.  Thank you.  How can that be overcome, the

6  time element that you just described?

7  A.  The simplest and most logical way is to have that person

8  carry a gun, or have access to a gun if it's home defense, that

9  has that many more cartridges in it.  The more cartridges there

10  are, the less often he will have to reload.  The more

11  cartridges there are, the longer he can stay in the fight

12  before he has to reload.

13  Q.  How, then -- taking everything you just testified to into

14  account, how, then, did you arrive at your opinion that the

15  ability of a disabled, infirm, or injured person to protect

16  themselves will be adversely protected by a magazine capacity

17  limitation?

18  A.  Well, certainly, through a lifetime of study, through

19  observation.  When you look at the lower-capacity gun versus

20  the higher-capacity gun in fully skilled hands, it becomes

21  pretty stark.  There is an organization that conducts what you

22  might call simulated gunfighting, called IDPA, International

23  Defensive Pistol Association.

24        At their national championships last year, the top

25  revolver shooter in the world, a guy named Jerry Miculek,

Massad Ayoob – Direct

1   M-I-C-U-L-E-K, was shooting against the top semiautomatic

2   pistol shooter in the world, Rob Vogel.  They're shooting the

3   exact same course of fire, the exact same number of hits

4   required.  The rules limit Miculek with the revolver to six

5   shots, then he has to reload again, six shots, then he has to

6   reload again, et cetera.  Their rules, to keep a level playing

7   field for semiautomatics in states that have ten-round magazine

8   limits, is ten in the magazine, one in the chamber.  So the

9   semiautomatic shooter in that case had eleven rounds to six the

10  other man had.

11         When you figure the time it takes to reload and the

12  number of times you have to reload, at the end, Vogel's score

13  was 28 percent faster than the revolver shooter.  So,

14  essentially, comparing like with like, the greatest world

15  champions in the sports at this time, it was a 28 percent

16  deficit to have the gun with less capacity.

17  *Q.*  We've already done this to a certain degree, so I want to

18  skip over anything that you have already covered in your

19  testimony.  Now is about the time I wanted to get into

20  particular disabilities that present specific problems for

21  handicapped or injured able-bodied shooters which adversely

22  affect their ability to address a threat due to a magazine

23  limitation.  And you had started to talk about shortened or

24  missing fingers, and you actually effected the demonstration of

25  some of the issues for the Court.

 1          Are there any other points that you'd like the Court

 2   to consider with regard to how individuals with missing or

 3   shortened fingers are impacted by capacity limit on detachable

 4   box magazines?

 5   A.  Well, the missing or shortened fingers, if it reduces their

 6   ability to shoot fast and straight, means that a shot that had

 7   they had perfect hands and had lined up, might have struck

 8   center and ended the fight, might hit off center, leave the

 9   opponent up and running and trying to kill them and others and

10   require them to shoot again.  If you don't have any ammunition

11   left with which to shoot again, you're back in that window of

12   utter helplessness.

13   Q.  You mentioned possible design -- mechanical design

14   modifications to a firearm to address a problem associated with

15   missing or shortened fingers.

16   A.  One that has been suggested in some of the plaintiffs' --

17   I'm sorry, the defendant's reports and depositions that I've

18   read has been simply putting an extended magazine release on

19   the semiautomatic pistol.  That would work to some degree,

20   certainly, on the range.  Your problem with it is if the gun is

21   going to be carried.  The magazine button tends to extend --

22   it's going to be generally the same diameter, a bit larger, but

23   it will extend out away from the pistol.  That means we have a

24   protuberance that in a right-handed person's holster, coming

25   from the left side of the gun, is going to be pressing against

APP. 813

1    the left side.

2         Apart from discomfort, any time that person bumps into

3    a door or simply leans to the right side in a wheelchair when

4    the armchair hits it, the weight of the gun will now drive the

5    button against the body, it will press the release, and the

6    magazine will pop out.  This means the gun is no longer

7    functional.  On some guns, if they need to draw and fire in

8    self-defense, they will get one shot before the gun ceases to

9    fire.  Some others have a feature called a magazine

10   disconnector safety, which means that when a magazine drops out

11   of place, even the live round in the chamber cannot be fired.

12   In that situation, they'd be totally helpless.

13        Carrying on the left side, since most of the pistols

14   have the button protruding to the left, that would allow any

15   time the edge of the chair -- the wheelchair strikes the hip,

16   once again, the magazine is going to be released, and it will

17   turn the whatever-many-shot pistol into a one-shot pistol, or

18   if it has the disconnector safety, a nonfunctional,

19   nonshootable pistol.

20   Q.  All right.  I want to move on, if we've covered everything

21   dealing with adverse effects of missing or shortened fingers on

22   the mechanical operation of the firearm, and talk about either

23   a completely paralyzed arm or missing arm or hand and whether

24   or not, first of all, you've trained people with those

25   disabilities.

Massad Ayoob - Direct

1   A.  I have.

2   Q.  Secondly, when you're training those folks, is that similar

3   to teaching an able-bodied person how to shoot one-handed, for

4   example?

5   A.  It is.  It is very much the same, I'd say high 90th

6   percentile commonality.  What you've got there -- with only one

7   hand on the gun, you've literally lost 50 percent of the flesh

8   and bone that your opponent might have to control his gun.

9   You've got to remember with even a 6 1/2 pound trigger pull,

10  this is going to be only about a -- about a 2-pound gun once

11  it's loaded, give or take a few ounces.  Putting 6 1/2 pounds

12  pressure suddenly on something that weighs only 2 pounds,

13  something a third of its weight, it's very easy for that to be

14  tripped off target.  If you have a two-handed grasp, it's much

15  easier to keep it stable on target and make those shots.  So

16  if --

17  Q.  So just so I understand, what you're saying, it potentially

18  affects accuracy?

19  A.  Potentially affects accuracy.  It will also dramatically

20  affect recoil recovery.  That is, the speed -- the time it's

21  going to take from one accurate self-defense shot to the next

22  accurate self-defense shot.  Two hands could control the

23  recoil, which takes the form of what is colloquially called

24  kick, the gun coming back into your hand, and includes also

25  muscle rise or muscle jumps, as the muscle levers up against

Massad Ayoob – Direct

1   the axis of the wrist.

2   Q.  So one-handed shooting affects accuracy in two ways that

3   you just described?

4   A.  It affects accuracy, and it affects speed.

5   Q.  Let's talk about the speed component.  When you're talking

6   about speed, are you talking about the speed to reload or

7   replace a magazine?

8   A.  No, that would be the speed to get multiple hits.

9   Q.  All right.  Let's talk about that, and then we'll talk

10  about the other issue.  Tell me about the speed to get multiple

11  hits.

12  A.  Okay.  The speed of shooting is going to be the same one or

13  two hands, because the same index finger is controlling the

14  trigger.  The delivery of accurate hits is what changes.  Given

15  the fact that, again, we only have half the flesh and bone to

16  stabilize against the trigger pull weight against the

17  trigger's -- excuse me, to stabilize the gun against the weight

18  of the trigger pull, and we're going to have more muscle rise

19  between shots, it's going to take longer between shots to

20  align, hold and squeeze, bring the muscle back down from the

21  recoil of shot one to align it for shot two.

22         You could put -- one-handed, I could shoot as fast as

23  I can shoot two-handed.  One-handed, none of us are going to be

24  able to hit accurately as fast as we could two-handed.

25  Q.  So what's a work-around?  What -- what are ways that you

1    have developed to overcome the problem with hit potential here

2    that you've just described, or accuracy?

3    A.  We teach very hard grasp, very aggressive stances.

4          May I stand?

5          THE COURT:  You may.

6          THE WITNESS:  It's like throwing a punch.  If you're

7    standing upright, like, on the target range, and the pistol

8    recoil is one-handed, the gun comes up and toward your weak

9    hand side like a lever.  It's following the line of least

10   resistance.  It goes upward because the axis of the barrel is

11   above the wrist, and it goes inward because that's where the

12   hand is open and, therefore, the weakest.  That would be

13   happening much less if that side was closed.

14         By getting the upper body forward, we're getting body

15   weight into it, and we can recover faster.  These are fixes,

16   but they're not perfect fixes.

17         I referred a minute ago to IDPA, International

18   Defensive Pistol Association.  In their current rules, the

19   matches cannot put the target more than 7 yards away from the

20   shooter when he's firing non-dominant hand or weak hand only.

21   They cannot put the targets more than 10 yards away in a stage

22   that requires strong hand only shooting.  And the stages where

23   two-handed shooting is allowed, the distances go to three or

24   more times that distance.  That gives you an idea of how much

25   the one-handed versus two-handed shooting affects accuracy and

APP. 817

  1   speed.

  2   *BY MR. COLIN:*

  3   *Q.* What is the most effective way to address diminished

  4   accuracy?

  5   *A.* Diminished accuracy means you're going to need more makeup

  6   shots. If you get clumsy in the golf game, you're going to

  7   need more strokes. If something has kept you from getting the

  8   bullet exactly where it needs to go, you're going to need a

  9   Mulligan, a do-over. Given that that is highly predictable,

 10   particularly for the physically handicapped individual, that

 11   means you're going to need more cartridges in the firearm.

 12   *Q.* And then I had referenced time to reload. Is there an

 13   adverse effect on an individual who has been injured in a hand

 14   or an arm or if the arm is disabled, the hand is disabled, is

 15   there an adverse effect on their ability to reload?

 16   *A.* Yes. The one-handed reload can be done; but it takes so

 17   much longer. It's not just increasing the time, it's literally

 18   multiplying the time.

 19        It would probably be best if I demonstrated the

 20   mechanics really quick.

 21        *MR. COLIN:* Your Honor, may he demonstrate from the

 22   witness stand?

 23        *THE COURT:* He may.

 24        *MR. COLIN:* Thank you.

 25        *THE WITNESS:* Okay. We discussed before two-handed

**APP. 818**

 1   with the revolver, simply open the cylinder, support hand slaps

 2   out and grabs, loads go in, other hand closing cylinder, we're

 3   back in business.

 4        But now if, let's say, all I have is my left hand only

 5   on this revolver, last shot has been fired.  I can't flip it

 6   around like this without dropping it, so I've got to bring it

 7   back to my chest and let the back of the butt touch here to

 8   stabilize.  Now my left hand can go under the trigger guard,

 9   and that's the only way this thumb can reach the cylinder.  The

10   fingers of this hand simultaneously have to push the cylinder

11   out of the frame.  At this point my fingers would go through

12   the now open frame, and the thumb would hit the ejector rod to

13   clear the shells.

14        I don't have another hand to hold it with, so I have

15   to put it somewhere.  If I had a holster on the left-hand side,

16   I'd stick it in the holster with the cylinder up.  If not, I'd

17   shove it in the waistband.  But either way, I would have to

18   remember to hold my thumb on that ejector star we talked about,

19   because when the ejector rod touched the clothing where the end

20   of the holster would come up, it blocks the insertion of any

21   fresh cartridges.

22        Once that's there, now this hand has to go to the

23   ammunition, one cartridge at a time, if we have a pouch or

24   maybe the speed loader.  If it's the most popular type of speed

25   loader, with a release knob that turns clockwise, as I turn

1    clockwise, the cylinder will turn with it.  So now I've got to

2    remember to hold the finger to stabilize the cylinder.  And

3    that's a whole lot of fine motor dexterity and a whole lot of

4    dancing going on.

5         Finally, the rounds are in the chamber, I've got to

6    draw the gun again, use the trigger finger now to close the

7    cylinder and come back.  It takes multiple times longer than

8    the two-hand reload.

9    *BY MR. COLIN:*

10    *Q.*  What is the most effective way to address that problem?

11    *A.*  The most effective way is not to have to reload because you

12    had enough cartridges in your pistol to end the fight.

13    *Q.*  Are you aware of any statistical data regarding the number

14    of rounds in which a defensive shooter has had to fire more

15    than 15 rounds under those circumstances?

16    *A.*  No.  To the best of my knowledge -- believe me, I've looked

17    for it -- no such data exists.  The reason being, there is no

18    central repository where that kind of empirical data is

19    gathered.  We don't even have it for police nationwide.  What

20    we do have is FBI's officers killed, several every year, but

21    that's only the officers who are murdered in the line of duty.

22    It's not at all applicable to all gunfights, which would

23    encompass the victory by the good guys that we hope we're

24    looking for.

25         What we do have on the police side is, there are a

1   couple of large departments that every year analyze and detail

2   every shooting involving their officers.  Now, if one accepts

3   the extrapolation, the private citizens are going to be

4   shooting in self-defense at the exact same people the police

5   are going to be shooting in self-defense, I think it's a

6   reasonable extrapolation.

7          Insofar as high round counts, the last year I can find

8   for the New York City Police Department, the largest in the

9   country, 3 percent of the shootings that year went over 16

10  shots fired by police.  On the West Coast, Los Angeles Police

11  Department, the third largest, it was 5 percent.

12  Q.  So if we're only talking about 3 to 5 percent, help me

13  understand why that's significant.

14  A.  It is significant because in a life-or-death issue,

15  Mr. Colin, it's not about the odds, it's about the stakes.  I

16  think the best analogy I could give is, probably everyone in

17  this room has fire insurance on their home.  If the judge would

18  ask for a show of hands, okay, how many of you have ever had

19  your house burn down, you probably wouldn't see more than one

20  or two hands go up.  Those people would be awfully glad they

21  have the fire insurance.  Would the rest of us look at each

22  other and say, darn, we've been cheated by the insurance

23  company and all of those premiums because our house didn't burn

24  down?

25          What we have for every premium, the value we got was

1   the peace of mind.  And that is, in essence, exactly what we're

2   looking at when police or civilians select the firearm they're

3   going to carry.  The odds say, none of us, even the police, are

4   ever going to need to shoot anyone during our career.  The odds

5   say, the cops should be able to be Andy of Mayberry and go out

6   and do their duty without a gun at all.  But in those moments

7   when you become the 3 percent, the 5 percent, it's like the

8   fire extinguisher -- it's like the fire insurance, the cost of

9   not being prepared for it is so absolutely catastrophic, it is

10  simply unacceptable.

11  *Q.*  Thank you.

12       I'd like to move on to your training of individuals

13  who, either due to age or some other infirmity, have

14  experienced, perhaps not the level of disabilities to which you

15  previously -- those profound disabilities, but nonetheless fall

16  into that other 5 to 10 percent of your category of your

17  students who you've had to develop work-arounds similar to the

18  work-around for an injured shooter.  Can you describe the

19  nature of the infirmities, if you will, caused by age or

20  illness that you've had to address in your instruction.

21  *A.*  I'm not sure if they're caused by age or just come with it,

22  but I'm at an age experiencing it.  Essentially, there, we see

23  more the tactical disability elements, the -- they can't move

24  to cover or get in behind cover as effectively.  The current

25  protocol that's being put forth by the authorities for active

APP. 822

1   murder attempt responses is run, hide, fight.  First try to run

2   and get away, get out of range.  Second, if you can't do that,

3   hide someplace and hope they can't see you or hope you're

4   hiding behind something so solid they can't shoot through it

5   and kill you.  And fight only as a last resort.  The person who

6   cannot move quickly, the run part and the hide part are off the

7   table from when the killer's first shot goes off.  Their only

8   chance is to fight.

9   Q.  Stop there.  So these folks with these lower-body problems

10  that you've just described, are those similar to folks with

11  lower-body disabilities that you've talked about, folks in

12  wheelchairs, missing legs?

13  A.  Correct.  It's a matter of degree.

14  O.  Well, then, to save a little bit of time, let's combine

15  those discussions, if we could.  You talked about infirmities

16  that affect this run, hide, fight situation.  Same true of

17  lower-body disabilities?

18  A.  Yes.

19  Q.  All right.  And so can you describe to the Court the

20  adverse effect of being unable to run and hide and the methods

21  that you've developed to try to address those adverse effects.

22  A.  Basically, there, you become a sitting duck, once again,

23  that window of helplessness that we've been speaking of.  I can

24  teach them to shoot while they're moving.  One of the few

25  advantages of the slow-moving guy is he'll be able to hit

Massad Ayoob – Direct

  1   better than the fast-running guy when he shoots while he's

  2   moving.  But, in essence, if you cannot escape the line of fire

  3   with the opponent, if you cannot outrun the guy coming at you

  4   with a knife, the only chance you have left is to use your

  5   weapon to neutralize his threat.  And that means you need

  6   enough punches to be able to throw to finish the knockout blow

  7   to end the fight.

  8   Q.  I've heard the word in a different context in law

  9   enforcement called cover fire; is that what you're talking

 10   about?

 11   A.  No.  If you shoot -- the object you're shooting is to hit,

 12   particularly in a crowd situation.  Again, we want -- don't

 13   want to jump into that spray and pray.  The whole purpose of

 14   the gun is to deliver accurate fire, perhaps rapid fire, if

 15   necessary, that will stop the threat.  Shooting while you're

 16   moving, you will have to slow down your rate of fire to get

 17   accurate hits.

 18   Q.  So the -- your ability to return cover fire -- or to

 19   provide the kind of defensive fire that you're talking about,

 20   is that impacted by the number of rounds that you have

 21   available to you before you reload?

 22   A.  Certainly, the more punches you have to throw, the more

 23   likely you are to land the punch that ends the fight.  The

 24   opponent very often is behind heavy cover.  You look at

 25   situations like the Trolley Square Mall mass shooting in Salt

Massad Ayoob – Direct

1   Lake City, Utah.  The killer was shooting people in the Von

2   Maur mall –– I'm sorry, I'm not sure if it was Von Maur or not

3   –– the Trolley Square Mall.  The first responder was an

4   off-duty police officer who only had a seven-shot pistol.

5        He sees the shooter, fires the shot at him.  The

6   shooter ducks in behind the cover of a store that everybody has

7   run out of.  And every time he ducks his head out, the officer

8   takes another shot.  Doesn't hit him, but comes close, and pins

9   him down.  Everyone is stampeding to the exits.  But during

10  those moments, the killer has been diverted.  He claims no more

11  victims from then on.

12       As the young officer is –– he either ran out of

13  ammunition or had one cartridge left, the accounts of that

14  vary.  At that moment, the second responding officer arrived,

15  joined in the fight, pinned the guy down until the SWAT team

16  arrived.  And it took the SWAT team 14 rounds of submachine

17  gunfire and M16 rifle fire to finally kill the killer.  But it

18  wasn't about posing, it was about sustaining fire that kept him

19  in position.  And I gather that's what you were talking about

20  when you spoke of cover fire.

21       We saw it earlier in the classic 20th century mass

22  murder, back in '66, the Texas tower.  Charles Whitman had

23  climbed that tower with literally a footlocker full of guns and

24  ammunition that he rolled up on a dolly on the elevator.  He

25  opens fire from the top of the tower, more than 330 feet up.

1  The police with .38 caliber revolvers, short-range buckshot,

2  were helpless to stop him.  Once the people down on the streets

3  figured out what was going on and saw people falling around

4  them, hunting rifles started coming out of pickup trucks.

5       One of the guys who returned fire was a civilian rifle

6  competitor who had been issued a national match at 14.  And if

7  you look at the news cam footage of what happened then at the

8  tower, you see puffs of dust coming off the parapets behind

9  which Whitman was shooting.  At that point, the last civilian

10  victim had been killed, once he came under return fire.  The

11  ability of those multiple people from the ground to pin him

12  down stopped the killing until another citizen with a rifle

13  could lead two policemen to the roof and end the whole thing.

14       Those are examples of the appropriate use of cover

15  fire, not spray and pray, nothing that endangers the public,

16  but something that can hold -- if it can't neutralize the

17  threat, can at least contain the threat in one spot until

18  society's forces can be marshaled to close in on it and deal

19  with it.

20  Q.  Well, we heard at the outset of this case a list of four or

21  five indents in which I think -- we're calling the mass

22  shootings where multiple individuals were shot.  I'd like to

23  ask the reverse question, in the context that you've just been

24  talking about.  Are you aware of incidents where law

25  enforcement officers, as you've previously described, fired

Massad Ayoob – Direct

1  more than 15 rounds?  Did those involve multiple assailants, is

2  that usually the case when law enforcement officer is firing

3  more than 15 rounds?

4  A.  Not necessarily.  There are any number of things that could

5  make a law enforcement officer or, for that matter, the private

6  citizen have to go to a high round count.

7        Let's say the opponent is firing at you from a

8  vehicle.  A solidly built automobile is pretty solid cover.

9  Most pistol bullets are going to have difficulty getting

10  through a car door, particularly on an angle.  Heavy window

11  safety glass has the same effect.  So it's going to take a lot

12  of shots to chew into that car, make the killer inside stop

13  shooting from there.  He's not in a tank, it's only an

14  automobile, but we don't have bazookas or antitank rockets

15  either, so it kind of balances with small arms.

16        We see today probably more criminals wearing soft body

17  armor during their crimes than during the time of John

18  Dillinger in the 1930s.  It's very standard among the cocaine

19  cowboys.  You saw it here in Colorado at the Aurora theater

20  with Holmes.  The actual videotape exists from 1997 of the

21  North Hollywood bank robbery at the Bank of America.  The

22  suspects, Phillips and Matasareanu -- M-A-T-T-S-E-A-R-A-N-U, I

23  think -- had got old military surplus flak vests.  They had

24  disassembled them prior to their robberies with tape strips and

25  wrapped the bullet-resistant Kevlar around each other's upper

1  arms, forearms, leaving the joints uncovered so they could flex

2  their limbs, thighs and calves, and heavy armor around the

3  torsos.  They put on these big coveralls.

4        And if you look at the action news cam footage of the

5  44 minutes of that shooting, they look like the Michelin tire

6  men.

7        Police, once again, were limited to medium-caliber

8  pistols, 9 millimeter and .38 and shotguns with buckshot.  You

9  can see these guys jerking and flinching as the bullets hit

10 them, but they have absolutely no effect.  They are using

11 totally illegal machine guns, for which they have a four-figure

12 round count of ammunition with them.  They lay 13 good people,

13 cops and civilians, down on the street before the SWAT team

14 gets there and it's over.  I do not recall what the round count

15 was, but the round count was huge.

16       The running opponents or running and shooting, it's a

17 more difficult marksmanship problem.  It will take more shots

18 to hit them.  The guy who knows how to take cover, that is

19 going to take more shots to keep him there or maybe shoot

20 through the cover.

21       Multiple opponents.  We look at the typical hit ratio

22 on the street.  New York City Police tends to run in the mid

23 30th percentile.  That is about 34, 35 percent of the shots

24 they fire in actual combat will hit the suspect.  Let's, for

25 the sake of argument, assume the private citizen has the same

APP. 828

Massad Ayoob – Direct

1   hit potential, hits with the same ratio.  We have three home

2   invaders kick down the door.  You're going to need three shots

3   apiece to get one bullet into each of them.  And you ask

4   yourself, how many rounds do I have?  How many rounds will it

5   take to stop them?

6          We have cases, one out of Cook County, Illinois.  A

7   heroin addict doing a liquor store robbery.  Took 33 rounds, 33

8   hits from 9 millimeter pistols.  Stayed on his feet until

9   finally one or two shotgun blasts put him down.  We have case

10   after case where these guys just turn into bullet sponges.

11          The medical examiners tell us that since they are

12   going through the same fight-or-flight response as the

13   defenders, the -- the adrenaline release will leave no artifact

14   in the body.  There is no postmortem artifact to test for

15   adrenaline like you can test for cocaine or heroin.  If there

16   was, we could never tell how much that particular person was

17   affected by that particular internally generated substance.

18          Then you start looking at the drug use.  If your

19   assailant is on cocaine -- let's say, crack cocaine, which is

20   an intensified form of flake cocaine -- one of the ways cocaine

21   gives its rush is adrenaline release in the body.  So he is,

22   essentially, that much more supercharged, that much stronger,

23   that much more capable of absorbing pain and trauma before you

24   put him down.

25          So when you read about these situations where many,

Massad Ayoob – Direct

1    many shots were fired at the criminal before the criminal goes

2    down, you have to remember, that's not necessarily spray and

3    pray.  It may well be any number of any combination of

4    circumstances that kept him up and running.  Real life is not

5    like TV, where one shot is fired, and the bad guy goes flying

6    through a plate glass window like he's scooped up by an

7    invisible giant.

8    *Q.*  Which he may have been on TV.

9         You've talked about a number of events where multiple

10   rounds were fired.  I'd like you to focus just for a minute on

11   events of which you are aware in which multiple rounds, more

12   than 15 rounds, were necessary for a civilian defensive gun

13   use.  And I'd like you to tell us whether or not you are aware

14   of any such incidents.

15   *A.*  The largest one I'm aware of was a man I became friends

16   with, Harry Beckwith, in Micanopy, Florida, M-I-C-A-N-O-P-Y.

17        Harry ran a gun shop in Alachua County.  There had

18   been robberies, so he had a lot of security in place, and he

19   lived next door to the gun shop.  One night the alarm -- he

20   hears a crash, and, of course, the alarms are going off.  And

21   he looks out, and multiple carloads of perpetrators have driven

22   through the door and window to run in and scoop all the guns

23   and stuff.

24        Harry is not about to put up with that, and he figures

25   he will interject, yell at them, "stop or I'll shoot,"

 1   something like that.  Harry has on a pistol.  He is a licensed

 2   machine gun dealer, and he grabs a fully automatic M16 and a

 3   fully automatic 9 millimeter submachine gun.  He also after the

 4   stop sees a gun in their hand coming up toward him, and he

 5   starts shooting.  By the time that was over, Harry had fired

 6   more than 100 rounds.  One of the perpetrators was killed, one

 7   or more wounded, all of them captured and convicted, and he was

 8   cleared by the grand jury.

 9          Others I'm aware of, there was a string of I think

10   five gunfights involving a man named Lance Thomas.  He owned a

11   watch shop and Rolex repair center in Los Angeles.  After the

12   first gunfight, he started staging multiple handguns.  He had a

13   very small workplace, not a heck of a lot bigger than this

14   witness stand, and he had barred doors.  And he would buzz in

15   people after he looked through the window and was comfortable

16   with their look.  And a few of them got through anyway.  He had

17   a pistol staged probably every 3 or 4 feet behind the counter.

18   It was safe in there because it was a secured workplace, and

19   there was no chance of little kids getting at them or anything.

20          In the course of five gunfights, at least one of his

21   went beyond 16.  It was either 17 or 19 shots before the last

22   of the multiple perpetrators was either down or had fled.

23          There was another where I debriefed the survivors.

24   Two brothers owned a jewelry store.  They called it the Beverly

25   Hills Jewelry Store, but it was located in Richmond, Virginia.

Massad Ayoob – Direct

1    They had done something very similar.  They had bought a large

2    number of five-shot .38 revolvers and staged them behind the

3    counter, so if there was a robbery at any point, the person

4    behind the counter would be within a few steps of a gun to

5    fight back with.

6              Their shootout was with two old gangster type guys,

7    both members of the Dixie Mafia.  They walked in, one with a

8    sawed-off shotgun, one with a .45.  And in the course of the

9    firefight, I actually lost count of how many guns one brother

10   emptied, pinning one of them down.  The other brother shot and

11   killed the perpetrator with the .45, then went to the shotgun.

12   And between the two, they were able to finally put both of them

13   down.

14   Q.  So these multiple staged firearms seem to be a fairly --

15   even low-capacity firearms, seem to be a fairly effective

16   method of home defense, then, would it not?

17   A.  No, not at all.  What you had, particularly in the Lance

18   Thomas case, and to a significant degree in the Beverly Hills

19   Jewelers case, is these were in secured areas.  Lance Thomas

20   worked alone.  He did not have employees, to my knowledge.  The

21   jewelry store, only trusted employees were allowed behind

22   there.

23             In the home, I think it would be madness staging a

24   loaded gun in instant reach every few feet.  Because what are

25   you going to do when the neighbors or the relatives come by

APP. 832

Massad Ayoob – Direct

1   unexpectedly with their little kids?  What are you going to do

2   when -- you know, when the burglar walks into the house while

3   you're gone and finds, there is ten guns laying around waiting

4   for, you know, quick draw?  I would consider it not only

5   totally impractical, but a little bit reckless to have that

6   many loaded guns staged in plain sight and easy reach in

7   anyone's home.

8   Q.  Does the law enforcement exemption in 18-12-302 provide law

9   enforcement officers with an advantage over armed criminals?

10  A.  Only if the armed criminals obey that law.

11  Q.  What about civilians, meaning, do --

12  A.  I'm not sure I understand --

13  Q.  Do criminals have an advantage over civilians with regard

14  to the capacity limitations of the magazine?

15          MS. MORRILL:  Objection, Your Honor.  Foundation.

16          THE COURT:  Sustained.

17  BY MR. COLIN:

18  Q.  Have you reviewed report of a Dr. Jeffrey Zax?

19  A.  I have.

20  Q.  And in his report, Dr. Zax opines, "The use" -- and I'm

21  quoting, "The use of firearms for purposes of assault seems to

22  far exceed the use for the purposes of self-defense."

23          Do you agree with that proposition?

24  A.  I do not.

25  Q.  Why not?

1    A.  As I read Dr. Zax's report, he is comparing all criminal

2    assaults with firearms to only justifiable homicides committed

3    by private citizens.  What is called in the trade DGUs,

4    defensive gun usages, by private citizens are very much like

5    the police.  Overwhelmingly, the great majority of the time,

6    when the gun comes out, the fight is over.  The criminals

7    submit to the officer, may even submit to a homeowner,

8    citizen's arrest, or runs away.

9         There are a number of cases where the victim shoots

10   the attacker, the attacker does not die, he either runs away

11   and is arrested later or collapses at the scene.  Of course,

12   when he stops attacking, the citizen stops shooting.  And none

13   of those figure into the report that I read by Dr. Zax.

14   O.  Dr. Zax also opines that "mass shootings are more

15   lethal" -- more lethal -- "Mass shootings are more lethal when

16   executed using large-capacity magazines.  If these magazines

17   become less widely available, there is some chance that mass

18   shootings will become somewhat less horrific."

19        Do you agree with that proposition?

20        MS. MORRILL:  Objection, Your Honor.  Foundation.

21        THE COURT:  Response.

22        MR. COLIN:  Your Honor, the foundation for his

23   response to Dr. Zax's opinions has been, we believe, adequately

24   established throughout his testimony here.  He is an expert

25   in -- well, let me withdraw that.  Let me build a foundation.

1         *THE COURT:*  Thank you.

2    *BY MR. COLIN:*

3    *Q.*  Do you know the basis upon which Dr. Zax rendered that

4    opinion?

5    *A.*  I would have to go back and review his report.  I do not

6    recall as I sit here.

7    *Q.*  Then let me move on to a different topic area.  Defendant

8    suggested that the delay associated with a suspect's need to

9    reload gives potential victims an opportunity to intervene.

10         My understanding is that you actually instruct

11   individuals on disarming suspects; is that right?

12   *A.*  I do.

13   *Q.*  Do you believe that intervention is an appropriate method

14   by virtue of which to deal with an armed suspect who has a

15   lower magazine capacity firearm.

16   *A.*  Well, first, let's clarify for the record, attempting to

17   disarm is something we would only recommend if the -- if it's

18   obvious the guy is going to kill somebody.  He's just said, I'm

19   going to kill this person, I'm going to do a countdown, or the

20   killing has already begun.  At that point, the -- any officer,

21   any armed citizen with a gun, their best recourse would be to

22   go to their own gun.

23         For the many who do not, it would be at that point

24   that it would make sense to attempt to intervene.  But to wait

25   until he has expended -- okay.  Let's say he's only got a

APP. 835

Massad Ayoob - Direct

1  15-shot magazine -- heck, let's say he's only got a ten-shot

2  magazine.  I'm standing behind him, I've heard a shot, I turn

3  around, here is this guy behind me shooting into the crowd.  Am

4  I supposed to wait and let him shoot nine more, let him shoot

5  fourteen more?  If you're going to disarm him, disarm him now.

6        The whole concept of disarming with a firearm, why

7  it's actually easier than with a knife, is the firearm only

8  directs its force in one very specific direction.  If you can

9  get in behind the muzzle of the gun and you know how to apply

10  leverage, you have a very good fighting chance of disarming him

11  now.  The recoiling slide of the pistol as he pulls the trigger

12  might give you minor cuts on your hands.  You could fix that

13  with a bandaid.  The very hot barrel of, let's say, a machine

14  gun, there is going to be a burn on your hand that is going to

15  heal.

16        The rationale of waiting until he runs dry allows him

17  to kill numerous victims.  And what's to say during that

18  period, he won't kill you.  If you're close enough to grab him

19  and disarm him, you're close enough to be one of the primary

20  targets.

21  Q.  Are you aware of circumstances where that's occurred?

22  A.  Yes.

23  Q.  Can you describe that, please.

24  A.  Let's look at one of the most recent.  Sparks, Nevada,

25  last year.  A 12-year-old kid brings a gun to school, starts

APP. 836

1   shooting.  The math teacher attempts to get the gun away from

2   him.  He didn't -- my reading of it is, he didn't jump him.  He

3   was approaching him and trying to talk to him down.  He never

4   got there.  The kid shot him in the chest and killed him, then

5   committed suicide.

6          Your classic sample, Sandy Hook.  You look at the

7   first victim, Dawn Hochsprung.  She's about 5 feet 2 inches

8   tall.  Lanza literally shoots his way through that front door.

9   She charged him.  She charged him, clearly going for an attempt

10  to disarm.  Going from the front on a guy who has got the gun

11  up is hopeless.  She was the first to die, and the dominoes

12  fall from there.

13         Where you'll see the successful disarm will be the

14  very physically strong person who is in a position.  The -- I

15  want to say it was the Barry Loukaitis mass shooting,

16  L-O-U-K-A-T-I-S.  Loukaitis was a 14-year-old boy who went to

17  school and opened fire.  A large male gym teacher jumps him,

18  diverts the muzzle of the gun, and wrestles him down and gets

19  the gun away.  If you can get onto the gun without being shot,

20  you're a large male gym teacher against an average-sized kid,

21  God bless that man for doing that.  But most people will not

22  have that physical advantage.

23         In New Hampshire, 1997, the Carl Drega murder spree.

24  Drega had murdered two state troopers.  He had hunted down the

25  local judge that he hated, Judge Vickie Bunnell, and shot her

Massad Ayoob – Direct

1    in the back.  A man named Dennis Joos, J-O-O-S, a physically

2    small man, a newspaper publisher whose office was next door to

3    Judge Bunnell's, jumped him and tried to get the gun away from

4    him.  Drega, who was 6-foot 3, 240 pounds, and rock solid, just

5    knocked him to the ground, said, Mind your own F-ing business,

6    and shot him dead.

7         What that tells us is, there are the occasional

8    successful disarms.  If we tell the public, hey, we're going to

9    try to give you a little opening here so it will be safe for

10   you to jump the guy and get the gun away, that means nobody is

11   going to try to disarm him until all of those rounds have been

12   fired and X number of those victims have been claimed.  So in

13   the end, I don't think there is going to be a whole lot of

14   change in the victim count based on round count, particularly

15   because the great majority of these things have involved guns

16   that were not the so-called high-capacity magazines under

17   discussion today.

18   Q.  Thank you.

19        I have no further questions of this witness.

20        THE COURT:  I think this might be a good time to take

21   our afternoon recess.  The court clock is showing about 2:40,

22   and we'll reconvene at 2:55.  We'll stand in recess until then.

23        (Recess at 2:39 p.m.)

24        (In open court at 3:04 p.m.)

25        THE COURT:  Are we ready for cross-examination?

1          *MS. MORRILL:*  Thank you, Your Honor.  We have no

2     cross-examination for this witness.

3          *THE COURT:*  Thank you.

4          Can this witness step down and be excused?

5          *MR. COLIN:*  He may.  I would ask to withdraw Exhibits

6     93 and 94, please.

7          *THE COURT:*  Any objection?

8          *MS. MORRILL:*  No objection.

9          *THE COURT:*  All right.  Then, thank you very much,

10    sir.  You may step down.  You are excused.

11         And Exhibits 93 and 94 are withdrawn.  I think that

12    means they go back into the briefcase.

13         *MR. COLIN:*  I'm hoping.  The person who brought them

14    is here to take them.

15         *THE COURT:*  Would you call your next witness, please.

16         *MR. COLIN:*  Sorry?

17         *THE COURT:*  Next witness.

18         *MR. FABIAN:*  Thank you, Your Honor.  Plaintiff would

19    call Dave Gill.

20         *THE COURT:*  Thank you.

21              (**DAVE GILL, PLAINTIFFS' WITNESS, SWORN**)

22         *COURTROOM DEPUTY:*  Please be seated.

23         Please state your name and spell your first and last

24    name for the record.

25         *THE WITNESS:*  Dave Gill, D-A-V-E, Gill, G-I-L-L.

Dave Gill – Direct

1          *THE COURT:*  Ready to proceed?

2          *MR. FABIAN:*  Yes, Your Honor.  Thank you.

3          *THE COURT:*  Please do so.

4                          **DIRECT EXAMINATION**

5     *BY MR. FABIAN:*

6     *Q.*  Mr. Gill, are you a Colorado resident?

7     *A.*  Yes, I am.

8     *Q.*  How long have you been a Colorado resident?

9     *A.*  Since 1983.

10    *Q.*  Where do you live?

11    *A.*  I live in unincorporated Douglas County.

12    *Q.*  Are you a member of the Colorado State Shooting

13    Association?

14    *A.*  I am.

15    *Q.*  For how long?

16    *A.*  Been a member since 2000.

17    *Q.*  What is the Colorado State Shooting Association, what does

18    it do?

19    *A.*  Well, its primary function is to provide shooting

20    opportunities to law-abiding Colorado citizens.

21    *Q.*  And is that the stated mission or purpose of the

22    association?

23    *A.*  Yes, it is.  We also do bring people together to provide a

24    uniform voice in governmental issues.

25    *Q.*  As a member of CSSA -- do you mind if I refer to the

Dave Gill – Direct

1    shooting association as CSSA?

2    A.   Please do.

3    Q.   Is it safe to say you're a shooter and gun owner?

4    A.   Yes, I am.

5    Q.   Are you also a hunter?

6    A.   I am.

7    Q.   How long have you been shooting?

8    A.   Since 1959.

9    Q.   What types of shooting have you engaged in or currently

10   engage in?

11   A.   Trapshooting, sporting clay shooting, target shooting,

12   variety, both with shotguns and rifles and handguns.

13   Q.   And what type of hunting have you participated in?

14   A.   In the past, I have participated in bow hunting, which I no

15   longer do because of an injury.  But big game hunting for elk

16   and deer.

17   Q.   And does that big game hunting involve use of firearms?

18   A.   Yes, it does.

19   Q.   Is it fair to say you're well acquainted with firearms in

20   general and a wide variety of firearms?

21   A.   Yes, I have.

22   Q.   Have you ever used firearms that accept detachable

23   magazines with a capacity of more than 15 rounds?

24   A.   I have.

25   Q.   Have you ever owned any of these types of firearms?

Dave Gill – Direct

1   A.  I have, several.

2   Q.  Without getting into every single type of firearm you own

3   and how many, do you own an AR-15 style rifle?

4   A.  Yes, I do.

5   Q.  What type or make model is it?

6   A.  Well, there are three.  One is made by Colt, another is a

7   Bushmaster target rifle that I received through the Civilian

8   Marksmanship Program, and the other is a tactical AR.

9   Q.  But they're all built on the AR-15 style platform; is that

10  correct?

11  A.  Yes, they are.

12  Q.  What type of magazines do you use in those rifles?

13  A.  The standard-capacity magazines.

14  O.  Okay.  What is standard-capacity magazines?

15  A.  Twenty and thirty rounds.

16  Q.  And what do you use these rifles for?

17  A.  Different things.  Mostly for either varmint control, home

18  defense, and target shooting.

19  Q.  Are -- you mentioned varmint control.  What specifically

20  are you talking about?

21  A.  Cutting down the population of prairie dogs.

22  Q.  And have you seen other hunters or varmint controllers use

23  AR style rifles?

24  A.  They're very popular for that, yes.

25  Q.  Have you ever used a handgun while hunting?

Dave Gill – Direct

1   *A.*  I've carried a handgun with me while hunting.

2   *Q.*  So was -- were you carrying the handgun to hunt with or for

3   another purpose?

4   *A.*  For self-defense.

5   *Q.*  Okay.  And defense against what?

6   *A.*  Two-legged and four-legged critters.

7   *Q.*  To be a little more specific for the record, are you

8   talking about both animals and people?

9   *A.*  Yes.  And when hunting in the East Coast, it is often

10  considered necessary.

11  *Q.*  So is there a time when you actually had to use or were

12  glad that you had a handgun for self-defense while you were

13  hunting?

14  *A.*  Personally, no.  I've never needed it.

15  *Q.*  Now, do you hold any leadership position in Colorado State

16  Shooting Association?

17  *A.*  I'm the vice president.

18  *Q.*  How long have you been vice president?

19  *A.*  Since 2001.

20  *Q.*  And what do you do as vice president of the association?

21  *A.*  Primary duties are to assist the president and to fill in

22  for him when he is not present.

23  *Q.*  So, essentially, you occupy the second highest position of

24  the association?

25  *A.*  Yes, I do.

APP. 843

Dave Gill - Direct

1   Q.  And is it fair to say, then, you are familiar with CSSA and

2   its operation, at least in a general way?

3   A.  Yes, I am.

4   Q.  Is CSSA associated in any way with the National Rifle

5   Association of America?

6   A.  Yes, we are the official state association for NRA.

7   Q.  And is one of the functions that CSSA performs under the

8   auspices of the NRA the sanctioning of firearm competitions?

9   A.  Yes, it is.

10  Q.  Do some of those shooting competitions involve the use

11  firearms that use or accept magazines with the capacity of

12  greater than 15 rounds?

13  A.  Yes, they do.

14  O.  Do shooting competitions involving the use of firearms that

15  use magazines of greater than 15 rounds have specific

16  limitations on magazine capacities?

17  A.  No, they don't.

18  Q.  Do any of these competitions, though, require that shooters

19  load more than 15 rounds at any single time?

20  A.  No.

21  Q.  That being -- that being established, do shooters in these

22  competitions still use magazines that have capacities of

23  greater than 15 rounds?

24  A.  Yes, they do.  The normal capacity magazines are the ones

25  that are commonly used.

APP. 844

Dave Gill – Direct

1    *Q.*  And why is that?

2    *A.*  They're more reliable.

3              *MS. SCOVILLE:*  Objection.  I don't think that this

4    witness has established the personal knowledge on a non-hearsay

5    basis for this information.

6              *THE COURT:*  Your objection is to foundation?

7              *MS. SCOVILLE:*  Yes.

8              *THE COURT:*  Response.

9              *MR. FABIAN:*  Your Honor, I think he's already said

10   he's familiar with CSSA sanctioning.  If the Court is not

11   satisfied, I can lay further foundation.

12             *THE COURT:*  I think the foundation is adequate.

13   *BY MR. FABIAN:*

14   *O.*  You can answer the question, Mr. Gill.  Do I need to reask

15   the question?

16   *A.*  Would you please.

17   *Q.*  You mentioned that shooters in competition still use

18   magazines of a capacity of greater than 15 rounds.  Why is

19   that?

20   *A.*  Because they're more reliable in their function.

21   *Q.*  Now, are you familiar with Colorado Revised Statute

22   18-12-301, *et sequentes*, commonly known as House Bill 1224?

23   *A.*  Yes, I am.

24   *Q.*  Even though the competitions you discussed don't require

25   loading more than 15 rounds at any specific time, does the

 1   restriction of Colorado Revised Statute 18-12-301, 302, and 303

 2   have any adverse effect on shooters competing in those matches

 3   or competitions?

 4   A.  Yes, I think it will.

 5   Q.  What is that?

 6   A.  Well, it will give older shooters, current shooters, a

 7   tactical and significant advantage over new shooters that are

 8   coming in to the sport because the new shooters won't be able

 9   to have the normal-capacity magazines that those of us who have

10   been around a few years have in adequate supply.  If they --

11   Q.  I'm sorry.

12   A.  Go ahead.

13   Q.  If I understand you correctly, you're saying, shooters who

14   aren't in the sport now but who may enter the sport down the

15   road are not going to have the opportunity to obtain and use

16   the magazines that are the preferred type of magazine in the

17   competition?

18   A.  Yes, they'll be barred from ownership of them legally.

19   Q.  Have you, yourself, ever used a magazine that was modified

20   to accept fewer than its original full complement of rounds?

21   A.  I have used a ten-round magazine that came with a Colt

22   rifle, yes.

23   Q.  How did you find its reliability compared to

24   standard-capacity magazines?

25   A.  Substandard, and I discontinued using it rather quickly

Dave Gill – Direct

1   because of the lack of reliability.

2   Q.  Specifically, when you say "lack of reliability," what was

3   the specific problem that you encountered?

4   A.  Frequent failure to feed and occasional severe jams.

5   Q.  Is magazine reliability important to competitive shooters?

6   A.  It's critical.

7   Q.  Why?

8   A.  Well, they're timed events.  So that if you are fighting

9   with your rifle because it didn't feed properly or jammed,

10  you're losing time.  The jams can be so severe that, basically,

11  you're out of the competition if you don't have another rifle

12  with you and the match will not allow you to substitute.

13  Q.  Is CSSA affiliated in any way with the Civilian

14  Marksmanship Program?

15  A.  We're the official state organization in Colorado.

16  Q.  What is the Civilian Marksmanship Program?

17  A.  It's a program established by Congress to encourage safe

18  and accurate use of firearms, specifically, of military type

19  firearms.

20  Q.  And I'm going to refer to the Civilian Marksmanship Program

21  as CMP.  Is that all right?

22  A.  Please do.

23  Q.  Okay.  Does CMP sell magazines -- I'm sorry, does CMP sell

24  firearms that accept magazines with greater than 15-round

25  capacity?

Dave Gill - Direct

1  A.  Yes, they do.

2  Q.  What type of firearms would those be?

3  A.  The ones that come to mind immediately are the M1 carbine

4  and the AR.

5  Q.  The AR-15 type model that you previously discussed that

6  your -- the type of firearm that you own?

7  A.  Yes.

8  Q.  Has CSSA ever purchased any firearms from CMP?

9  A.  Yes, we have.  We've purchased both the AR target rifles

10  and M1.

11  Q.  For what purpose were those purchased?

12  A.  To facilitate our lending of firearms to new shooters,

13  people who are looking at the sport and trying to see if

14  they're interested in pursuing it, if so, what type of target

15  rifle they may be interested in purchasing.

16  Q.  So does CSSA make both the M1 Garands and the AR-15 type

17  rifles available for loan for individuals who wanted to use

18  them in shooting competitions?

19  A.  Yes, we have.

20  Q.  And do these loans frequently exceed 72 hours in length?

21  A.  Yes, they do.

22  Q.  What might -- what might be the longest period of time they

23  may be loaned for?

24  A.  The longest I am aware of is two years.  Generally, it's

25  one year; sometimes for a specific match.

Dave Gill - Direct

1    Q.  As we previously discussed, AR-15 type rifles accept

2    magazines with capacity of, standard, 20 and 30 rounds,

3    correct?

4    A.  Yes, they do.

5    Q.  Did CSSA provide these sized magazines with the AR-15

6    rifles that they loaned?

7    A.  We did.

8    Q.  Now, are you familiar with the Colorado Revised Statute

9    18-12-112, we've commonly referred to this in this lawsuit as

10   House Bill 1229?

11   A.  I am.

12   Q.  And what effect did this law have on the CSSA rifle loaner

13   program?

14   A.  It forced us to suspend it.

15   Q.  Why was the program suspended?

16   A.  The amount of time and work required to try to understand

17   and comply with the requirements of what I'm going to refer to

18   as 1229, if I may, were excessive and exceed our ability.

19   Q.  Okay.  Could you be a little more specific about -- with

20   respect to 1229, let me just ask the question this way:  Did

21   CSSA find it easy to conduct background checks every time these

22   rifles were transferred for possession?

23   A.  No, we did not.

24   Q.  Also, I think you've already testified that magazines of

25   greater than 15 rounds -- greater than 15-round capacity were

APP. 849

1   also usually provided with these rifles, correct?

2   *A.*  Yes, they were.

3   *Q.*  You previously testified that you were familiar with the

4   Colorado statute pertaining to magazine limitations, 18-12-301,

5   302, and 303, correct?

6   *A.*  Yes.

7   *Q.*  Does that have any effect on the CSSA loaner program?

8   *A.*  It would have required that we either lend the rifles

9   without a magazine, which wouldn't have been particularly

10  useful for the individual borrowing it, or acquire magazines

11  that were compliant with that.

12  *Q.*  With respect to the concerns with respect to these laws

13  affecting the CSSA loaner program, did you warrant this program

14  when you testified last year in opposition to these laws?

15  *A.*  Excuse me I missed part of your statement.

16  *Q.*  Did you testify in opposition to either of these statutes

17  that we've referred to in your testimony?

18  *A.*  Yes, I did.

19  *Q.*  Okay.  And in the course of that testimony, did you in fact

20  make it known to the legislators involved that these -- this

21  legislation would adversely affect the CSSA loaner program?

22  *A.*  I did.

23      *MS. SCOVILLE:*  Objection, Your Honor.  The legislative

24  history has been stipulated and admitted as an exhibit, so this

25  is cumulative testimony.

Dave Gill – Direct

1              *THE COURT:*  Response.

2              *MR. FABIAN:*  I'm just asking Mr. Gill to verify that

3    this information was made available to the legislature.

4              *THE COURT:*  It's cumulative.

5              *MR. FABIAN:*  I understand, Your Honor.

6    *BY MR. FABIAN:*

7    *Q.*  Mr. Gill, did CSSA ever provide background checks on

8    individuals who checked out these loaner rifles?

9    *A.*  No, they did not.

10   *Q.*  If the 14 years you've been a member, 13 years as vice

11   president, has there been any incident or episode involving the

12   criminal use, possession of one of the CSSA loaner rifles?

13   *A.*  No, there was not.

14   *O.*  Was the purpose of the loaner rifle program, as you

15   previously explained, made clear to those who used the rifles?

16   *A.*  Yes, it was.

17   *Q.*  In other words, were the rifles offered for any other

18   purpose, such as hunting?

19   *A.*  No.

20             *MR. FABIAN:*  If I may have a moment, Your Honor?

21             *THE COURT:*  You may.

22             *MR. FABIAN:*  I have no further questions at this time,

23   Your Honor.

24             *THE COURT:*  Thank you.

25             Cross-examination.

**APP. 851**

Dave Gill – Cross

1                              **CROSS-EXAMINATION**

2      *BY MS. SCOVILLE:*

3      *Q.*  Good afternoon, Mr. Gill.

4      *A.*  Good afternoon.

5      *Q.*  You spoke this afternoon about the loans of CSSA rifles for

6      competition, correct?

7      *A.*  Correct.

8      *Q.*  And you don't know exactly how many rifles CSSA has for

9      loans, right?

10     *A.*  Not specifically at this moment, no.

11     *Q.*  CSSA lends M1 Garands, you mentioned?

12     *A.*  Yes.

13     *Q.*  And an M1 Garand has a capacity of eight rounds, correct?

14     *A.*  Correct.

15     *Q.*  So those rifles are not affected by 18-12-302 or House Bill

16     1224?

17     *A.*  No, they have not been.

18     *Q.*  The AR-15 style rifles that are available for loaning have

19     a detachable box magazine, you testified, correct?

20     *A.*  Yes, they do.

21     *Q.*  And the AR style platform rifles were made with

22     lower-capacity magazines during the federal assault weapons

23     ban, correct?

24     *A.*  Yes, they were.

25     *Q.*  And lower-capacity magazines are available for those rifles

                                                                    **APP. 852**

```
 1   at this time, right?

 2   A.  I assume they are.

 3   Q.  And it would be possible for CSSA to loan AR style rifles

 4   with smaller magazines, right?

 5           MR. FABIAN:  Objection, asked and answered on direct.

 6           THE COURT:  Overruled.

 7   BY MS. SCOVILLE:

 8   Q.  You can go ahead and answer.

 9   A.  I suspect it would be possible that we could do it, but it

10   would put those people at a competitive disadvantage.

11   Q.  It would also be possible to loan the AR style rifles

12   without any box magazine attached and permit competitors to

13   supply their own, correct?

14   A.  As far as 1224 goes, yes.  As far as 1229, I don't believe

15   that would be possible for us.

16   Q.  Well, certainly would be possible if the competitor went

17   through a background check, wouldn't it?

18   A.  Yes.

19           THE COURT:  Counsel, would you speak up a little bit,

20   please.  It's hard to hear you.

21           MS. SCOVILLE:  Certainly.  I think with these high

22   heels on, I'm taller than the microphone today.

23           THE COURT:  Well, feel free to take them off if you'd

24   like.

25   BY MS. SCOVILLE:
```

APP. 853

Dave Gill – Cross

1  Q.  You mentioned that CSSA has made loans of the rifles for up

2  to a period of two years, correct?

3  A.  Correct.

4  Q.  I believe you just testified that CSSA has not done

5  background checks on any of the competitors who borrowed the

6  rifles?

7  A.  Correct.

8  Q.  So CSSA was not aware of whether any of these people had

9  outstanding warrants, right?

10  A.  I suppose anything is possible, but we've never had a

11  problem.

12  Q.  It's not something you would know because you never did a

13  background check, right?

14        MR. COLIN:  Objection, argumentative.

15        THE COURT:  Overruled.

16  BY MS. SCOVILLE:

17  Q.  You can go ahead and answer.

18  A.  It's our experience that the people who are involved in the

19  shooting sports do not have these problems.  We've never had a

20  problem with it.

21  Q.  My question was, I believe, you are not aware of whether

22  any of these people who borrowed the guns for competition had

23  outstanding warrants, right?

24  A.  No, we're not aware of that.

25  Q.  And you're not aware of whether any of the people who

Dave Gill - Cross

1  borrowed the firearm for competition had outstanding domestic

2  violence restraining orders?

3  *A.*  I suppose inasmuch as anything could be possible, I suppose

4  that could occur.  But, once again, there was never a problem

5  in all the years.

6  *Q.*  My question was, you are not aware of any instances of

7  people having domestic violence retraining orders, because you

8  didn't check, correct?

9  *A.*  No, we did not.

10  *Q.*  And you didn't check to see whether any of the people to

11  whom you had loaned guns for competition were felons?

12  *A.*  Excuse me.  I couldn't hear you.

13  *Q.*  Were felons?

14  *A.*  Well, once again, anything being possible, I suppose, yes,

15  it could be.  But we're not aware --

16  *Q.*  But you did not know?

17  *A.*  No.

18  *Q.*  You have read Section 18-12-122, or House Bill 1229,

19  haven't you?

20  *A.*  Yes, I have.

21  *Q.*  All right.  And you are aware that there is an exception to

22  the background check requirement in that bill for competition

23  that takes place at a shooting range, correct?

24  *A.*  Yes, if that shooting range is being operated by an

25  incorporated entity.

**APP. 855**

Dave Gill - Cross

1    Q.  And CSSA-sanctioned events do take place at incorporated

2    rifle clubs, right?

3    A.  I believe they're all incorporated.  I've never checked.

4    Q.  And the legislation also includes an exception from the

5    background check requirement for competition -- for shooting

6    competitions, right?

7    A.  Under certain circumstances.  But to qualify for that, we

8    would have to deliver the firearms to the range at the

9    competition and then return with them.  Part of our program has

10   been that the people have to learn also not only to handle and

11   fire the firearm safely, but also to maintain and care for it.

12   And that would not be possible if we had to do all of the

13   cleaning, maintenance, and care of the rifles.

14   Q.  The Section 18-12-112 also includes an exception for

15   temporary transfers of up to 72 hours, correct?

16   A.  Yes.

17   Q.  And CSSA competitions are all under 72 hours, right?

18   A.  Frequently, the guns are not returned within 72 hours

19   because of the need to take them home, clean them, lubricate

20   them, et cetera.

21   Q.  Yes, but that wasn't my question.  My question was, you are

22   not aware of any CSSA-sanctioned shooting competitions that

23   last longer than 72 hours, correct?

24   A.  No, that's correct.

25   Q.  Now, there are no CSSA-sanctioned events that require a

1   competitor to use a magazine or a firearm that has a capacity

2   of greater than 15 rounds, right?

3   A.  True.

4   Q.  In any of the CSSA sanctioned pistol events, the maximum

5   number of rounds that could be fired at any time -- strike

6   that.  Any of the CSSA sanctioned pistol events, the maximum

7   number of rounds that would be permitted to be loaded at any

8   time is ten, right?

9   A.  Yes.

10  Q.  And in any of the CSSA sanctioned rifle events, the maximum

11  number of rounds that would be permitted to be loaded at any

12  time is eight, correct?

13  A.  Yes.

14  O.  You mentioned that competitors prefer large-capacity

15  magazines.  And when I use the term "large-capacity magazines,"

16  I mean those that are of 16 rounds or greater.  You have

17  testified that competitors prefer large-capacity magazines

18  because they're more dependable, right?

19  A.  I've testified that normal-capacity magazines are

20  preferred.

21  Q.  All right.  And "normal" in your definition is, for an AR

22  style rifle, 20 or 30 rounds, right?

23  A.  Yes, it is.

24  Q.  Okay.  And you have experienced problems with the Colt

25  ten-round magazine that you used on a Colt AR style rifle,

1    correct?

2    A.  Yes.

3    Q.  And you had problems with one magazine, right?

4    A.  Yes.

5    Q.  And that happened in the late 1990s, correct?

6    A.  Correct.

7    Q.  You are not aware of any data or studies showing that

8    lower-capacity magazines for AR style rifles are less reliable?

9            MR. FABIAN:  Objection, beyond the scope.

10           THE COURT:  Overrule.

11           THE WITNESS:  I'm not aware of any studies, but it is

12   generally believed and accepted by shooters who are

13   knowledgeable that they are less reliable.

14   BY MS. SCOVILLE:

15   Q.  And you know that only from your discussions with various

16   competitors, correct?

17   A.  Yes.

18           MS. SCOVILLE:  And, Your Honor, I would move to strike

19   his response as based on hearsay.

20           THE COURT:  Overruled.

21   BY MS. SCOVILLE:

22   Q.  And CSSA has not collected any data from its members about

23   the decreased reliability of lower-capacity magazines, correct?

24   A.  Correct.

25   Q.  CSSA is not aware of any competitive shooters who have yet

APP. 858

Dave Gill - Cross

1   been impacted by House Bill 1224, Section 18-12-302, right?

2   A.   Correct.

3   Q.   That's because current competitors with high-powered rifles

4   already own high-capacity magazines, right?

5   A.   Yes, they do.

6   Q.   Now, you testified that you owned several high-capacity

7   magazines, didn't you?

8   A.   I have quite a few.

9   Q.   I think you've told me in the past that you've been blessed

10  with a very large supply, right?

11  A.   Yes.  I have a lifetime supply.

12  Q.   You mentioned earlier that CSSA has suspended its loan

13  program as a result of the legislation that was passed, right?

14  A.   Yes, we have.

15  Q.   That's something that has happened since your deposition

16  was taken on November 1, 2013?

17  A.   I'm not sure of the exact date of when we suspended.

18  Q.   And part of the reason for that suspension, as I understand

19  your testimony, is that it is too difficult to conduct the

20  background checks that would be required to loan these firearms

21  to competitors?

22  A.   It would be difficult or impossible.

23  Q.   All right.  CSSA is not aware of any members who have had

24  difficulty finding a federally licensed firearms dealer to

25  perform a background check for private transfers since July 1,

1   2013, right?

2   A.  We're aware of many dealers who are refusing to do it.

3   Q.  That wasn't my question.

4   A.  I've not had a member specifically tell me they have been

5   unable.

6   Q.  You mentioned the firearms that you own and the way that

7   you use them.  You also carry firearms for self-defense,

8   correct?

9   A.  I do.

10  Q.  And you've had, in fact, several experiences in which you

11  have at least displayed a weapon in self-defense, correct?

12  A.  There have been a couple, yes.

13  Q.  And in the two situations of which I'm a -- let me back up.

14  First of all, how many situations have you had where you had to

15  display a weapon?

16  A.  Two.

17  Q.  All right.  In each of those two situations, you had

18  weapons with you that had a capacity of 15 or less, correct?

19  A.  That is correct.

20  Q.  And in neither instance were you required to discharge your

21  firearm, right?

22  A.  That is true.

23  Q.  And you have never had to fire a weapon in self-defense?

24  A.  Correct.

25          MS. SCOVILLE:  If you would permit just a moment, Your

**APP. 860**

1  Honor.

2          I have no further questions, thank you.

3          *THE COURT:*  Redirect?

4          *MR. FABIAN:*  Briefly, Your Honor.

5                    **REDIRECT EXAMINATION**

6  *BY MR. FABIAN:*

7  *Q.*  Mr. Gill, counsel just asked you regarding incidents in

8  which you had to use your firearm in self-defense, I'd like to

9  turn your attention to one of those incidents.  I believe it

10  was the incident where you and your wife were both involved.

11  Do you recall that?

12  *A.*  Yes, I do.

13  *Q.*  Okay.  Would you briefly describe for the Court what that

14  incident involved.

15  *A.*  We were leaving our home, going for a hike in the national

16  forest.  We were both carrying.  Ann had her firearm concealed

17  in a fanny pack; mine was on my belt and was visible.  We saw

18  eight young men who were on a neighbor's property and drinking.

19  And we tend to look after each other's property.  We live on

20  acreage in rural Douglas County.  And we stopped and just

21  politely asked that they please move on, they don't have

22  permission to be there, they were on private property.  If they

23  were to go up the road a few miles, they'd be in the national

24  forest and could do whatever they chose there without a

25  problem.  Their response was to refuse to reply to us and come

 1  out at us and attempt to encircle us.

 2  *Q.*  And in addition to the multiple threats that you perceived,

 3  was there anything that concerned you about the adequacy of the

 4  firearm that you and your wife carry?

 5  *A.*  Yes.  I had fifteen plus one rounds, and there were eight

 6  of them.  This was obviously a high-stress situation.  One of

 7  the unfortunate things that I've experienced was an accident

 8  that left me 27 percent partially permanently disabled.  I

 9  can't run.  So I was one of the people that Mr. Ayoob was

10  describing who does not have the alternative of running or

11  hiding effectively.  I'm going to stay pretty close to where I

12  am.

13        And I was not at all certain that the 16 rounds that I

14  had would have been adequate without reloading.  There were

15  eight of them, and they were coming at us fairly quickly.

16        *MR. FABIAN:*  I have nothing further, Your Honor.

17        *THE COURT:*  Thank you.

18        I have some questions for this witness.

19        Sir, if I understood your testimony correctly, you

20  defined reliability as being, essentially, no misfires and no

21  feeding jams, right?

22        *THE WITNESS:*  Correct.

23        *THE COURT:*  Why is it in your view that a

24  high-capacity magazine would have fewer misfires or feeding

25  jams than a lower-capacity magazine?

1          THE WITNESS:  Those were the magazines that the

2    firearm was originally designed for.  They're mil spec,

3    military specification, magazines.  And they seem to work

4    better with the rifle.  They were designed to function with

5    each other.  The reduced-capacity magazines tend to have

6    different length springs, and I suspect it's the spring that is

7    the primary cause of the problem.

8          THE COURT:  Now, the ten-round magazine for the Colt

9    that you had was manufactured by Colt to fit that particular

10   firearm, wasn't it?

11         THE WITNESS:  Yes, it was.

12         THE COURT:  But that was the one you had the problem

13   with, right?

14         THE WITNESS:  Yes, it was.

15         THE COURT:  So how is it that you conclude that is a

16   function of whether the magazines were manufactured for the

17   particular firearm or not?

18         THE WITNESS:  Well, when the firearm was designed, it

19   was designed to function with the 20- or 30-round magazine.

20   And I suspect maybe our manufacturers don't put the same care

21   in the manufacture of those that are designed to meet a law

22   governing the civilians.

23         THE COURT:  Or perhaps manufacturing standards have

24   declined over time and, therefore, this might be a problem with

25   future magazines?

APP. 863

1          THE WITNESS:  Well, possibly.  But the current 20- or

2     30-round magazines being produced, for instance by Magpul, are

3     fine quality and fine performing magazines.  People are not

4     encountering the problem with them that we did with the

5     diminished-capacity magazines in past years.

6          THE COURT:  This problem that you've encountered with

7     diminished-capacity magazines, you've encountered with all

8     diminished-capacity magazines?

9          THE WITNESS:  I only had the one.

10          THE COURT:  Okay.  Thank you very much.

11          Does that prompt any more questions?

12          MR. FABIAN:  Yes, Your Honor.

13          THE COURT:  Okay.

14                              **EXAMINATION**

15     BY MR. FABIAN:

16     Q.  Mr. Gill, do you recall the 1994 federal legislation that

17     placed the limitation on magazine capacity?

18     A.  Yes.

19     Q.  Prior to 1994, were -- are you familiar with Colt AR-15

20     style rifles that were offered for sale?

21     A.  Yes, I was.

22     Q.  And what size -- were those rifles normally offered for

23     sale with any magazine size other than 20 rounds?

24     A.  No.

25     Q.  And when did the ten-round magazines become available for

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

SECOND AMENDMENT

## Bowie knife statutes 1837-1899

Bowies were regulated like other knives; knives were sometimes regulated like handguns

**DAVID KOPEL** | 11.20.2022 12:53 PM

This post describes and analyzes nineteenth century state statutes on Bowie knives. It is a companion to my post *The legal history of bans on firearms and Bowie knives before 1900*, which described case law.

As detailed in that article, the term "Bowie knife" because popular for knife marketing in America and Great Britain after Jim Bowie used a traditional knife at a famous "sandbar fight" on the lower Mississippi River in 1827. Statutes specifically regulating the "Bowie knife" began with Mississippi in 1837, and continued for the rest of the century.

Among the 220 state or territorial statutes with the words "Bowie knife" or "Bowie knives" only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other well-known knives that were well-suited for fighting against humans and animals–namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98% of statutes on "Bowie knives" treated them the same as other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many others were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade *concealed* carry. In the 19th century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the the U.S. Supreme Court affirmed in *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 220 state or territorial statutes cited in this post, 114 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

**Glossary**

*Bowie knife*. This was marketing and newspaper term for old or new knives suitable for fighting, hunting, and utility. There was no common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length. *The legal history of bans on firearms and Bowie knives before 1900*.

*Arkansas toothpick*. A loose term for some Bowie knives popular in Arkansas. *The legal history of bans on firearms and Bowie knives before 1900*.

*Dagger*. A straight knife with two cutting edges and a handguard.

*Dirk*. Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to a Nov. 19, 2022, email to me from Mark Zalesky, publisher of *Knife Magazine*, "Dirks in America were small stabbing weapons, usually

*Slungshot.* A slungshot is a rope looped on both ends, with a lead weight or other small, dense item at one end. It helps sailors accurately cast mooring lines and other ropes. A slungshot rope that is shortened to forearm length and spun rapidly is an effective blunt force weapon.

*Colt.* Similar to a slungshot. 1 *Shorter Oxford English Dictionary* 444 ("4. A short piece of weighted rope used as a weapon").

*Knucks, knuckles.* Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon.

*Revolver.* A handgun in which the ammunition is held in a rotating cylinder.

*Pistol.* Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

**Methodology**

I started with the Appendix to Clayton E. Cramer, *Concealed Weapon Laws of Early Republic: Dueling, Southern Violence, and Moral Reform* (1999), plus the Appendix to Maryland Attorney General Brian Frosh's Fourth Circuit supplemental brief in *Bianchi v. Frosh.* The brief argues that 19th century laws about Bowie knives provide a historical analogy to justify the Maryland legislature's ban on many common modern rifles.

Then I searched the HeinOnline Sessions Law Library for occurrences of "bowie" within 5 words of "knife." After that, the same search, but with "knives." In some state databases, I searched for "bowie." Finally, I read the Declaration of Robert Spitzer, which is Exhibit E of the California Attorney General's Supplemental Brief in Response to the Court's Order of September 26, 2022, *Duncan v. Bonta*, No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The case involves a challenge to a California statute to confiscate magazines over 10 rounds.

Reviewing the Spitzer Declaration led to finding three laws I had missed: an 1871 D.C. ordinance, an 1893 Rhode Island statute, and another enactment of a Montana anti-dueling statute. Spitzer also lists 16 municipal ordinances about Bowie knives in the 19th century, which are summarized below, after the state-by-state presentation.

*Citations*: Some session laws cites below exceed the information required by the Blue Book. I follow the convention of calling each separate enactment in annual session laws a "chapter." That is, "chap. 68" was the 68th law enacted by the state legislature that year. The official state session laws sometimes use other words, such as "Act 68" or "No. 68." Not all session laws provide a number for the bills enacted in a given session.

This post is part of a law review article I am writing, so it has not been cite-checked by journal editors; citations might have typos or similar errors. *Nemo sine vitiis est* (no one is without faults).

**Mississippi** (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."

It was forbidden to use such arms in a fight in a city, town, or other public place. It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence." Finally, if one of the arms were used in a duel and caused a death, the duelist would liable for the debts owed by the deceased. 1837 Miss. L. pp. 291-92. All these provisions were enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols." 1837 Miss. L. p. 294. Similar language appeared in the incorporation of towns in 1839 and 1840. 1839 Miss. L. chap. 168, p. 385 (Emery); 1840 Miss. L. chap. 111, p. 181 (Hernando).

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife." 1841 Miss. Chap. 1, p. 52; 1844 Miss. chapter 1, p. 58. The tax was cut to fifty cents in 1850. 1850 Miss. chap. 1, p. 43. But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane, duelling or pocket pistol." 1854 Miss. Chap. 1, p. 50. In the next legislature, pocket pistols were removed from the tax. 1856-57 Miss. L. chap. 1, p. 36 ("each bowie knife, dirk knife, or sword cane").

When the Civil War came, the legislature prohibited "any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any bowie-knife, sword cane, or dirk-knife, and that hereafter the owner of any howie-knife, sword-cane or dirk-knife shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property." 1861-62 Miss. L. chap. 125, p. 134 (Dec. 19, 1861). That was a change for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

[N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.

1865 Miss. L. chap. 23, pp. 165-66. As detailed in Justice Alito's opinion and Justice Thomas's concurrence _McDonald v. Chicago_, laws such as these prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen. 561 U.S. 742 (2010).

After the war, handguns and knives were again subject to the state property tax. The Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."1871 Miss. L. chap. 33; 1871 Miss. L. pp. 819-20; 1876 Miss. L. chap. 104, pp. 131, 134; 1878 Miss. L. chap. 3, pp. 27, 29; 1880 Miss. L. chap. 6, p. 21; 1892 Miss. L. chap. 74, pp. 194, 198; 1894 Miss. L. chap. 32, p. 27; 1897 Miss. L. ch. 10, p. 10.

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description." There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack." Also excepted were travelers, but not "a tramp." Sales to minors or to intoxicated persons were outlawed. A father who permitted a son under 16 to carry concealed was criminally liable. Students at "any university, college, or school" could not carry concealed. 1878 Miss. L. chap. 46, p. 175-76.

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description." 1896 Miss. L. chap. 104, pp. 109-10. Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine. 1898 Miss. L. chap. 68, p. 86.

**Alabama** (1837).

The legislature imposed a $100 per knife tax on the sale, or transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today. (Fed. Reserve Bank of Minneapolis, _Consumer Price Index 1800-_; 2022 = 884.6. 1837 = 34.)

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought." _Acts Passed at the Called Session of the General Assembly of the State of Alabama_, chap. 11, p. 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." _Acts Passed at the Annual Session of the General Assembly of the State of Alabama_, chap. 77, pp. 67-68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry. _New York State Rifle and Pistol Association v. Bruen_, 142 S. Ct. 2111 (2022).

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol." 1851-52 Ala. chap. 1, p. 3. Even that amount was hefty for a poor person. As the defense counsel in a 1859 Texas case had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for 50 cents. _Cockrum v. State_, 24 Tex. 394 (1859). As described next, the cost of manufacturing a high quality Bowie knife was a little less than $3, which approximately implies a retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. In just a few years, the cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was underarmed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore

**APP. 867**

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops." 1861 Ala. L. chap. 22, pp. 214-15 (Nov. 27, 1861).

If the legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives. This works out to $3 manufacturing cost per knife, not counting the cost of the wooden shaft for the pikes, which was perhaps more expensive than the handle of a knife.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes, harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives." 1862 Ala. chap. 1, p. 8.

An 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun." "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."

Throughout the 19th century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment." To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.). 1880-81 Ala. L. chap. 44, pp. 38-39.

The state property tax continued, with variations on the tax amount and what arms were subject to taxation. Shortly after the end of the Civil War, the unreconstructed white supremacist legislature enacted a harsh tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale." For "all bowie-knives, or knives of the like description," the tax was $3. If the tax were not paid, the county assessor could seize the arms. To recover the arms, the owner had to pay the tax plus a 50% penalty. After 10 days, the assessor could sell the arms at auction. 1865-66 Ala. chap. 1, p. 7 (Feb. 22, 1866); 1866-67 Ala. L. chap. 260, p. 263.

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars." 1874-75 Ala. chap. 1, p. 6.

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ." The tax rate was 3/4 of 1% of the value. 1875-76 Ala. chap. 2, p. 46; 1876-77 Ala. L. chap. 2, p. 4.

The tax was cut in 1882 to 55 cents on the dollar for "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats." Ala. chap. 61, p. 71. Then it was raised to 60 cents on each 100 dollars of value, for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats." 1884 Ala. L. chap. 1, p. 6.

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars." 1874 Ala. L. ch. 1, p. 41. *See also* 1875-76 Ala. chap. 1, p. 82 ($50); 1886 Ala. L. chap. 4, p. 36 (adding "pistol cartridges"); 1892 Ala. L. chap.  95, p. 183 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section"). Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100. Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more. The wholesale license also authorized retail sales. 1898 Ala. chap. 9036, p. 190.

State legislative revisions to municipal charters gave a municipality the power "to license dealers in pistols, bowie-knives and dirk-knives." 1878 Ala. L. chap. 314, p. 437 (Uniontown); 1884 Ala. L. chap. 314, p. 552 (Uniontown) (adding dealer in "brass knuckles"; "the sums charged for such licenses" may "not exceed the sums established by the revenue laws of the State . . ."); 1884-85 Ala. chap. 197, p. 323 (Tuscaloosa) ("to license and regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. L. chap. 550, p. 965 (Faunsdale); 1890 Ala. chap. 357, p. 764 (Uniontown); 1890 Ala. L. chap. 573, p. 1317 (Decatur) (to license dealers in "pistols, or

("to license . . . dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. chap. 1046 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. chap. 566, p. 1102 (Uniontown) (same as previous Uniontown charter); 1898 Ala. 704, p. 1457 (Uniontown) (same).

**Georgia** (1837).

As described in the companion post, _The legal history of bans on firearms and Bowie knives before 1900,_ the legislature in 1837 declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

_Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837,_ pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry. _Nunn v. State,_ 1 Ga. 243 (1846).

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence." The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer." 1860 Ga. L. chap. 64, pp. 56-57.

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters. 1870 Ga. L. chap. 285, p. 421; 1879 Ga. L. chap. 266, p. 64 (creating law enforcement officer exception).

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for "horsemen's pistol." Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense." 1882-83 Ga. L. chap. 94, pp. 48-49. Any "kind of metal knucks" was added in 1898. 1898 Ga. L. chap. 103, p. 60.

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876. 1876 Ga. L. chap. 128 (O. no. 63), p. 112.

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives." 1882-833 Ga. L. chap. 18, p. 37. The tax was later raised to $100, adding dealers of "pistol or revolver cartridges." 1884-85 Ga. L. chap. 52, p. 23; 1886 Ga. L. chap. 54, p. 17. Then the tax was reduced to $25. 1888 Ga. L. chap. 123, p. 22. But raised back to $100 in 1890. 1890 Ga. L. chap. 131, p. 38. In 1892, "metal knucks" were added, and the ammunition expanded to "shooting cartridges." 1892 Ga. L. chap. 133. p. 25. The tax was cut to $25 in 1894. 1894 Ga. L. chap. 151, p. 21; 1896 Ga. L. chap. 132, p. 25; 1898 Ga. L. p. 25 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie knives and such articles."1884 Ga. L. chap. 457, p. 30; 1886 Ga. L. chap. 101, pp. 26, 28; 1888 Ga. L. chap. 103, p. 261; 1889 Ga. L. chap. 640, p. 993. The same question was included in the municipal charter for the town of Jessup. 1888 Ga. L. chap. 103, p. 261. And in the new charter for Cedartown. 1889 Ga. L. chap. 640, p. 993.

**South Carolina** (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee. 1838 S.C. L. (Journal to the Proceedings), pp. 29, 31.

The legislature did not act any law with the words "bowie knife" in 1838, or in the 19th century.

**Tennessee** (1838).

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after a nationally infamous crime. In December, two members of the Arkansas House of Representatives had fought with Bowie knives on the floor of House, and one had killed the other. _See The legal history of bans on firearms and Bowie knives before 1900._

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony. Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony." Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8*, chap. 137, pp. 200-201 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

The concealed carry ban was upheld against a state constitution challenge. *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840). The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia. *The legal history of bans on firearms and Bowie knives before 1900*.

The 1838 law against drawing a Bowie knife applied even against crime victims who had drawn in self-defense, such as when Richard Day drew a knife against a violent home invader. The state supreme court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns." *Day v. State*, 37 Tenn. (5 Sneed.) 496 (1857). Likewise, a post-Reconstruction statute, described in *The legal history of bans on firearms and Bowie knives before 1900*, allowed carrying only of Army or Navy type pistols. When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the victim carried a concealed pistol that was not an Army or Navy type. The conviction was upheld, citing *Day v. State. Coffee v. State*, 72 Tenn. (4 Lea.) 245 (1880)

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife." The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting." 1855-56 Tenn. L. chap. 81, p. 92.

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war. 1861 Tenn. L. chap. 23, pp. 16-17.

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." 1869-70 Tenn. L. chap. 22, pp. 23-24.

**Virginia** (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind." If a habitual concealed carrier were prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact. Even if the defendant were acquitted or discharged, he could be prosecuted within a year for the unlawful carry. Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor. *Acts of the General Assembly of Virginia, Passed at the Session of 1838*, chap. 101, pp. 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same." 1847 Va. L. p. 110; 1870 Va. L. chap. 349, p. 510.

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind." 1881 Va. L. chap. 219, p. 233; 1883-84 Va. L. chap. 144, p. 180 (1884); 1896 Va. L. chap. 745, p. 826 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869. So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause." 1875 Va. L. chap. 124, p. 102; 1877 Va. L. chap. 7, p. 305.

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind." There was an exception for arms issued by the state "to members of volunteer companies." 1874 Va. L. chap. 239, pp. 282-83; 1875 Va. L. chap. 162, p. 164; 1881 Va. L. chap. 119, p. 499; 1883 Va. L. chap. 450, p. 563; 1889 Va. L. chap. 19, p. 19; 1889 Va. L. chap. 244, p. 200; 1893 Va. L. chap. 797, p. 931.

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives." 1889-90 Va. L. chap. 152, p. 118; 1893-94 Va. L. chap. 366, pp. 425-26.

**Florida** (1838).

**APP. 870**

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county." The applicant needed  "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant." A person who informed about a violation could keep the arms. Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury." 1865 Fla. L. chap 1466, p. 25.

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors. 1 *Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One Inclusive* 873 (James F. McClellan, comp.) (1881) (Fla. chap. 174, § 24, item 14). The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives." Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."1889 Fla. chap. 3847, p. 6 (2d reg. sess.); 1891 Fla. L. chap. 4010, p. 9 (3d regular sess.). The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives." 1893 Fla. L. chap. 4115, p. 18 (4th regular sess.); 1895 Fla. L. chap 4322, p. 13 (5th regular sess.).

**North Carolina** (1846).

An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting." There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager." 1846 N.C. L. chap. 42.

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for Sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner . .

1850 N.C. L. chap. 121, p. 243. *See also* 1856-57 N.C. L. chap. 34, p. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. L. chap. 21, § 11, pp. 33-34 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

The Black Code continued to treat Bowie knives like firearms, in the arms licensing law for free people of color. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had been issued a one-year license from the court of pleas and quarter-sessions. 1856 N.C. L. chap. 107, § 66, p. 577. When the Civil War drew near, the legislature repealed the licensing law, and forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot." 1860-61 N.C. L. chap. 34. p. 68 (Feb. 23, 1861).

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879. 1877 N.C. L. ch. 54, pp. 162-63. The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slungshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like like kind," "except when upon his own premises." 1879 N.C. L. chap. 127, p. 231.

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot." 1893 N.C. L. chap. 514, pp. 468-69. A <u>loaded cane</u> had a hollowed section filled with lead. It was a powerful impact weapon.

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maximums. In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. L. chap. 180, pp. 219-20. Charlotte: $50 on "every pistol, bowie-knife, dirk, sword-cane, or other deadly weapons worn upon the person, except a pocket knife, without special permission of the board of aldermen." 1866 N.C. L. chap. 7, § 19, p. 63. Salisbury: "on all pistols, except when part of stock in trade, a tax not exceeding one dollar; on all dirks, bowie-knives and sword canes, if worn about the person at any time during the year, a tax not exceeding ten dollars." 1868 N.C. L. chap. 123, p. 202. Lincolnton: $5 for worn weapons. 1870 N.C. L. chap. 32, p. 73. Lumberton: Can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. L. chap. 7, p. 279; 1883 chap. 89, p. 791 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. L. chap. 111, p. 872. Waynesville: like Ashville, but $40. 1885 N.C. L. chap. 127, p. 1097. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. L. chap. 58, § 50, p. 885. Rockingham: to tax pistols, dirks, bowie

guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. L. chap. 26, p. 705. Columbus: same. 1891 N.C. L. chap. 101, p. 902. Buncombe: same. 1891 N.C. L. chap. 327, p. 1423. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. L. chap. 352, p. 611. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. L. chap. 71, pp. 115-16. Lilesville: same. 1897 N.C. L. chap. 130, p. 237. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. L. ch. 90, p. 154. Salisbury: same $500 as Asheville. 1899 N.C. L. chap. 186, p. 503. Monroe: Same, but $100. 1899 N.C. L. chap. 352, p. 968. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. L. chap. 260, p. 766.

**Washington territory** (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ." 1854 Wash. L. chap. 2, p. 80; 1859 Wash. L. chap. 2, p. 109; 1862 Wash. L. chap. 2, p. 284; 1869 Wash. L. chap. 2, pp. 203-04; 1873 Wash. L. chap. 2, p. 168.

**California** (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts. The duelist would also be liable to the decedent's family for liquidated damages. 1855 Cal. L. chap. 127, pp. 152-53.

**Louisiana** (1855).

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon." 1855 La. L. chap. 120, p. 148; 1898 La. L. ch. 112, p. 159 (same).

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days. 1870 La. L. chap. 100, p. 159; 1873 La. L. chap. 98, p. 27.

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden. 1890 La. L. chap. 46, p. 39.

**New Hampshire** (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas." Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

> Next comes the Remedy of Folly . . .  from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this ? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment. Sir, the senator is venerable . . .  but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.

That wasn't even close to the worst that Sumner said about Brooks in "The Crime Against Kansas." Most notably, he compared Butler to Don Quixote:

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane. He nearly killed Sumner, who never fully recovered. The assault was widely applauded in the South. The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest in inspire slave revolt. Even in free states, even in free-thinking Boston, abolitionist speakers were attacked by mobs.

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital." As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense.

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall not be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.

1856 N.H. chap. 1870, pp. 1781-82.

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

**Texas** (1856).

If a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife." Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) in 1 *A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas* (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger"); 1871 Tex. L. chap. 26, p. 20 (adding doubling if perpetrator "in disguise").

The Texas Supreme Court upheld the law in *Cockrum v. State*, 24 Tex. 394 (1859). Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." *Id.* at 402. However, extra punishment for a crime with a Bowie knife did not violate the right to arms. Discussed further in *The legal history of bans on firearms and Bowie knives before 1900*.

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open. 1870 Tex. L. chap. 73, p. 139; 1873 Tex. L. chap. 19, pp. 29-30; 1876 Tex. L. chap. 166, p. 311.

Then came the most repressive anti-carry law enacted by an American state until then. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." Both open and concealed carry were forbidden. The exceptions were "immediate and pressing" self-defense, or in a person's home or business, or travelers with arms in their baggage. Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering." The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians." 1871 Tex. L. chap. 34, pp. 25-26; 1887 Tex. L chap. 9, p. 7 (amending); 1889 Tex. L. chap. 37, p. 33; 1897 Tex. L. chap. 25, p. 24.

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons. The statute did not apply to long guns. 1887 Tex. L. chap. 155, pp. 221-22.

**New Mexico** (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms." 1856 N.M. L. chap. 26, p. 68. Slavery in New Mexico was usually in the form of peonage. The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races. *See* Andrés Reséndez, *The Other Slavery: The Uncovered Story of Indian Enslavement in America* (2016).

Concealed and open carry were prohibited in 1859. The scope was expansive:

**APP. 873**

1859 N.M. L. pp. 94-96; 1864-65 N.M. L. chap. 61, pp. 407-08 (miscited in the Spitzer declaration as 1855). Territorial statues were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortifera de cualesquiera clase ó descripcion."

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms. It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes: as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted . . .

A person carrying a deadly weapon was not allowed to "insult or assault another." Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory." The statute defined a "settlement" as anyplace within 300 yards of any inhabited house. The exceptions to the the carry ban were:

> except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family, or property, the same being then and there threatened with danger

Travelers could ride armed through a settlement. If they stopped, they had to disarm within 15 minutes, and not resume until eve of departure. Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . ." 1886-87 N.M. L. chap. 30, pp. 55-58.

**Ohio** (1859).

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon." The jury must acquit if it is proven that the defendant was "engaged in pursuit of any lawful business, calling, or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family..." 1859 Ohio L. pp. 56-57.

**Kentucky** (1859).

"If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars." 1859 Ky. L. chap. 33, p. 245.

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50. 1885 Ky. L. chap. 1233, p. 154; 1891 Ky. L. chap. 103, p. 346 (Nov. 11, 1892); 1891-92 Ky. L. chap. 217, p. 1001 (June 9, 1893).

**Indiana** (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon." Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man." 1859 Ind. L. chap. 78, p. 129; 1881 Ind. L. chap. 37, p. 191.

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person." Or to give such person pistol ammunition. 1875 Ind. L. chap. 40, p. 59.

**Nevada** (1861).

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree. 1861 Nev. L. p. 61.

**APP. 874**

**Montana territory** (1864).

No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon." 1864-65 Mont. L. p. 335. Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder. 1879 Mont. Laws p. 359; 1887 Mont. L. p. 505.

**Colorado territory** (1867).

No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon." 1867 Colo. L. chap. 22, p. 229; 1876 Colo. L. chap. 24, p. 304; 1881 Colo. L. p. 74 (post-statehood); 1885 Colo. L. p. 170; 1891 Colo. L. p. 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").

**Arizona territory** (1867).

Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime. So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel." 1867 Ariz. L. p. 21; 1875 Ariz L. p. 101.

Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache and Graham, over the age of ten years." The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind." 1883 Ariz. L. chap. 19, pp. 21-22.

Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or town. 1883 Ariz. L. chap. 36, pp. 65-66. Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887. 1887 Ariz. L. chap. 11, p. 726. And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense." 1893 Ariz. chap. 2, p. 3.

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense." Arriving travelers could carry for the first half hour, or on the way out of town. Hotels had to post notices about the no carry rule. Carry was also forbidden at public events, and even at some private social gatherings. 1889 Ariz. chap. 13, pp. 30-31.

**Illinois** (1867).

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon." 1867 Ill. L. p. 650.

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character." 1881 Ill. L. p. 73.

**Kansas** (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States." 1868 Kan. L. p. 378.

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind" "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor." 1883 Kan. L. chap. 55, p. 159.

**West Virginia** (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind." *Code of West Virginia Comprising Legislation to the Year 1870*, chap. 148, p. 692. Justices of the Peace had a duty to enforce the statute W.V. Acts of 1872-73, chap. 226, p. 709, in *Constitution and Schedule Adopted in Convention at Charleston, April 9th, 1872* (Charleston, W.V.: John W. Gentry, 1874).

**APP. 875**

**Maryland** (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars. 1870 Md. L. chap. 473, p. 892. Reenactments, changes in the fine amount: 1874 Md. L. chap. 178; 1884 Md. L. chap. 187; 1890 Md. L. chap. 534; 1898 Md. L. p. 533.

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon." 1872 Md. L. chap. 42, pp. 56-57.

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)." 1886 Md. L. chap. 375, p. 602.

**District of Columbia** (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles." 1 *The Compiled Statutes in Force in the District of Columbia, including the Acts of the Second Session of the Fiftieth Congress, 1887-89* (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871). Hat tip to Prof. Spitzer for this.

In 1892, Congress enacted a similar statute for D.C., with additional provisions. It prohibited concealed carry of the same weapons as 1871, plus "blackjacks." A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.

Open carry was lawful, except "with intent to unlawfully use." The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.

Giving a deadly weapon to a minor was forbidden. Vendors had to be licensed by Commissioners of the District of Columbia. The license itself was "without fee," but the licensee could be required to post a bond. Sellers had to keep a written list of purchasers, which was subject to police inspection. Weekly sales reports to the police were required. 27 Stat. chap. 159, pp. 116-17 (July 13, 1892).

**Nebraska** (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon." As in Ohio, there was a "prudent man" defense. 1873 Neb. L. p. 724; 1875 Neb. L. p. 3; 1899 Neb. L. chap. 94, p. 349.

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind." The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him." 1895 Neb. L. pp. 209-10.

**Missouri** (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon…

1874 Mo. L. p. 43; 1875 Mo. L. pp. 50-51. This was similar to the 1873 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property." 1877 Mo. L. p. 240.

The exhibiting statute and the concealed carry statute were combined in 1885. The new law also forbade carrying the listed weapons when intoxicated or under the influence. Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed. 1885 Mo. L. p. 140.

**Arkansas** (1874).

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The next year, the state supreme court heard a case of a man who had been convicted of carrying a concealed pocket pistol. In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered

> Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane." The pocket pistol not being a war arm, the defendant's conviction was upheld. *Fife v. State*, 31 Ark. 455 (1876). Needless to say, *Fife*'s protection of "the rifle of all descriptions" makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed. "[T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms. . . . If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson v. State*, 33 Ark. 557 (1878).

The legislature responded in 1881 with a new statute against the sale or carry of "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy." 1881 Ark. Acts chap. 96, pp. 191-92.

As discussed in my companion post, *The legal history of bans on firearms and Bowie knives before 1900*, the 1881 Arkansas statute might arguably have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.

**Wisconsin** (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon." 1874 Wisc. L. chap. 4, p. 184 (Milwaukee); 1875 Wisc. L. chap. 262, p. 471 (Green Bay); 1876 Wisc. L. chap. 4, p. 218 (Platteville); 1876 Wisc. L. chap. 313, p. 737 (Racine); 1877 Wisc. L. chap. 5, p. 367 (New London); 1878 Wisc. L. chap. 112, pp. 119-20 (Beaver Dam); 1882 Wisc. L. chap. 92, p. 309 (Lancaster); 1882 Wisc. L. chap. 169, p. 524 (Green Bay); 1883 Wisc. L. chap. 183, p. 713 (Oshkosh); 1883 Wisc. L. chap. 341, p. 990 (La Crosse); 1883 Wisc. L. chap. 351, p. 1034 (Nicolet); 1885 Wisc. L. chap. 37, p. 26 (Kaukana); 1885 Wisc. L. chap. 159, p. 753 (Shawano); 1885 Wisc. L. chap. 227, p. 1109 (Whitewater); 1887 Wisc. L. chap. 124, p. 336 (Sheboygan); 1887 Wisc. L. chap. 161, p. 684 (Clintonville); 1887 Wisc. L. chap. 162, p. 754 (La Crosse); 1887 Wisc. L. chap. 409, p. 1308 (Berlin); 1891 Wisc. L. chap. 123, p. 699 (Menasha); 1891 Wisc. L. chap. 23, p. 61 (Sparta); 1891 Wisc. L. chap. 40, p. 186 (Racine).

**Wyoming** (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property." 1882 Wyo. chap. 81, p. 174; 1884 Wyo. chap.  67, p. 114.

**Oklahoma territory** (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense." Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns. Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon." Unlike section 1, section 2 applied to carry in general, not just concealed carry. Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was "any other offensive or defensive weapon." What the difference was is unclear. Section 3 banned sales of the aforesaid items to minors. The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair. 1890 Okla. L. chap. 25, p. 495; 1893 Okla. L. chap. 25, p. 503.

**Iowa** (1887).

There was no state legislation on Bowie knives in the 19th century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887. See id., Ex. E at 24." Defendant's Supplemental Brief in Response to the Court's Order of September, 26, 2022, *Duncan v. Bonta*, at 41-42, Case No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The brief's cite to Declaration of Robert Spitzer, p. 24, electronic page no. 163 of 230, reproducing without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms"

home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

**Michigan** (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon." 1891 Mich. L. chap. 257, p. 409; 1897 Mich. L. chap. 465, p. 1030.

**Vermont** (1891).

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon."  1891 Vt. L. chap. 85, p. 95.

**Rhode Island** (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description." 1893 R.I. L. chap. 1180, p. 231. Hat tip to Prof. Spitzer's Declaration for this; Hein Online has the session law book, but it returns a null search result for "bowie."

**Local ordinances on Bowie knives**

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the <u>Declaration of Robert Spitzer</u>, above. The cities are in alphabetical order by state. The year is often the year of publication of municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield, Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of "any sword in a cane, or air-gun"); Memphis, Tennessee (1863);

No carrying: Nashville, Tennessee (1881); Provo City, Utah territory (1877)

Against hostile display: Independence, Kansas (1887).

Against carry with intent to do bodily harm: Syracuse, New York (1885).

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871); Denver, Colorado (1886).

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).

**Conclusion**

As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words "bowie knife" or variant. (This figure includes enactments by territories that had achieved statehood by 1899.) At the end of the 19th century, no state prohibited possession of Bowie knives. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.

Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century. The overwhelming majority of state statutes that addressed Bowie knives treated them exactly the same as comparable knives; many treated such knives like handguns. As with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives. Likewise, only a few jurisdictions forbade the open carry of Bowie knives, and in those that did, open carry of handguns was also outlawed.The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors. In a few states, taxes on knives and handguns were sometimes different.

In the Supreme Court's Heller and Bruen decisions,  the few laws that banned acquisition or open carry of handguns laws of the 19th century were treated as eccentricities that did not establish a national tradition. The history of Bowie knife laws is no stronger in terms of creating historical precedents for bans on owning,  acquiring,  or carrying common knives. It  would be implausible to claim that the 19th century laws on Bowie knives or handguns can be stretched by analogy to justify 21st century bans on common firearms or magazines.

Case 3:17-cv-02256-RC Document 24-13 Filed 01/23/23 Page 1 of 4
Case 1:22-cv-02256-BEN-JLB Document 53-1 Filed 04/09/18 PageID 5598 Page 16 of 103
USCA Case #23-7061    Document #2028785    Filed: 11/27/2023    Page 882 of 1070

CHAP. 95.—An ACT to empower the councils of cities and towns to release the liability and liens for interest, penalties and accrued costs, or any part thereof, on unpaid taxes due such cities and towns for any year or years to and including 1933, provided such taxes are paid within one hundred and twenty days after this act is in force.    [H B 48]

### Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, That the councils of cities and towns are hereby empowered to release all persons, firms, associations and corporations from all liability, for interest, penalties and accrued costs on any taxes due such respective cities and towns for any year or years prior to and including the year nineteen hundred and thirty-three, that are unpaid at the time the ordinance relieving same goes into effect, provided such unpaid taxes are paid such cities or towns within one hundred and twenty days after the date this act shall be in force.

2. That nothing in this act contained shall empower any such council to release any liability for interest, penalties and accrued costs, or any part thereof, on such unpaid taxes as are not paid within the one hundred and twenty days aforesaid.

3. By reason of the necessity of immediately granting said councils power to grant taxpayers the above relief, an emergency is declared to exist, and this act shall be in force from its passage.

---

CHAP. 96.—An ACT to define the term "machine gun"; to declare the use and possession of a machine gun, for certain purposes, a crime and to prescribe the punishment therefor; to require manufacturers, dealers and other persons, with certain exemptions, in possession thereof, to register all machine guns with the Secretary of the Commonwealth; to keep records of and report transfers and sales to the said Secretary; to allow inspection of records and of machine guns by peace officers; to provide for seizures and search warrants; to prescribe rules of evidence and presumptions; to provide penalties, and to repeal all inconsistent acts.    [S B 110]

### Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, as follows: Section 1. Where used in this act:

(a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading.

(b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim,

138                          ACTS OF ASSEMBLY                          [VA.

disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term of not less than twenty years.

Section 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or

(d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be *prima facie* evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Nothing contained in this act shall prohibit or interfere with

First. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose. This act shall not apply to machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other States or Territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

Second. The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

Third. The possession of a machine gun other than one adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber, for a purpose manifestly not aggressive or offensive.

Case 3:17-cv-02461-BEN-JLB Document 34-13 Filed 01/23/23 PageID 5690 Page 3 of 4
Case 1:22-cv-02256-RC Document 34-13 Filed 04/09/19 PageID 5690 Page 18 of 103
USCA Case #23-7061    Document #2028785    Filed: 11/27/2023    Page 884 of 1070

Section 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars nor more than one thousand dollars.

Section 8. Every machine gun now in this State adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber shall be registered in the office of the Secretary of the Commonwealth on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of the Commonwealth, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The Secretary of the Commonwealth shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer. Failure to keep or produce such certificate for inspection shall be a misdemeanor and punishable by a fine of not less than five nor more than one thousand dollars, and any peace officer may, without warrant, seize the machine gun and apply for its confiscation as provided in section nine of this act. The registration shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber possessed in violation of this act may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the Commonwealth's attorney, a police officer or conservator of the peace, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given

Case 3:17-cv-02256-RC  Document 24-13  Filed 01/23/23  Page 4 of 4
Case 1:22-cv-02256-RC  Document 24-13  Filed 01/23/23  Page 19 of 103
USCA Case #23-7061   Document #2028785        Filed: 11/27/2023    Page 885 of 1070

140                          ACTS OF ASSEMBLY                          [VA.

effect without the invalid provision or application, and to this end the
provisions of this act are declared to be severable.

Section 11. This act shall be so interpreted and construed as to
effectuate its general purpose to make uniform the law of those states
which enact it.

Section 12. This act may be cited as the Uniform Machine Gun Act.

Section 13. All acts or parts of acts which are inconsistent with the
provisions of this act are hereby repealed.

---

CHAP. 97.—An ACT to make effective the Constitutional provision to the effect
that the General Assembly shall establish and maintain an efficient system of
public free schools throughout the State, and to repeal all acts and parts of
acts inconsistent with this act.                                      [S B 153]

Approved March 7, 1934

Whereas, section one hundred and twenty-nine of the Constitution
of Virginia provides that "The General Assembly shall establish and
maintain an efficient system of public free schools throughout the
State," now, therefore,

1. Be it enacted by the General Assembly of Virginia, as follows:

Section 1. The school board of each and every school division in
the State is hereby empowered and required to maintain the public free
schools of such division for a period of at least eight months or one
hundred and sixty teaching days in each school year. In order that
each school division may have the funds necessary to enable the school
board to maintain the elementary and high schools thereof for such
minimum terms, it is hereby provided that when any county, city or
town has legally complied with the existing laws with reference to local
school levies, such school division or divisions shall be allotted out of
the public school funds held in the treasury of the State for each group
of twenty-five to forty pupils in average daily attendance, a sum equal
to the amount to be derived by dividing said public school fund by the
number of groups of twenty-five to forty pupils in average daily attend-
ance in the State, depending upon the density of population, to be ap-
portioned by the State Board of Education, as provided in section one
hundred and thirty-five of the Constitution and in conformity with the
provisions of the Code and of the Acts of the Assembly under such
rules and regulations as may be set up by said State Board of Education.

Section 2. That in addition the counties and cities shall provide,
from local school taxes, as provided in section one hundred and thirty-
six of the Constitution of Virginia, for the supplementing of their in-
structional programs such amounts as will insure the services of proper-
ly prepared and effective teaching personnel, and to the degree that
financial ability and community interest in education will permit; pro-
vided further, that the counties and cities shall provide, in keeping with
the laws already existing, such funds as may be necessary for debt ser-
vice, capital outlay, transportation, general operation and maintenance.

1   C.D. Michel – SBN 144258
    Sean A. Brady – SBN 262007
2   Anna M. Barvir – SBN 268728
    Matthew D. Cubeiro – SBN 291519
3   MICHEL & ASSOCIATES, P.C.
    180 E. Ocean Boulevard, Suite 200
4   Long Beach, CA 90802
    Telephone: (562) 216-4444
5   Facsimile: (562) 216-4445
    Email: abarvir@michellawyers.com
6

7   Attorneys for Plaintiffs

8

9              IN THE UNITED STATES DISTRICT COURT

10        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,          Case No:  17-cv-1017-BEN-JLB

12                      Plaintiffs,   **DECLARATION OF CLAYTON
                                      CRAMER IN SUPPORT OF
13              v.                    PLAINTIFFS' SUPPLEMENTAL
                                      BRIEF; EXHIBIT 42**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the State
    of California,
16
17                      Defendant.
18

19

20

21

22

23

24

25

26

27

28

                            1

# TABLE OF AUTHORITIES

"The Insanity Defense' and Diminished Capacity,"
  https://www.law.cornell.edu/background/insane/insanity.html ...............................25

22 Killed In Hotel Fire In San Francisco, [Santa Cruz, Cal.] Santa Cruz Sentinel,
  Mar. 29, 1944, 1. ....................................................................................................20

3 Teamsters Charged in San Juan Hotel Fire, Chicago Tribune, Feb. 4, 1988,.........6, 22

A Decade On, Childers Remembers Hostel Fire Tragedy, Brisbane [Australia]
  Times, Jun. 23, 2010 ..............................................................................................22

A Triple Murder at Sleepy Hollow, Wilmington [N.C.] Journal, Jan. 14, 1870, 1 .......10

A Triple Murder, [Plymouth, Ind.] Marshall County Republican, Feb. 16, 1865, 1 .......9

A War in Wyoming, [Maysville, Ky.] Evening Bulletin, Apr. 13, 1892, 1. .....................3

Annie Sciacca, "It was a bloodbath": Orinda Halloween shooting investigation
  reveals gang connections, San Jose Mercury-News, Nov. 17, 2019. .........................6

Attempt Made To Wreck Soo Locks, EAST OREGONIAN, May 16, 1917, 1. ....................2

Bernard E. Harcourt, From the Asylum to the Prison: Rethinking the Incarceration
  Revolution, 84 Texas Law Review 1766-75 (2006). ..................................................30

Black Hand Kills Four By Dynamite, Bluefield [W.Va.] Evening Leader, May 17,
  1909, 1 ....................................................................................................................14

Bomb Batters Wall Street; 31 Slain, 125 Hurt, The Sun and the New York Herald,
  Sep. 17, 1920, 1 ......................................................................................................16

Bomb Survivors Tell Of Explosion, [Washington, D.C.] Evening Star, Jan. 12,
  1930, 1 ....................................................................................................................18

Bomb Wrecks Farmers Home Killing Three, [Salem, Ore.] Capital Journal, Nov.
  19, 1920, 1 ..............................................................................................................16

Boy Admits Fire Fatal To 95, Miami News, January 16, 1962, 1. ...............................21

Burns Lodging House When Refused Room; 27 Homeless Men Died, [New York,
  N.Y.] Evening World, Dec. 3, 1913, 1 ......................................................................20

Candace Sutton, Man Who Murdered 11 People in Nursing Home Fire 'Frothed At
The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's
Car, Inquest Hears, [U.K.] Daily Mail, Sep. 8, 2014.................................................22

Centers for Disease Control and Prevention, National Center for Health Statistics.
National Vital Statistics System, Mortality 1999-2020 on CDC WONDER
Online Database .................................................................................................30

Christine Sarteschi. (2015). Severe Mental Illness, Somatic Delusions, and
Attempted Mass Murder. Journal Of Forensic Sciences. 61. 10.1111/1556-
4029.12876. ..........................................................................................................33

Clayton E. Cramer, Ethical Problems of Mass Murder Coverage in the Mass Media,
9:1 Journal of Mass Media Ethics 26-42 (Winter, 1993-94). ....................................7

Clayton E. Cramer, Mental Illness and the Second Amendment. 46 Connecticut
Law Review 1301-6 (May 2014):(.........................................................................29

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the
Deinstitutionalization of the Mentally Ill (2012) ...................................................29

Criminal Justice Research Center, *Homicide Among Adults in Colonial and
Revolutionary New England, 1630-1797,*
https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-
revolutionary-new-england ....................................................................................3

Day of Joy is One of Sorrow, [Valley City, N.D.] Weekly Times-Record, January
1, 1914, 6. ...............................................................................................................24

Drowned Her Six Children, Adams County News [Ritzville, Wash.] Feb. 27,
1901, 4 .....................................................................................................................8

Dynamite Kills Five In Spite Act, New-York Tribune, Nov. 16, 1914, 1. ...................15

Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb, Bemidji
[Minn.] Daily Pioneer, Jan. 3, 1917, 1;....................................................................15

Eight Are Killed In Blasted Homes, [Washington, D.C.] Evening Star, May 06,
1925, 1 .....................................................................................................................16

Elisabeth Dias with Jim Down, The Horror Upstairs, Time, Jul. 1, 2013 ....................22

Fate Saves Scores in Blast When Maniac's Plot Kills 43, [Washington, D.C.]
Evening Star, May 19, 1927, 1................................................................................17

TABLE OF AUTHORITIES

FBI, Jack Gilbert Graham, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham,.................................................................................19

FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008),............1

Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement, New York Times, Oct. 9, 1927, 1. ............................................................17

Flowers And Flowers, Murders In The United States, 30-1 ...........................................19

Flowers and Flowers, Murders in the United States, 56-7..............................................19

Four Killed In Bomb Explosion In Tenement District Of New York, [Douglas, Ariz.] Douglas Daily Dispatch, Oct. 09, 1927, 1;.......................................17

Four People Wounded, Palestine [Tex.] Daily Herald, Feb. 4, 1909, 2 ..........................3

From California and Oregon, [Washington, D.C.] Evening Star, Mar. 21, 1860, 2.......26

Gift Package Bomb Kills Woman; 5 Hurt, [Washington, D.C.] Evening Star, Jan. 01, 1930, 1; .......................................................................18

He was a Rejected Lover, St. Paul Globe, Feb. 17, 1889, 1. .........................................10

Horrid Murder! At An Early Hour On Wednesday Morning Last, The Inhabitants Of This Town Were Alarmed With The Dreadful Information… 1 (1806)...............8

Ill-Fated Plane Wrecked By Bomb US Prober Says, Indianapolis Times, Oct. 14, 1933, 1.......................................................................19

Indian revenge, Muscatine [Iowa] Weekly Journal, Jan. 27, 1860, 1............................9

Jean Isaac Rael and Virginia C. Armat, Madness In The Streets: How Psychiatry And The Law Abandoned The Mentally Ill (1990) ...............................29

Jos. Veltman, Do Workers Want War? [letter to the editor] [Chicago, Ill.] The Day Book, Jan. 17, 1916, 23...............................................................4

Jury Verdict Not Guilty, Liberty [Tex.] Vindicator, Feb. 11, 1910, 1............................3

Killed Her Children, Cottonwood [Ida.] Report, Mar. 1, 1901, 1...................................8

Laurel Thatcher Ulrich, A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812 291-307 (1990),;........................................................8

iv

TABLE OF AUTHORITIES

Laurie Goodstein and William Glaberson, The Well-Marked Roads to Homicidal Rage, New York Times, Apr. 10, 2000 ...................................................................31

Makiko Inoue, Motoko Rich and Hikari Hida, 24 Dead in Suspected Arson at Office Building in Japan, N.Y. Times, Dec. 16, 2021, ...............................................22

Maniac Shot Many People, Barre [Vt.] Daily Times, Jun. 20, 1913, 1 .......................10

Maniac Veteran Kills His Family, New Britain Herald, Jun. 23, 1930, 9. ...................31

Maniacal Unknown in Attempt to Exterminate Whole Family, Bisbee [Ariz.] Daily Review, Apr. 6, 1922, 1. ..........................................................................................5

Michigan State Prison, Biennial Report of the Board of Control and Officers of the State House of Correction and Branch Prison of State Prison in Upper Peninsula… 22, 41, 65 (1916) ...............................................................................................4

Murders Whole Family and Then Kills Self, [Pendleton, Ore.] East Oregonian, Feb. 22, 1909, 8. ................................................................................................32

Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story, Brownsville Herald, Jan. 31, 1928, 1. .............................................................18

National Fire Protection Association, Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home, 1, 4, .............................................................23

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings, October, 1989, 19 ....................33

Nevada Mining Boss Besieged in His Office, Kalispell Bee, Jan. 09, 1903, 1 ...............3

Ore Miner Charged Eight-Seven Cents for Month's Labor, Omaha Daily Bee, Feb. 12, 1914, 1. ..................................................................................................24

Our Lady of the Angels School fire ................................................................................21

Plot to Kill Their Wives, [Maysville, Ky.] Evening Bulletin, Mar. 26, 1896, 1 ..........12

Preparedness Day Bombing, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations ...............................................................................................................15

Principal Events of General and Local Interest During the Year 1857, Lewiston [Penn.] Gazette, Jan. 21, 1858, 1 .......................................................................5

v

TABLE OF AUTHORITIES

R. Barri Flowers and H. Loraine Flowers, Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59 (2001). ............................6

R.W. Bligh, comp., New York Herald Almanac: Financial, Commercial and Political Register 1874 87 (1874). ..................................................................4

Ralph Blumenthal, Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911, New York Times, Mar. 26, 1990. .............................................................................................................22

Randolph Roth and Cornelia Hughes Dayton, comp., Homicide among Adults in Colonial and Revolutionary New England, 1630-1797,.................................6

Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1. ..............................................................................................2

Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017). ..........................2

Seven Detectives and Three Miners Dead, Seattle Star, Jul. 26, 1912, 1. .....................14

Shelby Lin Erdman and Greg Botelho, Timeline: A killer's rampage through a California college town, CNN, May 27, 2014, .........................................11

Some Facts About Clayhole, [Lancaster, Ky.] Central Record, Jul. 20, 1922, 1 ............3

Steven P. Segal, Civil Commitment Law, Mental Health Services, and US Homicide Rates, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011 ........31

Strike Breakers Taken to Mines at Point of Pistols, Omaha Daily Bee, Jan. 11, 1914, 1 ..................................................................................................................24

Tenement House Fire, [Maysville, Ky.] Evening Bulletin, Nov. 2, 1903, 4. ...............20

Terrorism and Death Dominate Colorado, Saint Paul Globe, Jun. 7, 1904, 1. ..............14

Trial of Abel Clements, [Edinburgh, Scotland] Caledonian Mercury, Aug. 25, 1806, 4. ...............................................................................................................7

Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children 6-7, 9-10 (1841). ......................................13

Trio Held In Wreck Accused Of Murder, [Washington, D.C.] Evening Star, Mar. 10, 1935, 1. ...........................................................................................12

Triple Murder, Suicide Apparent, [Parsons, Kansas] Parsons Sun, Apr. 04,
   1953, 7. ..................................................................................................32

Tulsa Race Riots, https://www.history.com/topics/roaring-twenties/tulsa-race-
   massacre, ...............................................................................................21

U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020) .............1

Villisca Ax Murders to Be Discussed in Mass Meeting, Omaha Daily Bee, Jul.
   6, 1917, 1. .............................................................................................23

Washington Standard [Olympia, Wash.], Mar. 1, 1901, 3.................................................8

Whole Family Murdered, [St. Genevieve, Mo.] Fair Play, Oct. 20. 1900, 1. ...............13

Woman Indicted in Chicago Blaze, New York Times, Feb. 4, 1976...........................23

Woman Shot. Tots Choked, Brownsville Herald, May 20, 1931, 1 ...........................11

Woman to Face Murder Charge, Waxahachie [Tex.] Daily Light, Feb. 8, 1909, 1 ........3

vii

TABLE OF AUTHORITIES

APP. 889

17cv1017

I, Clayton Cramer, declare as follows:

**I.    Purpose**

1.    This Expert Declaration and Report identifies one gross error of fact in DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 26, 2022.  The claim: "From the colonial period into the early 20th century, mass murder occurred in the United States, but typically as a group activity, because technological limitations impaired the ability of a single person to commit mass murder."

2.    Even without Large Capacity Magazines (LCMs), mass murder was common and often individual in nature.

**II.    My Current Research Project**

**A. Defining Mass Murder**

3.    Since 2019, I have been researching the history of mass murder in the United States.  The definition of mass murder does not have a universal definition. The FBI's definition of mass murder is four or more dead (including the killer) in one event, in one location.[1]  Other agencies, such as the U.S. Secret Service use the term "mass attacks" in which "three or more people are harmed."[2]

4.    For purposes of my research, I have adapted the Secret Service and FBI definitions to include at least two murder victims committed in multiple locations within 24 hours and the Secret Service's "three or more harmed."  The suicide or lawful killing of the mass murderer or murderers is not included in the total dead.

5.    I have excluded multiday mass murders committed in riots, such as the New York City Draft Riots of 1863, and many of the race riots of the 20th century because they were not in one location.  Determining when these murders took place

---

[1] FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008), distinguishing mass murder from serial murderers. "Generally, mass murder was described as a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders."
[2] U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020).

precludes easy classification. I also have excluded crimes such as the Colorado cannibalism murders in 1874, because it is unclear over what period the victims were murdered.

6.      There are deaths that might qualify as mass murder, but which have circumstances that might also qualify as lawful self-defense and are thus not included.[3] There are mass murders which appear to be gang-related; I have excluded many of those because determining if they were defensive in nature or not requires confidence in the integrity of the participants, who often have reason to lie.

7.      Obviously, mass murder does not include acts of war.  Mass murders committed by governments as official policy are outside the legal definition of murder. Other horrifying mass killings outside our definition include those performed by non-state actors with the acquiescence, assistance, or encouragement of local, regional, or national governments.  Example: the Armenian genocide in Turkey during and immediately following World War I. Also excluded are governmentally supported acts of mass murder committed outside the rules of land warfare. The bombing of the Soo Locks on the Great Lakes shortly after U.S. entry into World War I, which would otherwise meet the criteria of mass murder, smells suspiciously like German sabotage and I therefore excluded it.[4] This also excludes one of the earliest American mass murders: ten murdered by Lenape Indians at a school in 1764 Greencastle, Pennsylvania,[5] as well as the many thousands (at least) killed in various Indian wars (such as the hundreds killed during the Dakota War of 1862).

8.      I have excluded *most* mass murders of Indians by Indians because most were outside the civil society of America, and the records of such crimes are thus

---

[3] *Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act*, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1.
[4] *Attempt Made To Wreck Soo Locks,* EAST OREGONIAN, May 16, 1917, 1.
[5] Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017).

2

DECLARATION OF CLAYTON CRAMER      **APP. 891**

17cv1017

necessarily incomplete.  The Criminal Justice Research Center's data on Colonial and Revolutionary New England murders contains examples that meet this definition.[6]  I have included incidents where a mass murder (by white or Indian and regardless of the victim's race) was clearly *not* a part of warfare, such as those motivated by robbery or kidnapping with the goal of ransom.

9.     There are mass murders where the victim count includes people killed because a felony was taking place.  Because of the felony-murder rule, I have included people killed lawfully in the course of a felony as mass murder victims, such as happened in the Johnson County War.[7]   I have excluded incidents in which all the dead were felons.[8]

10.     There are incidents which might be best categorized as mutual combat, where armed groups attacked each other with great loss of life but determining who were the victims and who were the murderers is not easy from surviving news coverage, such as the struggle between Democratic and Republican campaign workers in Clayhole Voting Precinct in 1922.  The ensuing gunfight killed at least five people and wounded ten to thirteen others.[9]

11.     I have excluded a small number of cases where trial found the killer not guilty of what were clearly mass murders.  Example: Miss Verna Ware opened fire in the Gatesville courthouse in 1909, killing the man she accused of seducing her, two others not involved in the case and wounding a fourth.[10]

---

[6] Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797*, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england.

[7] *A War in Wyoming*, [Maysville, Ky.] EVENING BULLETIN, Apr. 13, 1892, 1.

[8] *Nevada Mining Boss Besieged in His Office*, KALISPELL BEE, Jan. 09, 1903, 1

[9] *Some Facts About Clayhole*, [Lancaster, Ky.] CENTRAL RECORD, Jul. 20, 1922, 1.

[10] *Woman to Face Murder Charge*, WAXAHACHIE [Tex.] DAILY LIGHT, Feb. 8, 1909, 1; *Four People Wounded,* PALESTINE [Tex.] DAILY HERALD, Feb. 4, 1909, 2; *Jury Verdict Not Guilty*, LIBERTY [Tex.] VINDICATOR, Feb. 11, 1910, 1.

3

DECLARATION OF CLAYTON CRAMER          **APP. 892**

17cv1017

**B. Finding Mass Murders**

12.     How do you find historical mass murders?  The phrase "mass murder" is quite rare in historical documents.  Using the *ngram* tool in books.google.com for books published 1600-2000 shows essentially zero matches until 1952,[11] and many of the rare pre-1952 matches are actually abbreviations of Massachusetts such as "Mass. Murder" or "Mass., murder."[12]  The abbreviation "Mass." causes similar problems when searching the Library of Congress' collection of 1789-1963 newspapers for the words "mass" and "murder" within five words of each other.[13]  An additional problem is the use of the phrase to describe governmentally sanctioned and indeed government-operated warfare.[14]

13.     Searching the Library of Congress' *Chronicling America* collection of newspapers for the words "murders", "murdered", "killed", "slain", "dead" in association with numbers found a sea of matches, most of which needed to be read before discarding.  In many cases, similar or identical news stories appeared in multiple newspapers.  If the same facts appeared repeatedly, and there were hundreds of references to an event, I did not read every newspaper account of that event.

14.     There are several frustrating limitations of the *Chronicling America* collection:

---

[11] https://books.google.com/ngrams/graph?content=%27mass+murder%27&year_start=1600&year_end=2000&corpus=17&smoothing=3&share=&direct_url=t1%3B%2C%27%20mass%20murder%20%27%3B%2C0, last accessed June 12, 2018.

[12] Examples: Michigan State Prison, BIENNIAL REPORT OF THE BOARD OF CONTROL AND OFFICERS OF THE STATE HOUSE OF CORRECTION AND BRANCH PRISON OF STATE PRISON IN UPPER PENINSULA… 22, 41, 65 (1916),; R.W. Bligh, comp., NEW YORK HERALD ALMANAC: FINANCIAL, COMMERCIAL AND POLITICAL REGISTER 1874 87 (1874).

[13] https://chroniclingamerica.loc.gov/search/pages/results/?state=&dateFilterType=yearRange&date1=1789&date2=1963&language=&ortext=&andtext=&phrasetext=&proxtext=mass+murder&proxdistance=5&rows=20&searchType=advanced; Examples: *'Joe is a Good Boy,' Declares Ettor's Parents*, [Chicago, Ill.] THE DAY BOOK, Oct. 25, 1912; 14; *Queries Pour in on J. Frank Hickey*, [Chicago, Ill.] THE DAY BOOK, Dec. 4, 1912, 28; *Written Authority to Walk in Your Own Town*, [Chicago, Ill.] THE DAY BOOK, Feb. 5, 1912.

[14] Jos. Veltman, *Do Workers Want War?* [letter to the editor] [Chicago, Ill.] THE DAY BOOK, Jan. 17, 1916, 23.

4

DECLARATION OF CLAYTON CRAMER

i. Copyright restrictions make post-1922 newspaper collections incomplete.

ii. Many of these mass murders, in addition to appearing in many different newspapers, sometimes appear in only one or two newspapers, far removed from the crime, both geographically and temporally. One example is a mass murder of three in Tamworth, N.H. in 1857 which appeared only in an 1858 summary of the previous year's events, which was published in Pennsylvania.[15] This made it difficult to gather additional data on the crime.

iii. Nineteenth century accounts often used the word "murders" rather far afield from its legal meaning, or in reference to general social problems such as alcohol. This produced so many thousands of matches that I have often settled for detailed examination of the first 100 front page news stories. Newspapers in the nineteenth century also published many foreign news accounts and fiction. Limiting searches to the front pages thus reduced false positives which would have to be laboriously examined for location and fiction status. (If it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder.)

15. Defining a mass murder by the number of dead can understate mass murders, if either police or civilian intervention interrupts the murderer. (There are some examples in my list of mass murders cut short, although not soon enough, by such actions.) In addition, some of the events gathered here list crimes in which the immediate coverage includes persons wounded so seriously that the coverage describes them as "probably fatally."[16] When considering the nature of medical and surgical care available until my lifetime, it seems a good guess that those described as "probably fatally" wounded can be properly included among the dead.

---

[15] *Principal Events of General and Local Interest During the Year 1857*, LEWISTON [PENN.] GAZETTE, Jan. 21, 1858, 1.
[16] *Maniacal Unknown in Attempt to Exterminate Whole Family*, BISBEE [ARIZ.] DAILY REVIEW, Apr. 6, 1922, 1.

5

DECLARATION OF CLAYTON CRAMER   APP. 894

16.     Along with *Chronicling America*, I have made extensive use of the commercial site *Newspapers.com* and a few secondary sources.

17.     Another valuable source was the list of "Homicide among Adults in Colonial and Revolutionary New England, 1630-1797," compiled by Randolph Roth and Cornelia Hughes Dayton.[17]  While this is a list of *all* murders, not just mass murders, it provided an additional source of incidents.

### C. Group Activity

18.     The State's claim is that earlier mass murders were "typically… a group activity, because technological limitations impaired the ability of a single person to commit mass murder."  The supposed distinction between modern individual mass murder and group mass murder of earlier centuries does not stand careful examination. Mass murder is *still* sometimes a group activity.  Such happened at Littleton, Colo. on Apr. 20, 1999[18] and the terrorist attacks of September 11, 2001.  Other recent group mass murders include one on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured."[19]  On Dec. 31, 1986, in San Juan, P.R. three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[20]

19.     As this declaration later shows, individual mass murder is neither particularly modern not dependent on technological advances.

---

[17] Randolph Roth and Cornelia Hughes Dayton, comp., *Homicide among Adults in Colonial and Revolutionary New England, 1630-1797*, Oct. 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england, last accessed June 12, 2018.

[18] R. Barri Flowers and H. Loraine Flowers, MURDERS IN THE UNITED STATES: CRIMES, KILLERS AND VICTIMS OF THE TWENTIETH CENTURY 59 (2001).

[19] Annie Sciacca, *"It was a bloodbath": Orinda Halloween shooting investigation reveals gang connections*, SAN JOSE MERCURY-NEWS, Nov. 17, 2019.

[20] *3 Teamsters Charged in San Juan Hotel Fire*, CHICAGO TRIBUNE, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

6

DECLARATION OF CLAYTON CRAMER          APP. 895

### D. Data Limitations

20.     It would be very useful to be able to extract data identifying which were group mass murders and which were individual.  When I started this project, this seemed an unnecessary detail and so I did not gather it.  While I cannot provide that level of detail on group vs. individual mass murders, I can say with confidence that the mass murders in my collection are primarily individual, although there are a number that are group.  How can I be so sure?  Family mass murders are very common both historically and in the present.  They are usually by either the father or mother.  I cannot immediately recall an intra-family mass murder carried out by more than one person.

21.     Before 1960, these intra-family mass murders are 741 of 1796 incidents; 2,784 out of 12,730 dead. (To avoid giving fame to the infamous, which produces Herostratic mass murders,[21] my synopses consistently exclude the murderer's name.)

22.     When gathering this data, I only recorded if a particular weapon was used rather than counting deaths by weapon.  In older news accounts, there is no breakdown of deaths by weapon.  In many cases, the state of forensic medicine would make it impossible to determine if the ax to the head or the subsequent knife to the throat was the fatal injury.  It would make little difference which cause a victim's death: the murderer's punishment would be the same.

23.     A few examples of individual mass murders:

Clarksburg, Va.: Nov. 10, 1805: Man murdered his wife and eight children.  While found guilty, there was substantial evidence of mental illness.  Weapon: ax.[22]

---

[21] Clayton E. Cramer, *Ethical Problems of Mass Murder Coverage in the Mass Media*, 9:1 JOURNAL OF MASS MEDIA ETHICS 26-42 (Winter, 1993-94).
[22] *Trial of Abel Clements*, [Edinburgh, Scotland] CALEDONIAN MERCURY, Aug. 25, 1806, 4.

DECLARATION OF CLAYTON CRAMER        **APP. 896**

17cv1017

Hallowell, Me.: Jul. 9, 1806, James Purrington (or Purrinton), murdered his wife and seven of his eight children with an axe or knife before killing himself with a knife. The cause was unclear, but the murderer mentioned poverty in a suicide note. Weapon: ax.[23]

Uniontown, Wash. Feb. 25, 1901: A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned."[24]  "She is violently insane.  The woman's husband died a year ago, and she has been supported by the county and charity of neighbors."[25]  Reporter interview supports evidence of insanity: "[S]he gave him incoherent reasons for slaying her little ones…. [s]he had read of the Chinese war and the terrible atrocities committed in the Orient, and had warning that the Chinese were coming today to burn her house and slay her children… Mr. Rustemeyer… was well acquainted with the family…  He said… Mrs. Wurzer was never considered just right in her mind, and thinks she should have been restrained of her liberty long ago." Weapon: drowning.[26]

24.    Through 1960, there were 797 non-firearm mass murders: 3,781 dead: an average of 4.74 dead per incident; 840 exclusively firearms mass murders, 3,653 dead: an average of 4.35 dead per incident.  Nonetheless, firearms mass murders were not rare, even with "primitive" technology:

---

[23] Laurel Thatcher Ulrich, A MIDWIFE'S TALE: THE LIFE OF MARTHA BALLARD, BASED ON HER DIARY, 1785-1812 291-307 (1990),; HORRID MURDER! AT AN EARLY HOUR ON WEDNESDAY MORNING LAST, THE INHABITANTS OF THIS TOWN WERE ALARMED WITH THE DREADFUL INFORMATION… 1 (1806).

[24] *Drowned Her Six Children*, ADAMS COUNTY NEWS [Ritzville, Wash.] Feb. 27, 1901, 4.

[25] WASHINGTON STANDARD [Olympia, Wash.], Mar. 1, 1901, 3.

[26] *Killed Her Children*, COTTONWOOD [Ida.] REPORT, Mar. 1, 1901, 1.

**Swan River, Minn. Terr. (1860)**

Early 1860 or late 1859: A very complex incident.  One Chippewa warrior
("A") murdered another Chippewa ("B").  A few days later, B's squaw ("C")
saw A, and shot him.  A's brother ("D") shot C.  C's brother ("E") shot D.

Category: public

Suicide: no

Cause: revenge

Weapon: firearm[27]

**Coldwater, Mich. (1865)**

Jan. 30, 1865: Young man becomes engaged to a woman in Lorain Co.,
Ohio.  This is a problem, because his wife in Coldwater, Mich., is about to give
birth, so he returns home, where his wife lives with the young man's parents.  In
the midst of giving birth, the young man murdered his wife.  When the young
man's father and mother showed up, he shot them to death.  (Other accounts
identify the town as Woodstock, and that the murder of his wife and unborn
child followed the murder of his parents.)  His behavior after arrest, as
newspaper coverage described, "suggests the charitable conjecture that the man
is insane."  He confessed the crime and signed autographs for the crowd around
the jail that described himself as "murderer of his wife, father and mother."  He
invited his friends in Lorain County to visit him in jail "where they would find
him 'playing checkers with his nose, on the jail windows.'"

Category: family

Suicide: no

Cause: mental illness

---

[27] *Indian revenge*, MUSCATINE [Iowa] WEEKLY JOURNAL, Jan. 27, 1860, 1.

9

DECLARATION OF CLAYTON CRAMER

Weapon: firearm[28]

**Sleepy Hollow, N.Y. (1870)**

Jan. 1, 1870: Farmer murdered his wife, and two of his neighbors, father and son, who appear to have visited the murderer's wife in his absence. The murderer had a reputation for being too fond of rum.

Category: public

Suicide: no

Cause: jealousy?

Weapon: firearm[29]

**Glenville, Minn. (1889)**

Feb. 15, 1889: Murderer, relative of the victims, shot to death, "Mary Chemeieck, aged six, and her sister Rose, aged eleven…" Apparently, his niece, Rose, had spurned his advances. He then murdered their mother with a shotgun and committed suicide.

Suicide: yes

Cause: unknown

Weapon: pistol, shotgun[30]

25.    A mass murder that is not part of the database shows how "primitive" firearms technology is not a barrier to school mass murder. A former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers." He killed one teacher, two children, "three children were gravely injured and three other

---

[28] *A Triple Murder*, [Plymouth, Ind.] MARSHALL COUNTY REPUBLICAN, Feb. 16, 1865, 1.
[29] *A Triple Murder at Sleepy Hollow*, WILMINGTON [N.C.] JOURNAL, Jan. 14, 1870, 1.
[30] *He was a Rejected Lover*, ST. PAUL GLOBE, Feb. 17, 1889, 1.

10

children were slightly wounded." The article described him as "demented."[31] Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading. Of course, reloading a revolver with speedloaders can be done by a skilled shooter in a second or two at most.

26.     Firearms become more common weapons by the 1920s. Axes and hatchets declined as wood stoves became less common. While I have not categorized the poison mass murders as precisely as I might do if I were starting from scratch, "illuminating gas" and "Rough on Rats" (both commonly used to wipe out your spouse and children) declined as automobile exhaust poisoning rose.

27.     This should be no surprise; mass murderers use what is available. This May 20, 1931, Mattoon, Ill. incident catches this improvisational nature well. A former employee of her late husband attempted to burn to death the woman and her two daughters with whom he had recently moved to Illinois. They escaped the burning house. He then shot to death the mother, attempted to strangle the daughters, then shot them and beat them to death with an automobile starter crank. Weapons: firearm, strangle, blunt.[32] Even today's gun mass murders are not as narrowly focused as the popular imagination sees them.

28.     May 24, 2014, Isla Vista, Cal.: College student, upset about his sex life (or rather its absence) stabbed to death his three roommates, shot three women at a sorority (two of whom died), shot another student, injured two bicyclists by ramming them with his car, and shot and wounded four pedestrians

Category: public

Suicide: yes

Cause: mental illness

---

[31] *Maniac Shot Many People*, BARRE [Vt.] DAILY TIMES, Jun. 20, 1913, 1.
[32] *Woman Shot. Tots Choked,* BROWNSVILLE HERALD, May 20, 1931, 1.

11

Weapon: knife, pistol, automobile[33]

29.      For the following table, some of these weapon types require explanation.

UNKNOWN means the weapon type was not identified in the article.

AIRCRAFT is for murders committed with an airplane (not all of which took place on Sep. 11, 2001). (Bombing of planes is in the EXPLOSIVE weapon type.)

TRAIN involves intentional derailment of trains to cause loss of life. The motivation for most of these crimes in uncertain. One was insurance fraud; authorities alleged "that the men entered into the plot to get rid of their wives and at the same time to collect damages from the railroad company." One of the murderers collected $500 from the railroad for injuries to his wife.[34] Another, on Dec. 27, 1934: Police charged three men with the intentional derailment of a train, in the hopes that one of the train crew would lose his job, so that one of the three would get that job. The crash killed three employees and injured 16 passengers.[35]

Incident count by weapon type for mass murders before 1960 where only one weapon type was used:

| | |
|---|---|
| UNKNOWN | 862 |
| AX | 646 |
| HATCHET | 135 |
| KNIFE | 588 |
| OTHERSHARP | 215 |
| BLUNT | 868 |
| EXPLOSIVE | 299 |
| POISON | 286 |
| STRANGLE | 109 |

---

[33] Shelby Lin Erdman and Greg Botelho, *Timeline: A killer's rampage through a California college town*, CNN, May 27, 2014, https://www.cnn.com/2014/05/24/us/california-rampage-timeline/, last accessed November 27, 2018.
[34] *Plot to Kill Their Wives*, [Maysville, Ky.] EVENING BULLETIN, Mar. 26, 1896, 1.
[35] *Trio Held In Wreck Accused Of Murder*, [Washington, D.C.] EVENING STAR, Mar. 10, 1935, 1.

12

DECLARATION OF CLAYTON CRAMER

| | |
|---|---|
| DROWN | 139 |
| ARSON | 708 |
| HANG | 284 |
| OTHER | 157 |
| PERSONAL | 21 |
| FIREARM_UNKNOWN | 2571 |
| SHOTGUN | 504 |
| RIFLE | 570 |
| PISTOL | 933 |
| MACHINE_GUN | 61 |
| AIRCRAFT | |
| TRAIN | 76 |

30.    When grouped by incidents where *only* non-firearms were used, 3,809 died.  For firearms *only* mass murders, 2,068 died.

31.    Many mass murders involve multiple weapons.  Robert McConaughy, May 30, 1840, murdered his mother-in-law and her five children.  Cause: robbery.  Weapon: strangulation; stone; axe, rifle; knife.  He confessed after the first hanging failed.[36]

## III.    Killing People Without Modern Firearms Technology

32.    How do you kill lots of people without modern firearms technology?

### A. Explosives

33.    One popular method was explosives.

### Sells, Ark. (1900)

Oct. 15, 1900: "[F]ather, mother, and four young children blown to atoms" by dynamite explosion.  "It is believed that a dispute over a homestead claim prompted the outrage."

Category: family non-resident

---

[36] *Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children* 6-7, 9-10 (1841).

DECLARATION OF CLAYTON CRAMER      **APP. 902**

17cv1017

Suicide: no

Cause: greed

Weapon: explosives[37]

**Cripple Creek, Colo. (1904)**

Jun. 5, 1904: Someone set off a bomb under a train station platform where non-union men were waiting for a train during a strike. Twelve died "and a score or more injured..." Subsequently, "Forty shots were fired in a crowd in the street. Two men were killed and at least six persons wounded." One of the dead "by blow from revolver." Then the National Guard troops showed up and attempted to restore order.

Category: public

Suicide: no

Cause: labor

Weapon: explosives, firearm, blunt [38]

**Mullins, W.Va. (1909)**

5/16/1909: The Black Hand used dynamite to blow up an Italian boarding house. One of the victims broke faith with the Black Hand. The explosion killed four and injured three.

Category: residential

Suicide: no

Cause: gang

Weapon: explosives[39]

---

[37] *Whole Family Murdered*, [St. Genevieve, Mo.] FAIR PLAY, Oct. 20. 1900, 1.
[38] *Terrorism and Death Dominate Colorado*, SAINT PAUL GLOBE, Jun. 7, 1904, 1.
[39] *Black Hand Kills Four By Dynamite*, BLUEFIELD [W.Va.] EVENING LEADER, May 17, 1909, 1.

14

DECLARATION OF CLAYTON CRAMER    **APP. 903**

17cv1017

**Mudlow, W.Va. (1912)**

7/26/1912: Striking miners dynamited a machine gun operated by agents of the Baldwin detective agency, killing three miners and seven detectives.

Category: public

Suicide: no

Cause: labor

Weapon: explosives[40]

**Superior, Penn. (1914)**

11/15/1914: Someone blew up the Kanaza general store, which was also the Kanaza residence, with two separate dynamite bombs, killing Kanaza's three children and two other men.  Five others suffered injuries.  Mr. Kanaza believed the motive was revenge for a lawsuit.

Category: family

Suicide: no

Cause: revenge

Weapon: explosives[41]

**San Francisco, Cal. (1916)**

Feb. 1916: Someone set off a dynamite bomb, killing ten, during the "Preparedness Day Parade," in preparation for World War I.  While the identity of the murderers is uncertain (California Governor Culbert Olson many years later pardoned those originally convicted as evidence of perjury at the trial accumulated), circumstances suggests that it was the work of anarchists, hostile to U.S. involvement in the war.

---

[40] *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1.
[41] *Dynamite Kills Five In Spite Act*, NEW-YORK TRIBUNE, Nov. 16, 1914, 1.

DECLARATION OF CLAYTON CRAMER      APP. 904

17cv1017

Category: public

Suicide: no

Cause: terrorism

Weapon: dynamite[42]


**New York, N.Y. (1920)**

09/16/1920: Anarchists set off a bomb in Wall Street, killing 31 and injuring 125 others.

Category: public

Suicide: No

Cause: terrorism

Weapon: TNT[43]


**Germantown, Md. (1920)**

11/18/1920: Two neighbors had a longstanding feud.  On Election Day, one shot the other in the neck.  The farmer shot in the neck took revenge with 50 pounds of dynamite, killing his neighbor, the housekeeper and her two children.

Category: family non-resident

Suicide: no

Cause: revenge

Weapon: explosives[44]

---

[42] *Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb*, BEMIDJI [Minn.] DAILY PIONEER, Jan. 3, 1917, 1; *Preparedness Day Bombing*, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations.

[43] *Bomb Batters Wall Street; 31 Slain, 125 Hurt*, THE SUN AND THE NEW YORK HERALD, Sep. 17, 1920, 1.

[44] *Bomb Wrecks Farmers Home Killing Three*, [Salem, Ore.] CAPITAL JOURNAL, Nov. 19, 1920, 1.

16

DECLARATION OF CLAYTON CRAMER   **APP. 905**

17cv1017

**Pittsburgh, Penn. (1925)**

05/Jun. 1925: Two bombs destroyed three buildings, killing eight people immediately, and fatally injuring two others.  One of the buildings housed a grocer who had been the victim of extortion threats by a Black Hand society.

Category: residential

Suicide: no

Cause: extortion

Weapon: explosive[45]

**Bath, Michigan (1927)**

May 18, 1927: Treasurer of the local school board was angered by his property tax increase to pay for a new school building that he had opposed.  He placed a dynamite bomb in the basement of the school, by which method he murdered 37 children and six adults as well as seriously injuring 44 others.  Only a wiring mistake prevented other charges from taking down the rest of the building which would endangered 150 more students.  The murderer had already beaten his wife to death at their home before blowing up their house.  He blew himself up in his car in front of the school 30 minutes after the school explosion.

Category: public

Suicide: yes

Cause: revenge

Weapon: explosive, blunt object[46]

---

[45] *Eight Are Killed In Blasted Homes*, [Washington, D.C.] EVENING STAR, May 06, 1925, 1.

[46] *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1.

17

**New York, N.Y. (1927)**

Oct. 8, 1927: Someone set off a dynamite bomb demolishing a four-story apartment building, killing five and injuring eleven.  Why did police assume a dynamite bomb?  "Finding of 20-Pound Unexploded Bomb Leads Police to Suspect Infernal Machine."

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[47]

**Newton, Mass. (1928)**

01/31/1928: Someone used dynamite to destroy a building containing "extensive liquor making apparatus in the basement."  Six people died.

Category: private

Suicide: no

Cause: gang?

Weapon: explosive[48]

**Seat Pleasant, Md. (1930)**

01/01/1930: A belated and misdelivered Christmas gift was dynamite and exploded as the family unwrapped it.  The explosion killed an expectant mother and two siblings, her mother, and injured two other siblings.  The family was new to the community with no known enemies.

Category: family non-resident

---

[47] *Four Killed In Bomb Explosion In Tenement District Of New York*, [Douglas, Ariz.] DOUGLAS DAILY DISPATCH, Oct. 09, 1927, 1; *Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement*, NEW YORK TIMES, Oct. 9, 1927, 1.

[48] *Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story*, BROWNSVILLE HERALD, Jan. 31, 1928, 1.

Suicide: no

Cause: unknown

Weapon: explosives[49]

**Chesterton, Ind. (1933)**

10/10/1933: A bomb explosion in the cargo compartment aboard a United Airlines flight ripped the plane apart, killing seven people.  Motive remained uncertain.

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[50]

**Denver, Colo. (1955)**

11/1/1955: The 23-year-old son of passenger Daisie E. King eventually confessed that he placed a 25-stick dynamite bomb in her luggage, blowing up her airliner, killing 44 people.  The murderer had taken out life insurance policies on his mother and was expecting to receive a "substantial inheritance" upon her death.

Category: public

Suicide: no

Cause: greed

---

[49] *Gift Package Bomb Kills Woman; 5 Hurt*, [Washington, D.C.] EVENING STAR, Jan. 01, 1930, 1; *Bomb Survivors Tell Of Explosion,* [Washington, D.C.] EVENING STAR, Jan. 12, 1930, 1.

[50] *Ill-Fated Plane Wrecked By Bomb US Prober Says*, INDIANAPOLIS TIMES, Oct. 14, 1933, 1.

19

Weapon: explosives[51]

Since 1960, this technology, despite attempts to regulates explosives, remain a big dead per incident killer.  Using fertilizer, a  murderer on Apr. 20, 1995, set off a truck bomb in front of the Oklahoma City Federal Building killing 168 people and injuring hundreds more.

Category: public

Suicide: no

Cause: terrorism

Weapon: explosives[52]

**B. Arson**

33.    Arson is also a common and very low technology method to cause lots of suffering.

**New York, N.Y. (1903)**

11/1/1903: Police and coroner believed that a tenement building fire that killed 26 people was "of incendiary origin."

Category: residential

Suicide: no

Cause: unknown

Weapon: arson[53]

---

[51] Flowers And Flowers, MURDERS IN THE UNITED STATES, 30-1; FBI, *Jack Gilbert Graham*, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, last accessed October 5, 2022.

[52] Flowers and Flowers, MURDERS IN THE UNITED STATES, 56-7.

[53] *Tenement House Fire*, [Maysville, Ky.] EVENING BULLETIN, Nov. 2, 1903, 4.

20

DECLARATION OF CLAYTON CRAMER    APP. 909

17cv1017

**Boston, Mass. (1913)**

Feb. 3/1913: A lodging house refused a man a room "for want of 15 cents." He lit the structure on fire, killing 27 lodgers in a dangerously renovated structure.

Category: residential

Suicide: no

Cause: revenge

Weapon: arson[54]

**San Francisco, Cal. (1944)**

03/27/1944: Over a period of four hours, five San Francisco skid row hotels "burst into flames" following a previous weekend of 11 fires in Oakland hotels. The New Amsterdam Hotel fire killed 22 and injured 27. "Authorities noted an odor of kerosene or gasoline." One tenant, 33, showed injuries from the fire and was held in the "hospital psychopathic ward."

Category: public

Suicide: no

Cause: mental illness

Weapon: arson[55]

**Tulsa, Okla. (1921)**

05/01/1921: The police arrested a young black man for what later appears to have been an accidental touching of a white female elevator operator. Rumors spread that police charged him with sexual assault. A lynch mob

---

[54] *Burns Lodging House When Refused Room; 27 Homeless Men Died*, [New York, N.Y.] EVENING WORLD, Dec. 3, 1913, 1.

[55] *22 Killed In Hotel Fire In San Francisco*, [Santa Cruz, Cal.] SANTA CRUZ SENTINEL, Mar. 29, 1944, 1.

DECLARATION OF CLAYTON CRAMER   **APP. 910**

17cv1017

arrived at the county jail.  The sheriff and deputies prevented seizure of the young man.  A group of armed black men offered to help the sheriff defend the jail.  This display of arms by black men inflamed white public sentiment leading to the destruction of Greenwood, the black section of Tulsa.  More than one thousand homes were burned and *at least* 36 dead.  Newspapers and public officials removed news accounts and official records about the riot from files. The Tulsa Race Riot Commission in 2001 "concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921," with many bodies buried in unmarked mass graves.

Category: public

Suicide: no

Cause: racism

Weapon: firearms, arson, unknown?[56]

**Chicago, Ill. (1958)**

Dec. 1, 1958: Our Lady of the Angels school burned, killing 95.[57]  Several years later, a 13-year-old confessed while on a lie detector that he had started the fire: "because he hated school, rebelled at the authority of teachers, liked to hear the sound of fire sirens and to watch fire engines race along the street."[58]

34.    After 1960, of course, there have been several arson mass murders with equal or larger death counts, and this remains a common method of mass murder in other nations. In Australia, an arsonist burned the Childers, Queensland's Palace

---

[56] *Tulsa Race Riots*, https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, last accessed July 5, 2021.
[57] Our Lady of the Angels School fire, https://en.wikipedia.org/wiki/Our_Lady_of_the_Angels_School_fire
[58] *Boy Admits Fire Fatal To 95*, MIAMI NEWS, January 16, 1962, 1.

22

Backpackers Hostel in 2000, killing 15.[59]  The 2011 Quakers Hill Nursing Home fire killed eleven, set by a nurse after police questioned him about drug abuse.[60]  Japan had several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents.[61]  These required no advanced firearms technology or even firearms.  The previously mentioned San Juan, P.R. arson mass murder killed 97.[62]   The March 25, 1990, Happyland Social Club fire killed 87 people, leaving three survivors.  Angry at his girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of employment.[63]

### New Orleans, La. (1973)

Jun. 24/1973: The murderer took revenge for being expelled from the UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of cigarette lighter fluid, killing 33 people.[64]

---

[59] *A Decade On, Childers Remembers Hostel Fire Tragedy,* BRISBANE [Australia] TIMES, Jun. 23, 2010.

[60] Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears,* [U.K.] DAILY MAIL, Sep. 8, 2014.

[61] Makiko Inoue, Motoko Rich and Hikari Hida, *24 Dead in Suspected Arson at Office Building in Japan*, N.Y. TIMES, Dec. 16, 2021, https://www.nytimes.com/2021/12/16/world/asia/japan-fire-osaka.html, last accessed November 21, 2022.

[62] *3 Teamsters Charged in San Juan Hotel Fire,* CHICAGO TRIBUNE, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

[63] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, NEW YORK TIMES, Mar. 26, 1990.

[64] Elisabeth Dias with Jim Down, *The Horror Upstairs,* TIME, Jul. 1, 2013.

23

DECLARATION OF CLAYTON CRAMER

**Chicago, Ill. (1976)**

01/30/1976: An employee of Wincrest Nursing Home with a mental illness problem (pyromania) started a fire in a clothing wardrobe, which killed 22 residents.  The employee was charged with arson.[65]

**E. Brutal Misuse of Tools**

35.   **Villisca, Ia. (1912)**

Sep. 9, 1912: It appears that a business competitor and member of the Iowa State Senate murdered Joseph Moore, his wife Sarah, their four children and two visiting children "with an ax."  An "itinerant minister" was charged.  The Iowa Attorney-General "sought to commit" the minister "to an insane asylum, a step that would bar the prosecution of any other person suspected of the crime."  Relatives of the victims claimed that the Attorney-General blamed the wrong person; in response, the Iowa legislature passed a law prohibiting public discussion of the crime.  This led to an "injunction against J.N. Wilkerson, a detective, whose four years' investigation of the murders cast suspicion on a prominent state senator."  The public meeting by Villisca residents took place in Omaha, Neb., instead.

Category: greed

Suicide: no.

Cause: greed

Weapon: ax[66]

---

[65] National Fire Protection Association, *Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home*, 1, 4, https://oac.cdlib.org/view?docId=hb9v19p0sd&doc.view=frames&chunk.id=div00008&toc.id=0, last accessed November 27, 2022; *Woman Indicted in Chicago Blaze*, NEW YORK TIMES, Feb. 4, 1976.
[66] *Villisca Ax Murders to Be Discussed in Mass Meeting*, OMAHA DAILY BEE, Jul. 6, 1917, 1.

24

DECLARATION OF CLAYTON CRAMER   **APP. 913**

17cv1017

**F. Panic**

36.    **Calumet, Mich. (1913)**

Dec. 24, 1913: A man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were meeting for a Christmas party.  (There was no fire.)  As the crowd attempted to exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[67]  One account ascribed the false claim to "a drunken" man,[68] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[69] this seems unlikely as the cause.

Category: public

Suicide: no

Cause: labor

Weapon: mouth[70]

**Causes**

37.    The focus of the State on the *method* of mass murder might be better spent on solving the problem by solving underlying causes.

38.    The following table shows the proximate cause of all mass murders in my database before 1960.  (After 1960, the data is not yet complete.)  A breakdown of these abbreviations:

- **Rob** is a mass murder performed as part of a robbery or to eliminate witnesses to the robbery.

---

[67] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

[68] *Day of Joy is One of Sorrow*, [Valley City, N.D.] WEEKLY TIMES-RECORD, January 1, 1914, 6.

[69] *Strike Breakers Taken to Mines at Point of Pistols*, OMAHA DAILY BEE, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).

[70] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

25

DECLARATION OF CLAYTON CRAMER

- **MI** (Severe mental illness, primarily psychoses and other illnesses that cut off the sufferer from reality) includes all crimes where either contemporary accounts describe the murderer as insane, or where the nature of the crime makes other explanations implausible (this is necessarily a judgment call, on which my experience with mentally ill relatives and friends informs my opinion). The legal definition of mental illness is much narrower than the medical definition. Through most of U.S. history, the McNaughton Rule (sometimes spelled M'Naughten) defined legal insanity as: "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know what he was doing was wrong."[71]  A person who did not know he was doing wrong, was insane.

  Persons who are medically mentally ill sometimes know that they are doing wrong and try to escape arrest and conviction (perhaps because the "aliens," or the CIA or KGB "agents" that they have just murdered are still after them).  Such persons are legally sane, while in any conventional sense, they are as "mad as hatters."

- **MI?** are persons whose sanity seems questionable but for which contemporary accounts are less than persuasive.

- **PPD** (Postpartum Depression): Tragically, many of these mentally ill or possibly mentally ill incidents are mass murders by mothers with recently born babies.  In cases where the murders are by recent mothers and where news accounts provide no other explanation, I have categorized these as **postpartum depression**.  Some news accounts identified the mother as 'temporarily insane' with no previous history of mental illness. In a few cases the news accounts report on previous mental illness hospitalizations associated with previous births.

- Many cases I have listed as "**PPD?**" because this is a plausible explanation when no other seems more likely.

---

[71] *The insanity defense and Diminished Capacity*,
https://www.law.cornell.edu/background/insane/insanity.html

26

DECLARATION OF CLAYTON CRAMER     APP. 915

17cv1017

- **Resist** is a criminal resisting arrest.

- **Unknown** describes a very large number of crimes where either the motivation is unclear or the newspaper coverage is silent; this also includes some mass murders where the inability to identify the murderer makes cause impossible to determine.

- **Religion** is mass murders committed as part of religious persecution.  (And yes, in America!)

- **Racism** is its frequent cousin.  In some cases, these include revenge or retribution against Indians for crimes not, or at least not clearly committed by the victims.

- **Politics** are murders committed to advance a political cause.

- **Terror** are mass murders committed to cause mass fear for purposes of political change outside elections.  Example: 9/11.

- **Revenge** are mass murders committed to take revenge for real or perceived injuries by the murderer, his family, or acquaintances.

- **Ind** are crimes between Indians and settlers that are not official acts of war, but that might have been seen that way by the murderers.  I have classified all attacks against peaceful travelers, settlers, and Indians in this cause.  (In some cases, the killers openly admitted that the victims were "peaceful," but were supplying guns to less friendly tribes.)[72]

- **Financial** is a strange subclass of family murders committed, usually by a parent concerned their family is about to become impoverished, who then "protect" them from that suffering by mass murder.  In some cases, this seems to be a form of mental illness: at least one example involved a mass murderer who was in no danger of impoverishment.

---

[72] *From California and Oregon*, [Washington, D.C.] EVENING STAR, Mar. 21, 1860, 2.

27

DECLARATION OF CLAYTON CRAMER

- **Labor** are crimes committed during labor disputes, sometimes against strikebreakers, sometimes against labor unionists.

- **Quarrel** are incidents that start out as some relatively minor dispute before escalating into disproportionate response.

- **Cult** refers to mass murders committed by oddball religious cults; I was surprised how widespread these were in the early 20th century (the Church of the Sacrifice slaughtered entire families, often with the family's own ax).

- **Rape** are mass murders committed to eliminate witnesses to a rape.

- **Greed** are mass murders carried out to obtain wealth other than by robbery, often by inheritance from the deceased.

- **Divorce** is an alternative form of **Revenge**; divorce has been or is in the process and someone is seeking retribution. This includes separated spouses attempting reconciliation.

- **Adultery**: a variant of **Revenge**.

- **Jealousy**: should be obvious.

- **Intoxication** are crimes attributed to alcohol or drug-induced stupidity. The strong overlap between **mental illness** and **substance abuse** (one often causing the other) makes some of these hard to distinguish, especially 150 years after the crime.

- **Bullying** is a recent category, and one that I suspect reflects some deeper mental illness; I was bullied as a child, had access to low-grade explosives (nerds have peculiar hobbies), and never even *thought* of mass murder (or even low-intensity revenge).

- **Stalker**: someone did not get their attentions rewarded as they saw fit.

- **Witnesses**: Eliminating witnesses to some crime other than rape or robbery.

28

DECLARATION OF CLAYTON CRAMER

- **Lynch**: extralegal murders (and a surprising number had multiple victims).  These are always group mass murders.

**incidents by cause before 1960**

| Cause | incidents |
|---|---|
| ADULTERY | 3 |
| BULLYING | 2 |
| CULT | 10 |
| CULT? | 3 |
| DIVORCE | 73 |
| DRUG | 3 |
| EXTORTION | 6 |
| FINANCIAL | 51 |
| GANG | 33 |
| GREED | 43 |
| IND | 24 |
| INTOX | 53 |
| JEALOUSY | 37 |
| LABOR | 46 |
| LYNCH | 93 |
| MI | 211 |
| MI? | 97 |
| OTHER | 25 |
| POLITICS | 21 |
| PPD | 17 |
| PPD? | 58 |
| PRISON BREAK | 17 |
| QUAR | 176 |
| RACISM | 20 |
| RAPE | 18 |
| RELIGION | 3 |
| RESIST | 37 |
| REVENGE | 109 |
| REVENGE? | 1 |
| ROB | 153 |

DECLARATION OF CLAYTON CRAMER

**APP. 918**

17cv1017

| incidents by cause before 1960 | |
| --- | --- |
| **Cause** | **incidents** |
| SLAVERY | 1 |
| STALKER | 2 |
| TERROR | 19 |
| UNKNOWN | 447 |
| WITNESSES | 4 |

39.    Plotting the cause without UNKNOWN shows the high frequency causes:



40.    It should surprise no one that mental illness and likely mental illness are a high frequency category. While most mentally ill people are primarily a hazard to themselves, severely mentally ill people are overrepresented in murder and other violent crimes.[73] Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[74]

---

[73] See Clayton E. Cramer, *Mental Illness and the Second Amendment*. 46 Connecticut Law Review 1301-6 (May 2014):(collecting studies).
[74] See Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) and Jean Isaac Rael and Virginia C. Armat, MADNESS IN THE STREETS: HOW PSYCHIATRY AND THE LAW ABANDONED THE MENTALLY ILL (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

41.     Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s correlated with the change in the percentage of the population that was institutionalized: those who were confined to either a mental hospital or prison.  According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization: mental hospitals.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[75]

42.     Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[76] more access to beds is clearly quite important in reducing homicide rates; "poorly rated mental health systems" matter, but not as dramatically.)

43.     Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with

---

[75] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 *Texas Law Review* 1766-75 (2006).

[76] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[77]

44.    A 2000 *New York Times* examination of mass murderers concluded:

The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population. However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [78]

45.    A few representative cases from the period before 1960:

**New Haven, Conn. (1930)**

        Jun. 21, 1930: The father had been involuntarily committed to a mental hospital.  He escaped, threw his four children and wife from a 400-foot cliff, then jumped.

Category: family

Suicide: yes

---

[77] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, SOCIAL PSYCHIATRY AND PSYCHIATRIC EPIDEMIOLOGY, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.

[78] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, NEW YORK TIMES, Apr. 10, 2000.

DECLARATION OF CLAYTON CRAMER   **APP. 921**

17cv1017

Cause: mental illness

Weapon: other[79]


**New York, N.Y. (1953)**

Apr. 01, 1953: A college professor, 52, under psychiatric care, strangled his wife and their two children, then stabbed himself to death.

Category: family

Suicide: yes

Cause: mental illness

Weapon: strangled[80]


**Eleva, Wisc. (1909)**

Feb. 2. 1909: The father stabbed to death his four children, then "stabbed himself and then jumped from the barn loft with a rope around his neck. At the same time he hurled a fire brand into the stable, firing the barn."

Category: family

Suicide: Yes.

Cause: "[Father] was recently released from an insane asylum."

Weapon: knife[81]


**Summary**

46.     Mass murder is not particularly new, nor is historical mass murder a peculiarly group activity. Almost everything can be, and has been, used to commit mass murder in America. The mass murder at Cleveland School in 1989 that started

---

[79] *Maniac Veteran Kills His Family*, NEW BRITAIN HERALD, Jun. 23, 1930, 9.
[80] *Triple Murder, Suicide Apparent*, [Parsons, Kansas] PARSONS SUN, Apr. 04, 1953, 7.
[81] *Murders Whole Family and Then Kills Self,* [Pendleton, Ore.] EAST OREGONIAN, Feb. 22, 1909, 8.

DECLARATION OF CLAYTON CRAMER   **APP. 922**

California's legislative focus on LCMs involved a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[82]

47.    This is an especially painful paragraph for me.  My smarter, older brother's spiral down into schizophrenia resulted in brushes with the law but never with such a horrible ending.  It was still a life wasted by California's confused and irrational mental health policy.  Has more than 20 years of LCM laws, defenses of those laws, prison sentences for offenders, and dealing with other mass murders (not all with guns) *really* been cheaper than providing mental health care?

48.    The focus of the State on the *method* of mass murder might be better spent on solving the underlying *causes*.  This abstract closes with a chilling sentence:

> A case of an attempted mass shooting at a large psychiatric hospital in the United States by a 30-year-old male with severe mental illness, somatic delusions, and exceptional access to healthcare professionals is reported. Six persons were shot, one died at the scene, and the shooter was then killed by the police. Data were gathered from court documents and media accounts. An analysis of the shooter's psychiatric history, his interactions with healthcare professionals, and communications prior to the shooting suggest a rare form of mass murder, a random attack by a documented psychotic and delusional individual suffering with somatic delusions. Despite his being psychotic, the killer planned the attack and made a direct threat 1 month prior to the shootings. **This case highlights problems with the healthcare system, indicating that it**

---

[82] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

34

DECLARATION OF CLAYTON CRAMER     **APP. 923**

might be ill equipped to appropriately deal with severe mental illness.[83] [emphasis added]

49.     Confronting the extent which a shortage of mental health services and the difficult nature of involuntary mental health commitment in much of America would be a more effective strategy.  A severely mentally ill person without an LCM could follow in the footsteps of previous generations and use less regulated weapons: ax, hatchet, knife, poison, trail derailment.

### Background and Qualifications

50.     A copy of my *curriculum vitae* is attached to this Declaration as Exhibit 42.

51.     I attended Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

52.     I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

53.     I am currently employed as an Adjunct Professor College of Western Idaho, Nampa, teaching Western Civilization I and U.S. History I.

54.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles'

---

[83] Christine Sarteschi. (2015). *Severe Mental Illness, Somatic Delusions, and Attempted Mass Murder*. JOURNAL OF FORENSIC SCIENCES. 61. 10.1111/1556-4029.12876.

book contained quotations taken out of context, which completely reversed the author's original intent. Dates were altered and statutory text was changed to completely reverse the meaning of the law. The sheer volume of these errors, and their consistent direction, would seem to preclude honest error. Emory University conducted an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles resigned from his tenured position at Emory. Columbia University initially awarded Bellesiles the Bancroft prize for his book "Arming America", but revoked the award after my research proved that the book was fraudulent.

55.    My publications include:

·    *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press, 2018;

·    *Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*, CreateSpace, 2016;

·    *Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*, CreateSpace, 2016;

·    *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*, CreateSpace, 2012;

·    "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;

·    *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*, Nelson Current, 2006;

·    *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*, Praeger Press, 1999;

·    *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;

·    *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing, 1995;

·    *For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;

36

DECLARATION OF CLAYTON CRAMER

1   ·   *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*,

2   Editor, Library Research Associates, Inc., 1990

3          56.    I was retained at a rate of $75/hour to prepare this declaration.

4          57.    My compensation is not in any way dependent on the outcome of this or

5   any related proceeding, or on the substance of my opinion.

6

7          I declare under penalty of perjury that the foregoing is true and correct. Executed

8   within the United States on December 1, 2022.

9

10

11   _____

12   Clayton Cramer
     Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF CLAYTON CRAMER        **APP. 926**
17cv1017

# EXHIBIT 42

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com


**EDUCATION:**

|  | Sonoma State University, Rohnert Park, California |
|---|---|
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |


**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|---|---|
|  | First Place, Undergraduate Division |


**TEACHING EXPERIENCE:**

| Fall, 2017 – present | *Adjunct Faculty***:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
|---|---|
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | *Adjunct Faculty***:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | *Adjunct Faculty***:** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | *Adjunct Faculty***:** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

**APP. 928**

1996          **_Teaching Assistant_**: Assisted Professor Peter Mellini in his course
              "Twentieth Century World."  I graded quizzes, exams, and answered
              weekly written questions from students.  I also prepared and lectured
              about the rise of totalitarianism in the period between the world wars.

**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian
Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological
and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the
Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns
Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern
Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent
and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel
McIlvaine,* editor
Library Research Associates, Inc., 1990

**APP. 929**

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

*"*Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester*, 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien*, 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**APP. 932**

**LANGUAGES:**

> Very basic reading competence in German.

**OTHER SKILLS:**

> I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance.  I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

### CERTIFICATE OF SERVICE
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 42**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

1   C.D. Michel – SBN 144258
    Sean A. Brady – SBN 262007
2   Anna M. Barvir – SBN 268728
    Matthew D. Cubeiro – SBN 291519
3   MICHEL & ASSOCIATES, P.C.
    180 E. Ocean Boulevard, Suite 200
4   Long Beach, CA 90802
5   Telephone: (562) 216-4444
    Facsimile: (562) 216-4445
6   Email: abarvir@michellawyers.com

7   Attorneys for Plaintiffs

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,          Case No:  17-cv-1017-BEN-JLB

12                    Plaintiffs,     **DECLARATION OF GARY KLECK
                                      IN SUPPORT OF PLAINTIFFS'**
13             v.                     **SUPPLEMENTAL BRIEF;
                                      EXHIBIT 43**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the
    State of California,
16
17                    Defendant.

18

19

20

21

22

23

24

25

26

27

28

                                    1
                    DECLARATION OF GARY KLECK

I, Gary Kleck, declare as follows:

**Introduction**

1.      I am Dr. Gary Kleck, Emeritus Professor of Criminology & Criminal Justice at Florida State University. Counsel for plaintiffs have asked me to offer a rebuttal opinion regarding the supplemental reports filed by Lucy Allen and Louis Klarevas. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

**Background & Qualifications**

2.      I  am an emeritus Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I was, at the time of my retirement in May 2016, the David J. Bordua Professor of Criminology at Florida State University, where I served on the faculty from 1978 to 2016. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime." (William J. Vizzard, *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control* , 2003, p. 183).

3.      I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." I also authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001) - books that likewise addressed the topic of guns and violence.

4.      I have also published scholarly research articles in virtually all the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review*, *American Journal of Sociology*,

1  *Social Forces*, *Social Problems*, *Criminology*, *Journal of Criminal Law and*

2  *Criminology*, *Law & Society Review*, *Journal of Research in Crime and*

3  *Delinquency*, *Journal of Quantitative Criminology*, *Law & Contemporary Problems*,

4  *Law and Human Behavior, Law & Policy Quarterly*, *Violence and Victims*, *Journal*

5  *of the American Medical Association*, and other scholarly journals.

6       5.     I have testified before Congress and state legislatures on gun control

7  issues, and worked as a consultant to the National Research Council, National

8  Academy of Sciences Panel on the Understanding and Prevention of Violence, as a

9  member of the U.S. Sentencing Commission's Drugs—Violence Task Force, and as

10  a member of the Institute of Medicine and National Research Council Committee on

11  Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-

12  Related Violence. I am a referee for over a dozen professional journals, and serve as

13  a grants consultant to the National Science Foundation.

14       6.     Finally, I have taught doctoral students how to do research and evaluate

15  the quality of research evidence, and have taught graduate courses on research

16  design and causal inference, statistical techniques, and survey research methodology.

17       7.     My current curriculum vitae, which includes a full list of my

18  qualifications and publications, is attached hereto as **Exhibit 43.**

19  **Legal Cases in Which I Have Served as an Expert Witness**

20       8.     In the past ten years, I have been deposed and/or testified at trial in the

21  following matters:

22      *Heller v. District of Columbia*, D.D.C. (deposed July 2, 2013).

23      *Cook et al. v. Hickenlooper*, D. Colo. (deposed and testified Mar. or

24          April 2013).

25      *Wilson v. Cook County* (deposed Sept. 16, 2013).

26      *Kolbe v. O'Malley*, D. Md. (deposed Jan. 2, 2014).

27      *Barbra Schlifer Commemorative Clinic v. HMQ Canada* ("Cross-

28          examined" [Canadian term for deposed] Feb. 24, 2014).

*Friedman v. City of Highland Park* (deposed May or June 2014).

*Tracy Rifle and Pistol v. Harris*, E.D. Cal. (deposed Nov. 2, 2016).

*Flanagan v. Becerra*, U.S. District Court, Central District of
    California.  Deposed July 25, 2017.

*Worman v. Baker*, U.S. District Court for the District of
    Massachusetts.  Deposed October 25, 2017.

*Duncan v. Becerra*, U.S. District Court, Southern District of
    California.  Deposed January 3, 2018.

*MSI v. Hogan*, U.S. District Court, District of Maryland.  Deposed
    May 18, 2018.

*Association Of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Grewel
    et al.*, United States District Court  District Of New Jersey.
    Deposed 8-2-18.  Trial testimony 8-17-18.

*Rupp v. Becerra.*, U. S. District Court, Central District of California.
    Deposed 12-12-18.

*NRA v. Swearingen*, United States District Court for the Northern
    District of Florida, Deposed via Zoom 8-13-20.

*Maryland Shall Issue v. Anne Arundel County*.  United States District
    Court for Maryland.  Deposed via Zoom on 9-29-22.

**Compensation**

    9.    I am being compensated for my time in this case at an hourly rate of
$400 per hour. My compensation is not contingent on the results of my analysis or
the substance of my testimony.

**I.**    **Response to Supplemental Report of Lucy Allen**

    A.    *Allen's Claims About the Use of Large-capacity Magazines in Mass
    Shootings*

    10.    Less than 2% of gun crimes known to the police involve offenders
firing over 10 rounds (Reedy and Koper 2xxx). Since ordinary crimes almost never
involve over 10 rounds fired, the rationale for banning large-capacity magazines

4

DECLARATION OF GARY KLECK

1   (LCMs) is focused almost entirely on mass shootings (commonly defined as

2   incidents in which 4 or more victims are killed), since they do involve many rounds

3   fired.  Lucy Allen's defense of the LCM ban is consequently based on two claims

4   about LCM use in mass shootings: (1) a large share of mass shootings involve use of

5   LCMs, (and the related proposition that mass shooters prefer LCMs over smaller

6   magazines), and that (2) use of LCMs in mass shootings causes a higher casualty

7   count.

8        11.    What share of mass shootings (4+ dead) *actually* involve the use of

9   large-capacity magazines (LCMs), defined herein as those with over 10-round

10   capacity?  Allen uses a miscellaneous set of four largely overlapping sources of data

11   to defend her assertion that LCMs are frequently used in mass shootings, concluding

12   that 60% involve an LCM.  Unfortunately, what all four of her datasets have in

13   common is that they all cover only a small minority of all mass shootings, and the

14   few incidents they do cover are clearly unrepresentative of the full set of mass

15   shootings.

16        12.    The most comprehensive compilation of mass shooting incidents is

17   contained in the Gun Violence Archive (GVA), publicly available at

18   https://www.gunviolencearchive.org/.  Significantly, Allen ignored this widely used

19   data source – available since 2013 - in favor of her four radically incomplete

20   compilations.  The earliest GVA figures are for 2013, and the most recent complete

21   year covered is 2021.

22        13.    The most comprehensive source on mass shootings involving LCMs

23   can be found on the Violence Policy Center (VPC) website, available at

24   https://vpc.org/fact_sht/VPCshootinglist.pdf.  VPC advocates bans on LCM, and its

25   staff searches hundreds of news sources for stories reporting LCM use in mass

26   shootings.  If even a single news story reports use of a magazine holding over 10

27   rounds, it is included in the VPC database.  Any given individual news source might

28   omit mention of LCM use from their account of a mass shooting that involved one,

APP. 939

17cv1017

but in order for an LCM-involved mass shooting to be missed in the VPC search, mention of LCM involvement would have to be omitted from every single news source searched – even those with editorial policies favoring bans on LCMs. Such an occurrence is highly unlikely, so it is correspondingly unlikely that the VPC database excludes any significant number of LCM-involved mass shootings.

14.    I compiled counts from these two comprehensive sources to create the following table. It shows how often LCMs are involved in *all* mass shootings (4+ dead in a single incident), as distinct from Allen's tiny, arbitrarily selected subset of mass shootings.

Table 1 – Prevalence of LCM Use in All Mass Shootings, 2013-2021

| Year | Mass Shootings | LCM-involved Mass Shootings |
|------|----------------|------------------------------|
| 2013 | 25 | 2 |
| 2014 | 20 | 0 |
| 2015 | 26 | 4 |
| 2016 | 25 | 4 |
| 2017 | 24 | 4 |
| 2018 | 22 | 3 |
| 2019 | 31 | 4 |
| 2020 | 21 | 0 |
| 2021 | 28 | 5 |
| | | |
| 2013-2021 | 222 | 26 |

15.    Thus, when one examines the full set of *all* mass shootings instead of the tiny, arbitrarily selected subset examined by Allen, one finds that only **11.7%** of all mass shootings (4+ dead) in the U.S. involve LCMs – a far cry from Allen's claimed 60% (Allen, p. 19). It would be more accurate to say that mass shooters *rarely* use LCMs.

16.    Further, in terms of absolute frequency, it would also be fair to say that mass shootings in which an LCM was known to have been used are freakishly rare, occurring an average of just 2.9 times per year in the entire United States in 2013-

6

DECLARATION OF GARY KLECK

2021 (26/9 years=2.9). Specifically regarding California, while it is a big state, it still claims only about 12% of the U.S. population, so one could expect **0.35** LCM-involved mass shootings in a typical year in California (12% of 2.9=0.35), or about 1 every 3 years. Thus, the benefit of even a California LCM ban that somehow managed to completely eliminate LCM-involved mass shootings would be close to nonexistent.

B.    *Does Mass Shooter Use of LCMs Cause a Higher Casualty Count?*

17.    Allen correctly notes that mass shooters who used LCMs inflicted more casualties than those who did not, but leaves the impression that LCM use must have somehow *caused* the higher casualty count. She does not mention the obvious alternative explanation for this statistical association—that shooters more intent on hurting many people would prepare to do so by acquiring LCMs and bringing them to the scene of their crime. That is, lethality of intent determines both the choice of weaponry and ammunition and the outcome of the crime. If this completely accounts for the association, it means that the association is spurious, i.e. non-causal. That is, it means the LCM use has no effect of its own on the number of casualties inflicted.

18.    This alternative explanation entails two component assertions:

(1)    Greater lethality of offender intent causes shooters to fire more rounds and inflict more casualties.

(2)    Greater lethality of intent makes it more likely that mass shooters will use weaponry they believe is suited to their deadly intentions.

Regarding assertion (1), it is scarcely credible that the outcomes of mass shootings are not even slightly affected by what the shooters intended. While the correspondence between intent and outcome is not perfect, it surely is strong. To my knowledge, no proponent of LCM bans or scholarly student of LCM effects, including Allen, has ever denied this assertion. Thus, assertion (1) is widely accepted.

7

DECLARATION OF GARY KLECK

19.    Likewise, to my knowledge, no proponent of LCM bans or scholarly student of LCM effects has ever denied that many mass shooters commonly plan their attacks well in advance, and that this planning includes obtaining firearms and ammunition. News accounts of mass shootings routinely describe the perpetrators of mass shootings planning their attacks weeks or months in advance, acquiring guns and magazines that they later use to kill and injure. Assertion (2) is completely consistent with all evidence about mass shootings known to me or included in Allen's report.

20.    Therefore, the association between (a) LCM use and (b) the numbers of rounds fired and victims hurt in mass shootings, is at least partly (and possibly entirely) spurious (not causal), and is instead attributable to the common effects of (c) shooter lethality of intent on both (a) and (b). If propositions (1) and (2) are correct, the only way to support the claim that the association between (a) and (b) is *not* entirely spurious (and thus is at least partly causal in nature) is to measure and control for (c). Allen has not done this, nor has anyone else, to my knowledge. Thus, Allen has made no affirmative case for the claim that the association between (a) and (b) is even partially causal, or the position that LCM use has any causal effect on the number of casualties in mass shootings.

C.    *Allen does not Provide Any Reason Why LCM Use Would Affect the Number Killed or Wounded in a Mass Shooting*

21.    Allen fails to provide even a speculative explanation of *why* use of LCMs would increase the number of people killed or wounded in mass shootings – even though such an hypothesized effect is the main rationale for banning LCMs. Allen's implied position that LCM use actually affects the number of casualties might have been strengthened if she had cited details of actual mass shootings that indicate that LCMs were necessary for firing many rounds and inflicting many casualties, or that fewer rounds would have been fired and fewer casualties inflicted, had the shooter lacked LCMs.  For example, she might have tried to cite substantial

8

DECLARATION OF GARY KLECK

1    numbers of shootings in which the offender used an LCM, but had only one gun and

2    one magazine, since, in such a situation, bystanders would have a better chance of

3    tackling the shooter while he was reloading, and potential victims would have

4    additional time to escape while the shooter was reloading. Allen did not do this. To

5    my knowledge, she could not do this because there are no such known cases.

6        22.    All mass shooters use multiple guns or multiple magazines and

7    therefore could, even if they did not have LCMs, fire many rounds without

8    significant interruption, by either firing additional guns once the first one was

9    emptied or by quickly changing magazines, something that takes only about 3-4

10   seconds (Kleck 2016).  Allen neither acknowledges nor denies this, and

11   consequently fails to provide any explanation as to *why* LCM use would cause a

12   mass shooter to kill or wound more people.  She appears to believe that merely

13   citing the crude statistical association between LCM use and casualty county is

14   sufficient to establish a case for cause-and- effect.  However, as even beginning

15   statistics students know, correlation is not causation.  This is especially true in this

16   case because close examination of how mass shootings occur does not reveals any

17   causal mechanism by which LCM use by U.S. mass shooters could increase the

18   number of people they killed or wounded.

19       23.    Advocates of LCM bans have hypothesized two possible mechanisms

20   by which preventing LCM use by a mass shooter might decrease the casualty count,

21   both based on the fact that shooters confined to smaller capacity magazines would

22   have to reload more often.  First, more pauses to reload implies that bystanders

23   would have more opportunities to tackle the shooter and stop him before he hurt

24   more victims.  Second, the time the shooter devoted to reloading would give

25   prospective victims additional time to escape or hide.

26       24.    Regarding the first possibility, there have been no mass shootings in the

27   U.S. in the past 30 years in which the shooter was tackled while he was reloading.

28   All cases purported to involve such a scenario turn out to be incidents in which the

9

DECLARATION OF GARY KLECK

shooter was tackled while struggling with a jam or a defective magazine (Kleck 2016).  Since a ban on larger capacity magazines would not increase the frequency of gun jamming or use of defective magazines in mass shootings, this kind of opportunity for bystander intervention would not be increased by an LCM ban.  For example, the incident most frequently cited by LCM ban advocates to support the claim of bystander intervention while the shooter was reloading is the Arizona shooting involving an attack on Representative Gabriel Giffords in 2011.  Some bystanders claimed that the shooter was reloading when he was tackled, but subsequent police investigation found that one of the magazines was defective because its spring was broken.  As far as can be determined from eye witness testimony, the shooter was struggling with this defective magazine when he was tackled, rather than reloading.

25.     The second mechanism by which additional reloading might reduce the casualty count is that it purportedly provides additional time for victims to escape or hide.  To be sure, all mass shootings involve pauses between shots, whether because the shooter was choosing his next victim, was reloading, or for other reasons.  The key issue is whether the additional reloads *add* to these pauses to an extent that results in the shooter attacking fewer victims.  The plausibility of the speculation that reloads provide *additional* opportunity for victim evasion is dependent on just how much time it takes to reload a semiautomatic firearm, and how this compares with the length of the other pauses in shooting that occur when the offender is not reloading.

26.     Analysis of mass shootings in which it was possible to determine the offender's rate of fire reveals that mass shooters using semiautomatic guns fire at relatively slow rates, invariably less rapid than the rate of which the weapons are capable (3 or more rounds per second) (Kleck 2016) .  Reloading a detachable magazine takes ordinary shooters only about 3-4 seconds, and mass shooters who rehearse their crimes by practicing rapid reloads could probably do still better.  The

average interval between shots in mass shootings, however, is well over 3-4 seconds (see Table 3 in Kleck 2016). This means that pauses in shooting due to reloading are actually shorter in duration than the pauses between shots that mass shooters routinely take whether or not they are reloading. Thus, it is implausible that inducing mass shooters to reload more often provides any additional time sufficient for more victims to escape or hide.

27.    In sum, there is no known mechanism by which bans on LCMs could reduce the casualty count in mass shootings, and thus no empirical support for the benefits that Allen claims would accrue from such a ban.

D.    *Allen's Claims About the Number of Rounds Fired in Defensive Gun Uses*

28.    Allen asserts that very few defensive gun uses (DGUs) involve over 10 rounds being fired, implying that LCMs are unneeded for defensive purposes. As a preliminary logical note, it is important to point out that the data used by Allen could not tell her anything about incidents in which victims *needed* an LCM to carry out effective self-defense, but did not have one. Thus, as far as Allen knows, there could have been thousands of crime incidents in which crime victims needed to fire more than 10 rounds and would have benefited from use of an LCM but not possess one.

29.    In any case, Allen's claims about DGUs have no reliable foundation in evidence. She cites data from the "Armed Citizen" column of the National Rifle Association's (NRA) magazine, *American Rifleman*, and concludes that "it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds." She does not confine this conclusion to persons whose defensive gun use (DGU) was reported in the *American Rifleman*, but clearly intends it to apply to Americans in general. The NRA's database of "armed citizen" stories is not a representative sample of DGUs, nor does the NRA even claim it to be so. Indeed, Allen herself does not claim that the NRA sample is representative. She acknowledges the

11

DECLARATION OF GARY KLECK

possibility of bias in selecting cases "in favor of stories that put use of guns in self-defense in the best possible light." Therefore, there is no formal basis for generalizing the results of any analysis of this sample to any larger population of DGUs.

30.    The utility of the NRA sample is, however, even worse than merely being unrepresentative of DGUs in a general way. More specifically, there is strong reason to believe that the sample will largely exclude DGU incidents in which the defender fired more than 10 rounds. NRA staff nonrandomly select these incidents from news media-reported cases of DGU, most of them submitted by readers of the "Armed Citizen" feature of *American Rifleman*.  Based on the content of these stories published in the magazine, it is clear that they are selected to convey the impression that DGU is an extremely legitimate and effective activity, engaged in by responsible law-abiding persons, for clearly legally justifiable purposes, carried out in clearly lawful ways. The reality of the full array of DGUs is considerably more diverse, but the NRA has a political agenda to portray DGU in as positive a light as possible.

31.    Thus, Allen is quite right to note that the selection practices of NRA staff are likely to favor inclusion of DGU stories that put DGU "in the best possible light." She does not, however, appear to understand how this bias would work regarding stories in which defenders fired large numbers of rounds. It could not serve the NRA's purposes to disseminate accounts of DGUs in which the defenders appeared to use excessive force, indiscriminately firing arguably excessive numbers of rounds at their adversaries. The more seemingly excessive the defender's use of force appears to be, the less likely it is that his actions would appear to a reader to be justifiable. Likewise, the NRA is unlikely to want to disseminate stories in which effective self-defense was difficult and dangerous, requiring the firing of large numbers of rounds to protect the defender. Instead, NRA staff would better serve their political ends by selecting stories of DGUs in which the defenders used the

minimum amount of force needed to defend themselves, firing the fewest rounds needed to serve that purpose. This would bias the sample of selected DGUs in the direction of excluding cases in which many rounds were fired.

32.    Even though the NRA sample is not representative of DGUs in general, Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in which more than 10 rounds are fired *do* occur. Her analysis of the NRA sample identified two incidents in which over 10 rounds were fired, a frequency that Allen characterizes as "rare." This is indeed rare in absolute terms, but then so are mass shootings in which LCMs are used, typically occurring less than three times a year in the entire U.S.  (see Table 1 herein).  Indeed, detailed examination of the way mass shootings actually occur indicates that the number of incidents in which use of LCMs increased the number of victims killed or injured in a typical year may well be *zero* (Kleck 2016).

33.    It is therefore worth considering the implications if 0.3% of all DGUs involved over 10 rounds being fired, as Allen's results indicate. The numerous national surveys that have specifically asked about DGUs have consistently indicated 0.5-3.5 million DGUs per year, averaging about 2.2 million DGUs a year (Kleck 2021).  (Gun control advocates have speculated that these surveys overestimate the frequency of DGUs, but nearly all known sources of error in surveys tend to contribute to *under*estimation -  Kleck 2018).

34.    If 0.3% of DGUs involved over 10 rounds fired, this would imply there are about 6,600 such DGUs per year (0.003x2,200,000=6,600). Thus, the percentage of DGUs in which over 10 rounds were fired does not have to be very large in order for it to imply a number of DGU incidents many times the number of mass shootings with LCM use, or crimes in which LCM use increased the harm inflicted on victims. In short, Allen's own results from her "Armed Citizen" analysis, taken at face value, imply that *there are far more DGUs each year in which the defender fires over 10 rounds than there are mass shootings involving LCM use.*

DECLARATION OF GARY KLECK    APP. 947

17cv1017

E.   *Allen's Analysis of DGUs Reported in the News*

35.   DGUs reported in news outlets are no more likely to be representative of all DGUs than the "Armed Citizen" sample. News outlets rarely find out about crimes on their own—they find out about crimes from the police. DGUs that victims are willing to report to the police, like the NRA-selected DGUs, are likely to be especially legitimate and justified.  Conversely, defenders are less likely to report their DGUs to the police if their actions are likely to appear to the police as involving excessive force or indiscriminate firing of a gun. This means that incidents in which defenders fired over 10 rounds are likely to be rare among DGUs reported to the police and consequently covered by news outlets, even if they were common among all DGUs.

36.   Allen uncovered 4,800 news stories of DGUs over a span of six years, but needlessly sampled just 200 of the stories for analysis. Her sample was selected randomly and may well be approximately representative of the full set of DGU *news stories*, but since the set of DGUs reported in the news is itself likely to be an unrepresentative sample of all DGUs, Allen's sampling procedures cannot produce a representative sample of DGUs. She therefore has no basis for generalizing the results of this analysis to the entire population of DGUs.

37.   To summarize, Lucy Allen's own results indicate the Americans use guns for defense and fire over 10 rounds thousands of times a year.  Further, the best available evidence indicates that, contrary to Allen's claims, (1) mass shootings rarely involve LCMs, and (2) LCM use does not cause a larger number of victims to be killed or wounded.

## II.   Response to Supplemental Report of Louis Klarevas

A.   *Klarevas' Claims About the Magnitude of the Threat of Mass Shootings*

38.   As he did in his first expert report (Klarevas 2017), Klarevas makes the extraordinary claim that "gun massacres presently pose the deadliest threat to the

14

safety and security of American society, and the problem is growing," adding that "I continue to stand by the opinions and conclusions expressed in my 2018 Report" (Klarevas 2022, p. 3),   The claim is as absurd now as it was then.

39.     Klarevas documented 113 "gun massacres" (which he defines as incidents involving 6 or more dead), in which 1,009 people were killed, over the period from 1968 through September 2017. This is a period of 49 and ¾ years, so his own figures imply that an average of 20.3 Americans have been killed in "gun massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250 Americans were killed in criminal homicides of all types in 2016 (FBI 2017). Thus, only 1/10th of 1% of all murder victims are killed in "gun massacres."

40.     Alternatively, we can state the seriousness of the threat to the safety of Americans by computing the fraction who will be killed in a "gun massacre" in a given year.  Since there were about 323,127,513 Americans in 2016, the annual average of 20.3 deaths implies that the probability of an American dying in a "gun massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9 million.  As a point of comparison, defense expert Lucy Allen has calculated that the rate of Americans dying because they were struck by lightning is 0.09 per 100,000 population (Allen 2017, p. 16).  Thus, the risk of an American being killed in a "gun massacre" is less than 1/14th of the risk of being killed by a bolt of lightning—itself a freakishly rare event. However horrific individual mass shootings may be, it is absurd to describe their threat to the safety of Americans as "the greatest threat … to the … safety of American society in the present era." This sort of overheated rhetoric is appropriate to propagandists, not to serious scholars.

   B.   *Klarevas' Claims About the Frequency of LCM Use in Mass Shootings*

41.     Like Lucy Allen, Louis Klarevas attempts to make the case that a large share of mass shootings involve LCM use. His principle tactic to advance this claim is to restrict his analyses to only the rarest kinds of mass shootings, those with a huge number (10 or more) of fatalities (Klarevas 2022).  This represents his most

15

DECLARATION OF GARY KLECK

significant change from his initial expert report (Klarevas 2017)  He has changed the cut-off of the minimum number of number of deaths for a mass shooting to be included in his analysis from 6 to 10, making his conclusions even more trivial than before because they pertain only to an even more freakishly rare subset ("double-digit fatality" incidents) of a subset of violent crimes that was already freakishly rare to begin with.  He shows that 23 of 30 of these extreme cases involved LCMs (his Table 1), or 77% - an even higher share than the 48% share (53 of 111) he obtained when he used a fatalities cut-off of six or more.  Of course, Klarevas could have gone even further and analyzed only cases with over 50 deaths, since he then would have been able to report that *100%* of this set involved LCM use.  There was just one such incident and it did indeed involve LCM use (the Las Vegas shootings included in his Table 1).  Such an "analysis" of a single cased would be perceived by most scholars as pointless, but it is only marginally more pointless than analyzing the most extreme 30 cases.

42.    Over the entire history of the United States, Klarevas was able to identify just 30 mass shootings with 10 or more deaths – well under one per year over that entire history.  Even over the most recent 10 years, when such incidents became relatively more common, the average was just 1.6 per year.  In light of how extremely rare these incidents are, the share of them that involved LCM use is trivial and irrelevant to policy-making.

43.    This shift in the cut-off number of deaths Klarevas uses to define the set of shootings to analyze also has another subtle effect.  It allows him to make a claim that there is an upward trend in mass shootings that could not be sustained if he used the cut-off of four deaths commonly used by other scholars.  If one uses the conventional definition of four+ fatalities, there has been no trend in recent years. Table 1 included in this report provides counts of such shootings for 2013-2021 (all of the years for which complete data are available), based on the most comprehensive source available, and it shows there have been only slight

16

DECLARATION OF GARY KLECK

fluctuations in the past decade around an average of 25 incidents per year.  Indeed, if one were selective enough to focus only on the trends from 2015 to 2018, or from 2020 to 2021, one could even make it seem like there has been a *downward* trend in mass shootings.  Taking the data as a whole, however, there has been no upward trend in mass shootings.

44.    It was only when Klarevas limited his focus to "double-digit fatality incidents" that the data would fit his claim of an increasing frequency of mass shootings (Klarevas 2022, pp. 7-8).  Unfortunately, the more Klarevas' claims are confined to increasingly tiny subsets of shooting incidents, the less relevant they become to the likely benefits of a ban on LCMs.  As previously noted, in a typical year California experiences *zero* "double-digit fatality incidents," with or without LCMs used, and thus there are zero such shootings that could be prevented by an LCM ban.

C.    *Klarevas' Claims About Long-0term Historical Trends in Mass Shootings*

45.    Not satisfied with addressing recent trends in mass shootings, Klarevas claims to have established trends going back to 1776, using the Newspaper Archive (Klarevas 2022, pp. 3-6).  He describes this as a source that contains articles from "local and major metropolitan newspapers dating back to 1607" (p. 4, fn. 6).  This is a misleadingly incomplete description.  This archive includes *a few* local newspapers going back that far.  Prior to the 20th century most of the nation was not covered by these few local newspapers, so correspondingly few mass murders would be covered by these sources.

46.    This not only results in a gross undercount of mass shootings, but it also gives a misleading impression of trends over time.  Since the share of the population covered by newspapers included in this archive increased over time, the share of mass shootings covered in archive newspaper stories would also increase, even if there was no actual increase in the national number of mass shootings.  Thus, the

appearance of increasing mass shooting prevalence in Klarevas' Table 1 is at least partly just a reflection of historical increases in the share of the nation's events that were covered by newspapers.  Consequently, Klarevas had no reliable information on trends in mass shootings for any part of the nation's history up until this increase in newspaper coverage levelled off sometime in the late 20th century.  His data can tell us nothing about trends in mass shooting frequency for earlier periods..

47.     The scope of Klarevas' claims about historical trends is also extremely constricted by the arbitrary limits he placed on what kinds of mass shootings he was willing to count.  Those familiar with the history of firearm massacres of native Americans in the 18th and 19th centuries might wonder why they do not show up in Klarevas's data.  His footnote 6 explains why: "Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded."  If these were incidents in which large numbers of people were killed with firearms, what is the justification for not defining them as mass shootings?  If nearly all the mass shootings in these earlier periods fell into these excluded categories, Klarevas' arbitrary definitional decisions had the effect of magically making it seem that mass shootings are exclusively a product of very recent times - the impression clearly left by his Table 1 and Figure 1.  The nation's extensive earlier history of mass shootings simply vanishes.  This definitional maneuver, however, was necessary if Klarevas was to create the impression that mass shootings became frequent only when LCM-equipped firearms became common.  Earlier mass shootings may have differed from our contemporary stereotypes of what a mass shooting is, but the relevant historical reality is that Americans were able to carry out hundreds of mass shootings before the late 20th century without benefit of LCM use (for example, see Brown 1970 for examples of massacres of native Americans), just as is true today (see my Table 1).

48.     An even fundamental problem with Klarevas' analysis lies in the narrow focus on mass murders committed *with firearms*.  Virtually all of the mass

APP. 952
17cv1017

murders with very high fatality counts in the U.S. have been committed by means *other than shooting* (Duwe 2007).  Most prominently, the 9-11 mass murders of nearly 3,000 Americans were committed by crashing airliners.  More commonly, virtually all mass murders with very high fatality counts have been committed using arson, or occasionally with explosives (Duwe 2007).  Only two mass murders with over 32 dead in the 20th century were committed with firearms (Klarevas 2022, Table 1), while all others were committed with non-firearms methods, most commonly arson (Duwe 2007).  The obvious point is that it is not even necessary to use firearms to murder large numbers of people, never mind firearms equipped with LCMs.

> D.   *Klarevas' Hinted Claim that LCM Use* <u>*Causes*</u> *Higher Fatality Counts*

49.     Klarevas does not explicitly state that LCM use by mass shooters *causes* higher numbers of fatalities or woundings; rather he just leads readers up that conclusion by presenting crude bivariate correlations between LCM use and casualty counts (e.g., his p. 7 statement that "100 percent of mass shootings resulting in more than 14 deaths involved LCMs holding more than 10 bullets"), without stating any disclaimers that the correlations may be entirely spurious, i.e. not causal in nature. His problem is the same one that afflicted Lucy Allen – he did nothing to rule out the possibility that both the higher casualty counts and the shooter's choice to use LCMs could be due to the common effect of offender lethality.  That is, aggressors determined to kill larger numbers of victims are more likely to actually do so (lethality of intent affects fatality counts), and are also more likely to acquire and use LCMs in their crime (lethality of intent affects weapon choice).  Klarevas did not control for *any* potentially confounding variables, including offender lethality, so he had no legitimate foundation for concluding – or hinting to readers – that LCM use caused higher casualty counts. And if there is no causal effect of LCM use on casualty counts, there is no logical basis for believing that reducing LCM availability and use will cause a reduction in mass shooting casualties.

19

DECLARATION OF GARY KLECK

50.     Further, like Lucy Allen, Klarevas can offer no coherent explanation of *why* LCM use would increase casualty counts.  Three 10-round magazines of the sort left legally available after LCMs are banned contain exactly as many rounds as a 30-round magazine of the type prohibited by LCM bans. Therefore, LCM use does not affect how many rounds a mass shooter can acquire or fire in an attack.  Reloading creates a pause in firing that bystanders theoretically might use to tackle the shooter and stop the killing, but there are no known cases of this actually happening in the U.S. in the past 30 years.  Likewise, reloading does not slow the shooters rate of fire, which might have allowed more prospective victims to escape or hide (Kleck 2016).  So how does use of an LCM by a mass shooter increase how many people he hurts?  Conversely, how would preventing LCM use through a law banning LCMs decrease the number hurt?  Klarevas does not say.

E.     *Klarevas' Claims About Trends in LCM Availability*

51.     Another new element in Klarevas' Supplemental Declaration is his attempt to document trends in "the availability of LCMs in the U.S. civilian firearm marketplace" (Klarevas 2022, pp.7-9).  He uses data from *Gun Digest*, an annual catalog of firearms that were available for sale new (i.e., not used) at the time of publication.  His discussion of this analysis is misleading because of his slippery use of the phrase "number of firearms."  From context, it can be determined that Klarevas' numbers do not in fact pertain to numbers of firearms, but rather to numbers of firearms *models*.  This distinction is critical because *Gun Digest* does not report any figures on numbers of firearms equipped with LCMs – it merely lists models of guns (e.g., the "Accu-tek Model HC-380SS Auto Pistol") and notes the size of magazine with which they come equipped.  In short, Klarevas did not actually have any data on how many firearms came factory equipped with LCMs.  For all he could tell from the *Gun Digest* catalog, there may have been very few of the models that were equipped with LCMs manufactured and sold in a given year (regardless of how many *models* of that type there were), and huge numbers of guns

20

DECLARATION OF GARY KLECK

1  manufactured and sold that were not so equipped.  In sum, Klarevas did not have

2  any data that actually measure the availability of LCMs or trends in that availability.

3

4         I declare under penalty of perjury that the foregoing is true and correct.

5  Executed within the United States on December 1, 2022.

6

7

8

9         _____

10        Gary Kleck

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

DECLARATION OF GARY KLECK                    APP. 955

17cv1017

# References

Allen, 2017.  *Expert Report of Lucy P. Allen in Duncan v. Becerra.*

Allen, 2022.  *Supplemental Report of Dr. Lucy P. Allen in Duncan v. Becerra*

Brown, Dee. 1970. *Bury My Heart at Wounded Knee: An Indian History of the American West.*  NY: Holt, Rinehart and Winston.

Duwe, Grant. 2007.  *Mass Murder in the United States: A History.* NY: McFarland & Company.

Federal Bureau of Investigation (FBI) 2017.  Crime in the United States, 2016. Washington, D,C,: U.S. Government Printing Office.

Klarevas, Louis. 2017. Expert Report of Dr. Louis Klarevas.  United States District Court for the Southern District of California.

Klarevas, Louis. 2022.  Supplemental Declaration of Louis Klarevas.  United States District Court for the Southern District of California.

Kleck, Gary. 2016. "Large-capacity magazines and the casualty counts in mass shootings." *Justice Research and Policy* 17(1):28-47.

Kleck, Gary. 2018 "Response errors in survey estimates of defensive gun use." *Crime & Delinquency* 64(9):1119-1142.

Kleck, Gary. 2021. "What do CDC's surveys say about the prevalence of defensive gun use?" American Journal of Criminal Justice  46:401-421.

Reedy, D. C., and Christopher S. Koper, 2003. "Impact of Handgun Types on Gun Assault Outcomes, *Injury Prevention* 9:151-155.

# EXHIBIT 43

CURRICULUM VITAE

GARY KLECK

(Updated May 27, 2021)

PERSONAL

Place of Birth:            Lombard, Illinois

Date of Birth:            March 2, 1951

Address:                  College of Criminology and Criminal Justice
                          The Florida State University
                          112 S. Copeland Street
                          Tallahassee, FL 32306-1273

                          Tallahassee, Florida 32306-1127

Telephone Number:         Home: (850) 559-0922

e-mail Address:           gkleck@fsu.edu

website:                  http://criminology.fsu.edu/faculty-and-staff/college-faculty/gary-kleck/

CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

EDUCATION

A.B.        1973 - University of Illinois, with High Honors and with Distinction in
            Sociology

A.M.        1975 - University of Illinois at Urbana, in Sociology

Ph.D.          1979 - University of Illinois at Urbana, in Sociology

## ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
    Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
    Criminology, for the book that made "the most outstanding contribution to
    criminology"   (for Point Blank: Guns and Violence in America).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

Paper of the Year awarded by Criminal Justice Review for "Does Gun Control Reduce
    Crime?," Volume 4, pp. 488-513 (2016).

## TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to | Professor, College of Criminology and Criminal Justice, |
| May 2016 | Florida State University |
| | |
| Fall, 1984 to | Associate Professor, School of Criminology, |
| Spring, 1991 | Florida State University. |
| | |
| Fall, 1979 | Assistant Professor, School of  Criminology, |
| to Spring, 1984 | Florida State University. |
| | |
| Fall, 1978 to | Instructor, School of Criminology, |
| Spring, 1979 | Florida State University. |

## COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory
Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and
Causal Inference.

**APP. 959**

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,   Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005    Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American Society of Criminology.  Republished in 2005 in paperback by Transaction Publishers.

> Reviewed in Contemporary Sociology, American Journal of Sociology, Social Forces, Journal of Criminal Law and Criminology, The Criminologist, The Public Interest, Criminal Law Forum, Social Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and Law Enforcement, Newsletter of Public Policy Currents, Commonweal, Choice, and others.

1997   Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997   The Great American Gun Debate: Essays on Firearms and Violence (with Don B. Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001   (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.: Prometheus Books.

> Selected to Choice: Current Reviews for Academic Libraries' 39th annual "Outstanding Academic Title List," awarded for "excellence in scholarship and presentation, the significance of their contribution to their field, and their value as an important treatment of their topic."  Awarded to less than one percent of books.

2017   (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control. NY: Routledge.

RESEARCH MONOGRAPH

1979   Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforcement Commission, Springfield, Illinois.

**APP. 960**

ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide."  <u>American Journal of Sociology</u> 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." <u>American Sociological Review</u> 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal behavior." <u>American Sociological Review</u> 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control."  <u>Law and Policy Quarterly</u> 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on racial discrimination in criminal sentencing."  <u>Law and Human Behavior</u> 9(3):271-285.

1986     "Evidence that 'Saturday Night Specials' not very important for crime." <u>Sociology and Social Research</u> 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988    "Crime control through the private use of armed force." <u>Social Problems</u> 35(1):1-21.

1988    "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence." <u>Social Forces</u> 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates." <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control." <u>Violence and Victims</u> 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field." <u>Social Pathology</u> 1(1):12-47.

1995    "Using speculation to meet evidence."  <u>Journal of Quantitative Criminology</u>
        11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
        defense with a gun."  <u>Journal of Criminal Law & Criminology</u> 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level
        application of the General Social Surveys."  <u>American Behavioral Scientist</u>
        39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law:
        some cautionary notes on the use of interrupted time series designs for policy
        impact assessment." <u>Law & Society Review</u> 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding."
        <u>Law & Society Review</u> 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the
        defensive gun use estimate down."  <u>Journal of Criminal Law and Criminology</u>
        87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful
        vigilante imagery vs. reality: results from the National Self-Defense Survey."
        <u>Journal of Criminal Justice</u> 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-
        Defense Survey." <u>Journal of Research in Crime and Delinquency</u> 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?"  <u>Journal of the
        American Medical Association</u> 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of
        habitual offenders."  <u>Criminology</u> 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and
        gun ownership." <u>Social Problems</u> 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns
        to criminals."  <u>St. Louis University Public Law Review</u> 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?"
        <u>Homicide Studies</u> 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific
        assessment of  opportunity and motivation as mediating factors."

Criminology 40(3):649-680.

2004   "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004   (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005   (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006   (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007   "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007   (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008   (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009   "Mass shootings in schools: the worst possible case for gun control."  American Behavioral Scientist 52:1447-1464.

2009   (with Shun-Yung Wang) "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009   (with Tomislav Kovandzic)  "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009   (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2011   (with James C. Barnes)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Journal of Criminal Justice Education 22(1):43-66.

2011   (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of  Criminal Justice 39(4):312-319.

**APP. 963**

2013   (**w**ith Will Hauser)  "Guns and fear: a one-way street?"  <u>Crime and Delinquency</u> 59:271-291.

2013   "Gun control after Heller and McDonald: what cannot be done and what ought to be done." <u>Fordham Urban Law Journal</u> 39(5):1383-1420.

2013   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  <u>Crime and Delinquency</u> 59(7):1006-1035.

2013   (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." <u>Journal of Quantitative Criminology</u> 28(4):477-541.

2014   (**w**ith Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury."  <u>Violence Against Women</u> 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?" <u>Crime and Delinquency</u> 60(5):716-738.

2015   "The impact of gun ownership rates on crime rates:  a methodological review of the evidence." <u>Journal of  Criminal Justice</u> 43(1):40-48.

2016   (with Tomislav Kovandzic and Jon Bellows)  "Does gun control reduce violent crime?"  <u>Criminal Justice Review</u> 41:488-513.

2016   "Objective risks and individual perceptions of those risks."  <u>Criminology & Public Policy</u> 15:767-775.

2016   (with Dylan Jackson)  "What kind of joblessness affects crime?  A national case-control study of serious property crime."  <u>Journal of Quantitative Criminology</u> 32:489-513.

2016   "Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages."  <u>Justice Research and Policy</u> 17:28-47.

2017   (**w**ith Will Hauser)  "The impact of police strength and arrest productivity on fear of crime and subjective assessments of the police."  <u>American Journal of Criminal Justice</u> 42:86-111.

2017   (with Dylan Jackson)  "Does crime cause punitiveness?"  <u>Crime & Delinquency</u>. 63(12):1572-1599.

2017   (with Bethany Mims)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  <u>Journal of Criminal Justice Education</u> 28(4):467-487.

2018    (**w**ith Moonki Hong) "The short-term deterrent effect of executions: an analysis of daily homicide counts." <u>Crime & Delinquency</u> 64(7):939-970.

2018    "Response errors in survey estimates of defensive gun use." <u>Crime & Delinquency</u> 64(9):1119-1142.

2019    "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence." <u>Social Science Quarterly</u> 100(3):936-950.

2019    "Regulating guns among young adults." <u>American Journal of Criminal Justice</u> 44:689-704.

2021    "What do CDC's surveys say about the prevalence of defensive gun use?" <u>American Journal of Criminal Justice</u> 46:401-421.

2021    "The continuing vitality of bad research on guns and violence: a comment on Fridel." <u>Justice Quarterly</u> 38(5):916-924.

2021    "Compliance with universal background check gun laws." <u>Journal of Crime and Justice</u> (published online 9-2-20).

2021    Tomislav Kovandzic and Kleck.  "The impact of firearm levels on homicide rates: the effects of controlling for cultural differences in cross-national research." <u>American Journal of Criminal Justice</u> (published online 1-4-21).

2021    "The cross-national association of gun ownership rates and suicide rates: an analysis of 192 nations." <u>Archives of Suicide Research</u> (published online 5-12-21).

OTHER PUBLISHED ARTICLES

1985    "Policy lessons from recent gun control research." <u>Law and Contemporary Problems</u> 49(1):35-62.

1992    "Assault weapons aren't the problem." <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993    "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6. Invited article.

1994    "Guns and self-protection." <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1998    "Using speculation to meet evidence: reply to Alba and Messner." <u>Journal on Firearms and Public Policy</u> 9:13-49.

**APP. 965**

1998   "Has the gun deterrence hypothesis been discredited?"  <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999   "There are no lessons to be learned from Littleton."  <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  <u>Journal of the American Medical Association</u> 282(2):136-136.

1999   "The misfire that wounded Colt's."  <u>New York Times</u> October 23, 1999.  Invited Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."  <u>Journal on Firearms and Public Policy</u> 11:77-137.

2000   "Guns aren't ready to be smart."  <u>New York Times</u> March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using interrupted time series designs to evaluate social policy impact."  <u>Journal on Firearms and Public Policy</u> 12:197-247.

2001   "School lesson: armed self-defense works."  <u>Wall Street Journal</u> March 27, 2001.  Invited opinion article.

2001   "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth."  <u>Journal of Quantitative Criminology</u> 17:75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  <u>Journal on Firearms and Public Policy</u> 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  <u>Journal on Firearms and Public Policy</u> 14:51-72.

2006   "Off target."  <u>New York Sun</u> January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  <u>Journal on Firearms and Public Policy</u> 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  <u>Wall Street Journal</u> January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  <u>Wall Street Journal</u> May 21, 2011.  Invited opinion article.

2015   "Defensive gun ownership is not a myth: why my critics still have it wrong."
Politico Magazine, February 17, 2015.  Online at Politico.Com.

2021   "The futility of non-response responses: a reply to Fridel."  Justice Quarterly (in press).

## BOOK CHAPTERS

1984   (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in
Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge,
Mass.: Ballinger.

(Also appeared in Federal Regulation of Firearms, report prepared by the
Congressional Research Service, Library of Congress, for the Committee on
the Judiciary, United States Senate, 1982).

1984   "The relationship between gun ownership levels and rates of violence in the U.S."
Pp. 99-135 in Kates, above.

1984   "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in
Kates, above.

1996   "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and
Society, Volume III – Readings: Criminal Justice, edited by George Bridges,
Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine
Forge Press.

1996   "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in
Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by
Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000   "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and
Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor
& Francis, Inc.

2001   (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
What is Crime?: Controversy over the Nature of Crime and What to Do About It,
edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
Littlefield.

2003   "Constricted rationality and the limits of general deterrence."  Chapter 13 in
Punishment and Social Control: Enlarged Second Edition, edited by Thomas G.
Blomberg.  New York: Aldine de Gruyter.

2004   "The great American gun debate: what research has to say."  Pp. 470-487 in The
Criminal Justice System: Politics and Policies, 9th edition, edited by George F.
Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

**APP. 967**

2008   "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009   "Guns and crime." Invited chapter.  Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012   Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012   (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of Survey Methodology for the Social Sciences, edited by Lior Gideon.  NY: Springer.

2013   "An overview of gun control policy in the United States."  Pp. 562-579 in The Criminal Justice System, 10th edition. Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2014   "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of Criminology and Criminal Justice.  Berlin: Springer Verlag.

2019   "The effect of firearms on suicide."  Pp. 309-329 in Gun Studies: Interdisciplinary Approaches to Politics, Policy, and Practice, edited by Jennifer Carlson, Kristin Goss, and Harel Shapira. NY: Routledge.

2019   "Gun control."  Pp. 153-166 in The Handbook of Social Control, edited by Mattieu Deflem.  Hoboken, NJ: Wiley-Blackwell.

2021   "Research on guns and crime."  Chapter in The Encyclopedia of Research Methods and Statistical Techniques in Criminology and Criminal Justice, edited by J. C. Barnes and David R. Forde for Wiley Blackwell.

BOOK REVIEWS

1978   Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984   Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984   Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1985    Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988    Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989    Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991    Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999    Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001    Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010    Review of <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992    "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership."  <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." <u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9, 2005.

UNPUBLISHED REPORT

1987 <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994 "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997 "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

PRESENTED PAPERS

1976 "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979 "The assumptions of gun control."  Presented at the annual meetings of the American Sociological Association, New York City.

1981 "Lethality comparisons between handguns and weapons which might be substituted in assault if handguns were prohibited."  Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1982 "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial discrimination."  Presented at the annual meetings of the American Society of Criminology, Toronto.

1984 "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985 "Policy lessons from recent gun control research." Presented at the annual meetings of the American Society of Criminology, San Diego.

1986 "Miscounting suicides."  Presented at the annual meetings of the American Sociological Association, Chicago.

1987 (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Presented at the annual meetings of the American Society of Criminology, Montreal.

**APP. 970**

1988    "Suicide, guns and gun control."  Presented at the annual meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the annual meetings of the American Society of Criminology, Chicago.

1989    (with Karen McElrath)  "The impact of weaponry on human violence." Presented at the annual meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the annual meetings of the American Society of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the annual meetings of the American Political Science Association, Washington, D.C.

1991    "Victim resistance and weapons effects in robbery."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1991    "News media bias in covering gun control issues."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1992    "Interrupted time series designs: time for a re-evaluation."  Presented at the annual meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the annual meetings of the American Society of Criminology, Phoenix.

1993    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the annual meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the annual meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the annual meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the annual meetings of the American Society of Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
        Presented at the annual meetings of the Homicide Research Working Group,
        Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
        General Social Surveys."  Presented at the annual meetings of the American
        Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
        deterrence-based crime control policy."  Presented at the annual meetings of the
        American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the annual meetings
        of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?"
        Presented at the annual meetings of the American Society of Criminology,
        Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
        control movement."  Presented at the annual meetings of the American Society of
        Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime
        rates."  Presented at the annual meetings of the American Society of Criminology,
        Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented
        at the annual meetings of the American Society of Criminology, Atlanta.

2002    "The effects of gun ownership levels and gun control laws on urban crime rates."
        Presented at the annual meetings of the American Society of Criminology,
        Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends
        on who has them." Presented at the annual meetings of the American Society of
        Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
        Presented at the annual meetings of the American Society of
        Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in
        the community influence whether individuals own guns?"  Presented at the annual
        meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the annual meetings of the American Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the annual meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the annual meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the annual meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the annual meetings of the American Society of Criminology, Atlanta.

2008    (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the annual meetings of the American Society of Criminology,  St. Louis.

2008    "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u> Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the annual meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

**APP. 973**

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the annual meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual meetings of the American Society of Criminology, November 16, 2011, Washington, D.C.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2011    (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2012     (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 15, 2012, Chicago, IL.

2013    (with Will Hauser) "Confidence in the police and fear of crime: Do police force

size and productivity matter?"  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2013.   (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2014   (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual meetings of the American Society of Criminology, November 20, 2014, San Francisco, CA.

2015   "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual meetings of the American Society of Criminology, November 18, 2015, Washington, D.C.

2015   (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual meetings of the American Society of Criminology, November 20, 2015, Washington, D.C.

2016   "Firearms and the lethality of suicide methods."  Presented at the annual meetings of the American Society of Criminology, November 16, 2016, New Orleans, L.A.

2017   "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence."  Presented at the annual meetings of the American Society of Criminology, November 15, 2017, Philadelphia, PA.

2018   "Interstate gun movement is almost entirely due to migration, not gun trafficking." Presented at the annual meetings of the American Society of Criminology, November 16,  2018, Atlanta, GA.

2019   "What do CDC's surveys say about the prevalence of defensive gun use?" Presented at the annual meetings of the American Society of Criminology, November 13, 2019, San Francisco, CA.

2020  "Compliance with universal background check requirements."  Accepted to be presented at the annual meetings of the American Society of Criminology which were to be held in Washington, D.C., November 18-21, 2020 but were cancelled due to Covid-19 issues.

2021  "Do mass shooters favor using large-capacity magazines?"  Presented in poster form at the Annual Meeting of the American  Society of Criminology in Chicago, Illinois, November of 2021.

CHAIR

1983   Chair, session on Race and Crime.  annual meetings of the American Society of Criminology, Denver.

1989   Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  annual meetings of the American Society of Criminology, Reno.

1994   Chair, session on Interrupted Time Series Designs. annual meetings of the American Society of Criminology, New Orleans.

1993   Chair, session on Guns, Gun Control, and Violence. annual meetings of the American Society of Criminology, Phoenix.

1995   Chair, session on International Drug Enforcement. annual meetings of the American Society of Criminology, Boston.

1999   Chair, Author-Meets-Critics session, More Guns, Less Crime.  annual meetings of the American Society of Criminology, Toronto.

2000   Chair, session on Defensive Weapon and Gun Use.  annual meetings of the American Society of Criminology, San Francisco.

2002   Chair, session on the Causes of Gun Crime. annual  meetings of the American Society of Criminology, Chicago.

2004   Chair, session on Protecting the Victim.  annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981   Session on Gun Control Legislation, annual meetings of the American Society of Criminology, Washington, D.C.

1984   Session on Criminal Sentencing, annual meetings of the American Society of Criminology, Cincinnati.

1986   Session on Sentencing, annual meetings of the American Society of Criminology, Atlanta.

1988   Session on Gun Ownership and Self-protection, annual meetings of the Popular Culture Association, Montreal.

1991   Session on Gun Control, annual meetings of the American Statistical Association, Atlanta, Ga.

**APP. 976**

1995     Session on International Drug Enforcement, annual meetings of the American
         Society of Criminology, Boston.

2000     Session on Defensive Weapon and Gun Use, annual meetings of the American
         Society of Criminology, San Francisco.

2004     Author-Meets-Critic session on Guns, Violence, and Identity Among African-
         American and Latino Youth, by Deanna Wilkinson.  annual meetings of the
         American Society of Criminology, Nashville.

2007     Session on Deterrence and Perceptions, University of Maryland 2007 Crime &
         Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown
         MD, June 4, 2007.

2009     Session on Guns and Crime, at the DeVoe Moore Center Symposium On
         The Economics of Crime, March 26-28, 2009.

2010     Panel discussion of news media coverage of high profile crimes
         Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the
         Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

         Editorial consultant -
                  American Sociological Review
                  American Journal of Sociology
                  Social Forces
                  Social Problems
                  Law and Society Review
                  Journal of Research in Crime and Delinquency
                  Social Science Research
                  Criminology
                  Journal of Quantitative Criminology
                  Justice Quarterly
                  Journal of Criminal Justice
                  Violence and Victims
                  Violence Against Women
                  Journal of the American Medical Association
                  New England Journal of Medicine
                  American Journal of Public Health
                  Journal of Homicide Studies

         Grants consultant, National Science Foundation, Sociology Program.

         Member, Gene Carte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to 2016.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to 2000.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-2008t.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-2008.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-2010.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-?.

Member, University Promotion and Tenure Committee, Fall, 2003 to ?.

Member of University Graduate Policy Committee, Fall 2003 to 2011.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2015.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Served as major professor for doctoral students, Moonki Hong who defended his dissertation on April 14, 2016.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice

Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the <u>Tallahassee Democrat</u>.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

Public lecture, "Do Guns Cause Homicide?," Center for the Study of Liberal Democracy, University of Wisconsin-Madison, December 5, 2018.

OTHER ITEMS
   Listed in:
         Marquis Who's Who
         Marquis Who's Who in the South and Southwest
         Who's Who of Emerging Leaders in America
         Contemporary Authors
         Directory of American Scholars
         Writer's Directory

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed

through National Public Radio.  Further details are available at
http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in
Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges
website (http://www.forensicscolleges.com/), 2014.

1
2
3

## <u>CERTIFICATE OF SERVICE</u>
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 43**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

1          **UNITED STATES DISTRICT COURT**
          **FOR THE DISTRICT OF COLUMBIA**
2
Andrew Hanson, et al.,          ) Civil Action
3                               ) No. 1:22-cv-02256-RC
                   Plaintiffs,  )
4                               ) **Motion Hearing**
vs.                             )
5                               )
District of Columbia, et al.,   ) Washington, D.C.
6                               ) **April 13, 2023**
                   Defendants.  ) Time:  10:00 a.m.
7      _____

8          **Transcript of Motion Hearing**
                   **Held Before**
9          **The Honorable Rudolph Contreras**
              **United States District Judge**
10     _____

11
              A P P E A R A N C E S
12
For the Plaintiffs:      **George L. Lyon, Jr.**
13                       BERGSTROM ATTORNEYS
                         1929 Biltmore Street, Northwest
14                       Washington, D.C. 20009

15   For the Defendants:   **Richard P. Sobiecki**
                          **Mateya B. Kelley**
16                        **Helen M. Rave**
                          **Andrew J. Saindon**
17                        OFFICE OF THE ATTORNEY GENERAL
                          FOR THE DISTRICT OF COLUMBIA
18                        Civil Litigation Division
                          400 Sixth Street, Northwest
19                        Washington, D.C. 20001

20     _____

Stenographic Official Court Reporter:
21                        Nancy J. Meyer
                          Registered Diplomate Reporter
22                        Certified Realtime Reporter
                          333 Constitution Avenue, Northwest
23                        Washington, D.C. 20001
                          202-354-3118
24
Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.

1                    P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  This is Civil Action 22-2256,

3    Andrew Hanson, et al. v. the District of Columbia, et al.

4          Counsel, please approach the podium and state your

5    appearances for the record.

6          MR. LYON:  George Lyon for the plaintiffs,

7    Your Honor.

8          THE COURT:  Good morning.

9          MR. SOBIECKI:  Good morning, Your Honor.

10         Rich Sobiecki for the defendants; along with me, Andrew

11   Saindon, Helen Rave, and Mateya Kelley.

12         THE COURT:  Good morning.

13         All right.  It's the plaintiffs' motion, so the

14   plaintiffs can start.  You know, I've read all the pleadings.

15   I think they're straightforward.  And I've read the opinions

16   that have been issued on the topic as well.  So I think I have

17   my arms around the issues.  So don't feel like you have to

18   repeat everything in your brief, but, you know, to the extent

19   you want to highlight certain things.  And then we can talk

20   about where we go from here, if anywhere.  I know the

21   plaintiffs and the defendants have different views about that.

22         But go ahead.  You can start.

23         MR. LYON:  Your Honor, I hope you find this case and

24   the legal analysis required as fascinating as I do, and I must

25   admit that it was, at times, confusing to me as to the

1    appropriate analysis.  But in the last few days, as I have

2    prepared for the argument, it's crystallized.  And if I can --

3    the real issue is what is the test to decide this case --

4    okay? -- as in almost all cases.

5         And we have the test -- we have a test in *Heller*.  We

6    have a test in *Bruen*.  And trying to reconcile those, I found

7    to be challenging.  But I think that I've done so with the help

8    of a statement from the former solicitor general, Mr. Clement,

9    where he says the irreducible minimum of the Second Amendment

10   is that the government may not ban arms that millions of

11   Americans possess for lawful purposes.

12        If we go back to *Heller*, *Heller* said that presumptively

13   the Second Amendment protects all bearable arms.  What arms

14   that are not protected are the ones that are not in common use,

15   the ones that *Heller* stated are rare or unusual in society at

16   large, and that test resolves this case.

17        As I read through the opinion of the court in Delaware,

18   the judge got many things right, but the one area that he got

19   wrong was he employed the common use test as the presumptive;

20   that is, that arms in common use are presumptively protected.

21   But that's not what *Heller* says.  That's not what *Bruen* says.

22   That's not what *Caetano* says.  What those cases all say is that

23   arms in common use are protected.  The ones that are not

24   protected are the ones that are unusual in society at large --

25   okay? -- machine guns, short-barreled shotguns, things like

 1    that.

 2                THE COURT:  What do you make of *Heller*'s reference to

 3    weapons most suitable for military use?

 4                MR. LYON:  Referring to -- referring, for example, to

 5    machine guns?

 6                THE COURT:  Uh-huh.

 7                MR. LYON:  Well, if you look at machine guns and

 8    short-barreled shotguns -- we'll take machine guns.  Machine

 9    guns are not in common use, generally, for lawful purposes.

10    Yes, there are 175,000 civilian-owned machine guns on the NFA

11    registry.  And they're not banned, by the way.  They're not

12    banned in 37 states.  But they are highly -- they are highly

13    regulated.

14         But they are not the type of weapon that is generally

15    used or even suitable for personal defense.  Okay?  Full auto

16    fire is not something that I think anyone would recommend for

17    personal -- for personal defense.  Okay?  Controlling --

18    controlling a machine gun is exceedingly difficult.  I know

19    this.  I've shot many of them in training, and there are

20    particular ways to hold -- to hold and handle that gun that are

21    difficult to muster [sic].  The average citizen would not --

22    would not do well with them.  And the average citizen doesn't

23    possess machine guns.  They are possessed as rarities, as

24    collector's items, and so forth.  They're very expensive.

25    Okay?  But even a weapon such as a machine gun is not generally

1   banned in this country.

2        As the Kopel article that I provided the Court this

3   weekend indicates, there is not a historic tradition of banning

4   arms in this country.  Arms that are -- tend to be associated

5   with criminal use are regulated -- okay? -- but not banned.

6   Not -- they can be prohibited from concealed carry.  We saw in

7   the 19th century that handguns, Bowie knives, other

8   bludgeon-type weapons, there were prohibitions on concealed

9   carry, but there were, generally, not prohibitions in carrying

10  in general, and there were not prohibitions on possession in

11  the home.

12       In terms of these magazines, D.C. goes far beyond that

13  to prohibit possession in the home, possession of -- of arms

14  that are in common use.  In fact, the latest estimates in the

15  English survey that -- that is cited at -- I think it's

16  Footnote 952 of the Kopel article, indicates that there are

17  540 million plus-ten magazines in circulation; about evenly

18  divided between pistol magazines and -- and rifle magazines.  I

19  would contrast that with the 175,000 machine guns.  And, by the

20  way, in terms of machine guns, the overwhelming number of

21  machine guns in this country are possessed by law enforcement;

22  700,000 on the NFA registry.

23       So there is a massive difference between something like

24  a machine gun, a military weapon, and weapons in common use for

25  self -- for self-defense, such as firearms equipped with

1    plus-ten magazines.

2         Now, the question is -- and D.C. has raised it -- well,

3    these magazines are not arms.  Well, *Heller* says that --

4         THE COURT:  Don't spend a lot of time on that

5    argument.

6         MR. LYON:  Okay.  Then I won't.

7         Then the question -- then the question becomes are they

8    in common use for self-defense.  And D.C. -- D.C. says, well,

9    no, because no one ever fires more than ten shots in -- in

10   self-defense.  Well, we've shown in our papers that that's

11   wrong.  But beyond that, it's irrelevant because the question

12   is not are they -- how many shots are fired.  It is are they

13   possessed by the American public for self-defense.  And the

14   answer is overwhelmingly yes.

15        Again, if I go back to the English study cited by Kopel,

16   more than -- approximately half of firearm owners possess these

17   magazines.  And of those firearm owners, 48 percent use --

18   stated that they used these magazines for home defense,

19   62 percent said that they used them for defense outside the

20   home, and about 50 percent stated they used them for hunting or

21   for recreational shooting.

22        Now, again, D.C. would have you limit the protection

23   of these magazines to only self-defense use, and I don't

24   think that's a legitimate point under *Heller*, because *Heller*

25   talks about use of these magazines for lawful purposes; and

1  that would be self-defense, hunting, target shooting,

2  competition.

3       THE COURT:  Are there any cases that focus on those

4  other uses other than self-defense?

5       MR. LYON:  The Delaware case that they cited

6  rejected that -- that same argument.  Okay?  Generally, these

7  cases all cite self-defense because, after all, self-defense is

8  the -- the -- one of the primary purposes of -- of the

9  Second Amendment.  There are other purposes, of course; having

10  an armed citizen available to defend the -- defend the

11  homeland, defend themselves in the event of a tyrannical

12  government, and so forth.  But *Heller* focused on self-defense

13  and all the other cases as well.

14       But even if you were to accept that self-defense is the

15  only basis for protecting these magazines, the evidence is

16  substantial that these magazines are used for self-defense.  We

17  presented the affidavits -- or the declarations of five -- five

18  nationally recognized firearm instructors that say that,

19  overwhelmingly, in their classes their students use plus-ten

20  magazines.

21       In fact, Claude Werner, in his declaration -- Mr. Werner

22  ran the elite Rogers Shooting School in Georgia for many years.

23  In their introductory courses, they provided the firearms and

24  magazines for their students, and the magazines that they

25  provided were the plus-ten magazines.  Okay?

1      There are many reasons why plus-ten magazines are useful

2   for self-defense.  First of all, 50 percent of criminal violent

3   attacks involve multiple adversaries.  If we go to three or

4   more, then it becomes 20 percent.  Okay?  Having more than a

5   few rounds in your firearm is vitally important in being able

6   to handle that situation.

7      We know that pistol rounds only drill holes.  Okay?

8   I've given you examples in the -- in the papers of violent

9   attacks where it was necessary for law enforcement or civilians

10  to fire multiple rounds, many in excess of ten in order to --

11  in order to stop a violent attack.  Okay?  Criminals, just like

12  police, just like civilians, can also wear body armor.  Okay?

13  Under those circumstances, multiple rounds are going to be

14  necessary to stop -- to stop the assailant.

15     Pistol shots do not immediately incapacitate an

16  assailant.  It can require multiple rounds.  In the Jared

17  Reston example that we gave you, Reston fired, I believe it

18  was, 14 rounds out of his service pistol.  Reston himself took

19  seven hits from the -- from the assailant, was able to keep

20  fighting, and stopped -- stopped the attack.  The assailant

21  took, I believe it was, seven or eight rounds as well.

22     So it's not like -- it's not like the movies or TV where

23  someone takes a single shot, they immediately stop.  Very

24  often, yeah, that's -- that happens.  The majority of

25  instances, however, it's not even necessary to fire a single

1   shot.  So if you take D.C.'s argument at face value, magazines

2   don't need to have any rounds in them because the overwhelming

3   number of defensive gun uses involve merely showing the gun,

4   saying that you have a gun, and not firing a single shot.  But

5   that's an absurd -- that's an absurd interpretation.

6        So these magazines are used for self-defense, and under

7   *Heller*, under *Caetano*, under *Bruen*, they're in common use.

8        I would point out Justice Kavanaugh's dissent in the

9   second *Heller* case, essentially, is a precursor to the *Bruen*

10  decision.  Justice Kavanaugh came to the conclusion that common

11  use equals protection.  Justice Thomas, Justice -- and Justice

12  Scalia in their dissent to the denial of cert in the *Friedman*

13  case out of Illinois stated the same thing.  Weapons that are

14  in common use are protected.  The ones that are not are the

15  ones that are highly unusual in society.

16        THE COURT:  Let me ask you, since you bring up

17  Justice Kavanaugh now.  In *Heller*, Justice Scalia kind of set

18  down some markers as to things he thought were presumptively

19  constitutional; and Justice Kavanaugh, in his concurrence,

20  seems to have done the same.  It's not clear to me that if you

21  faithfully apply Justice Thomas's standard that all of those

22  things that they set forth as presumably constitutional would

23  necessarily pass muster.  What do you think about that?

24        MR. LYON:  That's a very good point, Your Honor.

25  And -- and I agree with you, actually.

1        In *Bruen*, Justice Thomas did not go as broad as *Heller*

2    in terms of -- of government buildings and schools being

3    presumptively protected.  Justice Thomas said the ones that we

4    can identify from history are courts, legislative assemblies,

5    and polling places.

6        Now, personally, with respect to schools, I think that

7    we can say that traditionally students -- and we're talking

8    about colleges now.  Students have been banned from possessing

9    firearms in -- at college campuses.  Now, there's some that do

10    and some that don't right now.  But, historically, if you look

11    at it, the major colleges all ban them.  Now, that was not

12    government -- generally not government because many of them

13    were private.  But there is a tradition, at least in that view.

14    But faculty and administrators were not.  Obviously, this is

15    not the issue that's present in this case.

16        THE COURT:  Sure; no.  I know it's not, but it -- you

17    know, you advocate for a very straightforward interpretation of

18    Justice Thomas's opinion, which, obviously, is one most helpful

19    to your case.  But I'm not sure that either Justice Scalia --

20    and we can't know what he thought at this point.  But Justice

21    Kavanaugh, if you take his examples, I'm not sure that they

22    coincide with a very straightforward analysis under Justice

23    Thomas's standard.  So perhaps other justices don't think it's

24    quite as straightforward as you advocate.

25        MR. LYON:  The sensitive places question is -- is --

**APP. 995**

1     is much more complex than this situation where we have a

2     bright -- a bright-line test in *Heller* that's repeated in

3     *Caetano* and repeated in *Bruen*.  So it's not like -- there is --

4     there is nothing -- and -- and I admit that I confused the

5     issue in my preliminary injunction motion.  But there is

6     nothing in the Supreme Court's Second Amendment cases that

7     indicates that the relative -- for example, relative

8     dangerousness of an arm is a relevant consideration.

9         All -- all weapons are dangerous.  The question is are

10    they unusual?  Are they not -- are -- are they rare -- rare in

11    society, such as machine guns and short-barreled shotguns.

12        I do want to make one -- I do want to make one other

13    point with -- with respect to *Bruen*, because this -- this was

14    something that -- that the light shined -- shined in my head;

15    that *Heller* sets forth the test for whether an arm is

16    protected.  And that's, again, echoed in *Caetano*.  It's echoed

17    in *Bruen*.  *Bruen* sets -- *Bruen*'s historic analysis -- which had

18    already been done in *Heller*.  *Bruen*'s historic analysis is with

19    respect to what people do with weapons.  Okay?

20        If the behavior, what people want to do with the weapon,

21    comes within the Second Amendment, then it is presumptively

22    protected.  And then the obligation is on the government to

23    show historically that it was not -- that it is not protected.

24    That is a distinctively different test from *Heller*'s test of

25    what arms are protected.  Because under *Heller*, again, it's

1  common use.

2        Now, I think *Heller* came to that conclusion after

3  reviewing the historical record.  And, again, if you review the

4  Kopel article, which I spent a lot of time going through that

5  160-some page article, it shows very clearly that there's not a

6  tradition in this country of banning completely both carry and

7  possession of bearable arms, even when we get to the 20th

8  century with the machine gun limitations.  It's not a complete

9  ban.  Highly regulated.  Taxed and so forth.

10        THE COURT:  Given the holiday -- and I've had a very

11  busy week -- I haven't gone through that whole article.  So if

12  there's something in particular you want to direct me to, I

13  would appreciate that.

14        MR. LYON:  I think the most important thing in

15  answering the District's claim is the article's exhausting

16  review of Bowie knife regulations.  The District implies that

17  Bowie knives were generally prohibited during the -- during the

18  19th century, and that is just completely not true.  Concealed

19  carry restrictions, exactly.  They were, essentially, treated

20  like pistols.

21        In fact, in the -- in the *Nunn* case cited in *Heller*,

22  *Nunn v. Georgia*, that was a complete prohibition on carriage of

23  pistols and Bowie knives and some other weapons.  And the

24  Georgia court, in what Justice Scalia said perfectly captures

25  the meaning of the Second Amendment, said that as to open carry

1    of these weapons, you can't prohibit it, but you can prohibit

2    concealed carry.

3         And that is, generally, what was done throughout the

4    19th century.  There are only a couple of states that purported

5    to completely ban the carriage of these weapons.  One of them,

6    Tennessee, taxed them very highly.  Okay?  But I think only

7    Texas and Arkansas had a complete prohibition on carry.  I

8    don't believe they had a prohibition on possession.

9         Here we're dealing with a complete ban on possession of

10   arms that number in excess of 500 million and that are

11   overwhelmingly chosen by citizens for their personal

12   protection.  *Bruen* says you don't give -- you don't give

13   deference to the government's choice in that regard.  You

14   give -- you give deference to the choice of the American

15   people.

16              THE COURT:  All right.  Let's talk a little bit

17   about -- I know you want me to fold in the merits into my

18   decision on the PI.  Is that position regardless of what side I

19   come out on?

20              MR. LYON:  Well, I don't think I -- I don't think

21   that you can come down against me on the merits without giving

22   me -- without giving me discovery.

23              THE COURT:  Okay.

24              MR. LYON:  But I think the question of -- the

25   question of common use has been thoroughly vetted in -- in this

1    case.  And the purported analogies of the District are not

2    going to get any -- are not going to get any -- any better.

3            THE COURT:  Sure.  But I -- you know, some of these

4    law review articles or pending law review articles come across

5    as expert reports, and they're not subject to any sort of

6    cross-examination or deposition, as you would have with a

7    traditional case with an expert.

8        So I'm just curious how -- I saw that in the Delaware

9    case, my friend Judge Andrews scheduled a trial date in the

10   fall.  I'm just curious how you see the case playing out from

11   here on out.

12           MR. LYON:  Well, as -- as Judge Moss mentioned in

13   another case that we're litigating, his decision and your

14   decision here is not going to be the last word.

15           THE COURT:  Of course.  Of course not.  And, frankly,

16   *Bruen* had virtually no district court record because everyone

17   was applying a different standard.  And rather than say you got

18   the wrong standard, take another shot, which is more common,

19   the issue was decided on what is, you know, essentially, a

20   record developed by amicus and the like at the Supreme Court.

21           MR. LYON:  I -- I -- I would contrast this case with

22   the Delaware case where the judge admittedly said that he's

23   really only heard from the defendants in terms of the factual

24   record.  I think we -- we presented a robust factual record to

25   refute the -- the allegations of the -- of the District's

**APP. 999**

15

 1   exhibits.

 2          THE COURT:  But you have indicated that to the extent

 3   that I'm inclined to rule against you, that you do wish to have

 4   discovery?

 5          MR. LYON:  That is true.

 6          THE COURT:  Okay.  That's helpful.

 7      All right.  Any other points you want to make?

 8          MR. LYON:  I think I -- I think I've covered

 9   everything, Your Honor.

10          THE COURT:  Okay.  All right.  Thank you.

11          MR. LYON:  Thank you.

12          MR. SOBIECKI:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. SOBIECKI:  Nineteen, Your Honor.  A little over a

15   year ago today, 19 large-capacity magazines were taken up to an

16   apartment in Van Ness and an individual rained gunfire, more

17   than 230 shots, on parents and children as they were leaving

18   school.

19      The District and 14 other states simply have common

20   sense reasonable restrictions on the amount of ammunition that

21   an individual could possess before reloading in an attempt to

22   prevent more horrific tragedies just like that.  This case is

23   not about an individual's right to defend themselves inside or

24   outside the home with a firearm.  This is about whether

25   individuals have a right to enhance their firepower far beyond

1    what is necessary for self-defense.

2         And that is one of the keys issues here on this

3    preliminary motion; is there evidence in the record connecting

4    possession of large-capacity magazines with their use.  Now,

5    plaintiffs would say, Your Honor, it's simply just a counting

6    exercise.  Just count it up.  There's 500 million.  That ends

7    the story.

8         But if that was the case, how did they reconcile that

9    with *Heller II*, which remains binding precedent on this Court.

10   The record in *Heller II* said the same.  The D.C. Circuit said

11   we see that there's millions and millions of these

12   large-capacity magazines.  But that did not end the inquiry.

13        They then proceed to say is there a nexus.  Has

14   plaintiff shown there's a connection between the common

15   possession of these large-capacity magazines and their use for

16   self-defense?  And what is the record in this case on that

17   point?  It's nonexistent.  Not to go too procedural, Your

18   Honor, but Local Rule 65.1 says your declarations have to come

19   with your motion.  You can't hold them for your reply and then

20   have the Court rely on them.  Your Honor made that point in

21   *John Doe v. CPFB [sic]*.  I have the cite, 235 F. Supp. 3d 194.

22        So that -- on the common use, Your Honor, first I would

23   say that not enough record- -- and the test does require a

24   connection between common possession and common use.

25   Plaintiffs, even if you look at their reply declarations, they

1    have a number of firearms' instructors who are just asserting

2    ipso facto, I've taught firearms, I can assure you that, you

3    know, more than ten rounds would be useful.  Well, is it just

4    peace of mind?  Why?  Why are more than ten rounds necessary?

5    There's no evidence in the record.

6         Mr. Hanish has a survey.  He says look at this 2021

7    survey; that shows that LCMs are useful for self-defense.  And

8    if you go, there's a question that says, "Why do you

9    respondents think more than ten is necessary?"  And it's

10   all peace of mind, except for one individual, Your Honor.

11   One individual does say I have had occasion to use an LCM.  And

12   it was a farmer who was defending his livestock from

13   20 coyotes.

14        And if we look at *Wrenn*, *Wrenn* says no -- inconsistent

15   with *Heller I* -- it's not any firearm for any purpose.  It is a

16   common need held by the ordinary citizen.  Plaintiffs have

17   focused all of their anecdotes in their motion are about police

18   officers.  Police officers are not the common individual with a

19   common need.  And so that is what we should be focused on.  Why

20   does the ordinary citizen need magazines with more than ten

21   rounds in them?

22        THE COURT:  Let me ask you this question, kind of

23   flipping your example.  So if you come across -- if you're in

24   the apartment next to the guy with the 17 magazines, do you

25   have to wait until the police can come with magazines that are

**APP. 1002**

1    greater than ten?

2              MR. SOBIECKI:  You need to --

3              THE COURT:  To defend yourself and stop them.

4              MR. SOBIECKI:  Well, again, is -- is that an ordinary

5    need?  But why -- is ten or fewer?  Can you -- can you defend

6    yourself in that case?  Yes.  I think, certainly, again, in

7    this record there's no indication -- studies show that it's

8    usually two to three shots are fired in self-defense purposes.

9         Now, before we get there, I hear Your Honor on the arms

10   argument, but I just want to make clear, our argument is not

11   that one could ban all magazines consistent with the

12   Second Amendment.  Okay?  That's not -- there's a corollary

13   right.  You have a right to a firearm.  You have a right to use

14   it.  But that should not go -- silencers are not an arm.  I

15   don't think that's a controversial point.

16        And so here we're, specifically, talking about

17   large-capacity magazines.  Do they fall within the definition

18   of arms?  And two district courts -- *Ocean State Tactical* and

19   *Oregon Firearms Federation* -- based their holding on that;

20   large-capacity magazines are not arms.

21        So I do want to preserve and --

22              THE COURT:  Of course.

23              MR. SOBIECKI:  -- Your Honor on that.

24              THE COURT:  Of course.

25              MR. SOBIECKI:  But if we get in common use for

**APP. 1003**

```
 1    self-defense purposes, the machine gun -- again, what --

 2    what -- counsel tried to avoid it.  There's hundreds of

 3    thousands of machine guns.  Why does that not end the inquiry?

 4    If more firepower is always more better in self-defense

 5    situations and these are in common use, do machine guns receive

 6    protection under the Second Amendment?  Everyone seems to say,

 7    well, of course not.  But then LCMs also developed for military

 8    use.  So why -- why not machine guns if -- if -- everything

 9    fits with -- under arms, why not machine guns but why

10    large-capacity magazines?

11         So on the common use, that is -- that is our main point,

12    Your Honor.  You do need a nexus between large-capacity

13    magazines and self-defense.  On this record, nonexistent.  The

14    evidence does show that it's usually two to three shots in

15    defensive use.  And, certainly, even if Your Honor was leaning

16    that way, discovery is important.

17         As you noted, there's a lot of anecdotes from Mr. Ayoob

18    that plaintiffs cite.  We looked into those.  Some of those

19    don't seem to be as clear as he would have.  There is an

20    article they cite, *Lead and Diamonds*.  There's a shootout in

21    Richmond.  But if you go and read that article, it was a

22    collection of smaller -- of smaller-capacity guns.

23         We would want the opportunity to test that; opportunity

24    to develop a record on what is in common use for large-capacity

25    magazines.  Again, 15 states have restrictions, covering more
```

**APP. 1004**

1     than a third of the population.  So to say that there's all

2     these large-capacity magazines out there, I don't think,

3     completes the story.  I think we need to know more about why

4     they are out there.

5          But even assuming Your Honor says, okay, I'm skeptical

6     about arms, common use, under *Bruen* that doesn't end the

7     inquiry.  We still have to look at:  Are there historical

8     analogs?  And I think much of what plaintiffs here are doing is

9     exactly what the Supreme Court said you should not do.  They're

10    looking for historical twins, not relevantly similar analogs

11    and -- because in *Bruen*, the issue was public carry outside the

12    home.

13         Well, at the founding, Your Honor, we had firearms, and

14    we had outside the home, and so it was reasonable for the court

15    to say, well, if they -- the founders were concerned about

16    this, we would expect to see regulations on this, kind of,

17    throughout that whole period.

18         That's not the case here.  And if -- a closer look at

19    the evidence, high-capacity magazines really, until the turn of

20    the century -- 20th century, Justice Kavanaugh in his *Heller II*

21    dissent notes that it was not until 1903 that the first

22    semiautomatic rifle became commercially available.

23         And just to kind of briefly review, we have muskets in

24    the late 1700s, Your Honor.  30 seconds a shot.

25         Now we're talking about 30 shots in seconds.

**APP. 1005**

21

1          Colt invents the revolver in 1836.  That's our first

2     six-shot.  You have to load each chamber individually.  Colt

3     cannot give them away.  He went to the government repeatedly

4     saying, hey, I've got this great new revolver.  He went

5     bankrupt.

6          We come to the Civil War.  Again, in the Civil War, we

7     now have some introduction of repeating rifles with fixed

8     magazines that you're having to load individually.  But the

9     rate of fire still is small compared to what we're talking

10    about today.

11         It's really until you get to the Tommy gun in the 1920s

12    where the level of firepower that is at issue started to

13    emerge.

14         So to say, well, there's no regulations in the 1800s

15    concerning high-capacity firearms really doesn't tell us much.

16    So *Bruen* says what are our historical analogs.  And as we laid

17    out -- and I know plaintiffs don't find them similar enough.

18    I'll try to clear that up.

19         But we have gunpowder storage rules.  Yes, it's true

20    these were meant to present -- prevent fires, but the

21    similarities are that gunpowder was necessary for ammunition by

22    imposing regulations limiting individual's access to gunpowder.

23    It was a limitation on their ability how many times they could

24    fire.  In a sense, a limitation on their enhancement.

25         So too here we have -- we're not saying you can't have a

1   magazine for your gun.  We're not saying you can't have several

2   magazines for your gun.  All we're saying is that firing it one

3   time, you get ten shots, and then have you to reload, which,

4   again, relevantly similar to the gunpowder.

5        We have trap guns.  Again, a gun, perfectly legal in --

6   in -- just used in common.  But if you enhance it, if you

7   enable it to fire without being present, that posed a greater

8   threat to innocent bystanders and so it was regulated.

9        Just like here, we're not saying you can't have a

10  magazine in your gun.  We're saying that there's a greater risk

11  to innocent bystanders if you can load your gun with a magazine

12  that contains more than ten bullets.

13       Bowie knives.  Again, I acknowledge that there was not a

14  complete ban on Bowie knives, but that misses the point.  The

15  point is we have a perfectly legal weapon, a knife, that was

16  enhanced through its design to inflict greater harm.  It

17  presented a greater risk to the public.  So there were

18  restrictions placed on one's Second Amendment right to carry

19  around a Bowie knife.

20       So too here.  You can have your gun with its magazine.

21  You can take it around.  You just can't have one with more than

22  ten.

23       Pocket pistols, same is true there.  A firearm,

24  perfectly legal, but because of the way it had been enhanced --

25  it's shrunk in size -- it posed a greater threat to the public.

23

1    No, you can't carry those around.  If you want to carry a

2    larger pistol, an Army, Navy pistol around, you can do that.

3          And then that brings us into the 20th century and Tommy

4    guns.  Now, I recognize *Bruen* says tread carefully on looking

5    at 20th century regulations, unless they're consistent with

6    historical tradition.  And I think what we've laid out for

7    Your Honor is a consistent tradition from the founding through

8    the 20th century because -- let's be clear.  The magazines

9    we're talking about, the '50s, the '60s, Your Honor, in terms

10   of handguns, that's when we're getting our first, and we can

11   say, kind of, widespread penetration into the commercial

12   market.

13         And, again, we think, certainly, no likelihood of

14   success on this.  But these -- these are difficult issues, as

15   our expert, Dr. Rivas, noted.  She needs more time to conduct

16   research into the Tennessee and Arkansas laws concerning the

17   regulation of these -- the pocket pistols, Bowie knives.

18         THE COURT:  Let me ask you this question about the

19   experts because, clearly, the experts are never going to come

20   to agreement.  So everyone seems to be in agreement, to a

21   certain extent, on the need to discovery if they lose.  But

22   what happens after that?  Am I going to be able to decide those

23   disputes amongst the experts on summary judgment, or will a

24   trial be necessary?

25         MR. SOBIECKI:  I think that will depend on -- kind of

1      like the normal civil case, Your Honor.  It will be like the

2      interpretation of a statute.  You'll have -- you'll make

3      credibility determinations as to whose opinions provide --

4      should be given greater weight.  I would, respectfully, submit

5      that our -- the heft of our experts -- certainly, these are

6      academics who have performed a lot of research.  They're not

7      interested parties who are active in the industry -- should be

8      given more weight.

9            We should have the opportunity, as Your Honor noted, to

10     depose these individuals, to test their opinions.  They've got

11     several individuals that just say, well, of course, LCMs are

12     more useful in self-defense, but they never go and add why.  I

13     think that's entirely fair for us to ask that question.

14           And then, you know, because we are all in this emergency

15     posture, the preliminary injunction stage, the balance of

16     equities, public interest, heavily in favor of the District.

17     The District has had this ban going back, some limitations,

18     since the 1930s.  This particular one has been in place since

19     2019.  Again, we're not talking about anyone's ability to

20     defend themselves outside the home with a firearm.  That will

21     stay.  The status quo will remain.  But we take it away, then

22     we do have a risk of LCMs flooding into the District.

23           Lieutenant Amodeo submitted his declaration.  If

24     Your Honor flips to the end, the pictures of the large-capacity

25     magazines we're talking about, huge drums, and the police are

**APP. 1009**

1    finding these everywhere.

2          So if we put this aside, there's a serious risk that

3    we're going to have just a ton of these coming in, huge risk to

4    innocent bystanders.

5          So we certainly think Your Honor should deny the

6    preliminary injunction.

7          THE COURT:  So let me ask you -- you know, let's say

8    we get past discovery; we get past summary judgment.  Is this a

9    jury trial?

10          MR. SOBIECKI:  That's an interesting question; one

11   I've pondered.  It does seem to be more of a legal question,

12   Your Honor.  So -- now, there are factual elements to it.

13   Frankly, I think we'd probably like the opportunity to do a

14   little more research on this.  You know, *Bruen* doesn't really

15   provide us a path forward.  So that is, kind of, my initial

16   reaction, Your Honor.

17          It's a legal question, in some sense, you know, what --

18   what does the Second Amendment cover.  However, there are

19   certainly -- I don't think a mixed question of fact and law.

20   But factual issues concerning, you know, how many LCMs.  But,

21   generally, I would go with more a legal question at this

22   moment.  But I would want the opportunity to consult with the

23   team.

24          THE COURT:  Of course.

25          I haven't looked at the complaint in a long time.  It's

**APP. 1010**

1   at least partially brought under 1983?

2            MR. SOBIECKI:  Yes, Your Honor.  I'll admit I have

3   not looked at the complaint recently, but I would certainly

4   presume so.

5            THE COURT:  So, then, assuming there are fact

6   questions, it would be a jury trial?

7            MR. SOBIECKI:  Yes, Your Honor.  Again, I would

8   reserve --

9            THE COURT:  Of course.

10            MR. SOBIECKI:  -- opining on that at this moment.

11            THE COURT:  Of course.  Any other issues you want to

12   highlight?

13            MR. SOBIECKI:  No, Your Honor.  If no other

14   questions, I thank you for your time.

15            THE COURT:  All right.  Thank you.

16        Go ahead, Mr. Lyon.

17        So, Mr. Lyon, on -- you know I've read the Oregon case

18   and the Rhode Island case and the Delaware case.  Are there any

19   cases on a PI footing that come out in your favor?

20            MR. LYON:  Well, there are -- prior to *Bruen*, there

21   is the *Duncan v. Bonta* case with Judge Benitez in California,

22   and the three-judge panel ruling sustaining the preliminary

23   injunction there.  That was vacated by the Ninth Circuit

24   en banc, which was, in turn, vacated by the Supreme Court

25   following *Bruen*.

27

1          We have -- there was -- there are a number of cases

2     pending.  I believe there is a New Jersey case that is -- that

3     is under briefing.  There is an Illinois case, the oral

4     argument of which was held yesterday.  I tried to monitor it

5     but I couldn't get through on the -- on the link.  And --

6          THE COURT:  That's a magazine case as well?

7          MR. LYON:  That's a magazine and an assault weapons

8     case and -- and some other issues.  I think there were four --

9     four cases that were consolidated before Judge McGlynn, I

10    think, is -- is the case.

11         And there is a Fourth Circuit case that is ripe for

12    decision; and the argument there is available on the Fourth

13    Circuit's website, and I think you would find that

14    illuminating.

15         So at this point, no.  I would -- I would suggest that

16    the Oregon case and the Rhode Island case are simply wrong

17    on -- on every point, inconsistent with the common use finding

18    by the judge in -- in Delaware.  And all of those cases were

19    decided on different records.  And, of course, the Delaware

20    case, the judge candidly admitted that he basically only heard

21    factual -- he only got factual argument -- or factual showings

22    from the defendant there.

23         Counsel made a -- a point that the D.C. Circuit had

24    raised in -- in the *Heller II* case, and -- which I think there

25    may be some merit to.  He points to big drum magazines and

**APP. 1012**

1    hundred-round magazines and so forth.  And I will candidly

2    admit that if D.C. had written their law to limit handgun

3    magazines to 20 rounds and rifle magazines to 30 rounds, I

4    wouldn't be here because those are pretty much the limits of

5    the standard capacity magazines that come with these guns.

6         I probably couldn't make a factual showing that

7    hundred-round big drum magazines are commonly possessed for --

8    for lawful purposes.  But that's not the law that they wrote,

9    and they're stuck with ten.  And the record is overwhelming

10   that ten-round magazines are common -- plus-ten magazines are

11   commonly possessed by American citizens for law enforcement

12   purposes.

13        I have to strongly dissent to the District's so-called

14   analogs.  There is nothing remotely similar to a gunpowder

15   storage law -- for example, that required storage on the third

16   floor of a building -- equal to a ban on a total class of arms.

17   And *Bruen* makes it very clear that the -- and *Heller* that the

18   fact that there were concealed carry restrictions doesn't

19   equate to a ban on carry and doesn't equate to a ban on

20   possession.

21        So the District has simply not shown -- assuming we get

22   there -- and I suggest we don't.  But assuming we do get there,

23   they have not shown relevantly similar or substantially similar

24   restrictions in the historical record.

25        And what they have shown is that, yes, we can ban

1   concealed carry of weapons that we consider particularly

2   susceptible to criminal use.  We can -- we can limit the

3   distribution of weapons to minors.  We can regulate the misuse

4   of weapons.  Okay?  For example, the -- the spring gun laws,

5   they didn't ban the guns.  They banned a particular use of

6   those guns that is so dangerous that it had to be stopped.  And

7   it's in persons just opening a door by mistake gets shot

8   without -- without any -- without any indication of -- of

9   criminal intent, without meeting any of the elements of -- that

10  are required for -- for self-defense.

11        Those are reasonable and, I would suggest, ought to be

12  mandatory restrictions, but they are not a ban on carry, not a

13  ban on possession.  The District has not been able to point to

14  any ban on possession of a commonly used arm, and that dooms

15  them, Your Honor.

16              THE COURT:  All right.  Thank you.  Why don't you

17  answer, if you can, my question about whether we end up in a

18  jury trial in this case or not.

19              MR. LYON:  I'm sorry.  Could you repeat that.

20              THE COURT:  Sure.  Whether we end up in a jury trial

21  in this case or not.

22              MR. LYON:  I can't -- I can't see that this is a case

23  that requires a -- that requires a jury.  I think that -- I'm

24  not aware of any Second Amendment case that's ever gone to a

25  jury, and -- and -- and jury selection would be quite

```
1    entertaining.

2            THE COURT:  Okay.

3            MR. LYON:  I -- I -- I think that like Wrenn, like

4    Heller, like Bruen, these cases are -- these cases turn on

5    legal analysis.  They don't -- I don't think the District

6    really disputes that there are hundreds of millions of plus-ten

7    magazines out there.  If they do, I'd like -- I'd -- I'd like

8    to see it.

9            THE COURT:  Sure.  On the issue of discovery, I

10   assume -- I'm assuming whatever side loses is going to take it

11   up.  Do -- at that point do we start discovery?  Do we wait

12   until we get instruction from the Court of Appeals on my legal

13   reasoning?  What are your thoughts on that?

14           MR. LYON:  Well, I -- I will appeal if the

15   preliminary injunction is -- is denied.  I don't see that I

16   have any recourse but to do that.

17           THE COURT:  And I suspect that they have even

18   stronger reason to appeal if they lose.  So I think there's a

19   fair chance we're going to end up in the Court of Appeals,

20   which doesn't always move briskly.  So what happens next?

21           MR. LYON:  Well, in terms of the discovery that I

22   anticipate, it's probably going to be predominantly admissions.

23   I'm not sure that I even need to depose their so-called experts

24   because of the flaws in the submissions that they make.  I

25   mean, they make a lot of generalities.  But when you actually
```

31

 1    look at the laws that they cite, they don't really say what

 2    they say.

 3              THE COURT:  You thought that the term high-capacity

 4    magazine were pejorative.  So-called experts, I think, are well

 5    beyond that.  But go ahead.

 6              MR. LYON:  I'm guilty, Your Honor.  I'm sorry.

 7              THE COURT:  All right.

 8              MR. LYON:  So I definitely would -- would go for

 9    admissions.  I'd have to evaluate whether it's -- it's

10    justified to -- and what I get out of going for depositions,

11    I am just -- just not sure at this point.  I'd have to think

12    and -- and probably consult with -- with my brethren on the

13    other side as to whether we would want to go to the -- the time

14    and expense of -- of conducting discovery until the Court of

15    Appeals makes its decision.

16              There's going to be -- there's going to be several other

17    Court of Appeals' decisions.  Certainly primed up for the

18    Fourth Circuit, and I expect that there'll be the -- that the

19    Third, Seventh, and Ninth, where there are cases pending --

20    will be -- will be percolating.  And, ultimately, the folks

21    over on -- I think it's Second Street, if I've got the address

22    right -- may come to bear on this before we even can get to

23    discovery.

24              THE COURT:  All right.  Thank you.

25              MR. SOBIECKI:  Just procedural point, Your Honor.

**APP. 1016**

1            THE COURT:  Sure.

2            MR. SOBIECKI:  I don't like entertaining the idea

3     that we might lose, but if we did, we would preview that we

4     would ask Your Honor to stay your ruling until we do get

5     guidance on -- the Court of Appeals on this issue, given the

6     consequences.

7            Thank you.

8            THE COURT:  All right.  Thank you.  You're excused.

9            I'll take it under advisement.  I plan to rule

10    relatively quickly.

11            (Proceedings were concluded at 10:54 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3             I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the above

5       and foregoing constitutes a true and accurate transcript of my

6       stenograph notes and is a full, true, and complete transcript

7       of the proceedings to the best of my ability.

8

9                       Dated this 18th day of April, 2023.

10

11                      /s/ Nancy J. Meyer
                        Nancy J. Meyer
12                      Official Court Reporter
                        Registered Diplomate Reporter
13                      Certified Realtime Reporter
                        333 Constitution Avenue Northwest
14                      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANDREW HANSON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-2256 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## ORDER

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Plaintiff's Motion for a Preliminary Injunction (ECF No. 8) is

**DENIED**.

**SO ORDERED.**

Dated:  April 20, 2023                                              RUDOLPH CONTRERAS
                                                                     United States District Judge

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ANDREW HANSON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-2256 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Plaintiffs, four American citizens who reside in or spend time in the District of Columbia, challenge the constitutionality of D.C. law that bans possession of large-capacity magazines ("LCMs").  Plaintiffs own pistols and wish to equip them with LCMs for self-defense.  They claim this conduct is protected by the Second Amendment under the test set forth in the Supreme Court's recent decision, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  They now move for a preliminary (and permanent) injunction that enjoins Defendants, the District of Columbia and the Chief of the Metropolitan Police Department Robert J. Contee III (together, "the District"), from enforcing this law.  The Court held oral argument on the motion.  The matter is fully briefed and ripe for decision.  For the reasons described below, the Court concludes that the District's LCM ban is constitutional, and therefore Plaintiffs have not shown likelihood of success on the merits.  The Court will thus deny Plaintiffs' motion for a preliminary injunction.

## II.  BACKGROUND

### A.  Case Background

The sole object of Plaintiffs' constitutional challenge is D.C.'s LCM ban, which provides in full:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm.  For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.  The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b).  Violation of this provision carries a penalty of up to three years in prison and a fine of up to $12,500.  D.C. Code §§ 7-2507.06(a)(4); 22-3571.01(b)(6).

Some context is in order to understand the gun law at issue.  An ammunition feeding device, more commonly known as a magazine, "is a vehicle for carrying ammunition.  It can be either integral to the gun or detachable."  *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *4 (D.R.I. Dec. 14, 2022).  "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines."  *Id.* The magazine is simply "inserted into and removed from the frame of the firearm, much as an extra battery-pack gets swapped in and out of a battery-operated tool, like a leaf blower, for example."  *Id.*  Magazines come in different sizes and have different capacities.  Under D.C. law, a large-capacity magazine, or LCM, is simply a magazine that can hold more than ten bullets. "When a multiple-round device like an LCM is attached, a handgun becomes a 'semiautomatic'

**APP. 1021**

weapon, meaning that it is capable of rapidly firing several bullets, one right after another. However, the gun still requires a trigger-pull for each round fired." *Id.*[1]

Plaintiffs each hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department and they regularly carry firearms in D.C. *See* Hanson Decl. ¶ 2, ECF No. 8-2; Yzaguirre Decl. ¶ 2, ECF No. 8-3; Chaney Decl. ¶ 2, ECF No. 8-4; Klun Decl. ¶ 2, ECF No. 8-5. Each Plaintiff possesses LCMs outside D.C., and each Plaintiff claims that, but for D.C. law banning LCM possession in D.C., he would use LCMs for self-defense in D.C. Hanson Decl. ¶¶ 3–4; Yzaguirre Decl. ¶¶ 3–4; Chaney Decl. ¶¶ 3–4; Klun Decl. ¶¶ 3–4. In October 2022, Plaintiff Yzaguirre attempted to register a firearm with the Metropolitan Police Department but was denied because his firearm came with a 12-round LCM, in violation of D.C. law. Yzaguirre 2d Decl. ¶¶ 2–7, ECF No. 16-1.

Plaintiffs brought suit on August 1, 2022, seeking: a declaratory judgment that D.C.'s LCM ban violates the Second and Fifth Amendments; a preliminary and permanent injunction preventing the District from enforcing this ban; damages; and other costs. *See* Compl. at 22–24, ECF No. 1. Plaintiffs then moved for a preliminary injunction on August 19, 2022. Pls.' Appl. for Prelim. Inj. ("Pls.' Mot."), ECF No. 8. A few days later, the District moved for an extension of time to respond and also to conduct limited discovery as to the facts underlying Plaintiffs' motion for a preliminary injunction. ECF Nos. 9, 10. The Court granted both motions on

---

[1] Both automatic and semi-automatic guns reload automatically; when fired, the force of a shot ejects the spent bullet casing while simultaneously pulling a fresh bullet from the magazine into the gun's chamber. *See* Tom Givens, *Concealed Carry Class* 113 (2019), Ex. C to Defs.' Opp'n, ECF No. 17-5. But whereas automatic guns fire continuously from a single pull of the trigger, semi-automatic guns fire only one bullet per pull of the trigger. *Id.*; *see, e.g.*, 1933 Ohio Laws 189, 189 ("Automatically . . . means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots.").

**APP. 1022**

September 7, 2022.  Min. Order (Sept. 7, 2022).  On October 31, 2022, Plaintiffs supplemented

their motion for a preliminary injunction with leave of Court.  Min. Order (Oct. 31, 2022).  On

December 1, 2022, the Court permitted three nonprofit organizations, Brady, Gifford Law Center

to Prevent Gun Violence, and March for our Lives to jointly submit an amicus brief in support of

the District.  Min. Order (Dec. 1, 2022); *see* Amicus Brief, ECF No. 18-1.  Plaintiffs' motion for

a preliminary injunction was fully briefed as of January 23, 2022.  The Court heard oral

argument on the motion on April 13, 2023.  The motion is now ripe for decision.

### B.  Legal Background

The Second Amendment to the United States Constitution provides: "A well regulated

Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms shall not be infringed."  U.S. Const. amend. II.  Although short, this text is anything but

simple.  To understand and interpret this constitutional text, the Court looks to caselaw that is

relevant to the specific question at hand.  As it turns out, Plaintiffs are not the first to raise a

Second Amendment challenge to the District's LCM ban: a group of plaintiffs challenged the

same law over a decade ago in *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C.

Cir. 2011), which ultimately upheld the ban.  *Heller II* was decided in the wake of the Supreme

Court's seminal Second Amendment case, *District of Columbia v. Heller ("Heller")*, 554 U.S.

570 (2008).  The Supreme Court's decision in *Bruen* last year, however, soundly rejected how

the Courts of Appeals interpreted and applied *Heller*, and so calls into question the outcome of

*Heller II*.  Thus, although Plaintiffs' challenge to D.C.'s LCM ban is not entirely new, it

demands renewed analysis under the framework *Bruen* provides.

Understanding *Bruen* requires taking a few steps back, to *Heller*.  In *Heller*, the Supreme

Court held that the District's ban on handgun possession in the home violated the Second

**APP. 1023**

Amendment.  554 U.S. at 572.  At the time, the District prohibited handgun registration, made it

a crime to carry an unregistered firearm, and required residents to keep any lawfully owned

firearms unloaded and dissembled.  *Id.* at 574.  In ruling for the plaintiffs and striking down D.C.

law, *Heller* established that the Second Amendment confers "the individual right to possess and

carry weapons in case of confrontation."  *Id.* at 592.  The Supreme Court explained in this

landmark decision that "the inherent right of self-defense has been central to the Second

Amendment right."  *Id.* at 628.

  *Heller* also cautioned that "[l]ike most rights, the right secured by the Second

Amendment is not unlimited."  *Id.* at 626.  Quoting Blackstone and other sources, the Supreme

Court stated that "the right was not a right to keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose."  *Id.*  Thus, the Second Amendment "does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.*

at 625.  And the Court did not "cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

places such as schools and government buildings, or laws imposing conditions and qualifications

on the commercial sale of arms."  *Id.* at 626–27.

  In the wake of *Heller*, the District passed the Firearms Registration Amendment Act of

2008 ("FRA"), which updated D.C.'s gun laws.  Of relevance here, the FRA added a new

provision that bans LCM possession—the same provision at issue in this case.  *See* D.C. Law 17-

372 § 3(n), Firearms Control Amendment Act of 2008,

https://code.dccouncil.gov/us/dc/council/laws/docs/17-372.pdf (adding "new subsection (b)" to

D.C. Code § 7-2506.01).  A group of plaintiffs once again sued the District, this time challenging

the constitutionality of, *inter alia*, the District's ban on assault weapons (in particular, semi-

**APP. 1024**

automatic rifles) and its ban on LCM possession.  *Heller II*, 670 F.3d at 1249.  In assessing the

plaintiffs' challenges to these laws, the D.C. Circuit followed the same framework that its sister

Courts of Appeals employed in Second Amendment challenges post-*Heller*.  Under this "two-

step approach," a court must "ask first whether a particular provision impinges upon a right

protected by the Second Amendment; if it does, then . . . go on to determine whether the

provision passes muster under the appropriate level of constitutional scrutiny."  *Id.* at 1252.

　　As relevant here, *Heller II* applied this two-step approach to the plaintiffs' challenge to

D.C.'s LCM ban.  At the first step, the Circuit examined "whether the prohibited weapons are

'typically possessed by law-abiding citizens for lawful purposes.'"  *Id.* at 1260 (quoting *Heller*,

554 U.S. at 625).  The Circuit found it was "clear enough in the record" that LCMs are in

common use and recognized that "fully 18 percent of all firearms owned by civilians in 1994

were equipped with magazines holding more than ten rounds, and approximately 4.7 million

more such magazines were imported into the United States between 1995 and 2000."  *Id.* at

1261.  Still, the Circuit was not "certain" "based upon the record as it st[ood]" whether LCMs

were in common use *for lawful purposes*—that is, "whether these weapons are commonly used

or are useful specifically for self-defense or hunting" and thus "whether the

prohibitions . . . meaningfully affect the right to keep and bear arms."  *Id.*  Ultimately, the Circuit

expressly declined to resolve the first step on the merits, instead assuming without deciding that

the first step was satisfied.  *Id.*

　　At the second step of the analysis, *Heller II* applied intermediate scrutiny.  It stated that

this was the proper standard because given that "the plaintiffs present hardly any evidence that

semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred

for the purpose of self-defense or sport," it was "reasonably certain the prohibitions do not

**APP. 1025**

impose a substantial burden upon t[he] right" to keep and bear arms under the Second Amendment. *Id.* at 1262. Under the intermediate scrutiny standard, the Circuit found that the LCM ban was "substantially related" to the District's "important interests in protecting police officers and controlling crime." *Id.* The Circuit credited testimony that "high-capacity magazines are dangerous in self-defense situations because 'the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders'" and studies showing that attacks with LCMs "result in more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Id.* at 1263–64. Thus, the Circuit held that D.C.'s LCM ban "do[es] not violate the plaintiffs' constitutional right to keep and bear arms." *Id.* at 1264.

Then came *Bruen*. In *Bruen*, the Supreme Court reaffirmed *Heller* and held that the Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. *Bruen*, however, rejected the Courts of Appeals' two-step framework for assessing Second Amendment challenges and announced that this framework was inconsistent with *Heller*. "*Heller*'s methodology centered on constitutional text and history" and "did not invoke any means-end test." *Id.* at 2128–29. Thus, although "step one of the [Courts of Appeals'] predominant framework [wa]s broadly consistent with *Heller*," step two "[wa]s one step too many." *Id.* at 2126–27. *Bruen* declared that the proper analytical framework for assessing Second Amendment challenges is as follows: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30 (brackets added).

**APP. 1026**

With respect to the second part of *Bruen*'s test, the Supreme Court acknowledged that in some cases the "historical inquiry" will not be "straightforward." *Id.* at 2131. For "cases implicating unprecedented societal concerns or dramatic technological changes," courts should take "a more nuanced approach." *Id.* at 2132. In those situations, courts must conduct a "historical inquiry that . . . will often involve reasoning by analogy." *Id.* "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Id. Bruen* provided two "metrics" for conducting this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original) (citation omitted). Analogical reasoning "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphases in original).

*Bruen* then applied this standard to the facts of the case, which involved a challenge to New York State's public-carry licensing regime that required an applicant to show "proper cause" for self-defense. At the first step, the Supreme Court had "little difficulty" in concluding that the plaintiffs' desire to "carry[] handguns publicly for self-defense" was covered by the text of the Second Amendment. *Id.* at 2134. Thus, the Second Amendment "presumptively guarantee[d]" the plaintiffs the right to do so. *Id.* at 2135. *Bruen* then turned to the next step of

**APP. 1027**

the inquiry, where New York State had the "burden" to "show that [its] proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* This New York could not do. After surveying history from the 12th through the 19th century, with particular emphasis on Founding-era regulations, *Bruen* concluded that "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. Thus, *Bruen* concluded that New York's "proper cause" licensing regime was unconstitutional. *Id.*

### III. LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. "A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell*, 391 F.3d at 261 (D.C. Cir. 2004).[2]

---

[2] At this stage, the Court will consider all of the many exhibits and sources upon which the parties rely. In addition to providing declarations from their own experts, Plaintiffs provided five expert declarations filed in *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.), an ongoing case involving a Second Amendment challenge to a California law that, like the D.C. law at issue here, bans LCM possession. *See* Pls.' Reply at 2 n.1, ECF No. 24.

**APP. 1028**

### IV.  ANALYSIS

The Court begins with standing.  "[T]he D.C. Circuit has declared in unequivocal terms that [a] party seeking a preliminary injunction must show a substantial likelihood of standing." *Angelo v. District of Columbia*, No. 22-cv-1878, 2022 WL 17974434, at *3 (D.D.C. Dec. 28, 2022) (cleaned up) (quoting *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022)). Plaintiffs breezed through the issue of standing in their briefing, and the District did not even bother to address standing at all.  Nonetheless, the Court finds that at least one Plaintiff, Tyler Yzaguirre, has demonstrated a substantial likelihood of standing because he was denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation of D.C.'s LCM ban.  *See generally* 2d Yzaguirre Decl.  That is a concrete injury, traceable to the allegedly unconstitutional law, which a court-issued injunction could redress.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *cf. Heller II*, 670 F.3d at 1249 (in recounting the plaintiffs' injuries, finding that "Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds").  And "because at least one Plaintiff has standing, the Court need not analyze whether other plaintiffs have standing."  *Williams v. Walsh*, No. 21-cv-1150, 2022 WL 17904227, at *11 n.7 (D.D.C. Dec. 23, 2022).

On the merits, *Bruen* governs.  Under *Bruen*, the Court must first determine whether "the Second Amendment's plain text covers an individual's conduct."  142 S. Ct. at 2126.  If so, "the Constitution presumptively protects that conduct," and "the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation."  *Id.* Thus, the first question in this case is whether the Second Amendment covers LCM possession. If yes, the second question is whether the District's LCM ban is relevantly similar to a historical analogue.  The Court holds that the answer to the first question is no.  Although that alone

**APP. 1029**

resolves the case for the District, the Court will nonetheless proceed to analyze the second question and hold that in the alternative, the District's LCM ban is also consistent with this country's historical tradition of firearm regulation.[3]

### A. Whether LCMs Are Covered by the Second Amendment

Under *Bruen*'s first step, the Court must determine whether the scope of the Second Amendment covers LCM possession. Notably, this first step is consistent with the first step of Courts of Appeals' decisions pre-*Bruen*. In other words, *Bruen* did not disturb the analysis Courts of Appeals conducted under the first step of their framework. *See* 142 S. Ct. at 2127 ("Step one of the [Courts of Appeals'] predominant framework is broadly consistent with *Heller*[.]"). The Court will therefore still discuss these now-abrogated cases in this section and accord their step-1 analysis persuasive weight to the extent they are instructive. At the first step in this case, the parties raise two primary disputes. First, they disagree whether LCMs are "arms" within the meaning of the Second Amendment. Second, they disagree whether LCMs are typically possessed by law-abiding citizens for lawful purposes. The Court will examine each in turn.

#### 1. Whether LCMs Are "Arms" Under the Second Amendment

The parties dispute whether LCMs are "arms" under the Second Amendment. Recall that the Second Amendment protects an individual right to "keep and bear *Arms*" for self-defense. U.S. Const. amend. II (emphasis added). *Heller* interpreted this term as follows:

> The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important

---

[3] Because the Court concludes that the District's LCM ban is constitutional and that Plaintiffs have "little likelihood of succeeding on the merits," the Court "[h]as no need to address the other preliminary injunction factors." *Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1253 (D.C. Cir. 2006) (citations omitted).

**APP. 1030**

> 1771 legal dictionary defined "arms" as "any thing that a man wears for his
> defence, or takes into his hands, or useth in wrath to cast at or strike another."  1
> A New and Complete Law Dictionary; *see also* N. Webster, American Dictionary
> of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

*Heller*, 554 U.S. at 581.

At least three Courts of Appeals have concluded that LCMs are "arms" within the

meaning of the Second Amendment.  *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y*

*Gen. New Jersey ("ANJRPC")*, 910 F.3d 106, 116 (3d Cir. 2018); *Kolbe v. Hogan*, 813 F.3d

160, 175 (4th Cir. 2016); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020).[4]  In

*ANJRPC*, the plaintiffs challenged the constitutionality of a New Jersey law that, as with the

D.C. law in this case, made it illegal to possess a magazine capable of holding more than ten

rounds of ammunition.  910 F.3d at 110.  The Third Circuit specifically addressed "the question

[of] whether a magazine is an arm under the Second Amendment" and concluded "[t]he answer

is yes." *Id.* at 116.  It reasoned that "[b]ecause magazines feed ammunition into certain guns,

and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within

the meaning of the Second Amendment." *Id.*

Likewise, a panel of the Fourth Circuit in *Kolbe* reasoned that because the Second

Amendment plainly covers firearms, "there must also be an ancillary right to possess the

magazines necessary to render those firearms operable." 813 F.3d at 175.  At issue in that case

was a Maryland law that banned assault weapons like the AR-15 as well as detachable LCMs.

*Id.* at 169–70.  The panel in *Kolbe* found "strong historical support" for the notion that

magazines constitute "arms" because "magazines and the rounds they contain are used to strike

---

[4] At least two Courts of Appeals have noted this question but declined to address it.  *See*
*Worman v. Healey*, 922 F.3d 26, 33 n.3 (1st Cir. 2019); *New York State Rifle & Pistol Ass'n, Inc.*
*v. Cuomo*, 804 F.3d 242, 264 n.127 (2d Cir. 2015).

**APP. 1031**

at another and inflict damages" and early American provisions protecting gun rights "suggest[] 'arms' should be read to protect all those items necessary to use the weapons effectively." *Id.* at 175 (citation omitted).

Finally, in *Duncan*, a panel of the Ninth Circuit considered the constitutionality of California's ban on LCM possession and concluded at the outset that "[f]irearm magazines are 'arms' under the Second Amendment." 970 F.3d at 1146. The Ninth Circuit reasoned that "[w]ithout a magazine, many weapons would be useless" and therefore "there must be some corollary . . . right to possess the magazines necessary to render those firearms operable." *Id.* (citation omitted).

*ANJRPC*, *Kolbe*, and *Duncan* all recognized that the Second Amendment covers not just possession of a firearm, but the sorts of things that make a firearm operable. *See Bruen*, 142 S. Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that *facilitate* armed self-defense." (emphasis added)). The same logic prevails in other Second Amendment contexts as well. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (finding that city's ban on firing ranges implicated the Second Amendment because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective").[5]

---

[5] Although *Kolbe* and *Duncan* were both subsequently vacated by en banc decisions in those circuits, the respective en banc decisions did not cast doubt on the panels' analysis of this specific question. *See Kolbe v. Hogan*, 849 F.3d 114, 137 n.12 (4th Cir. 2017) (en banc) (explaining that because it found LCMs "most useful in military service" and "not constitutionally protected," it would not reach the question whether LCMs were "arms" under the Second Amendment); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021) (en banc)

**APP. 1032**

The District, however, argues that LCMs are not "arms" but rather "accoutrements" (*i.e.*, accessories).  Defs.' Opp'n to Pls.' Appl. for Prelim. Inj. ("Defs.' Opp'n") at 9–11, ECF No. 17. According to the District, the term "arms" at the Founding did not encompass accoutrements such as ammunition or cartridges that stored such ammunition.  *Id.* at 10.  And the District argues that even if the Second Amendment covers accessories which are integral to the operation of a firearm, LCMs are not one of them because Plaintiffs could still use their existing firearms with magazines that carry ten bullets or less, and in fact, currently carry these smaller magazines on their firearms.  *Id.* at 11–12; *see also Ocean State Tactical*, 2022 WL 17721175, at *11 (finding similar arguments persuasive in holding that LCMs are not "arms" under the Second Amendment).

The Court is unpersuaded by the District's exacting standard.  Its position contradicts the conclusions that *ANJRPC*, *Kolbe*, and *Duncan* reached on this question.  In *ANJRPC*, for example, the Third Circuit found that LCMs are "arms" under the Second Amendment because "magazines *feed* ammunition into certain guns, and ammunition is necessary for such a gun to function as intended."  910 F.3d at 116 (emphasis added).  The District's logic, by contrast, would allow it to ban *all* magazines (not just LCMs)—a result even the District does not endorse here—because a firearm technically does not require *any* magazine to operate; one could simply fire the single bullet in the firearm's chamber.  *See Ocean State Tactical*, 2022 WL 17721175, at *12 (noting that "a firearm can fire bullets without a detachable magazine").  The Court will therefore follow the persuasive reasoning of *ANJRPC*, *Kolbe*, and *Duncan* in concluding that LCMs are "arms" within the meaning of the Second Amendment.

_____

("assuming, without deciding, that California's law implicates the Second Amendment" and not discussing the question of whether LCMs are "arms" under the Second Amendment).

**APP. 1033**

2. Whether LCMs Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes

Even though LCMs are "arms" within the meaning of the Second Amendment, they must still satisfy another inquiry to fall within the amendment's scope. The next question under step one of *Bruen* is whether LCMs are "typically possessed by law-abiding citizens for lawful purposes." *Heller II*, 670 F.3d at 1260 (quoting *Heller*, 554 U.S. at 625). In *Heller II*, the D.C. Circuit noted in passing that the record in that case showed that "magazines holding more than ten rounds are indeed in 'common use.'" *Id.* at 1261. As evidence, it observed that "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Id.*; *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo ("NYSRPA")*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*.").

Plaintiffs seize on this observation as if it alone decides the question of whether LCMs are covered by the Second Amendment. It does not. *Heller II*'s comment was dicta because the Circuit ultimately assumed, without deciding, that LCMs were covered by the Second Amendment. 670 F.3d at 1261. More importantly, *Heller II* recognized that whether LCMs are "in common use" is merely the beginning of the analysis. The full inquiry is "whether the prohibited weapons are 'typically possessed . . . *for lawful purposes*.'" *Heller II*, 670 F.3d at 1260 (emphasis added) (quoting *Heller*, 554 U.S. at 625). On *that* critical question, *Heller II* expressed uncertainty: "based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically *for self-defense*[.]" *Id.* at 1261 (emphasis added). That is the question this Court must now resolve.

**APP. 1034**

The parties unsurprisingly stake divergent positions.  Plaintiffs maintain that LCMs "are overwhelmingly used for lawful purposes" such as self-defense.  Pls.' Mem. of P. & A. in Reply to Opp'n to Appl. for Prelim. Inj. ("Pls.' Reply") at 12, ECF No. 24.[6]  The District disagrees; it argues that LCMs are not in common use for self-defense for two reasons.  First, it claims that LCMs' military characteristics make them a poor fit for self-defense and take them outside the scope of the Second Amendment.  Second, the District claims that law-abiding individuals do not use LCMs for self-defense because incidents where a civilian actually expends more than ten bullets in self-defense are "vanishingly rare."  Defs.' Opp'n at 18.  The Court agrees with the District on both arguments.

### a.  Whether LCMs are Most Useful in Military Service

*Heller* specifically contemplated that "weapons that are most useful in military service" fall outside of Second Amendment protection.  554 U.S. at 627; *see NYSRPA*, 804 F.3d at 256 ("*Heller* expressly highlighted 'weapons that are most useful in military service,' such as the fully automatic M–16 rifle, as weapons that could be banned without implicating the Second Amendment."); *Duncan*, 19 F.4th at 1102 (en banc) (noting in dicta "significant merit" to the plaintiffs' argument that because "large-capacity magazines have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting," they are not covered by Second Amendment).  Plaintiffs counter that "the Supreme Court's precedents do not withhold

---

[6] Plaintiffs also argue that LCMs are commonly used for lawful purposes such as training and competition.  Pls.' Reply at 11–12.  But given that "individual self-defense is 'the *central component*' of the Second Amendment right," it is unclear whether a weapon that is *not* typically possessed for self-defense may nonetheless be covered by the Second Amendment on the ground that it is typically possessed for sporting.  *Bruen*, 142 S. Ct. at 2118 (emphasis in original) (citation omitted).  The Court has no occasion to address that novel question here, because the Complaint and the motion for a preliminary injunction focus on Plaintiffs' right of self-defense. *See* Compl. ¶¶ 27–36; Pls.' Mot. at 7–14.  Indeed, Plaintiffs' counsel agreed at oral argument that *Heller* and its progeny focus on self-defense.

**APP. 1035**

protection from arms merely because they are useful in militia service."  Pls.' Reply at 15.  That may be true, but it is beside the point.  *Heller* established that weapons that are "*most* useful in military service" are excluded from Second Amendment protection.  554 U.S. at 627 (emphasis added).  "Most" is a superlative.  A weapon may have *some* useful purposes in both civilian and military contexts, but if it is *most* useful in military service, it is not protected by the Second Amendment.

Here, in passing the LCM ban, D.C. lawmakers took the position that LCMs were not suitable for civilian self-defense.  The D.C. Council's Committee on Public Safety and the Judiciary, which referred this legislation for approval, favorably referenced D.C. Chief of Police's observation that "magazines holding[] over 10 rounds are more about firepower than self-defense."  Council of the District of Columbia Committee on Public Safety and the Judiciary, Committee Report at 9, https://perma.cc/YN6H-2U9M.  That view is shared by judges, too.  The Fourth Circuit's en banc decision in *Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017), held that LCMs are unprotected by the Second Amendment because they are most useful in military service.  In *Kolbe*, the plaintiffs challenged the constitutionality of a Maryland law that banned assault weapons like the AR-15 as well as detachable LCMs.  *Id.* at 120.  After describing the many "difficult questions" that *Heller* raised concerning what the Second Amendment protects, the court remarked that *Heller* offers "a dispositive and relatively easy inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment?"  *Id.* at 136.  The "line that *Heller* drew," the court stated, was "between weapons that are most useful in military service and those that are not."  *Id.* at 137.  The court then found that "[t]he answer to that dispositive and relatively easy inquiry is plainly in the affirmative."  *Id.*

**APP. 1036**

at 136.  It held that "[w]hatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines prohibited . . . are unquestionably most useful in military service."  *Id.* at 137.  Turning to LCMs in particular, the court found that they "are particularly designed and most suitable for military and law enforcement applications" because of their "ability to reload rapidly," "hit multiple human targets very rapidly," and "deliver extraordinary firepower."  *Id.* (citations omitted).  *Kolbe* did not limit its analysis of LCMs as they are used in assault weapons—to the contrary, it found that the "uniquely military feature[]" of LCMs' rapid-fire capacity also applied to "other firearms to which they may be attached"—for example, the handguns that Plaintiffs in this case carry.  *Id.*; *cf. Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("We know . . . that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines.").

Kolbe is no outlier.  The en banc Ninth Circuit cited *Kolbe* approvingly for the proposition that "[large-capacity] magazines likely are 'most useful in military service,' at least in an ordinary understanding of that phrase."  *Duncan*, 19 F.4th at 1102.  The Ninth Circuit found that "[e]vidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier: 'the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries.'"  *Id.* at 1105.  *Duncan* also cited two reports by the Bureau of Alcohol, Tobacco, Firearms and Explosives (a federal agency) which concluded that "large capacity magazines are indicative of military firearms," in part because they "provide[ ] the soldier with a fairly large ammunition supply" and that "detachable large capacity magazine[s] [were] originally designed and produced for . . . military assault rifles."  *Id.* at 1105–06.  *See also Or.*

**APP. 1037**

*Firearms Fed'n, Inc. v. Brown*, No. 22-cv-01815, 2022 WL 17454829, at \*10–11 (D. Or. Dec. 6, 2022) (favorably citing *Kolbe* and *Duncan* en banc decisions and finding that evidentiary record showed that LCMs "are often used in law enforcement and military situations").

If *Kolbe* and other courts are correct that LCMs are most useful in military service, one would expect to find support for this in history.  Exactly so.  The District's historical evidence in this case shows that LCMs' lethality was popular in military settings, and indeed many of them were designed specifically for military (and law enforcement) use.  The District's expert, Brian DeLay, who has a Ph.D. in history and has extensively studied the history of firearms and arms trades, found that in the United States, "high-capacity firearms went almost exclusively to military buyers through the early 1870s and . . . very few were in the hands of private persons." Delay Decl. ¶ 23, ECF No. 17-9.  Mr. DeLay further concluded that "in the 1860s and 1870s . . . [d]etachable magazines were still decades away from practical success, and would be produced for militaries long before they made their way into civilian markets in meaningful quantities." *Id.* ¶ 25.  This trend continued into the 20th century.  *See, e.g.*, Pauly Decl. ¶ 77, ECF No. 17-8 (expert with a Ph.D. in history explaining that the first Lugers, which were semiautomatic pistols with a pistol-grip magazine, "w[ere] adopted by the German army in 1908"); Paul M. Barrett, *Glock: The Rise of America's Gun* 6–11 (2012) (explaining that in 1980, Glock, the founder of the popular pistol many Americans own, designed a pistol for the Austrian military that could hold more than eight rounds); Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 270–75 (2003) (explaining that Switzerland firm SIG developed the SIG-Sauer P226 in 1983 which could accept a 15-round magazine, and was used by the U.S. Navy SEALs as well as police and military organizations in Europe, and that the 1989 SIG-Sauer P228 and P229, which contain 13 and 12 round-magazines, "earned universal reputations as

**APP. 1038**

highly reliable and accurate weapons for military and police use"); Roth Decl. ¶ 48, ECF No. 17-

11 (observing that semi-automatic weapons with LCMs such as the M-16 rile "were designed for

offensive military applications rather than individual self-defense" and "emerged from

technologies developed for military use during the Cold War").

Even Plaintiffs' experts seem to believe that LCMs are best suited for military and law

enforcement use. *See, e.g.*, Murphy Decl. ¶ 9, ECF No. 24-6 (acknowledging that "magazines

holding more than 10 rounds are most useful in the military or in a law enforcement context");

Harnish Decl. ¶ 7, ECF No. 24-7 ("The Beretta M9 [which has a 15-round magazine] was

adopted by the United States Armed Forces as the official service pistol in 1985."); *id.* ¶ 9

("Pistols with the capacity to hold ten rounds, or more than ten rounds . . . [are] selected by law

enforcement and military agencies in the United States for the practicality and performance they

provide to the organization, but more importantly the capability they provide to the end user.").

Thus, the Court concludes that LCMs are not covered by the Second Amendment because they

are most useful in military service.

### b. Whether LCMs Are in Fact Used for Self-Defense

The District also argues that LCMs are not covered by the Second Amendment because

they are not "in fact used for th[e] purpose" of self-defense. Defs.' Opp'n at 18. As support, it

relies on a study of the National Rifle Association's ("NRA") "Armed Citizen Stories" website

which concluded that law-abiding citizens on average fire only *two* bullets in self-defense

situations and virtually never more than ten. *Id.* This study, which assessed data from the years

1997 – 2001, was actually conducted by one of Plaintiffs' experts, Claude Werner. Mr. Werner

is a retired U.S. Army officer who has experience in competitive shooting, self-defense, and

firearms instruction. Werner Decl. ¶¶ 2–5, 7, ECF No. 24-8. In his study, titled "Analysis of

**APP. 1039**

Five Years of Armed Encounters (With Data Tables)," Mr. Werner explained that he reviewed a

total of 482 reports in that time period from the NRA's database.  *See* https://perma.cc/QTL7-

U8EM.  Upon collecting and organizing the data from these reports, Mr. Werner concluded that

the average number of shots a civilian fired in a self-defense incident in this time period was 2.2.

*Id.*

Courts and scholars alike have relied on the findings of this study, specifically the 2.2

bullets per incident figure.  *See, e.g.*, Robert J. Spitzer, *Gun Accessories and the Second*

*Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020); *Kolbe*, 849 F.3d at 127 (en banc)

("[T]he State's evidence substantiates 'that it is rare for a person, when using a firearm in self-

defense, to fire more than ten rounds.'  Studies of 'armed citizen' stories collected by the

National Rifle Association, covering 1997-2001 and 2011-2013, found that the average number

of shots fired in self-defense was 2.2 and 2.1, respectively." (citations omitted)); *Duncan*, 19

F.4th at 1105 (en banc) ("[T]he record here, as in other cases, does not disclose whether the

added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid

succession—has *ever* been realized in self-defense in the home." (emphasis in original)); *cf.*

*Heller II*, 670 F.3d at 1262 ("[T]he plaintiffs present hardly any evidence that . . . magazines

holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or

sport.").

Plaintiffs raise primarily two arguments in response.  First, they try to back away from

the findings of the 1997 – 2001 study that their own expert conducted.  Mr. Werner claims that

his 1997 – 2001 timeframe is "dated."  Werner Decl. ¶ 7, ECF No. 24-8.  To the contrary, the 2.2

figure has remained exceptionally stable over time.  NERA Economic Consulting ("NERA"), a

reputable economic consulting firm, reviewed 736 reports from the same NRA Armed Citizen

**APP. 1040**

database in the *2011 – 2017 period* and concluded that the average number of shots a civilian

fired in a self-defense incident in this time period was 2.1.  *See* Amicus Brief at 19 & n.70; Decl.

of Lucy P. Allen ("Allen Decl.") ¶ 8, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*,

No. 3:18-cv-10507, 2018 WL 4688345 (D.N.J. Sept. 28, 2018), ECF No. 31-2.  The NERA

study tracked essentially the same metrics from the NRA Armed Citizen database over a more

recent time period and arrived at a virtually identical data point.[7]  Tellingly, one of Plaintiffs'

other experts concedes that "the average amount of rounds fired in self-defense is usually less

than 10, generally only two or three."  Murphy Decl. ¶ 8.[8]

      Mr. Werner next argues that his study is flawed because it is heavily skewed toward

"positive outcomes"—that is, successful self-defense incidents that are reported.  Werner Decl.

¶ 8; Ellifritz Decl. ¶¶ 14–16, ECF No. 24-7 (same).  Selection bias is no doubt a legitimate

concern in any statistical inquiry.  The problem for Plaintiffs is that Mr. Werner does not provide

any studies, arguments, or even logic that remotely suggests that were the study able to properly

capture negative outcomes, the average number of bullets fired in self-defense would somehow

*skyrocket* to 11 or more bullets.  The best Mr. Werner can say is that "[w]e don't know how may

[bullets] have been fired in non-positive outcomes."  Werner Decl. ¶ 8.  But if no one knows,

how does this support the idea that LCMs are commonly used for self-defense?

---

[7] In addition to studying the NRA Armed Citizen database from 2011 – 2017, NERA
performed another study of self-defense (in the home only) in the 2011 – 2017 timeframe based
on "comprehensive search of published news stories" online and concluded that the average
number of shots fired per incident was 2.34—again, a substantially similar figure.  *See* Allen
Decl. ¶¶ 12–17 (explaining methodology and findings).

[8] The Complaint attempts to describe six self-defense incidents in the country that
involved firing more than ten rounds.  But amicus correctly points out that *five* out of these
incidents were "officer involved" shootings, Compl. ¶¶ 28–33, and the sole example of civilian
self-defense involved a "[f]amed Los Angeles watch shop owner," Compl. ¶ 30—hardly
representative of ordinary civilian self-defense incidents.

**APP. 1041**

Finally, Mr. Werner points out that his study had "very little data as to the ammunition capacity of the citizen employed firearm." *Id.* ¶ 9. He reasons that although "a substantial number of citizen defenders would have used plus 10 magazines" in these incidents, "i[f] we were doing the study today using current data, the percentage of citizens using plus 10 magazines would be even higher." *Id.* This argument actually undermines Plaintiffs' position. If civilians only fired a few bullets on average *despite* using an LCM-equipped firearm, it was not for a lack of ammunition. The data shows that they simply did not need the extra ammunition in the LCM for self-defense.

Perhaps realizing that their own expert's study has backfired, Plaintiffs try a different tack: they claim that a law-abiding citizen nonetheless "uses" a LCM for self-defense even when he does not necessarily expend double-digit bullets in a self-defense incident. *See* Pls.' Reply at 13 ("If a citizen fires two rounds out of a 15 round magazine to save his life, he nevertheless uses the 15 round magazine for self-defense."). That is a creative argument, but the Court is unconvinced. The dictionary defines "use" as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing *for the purpose for which it is adapted*, as distinguished from a possession and employment that is merely temporary or occasional." *Use*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *cf. Voisine v. United States*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently define the noun 'use' to mean the 'act of employing' something."). Here, LCMs are best suited for a military "purpose" and are poorly "adapted" for self-defense. As the Ninth Circuit en banc put it, civilians do not "use" LCMs for self-defense, because "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has [virtually n]ever been realized in self-defense." *Duncan*, 19 F.4th at 1105 (en banc); *see* Allen Decl. ¶ 10 ("Out of 736 incidents [in

23

**APP. 1042**

the Armed Citizen database between 2011 – 2017], there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets."); *Or. Firearms Fed'n*, 2022 WL 17454829, at *11 (finding record showed that "large-capacity magazines are rarely used by civilians for self-defense").

Plaintiffs protest that the District's reasoning would allow it to "justify a ban on all firearms able to fire more than two or three shots" because "on average, only 2.2 shots are fired by defenders."  Pls.' Reply at 13.  But no such ban exists anywhere in the country, and the Court doubts that the District will see this as an invitation to go down Plaintiffs' slippery slope.  Recall that the studies show that two bullets is merely the *average* amount of bullets fired in self-defense situations; thus, a law that restricts magazine capacity to say, five or six bullets, might meaningfully hinder the common and lawful usage of magazines for self-defense.  In any event, this is not a case that requires the Court to delineate the constitutional limits of a hypothetical restriction.  It suffices to say that the District's LCM ban, which limits magazine capacity to ten bullets, enables law-abiding people in D.C. to possess magazines with ample ammunition to defend themselves.[9]

In conclusion, the Court finds that the Second Amendment does not cover LCMs because they are not typically possessed for self-defense.  LCMs fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense.  Given that the District prevails at step one of *Bruen*'s framework, the

---

[9] The District's magazine capacity limit (10) also prevents civilians from maintaining greater firepower than law enforcement.  Law enforcement in the District routinely carry 15- and 17-round magazines.  Parsons Decl. ¶¶ 14–16, ECF No. 17-7.  The District's LCM ban keeps the advantage police have over armed civilians who may be suspects or engaged in criminal activity. *Id.* ¶¶ 17–18.

**APP. 1043**

Court finds that D.C.'s LCM ban is constitutional.  Nonetheless, to round out the analysis, the Court will consider *Bruen*'s second step in the alternative.

**B. Whether the Ban Is Consistent with this Nation's Tradition of Firearm Regulation**

Even were LCMs covered by the scope of the Second Amendment, the Court finds that D.C.'s ban is constitutional for the independent reason that the District has shown that it is consistent with this country's historical tradition of firearm regulation.  "Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 142 S. Ct. at 2132.  *Bruen* provides two "metrics" for conducting this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.  "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

Although the burden is on the government to identify a historical analogue, *Bruen* stressed that this is not an impossible standard.  *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.").  *Bruen* acknowledged that in today's world, centuries after the ratification of the Second Amendment, it is not unusual to see "modern regulations that were unimaginable at the founding." *Id.* at 2132.  Thus, "cases implicating unprecedented societal concerns or dramatic technological changes" require "nuanced" consideration. *Id.* at 2131–32.  For that reason, analogical reasoning is not "a regulatory straightjacket": it "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at

**APP. 1044**

2133 (emphases in original).  "So even if a modern-day regulation is not a dead ringer for

historical precursors, it still may be analogous enough to pass constitutional muster."  *Id.*  After

all, "the Constitution, can, and must, apply to circumstances beyond those the Founders

specifically anticipated."  *Id.* at 2132; *see id.* (quoting *McCulloch v. Maryland*, 4 Wheat. 316,

415 (1819), for the principle that the Second Amendment was "intended . . . to be adapted to the

various crises of human affairs").

### 1.  Whether a Nuanced Approach to History Applies Here

Although D.C.'s LCM ban has yet to be tested under step two of *Bruen*'s framework, the

Court is not the first in the country to apply *Bruen* to this kind of regulation.  In *Oregon

Firearms Federation*, a federal district court employed *Bruen*'s test to a substantially similar

challenge to Oregon's LCM ban.  2022 WL 17454829 (D. Or. Dec. 6, 2022).  That case analyzed

the constitutionality of Measure 114, a ballot initiative passed by Oregon voters in November

2022 which outlawed the use and sales of LCMs.  *Id.* at *2.  The ballot measure provided limited

exceptions, such as allowing existing owners of LCMs to continue to use them on their property

or for recreation, and giving firearms manufacturers a 180-day grace period to fulfill existing

contracts to out-of-state buyers.  *Id.* at *4.  The plaintiffs, gun owners and users of LCMs,

brought suit and sought a temporary restraining order "aimed primarily" at the LCM ban.  *Id.* at

*5.  The court first held that under *Bruen*, LCMs are not covered by the Second Amendment.  *Id.*

at *8–11.  Then, "[a]ssuming for the sake of argument that the Second Amendment's plain text

covers large-capacity magazines," the court "next consider[ed] whether Measure 114 is

consistent with the Nation's historical tradition of firearm regulation."  *Id.* at *12.

*Oregon Firearms Federation* answered this second question in the affirmative.  The court

observed that LCMs are "a dramatic change in firearms technology" because although some

**APP. 1045**

multi-shot firearms existed before the Founding era, they were "experimental, designed for military use, rare, defective, or some combination of these features," and the evidence showed that "semi-automatic weapons did not become 'feasible and available' until the beginning of the twentieth century." *Id.* at *12 & n.17.  The court also found that "large-capacity magazines implicate unprecedented societal concerns" because of their frequent use in recent mass shootings. *Id.* at *13.  Turning to historical analogues, *Oregon Firearms Federation* observed that "in the 1800s, states often regulated certain types of weapon, such as Bowie knives, blunt weapons, slungshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense." *Id.*  The court also found a historical tradition of banning private military organizations as evidence that "demonstrates the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Id.* at *14.  The court found that Oregon's LCM ban was "comparably justified" with these historical regulations because just as the historical regulations were rooted in public safety concerns, the LCM ban "consider[ed] the public safety concerns of today" in "the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines." *Id.*  And Oregon's ban placed a "comparable burden" as the historical regulations on the right to self-defense: the burden was "minimal," the court explained, because "in over seven hundred self-defense incidents, less than one half of a percent involved more than ten shots." *Id.*

In this case, the District's evidence also shows that LCMs are the object of "dramatic technological changes" and implicate "unprecedented societal concerns," and thus its ban requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132.  First, with respect to the technological pedigree of LCMs, Mr. DeLay explained that while "firearms with ammunition

**APP. 1046**

capacity in excess of 10 rounds date back to the 1500s," "such weapons amounted to little more than experimental curiosities" and that "[m]ost never advanced beyond proof of concept." DeLay Decl. ¶ 7.  The airgun, "the only high-capacity weapons from the [founding] period that enjoyed even experimental military use" was "so rare that owners could charge people to see them." *Id.* ¶¶ 14–16; *see* "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792 (Ex. B to DeLay Decl.).  Based on his twelve years of studying the arms trade in the Founding era, Mr. DeLay found zero "evidence in primary sources that large-capacity firearms were anything other than exotic curios in this era." *Id.* ¶ 19; *cf.* Sweeney Decl. ¶¶ 15, 31, ECF No. 17-15 (expert with Ph.D. in history observing that review of 1,170 newspaper ads and reports in the 18th century shows that "repeating firearms in eighteenth-century America" "were extraordinarily rare"); *Friedman*, 784 F.3d at 410 (observing that assault weapons and LCMs, which city ordinance banned, "were not common in 1791" and that "[s]emi-automatic guns and large-capacity magazines are more recent developments").  Against this backdrop, statements such as "magazines of more than ten rounds are older than the United States" are misleading and grossly exaggerate the state of affairs at the Founding.  *See* David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) (hereinafter "Kopel"); Pls.' Mot. at 14–15 (relying on Mr. Kopel's "heavy lifting" research).  Even some of Plaintiffs' experts concede this point.  *See, e.g.*, Helsley Decl. ¶ 8, ECF No. 24-2 (acknowledging that multi-shot weapons like the Giradoni air rifle were "complex, likely unreliable, and fragile" and only "a window into the future"); Hlebinsky Decl. ¶ 23, ECF No. 24-3 (acknowledging it is "typical" to find "one-off examples" of multi-shot weapons at the Founding era).

High-capacity firearms became more common in military settings in the second half of the 19th century, but they were still rare.  DeLay Decl. ¶ 22.  The "Henry" rifle in 1860 could

**APP. 1047**

fire sixteen rounds without reloading, and the "Winchester Model 1866" also became an iconic high-capacity rifle. *Id.* But these "high-capacity firearms went almost exclusively to military buyers through the early 1870s," and "constituted less than 0.2% of all firearms in the United States in the late 1860s and early 1870s." *Id.* ¶¶ 23–24 (describing production numbers); *see also* Pauly Decl. ¶ 62 ("Henry rifles were developed by the start of the American Civil War but were quite expensive—exorbitantly priced for regular rank-and-file troops—and did not see much combat. By the end of the hostilities, the War Department had only officially bought 1,731 of the guns."). Moreover, these rifles did not resemble the semiautomatic weapons of today: they had fixed magazines, and "[u]sers of these 'lever-action' weapons were still required to pull a lever between shots, slowing the firing rate to about one shot every three seconds." Defs.' Opp'n at 23 (citing Pauly Decl. ¶ 61); *see* Rivas Dec. ¶¶ 29–30, ECF No. 17-12 (same, from expert with Ph.D. in history). Only near the "turn of the [20th] century" were "[t]he semiautomatic firearm and its detachable box magazine . . . invented." Kopel at 857; *see* Rivas Decl. ¶ 29 ("The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century.").[10] It would take yet even more time for these inventions to "improve[] and become more affordable." Pls.' Reply at 11 (citing Kopel at 857–64, which describes firearms in the 20th century). "[T]he first handheld firearm that both (a) had a detachable

---

[10] Mr. Kopel nevertheless claims that weapons such as the multi-shot flintlock rifle, "Pepperbox" pistols, Colt multi-shot revolver, and 1873 Winchester rifle were common in the 1800s. Kopel at 853–57. In view of the record, the Court joins *Oregon Firearms Federation* in concluding that "those firearms were experimental, designed for military use, rare, defective, or some combination of these features." 2022 WL 17454829 at 12 & n.17; *see also* Amicus Brief at 12–15 (analyzing firearms Plaintiffs identified in this era and concluding that "no firearm capable of firing more than ten rounds without reloading achieved widespread commercial success prior to ratification of the Fourteenth Amendment" (emphasis omitted)).

**APP. 1048**

magazine holding more than ten rounds and (b) was commercially available to civilians in the United States was the Thompson submachine gun, introduced to the market in the 1920s." DeLay Decl. ¶ 25; *see also* Kopel at 851 ("Handgun magazines of more than ten rounds would become popular in the 1930s.").  As this history shows, LCMs reflect "dramatic technological changes" in comparison to the weapons of the Founding era.  *Bruen*, 142 S. Ct. at 2132.

Second, the record also shows that LCMs implicate "unprecedented societal concerns." *Id.*  The District claims that "[t]he proliferation of modern semiautomatic arms, coupled with the availability of LCMs, directly correlates with the contemporary problem of mass shootings in America today."  Defs.' Opp'n at 26.  The District's expert, Randolph Roth, has a Ph.D. in history and has spent decades studying homicide and mass violence data.  Roth Decl. ¶¶ 9–10. He found that "the development of semiautomatic rifles and handguns dramatically increased the number killed and wounded in mass shootings from 1966 to the present."  *Id.* ¶ 53.[11]  Mr. Roth claims that "with extended magazines, semiautomatic rifles [in this period] cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms."  *Id.* ¶ 55.  He concluded that "[i]n combination, semiautomatic firearms and extended magazines are extraordinarily lethal."  *Id.*; *see also* Amicus Brief at 17 ("[A]s of July 2020, LCMs were used in the ten deadliest mass shootings of the prior decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62 percent higher

---

[11] Mr. Roth defined "mass shooting" as "a multiple homicide incident in which four or more victims are murdered with firearms not including the offender(s) within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  *Id.* ¶ 53 n.103. This is similar, although not identical, to the FBI's definition of "mass murder."  Cramer Decl. ¶ 3 n.1, ECF No. 24-14.

**APP. 1049**

death toll compared to those that did not involve an LCM."); *Or. Firearms Fed'n*, 2022 WL
17454829, at *13 ("Every mass shooting since 2004 resulting in fourteen or more deaths
involved large-capacity magazines with ten or more bullets."); *Worman*, 922 F.3d at 39
(observing that semiautomatic rifles "equipped with LCMs have been the weapons of choice in
many of the deadliest mass shootings in recent history"); *Duncan*, 19 F.4th at 1096 (en banc)
("About three-quarters of mass shooters possess their weapons and large-capacity magazines
lawfully.  In the past half-century, large-capacity magazines have been used in about three-
quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or
more deaths, and more than twice as many people have been killed or injured in mass shootings
that involved a large-capacity magazine as compared with mass shootings that involved a
smaller-capacity magazine."); *NYSRPA*, 804 F.3d at 263–64 ("Large-capacity magazines are
disproportionately used in mass shootings, like the one in Newtown, in which the shooter used
multiple large-capacity magazines to fire 154 rounds in less than five minutes.  Like assault
weapons, large-capacity magazines result in 'more shots fired, persons wounded, and wounds
per victim than do other gun attacks'").[12]

Small wonder that in recent years, numerous state legislatures—at least nine so far—have
banned LCMs.  *See ANJRPC*, 910 F.3d at 110 & n.1 (citing regulations and observing that they
responded to the fact that "[a]ctive shooting and mass shooting incidents have dramatically

---

[12] Plaintiffs' expert, Clayton Cramer, claims that "individual mass murder" is not
"particularly modern" and gives examples of mass murders committed by axes or by drowning in
prior centuries.  Cramer Decl. ¶¶ 19, 23.  But this is consistent with the District's claim that
individual mass *shootings* and the lethality associated with LCMs are a uniquely contemporary
problem.  Furthermore, Plaintiffs' expert Gary Kleck concedes that "mass shooters who used
LCMs inflicted more casualties than those who did not."  Kleck Decl. ¶ 17, ECF No. 24-15.
Although Mr. Kleck challenges any inference of causality, the Court need not resolve that debate
here.  That this is a hotly contested issue only reinforces the fact that LCMs are the subject of
unprecedented societal concerns today.

**APP. 1050**

increased during recent years," and that "[i]n addition to becoming more frequent, these shootings have also become more lethal"); *see also, e.g.*, *Kolbe*, 849 F.3d at 120 (en banc) ("In response to Newtown and other mass shootings, the duly elected members of the General Assembly of Maryland saw fit to enact the State's Firearm Safety Act of 2013 (the "FSA"), which bans the AR-15 and other military-style rifles and shotguns (referred to as "assault weapons") and detachable large-capacity magazines."); *Duncan*, 19 F.4th at 1095 (en banc) ("In response to mass shootings throughout the nation and in California, the California legislature enacted Senate Bill 1446, and California voters adopted Proposition 63.").

Because LCMs implicate "unprecedented societal concerns" and are the object of "dramatic technological changes," the Court's analysis of historical analogues to modern LCM bans requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132. In what follows, the Court examines one such historical analogue that the District has proffered: numerous states' high-capacity weapon bans during the Prohibition Era.

### 2. Whether Prohibition-Era Bans Are Historically Analogous

"Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s . . . these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time." Spitzer Decl. ¶ 22, ECF No. 17-10 (expert with Ph.D. in government); Tbl. 1 to Spitzer Decl. (listing states). These regulations largely banned the mere possession of a gun that was capable of holding a certain number of rounds without reloading. Plaintiffs attempt to dismiss these regulations as "restrictions on machine guns," and claim that what makes a machine gun worthy of regulation is "its ability to fire automatically, not [its ability to] accept detachable magazines of more than 10 rounds." Pls.' Reply at 25 & n.17. But it is wrong to characterize these laws as only regulating

**APP. 1051**

automatic weapons and their magazine capacity.  At least five states in this era, plus the District of Columbia, defined "machine gun" in their statutes *to include semi-automatic weapons* capable of shooting a certain number of bullets without reloading.  *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); 1927 Mass. Acts 413, 413-14 (Massachusetts); Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 (Minnesota); Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 (Ohio); 1927 R.I. Pub. Laws 256, 256 (Rhode Island); Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137 (Virginia).[13]  Indeed, D.C.'s ban—which Congress passed—was modeled heavily after the Uniform Act, "a model law" that the National Rifle Association endorsed.  Spitzer Decl. ¶¶ 12–13; *compare* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652, *with* Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting (1928) (attached as Ex. P to Defs.' Opp'n).  The D.C. statute defined "machine gun" as "any firearm which shoots automatically *or semiautomatically more than twelve shots without reloading*," and it prohibited the possession of any machine gun within D.C.  *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 654 (emphasis added).  As these regulations demonstrate, "[r]estrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent."  Spitzer Decl. ¶ 19.  Like fully automatic weapons, semi-automatic weapons "utilize the same fundamental firearms technology: an action that

---

[13] These statutes are reproduced in Appendix 3 to the Spitzer Decl.  In addition to these six jurisdictions, Michigan banned the possession of "any firearm which can be fired more than sixteen times without reloading" without specifying whether such a firearm was considered a machine gun.  Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929.
These seven jurisdictions capped capacity as follows: D.C. (12); Massachusetts (any); Michigan (16); Minnesota (12); Ohio (18); Rhode Island (12); Virginia (16).  *See* App'x 3 to Spitzer Decl.

**APP. 1052**

automatically loads a new round into the chamber after each shot is fired . . . and is capable of firing numerous rounds without reloading." *Id.* ¶ 17.  By defining "machine gun" broadly, these regulations revealed a widespread tradition dating back to the 1920s and 1930s of regulating high-capacity weapons that could fire rapidly without reloading.

These Prohibition-era bans closely resemble D.C.'s ban today.  It is therefore no surprise that the "how" and "why" of D.C.'s LCM ban is analogous to that of the Prohibition-era regulations.  Consider the "how," or the "comparable burden," first.  *Bruen*, 142 S. Ct. at 2133. The District's LCM ban is similar to the Prohibition-era regulations in that the burden it places on an individual's right of self-defense is relatively light.  Recall that studies show that an individual expends on average two bullets in a self-defense incident where she fires her weapon. *See supra* at subsection IV.A.2.b.  Similar to the regulations from a century ago, the District's ban does *not* prohibit individuals from obtaining magazines with capacities of ten or less rounds. Magazines with capacities of ten or less are plentiful.  *Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014) (citing evidence that LCMs make up minority of all magazines owned).  And it appears that these smaller-capacity magazines can readily replace an LCM in a firearm: every Plaintiff in this case admits that the firearms he currently carries— "even those for which the standard magazine is an LCM"— "are all equipped with magazines that are not LCMs."  Defs.' Opp'n at 12 (citing Plaintiffs' declarations and Ex. A, Pls.' Answers to Interrogs. at 7–10).  Furthermore, like the regulations from a century ago, D.C. law does not prohibit an individual from possessing multiple guns, or multiple magazines.  Thus, the burden that the District's ban imposes on ordinary individuals is commensurate to that of the Prohibition-era regulations, and not at all onerous.

**APP. 1053**

Similarly, with respect to the "why," D.C.'s LCM ban is "comparably justified" with the Prohibition-era regulations.  The Prohibition era witnessed the growth of gangster and criminal organizations who availed themselves of the enhanced firing capacity of these new technologies.  Spitzer Decl. ¶¶ 12–18.  In response, numerous states enacted sweeping bans on high-capacity semi-automatic and automatic weapons during this era that applied to *all individuals*, not just a certain subset of the population such as gangsters or criminals.  *Id.*  This shows that the states confronted the public safety issues of their time with vigor; indeed, these regulations were at the time "obviously uncontroversial" from a constitutional perspective.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69 (2017) (hereinafter "Spitzer, *Gun Law History*").  Likewise, the District's ban seeks to promote public safety by limiting the number of rounds in one magazine that an individual may lawfully carry for self-defense in an attempt to mitigate the carnage of mass shootings in this country.[14] Just as states and the District enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now.  *See supra* subsection IV.B.1 (describing mass shootings with LCMs as an "unprecedented societal concern").

Plaintiffs raise three main counterarguments to this analysis, but none is persuasive.  First, Plaintiffs argue that under *Bruen*, "20th century laws do not establish a historical tradition."  Pls.' Reply at 26.  But *Bruen* said no such thing.  *Bruen* merely stated that "when it comes to interpreting the Constitution, not all history is created equal."  142 S. Ct. at 2136.  Because "[c]onstitutional rights are enshrined with the scope they were understood to have when

---

[14] Whether LCM bans empirically increase public safety is again not an issue for the Court to resolve.  These policy decisions are appropriate for the legislature to consider.

35

**APP. 1054**

the people adopted them," the years leading up to 1791 (the adoption of the Second Amendment) and 1868 (the adoption of the Fourteenth Amendment) are particularly important touchstones of constitutional meaning. *Id.* at 2136 (emphasis omitted; citation omitted). Outside these windows, "post-ratification adoption or acceptance of laws" are insignificant to the extent that they are "*inconsistent* with the original meaning of the constitutional text." *Id.* at 2137 (emphasis added) (cleaned up). Thus, in *Bruen*, the Supreme Court paid little heed to 19th and 20th-century evidence because "it contradict[ed] earlier evidence" in that case. *Id.* at 2154 & n.28. That result, however, is not a directive to discard 20th century history in *every* case. *Bruen* left open the possibility that in an appropriate case, 20th century history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality. *Cf. Bruen*, 142 S. Ct. at 2136 (citing James Madison for the interpretive principle that "'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution" (citation omitted)). The 20th century, after all, began over a hundred years ago, and that is no inconsequential length of time. *Cf. Heller II*, 670 F.3d at 1253 ("*Heller* tells us 'longstanding' regulations are 'presumptively lawful.'" (citation omitted)).

In this case, it is appropriate to apply 20th century history to the regulation at issue. The historical tradition of high-capacity regulations in the 1920s and 1930s—over a hundred years ago—does not contradict any earlier evidence, and it supports the constitutionality of the District's LCM ban. To reiterate, *Bruen* had no occasion to consider 20th century history because while "handguns . . . had gained a fairly secure footing in English culture" leading up to the Founding era, there was no evidence that public carry was limited "only to those who demonstrate some special need for self-protection" like New York's proper cause regime. 142 S. Ct. at 2142. *Bruen* then ventured into the 18th century, where it found that "the history reveals a

36

consensus that States could *not* ban public carry altogether."  *Id.* at 2146 (emphasis in original).

By contrast, in this case, the 1920s and 1930s regulations do not contradict any earlier evidence.

That is so because semiautomatic and high-capacity weapons were *not* technologically feasible

and commercially available in meaningful quantities until the early 1900s.  *See supra* subsection

IV.B.1; Amicus Brief at 16 ("[C]rucially, when multi-shot firearms did begin to gain widespread

civilian use, states across the country passed laws limiting access to these weapons." (emphasis

omitted)).  Unlike the handguns at issue in *Bruen*, the weapons here did not gain a "secure

footing" in American society prior to the 1900s.  142 S. Ct. at 2142.  Accordingly, they did not

pose "a general societal problem that has persisted since the 18th century," and it would make no

sense to divine constitutional significance from non-existent legislation concerning non-existent

problems.  *Id.* at 2131.  States do not "regulate for problems that do not exist"; instead, they

"adopt laws to address the problems that confront them."  *McCullen v. Coakley*, 573 U.S. 464,

481 (2014); *see also McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("A legislative body

cannot legislate wisely or effectively in the absence of information respecting the conditions

which the legislation is intended to affect or change[.]").

To flesh this principle out a little more, consider personal jetpacks, an "expensive and

experimental curiosity" that are unregulated today despite the obvious safety issues and dangers

they pose.  DeLay Decl. ¶ 21.  "A future historian (or jurist) discovering evidence that a patent

was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by

the technology throughout the century (indeed, they still are); and that the jetpack commanded

enduring popular interest, could conclude that the absence of public regulation reflected an

ideological disposition against regulating jetpacks.  But the simpler and more accurate

explanation would be that jetpacks remained too rare to attract regulatory attention in 2022."  *Id.*

Second, Plaintiffs attempt to dismiss the Prohibition-era regulations as "irrelevant

outliers."  Pls.' Reply at 25.  But unlike "only three restrictions on public carry" that the

government could produce in *Bruen*, which the Supreme Court "doubt[ed] . . . could suffice to

show a tradition of public-carry regulation," 142 S. Ct. at 2142, the District here has pointed to

no less than *six states plus D.C.* that regulated semi-automatic and automatic weapons based on

their high firing capacity.  *See supra* subsection IV.B.2.[15]  Of particular significance, the D.C.

law that the Court has discussed above was passed by Congress (a nationwide body) and drew

heavily from the Uniform Act (a model law).  Like D.C., Massachusetts, Michigan, Minnesota,

and Rhode Island all banned mere possession.  *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat.

650, 650, 652; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts

887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933,

ch. 190, 1933 Minn. Laws 231, 232; 1927 R.I. Pub. Laws 256, 256.  Plaintiffs try to distinguish

the Ohio and Virginia laws as outliers because the former permitted *licensed* carry and the latter

permitted defensive uses of these weapons.  Pls.' Reply at 26.  But Ohio's licensing law in 1933

required one to post $5,000 bond—today's equivalent of over $115,000—effectively

"prevent[ing] law-abiding citizens with ordinary self-defense needs from carrying" these

weapons.  *Bruen*, 142 S. Ct. at 2150.[16]  As for Virginia, although it prohibited possession of a

machine gun only "for offensive and aggressive purpose," it "*presumed*" this purpose whenever

the weapon was possessed outside the home.  Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137,

---

[15] Actually, that number could be potentially as high as ten jurisdictions, if one reads three ambiguous state statutes in favor of the District.  *See* Spitzer, *Gun Law History* at 69 (describing statutory ambiguity in machine gun bans from Illinois, Louisiana, and South Carolina).

[16] *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator, at https://www.bls.gov/data/inflation_calculator.htm (last visited April 20, 2023).

**APP. 1057**

137 (emphasis added).  In short, Plaintiffs cannot avoid the conclusion that there is a historical

tradition of severe restrictions, if not outright bans, on these high-capacity weapons.

Accordingly, the District's law is at the very least "analogous enough to pass constitutional

muster."  *Bruen*, 142 S. Ct. at 2133.

Third, Plaintiffs argue that the subsequent repeal of some of these state regulations

undercuts the District's reliance on this history.  Pls.' Reply at 26.  But Plaintiffs do not explain

why the decision of some states to "devise solutions to social problems that suit local needs and

values" is anything more than permissible "experimentation with reasonable firearms

regulations . . . under the Second Amendment."  *McDonald v. City of Chicago*, 561 U.S. 742,

785 (2010).  Take Rhode Island, for example.  Although it eventually repealed its 1927 statute

banning possession of machine guns (defined, by the way, to include "any weapon which shoots

more than twelve shots semiautomatically without reloading"), Rhode Island changed course in

2022 "[i]n the wake of recent mass shootings" and amended its law to "specifically ban LCMs,"

*Ocean State Tactical*, 2022 WL 17721175, at *4.  And other jurisdictions, like D.C., made

modifications to its law without ever repealing it.  *See* Kopel at 874 ("The District of Columbia

ban, with modifications, is still in effect.").  The Second Amendment gives states space to

experiment, and that is what Rhode Island and D.C. have done.  *Bruen* did contemplate that state

regulations that were "rejected on constitutional grounds" can "provide some probative evidence

of [a similar modern regulation's] unconstitutionality."  142 S. Ct. at 2131.  But Plaintiffs have

not suggested that any repeal was related to constitutional infirmity.  The Court has conducted

independent research on this question and did not find anything suggesting this was the reason,

either.  Thus, the Court is satisfied that the District has met its burden to produce a historical

analogue justifying its LCM ban.[17]

### V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is

denied.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.


Dated:  April 20, 2023                                             RUDOLPH CONTRERAS
                                                                    United States District Judge

---

[17] The parties also dispute whether other potential historical analogues that the District
introduced are relevantly similar to the ban at issue here.  These include regulations on
gunpowder, trap guns, and dangerous weapons such as Bowie knives.  Defs.' Opp'n at 28–32,
35–39.  Because the Court holds that the District has adequately identified a historical analogue
in the Prohibition-era regulations, it has no occasion to consider additional examples.

APP. 1059

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-2256-RC** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## JOINT MOTION TO STAY PROCEEDINGS PENDING APPEAL

The Parties jointly move to stay proceedings pending Plaintiffs' appeal of the Court's denial of Plaintiffs' motion for a preliminary injunction. As discussed in the accompanying memorandum of points and authorities, a stay is warranted because it will preserve the Parties' resources, promote judicial efficiency, and no party will be prejudiced. A proposed order is attached.

Dated: May 3, 2023.

*/s/ George L. Lyon, Jr*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033

Respectfully Submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Equity Section, Civil Litigation Division

*/s/ Andrew J. Saindon*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]

HELEN M. RAVE [90003876]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-6643
Email: andy.saindon@dc.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs**, | |
| **v.** | **Civil Action No. 1:22-cv-2256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants**. | |

**JOINT MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING APPEAL**

The Parties seek to stay proceedings while Plaintiffs appeal this Court's denial of

Plaintiffs' motion for a preliminary injunction.  Granting a stay will preserve the status quo while

the D.C. Circuit decides legal issues that may alter the course of this litigation.  Balancing the

interests here demonstrates that a stay of proceedings would preserve the Parties' resources and

promote judicial economy.  Accordingly, the Court should grant a stay of proceedings pending

appeal.

**BACKGROUND**

On August 3, 2022, Plaintiffs filed the Complaint, alleging that D.C. Code § 7-

2506.01(b) violates the Second and Fifth Amendments of the Constitution.  *See* Complaint at 22.

On August 19, 2022, Plaintiffs filed an application for a preliminary injunction.  Application for

Preliminary Injunction [8].  After that application was fully briefed, the Court held oral argument

on April 13, 2023.  On April 20, 2023, the Court issued a memorandum opinion and order

denying Plaintiffs' application for a preliminary injunction.  Order Denying Plaintiffs' Motion

**APP. 1062**

for a Preliminary Injunction [27]; Memorandum Opinion Denying Plaintiff's Motion for a

Preliminary Injunction [28].  Plaintiffs intend to appeal this Court's decision.

## LEGAL STANDARD

A court has inherent, discretionary power to stay a case to control its own docket.  *Landis*

*v. North American Co.*, 299 U.S. 248, 254 (1936).  "In 'the exercise of its judgment,' the Court

must 'weigh competing interests and maintain an even balance' between the court's interests in

judicial economy and any possible hardship to the parties."  *Ctr. v. Biological Diversity v. Ross*,

419 F. Supp. 3d 16, 20 (D.D.C. 2019) (quoting *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d

724, 732–33 (D.C. Cir. 2012) (alterations omitted)).  Courts may also consider the public interest

in considering whether to grant a stay.  *See Feld Entm't, Inc. v. ASPCA*, 523 F. Supp. 2d 1, 5

(D.D.C. 2007).  Courts identifying and weighing competing interests must "make such

determinations in the light of the particular circumstances of the case."  *Hulley Enters. v. Russian*

*Fed'n*, Case No. 14-1996, 2020 U.S. Dist. LEXIS 219208, *14 (D.D.C. Nov. 20, 2020) (quoting

*SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980)).  Ultimately a district court's

authority to stay proceedings to control its own docket is "broad" and subject to review only as

an abuse of discretion.  *See Clinton v. Jones*, 520 U.S. 681, 706–07 (1997).

## ARGUMENT

The balance of interests, judicial economy, and the public interest each favor a stay

pending appeal in this case.  All Parties request that litigation in this case be stayed pending

appeal, and no Party will be harmed by a stay.  Instead, a stay will preserve the Parties' resources

and maintain the status quo while Plaintiffs' appeal of the denial of their application for

preliminary injunction is ongoing.

The resolution of Plaintiffs' requested preliminary injunction, and this case, largely turns

**APP. 1063**

on the interpretation and application of *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S.

Ct. 2111 (2022). *Bruen* is a recent and significant Second Amendment decision that the Circuit

has not yet applied or interpreted. Any decision on appeal is very likely to provide guidance on

the core legal issues of this case, thereby significantly impacting the course of the litigation and

discovery. As courts have repeatedly recognized, a stay pending appeal is particularly warranted

where the legal issue presented is novel or significant. *See Ctr. for Int'l Evntl. Law v. Office of*

*the United States Trade Representative*, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (granting stay

pending appeal party because the case presented an "issue of first impression" and the first to

involve application of a recent Supreme Court decision); *see also Al Maqaleh v. Gates*, 620 F.

Supp. 2d 51, 56 (D.D.C. 2009) (discussing that the "novel and weighty" issues presented favored

granting a stay pending appeal); *Philipp v. Fed. Rep. of Germany*, 436 F. Supp. 3d 61, 66

(D.D.C. 2020) ("so long as the other factors strongly favor a stay, [a stay of proceedings] is

appropriate if [a] 'serious legal question is presented'") (quoting *Loving v. IRS*, 920 F. Supp. 2d

108, 110 (D.D.C. 2013)). That is the case here.

The Parties do not seek to stay an order of this Court from going into effect, but instead

"seek a decision to stay discovery [and further litigation], . . . pending a D.C. Circuit

determination that almost certainly will affect discovery [and future litigation]." *Loumiet v.*

*United States*, 315 F. Supp. 3d 349, 353 (D.D.C. 2018). Thus, a stay here "would avoid

potentially 'fractured and disorderly' and unnecessary litigation and best preserve judicial and

parties' resources . . . .'" *Hulley*, 2020 U.S. Dist. LEXIS 219208, at *19 (quoting *Seneca Nation*

*of Indians v. U.S. Dep't of Health & Hum. Servs.*, 144 F. Supp. 3d 115, 119 (D.D.C. 2015)). As

courts have recognized, "subjecting a party to duplicative and wasteful litigation exercises is a

significant harm." *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 286 F.R.D. 88, 93

**APP. 1064**

(D.D.C. 2012).  Further, it is not in the public interest for the Parties or the Court to spend

resources on unnecessary or duplicative litigation.  Because any Circuit opinion on appeal is very

likely to impact the course of this litigation, it would preserve judicial and party resources and

promote the public interest to stay the litigation until the appeal is resolved.

## CONCLUSION

For the foregoing reasons, the Court should grant the Parties' Joint Motion to Stay

Proceedings Pending Appeal.


Dated: May 3, 2023.                                Respectfully Submitted,

_/s/ George L. Lyon, Jr_                            BRIAN L. SCHWALB
George L. Lyon, Jr. (D.C. Bar No. 388678)          Attorney General for the District of Columbia
Arsenal Attorneys
4000 Legato Road, Suite 1100                       STEPHANIE E. LITOS
Fairfax, VA 22033                                  Deputy Attorney General
202-669-0442, fax 202-483-9267                     Civil Litigation Division
gll@arsenalattorneys.com
                                                   _/s/ Matthew R. Blecher_
                                                   MATTHEW R. BLECHER [1012957]
Matthew J. Bergstrom (D.C. Bar No. 989706)         Chief, Equity Section, Civil Litigation Division
Arsenal Attorneys
4000 Legato Road, Suite 1100                       _/s/ Andrew J. Saindon_
Fairfax, VA 22033                                  ANDREW J. SAINDON [456987]
800-819-0608                                       Senior Assistant Attorney General
mjb@arsenalattorneys.com                           MATEYA B. KELLEY [888219451]
                                                   RICHARD P. SOBIECKI [500163]
_Attorneys for Plaintiffs_                          HELEN M. RAVE [90003876]
                                                   Assistant Attorneys General
                                                   400 6th Street, NW
                                                   Washington, D.C. 20001
                                                   Phone: (202) 724-6643
                                                   Email: andy.saindon@dc.gov

                                                   _Counsel for Defendants_

**APP. 1065**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREW HANSON )
)
TYLER YZAGUIRRE )
)
NATHAN CHANEY )
)
ERIC KLUN )
)
        Appellants, )
)
        v. )     Civil Action No. 22-cv-2256 RC
)
DISTRICT OF COLUBIA )
)
ROBERT J. CONTEE, III, )
)
        Appellees. )

### NOTICE OF APPEAL

Plaintiffs Hanson, Yzaguirre, Chaney and Klun appeal to the United States Court of Appeals for the District of Columbia Circuit from the District Court Order (ECF 27) and Memorandum Opinion (ECF 28) denying a preliminary injunction in this proceeding, entered on April 20, 2023.

**APP. 1066**

Respectfully submitted,

/s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com
*Attorneys for Plaintiffs*

May 16, 2023

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record in this proceeding via the Court's electronic filing system, this 16th day of May, 2023.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 1067**