ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7061

# In the United States Court of Appeals for the District of Columbia Circuit

ANDREW HANSON, ET AL.,

*Plaintiffs-Appellants,*

v.

THE DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees,*

## JOINT APPENDIX
Volume I

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-CV-02256-RC)

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
4000 Legato Road, 11th Floor
Fairfax, Virginia 22030
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Erielle R. Davidson
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

### APPENDIX VOLUME I

|  | Page Numbers |
|---|---|
| Docket Sheet, *Andrew Hanson et al. v. District of Columbia*, US. District Court for the District of Columbia No. 1:22-cv-02256 | APP. 1 - APP.8 |
| Complaint for Declaratory and Injunctive Relief and Damages | APP. 9 - APP. 32 |
| Plaintiffs' Motion for Preliminary Injunctive Relief | APP. 33 - APP 73 |
| Defendants' Opposition to Preliminary Injunctive Relief | APP. 74- App. 124 |
| Exhibits Attached to Defendants' Opposition to Preliminary Injunctive Relief |  |
| Ex. A: Plaintiffs' Answers and Objections to Defendants' First set of Interrogatories | APP. 125 - APP. 138 |
| Ex. B: Declaration of Dennis Baron | APP. 139 - APP. 161 |
| Ex. C: Excerpt of Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics* (2019) | APP. 162 - APP. 179 |
| Ex. D: Declaration of Stephen Amodeo | APP. 180 - APP. 185 |
| Ex. E: Declaration of Leslie Parsons | APP. 186 - APP. 212 |
| Ex. F: Declaration of Roger Pauly | APP. 213 - APP. 245 |
| Ex. G: Declaration of Brian Delay | APP. 246 - APP. 261 |
| Ex. H: Declaration of Robert Spitzer | APP. 262 - APP. 444 |
| Ex. I: Declaration of Randolph Roth | APP. 445 - APP. 478 |
| Ex. J: Declaration of Brennan Rivas | APP. 479 - APP. 502 |
| Ex. L: Excerpt of Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (2003) | APP. 503 - APP. 520 |
| Ex. M: Declaration of Kevin M. Sweeney | APP. 521 - APP. 541 |
| Ex. O: Declaration of Daniel W. Webster | APP. 542 - APP. 551 |
| Ex. P: Report of Firearms Committee, *Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting* (1928) | APP. 552 - APP. 563 |

APPENDIX VOLUME II

|  | Page Numbers |
|---|---|
| Exhibits Attached to Plaintiffs' Reply in Support of Preliminary Injunctive Relief | |
| Declaration of Mark Hanish | APP. 564 - APP. 645 |
| Declaration of Stephen Helsely | APP. 646 - APP. 662 |
| Declaration of Ashley Hlebinsky | APP. 663 - APP. 709 |
| Declaration of Tom Givens | APP. 710 - APP. 714 |
| Declaration of Brett Harnish | APP. 715 - APP. 718 |
| Declaration of John Murphy | APP. 719 - APP. 722 |
| Declaration of Greg Ellifritz | APP. 723 - APP. 743 |
| Declaration of Claude Werner | APP. 744 - APP. 747 |
| Examples of marketing of guns with magazines in excess of 10 rounds for self-defense | APP. 748 - APP. 751 |
| Declaration of Amy Swearer | APP. 752 - APP. 765 |
| Testimony of Massad Ayoob | APP. 766 - APP. 864 |
| Kopel, Bowie Knife Statutes | APP. 865 - APP. 878 |
| Virginia Historic machine gun statute | APP. 879 - APP. 882 |
| Declaration of Clayton Cramer | APP. 883 - APP. 934 |
| Declaration of Gary Kleck | APP. 935 - APP. 985 |
| Transcript of Motion Hearing, April 13, 2023, Case No. 1:22-cv-02256 | APP. 986 - APP. 1018 |
| Order Denying Plaintiffs' Motion for a Preliminary Injunction, April 20, 2023 | APP. 1019 |
| Memorandum Opinion Denying Plaintiffs' Motion for a Preliminary Injunction | APP. 1020 - APP. 1059 |
| Joint Motion to Stay Proceedings Pending Appeal | APP. 1060 - APP. 1065 |
| Notice of Appeal | APP. 1066 - APP. 1067 |

USCA Case #23-7061        Document #2029097        Filed: 11/29/2023    Page 4 of 566

APPEAL,STAYED,TYPE-L

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-cv-02256-RC

| | |
|---|---|
| HANSON et al v. DISTRICT OF COLUMBIA et al | Date Filed: 08/01/2022 |
| Assigned to: Judge Rudolph Contreras | Jury Demand: None |
| Case in other court:  USCA, 23-07061 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**ANDREW HANSON**                    represented by    **George L. Lyon , Jr.**
                                                       BERGSTROM ATTORNEYS
                                                       1929 Biltmore Street, NW
                                                       Washington, DC 20009
                                                       202-669-0442
                                                       Fax: 202-483-9267
                                                       Email: gll@bergstromattorneys.com
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**TYLER YZAGUIRRE**                  represented by    **George L. Lyon , Jr.**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATHAN CHANEY**                    represented by    **George L. Lyon , Jr.**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Plaintiff**

**ERIC KLUN**                        represented by    **George L. Lyon , Jr.**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**             represented by    **Andrew J. Saindon**
                                                       OFFICE OF THE ATTORNEY GENERAL
                                                       FOR THE DISTRICT OF COLUMBIA
                                                       400 Sixth Street, NW
                                                       Suite 10100
                                                       Washington, DC 20001-2703
                                                       202-724-6643
                                                       Email: andy.saindon@dc.gov
                                                       *TERMINATED: 07/28/2023*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

**APP. 1**

USCA Case #23-7061      Document #2029097        Filed: 11/29/2023      Page 5 of 566

**Richard P. Sobiecki**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
Civil Litigation Division, Equity Section
400 Sixth Street, NW
Suite 10100
Washington, DC 20001
202-805-7512
Email: richard.sobiecki@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
OFFICE OF THE ATTORNEY GENERAL
District of Columbia
400 Sixth Street NW
District of Columbia, DC 20001
(202) 735-7520
Fax: (202) 741-0665
Email: helen.rave@dc.gov
*ATTORNEY TO BE NOTICED*

**Mateya Beth Kelley**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 Sixth Street, NW
Suite 10100
Washington, DC 20001-2703
202-724-7854
Email: Mateya.Kelley@dc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT J. CONTEE, III**                represented by    **Andrew J. Saindon**
(See above for address)
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mateya Beth Kelley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**APP. 2**

**BRADY**                                    represented by **Timothy Channing Hester**
COVINGTON & BURLING
850 Tenth Street, N.W.
Washington, DC 20001-4956
202-662-5324
Fax: 202-778-5324
Email: thester@cov.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**GIFFORDS LAW CENTER TO**          represented by **Timothy Channing Hester**
**PREVENT GUN VIOLENCE**                          (See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**MARCH FOR OUR LIVES**          represented by **Timothy Channing Hester**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2022 | 1 | COMPLAINT against ERIC KLUN, ANDREW HANSON, NATHAN CHANEY, TYLER YZAGUIRRE ( Filing fee $ 402 receipt number ADCDC-9409010) filed by ERIC KLUN, ANDREW HANSON, NATHAN CHANEY, TYLER YZAGUIRRE. (Attachments: # 1 Civil Cover Sheet Cover Sheet, # 2 Summons Bowser, # 3 Summons OAG, # 4 Summons Contee)(Lyon, George) (Entered: 08/01/2022) |
| 08/03/2022 | | NOTICE OF ERROR re 1 Complaint; emailed to gll@bergstromattorneys.com, cc'd 2 associated attorneys -- The PDF file you docketed contained errors: 1. Noncompliance with LCvR 5.1(c). Please file an errata correcting the initiating pleading to include the name & full residence address of each party using the event Errata., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zsb, ) (Entered: 08/03/2022) |
| 08/03/2022 | 2 | ERRATA by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE re 1 Complaint, filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. (Lyon, George) (Entered: 08/03/2022) |
| 08/05/2022 | 3 | SUMMONS (3) Issued Electronically as to All Defendants, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachment: # 1 Notice and Consent)(zmrl) (Entered: 08/05/2022) |
| 08/08/2022 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 8/8/2022. ( Answer due for ALL D.C. DEFENDANTS by 8/29/2022.) (Lyon, George); Modified text on 8/9/2022 (ztth). (Entered: 08/08/2022) |
| 08/08/2022 | 5 | NOTICE of Appearance by Andrew J. Saindon on behalf of All Defendants (Saindon, Andrew) (Entered: 08/08/2022) |
| 08/08/2022 | | Case Assigned to Judge Rudolph Contreras. (zsb) (Entered: 08/08/2022) |
| 08/08/2022 | 6 | NOTICE of Appearance by Helen Marie Rave on behalf of All Defendants (Rave, Helen) (Entered: 08/08/2022) |

**APP. 3**

USCA Case #23-7061        Document #2029097          Filed: 11/29/2023        Page 7 of 566

| 08/15/2022 | 7 | NOTICE of Appearance by Mateya Beth Kelley on behalf of All Defendants (Kelley, Mateya) (Entered: 08/15/2022) |
|---|---|---|
| 08/19/2022 | 8 | MOTION for Preliminary Injunction by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit 1, Hanson Declaration, # 3 Exhibit Exhibit 2, Yzaguirre Declaration, # 4 Exhibit Exhibit 3, Chaney Declaration, # 5 Exhibit Exhibit 4, Klun Declaration, # 6 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/19/2022) |
| 08/23/2022 | 9 | MOTION for Extension of Time to *Oppose Application for Preliminary Injunction* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rave, Helen) (Entered: 08/23/2022) |
| 08/23/2022 | 10 | MOTION to Expedite *Discovery* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Exhibit A - Proposed Interrogatories)(Rave, Helen) (Entered: 08/23/2022) |
| 08/23/2022 | 11 | Memorandum in opposition to re 9 Motion for Extension of Time to filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/23/2022) |
| 08/23/2022 | 12 | Memorandum in opposition to re 10 Motion to Expedite *Discovery* filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Exhibit Exhibit 1, # 2 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 08/23/2022) |
| 08/24/2022 | 13 | REPLY to opposition to motion re 9 MOTION for Extension of Time to *Oppose Application for Preliminary Injunction* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Rave, Helen) (Entered: 08/24/2022) |
| 08/24/2022 | 14 | REPLY to opposition to motion re 10 MOTION to Expedite *Discovery* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Rave, Helen) (Entered: 08/24/2022) |
| 09/07/2022 | | MINUTE ORDER: On August 19, 2022, Plaintiffs filed a motion for preliminary injunction. ECF No. 8. Under Local Rule 65.1(c), Defendants' response was due on August 26, 2022. Defendants have filed a motion for an 89-day extension of time to respond to Plaintiffs' motion. ECF No. 9. Plaintiffs consent to a 30-day extension but ask that they also be given 30 days to reply. ECF No. 11. Due to the need to ensure that the record in this case is properly developed, it is hereby ORDERED that 9 Defendants' Motion for Extension of Time to Oppose Application for Preliminary Injunction is GRANTED. Defendants shall respond to Plaintiffs' motion before or on November 23, 2022, and Plaintiffs shall file any reply before or on December 23, 2022. It is FURTHER ORDERED that Defendants' deadline to respond to Plaintiffs' Complaint shall be HELD IN ABEYANCE until a decision is issued on Plaintiffs' motion. It is FURTHER ORDERED that 10 Defendants' Motion to Expedite Discovery is GRANTED. The Court finds that limited discovery at this stage is "reasonable[]" "in light of all of the surrounding circumstances." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (quotation marks omitted). Plaintiffs shall respond to Defendants' Interrogatories, filed at ECF No. 10-3, before or on September 21, 2022, subject to any particular objections Plaintiffs may raise. The parties shall inform the Court of any discovery disputes in accordance with the Local Rules prior to filing any discovery motions. SO ORDERED. Signed by Judge Rudolph Contreras on 9-7-2022. (lcrc3) (Entered: 09/07/2022) |
| 10/04/2022 | 15 | NOTICE of Appearance by Richard P. Sobiecki on behalf of All Defendants (Sobiecki, Richard) (Entered: 10/04/2022) |
| 10/31/2022 | 16 | Consent MOTION for Leave to File *Supplement to Preliminary Injunction Application* by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE, |

**APP. 4**

USCA Case #23-7061    Document #2039007    Filed: 11/29/2023    Page 8 of 566

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration Declaration of Tyler Yzaguirre, # 2 Memorandum in Support, # 3 Text of Proposed Order Proposed Order)(Lyon, George) (Entered: 10/31/2022) |
| 10/31/2022 | | MINUTE ORDER granting 16 Plaintiffs' Consent Motion for Leave to File: It is hereby ORDERED that Plaintiffs may supplement their application for a preliminary injunction with the declaration of Tyler Yzaguirre attached at ECF No. 16-1. SO ORDERED. Signed by Judge Rudolph Contreras on 10-31-2022. (lcrc3) (Entered: 10/31/2022) |
| 11/23/2022 | 17 | Memorandum in opposition to re 8 Motion for Preliminary Injunction, filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit List, # 3 Exhibit A (Interrogs.), # 4 Exhibit B (Baron), # 5 Exhibit C (Givens excerpt), # 6 Exhibit D (Amodeo MPD), # 7 Exhibit E (Parsons MPD), # 8 Exhibit F (Pauly), # 9 Exhibit G (DeLay), # 10 Exhibit H (Spitzer), # 11 Exhibit I (Roth), # 12 Exhibit J (Rivas), # 13 Exhibit K (Barrett excerpt), # 14 Exhibit L (Kinard excerpt), # 15 Exhibit M (Sweeney), # 16 Exhibit N (Sadowski excerpt), # 17 Exhibit O (Webster), # 18 Exhibit P (model law 1928), # 19 Exhibit Q (Charles excerpt), # 20 Exhibit R (Smithsonian excerpt))(Kelley, Mateya) (Entered: 11/23/2022) |
| 11/30/2022 | 18 | MOTION for Leave to File *Amicus Curiae Brief* by BRADY, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES. (Attachments: # 1 Amicus Curiae Brief, # 2 Proposed Order)(Hester, Timothy) (Entered: 11/30/2022) |
| 12/01/2022 | | MINUTE ORDER granting 18 Motion for Leave to File Amicus Brief: It is hereby ORDERED that the Motion is GRANTED; and it is FURTHER ORDERED that the Amicus Curiae brief attached to the Motion at ECF No. 18-1 is deemed filed with this Court upon entry of this Order. SO ORDERED. Signed by Judge Rudolph Contreras on 12-1-2022. (lcrc3) (Entered: 12/01/2022) |
| 12/01/2022 | 19 | Consent MOTION for Leave to File Excess Pages , Consent MOTION for Extension of Time to File *and Memorandum in Support* by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 12/01/2022) |
| 12/02/2022 | | MINUTE ORDER granting 19 Plaintiffs' Motion for Leave to File Excess Pages and Motion for Extension of Time: It is hereby ORDERED that the page limit for Plaintiffs' reply is increased to 35 pages and Plaintiffs' reply shall be filed on or before January 23, 2023. SO ORDERED. Signed by Judge Rudolph Contreras on 12-2-2022. (lcrc3) (Entered: 12/02/2022) |
| 12/08/2022 | 20 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Oregon Firearms Federation, Inc. v. Brown Opinion and Order)(Rave, Helen) (Entered: 12/08/2022) |
| 12/22/2022 | 21 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Ocean State Tactical, LLC et al v. Rhode Island et al Memorandum and Order)(Rave, Helen) (Entered: 12/22/2022) |
| 01/10/2023 | 22 | ENTERED IN ERROR.....Consent MOTION for Scheduling Order by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George); Modified on 1/11/2023 (ztth). (Entered: 01/10/2023) |
| 01/11/2023 | 23 | WITHDRAWAL of Motion by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE re 22 Consent MOTION for Scheduling Order filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON . (Lyon, George) (Entered: 01/11/2023) |

**APP. 5**

USCA Case #23-7061      Document #2029097      Filed: 11/29/2023      Page 9 of 566

| | | |
|---|---|---|
| 01/23/2023 | 24 | REPLY to opposition to motion re 8 MOTION for Preliminary Injunction filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Declaration Ex. 1 Hanish Declaration, # 2 Declaration Ex. 2 Helsley Declaration, # 3 Declaration Ex. 3 Hlebinsky Declaration, # 4 Declaration Ex 4 Givens Declaration, # 5 Declaration Ex. 5 Harnish Declaration, # 6 Declaration Ex. 6 Murphy Declaration, # 7 Declaration Ex. 7 Ellifritz Declaration, # 8 Declaration Ex. 8 Werner Declaration, # 9 Exhibit Ex. 9 Examples of marketing of guns with magazines in excess of 10 rounds for self-defense, # 10 Declaration Ex. 10 Swearer Declaration, # 11 Exhibit Ex 11 Testimony of Massad Ayoob, # 12 Exhibit Ex, 12 Kopel,Bowie knife statutes, # 13 Exhibit Ex. 13 Virginia historic machine gun statute, # 14 Declaration Ex. 14 Cramer Declaration, # 15 Declaration Ex, 15 Kleck Declaration)(Lyon, George) (Entered: 01/23/2023) |
| 01/24/2023 | | RESOLVED...NOTICE of Provisional/Government Not Certified Status re 24 REPLY to opposition to motion re 8 MOTION for Preliminary Injunction filed by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. (Attachments: # 1 Declaration Ex. 1 Hanish Declaration, # 2 Declaration Ex. 2 Helsley Declaration, # 3 Declaration Ex. 3 Hlebinsky Declaration, # 4 Declaration Ex 4 Givens Declaration, # 5 Declaration Ex. 5 Harnish Declaration, # 6 Declaration Ex. 6 Murphy Declaration, # 7 Declaration Ex. 7 Ellifritz Declaration, # 8 Declaration Ex. 8 Werner Declaration, # 9 Exhibit Ex. 9 Examples of marketing of guns with magazines in excess of 10 rounds for self-defense, # 10 Declaration Ex. 10 Swearer Declaration, # 11 Exhibit Ex 11 Testimony of Massad Ayoob, # 12 Exhibit Ex, 12 Kopel,Bowie knife statutes, # 13 Exhibit Ex. 13 Virginia historic machine gun statute, # 14 Declaration Ex. 14 Cramer Declaration, # 15 Declaration Ex, 15 Kleck Declaration)(Lyon, George).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney-renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 1/31/2023. (zbaj) Modified on 2/3/2023 (zbaj). (Entered: 01/24/2023) |
| 03/21/2023 | | MINUTE ORDER: It is hereby ORDERED that the parties shall appear before the Court on April 13, 2023 at 10:00 a.m. in Courtroom 23 for oral argument on 8 Plaintiffs' Motion for a Preliminary Injunction. The parties are advised that the procedures set forth in Local Civil Rule 65.1(d) shall govern this hearing. SO ORDERED. Signed by Judge Rudolph Contreras on 3-21-2023. (lcrc3) (Entered: 03/21/2023) |
| 03/31/2023 | | Set/Reset Hearings: Motion Hearing set for 4/13/2023 at 10:00 AM in Courtroom 23A- In Person before Judge Rudolph Contreras. (tj) (Entered: 03/31/2023) |
| 04/06/2023 | 25 | NOTICE OF SUPPLEMENTAL AUTHORITY by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA (Attachments: # 1 Exhibit A - Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety and Homeland Security Memorandum Opinion) (Rave, Helen) (Entered: 04/06/2023) |
| 04/08/2023 | 26 | NOTICE OF SUPPLEMENTAL AUTHORITY by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE (Attachments: # 1 Exhibit The History of Bans on Types of Arms Before 1900)(Lyon, George) (Entered: 04/08/2023) |
| 04/13/2023 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 4/13/2023 re 8 MOTION for Preliminary Injunction filed by TYLER YZAGUIRRE, |

**APP. 6**

USCA Case #23-7061    Document #2039097    Filed: 11/30/2023    Page 10 of 566

| | | |
|---|---|---|
| | | ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. Oral argument heard, and the court takes the motion under advisement. (Court Reporter: Nancy Meyer) (tj) (Entered: 04/13/2023) |
| 04/20/2023 | 27 | ORDER denying 8 Plaintiffs' Motion for a Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 4-20-2023. (lcrc3) (Entered: 04/20/2023) |
| 04/20/2023 | 28 | MEMORANDUM OPINION denying 8 Plaintiffs' Motion for a Preliminary Injunction. See document for details. Signed by Judge Rudolph Contreras on 4-20-2023. (lcrc3) (Entered: 04/20/2023) |
| 05/03/2023 | 29 | Joint MOTION to Stay *Proceedings Pending Appeal* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order)(Saindon, Andrew) (Entered: 05/03/2023) |
| 05/04/2023 | | MINUTE ORDER granting 29 Joint Motion to Stay Proceedings Pending Appeal: It is hereby ORDERED that this matter is STAYED until further order of the Court. SO ORDERED. Signed by Judge Rudolph Contreras on 5-4-2023. (lcrc3) (Entered: 05/04/2023) |
| 05/16/2023 | 30 | NOTICE OF APPEAL TO DC CIRCUIT COURT by NATHAN CHANEY, ANDREW HANSON, ERIC KLUN, TYLER YZAGUIRRE. Filing fee $ 505, receipt number ADCDC-10072470. Fee Status: Fee Paid. Parties have been notified. (Lyon, George); Modified on 5/17/2023 to add docket entry relationships. (ztth). (Entered: 05/16/2023) |
| 05/17/2023 | 31 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 30 Notice of Appeal to DC Circuit Court. (ztth) (Entered: 05/17/2023) |
| 05/17/2023 | | USCA Case Number 23-7061 for 30 Notice of Appeal to DC Circuit Court, filed by TYLER YZAGUIRRE, ERIC KLUN, NATHAN CHANEY, ANDREW HANSON. (znmw) (Entered: 05/17/2023) |
| 07/23/2023 | 32 | TRANSCRIPT OF MOTION HEARING before the Honorable Rudolph Contreras held on 04/13/2023. Page Numbers: 1-33. Date of Issuance: 07/23/2023. Stenographic Court Reporter: Nancy J. Meyer. Telephone Number: 202-354-3118. Email: nancymeyercourtreporter@gmail.com. Transcripts may be ordered by going to www.dcd.uscourts.gov (left-hand side under Transcript Requests). For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats (multi-page, condensed, CD, or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have 21 days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 8/13/2023. Redacted Transcript Deadline set for 8/23/2023. Release of Transcript Restriction set for 10/21/2023.(Meyer, Nancy J.) (Entered: 07/23/2023) |
| 07/28/2023 | 33 | NOTICE OF WITHDRAWAL OF APPEARANCE as to ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. Attorney Andrew J. Saindon terminated. (Saindon, Andrew) (Entered: 07/28/2023) |

**APP. 7**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/27/2023 06:10:12 | | | |
| **PACER Login:** | emwenger50 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-02256-RC |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANDREW HANSON** | ) | |
| **TYLER YZAGUIRRE** | ) | |
| **NATHAN CHANEY** | ) | |
| **ERIC KLUN** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-2256 |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| Serve: Mayor Muriel Bowser | ) | |
| 1350 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| c/o Office of Attorney General | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **ROBERT J. CONTEE III** | ) | |
| Metropolitan Police Department | ) | |
| 300 Indiana Avenue, N.W. | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF,
## AND DAMAGES

COME NOW the Plaintiffs, Andrew Hanson, Tyler Yzaguirre, Nathan Chaney, and Eric

Klun, by and through their undersigned counsel, and file this complaint for declaratory, injunctive

relief with respect to DC Code Section 7-2506.01(b) and damages for the enforcement of that code

section against Plaintiffs.

1

**APP. 9**

**THE PARTIES**

1.      Plaintiff Andrew Hanson is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

2.      Plaintiff Tyler Yzaguirre is a natural person and a citizen of the United States and of the District of Columbia. He owns registered firearms within the District of Columbia. He also holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess and use such magazines within the District of Columbia for all lawful purposes including for self-defense within the home and outside the home.

3.      Plaintiff Nathan Chaney is a natural person and a citizen of the United States and of the Commonwealth of Virginia. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would

**APP. 10**

possess such magazines within the District of Columbia for all lawful purposes including self-defense.

4.      Plaintiff Eric Klun is a natural person and a citizen of the United States and of the State of Maryland. He holds a Concealed Pistol Carry License issued by the Chief of the MPD. He regularly carries a concealed registered firearm for personal protection within the District. He owns firearm magazines capable of holding more than 10 rounds of ammunition that are stored outside the District of Columbia. But for DC Code Section 7-2506.01(b), he would possess such magazines within the District of Columbia for all lawful purposes including self-defense.

5.      Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

6.      Defendant Robert J. Contee III is the Chief of the District of Columbia's MPD. Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs, and practices against Plaintiffs, and is in fact presently enforcing the challenged laws, customs, and practices against Plaintiffs. Defendant Contee is sued in both his individual and official capacities.

**JURISDICTION AND VENUE.**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988. Plaintiffs' claims for declaratory and

3

**APP. 11**

injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

8.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## STATEMENT OF FACTS.

### The Second Amendment.

9.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

10.    The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* 597 U.S. __, Case No. 20-843, slip op. (June 23, 2022) (hereinafter "*Bruen*");  *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (per curiam) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn")*; *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer")*.

11.    Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

12.    The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1.

4

**APP. 12**

**The statutory scheme.**

13.     This action challenges the constitutionality of DC Code Section 7-2506.01(b). This Section outlaws the possession of so-called large capacity ammunition feeding devices. Specifically, this section provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

14.     Pursuant to DC Code Section 7-2507.06(a)(4) possession of what the District defines as a large capacity feeding device is a felony carrying a penalty of up to three years in prison. In addition, conviction can result in the imposition of a fine of up to $12,500. DC Code Section 22-3571.01(b)(6).

15.     The term "large capacity feeding device" as used in the Code is not a technical term used in the firearms industry or community. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that come standard with magazines holding more than 10 rounds, and which are owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the District's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Magazines" shall have the same meaning as the term "large capacity feeding device" in section DC Code Section 7-2506.01(b).

**APP. 13**

**DC Code Section 7-2506.01(b) infringes Plaintiffs' right to keep and bear arms.**

16.     Pursuant to the Supreme Court's decisions in *Bruen, supra,* and *District of Columbia v. Heller*, *supra*, and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to keep firearms in common use in the home and to carry a handgun in public for self-protection. A necessary component of the right to own or carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment). Likewise in order to employ ammunition in a firearm, it is necessary to possess and use ammunition feeding devices such as the Banned Magazines.

17.     Plaintiffs currently own and possess Banned Magazines outside the District. Plaintiffs desire to possess the Banned Magazines in the District for all lawful purposes including self-defense. Moreover, they wish to acquire more Banned Magazines and use their Banned Magazines for all lawful purposes, including self-defense.

18.     The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller,* 554 U.S. at 627. The D.C. Circuit addressed this commonly owned issue with respect to the Banned Magazines in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*")*.* There the majority opinion stated, "As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Id.* at 1261.

**APP. 14**

19.     Inasmuch as the decision in *Heller II,* upholding the ban on magazines holding in excess of 10 rounds was based on an application of so-called intermediate scrutiny, that decision has been abrogated by *Bruen,* slip op. at 13-15, which specifically rejected the application of means/ends balancing tests like intermediate scrutiny to firearms regulations in favor of the text, history and tradition approach favored by the dissenting opinion of then judge, now Justice Kavanaugh. *See Heller II,* 670 F.3d at 1269-96.

20.     Similarly, the 4th Circuit in Kolbe v. Hogan addressed the commonly owned issue. 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra.* In his dissent (which, after *Bruen,* likely represents the correct interpretation of the law), Judge Traxler stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

Id., 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted).

21.     Law-abiding citizens own literally tens of millions of Banned Magazines such as those owned and possessed by Plaintiffs. The District's prohibition on the possession of the Banned Magazines owned by Plaintiffs violates the Second Amendment because it prohibits the possession of a commonly owned component of an arm protected by the Second Amendment..

22.     There is an actual and present controversy between the parties. The District infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of magazines commonly possessed by millions of Americans for lawful purposes. Plaintiffs desire a judicial declaration that DC Code Section 7-2506,01(b), facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to

**APP. 15**

choose between risking criminal prosecution and exercising their constitutional rights. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

23.    Plaintiffs are injured by Defendants' enforcement of the DC Code Section 7-2506.01(b) as this provision violates Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will continue to enforce this provision in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Though Plaintiffs seek damages for the violation of their Second Amendment rights, damages appear indeterminate or unascertainable beyond a nominal amount and, in any event, would not fully redress the harm Plaintiffs are suffering.

24.    Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate, consistent with the nation's historical tradition of firearms regulation, the manner of keeping and carrying arms, and may prohibit certain arms in narrowly defined sensitive places, prohibit the keeping and carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and others, such laws are invalid unless supported by the text of the Second Amendment or by historical analogues existing at the time of, or in close proximity to, the founding. *Bruen, slip op.* at 13.

**APP. 16**

25.     Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

26.     The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection.

27.     The prohibiting on the Banned Magazines places Plaintiffs at risk in the event of a deadly force criminal attack by limiting the number of rounds Plaintiffs may rapidly bring to bear to protect their lives. There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Indeed, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

28.     Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by

**APP. 17**

causing sufficient trauma and blood loss so that the attacker loses the ability to cause harm. Handgun bullets, however, are rather weak for this purpose as has been proven by numerous officer involved and civilian shootings.

29.     For example, Jacksonville Police Officer Jared Reston fired 14 shots in attempting to stop a shoplifter who carried a handgun chambered in .45 caliber, one of the larger caliber pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight only with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/. In a video where Reston goes into detail concerning the incident, he states that if he had had to reload, he would have been killed. Reston, Winning an Armed Encounter, Speech Delivered at McHenry County College (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.[1]

30.     Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to

---

[1] Reston explained, "I am a huge capacity person. A good workable caliber with capacity. If I were to have like a single stack 1911 or any single stack gun at that point, I would have had to reload in to there somewhere and that reload would have probably cost me my life." *Id.* at 17:47-18:07. "I'm a pretty good reloader and I can do it under two seconds, but that's almost 50 percent of damn gun fight itself I would have wasted reloading." *Id.* at 18:09-18:17.T

**APP. 18**

fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.

A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

31.    Wisconsin officer Brian Murphy was shot 15 times by a mass murdering white supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms, and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

32.    In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report of the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated,  "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf.  In that gun fight, two officers

**APP. 19**

fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

33.     Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

34.     These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds will be sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[2] In his video presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter*, supra, at 23;50-24:24, available at

---

[2] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

**APP. 20**

https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

35.     Reloading a firearm takes precious seconds that a victim may not have during a criminal attack. SWAT officer Jared Reston may be able to reload his pistol in two seconds, but the average citizen gun owner is much slower. Moreover, there may be circumstances where reloading is impossible. Reloading a semi-automatic handgun requires the use of two hands. That might not be possible under certain circumstances. For example, a person attempting to fend off an attacker in physical contact with him or her, likely will not have both hands free to reload an empty gun. Likewise, a homeowner awakened at night by the sound of a break in will likely have a firearm in one hand and flashlight in the other, and no room for a second magazine. The Chief's rule thereby imposes a severe and substantial infringement on the ability of Plaintiffs to use their self-defense firearms for the lawful protection of themselves and others. This is especially the case in which a licensed concealed carrier or armed District homeowner might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.     (The     Ayoob     Files)     (2003),     available     at*

**APP. 21**

https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot

out.+(The+Ayoob...-a099130342.

36.    We note that District police officers are mandated to carry 52 rounds for their self-

defense when on duty with their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds,

and two additional full 17 round magazines.[3] What is good for MPD officers, however, is forbidden

to the D.C. residents and out of state persons who D.C. concealed pistol license holders. Yet, those

license holders have undergone rigorous training and background checks which are among the

most demanding in America.

**SECTION 7-2506.01(b) LACKS ANY HISTORIC ANALOGUE**.

37.    Plaintiffs are unaware of any founding era limitations on the capacity of firearms a

person could own or carry to defend himself from an assailant. The District of Colorado recently

addressed a similar magazine ban in *Rocky Mountain Gun Owners v. Town of Superior,* Case No.

22-cv01685. There Judge Raymond P. Moore issued a Temporary Restraining Order against the

town's ordinance which, inter alia, banned magazines like the Banned Magazines at issue in this

case. Applying the test the Supreme Court articulated in *Bruen,* Judge Moore stated, "the Court is

unaware of historical precedent that would permit a government entity to entirely ban a type of

weapon that is commonly used by law-abiding citizens for lawful purposes whether in an

individual's home or in public." *Id.* Doc. 18 at 10.

---

[3] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008). Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). *See Duncan v. Bonta,* Case No. 21-1194, Petition for Writ of Certiorari (February 28, 2022), cert. granted, vacated and remanded, 597 U.S. __ (June 30, 2022).

**APP. 22**

38.     Prior cases involving bans on magazines, such as the Banned Magazines at issue in this case, failed to elicit any historical justification as required by *Bruen. See generally Heller II,* 650 F.3d 1244; *Kolbe v. Hogan,* 849 F.3d 114; *Duncan v. Bonta*, No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; mandate stayed in part pending petition for certiorari Dec. 20, 2021), cert granted, vacated and remanded (June 30, 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), cert. denied, 141 S. Ct. 109 (2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J. ("ANJRPC")*, 910 F.3d 106 (3d Cir. 2018).; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("NYSRPA"), 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

39.     Firearms with ammunition capacity in excess of 10 rounds date back to the 1500s. Professor David Kopel has done the heavy lifting researching the history of firearm ammunition capacity and restrictions. *See* Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) (hereinafter "Kopel"). He reports the first known firearm able to fire more than ten rounds without reloading was a 16-shot gun created around 1580. *Id.* at 852. Another early design was the 11-round "Defence Gun," patented in 1718 by inventor James Puckle. *Id.*

40.     Professor Kopel further explains that when the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 22-shot magazine capacity. *Id.* at 853. Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition. *Id.* One shot from that gun could penetrate a one-inch-thick wood plank or take down an elk. *Id.*

41.     Firearm technology progressed rapidly in the 1800s as manufacturers sought to produce reliable firearms with greater ammunition capacities for consumers. *Id.* 1821 saw the introduction of the Jennings multi-shot flintlock rifle, which could fire 12 shots before reloading.

**APP. 23**

*Id.* "Pepperbox" pistols began to be produced in America in the 1830s. *Id.* at 853-54. These pistols had multiple barrels that would fire sequentially. *Id.* at 854. Although most were produced as five or six shot models, 12 shot, 18 shot and 24 shot models were produced. *Id.* Pepperboxes were eventually supplanted by revolvers. *Id.*

42.     A variety of other firearms having a capacity in excess of 10 rounds were invented in the antebellum years, including the Bennett and Haviland Rifle (12 shot); and rifles invented by Alexander Hall (15 shots) and by Colonel Parry W. Porter (38 shot). *Id.*

43.     Daniel Wesson and Oliver Winchester produced the first metallic cartridges similar to modern ammunition. *Id.* They also invented a lever action firearm that employed these cartridges. *Id.* In 1855, they introduced the Volcanic rifle, with up to a 30-round tubular magazine under the barrel. *Id.* at 855. In 1862, the Volcanic evolved into the 16-round capacity Henry lever action rifle. *Id.* The Henry rifle further evolved into the Winchester repeating rifle, Model 1866. *Id.* According to advertising, the M1866 could be fired 30 times a minute or with 17 rounds in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." *Id.* Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a 15-round capacity. *Id.* at 856. The Evans Repeating Rifle came on the market in 1873 with a rotary helical magazine in the buttstock that held 34 rounds. *Id.*

44.     Pin-fire revolvers with capacities of up to 20 or 21 rounds entered the market in the 1850s. *Id.* For revolvers with other firing mechanisms, there were some models with more than 17 rounds. *Id.* The 20-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. *Id.*

45.     The semiautomatic firearm with a detachable magazine was invented before the turn of the 20th century. *Id.* at 857. In 1896, Germany's Mauser introduced the C96 "broomhandle"

16

**APP. 24**

pistol, which remained in production until the late 1930s. *Id.* It has capacities ranging from a low of six to a high of 20 rounds. *Id.* The Luger semiautomatic pistol was brought to the market in 1899. *Id.* The most common magazines were seven or eight rounds, but there was also a 32-round drum magazine. *Id*

46.    The 20th Century saw a variety of rifles with magazines capable of holding more than 10 rounds, ranging from various .22 plinking rifles to the M-1 carbine introduced in 1927 to the AR-15 introduced in 1963, followed by such rifles as the Springfield M1A and the Ruger mini-14. *Id.* at 857-60.

47.    Firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. *Id.* at 861. In 1935, Browning introduced the Hi-Power pistol. *Id.* This handgun was sold with a 13-round detachable magazine and is still in production. *Id.* The Beretta model 92, a nine-millimeter pistol with a 16-round magazine, entered the market in 1976. *Id.* Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action). *Id.* Also coming on the market at that time were European handguns such as Austria's L.E.S. P-18 (18 rounds) and Germany's Heckler & Koch VP 70Z (also 18 rounds). *Id.* at 861-62. And the Austrian manufactured Glock 17 pistol (17 round magazine), now standard issue for a majority of law enforcement agencies in the United States, was introduced into the country in the 1980s. *See* Barrett, Glock: The Rise of America's Gun (2012).

48.    When the Second Amendment was adopted no laws restricted ammunition capacity. Kopel at 864. The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. *Id.* In 1927, Michigan prohibited

**APP. 25**

firearms which could be fired more than 16 times without reloading. *Id.* That same year Rhode Island banned semi-automatic firearms which could fire more than 12 shots without re-loading. *Id.*

49.    In 1959 Michigan repealed its ban and Rhode Island amended its limit to 14 shots, excluding .22 caliber rimfire guns. *Id.* at 864-65. Rhode Island repealed its limit in 1975. *Id.* at 865. Neither statute covered a bare magazine that was not inserted into a firearm. *Id.*

50.    Ohio enacted a 1933 law requiring a special permit for possession or sale of a semiautomatic firearm with an ammunition capacity of greater than 18 rounds. *Id.* In 1971, the state exempted .22 caliber firearms, and raised the limit for other calibers to 32 or more rounds. *Id.* The Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *Id.* With or without the permit, one could buy a 60-round magazine in Ohio. *Id.* The licensing law was repealed in 2014. *Id.*

51.    The only statute continuously in effect from the prohibition era limiting magazine capacity is the District's. *Id.* at 866.[4] In 1932, Congress prohibited the possession in the District of a firearm that "shoots automatically or semiautomatically more than 12 shots without reloading." *Id.* Prior to the *Heller* decision, the District interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. *Id.* The District stands alone in its historical restriction of magazines, and the law in question is not of founding era pedigree. *Id. See Bruen, slip op.* at 57 (finding that a Texas 1873 law and a West Virginia 1900 restricting public carry of handguns were outliers). Moreover, *Bruen, slip op.* at 58 n.28 specifically rejected 20th Century firearm restrictions as historical evidence, stating, "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-

---

[4] *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

**APP. 26**

century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

52.     The only widespread restriction on magazine capacity came in 1994 when Congress banned new magazines holding more 10 ten rounds. *Id.* The law sunset in 2004. *Id.* The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. *Id.* The final report concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury ...." *Id.* at 866-87[5] Further, "the ban has not yet reduced the use of [such magazines] in crime ...." *Id.* Doctor Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* As discussed above, *Bruen* renders the 1994 Congressional act historically irrelevant.

53.     Professor Kopel observes that of the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being "longstanding" or part of American history and tradition. *Id.* at 883-84. The opinion in *Bruen* requires a historical analogue to have been well-established. *Bruen, slip op.* at 21 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.") *Bruen* in fact found insufficient New York's reliance on the laws of "a handful of late-19th-century jurisdictions" to justify its restrictive firearm carry regime. *Bruen, slip op.* at 29. It is clear from the discussion above that Ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Kopel at 884.

---

[5] Quoting Koper, et al., An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

**APP. 27**

54.     In sum, no regulations from around the time of the adoption of the Second or 14th

Amendments limited the ammunition capacity of a firearm. Firearms with ammunition capacity in

excess of 10 rounds have been available since well before the Second Amendment was adopted.

Restrictions on ammunition capacity being  of only recent vintage are not supported by reference

to the nation's historical regulation of firearms.

55.     Certain 20th Century hunting regulations generally do restrict the number of

shotgun shells or rifle rounds allowable in a hunting weapon. However, these are conservation

regulations designed to prevent overhunting and are obviously not of founding era pedigree as

*Bruen* requires. As one commentator has explained it,

> At the behest of […] hunters, laws were passed to better regulate hunting in the
> United States. Laws created bag limits, possession limits, sectioned off certain plots
> of land as refuges for birds. This is also where we got laws banning the sale of wild
> game meat (if you have a source of venison that you purchase, it is from a farm).
>
> One set of game laws that rose out of that early movement was magazine capacity
> limits. The idea was that a recreational hunter would only kill one or two birds out
> of a flock, it wasn't considered sporting to blast dozens of ducks out of the water.
> Limiting shotguns to 10 gauge and smaller with only few shells played a big part
> in ending market hunting for birds.
>
> Many laws and hunting etiquette from those early days has carried over into the
> 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal
> law restricting waterfowl hunters to three shots was enacted. As it happened,
> waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3,

2021),           available           at           https://backfire.tv/why-shotguns-have-

plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depe

nding%20on%20the%20gauge%20and%20magazine%20length.

56.     Plainly, these types of modern hunting regulations have no nexus to the Second

Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen*

**APP. 28**

requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).") Since no historical analog for limiting the capacity of firearm magazines exists, the District's limitation as set forth in DC Code Section 7-25506.01(b) fails Second Amendment scrutiny. *See Bruen, slip op.* at 67.

57.    In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

58.    Accordingly, it would be error for the Court to evaluate the regulation at issue under some type of the means-end tiers of scrutiny approach *Bruen* specifically rejects. *Id.* at 15. The appropriate test is the text of the Second Amendment and the nation's historical tradition of firearms regulation. The D.C. magazine ban fails this test. Because there is no historic tradition in this nation of limiting firearm magazine capacity, the District's prohibition on possession of

**APP. 29**

magazines having a capacity in excess of 10 rounds is unconstitutional as violative of the Second Amendment.

**FIRST CLAIM FOR RELIEF: U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS.**

59.    DC Code Section 7-2506.01(b)'s prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is not supported by the nation's historical tradition of firearms regulation. As such the law violates Plaintiffs' Second Amendment rights.

60.    DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against DC Code Section 7-206.01(B), and damages for the violation of their Second Amendment rights.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

61.    DC Code Section 7-2506.01(b) prohibition on possession of a firearm feeding device capable of holding in excess of 10 rounds is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to keep and bear arms for self-defense.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgement that the DC Code Section 7-2506.01(b) is arbitrary and unreasonable under the Second and Fifth Amendments to the United States Constitution;

2. Enter a declaratory judgement that DC Code Section 7-2506.01(b) violates the Second Amendment to the United States Constitution;

3. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DC Code Section 7-2506.01(b) within the District of Columbia;

4. Enter an order awarding Plaintiffs damages in an amount to be determined at trial;

5. Enter an order awarding Plaintiffs their costs of suit, including attorneys fees and costs pursuant to 42 U.S.C. §1988; and

6. Enter an order providing any other and further relief that the court deems just and appropriate.

**APP. 31**

Respectfully submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 1, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ANDREW HANSON, ET AL.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-2256 RC |
| | ) | |
| **DISTRICT OF COLUMBIA**, **ET AL.** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**APPLICATION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this court to enter a preliminary injunction, enjoining Defendants from enforcing the provisions of DC Code Section 7-2506.01(b). Submitted concurrently herewith is a Memorandum of Points and Authorities in support of this application and a proposed order. Counsel for Defendants has been asked the Defendants' position on this application and has indicated that the Defendants do not consent to entry of the requested injunction.

Respectfully submitted

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By: /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 19, 2022

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing

document on all counsel of record for Defendants through the court's ECF system, this 19th day of

August, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 34**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ANDREW HANSON, ET AL.** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-2256 RC |
| | ) | |
| **DISTRICT OF COLUMBIA, ET AL.** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION


**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 19, 2022

# TABLE OF CONTENTS

Table of Authorities ……………………………………………………………………….... ii

I.      Plaintiffs have standing to bring this action ……………………………………………… 1

II.     Plaintiffs are entitled to a preliminary injunction ………………………..………………… 2

        A.      Plaintiffs are likely to prevail on the merits ………………………………...……… 3

                1.   The Second Amendment …………………………………….................... 3

                2.   The statutory scheme ……………………………...…………………….. 4

                3.   DC Code Section 7-2506.01(b) infringes Plaintiffs' right
                     to keep and bear arms ……………………………………………………… 5

                     a.   The Banned Magazines are commonly owned weapons
                          components ……………….…………………………………………... 5

                     b.   DC Code Section 7-2506.01(b) is more than a de minimis burden on
                          Plaintiffs' Second Amendment right of self-defense ……………… 7

                     c.   DC Code Section 7-2506.01(b) lacks any historical analogue ……….. 14

        B.      Plaintiffs will continue to suffer irreparably harm in the absence
                of preliminary relief ……………………………………………………………… 21

        C.   The balance of equities tips overwhelmingly in Plaintiffs' favor ……………..…… 23

        D.   An injunction is in the public interest …………………………………………… 23

III.    The court should waive the bond requirement or set a nominal bond because
        Defendants will suffer no harm from a preliminary injunction …………………..……24

IV.     The court should enter final judgment for plaintiffs …………………………..…… 26

V.      Conclusion ………………………………………………………………...…… 27

Exhibit 1, Declaration of Andrew Hanson

Exhibit 2, Declaration of Tyler Yzaguirre

Exhibit 3, Declaration of Nathan Chaney

Exhibit 4, Declaration of Eric Klun

**APP. 36**

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) …………………………………..…………..… 2, 3

*Ark. Best Corp. v. Carolina Freight Corp.,*
   60 F.Supp.2d 517 (W.D.N.C. 1999) ………………………………….…………… 24

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.,*
   910 F.3d 106 (3d Cir. 2018) ………………………………………………….…….. 14

*Berg v. Glen Cove City School District,*
   853 F.Supp. 651 (E.D.N.Y. 1994) ……………………………………….………… 22

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) …………………………………………………………… 3, 8

*Chaplaincy of Full Gospel Churches v. England,*
   454 F.3d 290 (D.C. Cir. 2006) ……………………………………….…… 21, 23

*Curtis 1000, Inc. v. Suess,*
   24 F.3d 941 (7th Cir. 1994) ……………………………….……………………… 26

*Davis v. District of Columbia,*
   158 F.3d 1342 (D.C. Cir. 1998) …………………………………………………… 22

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ……………………………………………….…….. passim

*Doe v. Shenandoah County School Board,*
   737 F.Supp. 913 (W.D.Va. 1990) …………………………………….………… 22

*Duncan v. Bonta,*
   No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; *mandate stayed in part pending petition for certiorari* Dec. 20, 2021), Case No. 21-1194, *cert granted, vacated and remanded,* 597 U.S. __ (June 30, 2022) ……………….... 13, 14

*Elrod v. Burns,*
   427 U.S. 347 (1976) ……………………………………………………………… 22

*Ezell v. Chicago,*
   651 F.3d 684 (7th Cir. 2011) …………………………………….…………….. 5, 22, 23

**\*Denotes principal cases relied upon**

**APP. 37**

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) …………………………………………………… 14

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ………………………………………….. 21, 22, 23

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ……………………………….…......... 5, 6

*Heller v. District of Columbia*,
   801 F.3d 264 (D.C. Cir. 2015) ……………………………………..…………….. 8

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) ……………………….…………………………… 24

*Joynes v. Lancaster*,
   553 F.Supp. 809 (M.D.N.C. 1982) …………………………………………..……. 22

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
   710 F.3d 99 (3d Cir. 2013) ……………………………………………………… 23

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ……………………………………………… 6, 14

*Konigsberg v. State Bar of California*,
   366 U.S. 36 (1961) …………..………………………………………………….. 21

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) …………..………………………………………..……… 1

*McDonald v. Chicago*,
   561 U.S. 742 (2010) …………………………………………………………… 3

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) *reh'g en banc denied*,
   708 F.3d 901 (7th Cir. 2013)…………………………………………… 26, 27

*Morris v. District of Columbia*,
   38 F. Supp. 3d 57 (D.D.C. 2014) …………………………………………... 26

*\*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. ___, Case No. 20-843, *slip op.* (June 23, 2022) …………………………… passim

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) …………………………………………………….. 14

**APP. 38**

*Palmer v. District of Columbia,*
59 F.Supp.3d 173 (D.D.C. 2014) …………………………………………….... 3, 8

*Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep 't of Soc Servs.,*
50 F.3d 1168 (2d Cir. 1995) …………………………………………………….. 25

*Rocky Mountain Gun Owners v. Town of Superior,*
Case No. 22-cv-01685, Doc. 18 …………………………………………………… 14

*SEC v. Dowdell,*
Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 (W.D. Va., Oct. 11 , 2002) ….. 24

*Temple Univ. v. White,*
941 F.2d 201 (3d Cir. 1991), *cert. denied* 502 U.S. 1032 (1992) ………………………. 25

*The Truth About Obama v. Federal Election Commission,*
575 F.3d 342 (4th Cir. 2009), *remanded other grounds* 130 S.Ct. 237 (2010) ………..… 2

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
249 F. Supp.2d 98, 128 (D. Mass. 2003) …………………………………………... 25

*Winter v. National Resources Defense Fund,*
555 U.S. 7 (2008) ……………………………………………………..……… 2, 21

*Worman v. Healey,*
922 F.3d 26 (1st Cir. 2019), *cert. denied* 141 S. Ct. 109 (2020) ………………………. 14

*\*Wrenn v. District of Columbia,*
864 F.3d 650 (D.C. Cir. 2017) ……………………...……………………….………… passim

## Statutes and Rules

Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652 ………………………. 18

DC Code Section 7-2506.01(b) ……………………………………………………….. passim

DC Code Section 7-2507.06(a)(4) …………………………………………………....….... 4

DC Code Section 22-3571.01(b)(6) ……………………………………………………. 4

Fed. R. Civ. P. 65(a) …………………………………………………..…………... 26

Fed. R. Civ. P. 65(c) …………………………………………………..…………… 24

U.S. Const. Amend. II ……………………………………………………………… passim

**APP. 39**

## Other authorities

1 A New and Complete Law Dictionary (1771) ………………………………………….…… 3

1 Dictionary of the English Language 107 (4th ed.) ………………………………….……3

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/ ………………………………………………………………... 10, 15

Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/ …………………………………………………………………………….. 11

Ayoob, *Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* (2003), available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot out.+(The+Ayoob...-a099130342 ……………………………………………………… 13

Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/ ……..… 10

Barrett, *Glock: The Rise of America's Gun* (2012) …………………………………….. 17

FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf ................................................. 11

Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%2 0the,can%20result%20in%20serious%20bodily%20injury%20or%av20death ……………….. 12

Klaus, *Carjacking, 1993-2002, National Crime Victimization Survey* (July 2004), available at https://bjs.ojp.gov/content/pub/pdf/c02.pdf ................................................................................. 13

Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) …………………………………………………………………… 15, 1, 17, 18, 19

Koper, et al., *An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003*, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ........................................................ 18, 19

Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017) ……………….... 11

MPD General Order RAR-901.01 (June 12, 2008) …………………………………………... 13

**APP. 40**

Purkiss, *Locked Back, Lessons from Jared Reston's Gun Fight – Shot 7 Times & Still Won*
(December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-
times-still-won/ ………………………………………………………………………….. 9

Reston, *Winning an Armed Encounter* (December 4, 2017), available at
https://www.youtube.com/watch?v=jIx0Y25aTfU ………………………………………… 9, 12

*Samson, 4 arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-
Madison,  Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-
including-15-old-174154164.html?fr=sycsrp_catchall* …………………………………… 12, 13

Seagraves, *Carjackings in DC Spark Anger, Frustration Among Residents* (January 31, 2022),
available at https://www.nbcwashington.com/news/carjackings-in-dc-spark-anger-frustration-
among-residents/2955523/ …………………………………………………………………... 13

Than, *Gunshot Wound Head Trauma (undated), available at
https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-
Head-Trauma* …………………………………………………………………………………... 11

Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019),
available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html ..... 9

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3,
2021), available at https://backfire.tv/why-shotguns-have-
plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depe
nding%20on%20the%20gauge%20and%20magazine%20length ……………………………... 20

**APP. 41**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON, ET AL.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-2256 RC |
| | ) |
| **DISTRICT OF COLUMBIA**, **ET AL.** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**

Plaintiffs submit this memorandum of points and authorities in support of their application to preliminarily enjoin enforcement of DC Code Section 7-2506.01(b). In support, the following is shown:

### I.      *Plaintiffs have standing to bring this action.*

To show standing, Plaintiffs must allege a concrete and particularized injury that is either actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be both fairly traceable to the challenged action of the Defendants and redressable by the court. *Id*. at 560-61. Plaintiffs plainly meet this standard.

Plaintiffs here are suffering an immediate and continuing injury because the Defendants by enforcement of DC Code Section 7-2506.01(b) restrict Plaintiffs from employing the firearm magazines banned by that provision which Plaintiffs would use in exercising their right under the Second Amendment to keep and carry firearms for personal protection within the District and for all other lawful purposes.

Each Plaintiff has been issued a license to carry handguns in public in the District pursuant to District law. *See* Exhibit 1 (Declaration of Andrew Hanson); Exhibit 2 (Declaration of Tyler

1

**APP. 42**

Yzaguirre); Exhibit 3 (Declaration of Nathan Chaney); Exhibit 4 (Declaration of Eric Klun). Plaintiffs would employ the banned magazines when carrying firearms outside their homes for personal protection. Moreover, Plaintiffs Hanson and Yzaguirre, as District residents, would employ the banned magazines for home protection as well. However, DC Code Section 7-2506.01(b) prohibits Plaintiffs' possession of the Banned Magazines within the District thereby restricting the amount of ammunition immediately available to Plaintiffs in the event of a lethal force attack upon them. This limitation restricts the ability of Plaintiffs to exercise their Second Amendment right to keep and carry firearms for personal protection in a way that is not consistent with the nation's historical tradition of firearms regulation. It is therefore invalid under the test the Supreme Court announced in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. __, Case No. 20-843, *slip op.* (June 23, 2022) (hereinafter "*Bruen*").

A decision by this court invalidating the District regulation in question and granting the relief requested in Plaintiffs' Complaint will redress the injury Plaintiffs are suffering as it will allow the Plaintiffs to possess the Banned Magazines and employ them in the event of a lethal force attach upon them. As such they have standing to maintain this action to enjoin DC Code Section 7-2506.01(b).

## II.    *Plaintiffs are entitled to a preliminary injunction.*

A plaintiff seeking a preliminary injunction must establish four factors: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. National Resources Defense Fund,* 555 U.S. 7 (2008); *The Truth About Obama v. Federal Election Commission,* 575 F.3d 342 (4th Cir. 2009), remanded other grounds, 130 S.Ct. 237 (2010) (subsequent history omitted). *See also Aamer v. Obama*, 742 F.3d

**APP. 43**

1023, 1038 (D.C. Cir. 2014). Each of these factors supports grant of Plaintiffs' application for a preliminary injunction.

### A.  *Plaintiffs are likely to prevail on the merits.*

As we show below, Plaintiffs are likely to prevail on the merits of their claims because DC Code Section 7-2506.01(b) violates their Second Amendment rights.

### 1.  *The Second Amendment.*

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *Bruen, supra*; *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (per curiam) (hereinafter *"Caetono")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1.

3

**APP. 44**

## 2. *The statutory scheme.*

This action challenges the constitutionality of DC Code Section 7-2506.01(b). This Section outlaws the possession of so-called large capacity ammunition feeding devices. Specifically, this section provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

Pursuant to DC Code Section 7-2507.06(a)(4) possession of what the District defines as a large capacity feeding device is a felony carrying a penalty of up to three years in prison. In addition, conviction can result in the imposition of a fine of up to $12,500. DC Code Section 22-3571.01(b)(6).

The term "large capacity feeding device" as used in the Code is not a technical term used in the firearms industry or community. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that come standard with magazines holding more than 10 rounds, and which are owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the District's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Magazines" shall have the same meaning as the term "large capacity feeding device" in DC Code Section 7-2506.01(b).

4

**APP. 45**

### 3. *DC Code Section 7-2506.01(b) infringes Plaintiffs' right to keep and bear arms.*

Pursuant to the Supreme Court's decisions in *Bruen, supra, and District of Columbia v. Heller*, *supra*, and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to keep firearms in common use in the home and to carry a handgun in public for self-protection. A necessary component of the right to own or carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment). Likewise in order to employ ammunition in a firearm, it is necessary to possess and use ammunition feeding devices such as the Banned Magazines.

Plaintiffs currently own and possess Banned Magazines outside the District. Plaintiffs desire to possess their Banned Magazines in the District for all lawful purposes including self-defense. Moreover, they wish to acquire more Banned Magazines and use their Banned Magazines for all lawful purposes, including self-defense.

### a. *The Banned Magazines are commonly owned weapons components.*

The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller,* 554 U.S. at 627. The D.C. Circuit addressed this commonly owned issue with respect to the Banned Magazines in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) (hereinafter "*Heller II*"*)*. There the majority opinion stated, "As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000. There may well be some

**APP. 46**

capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten." *Id.* at 1261.

Inasmuch as the decision in *Heller II,* upholding the ban on magazines holding in excess of 10 rounds was based on an application of so-called intermediate scrutiny, that decision has been abrogated by *Bruen,* slip op. at 13-15, which specifically rejected the application of means/ends balancing tests like intermediate scrutiny to firearms regulations in favor of the text, history and tradition approach favored by the dissenting opinion of then judge, now Justice Kavanaugh. *See Heller II,* 670 F.3d at 1269-96.

Similarly, the 4th Circuit in *Kolbe v. Hogan* 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen, supra,* addressed the commonly owned issue.. In his dissent (which, after *Bruen,* likely represents the correct interpretation of the law), Judge Traxler stated:

> The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: On a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds. Even more than 20 years ago, fully 18 percent of all firearms owned by civilians were equipped with magazines holding more than ten rounds.

Id., 849 F.3d at 154 (Traxler, J. dissenting) (internal citations and quotation marks omitted).

Law-abiding citizens own tens of millions of Banned Magazines such as those owned and possessed by Plaintiffs. The District's prohibition on the possession of the Banned Magazines owned by Plaintiffs violates the Second Amendment because it prohibits the possession of a commonly owned component of an arm protected by the Second Amendment.

There is an actual and present controversy between the parties. The District infringes on Plaintiffs' right to keep and bear arms under the Second Amendment by generally prohibiting the possession of magazines commonly possessed by millions of Americans for lawful purposes.

**APP. 47**

Plaintiffs desire a judicial declaration that DC Code Section 7-2506.01(b), facially and/or as applied to them, violate their constitutional rights. Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights. The risk of criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

### b. DC Code Section 7-2506.01(b) is more than a de minimis burden on Plaintiffs' Second Amendment right of self-defense.

Plaintiffs are injured by Defendants' enforcement of the DC Code Section 7-2506.01(b) as this provision violates Plaintiffs' rights under the Second Amendment by precluding the acquisition, possession, and use of arms that are "typically possessed by law-abiding citizens for lawful purposes" nationwide. If not enjoined by this Court, Defendants will continue to enforce this provision in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Though Plaintiffs seek damages for the violation of their Second Amendment rights, damages appear indeterminate or unascertainable beyond a nominal amount and, in any event, would not fully redress the harm Plaintiffs are suffering.

Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate, consistent with the nation's historical tradition of firearms regulation, the manner of keeping and carrying arms, and may prohibit certain arms in narrowly defined sensitive places, prohibit the keeping and carrying of arms that are not within the scope of the Second Amendment's protection, such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Bruen, slip. op.* at 13; *Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and others, such laws are invalid unless supported by the text of the

**APP. 48**

Second Amendment or by historical analogues existing at the time of, or in close proximity to, the founding. *Bruen, slip op.* at 13.

Given the decision in *Bruen and Heller*, the District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment and the historical tradition of firearms regulation in the United States. *Bruen, slip op.* at 13. *See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection.

The prohibiting of the Banned Magazines places Plaintiffs at risk in the event of a deadly force criminal attack by limiting the number of rounds Plaintiffs may rapidly bring to bear to protect their lives. There are two ways to stop a deadly force attack. The first is to persuade the attacker to stop. This could potentially be accomplished through verbal persuasion such as an appeal to morality and humanity; however, in the real world once someone has committed to the use of deadly force in the commission of a violent crime, he is not likely to be talked out of it. A more likely means of persuasion is the threat or application of deadly force in response. Indeed, most crimes which are stopped by armed citizens do not require the firing of a single shot. Similarly, an assailant who has been shot at or hit may decide he has made a grievous error in the victim selection process and break off the attack.

**APP. 49**

Not all criminals, however, are persuadable. To stop those criminals, it is necessary to incapacitate them before they can inflict serious bodily harm or death. This can be done by causing sufficient trauma and blood loss so that the attacker loses the ability to cause harm. Handgun bullets, however, are rather weak for this purpose as has been proven by numerous officer involved and civilian shootings.

For example, Jacksonville Police Officer Jared Reston fired 14 shots in stopping a shoplifter who tried to kill him. The suspect carried a handgun chambered in .45 caliber, one of the larger caliber pistol bullets. The suspect shot Reston once in the face and proceeded to fire 11 more rounds, six of which struck Reston who survived the gun fight. Reston managed to hit the suspect seven times, ending the fight only with a final shot to the suspect's head. *See* Wallace, *Shots Fired: Jared Reston Survival and Gear*, Recoil Magazine (December 6, 2019), available at https://www.recoilweb.com/shots-fired-jared-reston-survival-gear-154993.html. *See also* Purkiss, Locked Back*, Lessons from Jered Reston's Gun Fight – Shot 7 Times & Still Won* (December 20, 2017), available at https://lockedback.com/lessons-jared-restons-gunfight-shot-7-times-still-won/. In a video in which Reston goes into detail concerning the incident, he states that if he had had to reload, he would have been killed. Reston, *Winning an Armed Encounter*, Speech Delivered at McHenry County College (December 4, 2017), available at https://www.youtube.com/watch?v=jIx0Y25aTfU.[1]

---

[1] Reston explained, "I am a huge capacity person. A good workable caliber with capacity. If I were to have like a single stack 1911 or any single stack gun at that point, I would have had to reload in to there somewhere and that reload would have probably cost me my life." *Id.* at 17:47-18:07. "I'm a pretty good reloader and I can do it under two seconds, but that's almost 50 percent of damn gun fight itself I would have wasted reloading." *Id.* at 18:09-18:17.

**APP. 50**

Noted police and civilian firearms instructor and use of force expert Massad Ayoob illustrates this point with two shooting incidents, one involving a civilian and the other involving a law enforcement officer:

> Famed Los Angeles watch shop owner Lance Thomas was involved in multiple gun battles with armed robbers, winning every one. In one of those incidents, he had to fire 19 rounds before the last of his multiple opponents was out of the fight. Some bad guys can soak up an unbelievable amount of lead, and the cunning ones run and use cover, making them harder to hit and requiring more shots to stop them.

> A municipal police sergeant in northern Illinois, Tim Gramins, comes to mind. He pulled over a heavily armed suspect who came out shooting, and the fight was on. In just under a minute, the perpetrator was finally down and dead. During that time, Gramins had fired 33 rounds from his Glock 21 pistol, reloaded as necessary and hit his opponent 14 times with 230-grain Gold Dot .45 bullets. Six of those hits were in what most of us would call "vital zones," but the fight wasn't over until Gramins finally had the opportunity for brain shots. During that fight the suspect had gone through two semi-automatic pistols himself and had fired 21 shots.

Ayoob, *5 Gun Fighting Myths Debunked by Massad Ayoob*, Personal Defense World (October 14, 2014), available at https://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/.

Wisconsin officer Brian Murphy was shot 15 times by a mass murdering white supremist. Only three of those rounds were stopped by his body armor. Other shots hit him in the face, throat, both hands, both arms, and both legs. Despite these grievous injuries, he survived. *See* Ayoob, *Shot 15 Times: The Brian Murphy Story*, American Handgunner (2018), available at https://americanhandgunner.com/our-experts/shot-15-times-the-brian-murphy-story/.

In commenting on another incident in which a suspect was shot 17 times with both .40 caliber 180 Gr. Gold Dot hollow point pistol rounds and .223 Hornady TAP rifle rounds and was still struggling with police as he was being handcuffed, a report of the FBI's Defensive Systems Unit – Ballistic Research Facility, FBI Academy, stated, "Determined individuals can sustain many gunshot wounds in areas that produce great pain and continue to fight a long time, even

without the aid of drugs or alcohol. Shot placement is everything in a gunfight and always the key to stopping a threat effectively." FBI, *Officer Involved Shooting*, available at https://info.publicintelligence.net/FBIAAROfficerShooting.pdf. In that gun fight, two officers fired a total of 107 rounds. The suspect fired 26 rounds, reloading his magazine from a box of loose ammunition. *Id.*

Perhaps one of the more influential gun fights, which has since profoundly affected doctrine on gun selection and ammunition caliber and quantity, is the 1986 FBI Miami shootout. *See generally,* Mireles, *FBI Miami Firefight: Five Minutes that Changed the Bureau* (2017). In that incident two bank robbers shot it out with a team of FBI agents. "Early in the fight, a bullet from [FBI agent Jerry] Dove's 9mm pistol pierced the opposing rifleman's arm and into his chest, slicing an artery and inflicting a 'fatal, but not immediately neutralizing' hit when it stopped short of his heart. It was after that, that he [the bank robber] inflicted most of the deadly damage." Ayoob, *A Sad And Meaningful Anniversary*, Backwoods Home Magazine (April 11, 2016), available at https://www.backwoodshome.com/blogs/MassadAyoob/a-sad-and-meaningful-anniversary/. The assailant would go on to take five more hits from the agents' guns until Agent Edmundo Mireles killed him with a shot to the head. Two FBI agents died and five were seriously wounded in that incident.

These various incidents and many others present the reality of firearms and ammunition count in self-defense. One can never know how many rounds will be sufficient to stop a determined opponent. Even a shot in the face is no guarantee that it will incapacitate an opponent.[2] In his video

---

[2] Head shots are generally considered to be fight stoppers because a shot to the brain likely will shut down the attacker. *See* Than, *Gunshot Wound Head Trauma* (undated), available at https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Gunshot-Wound-Head-Trauma. By definition, a shot to the head is aimed at a small target, compared to a center mass shot, and requires considerably more skill in a life-or-death situation.

**APP. 52**

presentation, Officer Reston explained that on the Jacksonville, Florida Department, he and two other officers had been shot in the face, but each went on to prevail against their assailants. *See* Reston, *Winning an Armed Encounter*, supra, at 23:50-24:24, available at https://www.youtube.com/watch?v=jIx0Y25aTfU. Limits on ammunition such as the District has adopted here bear almost no relationship to reality.

Reloading a firearm takes precious seconds that a victim may not have during a criminal attack. SWAT officer Jared Reston may be able to reload his pistol in two seconds, but the average citizen gun owner is much slower. Moreover, there may be circumstances where reloading is impossible. Reloading a semi-automatic handgun quickly requires the use of two hands. That might not be possible under certain circumstances. For example, a person attempting to fend off an attacker in physical contact with him or her, likely will not have both hands free to reload an empty gun. Likewise, a homeowner awakened at night and wearing night clothes or no clothes by the sound of a break in will likely have a firearm in one hand and flashlight in the other, and no room for a second magazine. The statute thereby imposes a severe and substantial infringement on the ability of Plaintiffs to use their self-defense firearms for the lawful protection of themselves and others.

This is especially the case in which a licensed concealed carrier or armed District homeowner might be set upon by multiple assailants as is the case for residents of those neighborhoods in the District where gangs are prevalent. *See, e.g.,* Johnston, *Wolfpack-Multiple Assailants,* Police Law Enforcement Solutions (November 1, 1996), available at https://www.policemag.com/338649/wolf-pack-multiple-assailants#:~:text=There%20is%20considerable%20empirical%20evidence%20to%20support%20the,can%20result%20in%20serious%20bodily%20injury%20or%av20death. *See also* Samson, *4*

**APP. 53**

*arrested, including 15-year-old, for brutal attack on Chinese PhD student near UW-Madison*, Yahoo News (June 21, 2022), available at https://news.yahoo.com/4-arrested-including-15-old-174154164.html?fr=sycsrp_catchall; Ayoob, *Lead and diamonds: the Richmond jewelry store shootout.    (The     Ayoob     Files)*    (2003),    available    at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelry+store+shoot out.+(The+Ayoob...-a099130342.

One crime often involving multiple assailants is car jackings. Car jackings have recently become a particular problem nationwide and in the District. In 2019, there were 142 carjackings reported in the city. More than 400 carjackings were reported in the District in 2021, however. *See* Seagraves, *Carjackings in DC Spark Anger, Frustration Among Residents* (January 31, 2022), available    at    https://www.nbcwashington.com/news/carjackings-in-dc-spark-anger-frustration-among-residents/2955523/. The latest Department of Justice data on carjacking unfortunately dates back to 2002; however, that data is still illuminating.  56 percent of carjackings involve two suspects or more. 74 percent involved armed offenders. And 24 percent involved injuries to the victims. Klaus, *Carjacking, 1993-2002, National Crime Victimization Survey* (July 2004), available at https://bjs.ojp.gov/content/pub/pdf/c02.pdf.

We note that District police officers are mandated to carry 52 rounds for their self-defense when on duty with their Glock 17 pistols: one in the chamber, a full magazine of 17 rounds, and two additional full 17 round magazines.[3] What is good for MPD officers, however, is forbidden to

---

[3] *See* MPD General Order RAR-901.01 (Handling of Service Weapons) at 4 (June 12, 2008). Unlike MPD officers, District citizens are limited to 10 round low-capacity magazines, rather than the standard capacity magazines that come stock with most semi-automatic pistols such as the Glock 17 (17 round capacity standard magazine) or the Glock 19 (15 round capacity standard magazine). *See Duncan v. Bonta,* Case No. 21-1194, petition for writ of certiorari (February 28, 2022), *cert. granted, vacated and remanded*, 597 U.S. __ (June 30, 2022).

**APP. 54**

the D.C. residents and out of state persons with D.C. concealed pistol license holders. Yet, those license holders have undergone rigorous training and background checks which are among the most demanding in America.

### c.   DC Code Section 7-2506.01(b) lacks any historic analogue.

Plaintiffs are unaware of any founding era limitations on the capacity of firearms a person could own or carry to defend himself from an assailant. The U.S. District Court for Colorado recently addressed a similar magazine ban in *Rocky Mountain Gun Owners v. Town of Superior,* Case No. 22-cv01685. There Judge Raymond P. Moore issued a Temporary Restraining Order against the town's ordinance which, inter alia, banned magazines like the Banned Magazines at issue in this case. Applying the test the Supreme Court articulated in *Bruen,* Judge Moore stated, "the Court is unaware of historical precedent that would permit a government entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes whether in an individual's home or in public." *Id.* Doc. 18 at 10.

Prior cases involving bans on magazines, such as the Banned Magazines at issue in this case, failed to elicit any historical justification as required by *Bruen. See generally Heller II,* 650 F.3d 1244; *Kolbe v. Hogan,* 849 F.3d 114; *Duncan v. Bonta*, No. 19-55376 (9th Cir.) (en banc) (opinion issued Nov. 30, 2021; *mandate stayed in part pending petition for certiorari* (Dec. 20, 2021), *cert granted, vacated and remanded* (June 30, 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 109 (2020); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

Firearms with ammunition capacity in excess of 10 rounds date back to the 1500s. Professor David Kopel has done the heavy lifting researching the history of firearm ammunition

**APP. 55**

capacity and restrictions. *See* Kopel, *The History Of Firearm Magazines And Magazine Prohibitions,* 78 Albany L. Rev. 849 (2015) (hereinafter "Kopel"). He reports the first known firearm able to fire more than ten rounds without reloading was a 16-shot gun created around 1580. *Id.* at 852. Another early design was the 11-round "Defence Gun," patented in 1718 by inventor James Puckle. *Id.*

Professor Kopel further explains that when the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 22-shot magazine capacity. *Id.* at 853. Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition. *Id.* One shot from that gun could penetrate a one-inch-thick wood plank or take down an elk. *Id.*

Firearm technology progressed rapidly in the 1800s as manufacturers sought to produce reliable firearms with greater ammunition capacities for consumers. *Id.* 1821 saw the introduction of the Jennings multi-shot flintlock rifle, which could fire 12 shots before reloading. *Id.* "Pepperbox" pistols began to be produced in America in the 1830s. *Id.* at 853-54. These pistols had multiple barrels that would fire sequentially. *Id.* at 854. Although most were produced as five or six shot models, 12 shot, 18 shot and 24 shot models were produced. *Id.* Pepperboxes were eventually supplanted by revolvers. *Id.*

A variety of other firearms having a capacity in excess of 10 rounds were invented in the antebellum years, including the Bennett and Haviland Rifle (12 shot); and rifles invented by Alexander Hall (15 shots) and by Colonel Parry W. Porter (38 shot). *Id.*

Daniel Wesson and Oliver Winchester produced the first metallic cartridges similar to modern ammunition. *Id.* They also invented a lever action firearm that employed these cartridges. *Id.* In 1855, they introduced the Volcanic rifle, with up to a 30-round tubular magazine under the barrel. *Id.* at 855. In 1862, the Volcanic evolved into the 16-round capacity Henry lever action

15

rifle. *Id.* The Henry rifle further evolved into the Winchester repeating rifle, Model 1866. *Id.* According to advertising, the M1866 could be fired 30 times a minute or with 17 rounds in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." *Id.* Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a 15-round capacity. *Id.* at 856. The Evans Repeating Rifle came on the market in 1873 with a rotary helical magazine in the buttstock that held 34 rounds. *Id.*

Pin-fire revolvers with capacities of up to 20 or 21 rounds entered the market in the 1850s. *Id.* For revolvers with other firing mechanisms, there were some models with more than 17 rounds. *Id.* The 20-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. *Id.*

The semiautomatic firearm with a detachable magazine was invented before the turn of the 20th century. *Id.* at 857. In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s. *Id.* It has capacities ranging from a low of six to a high of 20 rounds. *Id.* The Luger semiautomatic pistol was brought to the market in 1899. *Id.* The most common magazines were seven or eight rounds, but there was also a 32-round drum magazine. *Id*

The 20th Century saw a variety of rifles with magazines capable of holding more than 10 rounds, ranging from various .22 plinking rifles to the M-1 carbine introduced in 1927 to the AR-15 introduced in 1963, followed by such rifles as the Springfield M1A and the Ruger mini-14. *Id.* at 857-60.

Firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. *Id.* at 861. In 1935, Browning introduced the Hi-Power pistol. *Id.* This handgun was sold with a 13-round detachable magazine and is still in production. *Id.* The Beretta model 92,

16

a nine-millimeter pistol with a 16-round magazine, entered the market in 1976. *Id.* Browning introduced another popular handgun in 1977, the 14-round BDA (Browning Double Action). *Id.* Also coming on the market at that time were European handguns such as Austria's L.E.S. P-18 (18 rounds) and Germany's Heckler & Koch VP 70Z (also 18 rounds). *Id.* at 861-62. And the Austrian manufactured Glock 17 pistol (17 round magazine), now standard issue for a majority of law enforcement agencies in the United States, was introduced into the country in the 1980s. *See* Barrett, *Glock: The Rise of America's Gun* (2012).

When the Second Amendment was adopted no laws restricted ammunition capacity. Kopel at 864. The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. *Id.* In 1927, Michigan prohibited firearms which could be fired more than 16 times without reloading. *Id.* That same year Rhode Island banned semi-automatic firearms which could fire more than 12 shots without re-loading. *Id.*

In 1959 Michigan repealed its ban and Rhode Island amended its limit to 14 shots, excluding .22 caliber rimfire guns. *Id.* at 864-65. Rhode Island repealed its limit in 1975. *Id.* at 865. Neither statute covered a bare magazine that was not inserted into a firearm. *Id.*

Ohio enacted a 1933 law requiring a special permit for possession or sale of a semiautomatic firearm with an ammunition capacity of greater than 18 rounds. *Id.* In 1971, the state exempted .22 caliber firearms, and raised the limit for other calibers to 32 or more rounds. *Id.* The Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. *Id.* With or without the permit, one could buy a 60-round magazine in Ohio. *Id.* The licensing law was repealed in 2014. *Id.*

**APP. 58**

The only statute continuously in effect from the prohibition era limiting magazine capacity is the District's. *Id.* at 866.[4] In 1932, Congress prohibited the possession in the District of a firearm that "shoots automatically or semiautomatically more than 12 shots without reloading." *Id.* Prior to the *Heller* decision, the District interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. *Id.* The District stands alone in its historical restriction of magazines, and the law in question is not of founding era pedigree. *Id. See Bruen, slip op.* at 57 (finding that a Texas 1873 law and a West Virginia 1900 restricting public carry of handguns were outliers). Moreover, *Bruen, slip op.* at 58 n.28 specifically rejected 20th century firearm restrictions as historical evidence, stating, "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."

The only widespread restriction on magazine capacity came in 1994 when Congress banned new magazines holding more 10 rounds. *Id.* at 866. The law sunset in 2004. *Id.* The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. *Id.* The final report concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury ...." *Id.* at 866-87[5] Further, "the ban has not yet reduced the use of [such magazines] in crime ...." *Id.* Doctor Koper noted also that state-level firearm bans have not had an impact on crime. *Id.* As

---

[4] *See* Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

[5] Quoting Koper, et al., An Updated Assessment Of The Federal Assault Weapons Ban: Impacts On Gun Markets And Gun Violence, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

**APP. 59**

discussed above, *Bruen* renders the 1994 Congressional act historically irrelevant given its late vintage.

Professor Kopel observes that of the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being "longstanding" or part of American history and tradition. *Id.* at 883-84. The opinion in *Bruen* requires a historical analogue to have been well-established. *Bruen, slip op.* at 21 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.") *Bruen* in fact found insufficient New York's reliance on the laws of "a handful of late-19th-century jurisdictions" to justify its restrictive firearm carry regime. *Bruen, slip op.* at 29. It is clear from the discussion above that ammunition capacity limits such as DC's magazine ban are far outside the norm of the traditional exercise and regulation of Second Amendment rights. *See* Kopel at 884.

In sum, no regulations from around the time of the adoption of the Second or for that matter the 14th Amendments limited the ammunition capacity of a firearm. Firearms with ammunition capacity in excess of 10 rounds have been available since well before the Second Amendment was adopted and continuing through this day. Restrictions on ammunition capacity being of only recent vintage are not supported by reference to the nation's historical tradition of firearms regulation.

Certain 20th Century hunting regulations generally do restrict the number of shotgun shells or rifle rounds allowable in a hunting firearm. However, these are conservation regulations designed to prevent overhunting and are obviously not of founding era pedigree as *Bruen* requires. As one commentator has explained it,

> At the behest of [...] hunters, laws were passed to better regulate hunting in the United States. Laws created bag limits, possession limits, sectioned off certain plots of land as refuges for birds. This is also where we got laws banning the sale of wild game meat (if you have a source of venison that you purchase, it is from a farm).

19

**APP. 60**

One set of game laws that rose out of that early movement was magazine capacity limits. The idea was that a recreational hunter would only kill one or two birds out of a flock, it wasn't considered sporting to blast dozens of ducks out of the water. Limiting shotguns to 10 gauge and smaller with only few shells played a big part in ending market hunting for birds.

Many laws and hunting etiquette from those early days has carried over into the 21st Century. One such law is shotgun magazine capacity. In 1935 the first federal law restricting waterfowl hunters to three shots was enacted. As it happened, waterfowl populations began to rebound after an all-time low in the mid-30's.

Willmus, *Why Shotguns Have Plugs (Plus the laws you need to know),* Backfire (November 3, 2021), available at https://backfire.tv/why-shotguns-have-plugs/#:~:text=Plugs%20are%20used%20in%20shotguns%20to%20limit%20the,varies%20depending%20on%20the%20gauge%20and%20magazine%20length.

Plainly, these types of modern hunting regulations have no nexus to the Second Amendment's core protection of armed self-defense; nor are they of founding era vintage as *Bruen* requires. *See Bruen, slip op.* at 30 ("[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' *Heller*, 554 U.S., at 634-635 (emphasis added).") Since no historical analog for limiting the capacity of firearm magazines exists, the District's limitation as set forth in DC Code Section 7-2506.01(b) fails Second Amendment scrutiny. *See Bruen, slip op.* at 67.

In *Heller,* the Supreme Court eschewed balancing tests for evaluating the Constitutionality of regulations burdening the Second Amendment. *Heller,* 554 U.S. at 576-627. The just recently released *Bruen* decision makes it abundantly clear as to the Constitutional test for governmental restrictions on Second Amendment conduct, and the District cannot meet this test with respect to the regulation here at issue:

**APP. 61**

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg [v. State Bar of California]*, 366 U.S., [36,] 50, n. 10 [(1961)].

*Bruen, slip op.* at 20 (2022).

Accordingly, it would be error for the Court to evaluate the regulation at issue under some type of the means-end tiers of scrutiny approach *Bruen* specifically rejects. *Id.* at 15. The appropriate test is the text of the Second Amendment and the nation's historical tradition of firearms regulation. The D.C. magazine ban fails this test. Because there is no historic tradition in this nation of limiting firearm magazine capacity, the District's prohibition on possession of magazines having a capacity in excess of 10 rounds is unconstitutional as violative of the Second Amendment. As such, Plaintiffs are likely to prevail on the merits in this action.

### B.   *Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.*

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. at 22. The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask, "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (hereinafter *"Chaplaincy"*). Plainly here, Plaintiffs are suffering irreparable injury.

Where the defendant's actions violate the plaintiff's constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*,

21

**APP. 62**

721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (hereinafter *"Gordon"*) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346). *See also Berg v. Glen Cove City School District,* 853 F.Supp. 651 (E.D.N.Y. 1994); *Doe v. Shenandoah County School Board,* 737 F.Supp. 913 (W.D.Va. 1990); *Joynes v. Lancaster,* 553 F.Supp. (M.D.N.C. 1982).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of another Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d at 699 (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id*. Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id*. Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id*.

For these reasons, law-abiding citizens like Plaintiffs suffer irreparable harm each day they are subjected to the restrictions of DC Code 7-2506.01(b). The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that the defendants' magazine restriction will "chill" their exercise of constitutionally

**APP. 63**

protected conduct, *see Chaplaincy*, 454 F.3d at 299, they have satisfied this requirement by declaring that, but for the challenged provision, they would regularly possess and carry the Banned Magazines if it were legal to do so. *See* Exhibits 1-4.

Each day that the unconstitutional regulation continues in force, Plaintiffs risk physical injury because they are unable to fully exercise their Second Amendment right to self-defense using arms with sufficient capacity of their choice. For example, each day DC Code Section 7-2506.01(b) remains in effect, Plaintiffs lack the security of knowing they have available an effective self-defense tool with sufficient ammunition to handle an assault by multiple attackers. Of course, that injury cannot be compensated adequately through money damages. *See Ezell*, 651 F.3d at 699.

### C. *The balance of equities tips overwhelmingly in Plaintiffs' favor.*

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. Any interest the District may have in enforcing this regulation is entirely speculative. Moreover, the Second Amendment itself is the product of interest balancing by the People and leaves no room for the third branch of government to determine whether the rights it protects are "*really* worth insisting upon." *Heller,* 554 U.S. at 634 (emphasis in original).

### D. *An injunction is in the public interest.*

For similar reasons, an injunction is also in the public interest. The courts have acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653; *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of DC Code Section 7-2506.01(b) is by definition contrary

**APP. 64**

to the public interest if it is likely unconstitutional, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity effectively to defend themselves from attack, not by perpetuating an unconstitutional and ineffective restriction on that right.

### III.   *The Court should waive the bond requirement or set a nominal bond because Defendants will suffer no harm from a preliminary injunction.*

Plaintiffs request the court set the bond amount at zero. Federal Rule of Civil Procedure 65(c) provides in relevant part:

> Security. No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The court has the discretion to set the bond amount "in such sum as the court deems proper." Fed. R. Civ. P. 65(c). Consequently, the district court may set the bond amount at zero or a nominal amount "[w]here [it] determines that the risk of harm is remote, or that the circumstances otherwise warrant it. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 41 1, 421, n.3 (4th Cir. 1999) (remanding case to district court for determination of appropriate bond amount).

Courts have set a nominal bond or waived the requirement altogether where, for example:

(l) the risk of harm to the defendant is remote or nonexistent, *SEC v. Dowdell*, Civil No. 3:01 cv 00116, 2002 U.S. Dist. LEXIS 19980 at (W.D. Va., Oct. 11, 2002) (setting nominal $100.00 bond after concluding that the risk of harm to the defendants was minimal);

(2)    the plaintiff has made a strong showing of likelihood of success on the merits, *Ark. Best corp. v. Carolina Freight Corp.*, 60 F.Supp.2d 517, 518 (W.D.N.C. 1999) (requiring nominal

**APP. 65**

$100.00 security bond where plaintiffs made a strong showing of likelihood of success on the merits);

(3)     the balance of hardships weighs overwhelmingly in favor of the plaintiff, *Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991), *cert. denied* 502 U.S. 1032 (1992) (requiring no bond in non-commercial case where the balance of hardships that each party would suffer as the result of a preliminary injunction weighs overwhelmingly in favor of the party seeking the injunction); and

(4)     the case involves enforcement of a public interest, *Pharm. Soc. of the State of N. Y., Inc. v. N. Y. State Dep't of Soc Servs.*, 50 F.3d 1 168, 1 174 (2d Cir. 1995) (concluding that "an exception to the bond requirement has been crafted for cases involving the enforcement of public interests arising out of 'comprehensive federal health and welfare statutes'"); *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F. Supp.2d 98, 128, 129 (D. Mass. 2003) (waiving bond requirement where plaintiffs submitted affidavits indicating their financial inability to post a security bond and where plaintiffs were seeking to preserve their rights to free expression and free exercise of religion).

Plaintiffs request the court set the bond requirement at zero because Defendants cannot demonstrate they will suffer any harm from grant of a preliminary injunction. This is a civil rights case, not commercial litigation. Even if Defendants were ultimately to prevail here, they would suffer no monetary damage. Indeed, by not enforcing the ordinances at issue, Defendants would avoid otherwise necessary public expenditure. In fact, Plaintiffs have demonstrated they will suffer irreparable harm if preliminary relief is not granted. The bond requirement should be waived because Plaintiffs' enforcement of important constitutional rights serves the public interest. *See Westfield High Sch. L.I. F. E. Club,* 249 F.Supp.2d at 129 (waiving bond requirement after

**APP. 66**

concluding that plaintiffs' suit to enforce their right to freedom of expression and free exercise of religion served the public interest). For these reasons, Plaintiffs respectfully request the court set the bond amount at zero.

### IV.   *The court should enter final judgment for Plaintiffs.*

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. Fed. R. Civ. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia,* 38 F.Supp.3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 945 (7th Cir. 1994)). The D.C. Circuit employed this procedure in *Wrenn. See* 864 F.3d at 667.

Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support the provisions at issue *and* that the regulation is supported by the nation's historical tradition of firearms regulation, a permanent injunction is appropriate now. In that regard the court should require the District to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, the final outcome of this case will not depend on any facts presented at trial, and no "genuine uncertainty [exists] at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945.

Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore v. Madigan,* "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact

**APP. 67**

exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial. *Id.*

The Seventh Circuit's disposition in *Moore*, involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting Illinois's motion to dismiss. *See Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's limitation on the amount of ammunition a concealed carry license holder may carry on his person.

## V.    *Conclusion.*

Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from DC Code Section 7-2506.01(b). They have shown the balance of equities weighs in their favor. They have shown that the public interest favors granting an injunction. And they have shown that they are entitled to a permanent injunction now. For the foregoing reasons, the court should preliminarily and permanently enjoin the defendants from enforcing DC Code Section 7-2506.01(b).

**APP. 68**

Respectfully submitted,

**ANDREW HANSON**

**TYLER YZAGUIRRE**

**NATHAN CHANEY**

**ERIC KLUN**

By:      /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:   August 19, 2022

### *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants through the court's ECF system, this 19th day of August, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

28

**APP. 69**

## DECLARATION UNDER PENALTY OF PERJURY OF ANDREW HANSON

Andrew Hanson, under penalty of perjury, deposes and states as follows:

1. My name is Andrew Hanson. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm outside the home in the District of Columbia.

3. I own outside the District magazines for a licensed firearm capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines for protection inside my home and when I am carrying a firearm outside the home for personal protection. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August __*19*__, 2022

_____
Andrew Hanson

**DECLARATION UNDER PENALTY OF PERJURY OF TYLER YZAGUIRRE**

Tyler Yzaguirre, under penalty of perjury, deposes and states as follows:

1.  My name is Tyler Yzaguirre. I am a resident of the District of Columbia.

2.  I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm outside the home in the District of Columbia.

3.  I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4.  But for D.C. law, I would employ these magazines for protection inside my home and when I am carrying a firearm outside the home for personal protection. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 18, 2022

*Tyler Yzaguirre*
_____
Tyler Yzaguirre

**APP. 71**

### DECLARATION UNDER PENALTY OF PERJURY OF NATHAN CHANEY

Nathan Chaney, under penalty of perjury, deposes and states as follows:

1. My name is Nathan Chaney. I am a resident of the Commonwealth of Virginia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm in the District of Columbia.

3. I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines when I am carrying a firearm for personal protection within the District of Columbia. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 17, 2022

_____
Nathan Chaney

**DECLARATION UNDER PENALTY OF PERJURY OF ERIC KLUN**

Eric Klun, under penalty of perjury, deposes and states as follows:

1. My name is Eric Klun. I am a resident of the State of Maryland.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a firearm in the District of Columbia.

3. I possess outside the District magazines for my licensed firearms capable of holding in excess of 10 rounds.

4. But for D.C. law, I would employ these magazines when I am carrying a firearm for personal protection within the District of Columbia. I do not do so now because I fear arrest and prosecution.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: August 17, 2022

Eric Klun

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**APPLICATION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

   I.    The Second Amendment Framework ..................................................................... 2

   II.   The Challenged Law .............................................................................................. 4

   III.  Procedural Background ........................................................................................ 5

LEGAL STANDARD ......................................................................................................... 7

   I.    Preliminary Injunctive Relief .............................................................................. 7

   II.   Federal Rule of Civil Procedure 65 ...................................................................... 7

   III.  Facial And As-Applied Challenges ...................................................................... 7

ARGUMENT ...................................................................................................................... 8

   I.    Plaintiffs Are Unlikely To Succeed On The Merits Because They Fail To Show That The Second Amendment Protects Large Capacity Magazines .......................................................... 8

      A.    LCMs are not "Arms" under the Second Amendment. ................................................ 9

      B.    Even if LCMs are "Arms," they are not protected by the Second Amendment because they are not in common use for self-defense. ......................................................... 13

   II.   Plaintiffs Are Unlikely To Succeed On The Merits Because The District's Law Regulates Unusually Dangerous Devices, In Keeping With American Tradition. .................................... 20

      A.    The District need only show that the Law is "relevantly similar" to regulations of dangerous and unusual weapons ........................................................................ 21

      B.    Regulations of dangerous and unusual weapons are ubiquitous in American history. 27

      C.    These historical regulations are relevantly similar to the District's Law. ................. 34

   III.  Plaintiffs Do Not Satisfy The Other Criteria For A Preliminary Injunction. ..................... 39

   IV.  Any Injunction Should Be Limited To Plaintiffs' As-Applied Challenge. ........................ 42

   V.   Defendants Would Be Prejudiced By Consolidation With The Merits. .............................. 43

CONCLUSION .................................................................................................................. 45

**APP. 75**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018)........ 40

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ................................................................................................................ 18, 36

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................................... 32, 35

*Brown v. Maryland*, 25 U.S. 419 (1827)................................................................... 29, 36

*Burdick v. Takushi*, 504 U.S. 428 (1992) ...................................................................... 8

*Caetano v. Massachusetts,* 577 U.S. 411 (2016) ........................................................ 14

*Citizens United v. FEC*, 558 U.S. 310 (2010) .............................................................. 42

*Cockrum v. State*, 24 Tex. 394 (1859) ......................................................................... 32

*Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657 F.2d 124 (7th Cir. 1981) ........................................................................................................ 44

*District of Columbia v. Heller (Heller I)*, 554 U.S. 570 (2008) ........................................... passim

*District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244 (D.C. Cir. 2011) ........................ passim

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ........................................... 16, 18, 36, 42

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ........................................ 14, 16

*In re Sealed Case*, 936 F.3d 582 (D.C. Cir. 2019) .................................................... 8, 42

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905).......................................................... 33

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022)............................................. 8

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...................................................... passim

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) ......................................... 43

*Maryland v. King*, 567 U.S. 1301 (2012) ................................................................... 40

*McCullen v. Coakley*, 573 U.S. 464 (2014) ................................................................. 27

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)................................................... 35, 39

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)............................................ 27

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ........................................................ 3

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .......................... 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)........................ passim

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................... 7

*People v. Persce*, 97 N.E. 877 (N.Y. 1912) ................................................................. 31

ii

**APP. 76**

*Peruta v. Cnty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) ...................................................... 28

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) .............................................................. 7, 40

*State v. Wilburn*, 66 Tenn. 57 (1872) ......................................................................................... 31

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) .............................................................. 12

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) ............. 12

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ....................................... 8, 43

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................................... 7, 8, 42

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ............................................................... 7, 44

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) ........................... 7, 8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................................... 7, 40

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ................................................................... 14, 18

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017). ............................................ 3, 20

**Constitutional Provisions**

U.S. Const. amend. II ..................................................................................................................... 2

**Statutes**

1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn ............................................................................. 29

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73 ..................................... 30

1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4 ............................................................. 29

1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844 ............................................... 29

42 U.S.C. § 1983 ........................................................................................................................... 6

A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57 .......................................................................................... 29

An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, https://tinyurl.com/mtxbn4nd ................................................................................................ 31

D.C. Code § 7-2506.01(b) ..................................................................................................... passim

**Rules**

Federal Rule of Civil Procedure 65(a)(2) ................................................................................ 6, 7

**Other Authorities**

Bennett & Haviland Many Chambered Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd .............................................................................................. 23

iii

Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021* 16 (2021), https://tinyurl.com/3aff4bft .................................. 14

Christopher S. Koper et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf .................................................. 37

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020) .................................... 37

Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj .......................................... 24

Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008 (Comm. Rep.), https://tinyurl.com/mryzvuuc ............................................................................................... 5

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ................................................................................................................. 24

David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ......................................................................................................................................... 23

Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754 (2019), https://tinyurl.com/4hmw3szk ..... ........................................................................................................................................ 38, 41

Matthew Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa 41

Michael Siegel et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html ........................................................... 38

Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331 (2020)........................................................................................................................................ 18

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) ...................................................................................................... 34

S. Rep. No. 72-575 (1932) ............................................................................................................ 34

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016)................................................................................... 21

Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf. ........................................................................... 38

William R. Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017), https://tinyurl.com/mpjzkfsj.......................................................................................................... 32

**APP. 78**

**INTRODUCTION**

In an emergency posture, Plaintiffs ask this Court to break new ground as the first to declare a constitutional right to possess large capacity magazines (LCMs), a gun accessory responsible for the deadliest mass shootings in history.  As concealed carry licensees who already publicly carry semi-automatic pistols for their personal protection, Plaintiffs now wish to enhance their firing capacity with LCMs.  The Court should reject Plaintiffs' novel assertion of a constitutional right to continually fire their semi-automatic pistols more than ten times without reloading, and instead heed the Supreme Court's repeated instruction that the Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller (Heller I)*, 554 U.S. 570, 626 (2008)).  Particularly at this early stage of the case, the Court should resist Plaintiffs' invitation to unleash dramatically augmented firing capacity on the public through the extraordinary remedy of a preliminary injunction.  Such a ruling would be premature, endanger residents and law enforcement officers, and imperil public safety—all contrary to the legislature's considered judgment, as well as history and tradition.

First, Plaintiffs have demonstrated no likelihood of success on their Second Amendment claim under the test recently articulated in *Bruen*.  To start, Plaintiffs have failed to show that LCMs are "arms" within the Second Amendment's text.  LCMs are firearm *accessories*, which, since the Founding, have always been considered outside the scope of the Second Amendment. The military-style enhancement that they provide—allowing continual fire of large amounts of ammunition without reloading—is not integral to the operation of a firearm and is neither necessary nor commonly used for self-defense.

Even if LCMs did fall within the scope of the Second Amendment's text, Plaintiffs would not demonstrate a likelihood of success because the District's prohibition on LCMs is entirely consistent with the Nation's tradition of regulating dangerous and unusual weapons. Even in this preliminary posture, the historical record establishes that the District's law is one in a long line of government restrictions on weapons and enhancements that endanger the public. As such, it constitutes a permissible legislative response both to dramatic technological developments in firing capacity and to the devastating societal consequences of those technological advances, neither of which existed at the adoption of the Second or Fourteenth Amendments.

Even if this case were a closer call on the merits, Plaintiffs would still not be entitled to a preliminary injunction. They have failed to show that such an injunction is necessary to save them from irreparable injury, let alone that the balance of equities and public interest favor immediate relief. Indeed, those factors weigh strongly *against* issuing an injunction at this early stage, as Plaintiffs' desire to possess LCMs pales in comparison to the public interest in preventing violence and mass murder. Finally, Plaintiffs' premature invitation for the Court to *permanently* enjoin the District's law lacks merit. Such a move would significantly prejudice Defendants and is an inappropriate way to decide a complicated Second Amendment claim that requires time-intensive historical research.

The Court should thus deny Plaintiffs' requests across the board and allow Defendants to conduct the discovery necessary for this Court to properly resolve the issues in this case.

## BACKGROUND

## I.   <u>The Second Amendment Framework</u>

The Second Amendment ensures that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This provision codified the right of "ordinary,

2

**APP. 80**

law-abiding," and "responsible" persons to own and carry common firearms for self-defense and
other lawful purposes. *See Bruen*, 142 S. Ct. at 2122, 2131, 2135, 2156. It does not, however,
entitle persons "to keep and carry any weapon whatsoever in any manner whatsoever and for
whatever purpose." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).

In the wake of the Supreme Court's decision in *Heller I*, courts of appeals developed a
two-step framework to analyze Second Amendment claims. *See id.* at 2126. The first step asked
whether a challenged law regulated conduct outside the scope of the Amendment, as defined by
its "text" and "historical limitations." *District of Columbia v. Heller* (*Heller II*), 670 F.3d 1244,
1252–53 (D.C. Cir. 2011). A number of Second Amendment challenges failed at this threshold
step. *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 157–60 (D.C. Cir. 2019) (holding that
convicted felons fell outside the category of "law-abiding and responsible" persons protected by
the Second Amendment). For those claims that survived, however, courts typically applied some
form of means-end scrutiny at step two, the strictness of which depended on how onerously the
challenged law burdened a "core" Second Amendment right. *Wrenn v. District of Columbia*, 864
F.3d 650, 664–68 (D.C. Cir. 2017).

In *Bruen*, the Supreme Court declined to adopt the courts of appeals' method of analysis
and clarified the test laid out in *Heller I*. 142 S. Ct. at 2127. While the Court rejected means-
ends scrutiny, it endorsed the first step of the above framework, noting that it is "rooted in the
Second Amendment's text" and "history." *Id.* at 2125–27. To satisfy their initial burden,
plaintiffs must show that the challenged restriction regulates conduct covered by "the Second
Amendment's plain text." *Id.* at 2129. The Court indicated that the plaintiffs' threshold burden
would entail both a textual and historical showing, given that "the right secured by the Second

3

**APP. 81**

Amendment is not unlimited" and "the historical understanding of the Amendment" serves "to demark the limits on the exercise of that right." *Id.* at 2128 (quoting *Heller I*, 554 U.S. at 626).[1]

Even when plaintiffs fit their claim within the Second Amendment's text, however, the government can still prevail by showing that its law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. To satisfy this standard, the challenged regulation need not be "a dead ringer for historical precursors." *Id*. at 2118. Rather, where a modern firearm regulation addresses "unprecedented societal concerns or dramatical technological changes," it will pass "constitutional muster" when it is "relevantly similar" to a historical regulation. *Id*. at 2133. A "well-established and representative historical *analogue*"—which need not be "a historical *twin*"—is one that "impose[s] a comparable burden on the right of armed self-defense" and is "comparably justified." *Id.* at 2133.

## II.   **The Challenged Law**

The challenged regulation (the "Law"), D.C. Code § 7-2506.01(b), bars the possession, sale, or transfer of devices that feed ammunition into firearms if they have a capacity larger than ten rounds of ammunition. These devices are commonly called "large capacity magazines," or LCMs. Borrowing language from other state and federal laws, the Law was intended "to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload." Council of the District of Columbia, Committee on Public Safety and the Judiciary,

---

[1]     The Court's reasoning in *Bruen* abrogated holdings that relied on means-end scrutiny, including the D.C. Circuit's decision in *Heller II* affirming that the District's prohibition on LCMs was constitutional. Still, these courts' surveys of the historical record are consistent with the *Bruen* framework and remain good law. Moreover, their factual findings, based on voluminous records, remain relevant, and this brief cites their decisions for that limited purpose.

4

**APP. 82**

Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," November 25, 2008

(Comm. Rep.) at 2, https://tinyurl.com/mryzvuuc.[2]  It provides as follows:

> No person in the District shall possess, sell, or transfer any large capacity
> ammunition feeding device regardless of whether the device is attached to a
> firearm.  For the purposes of this subsection, the term "large capacity ammunition
> feeding device" means a magazine, belt, drum, feed strip, or similar device that has
> a capacity of, or that can be readily restored or converted to accept, more than 10
> rounds of ammunition.  The term "large capacity ammunition feeding device" shall
> not include an attached tubular device designed to accept, and capable of operating
> only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b).  In recommending the Law, the Committee explained that

"magazines holdings over 10 rounds are more about firepower than self-defense" and that

"[l]imiting fire power" was warranted "especially given homeland security issues in the

District."  Comm. Rep. at 9.  In 2011, the D.C. Circuit upheld the prohibition on LCMs, finding

it "does not effectively disarm individuals or substantially affect their ability to defend

themselves."  *Heller II*, 670 F.3d at 1247–48, 1260–64 (surviving intermediate scrutiny).

### III.   <u>Procedural Background</u>

Plaintiffs are residents of the Washington, D.C.-metropolitan area who have licenses to

carry concealed handguns and who want to "possess and use" LCMs "within the District of

Columbia."  Compl. [2] ¶¶ 1–4.  Each Plaintiff regularly carries a concealed pistol in the District

of Columbia and possesses, outside of the District, magazines capable of holding more than ten

rounds.  Decl. of Andrew Hanson [8-2] ¶¶ 2–3; Decl. of Tyler Yzaguirre ¶¶ [8-3] 2–3; Decl. of

Nathan Chaney [8-4] ¶¶ 2–3; Decl. of Eric Klun [8-5] ¶¶ 2–3.  Plaintiffs do not seek to possess

LCMs for use with firearms other than pistols.  *Id.* at ¶¶ 2–4 (same in each); Ex. A, Pls.'

---

[2]      All cited electronic materials were last accessed on November 22, 2022.  All citations are
to ECF or .pdf pagination.

**APP. 83**

Answers and Objections to Defs.' First Set of Interrogs. at 7–10. Each Plaintiff contends that, but for the Law, they would carry firearms equipped with LCMs in the District of Columbia; Plaintiffs Hanson and Yzaguirre would also use firearms equipped with those magazines for protection inside their residences. Hanson Decl. ¶ 4; Yzaguirre Decl. ¶ 4; Chaney Decl. ¶ 4; Klun Decl. ¶ 4. On October 18, 2022, Plaintiff Yzaguirre applied to register a Sig Sauer P365 with a 12-round magazine with the District of Columbia Metropolitan Police Department (MPD), but his application was refused. Declaration of Tyler Yzaguirre [16-1] ¶¶ 2, 6.

Plaintiffs filed this suit on August 3, 2022. They bring two claims under 42 U.S.C. § 1983, alleging that D.C. Code § 7-2506.01(b) violates both the Second Amendment and the Fifth Amendment Due Process Clause. Compl. ¶¶ 59–61. On August 19, 2022, Plaintiffs filed their Application for a Preliminary Injunction (the "Motion"), seeking to enjoin enforcement of the Law, facially or as-applied, based on their Second Amendment claim alone.[3] *See* Pls.' Mem. at 8, 10, 14. Plaintiffs also requested that the Court consolidate consideration of their Motion with a trial on the merits and grant permanent relief under Fed. R. Civ. P. 65(a)(2). *Id.* at 33.

---

[3]      Although Plaintiffs purport to bring both a facial and an as-applied challenge to Section 7-2506.01(b), Pls.' Mem. at 7; Compl. ¶ 22, Plaintiffs make no attempt to establish standing for or support any argument related to the District's prohibition on the "sell[ing]" or "transfer" of LCMs. D.C. Code § 7-2506.01(b). Accordingly, the District understands Plaintiffs' challenge to refer only to the prohibition on "possess[ion]." *Id.*; *see Heller II*, 670 F.3d at 1249 (similarly limiting plaintiffs' challenge and citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009), for the proposition that "standing doctrine 'requires federal courts to satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction,' and the plaintiff 'bears the burden of showing that he has standing for each type of relief sought'").

**APP. 84**

**LEGAL STANDARD**

**I.     Preliminary Injunctive Relief**

A preliminary injunction "is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Plaintiffs must prove that they are "likely to succeed on the merits," that they are "likely to suffer irreparable harm," that "the balance of equities" favors such extraordinary relief, and "that an injunction is in the public interest."  *Winter*, 555 U.S. at 20; *see Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the last two factors merge when the government opposes an injunction).

**II.     Federal Rule of Civil Procedure 65**

Under Rule 65(a)(2), upon hearing a motion for preliminary injunction, "the [C]ourt may advance the trial on the merits and consolidate it with the hearing."  But this practice is disfavored:  "[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

**III.     Facial And As-Applied Challenges**

Litigants may attack the constitutionality of a law in two ways:  A facial challenge, which alleges that the law is unconstitutional in all its applications, and an as-applied challenge, which alleges that the law is unconstitutional as applied to the particular facts of their case.  Plaintiffs bear a "heavy burden" in bringing a facial challenge.  *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (explaining why facial challenges are "disfavored").  They cannot merely suggest that constitutional problems may arise when the law is applied to some "conceivable set of circumstances."  *Salerno*, 481 U.S. at 745.  Rather, they must affirmatively "establish that *no* set

of circumstances exists under which the Act would be valid." *Id*. (emphasis added).  Where a

statute has a "plainly legitimate sweep," a facial challenge must fail.  *Wash. State Grange*, 552

U.S. at 449; *see In re Sealed Case*, 936 F.3d 582, 588–89 (D.C. Cir. 2019).  And, although the

"occasional case" may require a court to entertain a facial challenge, the court should "neither

want nor need to provide relief to nonparties when a narrower remedy will fully protect the

litigants."  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477–78 (1995) (citing

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)).

**ARGUMENT**

I.   <u>**Plaintiffs Are Unlikely To Succeed on the Merits Because They Fail To Show that the
     Second Amendment Protects Large Capacity Magazines.**</u>

Plaintiffs have failed to carry their burden of demonstrating that "the Second

Amendment's plain text" protects their possession of LCMs.  *Bruen*, 142 S. Ct. at 2129–30.

"Under [the Supreme] Court's precedents, a plaintiff bears certain burdens to demonstrate an

infringement of his rights under the [Constitution]," and only "[i]f the plaintiff carries these

burdens" does "the focus then shift[ ] to the defendant to show that its actions were nonetheless

justified."  *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022) (emphasizing

plaintiffs' threshold burden in the First Amendment context); *Burdick v. Takushi*, 504 U.S. 428,

434 (1992) (same in the election law context); *see also Bruen*, 142 S. Ct. at 2130 ("This Second

Amendment standard accords with how we protect other constitutional rights.").

To make this showing under the Second Amendment, a plaintiff must demonstrate that

the "textual elements" of the Second Amendment's operative clause are applicable to the

conduct being restricted.  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller I*, 554 U.S. at 592).  Thus, in

*Bruen*, before turning to whether New York's restriction was "consistent with the Nation's

historical tradition of firearm regulation," *id*. at 2135, the Court confirmed that the plaintiffs

8

**APP. 86**

were "part of 'the People' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense," *id.* at 2134 (quoting *Heller I*, 554 U.S. at 627, and citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).  A plaintiff must therefore prove both that the regulated instrument, device, or weapon fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense purposes, *id.* at 2128.

Plaintiffs do not dispute that they bear this textual burden.  But their efforts to meet it consist of only a threadbare claim that LCMs are "instruments that constitute bearable arms" and evidence that LCMs are a "commonly *owned* weapons component[ ]."  *See* Pls.' Mem. at 3, 5 (emphasis added).  Plaintiffs' arguments are insufficient and, ultimately, incorrect.  The Second Amendment only reaches "Arms," and only those "Arms" that are not just commonly owned, but "in 'common *use*' for self-defense."  *Bruen*, 142 S. Ct. at 2143 (quoting *Heller I*, 554 U.S. at 627) (emphasis added).  LCMs are neither.

## A. LCMs Are Not "Arms" Under the Second Amendment.

"Like most rights, the right secured by the Second Amendment is not unlimited" and it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller I*, 554 U.S. at 636).  Although not cabined to the types of arms "in existence at the time of the founding," the right extends only to "arms" as that term was historically understood.  *Id.* at 2132 (quoting *Heller I*, 554 U.S. at 582) (internal quotation marks omitted).  LCMs do not fall within this scope.  Rather, since the Founding, bullet storage containers—whether Founding-era cartridge boxes or modern detachable magazines—have been recognized as accessories or "accoutrements," a category distinct from "arms."  And while some accessories may be so integral to the operation of a

**APP. 87**

firearm that the Second Amendment might be read to extend to them, LCMs, a capacity-based subset of ammunition magazines, are not among them.

### 1. LCMs Are Accessories, Which Are Distinct from Arms.

The "object" of an individual's Second Amendment right is "Arms." *Heller I*, 554 U.S. at 581. But LCMs are not "Arms" as that term was understood either at the Founding or at the ratification of the Second or Fourteenth Amendments. *See id.* ("The 18th-century meaning is no different from the meaning today."); *Bruen*, 142 S. Ct. at 2132 ("[T]he Second Amendment's definition of 'arms' is fixed according to its historical understanding.").

The term "arms" historically referred *only* to weapons, typically swords, knives, rifles, and pistols. Ex. B, Decl. of Dennis Baron ¶ 10. An analysis of the patterns in the meaning and usage of words from the Founding and Reconstruction Eras confirms as much. *See generally id.* ¶¶ 12–24 (discussing methodology in the field of corpus linguistics). "Arms" did not encompass parts of weapons or weapons accessories, such as ammunition, ammunition containers, flints, scabbards, or holsters. *Id.* ¶ 10. Rather, these items were separately identified as "accoutrements"—"ancillary equipment associated with soldiering, or service in the military," *id.* ¶¶ 10, 28. These terms identified distinct categories and were used in contrast with one another. *See id.* ¶¶ 43, 46 ("arms and accoutrements are separate categories"); *id.* ¶ 64 (finding "no data" that the term "arms" includes "accoutrements").

Cartridge boxes or cartridge cases, in which bullets were historically kept at the Founding, were an "accoutrement." *Id.* ¶¶ 26–27 ("[T]hese bullet storage containers were part of the general category of military accoutrements, not arms."). "[M]agazines," including LCMs, are the descendants of, and thus "analogous" to, cartridge boxes or cartridge cases. *Id.*; *see* D.C. Code § 7-2506.01(b) (defining an LCM as a "belt, drum, feed strip, or similar device . . . t[hat]

accept[s] . . . rounds of ammunition").  They therefore also fall within the category of

"accoutrements."  Baron Decl. ¶¶ 26–27; *id.* ¶ 64 (finding "no data" that the term "arms"

includes "magazines").  Indeed, even today, firearms sellers list magazines under the

"accessories" sections of their websites.  *Compare* Firearms, Guns.com,

https://www.guns.com/firearms (listing handguns, rifles, and shotguns for sale), *with*

Accessories, Guns.com, https://www.guns.com/accessories (listing magazines for sale); *see also*,

*e.g.*, Ex. C, Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics*

113 (16 of .pdf) (Gun Digest 2019) ("The magazine is not a part of the pistol, it is a feeding

device for the pistol.").  LCMs are therefore properly categorized as "accoutrements" or

accessories.  They are not "arms," as the term was understood when the Second and Fourteenth

Amendments were ratified.

### 2.  LCMs Are Not Integral to the Operation of a Firearm.

An LCM is also not an "arm" because even if that term included accessories that are

integral to the operation of a firearm, an LCM is not such an accessory.  *Cf. Heller I*, 554 U.S. at

630 (holding that "the District's requirement . . . that firearms in the home be rendered and kept

inoperable at all times . . . makes it impossible for citizens to use them for the core lawful

purpose of self-defense and is hence unconstitutional").  Ammunition magazines, or ammunition

feeding devices, hold ammunition and attach to weapons.  When used, these devices enable a

shooter to fire without reloading until the capacity of the magazine is spent.  Magazines come in

a variety of sizes, and the LCMs barred by the District's regulation are merely a capacity-based

*subset* of these devices.  Magazines holding ten rounds or fewer remain legal in the District, are

widely available, and are compatible with a range of semiautomatic firearms—including

handguns.  *See* Ex. D, Decl. of Stephen Amodeo ¶¶ 4, 12, 14, 16, 18, 19, 23–27.

11

**APP. 89**

Because the District's regulation limits only the capacity of the magazine that an individual may possess, it has no effect on whether the firearm is operable. Plaintiffs, for example, can operate all of their registered firearms in the District. Indeed, Plaintiffs state that the firearms they currently carry are all equipped with magazines that are not LCMs, even those for which the standard magazine is an LCM. *See* Hanson Decl. [8-2]; Yzaguirre Decl. [8-3]; Chaney Decl. [8-4]; Klun Decl. [8-5]; Ex. A, Pls.' Answers to Interrogs. at 7–10.

Plaintiffs' argument that a magazine of *some* sort is necessary "in order to employ ammunition in a firearm," Pls.' Mem. at 5, is therefore beside the point. The District's regulation restricts only the use of *large* capacity magazines, leaving gun owners free to use any number of magazines with a capacity of ten rounds or fewer to operate their firearms. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 260 (2d Cir. 2015) (examining a similar prohibition and noting that "while citizens may not acquire high-capacity magazines, they can purchase any number of magazines with a capacity of ten or fewer rounds").

Because LCMs are a firearm enhancement that do not affect the functioning of the firearm, they are most akin to silencers, which federal courts of appeals have held do not fall within the scope of the Second Amendment. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')" and thus "can't be a 'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).[4] Regulation of LCMs is thus "categorically unprotected," and Plaintiffs' challenge to the District's Law fails. *Bruen*, 142 S. Ct. at 2126.

---

[4]      Although these cases predate *Bruen*, *Bruen* did not abrogate their reasoning about what instruments qualify as protected arms. *See* 142 S. Ct. at 2157 (Alito, J., concurring) (*Bruen* did not "decide anything about the kinds of weapons [or accessories] that people may possess").

**APP. 90**

**B. Even if LCMs Are "Arms," They Are Not Protected by the Second Amendment Because They Are Not in Common Use for Self-Defense.**

Even if the Court determines that LCMs are bearable "arms," they are not the sort of "arms" protected by the Second Amendment because they are not "'in common use' . . . for lawful purposes like self-defense." *Heller I*, 554 U.S. at 624; *see also Bruen*, 142 S. Ct. at 2134 (discussing whether handguns are "weapons 'in common use' today for self-defense" as part of the test for whether they are protected by the plain text of the Second Amendment). This "important limitation on the right to keep and carry arms" remains a critical part of the Second Amendment following *Bruen*. *See id.* at 2162 (Kavanaugh, J., concurring).

As the phrase "in common *use* . . . for self-defense" suggests, the Second Amendment does not protect a weapon merely because it is commonly bought or sold—though, of course, to be commonly used the weapon must also be commonly possessed. Rather, in determining whether a weapon is commonly *used* for self-defense, both the Supreme Court and the D.C. Circuit consider the suitability of the weapon for self-defense and the frequency with which it is actually used for that purpose. In *Heller I*, for example, the Supreme Court specifically examined the "*reasons* that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police." 554 U.S. at 629 (emphasis added). And in *Bruen*, the Court reiterated that the weapon must be both suitable for use in self-defense and in practice be "commonly used" for that purpose. 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)).

Conversely, the Court made clear that there is no Second Amendment protection for weapons that are "most useful in military service," even if they are sufficiently popular. *Heller I*

13

**APP. 91**

at 627; *see also Kolbe v. Hogan*, 849 F.3d 114, 142 (4th Cir. 2017).  For example, there are more

than 700,000 machine guns registered in the United States.  *See* Bureau of Alcohol, Tobacco,

Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update*

*2021* 16 (2021), https://tinyurl.com/3aff4bft.  But even though there are more registered machine

guns than, for example, the number of stun guns discussed in Justice Alito's concurrence in

*Caetano*, 577 U.S. at 420, the Court in *Heller I* explained that the Second Amendment does not

protect such weapons because they are "not typically possessed by law-abiding citizens for

lawful purposes," 554 U.S. at 625.  The Court labelled "startling" the idea that "restrictions on

machine guns . . . might be unconstitutional."  *Id*. at 624; *see Friedman v. City of Highland Park*,

784 F.3d 406, 408 (7th Cir. 2015) (noting Tommy guns were "all too common" before being

federally prohibited and that the "popularity" of such dangerous military weapons doesn't mean

they have "constitutional immunity").

   Similarly, in *Heller II*, the D.C. Circuit expressly rejected the idea that common

ownership of LCMs is sufficient to establish that they are protected by the Second Amendment.

After crediting evidence in the record indicating that magazines with capacities of more than ten

were commonly "owned"—and therefore were "in 'common use'" in that respect—the court

declined to resolve whether the Second Amendment's text encompasses LCMs because, on the

record before it, the court could not "be certain whether [LCMs] are commonly used or are

useful *specifically* for self-defense."  *Heller II*, 670 F.3d at 1261 (emphasis added); *cf. id.*

(acknowledging that there may also "be some capacity above which magazines" are not

commonly owned).  Other federal courts of appeals are in accord.  *See Friedman*, 784 F.3d at

409 ("[R]elying on how common a weapon is at the time of litigation would be circular.");

*Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019) (calling measuring "common use" by the

sheer number of weapons lawfully owned "somewhat illogical"); *cf. Kolbe*, 849 F.3d at 141

(explaining that under a popularity test, manufacturers would need only "flood[ ] . . . the market

prior to any governmental prohibition in order to ensure [the weapon] constitutional protection").

Plaintiffs here have likewise built no record that LCMs are "commonly used or are useful

specifically for self-defense." *Heller II*, 670 F.3d at 1261.  Although they acknowledge that the

Second Amendment protects only their right "to own weapons in common use by law-abiding

citizens for lawful purposes," Pls.' Mem. at 5, they point to no evidence showing that LCMs are

commonly used for self-defense (or any other lawful purposes).  Instead, they argue that LCMs,

in unspecified capacities, are commonly owned and offer a single relevant anecdote about their

use, involving a civilian who fired 19 rounds during a gunfight.  *See* Pls.' Mem. at 6–7 (citing the

statistics recited in *Heller II* and the dissent in *Kolbe* to support the assertion that "[l]aw-abiding

citizens own tens of millions of Banned Magazines"), 10 (referring to a store owner who "fir[ed]

19 rounds").  They have thus failed to carry their burden of demonstrating that LCMs fall within

the category of arms protected by the Second Amendment and are therefore not entitled to

preliminary injunctive relief for that reason alone.[5]  *Bruen*, 142 S. Ct. at 2126.  Nor *could* they

carry that burden:  Even at this early stage, it is clear that LCMs are not in common use for self-

defense, as they are neither suitable for nor actually used for that purpose.

### 1.  LCMs Are Not Suited for Self-Defense.

LCMs are not in common use for self-defense because they are not suitable for that

purpose.  Rather, their basic characteristics—the ability to fire without reloading and the

---

[5]     At a minimum, Plaintiffs offer no evidence that 30-, 40-, or 50-round magazines are even
commonly *owned*, let alone commonly used for self-defense.  Indeed, none of the Plaintiffs
themselves own such devices.  Ex. A, Pls.' Answers to Interrogs. at 7–10.  Nor are they used by
MPD with pistols, Ex. E, Decl. of Leslie Parsons ¶ 16, even though law enforcement has
different, higher capacity needs, *id*. ¶¶ 17–18.

resulting heightened lethality—serve specific combat-oriented purposes.

Courts recognize the fact that a weapon is commonly used for military purposes or is designed to be similar to such weapons is a permissible basis for prohibiting that weapon for civilian use.  In *Heller I*, the Court made clear that "M-16 rifles and the like"—that is, "weapons that are most useful in military service"—may be banned.  554 U.S. at 627.  Courts of appeals, in portions of decisions not abrogated by *Bruen*, have applied this reasoning to uphold prohibitions on other weapons and accessories, including LCMs, that are "like" automatic firearms.  *See*, *e.g.*, *Kolbe*, 849 F.3d at 136 ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-16 rifles'—'weapons that are most useful in military service'—they are among those arms that the Second Amendment does not shield" (quoting *Heller I*, 554 U.S. at 627)).  The en banc Ninth Circuit, for instance, analogized between LCMs and military weapons, noting that such magazines are likely "most useful in military service" because they "provide significant benefits in a military setting."  *Duncan v. Bonta*, 19 F.4th 1087, 1102 (9th Cir. 2021) (vacated).

Those benefits include the ability to continually fire without reloading—a "uniquely military feature" intended to "enable a shooter to hit multiple human targets very rapidly." *Kolbe*, 849 F.3d at 137; *see Friedman*, 784 F.3d at 409.  Indeed, the first detachable, interchangeable LCMs made available to U.S. civilians were designed during World War I for use with a "one-man, hand held machine gun" (or "trench broom"), later commonly known as a "Tommy gun."  *See* Ex. F, Decl. of Roger Pauly ¶¶ 81–83; Ex. G, Declaration of Brian DeLay ¶ 25; Ex. H, Decl. of Robert Spitzer ¶ 11; Ex. I, Decl. of Randolph Roth ¶¶ 43–46.  LCMs for pistols—including the ones Plaintiffs seek to possess—were also specifically designed for military use.  Ex. J, Decl. of Brennan Rivas ¶ 40; Ex. K, Excerpts of Paul M. Barrett, *Glock: The*

**APP. 94**

*Rise of America's Gun* 7, 9–11 (2012) (3–5 of .pdf); Ex. L, Excerpt of Jeff Kinard, *Pistols: An Illustrated History of the Their Impact* 270–275 (10–12 of .pdf) (2003).

The ability to continually fire without reloading is valuable in battlefield situations, but it renders LCMs dangerously ill-suited for civilian self-defense. *See, e.g.*, *Heller II*, 670 F.3d at 1263–64 ("[T]he tendency is for defenders [using an LCM] to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders."); Ex. C, Givens at 31, 35 (8, 12 of .pdf) (explaining that shooters who do not have sufficient cool, or practice, "when suddenly confronted with a shooting situation . . . panic, stick the gun out in front of them and empty it as fast as they can"); Ex. E, Decl. of Leslie Parsons ¶¶ 25–27 (stating 16 children killed in District this year alone by gunfire).

This design function results, as intended, in exceptional lethality that is suitable only for military purposes. Outside of the military context, it has been taken advantage of for criminal ends—specifically mass murder. Attacks with LCMs result in "more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263 (cleaned up). Unsurprisingly, semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history." *Worman*, 922 F.3d at 39; *see* Roth Decl. ¶¶ 53–55 ("[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semi-automatic handguns."). And handguns equipped with LCMs were used in mass shootings at Virginia Tech (32 dead and 17 wounded); Fort Hood, Texas (13 killed and over 30 wounded); Binghamton, New York (13 killed and four wounded); and Tucson, Arizona (six killed and 13 wounded). *Kolbe*, 849 F.3d at 120.

### 2.  LCMs Are Not Commonly Used in Self-Defense.

**APP. 95**

LCMs are also not in common use for self-defense because they are not in fact used for that purpose.  *See Heller II*, 670 F.3d at 1262 (pointing to the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport").  As federal courts of appeals reviewing voluminous records have noted, examples of a civilian firing more than ten rounds in self-defense (let alone needing to do so without pause) are vanishingly rare—if they exist at all.  For example, the First Circuit has noted that "not one of the plaintiffs or their six experts could identify . . . even a single example of a self-defense episode in which ten or more shots were fired."  *Worman*, 922 F.3d at 37.  And recently, the Ninth Circuit has noted that "the record here, as in other cases does not disclose whether" the "benefit" of "being able to fire more than ten bullets in rapid succession . . . has *ever* been realized in self-defense in the home."  *Duncan*, 19 F.4th at 1105; *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018) ("The record reflects that most homeowners only use two to three rounds of ammunition in self-defense.");  *Kolbe*, 849 F.3d at 127 (explaining that "[n]either the plaintiffs nor Maryland law enforcement officials could identify a single incident in which a Marylander has . . . needed to fire more than ten rounds[ ] to protect herself" and concluding that such circumstances are "rare").  Indeed, a study of the National Rifle Association's database revealed that between 1997 and 2001, before the federal government's high-capacity magazine ban, the average number of shots fired in self-defense was only 2.2.  *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020).  That number has remained relatively stable since the federal ban was lifted—the average number of shots fired in self-defense from 2011 to 2013 was 2.1.  *Id.*

18

**APP. 96**

In response, Plaintiffs assert that "[o]ne can never know how many rounds will be sufficient to stop a determined opponent" and "[r]eloading a firearm takes precious seconds that a victim may not have during a criminal attack." Pls.' Mem. at 11–12. But those statements have no limiting principle and would require that any conceivable form of self-defense be permitted—an endless arms race, to the detriment of the public. In any event, missing from Plaintiffs' filing is any support that, in practice, personal self-defense is aided by the ability to "rapidly bring to bear" more than ten rounds of ammunition using an LCM. Pls.' Mem. at 8. Plaintiffs' Motion mentions a single anecdote of a civilian firing "19 rounds" to protect his business from "armed robbers," Pls.' Mem. at 10, without any suggestion that such circumstances are common or even precedented.[6] Indeed, Plaintiffs' own evidence suggests that when LCMs *are* used, it is for criminal purposes—several of Plaintiffs' anecdotes illustrate civilian attacks on law enforcement using heightened firing capacity. *See* Pls.' Mem. at 8 (describing a suspect who "proceeded to fire 11 more rounds" at an officer after the initial shot), 10 (mentioning an officer "shot 15 times by a mass murdering white suprem[ac]ist").

Plaintiffs' handful of anecdotes involving *police* use of LCMs is wholly irrelevant. There is no constitutional right to be as well-armed as professional peacekeepers. As the D.C. Circuit has observed, the Second Amendment right applicable to Plaintiffs "enables self-defense at least against the level of threat *generally* faced by those covered by the Amendment: responsible and

---

[6]      It is not clear from the article Plaintiffs cite that an LCM was even used in this incident. A separate article by the same author states that the "19 shots" were fired from three separate firearms. Massad Ayoob, *The Ayoob Files: An Urban Gunfighter—The Lessons of Lance Thomas* (Mar. 1, 2002), https://tinyurl.com/4t5fb4na. In their discovery responses, Ex. A, Pls.' Answers to Interrogs. 3–7, Plaintiffs cite two additional anecdotes, one of which has similar deficiencies. *See* Massad Ayoob, *The Ayoob Files: Lead and Diamonds: The Richmond Jewelry Store Shootout* (May 1, 2003), https://tinyurl.com/u3jz76zc (detailing that the 30 shots came from two defenders and at least six firearms). The District allows gun owners to possess multiple firearms and multiple magazines.

**APP. 97**

law-abiding citizens." *Wrenn*, 864 F.3d at 664; *cf. Heller I*, 554 U.S. at 595 (explaining that the Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation"). Those threats are readily distinguishable from the threats faced by professional law enforcement, like SWAT officers and FBI agents, when they are intervening in the commission of violent felonies. *See* Pls.' Mem. at 9–12; Parsons Decl ¶¶ 17–18. And although Plaintiffs express their own concern about being "set upon by multiple assailants," Pls.' Mem. at 12, they make no showing that this is a "level of threat generally faced" by the public or a "common level[ ] of risk." *Wrenn*, 864 F.3d at 664.

Because Plaintiffs have failed to show that LCMs are "in common use" for self-defense, their challenge to the District's Law fails. They are not entitled to preliminary injunctive relief. The analysis may end here.

## II. Plaintiffs Are Unlikely To Succeed on the Merits Because the District's Law Regulates Unusually Dangerous Devices, in Keeping with American Tradition.

Even if LCMs are "arms" within the meaning of the Second Amendment, Plaintiffs have still failed to carry their burden to show that they are likely to succeed on the merits. Plaintiffs rest their argument on the claim that they are "unaware" of any limit on the "ammunition capacity of a firearm at the time of the adoption of the Second or . . . [Fourteenth] Amendments," Pls.' Mem. at 14, 19. But because the Law regulates technology that did not exist, and that would have been "unimaginable at the founding," *Bruen*, 142 S. Ct. at 2132, the District is not required to identify a "historical *twin*," only a "well-established and representative historical *analogue*." *Id*. at 2133 (emphasis in original). Plaintiffs offer neither argument nor evidence to explain why they would prevail under this appropriate framework. Nor could they.

Even at this early stage, the information available shows that the Nation's tradition of regulating dangerous and unusual weapons is "'relevantly similar'" to the District's Law, such

20

**APP. 98**

that it can act as "a proper analogue." *Id*. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev, 741, 773 (1993)).  The Supreme Court has, of course, not defined the phrase "dangerous and unusual," *id*. at 2128 (quoting *Heller I*, 554 U.S. at 627), and there are some disputes over its origin and meaning.[7]  But its substance can be discerned by examining the pattern over time of restrictions on certain weapons (including weapons accessories and configurations) considered to be particularly susceptible to criminal misuse or to pose significant dangers to the public.  From the regulation of such weapons in pre-founding England through the founding of the United States and the antebellum and postbellum periods, and continuing into the 20th century, governments have regulated specific weapons, accessories, and associated conduct deemed uniquely dangerous to the public, leaving available other weapons for constitutionally protected use.  The District's Law is part of that tradition.  *See id.* at 2133 (holding that a regulation is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors and is "comparably justified").

A.  **The District Need Only Show that the Law Is "Relevantly Similar" to Regulations of Dangerous and Unusual Weapons.**

The District's Law requires the Court to employ the "more nuanced approach" of reasoning by analogy because it implicates both "dramatic technological changes" *and* "unprecedented societal concerns."  *Id*. at 2132 (indicating that *either* factor would require this

---

[7]      As the Fourth Circuit has pointed out, the Supreme Court's citation to Blackstone referred to the crime of carrying "dangerous *or* unusual weapons."  *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148–49 (1769)).  And the phrase may be better understood as a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper," which involve "two terms, separated by a conjunction, [that] are melded together to form a single complex expression."  Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016).  If viewed as a hendiadys, "dangerous and unusual" would be read as "unusually dangerous," which accurately describes LCMs for the reasons discussed *infra*.

mode of analysis).  LCMs would not exist without a dramatic change in firearms technology—indeed, without *several* dramatic changes—between 1791 and today.  The ability to fire a few rounds in one *minute* at the founding has become the ability to fire 30 rounds in five *seconds*, and those rounds go farther, fly straighter, and inflict more damage.  The growing availability of LCMs has also sparked unprecedented societal concerns, namely, the advent of a lone individual being able to commit mass murder.  Because the regulation at issue here is the product of these distinctly modern circumstances, Plaintiffs' reliance on a "straightforward historical inquiry"—whether an identical regulation existed at the founding—is inapposite.  *Id*. at 2131.

### 1.   **"Dramatic Technological Changes"**

The particularly lethal LCM technology regulated by the Law simply did not exist when the Second or Fourteenth Amendments were ratified.  *See* Delay Decl. ¶¶ 13, 19, 25; Ex. M, Decl. of Kevin M. Sweeney ¶¶ 4, 5, 14, 15, 32.  In the founding era, most arms were flintlock muzzleloaders capable of firing a single lead ball.  *See* Sweeney Decl. ¶¶ 4, 5, 12, 13; Pauly Decl. ¶¶ 29, 30, 32; Roth Decl. ¶ 17.  In favorable conditions, such guns could take half a minute to load (or reload).  *Id.* ¶ 17.[8]  They were the only ones "the vast majority of people ever owned, used or encountered."  DeLay Decl. ¶ 19.  There is "[no] evidence in primary sources" that guns with the capacity to fire repeatedly "were anything other than exotic curios in this era."  *Id*. ¶ 19; *see* Sweeney Decl. ¶15 (based on probate inventories and newspaper references, "repeating

---

[8]      The limits of flintlock technology also made these firearms poor instruments of homicide. They could not be stored loaded for long periods of time, and because the gun had to be loaded manually before use, it could not be used impulsively.  *See* Roth Decl. ¶¶ 17–19.

firearms in eighteenth-century America . . . were extraordinarily rare"). They were, to put it

simply, "militarily and commercially irrelevant." DeLay Decl. ¶ 19.[9]

By the 1860s, not much had changed for ordinary Americans. The Henry Model 1860

and the Winchester 1866 rifles mentioned by Plaintiffs, *see* Pls.' Mem. at 15–16, were both

expensive and rare: They were sold almost exclusively to military buyers through the early

1870s, and "very few" were in the hands of private persons in 1868. *See* DeLay Decl. ¶¶ 22–25

(these firearms were a "tiny percentage," or 0.2%, of those in circulation); Pauly Decl. ¶¶ 57–63

(discussing the firearms' development and use). They were also relatively slow to fire: Users of

these "lever-action" weapons were still required to pull a lever between shots, slowing the firing

rate to about one shot every three seconds. Pauly Decl. ¶ 61. And unlike modern LCMs, the

magazines of the time were a fixed part of the gun. *Id.* To reload, soldiers had to individually

insert each new cartridge. Rivas Decl. ¶ 30.[10]

Not until closer to the turn of the 20th century could weapons fire bullets in rapid

succession and be efficiently reloaded with interchangeable magazines. These innovations made

---

[9]    The examples Plaintiffs provide circa 1791 (or before), existed only as concept pieces or
curiosities. *See* DeLay Decl. ¶¶ 6, 7, 10–19, 21; Sweeney Decl. ¶¶ 15–32; Spitzer Decl. ¶¶ 24–
34. Historians widely agree that repeating arms were not practical, functional weapons until at
least the 1830s. Before that, they tended to explode at the shooter rather than the target. *See*
DeLay Decl. ¶ 11; Sweeney Decl. ¶¶ 16 n.21, 19, 23, 24, 26 (describing some early repeaters as
basically "pipe bomb[s]"), 31; Pauly Decl. ¶¶ 27, 28, 42–46.

[10]    Plaintiffs point to several other firearms capable of firing more than 10 rounds without
reloading between 1791 and 1868, Pls.' Mem. at 15, but these are inapt comparators. Pepperbox
pistols were "heavy, lumpy, and impractical" and "had a nasty habit of discharging all their
barrels at once." Spitzer Decl. ¶ 33. Fewer than ten of the Bennett and Haviland, and only
around 1,250 of the Porter Rifle, were produced. *See* Bennett & Haviland Many Chambered
Revolving Rifle, NRA Museums, http://tinyurl.com/mdejetmd; David Kopel, *The History of
Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 n.42 (2015).
Similarly, chain pistols "did not win much market share, perhaps in part because the large
dangling chain was such an impediment to carrying the gun." Kopel at 856–57. Volcanic
repeaters were "few, flawed, and experimental," Spitzer Decl. ¶ 31, and "suffered from an
exceptionally low muzzle velocity," Pauly Decl. ¶ 59, and thus had very little power.

firearms far more deadly.  *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022).  The magnitude of this change is illustrated by an index devised for the U.S. Army, which assessed the relative "lethality" of various weapons (defined as the number of people who could be killed in one hour by a particular weapon, taking into account a weapon's range, accuracy, rate of fire, reliability, and other metrics).  *Id.* at 2597–98.  The lethality of a founding-era flintlock muzzleloader was 43; that of a Civil-War-era rifle capable of firing conoidal bullets was 102; and that of a 1903 bolt-action rifle equipped with a magazine was *495*—"a ten-fold increase over the flintlock musket."  *Id*. at 2507–08.  (And that manually re-loaded rifle did *not* even have an LCM—it carried only a five-round clip-magazine.  Classic Firearms, "U.S. Model 1903," https://tinyurl.com/2p8c74rj.)

Interchangeable magazines capable of holding more than ten rounds, closer to the LCMs at issue here, did not appear for civilian use in America until the early 1920s.  They were used with submachine guns, which allowed for the ammunition to be loaded "automatically" into a gun's chamber from a magazine without the manual intervention of the shooter.  DeLay Decl. ¶ 25; Spitzer Decl. ¶ 11; Roth Decl. ¶¶ 43–46; Pauly Decl. ¶¶ 69–74, 83.  Handguns (pistols) using the same automated reloading technology—though called "semi-automatic," because the trigger has to be pulled after each round to reload the chamber —appeared about two decades before that but were not capable of accepting LCMs.  Pauly Decl. ¶¶ 75–78.

Handguns capable of accepting LCMs did not penetrate the U.S. market or society until *the 1980s*.  *See* Spitzer Decl. ¶¶ 61–62; Roth Decl. ¶ 50; Rivas Decl. ¶¶ 41–43; Pauly Decl. ¶ 78.  For example, not until 1985 did the U.S. military adopt a 15-round magazine instead of the 7-round magazine chosen in 1911.  Ex. K, Kinard at 263 (7 of .pdf).  Police, too, favored 6- or 7-shot revolvers "well into the second half" of the 20th century.  *Id*. at 256–57 (4 of .pdf).  Only in

24

the 1980s and 90s, when "a new generation of high-powered, high-magazine capacity pistols"

made with "advanced construction techniques and materials" became available, did police adopt

"military-style automatics." *Id.* at 256–57 (4 of .pdf); Ex. N, Robert Sadowski, *9MM: Guide to*

*America's Most Popular Caliber* 6–8 (Gun Digest 2018).  Civilian buyers followed.  Ex. K,

Barrett at 18–19 (9 of .pdf) (explaining the "American civilian gun-buying population tends to

gravitate to what professionals carry" and followed police toward Glocks); Ex. N, Sadowski at 7,

28–29 (9–10 of .pdf) (describing 9MM semiautomatic pistol in 1980s, 90s culture).  Today, a

Glock 17 handgun can be purchased for less than $200 and is capable of firing 30 rounds in five

seconds.  Roth Decl. ¶ 49.  And such modern firearms are much more deadly than their 1791 or

1868 counterparts, not only because of this increased rate of fire, but also due to increased

accuracy and firepower (*i.e.*, bullets that fly faster and straighter and dig deeper).  *See* Pauly

Decl. ¶¶ 8; 34–40; 64, 65; Ex. R, Graeme Rimer, et al., *Smithsonian Firearms* 302–08 (2014).

### 2.  "Unprecedented Societal Concerns"

The District's Law also responds to "unprecedented societal concerns," *Bruen*, 142 S. Ct.

at 2132, which similarly did not emerge until the turn of the 20th century and were driven by the

technological advances discussed above.  From the colonial period into the 1900s, mass murder

in the United States was almost always perpetrated by groups of individuals, because

technological limitations impaired the ability of a single person to kill multiple individuals at

once.  Roth Decl. ¶¶ 40–42 (citing examples, including Nat Turner's rebellion).  In 1791, for

example, firing 30 rounds in five seconds, which a single Glock 17 can accomplish, would have

required mustering 15 individuals, each with 2 firearms.

With the development of reliable rapid fire, including detachable magazines and

semiautomatic and fully automatic firearms, the "character of mass murder began to change" in

**APP. 103**

the late 19th and early 20th centuries.  These weapons dramatically increased the number of persons who could be killed or wounded by a lone person during criminal activity.  *See id*. ¶ 43. Markedly different from the firearms technology in use at the Founding or during the 1860s, such firearms enabled individuals to wreak havoc on communities.  Spitzer Decl. ¶ 11 (describing the transition of these weapons from military use to civilian circulation and their use in infrequent but highly publicized killings, such as the St. Valentine's Day massacre); Roth Decl. ¶ 45 (similar).  The proliferation of modern semiautomatic arms, coupled with the availability of LCMs, directly correlates with the contemporary problem of mass shootings in America today.  *See* Roth Decl. ¶¶ 50–55 & figs. 1, 2 (describing how the problem of mass shootings "is a modern phenomenon" and that "[t]he danger [semiautomatic weapons] pose is intrinsically different from past weaponry," particularly when paired with LCMs); Spitzer Decl. ¶ 8 (describing contemporary efforts to restrict LCMs as beginning with school shooting in 1989); *cf*. Google, Ngram Viewer, https://books.google.com/ngrams/, Query: "shooting=>mass".

### 3.  The Lack of an Express "Founding-Era" Limitation on the Capacity of Firearms Is Irrelevant.

These dramatic technological changes and unprecedented societal concerns readily explain why Plaintiffs are "unaware" of any limits on the "ammunition capacity of a firearm at the time of the adoption of the Second or . . . [Fourteenth] Amendments."  Pls.' Mem. at 14, 19; *see id*. at 21 (citing a lack of "limit[s] [on] firearm magazine capacity").  The District's prohibition on LCMs, implemented in response to the rise of this dangerous new technology and its public consequences, is a quintessential "modern regulation[ ] . . . unimaginable at the founding."  *Bruen*, 142 S. Ct. at 2132.  The failure of the Founders or the ratifiers of the Fourteenth Amendment to regulate for a degree of firing capacity that *did not exist*, let alone have any appreciable presence or impact on civil society, is thus easily explained.  "States adopt

26

**APP. 104**

laws to address the problems that confront them" at the current moment. *McCullen v. Coakley*, 573 U.S. 464, 481–82 (2014). The Constitution does not "require States to regulate for problems that do not exist." *Id.*; *cf.* DeLay Decl. ¶ 21.

Nor can the fact the Founders did not regulate yet-to-be-invented technologies mean that states are precluded from adopting new laws to address changing circumstances. As Justice Scalia observed in the free speech context, "[q]uite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is ipso facto unconstitutional, or else modern election laws . . . would be prohibited, as would (to mention only a few other categories) modern antinoise regulation . . . and modern parade-permitting regulation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 372 (1995) (Scalia, J., dissenting). The Court in *Bruen*, too, took care to emphasize that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." 142 S. Ct. at 2132 (citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)). Because the District's Law addresses a dramatic development in firearms technology and responds to the unprecedented societal consequences of that technology being adopted for crime and mass murder, reasoning by analogy is appropriate and necessary.

**B. Regulations of Dangerous and Unusual Weapons Are Ubiquitous in American History.**

Notwithstanding that LCMs are of only recent vintage, their regulation is part of a longstanding tradition whereby governments, from pre-founding English history to the early 20th century, restrict and even prohibit the use of weapons and weapons enhancements that threaten public safety. *See id.* at 2145 (noting a pattern of early state statutes that "prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people"). Both the reasoning for and the timing of such restrictions are consistent in each era: Governments adopt restrictions on new firearms technologies not when those technologies are first invented or introduced, but as they begin to

27

**APP. 105**

circulate widely in society and present "a safety, violence, or criminological problem or threat."
Spitzer Decl. ¶ 23.  Though these restrictions may include different weapons and address
different concerns, there is a clear through-line—they target weapons that are susceptible to
criminal misuse or that pose special dangers to the public, while leaving available a variety of
options for self-defense.

### 1.   Medieval and Pre-Founding English History

The tradition of government regulation of particularly dangerous weapons is deeply
rooted, stretching back to pre-founding English history.  *See Bruen*, 142 S. Ct. at 2136
(explaining that such evidence is helpful when it "survived to become our Founders' law").
English monarchs historically had the power to restrict possession of arms that they designated
as threats to public safety and order.  *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–32
(9th Cir. 2016) (en banc) (reviewing English prohibitions on the carrying of certain arms in the
16th and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  For example,
Richard II prohibited possession of the launcegay, a 10- to 12-foot-long lightweight lance,
because it was "generally worn or carried only when one intended to engage in lawful combat or
. . . to breach the peace."  *Bruen*, 142 S. Ct. at 2140.  Similarly, Henry VIII prohibited "little
short handguns, and little haquebuts," which he identified as a source of "continual feare [*sic*]
and danger of the king[']s loving subjects."  Ex. Q, Patrick J. Charles, *Armed in America: A
History of Gun Rights from Colonial Militias to Concealed Carry* 62 (5 of .pdf) (2018).  Thus,
the Second Amendment right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127
(quoting *Heller I*, 554 U.S. at 599), permitted government regulation of weapons that were
particularly dangerous or susceptible to criminal misuse.

### 2.   Colonial and Early National history:  Laws Enacted Around the Time of the Ratifications of the Second Amendment.

Throughout the colonial and founding eras, the government acted to protect the public by restricting dangerous types, uses, or configurations of weapons.  Indeed, governments frequently imposed regulations on weapons and accessories that posed a heightened threat to public safety. Gunpowder, for example, was highly regulated throughout the colonies.  Concerned about protecting the public from the threat of fire and explosion, governments frequently set up communal magazines and required that individuals store their gunpowder in those locations. *See*, *e.g.*, 1706-7 Mass. Acts ch. 4, *reprinted in Acts and Resolves Passed by the General Court* 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844.  Massachusetts went even further, prohibiting the possession of loaded firearms inside the home in recognition of the serious threat posed by the unintended discharge of such arms.  1783 Mass. Acts 37, § 2, https://tinyurl.com/nhdsh7w4.  Individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished; because munitions posed a uniquely dangerous risk to society, the government could lawfully regulate them.  *See Brown v. Maryland*, 25 U.S. 419, 443 (1827) ("The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains … with the States."), *abrogated on other grounds by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995).

Colonial governments also restricted the carrying of particular weapons that would induce "great fear and quarrels" among the public.  Spitzer Decl. ¶ 56; *see also Bruen*, 142 S. Ct. at 2143 (discussing "colonial legislatures['] . . .  prohibit[ion] [on] the carrying of 'dangerous and unusual weapons'").  For example, New Jersey enacted a law against wearing weapons as early as 1686, and Massachusetts, North Carolina, and Virginia followed.  Spitzer Decl. ¶ 56.  These

**APP. 107**

laws generally targeted the carrying of firearms in crowded places and groups of armed people,
*id.*, situations in which the danger of firearms possession were particularly heightened.

There were also widespread restrictions on the ownership and use of "trap guns," or
firearms that (through the use of string or other devices) were configured to fire remotely when
triggered. *Id.* ¶¶ 57, 60. Trap guns were frequently used for lawful purposes, including
protection of personal and commercial property. *Id.* ¶ 58. However, governments recognized
that these sorts of modifications to firearms were nonetheless "most dangerous," since their
uncontrolled lethality raised the risk of harm to innocent bystanders to unacceptable levels.
1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent
Trespassing with Guns, ch. 539, § 10, https://tinyurl.com/2cyczk73. Sixteen states ultimately
enacted anti-trap gun laws. Spitzer Decl. ¶ 60, Ex. B (listing years of enactment of trap gun
laws); *id.*, Ex. F (providing text of trap gun restrictions).

### 3. Antebellum and Postbellum history: Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

Regulations from throughout the antebellum and postbellum periods reflect a continuing
pattern of state regulation of weapons that were especially dangerous, associated with criminal
activity, or both.[11] These laws were passed in response to the most pressing threat to public
safety at the time they were enacted: the frequent use of concealable weapons in assaults and
homicides. *See* Spitzer Decl. ¶ 44 (quoting a grand jury, "the pistol dirk or club is immediately

---

[11] The Court in *Bruen* did not have occasion to resolve whether courts should "primarily
rely on the prevailing understanding of an individual right when the Fourteenth Amendment was
ratified in 1868" because "the public understanding of the right to keep and bear arms in both
1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 2138.
So too here as to dangerous and unusual weapons. *See id.* at 2136 ("[A] regular course of
practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases
in the Constitution." (cleaned up) (quoting James Madison)).

resorted to, hence we so often hear of the stabbing shooting & murdering so many of our

citizens"); *see also People v. Persce*, 97 N.E. 877, 878–79 (N.Y. 1912) (finding specified

weapons "are ordinarily used for criminal and improper purposes" and "are not amongst those

ordinary legitimate weapons of defense and protection").  Twelve states adopted broad

restrictions on any concealed weapon, while dozens of others passed restrictions on specific

types, including "bludgeons," "billies," "clubs," "slungshots," and "sandbags."  Spitzer Decl. Ex.

C.  Several states also restricted the sales of "pocket pistols," a subclass of the Colt six-shooter

designed to be concealed from public view and associated with criminal activity.  Rivas Decl.

¶¶ 21, 25, 44.  These sorts of regulations were designed to address *concealable* arms in

particular, leaving other arms available for self-defense—for example, although both Tennessee

and Arkansas restricted the sale and public carry of pocket pistols, they continued to allow the

carry of larger "army or navy" pistols "in the hand."  *Id*. ¶ 18; *see State v. Wilburn*, 66 Tenn. 57,

61 (1872); An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191,

https://tinyurl.com/mtxbn4nd.  By the end of the 19th century, almost every state in the country

regulated the concealed carry of guns and other specified weapons in an effort to ensure public

safety.  Spitzer Decl. ¶ 38; *cf. Bruen*, 142 S. Ct. at 2147 n.20 (noting that both Arkansas and

Tennessee "tolerated the prohibition of all public carry of handguns except for military-style

revolvers").

    Bowie knives were also considered to be an especially dangerous weapon and prone to

criminal misuse.  *See* Spitzer Decl. ¶ 44.  They were equipped with long blades designed for

fighting rather than for hunting or general utility, and they included features like crossguards and

clip points that were designed to facilitate cutting or stabbing.  *Id*.; *see also* William R.

Williamson, *Bowie Knife*, Texas State Historical Association (Jul. 6, 2017),

https://tinyurl.com/mpjzkfsj. As one court noted, Bowie knives were distinguishable from guns, pistols, or swords, the types of weapons with which "men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill." *Cockrum v. State*, 24 Tex. 394, 402 (1859). In contrast, the Bowie knife was, "in its device and design . . . *the instrument of almost certain death*." *Id*. (emphasis added); *see also Aymette v. State*, 21 Tenn. 154, 158 (1840) (explaining that Bowie knives "are efficient only in the hands of the robber and the assassin").[12]

Noting the unique risk Bowie knives posed to the public, states began to pass targeted laws restricting them. In the 1830s, six states enacted laws barring the carrying of Bowie knives specifically. Spitzer Decl. ¶ 47. In the years that followed, forty-nine states and the District of Columbia enacted similar prohibitions, addressing Bowie knives either by name or as part of a broader restriction on dangerous knives. *Id.* As the Tennessee Supreme Court held, these restrictions fell comfortably within the government's historical "right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens." *Aymette*, 21 Tenn. at 159. Thus, while antebellum state-court decisions "evidence[d] a consensus view that States could not altogether prohibit the public carry of 'arms' protected by the Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, states retained broad police powers to regulate particular weapons in the public interest.

### 4.  Twentieth Century

Evidence of similar regulations from the 20th century reaffirm the longstanding tradition

---

[12]    The *Heller I* Court criticized *Aymette*'s narrow reading of the Second Amendment as "odd." 554 U.S. at 613. Nevertheless, the case remains valuable as an articulation of Tennessee's reasons for prohibiting the carrying of Bowie knives and other dangerous weapons.

of government restriction of particularly dangerous weapons and accessories.[13]  Most notably,

state governments in this period adopted a variety of regulations targeting automatic and

semiautomatic firearms as those weapons came into widespread use for criminal activity.  Spitzer

Decl. ¶¶ 11–14.  An early example of this regulation targeted the Tommy gun, a machine gun

capable of holding up to 100 rounds.  *Id.* ¶ 12.  Guns like the Tommy gun could exact a

devastating toll when used by criminals and garnered extensive national attention.  *Id*. ¶ 11.

Responding to the growing availability and the extreme threat posed by these weapons, 32 states

banned them entirely in the 1920s and 30s.  *Id*. ¶ 12.

Indeed, a number of restrictions on firing capacity—the number of rounds that could be

fired without reloading—were enacted between 1927 and 1934, including the District's.  *See id*.

¶¶ 19–22, tbl. 1 (detailing numerous regulations "adopted by nearly half of all states,

representing approximately 58% of the American population at that time"); Roth Decl. ¶ 46.

These regulations were "closely tied to the enhanced firing capacity" of widely available

weapons and "the attractiveness (and use) of these weapons by criminals at the time."  Spitzer

Decl. ¶ 18; *see generally* ¶¶ 12–18.[14]  In 1934, the federal government passed the National

Firearms Act, which tightly regulated machine guns (including the Tommy gun) and sharply

---

[13]     Though the Supreme Court cautioned that 20th century evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence," *Bruen*, 142 S. Ct. at 2153 n.28, the consistency of such evidence with earlier regulations can illustrate the continuation of an American tradition.

[14]     Plaintiffs point out that some of these laws were later amended or repealed.  Pls.' Mem. at 17–18.  But where, as here, a regulation is consistent with historical tradition, legislatures are free to experiment to strike the right balance between effective intervention and the preference of the people.  *See Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905) (explaining that when a regulation is an exercise of the police power, "what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not").  If that preference changes, legislatures should be able to repeal the regulation without fear that such an action would alter the scope of permissible regulation in the future.

limited their availability to the public.  *Id.* ¶ 14 (citing National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236).  And in 1968, Congress banned the transfer or possession of new machine guns altogether.  Pub. L. Nos. 90-618 and 99-308 (1968).  The regulation of dynamite followed this same pattern.  Roth Decl. ¶¶ 44–46.

Early 20th century regulations of semi-automatic weapons were considered "obviously uncontroversial" exercises of states' police powers.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69 (2017).  Indeed, restricting this kind of firepower was so well-accepted that, in 1928, the National Conference on Uniform State Laws promulgated a model law for national use.  *See* Ex. P, Model Law: Report of Firearms Committee, Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting 422, 428 (5, 11 of .pdf) (1928) (prohibiting possession of "any firearm which shoots more than twelve shots semiautomatically without reloading").  And the National Rifle Association endorsed the District of Columbia semiautomatic firing capacity law, stating that "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."  S. Rep. No. 72-575, at 5–6 (1932); *see also* Spitzer Decl. ¶ 13.

## C. These Historical Regulations Are Relevantly Similar to the District's Law.

The District's Law is "relevantly similar" to the above analogues.  *Bruen*, 142 S. Ct. at 2132–33.  The limited burden it imposes on self-defense is comparable to that imposed by earlier regulations:  It is a narrow restriction targeted at a particularly dangerous weapons enhancement that is susceptible to criminal misuse, leaving available a wide variety of other options for self-defense.  And the justification for this regulation follows the same pattern as in prior eras.  The

District crafted its regulation in response to a particularly dangerous threat to public safety—the growing use of LCMs to facilitate crime and, specifically, to perpetrate mass murder.

### 1.  Comparable Burdens

Akin to its historical analogues, the Law restricts only a type of particularly dangerous enhancement that has been widely adopted for criminal activity:  the ability to fire more than 10 rounds continuously, a feature that has facilitated gun violence and mass murder.  This presents a comparably limited burden on the right to keep and bear arms because it preserves the right of individuals to act in self-defense.  *See McDonald v. City of Chicago*, 561 U.S. 742, 786–87 (2010) (plurality op.) (noting that the right to keep and bear arms is not an "intrinsic" right, valued for its own sake, but "instrumental"—a means to the end of enabling armed self-defense).

As discussed above, the regulations enacted throughout Anglo-American history targeted certain weapons considered uniquely dangerous and susceptible to criminal use.  *See* Section II.B.  The Bowie knife, for example, was designed for maximum lethality and was labeled "efficient only in the hands of the robber and the assassin."  *Aymette*, 21 Tenn. at 158.  When states passed regulations to respond to this threat, they did so specifically—indeed, a majority of states passed regulations restricting Bowie knives by name.  Spitzer Decl. ¶ 47.  The District's regulation is similarly targeted.  It does not ban any class of firearms, nor does it ban all magazines.  Instead, it restricts only the particular *subclass* of magazines that is strongly correlated with criminal attacks and mass shootings, and which is unsuited to self-defense.

This pattern of targeted regulation ensures that individuals retain access to firearms for constitutionally protected purposes.  When Tennessee and Arkansas banned the public carrying of a range of knives, blunt weapons, and pistols, for example, they included an explicit exception for large army and navy pistols so long as they were carried openly in the hand.  *See* Rivas Decl.

35

**APP. 113**

¶ 18.  Despite the limited nature of this exception, courts held that it left the right to self-defense sufficiently intact and upheld the laws.  *See id.* ¶ 20.  The same approach can be seen in other regulations of dangerous gun accessories, particularly ammunition.  While these early laws could be restrictive—some states required that gunpowder be stored in a communal magazine, and at least one state flatly prohibited the possession of loaded firearms in the home, *see* Section II.B.2—they were regarded as appropriate exercises "of the police power" to protect the public from a weapons accessory known to be volatile and dangerous, *Brown*, 25 U.S. at 443.  The District's regulation presents an even lesser burden than these historical analogues.

Indeed, the District's regulation is closer to the prohibitions on trap guns enacted at the Founding, which regulated only the *manner* in which firearms could be configured and did not prevent gun owners from using those firearms for self-defense.  Like trap gun laws, the District's regulation prohibits a particular gun enhancement, one that enables these weapons to fire without pause for more than ten rounds and heightens the risk to innocent bystanders.  Beyond the narrow restriction on magazine capacity, however, gun owners are free to use their weapons and possess lawful ammunition.  *See* Section I.A.2.  The Law requires only that the shooter pause to change magazines every ten rounds, which significantly reduces the risk of injury from violent confrontation and mass murders.  *See, e.g., Duncan*, 19 F.4th at 1109–10 (noting that an expert "described the period after a shooter has exhausted the current magazine as 'precious down-time' that 'affords those in the line of fire with a chance to flee, hide, or fight back'" and citing examples of "people fleeing, hiding, or fighting back during a shooter's pause"); *see ANJRPC*, 910 F.3d at 119 (similar); *Kolbe*, 849 F.3d at 128 (similar).  Nothing suggests that gun owners' ability to defend themselves is, in practice, at all burdened by the regulation.  *See* Section I.B.

### 2.  Comparable Justifications

The District's Law is also justified by the same reasoning that has driven governmental regulation of weapons (including weapons accessories and configurations) throughout history: The state's responsibility to protect the public from the increased danger caused by weapons that pose a particular threat to public safety.  As the historical analogues make clear, governments have long regulated weapons associated with rising crime rates and other salient societal dangers, and these regulations have targeted specific weapons with dangerous attributes, susceptibility to criminal misuse, or both.  The District's Law follows this tradition, addressing a particularly lethal form of firearms technology that has driven the rise of mass murder in this country.

LCMs have been linked to crime and mass shootings since the late 1980s, an association that led to their inclusion in the Federal Assault Weapons Ban in 1994.  "LCMs are used in crime much more often than [assault weapons] and accounted for 14% to 26% of guns used in crime prior to the [federal] ban."  Christopher S. Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, *1994–2003* 2 (2004) (Koper 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.  Since the sunset of that law, the criminal misuse of LCMs has only increased.  Criminals frequently take advantage of the lethal capacity of LCMs to fire without pause, with devastating results.  Recent studies suggest that firearms equipped with LCMs are involved in somewhere between half and two-thirds of public mass shootings and mass murders that result in six or more fatalities.  Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 Criminology & Pub. Pol'y 147, 151 (2020) (Koper 2020); *see* Ex. O, Decl. of Daniel W. Webster ¶¶ 9, 12.

**APP. 115**

And shootings tend to be more fatal when LCMs are involved:  The total number of victims killed and wounded are two to three times higher when LCMs are used.  *Id*. at 152. Attacks with assault weapons or other semiautomatic guns equipped with LCMs "result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms."  Koper 2004 at 3; *see also* Webster Decl. ¶¶ 10–12.  From Newtown to Las Vegas, Parkland to Tucson, Orlando to Uvalde, LCMs have enabled the most horrific mass shootings of our time.  *See* Violence Policy Center, *Mass Shootings in the United States Involving Large Capacity Magazines*, http://vpc.org/fact_sht/VPCshootinglist.pdf.

Contrary to Plaintiffs' assertions, *see* Pls.' Mem. at 19, LCM prohibitions effectively target this threat, reducing the frequency and lethality of mass shootings.  *See* Louis Klarevas, et al., *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017*, 109 Am. J. Pub. Health 1754, 1754 (2019), https://tinyurl.com/4hmw3szk; *see also* Michael Siegel, et al., *The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018*, 44 L. & Human Behavior 347, 347 (2020), https://psycnet.apa.org/fulltext/2020-78672-001.html (explaining that bans on LCMs are associated with fewer fatalities and nonfatal injuries in mass public shootings).  States that enacted such restrictions experienced fewer mass shootings and, when they occur, fewer deaths and injuries in those shootings.  *See* Webster Decl. ¶ 15 (discussing Klarevas, *supra*, at 1758; Daniel W. Webster, et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Criminology & Pub. Policy 171, 188 (2020), https://tinyurl.com/y64ebzxd).

As discussed above, a similar rationale has justified firearms regulations throughout Anglo-American history.  Governments have always used their police powers to protect their

**APP. 116**

populations, particularly from weapons linked with crime or with especially dangerous features.
In the colonial period, governments strictly controlled the storage of gunpowder because of the
extraordinary risk of fire or explosions.  And as the homicide rate began to rise in the antebellum
period, states adopted restrictions on the type of concealable weapons most frequently used in
assaults.  Weapons like pocket pistols and Bowie knives, which were designed to be highly lethal
and were often put to criminal misuse, were specifically targeted for regulation.  This pattern was
repeated in the 20th century, when automatic and semiautomatic firearms proliferated.  The
reason for these laws mirrors the reasoning behind the District's Law.[15]

* * *

Governments have long exercised their powers to regulate the possession, use, and
storage of unusually dangerous weapons and accessories in order to protect their residents.  And
even at this early stage, the uniformity of the available historical evidence makes clear that the
District's prohibition on LCMs is part of this unbroken tradition and therefore constitutional
under the Second Amendment.  Plaintiffs are thus unlikely to succeed on the merits.

## III.    Plaintiffs Do Not Satisfy the Other Criteria for a Preliminary Injunction.

Plaintiffs' claims of injury are based on the alleged denial of their constitutional rights.
But because their claims fail on the merits, Plaintiffs are not entitled to preliminary injunctive

---

[15]    Plaintiffs' exclusive focus on an alleged insufficient "handful" of regulations that
"limit[ ] firearm magazine capacity" is doubly mistaken.  *See* Pls.' Mem. at 19, 21.  *First*, this is
the wrong metric, as the District's prohibition on LCMs is a quintessential "modern regulation[ ]
. . . unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132; *see* Section II.A.  *Second*, the
number of states that restrict LCMs today is not a historically grounded approach for determining
what laws are consistent with the Second Amendment.  Laws satisfy *Bruen*'s standard where
they are "consistent with this Nation's *historical tradition* of firearm regulation." *Id*. at 2126
(emphasis added).  The right to keep and bear arms accommodates state and local variation in
"devis[ing] solutions to social problems that suit local needs and values." *McDonald*, 561 U.S.
at 784 (plurality opinion).  "[A]nalogical reasoning under the Second Amendment" is not a
"regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.

relief.[16]  Nor have Plaintiffs met the remaining factors necessary for a preliminary injunction.

Contrary to Plaintiffs' assertions, Pls.' Mem. at 22, the mere "allegation" of a Second

Amendment violation it is not enough to show irreparable injury.  *See Winter*, 555 U.S. at 21–22.

Instead, Plaintiffs must demonstrate that such a deprivation is actually "likely."  *Archdiocese of*

*Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (emphasis added).

Otherwise, anyone fearing a perceived rights-infringement would enjoy a presumption of

irreparable injury when seeking equitable relief.  That is not the law.  *See Winter*, 555 U.S. at 22

(rejecting the "possibility" of irreparable harm).  Because Plaintiffs' constitutional claims fail,

*see* Sections I and II, they cannot demonstrate that they will be injured, let alone irreparably so,

in the absence of an injunction.

Moreover, when "balanc[ing] the competing claims of injury," the Court must "consider

the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S.

at 24.  "Any time [the District] is enjoined by a court from effectuating statutes enacted by

representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S.

1301, 1303 (2012) (cleaned up)).   Furthermore, "[t]he equities and public interest . . . generally

weigh in favor of enforcing duly enacted state laws."  *Strange v. Searcy*, 135 S. Ct. 940, 940

(Feb. 9, 2015) (Thomas, J., dissenting).

These principles hold extra force here given the public's paramount interest in restricting

the use of deadly firearm accessories.  Plaintiffs' interest in possessing LCMs in anticipation of

---

[16]     The D.C. Circuit has not yet decided whether the "sliding-scale approach" remains valid after *Winter*, *see Sherley*, 644 F.3d at 393, and Plaintiffs do not argue that that approach should apply here.  However, the D.C. Circuit *has* made clear that it reads *Winter* to "suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'"  *Id*. (citing *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)).

needing to fire more than 10 rounds without reloading—a circumstance so rare that Plaintiffs

offer only stray or irrelevant anecdotes in support of it—pales in comparison to the District's

interest.  Large-capacity magazines have been illegal in the District of Columbia since 2009.  If

the Court were to enter Plaintiffs' requested injunction, individuals who have been prevented

from acquiring large-capacity magazines for nearly 15 years will be able to lawfully possess

them.  Significant numbers of large-capacity magazines could flood into the District, hobbling

enforcement even if the prohibition is later upheld on appeal.  That risk is tangible.  *See* Matthew

Green, Gun Groups: *More Than a Million High-Capacity Magazines Flooded California During*

*Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://tinyurl.com/586mj8fa; Parsons

Delc. ¶¶ 10–13.  Such an influx could also have devastating consequences for the public, as

"LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality

mass shootings."  Klarevas, *supra*, at 1758; *see* Section II.C.2.

The societal interest in preventing grievous injuries to and deaths of innocent civilians

and law enforcement caused by the use of LCMs is paramount.  Use of LCMs increases the

likelihood of indiscriminate fire that can strike a home, storefront, or bystander, especially in

urban environments like the District.  Parsons Decl. ¶ 25.  These bullets can and do travel

through walls and car doors.  *Id.*  Stray (and spray) gunfire is already a very real danger in the

District; in July 2022, for example, MPD recording devices documented discharge of 50 rounds

in 5.5 seconds.  *Id.* ¶ 23.  And allowing the use of LCMs risks multiplying the already tragic

number of deaths—including deaths of children—caused by errant bullets.  *Id.* ¶¶ 25–27.

Plaintiffs cannot demonstrate that it is in the public interest to enjoin a duly enacted law designed

to protect public safety and reduce gun violence and gun-related crime.  Indeed, invalidating the

District's prohibition on LCMs would remove a valuable tool from the hands of law

41

enforcement, making it more difficult to ensure the security of the Nation's Capital and to protect the safety of officers and members of the public. *Id.* ¶ 29.

## IV.   <u>Any Injunction Should Be Limited to Plaintiffs' As-Applied Challenge.</u>

Even were the Court to find that Plaintiffs have established some entitlement to injunctive relief, Plaintiffs have not met the "heavy burden" to show that the District's prohibition on LCMs violates the Second Amendment's guarantee under *every* circumstance—the requirement for any facial challenge. *Salerno*, 481 U.S. at 745; *see Duncan*, 19 F.4th at 1101 (explaining that, to succeed on a facial challenge to an LCM prohibition, plaintiffs "must show that no set of circumstances exists under which [it] would be valid."). The District's prohibition applies to a wide variety of LCMs—stick magazines, drum magazines, 30-round versions, and even 100-round versions. *See* D.C. Code § 7-2506.01(b). Yet Plaintiffs make no effort to show that a 30-, 50-, or 100-round magazine is in common use for self-defense—nor could they. *See supra* Section I.B; *cf. Heller II*, 670 F.3d at 1261 (even assuming magazines holding 10 rounds are commonly owned, "[t]here may well be some capacity above which" they are not).[17]

Thus, any injunctive relief should redress *only* the injuries alleged (1) by Plaintiffs, and (2) as to the magazines they have offered evidence that they would use. The Supreme Court has recognized the "general rule"—rooted in traditional equitable principles—that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the

---

[17]     Nor do Plaintiffs make any argument with respect to the Law's prohibition on the "sell[ing]" or "transfer" of LCMs. D.C. Code § 7-2506.01(b). Thus, Plaintiffs' challenge is the "sort of 'separate attack on a defined subset of the statute's applications' [that] is better read as an as-applied challenge." *In re Sealed Case*, 936 F.3d at 588 n.4 (quoting *United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010)); *see also Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (describing the distinction between facial and as-applied challenges as "both instructive and necessary, for it goes to the breadth of the remedy employed by the Court"). And, in any event, Plaintiffs could not bring a facial challenge to the entire law because they lack standing as to the sale and transfer provisions. *Cf. supra* n.3.

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (internal quotations and citation omitted).  And here, "a narrower remedy [would] fully protect [Plaintiffs]" and avoid prematurely resolving constitutional questions raised by other applications of the Law. *Nat'l Treasury Emps. Union*, 513 U.S. at 477–78.

Plaintiffs have offered no evidence that they currently own magazines with a capacity larger than 21 rounds, would seek to buy or use such magazines, or would be harmed if the injunction did not reach these larger magazines.  Although each Plaintiff filed a declaration in support of the Motion explaining that they seek to possess magazines holding more than 10 rounds while in the District, none mention any interest in possessing magazines with a capacity of more than 21.  *See generally* [8-2]–[8-5].  To the contrary, Plaintiffs aver only that they "would employ" magazines that *they already own* but keep outside the District.  *See id.* at ¶¶ 3, 4 (in each); *see, e.g.*, *id*. [8-3] at ¶¶ 3–4 ("I possess outside the District magazines . . . holding in excess of 10 rounds" and "I would employ these magazines").  None of those magazines have a capacity over 21 bullets.[18]  An injunction limited to the Plaintiffs and to LCMs with a capacity of 21 rounds would thus "fully protect" the Plaintiffs from the injuries they allege as part of their as-applied challenge.  *Nat'l Treasury Emps. Union*, 513 U.S. at 478.

Thus, if the Court finds that Plaintiffs are entitled to some form of preliminary relief— which they are not—the injunction should be limited exclusively to the Plaintiffs and should allow them (and only them) to possess LCMs with no more than 21 rounds of ammunition.

V.    **Defendants Would Be Prejudiced by Consolidation with the Merits.**

---

[18]    In response to a discovery request, Plaintiff Yzaguirre stated he possesses a 20-round magazine; Plaintiff Chaney has a 21-round magazine; and Plaintiff Klun has a 15-round magazine.  Ex. A at 7–10.  Plaintiff Hanson has not specified the capacity of magazines he already owns, though he does state that two of the three firearms he normally carries (or would use for home defense) come "standard issue" with magazines of 17 and 15 rounds.  *Id*.

In addition to denying the preliminary injunction, this Court should also decline

Plaintiffs' invitation to permanently enjoin the District's Law at this early stage of the case.

Such a move under Rule 65 is "generally inappropriate." *Camenisch*, 451 U.S. at 395. And

doing so here would "deprive [Defendants] of a full opportunity to discover and present all of

their evidence." *Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*, 657

F.2d 124, 126 (7th Cir. 1981).

The law Plaintiffs challenge addresses "unprecedented societal concerns or dramatic

technological changes," which demands a "nuanced approach." *Bruen*, 142 S. Ct. at 2132.

Specifically, assuming LCMs fall within the Second Amendment's scope, it requires that

Defendants and their experts undertake a complex survey of historical state and municipal laws

and additional primary-source research on the Nation's tradition of regulation of firearms and

other dangerous weapons. Defendants began their research by consulting the text of easily

accessible historical state and local laws, but despite working diligently since Plaintiffs' Motion

was filed, Defendants have not yet had the opportunity to fully explore all the relevant areas of

inquiry. Such an effort would require time-intensive projects, like a deeper canvass compiling

these laws, that are voluminous and unfinished. There are also many unexplored primary source

materials that contextualize how these laws were understood and enforced, including official

reports, manuscripts, newspaper articles, and archival records. *See* Rivas Decl. ¶¶ 9, 46, 47.

Analysis of these primary source materials could also help identify historical traditions of

restricting the availability and use of dangerous weapons through non-statutory means and could

shed light on the historical development of arms designed and intended for civilian self-defense

use. Defendants are not aware of existing secondary literature on these topics. Original work

will be time-consuming. *See Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C. filed

**APP. 122**

June 30, 2022), Declaration of Zachary Schrag [18-13].  Defendants should be permitted time to conduct the research—including original archival research—necessary to provide comprehensive insight on these issues before this Court issues a sweeping constitutional ruling.

Not only have Defendants not yet developed a complete account of this American tradition of regulation, given the breadth and complexity of the historical analysis that *Bruen* now requires, but Plaintiffs have not yet even *responded to it*.  And if Plaintiffs *do* respond to the District's extensive survey of historical laws in their reply brief, Defendants will have had no opportunity to address any issues Plaintiffs raise.  Defendants should have the opportunity to fully develop the record on these factors, and to depose the Plaintiffs or to test at all the other evidence on which they rely in their Complaint and Motion, before the Court makes a final determination on the merits.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Date: November 23, 2022.                                Respectfully Submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Mateya B. Kelley*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]
HELEN M. RAVE*

**APP. 123**

Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-7854
Email: mateya.kelley@dc.gov

*Counsel for Defendants*

*Bar number pending

APP. 124

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON, ET AL.** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-2256 RC |
| | ) |
| **DISTRICT OF COLUMBIA, ET AL.** | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**PLAINTIFFS' ANSWERS AND OBJECTIONS**
**TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

Plaintiffs hereby tender their answers and objections to Defendants' First

Set of Interrogatories.

**Interrogatories.**

1.      Since obtaining your concealed-carry license from MPD, have you (or

any family member) been subject to a specific threat of death or serious bodily harm,

or a theft of property? If so, identify each such incident and describe it in detail.

**Answer as to all Plaintiffs**: Objection, irrelevant, not likely to lead to the

discovery of relevant and admissible evidence. This case is a challenge to the

District's ban on the possession of magazines and other ammunition feeding devices

capable of holding more than 10 rounds of ammunition. The irreparable harm to

Plaintiffs alleged here is being subject to an unconstitutional infringement on their

**APP. 126**

**Answer as to all Plaintiffs:** Irrelevant, immaterial, not likely to lead to the discovery of relevant admissible evidence. This is perhaps interesting, but likewise irrelevant to the injury Plaintiffs face here, which is being subject to an unconstitutional infringement on their right to keep and bear arms. Dick Heller did not have to prove he had used a gun to defend himself in order to challenge DC's handgun prohibition. Nor did Brian Wrenn have to prove that he used a firearm for self-defense to challenge DC's may issue concealed carry regulation. Again, the answer to this interrogatory is irrelevant and immaterial to the constitutional challenge at issue here.

Subject to the objection, the following individual responses are provided:

Andrew Hanson: No.

Tyler Yzaguirre: No.

Nathan Chaney: No.

Eric Klun: No.

3.      Are you aware of any incidents in the District of Columbia, Maryland, or Virginia in which someone fired more than ten rounds in self-defense of him or herself, or another? If so, identify each incident and describe it in detail, including the date and location of the incident, the identity and contact information of the person(s) involved and their relation to you, if any, and how many rounds were fired. This interrogatory is not meant to include any incident

that occurred while the shooter was on active military duty or serving in any law enforcement capacity.

**Answer as to all Plaintiffs:** Objection to limiting the interrogatory to law enforcement or active military and to limiting the interrogatory to Maryland, Virginia and the District of Columbia. Moreover, whether Plaintiffs are or are not aware of these incidents is not relevant to the District's constitutional violation.

Subject to the objection, Plaintiffs state: This interrogatory appears directed at the question whether magazines holding more than 10 rounds are in fact necessary for self-defense, asking whether Plaintiffs are aware of more than 10 rounds having been fired in Virginia, DC, or Maryland in self-defense by civilians. Why the District limits its inquiry to Virginia, DC and Maryland is far from clear and biases the results as does the exclusion of law enforcement incidents. Of course DC has had its magazine ban in effect since the 1930s so it is unlikely to be many such non law enforcement cases in the District where civilians fire more than 10 shots. Maryland also has a lesser magazine restriction that unnecessarily biases the results of such an inquiry as well.

Nonetheless, Plaintiffs pointed to several such cases involving both civilians and law enforcement in their preliminary injunction application. ECF Doc 8-1, pp. 16-18. Presumably District counsel read that document. In one incident cited at ECF Doc 8-1, p. 20, more than 30 rounds were fired by store owners and staff in defending

against an armed robbery of a Richmond, Virginia area jewelry store. *See Ayoob, Lead and diamonds: the Richmond jewelry store shootout. (The Ayoob Files)* American Handgunner (2003), *available at https://www.thefreelibrary.com/Lead+and+diamonds%3A+the+Richmond+jewelr y+store+shootout.+(The+Ayoob... a099130342.* Here is another case where more than 10 rounds were fired in self-defense. Ayoob, *With A Gun To Your Head: The Larry Goldstein Incident,* American Handgunner (2020), available at https://americanhandgunner.com/our-experts/with-a-gun-to-your-head-the-larry-goldstein-incident/. *See also* English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, Expanded Report, pp. 28-33 (May 13, 2022) (detailing situations where respondents stated that having magazines holding in excess of 10 rounds would have been useful for self-defense).  Whether Plaintiffs are or are not aware of these incidents is not relevant to the District's constitutional violation.

Subject to the objection the following individual responses are provided:

Andrew Hanson: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense.  However, I would reiterate the following.  The majority of instances where I have been threatened/accosted while living in the District of Columbia have involved groups of four or more

persons threatening me on the street or on a sidewalk.  Granted, such incidents are unusual as I am generally thought of as friendly and – at a minimum – respectful to people I encounter/meet. That said, the groups of young men I encountered in these incidents were unknown to me, and I to them. In short, these incidents – though rare – generally occur when I am vastly outnumbered.

Tyler Yzaguirre: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense.  I note that published reports of the many self-defense incidents do not generally state the number of rounds fired by the defender(s). I do note that in the recent mall active shooter attack in Indiana, the good guy with a gun fired 10 rounds in order to stop the mass killer. Consider what he would have needed if there had been more than one mass murderer at that mall. Mass shootings sometimes involve more than one assailant.

Nathan Chaney: According to FBI statistics, the average number of rounds fired by assisting officers responding to the scene of a victim officer in 2017 was 28.2. This is in addition to the average 4.1 rounds fired by the victim officer themself. *See* Table 106, Law Enforcement Officers Assaulted and Injured with Firearms, Knives, or Other Cutting Instruments; Use of Firearm(s) During Incident by the Victim Officer, Assisting Officers, and Offenders, 2008–2017. Electronic copy available at: https://ucr.fbi.gov/leoka/2017/tables/table-106.xls

**APP. 130**

"For law-abiding Americans, firearms are tools of recreation and self-defense. Defensive uses of firearms can preserve human life. Americans use firearms with magazine capacities of 10 to 30 rounds for the same reason law enforcement officers do: because they are effective tools for defensive use. For this reason alone, magazine restrictions should be understood as restrictions on weapons themselves and should thus be taken as seriously and subject to as much scrutiny as restrictions directly on firearms." Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions By Matthew Larosiere, Cato Institute. July 17, 2018. Electronic copy available at: https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions

Eric Klun: Other than in the complaint and application for preliminary injunction, and as stated above, I am not aware of any incidents in DC, MD or VA in which more than 10 rounds were fired in self-defense.

4.      Identify each firearm for which you possess a concealed-carry license and state the maximum number of rounds each firearm may be loaded with, with and without the use of a large-capacity magazine.

**Answer as to all Plaintiffs:** Objection, the interrogatory calls for information already within the possession of the District. The District already has information for all of the Plaintiffs' registered firearms, including the number of rounds those guns may be loaded with using currently legal District

magazines. As to the number of rounds such guns can be loaded with using larger capacity magazines, it depends on the available larger capacity magazines. For example, a subcompact Glock 26 can be loaded with a 10 round District legal magazine for a total of 11 rounds, a 12 round standard capacity magazine (13), a 15 round Glock 19 standard capacity magazine (16), and a 17 round Glock 17 standard capacity magazine (18). In addition there are 20 and 32 round aftermarket magazines that will fit that gun. On information and belief, the District has that information as well.

Moreover, as asked, the answer is none since concealed carry licenses in DC are not issued for specific firearms; they are issued to persons to carry handguns. Construing the question as requesting information as to registered handguns that Plaintiffs are authorized by their DC Carry licenses to carry in public, subject to the objection, the answers are:

Andrew Hanson: The majority of handguns I own are for collectors' purposes and have never been fired outside the context of factory testing. However, the three main handguns I carry for target shooting and self-protection are:

1. Sig Sauer 229, 9mm, DC-compliant magazine holds 10 rounds for a total of 11 including the round in the chamber. I understand it will accept a 15

round magazine (standard issue), though higher capacity variants may be commercially-available as well.

2. Sig Sauer 320, 9mm, DC-compliant magazine holds 10 rounds for a total of 11 in the gun. My understanding is that it comes standard with 17 round magazines. Sig has magazines as large as 30 rounds for this firearm.

3. Glock 43, 9mm (sub-compact), 6 round magazine capacity and thus 7 total in the gun. I believe that larger magazines are commercially available for this firearm.

I own several additional semi-automatic pistols, but they are for collection purposes and I do not at this time plan to employ them for home or personal protection. Most of them can accept magazines capable of holding more than 10 rounds and of those most come standard (outside the District) with magazines holding more than 10 rounds. However, all magazines for these collectors' items are DC-compliant.  I also own several revolvers, all of which are either five or six shot firearms. They cannot be made to accept more rounds than that. I do not use any of those firearms for personal or home protection. I note that my attorney has a complete list of my handguns and their magazine capacities as does the MPD Firearms Registration Unit.

Tyler Yzaguirre:  Ruger P95, 10 round magazine allowable in DC plus one in the chamber; I also possess outside DC a 20 round magazine for the gun

(21 rounds). I understand it comes standard with a 15 round magazine (16 rounds) and up to 30 round magazines are available for the firearm (31). Ruger LCP six plus 1. I am unaware that larger magazines are available for it but they may exist.

Nathan Chaney: Sig Sauer P320, maximum number of rounds: 31 (30+1 in the chamber). Typically carried with 21 round magazine (+1 in the chamber). However, Sig Sauer does have 30 round extended capacity magazines available.

Sig Sauer P365, maximum number of rounds: 16 (15+1 in the chamber).

Smith & Wesson M&P Shield, maximum number of rounds: 11 (10 +1 in the chamber).

Ruger LCP 2 maximum number of rounds (with factory magazines): 8 (7 +1 in the chamber).

Eric Klun: I carry a Glock 43x with magazine capacity of 15 in the magazine and 1 round in the chamber for a total of 16 rounds. I also carry a Glock 23c with 13 rounds in the magazine and 1 round in the chamber for a total of 14 rounds. I am aware of magazines with greater capacity for these firearms than I own as set forth above. When carrying in the District of Columbia I am forced to use 10 round magazines for these guns.

APP. 134

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that

their respective foregoing answers are true and correct to the best of  their

knowledge, information and belief.

_____

Andrew Hanson

_____

Tyler Yzaguirre

_____

Nathan Chaney

_____

Eric Klun

### *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served
the foregoing document on all counsel of record for Defendants via email, this 13th
day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 135**

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that

their respective foregoing answers are true and correct to the best of their

knowledge, information and belief.

_____

Andrew Hanson

_____

Tyler Yzaguirre

_____

Nathan Chaney

_____

Eric Klun

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served
the foregoing document on all counsel of record for Defendants via email, this 13th
day of September, 2022.

/s/ George L. Lyon, Jr., DC Bar 388678

23                                                              **APP. 136**

The undersigned Plaintiffs in this action, state under penalty of perjury that their respective foregoing answers are true and correct to the best of their knowledge, information and belief.

_____
Andrew Hanson

_____
Tyler Yzaguirre

_____
Nathan Chaney

_____
Eric Klun

## CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record for Defendants via email, this 13th day of September, 2022.


/s/ George L. Lyon, Jr., DC Bar 388678

**APP. 137**

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned Plaintiffs in this action, state under penalty of perjury that

their respective foregoing answers are true and correct to the best of  their

knowledge, information and belief.


_____

Andrew Hanson


_____

Tyler Yzaguirre


_____

Nathan Chaney

_____

Eric Klun


## *CERTIFICATE OF SERVICE*

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served
the foregoing document on all counsel of record for Defendants via email, this 13th
day of September, 2022.


/s/ George L. Lyon, Jr., DC Bar 388678

                                                                        **APP. 138**

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br> **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

### <u>DECLARATION OF DENNIS BARON</u>

Pursuant to 28 U.S.C. § 1746, I, Dennis Baron, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I am a Research Professor of English and Linguistics at the University of Illinois. I have been retained by the District of Columbia to provide expert opinions in the above-captioned matter.

3.      I am an expert in the field of linguistics with a special emphasis on historical language usage.  Attached hereto is my curriculum vitae, Exhibit A.

4.      I have been retained by the District of Columbia to perform original historical language and Corpus Linguistics research in this case at a rate of $350.00 per hour.  I hold all opinions expressed herein to a reasonable degree of professional certainty.

### BACKGROUND AND QUALIFICATIONS

5.      I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the

Department of English and the Department of Linguistics since 1975.  I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years.  I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law.  I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English.  I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and law. I have also published books on language reform, on usage, and on gender in language.

6.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, January 2023).  In addition, I served as lead author on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia in his opinion in the case, and by Justice Stevens in his dissent.  I was a co-author on another brief by professors of linguistics and corpus linguistics in *New York State Rifle and Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022), which Justice Breyer cited in his dissent.  In that dissent, Justice Breyer also quoted directly from my essay *Corpus evidence and the meaning of "bear arms," Hastings Constitutional Law Quarterly,* 46.3 (2019).  I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young

2

**APP. 141**

University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law.  I've also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times.*  And I have been an expert consultant on historical meaning and legal interpretation of the Second Amendment for the State of California Department of Justice.  In the past twenty years I have been an expert consultant in perhaps a dozen cases involving document interpretation.

7.    My forthcoming essay, *Look It Up in Your* Funk and Wagnalls*: How Courts Define the Words of the Law*, an analysis of how courts incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, will appear in the next issue of the academic journal of the Dictionary Society of North America, *Dictionaries.*

8.    This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large, digitized corpora consisting of many millions of words.

## OPINIONS

### I.    Assignment

9.    I have been asked to analyze the historical use of the terms *arms* and *accoutrements* in order to show that large capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

### II.    Summary of Conclusions

10.    Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition,

3

**APP. 142**

ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements.* Nor does *arms* refer to *parts* of weapons. For example, *arms* does not refer to the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition*; *arms and accoutrements*; or *arms, ammunition, and accoutrements.* A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier's or militia member's kit or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as in *the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

11.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the different accessories that officers and the rank-and-file soldiers were also required to have.

### III.     Theory and Methodology

12.     Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did not typically involve legal issues. Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers. Scholars

**APP. 143**

plotted the frequency of words and phrases in order to develop a picture of an author's style, and

to determine authorship of a particular work when the provenance was in doubt.  Soon, in

addition to solving literary mysteries, the methodologies developed by corpus linguists were

successfully applied in a number of criminal cases in the U.S. and in England involving, for

example, the authorship of a ransom note or an email.

13.    Lexicographers, who began compiling large analog databases of text in the late

19th century, began to digitize their libraries of paper data and to add to that material,

assembling computerized databases of historical and contemporary text and, more recently, of

spoken language as well, in order to arrive at more precise definitions of the multiple senses of

words and phrases.

14.    As a graduate student at the University of Michigan in 1970, I coded analog texts

from the *Oxford English Dictionary* files to help build the computerized database for the

Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to

the language of the Founding Era.  Today, major dictionaries like the *Oxford English Dictionary*

and the Merriam-Webster suite of dictionaries rely on public databases of oral and written

language, as well as their own proprietary databases, in order to revise older definitions and to

track the spread of new words and meanings.  The great dictionary makers of Europe use similar

databases in their own work.

15.    Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a

subset of Corpus Linguistics.  LCL involves the analysis of digitized corpora of current and

historical English to establish meaning—often referred to as Original Public Meaning (OPM)—

in statutes and in the Constitution.  The promise of LCL attracted jurists as well as scholars with

a specific interest in language and law.  In *Muscarello v. United States*, 524 U.S. 125, 126–27

**APP. 144**

(1998), where the Supreme Court held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or trunk of a car," can be deemed to be within the scope of the statutory phrase "carries a firearm," Justice Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon, see id.* at 129–30.  In her dissent, Justice Ginsburg expressed skepticism that either dictionary evidence, or Justice Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question.  *Id.* at 142–43.  Her critique did not deter courts from performing other computerized data searches to determine legal meaning.  In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute.  Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean "shelter," as the government claimed, but rather "hide, conceal from view," as he felt it must mean in the context of the statute.  *United States v. Costello*, 666 F.3d 1040, 1044–45 (7th Cir. 2012).  Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean "provide shelter" as well as the narrower sense, "hide someone from the authorities."  But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so, even though using more rigorous parameters showed that Judge Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

16.    More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee of the Utah Supreme Court, a long-time champion of corpus linguistics, together

**APP. 145**

with the legal scholar Stephen Mouritsen, published *Judging Ordinary Meaning*, 127 Yale L. J. 788 (2018), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity.  Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning.  LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary,* as well, allowing a more precise interpretation of historical text data.

17.     In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers.  As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth federal Circuit Courts of Appeals, as well as a comment by Justice Alito in his concurrence in *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1174–75 (2021), where he suggested that LCL may one day provide a useful supplement to the canons of interpretation.  Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

18.     Several large databases have come online in the past few years that facilitate LCL research.  They have proved invaluable to me in compiling this report.  Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799.  BYU's Corpus of Early Modern English (COEME),

**APP. 146**

covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words.  For the 19th century, the Corpus of Historical American English (COHA), which was initially developed at BYU as well but is now independent of that institution, currently contains 475 million words of text from 1820–2020.  The size of these databases continues to grow as more works are digitized, coded, and added to the corpora.

19.     Critics of LCL have complained that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora.  It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers, and although ordinary people are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge.  A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, *Adult Literacy in America* (U.S. Department of Education, 1993), the average American today tends to have a seventh-grade reading level.  In order to counter any "elite" bias that may be found in databases like COFEA COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment.  Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early 19th century, when the Industrial Revolution drastically changed print technology.  The first printing press was

**APP. 147**

adapted by Gutenberg from the design of the traditional wine press, and printing was a slow and labor-intensive process.  As a result, newspapers in the founding era were small, averaging four to eight pages.  Papers tended to appear weekly or semi-weekly, rather than daily.  Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news.  Even though newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

20.     The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large and inexpensive rolls of newsprint, led to a revolution in print technology.  This led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day.  This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the U.S. and Europe that tracked the industrial revolution and the subsequent rise in universal public education.  By the end of the Civil War, there were more readers than ever, and they demanded more reading material.

21.     As for the question of "elites," as the principal means of communicating news and information, the newspapers of the 18th and 19th centuries embodied much of the language of the "ordinary people" who read them.  Newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

9

**APP. 148**

22.     Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans.  Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

23.     The newspaper databases I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (digitized by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com.  For this report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

24.     All the databases contain some duplicates.  COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not.  Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary.  Jurists from Learned Hand to Felix Frankfurter and from Frank Easterbrook to Richard Posner have warned their colleagues not to make a fortress of the dictionary.  The corpora are by necessity incomplete.  LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

10

**APP. 149**

### IV.    The Meaning of *Arms* and *Accoutrements* in the Databases

25.    I was asked to look at the meaning of *arms* and *accoutrements*, along with the phrase *arms and accoutrements*, in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment, focusing on whether the word *accoutrements* may be considered analogous to the present-day use of the term *magazine* in reference to firearms.

26.    In the 18th and 19th centuries, *magazine* was a word that meant "storehouse, depot."  A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits.  The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the 19th century, and the term was relatively rare until the 1920s.  Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms.*

27.    The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges*, *cartridge boxes* and later, *magazines*, are not arms in and of themselves.

28.    The *Oxford English Dictionary* (*OED*), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

11

**APP. 150**

29.     *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxedos, and other formal attire).  But, in the military sense, *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers.  The example given by the *OED* to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813:  "In order to collect the wounded and their arms and accoutrements."  Here, Wellington, recognized by all as a consummate soldier and who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements*.

30.     The term *accoutrement-maker*, though not defined separately by the *OED*, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated:

> The crowd was so great in the Rue de Richelieu … especially about the gunsmiths and accoutrement shops in the vicinity of the Palais Royal. [*United Service Jrnl.*  i. 325]

31.     The *OED* definitions are instructive.  But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora.  A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates).  A similar search of COEME returned 126 hits, the earliest from 1656.  I determined that the two search terms, *arms* and *accoutrements*, often appear together as a single phrase, *arms and accoutrements,* typically in military contexts having to do with an army or militia unit.  *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,* though when *ammunition* is

**APP. 151**

not listed separately, the term *accoutrements* will generally include *ammunition*.  *Accoutrements* sometimes occurs in a list alongside *clothing*, suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms).  But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where the term usually refers to clothing associated with particular professions or activities).  In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms*.

32.     But English usage is never simple.  As linguists often say, "all grammars leak"— which is to say, there are *always* a few counterexamples in the data.  The existence of counterexamples does not invalidate the data or undercut an interpretation:  It simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military *accoutrements*, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston.  [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

33.     This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that *arms* may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements provided by the militia law.

13

**APP. 152**

34.     But besides a handful of exceptions, in literally hundreds and hundreds of cases *arms* and *accoutrements* are treated as separate items of military gear.  Here are some typical examples from the Founding Era:

> **1776**:  Fire arms and accoutrements
>
> **1780**:  arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments.
>
> **1795**:  you will march … with arms and accoutrements in good order. If any volunteer should want arms and ammunition, bring them forward, and they shall be supplied as well as possible. [COEME; the other examples are from COFEA]
>
> **1798**: To hold his powder and his ball, his gun, accoutrements and all …. [This example rhymes because it's from a poem, indicating that the idiomatic phrase *arms and accoutrements* has become part of the general language available not just to military specialists but also to poets and novelists.]

35.     A second COFEA search, for *accoutrements* alone, returned 1,235 hits.  COEME yields 771 hits.  These searches add a number of non-military contexts, where *accoutrements* refers to religious gear (robes, mitres, and so on) as well as other sorts of fancy or special clothing.  These non-military examples do not reference weapons, ammunition, or other military equipment.

36.     I supplemented my COFEA search with a search of the newspaper database, newspapers.com, for the Founding Era period, 1750–1800.  The newspaper databases do not permit the kind of collocate searches that COFEA, COEME, and COHA allow.  Entering two search terms returns results in which either one or both terms occur on the same page, though not necessarily in the same sentence, or even in the same article, and not necessarily as linked terms.  There are 1,392 hits for *accoutrements*.  There are 692 matches for the exact phrase *arms and accoutrements*.

37.     Here's a mid-18th century British example from the newspapers.com corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:  "This Militia shall

14

**APP. 153**

receive their Arms, Accoutrements, and Ammunition from the Ordnance." *Derby Mercury,*

1756.

38.     Similarly, there's this "ploughshares into swords" example of a Cambridge

University library to be converted to a military barracks:

> [T]he new Building intended for a publick Library … may be converted into a
> Barrack, and be supplied with Provisions, Arms, and Accoutrements, at the
> Expence of the University.  1756

39.     A search of the Readex database of America's Historical Newspapers returns

3,103 hits from 1750–1800; and 2,036 hits from 1868–1880.  This early example from the

colonial period appeared in the *Boston Evening Post* in 1750.  It distinguishes *arms* from

uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in
> blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things
> necessary for a Gentleman Ranger.

40.     This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that *arms* and

*accoutrements* are distinct categories in the new nation as well:

> The militia … must be considered as the palladium of our security … .  The
> formation and discipline of the militia of the continent should be absolutely
> uniform; and that the same species of arms, accoutrements, and military apparatus,
> should be introduced in every part of the United States.

41.     The text of a bill in Congress to establish a uniform militia appeared in the *New*

*York Journal* in 1790.  It confirms the Founding-Era sense that *arms*, *ammunition*, and

*accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state … whose duty it shall
> be to … report[] the actual situation of their arms, accoutrements, and ammunition.
> … Every non-commissioned officer or private … for appearing at such meeting or
> rendezvous without his arms, ammunition, or accoutrements, as directed by this act,
> shall pay the sum of twenty-five cents.

42.     And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts … the following Arms, &c., will be sold: 10,699 rifled and smooth-bore Muskets … ; 261 Carbines … ; 305 Sabres … ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c.

43.     The newspaper data parallels that of COFEA:  The phrase *arms and accoutrements* is almost always military.  The phrase sometimes occurs alongside *ammunition* as a separate list item.  *Accoutrements,* when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than "equipment" (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations.  In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

44.     It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase in both England and America.  English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*.  Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random).  *Eggs and bacon* is rarer than *bacon and eggs*.  And it would be unusual to find *battery and assault*.  Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in *breaking and entering*) to prevent anyone from reversing the order.

45.     The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

**APP. 155**

46.     There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the U.S., *arms* and *accoutrements* are separate categories.  Here is one example from Gloucestershire, England, dated 1868:

> [A] letter was received from the Home Secretary, pointing out the danger of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot.

47.     A similar cite from Iowa in 1868:  "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property."

48.     And this, from Stroudsburg, PA, also in 1868:  "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana."

49.     The circa-1868 data confirmed the Founding Era data that *accoutrements* is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the terms refer to separate categories of equipment.

50.     One final note on *accoutrements.*  The Supreme Court in *Bruen* references *North Carolina v. Huntley*, 25 N.C. 418 (1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328.  *Bruen*, 142 S.Ct. at 2145–46.  In *Huntley*, the court states, "A gun is an 'unusual weapon,' wherewith to be armed and clad.  No man amongst

**APP. 156**

us carries it about with him, as one of his everyday accoutrements—as a part of his dress … ."
*Huntley*, 25 N.C. at 422.

51.     In the citation above, *accoutrements* does not refer to weaponry, but to the more
general category of "everyday attire, or clothing."  It may be normal to wear a shirt, or a belt, or
shoes, but it's not normal, the court is saying, to wear a gun in North Carolina in 1843.  It's
legal—the court agrees—to carry a gun for any lawful purpose, "either of business or
amusement"—but it's not *normal* or typical to do so.  In affirming Huntley's conviction, the
court noted that his purpose in carrying a shotgun was not a legal one.

### V.        Historical Notes on the Use of the Word *Magazine*

52.     Since the technology of arms and ammunition was changing by the mid-19th
century, I also searched for new uses of the term *magazine* in relation to *arms* and
*accoutrements.*  With advances in the design and manufacture of guns and ammunition, by the
mid-19th century, the term *magazine* starts to appear in the sense "ammunition container"
(replacing the earlier *cartridge box* or *cartridge case*).  According to the *OED,* in the 18th and
early 19th centuries, *magazine* referred generally to "a storehouse," and in military contexts it
referred specifically to a storehouse for gunpowder.  (The sense of "storehouse" also led to the
use of *magazine* to refer by the 18th century to a print publication containing a variety of articles,
and its sense of "depot, warehouse," is cognate with the French word *magasin*, "a shop or
store").

53.     Although most uses of the word *magazine* refer to printed periodicals, during the
19th century one sense of the term *magazine* narrows, referring more and more to an
"ammunition container," a primary sense of the word in reference to firearms today.  The *OED*
defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle,

18

**APP. 157**

machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

54.     COFEA and COEME do not cover the period past 1800.  COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s.  Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses.  Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals.  *Magazines* meaning "devices for holding bullets" form only a very small subset of these citations.  It took some thirty to forty years for the "bullet holder" sense of the word *magazine* to become more common, and even then, text references to ammunition magazines often appear, not in general discourse, but in legislation restricting their size or use.

55.     Most militia laws and regulations from the Founding Era specify minimum requirements for soldiers' weapons, ammunition, and accoutrements.  Most laws regulating weapons in the mid-19th century restrict or ban specific kinds of weapons, often enumerating them, sometimes in terms we find colorful today but which were common at the time (Arkansas toothpicks, Bowie knives, slung shots, swords in canes, pistols capable of being concealed in a pocket).  Occasionally these laws further identified such weapons as those used by "brawlers," thieves, robbers, or others bent on illegal activities.  Other weapons restrictions follow the English tradition of limiting possession of weapons by social class, nationality, or race.

56.     Although militia laws do specify weapons and other required accoutrements or pieces of military equipment, including horses for the officers, those laws that prohibit certain

kinds of weapons during the two critical periods (1789–1810; 1868–1880) do not single out *parts* of weapons.  Here is one exception from a 1776 Maryland statute:  "Resolved, that no muskets or rifles, except by the owner thereof on his removal to reside out of this province, or any gun barrels, gun locks, or bayonets, be carried out of his province, without the leave of the council of safety for the time being."  [1776 Md. Laws 146].

57.     I surveyed the gun regulations in the Duke Historical Database from the early medieval period through 1885 to see what terminology was used.  None of the laws that prohibit weapons, aside from the Maryland statute above, specifies a gun part or ammunition case or accoutrements of any kind.  Although many present a list of banned or prohibited weapons— usually without defining them (the assumption is that the reader knows what they refer to), none of the laws mention cartridge boxes, bullets, barrels, or other parts of any weapons.

58.     Later, however, in the decades after the introduction of *magazines* as "carriers or holders of bullets," laws and regulations against their nonmilitary use started to appear.  Here's a 1919 Maine law banning guns with loaded magazines:  "No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests."

59.     Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states.  Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds:  "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

20

**APP. 159**

60.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

61.   Finally, the National Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms:

(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

62.   The Act also provides a specific definition of "machine gun":  "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

**VI.   Conclusion**

63.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms.  In non-military contexts this does not apply:  The *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

64.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

65.   In addition, "bullet holders," whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

66.     To repeat, there is no data that I have found showing that *arms* includes

*accoutrements*, *magazines*, or any other *parts* of weapons.

_____

Dennis Baron, Ph.D.
Date: November 22, 2022

**APP. 161**

# EXHIBIT C

GunDigest® PRESENTS

# CONCEALED CARRY CLASS

## THE ABCs OF SELF-DEFENSE TOOLS AND TACTICS



## TOM GIVENS

Copyright © 2019 Caribou Media Group, LLC

All rights reserved. No portion of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a critical article or review to be printed in a magazine or newspaper, or electronically transmitted on radio, television, or the Internet.



Gun Digest® Books,  an imprint of Caribou Media Group, LLC
Gun Digest Media
5600 W. Grande Market Drive, Suite 100
Appleton, WI  54913
www.gundigest.com

To order books or other products call 920.471.4522 ext. 104
or visit us online at **www.gundigeststore.com**

CAUTION: Technical data presented here, particularly technical data on handloading and on firearms adjustment and alteration, inevitably reflects individual experience with particular equipment and components under specific circumstances the reader cannot duplicate exactly. Such data presentations therefore should be used for guidance only and with caution. Caribou Media accepts no responsibility for results obtained using these data.

ISBN-13: 978-1-946267-95-5

Cover Design by Gene Coo
Interior Design by Dave Hauser
Edited by Chuck Smock
Photos by Yamil Sued (unless otherwise noted)

Printed in the United States of America

10  9  8  7  6  5  4  3  2  1

**APP. 164**

# Introduction

**W**hy another book on shooting? There are lots of books about guns and shooting, but darn few about fighting with the gun to save your life or that of a loved one. In this book I have tried to go beyond the basics of how a handgun works, and how to shoot it, and get into how to integrate that handgun into your overall personal security program. Skill with a handgun is needed, but that skill is useless without an understanding of the dynamics of fighting, and the commitment to take control of one's own fate.

Why consider my advice on the subject? That's a fair question, since bad advice on personal-defense matters could be very costly. I consider myself a lifelong serious student of defensive weaponcraft, and as a serious student, I continually strive to learn more about my field. I have found teaching a subject is the best way to truly learn it, and I have been teaching weaponcraft for some 44 years, full time for the past 23 years. I have been carrying a gun professionally in one form or another for 49 years at this writing. Before I became a full-time instructor, I spent 25 years in various aspects of law enforcement and specialized security work, including stints in street patrol and investigations, and I have arrested scores of armed and dangerous criminals. I have been involved in armed confrontations both as a police officer and as a private citizen, and I have seen firsthand that decent people, with proper training, can fight back and overcome criminal attacks.



**APP. 165**

I owned and operated my own firing range and training center for more than 18 years. During that time, I oversaw the firing of about 1.5 million handgun rounds each year, with all types of handguns. During those years I trained about 2,500 students each year, from private citizens to security personnel and police officers to military police, intelligence units and Special Forces detachments. I also teach on the road, all over the United States and in Europe. Over the years, scores of my military students have used the skills we teach successfully in combat, and at this writing we have had more than 65 private-citizen students involved in defensive gunplay in the United States. These are just the ones I know of, who have reported back to me or been reported to me through law-enforcement channels. Thus, we have a lot of feedback on, and validation of, our training techniques.

In addition, I have actively competed with a handgun for many years, allowing me to continually evaluate guns and related gear in simulated armed conflicts. I not only got to see how my gear worked, I got to observe hundreds of other competitors using their guns and accessories in at least somewhat realistic conditions and under a fair bit of stress. I shot on the rifle team in high school, and I shot in Police Pistol Combat early in my law enforcement career. Back in the day, I held a Class A rating in IPSC, when that was the highest rating available. I also won several state and regional championships in the 1970s and 1980s in that game. I was involved in helping set up the International Defensive Pistol Association (IDPA), with a member number A00008. I also spent two years on the board of directors during IDPA's early formative years. I hold a Master rating in three IDPA divisions: CDP, ESP and SSP. I



**APP. 166**

have won several state and regional championships in IDPA competitions. All of this gives me a pretty broad perspective on the competitive shooting side of the handgun world.

I also hunt with a handgun, having harvested a number of deer and wild hogs while using a service type handgun.

Over the years I have done a fair bit of work as an expert witness in court cases involving firearms and firearms training. I've been accepted as an expert witness in federal courts in Alaska, Kansas, Tennessee and Illinois. I have been accepted as an expert by state courts in Illinois, Alaska, Ohio, Mississippi and Tennessee. My personal reference library contains more than 300 books on firearms and firearms training. This is my fifth published textbook on the subject, and I've written more than 100 magazine articles in SWAT Magazine, Combat Handguns, Handguns, American Handgunner, Soldier of Fortune and other publications.

It has been said that a book like this is 95-percent plagiarism and 5-percent opinion (I stole that line from fellow trainer John Mattera). Very few of us invent anything new in this business. What we do is observe each other's techniques, listen to each other's explanations, take each other's training, and attempt to adopt what works and discard the rest. In this I have been most fortunate, as over the years I have

**The author was involved in helping set up the International Defensive Pistol Association (IDPA), with a member number A00008. He also spent two years on the board of directors during IDPA's early formative years. He holds a Master rating in three IDPA divisions and has won several state and regional championships in IDPA competitions.**



**APP. 167**

trained with a virtual Who's Who in the firearms training industry. This has given me exposure to a broad range of training styles, tactical techniques and instructional methods, and I have combined and distilled these into my curriculum. My sincere thanks go out to these dedicated teachers, who have taught me so much of what I'm trying to pass on to you in this book. These instructors include Jeff Cooper, Chuck Taylor, Ken Hackathorn, Jim Higginbotham, Clint Smith, Dennis Tueller, John Farnam, Dave Grossi, Southnarc, Ernest Langdon, Jeff Gonzales, Massad Ayoob, Wayne Dobbs, Todd Green and many others. I attended an advanced 499 course at Gunsite all the way back in 1980. I have attended the NRA's Law Enforcement Firearms Instructor Schools for handgun, shotgun and Tactical Shooting Instructor, and I have been through the FBI police firearms instructor school. Truthfully, I have learned something of value in every single class I've taken over the past four decades, and I am deeply indebted to all the trainers who have allowed me to get to this point. This book is intended as a sort of conduit for wisdom from all of these assorted sources to you.

I sincerely hope this book will make you think about your personal security and how to achieve it. The mental skills involved in gun fighting are more important than the physical skills, and mental skills require personal effort, just like learning physical skills. The end result of this effort is, of course, peace of mind, which is well worth the time and effort invested.

Finally, I would like to thank Yamil Sued and Tamara Keel, who took the photographs used to illustrate this work. Also, a big thanks to Ken Campbell and the staff at Gunsite, who let us use some of their equipment and one of their ranges for some of the photography.



**APP. 168**

4

# PRINCIPLES OF PERSONAL DEFENSE

Some years ago, Jeff Cooper wrote an excellent booklet entitled *Principles of Personal Defense*. This brief work outlined seven principles that, according to Jeff, lay the groundwork for all successful self-defense efforts. This little book is available from several online sources and should be required reading for anyone interested in personal security.

I have taken the liberty of listing the seven key words Jeff used in enumerating these principles and adding my own perspective to them. I truly believe mastery of these principles, as your standard operating procedure, is the key to personal safety. Many of us concentrate too much on hardware (specific gun model, caliber or type of ammunition, etc.) when it is this type of software issue that really decides who wins. The seven keywords used by Jeff Cooper to enumerate his Principles of Personal Defense are used here by permission of Jeff and the publisher, Paladin Press.

APP. 169

## ALERTNESS

This one trait is the cornerstone of all physical security. You cannot defend yourself against something you don't know is there. You must learn habits of alertness and awareness, so you are always in tune with your environment.

Elsewhere in this text we cover some of the important facets of observation skills, but you must grasp the importance of this principle. If you know who is around you and what they are up to, you are in control. Always be on the lookout for people, behavior, or activity that is out of place or out of context. When you see something like that, question it. Ask yourself, "why…?" If you don't get a satisfactory answer, treat this as a danger signal.

## DECISIVENESS

You are going to have to select a course of action and implement it, right now! No one is going to be there to tell you what to do. You're on your own. This is especially difficult for us these days because all decisions are made by committee, and no one likes to sign off on anything anymore. See the chapter on mental imaging to learn how to prepare to make crucial tactical decisions quickly. Always, do something, immediately.

## AGGRESSIVENESS

This is another principle that is difficult for the average person, as aggressiveness is systematically being bred out of us. You have been taught all of your life that fighting is bad, human life is sacred and you should play nice. The trouble is you might be up against someone who shares none of these sentiments.

To a degree, we do a disservice to our students when we harp continually on the defensive nature of the pistol. The pistol is defensive in concept, but not in



**Running a timed drill during a competition helps you develop quickness in the presentation of your pistol from the holster and your firing stroke.**

**APP. 170**





Jeff Cooper wrote an excellent booklet entitled Principles of Personal Defense. This brief work outlined seven principles that, according to Jeff, lay the groundwork for all successful self-defense efforts. The author teaches these principles in his classes and adds his own perspective to them in this chapter. (File photo)

## "Speed is the defining element of any form of fighting."

use. Gun fighting is just a form of fighting, and any type of fighting is, by definition, an aggressive activity. You cannot win any type of fight by being passive. Imagine yourself in a fistfight where all you do is block punches, but never throw any of your own. Going to win? The same goes for armed conflict. If I have to defend my life with a firearm, I will use it vigorously, with all of the violence, aggressiveness and commitment I can muster, because my life is at stake!

When a fight starts, failing to respond aggressively is the same as surrender. If you let evil people do evil things to you, guess what will happen? You have a duty to resist evil. You owe this duty to your family, to society and to yourself. If attacked, attack right back!

**APP. 172**

## SPEED

Speed is the defining element of any form of fighting. Whoever moves faster wins. You must develop quickness in your presentation of your pistol from the holster and your firing stroke. This comes only through structured, careful, frequent practice. You also must develop quickness in your ability to assess developing situations and make sound decisions. Again, this comes from prior preparation. Play the "what if…" game to develop responses in advance of need. The time to debate strategy is not while someone is trying to kill you.

## COOLNESS

If attacked, you must keep your wits about you and do what you have to do to win. You must concentrate on the task at hand, and in our context, the task at hand is to focus on the front sight and press the trigger. Invariably, when I discuss this with a group of new students, some of them look incredulous and say something like, "how am I supposed to keep cool when someone a few steps away is trying to kill me?" The answer to that is simple – every day a large number of people have to do this. I personally know a very large group of people who have done this successfully. The key is in prior mental preparation. You must consider the possibility of an armed conflict and be prepared mentally to deal with it.

Part of the answer is practice. Practice builds skill. Skill builds confidence. Confidence prevents panic. If your mind knows that you have a fair degree of skill, your confidence in that skill will help you remain calm. Police officers in this country have an average hit ratio of around 20 percent. That means in the field they hit with 20 out of every 100 shots they fire. This is due to several factors. First is startle response – from not being mentally prepared for an attack and being caught completely off guard, which, as always, is a training issue. The second is infrequent and poor practice. One major East Coast agency, for instance, fired 1,293 shots on the street in 1996, and hit only 64 bad guys! They also hit 11 bystanders. This agency gets one day of live-fire training per year, and you can bet some of the officers never touch their weapons and practice on their own time, and never do any homework. As a result, when suddenly confronted with a shooting situation they panic, stick the gun out in front of them and empty it as fast as they can. This is called the "spray and pray" method, and it almost always results in two things: an empty gun and a pissed-off bad guy.

Over a period of 18 years, the school I ran in Memphis trained some 45,000 students, and a fair number of them have been involved in shootings. As far as I

can tell, they have about a 95-percent hit ratio. The very few misses that have occurred have been under very unusual circumstances. This extremely high hit rate occurs because they came here on their own time, and spent their own money, and then spent the time and effort it takes to achieve and retain basic proficiency with their weapons.

Do your homework. Repetition is the mother of all physical skill. Make time to get to the range. By constantly repeating the motions involved in your presentation and your firing stroke, you burn a neural pathway from your brain to your fingertips, eventually ingraining the proper response into your muscle memory. Sports physiologists will tell you it takes between 2,500 and 5,000 correct repetitions of any complex motor skill to automate it. To automate the skill means to be able to do it reflexively, without conscious thought or effort and this is the goal. You must concentrate your mental effort on the evolving tactical situation, not on marksmanship, and this is how you remain in control and hit under stress. Your mind must be free to work on the tactical situation, not on marksmanship.

Get some practice shooting under stress. Engage in competition shooting, like IDPA matches. Having to shoot an unfamiliar drill or scenario, under time and scoring pressure and with the peer pressure of having other shooters watching you is an excellent way to get some stress inoculation as well as some experience running your equipment under pressure. Hunt deer, wild hogs or similar game with your pistol and learn to control "buck fever." In training and practice, push yourself always to be better.

All shooters experience a degradation of skill under the extreme stress involved in a real life-and-death shooting confrontation. The more skill you have, however, the less you will lose when placed under sudden stress. The reason for this is simple. To get a higher degree of skill you had to do the work. You put in the repetitions both on the range and in dry work and have automated your physical skills. On the other hand, someone with a low skill level will drop even more skill under duress, simply because they have not driven those skills into the unconscious or automated level.

## RUTHLESSNESS

To many, this seems an odd word in the context of self-defense, but in reality, ruthlessness is a vital element of fighting to stay alive. In our context, ruthlessness means absolute single-mindedness of purpose. Once the fight starts, there are absolutely no considerations other than winning. It doesn't matter why he chose you. It doesn't matter why he's a

criminal. All that matters is winning. Bear in mind, in our context losing can mean dying. Hit him fast, hit him hard, hit him with everything you have, then assess and if needed, hit him some more.

## SURPRISE

Surprise is put last in this list deliberately, because surprise is the first element of offensive combat.

Surprise comes in two forms: strategic surprise and tactical surprise. Strategic surprise is what the bad guy plans on. I recently got my hands on a captured copy of a bad guy's training manual, and when I opened it, I found only this: sneak up on them and jump on them. That is his entire strategy. Surprise is the only true advantage he has over you. He is typically not as smart, as well armed, or as well-trained, but if he surprises you the advantage is entirely his. How, then do we neutralize this advantage? Simple. Be alert. If he cannot surprise you, he probably cannot harm you. This is a loop that goes right back to the beginning of this chapter. Be alert and aware so you cannot be surprised.

The other form of surprise is tactical surprise, and that is your advantage. If attacked, do something he does not expect. Action is faster than reaction. Make him react to you, not you to him. You



## "Surprise comes in two forms: strategic surprise and tactical surprise."



**Frequent and deliberate practice at the shooting range helps build and maintain the muscle-memory skills needed to draw and fire a handgun safely. Sports physiologists will tell you it takes between 2,500 and 5,000 correct repetitions of any complex motor skill to automate it.**

accomplish this by doing what he least expects, which is a violent, explosive counterattack.

He is just as culturally indoctrinated as anyone else. When he attacks what he believed to be a helpless victim, what does he expect that person to do? Whimper, whine, belly up and do whatever he is told. Think about it. If he points a gun at you and tells you to do something, what does he expect you to do? Comply, of course. The reason he didn't shoot you was because he believes you will comply. If you do something else, he has to process that information, decide what to do and only then can he act. It's over by then.

This would be a good time to mention the OODA Cycle. This was a development by Col. John Boyd (USAF, Ret.) who was a fighter pilot, a fighter-pilot instructor, a researcher and inventor and a true genius. OODA is the acronym for Observe, Orient, Decide, Act. That is the cycle the human mind goes through in order to react to something in our environment. This applies to us as well as to the other side. Whether someone's IQ is 40 or 140 his mind has to work through this sequence before any deliberate action can take place. Let's look at it in detail.

### OBSERVE

For the 10th time now, you cannot do anything about a problem until you detect it. Get your head up, open your eyes and look around. Bad guys do not beam down out of the mother ship and materialize next to you, despite what violent crime victims would have you believe. Remember, you're looking for anything in your immediate environment that looks suspicious because it is out of place, out of character or out of context.

### ORIENT

This means to turn your attention to the person or circumstance

**APP. 175**



that caught your eye. Assess the person as a potential threat. Evaluate your tactical position. Consider your options for dealing with the threat. Start playing the "what-if" game to determine your options.

### DECIDE

Action is needed. Select a course of action to fix the problem.

### ACT

Physical action in self-defense is needed. This can only occur after you have gone through the first three stages. You cannot act until you detect the threat, evaluate it and select an option for dealing with it. The time it takes to process this information and act is reduced greatly by being alert and having practiced emergency responses before the crisis.

This same OODA Cycle applies to the opposition.

When he tells you to do something, do something else. He will have to observe that action, realize it is not what he told you to do (orient to it), decide what to do about it (run, shoot, etc.) and only then can he act. By being alert and having preplanned tactical responses, you can short-circuit his reaction process.

If he is in the act stage while you are entering the observe stage, you probably have lost. Be alert. The same works in reverse. If you are acting while he is looking, you should be finished before he can move through the orientation, decision and action phases.

**Practicing your shooting skills with the added pressure of shooting in a competitive match is an excellent way to get some stress inoculation as well as some experience running your equipment under pressure. Pictured here, Lynn Givens, the author's wife, (foreground) competes one-on-one against another shooter. (Photo by Tamara Keel)**

**APP. 176**



## SEMI-AUTO PISTOLS

This brings us to the semi-auto pistol. The media would have you believe semi-auto pistols are some evil, modern inventions that have only been around a few years. This is simply not true. The first workable semi-auto pistols were developed in the late 1800s. The Mauser Model of 1896, for instance, was first used in the battle of Omdurman in the Sudan by a young Winston Churchill in 1896. The Swiss Army adopted the Luger pistol in 1903 and the German Army adopted it in 1908. In 1911, the U.S. military adopted the Colt .45 semi-auto, which is often today simply referred to as a 1911.

Before we get into specific types, there are some general features all semi-auto pistols have in common. First, the revolver is a manually operated handgun. The energy that rotates the cylinder, cocks the hammer and fires the revolver all comes from the shooter's trigger finger. In a semi-auto pistol, part of the energy that propels the bullet out of the gun and to the target also causes the slide to move to the rear, ejecting the spent case out of the gun, then as the

slide moves forward under spring pressure it strips a fresh round from the magazine and feeds it into the chamber ready to be fired. The archaic term for the semi-auto pistol is the "self-loading pistol," referring to this action of loading itself by using the energy supplied by the fired cartridge.

All semi-auto weapons, whether handgun, rifle or shotgun, fire only one shot with each press of the trigger. To fire another shot, the trigger must be re-set and then pressed again. In an automatic weapon, such as a submachinegun or a machine gun, the gun will continue to fire as long as the trigger is held to the rear until either the trigger is released, or the gun runs out of ammunition.

Semi-auto pistols have only one chamber, unlike the revolver. On a semi-auto pistol, the chamber is an integral part of the barrel. The semi-auto pistol uses ammunition that is housed in a detachable magazine. The magazine is not part of the pistol, it is a feeding device for the pistol. The whole purpose of the detachable magazine is to be able to carry spare magazines on your person, already loaded. This makes reloading the pistol a very simple and very quick process.

**Single-action semi-autos are intended to be carried with the hammer cocked and a manual safety engaged. This type of semi-auto will not fire if the hammer is all the way down in its un-cocked position.**

To reload a semi-auto pistol, one only has to push the magazine release button and let the empty magazine fall out and insert a new magazine into the magazine well. Magazines can be single column and have a single row of cartridges stacked one atop another, or they can be double column, with two rows of cartridges somewhat staggered in a fatter magazine. This allows higher magazine capacity, but tends to make the grip frame larger.

Semi-auto pistols have undergone a bit of evolution over their 130 years of existence. At present, we have essentially four mechanical families of semi-auto pistols available to us. They all operate essentially the same in that they use a magazine and a slide that reciprocates back and forth to eject the empty cartridges and load new cartridges into the chamber. The difference lies in how the trigger action of the gun operates during the firing cycle.

APP. 178





**The 9mm, .40 S&W and .45 Auto calibers are readily available and there is a wide variety of good, modern, effective defensive ammunition available for them.**

just simply cannot stand the sight of that cocked hammer on a single-action auto such as the 1911. The fact that the 1911 has a passive-grip safety and a manual-thumb safety doesn't mollify some people who are just terrified of that cocked hammer. If this describes you, that's probably not the right gun for you. Others are not comfortable carrying a striker-fired pistol like a Glock or M&P that has a fairly light, short trigger pull and no manual safety. This is especially true of shooters who carry their gun in the appendix position, which can point the gun at various body parts, like their own thigh, when seated. Choose an action type with which you personally are comfortable.

Of course, there's the consideration of caliber. We'll get into ammunition more deeply later on, but for now let's limit our consideration to pistols chambered for 9mm (9X19, 9mm Luger), .40 S&W and .45 Auto. These are readily available calibers and there is a wide variety of good, modern, effective defensive am-munition available for them. The 9mm is the smallest of these cartridges, and therefore offers the highest magazine capacity. This cartridge is available in very compact pistols or in service-size pistols that hold as many as 17 or 18 rounds. The .45 Auto is an older cartridge, is quite a bit larger and therefore maga-zine capacity will be somewhat limited. There are .45s with double-column magazines that hold as many as 10 to 13 cartridges, however, unless you have very large hands, they will be difficult to handle well. The typical .45 Auto only holds eight to nine rounds. The .40 Smith & Wesson is a compromise cartridge that is larger than the 9mm and smaller than the .45. Typical .40 caliber handguns hold anywhere from 12 to 16 shots.

If a particular handgun is not as common others, there might be a reason. Also, the more common mainstream handguns, particularly those in wide-spread law-enforcement use, will have a lot more holsters and accessories readily available.

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON,** *et al.*, <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br> **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF STEPHEN AMODEO</u>

Pursuant to 28 U.S.C. § 1746, I, Stephen Amodeo, declare as follows:

1.      I am over the age of 18 and competent to render the testimony contained herein based upon my personal knowledge, information provided to me by other District of Columbia employees, and documents that I have reviewed.

2.      I have been employed by the District of Columbia Metropolitan Police Department (MPD) since 2009.  I am currently a lieutenant assigned to the Records Division, a position I assumed in June 2022.  My duties include operation and supervision of the Firearms Registration Branch, including all staffing, firearm registration application procedures, and concealed-carry license procedures.  Prior to this assignment, I served as a patrol sergeant in MPD's First and Seventh Districts and as a patrol officer in MPD's Second District.

3.      In preparing this declaration, I reviewed Plaintiffs' firearm registration records and the relevant firearms specifications.

4.      Currently, Plaintiff Andrew Hanson has six firearms registered with the District of Columbia that have restricted capacity magazines (10 round maximum) but are sold in other

jurisdictions with a standard capacity magazine of more than 10 rounds. Each of these guns uses 9mm caliber bullets.

5.      Mr. Hanson has registered two Browning Hi Power pistols which each have a standard magazine capacity of 13 rounds.

6.      Mr. Hanson has registered a Sig Sauer P229 pistol which has a standard magazine capacity of 12 rounds.

7.      Mr. Hanson has registered a Beretta 92 FS pistol which has a standard magazine capacity of 15 rounds.

8.      Mr. Hanson has registered a Sig Sauer P320 pistol which has a standard magazine capacity of 17 rounds.

9.      Mr. Hanson has registered a Glock 17L pistol which has a standard magazine of 17 rounds.

10.     Extended capacity and/or drum magazines are commercially available for each of these firearms.

11.     For example, 30 round magazines are commercially available for use with the Sig Sauer P320 pistol. Below is a photo of a Sig Sauer P320 equipped with a 30-round magazine.



12.     Mr. Hanson has also registered a number of handguns that have a standard capacity of 10 rounds or less, including a Glock 43 handgun that has a standard capacity of six rounds.

2

**APP. 182**

13.     Plaintiff Tyler Yzaguirre has registered a Ruger P95 and a Ruger LCP with the District of Columbia.

14.     Mr. Yzaguirre registered his Ruger P95 pistol with a D.C. compliant 10-round magazine.  The standard magazine size for a Ruger P95 pistol is 15 rounds.  Ruger P95 pistols use 9mm caliber bullets.

15.     Extended magazines, such as the 32-round magazine pictured below, are commercially available for the Ruger P95 pistol.



16.     Ruger LCP pistols come standard with a 6-round magazine and use .380 caliber bullets.

17.     32-round drum magazines, such as the one pictured below, are commercially available for the Ruger LCP pistol.  The drum magazine pictured below weighs one and a half pounds.



18.     Plaintiff Nathan Chaney has registered a Sig Sauer P320, a Sig Sauer P365, a Smith & Wesson M&P Shield, and a Ruger LCP II with the District of Columbia.

19.     Mr. Chaney registered his Sig Sauer P320 with a D.C. compliant 10-round magazine.

20.     Sig Sauer P365 pistols come standard with a 10-round magazine and use 9mm caliber bullets.

21.     50-round magazines, such as the one pictured below, are commercially available for the Sig Sauer P365.  The magazine pictured below is seven inches wide, fourteen and a half inches tall and three and a half inches deep.



22.     The Smith & Wesson M&P Shield comes standard with an 8-round magazine and uses 9mm caliber bullets.

23.     Ruger LCP II pistols currently come standard with a 10-round magazine and use .380 caliber bullets.  Mr. Yzaguirre registered his Ruger LCP II pistol with a 7-round capacity.

24.     Plaintiff Eric Klun has registered a Glock 43x, a Glock 23c, and a Ruger LCP with the District of Columbia.

25.     The Glock 43x pistol comes standard with a 10-round magazine and use 9mm caliber bullets.

26.     The Glock 23c comes standard with a 13-round magazine and has a .40 caliber. Mr. Klun registered his Glock 23c with a D.C. compliant 10-round magazine.

APP. 184

27.    Magazines with capacities of 10 rounds or less are available for each of Plaintiffs'
guns.  Each of these firearms is fully functional when used with a magazine with a capacity of 10
rounds or less.

28.    50-round magazines, such as the one pictured below, are commercially available
for several models of Glock pistols.



29.    100-round drum magazines, such as the one pictured below, are commercially
available for some models of Glock pistols, including the Glock 17.



I declare under penalty of perjury that the foregoing is true and correct.

Executed on   22 November 2022

STEPHEN AMODEO

5

**APP. 185**

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>        **Plaintiffs**,<br><br>        **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>        **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF LESLIE PARSONS</u>

Pursuant to 28 U.S.C. § 1746, I, Leslie Parsons, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information, including information provided to me by other District of Columbia employees in the course of my official duties.  The views I state herein are drawn from my professional experience.

2.      I am the Assistant Chief of Police for the Investigative Services Bureau at the Metropolitan Police Department (MPD), a position I have held since January 2021.  In that role, I am responsible for managing the Criminal Investigations Division, including the Homicide Branch, the Violent Crime Suppression Division, the Evidence Control Division, and the Crime Scene Investigations Division.

3.      I began my law enforcement career with the Metropolitan Police Department in 1999 as a recruit and then served as a patrol officer.  In 2005, I became a crime scene search officer in the Crime Scene Investigations Division, where I collected evidence including DNA and latent prints, and documented crime scenes with written reports and photographs.

4.    In December 2005, I was promoted to the rank of sergeant and assigned to the Fifth District as a patrol supervisor.  In April 2008, I returned to the Crime Scene Investigations Division (CSID).  At CSID, I supervised both Crime Scene Search and Mobile Crime Technicians, reviewing case jackets for accuracy and completion, and coordinating investigative efforts with detectives, among other duties.

5.    I was promoted to lieutenant in 2014 and initially assigned to the Seventh District. Later that year, I was transferred to the Narcotics and Special Investigations Division where I served as the commanding officer of the Gun Recovery Unit (GRU).  During my time at GRU, I managed the day-to-day operations of the unit, worked on strategic briefings, and coordinated investigations with federal agencies.  In 2016, I was promoted to captain and assigned to the Criminal Investigations Division where I managed detectives conducting district-level investigations.  That same year, I was promoted to commander of the Criminal Investigations Division where I oversaw investigative units such as the Homicide Unit, Sexual Assault Unit, and the District Detective Units.

6.    I understand that Plaintiffs in this lawsuit are challenging a District law which bans the civilian possession of large-capacity magazines (LCMs) holding 10 or more rounds.

7.    In my nearly 23 years of law-enforcement experience, I have never fired my weapon on duty.

8.    I have worked in the District of Columbia my entire career, and I believe that LCMs pose a particular danger in urban environments.  Gun violence is probably the single biggest issue currently facing urban law enforcement.  I have seen, firsthand, the devastating effects of gun violence on families and communities.

2

**APP. 188**

9.      During my tenure as Assistant Chief, MPD is continuing its long-running efforts to get illegal guns off the street and, so far this year, has recovered more than 2,700 illegal guns (and more than 2,300 in each of the last two years).

10.      I have noticed that firearms recovered recently from homicides and other crime scenes are more dangerous and lethal than in previous years and include growing numbers of guns with large capacity magazines designed for use with pistols, such as the drum magazine pictured here, which was recovered in September 2022 with 40 rounds in the magazine:



11.      This LCM is attached to a privately made firearm (PMF), which, if registered and carried by a licensed user (without the LCM), could be legally carried concealed on one's person in the District.  This magazine accessory, however, cannot be legally carried because of the law Plaintiffs have challenged in this case.

12.      In just the past few months, many more guns that could otherwise be legally carried have been recovered with illegal LCMs, including many in stick form that extend below the grip.  For example, the LCM pictured here, attached to a Glock 17, was recovered this month

3

**APP. 189**

after a suspect attempted to hide it in the bushes on N Street SE (with one 9mm round in the

chamber and 24 9mm rounds in the 31-round extended magazine):



13.     I have also attached to this declaration, as Exhibit A, a document prepared by

members of my team that shows some of the LCMs recovered in the District since July 2022.

Most of the arms also pictured could be legally carried—the ones that look like the Glock above.

14.     MPD officers are issued Glock 17s, 19s, and 26s as everyday-carry duty pistols,

which are equipped with 17-, 15-, and 10-round magazines, respectively.  MPD officers are

required to carry three magazines, meaning that they are carrying 52 rounds (for a Glock 17), 46

rounds (for a Glock 19), or 31 rounds (for a Glock 26).

15.     MPD officers issued firearms are trained extensively in the Academy on the use

of their issued service firearm, including trigger discipline, grip, stance, and sight adjustment.

4

MPD officers issued firearms must qualify twice a year through range training and use of force training.

16.     MPD officers do not use magazines on pistols that carry more than 17 rounds, such as the extended stick or drum magazines pictured above.  MPD's equipment policies are similar to those of law enforcement in other jurisdictions.

17.      Law enforcement officers are more likely to face situations requiring them to fire more than 10 rounds of ammunition than law-abiding civilians.  For example, law enforcement officers may need to pursue armed suspects, enter buildings or similarly unfamiliar environments in order to conduct lengthy and dangerous searches for an unknown number of suspects, or directly confront criminals who are actively shooting.

18.     The primary role of law enforcement officers is to protect the general public, prevent crime, and track and apprehend criminals.  LCMs are appropriate for these law enforcement purposes.

19.     LCMs are also used for criminal purposes.  The most obvious example during my tenure as Assistant Chief was the Van Ness shooting on April 22, 2022, when a single shooter fired at least 239 rounds from a sniper's nest, injuring four people including a 12-year-old girl. Nineteen (19) LCMs were recovered from the scene.

20.     MPD also sees the use of LCMs on the streets of our city with the ShotSpotter system, an "acoustic surveillance technology" which uses sensors placed throughout the District "to detect, locate and alert law enforcement agencies of potential gunfire incidents in real time." *See* https://mpdc.dc.gov/publication/shotspotter-data-disclaimer-and-dictionary.

21.     ShotSpotter's software applies tags such as "High Capacity" and "Full Auto" to shooting incidents that indicate LCMs and fully automatic gun fire, respectively.  Fully

5

**APP. 191**

automatic gun fire—a continual spray of bullets until the trigger is released, ammunition is

exhausted, or the gun malfunctions—can occur through the use of a "Glock switch."  The Glock

switch, also called a "giggle switch," is a small device that can be easily attached to an otherwise

legal semi-automatic handgun and enables the shooter to fire continuously with one pull of the

trigger (automatic fire) instead of having to pull the trigger to fire each time (semi-automatic

fire).

22.     Automatic gun fire is extremely difficult to control, even for trained shooters,

because the force of that many explosions causes a powerful recoil effect.  In untrained hands, it

inevitably results in a loose or uncontrolled spray of bullets.

23.     Examples of shooting incidents that ShotSpotter tagged as "High Capacity"

and/or "Full Auto" in 2022 include:

     a.  March 24, 2022, 15:21:39 hours, 2513 Alabama Avenue SE (PSA 702), 26 rounds
        in 5.14 seconds ("High Capacity");

     b.  July 19, 2022, 18:22:27 hours, 2428 14th Street NE (PSA 505), 36 rounds in
        7.333 seconds ("High Capacity");

     c.  July 27, 2022, 22:26:42 hours, 4347 4th Street SE (PSA 708), 50 rounds in 5.526
        seconds ("High Capacity" and "Full Auto");

     d.  October 1, 2022, 21:28:33 hours, 240 60th Street NE (PSA 608), 29 rounds in
        3.485 seconds ("High Capacity" and "Full Auto");

     e.  October 9, 2022, 17:45:41 hours, 1401 7th Street NW (PSA 308), 27 rounds in
        3.455 seconds ("High Capacity" and "Full Auto").

24.     LCMs enable a shooter to fire many more rounds without having to reload, which

may reduce the frequency of pauses during shootings, significantly increase a shooter's ability to

**APP. 192**

quickly injure or kill large numbers of people, and further reduce opportunities for law enforcement or the public to intervene to save lives. Any delay, no matter how slight, in reloading introduces a disadvantage to the criminal.

25.     Use of LCMs (with or without Glock switches) also increases the likelihood of indiscriminate fire resulting in a hit (or multiple hits) to a victim, especially in urban environments like the District. These bullets can and do travel through walls and car doors.

26.     Sixteen (16) juveniles have been killed by gunfire in the District this year alone.

27.     The more LCMs there are on the street, the more likely it is that unintended targets, including children, will be killed here in the District by stray bullets.

28.     As a law enforcement officer, my immediate concern is to protect the public. Moreover, the safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously.

29.     In my professional opinion, the District's LCM ban aids MPD's efforts to prevent violent crime, ensures the security of the Nation's Capital, and protects the safety of law enforcement officers and members of the public. Invalidating the District's LCM ban would remove a valuable tool from law enforcement.

Executed on  11 / 22 / 2022

LESLIE PARSONS

7

**APP. 193**

# EXHIBIT A



# Violent Crime Suppression Division
## Gun Recoveries with Extended Magazines

**Commander Ramey Kyle**
**Inspector LaShay Makal**

**November 3, 2022**

    

# VCSD Gun Recoveries with Extended Magazines



**1160 First Street, NE (PSA 501)
Recovered 11/3/2022**



**319 18th Street, NE (PSA 507)
Recovered: 11/3/2022**



DCPOLICEDEPT    DCPOLICEDEPT    DCPOLICE    DCPOLICEDEPT    OFFICIALDCPOLICE

*Excellence is Transferrable*

# VCSD Gun Recoveries with Extended Magazines



**2730 Bruce Place, SE (PSA 702)**
**Recovered:  11/3/2022**



**1400 Saratoga Avenue, NE (PSA 505)**
**Recovered:  10/28/2022**

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE   DCPOLICEDEPT  OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 197**

# VCSD Gun Recoveries with Extended Magazines



**2128 H Street, NE (PSA 507)**
**Recovered:  10/20/2022**



**4020 Minnesota Avenue, NE (PSA 602)**
**Recovered:  10/14/2022**

*Excellence is Transferrable*

**APP. 198**

 



# VCSD Gun Recoveries with Extended Magazines



**2306 Raynolds Place, SE (PSA 702)**
**Recovered:  10/13/2022**



**2826 Q Street, SE (PSA 607)**
**Recovered:  10/08/2022**



*Excellence is Transferrable*



**APP. 199**

# VCSD Gun Recoveries with Extended Magazines



**800 Southern Avenue, SE (PSA 706)**
**Recovered:  9/23/2022**



**2304 2nd Street, NE (PSA 501)**
**Recovered:  7/17/2022**

*Excellence is Transferrable*

 DCPOLICEDEPT    DCPOLICEDEPT    DCPOLICE    DCPOLICEDEPT   OFFICIALDCPOLICE

**APP. 200**

# VCSD Gun Recoveries with Extended Magazines



**2929 Nelson Place, SE (PSA 605)**
**Recovered:  9/21/2022**



**280 37th Street, SE (PSA 603)**
**Recovered:  9/19/2022**

 DCPOLICEDEPT   DCPOLICEDEPT  DCPOLICE   DCPOLICEDEPT   OFFICIALDCPOLICE

Excellence is Transferrable

**APP. 201**

# VCSD Gun Recoveries with Extended Magazines



**600 Morton Street, NW (PSA 409)**
**Recovered:  9/16/2022**



**2121 1st Street, SW #364 (PSA 105)**
**Recovered:  9/14/2022**

 DCPOLICEDEPT  DCPOLICEDEPT  DCPOLICE  DCPOLICEDEPT  OFFICIALDCPOLICE

*Excellence is Transferrable.*

**APP. 202**

# VCSD Gun Recoveries with Extended Magazines



**1608 Kenilworth Avenue, NE (PSA 601)**
Recovered:  9/13/2022



**1528 Butler Street, SE (PSA 701)**
Recovered:  9/10/2022



# VCSD Gun Recoveries with Extended Magazines



**138 Michigan Avenue, NE (PSA 405)**
**Recovered:  9/12/2022**



**138 Michigan Avenue, NE (PSA 405)**
**Recovered:  9/12/2022**


*Excellence is Transferrable*



**APP. 204**

# VCSD Gun Recoveries with Extended Magazines





**4100 Block of 4th Street, SE (PSA 706)**
**Recovered:  9/4/2022**

**2311 14th Street, NE (PSA 505)**
**Recovered:  8/29/2022**





DCPOLICEDEPT    DCPOLICEDEPT    DCPOLICE    DCPOLICEDEPT    OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 205**

# VCSD Gun Recoveries with Extended Magazines



**1321 5th Street, NW (PSA 308)**
**Recovered: 8/26/2022**



**2315 15th Street, NW (PSA 505)**
**Recovered: 8/09/2022**

*Excellence is Transferrable*

**APP. 206**

 DCPOLICEDEPT   DCPOLICEDEPT   DCPOLICE  DCPOLICEDEPT   OFFICIALDCPOLICE

# VCSD Gun Recoveries with Extended Magazines



**1521 Benning Road, NE (PSA 507)**
Recovered:  8/07/2022



**1521 Benning Road, NE (PSA 507)**
Recovered:  8/07/2022



DCPOLICEDEPT    DCPOLICEDEPT    DCPOLICE    DCPOLICEDEPT    OFFICIALDCPOLICE

*Excellence is Transferrable*

**APP. 207**

# VCSD Gun Recoveries with Extended Magazines





**1521 Benning Road, NE (PSA 507)**
Recovered: 8/07/2022

**2923 MLK Avenue, SE (PSA 707)**
Recovered: 7/28/2022

 DCPOLICEDEPT  DCPOLICEDEPT  DCPOLICE  DCPOLICEDEPT OFFICIALDCPOLICE

*Excellence is Transferrable*

# VCSD Gun Recoveries with Extended Magazines





**2923 MLK Avenue, SE (PSA 707)**
Recovered:  7/28/2022

**1724 North Capitol Street, NE (PSA 501)**
Recovered:  7/19/2022


Excellence is Transferrable

**APP. 209**

# VCSD Gun Recoveries with Extended Magazines



**1724 North Capitol Street, NE (PSA 501)**
**Recovered:  7/19/2022**

*Excellence is Transferrable*



# VCSD Gun Recoveries with Extended Magazines

| District | Gun Recoveries with Extended Magazines |
|---|---|
| 1D | 1 |
| 2D | 0 |
| 3D | 1 |
| 4D | 3 |
| 5D | 12 |
| 6D | 5 |
| 7D | 7 |
| Total | 29 |

***It should be noted that the Power Point does not represent ALL of the recoveries of guns which possessed Extended Magazines – the numbers are a breakdown of the districts in the Power Point Only***

   



EXCELLENCE IS TRANSFERRABLE

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

### DECLARATION OF ROGER PAULY

Pursuant to 28 U.S.C. § 1746, I, Roger Pauly, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Associate Professor in the Department of History at the University of Central Arkansas, where I have taught for the last twenty years.  I received my B.A. from St. Olaf College (1988), my M.A. from Villanova University (1992) and my Ph.D. from the University of Delaware (2000), all in History.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

3.      I am also personally interested in antique firearms and firearms history.  I own a Remington Model 870 shotgun and a Marlin Model 60 target rifle.  These were treasured gifts to me from my father and son respectively.  More pertinent to history, I also own reproduction models of an 1853 Enfield Rifled Musket and an 1859 Sharps Infantry Model Rifle.  These are working firearms based upon nineteenth century designs, but they were built in the past few decades.  I have handled and fired a variety of other modern arms, including a Beretta 9mm semi-automatic pistol, a .38 caliber Smith and Wesson revolver, several civilian-model AK-47s

**APP. 214**

and a similar model AR-15.  I have also fired a Korean-War-Era Model M-1 'Garand' Rifle, as well as a Lee-Enfield Pattern Mark IV Rifle, a K98 German Mauser, and US M1-Carbine.  The last three of these were World War II era weapons.

4.      I am the author of *Firearms: The Lifestory of a Technology*, first issued in 2004 by Greenwood Publishing Group and again in 2008 by The Johns Hopkins University Press. *Firearms* was first in a series of works published by Greenwood that aimed to explore the holistic backgrounds of critical inventions.  I have also presented a variety of lectures on the subject, including a lecture on the role firearms technology played in the Civil War, available here: https://www.c-span.org/video/?301223-1/state-house-museum-civil-war-symposium.  I was similarly hired as a consultant and appeared on the British ITV documentary program *Groundwar: Warrior Weapons*, which premiered in the United States on 2010 on PBS Television.  I also appeared in 12 out of 13 episodes of the documentary series *American Guns: A History of US Firearms*, which premiered in 2017 on Amazon Prime.

5.      The Office of the Attorney General for the District of Columbia contacted me to render expert opinions in this case, relating to the history of firearms technology.  This declaration is essentially a very abbreviated version of my book on firearms, composed of selected highlights.  I did not include footnotes, or endnotes, in my book or this declaration, but I have attached the bibliography for my book as **Exhibit B**.  I have completed my work at no charge.

### Introduction

6.      Over approximately nine centuries so far, the development of an archetypical entity known simply as the "firearm" has been a gradual and uneven process much like the growth of an individual.  Thus, early human missile weapons like spears, slings, and bows

2

**APP. 215**

represent the distant ancestors of the gun.  The crossbow could probably be identified as a more immediate parent, with its telltale lock mechanism and its stock-like tiller.  Another parent might well be a medieval Chinese flamethrower known as a "firelance" that used gunpowder as an incendiary.  The earliest hand-cannons of Asia and Europe illustrate the gun's childhood, while the diverse weaponry of the sixteenth and seventeenth centuries is perhaps reflective of the rapid developments in adolescence.  In the nineteenth century new industrial techniques allowed the firearm to surge into a state of adulthood as metallic cartridges, revolvers, breechloaders, and repeating rifles appeared.  On the eve of the twentieth century, the recognition that gas and recoil from a shot could be used to drive a gun's reloading mechanism resulted in the rise of both semi- and fully automatic weapons that still predominate today.

7.     Like a human, this growth was uneven and erratic.  It was not marked by steady progress, but rather through periods of intense development and changes followed by episodes of slowing or stagnation.  Often future gun designs were anticipated well in advance of the necessary technological maturation, by decades and even by centuries, much like a child dreams about a future career well before she is capable of piloting a jet fighter.

8.     While the whole life story of the firearm might appear erratic and unpredictable, some consistent logic lay behind most of the process.  No matter what type of missile weapon one is considering, it has to address certain demands or meet certain needs.  First, it must be able to hit its target.  Small arms manufacturers have thus logically, consistently concerned themselves with promoting accuracy.  Linked to this is range—the potential to hit objects at far distances.  Second, it does no good to hit an enemy with a projectile that does no damage. Therefore, the power and strength with which a projectile crashes into its target are important too.  A third ingredient to these two factors is rate of fire.  Poor accuracy or weak power can be

**APP. 216**

offset to some extent with a weapon that discharges many shots in a short period of time.  Thus, the common imperatives of accuracy, power, and rate of fire has guided firearm development at each stage of its lifecycle.

### The First Five Hundred Years

9.      The firearm's exact birthdate is largely unknown.  We can estimate that a very simple version was on the scene in China by the end of the thirteenth century.

10.      The basic formula of saltpeter, sulphur and charcoal that formed the basis for gunpowder was devised by Chinese alchemists probably by the ninth century CE although earlier, weaker versions were almost certainly experimented with much earlier.  Upon ignition, gunpowder undergoes a chemical change that turns it from a solid into a gas of nitrogen and carbon dioxide that expands incredibly fast.  This rapid expansion is a visually spectacular burst of smoke and flame, and it is what gives gunpowder its power.

11.       This material was first employed in a device known as a firelance, which was based on a simple tube design (and which would eventually be transformed into a "barrel").  One end of the tube was sealed, and the hollow cylinder was filled with gunpowder.  In combat, a soldier would light a fuse at the open end of the tube, which would ignite the gunpowder, and then sparks and fire would shoot violently back out of the open end.

12.      At some point, someone recognized that the potential to cause harm from projectiles flying out of the firelance was far greater than any accompanying sparks.  To accomplish this, a "touchhole" was drilled into the closed, rear end of the tube (or "breech"), and a burning fuse was run to the powder through the touchhole.  Projectiles were loaded into the other, open, "muzzle" end of the tube.

**APP. 217**

13.     No one can say for certain when the first metal gun was constructed, but a weapon found at the site of a battle that took place in Manchuria in 1288 features essentially a short bronze tube with a touchhole in the breech.  The oldest evidence of a similar weapon in Europe appears in two separate written sources composed in 1326.

14.     At some point in the fourteenth century, a new technique of manufacturing gunpowder was developed, known as corning.  The new form was significantly more powerful and explosive.  Some contemporaries estimate it had three times the explosive potential, and, at last, a bullet propelled by this stuff could consistently punch through most armor.

15.     By the end of the fourteenth century, larger artillery was also developed, and the terms "hand gun" and "handcannon" came into use to distinguish the smaller pieces.

16.     By the early fifteenth century, weapons appeared that are clearly recognizable as firearms.  They used the explosion of gunpowder to fire projectile bullets.  Each one had a metal barrel and most models sported very simple version of a stock, which was a long, wooden structure set below and behind the barrel.  This stock allowed for better handling of the weapon and insulated the shooter's hands from the barrel, which could become exceptionally hot after firing.  Some of these were even built with gun sights very similar to those still used for many open-sighted firearms today.

17.     The term "arquebus" became a fairly standard appellation for most hand-held guns by the end of the fifteenth century.  "Muskets," in contrast, were particularly heavy arms, weighing as much as 20 pounds and sporting 4.5 foot-long barrels.  They often rested on a crude sort of tripod and came with a ramrod to push the bullet down the barrel into the breech.

18.     Also in the fifteenth century, the task of lighting a match to a fuse was mechanized through the use of a component known as a "matchlock."  The most common

5

**APP. 218**

version of this device featured a metal C-shaped arm, with the open part of the letter facing the shooter.  On the side of the stock near the breech was a flat piece of metal called a lockplate. The upper end of the "C" arm held a smoldering match (a cord covered in saltpeter, sometimes called "match cord"), while the lower extremity was attached to a metal leaf-spring mechanism hidden behind the plate.  A metal spring held the "C" in place, and when a large barlike trigger was squeezed, the "C" moved downward toward a small basinlike structure.  This was the aptly named "flashpan," which was fitted to the outside of the touchhole and filled with a small amount of gunpowder.  (This small amount of powder, at some point, came to be called "priming powder," as distinguished from the main charge in the barrel.)  If everything went right, the match at the top of the "C" would ignite the powder in the flashpan, the ignition would then travel through the touchhole, then down into the barrel, and in turn set off the main powder charge.[1]  The intricate components of the "C," the trigger, and the leaf-spring reminded people of similarly sophisticated metallic locks that could fix the door to a room or the lid of a chest firmly in place.  The word "lock" began to be used to describe the complex firing mechanisms of these weapons.

19.     By the early sixteenth century, simple handcannons had evolved to include all three key components of archetypical firearms:  locks, stocks, and barrels.

### The Sixteenth & Seventeenth Centuries

20.     In the sixteenth and seventeenth centuries, a variety of new ignition systems were created, with one—the flintlock—dominating the field across the world by the end of the period.

---

[1]     The origin of the old expression "just a flash in the pan" to describe a disappointing or unfulfilled event arose from cases in which things did not go quite this way.

**APP. 219**

21.     Pistols also appeared in noticeable numbers this period.  Although some matchlock pistols are known to have been produced, the development of pistols was largely dependent upon the advent of a new kind of ignition, known as the "wheel lock."  Written references to wheel lock weapons began to appear in the early sixteenth century.

22.     The idea was for a wheel to spin in place while its serrated edge ran against a flint, a device like the modern lighter.  The stone was held in a jawlike clamp attached to a hinged arm, known as a "doghead."  The shooter prepared the lock by using a wrench to wind a lug fixed to the axis of the wheel.  This action wrapped a very short chain around the wheel as it turned.  After being cranked, the whole thing was held in place by the nose of a metal sear, which popped into a hole drilled in the side of the wheel.  As the shooter prepared to fire, the cover was pushed away from the flashpan, and the hinged doghead was manually swung down against the top of the wheel.  When the trigger was pulled, it allowed the mainspring to reassert itself and pull out the chain that, in turn, spun the wheel.  The wheel rotated, with its serrated edge spinning against the flint.  The resulting shower of sparks set off the priming powder and main charge.

23.     The wheel lock system was complicated, delicate, and prone to breakage.  They also demanded more craftsmanship to make and more money to produce than matchlocks.  They therefore were not used in huge numbers by common troops in Europe or elsewhere.  Matchlock weapons remained most common for foot soldiers throughout the fifteenth, sixteenth, and seventeenth centuries.

24.     That said, a wheel lock pistol had no troublesome, smoldering match cord to kept lit and could hang from a belt or a saddle, ready for firing at a moment's notice.  These arms uniquely provided mounted troops of the time with the means to shoot back at the arquebusiers

7

**APP. 220**

and musketeers who were wreaking so much havoc on their ranks—although they had only a very short firing range.  It has been estimated that cavalry may have had to close to within five paces of the enemy in order for their wheel lock pistols to work at full effect.

25.     If a person could afford a pistol, wheel lock pistols also had some role to play in the realm of self-defense.  The wheel lock mechanism could stay at rest for a long time and still be ready to fire at a moment's notice, and when attached to a pistol was much easier to carry and conceal than a matchlock musket.  (Imagine trying to walk around town with a smoldering matchlock concealed under one's cape or hooked to a belt, or with a four-foot-long gun.)

26.     Near the very end of the seventeenth century, the major powers of Europe began switching from their matchlock arms to arms with a "flintlock" ignition device.

27.     "True" flintlocks first appeared in France between 1610 and 1620.  The device worked rather like a wheel lock, in that it had a doghead—by now known as a "cock" instead, for its beak-like appearance—holding a piece of flint, which the shooter would pull upward and backward and lock into an upright position prior to firing.  Pulling the trigger caused the cock to fall down and forward; the attached flint would then strike an L-shaped device, which contained both a "battery" (a stationary piece of iron) and a flashpan cover.  The falling action would simultaneously cause the flashpan cover to open and create sparks by striking the battery, thus igniting the exposed priming powder, which would, in turn, ignite the main charge through a touchhole in the breech.

28.     Flintlock ignitions dominated firearm technology until a new system, the percussion-cap, prevailed in the mid-nineteenth century.

29.     The prototypical example of an eighteenth-century musket, a British model widely known as the "Brown Bess," used flintlock ignition.  The design was fairly simple:  It had

8

**APP. 221**

a 46-inch-long barrel fixed to a walnut stock, with brass furniture (that is, functional niceties like the trigger-guard). Most models also came with an iron ramrod.  It did not have a rear sight, a testament to the gun's lack of long-range accuracy.  It has been said that 120 yards was the average distance at which fired projectiles would strike the ground due to a rapid loss of velocity. Most firearms of this age were accurate at less than 80 yards.  The muskets of the time, such as the Brown Bess, were not really built with an eye to individual marksmanship.  The idea was for dozens of these weapons to be fired at once at mass formations of troops.

30.    The musket was also (relatively) easy to shoot and reload.  By this time, individual paper cartridges, containing both pre-measured portions of gunpowder and round lead bullets, known as balls, were in wide use.  The paper cartridge was opened with one's teeth, and a small portion of the charge was poured in the gun's pan to prime the weapon.  The rest of the powder went down the barrel with the ball.  The paper tube could be rammed to pack the charge more tightly, or simply discarded.  Troops could carry anywhere from 20-40 of these lightweight paper cartridges in a leather purse (or "cartridge box").  Loaded this way, the musket could be fired approximately three times per minute.

31.    Flintlocks were simple to use and service (much more so than wheel locks), but they had a high incidence of misfire.  It has been estimated that in wet or humid weather, for example, as many as 50% of the flintlocks in a line of muskets might fail to fire properly.

32.    The flintlock musket enjoyed a widespread reign as the world's predominant gun design for about a century and a half.

### The Nineteenth Century

33.    Firearm technology saw a relative profusion of innovations in the nineteenth century that, especially when employed together, produced exponential changes in accuracy,

**APP. 222**

power, and rate of fire, as well as in firearms' reliability.  Two of the firearm's vital components, the barrel and the lock, would drastically change.  "Rifled," as opposed to smoothbore, barrels came into wide use, increasing arms' accuracy many times over.  Lock systems changed, dramatically increasing arms' reliability and usefulness across a variety of conditions.  By the end of the century, these developments—coupled with advances in manufacturing technology, in general, and in cartridge and even gunpowder design—produced firearms radically more capable of killing both animals and people efficiently and effectively.

### Rifling & Expanding Bullets ("Minie Balls")

34.    The manner through which a quarterback throws a football offers a good analogy to explain the concept of rifling.  The quarterback grasps the ball with his or her fingers on one side and thumb on the other.  If the throw is made properly, the thumb will release first, followed by the other four fingers, which roll more gradually off the ball as the arm swings forward.  This rolling motion will cause the ball to spin in midair, increasing the range and accuracy of the throw.  The ball performs better due to its spinning action—masters can make throws of mind-boggling precision.

35.    Similarly, probably around the end of the fifteenth century, a gunsmith once cut grooves in a curved, spiraling manner inside a barrel, and it was discovered that lead balls shot from such barrels traveled in a far more accurate fashion.

36.    The technique came to be known as "rifling."  And it could not have been easy; forging a plain smoothbore barrel was long and arduous work, let alone making one with spiral grooves cut into its inside surfaces.  Economical mass production, therefore, would await a few centuries for advances in manufacturing techniques.  Rifles were also very slow to load—requiring approximately three minutes per shot or "round" (the term is from the shape of the

10

**APP. 223**

bullet)—because, in order to get the projectile to spin, the bullet had to grip the grooves. Therefore, it needed to be slightly larger than the bore (or diameter) of the barrel.  Loading such a bullet was a challenge as it had to be jammed into and down the barrel, often with the assistance of a wooden mallet.  For this and other reasons, rifles were mostly slow-loading, expensive weapons that remained in the hands of a wealthy elite in the sixteenth and seventeenth centuries.

37.     Although much of the firearm's story is linked to warfare, in the sixteenth and seventeenth centuries, the rifle did find an important role in the field of hunting, especially in America.  Rate of fire is not a particularly important factor while pursuing most game.  A hunter was likely to only get one shot at a swift stag, and therefore, the difficulty of loading a rifle was worth the improved odds of hitting the animal on the first shot.  Although hunting was largely the preserve of the landed classes in Europe, in the New World hunting was customary for both the indigenous populations and the European settlers.  Rifles, known first as "Pennsylvania rifles," then as "Kentucky rifles," were popular and refined for these ends on the American frontier across the seventeenth and eighteenth centuries.

38.     Rifling could also be employed in this period for pistols for "civilian" usage. Like the musket, speed of reloading was considered essential in a military pistol.  But pistols with rifled barrels could be employed in target shooting, for self-defense, and in the nefarious fashion of dueling.  In these situations, fast reloading was less important or practical than an accurate initial shot.

39.     Rifling was not widely used in the military context, however, until advances in bullet technology enabled faster reloading and increased rate of fire.   Around 1850, a handful of attempts settled into a solution that came to be called a "minie-ball" (after one of its inventors,

**APP. 224**

Claude-Etienne Minie).  The Minie ball was closer to the non-familiar "bullet" shape, rather than the older, (actually round) "ball."  It had a hollow cavity at the base of the bullet which nestled against the powder charge when loaded.  The force of the charge would push into this cavity and expanded the rear of the bullet, driving its sides into the rifled grooves.  Since these minie-balls expanded upon firing, they could be made with a slightly *smaller* diameter than the barrel bore, and this greatly sped up loading time.

40.    Soon thereafter, enormous numbers of rifles were produced for military purposes, such as those for the British military at the Royal Small Arms Factory at Enfield, informally known as the Enfield Rifled Musket.  These arms significantly increased range and accuracy over the Brown Bess:  In one test, a large target could be repeatedly hit at a range of 800 yards, and even moderately skilled shooters could consistently hit man-sized targets at 200 yards.

41.    About a half million Enfields were ultimately imported to the United States for use in the Civil War.  The Union built nearly 1.5 million more of similar, American-made models, loosely known as "Springfields."

**Percussion Locks**

42.    Around the turn of the nineteenth century, a Scotsman, Alexander John Forsyth, discovered that highly volatiles substances, called fulminates, could be stabilized by mixing them with charcoal, sulphur, and other materials; and that striking a minute amount directly with a hammer regularly triggered a small but intense explosion.  Using this discovery, he devised a new rather complex lock, the percussion lock, named after its manner of ignition.  Forsyth's percussion lock was similar to the flintlock, except that a hammer-hitting-fulminate mechanism replaced the flint-hitting-steel one.

12

**APP. 225**

43.     This work eventually led to something called the percussion cap.  A touch of mercury fulminate compound was set inside a tiny, cheap copper or brass cup-like structure called a "cap," perhaps due to its similar appearance to headwear.  In a typical percussion lock, the cap was slipped over the top of a small cylindrical "nipple" that had a tiny hole drilled through it lengthwise.  The nipple's hollow center led directly into the closed touchhole.  When the hammer snapped down on the top of the cap, the fulminate exploded, and with nowhere else to go, the flame burned down the touchhole into the main powder charge.  This system of percussion was exceptionally simple to construct and replaced Forsyth's more complicated version.

44.     Digging around in one's pocket or "cap box" for a cap was not always quick or convenient, and the caps would sometimes explode, hazarding the shooter's eyes with a shower of metal fragments.  But the percussion cap lock system was far less prone to misfire than was the flintlock.  Being almost entirely enclosed, it was also much more resistant to foul weather.  Thus, when only 50% of flintlock musket line might actually fire in wet weather, 99% of percussion-cap guns would discharge.  By 1840, the United States, Britain and France had all adopted the lock for new military arms.

**Repeating Arms: Revolvers**

45.     Like so many other modern "innovations," the revolver was actually a much older concept, predating the famous American, Samuel Colt, by centuries.  One Venetian matchlock version with three rotating barrels, for example, has been dated to the 1540s.  The concept of a repeating arm with just one barrel, but rotating breech chambers—a "cylinder"— also dates to at least the sixteenth century.  But these early revolvers had to be turned by hand and reprimed after each shot.  And, like most early breechloaders in general, there was a problem with expanding

13

**APP. 226**

gas leaking through from ill-fitting parts.  Loose machinery work could also allow stray sparks from the chamber being fired to find their way into other loaded chambers with disastrous results.  In the best cases, these loose parts resulted in a loss of propulsion for the bullet; in the worst cases, after just a few shots early breechloaders tended to explode in the shooter's face.  It would take the precision manufacturing of the nineteenth-century's early industrial age to make this design workable.

46.     The new percussion lock system offered the opportunity to re-visit the revolver design and this is exactly what Samuel Colt did.  Colt's particular application, patented in 1836, was so successful that countless later enthusiasts credited the gunsmith with actually inventing the revolver.  Colt's basic system simply fixed a percussion nipple onto a slight recess at the rear of each individual cylinder chamber.  The enclosed nature of the percussion-cap ignition along with the recessed nipples greatly reduced the chance of other cylinder chambers accidentally discharging.  He also added a mechanism that rotated the cylinder automatically and lined up a new chamber each time the hammer was cocked.  The pistol chambers were loaded individually through the front along the side of the cylinder, initially as loose powder and shot, and later in premade paper cartridges.[2]

47.     This effective "cap and ball" revolver significantly increased firearms' rate of fire—whereas single-shot flintlock arms might be discharged about three times a minute, a Colt Revolver could now fire six aimed shots in under twenty seconds or even less time.  Reloading

---

[2]     Colt was also very good at precision manufacturing:  across the middle of the nineteenth century, his facilities used the most modern industrial equipment and production techniques available at the time, and he achieved an exceptionally high degree of standardization in firearm parts.

was a considerably slower process, involving at least 18 steps and some many minutes (despite the few seconds' time we see in the movies).

### Breech-loading Rifles

48.     If nineteenth-century gunsmiths were capable of mass-producing gastight revolvers, they certainly could revisit other old firearms experiments of the past.  One of the more successful efforts toward this end was the revival of the breechloader.  The basic idea was to have a section of the rear of the barrel (or "breech") open, thus allowing a cartridge to be more-easily inserted into the base of the barrel.  This would alleviate the burden of ramming a tight-fitting bullet and greatly ease the loading process.  This approach actually had been around since the late Middle Ages, but, like the early revolvers, the designs tended to leak excessive gas and/or explode.

49.     Gunmakers like the American, John Hall, began developing somewhat-safer breechloaders by the 1830s, but these were still less reliable than the older muzzle-loaders and received a cool reception from the military.  In 1853, fellow-American, Christian Sharps, significantly improved upon existing designs by creating a special breech seal.  This consisted of a movable metal ring about the diameter of the barrel, which was recessed into a sliding block of metal at the rear of the barrel called a "breechblock."  When the gun fired, gas from the charge itself was forced under the edges of the ring and drove it against the rear of the barrel.  The force of the expanding gas essentially helped seal the force of the expanding gas.

50.     Breechloading indeed significantly increased rate of fire, even as used with just single-shot guns.  A report from the U.S. secretary of war in 1859, for example, estimated that "[w]ith the best breech-loading arm, one skillful man would be equal to two, probably three armed with the ordinary muzzle-loading guns."

**APP. 228**

51.     It has been estimated that over 100,000 (single-shot) Sharps breechloading rifles saw action in the Civil War, mostly by cavalry.  Most infantry continued to use older styled weapons.

### The Self-Contained Metal Cartridge

52.     Around the same time Sharps' breechloaders came into being, John Forsyth's work with fulminates was being put to new use in America in metallic self-primed cartridges patented by Horace Smith and Daniel Wesson.

53.     Forsyth's work actually inspired this design decades earlier.  By about 1810, Samuel Johannes Pauly of Switzerland, impressed by Forsyth's work, recognized that Forsyth's fulminate did not have to rest in the lock but rather could be fixed to the actual cartridge itself. Pauly devised several types of ammunition utilizing metal casings fitted to the rear of a larger paper cartridge.  A small bit of fulminate was fixed in a miniature pan on the center back of the metallic casing and ignited by means of a new lock using an internal metal spring-driven "firing pin" instead of a side-mounted percussion hammer.  Pauly's work was not cost-effective at the time and never gained popularity in his lifetime.  It was decades before the metallic center-fire cartridge he had devised were rediscovered.[3]

54.     Like Pauly's, Smith and Wesson's similar design removed the need for a separate percussion cap and eliminated an extra loading step.  Unlike Pauly's, Smith and Wesson's design

---

[3]     Pauly's work was also taken up and modified by one of his assistants, Johann Nikolaus von Dreyse.  Von Dreyse, working in his native Prussia, set the fulminate primer inside the cartridge, but between the bullet and the powder charge.  He also modified the lock, changing Pauly's firing pin into a firing needle, to reach deeper inside the cartridge, and devising around it a breechloading lock that came to be known as the "bolt-action" lock.  This technology was widely adopted across Europe in the nineteenth century, and eventually in the U.S. as well, which switched to bolt-action rifles around the turn of the century.

**APP. 229**

was cost-effective, and successfully and widely employed.  As a result, the firearm was about to

take another major leap forward in rate of fire.[4]

55.    1n 1871, for example, the Colt Company produced its first breech-loading

metallic cartridge firing pistol modeled heavily on its earlier cap and ball revolvers.  This

particular gun was not a commercial success, but Colt's next effort, the Single Action Army

Model of 1873, would go on to become one of the most famous and distinct revolvers of all time.

Forty-five caliber cartridges were loaded one by one through a hinged feed slot or "gate" in the

rear of the cylinder.  (The colloquial term "forty five" caliber comes from the diameter of the

bullet, in this case, .45 inches.  Similarly, a "thirty-eight" would use a .38 inch-wide bullet while

a "twenty-two" bullet was a petite .22 inches in width.)  The Model 1873 could be rid of its

empty .45 cartridges in a reverse loading-motion with the assistance of an ejector rod.  This

model of revolver was purchased in large numbers all over the country and overseas.  The

weapon earned a number of nicknames, including the "equalizer" and the "peacekeeper."

56.    In its Navy Model 1889, Colt offered an even faster system.  This pistol had the

front of its cylinder fitted to a hinged arm or "crane."  After firing, the entire cylinder swung out

to the side of the revolver, away from the frame.  All six cartridges could then be simultaneously

pushed out using an ejector rod mechanism similar to that found in contemporary models made

by the American firm of Smith and Wesson.

**Repeating Arms: Rifles**

---

[4]    Smith and Wesson patented a "rimfire" design, in which the fulminate primer circled the
rear edge of the cartridge, rather than sitting in the middle.  This was thought to be a better
ammunition type to build a revolver around because in this type of weapon the striking edge of
the hammer was traditionally located closer to the edge of the cartridge than its center-rear.  By
the early 1870s, there was a general movement back toward center-fire cartridges because the
larger caliber rimfires tended to tear themselves apart when firing.

57.     The innovations in breechloading and metallic cartridges just discussed produced large gains in rate-of-fire in and of themselves.  They also quickly enabled yet another large leap—the repeating rifle.

58.     Like so many other weapons of the nineteenth century, the repeating rifles that appeared were similar to much older, but never perfected designs.  A seventeenth-century Danish marvel known as the Kalthoff gun, for example, used a cylindrical tube mounted under the barrel that held multiple balls.  This remarkable wheel lock also had a powder magazine in a hollowed section of the stock butt, and the whole gun could be primed and loaded by pivoting the trigger guard.  As brilliant as the design was, it was expensive and reportedly a bit delicate.

59.     A likewise frail pistol designed in the United States in 1848 by Walter Hunt, called the "Volitional Repeater," and later renamed the "Volcanic," used some similar elements. It employed a tubular spring-loaded bullet magazine under the barrel that fed ammunition into the breech chamber with a finger-lever.  The Volcanic was plagued by gas leakage, and its unique ammunition (like a minie ball, but with the hollow space filled with powder) only contained a very small powder charge.  The end result was that the Volcanic Repeater was not at all "volcanic" and suffered from an exceptionally low muzzle velocity—it was about half the speed of a Sharps gun, for example, which had a muzzle velocity of 950 to 1000 feet per second. (That is, it fired bullets moving at 950 to 1000 feet per second when first leaving the barrel.)

60.     Within a few years, by 1860, Benjamin Tyler Henry modified the Volcanic and its ammunition to create an effective repeating rifle with a larger and more powerful cartridge. Henry's new cartridge had a longer metal jacket that allowed for much greater powder capacity. The weapon also used a trigger lever that could be worked by the entire hand, rather than one finger, which eased the reloading process.  Because it was a long rifle, it was able to sport a

18

**APP. 231**

much longer tube magazine that could hold *fifteen* of the Henry cartridges (plus one in the chamber).  The bullet was much smaller than that used in other rifles, but when fired from the weapon Henry built for it, the projectile had a muzzle velocity of 1,125 feet per second, a relatively high speed.

61.    Not only did the Henry rifle's bullet move relatively quickly, but when compared to other contemporary firearms, the gun had an unheard-of rate of fire.  By simply shoving the trigger-guard lever down and forward, a spent casing from the gun's barrel was ejected through the top of the breech, a fresh cartridge slid into the lifting mechanism, and the hammer was cocked back in a firing position.  Snapping the lever back into place pushed the new cartridge up and into the breech, ready to be fired.  This lever-action design prepared a bullet for firing with one smooth and simple motion, requiring no cartridge biting, no ramrods, and no fumbling for percussion caps.  Unlike the three shots a minute that might be hoped for from an exceptionally quick infantryman armed with a Springfield, trials demonstrated that an average shooter could discharge a Henry rifle once every 3 seconds.

62.    Henry rifles were developed by the start of the American Civil War but were quite expensive—exorbitantly priced for regular rank-and-file troops—and did not see much combat. By the end of hostilities, the War Department had only officially bought 1,731 of the guns.

63.    A similar repeating weapon that saw much more use in that conflict was the Spencer rifle, also patented in 1860.  The Spencer likewise employed a magazine tube, but this feature was set in a different location, behind the lock hidden in the butt of the gunstock.  The shorter space of the butt and the larger bore/cartridge size only allowed seven cartridges to be loaded at a time.  Officially, the War Department bought almost 100,000 Spencer carbines and almost 12,500 rifles for use in the Civil War.

19

**APP. 232**

**Smokeless Powder**

64.     In 1884, Paul Vielle of France developed a new propellant that would quickly replace the basic gunpowder formula that had been pushed down gun barrels for nearly 600 years.  The new material, which he called "Powder B," came to be known as "smokeless" powder.  And because it was lighter in color than the older, charcoal-based powder, people began to refer to the older powder as "black powder."  Smokeless powder produced significantly less smoke than older gunpowders and was also a more efficient propellant.  The new powder was mixed at the molecular level, which meant its ignition was much faster, it burned more thoroughly, and it left less powder residue in the barrel.

65.     A cartridge made with smokeless powder could be blown down a barrel at a much faster rate than one made with the old "black" powder.  The force that a projectile has on an object when it impacts with it is a combination of both mass and speed.  Gunmakers knew that a small bullet travelling at a relatively higher velocity would be just as capable of inflicting a similar level of injury as a large bullet travelling slower.  Cartridges filled with smokeless powder could thus employ smaller caliber bullets, but these travelled significantly faster (over 2,000 feet per second muzzle velocity) and thus tended not to drop as much in flight.  This would make a new generation of these "high-powered" rifles more accurate in the hands of the average shooter.

**Machine Guns**

66.     Like so many nineteenth-century firearm developments already discussed, the machine gun had much older ancestors that were intended to accomplish similar tasks or to work upon similar principles.  The late fifteenth century saw the advent of "organ guns," so called because of their visual similarity to church organs.  These devices consisted of multiple barrels

20

**APP. 233**

fixed to a single stock, or more often to a wheeled carriage. They were made so that a single ignition traveled through passages cut in the rears of the barrels, firing each in succession. Some employed a "roman candle" technique. These devices must have been as cumbersome to employ and as slow to reload as they were spectacular to watch when fired.

67.     In 1861, Richard Gatling patented a hand-cranked, revolving, rapid-fire weapon that is widely credited as the first really successful "machine gun." The term "machine gun" generally refers to a relatively complex (hence "machine") weapon capable of very rapid fire. Richard Gatling's gun employed a revolver mechanism for a grouping of a half dozen barrels each with its own breech mechanism, all supported by a large-wheeled carriage. The first Gatling Guns used a loose ammunition hopper, but this was later replaced with a detachable magazine system set above the breech. These were of various shapes, including a round "drum" design and a flat curved "banana clip" magazine anticipating those found on later assault rifles.[5] As each barrel revolved past the magazine, it picked up a cartridge that was then fired at the bottom of the rotation cycle. The Gatling could be fired as fast as the handle could be cranked and empty magazines could be replaced. One version, the Model 1883, was capable of firing as many as 1,500 shots per minute.

68.     The Gatling, however, and other similar models like it, would be pushed aside in a few short years by more automated versions. Rather than relying upon cranks or handles to drive the firing system the next generation would be fully automatic. Simply pressing a trigger caused the gun to spit out a rapid, continuous spray of bullets.

---

[5]     These were not, however, the first detachable magazines. Those appeared in a bolt-action rifle known as the Lee-Metford, adopted by the British military in 1888, which used detachable 8-shot box magazines.

21

69.     These newer machine guns accomplished this task through somewhat different principles.  In each method, a by-product of the cartridge's explosion drove the mechanism of the gun.

70.     Perhaps the most lasting and revolutionary firearm of the late-nineteenth century was a machine gun developed by American, Hiram Maxim.  In the early 1880s, he began trying to develop an automatic firearm after reportedly being advised that the best way to get rich quick was to invent something to allow Europeans to kill each other more easily.

71.     When the propellant in a cartridge is ignited, the explosion does not travel exclusively down the barrel, but initially pushes outward in all different directions.  The metal barrel and the breechblock redirects much of this power to drive the bullet toward the muzzle.  Some of this energy travels in the opposite direction, however, shoving the gun backwards into the shoulder of the firer.  This recoil is an old but highly unwelcome feature of most firearms.

72.     In 1885, Maxim perfected a machine gun in which the firing action was driven by each shot's recoil.  The backward thrust of a shot pushed both the barrel and the breechblock slightly backward, opening the latter long enough to allow the empty cartridge to fling itself out of the gun.  Fresh ammunition was fixed and ready to be fed into the side of the breechblock by means of a cloth ammunition belt.  Besides throwing open the breechblock, the force of the Maxim Gun's initial shot also operated a mechanism that pulled the belt into the breechblock and lined up a fresh round.  After the first empty cartridge was flung clear, a recoil spring helped push the breechblock back in place, driving a second cartridge from the belt into the breech and firing it too.  This process repeated itself as long as the weapon's trigger was held down. The Maxim could fire at a rate of about 500-600 rounds per minute.

**APP. 235**

73.     As popular as recoil-operated Maxims became and would continue to be, a second machine gun using a different system of automation made an appearance at the close of the century.  Instead of relying on the simple recoil power of the shot, American inventor John Browning tapped into the expansion power of the gas created when the cartridge's propellant ignited.  The end result was the Colt Model 1895 Automatic Machine Gun.  Browning's gun provided a relatively low rate of fire, only about 400 rounds per minute, but was lighter and more portable than other machine guns.

74.     Most new successful firearms of the twentieth century would employ some variation or combination of these recoil and/or gas operation systems, or a combination of the two, known as a "blowback" system.

**Turn of The Twentieth Century: Semi-Automatic Pistols**

75.     The pistol continued to be an object of experimentation and a new class of handguns that could keep firing without being cocked after each shot was developed around the turn of the twentieth century.  Because the trigger still had to be pulled for every round fired, these new handguns were not considered fully automatic like a machine gun, but rather semi-automatic.

76.     In 1893, German inventor, Hugo Borchardt designed an innovative gun for the firm Ludwig Leowe that contained some of the key elements found in modern semiautomatic pistols.  In particular, the weapon had a clever detachable magazine system hidden in the pistol grip.  Up to 8 cartridges were stacked up with one on top of the other and pushed upwards into the breechblock by a spring, much like other magazine-fed rifles.  In this case, however, the shooter was relieved of the duty of rechambering each shot as required in a lever-action or bolt-action gunlock.  This job was instead performed by a heavy spring mechanism set in a

23

**APP. 236**

semicircular housing in the rear of the pistol behind the magazine.  This was fixed to the bolt by a hinged arm or "toggle" designed to bend in an upward motion.  The recoil from the first shot drove back the breech block, recocked the firing pin, and threw out the empty cartridge, all before the rear spring reasserted itself and pushed the bolt back forward.  As it reclosed, it picked up a fresh cartridge from the magazine and drove it into the firing chamber.  In many ways, the system was very similar to that used in the Maxim, except the shooter had to pull the trigger after each shot.

77.     The Borchardt was a little delicate for field use and clumsy to handle.  Still, it was successful enough to drive a flurry of competitors into designing similar guns, including a variant produced by the Mauser Company in 1896, and another model made by Leowe but designed by George Luger, which was officially named the "Parabellum," but famously came to be known as the "Luger."  Luger kept the hinged toggle arm and the pistol-grip magazine of the Borchardt but changed most other elements of the gun.  He also modified the pistol to use a slightly larger, 9mm, cartridge.  The weapon was adopted by the German army in 1908.

78.     In the late 1890s, John Browning began putting together his own prototypes for semi-automatic pistols.  The guns used the detachable magazine system set in the pistol grip like the original Borchardt.  But the main recoil spring was not behind the bolt but rather ran alongside the barrel.  One of these designs, the Colt Model 1911, chambered for a large .45-caliber cartridge (larger than the 9mm), would remain the standard U.S. Army service pistol right into the 1980s.  Most new semiautomatic pistols today, whether made by FN, Colt, Beretta, or Glock, use a firing action design not far removed from Browning's originals.  (Magazine capacity, however, expanded drastically in the late twentieth and early twenty-first century with semi-automatic pistols now capable of holding fifteen cartridges or more in their magazines.)

### Twentieth Century: Submachine Guns

79.     Before and particularly throughout World War I, considerable efforts were made to produce a lighter, more portable, yet durable machine gun.  Fully automatic versions of both the Colt Model 1911 and Luger were experimented with, for example.  In the latter case, a special Luger pistol was designed for artillery personnel to use for close defense.  These were fitted with an 8-inch barrel, a carbine shoulder stock, and a special thirty-two-shot snail-shaped drum magazine that extended out below the handgrip.  This "artillery Luger" was not particularly effective when converted to fire in a fully automatic manner.  Like most machine guns, the recoil of one shot tended to spoil the aim of the next.  In a heavy, fixed weapon like the Maxim this was less of a problem, but the lightweight experimental Luger machine gun/pistol tended to spray bullets all over the place.  This phenomenon of "muzzle rise" has in fact been an ongoing challenge to designers of lightweight automatic weapons, one that has never been completely addressed.

80.     A more satisfactory firearm was developed in 1916, by a designer for the Theodor Bergmann Armament Company.  The gun cleverly used the same 9mm cartridge and snail magazine as did the artillery Luger.  It was also designed as a two-handed weapon from the ground up which allowed for better automatic-fire control.  The firearm was designated "Machine Pistol 18, I," when adopted by the German military in 1918, but came to be known simply as the "Bergmann."

81.     As with semiautomatic pistols, American designers were separately developing light machine guns around the same time.  During World War I, retired U.S. Army general John Thompson privately put together a team of engineers to develop a lightweight automatic weapon for use in the war.  He originally envisioned a larger caliber rifle, but when his designers advised

**APP. 238**

using pistol cartridges Thompson reportedly stated: "Very well! We shall put aside the rifle for now and instead build a little machine gun. A one-man, hand held machine gun. A trench broom!" Thompson subsequently coined the term "submachine" for his gun.

82.     Although the gun came to be widely manufactured by Colt in 1921, the US Army initially showed little interest in it. Though it retailed for $200 in the 1920s, the new gun managed to find a civilian "niche market," as organizations of illegal alcohol dealers began using them in distribution disagreements with each other. As a result, the "tommy gun" or "Chicago typewriter" made a big splash in the U.S. popular imagination. Eventually the army adopted limited numbers of the gun as well.

83.     The Tommy gun differed from its continental cousins in a few notable respects. Like the M1911, it used a larger, .45 caliber cartridge, rather than the 9mm preferred in Europe. It was more rugged and dependable. Nor did it use a single-piece carbine-like wooden stock, but instead had a metal frame with a separate wooden pistol grip and buttstock. There was also a second pistol-type grip set closer to the muzzle for the shooter's other (non-trigger finger) hand. The double pistol grips were intended to improve fire control. Between these handholds, under the breech was a port that could accept several different magazines including fifty- and 100-round drum and twenty- and thirty-round straight box magazines.

84.     Experimentation continued with submachines guns for military use after and through World War II, resulting in many new and successful models. Nevertheless, as successful as these compact automatic weapons had been, they would not predominate on the battlefield for long. In spite of their television and cinema fame, in the second half of the century submachine guns like these were increasingly resigned to use by specialized military personnel, police, and more contemporary distributors of controlled substances. Most regular line soldiers

APP. 239

were not issued guns like these.  Despite popular images, even in World War II most soldiers were dragging around bolt-action rifles that were little changed from the late nineteenth century, largely because submachine guns used pistol ammunition, which lacked the long-range accuracy and hitting power offered by longer-barreled rifles with more powder-charge in their cartridges.

85.    The weapon causing the demise of both the long-range bolt-action rifle and the speedy submachine gun was the automatic or "assault" rifle that came to incorporate many of the best features of both.

**Conclusion**

86.    What's next in the lifestory of the firearm?  The American army is trying to revisit the ancient issue of accuracy in order to improve the firearm's potency.  A variety of high-tech optical scopes with range-finders and other features have been experimented with toward this end.  Some firms are seeking to increase a gun's power by including an option to fire explosive ammunition that does not even need to directly hit the enemy to inflict casualties.

87.    It seems unlikely, at present, that any groundbreaking designs will emerge.  The idea of blasting a projectile down a tube may stay around for a while, but we will need a radically different chemical propellant or even *type* of reaction if the basic potential of the firearm is to be significantly changed.  At the moment, it is hard to imagine the sudden appearance of anything dramatically futuristic like a ray gun, a phaser, or an explosive bolter.  On the other hand, the flintlock system had remained predominate for well over a century before Forsyth created an entirely new ignition system while trying to weatherproof a simple duck-hunting gun.  This kind of breakthrough made by a Forsyth, or a Vielle, or a Maxim has happened in the past and could occur again.  A period of great firearms innovation must certainly have seemed less likely in 1800 than it did in 2000.  Furthermore, the ancient imperatives of

**APP. 240**

accuracy, power, and rate of fire remain as compelling as ever.  As long as people retain their

desire to inflict harm at a distance, some version of the firearm will likely be around to perform

that notorious service.

Executed on <u>11/22/2022</u>  at <u>Conway, Arkansas</u>

ROGER PAULY

**APP. 241**

# EXHIBIT B

Case 1:22-cv-02256-RC   Document 17-8   Filed 11/23/22   Page 43 of 45
USCA Case #23-7061   Document #2029097   Filed: 11/29/2023   Page 246 of 566

lining up both sights with a target, the shooter increases her chance of hitting it. Some firearms utilize a telescopic variation.

**Smokeless powder.** These propellants were first developed in the nineteenth century based upon nitrocellulose. Technically speaking they do produce smoke, but not to the degree of older black powders.

**Smoothbore.** This can refer either to a barrel with no rifling or to a gun fitted with such a barrel.

**Snap-lock.** An early version of the flintlock firing mechanism. Like the flintlock, it too used the principle of flint striking steel to set off a powder charge.

**Stock.** The part of a firearm that is designed to be held and handled by the shooter. In more traditional firearms, the stock was often made from a single piece of wood, but in later weapons it might be composed of synthetic materials and be of a variety of designs. It often consists of a separate buttstock and fore stock.

**Submachine gun.** A two-handed firearm capable of automatic fire. Typically designed to use lower powered pistol ammunition. Sometimes called a machine pistol.

**Tiller.** The part of the crossbow that is grasped by the archer and that the bow is set perpendicular to. An important predecessor of the gunstock.

**Touchhole.** A hole drilled through the breech of the barrel through which an ignition travels in order to set off the main charge.

**Trajectory.** The path on which a bullet or other projectile travels through the air. Gun developers have typically tried to build weapons that fire with as "flat" or straight a trajectory as possible.

**Trigger.** The device on a firearm that ultimately causes it to discharge when pulled by a finger or otherwise engaged.

**Trigger guard.** A strip or band of metal that is fixed around the trigger in order to protect it from being damaged or accidentally pulled.

**Wheel lock.** An early modern ignition system that used a piece of flint set against a spinning metal wheel to set off a powder charge.

**Windage.** This refers to the difference between a projectile's diameter and the bore of a barrel. Expanding gases can slip through this gap past the bullet, similar to the co-viative principle. The term can also refer to the effect of wind on a projectile's trajectory.

# Bibliography

Albaugh, William, III, and Edward Simmons. *Confederate Arms.* Harrisburg, PA: Stackpole, 1957.

Anderson, Jervis. *Guns in American Life.* New York: Random House, 1984.

Armstrong, David. *Bullets and Bureaucrats: The Machine Gun and the United States Army, 1861–1916.* Westport, CT: Greenwood, 1982.

"Arquebuse and Matchlock Musket Page." http://www.geocities.com/Yosemite/Campground/8551/ (accessed February 21, 2004).

Ayalon, David. *Gunpowder and Firearms in the Mameluk Kingdom: A Challenge to Mediaeval Society.* London: Valentine and Mitchell, 1956.

Barker, A. J., and John Walter. *Russian Infantry Weapons of World War II.* New York: Arco Publishing Company, 1971.

Batchelor, Peter, and Keith Krause. *2003 Small Arms Survey.* Oxford: Oxford University Press, 2003.

Black, Jeremy. *European Warfare, 1660–1815.* New Haven, CT: Yale University Press, 1994.

Blackmore, Howard. *Firearms.* London: Dutton Vista, 1964.

Boothroyd, Geoffrey. *The Handgun,* part 2. New York: Crown Publishers, 1970.

Bradley, Joseph. *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia.* De Kalb: Northern Illinois University Press, 1990.

Brophy, Williams S. *The Krag Rifle.* Highland Park, NJ: Gun Room Press, 1985.

Brown, M. L. *Firearms in Colonial America*. Washington, DC: Smithsonian Institution Press, 1980.

Butler, David. *United States Firearms: The First Century*. New York: Winchester Press, 1971.

"C93 Borchardt Accessories." http://www.landofborchardt.com/C93_acc.html#MA (accessed February 21, 2004).

Chapel, Charles. *Guns of the Old West*. New York: Coward-McCann, 1961.

Childs, John. *Warfare in the Seventeenth Century*. London: Cassell, 2001.

Chinn, George. *The Machine Gun: Design and Analysis of Automatic Firing Weapons Systems*, vol. 4. Washington, DC: U.S. Government Printing Office, 1956.

Crosby, Alfred. *The Columbian Exchange*. Westport, CT: Greenwood Press, 1972.

———. *Throwing Fire: Projectile Technology through History*. New York: Cambridge University Press, 2002.

Croxall, Ian. "Snider Rifle 1867." http://www.britishempire.co.uk/forces/army armaments/rifles/sniderhistory.htm (accessed February 21, 2004).

Davis, William. *The Fighting Men of the American Civil War*. New York: Smithmark, 1991.

Diamond, Jared. *Guns, Germs, and Steel*. New York: Norton, 1997.

Diaz, Bernal. *The Conquest of New Spain*. Translated by J. M. Cohen. Harmondsworth, UK: Penguin Books, 1963.

Doyon, Keith. "Military Rifles in the Age of Transistion." http://militaryrifles.com/ (accessed February 21, 2004).

Dupuy, Trevor. *The Evolution of Weapons and Warfare*. Indianapolis, IN: Bobbs-Merrill, 1980.

Edwards, William. *Civil War Guns*. Harrisburg, PA: Stackpole, 1962.

———. *The Story of Colt's Revolver*. Harrisburg, PA: Stackpole, 1953.

Ellacott, S. E. *Guns*. New York: Roy Publishers, 1966.

Ellis, John. *Cavalry: The History of Mounted Warfare*. New York: G. P. Putnam's Sons, 1978.

———. *The Social History of the Machine Gun*. Baltimore: Johns Hopkins Press, 1986.

"Firearms: Muskets, Rifles and Carbines." http://www.researchpress.co.ukfirearms/firearms.htm (accessed February 21, 2004).

Freemantle, T. F. *Evolution of Guns and Rifles*. Washington, DC: Arkansas, 1965.

Fuller, Claud. *The Breechloader in Service 1816–1917: A History of All Standard and Experimental U.S. Breechloading and Magazine Shoulder Arms*. New Milford, CT: Flayderman and Company, 1965.

Given, Brian. *A Most Pernicious Thing: Gun Trading and Native Warfare in the Early Contact Period*. Ottawa: Carleton University Press, 1994.

Gluckman, Arcadi. *United States Muskets, Rifles, and Carbines*. Buffalo, NY: Otto Ulbrich Company, 1948.

Gorshkov, Nikolai. "Russian Producer Wins Kalashnikov Rights." *BBC News* world edition, June 2, 2001. http://news.bbc.co.uk/2/hi/europe/2021173.stm (accessed February 22, 2004).

**APP. 244**

Greener, W. W. *The Gun and Its Development*. New York: Bonanza Books, 1967.

"Gunpowder and Weapons of the Late Fifteenth Century." http://xenophongroup.com/montjoie/gp_wpns.htm (accessed February 21, 2004).

*Guns and Gunfighters*. New York: Bonanza Books, 1982.

"Guns of the Austrian Firm Steyr." http://trans.voila.fr/ano?anolg=65544&anourl=http%3A//users.skynet.be/HL-Editions/roth/roth1.htm (accessed February 21, 2004).

Hallahan, William. *Misfire: The History of How America's Small Arms Have Failed Our Military*. New York: Scribner's, 1994.

Hamilton, Douglas. *Cartridge Manufacture*. New York: Industrial Press, 1916.

"Handgonnes and Matchlocks: A Preliminary Essay in the History of Firearms to 1500." http://homepages.ihug.com.au/~dispater/handgonnes.htm (accessed February 21, 2004).

Hardy, Robert. *Longbow: A Social and Military History*. London: Bois d'Arc, 1992.

Hatch, Alden. *Remington Arms in American History*. New York: Rinehart and Company, 1956.

Haven, Charles, and Frank Belden. *A History of the Colt Revolver*. New York: Bonanza Books, 1940.

Headrick, Daniel. *The Tools of Empire: Technology and European Imperialism in the Nineteenth Century*. New York: Oxford University Press, 1981.

Held, Robert. *The Age of Firearms*. Northfield, IL: Gun Digest, 1970.

Helmer, William. *The Gun That Made the Twenties Roar*. London: MacMillan Company, 1969.

Hicks, James. *U.S. Firearms 1776–1956: Notes on Ordnance*, vol. 1. Beverly Hills, CA: Fadco Publishing Company, 1957.

———. *What the Citizen Should Know about Our Arms and Weapons*. New York: W. W. Norton, 1941.

Hobart, F.W.A., ed. *Jane's Infantry Weapons 1975*. London: Jane's Yearbooks, 1975.

Hogg, Ian. *The Story of the Gun*. New York: St. Martin's Press, 1996.

Hughes, B. P. *Firepower: Weapons Effectiveness on the Battlefield*. New York: Sarpedon, 1997.

Huntington, Roy. *Hall's Breechloaders*. York, PA: George Shumway, 1972.

Kaiser, Robert. "The Medieval English Longbow." *Journal of the Society of Archer-Antiquaries* 23 (1980). http://www.student.utwente.nl/~sagi/artikel/longbow/longbow.html (accessed February 22, 2004).

Keegan, John. *A History of Warfare*. New York: Vintage, 1994.

Keen, Maurice, ed. *Medieval Warfare: A History*. New York: Oxford University Press, 1999.

Kennedy, Paul. *The Rise and Fall of the Great Powers: Economic Change and Military Conflict from 1500 to 2000*. New York: Random House, 1987.

Lazenby, David. "Cannons: That Diabolic Instrument of War." 1999. http://www.middelaldercentret.dk/english/cannon2.htm#eksemplarer (accessed February 21, 2004).

Case 1:22-cv-02256-RC   Document 17-8   Filed 11/23/22   Page 44 of 45

USCA Case #23-7061   Document #2029097   Filed: 11/29/2023   Page 247 of 566

Lenk, Torsten. *The Flintlock: Its Origin and Development.* Translated by G. A. Urquart. Edited by J. F. Hayward. New York: Bramhall House, 1965.

Leseman, Jeff. "History and Development of the M1911/M1911A1 Pistol." http://www.sightm1911.com/lib/history/hist_dev.htm (accessed February 21, 2004).

Lugs, Jaroslav. *A History of Shooting.* Feltham, UK: Spring Books, 1968.

"M16A2 5.56mm Semiautomatic Rifle." http://www.fas.org/man/dod-101/sys/land/m16.htm (accessed February 22, 2004).

Machiavelli, Niccòlo. *The Seven Books on the Art of War.* 1520. Transcribed into HTML by Steven Thomas for the University of Adelaide Library, 2003. http://etext.library.adelaide.edu.au/m/m149a/ (accessed February 23, 2004).

"Machinepistole 18, I." http://www.cruffler.com/historic-july00.html (accessed February 22, 2004).

Marcot, Roy. *Spencer Repeating Arms.* Irvine, CA: Northwood Heritage Press, 1983.

Martin, Paul. *Armour and Weapons.* London: Herbert Jenkins, 1967.

McNeil, William H. *The Pursuit of Power.* Chicago: University of Chicago Press, 1982.

Neal, W. Keith, and D.H.L. Back. *The Mantons: Gunmakers.* New York: Walker and Company, 1966.

Needham, Joseph. *Science and Civilization in China,* vol. 5. New York: Cambridge University Press, 1986.

Newman, James. *The Tools of War.* New York: Doubleday, Duran and Co., 1942.

North, Anthony, and Ian Hogg. *The Book of Guns and Gunsmiths.* London: Quarto, 1977.

O'Connor, Jack. *The Rifle Book.* New York: Alfred Knopf, 1964.

Owen, J.I.H., ed. *Brassey's Infantry Weapons of the World, 1950–1975.* New York: Bonanza, 1975.

Pacey, Arnold. *Technology in World Civilization.* Cambridge, MA: MIT Press, 1990.

Parker, Geoffrey. *The Cambridge Illustrated History of Warfare.* New York: Cambridge University Press, 1995.

———. *The Military Revolution.* New York: Cambridge University Press, 1988.

Partington, J. R. *A History of Greek Fire and Gunpowder.* Baltimore, MD: Johns Hopkins University Press, 1999.

Perrin, Noel. *Giving up the Gun: Japan's Reversion to the Sword.* Boulder, CO: Shambhala, 1980.

Peterson, Harold. *Pageant of the Gun.* Garden City, NY: Doubleday, 1967.

Peterson, Harold, and Robert Elman. *The Great Guns.* New York: Grosset and Dunlap, 1971.

"Photogallery of World War 2, Vapenmenu." http://ww2photo.mimerswell.com/ (accessed February 22, 2004).

Pope, Dudley. *The Great Gunsmiths.* New York: Spring Books, 1969.

———. *Guns.* New York: Spring Books, 1969.

Popenker, Max. "Modern Firearms and Ammunition." http://world.guns.ru/main-e.htm (accessed February 21, 2004).

"Pyrotechnics, Explosives and Fireworks." http://www.vectorsite.net/ttpyro.html (accessed February 21, 2004).

Reid, William. *Arms through the Ages.* New York: Harper and Row, 1976.

———. *The Lore of Arms: A Concise History of Weaponry.* New York: Facts on File, 1984.

"REME: The Corps of the Royal Electrical and Mechanical Engineers Museum of Technology Weapons Collection." http://www.rememuseum.org.uk/arms/armindex.htm (accessed February 21, 2004).

Ross, Steven. *From Flintlock to Rifle.* London: Associated University Press, 1979.

Ruffell, Wally. "The Gun: Rifled Ordnance." 1997. http://riv.co.nz/rnza/hist/gun/rifled1.htm (accessed January 28, 2004).

Russell, Carl. *Guns on the Early Frontiers.* Berkeley: University of California Press, 1957.

Shepard, G. A. *A History of War and Weapons, 1660 to 1918.* New York: Thomas Crowell, 1972.

"The Smith and Wesson Story." http://www.smith-wesson.com/custsupport/story.htm (accessed February 21, 2004).

Smith, Graham, ed. *Military Small Arms.* London: A Salamander Book, 1996.

Smith, Merritt Roe. *Harpers Ferry Armory and the New Technology: The Challenge of Change.* Ithaca, NY: Cornell University Press, 1977.

Sumrall, Al. "The Colt Model 1895 Automatic Machine Gun." http://www.spanamwar.com/Coltmachinegun.htm (accessed February 21, 2004).

Tallet, Frank. *War and Society in Early Modern Europe.* New York: Routledge, 1992.

Taylor, Chuck. "The M-1 Garand." *SWAT Magazine* (November 1982). http://www.pattonhq.com/garand.html (accessed February 22, 2004).

Thornton, John. *Warfare in Atlantic Africa, 1500–1800.* London: UCL Press, 1999.

Trenk, Richard. "The Plevna Delay: Winchesters and Peabody-Martinis in the Russo-Turkish War." *Man at Arms Magazine* (August 1997). http://www.militaryrifles.com/Turkey/Plevna/ThePlevnaDelay.html (accessed February 21, 2004).

Wahl, Paul, and Donald Toppel. *The Gatling Gun.* New York: Arco Publishing Company, 1965.

Warder, Bill, and Jill Loux. "History of Armor and Weapons Relevant to Jamestown." 1995. http://www.nps.gov/colo/Jthanout/HisArmur.html (accessed February 21, 2004).

Wilkinson, Frederick. *Firearms.* London: Camden House Books, n.d.

———. *Flintlock Pistols: An Illustrated Reference Guide to Flintlock Pistols from the 17th to the 19th Century.* London: Arms and Armour Press, 1976.

Williamson, Harold. *Winchester: The Gun That Won the West.* Washington, DC: Combat Forces Press, 1952.

Young, Peter. *The Fighting Man: From Alexander the Great's Army to the Present Day.* New York: Rutledge Press, 1981.

Case 1:22-cv-02256-RC   Document 17-8   Filed 11/23/22   Page 45 of 45

USCA Case #23-7061      Document #2029097      Filed: 11/29/2023      Page 248 of 566

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF BRIAN DELAY</u>

Pursuant to 28 U.S.C. § 1746, I, Brian DeLay, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Associate Professor of History and the Preston Hotchkis Chair in the History of the United States at the University of California, Berkeley.

3.      I have been retained by the Office of the Attorney General for the District of Columbia to render expert opinions in this case.  I have reviewed Plaintiffs' Complaint, and I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

4.      I received my B.A. from the University of Colorado, Boulder (1994), and my M.A. (1998) and Ph.D. (2004) from Harvard University.  My first book, *War of a Thousand Deserts: Indian Raids and the U.S.-Mexican War* (Yale University Press, 2008), won best book prizes from several scholarly organizations.  Since 2010, I have been working on three interrelated projects about the historic arms trade: a monograph about the arms trade in the era of

American Revolutions (under contract with W.W. Norton and scheduled to be published in 2025); a second monograph about guns, freedom, and domination in the Americas from 1800-1945 (also under contract with W.W. Norton); and a database tracking the global trade in arms and ammunition between the end of the Napoleonic Wars and start of World War I.  These projects are grounded in primary-source research in archives in the United States, England, Spain, and Mexico.

5.      I have delivered around three dozen presentations on my arms trade research at universities in the U.S. and abroad, including Harvard University, the University of Chicago, Stanford University, Oxford University, Cambridge University, the University of Melbourne, Doshisha University in Kyoto, Japan, and the Zentrum für Interdisziplinäre Forschung (ZIF), in Bielefeld, Germany.  My research on the history of firearms has been supported by grants from the American Philosophical Society, the British Academy, the American Council of Learned Societies, and the Stanford Humanities Center, among other organizations.  In 2019, I was awarded a Guggenheim fellowship.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

## PURPOSE AND SUMMARY

6.      I have been asked to provide my understanding of the history of high-capacity firearms in the United States, with an emphasis on the years surrounding 1791 and 1868.  For the purposes of this declaration, I use high-capacity firearms to mean hand-held arms with a capacity greater than ten rounds.  Below I explain: (a) that high-capacity firearms were merely experimental and, consequently, vanishingly rare in 1791, and (b) that they accounted for less than 0.2% of guns in the United States in 1868.

**APP. 248**

## OPINIONS

I.  **High-capacity firearms were still an experimental technology and, consequently, vanishingly rare in the United States when the Second Amendment was ratified.**

7.      In their Complaint, Plaintiffs state that "firearms with ammunition capacity in excess of 10 rounds date back to the 1500s." That is true. Inventive gunsmiths spent centuries working on firearms capable of shooting multiple rounds without reloading. Evidence for their efforts can be found in personal and public archives, in patent records, and, very occasionally, in actual weapons still preserved in museums and private collections today. But such weapons amounted to little more than experimental curiosities prior to the mid-nineteenth century. Most never advanced beyond proof of concept. Only a small minority of high-capacity inventions ever moved past the design or prototype stage, and fewer still resulted in military contracts or private market share—and even those enjoyed only the most modest and temporary successes before the 1860s.

8.      This centuries-long history of inventive failure has a context, one that ought to be borne in mind when evaluating claims about the historic regulation of firearms—or lack thereof. Europeans began engaging with gunpowder and its potential military applications in the thirteenth century. By then, European states had long been in competition with one another for military and economic advantage. As the design and efficacy of artillery, bombs, and handheld firearms improved, and as these improvements forced leaders to reconsider venerable military traditions, states began spending more and more on their militaries. Intensifying competition between sovereigns created powerful incentives for craftspeople and inventors to improve on existing military technology.[1]

---

[1]      Geoffrey Parker, *The Military Revolution: Military Innovation and the Rise of the West, 1500-1800*, 2nd ed. (Cambridge University Press, 1996).

3

**APP. 249**

9.      Sovereign competition fueled innovation.  Three of the most important innovations in the seventeenth and eighteenth centuries were: (a) gradual improvements in gunpowder corning, a process that made powder burn more evenly and enabled producers to better modulate its power; (b) the substitution of the cumbersome matchlock ignition system for the more reliable flintlock system in the late seventeenth century; and (c) the development of the socket bayonet (also in the late seventeenth century), which, for the first time, enabled infantry to act both as musketeers and pikemen.  All three breakthroughs had significant consequences for the development and use of firearms around the world.  Still, most improvements to firearms technology were incremental during the Renaissance and early modern era.  Meaningful breakthroughs were very rare.

10.      Repeat fire was perhaps the most elusive of all hoped-for technological advances, but not for lack of trying.  Potential solutions came into view long ago.  For example, a revolving breech matchlock firearm was invented in Germany in the early sixteenth century.  A Scot took the opposite approach a century later and built a gun with a single, fixed breech and fifty barrels arrayed around an axis.  Yet another approach, the so-called superposed load or stacked charge, relied on complex innovations in the design of locks and barrels so that a single gun could be loaded with and successively fire multiple rounds.  Experimentation along these and other lines continued in multiple countries for centuries.[2]

11.      Notwithstanding often brilliant work on these and other approaches, no high-capacity firearm design worked well enough to enjoy anything close to widespread use before the nineteenth century.  The ideas were simply too far ahead of their times.  To be durable,

---

[2]      M. L Brown, *Firearms in Colonial America: The Impact on History and Technology, 1492-1792* (Washington: Smithsonian Institution Press, 1980), 50 (Germany), 100 (Scotland), 104 (superposed).

APP. 250

reliable, and—crucially—affordable enough to catch on, models that featured moving breeches or rotating barrels required metallurgical techniques and a level of machine precision unknown until well into the nineteenth century. And while the idea behind superposed loads prefigured some later firearms technologies, multiple powder charges in a single barrel always proved too dangerous and unreliable for real-world use. Not until the nineteenth-century advent of percussion-cap ignition and metal-jacketed ammunition would repeating firearms become practical weapons worthy of mass production, widespread military adoption, and commercial popularity. Neither the hustling arms inventors looking to make a fortune nor the military and political leaders looking for battlefield advantage knew that, of course. Hope sprung eternal, on both sides.[3]

      12.    That is why numerous historic designs for high-capacity firearms exist. Consider Joseph G. Chambers of Pennsylvania, who believed he had a "Genius for the Diabolical Arts of making havoc of the human species." Chambers wrote to Secretary of State Thomas Jefferson in 1792 with a musket design for a superposed load that, he claimed, could fire twenty rounds. [4] "Every nation desiring to possess the means of destroying the greatest number possible of their enemies," Jefferson responded enthusiastically and continued, "your discovery, if found effectual

---

[3]    For a summary of the basic technological hurdles and how they were finally overcome in the nineteenth century, see Joseph Bradley, *Guns for the Tsar: American Technology and the Small Arms Industry in Nineteenth-Century Russia* (DeKalb, Ill.: Northern Illinois University Press, 1990), 12–19.

[4]    To Thomas Jefferson from Joseph G. Chambers, 13 August 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0274. [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John Catanzariti. Princeton: Princeton University Press, 1990, pp. 290–293.]

in experiment, will not want patronage anywhere."[5]  Put differently, if Chambers could deliver, the inventor would become a very wealthy and influential man.  But, like so many who came before (and after) him, Chambers was unable to convince Jefferson or others in the U.S. government that his firearm was "effectual in experiment."[6]

13.     Plaintiffs contend in their Complaint that "firearms with ammunition capacity in excess of 10 rounds have been available since well before the Second Amendment was adopted." Again, it is true that they existed, and they were, in that sense, available before 1791.  By that time, European workshops had developed various prototypes of such weapons, and a few of the most successful of these prototypes enjoyed minor, experimental, and temporary adoption by specialized units in a few European armies.  However, officials with the U.S. War Department, U.S. merchants, and U.S. consumers would not have had experience with and reliable access to such weapons before or around 1791.  Thus, if Plaintiffs intend to suggest that people in the United States who wanted high-capacity firearms could get them "well before the Second Amendment was adopted," or around that time, that is *not* true.

14.     Given the technical challenges afflicting repeat-fire gunpowder weapons, it stands to reason that one of the only high-capacity weapons from the period that enjoyed even experimental military use wasn't a true firearm, but rather an air-gun.  Using highly compressed air as the propellant, rather than gunpowder, eliminated many of the problems that had long

---

[5]     From Thomas Jefferson to Joseph G. Chambers, 5 November 1792, *Founders Online,* National Archives, https://founders.archives.gov/documents/Jefferson/01-24-02-0539. [Original source: *The Papers of Thomas Jefferson*, vol. 24, *1 June–31 December 1792*, ed. John Catanzariti. Princeton: Princeton University Press, 1990, p. 580.]

[6]     For Chambers's proposal in context, see Andrew Fagal, "The Promise of American Repeating Weapons, 1791-1821," published online at *Age of Revolutions,* Oct. 20, 2016, https://ageofrevolutions.com/2016/10/20/the-promise-of-american-repeating-weapons-1791-1821/, accessed Nov. 6, 2021.

bedeviled the quest for repeating arms.  It was a relatively simple enhancement to attach a fixed tubular magazine to the underside of the air-gun's barrel, and to feed balls into the chamber (using gravity), one-by-one with a lever.  The shooter could then fire as many rounds as the magazine would hold before needing to reload the fixed magazine.  Depending on the size and pressure of the compressed air reservoir, the shooter could empty the magazine more than once before needing to refill the propellant.

15.     The most impressive air-gun of the period was developed in Vienna by Bartholomäus Girandoni in the 1780s.  His multi-shot air-rifles saw service in the Austrian military.  Experts estimate that Girandoni produced around 1500 of these weapons.  Why so few?  Because in addition to being very expensive, difficult to repair, and onerous to prime (requiring 1500 strokes of a pump to achieve optimal pressure), the rifles were unreliable.  Like most of his contemporaries, Girandoni did not yet have the materials or tools necessary to build the critical components of his design durably and with precision.[7]

16.     These finicky limitations help explain why air-guns were exceedingly rare in eighteenth-century America.  Indeed, they were so rare that owners could charge people to see them.  Two months after the Second Amendment was ratified, a museum proprietor in New York named Gardiner Baker took out ads in the city's newspapers to promote his latest acquisition: "an air gun, made by a young man, a native of Rhode-Island."  According to its new owner, the gun would "do execution twenty times, without renewing the charge," suggesting that it was a

---

[7]     For background on the Girandoni Air Rifle, see the learned essay by Robert D. Beeman, "New Evidence on the Lewis and Clark Air Rifle – an "Assault Rifle" of 1803," http://www.beemans.net/lewis-assault-rifle.htm, accessed Nov. 7, 2022.  For the weapon's weak points (mainly its leather gaskets and inadequate threading connecting the butt-stock reservoir to the rest of the gun), see John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure, accessed Nov. 7, 2022.

single-shot weapon capable of firing twenty individually loaded rounds before needing to renew the compressed air supply.  Baker explained that he had purchased the gun "at a very considerable price, with a view eventually to make it the property of the American museum."  In order to recoup his investment, he announced that he would "exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence."[8]

17.    Meriwether Lewis brought a Girandoni Air Rifle on his famous expedition across the continent with William Clark.  He did so not because these guns had become common, but because they remained so uncommon.  Lewis hoped a weapon that would fire multiple times without powder, flash, smoke, or much noise, would impress Native Peoples.  It did.  He happily reported that it "excite[d] great astonishment," which is itself a testament to the weapon's novelty.[9]  But Indigenous people weren't the only ones fascinated with this exotic gun.  At the very outset of the expedition near Pittsburg, "some gentlemen" asked for a demonstration.  Lewis obliged, firing the air-gun seven times.  But when one of the men took hold of the weapon, he accidentally squeezed off an eighth shot that hit a woman forty yards away, in the head.  To his great relief, Lewis found the woman's "wound by no means mortal, or even dangerous."[10]  That the gun's eighth round inflicted only a minor wound at forty yards suggests it lost pressure rapidly and might not have actually been able to fire more than ten effective rounds (our criteria for a "high-capacity firearm").

---

[8]      "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792. A copy of this article is attached as Exhibit B.

[9]      April 18, 1806 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.jrn.1806-04-18#lc.jrn.1806-04-18.01, accessed Nov. 7, 2022.

[10]     August 30, 1803 entry by Meriwether Lewis, *Journals of the Lewis & Clark Expedition*, https://lewisandclarkjournals.unl.edu/item/lc.mult.1803-08-30kloefkorn, accessed Nov. 7, 2022.

18.     Air-guns remained exotic curiosities elsewhere in the U.S. in the early nineteenth century.  Just a few months before Lewis and Clark set out, the museum in Connecticut's State House advertised an air-gun as one of its three prime attractions (the others being a wampum cloak and a sixteen-foot-long snake skin from South America).  In no sense were these weapons in common use at the time.[11]

19.     In sum, notwithstanding the great desire of states for military advantage, the great incentives that they held out for inventors who could deliver it, and the centuries of skillful effort that went into chasing those incentives, large-capacity firearms remained militarily and commercially irrelevant throughout the eighteenth and early nineteenth centuries.  I've spent the past twelve years studying the international arms trade in the Age of Revolutions (1763-1825).  I have never come across any evidence in primary sources that large-capacity firearms were anything other than exotic curios in this era.  Few alive at the time had ever laid eyes on one.  Single-shot muzzle-loading smoothbore muskets, rifles, and pistols remained the only handheld firearms that the vast majority of people ever owned, used, or encountered in the late-eighteenth and early-nineteenth centuries.

20.     In my judgement, that fact must be borne in mind when assessing the absence of laws restricting ammunition capacity at the time the Second Amendment was adopted.  It is always difficult for historians to explain why something *didn't* happen.  But in this case, the simplest and most obvious explanation for the absence of such regulations is that high-capacity firearms were too rare to attract regulatory attention in 1791.

---

[11]     "James Steward's advertisement "Museum," in *The Connecticut Courant*, April 27, 1803. A copy of this advertisement is attached as Exhibit C.

**APP. 255**

21.     An appropriate modern-day analogy might be personal jetpacks.  Much as high-capacity firearms did during the eighteenth-century, personal jetpacks have held appeal both for militaries and private consumers for more than a hundred years.  That appeal has generated competition in research and development.  But jetpacks remain an expensive and experimental curiosity to this day, because of stubborn technological, safety, and practical challenges, including cost.  A future historian (or jurist) discovering evidence that a patent was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by the technology throughout the century (indeed, they still are); and that the jetpack commanded enduring popular interest, could conclude that the absence of public regulation reflected an ideological disposition against regulating jetpacks.  But the simpler and more accurate explanation would be that jetpacks remained too rare to attract regulatory attention in 2022.[12]

## II.   While more common in 1868 than they had been in 1791, high-capacity firearms still only accounted for less than 0.2% of firearms in the United States when the Fourteenth Amendment was ratified.

22.     Firearms technology underwent dramatic changes in the years between the ratifications of the Second and Fourteenth Amendments.  By 1868, most of the material and technical challenges that had long prevented high-capacity firearms from working well and being embraced by militaries and consumers had finally been solved.  Oliver Winchester's New Haven Arms Company developed the world's first reliable high-capacity firearm in 1860.  The "Henry," named after Winchester's brilliant gunmaker, Benjamin Tyler Henry, was an ingenious breech-loading rifle that could fire sixteen rounds without reloading (one in the chamber and fifteen

---

[12]     Anthony Quinn, "The Fall and Rise of Jetpacks," Aug. 16, 2022, Royal Aeronautical Society Website, https://www.aerosociety.com/news/the-fall-and-rise-of-jetpacks/#:~:text=The%20concept%20of%20a%20jetpack,never%20built%20or%20even%20prototyped, accessed Nov. 5, 2022

from an attached, tubular magazine). Refinements to the Henry resulted in an even better gun: the Winchester Model 1866. While other gunmakers at the time produced iconic and successful multi-fire weapons (most famously Colt revolvers and Spencer repeating rifles), none of the viable alternatives fired more than ten rounds in the 1860s. Practically speaking, then, to ask how many high-capacity firearms were in circulation in the United States in 1868 is to ask how many Henrys and 1866 Winchesters were in circulation in 1868.

23.     Tom Hall, longtime curator of the Winchester Museum (now the Cody Firearms Museum) researched production runs for Henrys and Model 1866s by year. Combined, he concluded that there were 74,000 of these guns produced between 1861 and 1871.[13] Winchester exported the large majority of them to foreign militaries. The Ottoman Empire alone purchased 50,000 Model 1866s, and another 14,706 went to military purchasers in Europe, Latin America, and Japan during these years.[14] Based on Hall's production figures, that would have left only 9,294 high-capacity firearms for domestic consumption in the United States before 1872. 8,500 of those were Henrys purchased by or issued to Union soldiers during the Civil War. These figures suggest (a) that high-capacity firearms went almost exclusively to military buyers through the early 1870s, and (b) that very few were in the hands of private persons who might use them in ways that attracted regulatory attention.[15]

---

[13]     11k Henrys from 1861-March, 1863; 3k rifles with King's improvements, but without company name, from April 1866-March 1867; and 60k M1866 between 1866-1871. Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

[14]     Export numbers are drawn from Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75.

[15]     For Henrys used in the Civil War, see Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016), 81.

11

24.     The figures also tell us that even a few years after the ratification of the
Fourteenth Amendment, high-capacity firearms constituted a tiny percentage of firearms in the
United States.  How tiny?  Some numbers offer perspective.  In 1859, on the eve of the Civil
War, the U.S. Ordnance Department counted 610,262 shoulder arms in federal arsenals.
Combined, the arsenals of individual states likely contained hundreds of thousands more.
Domestic producers made 2.5-3 million firearms for the Union during the war, while Union
purchasing agents imported 1,165,000 European muskets and rifles.[16]  The Confederacy
imported several hundred-thousand firearms as well.  The scale of private gun ownership
involves more guesswork, though the U.S. may have had the most heavily armed civilian
population in the world in 1868.  All told, there were certainly more than five million firearms in
the U.S. when the Fourteenth Amendment was ratified—probably far more.  But even with the
implausibly low figure of five million, that would have meant that high-capacity firearms
constituted less than 0.2% of all firearms in the United States in the late 1860s and early 1870s.

25.     Like their competitors in the 1860s and 1870s, the Henry and the Winchester
Model 1866 had *fixed* magazines.  Detachable magazines were still decades away from practical
success, and would be produced for militaries long before they made their way into civilian
markets in meaningful quantities.  The first successful firearm with a detachable magazine was
developed by James Paris Lee in the 1880s.  Britain adopted a version of this weapon (the Lee-
Metford) as its standard service rifle in 1888.  In 1895, Britain replaced it with the Lee-Enfield,
which had been designed to accommodate new smokeless powder rounds.  Neither weapon
meets our criteria for a high-capacity firearm, however, because their detachable magazines held

---

[16]     Carl L Davis, *Arming the Union; Small Arms in the Civil War* (Port Washington, N.Y:
Kennikat Press, 1973), 39, 64, 106.

**APP. 258**

fewer than eleven rounds. Indeed, even as late as 1910, neither the United States Army nor any European army used high-capacity firearms as standard service weapons.[17]  To my knowledge, the first handheld firearm that both (a) had a detachable magazine holding more than ten rounds and (b) was commercially available to civilians in the United States was the Thompson submachine gun, introduced to the market in the 1920s.  This firearm was regulated by the U.S. government little more than a decade after its arrival, in the 1934 National Firearms Act.

26.    In sum, then, notwithstanding centuries of failed experimentation, high-capacity firearms only became practical battlefield or consumer items in the 1860s.  The arrival of these fixed-magazine weapons coincided with an unprecedented increase in firearms in the United States on account of the Civil War.  Once the war ended, the country was awash in guns, and virtually none of them were high-capacity firearms.  Consequently, it would take decades before high-capacity firearms enjoyed significant market share in the U.S., or became conspicuous tools for private violence and crime, or began to attract regulatory attention from state authorities.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on __11/22/2022_____

_____

BRIAN DELAY

---

[17]    In the ninth edition of his authoritative treatise *The Gun and its Development* (London: Cassell & Co., 1910), W.W. Greener compared the standard service arms of nineteen countries. Only four (Turkey, Switzerland, Great Britain, and Belgium) employed arms with detachable magazines.  See table on pp. 736-37.

**APP. 259**

**Exhibit B**



To the CURIOUS.

AN AIR GUN, made by a young man, a native of Rhode-Island, but now resident in this city, and which has been purchased by the subscriber, at a very considerable price, with a view eventually to make it the property of the American Museum but wishes to reimburse himself in the following manner, viz.

He will exhibit it to the examination of all persons desirous of viewing it, and of discharging a shot, for which they shall pay six-pence.

This gun, when properly filled with air, will do execution twenty times, without renewing the charge, and for several times will send a ball thro' an inch board, at the distance of sixty yards, to be seen at the subscribers, No. 13, Maiden-lane, every day in the week, from ten to twelve o'clock in the forenoon, and from three to five in the afternoon, Tuesday and Friday afternoons excepted, at which time it may be seen at the Museum.

GARDINER BAKER,

February 11, 1792.    Keeper of the Museum.

**Exhibit C**

# MUSEUM.

JOSEPH STEWARD, respectfully informs the public that he still continues to make additions to his collection in the State House in Hartford. Among which are several entertaining paintings. One large historic painting containing fourteen figures.

Among the natural curiosities is the skin of a large snake, from South America, 16 feet in length.

A curious savage Priest's cloak, wrought with wampum and bells after their manner.

An air-gun, shot with great force by air instead of powder.

The attention of gentlemen sailing to foreign parts, is requested, to collect curiosities, and every attention of this kind will be gratefully received and suitably rewarded.

*Portrait Painting* performed by said Steward as usual, at the Museum, and every attention paid to render it agreeable.

Hartford, April 11th, 1803.                    94

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs**, | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

<u>**DECLARATION OF ROBERT SPITZER**</u>

Pursuant to 28 U.S.C. § 1746, I, Robert Spitzer, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia to render an opinion on the history of firearms restrictions enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices (such as the large-capacity magazines (LCMs) challenged in this case), and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

3.      I have been retained by the District of Columbia to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

**BACKGROUND AND QUALIFICATIONS**

4.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for

thirty years, I earned my Ph.D. in Government from Cornell University.  I reside in

Williamsburg, Virginia.  A copy of my curriculum vitae is attached as Exhibit A to this

Declaration.

5.      I have been studying and writing about gun policy for over thirty years.  My first

publication on the subject appeared in 1985.  Since then, I have published six books and over one

hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun

laws, gun policy in American politics, and related historical, legal, political, and criminological

issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in

1995.  It examines firearms policy in the United States through the lenses of history, law,

politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge

Publishers.  My two most recent books on gun policy, *Guns Across America* (Oxford University

Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with

the study of historical gun laws.  I am frequently interviewed and quoted in the national and

international media on gun-related matters.  For over twenty years, I have been a member of the

National Rifle Association and of the Brady Campaign (formerly, the Brady Campaign to

Prevent Gun Violence).

6.      I have provided written testimony as an expert witness in *Worman v. Healey*, No.

1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts'

restrictions on assault weapons.  I have co-authored amicus briefs in numerous cases, including

*Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq

et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S.

Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh

**APP. 264**

Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme

Court, No. 08 CR 12069 (2012).

7.      I have also presented written testimony to the U.S. Congress on "The Second

Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee,

Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington,

D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to

the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights,

U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to

Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on

Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and

Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

OPINIONS

## I.      <u>Introduction</u>

8.      The current controversy surrounding legislative efforts to restrict large capacity

magazines and semi-automatic assault weapons would seem to be a purely contemporary matter,

responding to the modern phenomenon of mass shootings.  The effort to restrict such weapons

was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when

a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.

Later that year, California enacted the first assault weapons ban in the country.  Five years later,

Congress enacted a limited ten-year ban that was also a response to a sharp spike in gun crime

and homicide in the late 1980s and early 1990s, driven in no small measure by the introduction

of more deadly firearms, as discussed later in this document.[1]  This recent governmental

---

[1]      Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25–26,
205–11.

3

**APP. 265**

response follows a pattern very similar to other examples discussed in this document from prior

decades and centuries.  As of this writing, eight states plus the District of Columbia have similar

bans in place.[2]  These jurisdictions represent approximately 89 million people, or approximately

26.8% of the U.S. population.[3]  Twelve states plus the District of Columbia restrict LCMs.[4]

These jurisdictions represent more than 103 million individuals, or approximately 31.2% of the

U.S. population.[5]  And in 2022, the U.S. House of Representatives passed a renewed nationwide

assault weapons ban with LCM restrictions.[6]

      9.     But these recent efforts to restrict assault weapons and LCMs are simply the latest

chapter in a centuries-long effort to protect the public from harm and to dampen weapons-related

---

[2]     Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14–15.  The nine American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  Notably, the U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware recently enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[3]     See U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates).  The total population in these jurisdictions is estimated to be 88,976,315 out of a U.S. total of 331,501,080.

[4]     Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The thirteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, New York, Rhode Island, Vermont, and Washington.  With two exceptions, all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law, and Hawaii's restrictions apply to only handguns.

[5]     U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates).  The total population in these jurisdictions is estimated to be 103,503,256 out of a U.S. total of 331,501,080.

[6]     H.R. 1808, 117th Cong. (2022).

criminality.  The pattern of criminal violence and concerns for public safety leading to weapons

restrictions is not new; in fact, it can be traced back to the Nation's beginnings.  While the

particular weapons technologies and public safety threats have changed over time, governmental

responses to the dangers posed by certain weapons have remained constant.  Current restrictions

on assault weapons and detachable ammunition magazines are historically grounded.  They are

part of a pattern in America's history of legislative restrictions on particular weapons stretching

back centuries.

## II    Regulatory History of Fully Automatic and Semi-Automatic Firearms (Early Twentieth Century)

10.    A clear example of this historical pattern is provided by early twentieth-century

restrictions related to fully automatic firearms.  While weapons capable of firing rounds in rapid

succession can be traced to guns of the late nineteenth and early twentieth centuries, like the

hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[7] it and

its successors were military weapons designed to be used in combat and fired from a tripod or

similar supporting apparatus, owing to the Gatling gun's size and weight.  Strictly speaking, guns

like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets

while depressing a gun trigger.  The development of a fully automatic machine gun for

battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger

pull, came to fruition during World War I, and to devastating effect, with tripod-mounted

---

[7]    The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

APP. 267

machine guns on the battlefield, like the Maxim, which initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[8]

11.     Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon:  the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I, it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[9]  The Tommy gun was initially unregulated after World War I and made available for civilian purchase, typically with either a 20–30 round stick magazine or a 100-round drum magazine.  (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[10])  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[11] though sales in the early 1920s were sluggish.  By 1925, Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the 15,000 it had manufactured up to this point, including to police forces and individuals.[12]  Before the early 1920s, these weapons were

---

[8]     Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[9]     Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[10]    John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 149–52.

[11]    Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest,* July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

[12]    Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 203. William J. Helmer confirms the number of 3000 guns sold by

6

**APP. 268**

unregulated for the obvious reason that they did not exist or were not circulating widely in

society.  When they did begin to circulate, however, their uniquely destructive capabilities

rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of

the 1920s.  Another automatic weapon developed for World War I was the Browning Automatic

Rifle (BAR).  It fired a .30-06 caliber round, could receive a 20-round box magazine, and could

fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[13]  It, too,

made its way into civilian life and found favor among criminals and gangsters in the 1920s and

early 1930s.[14]  Guns like the Tommy gun and the BAR were actually used relatively infrequently

by criminals generally, but when they were used, they exacted a devastating toll and garnered

extensive national attention, such as their use in the infamous St. Valentine's Day massacre in

Chicago in 1929.[15]

### A.     State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century

12.     In response to the wider availability of firearms like the Tommy gun and the

BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws; eight of these

laws were passed in 1927 alone (see Appendices 1 and 3).  These state (and eventual federal)

---

1925: *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 74.

[13]     Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[14]     Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[15]     Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

7

**APP. 269**

enactments were anticipated, justified, and promoted by the National Conference of

Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-

partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical

areas of state statutory law."[16]  (Today, the organization is known as the Uniform Law

Commission.)  In 1923, the Commission organized a special committee to draft a "Uniform Act

to Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law calling for the

prohibition of the possession of "any firearm which shoots more than twelve shots semi-

automatically without reloading."[17]  In 1930, it issued a model firearms act focusing on "guns of

the pistol type."  In 1932, it issued a model act "intended not only to curb the use of the machine

gun, but to make it unwise for any civilian to possess one of the objectionable type."  The

Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to

monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a

partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun

becoming most popular. . . ."[18]

13.     Congress enacted a machine gun ban for the District of Columbia in 1932 which

included as a machine gun "any firearm which shoots automatically or semiautomatically more

than twelve shots without reloading."[19]  The National Rifle Association endorsed D.C.'s ban,

---

[16]     Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[17]     Report of Firearms Committee, 38th Conference Handbook of the National Conference
on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[18]     "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State
Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932,
http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[19]     "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R.
9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington,
D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[20]  In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation.  We are responsible for the uniform firearms act. . . . in the District of Columbia.  It is on the books now."[21]

14.     In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun.  The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities.  Such weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax.[22]  The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun could go through a 100-round drum magazine in four seconds.  Later versions fired 600 to 700 rounds per minute."[23]

15.     In his opening statement to the Ways and Means Committee of the U.S. House of Representatives, Attorney General Homer Cummings made clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from
> State to State, has created a situation which is giving concern to all who are

---

[20]   S. Rep. No. 72-575, at 5–6 (1932).

[21]   "Hearings Before the Committee on Ways and Means," 36.

[22]   48 Stat. 1236.

[23]   Moss, "From Gangland to the Battlefield."

9

interested in law and order. . . . there are more people in the underworld today
armed with deadly weapons, in fact, twice as many, as there are in the Army and
the Navy of the United States combined. . . . In other words, roughly speaking,
there are at least 500,000 of these people who are warring against society and who
are carrying about with them or have available at hand, weapons of the most
deadly character.[24]

16.     To address the problem, the original version of the bill proposed regulating both

semi-automatic and fully automatic firearms, as it defined restricted machine guns this way:

"The term 'machine gun' means any weapon designed to shoot automatically or

semiautomatically 12 or more shots without reloading."[25]  The final version of the bill limited

restrictions to fully automatic firearms.  Contemporary assault weapons that fire semi-

automatically, like AR-platform rifles, were excluded from the National Firearms Act.

17.     In addition to the National Firearms Act's restrictions on fully automatic

weapons, during this same time period at least seven states plus the District of Columbia, and as

many as eleven states, enacted laws restricting semi-automatic weapons (see Appendix 1).[26]  The

reason for restricting semi-automatic firearms is not hard to discern.  With the exception of the

District of Columbia's restrictions on semi-automatic weapons, these restrictions all appeared in

the same statutes as those restricting fully automatic weapons, which utilize the same

fundamental firearms technology:  an action that automatically loads a new round into the

---

[24]     "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that
appears on page 1 of the Hearings had this definition of machine gun:  "The term 'machine gun'
means any weapon designed to shoot automatically or semiautomatically twelve or more shots
without reloading."

[25]     Ibid., 52.

[26]     *See also* Robert J. Spitzer, "Gun Law History in the United States and Second
Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68–71.  The language of the
restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied
to semi-automatic weapons.

10

chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[27]

18.     As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, regulatory efforts proliferated.

**B.     State Regulation of Ammunition Feeding Devices**

19.     Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical loading function or device that automatically feeds new rounds into the firing chamber after the previous round is fired.  As is the case with contemporary state limitations on ammunition magazine capacity, state laws enacted early in the twentieth century imposed restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

20.     Magazine firing limits were imposed in three categories of state laws (see Table 1 below):  twelve states plus the District of Columbia regulating semi-automatic and fully

---

[27]     Spitzer, *The Gun Dilemma*, 32–33.  In 1913, Florida enacted this measure:  "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns." While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

automatic weapons (California, District of Columbia, Louisiana, Massachusetts, Michigan,

Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Carolina, South Dakota, and

Virginia);[28] nine states regulated fully automatic weapons only, where the regulation was defined

by the number of rounds that could be fired without reloading or by the ability to receive

ammunition feeding devices (Illinois, Minnesota, New Jersey, North Dakota, Oregon,

Pennsylvania, Texas, Vermont, and Wisconsin);[29] and four states restricted all guns that could

receive any type of ammo feeding mechanism or round feeding device and fire them

continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington

State).[30]

---

[28]    1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137. Two of these states enacted early laws focused on such weapons' use in hunting. New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading." 1920 N.J. Laws 67, ch. 31, Section 9. North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917. 1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[29]    1931 Ill. Laws 452–53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1–2; 1927 N.J. Laws 180–81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1–2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1–2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; 1933 Tex. Gen. Laws 219–20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1–4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[30]    1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917–1934[31]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Louisiana (8 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Carolina (8 rounds; 1934)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

*See* Appendix 3 for statutory text.

    21.    A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber *in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.*[32]

---

[31]    Including the District of Columbia. Note that California, Minnesota, and New Jersey appear twice in this table. The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

[32]    1927 Cal. Stat. 938 (emphasis added).

22.     The other three states in this category (Hawaii, Missouri, Washington)[33] utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).  Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality—as these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.[34]

C.     **Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices in the Early Twentieth Century**

23.     The lesson from this sequence of events early in the twentieth century demonstrates that changes in gun policy followed a series of steps that respond to developments in firearms technologies and their use in crime, each dependent on the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point.  *Third*, it may then be developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  New gun laws are not enacted when firearm technologies are invented or conceived.  They are enacted when those technologies

---

[33]     1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[34]     U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

24.     This lesson is significant because some argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable, or have no historical basis.  For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[35]  Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[36]  Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[37]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even before) the country's existence, and were not specifically regulated, ipso facto, today's governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities (typically, a ten-round limit).[38]

---

[35]     David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 851 (2014–2015).

[36]     Ibid., 852–54.

[37]     Ibid., 849.

[38]     Ibid., 871–72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century").

25.     Kopel's and similar arguments[39] fail for two sets of reasons.  First, as explained in the following section, this sort of narrative misrepresents the availability and capabilities of these early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[40]  The firearms and firearm feeding devices regulated in the early twentieth century represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

**III**.     **The History of Pre-Twentieth Century Firearms Technologies**

26.     As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  Kopel's example of a firearm from the late 1500s that could fire up to sixteen rounds is drawn from a book titled, *Firearms Curiosa*.  But this book's very title indicates why this narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is rare or unusual.  As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[41]  That is, they were anything but common, ordinary, or

---

[39]     Declaration of Ashley Hlebinsky in Support of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, Southern District of California, filed September 27, 2019.

[40]     Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3–4.

[41]     Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

16

found in general circulation. Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[42] A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[43] In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited. Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[44]

27.    An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the early twentieth century or modern era). The patent drawing of this weapon shows it sitting on a tripod on the ground.[45] It was not a hand-held weapon. In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[46] It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun. It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated

---

42    Ibid., 168.

43    Ibid., 166.

44    Ibid., 166.

45    Ibid., 220.

46    Ibid., 219.

17

APP. 279

machine guns."  Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[47]  A different account of this weapon says:  "There is in fact no record of such a gun ever having been built,"[48] although there are claims to the contrary.  A contemporaneous poet, commenting on 'Puckle's Machine Company,' wrote 'Fear not, my friends, this terrible machine.  They're only wounded who have shares therein.'"[49]  This weapon "never advanced beyond the prototype stage."[50]

28.      In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense.  As this account confirms, it was likely never even manufactured beyond perhaps a prototype or two.  It was a failed effort, even though later gun inventors learned from its failure.

29.      Kopel also cites the example of the Jennings multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading.[51]  Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[52]  Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century.  According to Carl P. Russell:  "Flintlock revolving pistols had been given trials and some

---

[47]      Ibid., 219-20.

[48]      Ellis, *The Social History of the Machine Gun,* 13.

[49]      Winant, *Firearms Curiosa,* 219–21.  See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[50]      Rasenberger, *Revolver,* 3.

[51]      Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 853.

[52]      Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

APP. 280

practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[53]

30.      Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed for crack shots in the Austrian army that was capable of firing up to 20 rounds.  One of these was taken along on the Lewis and Clark expedition of 1804–1806.[54]  But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than about 1,500.[55]  In fact, the rifles never caught on as they proved to be impractical on the battlefield, and even more so for civilian use.  To wit:  "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers, but this negated one of the key features—mobility.  The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon.  The reservoirs

---

[53]      Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[54]      David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.  The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered.  Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed.  See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[55]      Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[56]  It was pulled from military service by 1815.[57]

31.      To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[58]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[59]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[60] dubbed "radical defects" by Winchester himself.[61]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[62]

32.      Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle . . . generally attributed to be the first semi-automatic rifle."[63]  Yet this "development" was initially a

---

[56]      John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[57]      Markowitz, "The Girandoni Air Rifle."

[58]      Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6.

[59]      Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51–52.

[60]      "Volcanic Repeating Arms," https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[61]      Quoted in Haag, *The Gunning of America,* 56.

[62]      Haag, *The Gunning of America*, 60.

[63]      Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8.

failure:  "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[64]  The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[65]

33.     The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason:  pepperboxes were "heavy, lumpy, and impractical."[66]  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[67]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[68]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[69] although it took decades for this and similar revolvers to catch on.

34.     Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in

---

[64]     Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[65]     Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32–39.

[66]     Rasenberger, *Revolver*, 54.

[67]     Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[68]     Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms,* 32.

[69]     Rasenberger, *Revolver*, 401.

21

the Civil War.[70]  Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[71]

35.    As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[72]  Even then, Colt did not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public.  The government, in fact, dismissed such firearms as mere "novelties."[73]  After an 1837 test of Colt's gun and others the government concluded that it was "entirely unsuited to the general purposes of the service."[74]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[75]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a

---

[70]     Kopel, "The history of magazines holding 11 or more rounds"; Kennett and Anderson, *The Gun in America*, 112–13.

[71]     Snow and Drew, *From Lexington to Desert Storm*, 90.  As Civil War historian James M. McPherson noted, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war." *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

[72]     Rasenberger, *Revolver*, 3-5, 401.

[73]     Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

[74]     Rasenberger, *Revolver*, 136.

[75]     Ibid., 390.

single shot pistol."[76]  It took the Colt's use during the Civil War to finally spur the post-Civil

War proliferation of the Colt-type revolver and similar firearms into society.[77]

36.     While inventor Benjamin Henry claims credit for developing the first practical,

lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the

Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the

way for Winchester's dominance.[78]  The Winchester rifle could fire up to fifteen rounds without

reloading.  Yet the widely known Winchester 1873, "was designed for sale to the Government as

a military arm."[79]  A gun whose legendary status wildly outdistanced its actual production and

impact, it was nevertheless an important firearm in the late nineteenth century, although this

"quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity

biography backdated its diffusion and even its popularity."[80]  In fact, the slogan stating that the

Winchester "won the West" was invented by a Winchester executive as a marketing ploy in

1919.[81]  Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action

rifle that required the shooter to manipulate a lever in a forward-and-back motion before each

shot.  And when the gun was emptied, it had to be manually reloaded, one round at a time.[82]  The

Winchester Model 1905, then called a "self-loading" rifle, was a true semi-automatic firearm.  It

could receive a five or ten round box magazine, although from 1905 to 1920 only about 30,000

---

[76]     Kennett and Anderson, *The Gun in America*, 91.

[77]     Haag, *The Gunning of America,* 34–37, 46–64.  As Haag said, "the Civil War saved" the gun industrialists (65).

[78]     Haag, *The Gunning of America*, 96.

[79]     Koller, *The Fireside Book of Guns*, 112.

[80]     Haag, *The Gunning of America,* 179.

[81]     Ibid., 353.

[82]     Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

of the guns were made. Even in World War I, soldiers primarily used bolt-action one-shot rifles that could fire about twelve rounds per minute.[83]

37.     With all this, the Winchester was by no means universally embraced by long gun users. Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[84] According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[85]

38.     The rise in the circulation of multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions (see Appendices 1-4), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[86] By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted concealed gun and other weapons carrying.[87] It was only in the post-World War I era when

---

[83]     Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[84]     Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[85]     Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.

[86]     Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218–19.

[87]     Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63–67.

multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

39.    As noted earlier, the problems with arguments claiming that historical multi-shot weapons were both viable and commonly possessed before the late nineteenth century are two-fold:  they misrepresent the actual past of the weapons cited and, even more importantly, fail to understand the connection between gun technology developments and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

40.    First, a new gun or gun technology is invented.  Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution, and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[88]  And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[89]  Third, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.  Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[90]  Fourth, some military-designed weapons may then spill over into, or be

---

[88]    Winant, *Firearms Curiosa*, 36.

[89]    Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[90]    Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs.  These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War.  Knives and clubs are far simpler technologically compared to firearms

adapted to, civilian markets and use.  Fifth, if such weapons then circulate sufficiently to pose a public safety or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons.*[91]

41.      Again, to simply assert or assume that past firearms design/development, invention, or patenting equals commonality, viability, or a measurable presence or impact on society, is a leap in logic without historical foundation.  It would be as logical to reject modern governmental regulation of electric power through such government agencies as state power commissions and the Federal Energy Regulatory Commission because no such regulation was enacted around the time of Benjamin Franklin's experiments with electricity in the mid-eighteenth century.  The fact that inventors worked on new firearm designs and modifications tells us nothing about the *consequences* of such designs for society and public policy.  And the existence of such designs does not equal general availability, much less societal circulation and use of these weapons.  Other weapons subject to government restriction in our history further illustrate these principles.

## IV.   Historical Hardware Restrictions on Knives, Blunt Weapons, Pistols, and Trap Guns in the Eighteenth and Nineteenth Centuries

42.      Similar to government regulation of certain types of firearms and ammunition feeding devices in the early twentieth century, which occurred only after the weapons technologies matured, entered the civilian market, and threatened the public through criminal

---

(and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[91]      Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4–7.

APP. 288

use, government regulation of other weapons typically followed a version of this trajectory around the time of the ratification of the Fourteenth Amendment in the 1860s and even earlier.

### A.  **Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

43.    The Bowie knife is generally credited with having been invented by the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by his brother in the alternately notorious or celebrated "Sandbar Duel" in 1827.[92]  Bowie died at the Alamo in 1836.

44.    The "Bowie knife" rapidly became known in the 1830s for the distinctive type of long-bladed single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named.  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo), and the knife's distinctive features, encouraged its proliferation,[93] referred to by one historian as "the craze for the knives."[94]  As was true of other knives with long, thin blades,[95] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[96]  Indeed, such

---

[92]    "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77).

[93]    Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[94]    Davis, *Three Roads to the Alamo*, 583.

[95]    Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[96]    Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

APP. 289

knives were known as "fighting knives"[97] that were "intended for combat."[98]  In the early

nineteenth century "guns and knives accounted for a growing share of the known weapons that

whites used to kill whites."[99]  In 1834, for example, a grand jury in Jasper County, Georgia

deplored

> the practice which is common amongst us with the young the middle aged and the
> aged to arm themselves with Pistols, dirks knives sticks & spears under the
> specious pretence of protecting themselves against insult, when in fact being so
> armed they frequently insult others with impunity, or if resistance is made the
> pistol dirk or club is immediately resorted to, hence we so often hear of the
> stabbing shooting & murdering so many of our citizens.[100]

45.    Homicide rates increased in the South in the early nineteenth century, as did laws

restricting concealed weapons carrying.  Dueling also persisted during this time, even as the

practice was widely deplored by religious and other groups, in newspapers, by anti-dueling

societies and political leaders.[101]  Bowie knife expert Norm Flayderman provides abundant and

prolific evidence of the early criminal use of Bowie knives in the 1830s, quoting from dozens of

contemporaneous newspaper and other accounts, and providing references to literally hundreds

of additional articles and accounts attesting to the widespread use of Bowie knives in fights,

duels, brawls and other criminal activities.[102]  Flayderman concludes that, as early as 1836,

"most of the American public was well aware of the Bowie knife."[103]  (Very much like

---

[97]    Roth, *American Homicide*, 218.

[98]    Flayderman, *The Bowie Knife*, 59.

[99]    Roth, *American Homicide*, 218.

[100]    Quoted in Roth, *American Homicide*, 218–19.

[101]    Baugh, *Rendezvous at the Alamo*, 51.

[102]    Flayderman, *The Bowie Knife*, 25–64; 495–502.

[103]    Ibid., 43.

contemporary assault weapons,[104] the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[105])  All this led to widespread enactment of laws prohibiting dueling in the states.[106]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[107]  Both pistols and knives were prominently used in such affairs.[108]

      46.     In the 1840 case of *Aymette v. State*—a decision cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008)—the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[109]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private

---

[104]    Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12–15, 65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[105]    Flayderman, *The Bowie Knife*, 46.

[106]    A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[107]    H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[108]    Roth, *American Homicide*, 180–83, 210–17.

[109]    *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

broils, and which are efficient only in the hands of the robber and the assassin."[110]  The court

continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons

dangerous to the peace and safety of the citizens. . . ."[111]  Further, the court added that the state

law existed "to preserve the public peace, and protect our citizens from the terror which a wanton

and unusual exhibition of arms might produce, or their lives from being endangered by

desperadoes with concealed arms. . . ."[112]

47.    The ubiquity of the concern about the criminological consequences of carrying

Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws

barring or restricting these weapons.[113]  In the 1830s, at least six states enacted laws barring the

carrying of Bowie knives by name.[114]  From then to the start of the twentieth century, every state

plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie

knives:  a total of at least 42 states (including the District of Columbia) barred or restricted

Bowie knives by name; and another 8 states enacted laws barring the category or type of knife

embodied by the Bowie knife but without mentioning them by name (see Appendices 2 and 4)

totaling 49 states plus the District of Columbia.[115]  Several states banned the possession of

Bowie knives outright, and others imposed taxes on the ability for individuals to acquire or

---

[110]    Ibid., 156.

[111]    Ibid., 157.

[112]    Ibid.

[113]    The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[114]    A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law.  See Appendix 4.

[115]    Initial bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 10 states; 1860s: 13 states; 1870s: 18 states; 1880s: 20 states; 1890s: 19 states; 1900s: 12 states.  See Appendices 2 and 4.

possess them.  *See* Appendix 4.  The desirability and utility of concealed-carry restrictions were precisely that they pushed dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

### B.    <u>Historical Restrictions on Clubs and Other Blunt Weapons</u>

48.    Among the most widely and ubiquitously regulated harmful implements in U.S. history were various types of clubs and other blunt weapons.  See Appendices 2 and 4.  Most were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[116]  As the table in Appendix 2 shows, at least six distinct types of clubs and blunt objects were regulated in the United States.  Notably, every state in the nation had laws restricting one or more types of clubs.  According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[117]  Escobar provides what he calls "a family history" of these blunt weapons, but adding that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[118]  They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[119]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[120]  These club-type blunt objects compose a family of objects

---

[116]    E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[117]    Robert Escobar, *Saps, Blackjacks and Slungshots: A History of Forgotten Weapons* (Columbus, OH: Gatekeeper Press, 2018), 1.

[118]    Ibid., 2.

[119]    Ibid.

[120]    Ibid.

31

**APP. 293**

used for striking others, and while they vary in name and construction, the categories are

"somewhat fluid."[121]

49.     Among the six types of clubs regulated in U.S. laws, 15 states barred bludgeon

carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[122]  The

earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and

1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total

exceeds the total number of states because some states enacted the same or similar laws in

multiple centuries).

50.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[123] usually

made of wood, plastic, or metal,[124] that is traditionally carried by police, often called a nightstick

or baton.[125]  As noted similarly in *Fouts v. Bonta*, "[a]lthough the word 'baton' is not included in

the statutory language, it has long been held that the statute encompasses a variety of

bludgeoning instruments."[126]  Blunt object expert Escobar cites an early reference to the billy

club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police

---

[121]     Ibid., 1.

[122]     https://www.merriam-webster.com/dictionary/bludgeon.

[123]     Some versions were made to have some flexibility to increase their striking power.  See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[124]     https://www.merriam-webster.com/dictionary/billy%20club.  Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118.  One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[125]     Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.

[126]     *Fouts v. Bonta,* 561 F.Supp.3d 941, 944 (2021).

armed with batons,"[127] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 46 laws; the earliest law appears to have been enacted in Kansas in 1862,[128] followed by a New York law in 1866.[129]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

51.    At least 14 states barred the carrying of "clubs" more generically, without specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

52.    Anti-slungshot laws were enacted by 43 states, with 71 laws enacted in the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[130] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[131]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to

---

[127]    Escobar, *Saps, Blackjacks and Slungshots,* 105.

[128]    C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[129]    Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

[130]    Escobar, *Saps, Blackjacks and Slungshots*, 228.

[131]    See https://www.merriam-webster.com/dictionary/slungshot.  Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions. The use as a criminal weapon continued at least up until the early 1920s."[132]  Robert Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[133]

53.     In a criminal case considered the most famous of those involving lawyer Abraham Lincoln, the future president defended a man charged with murdering another using a slung shot. In the 1858 trial of William "Duff" Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[134]

54.     These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their spreading use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted in 1850; 43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

55.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-

---

[132]     "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[133]     Escobar, *Saps, Blackjacks and Slungshots*, 86.

[134]     Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim with a slung shot at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon.  Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[135] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was 1866, with 10 states enacted such laws—7 in the 1800s and 7 in the early 1900s.  Only 4 states did not have any prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[136]

### C.      Historical Restrictions on Pistol Carrying

56.      Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."  Massachusetts followed in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, 43 states joined the list; 3 more did so in the early 1900s (see Appendix 1).  The eighteenth-century laws generally restricted more general carrying of firearms, usually if done in crowded places, or in groups of armed people.

---

[135]     https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22.  Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[136]     Up to 2010, New Hampshire had this law on the books:  "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

The laws of the nineteenth century forward generally restricted concealed weapons carrying.
Among the earliest laws criminalizing the carrying of concealed weapons was that of Louisiana
in 1813.  Concealed carry laws normally targeted pistols as well as the types of knives and
various types of clubs discussed here (*see* Appendix 4 for text of most such laws).

### D.   Historical Restrictions on Trap Guns

57.     Not to be confused with firearms used in trapshooting, trap guns were devices or
contraptions rigged in such a way as to fire when the owner need not be present.  Typically, trap
guns could be set to fire remotely (without the user being present to operate the firearm) by
rigging the firearm to be fired with a string or wire when tripped.[137]  This early law from New
Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this
> Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons
> within this Colony shall presume to set any loaded Gun in such Manner as that the
> same shall be intended to go off or discharge itself, or be discharged by any
> String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay
> the Sum of Six Pounds; and on Non-payment thereof shall be committed to the
> common Gaol of the County for Six Months.[138]

58.     Also sometimes referred to as "infernal machines,"[139] the term trap gun came to
encompass other kinds of traps designed to harm or kill those who might encounter them,
including for purposes of defending property from intruders.  Unlike the other weapons
restrictions examined here, opinion was more divided on the relative merits or wisdom of setting
such devices, with some arguing that thieves or criminals hurt or killed by the devices had it

---

[137]     See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[138]     1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to
Prevent Trespassing with Guns, ch. 539, § 10.

[139]     E.g. 1901 Utah Laws 97–98, An Act Defining an Infernal Machine, and Prescribing
Penalties for the Construction or Contrivance of the Same, or Having Such Machine in
Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1–3.

coming,[140] though the weight of opinion seemed mostly against such devices.[141]  Those who set

gun traps typically did so to defend their places of business, properties, or possessions.  This

1870 newspaper account from an incident in New York City provides an example where a

burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted:  "As there is a

statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino."  After the verdict the man continued to be held under

$2,000 bail.[142]

59.     Inevitably, however, the traps wound up hurting or killing innocents, even

including the person who set the trap.  For example, this 1891 newspaper account from

Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50

under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but

his wife was the first person to visit the crib and on opening the door was shot dead."[143]

60.     In all, at least 16 states had anti-trap gun laws (see Appendices 1 and 5).  The

earliest such law encountered was the 1771 New Jersey law (above).  Nine laws were enacted in

---

[140]     For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870:  "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

[141]     This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted.  As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[142]     "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Appendix 6.

[143]     "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk. See Appendix 6.

APP. 299

the 1700s–1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

## V.    <u>Recent Developments</u>

61.    A profound change in firepower occurred in the U.S. in the 1980s, when semi-automatic handguns, and a new generation of more expensive and more deadly guns, entered the criminal market.[144]  According to criminologists Alfred Blumstein and Richard Rosenfeld, writing in the 1990s about the period from 1985-1993 and the dramatic rise in gun crime and homicides during that period, "[o]ver the last decade the weapons involved in settling juveniles' disputes have changed dramatically from fists or knives to handguns, with their much greater lethality."[145]  More specifically, Blumstein attributed this deadly crime spike in the 1980s to "the advent of crack cocaine, semiautomatic handguns and gangs" which "sparked the surge in killings by teen-agers."[146]  Blumstein noted that "[b]eginning in 1985, there was steady growth in the use of guns by juveniles in committing murder, leading to a doubling in the number of juvenile murders committed with guns, with no shift in the number of non-gun homicides."[147]

---

[144]    The prevailing crime handguns of the 1970s and early 1980s were so-called "Saturday night specials," cheap, smaller caliber, short-barreled, easily concealable revolvers that accounted for much gun crime. "Hot Guns," *Frontline,* PBS, aired June 3, 1997, https://www.pbs.org/wgbh/pages/frontline/shows/guns/etc/script.html; also Interview with Garen Wintemute, "Hot Guns," PBS, https://www.pbs.org/wgbh/pages/frontline/shows/guns/interviews/wintemute.html.

[145]    Alfred Blumstein and Richard Rosenfeld, "Explaining Recent Trends in U.S. Homicide Rates," *Journal of Criminal Law and Criminology* 4 (Summer 1998): 1191, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6976&context=jclc.

[146]    Fox Butterfield, "Guns Blamed for Rise in Homicides by Youths in 80's," *New York Times,* December 10, 1998, https://www.nytimes.com/1998/12/10/us/guns-blamed-for-rise-in-homicides-by-youths-in-80-s.html.

[147]    Alfred Blumstein, "Violence by Young People: Why the Deadly Nexus?" *National Institute of Justice Journal,* August 1995, 5, https://www.ojp.gov/pdffiles/nijj_229.pdf

**APP. 300**

These "young people are less likely to exercise the restraint necessary to handle dangerous weapons, particularly rapid-fire assault weapons."[148]

62.     This shift to greater firepower is consistent with the fact that "from 1973 to 1993, the types of handguns most frequently produced" were "pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993."[149]  Pistols "generally contain cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered"[150] whereas a revolver is defined as a "handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges. . . ."[151]

63.     In testimony before Congress on what became the assault weapons ban of 1994, law enforcement representatives discussed the rise in criminal firepower they witnessed in the 1980s.  For example, the executive vice president of the National Association of Police Organizations, Tony Loizzo, offered this testimony:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased. . . dramatically. . . . The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon.[152]

---

[148]     Blumstein, "Violence by Young People," 5.

[149]     Marianne W. Zawitz, "Guns Used in Crime," *Bureau of Justice Statistics,* July 1995, 3, https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

[150]     Zawitz, "Guns Used in Crime," 2.

[151]     Zawitz, "Guns Used in Crime," 2.

[152]     H.R. Rep. No. 103-489, at 32 (1994).

64.     John Pitta, executive vice president of the Federal Law Enforcement Officers Association testified similarly with respect to the 1994 bill: "[t]he TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals.  Cities across the country confiscate more TEC–9s than any other assault pistol."[153]  The ultimate result was congressional enactment of a ten-year restriction on assault weapons and also on ammunition magazines capable of holding more than ten rounds.[154]

## CONCLUSION

65.     Contemporary restrictions among the States pertaining to large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.  Gun ownership is as old as the country.  But so are gun and other dangerous weapons laws, which have adapted to changes in threats to public safety.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on  Nov. 22, 2022

*Robert J. Spitzer*
ROBERT SPITZER

---

[153]     H.R. Rep. No. 103-489, at 32 (1994).

[154]     Spitzer, *The Politics of Gun Control*, 205–11.

40

**APP. 302**

**APPENDIX 1**

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)[1]

| STATE[2] | TRAP GUNS[3] | CONCEALED CARRY[4] | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | | | |
| Alaska | | 1896 | | | |
| Arizona | | 1889 | | | |
| Arkansas | | 1820,1837 | | | |
| California | | 1850, 1864 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | |
| Connecticut | | 1890, 1923 | | | |
| Delaware | | 1852 | 1931 | | |
| District of Columbia | | 1857, 1871 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1913[5], 1933 | | |
| Georgia | | 1837 | | | |
| Hawaii | | 1913 | 1933 | | 1933 |
| Idaho | | 1909 | | | |

---

[1] Further research may yield additional laws regulating firearm hardware.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

[3] Sometimes trap guns were also referred to as "infernal machines."

[4] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[5] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

| Illinois | | 1881 | 1931 | 1931[†] | 1931 |
|---|---|---|---|---|---|
| Indiana | | 1820 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | 1927 | | |
| Kansas | | 1901 | 1933 | | |
| Kentucky | | 1812, 1813 | | | |
| Louisiana | | 1813 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | |
| Maryland | 1910 | 1872 | 1927 | | |
| Massachusetts | | 1751 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | 1933 | 1933 | 1933 |
| Mississippi | | 1878 | | | |
| Missouri | 1891[6] | 1873 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | |
| Nebraska | | 1881 | 1929 | | |
| Nevada | | 1881, 1925 | | | |
| New Hampshire | 1915 | | | | |
| New Jersey | 1771 | 1686 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | |
| New York | 1870[7] | 1891 | 1931, 1933 | | |

---

[6] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

[7] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured

2

| North Carolina | | 1792 | | | 1917 |
|---|---|---|---|---|---|
| North Dakota | 1891, 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | | | |
| Oregon | 1925 | 1853 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1934 | 1934[†] | 1934 |
| South Dakota | 1909 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | | | |
| Texas | | 1870 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | | | |
| Vermont | 1884, 1912 | 1895, 1897 | 1923 | | 1923 |
| Virginia | | 1794, 1838 | 1934 | 1934 | 1934 |
| Washington | 1909 | 1881 | 1933 | | 1933 |
| West Virginia | | 1870 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1933 | | |
| Total Laws | 16 | 50 | 31 | 8–11 | 23 |

SOURCE:  Duke Law, Duke Center for Firearms Law, Repository of Historical Gun Laws,
https://firearmslaw.duke.edu/repository/search-the-repository/

[†]Ambiguous law that could apply to semi-automatic in addition to automatic firearms.

---

Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo
Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

## APPENDIX 2

### DANGEROUS WEAPONS RESTRICTIONS
### (YEARS OF ENACTMENT)[1]

| STATE[2] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dangerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837,1839, 1841,1867, 1876,1877, 1879,1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896† | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1867,1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862,1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890† | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881† | | | 1797 | | | 1852 | |
| District of Columbia | 1871 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835,†1838 ,1847,1868 ,1893† | | 1888 | | 1868, 1888 | | 1887 | |

[1] Further research may yield additional laws regulating dangerous weapons.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Georgia | 1837,1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1864$^\dagger$1875, 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882,1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862,1863 1868,1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840,1841, 1884$^\dagger$ | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872,1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836$^\dagger$ | | | 1750 | 1850, 1927 | | 1751 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1837,1838, 1878 | | | 1799, 1804 | 1878 | | 1838,1878 | |
| Missouri | 1871,1897, 1917, 1923 | | 1871, 1897, 1923 | 1818 | 1883, 1888, 1897, 1917 | | 1873 | |
| Montana | 1864,1879, 1885 | 1887 | | | | | 1864, 1865 | 1888 |
| Nebraska | 1877,1890, 1899 | 1858 | 1872, 1890, 1899 | | 1890 | | 1881 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Nevada | 1873 | 1872 | | | 1881 | | 1881, 1925 | |
| New Hampshire | | | | | | | | |
| New Jersey | 1871,1905† | 1799, 1877, 1927 | 1871, 1927 | | 1871, 1873, 1927 | 1871, 1927 | 1686 | |
| New Mexico | 1852†1853, 1859,1864 1887 | 1887 | | | 1853, 1859, 1869, 1887 | | 1852, 1853 | |
| New York | 1866,1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 | |
| North Carolina | 1840,1856, 1858,1860, 1879 | | | | 1879 | | 1792, 1840 | |
| North Dakota | 1895,1915† | 1915 | 1915 | | 1895 | 1915 | 1895 | |
| Ohio | 1859,1880, 1890 | | | | | | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890,1891, 1903 | | 1890, 1891 | | 1890, 1891, 1903 | 1890 | 1890 | |
| Oregon | 1885† | | 1898, 1917 | | 1885, 1917 | 1917 | 1853 | |
| Pennsylvania | 1897 | | 1897 | | 1851 | | 1851 | |
| Rhode Island | 1893,1896, 1908 | | 1893, 1908 | | 1893, 1896 | | 1893 | |
| South Carolina | 1880, 1923 | | | | 1880 | | 1880 | |
| South Dakota | 1903† | | | | 1877, 1903 | | 1877 | |
| Tennessee | 1838,1856, 1863,1867, 1871,1881, 1893 | | | | 1879, 1882, 1893 | | 1821 | |
| Texas | 1856,1871, 1879,1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |

3

**APP. 308**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1895[†] | | | | 1895 | | 1895, 1897 | |
| Virginia | 1838,1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 128 | 25 | 44 | 17 | 79 | 21 | 64 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

[†] States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

# APPENDIX 3

## MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

### CALIFORNIA:

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

**DELAWARE:**

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.

On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

**DISTRICT OF COLUMBIA:**

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

**APP. 312**

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,

machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

6

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## **FLORIDA:**

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

**APP. 316**

## HAWAII:

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.

Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. ""Person" as used in this Act includes

8

**APP. 317**

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

APP. 318

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

**INDIANA:**

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

**APP. 319**

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

## IOWA:

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

## KANSAS:

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

**APP. 320**

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

12

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)

. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)

§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .

§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

**APP. 322**

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

**APP. 323**

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

## MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

**APP. 324**

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.

§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.

§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.

It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

APP. 326

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

**NEW YORK:**

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

18

**APP. 327**

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

20

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

## PENNSYLVANIA:

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.

§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

23

**APP. 332**

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

24

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

## SOUTH CAROLINA:

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns:
§§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

**APP. 337**

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggressive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

**TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

29

**APP. 338**

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**<u>VIRGINIA:</u>**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b. It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b. (b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06.
164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .
164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.
164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.
164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.
164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.
164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.

No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## **WYOMING:**

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.

§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.

§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

35

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# APPENDIX 4

## DANGEROUS WEAPONS LAWS[1]

### ALABAMA

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up

---

[1] Further research may yield additional laws regulating firearm hardware.

the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

2

APP. 347

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.

Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873
Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be

3

**APP. 348**

fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.
§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

4

**APP. 349**

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.

That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

Coles Bashford, The Compiled Laws of the Territory of Arizona, Including the Howell Code and the Session Laws From 1864 to 1871, Inclusive: To Which is Prefixed the Constitution of the United States, the Mining Law of the United States, and the Organic Acts of the Territory of Arizona and New Mexico Page 96, Image 102 (1871) available at The Making of Modern Law: Primary Sources, 1867.

An Act to prevent the improper use of deadly weapons, and the indiscriminate use of fire arms in the towns and villages of the territory. § 1. That any person in this Territory, having, carrying or procuring from another person, any dirk, dirk knife, bowie knife, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry or threatening manner, not in necessary self defense, or who shall, in any manner, unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this Territory, shall be fined in any sum not less than one hundred nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, in the discretion of the court, or both such fine and imprisonment, together with the cost of prosecution.

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.

If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

5

**APP. 350**

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.

It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.

§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.

§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.

§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.

§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

**APP. 351**

§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82. 1837.
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

7

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.

§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.

That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

## **CALIFORNIA**

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.

[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of

**APP. 353**

Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | California | 1853

Compiled Laws of California, § 127.

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .


Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in

10

**APP. 355**

the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.

William. M. Caswell, Revised Charter and Compiled Ordinances and Resolutions of the City of Los Angeles Page 85, Image 83 (1878) available at The Making of Modern Law: Primary Sources. 1878
Ordinances of the City of Los Angeles, § 36. In future, no persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately.

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.
No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Fresno, § 8.
Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

APP. 356

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.


1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

12

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

13

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.
If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)
No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886
City of Denver, Slung Shot – Brass Knuckles, § 10.
Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## CONNECTICUT

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.
Good Order and Decency § 192.
Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

14

**APP. 359**

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

15

**APP. 360**

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons | | 1871
Ch. XXV. Be in enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources, 1835.
An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

16

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

No. 24. An Act in addition to An Act, (approved January 30th, 1835) entitled An Act to prevent any person in this Territory from carrying arms secretly.

Section 1. Be it enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person or persons in this Territory to vend dirks, pocket pistols, sword canes, or bowie knives, until he or they shall have first paid to the treasurer of the county in which he or they intend to vend weapons, a tax of two hundred dollars per annum, and all persons carrying said weapons openly shall pay to the officer aforesaid a tax of ten dollars per annum; and it shall be the duty of said officer to give the parties so paying a written certificate, stating that they have complied with the provisions of this act. Four fifths of all monies so collected to be applied by the county courts to county purposes, the other fifth to be paid to the prosecuting attorney.

Sec. 2. Be it further enacted, That if any person shall be known to violate this act, he or they so offending, shall be subject to an indictment, and on conviction, to a fine of not less than two hundred nor exceeding five hundred dollars, at the discretion of the court.

Sec. 3. Be it further enacted, That it shall be the duty of the several Judges of the Superior Courts of this Territory, to give this act in charge to the grand juriors [sic] of their respective districts at each term of the court.

Passed 5th February 1838.—Approved 10th Feb. 1838.

https://www.google.com/books/edition/Acts_of_the_Legislative_Council_of_the_T/-LIwAQAAMAAJ?hl=en&gbpv=1&dq=%22vend+dirks,+pocket+pistols,+sword+canes,+or+bowie+knives%22&pg=PA36&printsec=frontcover


Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425. Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

**APP. 362**

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.

Sentence Enhancement for Use of Weapon | Florida | 1868

Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]

Offences Against Public Peace, § 13.

Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.

Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## **GEORGIA**

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Georgia | 1816

Offences Against the Public Peace, (1816) § 19.

18

**APP. 363**

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1837 Ga. Acts 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent use of Deadly Weapons, §§ 1–4.

§ 1 . . . it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or to have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kinds of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defense, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols, &c.

§ 2. And be it further enacted by the authority aforesaid, That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

§ 3. And be it further enacted by the authority aforesaid, That it shall be the duty of all civil officers, to be vigilant in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

§4. And be it further enacted by the authority aforesaid, That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: Provided, nevertheless, that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: Provided, also, that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: And provided,

19

**APP. 364**

nevertheless, that the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons Dangerous or Unusual Weapons | Hawaii | 1852

§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

20

**APP. 365**

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law,
who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-
gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than
Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of
payment of such fine, to imprisonment of a term not exceeding one year, nor less
than three months, upon conviction for such offense, unless good cause be shown
for having such dangerous weapon; and any such person may be immediately
arrested without warrant by the high sheriff, or any sheriff, policeman, or other
officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho
354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit
or other instrument or tool, with intent feloniously to crack and enter into any
dwelling-house, store, shop, warehouse, or other building containing valuable
property, or shall be found in the aforesaid buildings with intent to steal any
money, goods and chattels, every person so offending shall, on conviction thereof,
be imprisoned in the Territorial prison for a term not less than one year nor more
than five years; and if any person shall have upon him or her any pistol, gun, knife,
dirk, bludgeon, or other offensive weapon, with intent to assault any person, every
such person, on conviction, shall be fined not more than one hundred dollars, or
imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894
Page 118-119, Image 119-120 (1894) available at The Making of Modern Law:
Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer,
who shall carry or wear within the incorporated limits of Boise City, Idaho, any
bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or
other dangerous or deadly weapons, concealed, unless such persons be traveling or
setting out on a journey, shall, upon conviction thereof before the city magistrate of
said Boise City, be fined in any sum not exceeding twenty-five dollars for each

21

offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139. If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other

22

**APP. 367**

General Statutes of the State, in Force on the First Day of July, 1874 Page 360,
Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.

Whoever, at a late and unusual hour of the night time, willfully and maliciously
disturbs the peace and quiet of any neighborhood or family, by loud or unusual
noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling,
challenging to fight or fighting, or whoever shall carry concealed weapons, or in a
threatening manner display any pistol, knife, slungshot, brass, steel or iron
knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park
[Illinois] Together with Its Charter and General Laws Affecting Municipal
Corporations; Special Ordinances and Charters under Which Corporations Have
Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court
Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64
(1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.

No person, except peace officers, shall carry or wear under their clothes, or
concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-
knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by
written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of
Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments
Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882,
Being All the General Statutes of the State, in Force on the First Day of December,
1882 Page 375, Image 392 (1882) available at The Making of Modern Law:
Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.

Whoever, not being the father, guardian, or employer or the minor herein named,
by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give,
loan, hire or barter to any minor within this state, any pistol, revolver, derringer,
bowie knife, dirk or other deadly weapon of like character, capable of being
secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in
any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883)
available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.

Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.
Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## INDIANA

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.
And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.
That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.
§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife,

24

dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.
That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

25

**APP. 370**

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.
No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing

26

APP. 371

or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

1913 Iowa Acts 307, ch. 297, § 2
§ 1. It shall be unlawful for any person, except as hereinafter provided, to go armed with and have concealed upon his person a dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sand bag, skull cracker, slung-shot, or other offensive and dangerous weapons or instruments concealed upon his person.


## KANSAS

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

Samuel Kimball, Charter, Other Powers, and Ordinances of the City of Lawrence Page 149, Image 157 (1866) available at The Making of Modern Law: Primary Sources, 1863.
Nuisances, § 10. Any person who shall in this city have or carry concealed or partially concealed, upon his person, any pistol, bowie knife or other deadly weapon, shall, on conviction, be fined not less than one nor more than ten dollars; Provided, This section shall not apply to peace officers of the city or state. The carrying of a weapon in a holster, exposed to full view, shall not be deemed a concealed or partially concealed weapon under this section.

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources, 1868.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be

27

found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1887

28

**APP. 373**

Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act E ntitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.
If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.
Carrying Weapons | Louisiana | 1813
Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

29

**APP. 374**

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the
State of Louisiana, from the Change of Government to the Year 1841 at 252 (E.
Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk,
dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or
in any other place about him, that do not appear in full open view, any person so
offending, shall, on conviction thereof, before an justice of the peace, be subject to
pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .


1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the
Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other
dangerous weapon, concealed or unconcealed, on any day of election during the
hours the polls are open, or on any day of registration or revision of registration,
within a distance of one-half mile of any place of registration or revision of
registration; any person violating the provisions of this section shall be deemed
guilty of a misdemeanor; and on conviction shall be punished by a fine of not less
than one hundred dollars, and imprisonment in the parish jail not less than one
month . . . .


La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of
the people to keep and bear arms shall not be abridged. This shall not prevent the
passage of laws to punish those who carry weapons concealed.

**APP. 375**

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, riotously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

**APP. 376**

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.

Prevention of Crimes, § 10.

Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## **MARYLAND**

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Maryland | 1809If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.

Carrying Weapons | Maryland | 1872

It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local

32

**APP. 377**

Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court

33

APP. 378

of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,) concealed upon or about his person; and every person who shall carry or wear any such weapon openly, with the intent or purpose of injuring any person, shall, upon conviction thereof, be fined not more than five hundred dollars, or be imprisoned not more than six months in jail or in the house of correction.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1.
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for each such offense. . .

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## **MASSACHUSETTS**

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be

killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.

All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.

Of Proceedings to Prevent the Commission of Crimes, § 16.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.

Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff , constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.

36

APP. 381

Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## MICHIGAN

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1927
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.
It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of

said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## **MISSISSIPPI**

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

39

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1837 Miss. Law 289-90, An Act To Prevent The Evil Practice Of Dueling In This State And For Other Purposes, § 5.
That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any person shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

Laws of the State of Mississippi ; embracing all Acts of a Public Nature from January Session, 1824, to January Session 1838, Inclusive Page 736, Image 738 (Jackson, 1838) available at The Making of Modern Law: Primary Sources, 1838. An Act to Prevent the Evil Practice of Dueling in this State, and for other Purposes, § 5. Be it further enacted, That if any person or persons shall be guilty of fighting in any corporate city or town, or any other town, or public place, in this state, and shall in such fight use any rifle, shot gun, sword, sword cane, pistol, dirk, bowie knife, dirk knife, or any other deadly weapon; or if any persons shall be second or aid in such fight, the persons so offending shall be fined not less than three hundred dollars, and shall be imprisoned not less than three months; and if any person shall be killed in such fight, the person so killing the other may also be prosecuted and convicted as in other cases of murder.

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.
That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.


Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Missouri | 1871

Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.

§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.

§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government,

41

from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Nebraska | 1890

Ordinances of Omaha, Concealed Weapons, § 10.

It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from

42

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving

43

the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## **MONTANA**

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

44

**APP. 389**

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.

If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from

the testimony on the trial of any such case, that the accused was, at the time of
carrying any weapon as aforesaid, engaged in the pursuit of lawful business,
calling or employment and the circumstances in which he was placed at the time
aforesaid were such as to justify a prudent man in carrying the weapon or weapons
aforesaid, for the defense of his person, property or family, the accused shall be
acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34,
Image 34 (1899) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons
and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor
and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol,
revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or
deadly weapons of any kind, excepting only officers of the law in the discharge or
their duties; and any person so offending shall be deemed guilty of a misdemeanor,
and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2.
Any such weapon or weapons, duly adjudged by the Police Judge of said city to
have been worn or carried by any person in violation of the first section of this
ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so
adjudged.

## NEVADA

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of
1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The
Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a
rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous
weapon, and in doing shall kill his antagonist, or any person or persons, or shall
inflict such wound as that the party or parties injured shall die thereof within one
year thereafter, every such offender shall be deemed guiltily of murder in the first
degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no
homicide ensue or shall challenge another to fight such duel, or shall send or
deliver any verbal or written message reporting or intending to be such challenge,
although no duel ensue, shall be punished by imprisonment in the State prison not

less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.

Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881

An Act to prohibit the carrying of concealed weapons by minors. § 1.

Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## **NEW JERSEY**

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)

An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to

48

be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | New Jersey | 1799
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.
And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources, 1799.
[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2. And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be

49

found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

50

**APP. 395**

That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.

And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.
Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927
No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or

other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

1852 N.M. Laws 67, An Act Prohibiting the Carrying a Certain Class of Arms, within the Settlements and in Balls, § 1.

That each and every person is prohibited from carrying short arms such as pistols, daggers, knives, and other deadly weapons, about their persons concealed, within the settlements, and any person who violates the provisions of this act shall be fined in a sum not exceeding ten dollars, nor less than two dollars, or shall be imprisoned for a term not exceeding fifteen days nor less than five days.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.

That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

1859 N.M. Laws 94, § 1-2.

§ 1. That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, of any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called, under the penalities and punishment which shall hereinafter be described. § 2. Be it further enacted: That if any person shall carry about his person, either concealed or otherwise, any deadly weapon of the class and description mentioned in the preceeding section, the person or persons who shall so offend, on conviction, which shall be by indictment in the district court, shall be fined in any sum not less than fifty dollars, nor more than one hundred dollars, at the discretion of the court trying the cause, on the first conviction under this act; and for the second conviction, the party convicted shall be imprisoned in the county jail for a term of not less than three months, nor more than one year, also at the discretion of the court trying the cause.

1864-1865 N.M. Laws 406-08, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, ch. 61, § 25, 1864.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called, under the penalties and punishment which shall hereinafter be described.

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .

## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1866

An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.

Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | New York | 1881

Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.

Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a

**APP. 401**

term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any

instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckes, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pisol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under ht age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911

Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

**APP. 403**

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.


1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.


1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

59

## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources, 1840.

Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 75, Image 75 (1847) available at The Making of Modern Law: Primary Sources, 1846.

Crimes and Punishments, 1846 – 7- Ch. 42. It shall not be lawful for any person or persons to sell or barter and deliver, to any slave, or slaves, any gun cotton, fire arms, swords, dirks or other side arms, unless those articles be for the owner or employer, and by the written order of the owner or employer of such slave or slaves, under the penalty of one hundred dollars for each offence, to be recovered, by warrant, before any Justice of the Peace, and applied, one half to the use of the party suing for the same, and the other half to the wardens of the poor of the county; and, moreover, may be indicted in the County or Superior Courts of Law; and the defendant, on conviction, shall be fined or imprisoned at the discretion of the Court; the fine, however, not to exceed fifty dollars, or the imprisonment three months.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1856-1857 N.C. Sess. Laws 34, Pub. Laws, An Act Entitled "Revenue," ch. 34, § 23, pt. 4, 1856.

On every pistol, except such as are used exclusively for mustering, and on every bowie-knife, one dollar and twenty five cents; on dirks and swordcanes, sixty five cents: Provided, however, That of said arms, only such shall be taxable, as at some time within the year have been used, worn or carried about the person of the owner, or of some other, by his consent.

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15, 1858.

The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, § 1, 1860.

That chapter 107, section 66, of the Revised Code be amended to read as follows: If any free negro shall wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot, he shall be guilty of a misdemeanor, and upon conviction fined not less than fifty dollars.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.

If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## **NORTH DAKOTA**

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.

§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.

§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6.
Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be

**APP. 407**

fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec. § 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## **OKLAHOMA**

1890 Okla. Laws 495, art. 47

63

**APP. 408**

Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.
To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.

§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

65

**APP. 410**

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

**OREGON**

66

**APP. 411**

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.

§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Oregon | 1898

An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.

Carrying Weapons | Oregon | 1917

§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law.

Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## **PENNSYLVANIA**

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.

That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one

68

**APP. 413**

year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Pennsylvania | 1897

An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.

No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## **RHODE ISLAND**

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.

No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.

Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893

§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.

69

**APP. 414**

§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.

§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.


General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Rhode Island | 1896

Offences Against Public Policy, §§ 23, 24, 26.

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.


1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws

Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the

70

**APP. 415**

blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.
§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

1923 S.C. Acts 221
If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.

71

**APP. 416**

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## **TENNESSEE**

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.
That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.

72

**APP. 417**

That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.

§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.

§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864. Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.

Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.

§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.

§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources.

Elections.

§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other

74

public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.

§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

**TEXAS**

75

**APP. 420**

A Digest of the General Statute Laws of the State of Texas: to Which Are
Subjoined the Repealed Laws of the Republic and State of Texas (Austin, Texas:
Williamson S. Oldham & George W. White, comp., 1859)
Texas, Chapter 3, Act of August 28, 1856
Art. 493. If any person shall assault another with intent to murder, he shall be
punished by confinement in the Penitentiary, not less than two years, nor more than
seven years. If the assault be made with a bowie-knife, or dagger, the punishment
shall be doubled. Page 520
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=538
&q1=bowie%20knife

Art. 610. If any person be killed with a *bowie knife* or *dagger*, under circumstances
which would otherwise render the homicide a case of manslaughter, the killing
shall nevertheless be deemed murder, and punished accordingly. [emphasis in
original] Page 534
https://babel.hathitrust.org/cgi/pt?id=mdp.39015073228879&view=1up&seq=552
&q1=bowie%20knife


1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly
Weapons.
§ 1. Be it enacted by the Legislature of the State of Texas, That any person
carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk,
dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other
kind of knife manufactured or sold for the purposes of offense or defense, unless
he had reasonable grounds for fearing an unlawful attack on his person, and that
such ground of attack shall be immediate and pressing; or unless having or
carrying the same on or about his person for the lawful defense of the State, as a
militiaman in actual service, or as a peace officer or policeman, shall be guilty of a
misdemeanor, and on conviction thereof shall, for the first offense, be punished by
fine of not less then than twenty-five nor more than one hundred dollars, and shall
forfeit to the county the weapon or weapons so found on or about his person; and
for every subsequent offense may, in addition to such fine and forfeiture, be
imprisoned in the county jail for a term not exceeding sixty days; and in every case
of fine under this section the fined imposed and collected shall go into the treasury
of the county in which they may have been imposed; provided, that this section
shall not be so contrued as to prohibit any person from keeping or bearing arms on
his or her own premises, or at his or her own place of business, nor to prohibit
sheriffs or other revenue officers, and other civil officers, from keeping or bearing
arms while engaged in the discharge of their official duties, nor to prohibit persons
traveling in the State from keeping or carrying arms with their baggage; provided

further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.


Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code.


1879 Tex. Crim. Stat. tit. IX, Ch. 4 (Penal Code)
Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.
Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, not to a revenue or other civil officer engaged in the discharge of official duty, not to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.
Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk,

77

dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

Art. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

Art. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail to refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

Art. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.

Brandishing | Texas | 1899

Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.

If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

**APP. 423**

## UTAH

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14. Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm, slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

## VERMONT

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stiletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | Virginia | 1792

[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.

§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

Acts of the General Assembly of Virginia, Passed at the Session of 1838, chap. 101, at 76; 1838.

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

1847 Va. Laws 127, c. 14, § 16.

If any person shall go armed with any offensive or dangerous weapon without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided.

Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.
Ordinances of The Town of Lexington, VA, Of Concealed Weapons and Cigarettes, § 1. If any person carrying about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty dollars nor more than one hundred dollars; and any of such weapons mentioned shall be forfeited to the town. Nothing in this section shall apply to any officer of the town, county or state while in the discharge of his duty.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Virginia | 1887
Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

## **WASHINGTON**

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall

**APP. 426**

on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956,

Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to cause terror to the people passing, exhibit or flourish, in the streets of an incorporated city or unincorporated town, any dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in any sum not exceeding twenty-five dollars. Justices of the peace shall have exclusive original jurisdiction of all offenses arising under the last two preceding sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms, fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334, Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All persons (except police officers and other persons whose duty it is to execute process or warrants or make arrests) who shall carry upon his person any concealed weapon consisting of a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.

If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Washington | 1897

Carrying Concealed Weapons, § 7084.

If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

## WEST VIRGINIA

1870 W. Va. Code 692, Of Offenses against the Peace, ch. 148, § 7.
If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informers shall have one half of such fine.

1870 W. Va. Code 703, For Preventing the Commission of Crimes, ch. 153, § 8.
If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

85

Carrying Weapons | West Virginia | 1891

If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925

§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

86

**APP. 431**

## WISCONSIN

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.

To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

## WYOMING

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.

Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.

If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Wyoming | 1893

Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.

It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding

87

section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

**APP. 433**

# APPENDIX 5

## TRAP GUN RESTRICTIONS[1]

**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

**APP. 434**

**MINNESOTA:**

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1873
Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.
§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.
§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

**MISSOURI:**

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891:  "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun.  Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

**APP. 435**

## NEW HAMPSHIRE:

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

## NEW JERSEY:

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

## NEW YORK:

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870:  "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . .  A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter.  The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino.  As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

**APP. 436**

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

## NORTH DAKOTA:

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

## OREGON:

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

**APP. 437**

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.

## RHODE ISLAND:

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

## SOUTH CAROLINA:

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

**APP. 438**

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

## SOUTH DAKOTA:

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

## UTAH:

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901

§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.

§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.

§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

## VERMONT:

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884

A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

**APP. 440**

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.

## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

**APP. 441**

## WISCONSIN:

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1.

Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

9

**APP. 442**

Newspapers
by Ancestry
https //www newspapers com/ mage/264632378
Down oaded on Aug 8 2022



conclusion.

## THE MAN TRAP.

**Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.**

*From the N. Y. Standard, Oct. 29th.*

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning.

AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO's gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $2,000 bail.

Copyr ght © 2022 Newspapers com  A R ghts Reserved

Newspapers

APP. 443

Case 1:22-cv-02256-RC Document 17-10 Filed 11/23/22 Page 183 of 187
USCA Case #23-7061 Document #2029097 Filed: 11/29/2023 Page 447 of 566
Newspapers
by ancestry
The Sou h Bend Tribune (Sou h Bend, Indiana) Wed Feb 11 1891 Page 3
https //www newspapers com/ mage/513456592
Down oaded on Aug 8 2022



### Shot by a Trap-Gun.

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyr ght © 2022 Newspapers com A R ghts Reserved



**APP. 444**

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANDREW HANSON,** *et al.***,**

    **Plaintiffs,**

    **v.**

**DISTRICT OF COLUMBIA,** *et al.***,**

    **Defendants.**

**Civil Action No. 1:22-cv-02256-RC**

## <u>DECLARATION OF RANDOLPH ROTH</u>

Pursuant to 28 U.S.C. § 1746, I, Randolph Roth, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.

3.      I have been retained by the Office of the Attorney General for the District of Columbia to render expert opinions in this case. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $250 per hour.

## BACKGROUND AND QUALIFICATIONS

4.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field prize for the outstanding dissertation in the Humanities and the George Washington Eggleston prize for the outstanding dissertation in American history. I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and

the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

5.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Prize from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional, internationally comparative study of homicide in the United States from colonial times to the present.  I am a Fellow of the American Association for the Advancement of Science, and I have served as a member of the National Academy of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American Historical Review*, the most influential journal in the discipline.  And in 2022, I received the inaugural Distinguished Scholar Award from the Historical Criminology Division of the American Society of Criminology.

6.      I am the principal investigator on the National Homicide Data Improvement Project, a project funded by the National Science Foundation (SES-1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID 1228406) and the Harry Frank Guggenheim Foundation to improve the quality of homicide data in the United States from 1959 to the present.  The pilot project on Ohio has drawn on a wide range of sources in its effort to create a comprehensive database on homicides (including narratives of each incident) based on the mortality statistics of the Ohio Department of Health, the confidential compressed mortality

---

[1]      See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2]      See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

**APP. 447**

files of the National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports,

death certificates, coroner's reports, the homicide case files of Cincinnati, Cleveland, and

Columbus, obituaries, and newspaper accounts.

7.      I have published numerous essays on the history of violence and the use of

firearms in the United States, including a) "Guns, Gun Culture, and Homicide: The Relationship

between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William

and Mary Quarterly* (2002) 59: 223-240

(https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b) "Counting Guns: What

Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun

Violence in the United States," *Social Science History* (2002) 26: 699-708

(https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why Guns Are and

Aren't the Problem: The Relationship between Guns and Homicide in American History," in

Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The

Contested Role of History in Contemporary Debates on the Second Amendment* (Washington,

D.C.: Smithsonian Institution Scholarly Press, 2019); and d) "The Opioid Epidemic and

Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the

*Journal of Research in Crime and Delinquency* (2021)

(https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_Homicide_in

_the_United_States).

8.      I am also co-founder and co-director of the Historical Violence Database.  The

web address for the Historical Violence Database is:

http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this declaration

draws are available through the Historical Violence Database.  The Historical Violence Database

is a collaborative project by scholars in the United States, Canada, and Europe to gather data on

the history of violent crime and violent death (homicides, suicides, accidents, and casualties of

war) from medieval times to the present.  The project is described in Randolph Roth et al., "The

Historical Violence Database: A Collaborative Research Project on the History of Violent Crime

**APP. 448**

and Violent Death." *Historical Methods* (2008) 41: 81-98

(https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

98?casa_token  PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-

L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).

9.      Compilation, and estimation, of historical homicide data is a time-consuming

process.  The only way to obtain reliable historical homicide estimates is to review every scrap

of paper on criminal matters in every courthouse (indictments, docket books, case files, and

judicial proceedings), every jail roll and coroner's report, every diary and memoir, every article

in every issue of a number of local newspapers, every entry in the vital records, and every local

history based on lost sources, local tradition, or oral testimony.  That is why it takes months to

study a single rural county, and years to study a single city.[3]  I have spent decades of my life on

this and related work.

10.      My work on data collection and my research for *American Homicide*, together

with the research I have conducted for related essays, has helped me gain expertise on the causes

of homicide and mass violence, and on the role technology has played in changing the nature and

incidence of homicide and mass violence.  I have provided expert witness testimony in *Miller v.*

*Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.).

---

[3]      It is also essential, in the opinion of historians and historical social scientists involved in
the HDV, to use capture-recapture mathematics, when multiple sources are available, to estimate
homicide rates where gaps exist in the historical record.  See Randolph Roth, "American
Homicide Supplemental Volume: Homicide Estimates" (2009)
(https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child
Murder in New England," *Social Science History* (2001) 25: 101-147
(https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M.
Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly*
86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-
Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings."  *Social*
*Science History* 25 (2001): 67-91
(https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

**APP. 449**

## OPINIONS

### I.   Summary of Opinions

11.     I have been asked to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

12.     For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States   which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century   became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults   friends, acquaintances, strangers   coincide with political instability, a loss of trust in government and political leaders, a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our catastrophic failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

13.     Our nation's homicide rate would thus be high today even in the absence of modern technologies that have made firearms far more lethal than they were in colonial and

---

[4]     See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token  dkP_nZZxCaY AAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwi RWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random.  They reveal deep patterns that are causal.

**APP. 450**

Revolutionary era.  But the evidence also shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide rate in United States well beyond what it would otherwise have been.  The evidence also shows that, over centuries, public officials have regulated the use or ownership of dangerous technologies    firearms, fertilizers, airplanes    in response to real, rather than imagined threats to public safety, public officials, and law enforcement.

14.    My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state but Vermont by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I    a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

**APP. 451**

## II.   Government Regulation of Firearms in Response to Homicide Trends

### A.   Homicide and Firearms in the Colonial Era (1688-1763)

15.   In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

16.   Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.[8]  Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[9]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low   never more than 10 to 15 percent.[10]

---

[5]      Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016).  Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id 2759961.

[6]      Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63.

[7]      Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016 an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era    was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8]      Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9]      Roth, "Why Guns Are and Aren't the Problem," 116.

[10]      Ibid., 116-119.

**APP. 452**

17.     Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era.[11]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[12]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat.  They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[13]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[14]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[15]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[16]  The firing mechanism also had to be readied, often with a fresh flint.[17]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[18]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather

---

[11]     Ibid., 117.

[12]     Ibid.

[13]     Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[14]     Roth, "Why Guns Are and Aren't the Problem," 117.

[15]     Ibid.

[16]     Ibid.

[17]     Ibid.

[18]     Ibid.

**APP. 453**

could do damage.[19]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[20]

18.      The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides — most of which were caused by abuse or fights between family members that got out of control — were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[21]  It did not matter whether the type of homicide was rare, like family and intimate homicides, or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[22]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[23]

19.      When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[24] so the proportion of homicides committed with firearms was at that time forty percent and rose even higher in contested areas on the frontier.[25]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so three-fifths of homicides of Native Americans by European Americans in New England were committed with firearms.[26]  And slave

---

[19]     Ibid.

[20]     Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[21]     Roth, "Why Guns Are and Aren't the Problem," 117.

[22]     Ibid.

[23]     Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

[24]     Roth, "Why Guns Are and Aren't the Problem," 118-119.

[25]     Ibid., 116-117.

[26]     Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

**APP. 454**

catchers and posses kept their firearms at the ready, so ninety percent of runaway slaves who were killed in Virginia were shot.[27]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[28]  That is why firearms had a modest impact on homicide rates among colonists.

> **B.**    **The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

20.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[29]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[30] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and

---

[27]    Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[28]    Ibid., 118-119.

[29]    Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[30]    Roth, "Why Guns Are and Aren't the Problem," 119-120.

Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England. Only New York City stood out, at 6 per 100,000 adults per year.[31]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low between 0 and 10 percent   because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[32]

21.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[33]  And self-employment   the bedrock of citizenship, self-respect, and respect from others   was widespread.

22.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels.  They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men.[34]

---

[31]     Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[32]     For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[33]     Roth, *American Homicide*, 180, 183-186.

[34]     Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article 1884&context vlr).

**APP. 456**

23.     Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[35] where violence among citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[36]  During this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[37]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana    wherever Southerners settled in the early national period.[38]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[39]

24.     Citizens and public officials in these states recognized that concealable weapons    pistols, folding knives, dirk knives, and Bowie knives    were used in an alarming proportion of the era's murders and serious assaults.[40]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the
> aged to arm themselves with Pistols, dirks knives sticks & spears under the specious

---

[35]     Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[36]     Roth, *American Homicide*, 180, 199-203.

[37]     Ibid., 182, 199-203.

[38]     Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[39]     Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[40]     Roth, *American Homicide*, 218.

pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[41]

The justices of the Louisiana Supreme Court echoed these sentiments    "unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[42]  These concealed weapons laws were notably difficult to enforce.  Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

    25.    The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[43]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[44]

    26.    The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia

---

[41]    Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[42]    Roth, *American Homicide*, 219.

[43]    Roth, "Why Guns Are and Aren't the Problem," 117.

[44]    Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

13

**APP. 458**

between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols    large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[45]

27.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[46]

---

[45]     Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects  dangerous-or-unusual-weapons, accessed September 9, 2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms.  That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

[46]     Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order    10 Essays* (Lincoln: University of Nebraska Press, 1970),

(continued…)

**APP. 459**

C.    **Homicide, Concealable Weapons, and Concealable Weapons Regulations**
    **from the Mexican War through the Early Twentieth Century (1846-1920s)**

28.    By the early twentieth century, every state except Vermont either banned concealed firearms or placed severe restrictions on their possession.[47]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[48]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became   and remains today   by far the most murderous affluent society in the world.[49]

29.    The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[50]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century   the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities   the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by

---

1-22.  Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836.

[47]    Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.

[48]    Roth, *American Homicide*, 297-300.

[49]    Ibid., 297-300.

[50]    Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

**APP. 460**

anger and distrust.[51] Law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[52]

30.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[53] Because the pistols, muskets, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[54] Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons. But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[55] They retained some of the limitations of earlier firearms, because their rotating cylinders   two of which came with each revolver   had to be loaded one chamber at a time. Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an

---

[51]    Roth, *American Homicide*, 299-302, 384-385. See also Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token dkP_nZZxCaY AAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwi RWPEom7M).

[52]    Ibid., 299-302, 332, 337, 354.

[53]    Roth, "Why Guns Are and Aren't the Problem," 116-117.

[54]    Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[55]    Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

**APP. 461**

attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[56]

32.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[57]   And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[58]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[59]

---

[56]    Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

[57]    Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[58]    Ibid., 38-57.

[59]    Ibid., 39.

**APP. 462**

33.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[60]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading. The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[61]

34.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[62]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[63]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.[64]  Ominously, too, firearms

---

[60] Ibid., 38-57.

[61] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[62] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[63] Ibid., 124-125.

[64] Ibid., 125-127.

**APP. 463**

invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults    something that had never happened before in America's history.[65]  That is why the proportion of homicides committed with firearms    overwhelmingly, concealed revolvers in the homicides I have studied    reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[66]  And that is why every state in the Union except one restricted the right to carrying certain concealable weapons.  The lone holdout was Vermont, the state with the lowest homicide rate.[67]

35.    It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June 1865 to June 1868,[68] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions;[69] and it followed in

---

[65]    Ibid., 125.

[66]    Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[67]    Roth, *American Homicide*, 184; and Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000).

[68]    Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[69]    Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf).  "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be

(continued…)

**APP. 464**

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[70] These laws

_____

deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019).

[70]     Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be

(continued…)

**APP. 465**

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[71]

36.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[72] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[73]

---

punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

[71]     Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.

[72]     Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183.  On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[73]     Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id 2599851).

**APP. 466**

37.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[74]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit   ordinances that they enforced.[75]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[76]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[77]

38.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[78]

The burden of proof remained with the person who carried the concealed weapon.

---

[74]     Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[75]     Ibid., 11.

[76]     Ibid., 11-13.

[77]     Ibid., 13-15.

[78]     Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

**APP. 467**

39.     It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

III.     **Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Revolution into the Early Twentieth Century**

40.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[79]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles    weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans or irregular warfare among citizens seeking political power.[80]  But from the 1830s into the early twentieth century, mass killings were common.

---

[79]     On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[80]     For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)].  For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

23

**APP. 468**

41.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.  Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[81]

42.     The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[82]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example,

---

[81]     David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[82]     Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[83]  And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[84]

## IV.  Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Early Twentieth Century to the Present

43.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time.  These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers.  The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the submachine gun, invented by General John T. Thompson in 1918.

44.    The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare.  The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable

---

[83]    Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[84]    On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

APP. 470

of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[85]

45.     Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens.  In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, when a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[86]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[87]  Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St.

---

[85]     Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[86]     Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.  The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange  %24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[87]     Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today    potentially hundreds of thousands of dollars    because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

Valentine's Day Massacre and the Kansas City Massacre.[88]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[89]  Dynamite was also used effectively for malicious, private ends.  For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[90]

46.      Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons.  Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[91] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[92]  And the

---

[88]      William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[89]      Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[90]      For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[91]      Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13).  In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[92]      The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

**APP. 472**

Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[93]

47.   Since 1970, public officials have continued to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[94]  And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks.  It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[95]

48.   In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines.  These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War.  The signature military firearm of that era   the M-16 rifle

---

[93]   The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[94]   Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007.  Accessed August 31, 2022.

[95]   *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

**APP. 473**

with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[96]   was capable of firing 750 to 900 rounds per minute when set on fully automatic.  But the M-16 was used more often in combat   and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties   when set on semiautomatic, which was standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute, not 750 to 900.[97]  And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst   an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[98]

 49. The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological advances have increased the speed at which semiautomatic handguns can be fired.  An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[99]  And they are affordable. A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[100]

 50. It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that poured onto the domestic

---

[96] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[97] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016).  Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[98] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

[99] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v  1H5KsnoUBzs), accessed September 1, 2022.

[100] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange  Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

**APP. 474**

market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.

51.     Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*  a modification that doubles the rate at which semiautomatic weapons can be fired.[101]

52.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15   the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[102]

53.     The threat to public safety and law enforcement posed by semiautomatic rifles with or without dangerous modifications    is a modern phenomenon that has a direct correlation

---

[101]     Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[102]     See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v  PVfwFP_RwTQ), accessed October 4, 2022.

**APP. 475**

with mass murder and mass shootings.  The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
| --- | --- | --- | --- | --- |
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.[103]

---

[103]    The data are from the Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms    not including the offender(s)    within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2

(continued…)

APP. 476

54.    And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

55.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms.  In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.[104]

56.    For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene   usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before

---

AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, that fit the Violence Project's definition of a mass shooting.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded).

[104]    The data are from the Violence Project.

**APP. 477**

bystanders could disarm him as he changed magazines. Every one of those rounds hit an individual, killing six and injuring twelve.[105]

## V.   Conclusion

57.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions. That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder. Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so. There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations. And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century. Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on   11/23/2022                     *Randolph Roth*
                                             Randolph Roth (Nov 23, 2022 12:08 EST)

                                             RANDOLPH ROTH

---

[105]    "2011 Tucson Shooting," Wikipedia
(https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

# EXHIBIT J

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-02256-RC** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

## DECLARATION OF BRENNAN RIVAS

Pursuant to 28 U.S.C. § 1746, I, Brennan Rivas, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.  The views I state herein are drawn from my professional experience.

2.      I have been asked by the District of Columbia to render an opinion on the history of firearms restrictions enacted in the mid- and late nineteenth century, especially as it relates to large-capacity magazines (LCMs) as defined in D.C. Code § 7-2506.01(b).  I have also been asked when ammunition feeding devices capable of holding more than 10 rounds first became commercially available in the United States, widely or at all.

3.      I have been retained by the District of Columbia to render expert opinions in this case.  I am being compensated at a rate of $175 per hour for research and $200 per hour for my work on this declaration.

**APP. 480**

## BACKGROUND AND QUALIFICATIONS

4.      I am an Historian and Independent Scholar. From 2021 until earlier this year, I was the Lloyd Lewis Fellow in American History at The Newberry Library.  From 2020 to 2021, I was a Bill & Rita Clements Fellow for the Study of Southwestern America within the Clements Center for Southwest Studies at Southern Methodist University.  From 2019 to 2020, I was a Lecturer in American History at Texas Christian University.  Before that, I was a graduate student in history who conducted research and administrative tasks on behalf of my professors, taught undergraduate survey courses, and worked at my university library.  My educational background includes a Ph.D. in History from TCU, where my Thesis was on the development, evolution, and enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.

5.      My expertise includes historical weapon regulations in the United States.  I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.  I am currently completing a book manuscript, based upon my dissertation research.

6.      I have provided expert witness testimony in *Miller v. Bonta*, No. 19-cv-01537 (S.D. Cal.); *Angelo v. District of Columbia*, No. 22-cv-01878 (D.D.C); *Duncan v. Bonta*, 17-cv-1017 (S.D. Cal.); *Brumback v. Ferguson*, No. 22-cv-03093 (E.D. Wash.); and *Christian v. Nigrelli*, No. 22-cv-00695 (W.D.N.Y.).

7.      A true and correct copy of my current curriculum vitae is attached as Exhibit A.

## OPINIONS

8.      The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more

**APP. 481**

and better scholarship on the subject. My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to the District of Columbia's restrictions on large-capacity magazines. Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of multi-shot revolvers and other pistols which people of the time associated with criminal activity.

9.     My research as an historian began with an exploration of a public carry law enacted in Texas in 1871; I examined its legislative history, socio-political context, and the ways in which it was amended over the ensuing decades. For my dissertation, I expanded upon that project, tracing the weapon-related laws and bills debated in the Texas legislature from 1836 to the 1930s. Even though my work has focused on a state-level case study (a methodological approach that is needed within this historical subfield), I placed Texas within the larger context of national and regional regulatory traditions. Along the way I conducted additional research on late-nineteenth-century public carry and sales restrictions from Arkansas and Tennessee—two states whose gun laws Texan policymakers had clearly followed and considered emulating. The years-long endeavor of uncovering the history of weapon regulations in Texas and the greater southwest forms the basis of my expertise in historical gun regulations. This is a relatively young and small field for historians, and much work remains to be done to bring the landscape of nineteenth-century weapon regulations into a clearer view.

10.     My research into the history of nineteenth- and early twentieth-century gun laws demonstrates that the proliferation of public carry laws and sales regulations during that time grew out of Americans' concerns about rising levels of gun crime. Technological developments in the design and production of firearms made them more lethal and more widely available in the decades following the Civil War, which led to the country's first encounter with rampant gun violence. The first impulse of the American people, from the purported "wild west" to the seemingly refined metropolitan centers was to reduce the number of guns circulating in public by restricting access to them. Importantly, these restrictions did not flatly ban the carry or

**APP. 482**

possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

11.     In addition to the research I have conducted on gun laws, I have examined the availability of certain types of firearm magazines in the early twentieth century.  The core of this project has been a research trip to the McCracken Research Library[1] and access to significant firearm publications from the twentieth century, particularly *Gun Digest*.  Though it is still a work in progress, the research conducted so far indicates that semi-automatic firearms available for civilian purchase in the United States generally did not feature detachable clip magazines with a capacity of more than ten rounds until the late twentieth century; even through the mid-twentieth century, such firearms remained the rarity within a sizable market of semi-automatic weapons.

I.     <u>**Brief History of the Colt Revolver and the Spread of Handgun Violence in the Nineteenth Century**</u>

12.     The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

13.     The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six rounds.  The earliest revolvers (those manufactured prior to and during the Civil War) were of the "cap and ball" type, which required a delicate and time-consuming reloading process.  By about the 1870s, technological developments in the design and

---

[1]     The McCracken Research Library houses the archives of the Winchester Repeating Arms Company in addition to numerous other gun-related materials; its collection of firearm history books is unparalleled.  The library is affiliated with the Buffalo Bill Center of the West in Cody, Wyoming.

functionality of ammunition meant that later models of Colt's could use individual cartridges; these could be inserted fairly quickly into the cylinder, which made the reloading process much more swift—a boon on the battlefield, but a new danger in other contexts.

14.     Though Colt's revolver was a revolutionary device that represented a paradigmatic shift in firearm technology, his company struggled to reach its potential.  The expiration of Colt's patent in 1857 opened the door for other manufacturers to enter the market without having to endure the same decades-long startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect of war gave Colt what he had always wanted—substantial government patronage.  Southern states ordered as many revolvers as they could in the lead-up to Fort Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than willing to deliver.  But the far more important contracts came from the United States military, whose orders for pistols like Colt's revolver skyrocketed during the course of the Civil War.[2]  Wartime production by Colt, in addition to the new entrants into the market (like Smith & Wesson), created an unprecedented infrastructure to manufacture staggeringly large quantities of pistols.  As production capacity increased and the U.S. military demobilized, more of these weapons became available to and affordable for American consumers; by the 1870s, the net result was more and cheaper pistols spread throughout the country,[3] introducing the United States to its first experience with rampant gun violence.

15.     The Civil War Era, making up the central three decades of the nineteenth century (1840-1870), marked a sharp departure for the United States in terms of violence and homicide

---

[2]     On the life of Samuel Colt and the history of his firearm manufacturing companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Scribner, 2020).

[3]     Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://bit.ly/3VeUhHo.

in comparison to other Western nations.  Distrust in governing institutions and tremendous economic change wrought by industrialization primed Americans for homicidal violence to a degree that was unprecedented in American history.  In northern cities, rising population levels accompanied urbanization, labor agitation, and poverty, which caused an increase in homicide and crime.  Though military victory and a renewed faith in American government reduced homicide in northern states after the 1860s, the rates for the 1870s and 1880s in the north remained higher than those from the more peaceful era prior to the 1840s, and by the close of the 1890s northern homicide rates began ratcheting upward yet again.[4]  Broader crime rates for the late nineteenth century are harder to pin down than those for homicide, but the development of urban, industrial life produced abundant opportunities for the criminally inclined.  That city governments enacted new criminal ordinances and increased funding for police strongly suggests that urban residents perceived themselves to be more vulnerable to victimization than they had been in the past.  In the southern states, the revolutionary consequences of emancipation and Reconstruction created an atmosphere of distrust of government and one's neighbor, mutual hatred, and deeply ideological partisanship that resulted in tremendous, gut-wrenching violence suffered primarily by Black Americans and their political allies.  The disruption of war, occupation, and frequent changes in state government and constitutional structure bred attitudes of vigilantism and disregard for the judicial process.  Rates of violence and homicide remained quite high in the southern states across the nineteenth century.[5]  The proliferation of deadly weapons, and especially easily concealable pistols, to a point of near ubiquity in American

---

[4]     On homicide in American history, particularly as broken down into northern and southern regions, see Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[5]     Roth, *American Homicide*, 411-434.

**APP. 485**

communities rendered the interpersonal conflicts that erupted as a result of urbanization, Reconstruction, economic hardship, and social dislocation all the more deadly.

## II.    Governmental Responses to the Rise in Handgun Violence

16.    The response to this gun violence varied across the United States.  The most popular approach was the enactment or strengthening of public carry laws.  Jurisdictions that did not already have such laws were likely to enact them, and those using the older mechanism of sureties to keep the peace were likely to transition toward the implementation of criminal statutes mandating fines and/or jail time for violators.[6]  These public carry regulations targeted concealable items like pistols, sword canes, and daggers that were used in the commission of crimes and generally referred to as deadly weapons.  The closing third of the nineteenth century saw a flurry of this activity as states and municipalities tried new penalties, added new weapons to the lists of prohibited weapons, and generally attempted to eliminate small, easily concealable weapons from the public sphere.[7]

17.    Another strategy employed by state governments to reduce gun violence and gun crime was to tax certain types of firearms.  In 1894, Georgia enacted a new occupation tax law that applied to "dealers in pistols and other weapons."  A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per place of business.[8]  In 1907, the Texas legislature placed a fifty-percent sales tax upon pistols; dealers had to report their sales and pay the required tax to the state comptroller's

---

[6]    The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[7]    In the second half of the nineteenth century, items like metal knuckles and razor blades became targets for proscription alongside bowie knives, pistols, and sword canes.

[8]    Acts of the General Assembly of the State of Georgia (1894) available online from the Digital Library of Georgia; see https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there were likely many more occupation taxes, though they have not been comprehensively indexed as of yet.

**APP. 486**

office on a quarterly basis.[9]  Sales and occupation taxes like these tended to be less about generating revenue than regulating an activity that was frowned upon by society more generally. Occupation tax laws applied to vendors who appealed to vices like smoking, gambling, and playing games as well as peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent sales tax (over loud complaints by dealers), the judge described the business of selling pistols as one "hurtful to the welfare of society" and among that class of occupations "detrimental to the health, morals, or good order of society."  As a result, the court reasoned that the legislature "would have the right, not only to levy an excessive tax, which would be prohibitory thereof, but could go further and absolutely prohibit any one from engaging therein."[10]

18.      Arkansas and Tennessee, for example, adopted a two-pronged approach that displayed attributes of both public carry laws as well as dealer regulations.  The first prong was to prohibit the public carrying of pistols.[11]  Courts in both states struck down early versions of the laws because they applied to all revolvers, including those being issued to certain classes of soldiers by the United States military.[12]  But they were quickly amended to exclude "army and navy pistols"—those types or models in use by the US military—when carried openly in the hand.  By exempting these models, Arkansas and Tennessee lawmakers made their gun policies comport with the reigning Second Amendment jurisprudence of their day, which held that militia arms enjoyed special protection from certain forms of regulation.

---

[9]      An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

[10]     *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

[11]     See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

[12]     *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878).

19.     Unlike today, where laws generally prevent the civilian sale of military-grade weapons while carving out protections for self-defense weapons, Americans of the nineteenth century did just the opposite; case law at that time held that a citizen's militia obligation conferred upon certain kinds of firearms, especially muskets and rifles, a protected status under the law as "militia arms," while those smaller weapons which lent themselves to concealability and were more conducive to interpersonal violence could be prohibited.  This view of arms and their place in society changed in the twentieth century as a result of substantial alterations to the militia system (and the development of the National Guard) as well as the advent of automatic and select-fire weapons for military use.

20.     When the Tennessee high court struck down the initial statute, which prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute that, "it shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands."[13]  It is worth noting that even the exempted army/navy pistols could not be carried concealed, or even visible within a waistband or hip holster; the only way to carry legally exempted pistols was to hold them in one's hand.  The purpose of this additional phrase was to curtail as much as possible the carrying of these weapons in public spaces so that a person would only do so in the event of a real emergency.  Arkansas's replacement statute was similar to that of Tennessee.[14]  The Tennessee

---

[13]     1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[14]     1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

9

Supreme Court upheld that state's replacement statute against constitutional challenge.[15]  The revised Arkansas statute received no notable challenge.

21.      The second prong which these states employed was a prohibition on the sale of certain pistols.  Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[16]  Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well.  "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[17]

22.      Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[18]  Condemnations of such behavior and calls for regulations rang out across the country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.  Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse of their counterparts elsewhere.  The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun and the bludgeon too often do

---

[15]      *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

[16]      1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[17]      Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[18]      For example, see Patrick Charles, *Armed in America* (New York: Promethus Books, 2018), 152 (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

their bloody work."[19]  After the 1875 statute went into effect in Arkansas, news editors began

praising it as "about the best law that has ever been enacted in this state," and one that, had it

been in effect since statehood in 1836, "would have saved the lives of thousands of good men

who have fallen victim to the vice of carrying deadly weapons, or from the results and natural

consequences thereof."[20]  Some judges in Tennessee began handing down penalties of a fifty-

dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that]

county."[21]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who

viewed it as a social benefit that in Tennessee "men who for years converted themselves into

walking arsenals discover that they can pursue their ordinary vocations without fear that they

may at any moment be called upon to defend their persons against assault."[22]  From their

perspective, the distrust of one's fellow community members that went along with habitual gun-

toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public

sphere.  Middle-class Americans, white southerners included, held the view that carrying deadly

weapons was not honorable, and that such behavior should be stopped.[23]

---

[19]    "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[20]    *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[21]    The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.  Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'"  *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[22]    *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

[23]    For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

23.    To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[24]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

24.    Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened;[25] during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

---

[24]    On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

[25]    See note 24, above.

25.     Finally, the third kind of pistol available was the "pocket pistol."  These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[26]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[27]  These cheap revolvers could be had for a few dollars, with used ones selling for even less.[28]

26.     It is in this context that the public carry regulations and associated sales bans and prohibitory taxes mentioned above must be understood.  A confluence of technical advancements and social changes resulted in the widespread adoption of new weapons, causing new societal problems that increased levels of interpersonal violence and ratcheted up public fear.  In response, state legislatures enacted regulations targeting the dangerous weapons that were the source of that problem.  These regulations remained in force well into the twentieth century.

---

[26]    For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[27]    See note 24, above.

[28]    Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as a couple of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (see pp. 367).  Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online, see https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

**APP. 492**

27.     Previous scholarship addressing these statutes has cast them as racially motivated.[29]  Those articles did not investigate deeply the primary sources of the time.  My research shows that these accounts have misrepresented the Tennessee and Arkansas statutes, which were enacted as a public safety measure rather than an attempt to disarm Black residents.  The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[30]  Civil War soldiers on both sides of the conflict were unlikely to be issued a revolver unless they were officers, cavalry, or artillery; a great number of enlisted soldiers who possessed revolvers during the conflict had purchased them on their own, and at times their carrying of the weapons caused sufficient trouble within the ranks that officers confiscated them.  Others discarded heavy and seemingly unnecessary pistols on long, grueling marches.[31]  Confederate service did not automatically correlate to white possession of an exempted pistol.

28.     Rather than impute racism to these laws simply because of their occurrence during Reconstruction, we should embed them within their appropriate political and cultural context.  The fact that Tennessee's legislature amended the public carry law so swiftly to add the army/navy exception could indicate to the casual observer that white residents were dissatisfied with the original statute; however, when the statutes and their constitutional challenges are placed in chronological order and interpreted in light of the other primary sources of the era

---

[29]     For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75; Robert Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4, 1619-1620.

[30]     Tahmassebi, "Gun Control and Racism," 74-75.

[31]     On pistols and other arms issued during the Civil War, see Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside House, 1989).

(particularly newspapers and the widespread social contempt for publicly carrying deadly weapons), it is clear that racism was not behind the army/navy exemption.  Instead, it represented the best effort of Tennessee lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[32] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*.  The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand.  Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

### III.     The Recent Emergence of Large-Capacity Magazines

29.     As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently.  The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century.  Nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

30.     In the decades following the Civil War, lever-action rifles became commercially available to American consumers for the first time.  Lever-action rifles permitted the user to fire

---

[32]     Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."  There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."  *General Laws of Texas*, ch. XXXIV, §1 (1871).  The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception.  See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

APP. 494

multiple shots without reloading.  The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm.  While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[33] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber.  And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

31.     In fact, developments in cartridge design in the second half of the nineteenth century led to a shift toward smaller, not larger, magazine capacities, to accommodate larger and more powerful cartridges. The Winchester 1883 Hotchkiss Repeater was chambered for the newer 45-70 US Government cartridge and featured a magazine in the butt stock that held 6 rounds.[34]  And the Winchester Model 1894 Repeating Rifle was chambered for various center-fire cartridges and its maximum magazine capacity was only 8 rounds.[35]

32.     Around the turn of the twentieth century, John M. Browning began working on the design of a semi-automatic firearm that functioned through a "blowback" method in which "[t]he recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[36]  This design was sometimes referred to as "automatic," though its function aligns with our current definition of "semi-automatic;" it was also referred to as "auto-loading" or "self-loading."

---

[33]     Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

[34]     Henshaw, *Winchester Firearms*, 23-24. On cartridges, see Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97.

[35]     Henshaw, *Winchester Firearms*, 41.

[36]     "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

APP. 495

33.     Shortly after Browning's developments, Winchester released its Model 1903 Automatic Rifle, which employed this method, and featured a 10-round, fixed, tubular magazine for .22 caliber cartridges.  According to its product description, "…all that is necessary to do to shoot the ten cartridges that the magazine holds is to pull the trigger for each shot."[37] Winchester did not release a semi-automatic sporting rifle featuring a detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable box magazine held only five cartridges in a single column.[38]  The next semi-automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round detachable box magazine.

34.     A major rival of Winchester at the time was Marlin Firearms, a company that became a highly popular producer of lever-action rifles.  Marlin did not begin manufacturing semi-automatic rifles until 1931 when the company (under new leadership) released the "22 Caliber Autoloading Rifle," also called the Model 50 / 50E.[39]  It came with a six-round detachable clip magazine.[40]

35.     As the twentieth century wore on, both Marlin and Winchester featured semi-automatic rifles as a part of their regular lineup of sporting firearms, though lever-action, pump action, and bolt action designs tended to be more popular.[41]  The magazine capacities of their semi-automatic models with detachable magazines remained at or below 10 rounds with very few exceptions.  In 1948, Marlin released the Model 89C chambered for .22 caliber long rifle rounds, which was sold with a standard 7-shot clip magazine.  Beginning in 1953, new models

---

[37]     "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[38]     Henshaw, *Winchester Firearms*, 61-62.

[39]     William S. Brophy, *Marlin Firearms: A History of the Guns and the Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300-301.

[40]     Brophy, *Marlin Firearms*, 301.

[41]     See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

APP. 496

were sold with two 5-shot clip magazines.  In 1957, that changed once again when standard magazines for new manufactures was a 12-shot clip magazine.[42]  The last year in which Marlin featured the Model 89C was 1961; for the next two decades or more, the company's standard magazine sizes tended to max out at 7 rounds.[43]

36.     Even though Winchester produced semi-automatic rifles before Marlin, the company did not sell rifles with a standard clip magazine capacity over 10 rounds to civilians through at least 1996.[44]  For a brief period in the 1970s (1974-1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire Rifle.  These firearms came with a standard 5-round clip magazine and were shown with that magazine in Winchester catalogs; customers who wish to purchase magazines holding 10 or 15 rounds had to do so as accessories.[45]

37.     Records relating to the production and advertisement of rifles manufactured by two of the most popular brands shows that even though detachable clip/box magazines have been in existence since the early twentieth century, they were not generally sold with a capacity of more than 10 rounds until recently.  In fact, these records show that during most of the twentieth century standard clip/box magazine sizes usually ranged from 3 to 7 rounds.[46]

38.     The technological developments that produced automatic and semi-automatic rifles and shotguns also made possible the automatic and semi-automatic pistol.  A German engineer designed the first fully functional semi-automatic pistol, but its unusual size and shape

---

[42]     Brophy, *Marlin Firearms*, 306-307.

[43]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[44]     Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[45]     Henshaw, *Winchester Firearms*, 174.  Winchester Catalogs 1970-1975, Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

[46]     See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s.  Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

**APP. 497**

prevented it from being the financial success its manufacturers wanted.[47]  The company

commissioned Georg Luger to redesign it, which he did over the course of the 1890s.[48]

Meanwhile, the American gun designer, John Moses Browning, developed various semi-

automatic pistol designs.  One, which promised US military contracts, was purchased by

Colt's.[49]  The company's developments began with a series of handguns chambered for .38

Auto, then .45 caliber rounds, each of which had a magazine capacity of less than ten rounds.[50]

Efforts culminated in the development of the Colt Government Model .45 1911 Automatic—the

standard-issue sidearm for American armed forces until the 1980s, which featured a magazine

capacity of seven rounds.

39.    Browning's other semi-automatic pistol design was purchased by Fabrique

Nationale d'Armes de Guerre (FN), a Belgian arms manufacturer.  The FN Browning M1900

was released at the turn of the twentieth century and sold quite successfully in Europe.  It was

chambered for .32 caliber cartridges and had a magazine in the hand-grip which held seven

rounds.  These "Browning pistols" were associated with tremendous rises in crimes, accidents,

and deaths related to firearms, and particularly the anarchist movement that carried out numerous

assassinations on the Continent.[51]  Like its closest European competitor, the Luger 9mm

handgun, its magazine capacity remained below ten rounds.

40.    FN subsequently approached Browning to design another semi-automatic

handgun that might be purchased in large numbers by the French army.  One of the requirements

for consideration was that the firearm have a magazine capacity greater than ten rounds.

---

[47]    Nathan Gorenstein, *The Guns of John Moses Browning: The Remarkable Story of the Inventor Whose Firearms Changed the World* (New York: Scribner, 2021), 119-120.

[48]    The company was Deutsche Waffen- und Munitionsfabriken (DWM), which owned a controlling interest in the Belgian armsmaker Fabrique Nationale d'Armes de Guerre (FN).  See Gorenstein, *The Guns of John Moses Browning*, 128.

[49]    Gorenstein, *The Guns of John Moses Browning*, 123-125.

[50]    Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver, and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 205-207, 209, 210-213.

[51]    Gorenstein, *The Guns of John Moses Browning*, 130-133.

Browning was initially reluctant to participate in the endeavor but soon changed his mind.  An engineer from FN, Dieudonne Saive, developed a functional "double-stacked" magazine prototype, which offset cartridges in two separate columns to double the capacity.[52]  The resulting hand-grip was significantly wider than those of previous models, but it held thirteen 9mm cartridges.[53]  The FN Browning M35 Hi-Power pistol went into production after John M. Browning passed away in the 1930s, but FN produced the weapon (even though it was not initially selected by the French military) until 2018.  When the Nazis occupied Belgium, they took over the FN factory and produced some of these pistols for their own use during World War II.[54]

41.     Even though American companies and designers proved to be trailblazers in the development of semi-automatic handguns, American consumers were not quickly won over by them.  Through at least the World War II era, Americans seem to have preferred revolvers to semi-automatic designs; this was in sharp contrast to Europe, where semi-automatic pistols were favored over revolvers.[55]  Browning M35 Hi-Power pistols were sold in the United States and some Americans purchased them with magazine capacities greater than ten rounds, but by far most semi-automatic firearms on the American market maxed out at ten.  Brands like Colt's and Smith & Wesson produced several semi-automatic models for target shooting, police, military, and personal defense, and these firearms generally had a capacity of six to ten rounds.

42.     By 1940, Colt's still had not produced a handgun with a magazine capacity greater than ten,[56] and by 1944 the inaugural issue of Gun Digest (which published advertisements for the best-selling American handguns) did not feature one.[57]  By 1951, Gun

---

[52]     Gorenstein, *The Guns of John Moses Browning*, 209-210.

[53]     Henry M. Stebbins, Albert J. E. Shay, and Oscar R. Hammond, *Pistols: A Modern Encyclopedia* (Harrisburg, PA: The Stackpole Company, 1961), 140.

[54]     Stebbins, Shay, and Hammond, *Pistols*, 139-140.

[55]     Gorenstein, *The Guns of John Moses Browning*, 130-133.

[56]     Haven and Belden, *A History of the Colt Revolver*, 219-225.

[57]     *The Gun Digest: Complete Guide to American Rifles, Shotguns, Handguns and Accessories, The Encyclopedia for Shooters, 1944 First Annual Edition* (Chicago: Follett

Digest included the Browning Hi-Power in its lineup of "military small arms," but it was an outlier among the other sixteen semi-automatic handguns with magazine capacities of ten or less.[58]  The section featuring foreign handguns included two models with magazine capacities over ten out of a total of nine semi-automatic models.[59]  By 1969, the selection of handguns featured in Gun Digest had grown substantially, but only two models had a capacity of more than ten rounds.[60]

43.    The production history of mainstream American companies (like Colt's and Smith & Wesson) in addition to the enthusiasts' literature of the time shows that most semi-automatic handguns from the late-nineteenth and early twentieth centuries did not typically have magazine capacities larger than ten.  Even though the technology existed, American producers did not manufacture them in significant numbers until the post-World War II period.  And even then, the vast majority of handguns available for purchase (including semi-automatic pistols) had a magazine capacity of less than ten rounds.

## CONCLUSIONS

44.    An important lesson that the study of history shows us is that nineteenth-century Americans confronted a gun violence problem, and their solution was the enactment of state and local regulations that might limit the number of pistols in circulation.  These took the form of

---

Publishing Company, 1944, repr. 1963), 155-127.

[58]    John T. Amber, ed., *The Gun Digest: 5th Edition—1951* (Northfield, IL: DBI Books, Inc., 1950, repr. 1977), 131-132.

[59]    These were the Ranger 22 Automatic with a magazine capacity of 11 shots and the Starr Automatic Target Pistol with a magazine capacity of 11 shots.  See Amber, ed., *The Gun Digest: 5th Edition*, 146-147.

[60]    The two models with magazine capacities greater than ten were the Browning M35 Hi-Power (13 rounds) and the Universal Enforcer Auto Carbine (30 shot magazine).  All other handguns maxed out at 10 round magazine capacities.  See John T. Amber, ed., *Gun Digest: World's Greatest Gun Book, The Shooter's Encyclopedia of Handguns, Rifles, Shotguns and Accessories, Twenty-Third Anniversary DeLuxe Edition, 1969* (Chicago: The Gun Digest Company, 1968), 294-306.  That year's selection of foreign-made handguns featured only two models that could come with a standard magazine capacity greater than ten rounds.  The Luger 22 Auto Pistol had "a 12-shot capacity with one round in the chamber," and the MAB Autoloading Pistol could be purchased with a magazine capacity of either 8 or 15 rounds.  See Amber, ed., *Gun Digest 1969*, 345, 344-351.

**APP. 500**

public carry laws, prohibitive taxes, and other sales restrictions.  These states targeted pocket pistols and other types of weapons that, due to their concealability, were associated with forms of criminal activity that were threatening the public at that time.

45.     These restrictions on pocket pistols provide historical precedent for the District's restrictions on large-capacity magazines.  As explained above, large-capacity magazines as we understand them today only became commercially available for the first time in the later parts of the twentieth century and earlier parts of the twenty-first.  Sources pertaining to the development of semi-automatic firearms and detachable box magazines also indicate that through much of the twentieth century, most semi-automatics were sold to civilians with magazine capacities at or below ten rounds.  There are a few outliers in the historical record, but most semi-automatic rifles, shotguns, and handguns available in the United States were sold with magazines housing anywhere from three to ten rounds.  Some fixed, tubular magazines for rifles had a magazine capacity greater than ten rounds, but the operation and reloading of these firearms makes them qualitatively different from the detachable box magazines which Americans currently associate with semi-automatic weapons.

46.     As with any historical research project, my work on this subject remains ongoing. There is significant research and analysis to be done on the drafting and enforcement of the pistol sales restrictions in Arkansas and Tennessee, as well as the attitudes of residents toward them as time wore on.  Very little research that is based upon primary sources, other than the review of case law and historical statutes, has yet been conducted into the history of these statutes.

47.     Additional research is also required to develop a complete timetable for the introduction of magazines holding more than ten rounds and evaluate their production numbers, sales, and market penetration.  But this short overview is sufficient to draw a general conclusion that most semi-automatic weapons, at least through the mid-twentieth century, were not designed for or sold to civilians with magazine capacities larger than ten rounds.

**APP. 501**

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

SIGNED this 22 day of November 2022 at Fort Worth, Texas.

*Brennan Nicole Rivas*
Brennan Nicole Rivas (Nov 22, 2022 13:33 CST)

BRENNAN NICOLE RIVAS, Ph.D.

**APP. 502**

# EXHIBIT L

Other Titles in ABC-CLIO's

## WEAPONS AND WARFARE SERIES

Spencer C. Tucker, Series Editor

Air Defense, *Shannon A. Brown*

Aircraft Carriers, *Hedley Paul Wilmott*

Ancient Weapons, *James T. Chambers*

Artillery, *Jeff Kinard*

Ballistic Missiles, *Kev Darling*

Battleships, *Stanley Sandler*

Cruisers and Battle Cruisers, *Eric W. Osborne*

Destroyers, *Eric W. Osborne*

Helicopters, *Stanley S. McGowen*

Machine Guns, *James H. Willbanks*

Medieval Weapons, *James T. Chambers*

Military Aircraft in the Jet Age, *Justin D. Murphy*

Military Aircraft, 1919–1945, *Justin D. Murphy*

Military Aircraft, Origins to 1918, *Justin D. Murphy*

Rifles, *David Westwood*

Submarines, *Hedley Paul Wilmott*

Tanks, *Spencer C. Tucker*

# PISTOLS

## AN ILLUSTRATED HISTORY
## OF THEIR IMPACT

## Jeff Kinard

A B C 🌓 C L I O

Santa Barbara, California     Denver, Colorado     Oxford, England

**APP. 504**

Copyright 2003 by Jeff Kinard

All rights reserved. No part of this publication may be reproduced, stored in a
retrieval system, or transmitted, in any form or by any means, electronic,
mechanical, photocopying, recording, or otherwise, except for the inclusion of brief
quotations in a review, without prior permission in writing from the publishers.

Library of Congress Cataloging-in-Publication Data
Kinard, Jeff, 1954–
Pistols : an illustrated history of their impact / Jeffrey Kinard.
p. cm.—(Weapons and warfare series)
Includes bibliographical references and index.
ISBN 1-85109-470-9 (hardback : alk. paper)—ISBN 1-85109-475-X
(e-book) 1. Pistols—History. I. Title. II. Series.

TS537.K54 2004
623.4'432'  09—dc22
2004020415

07 06 05 04 03 02    10 9 8 7 6 5 4 3 2 1
This book is also available on the World Wide Web as an e-book.
Visit abc-clio.com for details.

ABC-CLIO, Inc.
130 Cremona Drive, P.O. Box 1911
Santa Barbara, California 93116–1911

This book is printed on acid-free paper.
Manufactured in the United States of America

# CONTENTS

*Introduction to Weapons and Warfare Series,*
Spencer C. Tucker   VII

*Acknowledgments*   IX

CHAPTER ONE
Introduction   1

CHAPTER TWO
The Match, the Wheel, the Flint, and Steel   5

CHAPTER THREE
The Percussion System   49

CHAPTER FOUR
The Metallic Cartridge and the Modern Revolver   105

CHAPTER FIVE
The Semiautomatic Pistol   171

CHAPTER SIX
Post–World War II Developments   255

INDIVIDUAL PISTOL MODELS   283

*Glossary*   375
*Bibliography*   381
*Index*   383

**APP. 505**

## CHAPTER 6

# Post–World War II Developments

THE COLD WAR—the decades-long confrontation between the United States and the Soviet Union following 1945—saw both superpowers consolidating their respective spheres of influence. In 1949 the United States was instrumental in the formation of the North Atlantic Treaty Organization (NATO) to counter the Soviets in Europe. The Soviet Union responded in 1955 with the Warsaw Pact, a forced alliance of formerly independent Eastern European nations that fell under Soviet domination at the close of World War II.

Both the Eastern and the Western military establishments quickly recognized the potential logistical problems posed by these rapidly imposed alliances. NATO and the Warsaw Pact thus moved to standardize weapon types and calibers among their respective allies to ensure interchangeability. The Warsaw Pact nations and, by extension, the People's Republic of China and its satellites thus adopted the Soviet 7.62mm Tokarev TT33 pistol as their standard military sidearm. As a result, the arsenals of the previously independent Eastern nations suspended the production of native designs and retooled to manufacture domestic versions of the Soviet weapon.

NATO's signatories were, especially concerning the question of caliber, less than unanimous in their choice of both military pistols and calibers. Nearly all European nations had made the transition from revolvers to semiautomatics before World War II and had adopted the 9mm Parabellum cartridge (9x19mm NATO) as the

255

**APP. 506**

ideal front-line combat loading. With the most notable exception of West Germany's post–World War II Walther P38, the P1, most European NATO members adopted John Browning's Model 1935 High Power or a variation of its basic design. The United States, for its part, remained firmly committed to another of Browning's creations: the tried-and-true caliber .45 ACP Colt Model 1911A1.

Lighter caliber weapons also retained popularity for use by officers, some police forces, and secondary or specialized military personnel. The 7.65mm Browning cartridge (.32 ACP), disdained by most U.S. agencies as being too anemic for practical use, remained the loading of choice for many European police forces and higher-ranking military officers. A leading factor in the longevity of the caliber .32 ACP cartridge was its suitability for use with the simplest semiautomatic operating principle—the blowback mechanism. Another rationale behind the retention of caliber .32 weapons for police was based on their use in the closer confines of European cities (the light caliber .32 bullet is less likely to pass through the intended target and strike an innocent bystander). The 9mm Short (.380 ACP) cartridge, however, had rapidly gained in popularity in the postwar years owing to its marked lethality over the .32 and its easy accommodation in blowback weapons.

U.S. police and security forces continued to favor revolvers well into the second half of the twentieth century. Their preference was grounded not only in a traditional affection for the reliable six-shooter but the revolver's inherent structural strength. More concerned with the man-stopping capabilities of their sidearms, U.S. lawmen typically holstered weapons chambered for the potent .357 Magnum cartridge or, to a lesser extent, the even more powerful .44 Magnum—cartridges that are too powerful for the standard semiautomatic to safely chamber. The 1980s and 1990s, however, saw the rapidly escalating acceptance in the U.S. law enforcement community of military-style semiautomatics. The new trend grew out of the availability of a new generation of high-powered, high magazine–capacity pistols and a number of new cartridges, most notably the .40 Smith & Wesson. The .40 S&W offered a logical compromise between the caliber 9mm Parabellum and the .45 ACP, being more powerful than the former but having less recoil than the latter.

During this period U.S. manufacturers lost significant ground as European manufacturers such as SIG-Sauer, Heckler & Koch, and Glock set higher standards for military handgun design. The new

pistols offered the multiple advantages of high magazine capacities, advanced construction techniques and materials, and the ability to be carried safely with a cartridge in the chamber yet capable of instant use. The U.S. companies' loss of prominence is no better illustrated than by the controversial choice of an Italian pistol, the 9mm NATO Beretta 92, as a replacement for the venerable caliber .45 ACP Colt Model 1911A1.

## SOVIET UNION/RUSSIA

### Makarov PM

The Soviet Union and a number of other Warsaw Pact countries officially replaced the Tokarev TT33 in 1951 with the 9x18mm Pistolet Makarova (PM). The new pistol was intended to be easier to control than the Tokarev, but, as typical of many Soviet-made weapons, it is more awkward to handle and has a much worse trigger pull than comparable Western handguns. The Makarov is a fixed-barrel, double-action, blowback pistol that externally resembled the Walther PP. Although pulling the hinged trigger guard downward also disassembled the Makarov, it lacked a loaded indicator pin and differed from the Model PP in a number of internal details. The magazine has a capacity of eight rounds and was released by a catch on the bottom of the grip. The safety switch was mounted on the left rear of the slide. The Makarov also chambered a new caliber 9x18mm cartridge that in size and power place it between the .380 Browning (9mm *kurz*) and 9mm NATO. The caliber 9mm Makarov cartridge, although very similar to a caliber 9x18mm Police cartridge introduced in Western Europe, would not chamber correctly in western pistols.

### PSM

In 1980 a number of Soviet security forces began issuing the PSM (Pistolet Samosarjadnij Malogabaritnij, "self-loading small pistol"). Designed by Lev Koulikov, Tikhon Lashnev, and Anatoliy Simarin, the PSM is a blowback weapon designed for easy concealment. Its most notable feature is its unique 5.45x18mm bottlenecked cartridge capable of considerable penetration against body armor. The

**APP. 507**

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 6 of 18

USCA Case #23-7061      Document #2029097      Filed: 11/29/2023      Page 511 of 566

PSM is 160mm (6.3") in overall length and has an 85mm (3.35") barrel. Magazine capacity is eight cartridges.

### Stetchkin Machine Pistol (APS)

The Automaticheskia Pistolet Stetchkina (APS) shares the appearance and basic blowback mechanism of the Makarov but is somewhat larger and capable of selective fire. A selector mounted on the left rear slide indicates safe in its lower position, semiautomatic in the middle, and full automatic in the top position. The Stechkin utilizes a 20-round magazine and was issued with a wood shoulder stock/holster very similar to that of the Mauser Model 1896. Its cyclic rate of fire on full-automatic mode is approximately 750 rounds per minute. The Stechkin's main fault lies in that it is too large to be a practical handgun and too light to be controlled effectively as a submachine gun. It was eventually phased out and replaced by the Makarov.

### CZECHOSLOVAKIA

### CZ Model 1950 and Model 1970

The postwar Model 1950 was the product of the Kratochvil brothers' design team at CZ (_eska Zbrojovká) and, chambered in caliber 7.65mm (.32 ACP), was intended for use by the Czech police. Although much more modern in appearance than earlier Czech pistols, the Model 1950 is of a conventional blowback design, with an external hammer and many features apparently derived from the Walther PP. It differs from the Model PP in that the loaded indicator pin is located on the side of the slide rather than above the hammer, a catch on the side of the frame allows dismantling, and the safety is located on the frame rather than slide. CZ later modernized the Model 1950 to produce the Model 1970 for issue to police personnel and higher-ranking military officers.

### CZ Model 1952

Immediately following World War II Czechoslovakia followed other Soviet bloc nations in issuing Soviet weapons, including the

7.63mm Tokarev TT33. In the early 1950s CZ began production of an excellent new domestic pistol to replace the aging Tokarevs. The CZ Model 1952 was fitted with an external hammer and accepted an eight-round magazine; a unique clip arrangement rather than the typical screw secures its composition grips. Its recoil-operated mechanism relied on a roller-locking system derived from the German MG-42 machine gun. This arrangement was necessary owing to the pistol's highly potent 7.62mm Czech Model 48 cartridge, a loading based on the Soviet 7.62mm Type P cartridge but with 20 percent more powder. The resultant impressive ballistics of the Model 1952, combined with its easy handling and sleek lines, made it a popular sidearm among those receiving it. The Model 1952 was manufactured between 1953 and 1970 and was eventually phased out of front-line Czech service and relegated to reserve units.

### CZ75 and CZ85

As a member of the Warsaw Pact, Czechoslovakia was required to issue weapons chambered to accept cartridges interchangeable with those of the Soviet Union. The 9mm Parabellum (NATO) CZ75 was thus initially not accepted for Czech service but released as an export pistol. Its debut on the international market in 1975 won the CZ75 instant acclaim as one of the finest military-style pistols to appear in the post–World War II years.

Its basic mechanism and appearance are of the traditional Browning High Power type but exhibit some characteristics found in the SIG P220 and other significant improvements. Constructed of high-grade materials with superior craftsmanship, the CZ75 is a double-action weapon with either plastic (for civilian use) or walnut (military issue) grips and accepts a 15-round magazine. The CZ85 followed in 1985 and is essentially a CZ75 with the addition of ambidextrous safety and slide stops. Both models were manufactured in selective-fire versions with somewhat longer barrels and a provision to use a spare magazine as a forward grip. In 1984 the Swiss firm Sphinx Engineering SA of Porrentruy began offering its AT-2000S, a modification of the CZ75 design.

### CZ82 and CZ83

The CZ82 (CZ8-3 in its civilian form) appeared in 1984 and is a

260 PISTOLS

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 7 of 18
USCA Case #23-7061   Document #2029097   Filed: 11/29/2023   Page 512 of 566

POST-WORLD WAR II DEVELOPMENTS   261

blowback-operated, double-action pistol similar in purpose and operation to the Walther PP and Soviet Makarov. It has an ambidextrous safety, slide lock, and magazine release controls, a firing-pin locking safety, and a large trigger guard to accommodate a gloved finger. The civilian CZ83 is available chambered in 7.65mm (.32 ACP) and 9mm Short (.380 ACP), with the military CZ82 being chambered for the 9mm Short or 9mm Makarov cartridge. Magazine capacity is 15 rounds for 7.65mm models and 13 rounds for 9mm pistols. Caliber 9mm Makarov-chambered pistols also differ from the other models in that they are bored with polygonal rifling rather than traditional lands and grooves.

## POLAND

### Model 65 and 64

As a Soviet satellite, Poland adopted the 9x18mm (9mm Makarov) P65, a domestically manufactured variation of the Makarov. It also issued the double-action, 9x18mm P64, a Polish design that shares characteristics of both the larger Makarov and the Walther PPK. The select-fire 9x18mm Model 63 Machine Pistol also shows considerable Soviet influence and in a number of ways resembles the Soviet Stechkin. It is a blowback weapon and accepts either 15- or 20-round magazines.

## PEOPLE'S REPUBLIC OF CHINA

### Type 51

Before World War II, the Chinese government and various warlords armed their forces with a large variety of imported pistols such as the Mauser Model 1896, the Browning Model 1900, and the FN High Power. In addition, small domestic shops and larger factories fabricated many thousands of copies of foreign pistols. The Chinese also acquired huge numbers of Japanese arms from the Soviets, who captured them in Manchuria, as well as U.S. weapons taken from the Nationalists during the civil war. The Communist Chinese government later began a gradual move toward standardization based on Soviet weapons with the Type 51 Pistol, a reasonably accurate copy of the 7.62mm Soviet Tokarev TT33.

### Type 64 and Type 67

Adopted in 1964, the blowback-operated Chinese Type 64 is a uniquely diabolical weapon with an integral silencer designed specifically for assassinations. The rubber baffles and extremely fine wire mesh within the tubular silencer effectively muzzle the report of its special subsonic 7.65x17mm rimless Type 64 cartridge—a loading similar in appearance to the .32 ACP but interchangeable in no other weapon. A latch on the side of the pistol also locks the slide to prevent the mechanical noise and rear escape of the report that accompanies a semiautomatic pistol. A mechanical safety is located on the left side of the pistol above the grip. The magazine capacity is nine rounds. In 1968 Communist China put into service an improved and more compact assassination pistol, the Type 67. The Type 67 features a more streamlined and efficient silencer and a cross bolt to lock the slide to the barrel. Although in many respects similar to the Type 64, the Type 67 is chambered for yet another unique cartridge, the 7.62x17mm Type 67.

## NORTH KOREA
## (DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA)

### Type 64

North Korea originally armed its forces with a mix of captured Japanese, foreign imports, and Soviet and Chinese weapons. The country's first domestically manufactured service pistol, the Type 64, is a relatively direct copy of the Browning Model 1900 Old Model in 7.65mm (.32 ACP). A limited number were also manufactured with a shortened slide that exposed a length of barrel sufficient to attach a silencer.

### Type 68

The North Korean Type 68 was a significantly modified Tokarev

**APP. 509**

TT33 design that locks in a manner similar to the Browning High Power. It retains the Tokarev's 7.62mm chambering but is somewhat shorter, with the magazine release located in the base of the grip rather than the button type behind the trigger guard found on Soviet weapons.

### Type 70

The Type 70 is a blowback-operated 7.65mm weapon of conventional design. Its main distinguishing feature is a large star insignia on the upper portion of the grip panels.

### UNITED STATES

The decision to join its NATO allies in a sidearm chambered for the standard 9x19mm NATO (9mm Parabellum) cartridge proved particularly traumatic for the U.S. military. The United States flirted with the idea during the Korean War but abandoned the transition as uneconomical considering the vast numbers of caliber .45 Model 1911A1s then in service. That those Model 1911A1s were perfectly serviceable and proven combat veterans further strengthened the Army's decision to retain them for the indefinite future.

### Colt General Officer Model Pistol, M15

Colt again broached the subject on a limited scale during the Vietnam War. In 1969 the company offered a modified version of its 9mm Commander as a replacement for the older model pistols then issued to general officers. The Army, for its part, declined Colt's submission in favor of a more sophisticated version of the caliber .45 ACP 1911A1. Originally manufactured at the government's Springfield Arsenal and later the Rock Island Arsenal, the new pistol entered service in 1972 as the Caliber .45 General Officer Model Pistol, M15. The M15 was somewhat more compact than the Model 1911A1 and was fitted with select-grade walnut grips with a brass insert engraved with the owner's name. It also exhibited a much superior finish to standard-issue weapons. To further distinguish it from the pistols issued to the rank and file, its slide also bears, in script, the legend "GENERAL OFFICER MODEL" and "RIA," indicating its manufacturer. The M15 issue package includes a two-magazine pouch and flapless holster.

### Beretta M9 (Model 92FS)

In 1977 new small-arms studies undertaken at the U.S. Air Force Armaments Laboratory at Elgin Air Force Base reignited the 9mm transition debate. The Florida laboratory's initial findings indicated that government inventories contained not only thousands of Model 1911A1s but also a bewildering variety of various caliber .38 revolvers. The Air Force quickly reached the obvious conclusion: The U.S. military faced a pressing need to restandardize its handgun issues. The Air Force findings soon found their way to the other services, as well as Congress, with predictable results. By 1979 the standardization issue and 9mm transition debate were embroiled in a bureaucratic quarrel complete with the requisite committees and government tests. In 1981 the government at last announced its decision to finally join its allies in adopting the 9x19mm NATO chambering and called on various foreign and domestic manufacturers for test pistols.

To the dismay of many, only one U.S.-made pistol—a Smith & Wesson—reached the final testing stages. It faced entries by Beretta, Fabrique Nationale, Heckler & Koch, and SIG-SACO Defense Systems. After seemingly interminable delays, in 1985 the U.S. government officially announced its decision to replace the caliber .45 ACP Colt Model 1911A1 with the Italian entry: the Beretta 92FS.

Designated the M9 in U.S. service, the new Beretta was manufactured in Italy and now in the United States by Beretta USA Corp. of Accokeek, Maryland. Beretta's concession to manufacture the pistol in the United States and its relatively low cost were major factors in the decision to adopt the foreign-designed weapon. In the wake of the military's action, numerous police departments followed its lead, phasing out traditional revolvers in favor of the Model 92. The M9 is a double-action weapon and accepts a 15-round magazine. It is equipped with a trigger-disconnect safety, is coated in a durable matte Bruniton finish, and fitted with a lanyard ring and chrome-lined barrel. The forward trigger-guard strap is also recurved to accommodate a two-hand grip.

Inevitably, the adoption of Beretta by the U.S. government prompted a considerable ongoing debate as to the military effectiveness of the pistol and its 9mm cartridge. Its proponents continue to argue the advantage that they more conform to U.S. allies' issues. They further press that the 9mm cartridge produces less recoil than the caliber .45 ACP and is thus more suited for use by the growing number of women entering the U.S. military. Both the pistol and its cartridge, however, have found some of their greatest opposition among U.S. combat veterans who witnessed enemies sustain multiple wounds from 9mm ammunition and still continue an attack. The critics' resistance has been further strengthened by reports from Kuwait, Afghanistan, Iraq, and other recent arid battlegrounds: A number of troops involved in those actions have complained that the Beretta requires frequent maintenance to maintain reliability and does not stand up well in harsh combat conditions.

In a scenario hauntingly reminiscent of the Philippines in the early 1900s, many U.S. soldiers locked away their government-issue pistols in favor of more powerful caliber .45 weapons. Adding to the irony, many U.S. troops still prefer the supposedly obsolescent Colt Model 1911A1 to the advanced M9, while others holster pistols manufactured by SIG, Heckler & Koch, and Smith & Wesson. In addition to the issue of personal weapons, in 1996 the U.S. Special Operations Command (USSOCOM) adopted the caliber .45 ACP Heckler & Koch Mark 23 mod 0 for issue to certain elite units. At the beginning of the twenty-first century the United States is no closer to standardization than it was in 1900.

### Smith & Wesson Model 39, Model 59, and Model 459

The Model 459, Smith & Wesson's entry in the government trials, was based on designs the company had introduced in the 1950s. The company began production of the double-action, eight-round Model 39 and its 14-round counterpart, the Model 59, in 1954. The two pistols marked something of a breakthrough in the U.S. handgun industry, as both were chambered for the 9mm Parabellum cartridge so popular in Europe but as yet relatively untried in the United States. The two pistols have seen service with the U.S. Navy, Air Force, and Army Special Forces (Green Berets). The Model 459 was essentially an updated version of the Model 59

with improved sights. Despite its loss in the U.S. government trials, it is an excellent weapon and has seen some use by U.S. forces. During the 1990s Smith & Wesson continued to expand its semiautomatic offerings with its Third Generation series and the Sigma, a high magazine–capacity pistol utilizing modern polymers in its construction.

### GERMANY

#### Walther P1

Its original facilities devastated and lost to the Soviets in the final days of World War II, Walther eventually established a new factory at Ulm/Donau in the early 1950s and renewed production of the P38 in 1957. That year the new German Federal Republic Army, the Bundeswehr, adopted the pistol as the Pistole 1, or P1. The P1 differs from the earlier P38 only in its lighter alloy frame, slight changes in its safety and extractor, and a matte-black finish and black plastic checkered grips. The P1 was also adopted at various times by the armed forces of Austria, Norway, and Portugal, as well as Sweden, its initial contractor. The company also manufactured a more meticulously finished model for the civilian market and sold it, in addition to the standard caliber 9mm Parabellum, in calibers .22 Long Rifle and 7.65 Parabellum. Shorter-barreled versions, the P38K and the P4, were also manufactured for police use in the 1970s but were soon discontinued.

#### Walther P5

In 1975 Walther introduced the caliber 9mm NATO P5 in response to changing German police requirements for a high magazine–capacity, double-action sidearm that could be safely carried and quickly put into action. Externally the P5 is a sleek, modern-looking pistol with a slide enclosing all but the muzzle of the barrel. Its locking system, however, is essentially the same tilting wedge as that of the P38. The P5 also shares the same eight-round magazine capacity of its predecessor, as well as its trigger mechanism.

Although the P5's basic mechanics harken to the 1930s, its safety features are much more advanced. A large lever on the left side of

the frame acts as both a safety and decocking switch that safely lowers the exposed hammer. In addition, a spring maintains the firing pin itself in a position out of alignment with the hammer's striking surface. Only when the trigger is deliberately pulled does this spring allow the pin to shift into firing position. A number of police organizations in Germany and other countries adopted the P5, as did the Portuguese Army. Walther followed the basic P5 in 1988 with the shorter P5 Compact and later the improved-safety P1A1. Although an excellent pistol, the P5 series was destined for rapid obsolescence owing to its relatively small magazine capacity and outmoded locking system.

### Walther P88

In 1988 Walther combined the best features of the P5 with a modified Browning locking system to offer the P88, a cost-efficient, 15-round capacity, double-action pistol suitable for police and military use. The P88 thus shares the excellent trigger and safety mechanisms of the P5, as well as an ambidextrous decocking lever. It does, however, abandon the tilting wedge for a system similar to that of the Glock, SIG-Sauer, and other new and popular pistols. The tilting barrel, combined with its method of locking into the ejection port, allowed for much more efficient machining, with a resultant positive effect on the pistol's overall cost. In 1996 Walther discontinued the P88 in favor of the less bulky P88 Compact.

### Heckler & Koch Model HK 4/ P 11

In the 1950s Heckler & Koch GmbH began operations at the site of the former Mauser factory in Oberndorf/Neckar, the old Mauser machinery having been confiscated by French forces. Alex Seidel, formally of Mauser, was a cofounder of the new firm and reintroduced the Mauser HSc as the Heckler & Koch HK 4. The blowback HK 4, known as the P11 in German service, is manufactured with a stamped steel rather than the earlier machined steel slide and an aluminum alloy frame. It differs externally in its basic lines and black plastic checkered grips molded with a more comfortable thumb rest. A catch on the base of the grip releases the magazine.

Heckler & Koch designed the HK4 to be easily converted to a variety of calibers. By switching barrels, magazines, and recoil spring,

the pistol can chamber 6.35mm (.25 ACP), 7.65mm (32 ACP), and 9mm *kurz* (.380 ACP) cartridges. The breechblock is also fitted with a faceplate that can be rotated 180 degrees to convert the pistol to the more economical rimfire caliber .22 Long Rifle cartridge. The HK4 was manufactured from 1967 to 1984 and issued to the Zollpolizei (Customs Police) among other military and police units.

### Heckler & Koch Model P7 (PSP)

The 9mm NATO Model P7 was introduced in the early 1970s as a police weapon (thus its alternate designation, Polizei Selbstlade Pistole, or PSP). The P7 introduced a unique cocking and decocking device on the front grip strap activated by squeezing the pistol grip. The pistol is also unusual in that it incorporates the gas-delayed blowback principle. This system relies on a small hole drilled in the barrel that siphons off a portion of the ignition gasses to operate a piston attached to the slide. The pressure exerted by the gas thus delays the opening of the breech until the bullet leaves the barrel.

Heckler & Koch first offered the improved P7 M8 and P7 M13 pistols in 1983. These pistols feature ambidextrous magazine releases and enlarged trigger guards. The P7 M13 also offers the advantage of a 13-round staggered-row magazine. Other variants in the series include the blowback-operated P7 K3 in caliber .22 Long Rifle and 9mm Short and the P7 M10 in caliber .40 S&W. Some units of the Bundeswehr adopted the P7, as did various police agencies, including the federal Bundesgrenzschutz (GSG9) and the state police departments of Baden-Württemberg, Bavaria, and Lower Saxony.

### Heckler & Koch Model P9 and Model P9S

Manufactured between about 1972 and 1984, the Heckler & Koch Model P9 and its military and police-type counterpart, the P9S, incorporate numerous modern synthetic components. The civilian Model P9 differs primarily from the P9S in that it is a single-action rather than double-action weapon and is fitted with adjustable rear sights. Both pistols were offered in 9mm Parabellum (NATO) and 7.65 Parabellum (.30 Luger). The company introduced a caliber .45 ACP model in 1977. The pistols operate on the delayed blowback system and lock and unlock by means of rollers that engage the slide and two-piece breechblock, an arrangement used in the company's

G-3 rifle. Typical slide markings are "HK MOD P9S HECKLER & KOCH OBERNDORF/N," with the "HK" initials also appearing on the lower grip panels.

The P9 and P9S are fitted with a thumb-operated lever to cock and decock the internal hammer, as well as a loaded indicator pin. A manual safety is positioned on the left rear of the slide, and a durable black polymer finish protects the metal parts. Later versions of the P9S were manufactured with a reverse-curve front trigger guard to accommodate a more comfortable two-handed grip. The P9 and P9S also incorporate an advanced polygonal bore that, unlike conventional rifling, presents a smoother internal surface that discourages fouling and provides twist without overly deforming bullets as they pass through. The P9S was adopted a number of police organizations, including the Saarland state police.

### Heckler & Koch Model VP70

Heckler & Koch intended its Model VP70 as a compact selective-fire combat pistol for modern military and police use. Manufactured from about 1970 to 1984, it incorporates a largely polymer frame and enclosed striker. Its sophisticated blowback, fixed-barrel design allows it to efficiently chamber 9mm NATO ammunition, an achievement that had long eluded earlier manufacturers. A special shock-absorbing system helps reduce recoil and thus aids control while in full-automatic mode. Cartridge capacity is an impressive 18 rounds and is accomplished with a double-row magazine that does not overly widen the grips. Disassembly is easily accomplished by pulling down a catch within the trigger guard on the bottom of the frame. Optional equipment for the VP70 includes a push-through safety behind the trigger guard and a detachable shoulder stock. The VP70 A1 is equipped with a three-shot burst feature; the VP70 Z was offered in semiautomatic only. European police and border guards have used it extensively.

### Heckler & Koch USP Series

In 1993 Heckler & Koch debuted its Universal Selbstlade Pistole (Universal Self-Loading Pistol, or USP) series in calibers 9mm NATO and .40 S&W. A caliber .45 ACP model, intended primarily for sales in the United States, appeared in 1995. All ... pistols are designed to accommodate both standard military cartridges as well as the more powerful +P loadings. Intended as highly versatile military and police weapons, the USP pistols incorporate the most advanced manufacturing techniques and materials available. The basic USP models are the Standard, Compact, Match, Expert, and Tactical. The Standard was adopted by the Bundeswehr as the P8 and the Compact by German police as the P10. Both the P8 and P10 are chambered for the 9mm NATO cartridge.

The USP series is based on a modified Browning locking design assisted by an original Heckler & Koch recoil reduction system to ease handling. Truly modern weapons, the USP pistols are manufactured with steel-reinforced, high-strength polyamide frames capable of withstanding extreme temperatures, wear, and corrosion. Barrels are polygonal-bored cold-hammer forged chromium steel; the slides are of machined steel. To withstand corrosion, external metal parts are treated in a nitro-gas carburized and black oxide coating, with internal parts receiving a protective Dow-Corning antifriction treatment. As a result of such advanced technologies and exacting Heckler & Koch craftsmanship, the USP has proved one of the most accurate, powerful, and defect-free handguns ever manufactured.

Heckler & Koch also designed the USP as a highly versatile, good-handling weapon capable of filling a variety of roles and needs. Grooves cast in the frame allow the attachment of either a laser aiming module (LAM) or tactical light.

The combined safety and decocking lever is mounted on the frame above the trigger and can be easily moved from one side to the other for either right- or left-handed use. The magazine release, protected by the trigger guard, allows the magazine to drop free of the pistol and is also designed for ambidextrous use. Caliber 9mm and .40 S&W magazines are constructed of a stainless steel–reinforced translucent polymer; caliber .45 ACP magazines are of steel. The nonslip polymer grips are ergonomically slanted for comfortable aiming. A wide variety of trigger and control-lever options also give USP pistols nine potential combinations of safety as well as single- and double-action modes.

### Heckler & Koch Mark 23 mod 0

In 1991 USSOCOM, the overall command for special operations, awarded contracts to Heckler & Koch and to Colt Manufacturing Co. to submit test pistols for a new Offensive Handgun Weapon

System (OHWS). As the name of the system suggests, the new pistol was not to perform in a traditional defensive role but as a specialized offensive weapon for special operations. The government intended to issue the new weapons to elite organizations such as the Army's Special Forces (Green Berets) and Rangers, Special Operations Aviation, the Navy SEALS, and the Air Force Special Operations Wings. The new weapon system required chambering for the caliber .45 ACP cartridge, a sound and flash suppressor, and a LAM. More powerful than the general-issue 9mm NATO Beretta M9, the OHWS was to be the first caliber .45 ACP government pistol since the Colt Model 1911A1. After extensive testing, USSOCOM awarded the final contract to Heckler & Koch; the first pistols were delivered on 1 May 1996.

Although larger and heavier, the winning design, designated the Mark 23 mod 0, shares many design features of the H&K caliber .45 USP, including its locking system, steel-reinforced polymer components, and advanced anticorrosion coatings. The polygonal bore is also chrome-plated to resist wear and corrosion. The trigger guard is recurved at the front for two-handed use, and the magazine release and safety are ambidextrous. Unlike the USP, the decocking lever is a separate component to allow the silent lowering of the hammer in close or covert combat situations. Frames are grooved for the attachment of the LAM, and the muzzle is threaded to accept a silencer supplied by Knight's Manufacturing USA. Magazine capacity is 12 rounds.

The Mark 23 mod 0 is possibly the most thoroughly tested handgun ever built and exceeded all government specifications during trials. The issue pistol achieves match-grade accuracy and operates almost flawlessly in the most extreme environments.

## GERMANY/SWITZERLAND

### SIG-Sauer

Following World War II the Swiss firm Schweizerische Industrie Gesellschaft (SIG) negotiated an agreement with Germany's J. P. Sauer & Sohn to develop and manufacture pistols in Germany. This arrangement was made necessary by Switzerland's strict nonexportation laws against firearms—a restriction not imposed in Germany. The collaboration between SIG and           has produced a series of

semiautomatics universally hailed as some of the finest, most advanced combat handguns ever manufactured.

### Swiss SIG P210/P49

SIG began development of the single-action P210 during the 1940s to replace the obsolescent Lugers still in service at that time. Known as the P210 in its civilian form and the Pistole 49 (designating the year it was accepted by the Swiss military), the new SIG exhibited the superb materials, craftsmanship, and accuracy typical of Swiss arms. The design originated in 1937 when France's SACM negotiated an agreement with the Swiss firm SIG to manufacture a modified Petter-designed Mle 1935 in that country. After a number of improvements SIG developed the SIG SP47/8 (Self-Loading Pistol M1947—eight-round magazine) and, after more modifications, introduced the P49. Denmark also adopted the P49 for its military, as did West Germany's Bundesgrenzpolizei (Border Patrol).

The P49 is a locked-breech, recoil-operated modified Browning design and is fed by an eight-round magazine. Unlike the earlier designs, the slide of the SIG rides on rails inside rather than outside the frame. The P49 is equipped with both a frame-mounted safety and a magazine safety, preventing the pistol from firing without the magazine in place. It is chambered for the 9mm NATO cartridge rather than the earlier caliber 7.65 Parabellum of the Model 1900 Swiss Lugers. The pistol is, however, easily converted to the caliber 7.65 cartridge by simply changing the barrel and to the caliber .22 Long Rifle with a conversion kit. Military pistols are finished in a dull matte finish and plastic grips, with civilian versions usually receiving a blue finish and wood grips.

Although Switzerland adopted the P49, export military sales suffered—the precise machining tolerances and quality of materials used in the P49, as in all SIG products, made it a prohibitively expensive weapon for general issue. Switzerland replaced the P49 in 1975 with the SIG-Sauer Pistole 75.

### SIG-Sauer P220/Pistole 75

Designated the P220 in its civilian version and P75 for military use, SIG-Sauer's next pistol was originally designed as a double-action,

**APP. 514**

less-expensive replacement for the Swiss P49. It quickly gained a reputation as one of the finest combat pistols ever made. Available in a number of calibers, the new pistol was adopted in 9mm NATO by Switzerland as the P75 and later by the Japanese Defense Forces. The P220 locking system is a great improvement both in efficiency and manufacturing costs over earlier pistols. Rather than rely on a series of complicated links or machining processes, the P220 barrel is machined with a single large lug that locks into the ejection port.

A number of other features found on the P220/75 had appeared earlier on the Sauer 38H. Sauer-designed components include the P220/75's double-action mechanism and cocking and decocking lever. Unlike the 38H, the P220/75 is fitted with an external hammer. Original P220/75s were manufactured with aluminum alloy frames and Sauer's machined breechblock pinned to the interior of stamped steel slides. The P220/75 is not equipped with a manual safety owing to the very effective hammer and firing-pin lock. This mechanism prevents the pistol from firing unless the trigger is deliberately pulled. A slide stop is located above the left grip. The magazine holds eight caliber 9mm cartridges (seven .45 ACP) and is released by a catch at the rear base of the grip on European pistols. Those exported to the United States are fitted with a button-type magazine release behind the trigger guard.

The P220/75 is also a highly accurate combat handgun. Sights are of the patented Stavenhagen type, with white-highlighted rear and front sights to facilitate more precise aiming in dim conditions. The front trigger guard is also reverse-curved and grooved to allow a steadier two-hand grip.

### SIG-Sauer P225 (P6)

In 1980 SIG-Sauer lightened the P220/75 design and reduced its length to offer a more compact weapon, the 9mm NATO P225. It was adopted by the West German military and various state police agencies as the P6 and saw extensive police use in other European countries.

### SIG-Sauer P226

In 1983 SIG-Sauer modified the basic P220 design to accept a high-capacity magazine (15 9mm NATO or 12 caliber .40 S&W or

.357 SIG cartridges). The caliber .40 S&W cartridge is a recent development by the U.S. firm Smith & Wesson, and the caliber .357 SIG is essentially a necked-down version of the Smith & Wesson cartridge. Although the new pistol, designated the P226, failed to win the U.S. government trials to replace the Colt Model 1911A1, the U.S. Navy SEALs, as well as some police and military organizations in Europe, adopted it for issue.

### SIG-Sauer P228 and P229

Introduced in 1989, the P228 is a compact version of the P226 and mechanically is virtually identical. It is constructed with an aluminum alloy frame with a machined steel block pinned inside the stamped steel slide. The magazine holds 13 caliber 9mm NATO cartridges. The U.S. Army adopted the P228 in 1992 as the M11 for issue to aircrews and military police personnel; it is also issued to the Army's Criminal Investigation Division.

The P229 shares the same internal mechanism and aluminum alloy frame as the P228. It is, however, chambered for the more potent caliber .40 S&W and .357 SIG cartridges and as a result is fitted with a sturdier machined-steel slide. The P229 magazine capacity is 12 rather than the P228's 13 owing to its larger cartridge size. Both the P228 and P229 earned universal reputations as highly reliable and accurate weapons for military and police use. U.S. government organizations issuing the P229 include the FBI; the Secret Service; the Bureau of Alcohol, Tobacco, and Firearms; and the Drug Enforcement Agency. The P229 also offers the added versatility of interchangeable .40 S&W, .357 SIG, and 9mm NATO barrels. A Sig-Sauer subsidiary, SIGArms, manufactures the P229 in the United States.

### AUSTRIA

### Glock

Gaston Glock founded the small firm of Glock GmbH in Deutsch-Wagram near Vienna in 1963. During its first 17 years the company manufactured an array of products for the Austrian Army, including fighting knives, entrenching tools, machine-gun ammuni-

Case 1:22-cv-02256-RC   Document 17-14   Filed 11/23/22   Page 14 of 18
USCA Case #23-7061      Document #2029097      Filed: 11/29/2023      Page 519 of 566

tion links, and practice grenades. Glock made his first foray into the handgun field in 1980 when the Austrian Army announced that it was accepting submissions for a new service pistol. Gaston Glock had little experience in firearms but approached the project with a combination of originality and logic. He first consulted a number of weapons experts to determine the features most desirable in a combat handgun and then applied his own engineering experience to the problem. Following a six-month whirlwind of research and development Glock revealed his new pistol: the Glock 17, a revolutionary combination of the best existing technology and Glock's innovative application of polymers to firearm construction.

The Austrian Army adopted the recoil-operated, 9mm NATO Glock 17 in 1983 as the P80 and was soon joined by the armed forces of the Netherlands, Norway, the Philippines, Sweden, and Thailand. The pistol quickly became the weapon of choice worldwide among military and police organizations. In the United States the Glock played a major role during the transition from revolvers to semiautomatics as the preferred police sidearm. In the process the previously tiny Glock GmbH grew to become an international arms giant. The appearance of the Glock initially sparked a frenzy among some members of the press and antigun lobbyists, who feared that its polymer components would make it undetectable by airport security scanning devices and thus be an ideal terrorist weapon. These concerns were unfounded in that the Glock barrel and slide, as well as numerous other components, are of high-grade steel and are thus easily detectable by metal detectors and x-ray machines. Above all, Glock pistols have won a reputation for accuracy and reliability in all types of combat conditions.

## Glock 17

Gaston Glock gained instant recognition by pioneering the use of high tensile-strength polymers in the Glock 17. The frames, with the exception of integral steel guide rails for the slide, are of a molded polymer that has a stronger resistance to shock damage than aluminum and most steels. The polymer frame offers the triple advantages of reduced costs in fabrication, imperviousness to corrosion, and light weight. The slide is milled from a single piece of steel and treated with an extremely hard and corrosion-resistant Tenifer heat treatment. The pistol is rugged, accurate, compact, and lightweight. It also easily dismantles for cleaning and incorporates only 33 components in its construction.

The Glock 17 shares with SIG-Sauer the sophisticated modified Browning tilting-barrel locking principle in which a single lug on the top of the barrel locks into the ejection port. The bore of the 4.5-inch barrel, however, is of a hexagonal type, in contrast to the lands and grooves of conventional pistols and the polygonal SIG-Sauer bores. The Glock Safe Action trigger mechanism is also a significant improvement over earlier systems and is designed for instant yet safe use under combat conditions. It is based on two molded polymer triggers (a large outer trigger that protects a smaller middle trigger from accidental activation); there is no external safety switch. The pistol can thus be fired only with a deliberate finger-pull on the center of the trigger arrangement. Pulling the trigger first disengages the internal safety mechanism and then moves the striker from half-cock to full-cock and then releases it to strike the cartridge primer. The action of the slide then returns the striker to the half-cock position.

The only external controls other than the trigger are the slide stop and magazine release button, both mounted on the left of the frame. The standard polymer magazine has a capacity of 17 9mm NATO cartridges. Nineteen- and 31-round magazines that extend below the grip are also available, as is a 10-round model for civilian sales. The Glock accepts a laser sight attachment as well as a special amphibious kit that permits underwater firing at very close range. Although rather boxy in appearance, the Glock 17 is well-balanced and ergonomically designed, with a raked grip with finger grooves on the front for comfortable and instinctive aiming. A recurved front trigger guard also aids two-handed use.

In 1986 the company offered the Glock 18, a select-fire version of the original model. The Glock 18 is fitted with a slightly extended barrel with dorsal compensator cuts and a selector switch on the left rear of the slide. Other variations of the Glock 17 include two more compact pistols: the Glock 19 in 9mm NATO, and the Glock 23 in .40 Smith & Wesson. The Glock 20 was offered in 1990 and is chambered in the new 10mm Auto cartridge and was followed by the Glock 21 in caliber 1.45 ACP and the Glock 22 in .40 Smith & Wesson.

## Steyr Pi18 and GB80

The Austrian army's choice of the Glock was a disappointment to that country's long-established Steyr dynasty. In 1981 Steyr-Daimler-Puch AG (later Steyr-Mannlicher AG) pinned its hopes for the Army's upcoming trials on its double-action 9mm NATO Steyr

282    PISTOLS

Case 1:22-cv-02256-RC    Document 17-14    Filed 11/23/22    Page 15 of 18
USCA Case #23-7061    Document #2029097    Filed: 11/29/2023    Page 520 of 566

ics that it marketed as the New Nambu. The New Nambu Model 57A, as considered for adoption by the Self-Defense Forces, is a modified Browning-Colt design chambered for the caliber 9mm NATO cartridge. The company also produced the smaller caliber 7.65mm (.32 ACP) blowback Type 57B, also a modified Browning design.

## SOUTH AFRICA

### Vektor Z-88 and SP1

The Republic of South Africa initially issued FN Browning High Powers to its forces. Imports ended, however, with a United Nations–mandated ban on arms shipments in response to the country's policy of apartheid. The embargo, in turn, prompted the country to initiate its own domestic arms industry in the late 1960s and early 1970s. The first South African–manufactured pistol was the Vektor Z-88, a licensed copy of the 9mm NATO Beretta Model 92. In 1992 Lyttleton Engineering Company of Pretoria began production of the Vektor SP1 for issue to the South African Defence Force. The caliber 9mm NATO SP1 incorporates a Walther-type tilting-wedge locking system in combination with a number of more modern features. It is a double-action weapon constructed with a machined steel slide and aluminum alloy frame with checkered polymer grips. It is fitted with a firing-pin safety, an ambidextrous manual safety, and a magazine release easily positioned on either side of the frame. Magazine capacity is 15 rounds.

The Vektor SP2 differs from the SP1 in that it is chambered in caliber .40 S&W and is fitted with an 11-round magazine. Lyttleton offers a conversion kit that allows the SP2 to fire 9mm ammunition. The SP-1 and SP-2 General Officer's Pistols are scaled-down versions of the original models intended for use by higher-ranking officers.

# Individual Pistol Models

## EARLY PISTOLS

Appearing in the fifteenth century, the earliest pistols incorporated the matchlock principle, relying on a smoldering length of cord for ignition. Their vulnerability to damp conditions and general unreliability, however, made them impractical combat weapons and relatively few saw actual use. The wheel lock appeared in about 1500 and, although relatively delicate and expensive to manufacture, finally provided a suitable weapon for mounted troops. The wheel lock relied on sparks from a spring-activated serrated steel wheel spinning against iron pyrites to ignite its priming. This innovation eliminated the need for a smoldering match and provided a firearm that could safely be carried loaded and ready to fire from horseback. The wheel lock was instrumental in making the pistol an integral part of the cavalryman's arsenal and helped lead to the obsolescence of the mounted knights' traditional lances and swords. By the mid-1500s firearms designers began abandoning the wheel lock mechanism in favor of systems relying on the striking of flint against steel for ignition. Handgun evolution subsequently produced such types as the snaphaunce, dog lock, and miquelet before culminating in the true flintlock in about 1630. Relatively simple and rugged, the flintlock remained in wide use until the first half of the nineteenth century.

The Matchlock: circa early fifteenth to
   centuries   294
The Wheel Lock: circa fifteenth to early seventeenth centuries
   294
English Lock: early seventeenth century   295
French Lock: circa 1610 to nineteenth century   295
Scottish Pistol: seventeenth to eighteenth centuries   296
Queen Anne Pistol: seventeenth to eighteenth centuries   296
Dueling Pistol: eighteenth to nineteenth centuries   297
Duck Foot Pistol: eighteenth to early nineteenth centuries   298

## PERCUSSION PISTOLS

In 1807 the Reverend Alexander Forsyth of Belhelvie, Scotland patented the use of fulminate powder for firearms ignition. Highly explosive when struck a sharp blow, fulminates made possible the elimination of the complex flintlock priming procedure and introduced the percussion ignition system. Within fifteen years other inventers devised a method of containing fulminates in a small metal cup—the percussion cap—and quickly rendered all earlier firearms obsolete. During the 1840s and 1850s all major powers began manufacturing percussion pistols and converted thousands of the older flintlocks to the new system. In 1836 the American Samuel Colt patented the first practical percussion revolver, thus initiating a worldwide revolution in firearms manufacturing and technological innovation. The percussion revolver was the standard sidearm of the American Civil War and saw wide use by other nations until it was eventually phased out in the 1870s in favor of metallic cartridge weapons.

The Pepperbox: late 1830s–early 1860s   300
United Kingdom: Adams Percussion Revolver, 1851–1860s   300
United Kingdom: Tranter Percussion Revolver, 1853–1860s   301
United Kingdom: Webley Percussion Revolver,
   circa 1853–1860s   301
United States: Colt Paterson Revolver, circa 1838–1840   302
United States: Colt Walker Model, 1847   302

United States: Colt Model 1851 Navy Revolver, 1850–1873   303
United States: Colt Model 1860 Army Revolver, 1860–1873   304
United States: Remington New Model Army Revolver, circa
   1863–1875   304
United States: LeMat Two-Barrel Revolver,
   circa 1856–1865   303
United States: Starr Revolver, double-action circa 1858–c. 1863;
   single–action circa 1863–1865   305
United States: Savage Revolving Firearms Company Navy Model
   Revolver, circa 1861–1865   305

## CARTRIDGE REVOLVERS

The self-contained metallic cartridge offers the advantages of speed in reloading and resistance to moisture. In the 1850s designers combined the metallic cartridge with the bored-through cylinder to create the first modern breech-loading revolvers. Primitive forms of metallic cartridges had appeared in Europe during the early years of the nineteenth century; in about 1836 the Frenchman Casimir Lefaucheux introduced the pinfire system. The pinfire cartridge utilized a small metal pin that extended from the side of the cartridge base and protruded through a notch in the rear of the revolver's cylinder. The strike of the pistol's hammer on the pin forced it against the priming within the cartridge base, thus detonating the cartridge. Although popular in Europe during the mid-nineteenth century, the pinfire cartridge proved liable to accidental detonation and reached obsolescence by the 1870s.

In 1857 the Americans Horace Smith and Daniel B. Wesson combined the bored-through cylinder patented by Rollin White with a small, caliber .22 cartridge of their own invention containing its priming in the cartridge base's rim. Their caliber .22 Model No.1 Revolver was the first mass-produced rimfire pistol and the partners' venture proved so successful that both the firm of Smith & Wesson and various forms of their cartridge survive into the twenty-first century. Later innovations included the larger caliber centerfire cartridge offering the twin advantages of being easily reloaded and a lethality suited to military weapons. By the 1880s metallic cartridge revolvers

had replaced the muzzle-loading percussion system and continue to see worldwide usage in the present day.

Italy: Model 1889   308
Japan: Type 26, 1893   308
Russia/Soviet Union: Nagant Model 1895   308
United Kingdom: Webley .45 WG, 1889   309
United Kingdom: Webley Mark IV, 1899   309
United Kingdom: Webley .455 Mark VI Revolver, 1915   310
United Kingdom: Webley .38 Mark IV, 1929   311
United Kingdom: Webley Mark V, 1929   311
United Kingdom: Enfield Pistol, Revolver, No. 2 Mk1 and Mk1*, 1931   312
United Kingdom: Smith & Wesson .38 Pistol, circa 1940   312
United States: Colt Model 1873 Single Action Army Revolver, 1872–1940   313
United States: Smith & Wesson .44 Pistol, 1873–1878   313
United States: Colt New Navy, Army, and Marine Revolvers, 1889   314
United States: Colt New Service Double Action Revolver, 1898–1944   315
United States: Colt New Service Revolver, Military Model 1917, World War I Issue   316
United States: Smith & Wesson Military & Police 10, 1905   317
United States: Smith & Wesson New Century Hand Ejector, 1908   317
United States: Smith & Wesson .38/200 British Service, circa 1940   318
United States: Colt Python, 1953   318
United States: Ruger Security Six, 1968   320
United States: Ruger Speed-Six, 1968   320
United States: Colt Lawman, 1969   319
United States: Ruger GP 100, 1987   320

## SEMIAUTOMATICS

Semiautomatic—or self-loading—pistols fire once with each pull of the trigger and mechanically reload and ~~~ck themselves by divert-

ing a portion of the energy from their discharge. Semiautomatics offer numerous advantages over revolvers in their ease of reloading, expanded cartridge capacities, and higher rate of fire. Appearing at the end of the nineteenth century, semiautomatics soon replaced revolvers in the arsenals of the major military powers and are issued universally at the present time. Although Germany at first led the world in semiautomatic developments it was soon challenged by other nations, most notably the United States. In 1896 Peter Paul Mauser introduced the Model 1896, the first mass-produced autoloading pistol that saw worldwide military usage. The P08, another German development by Georg Luger, was essentially a refinement of an earlier design by Hugo Borchardt. The most prolific and successful of all pistol designers, however, was an American, John Browning. Browning's Model 1900, manufactured by Colt, became the model for countless other designs throughout the world. His greatest fame came from his celebrated caliber .45 ACP Colt Models 1911 and 1911A1, the United States' primary sidearms from WWI through the Vietnam War. The legacy of Browning continues in the widespread incorporation of his ideas by others—the vast majority of modern semiautomatics still utilize the basic Browning principles established over a century ago.

Argentina: Ballester Molina, circa 1930   322
Austria: Roth-Steyr Model 1907   322
Austria: Steyr Model 1912   323
Austria: Steyr Pi18, 1974   322
Austria: Glock 17, adopted by Austria 1983   324
Austria: Steyr GB, 1981   323
Austria: Steyr M Series, 2000   323
Belgium: FN Model 1900   325
Belgium: FN Model 1903   325
Belgium: FN Model 1910   325
Belgium: FN Model 1922   326
Belgium: FN Browning GP-35 High Power, 1935   327
Belgium: FN BDA 9, 1993   328
Belgium: FN Five-seveN, 1998   329
China: Type 64, 1964   330
China: Type 67, 1967   330
Czechoslovakia: CZ 22, 1922   330
Czechoslovakia: CZ 24, 1924   330

had replaced the muzzle-loading percussion system and continue to see worldwide usage in the present day.

Italy: Model 1889   308
Japan: Type 26, 1893   308
Russia/Soviet Union: Nagant Model 1895   308
United Kingdom: Webley .45 WG, 1889   309
United Kingdom: Webley Mark IV, 1899   309
United Kingdom: Webley .455 Mark VI Revolver, 1915   310
United Kingdom: Webley .38 Mark IV, 1929   311
United Kingdom: Webley Mark V, 1929   311
United Kingdom: Enfield Pistol, Revolver, No. 2 Mk1 and Mk1*, 1931   312
United Kingdom: Smith & Wesson .38 Pistol, circa 1940   312
United States: Colt Model 1873 Single Action Army Revolver, 1872–1940   313
United States: Smith & Wesson .44 Pistol, 1873–1878   313
United States: Colt New Navy, Army, and Marine Revolvers, 1889   314
United States: Colt New Service Double Action Revolver, 1898–1944   315
United States: Colt New Service Revolver, Military Model 1917, World War I Issue   316
United States: Smith & Wesson Military & Police 10, 1905   317
United States: Smith & Wesson New Century Hand Ejector, 1908   317
United States: Smith & Wesson .38/200 British Service, circa 1940   318
United States: Colt Python, 1953   318
United States: Ruger Security Six, 1968   320
United States: Ruger Speed-Six, 1968   320
United States: Colt Lawman, 1969   319
United States: Ruger GP 100, 1987   320

## SEMIAUTOMATICS

Semiautomatic—or self-loading—pistols fire once with each pull of the trigger and mechanically reload and recock themselves by divert-ing a portion of the energy from their discharge. Semiautomatics of-fer numerous advantages over revolvers in their ease of reloading, ex-panded cartridge capacities, and higher rate of fire. Appearing at the end of the nineteenth century, semiautomatics soon replaced re-volvers in the arsenals of the major military powers and are issued universally at the present time. Although Germany at first led the world in semiautomatic developments it was soon challenged by other nations, most notably the United States. In 1896 Peter Paul Mauser introduced the Model 1896, the first mass-produced au-toloading pistol that saw worldwide military usage. The P08, another German development by Georg Luger, was essentially a refinement of an earlier design by Hugo Borchardt. The most prolific and suc-cessful of all pistol designers, however, was an American, John Browning. Browning's Model 1900, manufactured by Colt, became the model for countless other designs throughout the world. His greatest fame came from his celebrated caliber .45 ACP Colt Models 1911 and 1911A1, the United States' primary sidearms from WWI through the Vietnam War. The legacy of Browning continues in the widespread incorporation of his ideas by others—the vast majority of modern semiautomatics still utilize the basic Browning principles es-tablished over a century ago.

Argentina: Ballester Molina, circa 1930   322
Austria: Roth-Steyr Model 1907   322
Austria: Steyr Model 1912   323
Austria: Steyr Pi18, 1974   322
Austria: Glock 17, adopted by Austria 1983   324
Austria: Steyr GB, 1981   323
Austria: Steyr M Series, 2000   323
Belgium: FN Model 1900   325
Belgium: FN Model 1903   325
Belgium: FN Model 1910   325
Belgium: FN Model 1922   326
Belgium: FN Browning GP-35 High Power, 1935   327
Belgium: FN BDA 9, 1993   328
Belgium: FN Five-seveN, 1998   329
China: Type 64, 1964   330
China: Type 67, 1967   330
Czechoslovakia: CZ 22, 1922   330
Czechoslovakia: CZ 24, 1924   330

# EXHIBIT M

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

## <u>DECLARATION OF KEVIN M. SWEENEY</u>

Pursuant to 28 U.S.C. § 1746, I, Kevin M. Sweeney, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.  I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts dating from the 1600s, 1700s, and early 1800s.  My current research on seventeenth and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts.  This project, which has been going on for over a decade, has produced academic papers given at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and two published essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and Militias in Seventeenth- and

Eighteenth-Century England and America" (2019).  My curriculum vitae, detailing my

education, experience, and publications, is attached to this declaration as **Exhibit A**.

3.      I have been retained by the District of Columbia to provide an expert opinion on

repeating firearms in eighteenth-century America.  I make this declaration on the basis of my

training, professional expertise, and research.  For my work in this case, I am being compensated

at a rate of $50 per hour.

4.      During the 1700s, most gun owners in the British American colonies and in the

newly independent republic of the United States possessed and used single-shot, muzzle-loading,

flintlock firearms.  As Harold Peterson stated in his classic 1956 book—*Arms and Armor in

Colonial America, 1526-1783*—"The period began in 1689 with the muzzle-loading smooth-bore

musket and pistol as the most popular weapons.  In 1783, almost a hundred years later, the period

ended with the same weapons still supreme, and without even any notable improvements in their

design or construction."[1]  Peterson continued "Breech-loaders and repeaters had appeared

frequently on the scene but had made little impression upon it."[2]

5.      Evidence compiled during a decade of research using eighteenth-century probate

inventories, militia muster lists, newspapers, and other documentary sources confirms the

validity of Peterson's basic conclusions while offering three minor modifications.  First, these

weapons described by Peterson were still "supreme" in 1800 and probably as late as 1810.

Second, most muzzle-loading, flintlock long arms that were privately owned and used during this

period were not muskets, but lighter firearms that were usually cheaper and had narrower bores

than did muskets.  Finally, it would more accurate to say that repeaters had *occasionally*

---

[1]      Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.:
Stackpole Publishing 1956), 221.

[2]      Ibid, 221.

**APP. 523**

appeared on the scene and not "frequently" as Peterson believed.  Here, he was probably misled

by the preference that private collectors and institutional collections had (and still have) for

obtaining rare examples of unusual or innovative firearms.

## I.    Firearms Owned by Eighteenth Century Americans

6.    Today, we tend to refer to any muzzle-loading eighteenth-century gun as a

musket, and this is what Peterson did in the statement quoted above.  However, Peterson knew

better, as did Ben Franklin.  In the mid-1740s, Franklin informed the readers of his Philadelphia

newspaper that a "Musket" was "the Name of a particular Kind of Gun."[3]  An eighteenth-century

musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about

an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for

attaching a bayonet.  It weighed about 10 to 11 pounds and was .69 caliber in its bore if French

or .75 caliber if English, with an average barrel length of 44 inches.[4]  Because of this fact,

colonial governments and later state governments had to scramble to obtain enough muskets to

arm troops raised during the French and Indian War (1754-1763) and the Revolutionary War

(1775-1783).  The British Ordnance Office loaned colonial governments 22,000 muskets to arm

provincial troops raised during the French and Indian War, and at least 100,000 European

muskets—most of them French—were imported during the American War for Independence.[5]

---

[3]    "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[4]    Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121–141.

[5]    De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120–123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484–485.

7.      As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting.  Especially popular in New England were locally made or imported smoothbore fowlers and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[6]  The narrower bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[7]

8.      Many residents living in the colonies stretching from New York to Virginia owned "trade guns."  These were cheap, muzzle-loading, single-shot, smooth-bore firearms originally designed and produced for trade with Native Americans.  Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[8]  Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder that a musket did for each shot.

9.      In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles.  As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 bores—though some were even smaller— barrels averaging 42 inches in length, and fired projectiles weighing much less than musket

---

[6]      Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150–166.

[7]      Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121–122; Neumann, *Battle Weapons of the American Revolution*, 206–210.

[8]      M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 202–205.

4

**APP. 525**

balls.[9]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload and reloading became harder as gunpowder residue built up in the grooves of the barrel's rifling.[10]

10.    Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[11]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and because of this fact, they were often made in pairs "so that the owner might have two shots at his command."[12]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen. [13]  As it was, period pistols were discharged in close proximity to their targets, because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[14]

---

[9]    Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215–225.

[10]    John W. Wright, "The rifle in the American Revolution*," American Historical Review* Vol. 29, No. 2 (January 1924), 293–299.

[11]    Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[12]    Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[13]    For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd. e.d (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[14]    Douglas D. Scott, et al, "Colonial Era Firearm Bullet Performance: Alive Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

**APP. 526**

11.    Civilian officials and military officers generally had a low opinion of these popular firearms, including the period's long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[15]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian Trade," and not muskets.[16]  Later, George Washington referred to such smoothbore long arms as "trash or light arms."[17]  Over the course of the Revolutionary War, he and his officers also phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[18]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen, as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[19]

12.    Data drawn from the probate inventories of 3178 males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners.  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms.  Even cursory

---

[15]    "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265–266.

[16]    "Blair Report," 171.

[17]    General George Washington to Gentlemen, Morris Town, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[18]    Wright, "Rifle in the American Revolution," 297–298.

[19]    Thomas Jefferson, *Notes on the State of Virginia*, edited by William Pedue (New York: W. W. Norton, 1982), 88.

descriptions of firearms as "a gun" can be revealing when combined with the price that

individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at

£1 (i.e. 20 shillings), which was the usual cost of a single-shot muzzle-loading firearm.  Such

weapons would have been affordable given the fact that a daily wage during the period for

unskilled day labor was usually varied between 1 and a half and 2 shillings.  While there was an

obvious preference for long arms, guns clearly identified as muskets and rifles constituted a

minority of such weapons.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 0.2% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 485 | 39.9% | 0.3% | 0.8% | 5.6% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 435 | 63.2% | 2.9% | 0.9% | 20.0% |

 **Sources: The sources for the probate inventories used is this table can are listed in Kevin M. Sweeney,
"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds.,** *A Right to Bear Arms? The Contested History
in Contemporary Debates on the Second Amendment* **(Washington, D.C.: Smithsonian Press, 2019), 70-71.**

13.     The more expensive guns found in these 3178 eighteenth-century probate

inventories were also likely to be some type of muzzle-loading, single-shot long arms.  As a rule,

rifles were valued at £2 to £3, which was two or three times the cost of common muzzle-loading

**APP. 528**

smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, were the period's more realistic provision for being able to readily discharge more than one shot.  Even more rare were references to custom-made firearms such as a left-handed gun.  Nothing found in the almost 3200 probate inventories contained in the database used to construct Table 1 can be identified as a repeating firearm.

II.     **References to Repeating Arms in Eighteenth Century Media**

14.     Information drawn from 1170 eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5000 newspapers—tells much the same story.[20]  The search turned up 480 different newspaper advertisements for wholesalers and retailers which indicate the types of firearms that were available for purchase.  Another 132 personal advertisements for lost, stolen, or found guns and 96 notices of public auctions provide further insight into the kinds guns that residents actually possessed.  News reports of 233 accidents describe firearms that were used and abused while hunting, attending militia musters, shooting vermin, and engaging in reckless horse play with guns that unexpectedly turned out to be loaded.  Tragically, these reports also recount accidental discharges of loaded guns that were stored or left lying about inside eighteenth-century homes.  Reports on 167 homicides and attempted homicides and on 62 robberies reveal the types of firearms employed in activities considered to be criminal.  All told, these 1170 newspaper sources contained 1648 references to firearms.

15.     So, how common were repeating firearms in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Among the 1648

---

[20]     *America's Historical Newspapers* (Chester, VT: Readex, 2004).

references to guns uncovered in the 1170 eighteenth-century newspaper advertisements and news reports on crime only 6 contained references to repeating firearms. To this total can be added 3 more news reports that mentioned repeating firearms that were not related to criminal activities and were therefore not included in the total of 1170. To this information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777. This makes a total of 10 references to eighteenth-century repeaters in period sources.

16.    What do these period references to repeating firearms tell us about their features and practicality, how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America? The earliest newspaper reference to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723: "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once. This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730. This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty. There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[21]

---

[21]    John Pimm's 1715 revolver with a hand rotated cylinder and flint ignition system bears an apparent resemblance to a modern Smith and Wesson .38 caliber revolver. Brown, *Firearms in Colonial America*, 255–256. Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed. The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint. The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel. He then pulled back the hammer by hand. Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball. To fire again, the

9

17.     The next newspaper reference is contained in an advertisement in the March 2,

1730 issue of Boston's *New-England Weekly Journal*.  It was for a firearm employing an

uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at

once Loading."  This advertisement also makes clear the novelty of such a repeating firearm.

Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the

gun and 2 shillings—about the equivalent of a day's wage for unskilled labor—to see it fired.

Basically, this gun was being used in an eighteenth-century version of a sideshow.  There is no

indication that Miller was producing or selling such firearms.

18.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson

(1674-1762) advertised for sale a gun capable of firing 9 bullets in rapid succession.  It was "A

handy Gun of 9 pounds and a half Weight; having a Place convenient to hold 9 Bullets, and

Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow

as you please, which one turn with Handle of the Said Gun, it doth charge the Gun with Powder

and Bullet, and doth prime and shut the Pan, and cock the Gun."  The advertisement provides a

---

shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer
and repeated the process outlined above.  Primm's pistol could deliver six shots after being
loaded once, but it was not a rapid-fire weapon and it took time to reload the individual chambers
with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in
Germany between 1490-1530.  Brown, *Firearms in Colonial America*, 50.  However, they
remained rare, expensive, and suffered from mechanical problems because of the inability of
gunsmiths to fit together the moving parts with enough precision to prevent loose powder from
jamming the cylinder or producing an accidental discharge of the six chambers simultaneously.
Brown, *Firearms in Colonial, America*, 50–51; Graeme Rimer, et al., *Smithsonian Firearms: An
Illustrated History,* (New York: D. K. Publishing 2014), 56.  The revolver patented by Samuel
Colt in 1836 and produced in his factory in Patterson, New Jersey employed percussion caps in
its priming system and remains the first practical revolver to enter production.  The cylinder
rotated when the gun was cocked and fired when the trigger was pulled.  However, even sales of
this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of
Colt's first gun manufactory.  See Peterson, *Treasury of the Gun*, 211.

10

spot-on description of three repeating firearms found in the collections of the Milwaukee Public

Museum, Royal Amouries Museum in Leeds, and the Victoria and Albert Museum in London

that were produced sometime around 1690 by John Cookson, an English gunsmith.[22]  These

were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10

pounds when loaded with 9 balls and powder charges

19.    Cookson's English repeater employed what was known as the Lorenzoni breech-

loading system.[23]  This system placed at the end of the barrel a complex and delicate gun lock

operated by a handle or lever attached to the left side of the lock.  Separate tubes in the stock of

the firearm were filled with gunpowder for each charge and 9 to 11 balls.  The shooter pointed

the gun barrel towards the ground and pushed the handle or lever down and forward, which

rotated a mechanism located inside the gun lock that simultaneously brought forward one ball,

enough gunpowder to discharge it, and enough priming powder to set off the charge in the barrel

when the trigger was pulled.  To recharge and again fire the gun, the shooter again pointed the

barrel towards the ground, pushed on the lever and then pulled the trigger.  However, if the parts

of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when

firing, flames might leak back and explode the powder stored in the butt.  Catastrophic failures

happened because the period's methods of fabrication were not reliably capable of producing and

fitting together the parts needed to prevent malfunctions caused by errant sparks.

---

[22]    Brown, *Firearms in Colonial America*, 144–146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June, 2022), 43–63.

[23]    Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot.  His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon innovations by two German gunsmiths, Peter and Mathias Kaltoff. Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun*, 229-231.  Today this type of repeating firearm it is generally identified as employing the Lorenzoni system by English and American collectors and curators.

11

20.    Sometime before 1701, John Cookson moved to Boston.[24]  Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston.  There are no surviving eighteenth-century, American-made Cookson repeaters.[25]  This is actually not surprising that given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[26]  Authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[27]  The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[28]

21.    The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records of the Continental Congress.  English gunsmith and inventor Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid to discharge eight balls one after another, in eight, five or three seconds of time."[29]  He also claimed that his gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[30]  Despite a congressional resolution to purchase Belton's weapon,

---

[24]    Weaver and Godwin, "John Cookson, gunmaker," 51–56, 59–61.

[25]    Ibid., 56, 60.  Weaver and Goodwin make clear that the firearm identified as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was actually made in the late 1600s by John Shaw, a London gunsmith.

[26]    Ibid., 55.

[27]    Ibid., 60.

[28]    Ibid., 56-57.

[29]    Quoted in Brown, *Firearms in Colonial America*, 317.

[30]    Ibid.

none are known to have been produced or delivered.  It appears that Belton and Congress failed

to agree on a price.  The fate of Belton's repeater underscores two reasons why such weapons

were not popular with civilians and even had a hard time winning a military contract:  they were

expensive and they expended a lot of powder and lead with each discharge.

22.     If the arm that Belton demonstrated in Philadelphia in 1777 resembled to any

degree the repeating firearm that he produced in England in 1786, it was also heavy and

challenging to handle.  Belton returned to London in 1784 where he entered into a partnership

with London gunsmith William Jover (active 1750-1810).  In 1786, they produced a smoothbore

repeating fire arm with a sliding firelock and replaceable metal magazine containing seven

projectiles.  With each cock of the hammer and pull of the trigger, a single projectile could be

discharged.  There are two examples of the Jover and Belton repeating firearm in the collection

of the Royal Armouries, National Firearms Center in Leeds, England.  It weighs 10 pounds

unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the

Keeper of Firearms and Artillery at the Firearms Center observes in an on-line video that

managing the weapon is "a bit of a three-handed job."[31]

23.     Another disadvantage associated with eighteenth-century repeating firearms arose

from their reliance on large charges of black powder as an explosive propellant for discharging

bullets.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from

Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and philosophic Mr.

Chambers of Mercersburg in Pennsylvania."  This was Joseph Gaston Chambers (1756-1829).

According to the news report, this firearm "discharged six balls in succession, with only one

---

[31]     Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-
OmUM40G2U.  Accessed online 11/6/2022 at 4:00 P.M.

**APP. 534**

loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger."  A drawing of this firearm is attached as Exhibit B.

24.     This unusual firearm employed what is today referred to as a superposed or superimposition system that set off a series of charges in a single barrel.  This approach to achieving a basically uncontrolled discharge of a succession of bullets had been tried as early as 1580 by a German gunsmith working in London.[32]  Today, early flintlock pistols that used a superposed loading system are sometimes referred to as the "Roman candle pistol," because it employed "the same principle as the firework" that involved setting off "a chain reaction of multiple discharges."[33]  Other writers also liken such firearms that used a superposed system of multiple charges to a "Roman candle."[34]  In the 1820s, the "complexity and inherent dangers" of superposed systems such as that employed by Chambers "led to their wholesale abandonment."[35]

25.     Chambers's specific version of the system employed two gun locks:  one near the front of the barrel and the other in the usual location at the barrel's breech.  First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech.  This was the reserve shot.  Next a succession of eight cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel.  Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle which fired the first cylindrical projectile.  A hole in the next projectile carried the charge though

---

[32]     Peterson, *Treasury of the Gun*, 195.

[33]     Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara*, CA: ABC-CLIO, 2004), 37.

[34]     Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[35]     Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" accessed online 10/25/2022 at 4:55 P.M, page 2 of 6.  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

14

it and down its conical tail which ignited the charge which propelled the second cylindrical charge and so on. Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[36]

26.     The inventor's initial efforts to win government support and a patent for his invention were unsuccessful. A demonstration in May of 1793 failed to impress the War Department. Later in 1813, he did secure a patent to supply the U. S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[37] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government. His guns did work, but they could also produce devastating malfunctions. As historian Andrew Fagal has pointed out, cramming the gun's barrel with projectiles and gunpowder produced what was potentially a pipe bomb.[38] All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[39] With Chambers's particular system, an explosion would actually be guaranteed if a shooter accidently first pulled the trigger nearest the breech.

27.     A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use gunpowder. There are two advertisements—one for a demonstration and one for an auction—that contained references to guns. The February 10, 1792 issue of New York

---

[36]     For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821," pages 2–3 of 6.

[37]     Peterson, *Treasury of the Gun*, 197.

[38]     Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[39]     Peterson, *Treasury of the G*un, 198.

City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, although in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.

28.    This particular air gun appears to have resembled or possibly could have been an actual example of the European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun also had a magazine with a capacity of 20 balls, each of which was propelled by discharges of compressed air from a cannister of compressed air carried in the gun's stock.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

29.    However, someone at this time does appear to have been selling air guns.  An announcement for a public auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot."  This air gun appears to be a repeating gun because of its reference to a "Magazine."  However, one should not automatically assume that all eighteenth-century air guns

16

**APP. 537**

were repeaters.  Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single-shot air guns, though some erroneously assume that they were repeaters like Girardoni's air rifle.[40]

30.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers. One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia."  However, this particular news report has been dismissed as a fabrication.[41] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina.  It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries.  Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular "could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

31.     Ransier appears to be describing imported Belgian or French-made Seglas pistols which had four rifled barrels.  These were small pistols that had a box lock and a swiveling breech attached to a cluster of four separate barrels:  two upper barrels placed on top of two lower barrels.  The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels.  Each barrel was

---

[40]     Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West, accessed online on 10/31/2022, at 10:40 A.M.  On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[41]     Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability as does the fact that it was immediately followed by a news report on a Sea Monster. An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report. Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

loaded separately at the muzzle with powder and ball.  The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky).  After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard.  Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously.  However, as experts have pointed out:  "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[42]  If this happened, the gun would explode in the shooter's hand.

32.     In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's repeating flintlock, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  Lewis and Clark and their "Corps of Discovery" consisting of soldiers carried a Girardoni air rifle to the Pacific Ocean and back.  However, well into the 1800s, the American government armed the overwhelming majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating firearms made by the Spencer Arms Company and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.

33.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is really not surprising given the colonists' demonstrated preferences for inexpensive,

---

[42]     Rimer, *Smithsonian's Firearms,* 56.

light firearms that used less powder and lead than did muskets. By contrast, most of the period's repeating arms were heavy, more expensive, and required greater expenditures of gunpowder and lead. Because repeating firearms contained multiple charges of explosive black powder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile. Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb. As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[43] For these reasons, eighteenth-century advertisements and homes were still filled with muzzle-loading, single-shot firearms.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on  11/22/2022                    KEVIN M. SWEENEY

---

[43]     Peterson, *Treasury of the Gun*, 233.

**Exhibit B**



# EXHIBIT O

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 1:22-cv-02256-RC** |

### <u>DECLARATION OF DANIEL W. WEBSTER</u>

Pursuant to 28 U.S.C. § 1746, I, Daniel W. Webster, declare and state as follows:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am Bloomberg Professor of American Health in Violence Prevention in the Department of Health Policy and Management at the Johns Hopkins Bloomberg School of Public Health.  I am Co-Director of the Johns Hopkins Center for Gun Violence Solutions and served as either Director or Co-director of Policy and Research and previously served as Co-Director of the Johns Hopkins Center for the Prevention of Youth Violence.

3.      I began my career in public safety research in 1985 as a Research Associate at the University of Michigan's School of Public Health, and I have devoted most of my research since then to gun-related violence and its prevention.  I have a Master of Public Health degree from the University of Michigan and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health.  This graduate training included many advanced courses in epidemiology, research methods, and statistical analysis.

**APP. 543**

4.     Immediately prior to joining the faculty at Johns Hopkins, I directed a program on violence research at the Washington (D.C.) Hospital Center.  I joined the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010 have been a tenured Professor of Health Policy and Management.  I teach graduate courses on violence prevention. Previously, I taught courses in research and evaluation methods at Johns Hopkins, directed the Ph.D. program in Health and Public Policy, and served on the steering committee of a pre- and post-doctoral training program in violence prevention research funded by the National Institutes of Health.

5.     I have directed numerous studies related to gun violence and its prevention.  I have published 147 scientific articles and nine invited commentaries in academic peer-reviewed journals, the vast majority of these addressed some aspect of violence and/or firearm injuries and their prevention.  I am the lead editor of a book entitled *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* by Johns Hopkins University Press (2013), and I am the lead author for two chapters and co-author on three other chapters in this book.  In addition, I recently served as special editor or co-editor of three special issues on gun violence for top tier public health journals.  My curriculum vitae, detailing these publications, is attached as Exhibit 1 to this Declaration.

6.     I have been asked by the Attorney General's Office for the District of Columbia to provide information about current research on gun violence and its prevention, particularly as it relates to large capacity magazines.  I have provided this declaration without charge.

7.     There are data that indicate that design and capabilities of firearms can potentially affect the likelihood that an intended target or bystander at a shooting will be wounded as well as the severity of wounds resulting from criminal shootings.  Particularly relevant is the capacity of a firearm's ammunition feeding device.  In comparison to other magazines which feed

**APP. 544**

ammunition to semi-automatic firearms, large capacity magazines (LCMs)—often defined as those that hold more than 10 rounds—increase the number of rounds that can be fired without the shooter having to take the time to reload.

8.      Assault weapons have been defined in laws as semi-automatic firearms capable of accepting LCMs in addition to one or more deemed useful in military or criminal applications, especially mass shootings.  These include pistol grips on rifles, folding rifle stocks (to make rifles more concealable), threaded barrels for attaching silencers, and barrel shrouds on pistols.

9.      There is evidence that the design features of assault weapons make them especially appealing to criminals and to those who commit mass shootings.  When mass shootings occur in public, especially shootings that take place in public places, the shooter often selects an assault weapon or another firearm with an LCM.  Data on 15 public mass shootings in the U.S. from 1984 to 1993 collected by Gary Kleck revealed that six (40%) involved assault weapons or other firearms equipped with LCMs.[1, 2]  A collection of data by Mother Jones magazine on 62 mass shootings in public places by lone shooters from 1982 through 2012 found that 33 perpetrators (53.2%) used firearms or LCMs that were or would have been banned by the federal ban of assault weapons and LCMs.[3]

10.      Reviewing data on fatal mass shootings (4 or more victim fatalities) compiled by Everytown for Gun safety for the period 2009-2020, an assault weapon was used in at least 30 of

---

[1]      Kleck, Gary. Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter, pp. 124-126 (1997).

[2]      Koper, Christopher S. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*. Philadelphia: University of Pennsylvania. p. 14 (2004).

[3]      Mother Jones Magazine, US Mass Shootings, 1982-2012.  Data from Mother Jones' Investigation, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (2014).

**APP. 545**

these events involving 347 deaths (25% of all victims killed in mass shootings) and 719

individuals with nonfatal gunshot wounds (76% of the total). Fatal mass shootings during this

time period that were carried out with an assault weapon accounted for 6 times as many people

shot as fatal mass shootings committed with other firearms.[4] In these same data, a total of 42

fatal mass shootings were committed with firearms with an LCM the resulted in 422 deaths and

an additional 710 with nonfatal gunshot wounds. In comparison with the 34 fatal mass shootings

in which there was information indicating that the firearm did not have an LCM, the average

number of people shot was 4.4 times higher in shootings with firearms with LCMs (26.6 vs. 6.0).

     11.    Similarly, Professor Christopher Koper's re-analysis of data from Mother Jones

magazine's study of public mass murders with firearms (1982-2012) revealed that mass

shootings with assault weapons, compared with mass shootings with other firearms, involved

more fatalities per incident (a mean of 10.4 vs. 7.4) and more victims with nonfatal gunshot

wounds (mean of 13.5 vs. 6.4).[5] Dillon (2013) also reported that, compared with assaults carried

out with firearms that did not have LCMs, mass shootings in which firearms with LCMs were

used had 60% more fatalities on average (a mean of 10.19 vs. 6.35) and more than 3 times as

many persons with nonfatal gunshot wounds (12.39 vs. 3.55). These findings are consistent with

those from a study of criminal shootings in Jersey City, NJ, which found that, compared to

---

[4] Everytown Research & Policy. Mass Shootings in America.
https://everytownresearch.org/maps/mass-shootings-in-america/#mass-shootings-involving-assault-weapons-or-high-capacity-magazines-were-far-deadlier

[5]    Dillon, Luke, Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012, Thesis for Master of Arts in Criminology, Law and Society, George Mason University, September 2013; Koper, Christopher S., Supplemental affidavit submitted on January 6, 2014 in *Shew v. Malloy*, Civil Action No. 3:13-CV-00739-AVC (D. Conn).

**APP. 546**

shootings with revolvers, shootings with semi-automatic pistols—which tend to hold

significantly more bullets than revolvers—had more shots fired and more victims wounded.[6]

    12.    A study led by criminologist Christopher Koper and colleagues gather a variety of

kinds of data from law enforcement agencies on the use of LCMs and assault weapons in various

types of crime.  Firearms with LCMs accounted for 15 to 36% of firearms recovered by law

enforcement across ten cities with detailed data on firearm characteristics between 2001 and

2014, 40.6% of firearms used to murder police nationally between 2009 and 2013, and as much

as 57.4% of firearms used in mass shootings involving 4 or more victim deaths for the period

2009-2015.[7]  In this same study, Dr. Koper and his colleagues reported that assault weapons

accounted for between 2.6 and 8.5% of firearms recovered by 10 large city police departments

between 2001 and 2014, 13.2% of murders of police involving firearms, and up to 35.7% of fatal

mass shootings nationally 2009-2015.[7]  In a separate study published in *Criminology & Public

Policy* in 2019 that drew upon a wider set of data on fatal mass shootings, Dr. Koper found that

about half of all firearms used in fatal mass shootings[8] and two-thirds of the most deadly

shootings were committed with semiautomatic firearms with LCMs.[9]  When details on the

---

[6]    Reedy, Darin C., and Christopher S. Koper, Impact of handgun types on gun assault outcomes:  a comparison of gun assaults involving semiautomatic pistols and revolvers, *Injury Prevention* 9:151-155 (2003).

[7]    Koper, Christopher S., William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins. Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources. *Journal of Urban Health* (2017), DOI 10.1007/s11524-017-0205-7

[8]    Koper, Christopher S. Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms. *Criminology & Public Policy*. 19(1): 147-170 (2020), https://doi.org/10.1111/1745-9133.12485

[9]    Klarevas, Louis. *Rampage Nation: Securing America from Mass Shootings*. Amherst, NY: Prometheus Books (2016).

weapons used in fatal mass shootings was available, just over one quarter involved the use of an assault weapon.[10]

13.     As a point of comparison, it is estimated that assault weapons accounted for about 3 percent of all firearms in civilian hands in 2013.  Thus, semiautomatic firearms with LCMs and assault weapons specifically are used in crime, lethal violence against law enforcement officers, and in fatal mass shootings at percentages five to ten times higher than would be by chance or if weapon features played no role in these acts of violence.  A study using data from handgun purchasers in California and subsequent crimes committed with those handguns prior to the state banning assault-style pistols found that the share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.[11]  These findings are consistent with the thesis that design features of assault style firearms, including LCMs, are attractive to those who are most likely to use firearms in crime.

14.     Available evidence indicates that bans of LCMs and assault weapons reduce the incidence of fatal mass shootings and the number of people shot in such shootings.  In a study that I led that was published in *Criminology & Public Policy* (a journal of the American Society of Criminology) my team analyzed data on fatal mass shootings by state over the period 1984-2017 to assess independent associations between state and federal firearm laws and the incidence of fatal mass shootings.  Using regression analyses to control for other factors in addition to

---

[10] Koper (2019) and Klarevas (2016) in footnotes 8 and 9.
[11] Wintemute, Garen J, Mona A Wright, Carrie A Parham, Christiana M Drake, and James J Beaumont. (1998) Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32(1):44-50. doi.org/10.1016/S0196-0644(98)70098-8

**APP. 548**

firearm laws, we found that state bans on LCMs were associated with a statistically significant 48 percent lower incidence of fatal mass shootings when contrasted with state-years in which there was no LCM ban.[12]  Our statistical models also indicated that LCM bans were associated with 70% fewer deaths from fatal mass shootings per capita; however, there was a wide confidence interval around that estimate.  Another study, using similar data and methods also published in 2020 likewise found that LCM bans were associated with significantly lower rates of fatal mass shootings.[13]  Dr. Louis Klarevas led a study published in the American Journal of Public Health 2019 using data from 1990-2017 and reported that the incidence of high-fatality mass shootings (6 or more victim deaths) in non-LCM ban states was more than double the rate in LCM ban states; the annual number of deaths from these shootings per capita was more than 3 times higher.  Statistical models also found a significant association between LCM bans and lower rates of high-fatality mass shootings.[14]  From the available research evidence, I conclude that state bans of LCMs are associated with lower rates of fatal mass shootings and mass shooting deaths.

   15.    I have also conducted and synthesized research on the estimated effects of bans of assault weapons on fatal mass shootings.  First, there is evidence that the federal ban of assault weapons and LCMs reduced the incidence of the criminal use of banned guns.  Christopher

---

[12]    Webster, Daniel W., Alexander D. McCourt, Cassandra K. Crifasi, Marisa Doll Booty, and Elizabeth A. Stuart. Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States. *Criminology & Public Policy*, 19:171–212 (2020), doi.org/10.1111/1745-9133.12487.

[13]    Siegel M, Goder-Rieser M, Duwe G, Rocque M, Fox JA. The Relation Between State Gun Laws and the Incidence and Severity of Mass Public Shootings in the United States, 1976–2018. *Law and Human Behavior*. 44(5): 34t-360 (2020), http://dx.doi.org/10.1037/lhb0000378

[14]    Klarevas, Louis, A Conner, David Hemenway. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990-2017. *American Journal of Public Health*. 109(12):1754-1761 (2019), doi: 10.2105/AJPH.2019.305311

Koper and colleagues' study of the federal ban that used a variety of data revealed about a one third reduction in the share of crime guns recovered and traced by law enforcement that were assault weapons.[15]

16.    The study that I led on firearm laws and fatal mass shootings estimated the independent association between state assault weapons bans and fatal mass shootings.  Our point estimates suggested that assault weapon bans were associated with a 29 to 36% lower rate of fatal mass shootings after controlling for the effects of LCM bans and other firearm laws. However, there was significant uncertainty surrounding those estimates and they were not statistically significant.  In a study of public fatal mass shootings during 1982-2011 and the association with federal and state assault weapon bans, economist Mark Gius found statistically significant negative associations between assault weapon bans and fatalities from public mass shootings.[16]

17.    A recent study used the most comprehensive data collected to date on fatal mass shootings in public places[17] to assess the effects of the federal ban on assault weapons and LCMs and the sunsetting of that law in 2004.  Philip Cook and John Donohue found that fatalities from shootings with banned weapons decreased during the second half of the ban and then surged after the ban expired.  From 2015 to 2019, five of the top ten deadliest mass public shootings in

---

[15]    Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003," National Institute of Justice, US Department of Justice (June 2004).

[16]    Mark Gius. The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings. *Applied Economics Letters* 22(2):281–284 (2015).

[17]    Violence Project. Mass shooter database: version 5.0. https://www.theviolenceproject.org/mass-shooter-database/

**APP. 550**

U.S. history occurred and each was committed with an assault weapon.  The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.[18]

   I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on ___November 22, 2022_      _____

                                DANIEL W. WEBSTER

---

[18]     Cook, Philip J. and John J. Donohue. Regulating Assault Weapons and Large-Capacity Magazines for Ammunition. *JAMA.* 2022;328(12):1191-1192 (2022), doi:10.1001/jama.2022.17120

**APP. 551**

# EXHIBIT P

## REPORT OF FIREARMS COMMITTEE

*To the National Conference of Commissioners on Uniform State Laws:*

The report of this committee at Buffalo last year showed that following the publication of the Uniform Firearms Act as approved by the Conference and the Bar Association at Denver in July, 1926, some objections raised by the Police Commissioner of New York City through Governor Whitman induced the Executive Committee of the Conference in January, 1927, to recommend to the Conference the withholding of the act from presentation to the states, and the recommitment of the matter to the Firearms Committee for further study and report. (Handbook, 1927, p. 866.) In view of this action of the Executive Committee of the Conference the Executive Committee of the American Bar Association took under reconsideration the approval of the act, this action being approved at the Buffalo meeting. (Bar Assn. Reports, No. 52, 1927, p. 223.)

The Firearms Committee reported at the Buffalo meeting, outlining its efforts to cooperate with the National Crime Commission, which through a subcommittee had drafted and presented to the legislatures the so-called Crime Commission Bill on the subject of firearms regulation. The text of this was printed in display with the text of the Uniform Act. It was pointed out that the Crimes Commission had taken the Uniform Act as the basis of its work, adopting a great deal of it, but with the addition of some new matters, and the change of some of the principles of the Uniform Act. (Handbook, 1927, pp. 866-914.) These matters were also adverted to by President Young in his opening address. (*Ibid.*, p. 453.) In accordance with the recommendations of the committee the Conference voted as follows (*Ibid.*, pp. 267-268, 914):

419

" 1. That in accordance with action already taken by the Executive Committee the Uniform Firearms Act be withheld from presentation to the legislatures until further action of the Conference.

" 2. That the committee on the Uniform Firearms Act be continued for the purpose of giving further consideration to the objections thereto, for further study of other proposed legislation, for further conferences with the committee of the National Crime Commission, and for further report as to whether or not it is desirable that the act be amended or retained in its present form, or as to what definite disposition should be made thereof."

With the Uniform Act thus back for consideration various meetings have been held during the year between members of the undersigned committee and members of the subcommittee of the National Crime Commission. The final joint meetings were in Washington on April 26-27, 1928, at which were present on behalf of your committee Judge Ailshie and Messrs. O'Connell and Imlay, and on behalf of the subcommittee of the Crime Commission General J. Weston Allen and Mr. J. E. Baum, of the American Bankers Association.

As a result of these meetings and the separate attention given to these matters by your own committee, both in personal conference in Washington, and in an exchange of views by letter, your committee has formulated a proposed revision, printed herewith, of the Uniform Act, incorporating some of the new matter of the Crime Commission Bill, but retaining the basic features of the Uniform Act. In notes accompanying each section, which should be studied in connection with the parallel references in the two acts as printed in last year's report (Handbook, 1927, pp. 878-889), an attempt has been made to indicate the changes. Some of the matters of major importance may be summarized as follows:

1. The revision incorporates the new matter of the Crime Commission Bill on machine guns. Most of the firearms legislation passed in the current year has been on the subject of machine guns, e. g., General Laws of California of 1927, Ch. 552; Acts and Resolves of Mass., 1927, Ch. 326; Mich. Public Acts of 1927, No. 372; N. J. Public Laws 1927, Ch. 95, p. 180. There has been recent legislation on the subject also in Iowa.

420

2. The revision retains the principle of forbidding the carrying of concealed weapons with strict regulations for identification, but does not require a license to purchase as does the Crime Commission Bill. This constitutes the basic difference between the two acts. Upon this point your committee and the subcommittee of the Crime Commission have been unable to agree.

3. The revision retains the method of the Uniform Act in providing a general penalty section (S. 19) rather than, as in the other act, placing penalty clauses within the various sections.

4. The revision, like the original act, does not fix mandatory sentences, the matter of sentences being left open for the exercise of discretion by the courts.

Upon the basic difference between the two acts mentioned above your committee has bestowed much careful thought. The form of regulation contained in the Uniform Act was adopted by the Conference advisedly. That form is consistent with the forms of regulation which have always obtained and now obtain in the states generally, as the analysis of the subject in the second report of this committee shows. (Handbook, 1925, pp. 854-898.) The system of license to purchase has been for many years the law of New York. It was adopted in Michigan in 1925, being reenacted in the 1927 act mentioned above: it was also adopted in Massachusetts in 1926. (Acts of 1926, Ch. 395.) Beyond those states it has not gone, so far as this committee is advised.

This committee reaffirms the position heretofore taken on this subject, that such a provision is not only out of line with legislative precedents and experience, but is unenforceable. It would make criminals out of law-abiding citizens, and would not be obeyed by the lawless.

A bill drawn very much along the lines of this proposed revision, was introduced into the United States Senate April 16, 1928, by Senator Capper (S. 4086, 70th Cong.) as a local law for the District of Columbia: the same bill was introduced into the House of Representatives a few days later by Representative Frederick J. Zihlman of Maryland, a member of the District of Columbia Committee (No. 13211). The bills are now under consideration before the respective Committees on the District of Columbia of the two houses.

421

Your committee presents this revision for the consideration of the Conference and recommends its adoption as an act which preserves the results achieved in the work heretofore done on the Uniform Act, and incorporates valuable new material from the Crime Commission Act.

Respectfully submitted,

JOSEPH F. O'CONNELL, *Chairman*,
JAMES F. AILSHIE,
CHARLES V. IMLAY,
J. O. SETH,
L. C. SPIETH,
D. A. McDOUGAL,
GEORGE B. MARTIN,
HARRY L. CRAM.

## A UNIFORM ACT TO REGULATE THE SALE AND POSSESSION OF FIREARMS

AN ACT REGULATING THE SALE, TRANSFER AND POSSESSION OF CERTAIN FIREARMS, PRESCRIBING PENALTIES AND RULES OF EVIDENCE, AND TO MAKE UNIFORM THE LAW WITH REFERENCE THERETO

1    SECTION 1. (*Definitions.*) "Pistol," as used in this act,
2    means any firearm with a barrel less than twelve inches in
3    length.
4        "Machine gun," as used in this act, means any firearm
5    which shoots automatically and any firearm which shoots
6    more than twelve shots semi-automatically without reloading.
7        "Person," as used in this act, includes firm, association or
8    corporation.
9        "Sell" and "purchase" and the various derivatives of
10   such words, as used in this act, shall be construed to include
11   letting on hire, giving, lending, borrowing, and otherwise
12   transferring.
13       "Crime of violence," as used in this act, means any of the
14   following crimes or an attempt to commit any of the same,
15   namely: Murder, manslaughter, rape, mayhem, assault to do
16   great bodily harm, robbery, larceny, burglary, and house-
17   breaking.

422

*Note:* The words "or revolver" are omitted in the first definition and at other places where they occur in the Uniform Act, as in the Crime Commission Act, for greater simplicity.

The new definition of "machine gun" is substantially that of the Crime Commission Act.

The new definitions of "person" and "sell and purchase" are substantially those of the Crime Commission Act.

1    SECTION 2. (*Committing Crime When Armed.*) If any
2    person shall commit a crime of violence when armed with or
3    having readily available any pistol or other firearm, he may
4    in addition to the punishment provided for the crime be
5    punished also as provided by this act.

*Note:* The words "or having readily available" and "or other firearm" are added from the Crime Commission Act.

1    SECTION 3. (*Being Armed Prima Facie Evidence of In-*
2    *tent.*) In the trial of a person for committing a crime of
3    violence the fact that he was armed or had readily available
4    a pistol, and had no license to carry the same, or was armed
5    with or had readily available any other firearm having a total
6    length of less than twenty-six inches, or any machine gun,
7    shall be *prima facie* evidence of his intention to commit such
8    crime of violence.

*Note:* The words "or had readily available" are added from the Crime Commission Act: the words "or was armed with, etc.," are adopted from that act, to include firearms longer than twelve inches capable of being concealed on the person and machine guns.

1    SECTION 4. (*Persons Forbidden to Possess Certain Fire-*
2    *arms.*) No person who has been convicted in this state or
3    elsewhere of a crime of violence shall own a pistol or have one
4    in his possession or under his control.

*Note:* This section is substantially the same as that of the original Uniform Act and of the Crime Commission Act, except that the latter specifies a punishment which in this proposed revision as in the original Uniform Act is left for a general section.

1    SECTION 5. (*Carrying Pistol.*) No person shall carry a
2    pistol in any vehicle or concealed on or about his person, ex-
3    cept in his dwelling house or place of business or on other

423

4   land possessed by him, without a license therefor issued as
5   hereinafter provided.

*Note:* This section is the same as that of the original Uniform Act except that it incorporates the language of the corresponding Section 11 of the Crime Commission Act in making the prohibition against carrying pistols in vehicles absolute.

1   SECTION 6. (*Exceptions.*)  The provisions of the preced-
2   ing section shall not apply to marshals, sheriffs, prison or
3   jail wardens or their deputies, policemen or other duly ap-
4   pointed law-enforcement officers, or to members of the army,
5   navy, or marine corps of the United States or of the national
6   guard or organized reserves when on duty, or to the regu-
7   larly enrolled members of any organization duly authorized
8   to purchase or receive such weapons from the United States
9   or from this state, provided such members are at or are going
10  to or from their places of assembly or target practice, or to
11  officers or employees of the United States duly authorized to
12  carry a concealed pistol, or to any person engaged in the busi-
13  ness of manufacturing, repairing, or dealing in firearms or
14  the agent or representative of any such person having in his
15  possession, using, or carrying a pistol in the usual or ordinary
16  course of such business, or to any person while carrying a
17  pistol unloaded and in a secure wrapper from the place of
18  purchase to his home or place of business or to a place of
19  repair or back to his home or place of business or in moving
20  goods from one place of abode or business to another.

*Note:* This section remains the same as that of the original Uniform Act with a few modifications introduced from the corresponding Section 12 of the Crime Commission Act.

1   SECTION 7. (*Issue of Licenses to Carry.*)  [The justice
2   of a court of record, the chief of police of a city or town, and
3   the sheriff of a county or the persons authorized by any of
4   them] shall, upon the application of any person having a
5   bona fide residence or place of business within the jurisdic-
6   tion of said licensing authority or of any person having a
7   bona fide residence or place of business within the United
8   States and a license to carry a pistol concealed upon his per-
9   son issued by the lawful authorities of any state or subdivi-

424

10 sion of the United States, issue a license to such person to
11 carry a pistol within this state for not more than one year
12 from date of issue, if it appears that the applicant has good
13 reason to fear injury to his person or property or has any
14 other proper reason for carrying a pistol and that he is a
15 suitable person to be so licensed. The license shall be in tripli-
16 cate in form to be prescribed by the [Secretary of State] and
17 shall bear the name, address, description, photograph, and
18 signature of the licensee and the reason given for desiring a
19 license. The original thereof shall be delivered to the licensee,
20 the duplicate shall within seven days be sent by registered
21 mail to the [Secretary of State] and the triplicate shall be
22 preserved for six years by the authority issuing said license.

*Note:* This section remains substantially as in the original Uniform Act
and as in Section 10 of the Crime Commission Act.

1 SECTION 8. (*Selling to Minors and Others.*)  No person
2 shall sell any pistol to a person who he has reasonable cause
3 to believe is not of sound mind, or is a drug addict, or is a
4 person who has been convicted in the District of Columbia or
5 elsewhere of a crime of violence, or, except when the relation
6 of parent and child or guardian and ward exists, is under
7 the age of eighteen years.

*Note:* This section has been expanded to include in addition to infants
the other disqualified persons named in the corresponding Section 7 of the
Crime Commission Act.

1 SECTION 9. (*Transfers Regulated.*)  No seller shall de-
2 liver a pistol to the purchaser thereof until forty-eight hours
3 shall have elapsed from the time of the application for the
4 purchase thereof, and, when delivered, said pistol shall be
5 securely wrapped and shall be unloaded. At the time of ap-
6 plying for the purchase of a pistol the purchaser shall sign
7 in triplicate and deliver to the seller a statement containing
8 his full name, address, occupation, color, place of birth, the
9 date and hour of application, the caliber, make, model, and
10 manufacturer's number of the pistol to be purchased and a
11 statement that he has never been convicted in this state or
12 elsewhere of a crime of violence. The seller shall within six

425

13  hours after such application sign and attach his address and
14  forward by registered mail one copy of such statement to the
15  chief of police of the city or town or the sheriff of the county
16  of which the seller is a resident; the duplicate the seller shall
17  within seven days send with his signature and address to the
18  [Secretary of State]; the triplicate he shall retain for six
19  years. This section shall not apply to sales at wholesale.

*Note:* This section has been modified to require forty-eight instead of twenty-four hours to elapse from the time of application till the time of delivery of a weapon. A provision is also inserted for a more immediate notice to the police.

1  SECTION 10. (*Dealers to be Licensed.*) No retail dealer
2  shall sell or expose for sale or have in his possession with in-
3  tent to sell any pistol without being licensed as hereinafter
4  provided.

*Note:* This section remains in substance the same as in the original Uniform Act except that with the new matters of definition adopted from the Crime Commission Act it conforms in language to Section 6 thereof.

1  SECTION 11. (*Dealers' Licenses, by Whom Granted and
2  Conditions Thereof.*) The duly constituted licensing authori-
3  ties of any city, town, or political subdivision of this state
4  may grant licenses in form prescribed by the [Secretary of
5  State] effective for not more than one year from date of issue,
6  permitting the licensee to sell pistols at retail within this
7  state subject to the following conditions in addition to those
8  specified in Section 9 hereof, for breach of any of which the
9  license shall be subject to forfeiture and the licensee subject
10  to punishment as provided in this act:
11  1. The business shall be carried on only in the building
12  designated in the license.
13  2. The license or a copy thereof, certified by the issuing
14  authority, shall be displayed on the premises where it can
15  easily be read.
16  3. No pistol shall be sold (a) if the seller has reasonable
17  cause to believe that the purchaser is not of sound mind or
18  is a drug addict or has been convicted in this state or else-
19  where of a crime of violence or is under the age of eighteen

426

20  years, or (b) unless the purchaser is personally known to
21  the seller or shall present clear evidence of his identity.
22      4. A true record in triplicate shall be made of every pistol
23  sold, said record to be made in a book kept for the purpose,
24  the form of which may be prescribed by the [Secretary of
25  State] and shall be personally signed by the purchaser and
26  by the person effecting the sale, each in the presence of the
27  other, and shall contain the date of sale, the caliber, make,
28  model, and manufacturer's number of the weapon, the name,
29  address, occupation, color, and place of birth of the purchaser,
30  and a statement signed by the purchaser that he has never
31  been convicted in this state or elsewhere of a crime of vio-
32  lence. One copy of said record shall within six hours be sent
33  by registered mail to the chief of police of the city or town
34  or the sheriff of the county of which the dealer is a resident;
35  the duplicate the dealer shall within seven days send to the
36  [Secretary of State]; the triplicate the dealer shall retain for
37  six years.
38      5. No pistol or imitation thereof or placard advertising the
39  sale thereof shall be displayed in any part of said premises
40  where it can readily be seen from the outside.
41      No license to sell at retail shall be granted to anyone except
42  as provided in this section.

*Note:* This section remains substantially the same as the original
Section 11 and Section 6 of the Crime Commission Act, except that it
incorporates, like Section 9 hereof, a provision for a more immediate notice
by the dealer to the police.

1      SECTION 12.   (*False Information Forbidden.*)  No person
2  shall, in purchasing a pistol or in applying for a license to
3  carry the same, give false information or offer false evidence
4  of his identity.

*Note:* This section remains practically the same as the same section in
the original Uniform Act and as Section 13 of the Crime Commission Act,
except that the latter makes special mention therein of a penalty.

1      SECTION 13.   (*Alteration of Identifying Marks Pro-*
2  *hibited.*)  No person shall change, alter, remove, or obliterate
3  the name of the maker, model, manufacturer's number, or other
4  mark of identification on any pistol. Possession of any pistol

427

5   upon which any such mark shall have been changed, altered,
6   removed, or obliterated shall be *prima facie* evidence that the
7   possessor has changed, altered, removed, or obliterated the
8.  same.

*Note:* This section remains the same as in the original Uniform Act and in the corresponding Section 18 of the Crime Commission Act.

1   SECTION 14. (*Existing Licenses Revoked.*)  All licenses
2   heretofore issued in this state permitting the carrying of
3   pistols shall expire at midnight of the —— day of ———,
4   19—.

*Note:* This section remains the same as in the original Uniform Act and in Section 23 of the other act.

1   SECTION 15. (*Exceptions.*)  This act shall not apply to
2   antique pistols unsuitable for use as firearms and possessed
3   as curiosities or ornaments.

*Note:* This section is the same in substance as in the original act, but it adopts from the corresponding Section 22 of the other act the words "and possessed as curiosities or ornaments."

1   SECTION 16. (*Pawning of Pistols Prohibited.*)  No per-
2   son shall make any loan secured by mortgage, deposit, or
3   pledge of a pistol.

*Note:* This is a new section, adopting the substance of Section 8 of the Crime Commission Act.

1   SECTION 17. (*Machine Guns.*)  No person shall possess
2   any machine gun.  This section shall not apply to any foreign
3   government nor to members of the army, navy, or marine
4   corps of the United States, or of the national guard or organ-
5   ized reserves when on duty, nor to the Post Office Department
6   or its employees when on duty, nor to duly appointed law-
7   enforcement officers, nor to banking institutions established
8   under the laws of the United States, nor to public carriers
9   who are engaged in the business of transporting mail, money,
10  securities, or other valuables.

*Note:* This is a new section, incorporating the provisions of Sections 14 and 15 of the Crime Commission Act.

1   SECTION 18. (*Act Supersedes Local Laws.*)  The provi-
2   sions of this act shall be effective and controlling throughout

428

**APP. 562**

3  this state, notwithstanding the provisions of any local law
4  or ordinance.

*Note:* This section remains the same as Section 16 of the original act and is the same in substance as Section 26 of the Crime Commission Act.

1  SECTION 19.  (*Penalties.*)  Any violation of any provi-
2  sion of this act shall constitute an offense punishable by a
3  fine of not more than [$——] or imprisonment for not more
4  than [——] or both, or by imprisonment in the peniten-
5  tiary for not less than [——] nor more than [——].

1  SECTION 20.  (*Constitutionality.*)  If any part of this act
2  is for any reason declared void, such invalidity shall not af-
3  fect the validity of the remaining portion of this act.

1  SECTION 21.  (*Short Title.*)  This act may be cited as
2  "Uniform Firearms Act."

1  SECTION 22.  (*Effective Date.*)  This act shall take effect
2  on the —— day of ——, 19—.

1  SECTION 23.  (*Certain Acts Repealed.*)  All laws or parts
2  of laws inconsistent herewith are hereby repealed.

*Note:* The above sections remain the same as Sections 17-21 in the original Uniform Act. Section 25 of the Crime Commission Act adopts Section 20. Section 24 of that act has a provision for a general penalty where none is otherwise specified, but as penalties are generally specified throughout the Crime Commission Act, Section 24 thereof differs from Section 19 hereof, which declares penalties for the whole act. This method was adopted advisedly by the Conference, as a more scientific way to deal with the subject of penalties.

429