ORAL ARGUMENT NOT YET SCHEDULED

No. 23-7061

════════════════════════════════════════

# In the United States Court of Appeals for the District of Columbia Circuit

────────────────────────────

ANDREW HANSON, ET AL.,

*Plaintiffs-Appellants,*

v.

THE DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees,*

────────────────────────────

## JOINT APPENDIX
Volume II

────────────────────────────

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-CV-02256-RC)

────────────────────────────

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
4000 Legato Road, 11th Floor
Fairfax, Virginia 22030
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Erielle R. Davidson
Mateo Forero-Norena
Zachary D. Henson
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

════════════════════════════════════════

**TABLE OF CONTENTS**

APPENDIX VOLUME I

Page Numbers

Docket Sheet, *Andrew Hanson et al. v. District of Columbia*, US. District Court for the District of Columbia No. 1:22-cv-02256    APP. 1 - APP.8

Complaint for Declaratory and Injunctive Relief and Damages    APP. 9 - APP. 32

Plaintiffs' Motion for Preliminary Injunctive Relief    APP. 33 - APP 73

Defendants' Opposition to Preliminary Injunctive Relief    APP. 74- App. 124

Exhibits Attached to Defendants' Opposition to Preliminary Injunctive Relief

    Ex. A: Plaintiffs' Answers and Objections to Defendants' First set of Interrogatories    APP. 125 - APP. 138
    Ex. B: Declaration of Dennis Baron    APP. 139 - APP. 161
    Ex. C: Excerpt of Tom Givens, *Concealed Carry Class: the ABCs of Self-Defense Tools and Tactics* (2019)    APP. 162 - APP. 179
    Ex. D: Declaration of Stephen Amodeo    APP. 180 - APP. 185
    Ex. E: Declaration of Leslie Parsons    APP. 186 - APP. 212
    Ex. F: Declaration of Roger Pauly    APP. 213 - APP. 245
    Ex. G: Declaration of Brian Delay    APP. 246 - APP. 261
    Ex. H: Declaration of Robert Spitzer    APP. 262 - APP. 444
    Ex. I: Declaration of Randolph Roth    APP. 445 - APP. 478
    Ex. J: Declaration of Brennan Rivas    APP. 479 - APP. 502
    Ex. L: Excerpt of Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (2003)    APP. 503 - APP. 520
    Ex. M: Declaration of Kevin M. Sweeney    APP. 521 - APP. 541
    Ex. O: Declaration of Daniel W. Webster    APP. 542 - APP. 551
    Ex. P: Report of Firearms Committee, *Handbook of the National Conference on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting* (1928)    APP. 552 - APP. 563

## APPENDIX VOLUME II

Page Numbers

Exhibits Attached to Plaintiffs' Reply in Support of
Preliminary Injunctive Relief

| | |
|---|---|
| Declaration of Mark Hanish | APP. 564 - APP. 645 |
| Declaration of Stephen Helsely | APP. 646 - APP. 662 |
| Declaration of Ashley Hlebinsky | APP. 663 - APP. 709 |
| Declaration of Tom Givens | APP. 710 - APP. 714 |
| Declaration of Brett Harnish | APP. 715 - APP. 718 |
| Declaration of John Murphy | APP. 719 - APP. 722 |
| Declaration of Greg Ellifritz | APP. 723 - APP. 743 |
| Declaration of Claude Werner | APP. 744 - APP. 747 |
| Examples of marketing of guns with magazines in excess of 10 rounds for self-defense | APP. 748 - APP. 751 |
| Declaration of Amy Swearer | APP. 752 - APP. 765 |
| Testimony of Massad Ayoob | APP. 766 - APP. 864 |
| Kopel, Bowie Knife Statutes | APP. 865 - APP. 878 |
| Virginia Historic machine gun statute | APP. 879 - APP. 882 |
| Declaration of Clayton Cramer | APP. 883 - APP. 934 |
| Declaration of Gary Kleck | APP. 935 - APP. 985 |
| Transcript of Motion Hearing, April 13, 2023, Case No. 1:22-cv-02256 | APP. 986 - APP. 1018 |
| Order Denying Plaintiffs' Motion for a Preliminary Injunction, April 20, 2023 | APP. 1019 |
| Memorandum Opinion Denying Plaintiffs' Motion for a Preliminary Injunction | APP. 1020 - APP. 1059 |
| Joint Motion to Stay Proceedings Pending Appeal | APP. 1060 - APP. 1065 |
| Notice of Appeal | APP. 1066 - APP. 1067 |

C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No: 17-cv-1017-BEN-JLB |
| Plaintiffs, | **DECLARATION OF MARK HANISH IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBITS 2-7** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

1

DECLARATION OF MARK HANISH

1    I, Mark Hanish, declare as follows:

2    1.    I am a firearm industry senior executive with over two decades worth of

3    experience building indoor shooting ranges, running domestic and international sales

4    and marketing departments for firearms, ammunition, and accessory companies,

5    along with designing products with various engineering departments for the

6    commercial, law enforcement, and military markets. I have also spent over 25 years

7    as a professional shooter, holding several world, national and state level titles, using

8    the firearms technologies that are relevant to this case.

9    2.    I have been retained by the plaintiffs in this matter to provide a well-

10   rounded industry perspective on firearms technology and the marketplace over the

11   last twenty years, specifically as it relates to semi-automatic firearms with

12   detachable magazines that are capable of holding over ten rounds. This report has

13   been prepared for the supplemental briefing that was ordered following the 9th

14   Circuit's remand in Virginia Duncan, et al. v. Rob Bonta. I have been retained to

15   write a declaration at the rate of $300/hour.

16   **Background and Qualifications**

17   3.    I have spent the last twenty years as a firearms, ammunition, and

18   defense industry executive. In addition to my role in the firearms industry, I have

19   also been a professional shooter, competing in domestic and international matches in

20   practical pistol and 3-gun for over 25 years.[1]  I have a Bachelor of Science Degree in

21   Entrepreneurship and Business Management from the W.P. Carey School of

22   Business at Arizona State University. Through the Barrett Honors College, I wrote

23   an Honor's Thesis for the basis of my first firearms training and supply business,

24   whose growth led to the conceptualization of a luxury indoor shooting range. My

25   partners and I founded the Scottsdale Gun Club, which at the time of the facility

26   _____

27
28   [1] 3 Gun is a speed and accuracy sport, where the athlete uses the three platforms
     of semi-automatic firearms – rifles, pistols, and shotguns – all with what were
     considered large capacity magazines.

2

DECLARATION OF MARK HANISH          APP. 565

17cv1017

1   opening (2004) was the world's largest and most luxurious public indoor range,

2   creating a new market segment.

3       4.    While developing the Scottsdale Gun Club, my partners and I operated

4   The Armory gun store, which focused on self-defense and tactical products and

5   training. My position was Founder and Vice President of Sales and Marketing for

6   the Scottsdale Gun Club and at the time we created an entirely new model of high-

7   end shooting and retail facilities. In addition to my sales and marketing roles, I was

8   responsible for our product selection and purchasing. The Scottsdale Gun Club

9   retained its tactical firearms and training roots and was nationally known as the

10  leader in that category. We were doing such high volume in those categories we

11  started a firearms and ammunition distribution business to resell products to other

12  gun stores. Prominent firearms manufacturers would consult with me on their

13  potential expansions into tactical market segments. Notably, we also launched a

14  manufacturing brand, U.S. PALM, that developed and produced a line of high-tech

15  polymer 30rd magazines for AK pattern rifles. These magazines are still

16  manufactured and distributed nationwide.

17      5.    In 2010, I transitioned from the dealer and distributor side of the

18  industry into sales for FNH USA, LLC (later becoming FN America, LLC), which is

19  a subsidiary of Fabrique Nationale out of Herstal, Belgium. In the South Carolina

20  manufacturing facility FN has produced a multitude of arms for the US Military to

21  include the M4, M16, M249, M240, and MK19. FN also began developing a robust

22  commercial presence of which I was a part. Over six years, I rose to the position of

23  Senior Director of Commercial Sales. I also was on the FNH USA professional

24  shooting team. During my tenure at FN, I contributed to many aspects of the

25  commercial business for US operations, including sales, product management,

26  production forecasting, and marketing. At FN America we produced and marketed

27  both pistol and rifle lines, almost all were sold with "large capacity" magazines as

28  the standard offering. I have first-hand knowledge of the changes within the firearms

DECLARATION OF MARK HANISH

1  industry market over the past several decades and I have been able to create
2  consistent growth of the core business even in unstable market conditions. I worked
3  closely with the production and engineering side of the company. With those
4  departments, I principally directed the design for most models in the FN-15 line,
5  working to define the market position and models for the consumer, which included
6  both Law Enforcement and Commercial markets. The FN-15 is the company's AR-
7  15 style line of rifles. Additionally, I conceptualized and worked with the team to
8  design a high-end collector line of firearms, known as the Military Collector Series.
9  These firearms included semi-automatic versions of American military issue
10  firearms: the M4, the M16, and the M249 which generated over $10million in
11  revenue the first year of production.
12          6.    In 2016, I became the Vice President of Sales and Marketing for
13  Surefire, LLC, a company that specializes in tactical illumination devices, firearm
14  suppressors, and "large capacity" magazines for AR-15 style rifles for the civilian,
15  law enforcement, and military markets. At Surefire, I managed US commercial and
16  law enforcement business. Internationally, I managed commercial, law enforcement
17  and military markets. In 2019, I became the President of Global Sales and Marketing
18  for Ammo Inc. and in just over 3 years sales increased from $4M to $240M. I was
19  responsible for all sales, marketing, and product development activities including the
20  design and development of specialty cartridges for US Special Operations
21  Command. I successfully competed for and won several government contracts in a
22  short period of time. AMMO acquired GunBroker.com, the largest internet
23  marketplace for the firearms industry in 2021.In 2022, I joined the team at Timney
24  Triggers as their Vice President of Sales, thanks in large part to my rich and well-
25  rounded knowledge of the firearms industry. Due to my high-profile positions in a
26  range of companies that directly impact the conversation about firearms technology
27  available to the public and the military, as well as the ammunition side of the
28  market. I am uniquely qualified to discuss this matter.

4

DECLARATION OF MARK HANISH

7.     As I have previously stated, not only is my experience in the industry as an executive, but as a shooter and collector. I have personal experience purchasing and using "large capacity magazines" prior to 1994 and continuing both throughout the entire 10 years of the federal ban. I also have an extensive background of practical application as a professional shooter. I have held multiple world, national, and state shooting titles across disciplines for over 25 years. Notably, I was a part of the 3 Gun National Pro Tour for six years, as a regular finalist and 2012 overall runner up. 3 Gun Nation was a television show that aired on NBC Sports and Sportsman Channel promoting the practical shooting use of semi-automatic rifles, pistols, and shotguns with "large capacity" magazines.

8.     Due to my professional background within the firearms industry, I have served on the Board of the American Suppressor Association and have regularly appeared as an on-camera expert for the National Shooting Sports Foundation, the Outdoor Channel's Gun Stories with Joe Mantegna, and Gallery of Guns TV. I have also been an industry guest speaker for college students at institutions such as the School of the Art Institute of Chicago and the W.P. Carey School of Business' MBA Program.

**Scope of Work**

9.     I have been asked to write this statement as a direct response to assertions made in Ryan Busse's declaration for the supplemental briefing that was ordered following the 9th Circuit's remand in Virginia Duncan, et al. v. Rob Bonta. In this document, I will provide a general statement on the popularity of AR-15 style and similar rifles and their popularization on the firearms market, with a specific emphasis on limitations in advertising and other avenues that contributed to this robust market. I will then discuss the importance of magazines to the fundamental operation of a semi-automatic firearm, as well as address their extensive use before and after 1994 and the ways in which manufacturers have responded to the changing

1 in legislation. I will conclude on a discussion surrounding the 1911 style semi-
2 automatic pistol and its waning popularity in a defensive handgun market.

3      10.    For the purposes of this report, I will use the terms "high capacity"
4 magazine and "large capacity magazine" and the abbreviation "LCM"
5 interchangeably to reference magazines capable of holding more than ten rounds. I
6 use the terms as they relate to the ways in which Busse categorizes them in his
7 declaration and the way they are defined in the Violent Crime Control and Law
8 Enforcement Act (1994).

9 **AR-15 and Civilian Popularity**

10      11.    The demand for AR-15s and similar rifles grew steadily since their
11 inception and continued through the 1994-2004 federal "Assault Weapons Ban"
12 (AWB). The Colt AR-15 first became available on the commercial market in 1964.
13 In addition to the domestic production, throughout the 1970s and 1980s, semi-
14 automatic rifles with "large capacity magazines", similar in style and function, were
15 imported into the United States for sale to the commercial market.  These
16 comparable rifles followed an overarching trend in firearms design towards smaller
17 calibers with larger magazine capacities. A few notable examples of these were
18 manufactured by Beretta, Daewoo, FN, HK, IMI, SIG, STEYR, as well as several
19 AK pattern rifles. The importation of these foreign made rifles however was
20 restricted in 1989. Domestic manufacturers such as Colt, Bushmaster, Olympic
21 Arms, Pac-West Arms, Eagle Arms / Armalite, and DPMS that were previously
22 building AR-15 style rifles continued, for the most part, with production of slightly
23 modified rifles to comply with the new federal regulations.  These rifles increased
24 exponentially in popularity as more consumers became aware of them, as they have
25 many benefits for a multitude of applications including personal defense, target
26 shooting, competition, and hunting. The AR-15 style of rifle is lightweight, has low
27 recoil, is relatively easy to learn how to use, can be customized by the consumer, and
28 is easily adjustable to fit most users of varying sizes and physical abilities. During

DECLARATION OF MARK HANISH

APP. 569

17cv1017

1   the AWB period, many companies were discouraged from investing in production

2   capacity to enter the AR-15 style rifle market due to legislative uncertainty. In the

3   years following the sunset of the AWB more recognizable brands such as Smith &

4   Wesson, Ruger, Sig Sauer, FN, and Remington were willing to invest the capital and

5   enter the market. These well-known and trusted brands responded to market demand

6   for AR-15 style rifles manufactured by established companies.

7       12.    There is a lot of debate surrounding the effectiveness of advertising and

8   its impact on the consumer. In terms of firearms marketing, however, it is important

9   to note that there are significant limitations on the manufacturer due to the nature of

10   the product which must be considered when analyzing how successful and how

11   much of an impact firearms industry marketing has actually had on consumer

12   decision making.

13       Marketing and Advertising Limitations and Considerations

14       13.    As a Senior Executive at one of the larger firearms manufacturers in the

15   world, I have been responsible for determining the firearms product mix and

16   production quantities based on the marketplace. Most manufacturers forecast their

17   future sales, and corresponding production, to match the products and quantities

18   their customers are demanding rather than the other way around. Its common sense

19   to manufacture and deliver what your customers are asking to purchase. Beyond

20   those core product sales, companies introduce new products to market that are either

21   a variation of a core product, a direct response to new customer demand, or a totally

22   new concept product. Consumer demand for the AR-15 style and similar rifles,

23   along with "high capacity" magazines for both rifles and pistols, has been the market

24   driver for the increased production and sales.

25       14.    In Ryan Busse's declaration, he asserts that the gun industry is

26   responsible for collectively pushing AR-15 style rifles and "high capacity"

27   magazines onto the market – a notion that fails to consider the myriad of factors that

28   influence consumer purchasing behavior. There are many fine marketing

DECLARATION OF MARK HANISH    APP. 570

1   professionals in the industry capable of creating innovative campaigns, but they still
2   are forced to compete for consumer attention without access to most standard
3   marketing avenues. Marketing is severely restricted and companies in the firearms
4   industry are prohibited or limited when using typical services to sell to the
5   consumers through means of television, Google Ads, e-commerce platforms,
6   merchant payment processing services and mainstream social media (Facebook,
7   Instagram, YouTube, etc). Without the ability to advertise via most technology,
8   industry does its best to respond to consumer demand with antiquated feedback
9   channels. Most firearms industry advertising is limited to endemic periodicals,
10  limited cable television channels such as the Outdoor Channel, and websites visited
11  directly by consumers or found through organic search results.

12      15.   While firearms manufacturers have had restrictions imposed upon on
13  their abilities to market, there are other factors to consider for the proliferation and
14  popularity of the AR-15 and similar rifles that were completely outside of the scope
15  of the industry. For example, the Global War on Terror (GWOT) starting in 2001
16  produced images and video of American service members with their rifles and
17  tactical gear, which was broadcast across major media outlets. In the early years of
18  the war, the televised GWOT exposed the entire American consumer market to the
19  likeness of the iconic Colt and FN M4/M16 fueling awareness of the semi-automatic
20  commercial AR-15 style rifle. The War on Terror has continued for decades, and a
21  generation of consumers, including service members, now desired to own AR-15
22  style semi-automatic rifles.  There is a long history of service rifles becoming
23  familiar to the generation that used them in conflict, and the resulting desire to bring
24  those rifles home from service and onto the shooting range and into the field for
25  sporting uses.

26      16.   However, the Hughes Amendment, a portion of the Firearm Owners'
27  Protection Act of 1986, which essentially banned the civilian ownership of machine
28  guns made after 1986, prevents this practice in some form from continuing. The

8

DECLARATION OF MARK HANISH

1   military issued machine guns are no longer allowed to be transferred, but the desire

2   to own and use the issued rifles has not subsided.  While in my role at FN America, I

3   directed the design and sales for most of the commercial FN15 model rifles.

4   Additionally, I was instrumental in creating and launching the Military Collector

5   Series consisting of the FN15 M4 (attached as **Exhibit 2**), FN15 M16 (**Exhibit 3**),

6   and FN M249s (**Exhibit 4**). This Military Collector Series was comprised of semi-

7   automatic replicas of the government issued M4, M16, and M249.  These rifles were

8   exceptionally well received by general commercial customers and service members

9   desiring a replica of their issued rifle. The consumer demand for these rifles was

10  driven mainly by the customer's familiarity with the designs either through service

11  or media exposure.

12        17.    Today the AR-15 style rifle is one of the most popular rifles in

13  America. However, that popularity was not just engineered by the firearms industry,

14  who have limited advertising channels. Rather, the popularity of this firearm has

15  more to do with the design's features, benefits, and adaptability to be well suited for

16  a wide array of legitimate uses. To quantify the acceptance and widespread adoption

17  of these rifles, it is of note that according to the 2021 National Firearms Survey

18  (expanded May 2022) about 24.6 million people, have owned an AR-15 or similarly

19  styled rifle, and up to 44 million such rifles have been owned.[2]

20  **"Large Capacity Magazines" and the Firearms Market**

21        18.    In Busse's declaration, he asserts that "large capacity magazines"

22  (LCM) are only recently popular, which is a specious argument. In 1993, the year

23  prior to the 1994 federal ban, semi-automatic pistols accounted for 80% of handguns

24  produced in the US.[3] According to Christopher S. Koper in his 2004 Updated

25  _____

26

27  [2] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract

28  =4109494 or http://dx.doi.org/10.2139/ssrn.4109494 (**Exhibit 5**)
    [3] (Zawitz, 1995, p. 3) (**Exhibit 6**).

9

DECLARATION OF MARK HANISH

1   Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun

2   Violence, 1994-2003 report "*Approximately 40 percent of the semiautomatic*

3   *handgun models and a majority of the semiautomatic rifle models being*

4   *manufactured and advertised prior to the ban were sold with LCMs or had a*

5   *variation that was sold with an LCM".*[4] This study clearly illustrates the significance

6   of large capacity magazines on the market even before the Federal Assault Weapons

7   Ban. Today, that trend continues to grow. The 2021 National Firearms Survey

8   (expanded May 2022) reported:

9       48.0% of gun owners, about 39 million people, have owned
10      magazines that hold over 10 rounds, and up to 542 million such
11      magazines have been owned.[5]

12      19.    As far as I am aware, the legal concept at the federal level of using the

13  arbitrary quantity of greater than 10 rounds to define a magazine as a "large capacity

14  ammunition feeding device" first appeared in the Violent Crime Control and Law

15  Enforcement Act of 1994. Since the inception of magazine fed firearms, designers

16  explored magazine designs and manufacturing methods to maximize intended

17  functionality and reliability of their firearms without arbitrary capacity limitations. It

18  wasn't until restrictions were legally mandated did engineers modify or alter their

19  designs to conform to a random capacity limit. In order to comply with capacity

20  laws, manufacturers were compelled to redesign or modify existing standard

21  capacity magazines to limit their capacity to hold no more than 10rds, with severe

22  consequences if an 11th round can still be forced in the magazine. Often the

23  regulations are left ambiguous and subject to court interpretation after the fact as to

24  what constitutes a permanent modification preventing the magazine from being

---

[4] https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf
[5] English, William, 2021 National Firearms Survey: Updated Analysis Including
Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of
Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract
=4109494 or http://dx.doi.org/10.2139/ssrn.4109494 (**Exhibit 5**)

10

DECLARATION OF MARK HANISH

considered readily convertible back to standard capacity. Manufacturers make every effort to avoid exposing themselves and their customers to this legal risk. Reducing the standard capacity of a magazine to hold 10 or fewer rounds has been accomplished through a variety of methods, some of which result in a less than optimal magazine design while potentially introducing a higher risk of failure, increased costs, and often adding unnecessary complexity. Some of the methods used to reduce capacity include:

    i.   Narrowing of the internal width down the entire length of the magazine, altering the internal geometry from the original design intent.

    ii.   Creating indentations in the side of the magazine designed to limit the downward travel of the follower in the magazine tube. This method is sometimes coupled with weakening cuts made to the remainder of the circumference of the magazine tube adjacent to the indentations. In this design the magazine spring usually extends to the baseplate and is at risk of catching or hanging up on the indentations, impeding normal operation.

    iii.   Shortening the magazine tube in conjunction with designing a novel base pad that extends upward into the firearm to connect with and complete the magazine assembly. These base pads with magazine tube extender pieces are more complicated to use, costly to manufacture, and their increased complexity invites a possible reduction in structural integrity.

    iv.   Inserting an object into the magazine to limit follower travel and permanently attaching the base pad to encapsulate the object in the magazine tube.

    v.   Installing a pin or rivet through the exterior of the magazine body to limit the travel of the follower.

20.    The burden on the manufacturers to produce these 10rd or less magazines was reduced with the sunset of the AWB in 2004. The few states

11

DECLARATION OF MARK HANISH

1   remaining with their own capacity limits require manufacturers to continue to

2   modify their products as described above to comply with the restrictions. This

3   increases costs for manufacturers to design or redesign magazines, producing lower

4   quantities of the restricted magazines that potentially don't reach the manufacturing

5   amounts required to realize volume savings. Manufacturers may also choose not to

6   offer the affected models for sale to the residents of the restrictive state, reducing the

7   options for those residents to select from.

8   <u>Magazines are an Integral Part of a Firearm</u>

9   21.   Magazine fed firearms are systems with many parts that must function

10  together in order to operate properly, and the ammunition feeding device is critical

11  to the overall performance and success of the firearm. To this day, especially in

12  modern handguns, the magazine is often the cornerstone of the pistol design. Unless

13  designing a new pistol to utilize an existing magazine, engineers will start a new

14  pistol project with designing the magazine first. The ammunition feeding device

15  must be optimized to reliably deliver cartridges into the operating system. The

16  engineers must consider the dimensions of the cartridge, with specific attention to

17  the cartridge case being either a straight wall or a tapered case, and angles at which

18  the magazine presents cartridges to the action.  The manner in which the magazine

19  and action interface is critical.  The remainder of the firearm design builds upon the

20  foundation laid by the magazine's form.  Many, if not most, modern pistols are built

21  around a magazine designed to hold more than 10 rounds. Pistols designed for

22  defensive use balance maximizing the number of rounds carried for personal

23  protection within a size constraint of the pistol to perform its intended function.

24  Even though subcompact pistols are designed primarily for concealment and safety

25  while carrying, designers also attempt to maximize magazine capacity as well.

26  Pistols designed for recreation, sport, and competition are usually designed to

27  maximize capacity, accuracy, and reliability with few constraints on size.

28

DECLARATION OF MARK HANISH

APP. 575

17cv1017

22.    As an integral part of the firearm, magazines are required for proper function. While firearms are one of the few consumer items designed for several lifetimes of service, their magazines are an item that can degrade with use. In addition to the routine maintenance of replacing springs and worn followers, feed lips of magazines which hold the next round in position to be presented to the action, may both wear and crack from the cycling of the action.  Magazines and their feed lips are also susceptible to bending, cracking, denting, or deforming and being rendered unserviceable when dropped during normal use. This is not uncommon, and therefore, not an exceptionally rare occurrence that would only affect high volume shooters.[6]  Shooters run the risk of damaging a magazine every time they practice a reload and eject a magazine onto the ground.

23.    A prudent firearms owner will purchase enough magazines to sustain the use of their firearm as intended over the remainder of their lifetime, accounting for damaged and worn-out magazines along the way. Many handguns and rifles have proprietary magazines that are specific to the manufacturer, product family, and many times the specific model. Replacement magazines may not be available in the future as there is no guarantee the manufacturer will be in business to support the platform, and there is no guarantee that an aftermarket company will produce that specific magazine. A firearm without a functional magazine is of little use to an owner, and of little value to another consumer. There is less risk for consumers that possess firearms capable of accepting a magazine with a somewhat standardized interface.  These firearms are generally older legacy designs that were used in rifles and pistols adopted by militaries.  Magazines for the AR-15 style rifles, AK pattern rifles, and model 1911 pistols fall into this category. Busse also asserts that one may simply purchase a kit to refurbish a previously owned magazine. This option has effectively been nullified as the possible enforcement of CA Penal Code Section

---

[6] Busse Decl., ¶10.

13
DECLARATION OF MARK HANISH

1  32311 regulating "conversion kits" has limited retailers from selling magazine repair

2  kits.[7] During the 1994-2004 AWB period, individual manufacturers would not sell

3  consumers all the magazine components required to build a new magazine. Many

4  would designate a single component of the magazine as their control item and refuse

5  to sell that item to consumers. Any consumer needing to repair a legally owned pre-

6  ban magazine was out of luck if they had broken or damaged the restricted part.

7      24.    As previously stated, magazines are so critical to the firearm, engineers

8  often start the design of a new firearm around the magazine. Magazines are a highly

9  specialized item to manufacture, whether they are stamped and welded from steel or

10  aluminum, injection molded from an advanced polymer, or a combination of

11  stamped feed lip and mag catch parts over-molded into a polymer body. These

12  specific manufacturing processes require specialized equipment, skillsets, and

13  sometimes stabilized environments not found in most firearms manufacturing

14  facilities. Firearms manufacturers choose to utilize the services of highly skilled

15  outside vendors to deliver a superior product built to their design specifications

16  precisely because of the importance of the magazine in the overall system. As an

17  added benefit to all commercial, law enforcement, and military customers, these

18  specialized magazine companies have grown and matured and are far more capable

19  to produce significantly higher quality products for the entire marketplace.

20  Magazines built today are some of the most advanced magazines in history and as a

21  result, are structurally safer and more reliable for the end user. Gun barrels and other

22  critical components are also routinely outsourced to specialized manufacturers. For

23  example, a firearm manufacturer may specify a hammer forged barrel to meet safety

24

25  _____

26  [7] https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=
PEN&sectionNum=32311. *(b) For purposes of this section, a "large capacity*

27  *magazine conversion kit" is a device or combination of parts of a fully functioning
large-capacity magazine, including, but not limited to, the body, spring, follower,*

28  *and floor plate or end plate, capable of converting an ammunition feeding device
into a large-capacity magazine.*

14

DECLARATION OF MARK HANISH

1   and performance standards, and it would be absurd to contend the mere act of

2   outsourcing somehow reduces the importance of the barrel.

3       25.    The magazine is correctly considered an integral part of the firearm, not

4   merely an accessory. It is considered such a vital part of the firearm that the

5   magazine's value is included in the cost of the firearm for calculation of the

6   Firearms and Ammunition Excise Tax (FAET) paid by the manufacturer or

7   importer.[8] It is only additional magazines that are treated as non-taxable extra parts.

8   To contrast, accessories, even if included with the firearm, are not subject to FAET.

9   Typical examples of accessories include holsters, cleaning kits, gun locks, optics,

10  and other accoutrement not critical to the function of the firearm.

11  **Consumer Demand and Defensive Pistol Selection**

12      26.    In Busse's declaration he focuses heavily on the 1911 design as the

13  basis for his claims that 7 or 8 rounds of .45 ACP is more than adequate for a pistol.

14  This limited perspective is understandable given his career at one of the larger

15  manufacturers of 1911 style pistols. However, there are a multitude of shortcomings

16  with the anecdotal statements he employs to support his position. There are many

17  pistols that are more effective for self-defense while offering a superior balance of

18  reliability, affordability, and capacity. It is widely understood that most of the less

19  expensive models of 1911s, and even many of the mid-level price point pistols in the

20  $1000-$1500 range from companies like Colt and Kimber may require an additional

21  investment in gunsmithing services to make them suitably reliable for defensive use.

22  Many people cannot afford one of the higher priced 1911 pistols he espouses, nor

23  can everyone handle the recoil of the .45 ACP and have the confidence to defend

24  themselves with the 7 or 8 rounds Busse advocates. Persons of a smaller stature

25  and/or having reduced strength may select a 1911 design pistol in 9mm for its

26  reduced recoil, but in turn they are accepting the accompanying risk of using single

27

28

[8] https://www.ttb.gov/images/pdfs/presentations/FAET-Return-Walkthrough.pdf

15

DECLARATION OF MARK HANISH

1  stack 9mm magazines which are inherently less reliable due to the tapered case of

2  the 9mm cartridge. The century old 1911 design is also less intuitive and requires

3  more familiarity and training for novice shooters to master. For these and other

4  reasons, many of the leading firearms trainers in the country recommend a multitude

5  of superior modern design pistol options for self-defense firearms.

6      27.    Busse also claims the 1911 to be "still one of the most widely sold guns

7  in the United States". This claim might be referring to a wide geographic territory as

8  the defining standard of sales, as the "high volumes" of the past cannot be favorably

9  compared to current modern pistol sales. In comparing aggregated data on broad

10  categories of self-defense pistols, the BATF&E's 2020 Annual Firearms

11  Manufacturing and Export Report does not give specific model information, but

12  rather we can make inferences from the pistol category, which is broken down into

13  caliber ranges. We find there were just shy of 3.9 million 9mm and .380 pistols

14  manufactured in 2020, and in comparison, just over 705,000 pistols comprise the up

15  to .50 caliber category.[9] This category includes all pistols chambered in .45 ACP, not

16  just 1911s, as well as additional designs and calibers such as the .40 S&W, making

17  the 1911 production somewhere below that ceiling. With further examination of the

18  manufacturer's individual reporting data, it is evident the market clearly indicates

19  significantly higher demand for modern pistols in calibers smaller than .45 ACP.

20      28.    Busse goes on to state that based on his experience, "a large-capacity

21  magazine is not necessary to use a firearm effectively for self-defense or other

22  sporting purpose, like hunting." However, the 2021 National Firearms Survey

23  (expanded May 2022) provides contrary information regarding the carry and use of

24  firearms for self-defense. According to the Survey:

25      31.1% of gun owners, or approximately 25.3 million adult Americans,
        have used a gun in self-defense. Gun owners engage in approximately
26      1.67 million defensive uses of firearms per year. Handguns are the

27  —————————————————

28  [9] 2022.06.10_afmer_2020_cover_sheet_508 (1) (**Exhibit 7**).

16

DECLARATION OF MARK HANISH                    APP. 579

17cv1017

1
2
3

firearm most commonly used in defensive incidents (65.9%) The majority of defensive gun uses take place outside of the home (74.8%). About half of defensive gun uses involve more than one assailant (51.2%).

4
5
6
7
8
9
10
11
12



13    29.    Conclusions drawn in the survey state that "presumably, it would be

14   advantageous to have a firearm with a larger capacity magazine if one needed to

15   engage more than one assailant, which these responses suggest is indeed common.

16   Although in most defensive gun uses the gun was not fired (81.9%), we can further

17   analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in

18   which a gun was fired in self-defense, multiple rounds were fired."[10]

19   **Conclusion**

20    30.    In this report, I have addressed several statements made in Ryan

21   Busse's declaration. It is my findings, as an industry expert with a range of

22   backgrounds in the tactical firearms market and culture, that several factors

23   contributed to the popularity of the AR-15 style and comparable rifles starting in the

24   1960s and that this phenomenon is not solely the result of an industry marketing

25
26
27
28

[10] English, William, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned (May 13, 2022). Georgetown McDonough School of Business Research Paper No. 4109494, Available at SSRN: https://ssrn.com/abstract =4109494 or http://dx.doi.org/10.2139/ssrn.4109494 **(Exhibit 5)**

17
DECLARATION OF MARK HANISH

1   scheme. Furthermore, I conclude that large capacity magazines have been popular

2   since well before their 1994 regulation and rebut the assertion that these magazines

3   are not ubiquitous. Additionally, I provided a perspective on the importance of a

4   magazine to firearms design as well as ways in which the industry have improved

5   these magazines to be of superior technology ultimately being fundamentally safer. I

6   finish the report with an analysis on the proliferation of self defense handguns that

7   have far surpassed the production and popularity of the 1911 style design in today's

8   gun ownership community.

9        I declare under penalty of perjury that the foregoing is true and correct.

10   Executed within the United States on _November 30th, 2022._

11

12                                    _____

13                                    Mark Hanish
                                      Declarant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

18
DECLARATION OF MARK HANISH

# EXHIBIT 2

# FN 15™ M4 MILITARY COLLECTOR

## THE WORLD'S MOST BATTLE-PROVEN FIREARMS™

CARBINES

FN 15™ SERIES



### FN 15™ M4 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 6.6 LBS. | 30.5"-34.2" | 16" |
|-----------|--------|----------|-------------|-----|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series brings to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4 -profile 16 and 20-inch 1:7" RH, button broached and chrome-lined barrels, respectively. Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

## PRIMARY FEATURES

Knights Armament M4RAS Adapter rail w/ rail adapter covers

Ambidextrous safety lever

## RECEIVER

Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

## BARREL

16" Button-broached, chrome-lined

A2-style compensator (Permanently attached)

1:7" RH twist

## STOCK

Collapsible, 6-position with sling mount

M4 with pistol grip

## OPERATING CONTROLS

Ambidextrous safety lever

Ergonomic magazine release

Forward assist

## MAGAZINE

Aluminum body, Low friction follower, AR-style 30 round capacity

## ACCESSORIES



FN UNIVERSAL
TACTICAL SLING



FN PREMIUM COLD HAMMER-
FORGED AR-15 BARRELS

| Product | Designation | Product Type | UPC |
|---------|-------------|--------------|-----|
| 36318 | FN 15™ M4 Military Collector | Consumer | 845737006211 |
| 36318-02 | FN 15™ M4 Military Collector LE | Law Enforcement | TBD |

FOR MORE INFORMATION, CONTACT YOUR LOCAL FIREARMS RETAILER OR VISIT FNAMERICA.COM

APP. 583

# EXHIBIT 3

# FN 15™ M16 MILITARY COLLECTOR

## THE WORLD'S MOST BATTLE-PROVEN FIREARMS™

CARBINES

FN 15™ SERIES



### FN 15™ M16 MILITARY COLLECTOR

| 5.56x45mm | 30 Rd. | 8.2LBS. | 39.5" | 20" |
|-----------|--------|---------|-------|-----|
| CALIBER | MAGAZINE | WEIGHT | LENGTH | BARREL LENGTH |

**OPERATION:** DIRECT IMPINGEMENT

**FINISH:** BLACK

**SIGHTS:** A2-STYLE FRONT, ADJUSTABLE REAR SIGHT

The FN 15™ Military Collector Series M4 and M16 bring to market military replica rifles made to FN's exacting specifications. The semi-automatic rifles are chambered in 5.56x45mm NATO and feature M4-profile 16 and 20-inch 1:7" RH, button broached and chrome-lined barrels, respectively. Each UID-labeled lower receiver is equipped with an ambidextrous selector switch, just like its select-fire big brother.

### PRIMARY FEATURES
Knights Armament M5RAS Adapter rail
w/ rail adapter covers

Ambidextrous safety lever

### RECEIVER
Hard-anodized aluminum

Flat-top receiver, M-1913

MIL-STD rail at the 12 o'clock position

A2-style front sight, adjustable rear sight

UID Label

### BARREL
20" Button-broached, chrome-lined

A2-style compensator

1:7" RH twist

### STOCK
Fixed, A2 Rifle Butt-Stock

M16 with pistol grip

### OPERATING CONTROLS
Ambidextrous safety lever

Ergonomic magazine release

Forward assist

### MAGAZINE
Aluminum body, Low friction follower,
AR-style 30 round capacity

### ACCESSORIES



FN UNIVERSAL
TACTICAL SLING



FN PREMIUM COLD HAMMER-
FORGED AR-15 BARRELS

| Product | Designation | Product Type | UPC |
|---------|-------------|--------------|-----|
| 36320 | FN 15™ M16 Military Collector | Consumer | 845737005061 |
| 36320-02 | FN 15™ M16 Military Collector LE | Law Enforcement | TBD |

# EXHIBIT 4

# FN M249S®



FN M249S
Standard Black

FN M249S
Standard FDE

**RIFLE**

**FN M249S®**

| **FN M249S® STANDARD** | | | | |
|---|---|---|---|---|
| 5.56x45mm<br>CALIBER | 30/200 Rd.<br>CAPACITY | 17.2 LBS.<br>WEIGHT | 40.7"<br>LENGTH | 18.5"<br>BARREL<br>LENGTH |

| **FN M249S® PARA** | | | | |
|---|---|---|---|---|
| 5.56x45mm<br>CALIBER | 30/200 Rd.<br>CAPACITY | 16.9 LBS.<br>WEIGHT | 31.5-37"<br>LENGTH | 16.1"<br>BARREL<br>LENGTH |

**OPERATION:** SEMI-AUTOMATIC, CLOSED BOLT

**FINISH:** BLACK OR FDE

**SIGHTS:** STEEL, ADJUSTABLE TO 1,000 METERS

FN M249S
Para Black



FN M249S
Para FDE

## PRIMARY FEATURES
- Semi-automatic, closed-bolt operation
- Primary sights graduated to 1000 meters with MIL-STD 1913 rail system for optics
- Quick change barrel and integral steel bipod

### RECEIVER
- Formed steel frame with magazine well for alternate feed
- Fixed, pivoting ejector for robust ejection
- Top cover integrated MIL-STD 1913 mounting rail for sighting systems

## BARREL
- Changeable barrel
- Cold hammer-forged steel
- Chrome-lined bore and chamber
- Heat shield and carry handle included

### STOCK
- STANDARD - Highly ergonomic polymer butt-stock assembly with hydraulic recoil buffer system and non-slip buttplate
- PARA - Rotating, telescoping buttstock with hydraulic recoil buffer and non-slip buttplate

## OPERATING CONTROLS
- Crossbolt safety
- Curved trigger for improved finger position and control
- Non-reciprocating charging handle

### FEED SYSTEM
- Standard disintegrating link belt-fed
- Under-mounted polymer ammunition container helps keep ammunition cleaner for reduced wear and added reliability

The FN M249S Standard and Para, semi-automatic versions of the M249 SAW light machine gun, originally developed by FN Herstal as the FN MINIMI® and adopted by the U.S. Military in 1988. Features the signature FN cold hammer-forged, chrome-lined barrel and operates from a closed bolt position. Chambered in 5.56x45mm NATO, the rifle will accept both magazine and linked belt ammunition.

| Product | Designation | UPC |
|---|---|---|
| 46-100169 | M249S Standard Black | 845737015077 |
| 46-100170 | M249S Standard FDE | 845737015091 |
| 46-100171 | M249S Para Black | 845737015084 |
| 46-100172 | M249S Para FDE | 845737015107 |

# EXHIBIT 5

# 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned

William English, PhD

Georgetown University

Expanded Report: May 13, 2022

## Abstract

This report summarizes the findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date. This online survey was administered to a representative sample of approximately fifty-four thousand U.S. residents aged 18 and over, and it identified 16,708 gun owners who were, in turn, asked in-depth questions about their ownership and their use of firearms, including defensive uses of firearms.

Consistent with other recent survey research, the survey finds an overall rate of adult firearm ownership of 31.9%, suggesting that in excess of 81.4 million Americans aged 18 and over own firearms. The survey further finds that approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and it estimates that guns are used defensively by firearms owners in approximately 1.67 million incidents per year. Handguns are the most common firearm employed for self-defense (used in 65.9% of defensive incidents), and in most defensive incidents (81.9%) no shot was fired. Approximately a quarter (25.2%) of defensive incidents occurred within the gun owner's home, and approximately half (53.9%) occurred outside their home, but on their property. About one out of ten (9.1%) defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.

A majority of gun owners (56.2%) indicate that they carry a handgun for self-defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency. We estimate that approximately 20.7 million gun owners (26.3%) carry a handgun in public under a "concealed carry" regime; and 34.9% of gun owners report that there have been instances in which they had wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

The average gun owner owns about 5 firearms, and handguns are the most common type of firearm owned. 48.0% of gun owners – about 39 million individuals – have

1

Electronic copy available at: https://ssrn.com/abstract=4109494

owned magazines that hold over 10 rounds (up to 542 million such magazines in total), and 30.2% of gun owners – about 24.6 million individuals – have owned an AR-15 or similarly styled rifle (up to 44 million such rifles in total). Demographically, gun owners are diverse. 42.2% are female and 57.8% are male. Approximately 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms. In total, Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

# 1   Introduction

This report summarizes the main findings of a national survey of firearms ownership and use conducted between February 17th and March 23rd, 2021 by the professional survey firm Centiment. This survey, which is part of a larger book project, aims to provide the most comprehensive assessment of firearms ownership and use patterns in America to date.

Before this survey, the most authoritative resource for estimating details of gun ownership in the U.S. has been the "Comprehensive National Survey on Firearms Ownership and Use" conducted by Cook and Ludwig in 1994 (Cook and Ludwig, 1996), and the most authoritative resource for estimating defensive gun use in the U.S. has been the "National Self-Defense Survey" conducted by Kleck and Gertz in 1993 (Kleck and Gertz, 1995, 1998). While valuable resources, they are both now a quarter century old, and no surveys of similar scope and depth have documented firearms ownership and use in more recent years.

Hepburn et al. (2007) conducted a more limited survey to ascertain the "gun stock" in 2004, a version of which was repeated in 2015 (Azrael et al., 2017). However, as they explain in introducing their latter survey, data sources on firearms ownership and use remain scarce:

> Although the National Opinion Research Center's General Social Survey and other surveys have asked respondents whether they personally own a firearm or live in a home with firearms, few have asked about the number of guns respondents own, let alone more detailed information about these firearms and the people who own them, such as reasons for firearm ownership, where firearms were acquired, how much firearms cost, whether they are carried in public, and how they are stored at home (Smith and Son 2015; Gallup 2016; Morin 2014). Because of this, the best and most widely cited estimates of the number of firearms

**APP. 590**

Electronic copy available at: https://ssrn.com/abstract=4109697

in civilian hands are derived from two national surveys dedicated to producing detailed, disaggregated, estimates of the U.S. gun stock, one conducted in 1994, the other in 2004 (Cook and Ludwig 1997, 1996; Hepburn et al. 2007).

Miller, Zhang, and Azrael conducted an expanded survey in 2021 of 5,932 gun owners with a focus on characterizing the demographics of those who acquired firearms for the first time during the COVID-19 Pandemic, based on a sub-sample of 447 individuals who fit this criterion (Miller et al., 2022). This team also described their survey as a "2021 National Firearms Survey," and it is helpful to clarify that their survey was distinct from the survey reported here.

Richer survey data on firearms ownership and use has been collected by industry associations such as the National Shooting Sports Foundation (NSSF).[1] However, these surveys generally aim at assessing industry trends and market segmentation and are not necessarily designed to be nationally representative. In 2017, the Pew Research Center conducted one of the most recent and detailed surveys of the demographics of gun ownership (Brown, 2017).[2] Although it did not ask detailed questions concerning defensive use of firearms and the types of firearms owned, this recent Pew survey serves as a helpful benchmark for corroborating the general ownership estimates of the present survey.

Advances in survey research technologies make it possible to reach large, representative respondent populations today at a much lower cost than a quarter century ago. One of the limitations of the Cook and Ludwig survey, which sought to be nationally representative, was that the survey sample was relatively small, with about 2,500 respondents of whom only about 600, or (24.6%), owned a firearm when the survey was administered. As the investigators noted in their report, some sub-questions were not sufficiently well powered to make confident inferences, particularly concerning the defensive use of firearms. Similarly, Kleck and Gertz's survey was limited to 4,977 respondents, and the more recent surveys by Pew, Hepburn, and Azrael are all based on less than 4,000 respondents.

---

[1] See https://www.nssf.org/research/

[2] See Pew Research Center, June 2017, "America's Complex Relationship With Guns" https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2017/06/Guns-Report-FOR-WEBSITE-PDF-6-21.pdf

**APP. 591**

Electronic copy available at: https://ssrn.com/abstract=4209697

Today, professional survey firms like Centiment[3] cultivate large pools of survey respondents, enabling representative sampling, and have techniques that encourage high response and completion rates while also ensuring the integrity of responses.[4] The online survey summarized here was presented to a nationally representative sample (excluding residents of Vermont who had already responded to a pilot version of this survey) of 54,244 individuals aged 18 or over who completed an initial questionnaire that included an indirect question indicating whether they owned a firearm (respondents were presented with a list of items commonly owned for outdoor recreational purposes, including firearms, and were asked to select all items that they own).

This question identified 16,708 individuals as gun owners, who were then transferred to the main survey, which then asked detailed questions about their ownership and use of firearms. Given the length and detail of the survey, there was a slight amount of attrition, as 7.5%, or 1,258 individuals, did not make it through all questions to the end of the survey. However, 92.5% of the responding firearms owners (15,450) did proceed through all of the survey questions.

This survey thus contains what we believe is the largest sample of firearms owners ever queried about their firearms ownership and firearms use in a scientific survey in the United States. This survey was approved by Georgetown University's Institutional Review Board. Of note, this survey was conducted just after a period of widespread social unrest across the U.S. and a contentious presidential election, which background check data suggests led to record gun sales (approximately 39.7 million in 2020, up 40% from the prior year).[5] It is thus a comprehensive and timely assessment of the state of firearms ownership and use in the United States. Finally, the extraordinarily large size of this sample enables us to make well-powered, statistically informative inferences within individual states, which considerably extends the value of this data.

The initial sample of respondents achieved excellent demographic representation across

---

[3]See https://www.centiment.co/

[4]See https://help.centiment.co/how-we-safeguard-your-data

[5]See McIntyre, Douglas A. "Guns in America: Nearly 40 million guns were purchased legally in 2020 and another 4.1 million bought in January" https://www.usatoday.com/story/money/2021/02/10/this-is-how-many-guns-were-sold-in-all-50-states/43371461/

4

**APP. 592**

Electronic copy available at: https://ssrn.com/abstract=4209697

all 49 states and DC, excluding Vermont (see Appendix A and B). For the purpose of estimating firearms ownership rates for the general U.S. population we employed raked weighting on gender, income, age, race, and state of residence. Note that there was a brief period in the first two days after the soft launch of the survey that comprehensive demographic data was not collected from those respondents who did not indicate firearms ownership, and thus did not proceed to the main survey (approximately 300 respondents). Although the survey company, Centiment, maintained demographic data on these panel respondents, it was determined that this data was not as comprehensive as the data collected by the survey, at which point the demographic questions were moved to the front of the survey, and asked of all respondents, including those who did not indicate firearms ownership. For the purpose of calculating statistics on national firearms ownership rates, we exclude the entire sample of both firearms owners and non-firearms owners from these first two days (410 respondents), leaving us with 53,834 respondents after this date for whom we have comprehensive demographic data. Firearms-owning respondents from the first two days are included in subsequent analysis of firearms owners, and we do possess comprehensive demographic information for these individuals.

Appendix B contains tables reporting the demographic sampling rates and the Census demographics used for raked weighting of the national survey. Note that the overall effect of weights is minimal given the high representativeness of the initial sample. For the purposes of analyzing responses within the sub-sample of firearms owners, we do not employ weighting schemes, in part because the "true" demographics of gun ownership are not knowable from an authoritative source analogous to the U.S. Census Bureau. However, as a robustness exercise, using weights based on estimates derived from the larger survey response rates yields results that are substantially identical for the analysis of responses from firearms owners.

One of the challenges in asking questions about firearms is eliciting truthful responses from firearms owners who may be hesitant to reveal information about practices that are associated with public controversy. The "tendency to respond to questions in a socially acceptable direction" when answering surveys is often referred to as "social desirability bias" (Spector, 2004), and there is evidence that it can influence survey responses to questions regarding firearms. For example, when Rafferty et al. (1995) conducted a telephone survey

APP. 593

Electronic copy available at: https://ssrn.com/abstract=4206997

of Michigan residents who had purchased a hunting license or registered a handgun, only 87.3 percent of the handgun registrants and 89.7 percent of hunting license holders reported having a gun in their household. Similarly, Ludwig et al. (1998) have documented a large gender gap in reporting of firearms ownership, finding that "in telephone surveys, the rate of household gun ownership reported by husbands exceeded wives' reports by an average of 12 percentage points." Asking questions via an anonymous survey instrument on the internet is likely to cause less concern or worry than traditional phone-based questionnaires with a live person on the other end or during face-to-face interviews, which is how the General Social Survey – one of the most prominent national surveys that regularly asks about firearm ownership – is conducted.[6] Even when presented in the more impersonal setting of a computer interface, however, a survey must be worded thoughtfully so as to assure anonymity, and not give respondents reason to worry about answering truthfully.

This survey employs five common devices to encourage more truthful responses. First, it uses an indirect "teaser" question to pre-screen respondents in order to select those who own firearms. The initial question prompt presents the survey as concerned with "recreational opportunities and related public policies" and asks respondents if they own any of the following items, presented in a random order: Bicycle, Canoe or Kayak, Firearm, Rock Climbing Equipment, None of the Above. Only those who select "Firearm" are then presented the full survey. We also ask demographic questions at the outset, which allows us to assess the representativeness of the sample, including those who do not indicate firearms ownership. Second, the survey was carefully phrased so as to not suggest animus towards gun owners or ignorance of firearms-related terminology. Third, the survey assures respondents of anonymity. Fourth, in order to ensure that respondents are reading the survey questions carefully, and then responding with considered answers thereto, a "disqualifying" question (sometimes referred to as a "screening" question) was embedded a little over half of the way through the survey instructing respondents to select a particular answer for that question, which only those who read the question in its entirety would understand. Anyone registering an incorrect answer to this question was disqualified from the survey and their responses to

---

[6]For a description of the methods of the General Social Survey see: `https://www.nsf.gov/pubs/2007/nsf0748/nsf0748_3.pdf`

6

APP. 594

Electronic copy available at: https://ssrn.com/abstract=4109657

any of the survey questions were neither considered nor tallied.

Finally, while responses were required for basic demographic questions, if questions of a sensitive nature were left blank, the software would first call attention to the blank response and prompt the respondent to enter a response. However, if a respondent persisted in not responding and again tried to progress, rather than kick them out of the survey, they would be allowed to progress to the next section in the interest of obtaining the maximum amount of information that they were willing to share. Respondents were not made aware of this possibility in advance, and in practice such "opting out" of a particular question was seldom done (less than 1% of responses for the average question). This is the reason that small variations are sometimes observed in the total number of respondents for certain questions.

A pilot version of this survey was first fielded in Vermont as part of a research project aimed at documenting firearms ownership and firearms use rates in that specific state. The Vermont survey served as a proof of concept for the national version, demonstrating that this survey is a viable instrument for eliciting responses from firearms owners with both high response rates and low disqualification rates. The results of the Vermont survey are presented separately in Appendix A of this report and closely mirror national results.

This report focuses on providing descriptive statistics of answers to the major questions asked in the survey. Future research will examine responses, and relationships between them, in more detail. The report proceeds as follows: the next (second) section summarizes national firearms ownership estimates and demographics; the third section examines defensive uses of firearms; the fourth section examines question regarding carrying for self-defense; the fifth section summarizes ownership statistics, and the sixth section concludes.

## 2   Gun Ownership Demographics

- About a third of adults in the U.S. report owning a firearm, totaling about 81.4 million adult gun owners.

- 57.8% of gun owners are male, 42.2% are female.

- 25.4% of Blacks own firearms.

7

Electronic copy available at: https://ssrn.com/abstract=4209697

- 28.3% of Hispanics own firearms.

- 19.4% of Asians own firearms.

- 34.3% of Whites own firearms.

With raked weighting employed for gender, state, income, race, and age we find that 32.5% of US adults age 21 and over own a firearm (95% Confidence Interval, 32.1 - 32.9%). Expanding the sample population to include those age 18-20, who are restricted in some states from purchasing firearms, 31.9% of US adults age 18 and over own firearms (95% Confidence Interval, 31.5% - 32.3%). This is slightly above, but consistent with, the most recent in-depth survey of firearms ownership conducted by Pew in 2017 before the Covid-19 pandemic, which found that 30% of adults in America own a firearm (Brown, 2017). It is also consistent with recent Gallup polling in 2020 and 2021, which found that 32% and 31% of adults personally own a firearm (Gallup, 2021).

As a benchmark to assess the accuracy of the teaser question used to ascertain firearm ownership, we can also compare ownership rates of other items reported by respondents for this question. We find 52% of respondents indicating owning a bicycle, which closely matches Pew's finding that 53% of Americans own a bicycle, according to a poll conducted in 2014.[7]

The distribution of gun owners surveyed by state is illustrated in Figure 1, and ranges from 1,287 in California and 1,264 in Texas to 26 in Washington, DC and 24 in North Dakota.

Table 1 shows the proportion of the population in each state estimated to own a firearm. Massachusetts, Hawaii, Rhode Island, and New Jersey have the lowest rates of ownership with less than 20% of the adult population owning firearms, while Kentucky, Montana, West Virginia, and Idaho have the highest rates of ownership with more than 45% of the adult population owning firearms.

With regard to the demographics of gun ownership, we find that 57.8% of gun owners are male and 42.2% are female, the average age of gun owners is 46-50 years old, and the average annual household income is $80,000-$90,000. Approximately 18% of gun owners do not identify as White (alone). Overall, approximately 10.6% of gun owners identify as Black,

---

[7]See   https://www.pewresearch.org/fact-tank/2015/04/16/car-bike-or-motorcycle-depends-on-where-you-live/

Electronic copy available at: https://ssrn.com/abstract=4209697

Figure 1: Distribution of Firearms Owners Surveyed

3.6% identify as Asian, 1.6% identify as American Indian, .2% identify as Pacific Islander, 82.0% identify as White, and 2.0% identify as Other. When analyzed within racial groups, we find that 25.4% of Blacks own firearms, 28.3% of Hispanics own firearms, 19.4% of Asians own firearms, and 34.3% of Whites own firearms.

According to the latest (2019) census estimates, there are approximately 255,200,373 individuals age 18 and over in the U.S., which implies that there are about 81.4 million adult gun owners.[8] Note that this figure does not include those under the age of 18 who may use or possess firearms for purposes such as hunting or shooting sports.

In sum, firearms ownership is widespread, and firearms owners are diverse.

# 3   Defensive Use of Firearms

- 31.1% of gun owners, or approximately 25.3 million adult Americans, have used a gun in self-defense.

- In most cases (81.9%) the gun is not fired.

- Gun owners engage in approximately 1.67 million defensive uses of firearms per year.

- The majority of defensive gun uses take place outside of the home (74.8%).

---

[8]Census date is available at https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-syasexn.xlsx

9

**APP. 597**

Electronic copy available at: https://ssm.com/abstract=4209657

| State | Proportion of adult population estimated to own firearms | 95% Confidence Interval |
| --- | --- | --- |
| Alabama | 39.6% | 35.2% – 44.1% |
| Alaska | 33.4% | 25.7% – 42.1% |
| Arizona | 32.0% | 28.8% – 35.4% |
| Arkansas | 36.6% | 31.1% – 42.5% |
| California | 25.5% | 24.0% – 27.0% |
| Colorado | 33.6% | 29.8% – 37.7% |
| Connecticut | 20.2% | 16.8% – 24.1% |
| Delaware | 24.7% | 18.9% – 31.6% |
| District of Columbia | 23.9% | 15.6% – 34.9% |
| Florida | 30.3% | 28.5% – 32.2% |
| Georgia | 37.1% | 34.5% – 39.9% |
| Hawaii | 16.4% | 10.6% – 24.5% |
| Idaho | 54.5% | 45.5% – 63.1% |
| Illinois | 26.5% | 24.3% – 28.9% |
| Indiana | 40.3% | 36.6% – 44.1% |
| Iowa | 33.2% | 28.1% – 38.8% |
| Kansas | 42.8% | 37.4% – 48.3% |
| Kentucky | 46.7% | 42.6% – 50.8% |
| Louisiana | 32.8% | 28.0% – 38.0% |
| Maine | 35.9% | 29.7% – 42.6% |
| Maryland | 21.7% | 18.5% – 25.2% |
| Massachusetts | 15.8% | 13.4% – 18.6% |
| Michigan | 34.7% | 32.0% – 37.5% |
| Minnesota | 32.5% | 28.4% – 36.8% |
| Mississippi | 39.5% | 33.5% – 45.8% |
| Missouri | 39.7% | 36.2% – 43.4% |
| Montana | 48.4% | 38.7% – 58.3% |
| Nebraska | 37.2% | 29.8% – 45.2% |
| Nevada | 38.0% | 32.8% – 43.4% |
| New Hampshire | 24.1% | 18.4% – 30.9% |
| New Jersey | 19.3% | 16.9% – 22.0% |
| New Mexico | 33.8% | 25.9% – 42.7% |
| New York | 22.7% | 21.3% – 24.2% |
| North Carolina | 37.3% | 34.5% – 40.2% |
| North Dakota | 42.6% | 29.9% – 56.4% |
| Ohio | 33.7% | 31.1% – 36.4% |
| Oklahoma | 40.5% | 36.2% – 45.0% |
| Oregon | 38.3% | 32.7% – 44.2% |
| Pennsylvania | 30.3% | 28.1% – 32.6% |
| Rhode Island | 16.9% | 11.4% – 24.2% |
| South Carolina | 40.7% | 36.5% – 45.1% |
| South Dakota | 39.2% | 32.4% – 46.4% |
| Tennessee | 43.0% | 39.5% – 46.6% |
| Texas | 36.0% | 34.1% – 38.0% |
| Utah | 42.8% | 36.1% – 49.8% |
| Virginia | 30.6% | 27.6% – 33.7% |
| Washington | 32.8% | 29.3% – 36.4% |
| West Virginia | 53.0% | 45.6% – 60.2% |
| Wisconsin | 33.3% | 29.9% – 36.9% |
| Wyoming | 42.7% | 34.5% – 51.2% |

Table 1: Proportion of the population estimated to own a firearm in each state.

- About half of defensive gun uses involve more than one assailant (51.2%).

- Handguns are the firearm most commonly used in defensive incidents (65.9%), followed

10

**APP. 598**

Electronic copy available at: https://ssrn.com/abstract=4205697

by shotguns (21.0%) and rifles (13.1%).

Defensive use of firearms was assessed through a series of questions that asked for increasingly detailed information from those who indicated that they had used a firearm in self-defense.

First, all gun owners were asked, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed? Please do not include military service, police work, or work as a security guard." About a third (31.1%) answered in the affirmative, and they were then asked how many times they defended themselves with a firearm (from "once" to "five or more times"). As Figure 2 shows, a majority of gun owners who have used a firearm to defend themselves have done so on more than one occasion.



Figure 2: Defensive Gun Use: 31.1% of firearms owners have defended themselves of their property with a gun, and a majority have done so more than once.

Both men and women report having used firearms in self-defense at high rates, with 33.8% of male gun owners indicating they have defensively used a gun, and 27.3% of female gun owners indicating they have defensively used a gun. Table 2 further breaks down reports of

11

Electronic copy available at: https://ssrn.com/abstract=4206697

APP. 599

defensive use of firearms by categories of race and ethnic ancestry, illustrating that defensive gun use rates are higher in some minority groups.

| Demographic Group | Proportion of Gun Owners Who Used Gun Defensively | 95% Confidence Interval |
|---|---|---|
| White | 29.7% | 29.0% − 30.5% |
| Black | 44.3% | 41.2% − 47.5% |
| Asian | 26.0% | 21.7% − 30.9% |
| Native American | 47.7% | 42.7% − 52.7% |
| Pacific Islander | 37.1% | 26.0% − 49.7% |
| Other Ethnic Ancestry | 36.2% | 30.3% − 42.7% |
| Hispanic (any ancestry) | 39.3% | 36.0% − 42.8% |
| Male | 33.8% | 32.8% − 34.8% |
| Female | 27.3% | 26.2% − 28.4% |

Table 2: Demographics of defensive gun use.

Given that 31.1% of firearms owners have used a firearm in self-defense, this implies that approximately 25.3 million adult Americans have defended themselves with a firearm. Answers to the frequency question suggest that these gun owners have been involved in a total of approximately 50 million defensive incidents. Assuming that defensive uses of firearms are distributed roughly equally across years, this suggests at least 1.67 million defensive uses of firearms per year in which firearms owners have defended themselves or their property through the discharge, display, or mention of a firearm (excluding military service, police work, or work as a security guard).[9]

---

[9]This is calculated by taking the total number of defensive incidents represented by the survey responses (50 million) and dividing by the number of adult years of the average respondent, which is 30. According to U.S. Census data, the average age of U.S. adults (i.e. the average age of those in the set of everyone 18 years or older) is 48, which also matches our survey data. Thus, the average respondent of the survey has 30 years of adult experience (48 years - 18 years = 30 adult years), over which the defensive incidents captured in this survey are reported.

Note that this estimate is inherently conservative for two reasons. First, it assumes that gun owners possessed firearms, or had access to firearms, from the age of 18. In so far as firearms were only first ac-

**APP. 600**

Electronic copy available at: https://ssrn.com/abstract=4109497



Figure 3: How Guns are Employed in Self-defense: In most defensive incidents no shots are fired.

Gun owner respondents were asked to answer detailed questions regarding each defensive

quired/accessed by some respondents in later years, this would reduce the number of adult firearms owning years represented by the survey responses and result in a higher estimate of the number of defensive incidents per year. Second, this figure only captures defensive gun uses by those currently indicating firearms ownership. According to Kleck and Gertz (1995), only 59.5% of respondents who reported a defensive gun use personally owed a gun (p.187). This would suggest that the true number of defensive gun uses, if those who do not personally own firearms are included in the estimate, could be substantially higher - perhaps as high as 2.8 million per year.

This approach is also robust to critiques that have been made by Hemenway (1996) and others who argue that defensive gun use estimates from surveys can be exaggerated due to recollection bias when respondents are asked to recount incidents within a limited time period. The intuition behind these critiques is that if respondents are asked, for example, if they used a gun defensively within the last year, there is a possibility that people will respond affirmatively if they used a gun in self-defense in recent memory, even if that incident wasn't strictly within the last 12 months. This could lead to inflated "per year" estimates of defensive gun uses, which would only be further magnified when extrapolated out to total defensive gun uses over many years. However, the approach of this survey is not vulnerable to this critique because the survey asks about defensive gun use at any time, not simply those within the last year or some other short time horizon. We thus do not engage in the exercise of extrapolating out estimates from potentially biased measures of comparatively rare events in a restricted window of time. Rather our approach asks questions about defensive gun use in the manner that is most methodologically sound for eliciting unbiased estimates.

Finally, note that our overall approach assumes that children are not employing firearms for self-defense

13

**APP. 601**

Electronic copy available at: https://ssrn.com/abstract=4209697

incident that they reported. As Figure 3 shows, in the vast majority of defensive gun uses (81.9%), the gun was not fired. Rather, displaying a firearm or threatening to use a firearm (through, for example, a verbal threat) was sufficient. This suggests that firearms have a powerful deterrent effect on crime, which, in most cases, does not depend on a gun actually being fired or an aggressor being injured.

Figure 4 shows where defensive gun uses occurred. Approximately a quarter (25.2%) of defensive incidents took place within the gun owner's home, and approximately half (53.9%) occurred outside their home but on their property. About one out of ten (9.1%) of defensive gun uses occurred in public, and about one out of thirty (3.2%) occurred at work.



Figure 4: The Location of Defensive Incidents: Most take place outside the home.

For each incident, respondents were asked to indicate what sort of firearm was used. Figure 5 show the distribution of types of firearms employed in defensive incidents. Handguns were the most commonly used firearm for self-defense, used in nearly two-thirds (65.9%) of defensive incidents, followed by shotguns (21.0%) and rifles (13.1%).

Respondents were also asked to indicate how many assailants were involved in each de-

with any meaningful frequency. However, for the purpose of sensitivity analysis, if we lower the age used for calculating defensive incident frequency to assume that children as young as 12 years old are commonly possessing and using firearms for self-defense (and no non-firearms owning adults used firearms for self-defense), this would still imply 1.39 million defensive uses of firearms per year (48 years - 12 years = 36 years over which 50 million defensive incidents took place).

APP. 602

Electronic copy available at: https://ssm.com/abstract=4209697



What sort of firearm did you use during this incident? (%)

Figure 5: Type of Gun Used for Defense: Handguns are the most common type of firearm used in defensive encounters, followed by shotguns and rifles.

fensive incident. As Figure 6 illustrates, about half of defensive encounters (51.2%) involved more than one assailant. Presumably, part of the value of using a firearm in self-defense is that it serves as a force multiplier against more powerful or more numerous assailants. Survey responses confirm that encountering multiple assailants is not an infrequent occurrence in defensive incidents. 30.8% of defensive incidents involved two assailants, and 20.4% involved three or more, while slightly less than half (48.8%) involved a single assailant.

Finally, after respondents answered these detailed questions about each defensive incident, which all flowed from their initial affirmative answer to the question, "Have you ever defended yourself or your property with a firearm, even if it was not fired or displayed?", all gun owners were asked, "Separate from any incident in which you directly used a gun to defend yourself, has the presence of a gun ever deterred any criminal conduct against you, your family, or your property?" This question was meant to capture incidents that did not involve active self-defense, but for which individuals believed that the presence of a firearm helped deter predatory behavior. For example, a situation in which a combative customer calmed down after noticing that shop owner had a handgun on his or her hip, or a situation in which a trespasser cooperatively left a property when questioned by a landowner who had a rifle slung over his or her shoulder, or a situation in which a friend showed up with a firearm

15

**APP. 603**

Electronic copy available at: https://ssm.com/abstract=4109807



Figure 6: Distribution of the Number of Assailants Involved in a Defensive Incident: Multiple assailants are common.

to help diffuse a dangerous situation, could fall into this category. Respondents answering in the affirmative could indicate how many times such deterrence occurred, from once to five or more occasions. As Figure 7 illustrates, separate from the self-defense incidents summarized earlier, 31.8% of gun owners reported that the mere presence of a gun has deterred criminal conduct, and 40.2% of these individuals indicated that this has happened on more than one occasion. Extrapolated to the population at large, this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime.

# 4   Carry Outside of the Home

- A majority of gun owners (56.2%) indicate that there are some circumstances for which they carry a handgun for self-defense.

- Approximately 26.3% of gun owners, or 20.7 million individuals, carry handguns for defensive purposes under a "concealed carry" regime.

- About a third of gun owners (34.9%) have wanted to carry a handgun for self-defense

16

APP. 604

Electronic copy available at: https://ssm.com/abstract=4109494



Figure 7: Frequency with which Firearms Deter Crime: 31.8% of firearms owners report that the presence of a firearm has deterred criminal conduct against them, often on more than one occasion.

in a particular situation but local rules prohibited them from doing so.

As Figure 8 illustrates, a majority of gun owners (56.2%), or about 45.8 million, indicate that there are some circumstances in which they carry a handgun for self-defense (which can include situations in which no permit is required to carry, such as on their own property); and about 35% of gun owners report carrying a handgun with some frequency (indicating that they carry "Sometimes," "Often," or "Always or almost always."). Moreover, as Figure 9 summarizes, 34.9% of gun owners report that there have been instances in which they wanted to carry a handgun for self-defense, but local rules did not allow them to carry.

Assessing the number of people who carry a concealed handgun in public is complicated due, in part, to the proliferation of so-called "constitutional carry" or "permitless carry" states in recent years. These states - about 18 at the time this survey was conducted - generally allow adults in good legal standing (often restricted to those age 21 and older) to

APP. 605

Electronic copy available at: https://ssrn.com/abstract=4230697



Figure 8: Frequency of Defensive Carry: Carrying a handgun for self-defense is common.



Figure 9: Prohibition of Carry: About a third of gun owners have wanted to carry a handgun for self-defense in a particular situation but local rules prohibited them from doing so.

carry a concealed weapon without a permit. Most of these states previously had a permitting process for concealed carry and required permits to be renewed at regular intervals in order to remain valid. Under constitutional carry, law abiding adults in these states are permitted to carry concealed without an official "permit." However, most of these states continue to issue permits to residents who desire them because such permits can be useful for reciprocal carry benefits in other states. For example, a person acquiring a Utah carry permit would be entitled to carry a handgun in a number of other states such as neighboring Colorado and

18

**APP. 606**

Electronic copy available at: https://ssrn.com/abstract=4209607

Nevada.[10] Thus, while basically all gun owners age 21 and over are "permitted" to carry a handgun for self-defense in constitutional carry states, many individuals may also possess a "permit," even though it is redundant for in-state carry.

Unsurprisingly, when asked "Do you have a concealed carry permit?" gun owning residents of many constitutional carry states respond in the affirmative at high rates. Also complicating this question about concealed carry permits is the fact that many states refer to such permits by different names, the fact that the right to carry a handgun can be conferred in certain circumstances by hunting or fishing licenses in some states,[11] and the existence of other related permits, some of which do not license concealed carry (e.g. standard pistol permits in North Carolina or New York, eligibility certificates in Connecticut) and some of which do (most License To Carry permits required for handgun ownership in Massachusetts, state pistol permits in Connecticut, and LEOSA permits available to current and retired law enforcement officers nationwide). Finally, it is also possible for individuals to obtain concealed carry permits in states other than the one in which they reside.

In order to provide a robust but conservative estimate of those who actually carry in public, we code as "public carriers" those individuals who indicated both that they have a concealed carry permit and that they carry a handgun for self-defense at least "sometimes." We also restrict analysis and population estimates to those age 21 and over given that most states restrict those under 21 from carrying concealed in public.

Using this simple definition, we find that 26.3% of gun owners are "public carriers," which translates to approximately 20.7 million individuals who carry handguns in public under a concealed carry regime. Note that this could include current and former law enforcement officers who may be represented in the survey. However, the number of active law enforcement officers in the U.S. is well under a million (approximately 700,000 in 2019).[12]

---

[10]See https://bci.utah.gov/concealed-firearm/reciprocity-with-other-states/

[11]For example, a number of states such as California, Georgia, and Oregon allow those with a hunting or fishing license to carry concealed while engaged in hunting or fishing or while going to or returning from an expedition. See: https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/pdf/cfl2016.pdf, https://law.justia.com/codes/georgia/2010/title-16/chapter-11/article-4/part-3/16-11-126/, https://codes.findlaw.com/or/title-16-crimes-and-punishments/or-rev-st-sect-166-260.html

[12]See https://ucr.fbi.gov/crime-in-the.u.s/2019/crime-in-the.u.s.-2019/tables/table-74

**APP. 607**

Electronic copy available at: https://ssrn.com/abstract=4095697

# 5    Types of Firearms and Magazines Owned

- 82.7% of gun owners report owning a handgun, 68.8% report owning a rifle, and 58.4% report owning a shotgun.

- The average gun owner owns about 5 firearms. The median gun owner owns 3.

- 29.0% of gun owners own only one firearm.

- 30.2% of gun owners, about 24.6 million people, have owned an AR-15 or similarly styled rifle, and up to 44 million such rifles have been owned.

- 48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned.

- Overall, Americans own in excess of 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

## 5.1    Rifles, Shotguns, and Handguns

Respondents were asked to indicate the number of rifles, shotguns, and handguns that they owned. 82.7% of gun owners report owning a handgun (95% CI 82.0% - 83.3%), 68.8% reported owning a rifle (95% CI 68.1% - 69.6%), and 58.4% report owning a shotgun (95% CI 57.6% - 59.2%). Note that using survey weights based on in-survey demographics of firearms ownership has no substantive effect on these estimates: Handgun, 83.7% (82.9% - 84.4%), Rifle, 68.6% (67.7% - 69.6%), Shotgun 58.6% (57.6% - 59.6%).

Approximately 99.8% of respondents indicated owning fewer than 100 firearms of each type, and approximately 97.2% indicated owning fewer than 10 firearms of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 firearms in any category in the analysis that examines average numbers of guns owned. Also, 1.5% of respondents entered zero for each category of firearms ownership. While ostensibly inconsistent with having earlier indicated ownership of a firearm, there are a number of plausible explanations for this discrepancy including a reluctance to

**APP. 608**

Electronic copy available at: https://ssrn.com/abstract=4206867



Percentage of gun owners reporting ownership of at least one firearm in the indicated category.

Figure 10: Percent of gun owners who own each type of firearm.

provide this level of detailed information, having use of a firearm in one's household which one does not personally own, or owning a firearm that technically does not fall into one of these three categories. We exclude these response in analyzing ownership rates below. However, including them has no significant effect on estimates.

On average, gun owners owned 5.1 firearms, consisting of 1.8 rifles, 1.2 shotguns, and 2.1 handguns. Figure 11 plots histograms of the number of firearms owned by respondents. Unsurprisingly, these are skewed right, indicating that most gun owners own a small number of guns, while a smaller portion of gun owners own a large number of guns. The median gun owner owned 3 firearms. 29.0% of firearms owners owned only one firearm.[13] Among those who only own one firearm, handguns are the most commonly owned type of gun (64.7%), followed by rifles (22.5%) and shotguns (13.3%).

Overall, these estimates imply that Americans own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns.

---

[13]An earlier draft had estimated that 21.9% of gun owners owned only one firearm, but the denominator for that calculation mistakenly included respondents who did not provide an answer to this question. The estimate of 29.0% properly incorporates all information provided by respondents.

**APP. 609**

Electronic copy available at: https://ssrn.com/abstract=4206097



(a) Histogram of number of rifles owned      (b) Histogram of number of shotguns owned

(c) Histogram of number of handguns owned      (d) Histogram of total number of guns owned

Figure 11: Histograms showing the distributions of gun ownership.

## 5.2   Magazine Ownership

The survey asked respondents whether they have ever owned a magazine that holds more than 10 rounds. Those who answered in the affirmative were then asked to indicate the purposes for which they owned such magazines and to estimate how many magazines of different types they owned.

48.0% of gun owners (95% CI 47.2%-48.7%) responded yes to the question, "Have you ever owned a handgun or rifle magazine that holds more than 10 rounds? (You can count magazines that you may keep in another state if there are local restrictions against ownership.)" indicating that they had owned such magazines. Note that, again, using survey

22

**APP. 610**

Electronic copy available at: https://ssm.com/abstract=4209097

weights based on in-survey demographics of firearms ownership has no substantive effect on this estimate (47.4%, CI 46.5%-48.4%). This suggests that approximately 39 million adults in the U.S. have owned magazines that hold more than 10 rounds.



Percentage indicating each factor was a reason for ownership.

Figure 12: Purposes indicated for owning 11+ capacity magazines.

Figure 12 shows the percentage of respondents who indicated that they owned magazines that can hold more than 10 rounds for the following purposes: defense outside the home (41.7%), home defense (62.4%), competitive shooting sports (27.2%), recreational target shooting (64.3%), hunting (47.0%), and other (3.9%). Note that respondents could choose multiple purposes for which they owned such magazines. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

Respondents who indicated that they had owned magazines that can hold more than 10 rounds were also asked to estimate the number of pistol and rifle magazines they owned of particular sizes. Numerical responses were unbounded. Approximately 99.8% of respondents indicated owning fewer than 100 magazines of each type, and approximately 96.5% indicated owning fewer than 10 magazines of each type. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we exclude the 0.2% of responses that indicated owning over 100 magazines

Electronic copy available at: https://ssrn.com/abstract=4209697

in a category.



Average number of handgun magazines owned by capacity.

Figure 13: About how many handgun magazines of each type would you estimate you have owned?

Figure 13 shows the average number of handgun magazines of each type reported by respondents in this section: 10 rounds or less (3.1 magazines), 11-15 rounds (2.5 magazines), more than 15 rounds (4.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 10 handgun magazines, and more than two-thirds of these magazines hold more than 10 rounds. Note that the question asked whether respondents have ever owned such magazines and how many such magazines they have owned, so these estimates should be interpreted as an upper bound on current ownership given that some magazines may have been resold. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 269 million handgun magazines that hold over 10 rounds.

Figure 14 shows the average number of rifle magazines of each type reported by respondents in this section: 10 rounds or less (2.4 magazines), 11-15 rounds (1.8 magazines), over 15 rounds (5.4 magazines). In sum, the average respondent (who indicated that they have owned a magazine that holds more than 10 rounds), owns about 9.6 rifle magazines, and about three-quarters of these magazines hold more than 10 rounds. Building on earlier estimates, this suggests that U.S. gun owners have owned up to 273 million rifle magazines that

24

APP. 612

Electronic copy available at: https://ssrn.com/abstract=4209697

hold over 10 rounds.



Average number of rifle magazines owned by capacity.

Figure 14: About how many rifle magazines of each type would you estimate you have owned?

These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds. Finally, note that these questions about the types of magazines owned were only asked of those who indicated that they had owned a magazine that holds more than 10 rounds, and thus we do not know how many magazines up to 10 rounds are owned by the 52.0% of gun owners who are not in this category.

Table 3 shows the breakdown of ownership of magazines that hold over 10 rounds across different demographic segments.

Table 4 shows the percentage of gun owners in each state who indicated that they have owned magazines that hold more than 10 rounds. Note that this question explicitly instructed respondents that "You can count magazines that you may keep in another state if there are local restrictions against ownership." This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such magazines. It's also possible that those answering in the affirmative possess magazines that were grandfathered in because they were acquired before such bans or that some respondents have gotten rid of magazines that they owned in the past.

Another dynamic that likely contributes to such differences in ownership rates derives

APP. 613

Electronic copy available at: https://ssrn.com/abstract=4209697

| Demographic Group | Proportion Owned 11+ Mags | 95% Confidence Interval |
|---|---|---|
| White | 47.0% | 46.1% – 47.8% |
| Black | 55.2% | 52.2% – 58.2% |
| Asian | 50.0% | 44.8 – 55.2% |
| Native American | 52.6% | 47.7% – 57.4% |
| Pacific Islander | 59.1% | 47.4% – 69.9% |
| Other Ethnic Ancestry | 59.6% | 53.3% – 65.6% |
| Hispanic (any ancestry) | 61.6% | 58.3% – 64.7% |
| Male | 57.7% | 56.7% – 58.7% |
| Female | 34.1% | 33.0% – 35.3% |

Table 3: Demographics of ownership of magazines that hold more than 10 rounds.

from the fact that in states with low rates of firearms ownership, such as DC and Hawaii, those few individuals who do own guns are presumably more likely to be gun enthusiasts. Indeed, analysis of the survey data reveals that states with higher rates of firearms ownership are associated with slightly lower rates of ownership of magazines that own over 10 rounds, and this difference is statistically significant (coef = -0.36, p=.03).

Given that such a large percentage of gun owners indicated that they owned magazines that hold over ten rounds for defensive purposes, we further analyze the potential value of these magazines for defense. Recall that a majority of defensive incidents involved multiple assailants (51.2%). Presumably, it would be advantageous to have a firearm with a larger capacity magazine if one needed to engage more than one assailant, which these responses suggest is indeed common. Although in most defensive gun uses the gun was not fired (81.9%), we can further analyze the subset of incidents in which a gun was fired. In 67.8% of these cases in which a gun was fired in self defense, multiple rounds were fired.

As part of the self-defense section of the survey, respondents were invited to answer an open response question that asked: "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes

26

**APP. 614**

Electronic copy available at: https://ssrn.com/abstract=4109567

| State | Owned 11+ cap. mags | 95% Confidence Interval |
|---|---|---|
| Alabama | 48.1% | 42.7% − 53.6% |
| Alaska | 52.7% | 39.6% − 65.4% |
| Arizona | 47.5% | 42.3% − 52.8% |
| Arkansas | 50.7% | 44.1% − 57.3% |
| California | 53.8% | 51.0% − 56.5% |
| Colorado | 51.4% | 45.3% − 57.4% |
| Connecticut | 42.6% | 34.4% − 51.3% |
| Delaware | 50.6% | 39.8% − 61.5% |
| District of Columbia | 69.2% | 49.5% − 83.8% |
| Florida | 46.9% | 43.9% − 49.8% |
| Georgia | 52.4% | 48.7% − 56.2% |
| Hawaii | 59.3% | 40.3% − 75.8% |
| Idaho | 45.4% | 36.7% − 54.4% |
| Illinois | 51.5% | 47.3% − 55.6% |
| Indiana | 46.5% | 41.8% − 51.2% |
| Iowa | 35.4% | 28.0% − 43.6% |
| Kansas | 42.2% | 35.4% − 49.4% |
| Kentucky | 43.7% | 38.5% − 49.0% |
| Louisiana | 47.4% | 41.1% − 53.8% |
| Maine | 37.9% | 28.7% − 48.0% |
| Maryland | 50.8% | 43.7% − 57.8% |
| Massachusetts | 53.3% | 45.7% − 60.8% |
| Michigan | 37.1% | 33.2% − 41.1% |
| Minnesota | 39.8% | 34.0% − 46.0% |
| Mississippi | 44.6% | 37.3% − 52.2% |
| Missouri | 50.6% | 45.8% − 55.5% |
| Montana | 52.6% | 39.8% − 65.1% |
| Nebraska | 45.5% | 35.9% − 55.3% |
| Nevada | 61.0% | 52.8% − 68.5% |
| New Hampshire | 43.9% | 31.6% − 56.9% |
| New Jersey | 52.2% | 46.5% − 57.8% |
| New Mexico | 49.2% | 36.9% − 61.5% |
| New York | 54.9% | 51.8% − 58.0% |
| North Carolina | 43.9% | 39.9% − 47.9% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 42.0% | 38.4% − 45.7% |
| Oklahoma | 47.5% | 41.7% − 53.4% |
| Oregon | 49.8% | 42.9% − 56.6% |
| Pennsylvania | 39.6% | 36.0% − 43.2% |
| Rhode Island | 55.3% | 39.5% − 70.1% |
| South Carolina | 42.8% | 37.7% − 48.0% |
| South Dakota | 50.0% | 40.2% − 59.8% |
| Tennessee | 44.1% | 39.5% − 48.7% |
| Texas | 54.1% | 51.3% − 56.8% |
| Utah | 46.8% | 38.2% − 55.6% |
| Virginia | 47.5% | 42.7% − 52.4% |
| Washington | 53.1% | 47.8% − 58.4% |
| West Virginia | 44.8% | 37.7% − 52.1% |
| Wisconsin | 33.6% | 28.5% − 39.0% |
| Wyoming | 63.0% | 51.4% − 73.3% |

Table 4: Percent of gun owners who have indicated that they have ever owned magazines that hold over 10 rounds by state. Note that this includes magazines that an owner holds in other states if there are local ownership restrictions.

27

**APP. 615**

Electronic copy available at: https://ssrn.com/abstract=4206697

to have a firearm with a magazine capacity in excess of 10 rounds? If so, please briefly describe that situation." Approximately 550 respondents gave a affirmative response with most sketching out details of the encounter. Examples of these responses (reported verbatim) include:

- I got jumped by multiple people in a carjacking in front of our apartments with my wife and children.

- Yes. I was robbed on a street 1 time by a group of about 6 people that at least 1 was armed and I wasn't. It took about 6 hours of emergency surgery to gat my bones in face jaws and skull back in place form being beaten in the head face kicked all over. Damn near killed me.

- Yes, a man broke into our apartment, high. He was approx 6'4, 300 pounds & threw a friend of ours around the living room like a rag doll. Beat her repeatedly.

- Yes. The first incident I mentioned. Three men attempted to rob me outside my home, with the intention of entering my home thereafter. My wife and child were inside the home at the time. That was in California with a magazine that only held 7 shots. I am a great shot, prior military and other firearms training, but I hate to only have 7 shots with three people. In such a situation, very well trained people, pumped up with adrenalin can and do miss their target. Thank you.

- Yes, absolutely. I am mobility challenged and was walking my dog one day. Three men ambushed me from behind, but luckily my dog chased them away. My dog actually bit one of the men.

- On the farm, we have had mountain lions killing our calves so a larger animal could require more rounds

- When two people attacked my company's warehouse

- Yes, I was alone with my son and 3 large men were trying to break in, I was unable to reload, thank goodness they realized and left.

28

**APP. 616**

Electronic copy available at: https://ssrn.com/abstract=4209697

- I was charged by a bear. It was very scary in the moment I panicked and rattled over multiple shots. Most missed but some hit home and eventually stopped him.

- Yes. I went in but into a store and 4 thugs approached me telling me to give them money. I produced my handgun at my side and they left. If this had been a shooting with multiple bad guys with guns a 15 round magazine is best.

- When I was a teenager 4 guys did a home invasion at our house. I could easily see needing a 20 to 30 round clip would be necessary.. we didnt have weapons and my mom and dad were hurt pretty bad. Dad was stabbed 4 times and they had a gun too. Thats when I decided when I was on my own that I would have protection.

- About 20 coyotes attacked some of my livestock. It took two 30 round magazines to repel the animals and then only after killing 10 of them.

- Yes. I was surrounded by would-be assailants in a perking lot. I was able to escape unharmed, but if they had rushed me, I would most certainly had to lay down a rapid field of fire, alternately in various directions. In that scenario, I probably would have missed the targets and needed multiple, rapid follow-up shots to hit or at least dissuade the attackers from pressing forward. Only a firearm with 10 or more round magazine would offer that kind of defensive capability.

- Had several people trespass on my property doing something illegal and when I called the police said it would be a while before they could come out so when I asked the people to leave they threatened to kill me but after they seen that I was open carry the left if the situation went a different way I dont know if I would have been about to protect myself with as many of them as there was

- The time when there were 4 people in my home and I was fearful of being hurt and my concern was do I have enough rounds to protect myself what if I missed if I had to fire the weapon .

- Yes. Been stalked by a pack of coyotes while hiking with my children

APP. 617

Electronic copy available at: https://ssrn.com/abstract=4209697

- Yes when I had more than one person trying to break into my car. I live out in the country so I do not have time to wait for police to get to me I have to act fast and protect myself and my family.

- Yes, I ran into a situation where there were numerous criminals breaking the law and rioting at a public venue during an annual festival event. They were blocking my self and my friends, two of which were females, from leaving the area as well as preventing the police from reaching us. I was very glad that I had multiple magazines that had more then a 10 round capacity.

- 2 men broke into my home while I was sleeping. I woke up and heard them breaking stuff downstairs. I grabbed my gun and ran down stairs and confronted them. I pointed my gun at them and told them to get out. They ran off.

- I was stopped at a red light. Car in front of me backed up and the car behind me pulled up to my bumper. Both drivers got out and approached both sides of my car. Light turned green. I gassed it pushing the car in front of me out of the way. They had bats to break my windows. Would've robbed me I think. Was under a overpass.

- Twice it was people attempting to break into my home I was alone age 64 and 4 burly men thought no one was home as I had been napping. They learned quickly this old lady was not without protection. They saw the gun and quickly left. I called 911 and they were apprended they had been robbing homes for 6 weeks in the area. Those home who had guns they left and went elsewhere. Another time people a group wanted a big party came to the wrong road half were drunk or stoned. I had small children. There was finally someone sober enough to see I had a gun and that I meant business it was the middle of the night and they wanted to party but had the wrong road. The sane person got them to all leave and they never came back. We had no phone at that time. The third time was a cougar attacking my livestock. It ran off but had killed 4 goats. We called the game warden they had a special hunt and killed it as we had been the 4th place hit it had killed livestock. We have had cougar on our property in our yard 3 times since once my son shot one stalking him and his dog the other time

30

Electronic copy available at: https://ssrn.com/abstract=4209697

it ran off before he could get his gun ready.

- yes, but not at home, we were camping in prescott arizona and several men came up and wanted to harass and steal from our family. We all felt very threatened and if another couple of people had not shown up with their guns the people would have over ran us and my family would have been hurt.

- It could have helped during a robbery at my residence where 4 intruders entered my home

- I was a small business owner before I became disabled. I would often carry large amounts of cash. On more than 1 occasion I was faced with pulling my weapon or lose my cash

- I was walking a long distance through Philadelphia to get to a restaurant and was approached by 3 men who demanded to know why I thought I could go through their neighborhood. I told them I did not want any trouble and tried to continue walking but one stood in my way and asked if I actually thought I was going to leave without answering them. I began to wonder if I was going to be robbed or assaulted when they first approached and at this point it seemed like they would prevent me from leaving. I lifted my shirt and placed my hand on a pistol I was legally able to conceal carry and said yes I would be leaving. They backed away from me but continued to yell things at me as I left the area. I never pulled the gun out, but them knowing I had it and may use it to stop them was enough to escape unharmed. Having less than 10 rounds against 3 attackers, especially if they were also armed, would have put me at a disadvantage if I was unable to accurately hit my targets initially and they continued to Pursue me.

- Yes, I was in Illinois, which does not honor Indiana concealed carry. I had to leave my firearm at home. This was truly the only time in my life I felt I needed to actually use a firearm, but almost was killed. 4 men (3 with guns displayed and 1 with a knife in his hand) were walking up to me fast in a parking lot screaming stop and give me everything you have. The parking lot was near empty, and dark outside. I was able

31

APP. 619

Electronic copy available at: https://ssrn.com/abstract=4209697

to unlock my car while running, start the car and speed off. Just as I got in the car, I had just enough time to lock the door before the 3 men pointed there guns at the car and the other was stabbing the window with a knife. They intended to rob and kill me. I couple rounds were fired as I sped off. I would have needed minimally 10 rounds if I had discharged given their distancing. I almost died because of Illinois law and my street smarts and luck was the only thing that saved me

- Yes An incident occurred when a man was drunk and crashed his car in front of me while I was carrying my 2 small children. A large group of his friends tried to get the drunk away before the police arrived. A fight started with them punching my elderly dad and threatened my elderly mother with violence.

- I was confronted then attacked by a group of about 12 teens when I was a teenager. They kicked me and caused a sever head injury and fractured ribs. I was defenseless. Being able to brandish a weapon with the capacity to take on a group of that size would have deterred their next step of physically assaulting me

- The two large males that attempted to break into my home. Much larger than myself. A 9mm would take several shots to slow down either and/or both.

- Yes. I am a 5'2" disabled female. I was stalked by a homeless drug addict. He was detained 4-5 times due to red behavior because he was high on methamphetamine. This person could have potentially done great harm to me. Meth addicts don't always go down easy. Sometimes it takes numerous rounds to get them down.

- My brother and I were robbed at gun point when ione of the men got in the car with me after my brother got out of the car. The man had already told my brother that he wanted his money and that there were other people watching across the parking lot in case he had any problems with us. So when my brother got out, that man got in with a gun and stuck it right into my right side. He told me not to look at him and to give him all my money. With the other men standing in different positions in the parking lot my brother could have tried to shoot them (or at them) to try and scare them off

32

**APP. 620**

Electronic copy available at: https://ssrn.com/abstract=4209697

and if he could have had a larger capacity magazine he could have been able to fire more rounds at them to keep them away while we tried to get help from someone.

Finally, it is worth noting that, although a majority of these scenarios involve the prospect of defending against criminal aggression, a number involve defending against animals. The pilot survey in Vermont similarly documented a number of incidents involving animals (see Appendix A). This is a phenomenon that has been largely neglected in the scholarly literature examining the value of firearms for self-defense, and it would be helpful for future research to evaluate the frequency with which firearms are employed in defense against animal threats.

## 5.3   Ownership of AR-15 and similarly styled rifles

All gun owners were asked, "Have you ever owned an AR-15 or similarly styled rifle? You can include any rifles of this style that have been modified or moved to be compliant with local law." 30.2% of gun owners, about 24.6 million people, indicated that they have owned an AR-15 or similarly styled rifle. Using survey weights based on in-survey demographics of firearms ownership has no effect on this estimate. Respondents were then asked to indicate how many of such rifles they have owned. Approximately 99.7% indicated owning under 100 and 98.4% under 10. In order to provide a conservative estimate of ownership rates and to ensure that average estimates are not skewed by a small number of large outliers, we disregard the 0.3% that indicate owning over 100 in calculating average ownership numbers. Among those who indicate having owned AR-15 and similarly styled rifles, they indicate having owned an average of 1.8, with the median owner having owned 1. This suggest that up to 44 million AR-15 styled rifles have been owned by U.S. gun owners. Note, again, that this estimate is based on a question that asks whether someone has ever owned such a rifle, so this estimate should be interpreted as an upper bound on current ownership given that some rifles may have been resold.

Figure 15 shows the percentage of respondents who indicated that they owned AR-15 styled rifles for the following purposes: defense outside the home (34.6%), home defense (61.9%), competitive shooting sports (32.1%), recreational target shooting (66.0%), hunting (50.5%), and other (5.1%). Note that respondents could choose multiple purposes for which

Electronic copy available at: https://ssrn.com/abstract=4206597



Percentage indicating each factor was a reason for ownership.

Figure 15: Purposes indicated for owning AR-15 styled rifles.

they owned such firearms. Home defense and recreational target shooting were the two most common reasons indicated for owning these magazines, with approximately two-thirds of respondents identifying each of these as a rationale for ownership.

| Demographic Group | Proportion Owned AR-15 Styled Rifle | 95% Confidence Interval |
|---|---|---|
| White | 29.6% | 28.9% – 30.4% |
| Black | 34.0% | 31.0% – 37.1% |
| Asian | 29.2% | 24.6% – 34.2% |
| Native American | 35.4% | 30.8% – 40.3% |
| Pacific Islander | 48.4% | 36.3% – 60.7% |
| Other Ethnic Ancestry | 34.6% | 28.8% – 41.1% |
| Hispanic (any ancestry) | 38.3% | 35.0% – 41.8% |
| Male | 36.4% | 35.5% – 37.4% |
| Female | 21.3% | 20.3% – 22.3% |

Table 5: Demographics of ownership of AR-15 styled rifles.

Table 5 shows the breakdown of ownership of AR-15 styled rifles across different demographic segments. As this table demonstrates, AR-15 styled rifles are commonly owned at

34

**APP. 622**

Electronic copy available at: https://ssm.com/abstract=4213687

high rates across many different demographic groups.

Table 6 shows the percentage of gun owners in each state who indicated that they have owned AR-15 styled rifles. Note that this question explicitly instructed respondents that "You can include any rifles of this style that have been modified or moved to be compliant with local law." Thus, as with magazines, these answers can include firearms that are kept in other states, as well as firearms that were grandfathered in or modified to be compliant with local law, or respondents who have since sold or disposed of such guns. This presumably explains the relatively high rates of ownership in states that restrict the purchase or ownership of such firearms.

# 6   Conclusion

This report summarizes the main findings of the most comprehensive survey of firearms ownership and use conducted in the United States to date. While many of its estimates corroborate prior survey research in this area, it also provides unique insights that are relevant to timely public policy debates, particularly regarding the defensive use of firearms and the ownership and use of AR-15 styled rifles and magazines that hold over 10 rounds.

This survey finds firearms ownership rates slightly above those documented before the Covid-19 pandemic, which is consistent with other recent scholarly research finding a large surge in firearms purchases during the pandemic, particularly among first time buyers (Crifasi et al., 2021; Miller et al., 2022).

In sum, about 31.9% of U.S. adults, or 81.4 million Americans, own over 415 million firearms, consisting of approximately 171 million handguns, 146 million rifles, and 98 million shotguns. About 24.6 million individuals have owned a up to 44 million AR-15 and similarly styled rifles, and 39 million individuals have owned up to 542 million magazines that hold over 10 rounds. Approximately a third of gun owners (31.1%) have used a firearm to defend themselves or their property, often on more than one occasion, and guns are used defensively by firearms owners in approximately 1.67 million incidents per year. A majority of gun owners (56.2%) indicate that they carry a handgun for self- defense in at least some circumstances, and about 35% of gun owners report carrying a handgun with some frequency.

Electronic copy available at: https://ssrn.com/abstract=4109697

| State | Owned AR-15 Style Rifle | 95% Confidence Interval |
|---|---|---|
| Alabama | 28.9% | 24.1% − 34.3% |
| Alaska | 37.0% | 24.4% − 51.6% |
| Arizona | 28.8% | 24.2% − 34.0% |
| Arkansas | 35.0% | 28.7% − 41.8% |
| California | 37.5% | 34.8% − 40.2% |
| Colorado | 33.3% | 27.7% − 39.5% |
| Connecticut | 21.8% | 15.3% − 30.2% |
| Delaware | 20.3% | 12.6% − 30.9% |
| District of Columbia | 30.0% | 14.1% − 52.7% |
| Florida | 28.1% | 25.5% − 30.9% |
| Georgia | 31.4% | 27.9% − 35.1% |
| Hawaii | 34.6% | 19.1% − 54.3% |
| Idaho | 31.0% | 23.3% − 40.0% |
| Illinois | 32.6% | 28.7% − 36.7% |
| Indiana | 30.8% | 26.5% − 35.5% |
| Iowa | 27.1% | 20.4% − 35.1% |
| Kansas | 28.4% | 22.4% − 35.4% |
| Kentucky | 29.9% | 25.2% − 35.1% |
| Louisiana | 27.5% | 22.0% − 33.7% |
| Maine | 22.0% | 14.6% − 31.6% |
| Maryland | 29.9% | 23.7% − 36.9% |
| Massachusetts | 33.8% | 26.9% − 41.4% |
| Michigan | 24.9% | 21.5% − 28.6% |
| Minnesota | 20.7% | 16.1% − 26.3% |
| Mississippi | 30.4% | 23.8% − 38.0% |
| Missouri | 28.0% | 23.8% − 32.7% |
| Montana | 26.8% | 16.8% − 39.8% |
| Nebraska | 22.4% | 15.3% − 31.8% |
| Nevada | 42.4% | 34.6% − 50.6% |
| New Hampshire | 23.2% | 14.0% − 36.0% |
| New Jersey | 30.7% | 25.7% − 36.2% |
| New Mexico | 29.5% | 19.4% − 42.1% |
| New York | 37.8% | 34.8% − 41.0% |
| North Carolina | 25.6% | 22.2% − 29.4% |
| North Dakota | 44.4% | 24.0% − 67.0% |
| Ohio | 25.9% | 22.7% − 29.4% |
| Oklahoma | 29.3% | 24.1% − 35.0% |
| Oregon | 25.6% | 20.0% − 32.2% |
| Pennsylvania | 24.4% | 21.3% − 27.8% |
| Rhode Island | 29.7% | 17.3% − 46.1% |
| South Carolina | 25.3% | 21.0% − 30.2% |
| South Dakota | 35.8% | 26.8% − 45.9% |
| Tennessee | 28.9% | 24.8% − 33.3% |
| Texas | 36.0% | 33.3% − 38.7% |
| Utah | 24.8% | 17.9% − 33.2% |
| Virginia | 26.0% | 21.9% − 30.6% |
| Washington | 35.3% | 30.3% − 40.6% |
| West Virginia | 27.4% | 21.3% − 34.5% |
| Wisconsin | 19.7% | 15.6% − 24.6% |
| Wyoming | 36.1% | 25.9% − 47.8% |

Table 6: Percent of gun owners who have indicated that they have ever owned an AR-15 styled rifle by state. Note that this includes rifles that an owner holds in other locations if there are local ownership restrictions and rifles modified to be compliant with local laws.

**APP. 624**

Electronic copy available at: https://ssrn.com/abstract=4206697

Finally, the demographics of firearms ownership and defensive use are diverse, with different demographic groups commonly owning and using firearms at substantial rates.

**APP. 625**

Electronic copy available at: https://ssrn.com/abstract=4209697

# References

Deborah Azrael, Lisa Hepburn, David Hemenway, and Matthew Miller. The stock and flow of us firearms: results from the 2015 national firearms survey. *RSF: The Russell Sage Foundation Journal of the Social Sciences*, 3(5):38–57, 2017.

Anna Brown. *America's Complex Relationship With Guns: An In-depth Look at the Attitudes and Experiences of US Adults.* Pew Research Center, 2017.

Philip J Cook and Jens Ludwig. *Guns in America: results of a comprehensive national survey on firearms ownership and use.* Police Foundation Washington, DC, 1996.

Cassandra K Crifasi, Julie A Ward, Emma E McGinty, Daniel W Webster, and Colleen L Barry. Gun purchasing behaviours during the initial phase of the covid-19 pandemic, march to mid-july 2020. *International review of psychiatry*, 33(7):593–597, 2021.

Gallup. *In Depth: Topics, Guns.* https://news.gallup.com/poll/1645/guns.aspx , https://news.gallup.com/poll/264932/percentage-americans-own-guns.aspx, 2021.

David Hemenway. Survey research and self-defense gun use: an explanation of extreme overestimates. *J. Crim. L. & Criminology*, 87:1430, 1996.

Lisa Hepburn, Matthew Miller, Deborah Azrael, and David Hemenway. The us gun stock: results from the 2004 national firearms survey. *Injury prevention*, 13(1):15–19, 2007.

Gary Kleck and Marc Gertz. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J. Crim. L. & Criminology*, 86:150, 1995.

Gary Kleck and Marc Gertz. Carrying guns for protection: results from the national self-defense survey. *Journal of Research in Crime and Delinquency*, 35(2):193–224, 1998.

Jens Ludwig, Philip J Cook, and Tom W Smith. The gender gap in reporting household gun ownership. *American Journal of Public Health*, 88(11):1715–1718, 1998.

Matthew Miller, Wilson Zhang, and Deborah Azrael. Firearm purchasing during the covid-19 pandemic: results from the 2021 national firearms survey. *Annals of internal medicine*, 175(2):219–225, 2022.

Electronic copy available at: https://ssrn.com/abstract=4209697

Ann P Rafferty, John C Thrush, Patricia K Smith, and Harry B McGee.  Validity of a
household gun question in a telephone survey. *Public Health Reports*, 110(3):282, 1995.

Paul Spector.  Social desirability bias.  *The SAGE encyclopedia of social science research
methods*, 2004.

**APP. 627**

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix A: Vermont Pilot Survey

An initial version of this survey was fielded in Vermont. We report below the top line results from the Vermont survey, which closely mirror the results of the national survey.

In sum, 572 Vermont residents were surveyed, of which 163 indicated owning firearms. The survey sample represented the demographics of Vermont well on all dimensions except gender, as women were over represented and comprised 65.2% of respondents. Thus, weights were employed for gender.

With weighting employed, we find that 30% of Vermont residents own a firearm. Given that the adult population of Vermont is approximately 486,000, this suggest that there are over 145,600 firearms owners in Vermont. 42.1% of Vermont firearms owners are estimated to be female and 57.9% male.

As Figure 16 illustrates, almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property (not counting incidents that were due to military service, police work, or work as a security guard). In nearly half of these defensive gun uses (45.9%), respondents reported facing multiple assailants. 85.8% of all incidents were resolved without the firearm owner having to fire a shot (e.g. by simply showing a firearm or verbally threatening to use it).



Figure 16: Proportion of gun owners in Vermont who have use a firearm in self-defense and number of assailants involved.

Electronic copy available at: https://ssm.com/abstract=4209097

APP. 628

Sample of Vermont responses to open ended question prompt of "Have you ever been in a situation (including any referenced in earlier responses) in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds?":

- in the first incident it was five to one. I was outnumbered. three rounds per person if needed

- The time I was assaulted by 10 individuals.

- Yes. We have bear that frequently come to our home. They've attempted to get into my truck, they have come onto our porch thru the dog door (XL size) they have been in our chicken coops and in our garage. They have damaged many items, destroyed gas grills and threatened my dogs and children. Sometimes a warning shot isn't enough. And if, God forbid, the bear turned and started to attack us multiple bullets would be needed to stop him.

- About 6 individuals broke into my house one night. I locked myself in my room and they tried to break my door down. I threatened them with use of deadly force, but they kept trying. One of them was outside and broke my bedroom window and I aimed my shotgun at him and he ran off. I threatened again with the sound of charging my shotgun that they knew I wasn't bluffing and they all fled. Had they entered with the intent to kill my family and I, then we would have been out numbered. If there was an exchange of gun fire, I wouldn't want to have the restriction of reloading within the time I needed to protect my family and myself. Outgun the enemy or the enemy will surely outgun you. Limiting everyone's right to weapons is not the answer, and clearly this attempt to ban high capacity magazines is just the catalyst to a government gun grab for easier totalitarian control of the population.

- Yes, i had two run ins with a mountain lion.

- We had a home invasion two times in a month

- Yes. We live in VT. Every time I fired my gun in defense of my property it was to deter bears from damaging my property. It takes more than 1 shot to scare a bear. If

41

APP. 629

Electronic copy available at: https://ssrn.com/abstract=4103694

it charges you or your family it'll definitely take a bunch of shots to stop the bear.

- Yes.  Just because there are 10 rounds in a magazine does not mean all will be on target during a self defense incident.  In 2012 while I was in college in Connecticut, I got jumped by 4 people in Hartford ct.  I had nothing on me to defend myself.  The men all threatened me with knives and handguns.  I wish I was able to carry a firearm at that point.

**APP. 630**

Electronic copy available at: https://ssrn.com/abstract=4209697

# Appendix B: Sampling Proportions With and Without Weights for National Survey

| Gender | Initial Sample Proportions | Census Based Weighted Proportions |
|--------|----------------------------|------------------------------------|
| Male   | 49.32%                     | 49.23%                             |
| Female | 50.68%                     | 50.77%                             |

| Age Range | Initial Sample Proportions | Census Based Weighted Proportions |
|-----------|----------------------------|------------------------------------|
| 18-20     | 7.89%                      | 5.04%                              |
| 21-25     | 8.11%                      | 8.58%                              |
| 26-30     | 7.30%                      | 9.24%                              |
| 31-35     | 11.67%                     | 8.67%                              |
| 36-40     | 12.66%                     | 8.44%                              |
| 41-45     | 8.49%                      | 7.70%                              |
| 46-50     | 6.46%                      | 8.09%                              |
| 51-55     | 6.37%                      | 8.13%                              |
| 56-60     | 7.39%                      | 8.52%                              |
| 61-65     | 7.67%                      | 7.87%                              |
| 66-70     | 8.03%                      | 6.59%                              |
| 71-75     | 5.07%                      | 5.13%                              |
| 76-80     | 1.94%                      | 3.50%                              |
| Over 80   | 0.93%                      | 4.49%                              |

APP. 631

Electronic copy available at: https://ssrn.com/abstract=4209697

| Annual Household Income | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Less than $10,000 | 8.87% | 3.40% |
| $10,000-20,000 | 8.95% | 4.89% |
| $20,000-30,000 | 9.69% | 6.26% |
| $30,000-40,000 | 8.78% | 7.06% |
| $40,000-50,000 | 7.44% | 7.21% |
| $50,000-60,000 | 7.72% | 6.96% |
| $60,000-70,000 | 6.00% | 6.96% |
| $70,000-80,000 | 6.37% | 6.37% |
| $80,000-90,000 | 4.51% | 5.76% |
| $90,000-100,000 | 5.89% | 5.76% |
| $100,000-150,000 | 17.67% | 19.11% |
| Over $150,000 | 8.12% | 20.23% |

44

**APP. 632**

Electronic copy available at: https://ssrn.com/abstract=4209697

| State of Residence | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| Alabama | 1.83% | 1.52% |
| Alaska | 0.39% | 0.22% |
| Arizona | 2.10% | 2.16% |
| Arkansas | 1.10% | 0.91% |
| California | 9.75% | 11.95% |
| Colorado | 1.59% | 1.75% |
| Connecticut | 1.23% | 1.09% |
| Delaware | 0.56% | 0.30% |
| District of Columbia | 0.27% | 0.21% |
| Florida | 7.29% | 6.51% |
| Georgia | 3.67% | 3.24% |
| Hawaii | 0.36% | 0.44% |
| Idaho | 0.44% | 0.56% |
| Illinois | 4.14% | 3.87% |
| Indiana | 2.13% | 2.05% |
| Iowa | 0.91% | 0.96% |
| Kansas | 0.92% | 0.89% |
| Kentucky | 1.61% | 1.36% |
| Louisiana | 1.23% | 1.41% |
| Maine | 0.51% | 0.41% |
| Maryland | 1.67% | 1.87% |
| Massachusetts | 1.88% | 2.13% |
| Michigan | 3.21% | 3.05% |
| Minnesota | 1.36% | 1.73% |
| Mississippi | 0.83% | 0.90% |
| Missouri | 1.93% | 1.86% |
| Montana | 0.25% | 0.33% |
| Nebraska | 0.53% | 0.59% |
| Nevada | 0.90% | 0.94% |
| New Hampshire | 0.40% | 0.42% |
| New Jersey | 2.97% | 2.81% |
| New Mexico | 0.36% | 0.64% |
| New York | 8.09% | 6.11% |
| North Carolina | 3.18% | 3.16% |
| North Dakota | 0.13% | 0.24% |
| Ohio | 4.13% | 3.57% |
| Oklahoma | 1.32% | 1.20% |
| Oregon | 1.05% | 1.28% |
| Pennsylvania | 4.30% | 3.93% |
| Rhode Island | 0.33% | 0.33% |
| South Carolina | 1.68% | 1.55% |
| South Dakota | 0.48% | 0.27% |
| Tennessee | 2.18% | 2.09% |
| Texas | 6.91% | 8.81% |
| Utah | 0.56% | 0.99% |
| Virginia | 2.43% | 2.61% |
| Washington | 2.03% | 2.33% |
| West Virginia | 0.71% | 0.54% |
| Wisconsin | 1.83% | 1.78% |
| Wyoming | 0.32% | 0.17% |

Electronic copy available at: https://ssrn.com/abstract=4209697

**APP. 633**

| Race | Initial Sample Proportions | Census Based Weighted Proportions |
|---|---|---|
| White | 81.26% | 76.30% |
| Black | 9.85% | 13.40% |
| Asian | 3.98% | 5.90% |
| Native American | 2.19% | 1.30% |
| Pacific Islander | 0.49% | 0.20% |
| Other | 2.22% | 2.90% |

46

**APP. 634**

Electronic copy available at: https://ssrn.com/abstract=4209697

# EXHIBIT 6

**U.S. Department of Justice**
●ffice of Justice Programs



---

## Bureau of Justice Statistics
# Selected Findings

July 1995, NCJ-148201

*Firearms, crime, and criminal justice*

# Guns Used in Crime

By Marianne W. Zawitz
BJS Statistician

### How often are guns used in violent crimes?

According to the National Crime Victimization Survey (NCVS), almost 43.6 million criminal victimizations occurred in 1993, including 4.4 million violent crimes of rape and sexual assault, robbery, and aggravated assault. Of the victims of these violent crimes, 1.3 million (29%) stated that they faced an offender with a firearm.*

In 1993, the FBI's *Crime in the United States* estimated that almost 2 million violent crimes of murder, rape, robbery, and aggravated assault were reported to the police by citizens. About 582,000 of these reported murders, robberies, and aggravated assaults were committed with firearms. Murder was the crime that most frequently involved firearms; 70% of the 24,526 murders in 1993 were committed with firearms.

### How do we know about the guns used by criminals?

No national collection of data contains detailed information about all of the guns used in crimes. Snapshots of

## Highlights

● Although most crime is not committed with guns, most gun crime is committed with handguns. *pages 1 & 2*
● Although most available guns are not used in crime, information about the 223 million guns available to the general public provides a context for evaluating criminal preferences for guns. *page 2*
● By definition, stolen guns are available to criminals. The FBI's National Crime Information Center (NCIC) stolen gun file contains over 2 million reports; 60% are reports of stolen handguns. *page 3*
● In 1994, the Bureau of Alcohol, Tobacco and Firearms (ATF) received over 85,132 requests from law enforcement agencies for traces of guns used in crime. Over three-quarters of the guns traced by the

ATF in 1994 were handguns (mostly pistols), and almost a third were less than 3 years old. *page 4*
● Surveys of inmates show that they prefer concealable, large caliber guns. Juvenile offenders appear to be more likely to possess guns than adults. *page 5*
● Studies of the guns used in homicides show that large caliber revolvers are the most frequent type of gun used in homicides, but the number of large caliber semiautomatic guns used in murders is increasing. *page 5*
● Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted. *page 6*

information about the guns used by criminals are available from—
● official police records concerning the guns recovered in crimes and reports gathered from victims
● surveys that interview criminals
● surveys that interview victims of crime.

From these sources, we know how often guns are involved in crime, how guns are used in crime, what general categories of firearms are most often used in crime, and, to a limited extent, the specific types of guns most frequently used by criminals.

---

* See note on page 7.

**APP. 636**

**What are the different types of firearms?**

**Types**

| | |
|---|---|
| **Handgun** | A weapon designed to fire a small projectile from one or more barrels when held in one hand with a short stock designed to be gripped by one hand. |
| Revolver | A handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges, each within a separate chamber. Before a revolver fires, the cylinder rotates, and the next chamber is aligned with the barrel. |
| Pistol | Any handgun that does not contain its ammunition in a revolving cylinder. Pistols can be manually operated or semiautomatic. A semiautomatic pistol generally contains cartridges in a magazine located in the grip of the gun. When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is ejected, the firing mechanism is cocked, and a new cartridge is chambered. |
| Derringer | A small single- or multiple-shot handgun other than a revolver or semiautomatic pistol. |
| **Rifle** | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger. |
| **Shotgun** | A weapon intended to be fired from the shoulder that uses the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger. |

**Firing action**

| | |
|---|---|
| Fully automatic | Capability to fire a succession of cartridges so long as the trigger is depressed or until the ammunition supply is exhausted. Automatic weapons are considered machineguns subject to the provisions of the National Firearms Act. |
| Semiautomatic | An autoloading action that will fire only a single shot for each single function of a trigger. |
| Machinegun | Any weapon that shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot without manual reloading by a single function of the trigger. |
| Submachinegun | A simple fully automatic weapon that fires a pistol cartridge that is also referred to as a machine pistol. |

**Ammunition**

| | |
|---|---|
| Caliber | The size of the ammunition that a weapon is designed to shoot, as measured by the bullet's approximate diameter in inches in the United States and in millimeters in other countries. In some instances, ammunition is described with additional terms, such as the year of its introduction (.30/06) or the name of the designer (.30 Newton). In some countries, ammunition is also described in terms of the length of the cartridge case (7.62 × 63 mm). |
| Gauge | For shotguns, the number of spherical balls of pure lead, each exactly fitting the bore, that equals one pound. |

Sources: ATF, *Firearms & Explosives Tracing Guidebook*, September 1993, pp. 35-40, and Paul C. Giannelli, "Ballistics Evidence: Firearms Identification," *Criminal Law Bulletin*, May-June 1991, pp. 195-215.

**Handguns are most often the type of firearm used in crime**

● According to the Victim Survey (NCVS), 25% of the victims of rape and sexual assault, robbery, and aggravated assault in 1993 faced an offender armed with a handgun. Of all firearm-related crime reported to the survey, 86% involved handguns.
● The FBI's Supplemental Homicide Reports show that 57% of all murders in 1993 were committed with handguns, 3% with rifles, 5% with shotguns, and 5% with firearms where the type was unknown.
● The 1991 Survey of State Prison Inmates found that violent inmates who used a weapon were more likely to use a handgun than any other weapon; 24% of all violent inmates reported that they used a handgun. Of all inmates, 13% reported carrying a handgun when they committed the offense for which they were serving time.

**What types of guns do criminals prefer?**

Research by Wright and Rossi in the 1980's found that most criminals prefer guns that are easily concealable, large caliber, and well made. Their studies also found that the handguns used by the felons interviewed were similar to the handguns available to the general public, except that the criminals preferred larger caliber guns.

**What types of guns are available generally?**

The Bureau of Alcohol, Tobacco and Firearms (ATF) estimates that from 1899 to 1993 about 223 million guns became available in the United States, including over 79 million rifles, 77 million handguns, and 66 million shotguns. The number of guns seized, destroyed, lost, or not working is unknown.

The number of new handguns added to those available has exceeded the number of new shotguns and rifles in recent years. More than half of the guns added in 1993 were handguns.

Over 40 million handguns have been produced in the United States since 1973.

Since over 80% of the guns available in the United States are manufactured here, gun production is a reasonable indicator of the guns made available. From 1973 to 1993, U.S. manufacturers produced —
- 6.6 million .357 Magnum revolvers
- 6.5 million .38 Special revolvers
- 5.4 million .22 caliber pistols
- 5.3 million .22 caliber revolvers
- 4.5 million .25 caliber pistols
- 3.1 million 9 millimeter pistols
- 2.4 million .380 caliber pistols
- 2.2 million .44 Magnum revolvers
- 1.7 million .45 caliber pistols
- 1.2 million .32 caliber revolvers.

During the two decades from 1973 to 1993, the types of handguns most frequently produced have changed. Most new handguns are pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993.

The number of large caliber pistols produced annually increased substantially after 1986. Until the mid-1980's, most pistols produced in the United States were .22 and .25 caliber models. Production of .380 caliber and 9 millimeter pistols began to increase substantially in 1987, so that by 1993 they became the most frequently produced pistols. From 1991 to 1993, the last 3 years for which data are available, the most frequently produced handguns were —
- .380 caliber pistols (20%)
- 9 millimeter pistols (19%)
- .22 caliber pistols (17%)
- .25 caliber pistols (13%)
- .50 caliber pistols (8%).

## Stolen guns are a source of weapons for criminals

All stolen guns are available to criminals by definition. Recent studies of adult and juvenile offenders show that many have either stolen a firearm or kept, sold, or traded a stolen firearm:
- According to the 1991 Survey of State Prison Inmates, among those inmates who possessed a handgun, 9% had acquired it through theft, and 28% had acquired it through an illegal market such as a drug dealer or fence. Of all inmates, 10% had stolen at least one gun, and 11% had sold or traded stolen guns.
- Studies of adult and juvenile offenders that the Virginia Department of Criminal Justice Services conducted in 1992 and 1993 found that 15% of the adult offenders and 19% of the juvenile offenders had stolen guns; 16% of the adults and 24% of the juveniles had kept a stolen gun; and 20% of the adults and 30% of the juveniles had sold or traded a stolen gun.
- From a sample of juvenile inmates in four States, Sheley and Wright found that more than 50% had stolen a gun at least once in their lives and 24% had stolen their most recently obtained handgun. They concluded that theft and burglary were the original, not always the proximate, source of many guns acquired by the juveniles.

## How many guns are stolen?

The Victim Survey (NCVS) estimates that there were 341,000 incidents of firearm theft from private citizens annually from 1987 to 1992. Because the survey does not ask how many guns were stolen, the number of guns stolen probably exceeds the number of incidents of gun theft.

The FBI's National Crime Information Center (NCIC) stolen gun file contained over 2 million reports as of March 1995. In 1994, over 306,000 entries were added to this file including a variety of guns, ammunition, cannons, and grenades. Reports of stolen guns are included in the NCIC files when citizens report a theft to law enforcement agencies that submit a report to the FBI. All entries must include make, caliber, and serial number. Initiated in 1967, the NCIC stolen gun file retains all entries indefinitely unless a recovery is reported.

### Most stolen guns are handguns

Victims report to the Victim Survey that handguns were stolen in 53% of the thefts of guns. The FBI's stolen gun file's 2 million reports include information on —
- 1.26 million handguns (almost 60%)
- 470,000 rifles (22%)
- 356,000 shotguns (17%).



**From 1985 to 1994, the FBI received an annual average of over 274,000 reports of stolen guns**

Number of stolen gun entries into NCIC

Source: FBI, National Crime Information Center, 1995.

## How many automatic weapons are stolen?

Under the provisions of the National Firearms Act, all automatic weapons such as machine guns must be registered with the ATF. In 1995, over 240,000 automatic weapons were registered with the ATF. As of March 1995, the NCIC stolen gun file contained reports on about 7,700 machine guns and submachine guns.

## What types of handguns are most frequently stolen?

Most frequently reported handguns in the NCIC stolen gun file

| Percent of stolen handguns | Number | Caliber | Type |
|---|---|---|---|
| 20.5% | 259,184 | .38 | Revolver |
| 11.7 | 147,681 | .22 | Revolver |
| 11.6 | 146,474 | .357 | Revolver |
| 8.8 | 111,558 | 9 mm | Semiautomatic |
| 7.0 | 87,714 | .25 | Semiautomatic |
| 6.7 | 84,474 | .22 | Semiautomatic |
| 5.4 | 68,112 | .380 | Semiautomatic |
| 3.7 | 46,503 | .45 | Semiautomatic |
| 3.3 | 41,318 | .32 | Revolver |
| 3.1 | 39,254 | .44 | Revolver |
| 1.5 | 18,377 | .32 | Semiautomatic |
| 1.3 | 16,214 | .45 | Revolver |

## Upon request, the ATF traces some guns used in crime to their origin

The National Tracing Center of ATF traces firearms to their original point of sale upon the request of police agencies. The requesting agency can use this information to assist in identifying suspects, providing evidence for subsequent prosecution, establishing stolen status, and proving ownership. The number of requests for firearms traces increased from 37,181 in 1990 to 85,132 in 1994.

Trace requests represent an unknown portion of all the guns used in crimes. ATF is not able to trace guns manufactured before 1968, most surplus military weapons, imported guns without the importer's name, stolen guns, and guns missing a legible serial number.

Police agencies do not request traces on all firearms used in crimes. Not all firearms used in crimes are recovered so that a trace could be done and, in some States and localities, the police agencies may be able to establish ownership locally without going to the ATF.

## Most trace requests concern handguns

Over half of the guns that police agencies asked ATF to trace were pistols and another quarter were revolvers.

| Type of gun | Percent of all 1994 traces |
|---|---|
| Total | 100.0% |
| Handgun | 79.1 |
| Pistol | 53.0 |
| Pistol Revolver | 24.7 |
| Pistol Derringer | 1.4 |
| Rifle | 11.1 |
| Shotgun | 9.7 |
| Other including machinegun | 0.1 |

While trace requests for all types of guns increased in recent years, the number of pistols traced increased the most, doubling from 1990 to 1994.

## What are the countries of origin of the guns that are traced?

Traced guns come from many countries across the globe. However, 78% of the guns that were traced in 1994 originated in the United States and most of the rest were from —
- Brazil (5%)
- Germany (3%)
- China (3%)
- Austria (3%)
- Italy (2%)
- Spain (2%).

## Almost a third of the guns traced by ATF in 1994 were 3 years old or less

| Age of traced guns | Traces completed in 1994 | |
|---|---|---|
| | Number | Percent |
| Total | 83,362 | 100% |
| Less than 1 year | 4,072 | 5 |
| 1 year | 11,617 | 14 |
| 2 years | 6,764 | 8 |
| 3 years | 4,369 | 5 |

### What crimes are most likely to result in a gun-tracing request?

| | | Percent of traces by crime type | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Percent of all 1994 traces | | Handgun | | | | | |
| Crime type | | Total | Total | Pistol | Pistol Derringer | Pistol Revolver | Rifle | Shotgun |
| Weapons offenses | 72% | 100% | 81% | 55% | 1% | 25% | 10% | 9% |
| Drug offenses | 12 | 100 | 75 | 50 | 2 | 23 | 14 | 11 |
| Homicide | 6 | 100 | 79 | 49 | 1 | 29 | 11 | 10 |
| Assault | 5 | 100 | 80 | 50 | 1 | 28 | 10 | 11 |
| Burglary | 2 | 100 | 57 | 34 | 1 | 22 | 24 | 19 |
| Robbery | 2 | 100 | 84 | 53 | 1 | 29 | 7 | 10 |
| Other | 2 | 100 | 76 | 54 | 1 | 21 | 14 | 10 |

Note: Detail may not add to total because of rounding.
Source: ATF, unpublished data, May 1995.

## What guns are the most frequently traced?

The most frequently traced guns vary from year to year. The ATF publishes a list of the 10 specific guns most frequently traced annually. The total number of traced guns on the top 10 list was 18% of the total traced from 1991 to 1994. Most of the top 10 guns were pistols (over 30% were .25 caliber pistols), although a number of revolvers and a few shotguns and rifles were also included. The most frequently traced gun was a Smith and Wesson .38 caliber revolver in 1990, the Raven Arms P25 (a .25 caliber pistol) from 1991 through 1993, and the Lorcin P25 in 1994.

### 10 most frequently traced guns in 1994

| Rank | Manufacturer | Model | Caliber | Type | Number traced |
|---|---|---|---|---|---|
| 1 | Lorcin | P25 | .25 | Pistol | 3,223 |
| 2 | Davis Industries | P380 | .38 | Pistol | 2,454 |
| 3 | Raven Arms | MP25 | .25 | Pistol | 2,107 |
| 4 | Lorcin | L25 | .25 | Pistol | 1,258 |
| 5 | Mossburg | 500 | 12G | Shotgun | 1,015 |
| 6 | Phoenix Arms | Raven | .25 | Pistol | 959 |
| 7 | Jennings | J22 | .22 | Pistol | 929 |
| 8 | Ruger | P89 | 9 mm | Pistol | 895 |
| 9 | Glock | 17 | 9 mm | Pistol | 843 |
| 10 | Bryco | 38 | .38 | Pistol | 820 |

Source: ATF, May 1995.

### What caliber guns do criminals prefer?

In their 1983 study, Wright, Rossi, and Daly asked a sample of felons about the handgun they had most recently acquired. Of the felons sampled—
• 29% had acquired a .38 caliber handgun
• 20% had acquired a .357 caliber handgun
• 16% had acquired a .22 caliber handgun.

Sheley and Wright found that the juvenile inmates in their 1991 sample in four States preferred large caliber, high quality handguns. Just prior to their confinement —
• 58% owned a revolver, usually a .38 or .357 caliber gun
• 55% owned a semiautomatic handgun, usually a 9 millimeter or .45 caliber gun
• 51% owned a sawed-off shotgun
• 35% owned a military-style automatic or semiautomatic rifle.

### Do juvenile offenders use different types of guns than adult offenders?

A study of adult and juvenile offenders by the Virginia Department of Criminal Justice Services found that juvenile offenders were more likely than adults to have carried a semiautomatic pistol at the crime scene (18% versus 7%).

They were also more likely to have carried a revolver (10% versus 7%). The same proportion of adults and juveniles (3%) carried a shotgun or rifle at the crime scene.

### Some studies of guns used in homicides provide information about caliber

McGonigal and colleagues at the University of Pennsylvania Medical Center studied firearm homicides that occurred in Philadelphia: 145 in 1985 and 324 in 1990. Most of the firearms used in the homicides studied were handguns: 90% in 1985 and 95% in 1990. In both years, revolvers were the predominant type of handgun used; however, the use of semiautomatic pistols increased from 24% in 1985 to 38% in 1990. The caliber of the handguns used also changed:

In Philadelphia, handguns most often used:

| In 1985, of 91 homicides | | In 1990, of 204 homicides | |
|---|---|---|---|
| 44% | .38 caliber revolver | 23% | 9 mm pistol |
| 19% | .25 caliber pistol | 18% | .38 caliber revolver |
| 14% | .22 caliber revolver | 16% | .357 caliber revolver |
| 14% | .32 caliber revolver | 16% | .22 caliber revolver |
| 3% | 9 mm pistol | 10% | .32 caliber revolver |
| 2% | .357 caliber revolver | 6% | .380 caliber pistol |

The Virginia Department of Criminal Justice Services studied 844 homicides that occurred in 18 jurisdictions

from 1989 through 1991. Firearms were identified as the murder weapon in 600 cases. Over 70% of the firearms used were handguns. Of those handguns for which the caliber and firing action could be identified, 19% were .38 caliber revolvers, 10% were .22 caliber revolvers, and 9% were 9 millimeter semiautomatic pistols.

The Hawaii Department of the Attorney General, Crime Prevention Division, studied 59 firearm-related homicides in Honolulu from 1988 to 1992. Handguns were used in 48 homicides (over 80%) including 11 handguns of 9 millimeter caliber, 10 of .357 caliber, 10 of .38 caliber, and 5 of .25 caliber.

### What caliber guns are used in the killings of law enforcement officers?

From 1982 to 1993, of the 687 officers who were killed by firearms other than their own guns, more were killed by .38 caliber handguns than by any other type of weapon.

| Type of firearm | Percent of law enforcement officers killed with a firearm |
|---|---|
| .38 caliber handgun | 25.2% |
| .357 Magnum handgun | 12.1 |
| 9 millimeter handgun | 9.5 |
| 12 gauge shotgun | 7.4 |
| .22 caliber handgun | 5.4 |
| .22 caliber rifle | 4.4 |

## How often are assault weapons used in crime?

Little information exists about the use of assault weapons in crime. The information that does exist uses varying definitions of assault weapons that were developed before the Federal assault weapons ban was enacted.

In general, assault weapons are semiautomatic firearms with a large magazine of ammunition that were designed and configured for rapid fire and combat use. An assault weapon can be a pistol, a rifle, or a shotgun. The Federal Violent Crime Control and Law Enforcement Act of 1994 bans the manufacture and sale of 19 specific assault weapons identified by make and manufacturer. It also provides for a ban on those weapons that have a combination of features such as flash suppressors and grenade launchers. The ban does not cover those weapons legally possessed before the law was enacted. The National Institute of Justice will be evaluating the effect of the ban and reporting to Congress in 1997.

In 1993 prior to the passage of the assault weapons ban, the Bureau of Alcohol, Tobacco and Firearms (ATF), reported that about 1% of the estimated 200 million guns in circulation were assault weapons. Of the gun-tracing requests received that year by ATF from law enforcement agencies, 8% involved assault weapons.

### Assault weapons and homicide

A New York State Division of Criminal Justice Services study of homicides in 1993 in New York City found that assault weapons were involved in 16% of the homicides studied. The definition of assault weapons used was from proposed but not enacted State legislation that was more expansive than the Federal legislation. By matching ballistics records and homicide files, the study found information on 366 firearms recovered in the homicides of 271 victims. Assault weapons were linked to the deaths of 43 victims (16% of those studied).

A study by the Virginia Department of Criminal Justice Services reviewed the files of 600 firearm murders that occurred in 18 jurisdictions from 1989 to 1991. The study found that handguns were used in 72% of the murders (431 murders). Ten guns were identified as assault weapons, including five pistols, four rifles, and one shotgun.

### Assault weapons and offenders

In the 1991 BJS Survey of State Inmates, about 8% of the inmates reported that they had owned a military-type weapon, such as an Uzi, AK-47, AR-15, or M-16. Less than 1% said that they carried such a weapon when they committed the incident for which they were incarcerated. A Virginia inmate survey conducted between November 1992 and May 1993 found similar results: About 10% of the adult inmates reported that they had ever possessed an assault rifle, but none had carried it at the scene of a crime.

Two studies indicate higher proportions of juvenile offenders reporting possession and use of assault rifles. The Virginia inmate survey also covered 192 juvenile offenders. About 20% reported that they had possessed an assault rifle and 1% said that they had carried it at the scene of a crime. In 1991 Sheley and Wright surveyed 835 serious juvenile offenders incarcerated in 6 facilities in 4 States. In the Sheley and Wright study, 35% of the juvenile inmates reported that they had owned a military-style automatic or semiautomatic rifle just prior to confinement.

### Sources

*Assault Weapons and Homicide in New York City*, Office of Justice Systems Analysis, New York State Division of Criminal Justice Services, May 1994.

Bureau of Alcohol, Tobacco and Firearms, *ATF Facts*, November 1994.

Bureau of Alcohol, Tobacco and Firearms, *Firearms & Explosives Tracing Guidebook*, September 1993.

Bureau of Alcohol, Tobacco and Firearms, unpublished data.

BJS, *Criminal Victimization 1993*, Bulletin, NCJ-151658, May 1995.

BJS, *Guns and Crime*, Crime Data Brief, NCJ-147003, April 1994.

BJS, National Crime Victimization Survey, 1992, unpublished data.

BJS, *Survey of State Prison Inmates, 1991*, NCJ-136949, March 1993.

"Crimes Committed with Firearms in the State of Hawaii, 1983-1992," *Crime Trends Series*, Department of the Attorney General, Crime Prevention Division, Vol. 2, Issue 1, April 1994.

Federal Bureau of Investigation, *Crime in the United States 1993*, October 4, 1994.

Federal Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted*, annually 1987 to 1992.

Federal Bureau of Investigation, National Crime Information Center, unpublished data.

Giannelli, Paul C., "Ballistics Evidence: Firearms Identification," *Criminal Law Bulletin*, May-June 1991.

*Guns and Violent Crime*, Criminal Justice Research Center, Commonwealth of Virginia, Department of Criminal Justice Services, January 1994 with updated data for homicide study.

McGonigal, Michael D., MD, John Cole, BS, C. William Schwab, MD, Donald R. Kauder, MD, Michael R. Rotondo, MD, and Peter B. Angood, "Urban Firearm Deaths: A Five-year Perspective," *The Journal of Trauma*, Vol. 35, No. 4, October 1993, pp. 532-37.

Sheley, Joseph F., and James D. Wright, "Gun Acquisition and Possession in Selected Juvenile Samples," National Institute of Justice and Office of Juvenile Justice and Delinquency Prevention, *Research in Brief*, NCJ-145326, December 1993.

Wright, James D., and Peter H. Rossi, *Armed and Considered Dangerous* (New York: Adline de Gruyter) 1986.

Wright, James D., Peter H. Rossi, and Kathleen Daly, *Under the Gun: Weapons, Crime, and Violence in America* (New York: Adline de Gruyter) 1983.

**Note**

Data in this report from the 1993 National Crime Victimization Survey are the first released on this topic since the survey was redesigned. Because of changes in the methodology, direct comparisons with BJS's victim survey data from prior years are not appropriate. Additional information about the survey's redesign can be obtained from the Bureau of Justice Statistics Clearinghouse at 1-800-732-3277.

The Bureau of Justice Statistics is the statistical arm of the U.S. Department of Justice. Jan M. Chaiken, Ph.D., is director.

BJS Selected Findings summarize statistics about a topic of current concern from both BJS and non-BJS datasets.

Substantial assistance in preparing this document was provided by Roy Weise and Gary Boatman of the Criminal Justice Information Systems Division of the FBI; Edward Troiano, Emmett Masterson, Gerald Nunziato, Gary Kirchoff, and Kris Denholm of the Bureau of Alcohol, Tobacco and Firearms; Jim McDonough of the Virginia Department of Criminal Justice Services; Henry Brownstein and Kelly Haskin-Tenenini of the New York State Division of Criminal Justice Services; and Larry Greenfeld, Thomas Hester, and Michael Rand of the Bureau of Justice Statistics. Verification and publication review were provided by Yvonne Boston, Ida Hines, Rhonda Keith, and Priscilla Middleton of the Bureau of Justice Statistics.

July 1995, NCJ-148201

*Guns Used in Crime* is the first of a series of reports on firearms and crime that will become part of a longer document, *Firearms, Crime, and Criminal Justice*. Other topics to be covered in this series include weapons offenses and offenders, how criminals obtain guns, and intentional firearm injury. The full report will focus on the use of guns in crime, trends in gun crime, consequences of gun crimes, characteristics of offenders who use guns, and sanctions for offenders who use guns. This report will not cover the involvement of firearms in accidents or suicides.

# EXHIBIT 7

# ANNUAL FIREARMS MANUFACTURING AND EXPORT REPORT





### YEAR 2020 Final*

### MANUFACTURED

| *PISTOLS* | | *REVOLVERS* | |
|-----------|--------|-------------|--------|
| TO .22 | 678,967 | TO .22 | 597,015 |
| TO .25 | 195,992 | TO .32 | 4,124 |
| TO .32 | 56,887 | TO .357 MAG | 152,921 |
| TO .380 | 659,899 | TO .38 SPEC | 181,585 |
| TO 9MM | 3,211,775 | TO .44 MAG | 27,151 |
| TO .50 | 705,663 | TO .50 | 30,282 |
| **TOTAL** | **5,509,183** | **TOTAL** | **993,078** |

| | |
|-----------|-----------|
| *RIFLES* | 2,760,392 |
| *SHOTGUNS* | 476,682 |
| *MISC. FIREARMS* | 1,324,743 |

### EXPORTED

| | |
|-----------|-----------|
| *PISTOLS* | 382,758 |
| *REVOLVERS* | 19,264 |
| *RIFLES* | 99,454 |
| *SHOTGUNS* | 17,874 |
| *MISC. FIREARMS* | 9,788 |

\* FOR PURPOSES OF THIS REPORT ONLY, "PRODUCTION" IS DEFINED AS:
FIREARMS, INCLUDING SEPARATE FRAMES OR RECEIVERS, ACTIONS OR
BARRELED ACTIONS, MANUFACTURED AND DISPOSED OF IN COMMERCE
DURING THE CALENDAR YEAR.

PREPARED BY LED 03/10/2021
REPORT DATA AS OF 03/10/2021

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**DECLARATION OF MARK HANISH IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBITS 2-7**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

    I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

1 | C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
2 | Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
3 | MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
4 | Long Beach, CA 90802
Telephone: (562) 216-4444
5 | Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com
6 |
Attorneys for Plaintiffs
7 |

8 | IN THE UNITED STATES DISTRICT COURT

9 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10 |

11 | VIRGINIA DUNCAN, et al.,                    Case No:  17-cv-1017-BEN-JLB

12 |                     Plaintiffs,        **DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 10**

13 | v.

14 | XAVIER BECERRA, in his official capacity as Attorney General of the State of California,

15 |

16 |                     Defendant.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1
DECLARATION OF STEPHEN HELSLEY

**APP. 646**
17cv1017

**DECLARATION OF STEPHEN HELSLEY**

1.    I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

2.    I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For well over two decades, I was first a state liaison and, then later, a consultant to the National Rifle Association, where I was heavily involved in "assault weapon" and magazine legislative issues. For the past ten years I have also served as the historian for the London-based company, John Rigby & Co. (Gunmakers, Ltd.). Rigby is the oldest continuously operating gun maker in the English-speaking world, having been established in 1775.

3.    I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

4.    Finally, I am a collector of firearm-related books—of which I have thousands. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is

2

1  widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a

2  comprehensive overview of the firearms and related items available to retail buyers.

3      5.    Attached hereto as **Exhibit 10** is a true and correct copy of my signed

4  expert witness report previously submitted in this matter. Exhibit 10 contains my

5  opinions and analysis relevant to this matter.

6      6.    While I was unable to fully update my work in time to reflect post-2017

7  research, I can confirm that I stand by my prior report. I have also made some limited

8  additional findings, which will now be discussed in the remainder of this declaration.

9      7.    During my 35-years of involvement in the "assault weapon" issue, I have

10  heard innumerable times that the "founding fathers" never envisioned higher capacity

11  firearms than the single shot musket of their day and that the Second Amendment was

12  never intended to offer protection for such arms. Such a notion is preposterous.

13  Among the Founders, George Washington and John Adams were personally involved

14  in the consideration to purchase for the Continental Army 100 Belton 8-shot firearms,

15  which were repeating muskets with detachable magazines. (Washington had been

16  encouraged by Benjamin Franklin to consider the "Belton flintlock.)

17      8.    The Belton flintlock was one of a number of multi-shot firearms

18  (including the Giradoni air rifle and the Lorenzoni among others) that were beginning

19  to appear at the end of the 18th century. Such weapons were complex, likely

20  unreliable, and fragile, but they were also a window into the future. The Belton

21  purchase never materialized – primarily because of cost – but prescient men like the

22  Founders surely understood that it would only be a matter of time before such arms

23  were practical, affordable, and reliable. In the absence of government interest, private

24  citizens would be clients for such arms, and the Founding generation imposed no

25  restrictions to stop them.

26      9.    The State also argues that magazines capable of holding more than 10

27  rounds do not warrant Second Amendment protection because they are

28  "accoutrements" (accessories) and not necessary to the functioning of the firearm for

3

DECLARATION OF STEPHEN HELSLEY

**APP. 648**

17cv1017

1  which they are designed. The State also argues that if the weapon can function in the

2  absence of the magazine, then the magazine is an accessory. As a single-shot, that is

3  correct, it could function – but not as intended. Consider such logic applied to a

4  pickup truck. If a rear tire is removed, the truck can still be driven, but not as intended.

5  A Glock pistol requires only the slide and barrel to fire a round, but that would not

6  make the Glock's frame a mere accessory. The Glock is just one example of many

7  firearms that doesn't require all of its parts to be present to discharge a cartridge. An

8  expansive definition of "accessory" is thus a serious threat to Second Amendment

9  rights. If by designating a part an "accessory" it can be banned, taxed, or otherwise

10  restricted, there is no protection for the complete firearm.

11       10.    An expert for the defense (Ryan Busse) makes the related point that large

12  capacity magazines are not typically manufactured by the same company that

13  produces the firearm itself and therefore magazines should be considered an

14  accessory. Again, I am the historian for a British company whose two main product

15  lines were developed and patented in the third quarter of the 19th century. Do we

16  produce all the key parts of those guns and rifles? – no. Could we? – yes. Some key

17  parts, including the receiver, are precision machined by a specialty manufacturer for

18  us. That does not mean our receivers are mere "accessories". The use of outside

19  vendors is simply a good business practice to produce the best possible product in the

20  most cost-effective manner.

21       11.    AR-type magazines have been manufactured for over 60 years.

22  Production totals aren't known but given the number of rifles and pistols that accept

23  AR or other magazines capable of holding over ten rounds, it certainly wouldn't be

24  unreasonable to put the total between 500 million and 1 billion. They are undoubtedly

25  in common use by millions of Americans for lawful purposes including self-defense,

26  sports shooting, competitions, hunting, and other similar purposes.

27  / / /

28  / / /

4

DECLARATION OF STEPHEN HELSLEY

1      12.    I have received no remuneration for any work done in this matter.

2

3      I declare under penalty of perjury that the foregoing is true and correct.

4 Executed within the United States on November 30, 2022.

5

6

7                       Stephen Helsley

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

DECLARATION OF STEPHEN HELSLEY   **APP. 650**

17cv1017

# EXHIBIT 10

## Expert Witness Report of Stephen Helsley

*Duncan, et al. v. Becerra, et al.*

United States District Court (S.D. Cal.)

Case No: 3:17-cv-01017-BEN-JLB

November 30, 2022

## I.    INTRODUCTION

Counsel for plaintiffs in *Duncan v. Becerra* (E.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.    BACKGROUND & QUALIFICATIONS

I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For the past 24 years, I was first a state liaison and, then later, a consultant to the National Rifle Association.

I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

Finally, I am a collector of firearm-related books—of which I have approximately three thousand. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944.  It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

APP. 652

The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies.

I have qualified as an expert in both criminal and civil matters.

## A.    Published Articles

In the past ten years, I have written or contributed to the following published articles and opinion editorials:

### 1.    Articles

- *Of Birmingham and* Belgium, Double Gun Journal, vol. 18, iss. 2 (2007).
- *The .470 Nitro Express*, Sports Afield (June/July 2007).
- *Readings on the Roots of* the .410, Shooting Sportsman, Nov./Dec. 2007.
- *Hunting in Wales*, Hunting and Fishing (Russia), Dec. 2007.
- *A Pair for a Pair of Friends*, Shooting Sportsman, March/April 2008.
- *A Welsh Fantasy*, Shooting Sportsman, July/Aug. 2008.
- *A Maine Gun Goes Home*, Shooting Sportsman, Sept./Oct. 2008.
- *The Pin Fire Comes Home*, Libby Camps Newsletter, Winter 2008.
- *John Rigby & Co.*, Hunting and Fishing (Russia), July 2008.
- *The All-American Double Rifle*, Safari, Sept./Oct. 2008.
- *Eastern Oregon Odyssey*, Shooting Sportsman, Nov./Dec. 2008.
- *Rigby Marks 275th Anniversary*, Safari, Nov./Dec. 2009.
- *Finding* Papa's Guns, Shooting Sportsman, March/April 2010.
- *The Searcy Stalking Rifle*, Safari, May/June 2010.
- *The Ruggs Riders*, Shooting Sportsman, July/Aug. 2010.
- *Searcy Brings Back the Rising-Bite*, Shooting Sportsman, Sept./Oct. 2010.
- *John Rigby & Co.*, African Hunting Gazette, Fall 2010.
- *The Ageless .416 Rigby*, Safari, Nov./Dec. 2012.
- *J. P. Clabrough*, Shooting Sportsman, March/April 2015.
- *The Mystery of Hemingway's Guns*, Friends and Neighbors, Summer 2015.
- *The Enigma of Hemingway's Guns*, Master Gun (Russia), Sept. 2015.
- *The Mystery of Hemingway's Guns*, CRPA Firing Line, Sept./Oct. 2015.
- *Pistols at Dawn*, CRPA Firing Line, Jan./Feb. 2016.
- *The Silver Star*, CRPA Firing Line, Jan./Feb. 2016.
- *Women Guns & Politics*, CRPA Firing Line, March/April 2016.
- *Hunting the Big Mouse*, CRPA Firing Line, Sept./Oct. 2016.
- *Do Guns Make Heroes? The Congressional Medal of Honor*, CRPA Firing Line, Nov./Dec. 2016.
- *Thumbs-Up Guns*, Shooting Sportsman, Jan./Feb. 2017.
- *Is Your Gun Safely Stored? (Part 1)*, Friends and Neighbors, Summer 2017.
- *History of William Powell and His Patents*, Master Gun (Russia), Aug. 2017.

- *Guns from San Francisco and Birmingham*, Master Gun (Russia), Oct. 2017.
- *Is Your Gun Safely Stored? (Part 2)*, Friends and Neighbors, Autumn 2017.

### 2.    Opinion Editorials

- *It's About Time: State has Eroded Gun Owner's Rights*, Sac. Bee (July 4, 2010).
- *Nevada Views: Is Gun Registration Worth Cost?*, Nev. Rev. J. (Sept. 16, 2012).
- *Gun Roundup Program Has Too Many Flaws*, Sac. Bee (May 3, 2013).

### B.    Expert Witness History

In the past four years, I have not been deposed in or testified at trial as an expert witness.

## III.    COMPENSATION

I am not being compensated for my work on this report.

## IV.    ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the historical existence and prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition and the reasons law-abiding Americans, including law enforcement and private citizens, so often select such items.

Counsel has also asked that I provide opinion on the utility of firearm magazines with the ability to accept more than ten rounds of ammunition in self-defense, as well as the impact of ten-round magazine limitations on law-abiding citizens.

## V.    OPINIONS & ANALYSIS

*1.    Magazines over ten rounds are, and have historically been, a common choice for self-protection for use in both rifles and handguns.*

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92

3

APP. 654

(15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12-shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.

Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.

In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed. During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster—and by extension concealed carry for self-defense.

In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10-rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI—the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both increased after the war as a result of the training "doughboys" received before going to France. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of

other makes that followed—CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000, while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf. The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. The clear majority of California law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under California Penal Code section 32310.

The home-owner and the concealed weapon permit holder want a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one—to increase his or her chances of staying alive. For virtuous citizens buy their guns to protect themselves from the same criminals that police carry guns to protect the citizens, the public, and themselves from. For this reason, armed citizens have historically modeled their choice of firearms on what police carry.

2.  *Limiting the law-abiding citizen to a magazine of ten rounds limits their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.*

Based on my experience with and understanding of the customs and practices of citizens licensed to carry guns in public, individuals often carry *only*

5

the gun, without spare ammunition or magazines. Similarly, most plainclothes police officers do not find it practical to carry multiple handguns.

Likewise, the average homeowner who keeps a defensive firearm is unlikely to have time to gather spare ammunition or magazines. Rather, they are generally limited to one firearm and its magazine capacity. For the homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally prohibits the gathering of multiple firearms or magazines. Ideally, one hand would be occupied with the handgun and the other with a telephone to call the police. Assuming an individual even had time for a magazine change, most people do not sleep with firearms or magazines attached to their bodies or wearing clothing that would allow them to stow spare magazines or ammunition on their person. They would have only what was in the firearm.

The off-duty officer and the private law-abiding citizen are thus unlikely to have much, if any, spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a spare, loaded rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

Uniformed police officers who are traditionally armed against the same criminals, on the other hand *are* normally wearing body armor. They generally have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car. And they will have instant radio access to dispatch and fellow officers if backup help is needed. Further, they will generally have both a loaded gun *and* two additional magazines. Each of those magazines would generally hold 17 rounds of 9mm or 15 rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to allowing the officer to survive a gunfight with armed criminals.

What's more, the average citizen is not trained like law enforcement personnel and is generally not as readily prepared for combat with an armed criminal. As noted, they are likely to have a single firearm loaded with a single magazine available, and they are more susceptible to the psychological effects that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots.

For these reasons, having a magazine over ten rounds at one's disposal certainly could make a difference in self-defense situations, and likely would during home invasions or when facing armed attackers. In my opinion, law-abiding citizens will thus be at a disadvantage in such situations if California enforces its ban on the possession of magazines over ten rounds.

Criminals bent on causing harm, on the other hand, are not likely to be meaningfully affected by California's magazine restrictions. Even assuming they were impeded from obtaining magazines over ten rounds by Penal Code section 32310, they could simply arm themselves with multiple weapons and/or magazines, and they often do. Criminals have time to assess and plan shootings, whereas victims do not. Indeed, it is the attacker who chooses when, where, how, and whom to attack. So, the attacker is not as burdened by the surprise and shock that the victim is and is generally prepared for the confrontation with several firearms and a substantial amount of ammunition.

The virtuous citizen cannot practically be expected to have accessible multiple guns, magazines, or spare ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

Supporters of the magazine capacity limitation may point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting, and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer or the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

Finally, it is worth noting that it is difficult to say exactly how many private citizens have fired more than ten rounds in a self-defense shooting, because the number of rounds fired in such cases is very often an omitted fact in written accounts of such defensive gun uses. Often the accounts just say, "multiple shots fired." That could mean more or less than ten. This does not seem to be the case with shootings involving police officers, for which, the number of shots fired is generally documented. In my experience researching such shootings, officers often fire more than ten rounds. And cases where an individual officer fired less than ten rounds, but where multiple officers were shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the same criminals the police are armed to deal with.

   3.   *A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so.*

Gunfights frequently involve a lot of "missing." This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard

APP. 658

pressed to find someone who had been in a gunfight that complained about having too much ammunition.

Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers' hand or—if things got really serious—let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

The notion that a bullet can "knock-down" a person is a largely Hollywood-inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states—"For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as "stopping power." A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance, but placement is still the most critical factor.

A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See, e.g., The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (October 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

"Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't "knocked down") and then bouncing another round off my spine that exited my right leg. From a prone position, I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4—where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach

my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have "fought on" if more ammunition had been available. A total of 18 rounds were fired.

Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him—both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss—whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident I was awarded the department's Medal of Valor.

The "take away" from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

## VII.  REFERENCES

Silvio Calabi, Steve Helsley & Roger Sanger, *The Gun Book for Boys* 56-57 (Shooting Sportsman Books 2012).

United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf.

*The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984).

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

## VIII. CONCLUSION

It is clear to me from my collective experiences and from the analysis described above that firearms and magazines with ammunition capacities exceeding ten rounds have existed and have been in use since at least the 18th Century.

It is also clear that Americans commonly choose and use magazines capable of holding more than ten rounds of ammunition for lawful purposes, including self-defense.

Dated: October 6, 2017

_____
Stephen Helsley

10

**APP. 661**

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

   I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

   I have caused service of the following documents, described as:

**DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 10**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

   I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

**APP. 662**

17cv1017

1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
5  Telephone: (562) 216-4444
   Facsimile: (562) 216-4445
6  Email: abarvir@michellawyers.com
7  Attorneys for Plaintiffs

8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,           Case No:  17-cv-1017-BEN-JLB

12                    Plaintiffs,      **DECLARATION OF ASHLEY
                                       HLEBINSKY IN SUPPORT OF
13          v.                         PLAINTIFFS' SUPPLEMENTAL
                                       BRIEF; EXHIBIT 1**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the
    State of California,
16
17                    Defendant.

18

19

20

21

22

23

24

25

26

27

28

                                1
            DECLARATION OF ASHLEY HLEBINSKY

1  I, Ashley Hlebinsky, declare as follows:

2       1.     I am a firearms historian and public educator, specializing in material

3  culture studies, as well as a firearms and ammunition-related museum consultant,

4  expert witness, freelance writer, and guest lecturer. I conduct my business through a

5  single-member LLC, The Gun Code. I also am the Co-Founder and Senior Fellow

6  for the University of Wyoming College of Law's Firearms Research Center (2022).

7       2.     I have been retained by the plaintiffs in this matter to provide historical

8  testimony on firearms technology, with an emphasis on the history of technology in

9  relation to repeaters and magazine-fed repeaters, some with capacities greater than

10  ten rounds. I will also provide a brief look into the laws that existed at the time of

11  the United States' Founding and Second Founding Eras to provide reference for any

12  possible analogous comparisons to modern magazine restrictions as defined in the

13  *New York State Rifle and Pistol Association, Inc. v Bruen* (henceforth to be referred

14  to as *Bruen*) ruling by the Supreme Court. This report has been prepared for the

15  supplemental briefing that was ordered following the 9th Circuit's remand in

16  *Virginia Duncan, et al. v. Rob Bonta.* I have been retained to write a declaration at

17  the rate of $450/hour.

18  **Background and Qualifications**

19       3.     I have spent the last fifteen years immersed in the study of firearms

20  history, technology, and culture. I earned both Bachelor's and Master's Degrees in

21  American History from the University of Delaware, during which I studied firearms

22  history and culture and instructed undergraduate students about military weaponry

23  throughout history. Much of my work since then focuses heavily on material culture

24  surrounding the macro-history of firearms and how their developments have affected

25  industry, culture, and society for centuries. I have been fortunate to work in some of

26  the largest collections in the United States, beginning my career as a researcher and

27  fellow in the Smithsonian Institution's National Firearms Collection housed in the

28  National Museum of American History.

1        4.    Additionally, I spent a decade working with and running the only

2    accredited firearms museum in the United States, the Cody Firearms Museum

3    (henceforth to be referred to as the CFM). During my tenure, I also served as Project

4    Director of the museum's full-scale multimillion-dollar renovation. With the aid of

5    my team, I was responsible for all facets of the renovation including but not limited

6    to concept, content, fundraising, and collections management. The resulting

7    museum, which reopened July 2019, provides a more interpretive space to facilitate

8    productive dialogue on firearms and their roles in history. Throughout this museum,

9    terminology and definitions play a significant role in educating both visitors not

10   familiar with firearms and those who consider themselves aficionados. My team, a

11   panel of experts, and I were responsible for dedicating an entire gallery at the front

12   of the museum to understanding the basics of firearms past and present, their

13   features, ammunition, and safety.

14       5.    During my time at the CFM and through my consulting business, I have

15   become nationally known and sought after to provide a material culture perspective

16   on firearms history that is often lacking in much of modern, academic, and

17   legislative discussions on firearms. I guide museums as well other non- and for-

18   profit organizations and government entities on the interpretation and understanding

19   of that history. In May 2021, I testified in front of the Senate Judiciary

20   Subcommittee on the Constitution's Hearing regarding "Ghost Guns," for which I

21   researched and discussed the long history of privately made firearms and evolution

22   of arms technology from the colonies through the 1960s. Because I have worked in

23   several national collections that have upwards of 10,000 firearms each – collections

24   that range from the earliest through most recent technology – I have developed a

25   broad understanding of how firearms have evolved. Additionally, I have had the

26   opportunity to work with, see, study and handle many of the firearms referenced in

27   this declaration.

28

3

DECLARATION OF ASHLEY HLEBINSKY

6.     In addition to my historical scholarship, I also have played a role in public education around firearms. I have been responsible for the education of tens of thousands of students from elementary through college levels, teaching not only firearms safety and basics, but the historical and technical evolution of the firearm. In 2017, I developed the first full-scale symposium in the United States dedicated to the study of firearms as material culture, which reoccurs annually. These symposia were organized to bring together firearms scholars from around the world to discuss their collections but also to create metrics to analyze the quality of scholarship that already has been done in the field. The study of firearms is a complicated one, especially since much of the information about the objects themselves have traditionally been conducted by well-known firearms researchers and collectors. However, not all those people fall under traditional definitions of academic scholarship. On the other side, because of limitations in the study of firearms, academic research often has flaws in terms of a general understanding of the firearms themselves. We have worked to lessen that gap to create more balanced scholarship. To continue that mission, I sit on the Editorial Board for the recently revived, peer-reviewed arms journal, *Armax*, and I co-founded the University of Wyoming College of Law's Firearms Research Center in 2022. Despite its location in the College of Law, this new center intends to encourage research of all types related to arms and ammunition.

7.     Currently as a museum consultant, I am in the process of building several museums with heavy emphasis on firearms collections. I also conduct workshops on firearms, survey collections, and curate exhibitions at institutions such as the Houston Museum of Natural Science, CM Russell Museum & Complex, and the Mob Museum. I have served as a scholar and a panelist for the National Park Service and the Organization of American Historians on a forthcoming Coltsville National Historic Site. I am also an expert witness, freelance writer, guest lecturer, on-camera firearms historian, and television producer. A current copy of my

1  Curriculum Vitae summarizing my education and experience is attached at the end
2  of this document as **Exhibit 1.**
3      8.     **Prior Expert Witness Testimony**
4  Ocean State Tactical et al v Rhode Island, October 2022
5  Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost
6  Guns, May 2021
7  Franklin Armory et al v Bonta, February 2021
8  FN Herstal v Sturm, Ruger & Co, January 2021
9  Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020
10  Guedes v BATFE, June 2019
11  Miller v Becerra (Bonta), November 2019
12         -   Evidentiary Hearing Testimony October 2020
13         -   Deposition January 2021
14  Regina (Nova Scotia) v Clayton, January 2019
15  Garrison v Sturm, Ruger & Company, Inc. 2018
16         -   Deposition November 2018
17      9.     **Scope of Work**
18      This report has been prepared for *Virginia Duncan, et al. v. Rob Bonta.*
19  Firstly, the report will provide a brief statement on the long history of the
20  interconnectivity between military and civilian arms. It will address how the
21  advancement of technology often was driven by the civilian market; the multi-
22  purpose use of early arms for civilians and the military; the private acquisition of
23  firearms to be used on the battlefield; and the postwar weapons surpluses that have
24  flooded and continue to flood the civilian market. Secondly, it will provide a history
25  of repeaters and/or magazine-fed repeaters, including firearms with capacities over
26  ten rounds, as well as an overview of some relevant laws during the times in which
27  they were invented and/or used. The second section will be loosely organized into
28  two subsections: the Founding and the Second Founding Eras, with related

1   contextual histories, in chronological order, which also happens to be the order of

2   relevancy to constitutional law as defined in *Bruen*.

3       10.   According to *Heller v District of Columbia* and reiterated in *Bruen* "not

4   all history is created equal…Constitutional rights are enshrined with the scope they

5   were understood to have *when the people adopted them*."[1] Under *Bruen*, the most

6   relevant time frame in consideration regarding the constitutionality of modern

7   regulations is the Founding Era - when the Second Amendment was ratified. *Bruen*

8   does acknowledge that the period surrounding the creation of the Fourteenth

9   Amendment, known as the Second Founding Era, can be useful, although, as with

10   the Bruen case, it is not necessarily relevant when discussing the historical pedigree

11   of regulation.[2] Subsequent time frames can provide insight, albeit far less significant

12   if relevant at all, including the timeframe leading up to the ratification of the Second

13   Amendment, the time in between the Second and Fourteenth Amendments, and least

14   significant, the twentieth-century.[3]

15       11.   Important though to consider is "[guarding] against giving post

16   enactment history more weight than it can rightly bear."[4] *Bruen* does provide further

17   guidelines for when each era in history can inform the understanding of the Second

18   Amendment. It also provides guidance for how to determine a historical *analogue*.

19

20   _____

21   [1] The following two paragraphs are summarized from an analysis of relevant history and historical analogues found in Johnson, Nicholas, Kopel, David B., Mocsary, George A, Wallace, E Gregory, & Donald Kilmer. *Firearms Law and the Second Amendment Regulation, Rights and Policy* (3rd ed. 2021) 2022 Supplement (August 2022), pg. 86 – 88

23   [2] Ibid pg. 86

[3] Ibid pg. 86 According to Johnson et al: some time periods can be used to provide the context of what was available leading up to the formation of the Second Amendment as well. For example, those periods can possibly provide context for the mindset of the Founding Fathers when the Second Amendment was ratified. Additionally, the period directly after can provide insight "to determine *the public understanding* of a legal text in the period after its enactment or ratification." The late nineteenth century history is helpful in instances when it affirms what has been established by earlier history. The same can be said about twentieth century history, although significantly less relevant than the other periods. These times do not necessarily provide insight if it contradicts earlier evidence

28   [4] Ibid, pg. 86

6

DECLARATION OF ASHLEY HLEBINSKY   APP. 668

17cv1017

1  While the law does not have to be a twin of a past law, there is some guidance to

2  consider as "courts should not 'uphold every modern law that remotely resembles a

3  historical analogue."[5]

4      12.    For this report, please note that I will make a distinction between

5  repeater and magazine-fed repeater. A magazine is a vital part of the firearm; it is a

6  container, detachable or fixed, that holds ammunition while it feeds into a repeating

7  firearm. In the periods being discussed, there are repeating firearms that do not use

8  magazines, such as revolvers, which use a rotating cylinder that is as important and

9  integral as a magazine is in order to fire a gun. When I am discussing a repeater that

10  has a magazine, I will qualify it as such. Additionally, I will use capacity to refer

11  specifically to the number of rounds of ammunition that can be held within a

12  firearm. When I am discussing magazine capacity, I will qualify it as such.

13  **General Statement of the Interconnectivity of Sport and War**

14      13.    The expression *weapon of war* is used a lot in modern and historical

15  discussions surrounding firearms. Today, it is used as an umbrella term to describe a

16  range of different firearms that people perceive as being useful to warfare, regardless

17  of whether they were actually used on or designed for the battlefield. How the

18  expression is used today implies a distinct line between firearms made for the

19  military and firearms made for the civilian market. However, that line for seven

20  hundred years has always been blurred.

21      14.    Once firearms were developed, technology often advanced too quickly

22  for common battlefield use, finding popularity in the civilian market. Military

23  firearms in a general sense were limited by tactics, government bureaucracy, and

24  _____

25      [5] Johnson et al., pg. 88 According to the authors: "the analogue must be

26  "relevantly similar." One measure of these laws to consider according to *Heller and McDonald v. Chicago* (2012) is through "at least two metrics: how and why the

27  regulations burden a law-abiding citizen's right to armed defense." The how is defined as "whether modern and historical regulations impose comparable burden on

28  the right of armed self-defense." The why is defined as "whether that burden is comparably justified."

7

DECLARATION OF ASHLEY HLEBINSKY

1  expense, while civilian arms until recently were predominantly limited by individual

2  budget. Additionally, civilian arms can be employed for far greater number of uses,

3  including hunting, self-defense, and target shooting. The earliest firearms technology

4  appeared on the battlefield by the thirteenth century. The hand cannon, or

5  handgonne, was little more than the name suggests, a cannon for your hands. The

6  user utilized a touchhole and external fire source to ignite powder and fire the gun.

7  This primitive technology may not have been designed for a sporting purpose, but

8  once it was designed, inventors pushed the boundaries, capabilities, and usages of

9  firearms into the future. And while the hand cannon specifically may not have been

10  used for sport, other military weapons of the time such as longbows and crossbows

11  were popularly used for target shooting competitions in fairs during the Middle

12  Ages.

13      15.    The first true ignition system, the matchlock, was developed around

14  1400. This firearm, which utilized a burning match cord, was a popular military arm

15  used for centuries around the world. By the end of the 1400s, however, matchlocks

16  and subsequent ignition systems also began appearing in early target shooting

17  competitions.[6] Another example of a firearm being adopted for civilian use dates a

18  century after the matchlock. In the first decade of the 1500s, a highly advanced

19  handgun was developed, the wheel-lock. This gun, developed for use on horseback,

20  was operated by the turning of a spring-loaded wheel. While it saw some battlefield

21  use, it was expensive and difficult to repair. As a result, it was used for specialized

22  purpose on the battlefield in Europe, but not as much in the colonies. However, the

23  technology was considered so advanced, some European countries made and used

24  wheel-locks for sport into the 1800s. Another example of superior technology being

25  used by civilians rather than military is rifling. Rifling, the boring out of the inside

26

27

------

28      [6] Matchlocks and wheel-locks can be seen depicted in period imagery and in
medals for shooting competitions

8

DECLARATION OF ASHLEY HLEBINSKY

1  of a barrel with spiral lands and grooves to spin a projectile, thus making it more
2  accurate, was developed at the turn of the sixteenth century and appeared
3  predominantly in civilian arms, with a few military exceptions from the American
4  Revolution, until just before the turn of the twentieth century when military tactics
5  finally caught up to the technology.[7]

6       16.    Before the ability to mass manufacture firearms, guns were privately
7  made by gunsmiths. Although two armories did exist in the United States around the
8  time of the Founding Era, many guns for the battlefield were made by individuals.[8]
9  It is estimated that 2,500-3,000 gunsmiths worked in the colonies alone.[9] They, as
10 private citizens, were responsible for making guns for both the military and civilians.
11 While the standard infantry arm during the American Revolution was a smoothbore
12 (no rifling) musket, there were some regiments during the War that used a common
13 civilian firearm at the time, the American longrifle. The longrifle was a modified
14 design from the German Jaeger (Hunting) Rifle that tended to have a longer barrel
15 and a smaller caliber than its German counterpart. The rifle was the superior firearm
16 in terms of accuracy compared to the inaccurate smoothbore musket. However,
17 because of the type of projectile employed at the time – a round musket ball – the
18 process to load was slower for rifles because the ball had to fit snuggly within the
19 lands and grooves of the rifling. There was a trade off in terms of effectiveness for

20
21
22

23    [7] Examples of rifled matchlocks do exist. Rifled wheel-locks are far more
   common as they were so often used for hunting. This timeline provides a decent
24    overview of early technological developments: Gun Timeline. PBS History
   Detectives. <https://www.pbs.org/opb/historydetectives/technique/gun-
25    timeline/index.html> Accessed 10/22/2022
      [8] Springfield Armory was the first armory that began production in 1794
26    <https://www.nps.gov/spar/learn/historyculture/index.htm> Accessed 10/25/2022.
   The second armory was Harpers Ferry Armory and Arsenal, which began
27    construction in 1799 < https://www.nps.gov/hafe/learn/historyculture/harpers-ferry-
   armory-and-arsenal.htm> Accessed 10/25/2022
28    [9] Moller, George D. *American Military Shoulder Arms: Volume 1.* University of
   New Mexico Press, 2011. P.107

9

DECLARATION OF ASHLEY HLEBINSKY

1  specific purposes.[10] The longrifle in the colonies served as a multi-purpose tool. It

2  was capable of being used for hunting, self-defense, and target shooting. Important

3  to note though that unless being made for large-scale military adoption, such as the

4  smoothbore musket, and/or produced with the use of parts kits ordered from

5  overseas, many civilian arms were made at the behest of individuals or in small runs.

6       17.    Target shooting was a part of American culture before the formation of

7  the United States with colonists taking part in competitions known as "Rifle

8  Frolics."[11] This tradition has continued throughout American history, especially after

9  the Civil War. For example, the National Rifle Association may have been founded

10 by Union officers in 1871, but its core purpose was "to promote and encourage rifle

11 shooting on a scientific basis." What resulted was the proliferation of international

12 shooting competitions.[12] Another example is the Olympic sport of Biathlon, a sport

13 which involves both skiing and target shooting, dating to 1767 in Europe. It was

14 initially created for government use in places like Norway. That purpose persisted

15 for centuries, even after becoming an international sport. In the 1930s, Finnish

16 troops still used skis and rifles for patrol. Until recently, the firearms used in

17 Biathlon and other disciplines of the shooting sports, often used modified versions of

18

19

20

---

21    [10] Until the development of a successful conically shaped bullet (rather than a
round musket ball) by Claude Etienne Minie and modified by James Burton at
22 Harpers Ferry, rifling was expensive and slow to load. For a round ball to effectively
spin in rifling, it had to fit perfectly which slowed the loading process. However, it
23 was perfect for target shooting as well as hunting and specialized military use. Since
tactics by the military were still shoulder-to-shoulder fighting, accuracy was not of
24 prime importance, so militaries used smoothbore (unrifled) barrels for their standard
equipment.
25    [11] This is a tradition kept alive by several historic sites including, Fort
Boonesborough Living History Museum and Bardstown, KY's Colonial Days
26 <<https://fortboonesboroughlivinghistory.org/html/rifle_frolic.html> Accessed
10/25/2022 <https://www.prlog.org/11271548-rifle-frolics-18th-century-market-fair-
27 military-drills-displays-and-daniel-boone.html> Accessed 10/25/2022
   [12] The National Rifle Association of America was founded after the National
28 Rifle Association in the United Kingdom (1859). <https://home.nra.org/about-the-
nra/> Accessed 10/25/2022

10

DECLARATION OF ASHLEY HLEBINSKY

1   center-fire NATO cartridge firearms.[13] By the nineteenth century, progress on

2   manufacturing processes allowed more firearms of more varieties to be available to

3   the US government as well as civilians. Many of the repeaters of all sorts produced

4   during this century came in specific models indicating sporting vs military

5   variants.[14]

6        18.    The line between military and civilian arms was certainly blurred at the

7   founding of the country and thereafter, as was the role of the civilian and the soldier.

8   In the colonies and in early America, certain citizens were required to serve in their

9   militias with firearm and ammunition requirements and some soldiers carried their

10   personal firearms into battle. By the American Civil War, it was not unheard of for

11   soldiers to privately purchase firearms that the US government had not adopted or

12   did not issue to them for use in battle. After the war, even issued weapons that were

13   used *in* war were often sold on the civilian market. After the Civil War, soldiers

14   could buy their firearms and many dealers and distributors sold the surplus in mass

15   in their catalogs or at stores for even lower prices. According to Springfield Armory

16   National Historic Site, "many thousands [of] cheap surplus weapons were released

17   into private hands through General Orders 101, providing rifles, pistols, carbines,

18   and muskets that found their ways into the hands of Americans in the decades

19   following the Civil War."[15] The tradition of selling military arms to civilians

20   continues today with firearms such as the Springfield Model 1903 bolt action rifle

21

22

23

24   [13] An example of a centerfire modified firearm can be found in the Cody Firearms Museum. Here is a succinct summary of the history of the biathlon <https://minnesotabiathlon.com/about-biathlon/the-history-of-biathlon/> 10/25/2022

25   [14] Flayderman, Norm. *The Flayderman's Guide to Antique American Firearms...and their Values.* 9th Ed (2019). This book is considered the gold

26   standard in the evaluation of antique American made firearms. It provides not only firearms organized by manufacturer but also by type, such as repeater, military etc.

27   Here is just one example: pgs. 694-695
[15] Springfield Armory details this information here

28   <https://www.nps.gov/spar/learn/historyculture/a-springfield-rifle-musket.htm> Accessed 10/24/22

DECLARATION OF ASHLEY HLEBINSKY

1    and even with semi-automatics such as the M1 Garand rifle and the Model 1911

2    pistol.[16]

3        19.    There has always been an ebb and flow of civilian and military firearms

4    for centuries, some with clearer lines than others. However, the assertion that a gun,

5    especially during the Founding and Second Founding Eras, could be completely

6    understood as *only* for war in a time when there was such interchangeability, is

7    presentist at best.

8    **The Founding Era**

9        20.    In today's understanding of historical relevance, *Bruen* affirms that the

10    most crucial time for consideration of the constitutionality of modern regulations

11    falls under the Founding Era defined as the time around the ratification of the

12    Second Amendment. By this era, repeating, including magazine-fed, firearms had

13    been around for a long time. Additionally, repeaters, including those with

14    magazines, could have capacities of over ten rounds at least a century before and

15    during the ratification of the Second Amendment. Despite the invention of these

16    technologies, firearms laws during this time were primarily focused on restricting

17    access to enslaved, Native, and free Black peoples as well as other people of color.

18    *Repeaters*

19        21.    The concept of a repeating firearm dates to the earliest technology of

20    firearms. Hand cannons even came in repeating variations.[17] While some repeaters

21    were employed or simply attempted on the battlefield, repeating technology would

22    not be widely popular for use in war until the late nineteenth century. That did not

23    mean however that innovation in repeating technology was stymied. In fact, it was

24    quite the opposite. Without the confines of wartime tactics and budget, many

25

26

27    [16] Today, postwar weapon surplus guns including several semi-automatic
firearms such as the M1 Garand are sold through the Civilian Marksmanship Unit
<https://thecmp.org/sales-and-service/1911-information/> <https://thecmp.org/sales-

28    and-service/services-for-the-m1-garand/> Accessed 11/25/2022
    [17] An example can be found in the Cody Firearms Museum Collection

12

DECLARATION OF ASHLEY HLEBINSKY    APP. 674

17cv1017

1  repeating firearms were commissioned by civilians who utilized them. The simplest

2  method of producing arms capable of firing more than one round at a time initially

3  was to fit a firearm with more than one barrel. However, due to weight limitations,

4  gunmakers began experimenting with other means of producing repeating arms

5  during the sixteenth century. One of the first methods attempted involved

6  superimposed loads, which were successive charges of powder and ball on top of

7  each other that were separated by wadding or the projectile itself in one barrel. They

8  were fitted with locks that either had multiple cocks and pans or a single lock that

9  could slide upon a rail. One such example was a sixteen-shot firearm made in

10  1580.[18]

11     22.    By the 1630s, a Dutch gun making family, Kalthoff, began

12  experimenting with a design that allowed up to fifteen shots to be fired in rapid

13  succession. It utilized a tubular magazine located in a pistol's butt or a fowling

14  piece's stock to hold powder and balls.[19] This system was so innovative it was

15  reproduced and modified for over 150 years. Also, by the mid-seventeenth century

16  in Italy, magazine-fed repeaters were being developed. According to the Royal

17  Armouries (Leeds), the earliest example can be found at the Musée de

18  l'Armée which was made by Giacomo Berselli of Bolognia in the late 1660s.[20]

19  However, more well-known and relevant to the Founding Fathers, is Michele

20  Lorenzoni of Florence. He developed a magazine-fed repeater, in pistol and rifle

21  form, known as the Lorenzoni system. This design was copied and modified by

22  numerous designers after its invention with various configurations and magazine

23

24

---

25  [18] This firearm was on display at the National Firearms Museum's location in Missouri. Winant, Lewis. "A 16-Shot Wheel Lock," *America's 1st Freedom* (2014).
26  [19] Some of this research was compiled by the late historian, Herbert G. Houze and was featured in the Houston Museum of Natural Science's *The Art of the Hunt: Decorated European Sporting Arms from 1500-1800* (2019).
27  
28  [20] For more information, visit: https://royalarmouries.org/stories/our-collection/the-christmas-connection-to-captain-souths-lorenzoni-pistol-our-collection/ Accessed 10/24/2022

13

DECLARATION OF ASHLEY HLEBINSKY

1  capacities. One such firearm was designed by British gunsmith, John Cookson in the

2  late seventeenth century. A gunmaker in Boston, also named John Cookson – it is

3  not clear if this person was the same Cookson from England, a relative, or a

4  coincidence – published an ad in the *Boston Gazette*, in 1756, advertising a nine-shot

5  repeating firearm. Around the same time a Cookson-type twelve-shot repeater was

6  made by gunmaker John Shaw.[21] Another example from the 1750s in America is the

7  Belton repeating fusil. This gun was invented by Joseph Belton around 1758. Not a

8  magazine repeater like the Lorenzoni, the Belton utilized superimposed loads.

9  Notably, he petitioned the Continental Congress during the American Revolution to

10  adopt his firearm. In 1776, he wrote Congress saying he designed a firearm that

11  could fire eight shots in three seconds. Benjamin Franklin wrote to George

12  Washington in support of the idea.[22] Washington ordered one hundred Belton

13  firearms for use in the Continental Army. However, this order was canceled because,

14  as this report has previously stated, cost is often an impediment to battlefield

15  adoption. It is alleged that Belton then sold his firearms to the public.[23] A few

16  decades later around 1779, the Girardoni (also spelled Girandoni) air rifle was

17  developed. It was a repeating arm that could fire twenty-two rounds from a tubular

18

19  _____

20

21  [21]An example of this firearm can be found in the National Firearms Museum
   <https://www.nramuseum.org/the-museum/the-galleries/the-road-to-american-
22  liberty/case-22-the-paper-cartridge/cookson-volitional-repeating-flintlock.aspx> It is
   also discussed here: < http://firearmshistory.blogspot.com/2014/02/the-cookson-
   repeater.html> Accessed 10/24/22
23  [22] These letters can be found here:
   <https://founders.archives.gov/documents/Washington/03-05-02-0311> Accessed
24  10/22/22
   [23] What is believed to be the patent prototype of the Belton fusil is in the
25  Smithsonian Institution's National Firearms Collection:<
   https://americanhistory.si.edu/collections/search/object/nmah_440031> Accessed
26  10/22/2022. Additionally, Rock Island Auctions, who has sold recently several
   reproduction Beltons provides a great overview of this history
27  <https://www.rockislandauction.com/riac-blog/assault-weapons-before-the-second-
   amendment#:~:text=The%20Belton%20%22Roman%20candle%22%20fusil%20is
28  %20the%20first,a%20chained%20charge%20much%20like%20a%20Roman%20ca
   ndle> Accessed 10/22/2022

14

DECLARATION OF ASHLEY HLEBINSKY

1    magazine.[24] This design also was copied by gunmakers around the world.[25] The

2    actual Girardoni was used by Meriweather Lewis on the Lewis and Clark Expedition

3    (1804-1806). This air rifle had also been in service with the Austrian military, but

4    light weight examples were produced in sporting variations.[26]

5          23.    The above text serves merely as an example of the numerous types of

6    repeating firearms, utilizing a range of technologies including magazines, which

7    existed leading up to and at the time of the ratification of the Second Amendment

8    and in some cases had direct ties to Founding Fathers. While these repeaters can be

9    criticized as "one-off examples" or in some cases unsuccessful by modern and/or

10   historic standards, it is important to keep in mind that this was typical as they were

11   often made by private gunsmiths and sometimes individually commissioned.

12   Additionally, just because some firearms designs had flaws, imperfections, or issues,

13   does not mean the technology ceases to exist or can be expunged from history. As

14   manufacturing processes advanced, these concepts evolved into repeaters produced

15   in greater and more standard quantities.

16   / / /

17   / / /

18   _____

19   

20     [24] Kopel, David. "The History of Firearms Magazines and Magazine
     Prohibitions." Albany Law Review, Vol. 88, 2015, pg. 853

21     [25] An example of a Russian copy of a Girardoni Rifle can be found in the Cody
     Firearms Museum

22     [26]For more information on Lewis and Clark and the Girardoni, the most
     comprehensive research on the Girardoni air rifle was done by scholar Michael
     Carrick. His research is footnoted in this summary article of the Lewis and Clark

23   firearms that can be found here:
     <http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf> Accessed

24   10/22/22 Additionally, Ian McCollum, one of the foremost authorities on firearms
     technology in the United States, has done several videos and articles about the

25   firearm. This is one article he did
     <https://www.forgottenweapons.com/rifles/girardoni-air-rifle/> Accessed

26   10/22/2022. A surviving example of a Girardoni can be found:
     <https://www.nramuseum.org/guns/the-galleries/a-prospering-new-republic-1780-

27   to-1860/case-8-romance-of-the-long-rifle/girardoni-air-rifle-as-used-by-lewis-and-
     clark.aspx> Accessed 10/22/22 Rock Island sold a sporting variation in 2018:

28   <https://www.rockislandauction.com/detail/75/3293/girandoni-system-repeating-air-
     gun > Accessed 10/22/22

15

DECLARATION OF ASHLEY HLEBINSKY

APP. 677

17cv1017

*Laws and Relevance*

24.    In the colonial period, the bulk of firearms laws were centered on restricting access to certain people rather than firearms themselves. Therefore, even if a firearm or weapon was specifically mentioned in a law, the type of weapon is not necessarily relevant, as other civilians were still permitted to own them even if some people were restricted. Each colony developed their own policies. In 1640, Virginia law stated, "that all such free Mulattoes, Negroes and Indians…shall appear without arms."[27] South Carolina also had similar bans in 1712.[28] It is generally understood that early laws were largely motivated by race.[29]

25.    The British government also used regulation to control the colonists through access to gunpowder by seizing public powder houses, also referred to as "magazines." Although it is not to be confused or conflated with the mechanical devices discussed throughout this declaration. They achieved this because, due to fire hazard, large stocks of black powder were kept in a communal powder house, which was a repository for both individuals and merchants to store their powder. It also provided powder for people who were unable to afford it.[30] In one instance of disarmament, Royal Governor Thomas Gage, in 1774, seized remaining powder in Charleston, causing a flurry of responses, known as the Powder Alarm, from the

_____

[27] One of the best resources to search all firearms laws is the Duke Center for Firearms Law. <https://firearmslaw.duke.edu/> Accessed 10/25/2022. However, a concise summary of these laws is also broken down by: Ekwall, Steve. *The Racist Origins of US Gun Control*. <https://www.sedgwickcounty.org/media/29093/the-racist-origins-of-us-gun-control.pdf> Accessed 10/22/22 Here he references: 7 The Statues at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, p. 95 (W.W. Henning ed. 1823) (GMU CR LJ, p. 67)
[28] Eckwall, 7 Statutes at Large of South Carolina, p. 353-54 (D.J. McCord ed. 1836-1873). (GMU CR LJ, p. 70)
[29] The abstract of Cramer, Clayton E. "Colonia Firearms Regulation" (April 6, 2016) puts it fairly succinctly: "Firearms regulation in Colonial America was primarily focused on encouraging gun ownership for defense against external threats (Indians, pirates, non-British European powers) and internal threats (slave rebellions)"
[30] Johnson et al. Firearms Law and Second Amendment Regulation, Rights, and Policy (3rd ed. 2021), pg. 271

16

DECLARATION OF ASHLEY HLEBINSKY

1  colonists that was considered preparation for the Battles of Lexington and

2  Concord.[31] Shortly thereafter, King George III enacted a restriction to "prohibit the

3  Exportation of Gunpowder."[32] As a result, Revolutionary leaders, such as Paul

4  Revere, required possession of arms and ammunition by militiamen and many

5  required powder and projectiles in quantities greater than ten pounds and rounds

6  respectively.[33]

7          26.     While the ownership of gunpowder was outright encouraged by the

8  soon-to-be states of America, there were still very real concerns about the instability

9  of gunpowder. It is important to note that modern gunpowder is far more stable than

10 historic black powder. Even so, it is still recommended to be stored separately from

11 firearms in the home even today.[34] As a result of instability, fire prevention laws

12 were enacted, not to disarm individuals but to provide them a safe place to store their

13 powder while also reducing the potential for fire within communities. Philadelphia

14 in 1725 enacted a law "for the better securing of the city of Philadelphia from the

15 Danger of Gunpowder." Under this Act, safety was also defined as the distance of

16 beyond two miles outside of town limits. [35] Similarly, Boston in 1783 also made a

17 storage law citing the instability of black powder. "In the houses of the town of

18 Boston, [it] is dangerous to the lives of those who are disposed to exert themselves

19 when a fire happens to break out in town."[36] The idea of a required distance in which

20

21  _____

22     [31] Johnson, et al., pg. 271
       [32] Ibid, pg. 272
23     [33] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1150 (S.D. Cal. 2019)
       [34] According to the Sporting Arms and Ammunition Manufacturer's Institute,
24  "ammunition should be stored in a cool, dry location away from solvents and other
    chemical heat sources, or open flames…ammunition should be stored separately
25  from firearms" < https://saami.org/wp-
    content/uploads/2018/01/SAAMI_AmmoStorage.pdf> Accessed 10/25/22
26     [35] 1725 Pa. Laws 31, An Act for the Better Securing of the City of Philadelphia
    from the Danger of Gunpowder <https://firearmslaw.duke.edu/laws/1725-pa-laws-
27  31-an-act-for-the-better-securing-of-the-city-of-philadelphia-from-the-danger-of-
    gunpowder-%c2%a7-2/> Accessed 10/25/22
       [36] Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of
28  Boston <https://firearmslaw.duke.edu/laws/thomas-wetmore-commissioner-the-
    charter-and-ordinances-of-the-city-of-boston-together-with-the-acts-of-the-

                                      17

                    DECLARATION OF ASHLEY HLEBINSKY

1  it was safe to use black powder for firearms and also for fireworks, was echoed in

2  these laws. While in the above example it considered distance within town limits,

3  some places legislated a safe distance from the powder house itself. For example, in

4  1762, Rhode Island enacted "that no person whatsoever shall fire a gun or other

5  fireworks within one hundred yards of the said powder house."[37] Additionally,

6  Rhode Island in 1798, provided guidance on how to safely store powder in the home.

7  They also provided a safe space to store anything over twenty-eight pounds [38] These

8  laws strongly focused on safety from a perspective of fire prevention rather than a

9  position of regulating the amount of powder one could have since powder houses

10  were built for large quantities of chemically unstable and combustible material.

11      27.     In summary, at the time of the Founding Era, laws about firearms

12  restriction were regularly directed towards groups of people rather than the firearms

13  themselves. Within these laws, repeating and firing capacity are not mentioned. In

14  some cases, the militia required arms and ammunition to be in civilian possession

15  partially due to British attacks on public powder houses. Additionally, laws

16  concerning the private possession of gunpowder were centered around fire

17  prevention within and near town's limits or proximity to a powder house.

18  **The Second Founding Era**

19      28.     According to *Bruen,* under certain circumstances the Second Founding

20  Era, surrounding the Fourteenth Amendment, can be used to provide insight into

21  historical analogues. As mentioned in the previous section, repeaters, including

22  magazine-fed firearms, were known, and becoming increasingly popular at the time

23  of the Fourteenth Amendment. Capacities over ten rounds existed before and during

24  _____

25  legislature-relating-to-the-city-page-142-143-image-142-1834-available-at-the-

26  making-of/> Accessed 10/25/2022
     [37] 1762 R.I. Pub. Laws 132 <https://firearmslaw.duke.edu/laws/1762-r-i-pub-

27  laws-132/> Accessed 10/25/22
     [38] 1798-1813 R.I. Pub Laws 85 < https://firearmslaw.duke.edu/laws/1798-1813-r-

28  i-pub-laws-85-an-act-relative-to-the-keeping-gun-powder-in-the-town-of-
     providence-%c2%a72/> Accessed 10/25/22

18

DECLARATION OF ASHLEY HLEBINSKY

1   this time. Laws yet again did not concern capacity. They continued to center around

2   restrictions against groups of people. They also centered around carry. Ironically,

3   though some firearms regulated in carry laws were still legal, despite having the

4   same or even greater capacity, as long as they were physically larger in size, or in

5   some cases more expensive.

6   ***Repeaters***

7       29.     The period before and after ratification of the Fourteenth Amendment

8   saw changes in the landscape of design and technology outside of just firearms. The

9   transition of firearms being made by private gunmakers began shifting to factories

10  by the mid-nineteenth century. Inline manufacturing, interchangeable parts, and

11  mass production impacted not only the types of firearms that were available, but also

12  quantity and quality. Prior to the American Civil War, there were many makers and

13  manufacturers of repeating firearms, however, the tradition of individual gunmakers

14  was still prominent. While repeating firearms, magazine-fed or not, exceeded ten-

15  rounds centuries prior, the number of distinct types of repeaters by the middle of the

16  nineteenth century was staggering. It is important to note that while this report

17  references the ceiling of ten rounds, that number is historically arbitrary as it is

18  unfair to assume that a person during that time would make a distinction between

19  capacities under and over ten rounds, especially considering to my knowledge, the

20  federal government itself did not until the 1990s.[39]

21      30.     After the ratification of the Second Amendment, repeating technology

22  continued to evolve as it had for centuries. During this time frame, especially

23  leading up to the Industrial Revolutions and standardization of interchangeability

24  and in-line manufacturing processes, designs were very much a trial-and-error

25

26  _____

27  [39] This date is referencing the Public Safety and Recreational Firearms Use
    Protection Act (1994). Additionally, there are many resources that can showcase the
    number of repeaters available in this time frame in the United States, but the place

28  that aggregates them the best is Flayderman, Norm. *The Flayderman's Guide to
    Antique American Firearms…and their Values*. 9th Ed.

19

DECLARATION OF ASHLEY HLEBINSKY          APP. 681

1  process. One such repeater was designed in 1821 and was known as the Jennings

2  repeating flintlock. It was capable of firing twelve rounds before having to reload.[40]

3  Pepperbox pistols, a revolving pistol with multiple barrels that were manually

4  rotated on a central axis, were popular in the United States by the 1830s, some were

5  even taken out west with California gold miners. One maker of pepperboxes alone,

6  Ethan Allen, between the 1840s and 1850s made over forty variations of this style of

7  firearm.[41] While many pepperbox pistols typically fired four to six shots, some were

8  capable of firing twelve, eighteen, or twenty-four rounds.[42] It becomes difficult to

9  quantify the number of repeaters on the market though because makers were so

10  plentiful. In 1836, a year before Samuel Colt's first patent in England of his

11  revolving mechanism, the patent process was standardized through the United States

12  Patent Act. That year, Samuel Colt took out two patents for five or six-shot

13  revolving rifles and pistols. As a result, he owned the legal right to produce,

14  essentially the revolver, until it expired in the mid-1850s. This Act created a flurry

15  of production, innovation, and design especially towards repeaters and magazines to

16  varying degrees of success. The fact though that so many people were trying to

17  design the next great repeater shows the desire to capitalize on this technology.[43]

18      31.    It has been cited and challenged that the Winchester Model 1866 was

19  the first magazine-fed repeater that held more than ten rounds to achieve commercial

20  success.[44] The Winchester Model 1866 lever action rifle was the first firearm sold

21  using the Winchester name. Between 1866 and 1898, approximately 170,101 Model

22  1866s, in .44 Rimfire, were produced. Of that model alone, around ten variations

23

24  _____

25  [40] Flayderman, Pg 683
   [41] Ibid pg. 56-61

26  [42] Kopel, pg. 854. Additionally, pinfire pistols and long guns can be found in
   museum collections with capacities greater than ten rounds.

27  [43] Examples of these patented repeaters include Volcanic lever actions, the Jarre
   Harmonica pistol and rifle, Porter and Genhart turret rifles, Josselyn Chain
   Revolvers etc. More successfully were revolvers and repeaters by Smith & Wesson,

28  Remington, Merwin & Hulbert, Henry, Winchester etc.
   [44] Kopel, pg. 869

DECLARATION OF ASHLEY HLEBINSKY

APP. 682
17cv1017

1  existed. It was hoped that the Winchester Model 1866 would see successful adoption

2  by the US military, however, it did not. Only a small percentage, roughly 1/3 of total

3  production, were made ultimately for use by foreign militaries.[45] According to

4  another statistic, between 1861 and 1877, a total of 164,466 Henry and all models of

5  Winchester were made, with approximately 56,000 going to foreign governments.[46]

6  This number, even with the inclusion of other models, still is only 1/3 of all sales. In

7  reference to his Model 1866, Oliver Winchester referred to it as "one of [the

8  company's] best sporting guns" in a letter, dating 1871, to prominent gunmaker R.S.

9  Lawrence.[47] In a Winchester testimonial from 1865, W.C. Dodge, Late Examiner of

10  the US Patent Office, boasted that Winchester's "Magazine Rifle, with the recent

11  improvement, is superior to any other arm ever presented to the public."[48] In the

12  beginning, Winchester did lean into its previous involvement with the Henry rifle as

13  a marketing tool because it was a known commodity, however, within a decade after

14  the company's founding, Winchester catalogs detailing their sporting models and

15  diverse product lines were interspersed with testimonies from hunters and civilians

16  about their love of the technology.[49] The categories for their 1875 catalog reads:

17  "Winchester's Repeating Fire-Arms, Rifled Muskets, Carbines, Hunting and Target

18

19  ————————————————

20  [45] Flayderman's also provides the number of Mexican contract firearms there
were. The records are not complete for the Model 1866. The Records can be found
21  in the Cody Firearms Museum's Records Office. Here is a breakdown of what has
survived through the Winchester collector.
22  https://winchestercollector.org/models/model-1866/ This article also provides a
breakdown of other military contracts. <
23  https://www.americanrifleman.org/content/winchester-lever-actions-go-to-war/>
Accessed 10/22/22
24  [46] Michael Vorenberg Decl., pg. 28, note 32.
[47] Oliver F. Winchester's letter to R.S. Lawrence, dated 10 February 1871.
25  McCracken Research Library, MS20, Box 51, Folder 6
[48] Dodge is most likely referencing the 1865 King's Patent Improvement which
26  incorporated a side loading gate to improve the speed of loading the firearm.
Winchester's Repeating Fire-Arms Rifled Muskets, Carbines, Hunting, and Target
27  Rifles, &c…Metallic Cartridges of all Kinds, manufactured by the Winchester
Repeating Arms Company." Catalogues Vol. 1 (1865-1881). McCracken Research
28  Library TS 533.5.W5431991v1c2
[49] Ibid

21

1  Rifles, &c…"[50] One such testimonial was from famous performer, William F. Cody,

2  who proclaimed, "I have tried and used nearly every kind of gun made in the United

3  States, and for general hunting or Indian fighting, I pronounce your improved

4  Winchester the *boss.*"[51] Despite the ways that Winchester chose to frame and market

5  their firearms though, it should be noted that while advertising can influence a

6  consumer, a consumer also has agency to purchase and use the product they want for

7  their own purposes.

8      32.  While Winchester would provide the United States smaller runs of their

9  firearms designs modified for military service around the turn of the twentieth

10  century, Winchester would not truly be seen as a full-scale military manufacturer

11  until their involvement in World War I when government owned armories could no

12  longer meet the demand for military arms. Winchester and other manufacturers such

13  as Remington stepped in initially producing firearms – not even associated with their

14  brands - invented by other designers, companies, and/or armories, such as the British

15  Pattern 1914 Enfield and the American version, the U.S. Model 1917. These military

16  contracts however would ultimately be the financial demise of the company as it

17  went into receivership in 1931. [52]

18      33.  Outside of those early small contracts, Winchester continued designing

19  guns for the civilian market. The Winchester Model 1873 boasted a production of

20  around 720,610 manufactured in at least twelve variations, including almost 20,000

21  in .22 caliber rimfire – a caliber used for target shooting and varmint hunting. Model

22  1873 rifles were chambered in .32-20, .38-40, .44-40, and .22 caliber. The Model

23  1876 had a manufacturing run of 63,871 firearms with around fifteen variations.

24

25

_____

26  [50] McCracken Research Library TS 533.5.W543 1991v1c
    [51] Ibid, pg. 28-29

27  [52] This information can be found in pretty much any book about Winchester. The
    author also knows this information for the decade she spent running the Cody

28  Firearms Museum, formerly known as the Winchester Museum, which is home to
    Winchester's firearms collection as well as archives from the company

22

DECLARATION OF ASHLEY HLEBINSKY

1  This Model was a larger version of the Model 1873 and chambered in heavier

2  calibers (.40-60, .45-60, .45-75, .50-95), which made the firearm more desirable for

3  hunters, including President Theodore Roosevelt.[53] At one point, they produced an

4  exclusive line of high-level sporting arms of the Models 1873 and 1876 known as

5  the "1 of 100" and "1 of 1,000" models. Between the start of the company until

6  1898, Winchester released fourteen repeating models – not all lever actions. Those

7  models would eventually be produced in over one hundred variations, chambered for

8  around thirty different cartridges.[54] Winchester continued mass producing repeating

9  firearms throughout the rest of the nineteenth century and beyond. Considering the

10  diversity within models, variations and especially calibers, these guns were

11  developed for specific and sometimes divergent purposes and cannot not be reduced

12  into one category of simply being a Winchester repeater. There is more nuance than

13  that.

14      34.    During this same time, other companies were producing competitive

15  repeaters, such as the Evans Repeating Rifle, which was made between 1873 and

16  1879. Approximately, 12,200 were made and they came in three variations, Sporting

17  (approximately 4,350 made), Military (approximately 3,200), and Carbine (not

18  specified as either sporting or military, approximately 4,700 made). The Evans held

19  magazine capacities at twenty-eight, thirty-four, and thirty-eight rounds.[55] The Evans

20  as well as other companies such as the Spencer Repeating Rifle, Fogerty Repeating

21  Rifle, Adirondack Firearms, Bullard Repeating Arms, Burgess Gun, and the

22  Whitney Arms Companies were making repeaters. However, they are lesser known,

23  partially because Winchester realized the value in their designs and the threat of

24

25

26

27  _____

28  [53] Flayderman, pg 309
    [54] Ibid pg 306-322.
    [55] Ibid pg. 694-695

23

DECLARATION OF ASHLEY HLEBINSKY   APP. 685

1  them as a competitor so they acquired the companies.[56] Other major manufacturers,

2  such as Marlin, quickly popped up as well by the 1880s as a direct competitor to

3  Winchester. In all, there were over one hundred manufacturers or makers in the

4  United States alone producing some type of repeating firearm leading up to and

5  decades after the Civil War.[57]

6        35.     As plentiful as variations in Winchester firearms are though, the above

7  information does not take into account the gargantuan amount of ammunition

8  Winchester manufactured. In general, not enough is said about Winchester's

9  innovation in cartridge design and the fact that ammunition production was

10  responsible for much of the financial success of the company. According to David

11  Kowalski, author of the *Standard Catalog of Winchester: The Most Comprehensive*

12  *Price Guide Ever Published*, "cartridges played a larger role in the business

13  operations of the Winchester Repeating Arms Company (W.R.A. Co.) than most

14  collectors realize. Because ammunition is a high-volume, high profit product, it

15  literally carried the W.R.A. Co. for most of its existence."[58] Their cartridge designs

16  were so popular that other companies, such as Colt, would offer variations of their

17  iconic firearms, such as the Colt Single Action Army revolver, to accommodate

18  Winchester developed cartridges, such as the .44-40. Ammunition production was so

19  vital to Winchester that the company who bought them out of receivership, the Olin

20  Corporation, was their ammunition competitor. Today, the only surviving thread of

21  the company is Olin's Winchester Ammunition. The various firearms brands that

22

23

24  _____

25  [56] An entire exhibit at the Cody Firearms Museum is dedicated to the many
    repeating arms companies that Winchester acquired. Examples are archived in the

26  Winchester Arms Collection.
    [57] Flayderman, Chapters V: A-F pages 50-299; Chapter VII: A, B, C Pages 351-

27  387; Chapter VIII: A Pg458-524; Chapter XIII pages 691-697; Chapter XV: pages
    709-733

28  [58] Kowalski, David D. Ed. Standard Catalog of Winchester: The Most
    Comprehensive Price Guide Ever Published. Krause Publications 2000, pg. 159.

24

DECLARATION OF ASHLEY HLEBINSKY          APP. 686

17cv1017

1    bear the Winchester name, are produced by companies that license the name from

2    Olin.

3        ***Magazines***

4        36.    In addition to the developments in repeating innovation, magazines

5    began to be patented as well. Even though tubular magazines existed long before,

6    the tubular magazine was first patented in the US in the 1840s, notably with the

7    Hunt Volitional Rifle, the oldest direct ancestor to the Winchester rifle. Magazines

8    though came in many shapes and sizes and became prevalent around this time. For

9    example, the Spencer repeating rifle utilized a detachable tubular magazine from the

10   buttstock capable of holding seven rounds. A speed loader even existed for that

11   magazine. In the 1850s, the Genhart turret rifle had a detachable circular magazine

12   with an externally visible shot/round counter. Between 1859 and 1862, the Jarre

13   Harmonica Pistol and Rifle received several patents. This gun has a horizontally

14   seated magazine that slides after each round is fired like a typewriter. It is also

15   detachable.

16       37.    In terms of box magazines specifically, early ones were patented by

17   designers including Rollin White in 1855.[59] A detachable version was patented in

18   1864 by Robert Wilson.[60] A vertically stacked box magazine was patented by James

19   Paris Lee in 1879 which was applied to several rifles including the Mannlicher

20   Model 1886 rifle.[61] In terms of early semi-automatic pistols, the Mauser C-96 had a

21   fixed magazine and the Borchardt C-93 had a detachable one. Semi-automatic

22   models of Winchester utilized various types of magazines, including the Winchester

23   Model 1907, a centerfire rifle capable of firing up to twenty rounds from a box

24   magazine and the Winchester Model 1903 which was also fixed with a lesser-known

25   Sabo ninety-six round detachable magazine. By the end of the nineteenth century,

26

27       [59] White, Rollin. US Patent No 12648 (1855)
28       [60] Wilson, Robert. US Patent No 45105 (1864)
         [61] Lee, James Paris US Patent No 221328 (1879)

DECLARATION OF ASHLEY HLEBINSKY    APP. 687

17cv1017

1  the earliest versions of semi-automatic pistols such as the Borchardt C-93 contained

2  eight rounds from a detachable magazine (1893) and the Mauser C-96 had a ten

3  round magazine (1895) but also came in configurations as high as twenty rounds.[62]

4  Even certain Luger semi-automatic pistols in the early 1900s had the option of

5  thirty-two round snail drum magazines.[63]

6  ***Laws and Relevance***

7  38.     Racial firearm bans continued into the nineteenth century. States

8  including but not limited to Louisiana, South Carolina, Florida, Delaware, Maryland,

9  North Carolina, and Mississippi enacted race bans between ratification and the

10  American Civil War.[64] Some states, for a time, would permit African Americans to

11  carry guns with court approval, but they were eventually repealed.[65] Several laws

12  upheld their justification for race-based regulation on the fact that Black people were

13  not considered citizens, which was upheld in the 1857 case of *Dred Scott v*

14  *Sandford.*

15  39.     During this period in between ratifications of the Second and the

16  Fourteenth Amendments, some laws emerged restricting carry by any person.

17  According to Professor of Sociology at Wake Forest University David Yamane, one

18  of the earliest examples was in Kentucky in 1813. The General Assembly of the

19  Commonwealth stated: "That any person in this commonwealth, who shall hereafter

20  wear a pocket pistol, dirk, large knife, or a sword cane, concealed as a

21  weapon…shall be fined in any sum, not less than one hundred dollars." However,

22  nine years later in 1822, the Kentucky Supreme Court ruled that ban violated their

23

24  _____

25  [62] Kopel, 857 referencing *Standard Catalog of Firearms.* (2014), Gun Digest Books, pg. 708-709

26  [63] A version of this section on magazines was initially completed by author for Miller et al v Bonta

27  [64] Ekwall

28  [65] Ibid, referring to Act of Nov. 17, 1828, Sec. 9, 1828 Fla. Laws 174, 177; Act of Jan. 12, 1828, Sec. 9, 1827 Fla. Laws 97, 100; Referring to Act of Jan. 1831, 1831, Fla. Laws 30

26

DECLARATION OF ASHLEY HLEBINSKY

1   1792 Constitution.[66] Other states adopted similar carry regulations, some still only

2   for certain groups of people.

3        40.     Despite the abolition of slavery, discriminatory laws that included

4   firearms regulation continued. One such way that could be legally achieved was

5   through the Black Codes. While there were many aspects of discrimination in the

6   various state "Codes," many included challenges to Black Second Amendment

7   rights. For example, Alabama in 1866 not only banned Blacks from owning firearms

8   and other weapons, but also made it illegal to lend or sell to a black person.[67] The

9   Civil Rights Act of 1866, the Fourteenth Amendment and the Second Freedmen's

10   Bureau Act in 1866 attempted to dispel a variety of these issues.[68] In February 1866,

11   the House of Representatives amended the Second Freedmen's Bureau Act to

12   explicitly state that people had the "full and equal benefit of all laws and

13   proceedings for the security of person and estate *including the constitutional right to*

14   *bear arms.*"[69] Following the passage of these acts, however, southern states then

15   passed laws, known as Army/Navy Laws, in which certain firearms, such as Colt

16   Army and Navy model revolvers were permitted while cheaper versions were not

17   legal.[70] Prohibiting the proliferation of inexpensive handguns on the market, whether

18   intentionally or unintentionally imposed a classist restriction on those who could no

19   longer afford to arm themselves– a trend that has continued well into the modern

20   era.

21        41.     The Enforcement Acts of 1870 and 1871 were meant to protect the

22   rights of free men under the Fourteenth and Fifteenth Amendments. Yet these

---

[66] Yamane, David. *Concealed Carry Revolution: Expanding the Right to Bear Arms in America*. A New Press (2021), pg. 17-18. David Yamane is a Sociology Professor at Wake Forest. This book was just a small portion of his larger research on gun culture that he calls, "Gun Culture 2.0." More of his research can be found at gunculture2point0.com

[67] Ekwall

[68] A detailed explanation of this can be found in: Johnson et. al pg. 465-471

[69] *Ibid*, pg. 466

[70] Eckwall

DECLARATION OF ASHLEY HLEBINSKY    APP. 689

17cv1017

1   seemingly positive changes were short lived. During the 1872 election for Louisiana

2   governor, President Ulysses S. Grant sent troops to support the Republican

3   candidate. In response, a group of white supremacists began harassing Black and

4   White Republicans. These tensions culminated in Black and White Republicans

5   taking up defense in a local courthouse in Colfax, LA. In 1873, 150 white men

6   surrounded the courthouse and at one point, would fire a cannon at the building.

7   Note: White Republicans were given the opportunity to leave before the massacre

8   ensued. Black Republicans were left to fight with inferior weaponry. In the end,

9   Black Republicans would surrender to the mob, led by a man named William

10  Cruikshank. After surrender, somewhere between sixty to one hundred and fifty

11  African Americans were killed.[71] Although Cruikshank and around ninety-six white

12  vigilantes were charged for violating the Enforcements, only a few were convicted.[72]

13  Even then, the Supreme Court, in *United States v Cruikshank* (1875), overturned the

14  conviction ruling that the federal government could not prevent private citizens, in

15  this case KKK members, from disarming Blacks and that the matter must be

16  relegated to the states.[73]

17      42.    Another example concerning disarmament of a group of people

18  occurred leading up to the American Civil War. Violent confrontations broke out in

19  Kansas, known as Bleeding Kansas, between 1854 and 1859. At one point an anti-

20  slavery movement of "Free Soilers" decided to arm themselves with single-shot

21  Sharps rifles by smuggling them into the territory. However, the pro-slavery

22  segments, under the command of a deputy federal marshal, attempted to disarm

23  these settlers, most notably during the Sacking of Lawrence.[74] In response to the

24

25  ―――――――――

26      [71] Johnson et al, pg. 471
        [72] Ibid, pg. 471 as well as summarized in
27  <https://www.smithsonianmag.com/smart-news/1873-colfax-massacre-crippled-
    reconstruction-180958746/> Accessed 10/25/22
28      [73] Ibid, pg. 471
        [74] Ibid, pg. 456

                                    28
                    DECLARATION OF ASHLEY HLEBINSKY    APP. 690

situation in Kansas, abolitionist Charles Sumner gave his famous speech on the floor of the United States Senate on May 19, 1856, "The Crime Against Kansas." During which, South Carolina Senator A.P. Butler, supposedly stated that the people of Kansas should no longer possess their arms. During Sumner's speech, he attacked Butler and affirmed the right of individuals to bear arms:

> "The rifle has ever been the companion of the pioneer and, under God, his tutelary protector…Never was this efficient weapon [referring to the single shot Sharps Rifle] more needed in self-defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached…"[75]

This speech culminated in violence against Sumner, who was beaten with a cane on the Senate floor for advocating against disarmament. Yet, even after a Civil War and thirty-five years later government disarmament would lead to the largest mass murder in American history. On December 29, 1890, Colonel James Forsyth, commander of the 7th Cavalry, ordered the Lakota to surrender their firearms leading up to their removal from the land they inhabited. It is debated exactly what happened to pull the trigger on the slaughter, but in the end, hundreds of Lakota were killed.[76]

43. After a long history of government related violence as well as private vigilantism, Black people, particularly in the South, called for their personal armament to protect themselves. Much research has been done focusing on violence against people of color as a justification for firearms restrictions, however, less explored is the fact that Black people used and relied on firearms for protection *from* violence. These two ideologies conflict with one another. On one side, it is argued that restrictive laws would reduce violence, specifically on marginalized communities. On the other, it is argued that gun ownership allows those communities the best ability to protect themselves. In this circumstance, a restriction

---

[75] Johnson et. al, pg. 456
[76] Utley, Robert M. *The Last Days of the Sioux Nation.* 2nd Ed. Yale University Press, pg. 211

DECLARATION OF ASHLEY HLEBINSKY

APP. 691
17cv1017

1  would take away rights of the latter, putting them again at risk of violence. This

2  desire to protect oneself with the best technology available was echoed amongst the

3  Black community in the late nineteenth century through prominent leaders. For

4  example, John R. Mitchell, Jr., Vice President of the National Colored Press

5  Association, encouraged Black people to buy Winchesters to protect their families

6  from the 'two-legged animals…growling around your home in the dead of the

7  night."[77] Ida B Wells, an activist and journalist in the South, wrote in 1892, "that a

8  Winchester rifle should have a place of honor in every black home, and it should be

9  used for the protection which the law refuses to give."[78] These activists also

10 encouraged Black Americans to move to Oklahoma where they formed self-defense

11 organizations. One Black journalist reported that in Oklahoma he "found in every

12 cabin [he] visited a modern Winchester oiled and ready for use.'"[79]

13      44.     To summarize: in Kansas, pro-slavery government backed officials

14 sought to disarm Free Soilers of their high-quality single-shot Sharps rifles. Sumner

15 denounced this effort and started a fight with Senator Butler, who himself would

16 backtrack and claim he never supported disarmament. In the Colfax massacre, Black

17 Republicans were outgunned by a mob with superior weapons. The Wounded Knee

18 Massacre started because of a government sanctioned disarmament of the Lakota,

19 who had in some cases, superior weaponry. The firearms confiscated at Wounded

20

21 ───────────────

22  [77] Johnson et al., p 521 referencing Giddings, Paula J. *Ida: A Sword Among Lions*
    (2008), pg. 153-154
       [78] Johnson et al., pg. 521 referencing Wells, Ida B. *Southern Horrors.* N.Y. Age
23 June 25, 1892. Reprinted in Wells, Ida B. *The Light of Truth: Writings of an Anti-
    Lynching Crusader,* pg. 84
24     [79] While this reference is obviously anecdotal for the number of Winchesters in
    circulation in a given area, Vorenberg's declaration claims as little as 8,000
25 Winchesters were in circulation in the post-Civil War South. However, this number
    is based on an order of 6,000 from Governor Scott for the South Carolina Militia,
26 1,000 for the Metropolitan Police Force in Louisiana, and 1,000 potentially stolen
    firearms. It has been stated though that the government was slow to adopt this
27 technology, despite still being produced into the hundreds of thousands. Therefore, it
    is misleading to infer these orders would be the only way to measure the number of
28 Winchesters in the South at that time. The footnoted quote is from: Johnson et al., p
    521 referencing Giddings, pg. 198

30

DECLARATION OF ASHLEY HLEBINSKY

1    Knee included Winchester rifles, though it did not serve them any good considering

2    what transpired. And Black southerners particularly sought to have the best weapons

3    available for a government they believed was not there to protect them.

4          45.    Some scholars argue that the passage, despite the repeal in many

5    instances, of state laws regulating the carry of specific types of weapons serve as

6    sufficient evidence to support a modern magazine ban. However, it is important to

7    reiterate that these regulations regarding specific types of weapons have occurred in

8    some cases to take away the rights of some but not others. For laws that did include

9    everyone, weapons typically on that list had some sort of larger counterpart, as in the

10   Army/Navy laws, which would have at least equal capacity or were still permitted

11   via licensure. Furthermore, these laws did not explicitly concern themselves with

12   capacity or magazines but more often the size and/or other criteria of concealment.

13   Other laws during this period, had more to do with whether or not the government

14   could protect you and your rights resulting in unfortunate outcomes. In the case of

15   disarmament and the need for defense, it seems that citizens often affected by these

16   tragedies were less concerned about a discourse on the morality of firearms

17   technology, but instead protecting themselves with the best technology available.

18   **Conclusion**

19         46.    According to *Bruen,* time frames outside of the Founding and Second

20   Founding Eras can be considered informative, providing context for the mindset and

21   knowledge behind designs and legal decisions, although it does not hold the same

22   weight. This report has provided an outline of repeaters and magazine-fed repeaters

23   with a capacity of over ten rounds in the previous two sections establishing the

24   existence and use of these types of firearms. The proliferation of such technology in

25   the twentieth and twenty-first centuries is astounding. As such and coupled with the

26   tertiary importance according to *Bruen*, I will not dive into a comprehensive look at

27   all repeaters developed into the modern era.

28

47.     This report has looked at two timeframes relevant to this case as it pertains to *Bruen*. It has provided a snapshot account of several repeaters and magazine-fed repeaters of capacities over ten rounds throughout history. It has also examined corresponding laws from those time periods rebutting similarities to twentieth and twenty-first century legislation on capacity. It has stated that innumerable magazine-fed repeaters have been developed since the 1600s. At the time of the Founding Era repeaters and magazine-fed firearms, with a capacity over ten rounds had been in existence for over a century. To my knowledge, there are no laws during this period that restrict access to firearms magazines or strict firing capacity. By the time of the Second Founding Era, there were exponentially more repeaters and magazine-fed firearms with capacities greater than ten. According to scholarship outside of this declaration, the first laws referencing capacity, primarily for machine guns, only date to the 1920s, and all except one implemented during this period were repealed. Laws regulating detachable magazines date to the last decade of the twentieth century, and the ten round magazine limit was imposed through federal law for the first time in 1994, making the relevant conversation in this case much more recent history rather than the historical precedent *Bruen* requires.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on __November 30, 2022__.

Ashley Hlebinsky
Declarant

32
DECLARATION OF ASHLEY HLEBINSKY

# EXHIBIT 1

# EXHIBIT 1: HLEBINSKY CURRICULUM VITAE

**Ashley Hlebinsky Curriculum Vitae**

Ashley Hlebinsky, President, The Gun Code, LLC

2124 E Kerry Lane, Phoenix, AZ 85024

Email: theguncode@gmail.com

Phone: 412-491-2493


**Education:**

Master of Arts, American History, University of Delaware, 2013

Bachelor of Arts, American History, University of Delaware, 2011


**Recent Honors/Awards:**

Second Amendment Foundation's Defender of the Constitution, 2022

National Shooting Sports Foundation and Women's Outdoor Media Association's Top Five Finalist, Top Woman of the Gun Industry, 2022

National Shooting Sports Foundation's SHOT Business's Top 40 under 40, 2020

Wyoming Business Report's Top 40 Under 40, 2017

National Shooting Sports Foundation & Professional Outdoor Media Association's Shooting Sports Communicator of the Year Award, 2017

Wyoming's Non-Profit Woman of the Year Nominee, 2017


**Selected Professional Experience:**

Co-Founder and Senior Fellow, University of Wyoming College of Law's Firearms Research Center, Laramie, WY, 2020 (Current)

Consulting Director, Craig Boddington Wildlife and Firearms Museum, Independence, KS, 2022 (Current)

Consulting Curator, LA Police Museum, Pasadena, 2021 (Current)

EXHIBIT 1

APP. 696

17cv1017

1
2     Senior Consulting Specialist. Cowan's Auctions, Cincinnati, OH, 2021 (Current)
      Consultant, National Museum of Law Enforcement and Organized Crime (Mob
3     Museum), Las Vegas, NV, 2016 (Current)

4     Guest Curator, C.M. Russell Museums and Complex, Great Falls, MT 2021
      (Current)
5
6     Adjunct Scholar of Firearms History, Technology & Culture, Firearms Policy
      Coalition, 2020-2021
7
8     Curator Emerita & Senior Firearms Scholar, Cody Firearms Museum, Buffalo Bill
      Center of the West, 2020 – 2021.
9
10    Robert W. Woodruff Curator, Cody Firearms Museum, Buffalo Bill Center of the
      West, Cody, WY, 2015-2020
11
12    Project Director, Cody Firearms Museum Renovation, Buffalo Bill Center of the
      West, Cody, WY, 2015-2019
13
14    Consulting Curator, Houston Museum of Natural Sciences, 2018

15    Consultant. Adirondack Experience. November 2019
16
      Consultant. Winchester Mystery House, August 2019.
17
18    Consulting Scholar. National Park Service & Organization of American Historians,
      March 2019.
19
20    Consultant/Curator. Daniel Defense, Black Creek, Georgia. 2017

21    Associate & Acting Curator, Cody Firearms Museum, Buffalo Bill Center of the
      West, Cody, WY, 2015
22
23    Guest Curator. C.M. Russell Museums and Complex, 2015-2016

24    Guest Curator. Cody Firearms Experience, 2015
25
26    Assistant Curator, Cody Firearms Museum, Buffalo Bill Center of the West, Cody,
      WY, 2013-2014
27
28    Teaching Assistant, The Jewish Holocaust: 1933-1945, University of Delaware,
      2013

EXHIBIT 1

APP. 697
17cv1017

Teaching Assistant, Introduction to Military History, University of Delaware, 2012

Teaching Assistant, History Education, University of Delaware, 2011

Researcher/Fellow, National Museum of American History, Smithsonian Institution, 2010-2013

Archival Assistant, University of Delaware Special Collection, 2010-2011

Firearm Intern, Soldiers and Sailors National Memorial Hall, 2008

**Expert Witness Testimony:**

Senate Judiciary Subcommittee on the Constitution, Stop Gun Violence: Ghost Guns, May 2021

Franklin Armory et al v Bonta, February 2021

FN Herstal v Sturm, Ruger & Co, January 2021

Sturm, Ruger & Co. v American Outdoor Brands Corp., October 2020

Guedes v BATFE, June 2019

Miller v Becerra (Bonta), November 2019

    1. Evidentiary Hearing Testimony October 2020

    2. Deposition January 2021

Regina (Nova Scotia) v Clayton, January 2019

Garrison v Sturm, Ruger & Company, Inc. 2018

    1. Deposition November 2018

**Selected Media Work:**

Writer/Producer. Mountain Men: Ultimate Marksman. History Channel, May 2022 (Current)

EXHIBIT 1

APP. 698

17cv1017

Regular Contributor. *Our American Stories* Podcast, 2022 (Current)

Co-Host. History Unloaded Podcast. Various platforms with Wyoming Public Media, 2018-2022, 6 seasons (Current)

Producer & On Camera Expert. *Gun Stories with Joe Mantegna*, Outdoor Channel, 2015-2022, 8 seasons (Current)

Producer & On Camera Expert. *Man vs History*, History Channel & Matador Productions, 2020 (aired 2021)

Co-Host. *Master of Arms*, Discovery Channel & Matador Productions, 2018. 1 season

Consulting Producer. *Brothers in Arms*. History Channel, 2018. 1 season.

On Camera Expert. *Rob Riggle: Global Investigator*. Discovery Channel, 2020.

Recurring Expert. *Mysteries at the Museum.* Travel Channel. 2017-2019

Casting Consultant. *Gun Shop Project,* Vice Media & Cineflix Productions, 2020

On Camera Expert. *American Genius Colt V. Wesson*. National Geographic. 2015

*Also appears on:* Public Broadcasting Service, National Public Radio, Travel Channel, National Geographic, Popculture.com, Media, Entertainment, Arts, World Wide (MEAWW), Women's Outdoor News, Outdoor Life, Shooting USA, Gun Talk Media, National Shooting Sports Foundation, various firearms related podcasts.

*Has been profiled by: The Bourbon Review, Recoil Magazine, Outdoor Life Magazine, Guns.com, Blue Press Magazine, and others*

**Selected Lectures/Panels:**

Guest Speaker. Gun Rights Policy Conference, October 2022

Guest Speaker. Second Amendment Foundation Legal Scholars Forum, September 2022

Guest Lecturer and Panelist. AmmCon. Second Amendment Foundation, October 2021

---

EXHIBIT 1

1 | Guest Lecturer. Armed for Revolution. Royal Armouries, September 2021

2
3 | Guest Speaker. Preserving Firearms Heritage. Gun Rights Policy Coalition, 2020

4 | Guest Lecturer. Art of Collecting. Nevada Museum of Art. January 2020

5
6 | Panelist. Firearms and Museums in the 21st Century. National Council for Public History. March 2019.

7
8 | Scholars Roundtable. Coltsville National Historic Site. Organization of American Historians & National Park Service, March 2019.

9
10 | Forum Speaker. The Art of the Hunt: Embellished Sporting Arms in America. New Orleans Antique Forum, August 2018

11
12 | Guest Lecturer. Unloading the Gun: Firearms, History, and Museums. Yakima Valley Museum, June 2018

13
14
15 | Guest Lecturer. Perpetrators and Protectors: The Mob, The Law and Firearms, National Museum of Law Enforcement and Organized Crime (Mob Museum), September 2017

16
17 | Organizer. Arsenals of History: Firearms and Museums in the 21st Century, Buffalo Bill Center of the West, July 2017

18
19 | Lecturer. The Cody Firearms Museum, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

20
21 | Moderator. Addressing the Press: Firearms and the Media, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

22
23 | Moderator. Forming an Association: Legitimizing Firearms in Academic Study, Arsenals of History Symposium, Buffalo Bill Center of the West, July 2017

24
25 | Guest Lecturer. Displaying the "Politically Incorrect," C.M. Russell Museums and Complex, May 2017

26
27 | Guest Lecturer. Displaying the "Politically Incorrect," Blackhawk Museum, March 2017

28 | Panelist. Curator Roundtable, Firearms and Common Law Symposium, Aspen Institute, September 2016

EXHIBIT 1

Guest Lecturer. Displaying the "Politically Incorrect," Canadian Guild of Antique Arms Historians, April 2016

Guest Lecturer. The Cody Firearms Museum Renovation, American Society of Arms Collectors, September 2016

Guest Lecturer. From Protector to Perpetrator: Demystifying Firearms in History, Art Institute of Chicago, November 2015

Guest Lecturer. Winchester '73: The Illusion of Movie Making, Winchester Arms Collectors Association, July 2014

Guest Lecturer. Unloading the Six Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts, Buffalo Bill Center of the West, 2011

**Selected Firearms Exhibitions:**

Curator/Project Director. *Cody Firearms Museum Renovation.* Buffalo Bill Center of the West. 2019

Co-Curator. *The Art of the Hunt: Embellished Sporting Arms from 1500-1800.* Houston Museum of Natural Sciences. March 2019

Curator. *Glock Makes History: The Birth of the Polymer Handgun Market.* Buffalo Bill Center of the West. June 2016

Guest Curator. *Designing the American West: The Artist and the Inventor.* C.M. Russell Museum & Complex. February 2016

Curator. *The Greatest Gun Designer in History: John Moses Browning.* Buffalo Bill Center of the West. December 2015

Curator. *Journeying West: Distinctive Firearms from the Smithsonian Institution.* Buffalo Bill Center of the West. December 2015

Curator. *The Forgotten Winchester: Great Basin National Park.* Buffalo Bill Center of the West. June 2015

Curator. Western Firearms Gallery, including *Shoot for the Stars: The Tradition of Cowboy Action Shooting.* Buffalo Bill Center of the West. April 2015.

EXHIBIT 1                    APP. 701
17cv1017

Curator. *Steel Sculptures: Engraving Individuality from Mass Production*. Buffalo Bill Center of the West. Winter 2014.

**Certifications:**

Certified Firearms Instructor, Basic Pistol, 2016

Certified Firearms Instructor, Personal Protection Inside the Home, 2016

Well Armed Woman Instructor Certification, 2016

Museum Studies Certification, University of Delaware, 2013

**Grants:**

National Endowment for the Humanities, 2017

Institute of Museum and Library Services, 2017

Gretchen Swanson Family Foundation, 2015, 2016, 2017, 2018, 2019, 2020

Kinnucan Arms Chair Grant, 2012

**Fellowships:**

Firearms Curatorial Resident, Buffalo Bill Center of the West, 2013

Edward Ezell Fellowship, University of Delaware, 2012

Buffalo Bill Resident Fellowship, Buffalo Bill Center of the West, 2011

**Committees and Memberships:**

Board Member – Walk the Talk America

Founding President – Association of Firearms History and Museums
- Academic association for the study of firearms history in United States

EXHIBIT 1

APP. 702
17cv1017

Founder – Arsenals of History Symposia Series
- First international symposia series on the academic study of firearms

Spokesperson – NSSF/AFSP Suicide Prevention and Project ChildSafe Programs

American Alliance of Museums – Member

American Society of Arms Collectors – Member

Winchester Arms Collectors Association – Honorary

Remington Society of Arms Collectors – Member

Weatherby Collector's Association –Life Member

**Publication History**

Editorial Board – Armax Journal

**Selected Articles:**

Author. "Guns and Mental Health." *Recoil Magazine,* Upcoming

Author. "Colt Single Actions and Safety." *Armax Journal,* October 2021

Author. "Guns and Partisan Politics." *Recoil Magazine*, January 2021

Author. "Feminism & Firearms." *Recoil Magazine*, Summer 2020

Author. "Burton Light Machine Rifle." *Recoil Magazine*. October, 2019

Founder/Editor/Author. Arsenals of History Journal, Annual Publication, 2018 - Present

Author. "It's Complicated: The Short Answer to Firearms, Museums and History. *Journal of the Early Republic – The Panorama*, September 2018.

Contributor. "Firearms Curator Roundtable" *Technology & Culture Journal*, August 2018

EXHIBIT 1

APP. 703
17cv1017

Author. "Displaying the 'Politically Incorrect.'" *CLOG X Guns*: Chicago, IL, September 2017

Author. "Does History Repeat Itself? The Smith & Wesson LadySmith." *CLOG X Guns:* Chicago, IL, September 2017

Author. "Renovating the Cody Firearms Museum." *International Committee of Museums and Collections of Arms and Military History Magazine.* Issue 17, May 2017. Pg. 38 - 41

Author. "Renovating the Cody Firearms Museum." *American Society of Arms Collectors Journal.* Fall 2016.

Author. "Glock Exhibit Opening." *Glock Magazine.* Bang Media. Annual 2017

Author. "The 28 Most Notable Guns from Remington's 200-Year History." *Outdoor Life Magazine.* Bonnier Corporation, 2016

Author. "Cassie Waters: Businesswoman of the Old West." *Guns of the Old West.* Harris Publications, Spring 2016

Author. "Making History: GLOCK Pistols at the Cody Firearms Museum" *Glock Magazine.* Harris Publications. Annual 2016

Author. "Pocket Pistols: 10 Seminal Guns from the Past 300 Years." *Pocket Pistols.* Harris Publications. 2016

Author. "The Gun that Won the Western and the Unforeseen Stars of *Winchester '73*" *Guns of the Old West.* Harris Publications.

Author. "Frontier Profile: Jedediah Strong Smith" *American Frontiersman.* Harris Publications

Author. "Frontier Legend John Johnston." *American Frontiersman.* Harris Publications

Author. "The Guns of John Johnston." *American Frontiersman.* Harris Publications

Author. "Annie Oakley VS Lillian Smith: A Female Sharpshooter Rivarly." *Guns of the Old West.* Harris Publications, Spring 2015

Author. "Icons and Has-beens." *American Handgunner.* FMG Publications, 2014

EXHIBIT 1

Author. "Triggering Memory: American Identity in *Cowboys and Aliens*." *Points West*. Spring 2012

Author. "Unloading the Six-Shooter: Disassembling the Glamorization and Demonization of Firearms in the Arts." *Points West*, Fall 2011.

**Columns:**

Author. Old School Series. *Recoil Magazine*

Author. Flashback. *Concealment Magazine*

Author/Brand Ambassador. *The Bourbon Review*.

Author. *American Association for State and Local History*. Summer 2019

Author. "Weird West: Fact or Fiction" *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications)

1st Assault Rifle

Colt VS Winchester Revolver

Did Winchester Really Win the West?

Oliver Winchester's Lever Action Shotgun

Remington Cane Gun

Author. "Cowboy Action Round Up." SHOT Show New Products. *Guns of the Old West*. Athlon Outdoors (formerly Harris Publications). 2015, 2016, 2017

**Reviews:**

Reviewer: Edited by Jonathan Obert, Andrew Poe, and Austin Sarat. Oxford: Oxford University Press, 2018. *Journal of Technology & Culture*, Fall 2019

Author. "Everybody Loves an Outlaw: Taylor's Outlaw Legacy Revolver Series." *Guns of the Old West*. Harris Publications

EXHIBIT 1

APP. 705
17cv1017

1  Reviewer: Richard Rattenbury. *A Legacy in Arms: American Firearms Manufacture,*
2  *Design and Artistry, 1800-1900. Chronicle of Oklahoma,* Spring 2016

3
4  **Selected Blogs & Vlogs:**

5  Recoil Magazine

6  Weekly video series beginning October 2017 to Present
7
8  Dillon Precision
                    Historical Videos on Ammunition (Upcoming)
9
10  Outdoor Life
                 Top 10 Guns in American History
11               Guns of the Old West: 10 Iconic Firearms and the Legendary Men (and
12  Women) Who Shot Them
                 13 of the Biggest Gun Fails in Recent Firearms History
13               Gun of the Week:
14               John Martz Luger
                 Apache Revolver
15               German Frei Pistol
16               King Louis XV Embellished Blunderbuss
                 Armalite AR-17 Shotgun
17               Getting the Christmas Goose with a Goose Rifle & Cutaway Suppressor
18               Mossberg Brownie
                 Wesson & Leavitt Belt Revolver
19               William Harnett and the Faithful Colt 1890
20               Winchester Model 1894 Lever Action Rifle
                 Ruger Semi-Automatic Pistol, 1 of 5,000
21               Herb Parson's Winchester Model 71 Lever Action Rifle
22               Lincoln Head Hammer Gun
                 American Trap Gun
23               Browning Brother's Single Shot Rifle Patent
24               Feltman Pneumatic Machine Gun
                 U.S. Springfield-Allin Conversion Model 1866 Trapdoor Rifle
25               Winchester Wetmore-Wood Revolver
26               Webley-Fosbery Automatic Revolver
                 Hopkins & Allen XL3 Double Action Revolver
27               DuBiel Modern Classic Rifle
28               Colt Model 1877 "Thunderer" Double Action Revolver
                 Tom Tobin's Colt Model 1878 Frontier Revolver

EXHIBIT 1

| | |
|---|---|
| 1 | Walch 10-Shot Double Hammers Pocket Revolver |
| 2 | Winchester Model 1887, Serial No. 1 |
| | Deringer vs Derringer |
| 3 | The Forgotten Winchester 1873 of Great Basin National Park |
| 4 | Range 365 |
| | To the One Who Got Away |
| 5 | Gun Review: New Glock 19 Gen 5 |
| 6 | Ain't She a Pistol? 10 Historic Gun Ads Featuring Women |
| | National Shooting Sports Foundation |
| 7 | The Gun Vault: |
| 8 | Winchester 1873 Found in Great Basin National Park |
| | Col. Jeff Cooper's Colt MK IV Series 80 |
| 9 | 500+ Year Old Firearms, Matchlocks, Flintlocks |
| 10 | U.S. Presidents Guns |
| | Cross Dominance Shotgun |
| 11 | Herb Parson's Winchester Model 71 Rifle |
| 12 | Audie Murphy's Colt Bisley Revolver |
| | 4 Gauge Winchester Wildfowler |
| 13 | Pocket Pistols |
| 14 | Henry Ford's Winchester Model 1887 Lever Action Shotgun |
| | Tom Knapp's First Gun |
| 15 | Buffalo Bill Cody's Winchester 1873 |
| 16 | Colt Model 1861 Navy Serial No. 1 |
| | Cassie Waters' Hopkins & Allen XL3 Revolver |
| 17 | Glock 17 |
| 18 | |
| | The Truth About Guns |
| 19 | Presidential Presentation Rifles |
| 20 | Factory Cut-Away M16A1 |
| | 1854 Smith & Wesson Repeating Rifle (Serial Number 8) |
| 21 | Winchester World's Fair Model 1866 Deluxe Sporting Rifle |
| 22 | Raymond Wielgus Collection |
| | Gastinne-Renette Muzzleloading Percussion Target Pistols |
| 23 | Oliver Winchester's Jennings Repeater |
| 24 | Henry Ford's Winchester Model 1887 |
| | Winchester Model 1866 Musket in .44 Rimfire |
| 25 | English Wheellock |
| 26 | Southern Belle American Longrifle |
| | Annie Oakley's Model 1892 Smoothbore Rifle |
| 27 | Catherine the Great of Russia's Blunderbuss Gift to King Louis XV of France |
| 28 | Color Case-Hardened GLOCK 43: Merging the Old West with the New |
| | Buffalo Bill Center of the West – Unloading the Myth |

EXHIBIT 1

APP. 707

17cv1017

1     The Cody Firearms Museum – Yesterday, Today, and Tomorrow

2     Guns of the Week – Christmas List

     Guns of the Week: December 15-19

3     Guns of the Week – The Cody Firearms Museum

4     Guns of the Week – German Firearms

     Guns of the Week – Scheutzenfest

5     Guns of the Week – Air Guns

     Guns of the Week – Early Firearms Law

6     Guns of the Week – October 13-17

7     Guns of the Week – Ingenious Engineering

     Guns of the Week – Remington – Smoot

8     Guns of the Week – September 22-26; 15-19; 8-12

9     CSI: Firearms Museum Edition

10    Confessions of a Gun Historian

     Art Guns: Aesthetics Over Function?

11    What Good's a Gun Without a Firing Pin?

12    Gun Installations, Trials & Tribulations

     A True Test of Marital Trust and Love

13    Remembering Tom Knapp

14    Cody Firearms Museum Goes Hollywood

     When Will My Firearms Go On Display

15    What's Your Cody Firearms Museum

16    To Vlog or Not to Vlog

     We Don't Just Have Old Guns in Our Museum: SHOT Show 2014

17    Taking a Staba at Displaying More Guns

18    "Hi Yo Silver" Cook Away! Lone Ranger Display

     The Shooting Wire

19    Winchester's 150th Anniversary Website

20    Remington's 200th Anniversary Website

21

22

23

24

25

26

27

28

EXHIBIT 1

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF ASHLEY HLEBINSKY IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 1**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

## DECLARATION UNDER PENALTY OF PERJURY OF TOM GIVENS

Tom Givens, under penalty of perjury, deposes and states as follows:

1. My name is Tom Givens. I am giving this declaration in support of the Plaintiffs' reply to the District of Columbia's opposition to application for preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. Since 1996 I have operated Rangemaster, a firearms training company. I began teaching defensive firearms use in 1975 on a part-time basis, and began teaching full time in 1996.

3. Doing business as Rangemaster, I conduct training all over the United States. In 2022, I conducted courses in Pennsylvania, Texas, Arkansas, South Carolina, Georgia, Tennessee, Florida, West Virginia, North Carolina, Iowa, Louisiana, and Ohio.

4. I have been retained as a Firearms Expert in cases in Federal Courts in Alaska, Kansas, Tennessee, and Illinois. I have served as an Expert Witness in these matters in state courts in Illinois, Alaska, Ohio, Mississippi, and Tennessee.

5. I have been paid by the government to conduct training for the FBI Firearms Training Unit at the FBI Academy in Quantico, VA; for the Drug Enforcement Administration's firearms instructor cadre for South Florida; for the US Marine Corps High Risk Personnel program's cadre; and for multiple military units.

6. I have graduated from numerous defensive firearms training courses, including
NRA Law Enforcement Firearms Instructor School
NRA Law Enforcement Tactical Shooting Instructor School

FBI Police Firearms Instructor School
Gunsite, API 499
And many others.

7. I have been asked to provide my opinion concerning the utility for
lawful purposes of what the District of Columbia refers to as high-
capacity ammunition feeding devices, defined as an ammunition
feeding device with a capacity in excess of 10 rounds. This
designation is not a standard firearms term, however, as discussed
below.

8. A "standard capacity magazine" is the magazine the firearm was
designed to use, and which originally was shipped in place in the
firearm when the factory shipped the firearm to a dealer. In the case
of handguns designed for personal defense, some examples would
include:
The Glock 17, originally designed and shipped with 17 round
magazines;
The Glock 19, originally designed and shipped with 15 round
magazines;
The Smith & Wesson M&P, originally designed and shipped with 17
round magazines,
The SIG P365 Macro, a very compact self defense pistol, originally
designed and shipped with 17 round magazines;
The Springfield Armory Prodigy, originally designed and shipped with
a 17 round magazine;
The Wilson Combat SFT9, originally designed and shipped with a 15
round magazine;
The Walther PDP, originally designed and shipped with 18 round
magazines;
and the Springfield Armory XD-M, originally designed and shipped
with 16 round magazines.
There are many others, but the point is that these are the standard
capacities for these handguns, all of which are 9mm pistols designed
for personal defense.

APP. 711

9. In these listed examples, the pistol is shipped from the factory with one of these "standard capacity" magazines inserted in the pistol, plus one or more additional magazines in the same box/case.

10. Magazines for one of those listed pistols, with a capacity less than that original design, are properly referred to as "reduced capacity magazines". A 17 round magazine for a handgun designed to function with a 17 round magazine, is not a "high capacity magazine", it is a "standard capacity magazine".

11. In the case of the self defense pistols listed above, there are available 10 round magazines. In my observation and experience in watching thousands of rounds fired through these magazines in classes I have taught or attended, these reduced capacity magazines are not nearly as reliable as the originally designed standard capacity magazine. To fit into the pistol, lock in place, and feed, these reduced capacity magazines have to remain the same dimensions externally. Thus, capacity is reduced by blocking the inside of the magazine. I have seen numerous reliability issues with these reduced capacity magazines. Since the self defense pistol is an emergency piece of life saving equipment, compromising its reliability compromises the user's survivability.

12. The days of law enforcement officers routinely shooting fleeing suspects are long over in this country. At present, in law enforcement the pistol is seen as a last ditch emergency piece of life saving equipment, deployed to defend against a potentially lethal assault by a criminal suspect/assailant. Therefore, virtually every law enforcement agency in the US, including the District of Columbia, issues/authorizes pistols with magazines that hold 15-18 rounds of ammunition. The private citizen faces these exact same suspects/assailants, but without the luxury of body armor, direct radio contact with back-up officers, a long gun in a car rack, and armed partner(s). The armed citizen is truly on his/her own.

13.	The purpose of the standard capacity magazine is not to allow the user to shoot more. It's purpose is to sustain the user with an operable pistol long enough to get to the end of the incident without having to reload. Using regular concealed carry equipment and clothing, even a highly skilled and highly trained shooter needs around 3 seconds to reload an empty semiautomatic pistol, utilizing a pre-loaded spare magazine. In a close range defensive shooting, having an empty, thus inoperable, handgun for 3 seconds is essentially the same as being unarmed. In that 3 second time period, the defender cannot fire his weapon. In that same 3 second time period, the attacker can fire numerous shots or close the distance and strike with an impact or bladed weapon. The purpose of the standard capacity magazine is not to let one shoot more, it is to have to reload less.

14.	In my book, <u>Concealed Carry Class,</u> the statement that the magazine is not part of the pistol has been taken out of context by the District of Columbia. I was trying to have the reader understand that magazines are a consumable, non-permanent part of the pistol. To practice defensive shooting , a user needs multiple magazines. Magazines wear as they are used, and at some point become unserviceable. At that point they must be replaced. The user should have magazines that are dedicated to defensive use/carry, to ensure their reliability, and other magazines dedicated to training and practice, where they will sustain more wear.

15.	The magazine is the only part of the pistol that is routinely removed by the user. It is removed from the pistol every time the handgun is unloaded or reloaded. It is however, still very much a part of the pistol, as the pistol cannot function without the magazine. This is why every major manufacturer ships the pistol with a magazine in place in the magazine well of the pistol. The semiautomatic pistol is not really fully assembled without a magazine in place, so it is shipped with a magazine in place. There may be one or more additional magazines in the box/case with the handgun, but there will be a magazine in the handgun when it is shipped for sale. All promotional photographs of handguns in catalogs, print advertising,

and other media will show a magazine in place in the pistol, so that the consumer can see the fully assembled, ready for action state of the handgun.

16.     As stated earlier, the standard capacity magazine does not allow one to shoot more, it allows one to continue defending himself if more than a few shots are required. In my observation of many, many private citizen self defense shootings, hits to non-involved parties are very rare. Private citizen self defense shootings are not the running gun battles, with suspects and officers moving and maneuvering while firing at each other, that produce a lot of misses. Private citizen self defense shootings, however, often do involve two or even more armed assailants, and those assailants may include gang members, mentally unstable persons, and persons heavily under the influence of alcohol or illicit drugs. These factors make more rounds in the self defense pistol extremely desirable, and perhaps the difference between life and death. This is why common self defense pistols are supplied by the factory with 15-18 round magazines.

17.     In sum, magazines holding in excess of 10 rounds have been in use for almost one hundred years. They are commonly possessed and used by private citizens and law enforcement officers alike. They are an integral part of an emergency life saving equipment system. Without the magazine the pistol was designed to use, its utility and value as an emergency piece of life saving equipment is diminished, placing the user at higher risk of injury or death in a self defense event.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.


Dated:   December 11, 2022                    *Tom Givens*

                                              Tom Givens

**DECLARATION UNDER PENALTY OF PERJURY OF BRETT HARNISH**

Brett Harnish, under penalty of perjury, deposes and states as follows:

1. My name is Brett Harnish. I am composing this declaration in support of Plaintiffs' reply to the District of Columbia's opposition to the application for a preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. My relevant background. I served approximately six years active duty in the United States Marine Corps, and approximately two additional years of service in the Active Reserves. I served as an enlisted Marine in the infantry and as a commissioned officer in artillery. I then worked as a United States Border Patrol Agent for approximately six years. Following that I worked as a police officer for the Town of Herndon, Virginia, for approximately seven years. I currently work for a federal government law enforcement agency as a firearms instructor. I've held that position for almost four years. I have almost twenty-five years of professional firearms experience.

3. Since 2020 I have operated Justified Defensive Concepts, LLC (JDC). JDC provides safe, effective, professional firearms training to law abiding United States citizens looking for legitimate defensive firearms training. JDC offers training for safety, performance, competition, hunting, and legally justified use of firearms for self-defense. JDC is incorporated in Virginia as a limited liability company.

4. Prior to my founding of JDC, I worked as the lead firearms instructor for Green Ops, another firearms training company located in Northern Virginia. I worked for Green Ops for more than five years. Between JDC and Green Ops,  I have provided realistic and safe firearms training to thousands of law-abiding United States citizens without incident. During my work for the government, I have trained thousands of law enforcement and military personal. A common thread through all my employment is that I have earned and worked in the job classification of firearms instructor in all the above listed work experiences (this includes the Marine Corps, the Border Patrol, Herndon Police Department, and my current employment). In sum, I have more than twenty years of experience as an operational firearms instructor for law enforcement and military professionals as well as for conscientious and diligent private individuals.

APP. 715

5. I have been asked to provide my opinion regarding the utility for lawful purposes, including self-defense, of what the District of Columbia refers to as "high-capacity ammunition feeding devices, defined as ammunition feeding devices with a capacity to hold in excess of 10 rounds of ammunition. That designation is not a standard firearms term, as referenced below.

6. There are standard capacity magazines, which are the magazines manufacturers supply with a new firearm. These standard capacity magazines often are capably of holding significantly more rounds than ten rounds. In fact, many of the bestselling pistols today can hold fifteen or more rounds of ammunition. This has been true for quite a significant amount of time. The Browning High Power Pistol has been in the United States commercial market since 1954 and has a capacity of fifteen rounds. The Mauser C96 Broomhandle which had an ammunition feeding device of ten rounds was commercially available in the United States in 1901. Variants of that firearm had the capability of accepting magazines holding in excess of 10 rounds. Capacity is not the driving force in firearm manufacture and selection. Technology and capability are and will remain so. Capability and capacity, however, go hand in hand as additional capacity positively reflects on capability. If technology could facilitate larger capacity magazines in common sized pistols, it would happen. The widespread market acceptance of the Sig Sauer P365 is a prime example of this. Sig Sauer was able to design a relatively small size pistol with significant capacity. The small size of the pistol allows for more easily concealing the firearm, yet provides significantly more ammunition capacity than comparably sized guns. End users wisely want more capability, including capacity. Technology has been the engine of change through the history of firearms development.

7. The Beretta  M9 was adopted by the United States Armed Forces as the official service pistol in 1985. The Beretta M9 or commercially the Beretta 92 has a standard capacity of fifteen rounds in the magazine. Many other popularly sold pistols in the United States have offerings in defensive use pistols that are at least fifteen rounds of ammunition capacity or more. Glock, Sig Sauer, Smith & Wesson, Walther, Heckler & Koch, and Ruger are but some of the quality manufactures that sell pistols in the United States with standard capacities of fifteen, seventeen, or more rounds.

8. A consideration about utility. Pistols are not generally great stoppers of the human body, particularly the human body of a violent criminal actor

2

performing an illegal act of extreme violence amped up on adrenaline, alcohol, drugs, or rage. More than often, it will take several well-placed shots to stop a violent criminal actor from furthering their determined act of illegal interpersonal violence. Legal use of force is permitted for self-defense or defense of others. Force is applied to stop threats. One threat is not necessarily stopped by one bullet. It can and often does require several well-placed shots to put a stop to a violent criminal actor's potentially lethal or seriously harmful assault. That is just one threat. Several threats of violent criminal actors can be involved simultaneously. A firearm with the capacity to address multiple threats is certainly prudent; it may even be downright necessary to effectively stop multiple violent criminal actors. Criminals can, and certainly do work in pairs or even larger groups to achieve their illicit objectives. News reports are awash concerning such incidents.

9. Pistols with the capacity to hold ten rounds, or more than ten rounds, have been common for well over sixty years. That type of pistol is selected by law enforcement and military agencies in the United States for the practicality and performance they provide to the organization, but more importantly the capability they provide to the end user. When faced with a life threatening violent attack, good people want and deserve a good option to stop a criminal act of deadly violence. Pistols holding more than ten rounds in their ammunition feeding device are in common use in this country for self-defense and other lawful purposes. This type of pistol with this type of ammunition feeding device has been in common use in the United States for more than seven decades. The reason why is obvious. A quality reliable pistol with more than fifteen rounds of ammunition in it is 1) a strong deterrent, and 2) an effective tool to stop a violent criminal attack.

10. Law enforcement agencies and the Armed Forces of the United States have made weapon acquisitions on the criteria mentioned above for at least the last thirty-seven years. Why wouldn't a prudent and well-informed law-abiding United States citizen do the same? In my experience as a certified firearms instructor and law-abiding business owner, they do. The most often used pistols in my classes are Glock, Smith & Wesson, Sig Sauer, Heckler & Koch pistols chambered in 9mm and having ammunition capacities of at least fifteen rounds. The Glock 19 (fifteen round standard magazine capacity) and the Glock 17 (seventeen round standard magazine capacity) are by far the most popular firearms I see in my classes.

11. In conclusion, pistol magazines (or ammunition feeding devices) of capacity that exceed ten rounds are both common and extremely practical for

legitimate self-defensive purposes. In my experience magazines of fifteen rounds or more are extremely common and are in general widespread use. Those uses are for far more than just lawful self-defense. Competition, hunting, and recreation activities drive millions of Americans to regularly use firearms. In 2021, more than 18 million firearms and billions of rounds of ammunition were legally sold in the United States in legitimate interstate commerce. This commerce benefits the preservation of wildlife through the Pittman-Robertson Act. One of the bestselling pistols is the Glock 19. The Glock 19 has a standard magazine capacity of fifteen rounds. Pistols that have ammunition feeding devices are not merely popular for the ammunition capacity, but more so for the significant capability they provide to the individual user.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information, and belief.

Dated: _January 3rd, 2023_                    _Brett Harnish_
                                               Brett Harnish

**DECLARATION UNDER PENALTY OF PERJURY OF JOHN MURPHY**

John Murphy, under penalty of perjury, deposes and states as follows:

1. My name is John Murphy. I am giving this declaration in support of the Plaintiffs' reply to the District of Columbia's opposition to application for preliminary injunction in case number 22-cv-2256, *Hanson v. District of Columbia* (DC District Court).

2. My background is as follows. I served 10 years in the United States Marine Corps as an infantryman, security specialist and intelligence analyst. After that I was employed by the Defense Intelligence Agency for 15 years, serving as terrorist weapons and tactics analyst.

3. Since 2007 I have operated FPF Training providing defensive firearms training to the public. And since retiring from the government, FPF Training has been my full-time vocation. FPF Training offers training in handguns, shotguns, and emergency medical treatment of traumatic injuries, including injuries one might receive in a criminal assault.

4. Although FPF Training is headquartered in Virginia, I provide training throughout the United States. Beside various courses in Virginia, I currently have courses scheduled for the first half of the 2023 in the following states: Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Idaho, Maine, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Texas and Utah. For a detailed listing of courses available through FPF Training, please see our website: www.fpftraining.com. I also host some of the Nation's top firearm instructors at our Northern Virginia locations, including Tom Givens, Massad Ayoob, Cecil Burch, Wayne Dobbs, Greg Ellifritz, John Hearne, Tim Kelly, Karl Rehn and Tatiana Whitlock.

5. I have been asked to provide my opinion concerning the utility for lawful purposes of what the District of Columbia refers to as high-capacity ammunition feeding devices, defined as ammunition feeding devices with a capacity in excess of 10 rounds. That designation is not a standard firearms term, however, as discussed below.

1

6.  There are standard capacity magazines, which are the magazines that manufacturers supply with a new firearm. For example, the extremely popular Glock 19 compact handgun comes standard with 15 round magazines. The full-size Glock 17 handgun, standard issue to DC Police, comes standard issue with 17 round magazines. There are also what is often called California compliant magazines, which are limited to 10 rounds and are thus legal within the District of Columbia. There are also magazines produced capable of holding more rounds than those magazines normally supplied with a stock firearm. An example might be the 30 round stick magazine made by ETS for the Glock 9 mm series, including the Glock 19 and 17 discussed above. Similarly, AR-15 variant rifles come standard with 30 round magazines. However, AR-15 compliant magazines holding 40, 60 or even 100 rounds are available, though often having reliability issues. The District nonetheless restricts the handful of citizens who legally own AR-15s to 10 rounds.

7.  Standard capacity magazines, including those holding more than 10 rounds, are used and useful for a variety of legal purposes. From my experience and observation they are overwhelmingly used by my students and students in classes I have attended in the course of self-defense training. In a typical class most students will come with a firearm capable of holding more than 10 rounds. In our classes we will have students shoot several hundred rounds a day. Having adequate capacity allows students to train at a high pace without having to spend substantial downtime reloading magazines. Additionally, while some students will come to class with many magazines, other students may have only the two or three magazines that come with the firearm. Restricting firearm owners to magazines holding only 10 rounds thus adversely affects their ability to train at their maximum capable level. Similarly, my experience and observation is that magazines holding in excess of 10 rounds are routinely used for target shooting and marksmanship training at public ranges.

8.  From my experience and observation, magazines holding more than 10 rounds are widely carried in public for self-defense by licensed concealed carriers. I agree with noted firearms instructor Tom Givens that the *minimum* magazine size for concealed carry should be 10 rounds and that larger capacity magazines are to be preferred. I carry a Glock 48 equipped with a 15 round capacity magazine. This is because based on my study of the subject, criminal

2

assaults often are conducted by multiple assailants, assailants fortified by alcohol and stimulants such as cocaine and PCP, and increasingly assailants are wearing body armor. Pistol bullets have limited stopping power compared to rifle rounds and shotgun ammunition.  There are documented instances of criminal assailants taking multiple hits and continuing their attack. Although the average amount of rounds fired in self-defense is usually less than 10, generally only two or three, we cannot prudently assume that the situation we find ourselves in will comport with the average. Additional rounds in the gun are an important insurance policy in the event of multiple attackers, chemically fortified attackers and attackers using body armor. Where lives are at risk in a criminal assault, it is not the odds that are important, it is the stakes.

9.  The idea that magazines holding more than 10 rounds are most useful in the military or in a law enforcement context does not imply they are not useful for civilian self-defense. The assailant a citizen faces in a criminal attack is the same person law enforcement is tasked to arrest. Moreover, with respect to the military, most soldiers and marines do not even carry handguns, but rather fully automatic machine guns, such as the M-16 rifle or the M-4 carbine. In any event, as the preamble to the Second Amendment makes clear, a primary byproduct, if not purpose, of an armed populace is protection of freedom from external and internal threats. So such magazines are certainly useful for the maintenance of an armed citizenry available for militia service in the event needed to assist in combating an invasion or insurrection. Although the core of the Second Amendment is individual self-protection, the preamble to the amendment makes clear this civic purpose as well.

10. Having multiple magazines, although a good idea, is not a substitute for adequate magazine capacity. One of the reasons for that is that persons often get shot in the hand or arm in the course of a gun fight. Once they have lost the use of a hand or arm, reloading one handed is a time consuming process, assuming the victim has even learned to perform one-handed reloads. Every second his or her gun is out of action is a time when he or she is rendered defenseless while being shot, stabbed, bludgeoned, stomped, or stuck by an assailant or group of assailants. Even if both hands are functional, reloading could be problematic if the victim is physically entwined with his or her attacker(s) as will often be the case in a robbery, rape or beatdown.

APP. 721

11. This is an especially important issue for home defense. A homeowner awakened at night needs several pieces of equipment, including the firearm, telephone and a flashlight. That is already three items for two hands. Adding a fourth item such as a spare magazine becomes problematic. The homeowner is likely to be wearing night clothes with no pockets, or even less. There is likely not going to be a place where he or she is going to be able to carry spare ammunition.

12. Moreover, many persons who carry guns for self-protection do not carry spare magazines or cannot easily access a spare magazine. Think of the lady wearing a dress needing to carry her firearm in a separate compartment of her purse. Digging around for a spare magazine after having expended the capacity of her firearm could be a serious problem.

13. Standard capacity magazines and larger capacity magazines are also often used in shooting competition matches, such as those put on by the International Defensive Pistol Association and the United States Practical Shooting Association. These competitions help instill skills that are beneficial to keeping people alive in the event of a criminal assault.

14. There are other lawful uses for magazines in excess or 10 rounds, including for varmint control on farms and ranches, admittedly not something of high relevance to the District of Columbia, but nonetheless a widespread and lawful use of such items.

15. In sum, magazines holding in excess of more than 10 rounds are used and useful for self-defense and other lawful purposes. My experience and observation is that they are widely possessed and used for these lawful purposes by firearm owners throughout the Nation.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

Dated: _12 Dec 2022_

John Murphy

4

**APP. 722**

**DECLARATION UNDER PENALTY OF PERJURY OF GREG ELLIFRITZ**

Greg Ellifritz, under penalty of perjury, deposes and states as follows:

1.    My name is Greg Ellifritz. I am making this declaration for submission in Case Number 22-cv-2256, *Hanson v. District of Columbia* (D.D.C.).

2.    I am a retired police officer, having served 25 years with the Upper Arlington, Ohio police department. During my tenure, I spent 13 years as the full-time tactical training officer for the department. In that training position, I was responsible for developing and instructing all of the in-service training for our 55-officer agency. In addition to the training position, I also served as patrol officer, firearms armorer, bike patrol officer, bike patrol coordinator, sniper, and field training officer during the course of my career.

3.    I also instructed classes at the Tactical Defense Institute for 17 years and served as a lead instructor for TDI's ground fighting, knife fighting, active shooter, impact weapons, and extreme close quarters shooting classes.

4.    I hold instructor, master instructor, or armorer certifications in more than 80 different weapons systems, defensive tactics programs, and law enforcement specialty topics. In addition to these instructor certifications, I have successfully completed more than 4,000 hours of documented formal training with the leading firearms, empty hand fighting, and edged weapons instructors in the country. My training resume is attached herewith as Exhibit A and my CV is attached herewith as Exhibit B.

5.    Additionally I served as an adjunct instructor for the Ohio Peace Officer's Training Academy, teaching firearms, defensive tactics, bike patrol, knife defense, and physical fitness topics. I have also taught firearms and self defense classes at the national and international level through The American Society of Law Enforcement Trainers, The International Association of Law Enforcement Firearms Instructors, The Rangemaster Tactical Conference, and The Ohio Association of Chiefs of Police.

6.    I have a master's degree in Public Policy and Management with a research focus on criminal justice policy issues. I have written for several publications and websites including: *"The Firearms Instructor," "Ohio Police Chief," "Combat Handguns,"* Survivalblog.com," *"Concealed Carry Magazine,"* Primedia's *"Personal & Home Defense Annual," "Recoil Magazine,"* and *"American Handgunner."*

7.     Currently, I am a full time citizen defensive trainer, teaching classes across the country

8.     I have previously testified as an expert witness in the following cases:

State of Ohio v. Sgt. Aaron Bolton (Erie County Ohio Court of Common Pleas)

State of Ohio v. Officer Peter Burke (Cleveland Municipal Court)

Summit County Ohio Metroparks v. Ranger Jeff Axner (administrative action)

Wauseon PD v. Sgt, Kaleb Torbet (administrative action)

9.     I am also the author of the Amazon best-selling book *Choose Adventure- Safe Travel in Dangerous Places.*

10.     I have been asked to comment on certain matters raised in the Hanson case including citation to my 2011 article on handgun stopping power.

11.     ECF page 31 of the amicus brief submitted by the Brady organization cites my study that concluded that on average all defensive caliber ammunition required two rounds to incapacitate an assailant. From this statement Brady concludes that more than 10 rounds are not necessary for self-defense. Brady's conclusion poorly interprets the data in my study. My study only tracked hits, meaning rounds that impacted the assailant. It is true that most attackers stopped aggression after between two and three total hits. However, I did not track how many rounds the defenders fired to get those hits.

12.     A widely accepted statistic is that current police officers only hit with 30 percent of the bullets they fire. No one tracks the percentage of hits achieved by armed citizens. Some think the citizen hit rate is a little better than police because the encounters generally happen at closer distances than police gunfights. Others think that citizen hit rates are not as good as those of the police because they usually have less firearms training.

13.     If we held that the police and armed citizens hit at the same rate, the defender in my study likely fired an extra 2-3 rounds for each hit.. If we do the math, two hits plus 4-6 likely misses quickly depletes a 10-round magazine. We know that almost half of violent attacks involve more than one

attacker. Mathematically, a person firing at this rate would run out of ammunition in a 10-round magazine before the second attacker is incapacitated.

14.    Brady also (at ECF page 28) discusses a study of incidents reported in the NRA's Armed Citizens columns conducted by firearms instructor Claude Warner reporting that few incidents involved more than 10 rounds fired by the armed citizen. I am familiar with that study and would suggest that selection bias is a factor as it relates to any conclusion as to the need for more than 10 rounds for defensive carry.

15.    The Armed Citizen column is a compilation of short summaries of news incidents reported in the media. To keep the incident descriptions brief enough for the article format, it is likely that the editors of that column had to exclude any gunfights that are complex or difficult to describe. Those gunfights would likely have had more rounds fired.

16.    In addition, reference to the Armed Citizen column will show that almost all of the armed citizen reports are of armed citizen "wins." Very few had outcomes are ever cited. Thus, we don't know how many rounds the losers of those gunfights fired. More evidence of selection bias.

17.    In my career as a firearms instructor, I have taught an estimated 728 civilian firearms classes with thousands of students, ranging from introductory classes to advanced classes. Based upon my observation, with the exception of revolver classes where magazines are not employed, the majority of my students use magazines holding in excess of 10 rounds. So the assumption that magazines holding in excess of 10 rounds are not used or useful for armed self-defense is simply false.

18.    In addition, from my personal observation and experience magazines holding more than 10 rounds are widely used for other lawful purposes including target practice and competition.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: _12/15/22_                                   _____
                                                    (reg Ellifritz)

Exhibit A

# TRAINING BY TYPE

"*" *DENOTES INSTRUCTOR-LEVEL TRAINING*

## FIREARMS AND TACTICS (LIVE FIRE)

Ohio Peace Officers Training Academy

- Firearms Instructor (Revolver, Semi-Auto pistol and Shotgun) *

- Carbine/Assault Weapon Instructor *

Singleton International

 – Benelli Shotgun Instructor *

- MP-5 /UMP /Colt SMG /M-4 /M-16 Instructor *

Glock- Firearms Instructor Certification *

Strike Tactical (Henk Iverson)- Close Quarter Gunfight Survival Instructor *

Tactical Defense Institute

- Level 2 Handgun

- Level 3 Handgun

- Tactical Rifle I

- Tactical Rifle II

- Partners Tactics Class

- Precision Rifle I

- Concealed Carry Handgun


Defense Training International (John Farnam)

- Basic Defensive Handgun

- One-Handed Defensive Shooting

- Close Contact Fighting


Practical Shooting Academy (Ron Avery)

- Advanced Handgun Skills

- Tactical Handgun Skills


ASLET- Post-Shooting Procedures

**APP. 726**

Front Site- Introduction to the Submachinegun

Suarez International- Urban Combative Carbine

NRA LE Division- Tactical Shooting from Unconventional Positions

Columbus Police Department

- Basic SWAT School

- Police SWAT Sniper Course

Lethal Force Institute (Massad Ayoob)- Wounded Officer Return Fire

ASAA (Chuck Taylor)- Advanced Handgun Tactics

ATSA- National Tactical Invitational and Conference

Sigarms/Langdon Tactical- Handgun Performance Under Stress

Hoffner's Training Division- Ultimate Shotgun Training

Dave Spaulding's Handgun Combatives Training

Rob Leatham's Handgun Speed Shooting (repeated 2 times)

Shivworks- Extreme Close Quarters Concepts Levels 1-2

Trident Concepts (Jeff Gonzales)- Shooting on the Move

Chuck Klein- Instructing Instinctive Shooting Techniques *

Mike Janich- Point Shooting Progressions

LouKa Tactical- Understanding and Training the Female Shooter *

Northeastern Tactical (Michael de Bethencourt) - Secrets of the Concealed Carry Snub

Handgun Combatives- Optimal Snubby Skills with Ed Lovette

Sentinel Concepts (Steve Fisher)- Essential Carbine Employment

Keepers Concealment- AIWB Skills

TMACS (Pat MacNamara)- TAPS Pistol/Carbine-

Rangemaster

- Instructor Development Certification*

- Advanced Pistol Instructor*

- Defensive Shotgun

- Master Instructor Certification*

KR Training- Historical Handgun

Tactical Response Surgical Speed Shooting Summit*

FPF Training Street Encounter Skills and Tactics

**FIREARMS AND TACTICS (CLASSROOM)**

ASLET

- Current Issues in Firearms Training

- Gun Fitting for Female Officers

- Current Issues in Firearms Training

- Forensic Analysis of FBI Miami Gunfight

- Tactical Anatomy For Firearms Instructors

OPOTA

- Weapon Training and Requalification Instructor-*

- School Shooting Response

- School Shootings Prevention, Response, and Mitigation

Defense Training International

- Training Challenging Shooters

- Current Trends in Equipment and Firearms Training

Police Policy Studies Council

- Questionable Police Shootings

- Concealed Carry Instructor Development *

FBI- Advanced Firearms Instructor Training *

FAA- LE Flying While Armed Instructor *

CPD SWAT- Quick Action Deployment (Repeated 3 times)

Anchorage, AK Police Dept.- Analysis of Anchorage Sniper Shootings

FCSO- Wound Ballistics Workshop

Blauer Tactical Systems- SPEAR System as Related to the Gunfight

Strategos International- Prevailing in Low Light Conditions

Portland PD- Street Level Officer Rescues

Lasermax- Laser Sights for Liability Reduction

DEA- Active Vehicle Containment Measures

Westerville PD- Wound Ballistics Workshop

Shaykhet- "Shoot the bad guy while you dodge the bullet"

FLETC- Preparing Officers for the Aftermath of a Shooting

Rangemaster

    -How and Why Our Students Continually Win Fights

    - Active Killers

OPS- Tactical Eclecticism

ATK Ammunition- Wound Ballistic Workshop

KR Training

    - Handgun Shooting and Human Performance Factors

    - Correcting Common Shooting Errors

Firearms Safety LLC- Designing Partner Training Drills

Shivworks- Experiential Learning Lab (Repeated 3 times)

FPF Training- Street Encounter Skills

Agile Tactical- Ammunition Selection for Short-Barreled Handguns

Hardwire Tactical- "What Really Matters"

Vortex- All About Optics

Trident Concepts- Reducing Range Risk

Tim Herron Shooting- Throttle Control and Shot Calling


**<u>DEFENSIVE TACTICS</u>**

Columbus Police Department

- Controlled Force
- LAPD Arrest and Control System

OPOTA

- Weapon Retention/Shot Avoidance
- Defensive Tactics Instructor *
- Defensive Tactics Instructor Groundfighting Update Workshop *

Modern Warrior

- Tactical Jaw and Limb Control (Repeated 3 times)
- Firearms Retention and Disarming

- Confronting Multiple Assailants
- Firearms Alternative Survival Tactics

Krav Maga

- Combatives, Gun Retention and Disarming Instructor *
- Gun Defenses and Third Party Protection

Scientific Fighting Congress -

- Close Quarter Combat Seminar
- Gun Arm Grappling

RAD Systems- Basic Physical Defense Instructor *

TCM

- SPEAR Defensive Tactics

- The Human Weapon and the Economics of Violence

- Confined Space Combatives

ASLET- CLAMP Defensive Control Technique

TDI- Close Quarters Personal Control (Repeated 3 times)

NLETC- Lateral Vascular Neck Restraint Certification

ACM- Drawn Handgun Control Tactics

Strategos- Physical Conflict Resolution

FCSO- Cell Extraction Training

ApplePitt- Critical Combative Concepts

ARMA- Handcuffing Tactics and Liabilities

Shivworks- Managing Unknown Contacts (repeated 4 times)

Sharp Defense

- Weapon Retention and Disarms

- Multiple Opponents

Aprill Risk Consulting- Open Source Weapons Disarms (3X)

Immediate  Action Combatives

- Surviving the Knock Out Game

- Combative Use of the Choke

APP. 730

**GROUND FIGHTING**

Armor Holdings- Master Ground Defense Instructor *

Modern Warrior- Tactical Groundfighting Instructor *

RRB- Ground Stalling Tactics for Law Enforcement

Gracie Jiu-Jitsu (Royce Gracie)

- Law Enforcement Ground Fighting

- Advanced Ground Fighting

ASLET- Comprehensive Ground Defense Training

SODCS (Frank Shamrock)- Ground Control for Law Enforcement

1-on-1 Control- Cold Weather Ground Fighting

Krav Maga- Groundfighting and Edged Weapon Defense

FVTC- Enhanced Ground Handgun Retention

Danger Zone (Dan Severn)- LE Ground Fighting Seminar

OPOTA- Downed Officer Groundfighting Instructor-*

Relson Gracie- JiuJitsu Streetfighting Self Defense Seminar

Chitwood Brothers- Street Groundfighting


**EDGED WEAPONS**

American Bando Association (Dr. Gi) - Emergency Knife Defense

West Coast Academy (Steve Tarani)- Edged Weapons I

Tactical Defense Institute- Defensive Knife Class (Repeated 3 times)

Spyderco (Bram Frank) - Defensive Folding Knife

COMTECH (James Keating)- Defensive Knife Training

USA BANDO (Kevin Martin)- Knife Defense Class (Repeated 2 times)

COBD- Law Enforcement Knife Defense

Mike Janich    - Counter Blade Concepts Seminar

               - Basic Defensive Knife

Shivworks    - In Extremis Knife

               - Edged Weapons Overview

Kelly Worden- Wortac Knife Seminar

Steve Moses- Developing Defensive Knife Skills for Female Students

MDTS- Practical Small Knife Skills


**INTERMEDIATE WEAPONS**

OPOTA

- Individual Chemical Repellant Instructor *

- Specialty Impact Munitions Instructor *

- Distraction Devices Instructor *

- Conducted Energy Device Instructor *

ASP- Tactical Baton Instructor *

Taser International- Advanced Taser Instructor *

Spyderco MBC- Martial Stickcraft

Taser International M-26 and X-26 and X-26C Taser Instructor *

FNH- FN 303 Less Lethal Launcher Instructor *

ASLET

- Current Issues with Non-Lethal Alternatives

- Less-Lethal Panel of Experts

Pro-Systems- Mini Baton Instructor *

Martial Bladecraft- Self Defense with Improvised Weapons

Talon Group- Close Quarter Impact Weapon Instructor *

CTS- Flashbang and Stingball Instructor *

TASER- Taser Training and Product Update

SABRE- Law Enforcement O.C. Instructor *

Modern Warrior- High Efficiency Low Profile Baton Instructor *

UAPD- X2 Taser Operator Training

Point-Driven Training- Saps and Jacks

## GENERAL INSTRUCTIONAL SKILLS

OPOTA-

- Instructor Training Course *
- Confrontation Simulations Training Instructor *

ASLET

- Training and Equipping Female Officers
- Preventing Training Injuries and Death
- "Affective" Law Enforcement Training
- Understanding Gender Physiological Differences in Training

RedMan Training- Red Man 101 Instructor Certification *

LSE- Use of Force Instructor Training Symposium *

ILEETA- Deadly Force Training Expert Panel Discussion

Ohio EMA- Exercise Controller Training

CPD- Instructor Update Training *

GTS- Safe Dryfire Instructor *

FLETC- Designing Stress Exposure Training

Firearms Safety LLC- Tactical Decision Making Exercises for Armed Citizens

DVC Targets- Performance Under Fire: Myths, Realities, and Optimization (Repeated 2 times)

Citizens Safety Academy- Effective Assistant Instructors


## TERRORISM, ACTIVE KILLERS, and EMERGENCY RESPONSE

OPOTA

- Police Response to Weapons of Mass Destruction
- Terrorism Overview
- Weapons of Mass Destruction Awareness


Ohio Attorney General's Conference-

- Ohio Homeland Security Issues
- Terrorism and Weapons of Mass Destruction

APP. 733

ASLET

- Responding to Terrorism

- Tactical Emergency Medicine for Terrorist Incidents

- Counter-Terrorism for Patrol Officers

Columbus Police Department.

- Domestic Terrorism Response

- Responding to the Suicide Bomber

- Understanding the Terrorist Threat


New Mexico Tech EMRTC-

- Response to Terrorist Bombings Instructor *

- Understanding and Planning for School Bomb Incidents

- Prevention and Response to Suicide Bombings Instructor*


Archangel Group-

- Responding to School Violence- Beslan School Incident Debrief

- Multiple Terrorist Doctrine Training

- Terrorist Attack Strategies


Kentucky Dept. of Public Health-

- Bioterrorism Awareness Training

- Introduction to Terrorism


ILEETA-

- Fighting Terrorism on the 4th Generation Battleground

- Terrorism Intelligence and the Role of Law Enforcement

- Active Threat Response- Lesson from Mumbai

- Preparing for the Coming Terrorist Threat

- Preventing/Surviving a Large Disturbance

Loveland PD- Terrorism Identification and Interdiction

FBI National Academy- Fundamentals of Terrorism

Explosive Devices Technology- Bombs, Bomb Threats, and Explosive Devices

MSA- Gas Mask Fit Testing

OCPA- Terrorism Awareness and Prevention Train-the-Trainer *

Defense Intelligence Agency- Lessons Learned in the War on Terrorism

SUNY Albany- Terrorism, Preparedness, and Public Health

Triple Canopy- Techniques and Tactics of International Terrorists

State of Ohio- Ohio Homeland Security Symposium

OACP- Managing Crisis- Lessons Learned from the Amish School Shooting

LSU- Prevention and Deterrence of Terrorist Acts Instructor *

Team One- Disaster Survival Planning for Instructors *

OTOA- "Active Assailants" Conference

Last Resort Training- Active Killer Response

- Riot and Protest Survival- Repeated 2x

FBI

- Terrorism on the Street

- School Violence Threat Assessments

ASERO- Emerging Trends in Suicide Bombing

Sageman Inc.- The Terrorist Neo-Jihad in the West

UAFD- Protective Respirator Fit Testing Instructor *

ARMA Training- Dynamic Breaching Instructor *

Seal-Tac- Terrorist Methodology and Interdiction Tactics

Rangemaster

- The Active Shooter in the USA

- Surviving the Extreme Event

Dr. Martin Topper- Urban Terrorism

DIA- Global Jihadist Trends

**ARMORER TRAINING**

Glock- Glock Armorer Training (Repeated Four Times)

Smith and Wesson- Basic Autopistol Armorer

BenelliUSA- Benelli Shotgun Armorer Training (Repeated 2 times)

Colt- M-16, AR-15, and SMG Armorer (Repeated 2 times)

Springfield Armory- XD Pistol Armorer

FNH- FN 303 Less Lethal Launcher Armorer

Remington- 870 Shotgun and M700 Rifle Armorer

ILEETA- Maintaining and Upgrading AR-15/M-16 Rifles

Remington- Model 700 Rifle Armorer

Smith and Wesson- M&P Armorer

Rangemaster- Inspection and Maintenance of Weapons and Support Gear

AGI- Glock Armorer's Course


**OFFICER SAFETY AND SURVIVAL**

Calibre Press- Street Survival

Calibre Press- The Win

OPOTA- Police Involved Shootings

Killology Research Group- The Bulletproof Mind

ASLET- Behavioral Science and Officer Survival

Modern Warrior- Thinking Like a Cop Killer

H&K- Successful Female Officer Survival Training

ASLET- I'm Shot! Lessons Learned

NRA LEAD- Finish The Fight!

US Secret Service- Characteristics of Armed Individuals

FSRC- Dynamics of Police Shootings

ILEETA- Officer Safety Training for the Future

Agile Training- Excited Delirium

**LEGAL TOPICS**

Ohio CLE- OMVI Law

ASLET- Preparing to be an Expert Witness

Ohio AG Office- Conference on Law Enforcement

OPOTA- Legal Update Seminar

    - Concealed Weapons Legal Overview

    - Civil Liability for Police Officers

CPD- Terry Stops and Fourth Amendment Issues

LAAW- Legal Parameters of Intermediate Force

Ohio Ethics Commission- Ohio Ethics Law Update (Repeated 2 times)

State of Ohio- OVI Legal Update Training

UA City Attorney- Legal Update Training (Repeated 6 times)

ILEETA- Legal Aftermath of Police Use of Deadly Force

Means LLP- Best Practices in Law Enforcement Training

Ohio Ethics Commission- Ohio Ethics Laws

Massad Ayoob Training Group

    - Lessons Learned from Recent Cases- Repeated 4x

    - Expert Witness Testimony

    - Unconventional Wisdom: Why Some Defenses Fail

    - Explaining Controversial Acquittals

    - Deadly Force Instructor*

Rangemaster- Traveling Under the LEOSA and HR 218

ATSA- Legal Justification and Training Models

Force Science- Force Science Analyst Course

**GENERAL SUBJECT MATTER**

OPOTA

- Intro to Criminal Occult Activity-

- Special Issues in Domestic Violence Investigations

- Companion Animal Encounters

- Procedural Justice and Police Legitimacy

- 21st Century Policing

- Arrestee DNA Data Collections

- "Blue Courage"

- Responding to Missing Children

ASLET

- Lessons from the Diallo Tragedy

- Outlaw Motorcycle Gangs

Ohio Law Enforcement Training Center- IPMBA Police Cyclist

FCSO- Domestic Violence Update Training

UAPD- Ohio Basic Jailer Certification

ACIM- Missing Children Response for Patrol Officers

OSU- Crime Prevention through Environmental Design

OAG Conf- Lethality Assessment in Domestic Violence Cases

FCMC- Strangulation in Domestic Violence Incidents

On Point Tactical- Forensic Tracking

Covey- 7 Habits of Highly Effective Police Officers

Ontario Police College- Preventing Sudden In-Custody Deaths

FSRC- Current Use of Force Research

FCSO- Adult Gang Education Seminar

MCTFT- Body Language and Interview Techniques

ILEETA- Rapid Threat Recognition

Zulawski- Criminal Interview and Interrogation

Firearms Safety Training- Developing a Family Protection Plan

Bluff Dale Academy- Setting up a Church Security Program

LockSport- Basic Lock Picking Class

Reid Inc. Criminal Interview and Interrogation

Aprill Risk Consulting

    - Fatal Choices- What We Know about Victim Selection (Repeated 3 times)

    - The Five Ws of Risk

    - Psychological Survival for Hostages

    - Developing a Personal Risk Assessment Plan

Prepper Depot- Preparing for Things other than Violence

KR Training- Historical Handgun Trends


## CULTURAL DIVERSITY AND HUMAN RELATIONS

PATC- Street Spanish

CITY OF UA- Cultural Diversity Training

NCTC- Spanish for Law Enforcement Level I

Command Spanish- Spanish, Building Bridges, Saving Lives

UAPD- Project Lifesaver Certification

OPOTA

    - Financial Exploitation of the Elderly

    - Fraud against Seniors

    - Awareness of Human Trafficking

    - Responding to Human Trafficking

    - De-escalating Mental Health Crises

    - Victim's Rights Training

    - Helping the Victim through Understanding Trauma

    - Understanding Islam

    - Trauma Informed Policing

TEDX- Smart and Simple Ideas for Building Community

BRC- Human Energetic Connection Workshop

Caliber Press- "De-Escalation for Public Safety"

DIA- Personal Security During Foreign Travel

FSI/Lexipro- De-escalation- When and How to Make it Work

Lexipol- "Responding to Suicidal Subjects" webinar

Citizens Safety Academy- The Changing Face of the Firearms Industry

Jay Co- LE De-escalation for Civilians- 1 hour

## FITNESS AND HEALTH

OPOTA

- Physical Fitness Specialist *

- Managing Law Enforcement Stress

STT- Peak Performance Training

UMBC- Basic Critical Incident Stress Management

Ohio Attorney General's Conference- Managing Police Stress

ASLET- Fitness and Nutrition for Law Enforcement

LouKa Tactical- Sports Vision Training Exercises

Coretactix- Exercise Selection, Workout Structure, and Stretching Techniques

Velocity Fitness- Practical Police Kinesiology Instructor *

Tactical Strength Inc- Tactical Joint Mobility Exercises

Tactical Athlete Training- Functional Kettlebell Training

SETCAN- Tactical Fitness Instructor *

KBC- Level One Fitness and Kettlebell Instructor *

Crossfit- Level 1 Fitness Instructor *

Chad Waterbury- Strength, Muscle, and Power Training

## MEDICINE

Team Spartan- Emergency Trauma Management Instructor *

Gables Group

- Tactical Law Enforcement First Aid Instructor *

- Prevention and Treatment of Police Training Injuries

- Best Practices for LE Emergency Medical Training

**APP. 740**

TDI- Field Emergency Medicine Training (repeated 5 times)

DEA Emergency Self-Aid and Buddy Care for Instructors

Rangemaster

      - Combat Trauma Care for First Responders

      - Immediate Trauma Care for Fight Injuries

Lone Star Medics

    -   Field and Tactical Medicine Conference- (2x)

    -   Preparing for Medical Emergencies on the Range

    -   Emergency Airways

Techline Trauma- Tom Maniken Trauma Lab

The People's Dentist

      - Disaster Dentistry

      -Improvised Trauma Care

Patriot Nurse- Medical Preparations

IPICD- Recognizing Agonal Breathing and Other Breathing Problems

The Human Path- Plant Medicine and Herbal First Aid

SpiritQuest Sanctuary- Amazonian Plant Medicine- 32 hours

                -Andean Plant Medicine- 32 hours (2X)

ETS Consulting- Foot and Ankle Injuries

PEP- Medical Intensive Cadaver Lab (2x)

Optimum Vision- Dealing With Eye Injuries

FEMA- "You are the help until help arrives" training

ART- "Lend a Paw" Pet First Aid (4X)

SUNY Public Health- Preparedness and Response to Pandemics

Medical Corps- Medical Care in Hostile Environments Class

UAFD- CPR and AED Certification (multiple times)

OPOTA- Naloxone Administration Certification

Herbal Medics Academy- Botany for Herbal Medicine

The Laceration Course- Comprehensive Laceration Management

## TRAFFIC LAW ENFORCEMENT

FCSO DWI Detection and SFST

OSHP Electronic Speed Measuring Devices

LEC- BAC Data Master Senior Operator

ODPS- Hardcore Drunk Drivers' Summit (2X)

LEMVI- Mobile Videotaping

EMS- Professional Traffic Stops Instructor *

OPOTA- Pursuit Intervention Techniques

NHTSA- SFST Refresher Training

Stop Stick- Tire Deflation Device Instructor *

OLC- LTI Ultralight Laser Update

OPOTA- New OH-1 Crash Reporting Guidelines


## COMPUTERS

New Horizons- Beginning Excel

OPOTA- Internet Child Sexual Exploitation

City of UA- Armada Computer Software Train the Trainer *

Visionair- Paperless Reporting Software Training

Deadline Online- Using the Internet for Investigations

UAPD

      - Internet Predator Awareness Training

      - Livescan Fingerprint Computer Software Operator

VanBroklin- Officers on the Information Superhighway

Nighthawk Training- Using Modern Technology to Enhance Personal Security

BeKnow- Computer Security Threats


## DRUGS

FCSO- Street Smart Drug Trends Training

OPOTA- Designer Drug Update for Patrol Officers

OSU- Drug Selling Among High School Students Seminar

SARNCO- Substance-Related Sexual Assault

Street Training Group- Recognizing Rave and Street Drugs

Project GHB- Current Drug Trends

FCSO- Project Street Smart Drug Recognition

OPOTA- Drug Identification and Field Testing

BRC- Navigating Altered States

Zendo- Psychedelic Harm Reduction Strategies

**FEMA EMERGENCY MANAGEMENT TRAINING**

FEMA- IS-003- Radiological Emergency Management

FEMA- IS-15- Special Events Contingency Planning

FEMA- IS-100- Incident Command for Law Enforcement

FEMA- IS-200- Incident Command for Initial Action Incidents

FEMA- IS-230 Principles of Emergency Management

FEMA- IS-235- Emergency Planning

FEMA- IS 239- Training Exercise Design

FEMA- IS-240- Leadership and Influence

FEMA- IS-241- Decision Making and Problem Solving

FEMA- IS-242- Effective Communications

FEMA- IS-244- Developing and Managing Volunteers

FEMA- IS-301- Radiological Emergency Response

FEMA- IS-362- Multi-Hazard Emergency Planning for Schools

FEMA-  IS-700- National Incident Management Systems

FEMA- IS-800- The National Response Plan

FEMA- IS-00907- Active Shooter

## DECLARATION UNDER PENALTY OF PERJURY
## OF CLAUDE WERNER

Claude Werner, under penalty of perjury, deposes and states as follows:

1.      My name is Claude Werner. I am making this declaration in support of Plaintiffs' reply to opposition submissions made to Plaintiffs' application for preliminary injunction in the case of *Hanson v. District of Columbia,* Case No. 22-cv-2256 (D.D.C.).

2.      I am a retired U.S. Army officer, having served in Airborne, Ranger, Special Forces, and Mechanized Infantry units, including commanding a Special Forces A-Team and Bradley Infantry Company. I served in Special Forces for some 10 years.

3.      I trained in firearms instruction for seven years at the elite Rogers Shooting School and subsequently served as Chief Instructor at Rogers for five years. The Rogers Shooting School is known as one of if not the top firearms training school in the nation. I hold NRA instructor certifications in Basic Pistol, Rifle, and Shotgun; Personal Protection In The Home; Refuse To Be A Victim; and Home Firearms Safety. I operate a firearms training company, Firearms Safety Training LLC, the focus of which is on concealed carry and home defense training. I have presented at many self-defense training conferences including the annual Rangemaster Tactical Conference and the Mid-Atlantic Tactical Conference. My CV is attached to this declaration.

4.      I have written extensively on self-defense topics, including five books: Concealed Carry Skills and Drills; Indoor Range Practice Sessions; Shooting Your Black Rifle; Serious Mistakes Gun Owners Make and Real Shootouts of the LAPD. Via my website, *The Tactical Professor*, I write on various self-defense topics, including police and citizen self-defense incidents.

5.      I was formerly an active competitive shooter. I hold International Defensive Pistol Association ("IDPA") Master ratings in Stock Service Revolver, Stock Service Pistol, Enhanced Service Pistol, and Custom Defensive Pistol. I served as IDPA Area Coordinator for Georgia and Alabama and as match director for Georgia State Championship in years 2000, 2001 and 2002.

6.     A brief submitted by the Brady organization suggests that plus 10 magazines are not used (perhaps they mean useful) for self-defense because the average number of rounds fired by a citizen defender when a citizen defender fires a gun in response to a criminal attack is two rounds. That conclusion is at least partly based on my study of reports from the NRA Armed Citizens column. A number of logical flaws pervades Brady's assertion.

7.     First, my study was conducted of 1997-2001 reports contained in the Armed Citizens column. So the first issue is that the study is dated. Crime patterns have increased in the meantime, the number of persons carrying firearms for personal protection in public has increased substantially, and it is likely that citizen/criminal engagements patterns have changed as well.  One example, would be the number of multiple assailant attacks. My analysis showed 36 percent of incidents reported in the Armed Citizen column during the period involved multiple assailants, ranging from two to seven. Data I am familiar with indicates some 50 percent of criminal assaults now involve multiple assailants.

8.     Second, as I stated in my analysis, the Armed Citizens column by its nature focuses on positive outcomes; my analysis therefore did not present a view of the totality of armed self-defense in that non-positive outcomes were not available for inclusion in the database. We don't know how many rounds may have been fired in non-positive outcomes.

9.     Third, beyond the type of firearm used by the citizen for his or her defense, i.e., revolver, pistol, shotgun or rifle, there was very little data as to the ammunition capacity of the citizen employed firearm presented in the Armed Citizen reports. Therefore there is little we can say as to the number of rounds that were actually in the citizen's gun when he or she was faced with a criminal assault. If we assume a distribution of firearms and magazines used by the citizens in those incidents was proportional to the distribution of firearms and magazines within the U.S. civilian population, which would be a reasonable and logical assumption, a substantial number of citizen defenders would have used plus 10 magazines. If we were doing the study today using current data, the percentage of citizens using plus 10 magazines would be even higher due to the increase of the number of such magazines since 1997.

10.     Fourth, that on average two rounds were fired to stop the attack in the reported incidents, says absolutely nothing about the use (or usefulness) of plus 10 magazines for self-defense. Brady's view that magazines with capacity greater than 10 rounds are not used for self-defense because in the average self-defense incident only two rounds are fired, is fallacious. The average citizen defensive gun use involves *no rounds* fired. Using Brady's logic one could conclude that it is not necessary to have any ammunition capacity at all to use a gun for self-defense; unloaded guns would be good enough for almost all situations. By that logic one could conclude that ammunition is not protected by the Second Amendment because it is not necessary for self-defense. That conclusion is absurd on its face because there are in fact situations where shots need to be fired to stop a criminal attack. Likewise, as noted in my study there were situations where citizens fired more than 10 rounds and incidents where citizens needed to reload their firearms.

11.     Besides instances of self-defense, plus 10 magazines are used and useful for other lawful purposes, such as training and shooting sports. At the Rogers Shooting School we supplied all the equipment to students in our Basic/Intermediate handgun classes. The pistols we supplied to students had the standard capacity magazines that came stock with the pistols. These were plus 10 round magazines. We did so to allow them to train at the high pace our classes required. In our intermediate/advanced classes, where students brought their own firearms, students overwhelmingly brought and used plus 10 magazines.

12.     From my extensive experience in IDPA matches, students in the pistol class competitions also overwhelmingly used standard capacity magazines holding more than 10 rounds, and in many cases magazines holding rounds in excess of the standard capacity magazine supplied with their pistols.

13.     I am personally familiar with most of the top civilian firearm instructors in the U.S. I know of no instructor who encourages his or her students to use magazines of 10 rounds or fewer, or who discourages the use of standard capacity magazines holding more than 10 rounds.

14.     The District of Columbia asserts in its brief that plus 10 magazines are most useful for police and military, that assertion suggesting that such magazines are not therefore useful for citizen self-defense.   Even if the predicate to that statement is true, and that is not at all clear, the District's conclusion is another

3

APP. 746

logical fallacy. That something is most useful for one purpose, does not imply it is not useful for another purpose. The use of the word "most" belies the implication that such magazines are not used and useful for self-defense. My experience is that they are. From a military perspective most the soldier's primary weapon is his or her rifle, overwhelmingly being a select-fire automatic weapon such as an M-16 rifle or M-4 carbine. The average soldier is not even issued a handgun. The average citizen defender on the other hand overwhelmingly used a handgun in the incidents I studied from the Armed Citizens column and in instances I have reviewed since I wrote that article.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.


Dated: <u>January 8, 2023</u>                          *Claude Werner*
                                    —————————————————
                                         Claude Werner



# METAL MEETS 2022.



# NEW S&W® CSX™ PISTOL

**The New CSX Micro-9 Pistol Brings the Feel of All Metal**
and 12+1 capacity. Our flat faced trigger ensures consistent
finger placement for accuracy and repeatability. CSX – the
ultimate in everyday carry.



**smith-wesson.com**

©2022 Smith & Wesson, Inc. All Rights Reserved.

APP. 748

# RUGER MAX-9

     

**9MM LUGER**
Caliber

**10+1 12+1**
Capacity

**3.20"**
Barrel Length

**18.4 OZ.**
Weight

The MAX9™ is Your Next Handgun™. Whether you're new to firearms ownership, or you've been an enthusiast for years, the versatile MAX-9™ is sure to meet your personal protection needs. Comfortable enough to conceal in an inside the waistband holster or pocket holster, this micro-sized pistol has it all - without compromising on capacity or features. Rugged, reliable, affordable - the Ruger® MAX-9™.



**COLION NOIR,**
Firearms Enthusiast

**RUGER**
RUGER.COM/MAX-9

APP. 749



DEFENDING YOUR FAMILY.
DEFENDING YOUR HOME.™

**Protecting loved ones and neighbors is a high calling.** Over the last few years, men and women of all walks of life have chosen to exercise their Second Amendment rights as first-time gun owners. Through education and training, families and communities are empowered to protect themselves and those around them. At Daniel Defense, we advocate for the individual's right to bear arms. That's why we manufacture the highest quality, 100% American-made firearms backed with a lifetime warranty.



WORLD-CLASS FIREARMS
DESIGNED & MANUFACTURED
IN BLACK CREEK, GEORGIA, USA

DANIELDEFENSE.COM



DANIEL DEFENSE.
»·FREEDOM. PASSION. PRECISION.·



**MEGA-FEATURED**
# MICRO-COMPACT

### CARRY-READY. OPTIC-READY.

Slim, lightweight, and perfect for comfortable concealed carry— the all-new ergonomically-designed MC2sc Micro-Compact has double-stack 9mm magazines that provide 11+1 or 14+1 capacity when you need it most, and an optic-ready slide for easy direct mounting of micro dot optics.

Mossberg— Makers of dependable, hardworking firearms for more than a century.
**LEARN MORE AT MOSSBERG.COM**

⚠ **SAFETY TIP:** Store firearms securely, inaccessible to children and unauthorized users.

Consult and comply with any and all applicable federal, state, and local: laws, regulations, requirements, and/or restrictions, including but not limited to those regarding the purchase, ownership, use, transport, and carrying of a firearm.

## DECLARATION UNDER PENALTY OF PERJURY OF AMY SWEARER

Amy Swearer, under penalty of perjury, deposes and states as follows:

1.      My name is Amy Swearer. I am a Legal Fellow at the Heritage Foundation, where I run the organization's Defensive Gun Use Database. The bulk of my scholarship in recent years has focused on the Second Amendment and gun policy. I am giving this declaration in support of the application for preliminary injunction filed by Plaintiffs in the case of *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256 (D.D.C.).

2.      On November 30, 2022, a conglomerate of gun control groups filed a brief as *amici curiae* before the court in *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256, in support of defendants' opposition to plaintiff's application for a preliminary injunction.[1] In this brief, hereinafter referred to as the "Brady Brief," the gun control groups reference two recent articles I authored as part of a monthly series on defensive gun use that has been published by *The Daily Signal*, the multi-media arm of the Heritage Foundation, since 2019. The brief states, in relevant part, that:

> Even advocates of the permissive use of firearms have acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for defensive purposes. For example, recent compilations by The Heritage Foundation's *The Daily Signal* of national reports on defensive gun use cases reflect that **none** involved the use of anywhere close to ten rounds of ammunition.[2]

3.      At best, the Brady Brief's characterization of my monthly articles on defensive gun use is recklessly lazy and wrongly attributes to myself and my employer, the Heritage Foundation, a policy position that neither of us holds. At worst, it constitutes an intentional effort to deceive the federal court with blatantly misleading claims about my defensive gun use research at the Heritage Foundation. I strongly condemn this attempt by prominent gun control groups to misconstrue our

---

[1] Brief of Amici Curiae Brady et al., In Support Of Defendants' Opposition to Plaintiffs' Application For A Preliminary Injunction, *Hanson v. District of Columbia*, Civil Action No. 22-cv-2256 (D. D.C. Nov. 30, 2022).

[2] *Id.* at 21.

**APP. 752**

policy position on the civilian need for standard capacity magazines and to perpetuate falsehoods about my research.

4.      Far from having "acknowledged that the ability to fire more than ten rounds of ammunition without reloading is not necessary for defensive purposes," my research on the whole shows that civilians—just like the law enforcement officers who are universally exempt from these restrictions, including while off-duty—sometimes need more than ten rounds of ammunition to successfully defend themselves. While such cases likely do not constitute a majority of defensive gun uses, either by civilians or law enforcement officers, in those cases where more than 10 rounds are needed, the ability to fire those rounds without the need to reload can be the difference between life and death or serious injury. Those cases often involve a defensive gun user who is outnumbered by multiple armed assailants, or who is engaged in a sustained gunbattle with a heavily armed assailant.

5.      Importantly, my monthly articles provide nothing close to a comprehensive accounting of every defensive gun use that occurs in a given month—a point that is made quite clear in the articles themselves, which remind readers that almost every study on the issue has found that Americans use their firearms between 500,000 and 2.5 million times a year. The series is intended to provide a snapshot of the thousands of cases in our Defensive Gun Use Database, and highlights at most only a fraction of the media-verified cases compiled in any given month.[3] Cases for these monthly articles are chosen to a large extent based on aesthetic factors, like ensuring that featured cases are somewhat evenly spaced throughout a given month and are geographically diverse.

6.      It is in no way reasonable to conclude that if one of my monthly articles does not include an example in which a defensive gun user fired more than ten rounds, then no such cases occurred. Ironically, the September 2022 article to which the Brady Brief cites perfectly illustrates this point. Missing from that article (which covers cases from August 2022) is an August 19, 2022, defensive gun use in Williamsport, Pennsylvania, by a concealed carry permit holder who fired

---

[3] *See Defensive Gun Uses in the U.S.*, THE HERITAGE FOUNDATION (updated Dec. 12, 2022), https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us/.

**APP. 753**

"approximately 18 rounds" at an armed robber.[4] This defensive gun use was not highlighted in the monthly roundup, but it was included in the Heritage Foundation's interactive database and featured on the database's official twitter account.[5]

7.  The Heritage database does not currently track specific features like the number of rounds fired defensively, and my experience with compiling media-verified defensive gun uses in general is that media reports rarely include such specific information. However, even after only a cursory review of our database to find examples of where that information is provided or can be inferred, it is clear the Williamsport case is far from the only instance in which a defensive gun use involving more than ten defensive rounds being fired did not make it into the monthly highlight article. In my March 2022 article, for example, I did not highlight a February 22, 2022, defensive gun use in Richmond, Kentucky, in which a man fired at least 19 rounds during a shootout with an intruder who had just killed the man's daughter.[6]

8.  The authors of the Brady Brief also apparently assume that if a media report (or my summary of the media report) does not explicitly state that a defensive gun user fired more than ten rounds, then it could not have occurred. True, it is sometimes evident from the broader context that fewer than ten rounds were fired, or at least that such an event was unlikely. Other times, however, this assumption is entirely unwarranted. This includes two cases featured in the articles to which the Brady Brief cites, which the brief far too easily dismissed as involving "nowhere close" to the firing of ten rounds in self-defense.

9.  In the August 16, 2022, case in Lexington, South Carolina—featured in my September 2022 article—both the assailant and the defensive gun user sustained multiple gunshot wounds during an exchange of gunfire inside the defensive gun

---

[4] John Beauge, *Pa. Man Shoots Teen Multiple Times After Having Gun Drawn on Him: Police*, Penn Live (Aug. 21, 2022, 10:05 p.m.), https://www.pennlive.com/crime/2022/08/pa-man-shoots-teen-multiple-times-after-having-gun-drawn-on-him-police.html.

[5] @DailyDGU, Twitter (Aug. 24, 2022, 10:02 AM), https://twitter.com/DailyDGU/status/1562440111274729475.

[6] Krista Johnson & Hayes Gardner, *Jordan Morgan's Death: Suspect Shannon Gilday Arrested in Madison County*, Courier Journal (Updated Feb. 28, 2022, 1:23 p.m. ET), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/.

user's home.[7] As far as I can discern, law enforcement did not release details to the public concerning the number of rounds fired during the shootout. The broader context of this defensive gun use, however, is one in which it is more than plausible for the defensive gun user to have fired more than ten rounds. Much like the defensive gun user in the Richmond, Kentucky case mentioned above, the defensive gun user here was involved in what appears to have been an intense gunbattle with a heavily armed opponent, where both parties would have had ample opportunity for defensive cover.

10.    Similarly, a June 16 incident in Hopkinsville, Kentucky (featured in the July 2022 article cited by the Brady Brief) includes language and circumstances making it entirely plausible for the defensive gun user to have fired more than ten rounds. That elderly homeowner was involved in a shootout with three armed intruders who fired at him first, and the most detailed articles I can find says merely that the homeowner "returned shots."[8] Unless the authors of the gun control brief have information to which neither I nor the original journalists are privy, there is no reasonable basis to conclude that the homeowner could not have, or in fact did not, fire more than ten rounds in self-defense in a gunfight with multiple assailants.

11.    This type of scenario—and indeed, scenarios in which it is almost certain that the defensive gun user fired more than 10 rounds—are so commonly featured in the monthly articles that the authors of the Brady Brief must have gone out of their way to ignore any articles that did not fit the misleading narrative they wished to convey. For example, my May 2022 article featured a Florida gun owner who used three different firearms to defend himself during an April shootout.[9] While

---

[7] *Man Was Justified In Killing Man Who Broke Into His Lexington Home, Prosecutors Determine*, WLTX NEWS 19 (Updated Aug. 23, 2022, 6:13 PM EDT), https://www.wltx.com/article/news/local/mallard-lakes-lexington-sc-shooting-death-update/101-5a68bf5e-7c4c-46f6-8a33-57555e9bb6fb; Jordan Lawrence, *Man Killed In Invasion of His Sister's Lexington Home*, LEXINGTON CHRONICLE (Aug. 16, 2022, 4:56 pm), https://www.lexingtonchronicle.com/stories/man-killed-in-lexington-home-invasion,25581.

[8] John Godsey, *Third Suspect in June 16 Home Invasion Taken Into Custody*, WKDZ RADIO (June 30, 2022), https://www.wkdzradio.com/2022/06/30/third-suspect-in-hopkinsville-home-invasion-taken-into-custody/news-edge/.

[9] Thomas Mates, *Man Arrested After Shootout In Melbourne Neighborhood*, WKMG NEWS 6 ORLANDO (Apr. 20, 2022, 10:37 AM), http://thf-legal.s3.amazonaws.com/DGU/April%202022/04.08.22_Melbourne_FL.pdf; Amy Swearer, *11 Examples of Defensive Gun Use Dispel NYC Mayor's Concern on Public Carry*, DAILY SIGNAL

4

his first firearm appears to have jammed, it is reasonable to assumed that he moved to his third firearm because he expended all of the ammunition in his second firearm—an AR-15 rifle that commonly comes with 30-round magazines (which are unrestricted in Florida). The odds are therefore very high that this defensive gun user cumulatively fired more than 10 rounds from those three firearms. And during a September 2022 defensive gun use from Chicago featured in my October 2022 article, a concealed carry permit holder in Chicago shot back at gunmen who opened fire on a birthday celebration.[10] While reports do not say for certain how many rounds were fired by either the gunmen or the defensive gun user, so many were fired in total that one witness described initially thinking the gunshots were fireworks.[11]

12.     As with cases explicitly involving more than 10 rounds fired in self-defense, the monthly articles have also omitted plenty of cases where it was statistically probable that the defensive gun users fired more than 10 rounds. Consider a February 2022 incident in Maple Falls, Washington, in which a civilian gun owner fired an entire magazine's worth of ammunition at a gunman while providing covering fire for two wounded sheriff's deputies who were pinned down, allowing them to move to safety and likely saving their lives.[12] While the few readily available media reports on this shootout do not appear to include any information on the defensive gun user's magazine capacity, the prevalence of semi-automatic handguns that use magazines capable of holding more than 10 rounds—as well as the lawful nature of their possession in Washington—make it entirely unreasonable to conclude that the defensive gun user could not have or did not in fact fire more than 10 rounds. Meanwhile, a July 2022 case from Philadelphia involved at least 40

---

(May 17, 2022), https://www.dailysignal.com/2022/05/17/11-examples-of-defensive-gun-use-dispel-nyc-mayors-concerns-on-open-carry/.

[10] Amy Swearer, *Yes, Democrats, Sometimes A 'Good Guy With A Gun' Does 'Stop the Bad Guys.' Here's Proof.* DAILY SIGNAL (Oct. 7, 2022), https://www.dailysignal.com/2022/10/07/12-cases-that-prove-good-guys-with-guns-theory-far-from-over/.

[11] Evelyn Holmes, *Mother Speaks Out After 13-Year-Old Shot In Head In 'Random' SW Side Shooting*, ABC 7 CHICAGO (Sept. 16, 2022), https://abc7chicago.com/chicago-shooting-heart-of-boy-shot-cpd/12234454/.

[12] AJ Janavel, *'I Drop An Entire Magazine': Neighbor Shares Story About Saving Whatcom Co. Deputies*, FOX 13 SEATTLE (Feb. 15, 2022), https://www.q13fox.com/news/i-drop-an-entire-magazine-fox-13-news-talks-to-man-who-helped-save-whatcom-co-deputies.

**APP. 756**

rounds fired between the victim and his three assailants, only one of whom was clearly portrayed in media reports as being armed.[13] It is statistically reasonable, if not highly probable, for the victim to have fired more than 10 of those rounds under the circumstances.

13.    Finally, sometimes the monthly articles include summaries of defensive gun uses that unintentionally omitted relevant information on the number of rounds fired in self-defense. This happened, for example, in the very first article of the series, which was published in January 2019. The summary for a January 20 incident simply noted that a homeowner killed three of four intruders but, likely for purposes of brevity, left out the detail that he fired dozens of rounds during that gunbattle.[14] Similarly, the December 2021 article featured a November 20, 2021, shooting in Philadelphia in which an Uber driver shot and wounded two of three armed robbers, but did not note that video of the shootout indicates that he probably fired more than 10 rounds.[15] As the primary purpose of this monthly article series never has been to compile and showcase every single time a defensive gun user fires more than 10 rounds, it is likely that other articles in this series also contain case summaries inadvertently glossing over such information.

14.    Along those same lines, neither the article series nor the Defensive Gun Use Database provide insight into the number of times that defensive gun uses prove unsuccessful—or are rendered significantly less successful—precisely because a

---

[13] *Cobbs Creek Shootout Leaves Security Guard, Teen Injured; At Least 40 Shots Fired*, 6 ABC ACTION NEWS (Apr. 28, 2022), https://6abc.com/philadelphia-shooting-cobbs-creek-58th-street-baltimore-avenue-shootout-shopping-center/11799170/.

[14] Amy Swearer & Peyton Smith, *The Latest Crime News Provides Evidence In Favor Of Armed Citizens*, DAILY SIGNAL (Feb. 1, 2019), https://www.dailysignal.com/2019/02/01/a-month-of-crime-news-provides-evidence-in-favor-of-armed-civilians/; Travis Fedschun, *Texas Homeowner Shoots, Kills 3 Men and Injures 2 During Home Invasion, Officials Say*, FOX NEWS (Jan. 21, 2019), https://www.foxnews.com/us/texas-homeowner-shoots-kills-3-men-and-injures-2-during-home-invasion-officials-say.

[15] Amy Swearer, *These 12 Incidents of Defensive Gun Use Prove Armed Civilians Make Situations Safer*, DAILY SIGNAL (Dec. 22, 2021), https://www.dailysignal.com/2021/12/22/these-12-incidents-of-defensive-gun-use-prove-armed-civilians-make-situations-safer/; *Uber Driver Shoots 2 During Attempted Robbery In Mayfair, Police Say*, FOX 29 PHILADELPHIA (Updated Nov. 20, 2021 6:19PM), https://www.fox29.com/news/police-attempted-armed-robbery-victim-shoots-suspects-leaving-2-critical-in-mayfair; Active Self Protection, *Uber Driver Absolutely Delivers In Defensive Gun Use*, YOUTUBE (Dec. 7, 2021), https://www.youtube.com/watch?v=UspezjeLN_k.

**APP. 757**

gun owner is killed or sustains serious injury because he or she was limited to fewer than 10 rounds. Such cases would be equally difficult to research using available media reports for the same reason as cases involving more than 10 rounds fired defensively, but they do clearly occur and would be equally relevant to the policy conversation.[16] And, of course, there are cases that predate the current scope of the Defensive Gun Use Database, which right now only includes cases that occurred on or after January 1, 2019.[17]

15.    In sum, I categorically reject any assertion that I have at any point "acknowledged" that civilians do not sometimes need more than 10 rounds of ammunition to adequately defend themselves. My position, consistent with the research and my experience in compiling defensive gun use cases for the Heritage Foundation, is that bans on the civilian possession of standard capacity magazines can have devastating effects on law-abiding gun owners who find themselves outnumbered, outgunned, or otherwise at a severe disadvantage when defending themselves against criminal elements. It is neither constitutional nor prudent for the government to tie one hand behind the backs of peaceable gun owners, especially when it exempts itself from that same prohibition in a tacit acknowledgement that standard capacity magazines can be incredibly useful and necessary tools when facing criminal threats in a civilian context.

The above statement, given under penalty of perjury is true and correct to the best of my knowledge, information and belief.

Dated: January _11_, 2023

_Amy E. Swearer_
Amy Swearer

---

[16] Gary Detman, *Argument Spawns Round of Beers and Gunfire at Florida Bar, 1 Dead*, CBS 12 NEWS (May 4, 2022) (explaining, in the imbedded video, that the victim was fatally shot while reloading his revolver during a gunfight with his assailant), https://cbs12.com/news/local/argument-round-beers-gunfire-haines-city-joshua-badillo-florida-bar-murder-grady-judd.

[17] *See, e.g.*, Garrett Pelican, *Deputies: 30 Rounds Fired From AR-15 In Deadly Florida Home Invasion*, NEWS 4 JACKSONVILLE (Apr. 17, 2018), https://www.news4jax.com/news/2018/04/17/deputies-30-rounds-fired-from-ar-15-in-deadly-florida-home-invasion/; Hailey Winslow & Harrison Barras, *Dozens of Shots Fired At Westchase Apartments*, NEWS 4 JACKSONVILLE (Mar. 13, 2015), https://www.news4jax.com/news/2015/03/13/dozens-of-shots-fired-at-westchase-apartments/.

7

APP. 759

Appendix A

Non-Exhaustive Review of Defensive Gun Uses Likely Involving More Than 10
Defensive Rounds

| Date | Location | Context |
|------|----------|---------|
| 11/25/2022 | Chickasha, OK | Based on the number of shell casings found inside the home, an armed resident appears to have fired at least 12 rounds at an intruder.[18] |
| 08/19/2022 | Williamsport, PA | A concealed carry permit holder fired "approximately 18 rounds" in self-defense during an armed robbery.[19] |
| 07/11/2022 | Jonesboro, GA | A homeowner investigating suspected prowlers outside of his home engages in brief gunfight with armed assailants. It is difficult to tell from the video exactly how many rounds the homeowner fires based on sound alone, but he fires one warning shot, then fires rapidly an unknown number of times as he backs away, before clearly firing 4 additional rounds. Based on the video evidence of recoil during the rapid burst, it is likely that the homeowner fired more than 10 rounds in total.[20] |
| 04/27/2022 | Philadelphia, PA | An off-duty security guard exchanged fire with three would-be robbers, only one of whom was clearly |

---

[18] Kaylee Douglas & Natalie Clydesdale, *Chickasha Police: Homeowner Shoots, Kills Man Attempting to Enter House*, KFOR (Updated Nov. 15, 2022 10:13 PM), https://kfor.com/news/local/police-investigate-homicide-at-chickasha-home/.

[19] John Beauge, *Pa. Man Shoots Teen Multiple Times After Having Gun Drawn on Him: Police*, PENN LIVE (Aug. 21, 2022, 10:05 p.m.), https://www.pennlive.com/crime/2022/08/pa-man-shoots-teen-multiple-times-after-having-gun-drawn-on-him-police.html.

[20] Eric Perry, *Video Surveillance Captures Homeowner, Burglar Suspects In Shootout In Clayton County*, FOX 5 ATLANTA (Updated July 12, 2022 7:32 PM), https://www.fox5atlanta.com/news/video-surveillance-captures-homeowner-burglar-suspects-in-shootout-in-clayton-county.

9

| | | |
|---|---|---|
| | | identified as armed. Over 40 shell casings were found at the scene.[21] |
| 04/08/2022 | Melbourne, FL | A gun owner used three different firearms—including two AR-15 rifles, which presumptively had standard capacity magazines—to defend himself during a shootout with an assailant. While the defensive gun user's handgun jammed, it is likely that he switched to his third firearm because his second firearm ran out of ammunition, and that he fired more than 10 rounds in his own defense.[22] |
| 02/22/2022 | Richmond, KY | A man fired at least 19 rounds from two different handguns [and specifically 11 rounds from the first handgun] during a gunfight with a heavily armed intruder who had just killed his daughter.[23] |
| 02/10/2022 | Maple Falls, WA | An armed civilian fired an entire magazine of ammunition at a gunman while laying down covering fire for two wounded sheriff's deputies, enabling them to get to safety and likely saving their lives.[24] Given the prevalence of handguns with standard capacity magazines and their lawful status in Washington, this likely meant the civilian fired more than 10 rounds. |

---

[21] *Cobbs Creek Shootout Leaves Security Guard, Teen Injured; At Least 40 Shots Fired*, 6 ABC ACTION NEWS (Apr. 28, 2022), https://6abc.com/philadelphia-shooting-cobbs-creek-58th-street-baltimore-avenue-shootout-shopping-center/11799170/.

[22] Thomas Mates, *Man Arrested After Shootout In Melbourne Neighborhood*, WKMG NEWS 6 ORLANDO (Apr. 20, 2022, 10:37 AM), https://www.clickorlando.com/news/local/2022/04/20/man-arrested-after-shootout-in-melbourne-neighborhood/.

[23] Krista Johnson & Hayes Gardner, *Jordan Morgan's Death: Suspect Shannon Gilday Arrested in Madison County,* COURIER JOURNAL (Updated Feb. 28, 2022, 1:23 p.m. ET), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/.

[24] AJ Janavel, *'I Drop An Entire Magazine': Neighbor Shares Story About Saving Whatcom Co. Deputies,* FOX 13 SEATTLE (Feb. 15, 2022), https://www.q13fox.com/news/i-drop-an-entire-magazine-fox-13-news-talks-to-man-who-helped-save-whatcom-co-deputies.

| 11/20/2021 | Philadelphia, PA | An armed Uber driver defended himself against 3 armed carjackers, shooting two of the suspects "several times" each. A surveillance camera captured the incident, and while it is difficult to determine from the audio exactly how many shots the defensive gun user fired (the audio does not appear to match up with the muzzle flashes), a reasonable listener could discern more than 10 rounds, which is consistent with the number of gunshot wounds suffered by the suspects.[25] |
| --- | --- | --- |
| 11/21/2021 | Des Moines, IA | An armed homeowner exchanged gunfire with two intruders, and audio from nearby security cameras indicates at least 15 rounds were fired. Given that the two suspects were injured and fled while the homeowner was unharmed, it is reasonable to conclude that most of those rounds may have been fired by the homeowner.[26] |
| 06/22/2021 | Decatur, GA | When a gunman fatally shot a man in a targeted attack, some of the victim's friends engaged the gunman in a shootout, killing him in what police deemed lawful self-defense. According to reports, more than 50 rounds were fired from four guns, making it likely that at least one defensive gun user fired more than 10 rounds.[27] |
| 05/01/2021 | St. Paul, MN | Two concealed carry permit holders defended themselves against three armed assailants in a |

---

[25] *Uber Driver Shoots 2 During Attempted Robbery In Mayfair, Police Say*, Fox 29 Philadelphia (Updated Nov. 20, 2021 6:19PM), https://www.fox29.com/news/police-attempted-armed-robbery-victim-shoots-suspects-leaving-2-critical-in-mayfair; Active Self Protection, *Uber Driver Absolutely Delivers In Defensive Gun Use*, YouTube (Dec. 7, 2021), https://www.youtube.com/watch?v=UspezjeLN_k.

[26] *Homeowner, Des Moines Police Fire At Armed Robbery Suspects*, KIRO 7 (Nov. 22, 2021 3:54 pm), https://www.kiro7.com/news/local/homeowner-des-moines-police-fire-armed-robbery-suspects/HROO4ZCU3JE4HBD2INX46EG6WI/.

[27] Marc Teichner, *DeKalb County Gas Station Gunfire Leaves 2 Dead, 2 Injured*, Fox 5 Atlanta (June 23, 2021), https://www.fox5atlanta.com/news/gas-station-gunfire-leaves-2-dead-2-injured.

| | | |
|---|---|---|
| | | gunfight from which police recovered "dozens of shell casings," indicating a high likelihood that at least one of the defensive gun users fired more than 10 rounds.[28] |
| 02/20/2021 | Metairie, LA | Nearly 100 rounds were exchanged between an active shooter and seven gun store employees before the gunman was fatally shot. Investigators said the gunman fired 32 rounds, meaning defensive gun users cumulatively fired over 60 rounds. The timeline is not entirely clear but the best available information seems to indicate that the bulk of those rounds were fired by only three or four employees.[29] |
| 02/05/2021 | Summerville, SC | An armed resident of an apartment complex fired 13 rounds at multiple armed suspects who shot at him from the parking lot.[30] |
| 01/18/2021 | Hesperia, CA | A homeowner engaged an armed would-be intruder in a sustained gunfight for 45 seconds. While it is unclear exactly how many rounds are fired, the video evidence and sheer length of the engagement indicates a high probability that more than 10 |

---

[28] Kristi Belcamino, *Seven Injured By Gunfire During A Night Of Shootouts Across St. Paul*, TWIN CITIES PIONEER PRESS (Updated May 3, 2021 12:15 p.m.), https://www.twincities.com/2021/05/02/seven-shot-and-injured-in-st-paul-in-night-of-shoot-outs/.

[29] Neil Vigdor & Christine Hauser, *Gunman Who Killed 2 At Louisiana Gun Store Fired 32 Rounds, Sheriff Says*, NY TIMES (Feb. 22, 2021), https://www.nytimes.com/2021/02/22/us/new-orleans-shooting-joshua-williams.html; Victoria Cristina, *Watch: Surveillance Video Shows Before, During Shootout At Metairie Gun Store*, WGNO (Updated Feb. 23, 2021 8:08 AM CST), https://wgno.com/news/local/watch-live-sheriff-lopinto-provides-update-on-metairie-gun-store-shooting/.

[30]Ray Rivera, *Police Continuing Investigation Into Gun Battle At Summerville Apartment Complex*, LIVE NEWS 5 WCSC (Feb. 8, 2021 10:13 PM), https://www.live5news.com/2021/02/09/police-continuing-investigation-into-gun-battle-summerville-apartment-complex/.

APP. 763

| | | |
|---|---|---|
| | | defensive rounds were fired.[31] Importantly, the possession of standard capacity magazines was still perfectly lawful on this date, as long as they qualified under a then-existing grandfathering provision. |
| 04/29/2020 | Yoder, CO | A hemp farmer engaged in a gunbattle with four armed assailants who likely mistook the farmer's lawful business for an illegal (and often cash-heavy) marijuana operation. Hundreds of shell casings were reportedly found around the home, and while it is unclear exactly how many of these rounds were fired by the hemp farmer in self-defense, the single media report on the incident states that, at the very least, he "emptied an entire magazine" from his handgun.[32] |
| 04/22/2020 | Las Vegas, NV | A concealed carry permit holder fired 11 rounds at an assailant who, seemingly at random, opened fire on the permit holder and another person as they sat eating fast food in a shopping center parking lot.[33] |
| 11/25/2019 | Miami, FL | A concealed carry permit holder living in a van with his girlfriend and son fired "at least 14 rounds" at a man who threatened the family with an AK-47 rifle.[34] |
| 05/14/2019 | Tallahassee, FL | An armed homeowner engaged in a shootout with four armed intruders who broke into his home after |

------

[31] Jose Quintero, *Hesperia Shootout Suspect Pleads Not Guilty to 5 Felonies*, VICTORVILLE DAILY PRESS (Jan. 22, 2021), https://www.vvdailypress.com/story/news/2021/01/22/hesperia-shootout-suspect-pleads-not-guilty-5-felonies/6663407002/.

[32] Liz Henderson, *El Paso County Hemp Grower Reports Gunbattle With Invaders Who Might Have Mistaken Plants for Marijuana*, THE GAZETTE (Updated July 1, 2020), https://gazette.com/news/el-paso-county-hemp-grower-reports-gunbattle-with-invaders-who-might-have-mistaken-plants-for/article_f2f4083e-8bff-11ea-8f8d-83c959f9e23d.html.

[33] Glenn Puit, *DA: Fatal Shooting In Parking Lot Was 'Clear Case of Self-Defense'*, LAS VEGAS REVIEW-JOURNAL (May 4, 2020), https://www.reviewjournal.com/crime/homicides/da-fatal-shooting-in-parking-lot-was-clear-case-of-self-defense-2020768/.

[34] WPLG Local 10, *Man Explains How He Shot, Killed Gunman In Miami*, YOUTUBE (Nov. 25, 2019), https://www.youtube.com/watch?v=wvI-00hGtrA.

| | | |
|---|---|---|
| | | earlier stealing his keys. The homeowner fired at least 25 rounds from an AR-15 rifle in self-defense.[35] |
| 01/20/2019 | Houston, TX | A homeowner armed with a "fully loaded AK-47" almost certainly fired more than 10 rounds in self-defense when he fatally shot 3 of 4 intruders who broke into his home. Dozens of rounds were exchanged and only two of the intruders were clearly armed.[36] At least one media report explicitly states that the homeowner fired "dozens" of those rounds himself.[37] |

---

[35] *Police: Tallahassee Homeowner Shot 2 Out Of 4 Home Invasion Suspects, All 4 Charged*, ABC 27 WTXL (Updated May 24, 2019), https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery.

[36] Emily Reaux & Matt Dougherty, *3 Suspects Dead, Another Injured After Homeowner Opens Fire During East Houston Break-In*, KHOU 11 (Jan. 19, 2019), https://www.khou.com/article/news/crime/3-suspects-dead-another-injured-after-homeowner-opens-fire-during-east-houston-break-in/285-29b21dcb-0f08-43bb-8d1e-6bd7d8b559e2.

[37] Travis Fedschun, *Texas Homeowner Shoots, Kills 3 Men and Injures 2 During Home Invasion, Officials Say*, FOX NEWS (Jan. 21, 2019), https://www.foxnews.com/us/texas-homeowner-shoots-kills-3-men-and-injures-2-during-home-invasion-officials-say.

APP. 765

```
 1                THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 13-CV-1300-MSK-MJW
 3
     COLORADO OUTFITTERS ASSOCIATION,
 4   COLORADO FARM BUREAU,
     NATIONAL SHOOTING SPORTS FOUNDATION,
 5   MAGPUL INDUSTRIES,
     COLORADO YOUTH OUTDOORS,
 6   USA LIBERTY ARMS,
     OUTDOOR BUDDIES, INC.,
 7   WOMEN FOR CONCEALED CARRY,
     COLORADO STATE SHOOTING ASSOCIATION,
 8   HAMILTON FAMILY ENTERPRISES, INC.,
     d/b/a FAMILY SHOOTING CENTER AT CHERRY CREEK STATE PARK
 9   DAVID STRUMILLO,
     DAVID BAYNE,
10   DYLAN HARRELL,
     ROCKY MOUNTAIN SHOOTERS SUPPLY,
11   2ND AMENDMENT GUNSMITH & SHOOTER SUPPLY, LLC,
     BURRUD ARMS INC. D/B/A JENSEN ARMS,
12   GREEN MOUNTAIN GUNS,
     JERRY'S OUTDOOR SPORTS,
13   SPECIALTY SPORTS & SUPPLY,
     GOODS FOR THE WOODS,
14   JOHN B. COOKE,
     KEN PUTNAM,
15   JAMES FAULL,
     LARRY KUNTZ,
16   FRED JOBE,
     DONALD KRUEGER,
17   STAN HILKEY,
     DAVE STONG,
18   PETER GONZALEZ,
     SUE KURTZ,
19   DOUGLAS N. DARR,

20       Plaintiffs,

21   vs.

22   JOHN W. HICKENLOOPER, GOVERNOR OF THE STATE OF COLORADO,

23       Defendant.
     _____
24
                    REPORTER'S TRANSCRIPT
25                 TRIAL TO COURT - DAY TWO
     _____
```

**APP. 766**

1        Proceedings before the HONORABLE MARCIA S. KRIEGER,

2    Judge, United States District Court for the District of

3    Colorado, continuing at 8:37 a.m., on the 1st day of April,

4    2014, in Courtroom A901, United States Courthouse, Denver,

5    Colorado.

6

7                            **APPEARANCES**

8        RICHARD A. WESTFALL and PETER J. KRUMHOLZ, Attorneys
     at Law, Hale Westfall, LLP, 1600 Stout Street, Suite 500,
9    Denver, Colorado, 80202, appearing for the Plaintiffs.

10       DOUGLAS ABBOTT, Attorney at Law, Holland & Hart, LLP,
     555 17th Street, Suite 3200, Denver, Colorado, 80202, appearing
11   for the Plaintiffs.

12       MARC F. COLIN, Attorney at Law, Bruno, Colin & Lowe
     P.C., 1999 Broadway, Suite 3100, Denver, Colorado, 80202,
13   appearing for the Plaintiffs.

14       ANTHONY JOHN FABIAN, Attorney at Law, 510 Wilcox
     Street, Castle Rock, Colorado, 80104, appearing for the
15   Plaintiffs.

16       DAVID BENJAMIN KOPEL, Attorney at Law, Independence
     Institute, 727 East 16th Avenue, Denver, Colorado, 80203,
17   appearing for the Plaintiffs.

18       MATTHEW DAVID GROVE, LEEANN MORRILL, KATHLEEN L.
     SPALDING, and STEPHANIE LINDQUIST SCOVILLE, Assistant Attorneys
19   General, Colorado Attorney General's Office, Ralph L. Carr
     Colorado Judicial Center, 1300 Broadway, Denver, Colorado,
20   80203, appearing for the Defendant.

21

22

23

24            THERESE LINDBLOM, Official Reporter
               901 19th Street, Denver, Colorado 80294
25        Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

```
1                    P R O C E E D I N G S

2           THE COURT:  We are reconvened in Case No. 13-cv-1300.

3    This is the second day of trial.

4           Could I have entries of appearance, please.

5           MR. WESTFALL:  Good morning, Your Honor.  Richard

6    Westfall, Peter Krumholz on behalf of the disabled shooters,

7    the nonprofit plaintiffs in the case.

8           THE COURT:  Good morning.

9           MR. KOPEL:  Good morning, Your Honor.  David Kopel on

10   behalf of David Strumillo, John Cooke, Ken Putnam, James Faull,

11   Larry Kuntz, Fred Jobe, Donald Krueger, Stan Hilkey, Dave

12   Stong, Peter Gonzalez, Sue Kurtz, and Douglas Darr.  Thank you.

13          THE COURT:  Good morning.  Thank you.

14          MR. ABBOTT:  Good morning, Your Honor.  I am Doug

15   Abbott on behalf of plaintiffs Magpul and National Shooting

16   Sports Foundation.

17          And I just want to note that Mr. Colin expects to

18   arrive at about the morning break this morning.

19          THE COURT:  Good morning.  Thank you.

20          MR. FABIAN:  Good morning, Your Honor.  Anthony Fabian

21   on behalf of Colorado State Shooting Association and Hamilton

22   Family Enterprises.

23          THE COURT:  Good morning.

24          MR. GROVE:  Matthew Grove, along with Kit Spalding,

25   LeeAnn Morrill, and Stephanie Scoville on behalf of the
```

1          (**MASSAD AYOOB, PLAINTIFFS' WITNESS, SWORN**)

2          *COURTROOM DEPUTY:*  Please be seated.

3          Please state your name and spell your first and last

4     name for the record.

5          *THE WITNESS:*  Certainly.  My name is Massad Ayoob,

6     first name is spelled M-A-S-S A-D, last name spelled,

7     A-Y-O-O-B.

8          *MR. COLIN:*  Thank you.

9                    **DIRECT EXAMINATION**

10    *BY MR. COLIN:*

11    *Q.*  Good morning, Mr. Ayoob.

12    *A.*  Good morning, Mr. Colin.

13    *Q.*  Mr. Ayoob, you are a retained expert in this case; is that

14    accurate?

15    *A.*  I am.

16    *Q.*  And you charge for your services?

17    *A.*  I do.

18    *Q.*  Can you advise the Court as to the cost of your services.

19    *A.*  The same as I charge to teach, $2,500 a day and expenses.

20    *Q.*  Is that what you're charging the plaintiffs in this case?

21    *A.*  It is.

22    *Q.*  All right.  Can you describe for the Court your background,

23    training, and experience, please.

24    *A.*  Certainly.  As relates to this case, I've been a firearms

25    instructor since 1972 for police and since 1981 for private

1  citizens.

2  Q.  And can you describe what you instruct police and private

3  citizens in with regard to firearms, please.

4  A.  We begin with safety, the responsibility that comes with

5  the weapon; the operation of the gun; the efficient use of the

6  gun, in terms of accuracy, speed, sustainability of gunfire;

7  the tactics that accompany it, since the emphasis is on

8  self-defense.  So that will include movement, that will include

9  finding cover, that is, something that could stop opposing

10  gunfire.

11  Q.  And you mentioned that at least some of the training I

12  think you just described is in the context of self-defense; is

13  that accurate?

14  A.  That is virtually all in the context of self-defense.

15  Q.  Can you expand on that and explain what you mean, this

16  training is in the context of self-defense.

17  A.  Sure.  We don't teach how to win a bull's-eye target pistol

18  match.  We're teaching the police officer who is carrying the

19  gun as a tool of protection.  And the private citizen who is

20  carrying a very similar gun for a similar function,

21  essentially, the -- we teach the private citizen to think of

22  himself as a first responder and that his gun should be an

23  analog to a fire extinguisher.

24        The gun, like a fire extinguisher, is a symbol of a

25  public safety professional.  We remind them that possession of

1   that symbol does not make them a public safety professional,

2   does not mean that they don't need public safety professionals.

3   We make it clear that the gun, like the fire extinguisher, is

4   an emergency rescue tool to cut a lane of safety for you and

5   others until the designated professionals can get there to deal

6   with the crisis.

7   Q.  Overall, does the self-defense training that you're

8   describing involve the dynamics of violent encounters?

9   A.  Oh, it absolutely does.  And the techniques that we teach

10  are built from extensive research and study of dynamics of

11  violent encounters, things such as flight-or-fight response,

12  human action/reaction paradigms, things of that nature.

13  Q.  I'd like to explore your teaching experience for a moment,

14  if I could.  How long have you been engaged specifically in the

15  instruction of self-defense with firearms and dynamics of

16  violent encounters?

17  A.  Forty-two years, sir.

18  Q.  Can you describe your teaching experience.  What is the

19  context in which you have instructed individuals in those

20  areas?

21  A.  Certainly.  I began teaching a local police department in

22  1972, Hooksett, New Hampshire, H-O-O-K-S E-T-T.  Shortly

23  thereafter, I was retained to teach weapons and chemical agents

24  for the advanced police training program of New Hampshire in

25  Nashua, New Hampshire.  Began teaching civilians in 1981 after

Massad Ayoob - Direct

1   a pilot program at the Chapman Academy of Practical Shooting in

2   Columbia, Missouri.  And in October of that year, founded

3   Lethal Force Institute.  That organization was geared to

4   provide training to private citizens on a law enforcement level

5   in terms of safety, competence, and responsibility in

6   self-defense with firearms.  Within a year, that became pretty

7   much my full-time occupation, and has been ever since.

8   Q.  Are you still involved in the Lethal Force Institute?

9   A.  No, sir.  I left there in 2009 and now teach through Massad

10   Ayoob Group.

11   Q.  Can you explain briefly the nature of that change.

12   A.  Strictly a business decision.

13   Q.  Are you a member of any committees, training councils, and

14   the like, either nationally or international?

15   A.  Yes, sir.  I've spent -- I've been a member for many years

16   of the International Association of Law Enforcement Firearms

17   Instructors.  I've taught for them at local, regional,

18   national, and two international seminars.  For 19 years, I was

19   chair of the firearms committee for the American Society of Law

20   Enforcement Trainers.  For the last eleven years, I've been on

21   the advisory board for the International Law Enforcement

22   Educators and Trainers Association.  That's where I came from

23   this week, in fact, having taught there last week.

24   Q.  Do you participate in the National Law Enforcement Training

25   Center in any way?

1   A.   Yes, sir.   The National Law Enforcement Training Center is

2   headquartered in Kansas City, Missouri.   It's an institution

3   that focuses on teaching -- well, my side of it, at least, was

4   teaching gun retention and disarming, teaching how to take the

5   gun away from another person, from an offender.   And gun

6   retention is the corollary science to that, how to defeat the

7   man who is trying to take your gun away from you with felonious

8   purpose.

9        I began as an instructor -- certified by them as an

10  instructor in 1980 and as a -- what they called a national

11  instructor, meaning I trained and certified other instructors.

12  I was certified for that in 1990, and I've done a great deal of

13  that over the years.

14  Q.   So you've been teaching other instructors how to teach for

15  20 years or more?

16  A.   Yes, sir.   Well, for at least that.   I've also done that in

17  the baton training discipline with the PR24 baton, but I didn't

18  think that was relevant to the case at bar.

19  Q.   Specifically, you've been engaged in instructing law

20  enforcement and civilians in defensive tactics involving

21  firearms use for the last 40 years; is that fair to say?

22  A.   Forty-two, I think.

23  Q.   Okay.   You touched upon the training that you have given.

24  Can you touch upon the training that you have received,

25  specific to the areas that you've just been speaking to.

Massad Ayoob - Direct

1   A.   Certainly.   At Chapman Academy, I took the advanced pistol

2   course, became involved with them, did our pilot project for

3   armed citizens in 1981.   And until the late 1980s, their head

4   instructor, Ray Chapman, the world pistol champion, he and I

5   taught for the Police Marksman Association, going around the

6   country doing what they called an advanced officer survival

7   program for various police agencies.

8           Let's see.   My own training, six or seven times

9   through Smith & Wesson academy and various instructor or

10  instructor enhancement programs.

11          In the 19 years with American Society of Law

12  Enforcement Trainers, I attended all but two of the five or six

13  day-long annual seminars, and have attended all 11 of the

14  IOEETA seminars, many of the seminars at the International

15  Association of Law Enforcement Firearms Instructors.   1980 or

16  so, I went through the officer safety and survival program at

17  the Federal Law Enforcement Training Center in Brunswick,

18  Georgia.   Numerous other seminars over the years around the

19  country.

20          On the homicide investigation side, the basic and

21  advanced officer-involved investigation school, taught by the

22  commanders and members of the LAPD officer-involved shooting

23  investigation unit.   The advanced homicide school -- advanced

24  homicide investigative school taught by Vernon Geperth,

25  G-E-P-E-R-T-H, the author of the authoritative text in the

APP. 774

Massad Ayoob - Direct

1   field.  And the medical, legal investigation of death course

2   taught at what was then the Metro Dade Medical Examiner's

3   Office.  Twice attended and twice taught at the International

4   Homicide Investigators seminar as well.

5   Q.  Have you been published in the area specific to the

6   expertise that we're discussing now, the areas of self-defense

7   and use of firearms, defensive gun uses, dynamics of gun

8   encounters?

9   A.  Yes, I am.

10  Q.  Can you advise the Court of the nature of those

11  publications, please.

12  A.  Certainly.  The first article in a gun magazine was 1971.

13  Became more extensively involved in writing after that for

14  various law enforcement professional journals, martial arts

15  journals, and gun magazines.  For 30 some years now I've been

16  the law enforcement editor for *American Handgunn*er magazine.

17  My duties there include occasional feature articles, in every

18  issue, the Cop Talk column, which is basically focused on law

19  enforcement handgun trends and training issues.  Also each

20  issue I do a series called Ayoob Files, where we dissect an

21  actual gunfight and determine what lessons were learned from

22  that that could prevent tragedy in the future.

23         I've been handgun editor for *Guns Magazine* for, again,

24  30 some years.  Many of those articles focus on self-defense,

25  though the occasional one will focus on sport or gun

1    collecting.

2         I've been firearms editor for *Backwoods Home Magazine*

3    since about 1996.  My column there is sometimes self-defense,

4    sometimes recreation or hunting or gun safety.

5         I write in every issue of *Guns & Weapons for Law*

6    *Enforcement* the first responder column, which is geared to the

7    first officer who arrives at the scene, who is often the only

8    one who is there long enough to contain a fast-breaking scene.

9         For many years I've also done the self-defense and the

10   law column for *Combat Handguns Magazine*.  And my work has

11   appeared in various other periodicals over the years.

12        There have also been several books, a dozen or

13   fifteen -- I'd have to count them up -- all of them related in

14   some way to weapons or self-defense.

15   Q.  Can you identify a few of these dozen or so books that

16   you've written that focus specifically on the area of defensive

17   use of firearms and the dynamics of violent encounters?

18   A.  Certainly.  One would be *In the Gravest Extreme*, subtitled

19   *The Role of the Firearm in Personal Protection*.  That came out

20   in 1980 and has probably been my best seller.  Some were kind

21   enough to call it an authoritative text.

22        Others that would -- there was two in the Stressfire

23   series.  Stressfire is what I named the shooting system we

24   teach, because -- we found most training had been based on the

25   instructors going to the shooting range, timing each other, and

1  scoring their targets, and figuring whatever worked best is the

2  most accurate on the range, we would teach to the officers.

3  And we had found that would break down in the field because it

4  had not taken into account human factors of stress, shaking

5  hands, tunnel vision, and all of that.  So what we attempted to

6  do there was to study what happened to the human being in a

7  near-death experience and backspace developing techniques

8  around that.

9        That led to the *Stressfire Pistol Book* in early 1980s,

10  *Stressfire Shotgun* in the late 1980s.  Other books out today,

11  two editions of the *Gun Digest Book of Combat Handgunnery*,

12  *Ayoob on Combat Shooting*, two editions now of *Gun Digest Book*

13  *of Concealed Carry*, and most recently a book dedicated to

14  firearm safety.

15  *Q.*  Let's move on to training films.  Do you produce or are you

16  involved in the production of training films associated with

17  training civilians and law enforcement how to engage in

18  defensive gun uses in violent encounters?

19  *A.*  Yes, sir.

20  *Q.*  And can you describe for the Court the nature of those

21  training films, please.

22  *A.*  One is titled *Physio-Psychological Aspects of Violent*

23  *Encounters*.  And it explains phenomena such as tunnel vision,

24  auditory exclusion, or tunnel hearing, tachypsychia --

25  T-A-C-H-Y-P-S-Y-C-H-I-A -- the sense of things going into slow

1    motion.  We explain also what some of the physiological effects

2    are as heart rate increases, vasoconstriction occurs, physical

3    strength increases, but dexterity decreases.

4           Other films in the Stressfire series, we had

5    *Stressfire I*, for the handgun; *Stressfire II*, for the shotgun;

6    and *Stressfire III*, for the semiautomatic rifle and fully

7    automatic weapon.  More recently, Panteao Productions,

8    P-A-N-T-E-A-O, has released my film on home protection and

9    self-defense and a training film on concealed carry.  There are

10   others out there.  For eight seasons I was on Personal Defense

11   TV, touching on self-defense topics of various kinds.

12   Q.  How long were you on Personal Defense TV?

13   A.  That was eight years.  The series ended early this year.  I

14   don't believe it's going to be renewed for the late 2014

15   season.

16   Q.  With regard to the publications that you listed, have you

17   written any articles that deal specifically with the use of

18   firearms by disabled or otherwise infirm, handicapped

19   individuals?

20   A.  Yes, I've written a few that touch on that and -- a few

21   that were devoted to that and many that touched on that.

22   Q.  Are you familiar with the Wounded Warrior Project?

23   A.  Yes, I am.

24   Q.  And what is your involvement, if any, in publishing for the

25   Wounded Warrior Project?

Massad Ayoob - Direct

 1   A.  I don't publish for Wounded Warrior.  I have written about

 2   the programs they have as it relates to firearms.

 3        While Wounded Warrior does not advertise it, there are

 4   several gun clubs that have, essentially, done benefit shoots

 5   for soldiers and Marines who come back from the current

 6   conflict seriously injured or as amputees.  It gives them a

 7   chance to shoot firearms, something that, you know, most of

 8   them identified with based on their careers.  Let them know,

 9   yeah, you can get back into hunting, you can get back into

10   target shooting, and here is how to adapt.

11   Q.  Does the training also include how to adapt for defensive

12   gun use purposes?

13   A.  Mine does.  I'm not sure Wounded Warrior goes that far into

14   the tactics.

15   Q.  All right.  Have you ever been retained previous to today

16   to provide expert testimony in any court proceedings?

17   A.  Yes.  I've been an expert witness in weapon-related and

18   deadly force related cases since 1979.

19   Q.  Can you estimate how many cases that involved?

20   A.  It's in the dozens.  I don't know the exact number.

21   Q.  When you say "in the dozens," a couple dozen, more than

22   that?

23   A.  It would be 40 or 50 where I've given sworn testimony; a

24   great many more that I've consulted on and did not take the

25   case; and many were, we would do a report, and it ended in

 1  settlement or dismissal.

 2  Q.  Thanks for the clarification.  Did any of those cases in

 3  which you have rendered expert testimony involve persons with

 4  injuries, disabilities, infirmities of some kind that were

 5  relevant to the litigation?

 6  A.  There were none exactly like this case that resulted in

 7  legislation that became the focus of the legislation.  Some --

 8  there were more than one disparate impact case of female law

 9  enforcement officers who have been fired for failure to

10  qualify.  And there were physiological aspects involved,

11  typically, hands that were too small for the male-oriented guns

12  that they had been issued.

13      There have been self-defense cases where injury

14  inflicted on the individual who shot in self-defense had

15  created a disparity of force element that needed to be

16  explained to the juries.  There were -- I can think of at least

17  one case where the victim was a 63-year-old handicapped female,

18  violently attacked by a 1.8 percent blood alcohol 240-pound

19  male and was charged with either murder two or manslaughter

20  because she fired three bullets into an unarmed man, and that

21  needed to be explained.

22  Q.  What were you originally asked to evaluate in connection

23  with this case?

24  A.  Primarily, the disparate impact of a magazine limit on

25  handicapped individuals in terms of firearms kept for

APP. 780

Massad Ayoob - Direct

1   self-defense and home defense, whether carried on the street or

2   whether with a gun permit or whether kept in the home and

3   deployed in the home.

4   Q.  You've given us an overall general description of much of

5   your training and experience in the area of firearms defensive

6   gun uses and the dynamics of violent encounters.  Can you tell

7   us what specific training and experience you have that

8   qualifies you to render opinions regarding the impact of

9   magazine limitations on both able and disabled bodied

10  individuals?

11  A.   Sure.  From the beginning when I started teaching cops in

12  1972, while they were all able-bodied, except for the

13  occasional case, we'd have the injured officer on light duty

14  who still had to qualify on the range, one of the things that

15  we had to look at was, the very fact that the officer needed to

16  shoot meant he was likely in a gunfight.  He might well be

17  seriously  wounded and might often have been wounded at the

18  very beginning of the fight if he was ambushed.  So we have to

19  look at what I called wounded officer response techniques.

20  What do you do if one hand, one arm has been rendered

21  inoperable?  What do you do if the effect of the first couple

22  of shots have put you on your back, or you started in the

23  patrol car, can't get out of the patrol car because a bullet

24  has broken your hip?  Those techniques served very well in the

25  '80s, when I started teaching civilians, and started getting

 1  students who were physically handicapped to various degrees.

 2          There was a great deal of crossover.  There was some

 3  things that did not cross over, and we simply analyzed their

 4  situation and reached out to others who had dealt with

 5  handicapped shooters and worked on finding the most efficient

 6  ways to deal with them, both in terms of techniques and in

 7  terms of mechanics, in terms of guns that in one way or another

 8  might make up for their physical disability.

 9  Q.  Did the training that you provided to these able-bodied and

10  disabled individuals, whether they were law enforcement or

11  civilians, include defensive tactics in the use of --

12  apologize, poorly phrased.  Did it include the use of firearms

13  in defensive gun use situations, both inside the home and

14  outside the home?

15  A.  Yes.  The -- virtually all of the training I've done has

16  been focused on the firearm as a defensive instrument, as

17  opposed to a recreational tool or an instrument of sport.

18  Q.  Is there any difference to the training that you provide to

19  civilians, whether able-bodied or disabled, as to defensive

20  tactics inside the home versus outside the home?

21  A.  Yes, there would be.  Situationally, if you're outside the

22  home, by definition, if you're resorting to a firearm, that

23  means you're licensed to carry a gun, and you have one either

24  on your person or immediately within reach.  So we'll work with

25  them on drawing the gun from discreet concealment and being

Massad Ayoob - Direct

1   able to reload.  We strongly emphasize that we feel anyone

2   carrying a gun without spare ammunition is carrying a temporary

3   gun.  So we teach them how to carry a spare magazine or a spare

4   speed loader, if they're carrying a revolver.  But in the home,

5   there are relatively few people who keep their gun on all the

6   time when they're in their own domicile.

7   Q.  You mean on their person when you say "keep the gun on"?

8   A.  No.  What I'm saying is, most people do not keep their gun

9   on when they're at home.  They will typically when they're in

10  their domicile have it stored in one or another fixed, static

11  location.  Perhaps a quick-release gun safe; perhaps a home

12  where you don't have to worry about children running around,

13  simply in the nightstand.

14        For them it's not a matter, when danger comes on them

15  suddenly to simply reach under their coat.  They may have to go

16  into another room to get at where the gun is, they may have to

17  go down the hall to get at where the gun is.  So now their

18  mobility becomes a much more critical factor in their ability

19  to defend themselves.  If when the alarm goes off, or the door

20  kicks off, or the window breaks, every second that they're

21  trying to get the wheelchair down the hall to where the gun is,

22  is going to be more vulnerability.  So we tell them, once they

23  have been able to get their hand on the gun, things are going

24  to be happening fast.  They're going to have to be -- hopefully

25  with a Bluetooth if they have one on already -- communicating

Massad Ayoob - Direct

1   with the police.  But mostly, one hand is going to be occupied

2   with some sort of telephone communication device.

3        They're not going to have time to strap on a gun belt

4   with an ammunition pouch, and they're not going to have time to

5   grab a spare magazine or speed loader.  Essentially, what they

6   have in that gun is going to be probably all they're going to

7   have from the beginning to the end of fight that occurs.  So we

8   tell them, for the home defense gun in particular, it makes

9   sense to have higher cartridge capacity than some other

10  applications.

11  Q.  And the comparison, then, to defensive gun use outside the

12  home, how is your training or -- how is the advice that you

13  give to able-bodied and disabled shooters different, if it is?

14  A.  Well, again, in terms of the magazines and such, we would

15  be advising the person in the wheelchair, for example, to have

16  a higher-capacity gun.  The reason is, the ambulatory person --

17       If I may stand for a moment to demonstrate.

18  Q.  Sure.

19  A.  The ambulatory person can be almost like a uniformed police

20  officer.  If you look at the next cop you see on the street,

21  the duty belt is going to have gear all the way around it, all

22  the stuff they have to carry.  You'll see a lot of people -- a

23  lot of ordinary folks will carry their pager behind their belt

24  or something else behind their belt.  Your guy in a wheelchair

25  is very restricted on that, particularly if he's paralyzed from

Massad Ayoob - Direct

 1 | the waist down, and most particularly if he's paralyzed from

 2 | the chest up.

 3 |     If I lean back now against some hard object that is

 4 | behind my hip --

 5 | Q.  Mr. Ayoob, I'm really not getting into wheelchair-bound

 6 | individuals right now.  I'd like you to respond to the question

 7 | about any difference in the training that you give to students

 8 | for defensive gun uses outside the home versus inside the home.

 9 | You had spoken to larger firearms magazines, availability and

10 | those kinds of things.  Is that any different in terms of

11 | outside the home?

12 | A.  Well, outside the home, yes, because he's probably going

13 | to -- if they're in the wheelchair, again, they're going to

14 | have limitations.  There is only so much you can get in that

15 | very small space that you're taking around with you.  And as I

16 | was saying, you can't put any of it behind your backs.  You've

17 | got to put all of it in the front.

18 |     If you found room for the gun -- that's not that tough

19 | to do.  Finding room for the gun and spare ammunition is much

20 | more difficult in the more limited waist space.  What I was

21 | trying to get at is, that would be one more reason for them,

22 | we'd be suggesting they get a higher-capacity gun.  They will

23 | have much more difficulty reloading in the wheelchair than

24 | would an ambulatory person, as well.

25 | Q.  Thank you.  Do students bring their own firearms to your

Massad Ayoob - Direct

1   classes?

2   A.  The students normally will bring their own firearms,

3   correct.

4   Q.  And do you give them direction on what firearms to bring to

5   class, or do they select those on their own?

6   A.  Unless they ask, we simply tell them to bring the guns they

7   use for personal protection.

8   Q.  Have the -- has the equipment or the firearms that have

9   been most popular with your students changed over the years?

10  A.  Yes, they have.

11  Q.  Can you describe that, please.

12  A.  Over the last ten, twenty years, we've seen a much stronger

13  trend towards semiautomatic pistols and, particularly, the

14  pistols with relatively higher magazine capacity.

15  Q.  When did that take place?

16  A.  We started seeing it in the 1980s, and it was actually kind

17  of concurrent with the law enforcement switch from the old

18  service revolver to the semiautomatic service pistol.  And we

19  saw it more still in the '90s.  And today, the polymer-framed

20  pistol, usually 9 millimeter, occasionally larger calibers, is

21  by far the most popular type that we'll see in a civilian

22  course.

23  Q.  Can you estimate the percentage of students annually that

24  bring semiautomatic pistols to your class these days, in the

25  last ten years?

APP. 786

Massad Ayoob - Direct

1   A.  If we cover all semiautomatics, it would be in the high

2   90th percentile.  We do see the occasional revolver, but in

3   many classes there's not a revolver on the firing range.

4   Q.  Does the shift that you just described, the change in

5   popularity of handguns from revolvers to semiautomatics, affect

6   your training?

7   A.  We have to put more emphasis on avoiding what is called

8   colloquially spray and pray.  When someone suddenly goes from a

9   six-shot gun to an eighteen-shot gun, it's -- particularly if

10  fire power was the reason for the decision, it's real easy to

11  get the idea that the fire power was the *raison d'être.*  And

12  that means, if I ever have to pull this thing out, I better

13  hose all 18 rounds and hope something sticks; hence, spray and

14  pray.

15       And we told them, no, shoot it as if you had the

16  old-fashioned six shooter and you just have a greater reservoir

17  of ammunition.  The reservoir of ammo is not to hose the area;

18  it's to allow you to stay in the fight longer if the fight gets

19  particularly complicated and ugly.

20  Q.  Can you provide examples of the most commonly used firearms

21  brought by civilians and law enforcement officers to your

22  training classes in the last ten years.

23  A.  Yeah.  Some of the most popular brands will be the Glock,

24  the Smith & Wesson military and police semiautomatic, and to a

25  slightly lesser extent, but I'm seeing it increase, the

 1   Springfield Armory XD series.

 2   *Q.*  As to the Glock series, can you identify the most popular

 3   Glock model that you see in your classes.

 4   *A.*  The most popular I see in the class is the Glock 17.  It's

 5   their service-sized 9-millimeter pistol with 17-round magazine.

 6   *Q.*  You also mentioned the M&P, the military and police?

 7   *A.*  Yes, sir.

 8   *Q.*  How many rounds is that?

 9   *A.*  Again, 9 millimeter, that would be a 17-round magazine.

10   *Q.*  And then you also mentioned the Springfield XD series.

11   *A.*  Yes, the original XD, full-sized service pistol with the 15

12   or 16 -- I'd have to go back and look.  What we're seeing more

13   is the updated version of that gun, the XDM, which in full size

14   is a 19-shot magazine, in the 9 millimeter.  Of course, all of

15   them would have one more cartridge in the firing chamber when

16   kept loaded.

17   *Q.*  What percentage of students these days, in the past ten

18   years, bring revolvers to self-defense class?

19   *A.*  It's tiny percent.  As I've said, I see classes where there

20   is not a revolver in sight.  I think in the last year, the most

21   revolvers I ever saw in a class was three or four, in classes

22   of 20 to 40 people.

23   *Q.*  I want to move into some mechanical discussions regarding

24   the differences between a semiautomatic firearm or handgun and

25   a revolver.  All right.

Massad Ayoob - Direct

1           Your Honor, we have brought some dummy firearms into

2    the courtroom.  I'd like the clerk to provide those to the

3    witness at this time for this demonstration.

4           THE COURT:  Have they been marked as demonstrative

5    exhibits?

6           MR. COLIN:  They have not at this time, Your Honor.

7    We brought them in this morning, didn't --

8           THE COURT:  Well, let's get them marked.

9           MR. COLIN:  We'll do that.  I think we're at 93.

10          There is a semiautomatic you want to use?

11          THE WITNESS:  The blue one.

12          MS. MORRILL:  Your Honor, we have not seen this

13   demonstrative.  We'd ask to see it before it is handed to the

14   witness.

15          THE COURT:  I'm sorry?

16          MS. MORRILL:  We have not seen this demonstrative

17   exhibit before.  We would like to see it before it is handed to

18   the witness.

19          MR. COLIN:  Sure.

20          THE COURT:  Fine, you can see it.

21          MR. COLIN:  The blue revolver and the blue

22   semiautomatic.

23          THE WITNESS:  Yes, I think there is only one revolver,

24   should be blue, as I recall, blue semiautomatic.

25          THE COURT:  Mr. Keech, would you present those to

 1  defense counsel, please, so that they can see them.

 2          *COURTROOM DEPUTY:*  Yes, Your Honor.

 3  *BY MR. COLIN:*

 4  Q.  Okay.  Can you describe how semiautomatic firearms,

 5  semiautomatic handguns in specific, are similar to or different

 6  from a revolver, mechanically.

 7  A.  Certainly.  The dummy here in my left hand is apparently

 8  produced by Odin Press, O-D-I-N.  But they're designed

 9  originally for handgun retention and disarming instruction, for

10  obvious safety reasons.

11          This is a cast dummy of the gun in battery.  When I

12  say "in battery," the parts are in alignment for firing.

13  Because it's cast, there are, obviously, no moving parts.  So

14  bear with me, because that compounds the difficulty of the

15  demonstration.

16          Once the gun is loaded, the part I'm indicating here

17  is the cylinder.  Essentially, a rotary drum that rotates on an

18  axis.  The pulling of the trigger straight back over a long

19  pull that would go from the at-rest position I'm indicating

20  here to the back of the trigger guard will inside the gun cause

21  a part called the cylinder hand to engage a ratchet inside the

22  gun at the back of the cylinder.  That will turn the cylinder,

23  rotating it.  As the mechanism brings the hammer back, the

24  hammer -- which I'm indicating here -- will rise before it

25  falls.  The next cartridge in the cylinder, which in this sized

Massad Ayoob - Direct

1    gun there would be six chambers with six cartridges, will

2    rotate under that hammer.  When the trigger pull is completed,

3    the hammer falls, the firing pin strikes the primer and the

4    cartridge, and the bullet is propelled through -- out of the

5    chamber through the barrel and toward the target.

6         To unload the gun, the part I'm indicating here, the

7    cylinder release latch, would have to be pressed in a certain

8    direction.  This is a dummy copy of a Smith & Wesson combat

9    magnum, and that brand is pressed forward.

10        Simultaneously, the other hand or some force has to

11   push the cylinder to the left to bring it out of the frame.

12   The cylinder assembly will now swing out and will be located

13   where I'm indicating here to the Court with my hand.  The

14   ejector rod of -- the stick-like projection in front of the

15   frame that I'm indicating here, is a part of the cylinder

16   assembly and will swing out with it.

17        To eject the spent -- the six spent empty casings that

18   will be in the chamber located at the back of the cylinder,

19   that rod has to be pressed or struck toward the cylinder.  The

20   ejector star, which is part of the ratchet, now comes back out

21   of the cylinder and drives those cartridges out, and they'll

22   fall to the ground.

23        So get it reloaded, visualize the cylinder was still

24   outside the frame.  If we had just loose ammunition in a pouch,

25   most people would have to reload one cartridge at a time,

Massad Ayoob - Direct

1    chamber per chamber, so six separate complicated motions of

2    getting the -- a small, narrow cartridge into the chamber.  A

3    dexterous, experienced shooter can load them two at a time.

4            There is a device called a speed loader, which holds

5    all six cartridges in a circle, that allows them to be loaded

6    at once.  Because it's the diameter of the cylinder, it's very

7    bulky and relatively few people find they can comfortably,

8    discreetly carry them concealed.

9            Once those are in, if it's a speed loader, the loader

10   has to be released, and it will then be allowed to fall away.

11   The firing hand will come back to the grip, and the other hand

12   will close the cylinder of the revolver.  And as we've noted,

13   it's a fairly complicated procedure.

14           The semiautomatic pistol, demonstrated here with a

15   Ring's brand, R-I-N-G apostrophe S, blue gun.  This one is cast

16   with polymer.  The primary parts will be the frame -- which I'm

17   indicating here -- in which the magazine -- which I'm

18   indicating here -- would be housed.  The barrel would be inside

19   the slide -- which I'm indicating here -- riding on a spring

20   guide rod with a recoil spring inside the gun.  The trigger --

21   which I'm indicating here -- is pulled, the pistol fires.  The

22   recoil force of that shot going off will drive this whole slide

23   assembly back on the frame.  The extractor -- which I'm

24   indicating here -- is a hook that will catch the inside edge of

25   the cartridge, the spent casing, and drag it back until it is

 1   punched out through the eject port -- which I'm indicating

 2   here -- by the ejector, which is a little stub that is inside

 3   the gun.  In other words, the cartridge is dragged back by this

 4   by the extractor hook and is then bumped by the fixed ejector

 5   to kick it out.

 6        At that point, the slide will have reached its

 7   rearward point of movement.  It will no longer be blocking the

 8   spring-loaded magazine in which the remaining cartridges are

 9   stacked, and the spring will now drive the next cartridge up in

10   front of the slide.  As the recoil spring does its reciprocal

11   movement, brings the slide back forward, it will carry that

12   cartridge back into the firing chamber.  It happens in an

13   instant, and the gun is ready to fire.  If you watch it happen,

14   most people can't actually see the slide moving; they just see

15   the spent casing sticking out of the gun.

16        To unload -- to reload once it's run empty, most

17   pistols will usually lock their slides to the rear when they're

18   empty to signal to the shooter that it's time to reload.

19        To -- may I stand?

20        *THE COURT:*  Sure.

21        *THE WITNESS:*  Okay.  To get the -- we have to do what

22   we did with the revolver, get the old empty stuff out and the

23   new fresh stuff in.  With the semiautomatic, we now have an

24   empty magazine that will be released by pressing the magazine

25   release button.  This, as in most guns, it's in the form of a

1   button behind the left side of the trigger guard.  The magazine

2   will now fall away, or if it's stuck, the shooter will flip it

3   out.  The shooter will grasp a fresh magazine, insert it in one

4   motion.  The difference is, here, we were inserting six tiny --

5   six exact size objects into six exact size holes, and with a

6   speed loader, trying to do it all simultaneously.  Here, it's

7   more of a gross motor skill than a fine motor skill.  We have

8   one relatively larger object going into one relatively larger

9   area.

10       The magazine is inserted until it clicks and seats.

11  If the slide is locked to the rear, either tugging back on it

12  will release it forward, or just coming up with the thumb and

13  touching the part I'm indicating here, the slide release lever,

14  will allow the slide to close, chamber the round, and complete

15  the reloading cycle.

16       The difference would be, reloading the revolver would

17  look in sequence like this.  Reloading the semiautomatic would

18  be a much simpler sequence that would look like this.

19  *BY MR. COLIN:*

20  *Q.*  During the course of your comparative testimony, you

21  mentioned trigger pull and trigger distance with regard to the

22  revolver, but not the semiautomatic.  Are they the same between

23  the two?

24  *A.*  No.  There are two different issues, and they do tend to be

25  different between the two types of guns.

**APP. 794**

Massad Ayoob - Direct

1   Q.   What are the differences on those?

2   A.   On the revolver, we have a long, heavy pull.  The reason

3   is, mechanically, the index finger, the trigger finger,

4   bringing the trigger back is performing multiple functions.

5   It's driving the cylinder hand upward to rotate the cylinder

6   against resistance; it's bringing the hammer back against the

7   resistance of a very strong main string that will be located

8   inside the grip frame.  And, typically, your double-action

9   service revolver will have a trigger pull weight of 9 to

10  12 pounds.  I've seen some that ran 14 pounds.  It's also a

11  longer stroke, because to get all of that mechanical work done,

12  basically, we need some distance for the lever-shaped trigger

13  to move.

14          With the semiautomatic, it -- you can get -- most

15  designs will have a lighter, easier trigger pull, at least for

16  most shots.  In this pistol, the M&P, it's striker fired, so

17  there is no hammer that needs to be raised and lowered.  It's a

18  much shorter trigger stroke that tends to be lighter.  The

19  factory spec for trigger pull weight on this gun for a duty or

20  defense pistol is 6.5 pounds.

21  Q.   You've done a demonstration for us, you've given us a

22  mechanical description of the differences between a revolver

23  and firearm, have you performed any tests to determine which

24  is -- which can be reloaded more quickly and efficiently?

25  A.   Yes.

APP. 795

1    Q.  And can you describe those for the Court, please.

2    A.  Yeah, over the years, I've lost count of how many thousands

3    of people I've observed reloading both revolvers and

4    semiautomatics in 40 some years of shooting competition and

5    shooting training.  It is inarguable that the same individual

6    is going to be able to reload the semiautomatic faster than he

7    is the revolver.  It's simply a less complicated task with

8    fewer movements involved.

9    Q.  Why does the amount of time required for reload matter?

10   A.  Because it -- assuming real world and not sport, every

11   second the defender cannot fire is a second of absolute

12   helplessness.  The longer the reload process takes, the longer

13   they are helpless against an armed opponent.

14          That becomes magnified in a situation where the hands

15   are trembling, fine motor skill is being lost.  The revolver is

16   more dependent on fine motor skill than is the semiautomatic.

17   And, overall, when you're reloading, you're vulnerable.

18          I think the easiest way to explain it is, if it was a

19   boxing match, if someone said for X numbers of seconds you have

20   to lower your arms and not punch or block while your opponent

21   is allowed to punch, you would have just turned into a punching

22   bag, and for that period of seconds would take blow after blow

23   until they finally got the knockout blow, and you are going to

24   be unconscious on the mat.

25          That same -- that same dynamic occurs in the reloading

1  process.  While you're unable to fire the gun, since it's not

2  been reloaded yet, you are the equivalent of the boxer with his

3  hands at the side.  The opponent does now have you turned into

4  a target instead of a threat to flee.  And with impunity, he

5  can be sending his blows with a gun or knife at you until he

6  gets the knockout blow that leaves you dead.

7       MR. COLIN:  Thank you.  Your Honor, this would be a

8  good time for the noon break.

9       THE COURT:  All right.  Then we'll stand in recess,

10  and we'll stand in recess until 1:30 this afternoon.

11       Is there anything we need to take up before our noon

12  break?

13       MR. COLIN:  No.  Not from the plaintiff.

14       THE COURT:  Okay.  All right.  Then we'll stand in

15  recess until 1:30.

16       (Recess at 11:56 a.m.)

17       (Hearing continued at 1:33 p.m.)

18       THE COURT:  Please resume.

19       MR. COLIN:  Thank you, Your Honor.

20  BY MR. COLIN:

21  Q.  Mr. Ayoob, we've gone through your knowledge of the

22  mechanical functioning of both revolver and semiautomatic

23  pistol.  I'd like to move now on to how that's applied.

24       Do you teach civilian shooters and law enforcement

25  officers, both able-bodied and not, how to perform magazine

1   exchanges swiftly, efficiently?

2   A.  We do.

3   Q.  For how long have you been providing that kind of

4   instruction?

5   A.  For 42 years.

6   Q.  Can you estimate how many students you've taught how to do

7   tactical, standard, or any other kind of magazine exchanges

8   involving semiautomatic firearms?

9   A.  Countless thousands.

10  Q.  And did you say law enforcement since 1970 something, and

11  civilians after that?

12  A.  Law enforcement since '72; private citizens since '81.

13  Q.  Based upon that experience, can you tell us how long it

14  take an average shooter, able-bodied, to perform a magazine

15  exchange?

16  A.  With some proper training fresh in their mind, they'll

17  probably average around four to six seconds.  Of the more

18  dexterous, the more expert, the naturals, if you will, the ones

19  with more experience, will probably go two to three seconds.

20  Q.  Can you provide an average time for disabled shooters?

21  A.  We cannot.  The reason is the range of disabilities is

22  simply too far to figure out an average.

23  Q.  Describe what kind of considerations you have to take into

24  account when dealing with developing a training program for a

25  disabled shooter to effect a magazine exchange swiftly and

 1   effectively.

 2   *A.*   Sure.  The first thing that we have to do is analyze what

 3   the shooter's disabilities are, and just as important, what

 4   abilities he or she still has.  The disabilities may range from

 5   the guy who is palsied due to age or neurological problems or

 6   nerve damage.  The very rapid insertion of the magazine that

 7   would be easy for an able-bodied person sitting in here becomes

 8   a nightmare for him, because both the feeding hand and the

 9   receiving hand are shaking.  It's going to take him much

10   longer, and proportionately longer still with the revolver,

11   with smaller cartridges going into smaller receptacles.

12          Overall, we look at, where is the disability?  The

13   upper body disabilities, the upper limbs, whether it's hands,

14   arms, upper body strength issues, I see that when I'm

15   teaching the shooting of the gun, use of the guns, as a

16   profound disability in that respect.

17          The other element we have to look at is the lower

18   body, disabled knees, ankles, perhaps someone who has no

19   feeling at all in their legs.  That becomes an issue of

20   tactical mobility.  We can --

21   *Q.*  Before we get to that, I want to -- I certainly want to

22   speak to that issue.  I want to get there by laying foundation

23   before we can talk about it.

24          I'd like you to explain why -- if we're only talking

25   about two to three seconds for an expert or four to six seconds

Massad Ayoob - Direct

 1  for a typical civilian, an average civilian shooter -- if we're

 2  only talking about two to six seconds, what is the big deal?

 3  Why does it make a difference?

 4  A.  Remember, we're teaching them on the range to operate

 5  life-saving emergency rescue equipment.  When they actually

 6  need the skill, it will be during an ongoing attack.  Every

 7  second that they are unable to respond is a second of absolute

 8  total helplessness.  We often -- when we're looking at time on

 9  one side, we always have to look at time on the other.  The

10  opponent is up and running.  It has been well established in

11  firearms training literature for decades now that the average

12  person can pick up one of these guns -- here, I'm holding the

13  dummy revolver.  And even with its long trigger stroke back and

14  its long stroke forward to reset, if you start timing from the

15  first shot, the average person can fire four shots in about --

16  four shots in about one second.

17        The semiautomatic pistol, the majority of models which

18  have the shorter trigger stroke, like this M&P I'm now

19  demonstrating with, shorter back, shorter forward, less

20  distance equals less time and more output.  The average

21  person -- not the expert, not the master, the average person,

22  will get off five shots in the first second.  Some people if

23  they're fast will get off six.  That means the other person has

24  six chances to kill you or six chances to kill the people

25  you're protecting if you are unable to stop them.

Massad Ayoob - Direct

```
 1        If, instead of having to take that -- that, whether
 2   it's two-second, four-second, or ten-second reload, if you had
 3   enough cartridges in the gun that it had not run dry, that you
 4   could simply keep shooting, average break time -- that is, the
 5   elapsed time between shots -- is going to be a fourth to a
 6   fifth of a second.  So we're balancing several seconds,
 7   multiple whole seconds of vulnerability for you and those
 8   within the mantle of your protection against the ability to
 9   return a shot and hopefully end the danger in a quarter of a
10   second.
11   Q.  Now I want to get to the area you were about to speak to
12   with regard to upper and lower body disabilities if we could.
13   You have instructed, have you not, over the last 40 years,
14   individuals with both kinds of disabilities, meaning upper body
15   disabilities and lower?
16   A.  I have.
17   Q.  Can you tell us how many physically challenged, disabled,
18   infirm shooters that you have instructed over the last 40
19   years?
20   A.  It will go maybe one out of twenty with what I would
21   consider a profound disability in terms of shooting, the really
22   severe tremors in the hands, an arm that does not work, missing
23   digits from the hands, missing whole fingers from the hands,
24   and the occasional missing hand or missing arm.
25   Q.  Is --
```

APP. 801

Massad Ayoob - Direct

1   A.   It's at least twice that for the lower body disabilities.

2   A few times a year, every year, in civilian classes, we'll have

3   someone who is in a wheelchair.   There are many more whose

4   lower body disabilities don't show up until I ask them to shoot

5   from a cover position.   And most of the cover positions are

6   low, such as a kneeling position or a deep-cover crouch.   The

7   guy who you don't notice any disability when he's just walking

8   around casually, now in his bad knee, his replacement hip, his

9   fused ankle, whatever come into play, he can't do it.   He can't

10  get down behind that cover.   He doesn't have that protective

11  place, that safe harbor, that safe haven where he's going to

12  have the few seconds to reload the gun.   He may be caught in

13  the open, and the only thing he can stop the opposing fire with

14  is his own return fire.

15  Q.   So it sounded to me like you have two categories of

16  disabilities, at least in your mind.   You used the term

17  "profoundly disabled."

18  A.   From my perspective as a firearms instructor, yeah.   I'm

19  not looking at what a doctor would call profoundly disabled;

20  I'm looking at what me teaching the student this particular

21  skill is a profound handicap to overcome.

22  Q.   And you said, roughly 5 percent of your students over the

23  last 40 years have fallen into that category?

24  A.   Roughly 5 percent, yeah.

25  Q.   And then you said there is another category.   Can you give

**APP. 802**

1    us an estimate of how many students fall into this other

2    disability category.

3    A.   What I would call the tactically disabled.  The people who

4    move very slowly, the people who may not be able to move at all

5    if they're in a manually operated wheelchair, or the people

6    with lower limb injuries or disabilities that are in positions

7    where they cannot take cover behind something like an engine

8    block or a heavy stove during a home invasion or something like

9    that.  And that would be about twice as many.

10   Q.   So another 5 to 10 percent?

11   A.   Probably, yeah.

12   Q.   Okay.  Do you provide separate training classes for

13   disabled shooters, infirm shooters?

14   A.   I do not.  The reason is, there is such a wide range of

15   disabilities, there is no one curriculum that will fit them

16   all.  So we integrate them often with special needs assistance

17   into our regular programs.

18   Q.   In the regular programs in which you allow disabled

19   shooters to participate, is there training to able-bodied

20   students in those classes that is similar to the training that

21   is received by these disabled folks?

22   A.   Yes.  In the first level in police training and the second

23   level in our civilian training, we'll get into the wounded

24   defender techniques.  The situation where you walked into the

25   thing able-bodied, a gunshot went off, now one of your arms no

Massad Ayoob - Direct

1    longer works, now your leg has crumpled under you and no longer

2    works.  How do you transition from this hand to that hand,

3    let's say, for the police officer?  How do you shoot from the

4    ground and stabilize the shot, whether you're on your butt, on

5    your back, on your side, whatever?  If you only have one hand

6    to shoot back with, how do you maximize your ability to deliver

7    accurate rapid fire when 50 percent of your upper shooting

8    platform has just been shot away?

9    Q.  Am I accurately hearing that your training, then, for the

10   disabled shooter is pretty much the same as the training that

11   you give to able-bodied citizens on how to deal with injuries

12   during a gunfight?

13   A.  There is a lot of crossover, but it's not identical.  For

14   example, shooting from a seated position.  If we had a police

15   officer who's ambushed from the front, and he's seat-belted

16   into his cruiser, the car is in park, there is no time to

17   escape, he's literally got to shoot through the windshield.

18   From his seated position -- I will be visible from your

19   perspective -- he could jackknife his upper body forward, get

20   his upper body weight under the gun, and deliver very accurate

21   rapid fire, recovering from the recoil almost as quickly as he

22   can reset the trigger.

23        The person in the wheelchair very often will not be

24   able to do that.  The reason is, if you jackknife forward from

25   the hips, your legs become V springs that are holding your

Massad Ayoob - Direct

1  upper body upright as your upper body weight goes forward.  The

2  paraplegic, particularly the paraplegic who is paralyzed from

3  the chest down -- I've seen some who have to be strapped into

4  the wheelchairs.  If they try to lean their upper bodies

5  forward, it's going to overbalance, and they fall out of the

6  chair.  So we teach them different techniques.

7      For example, I teach them, since they're going to have

8  to lean back to stay in the chair, to shoot with what is called

9  the Weaver stance.  It's an isometric position in which both

10  elbows are bent, the gun hand pushes, the support hand pulls.

11  That allows recoil to -- it, essentially, turns the arms into

12  tense skeletomuscular shock absorbers.  The recoil is forced

13  between the gun and torso.  If they had tried to shoot in the

14  more modern technique that the officer could do jackknifed

15  forward, the locked arms will become levers.  The first shot

16  may go through the windshield.  The second shot will go into

17  the roof, unless they consciously take time to bring the gun

18  back down, which would greatly slow their rate of return.  So

19  in areas like that, there might be some difference.

20      In many of the others, we teach them exactly the same,

21  because so many wheelchair victims, when they're mugged, the

22  attacker's first thing is to tip them out of the wheelchair on

23  the ground, thinking they're going to be helpless like an

24  upside down turtle.  We emphasize with the wheelchair students

25  how to shoot from the ground a little more than we would with

1   the average civilian student.

2   Q.  Okay.  I'd like you to describe for the Court the process

3   that you use when a disabled individual comes to you, somebody

4   with an infirmity, a handicap of some kind.  Describe the

5   process that you use to develop training that will allow them

6   to overcome that disability.

7   A.  Sure.  Well, we'll start with, at the risk of repeating

8   from the last question, assessing, what is their disability?

9   What are their abilities?  We know now what they can't do;

10  let's see what they can do.  It may be more important for them

11  than for a perfectly able-bodied shooter to have a gun that

12  perfectly fits their hand.  And lets them apply maximum

13  mechanical damage to compensate for any upper body weakness

14  they might have.  We may have to place the gun differently.

15  Most people, police or civilian, who carry concealed handguns

16  will carry on or just behind the strong side hip.

17          If I may stand for one more moment.

18          It's a natural, easy place for the dominant hand to

19  simply come back to and access the gun.  If we have someone in

20  a wheelchair, it's going to be much more difficult.  The gun

21  tends to be pinned between the arm of the wheelchair and the

22  torso of the patient.  And as they reach down here, they've

23  about run out of range of movement, so they're going to have to

24  rock significantly to the side.  So people like that, we'll

25  suggest, you know, may be a little slower for the standing guy,

1    but we'll have you place your gun cross body.  That would be

2    the opposite hip, but forward.  Gives them much better range of

3    movement across the body, and we just show them how to safely

4    do it on the firing range in a way not to cross any other

5    shooter so they can practice and build their skills.

6              We will try to adapt the gun.  The person who is going

7    to have particular difficulty reloading for whatever reason is

8    obviously that much more a candidate for a gun that has a

9    higher reservoir of ammunition.

10   Q.  All right.  So you analyze the disability, you address how

11   they might carry it, where they might carry it, where they

12   might carry ammunition, drawing and aiming the weapon?

13   A.  Right.

14   Q.  Is there any identification -- and maybe that's what you

15   were getting to a moment ago with regard to mechanical changes

16   that might be made to the firearm itself.  So, do you study the

17   mechanical operation of the firearm in conjunction with the

18   disability to try to figure out how the mechanical function of

19   the firearm might be modified or how the shooter might modify a

20   more typical approach in firing?

21   A.  We do.  A classic example of that would be the person with

22   very short fingers.  We have a lot of people, particularly in

23   foreign countries, that have had industrial farming accidents,

24   so they're missing a fingertip or something.  I had one student

25   who was a Thalidomide baby in adulthood, and all of his fingers

**APP. 807**

Massad Ayoob - Direct

1    were about as long as the median joints are of mine here.  One

2    of the things you want is going to be a pistol with shorter

3    trigger reach.  The trigger reach dimension on the gun is

4    measured from the back strap under the grip tag, of the part

5    that I'm indicating here, to the center of the face of the

6    trigger, which I'm indicating here.

7         On the hand, it would be measured from the center, the

8    web of the hand, in line with the long bones of the forearm,

9    from this point I'm indicating here, to the contact point on

10   the trigger finger.

11        Someone with one digit shorter than what my finger is

12   here is barely going to be able to touch the trigger, but will

13   not have the left leverage to pull it.  My finger only went to

14   here on a longer trigger gun.  If you've got something with a

15   shorter trigger reach, as you can see here, they'll be able to

16   get at least -- where the joint -- with the distal joint of my

17   finger sits here, is where their fingertip will sit, and they

18   will be able to operate the gun effectively.

19   Q.  You've gotten into -- a little ahead of us in terms of the

20   missing shortened finger issue.

21   A.  I'm sorry.

22   Q.  I want to walk through the methodology you apply when

23   attempting to develop what I'm going to call the work-around or

24   a method by virtue of which someone with a disability can

25   overcome that disability.  And what I understood you to say,

APP. 808

Massad Ayoob - Direct

1   you start out by figuring out what the disability is, figuring

2   out what aspects of carrying, firing, reloading a firearm those

3   disabilities are going to affect; is that a fair beginning?

4   A.   Correct.

5   Q.   And then what's the next step in the process?

6   A.   The next step in the process is get the student out

7   actually shooting, and, basically, diagnose, how is he hitting?

8   How is his hand interfacing with the firearm?  What's his speed

9   of recoil control, et cetera?  And we adapt accordingly in

10   terms of technique and equipment.

11   Q.   So you develop ways for the disabled, injured, or infirm

12   shooter, whether able-bodied or not, to overcome whatever the

13   disability or injury presents?

14   A.   Correct.

15   Q.   Is that fair?

16   A.   Yes.

17   Q.   All right.

18   A.   Whether by technique or equipment or combination of both.

19   Q.   Can you advise the Court regarding the impact of upper body

20   disabilities on a shooter's ability to reload.  And whether

21   it's a disability or injury, let us know if there is a

22   difference.  Otherwise, if the same is true for able-bodied

23   injured shooters as it might be to a disabled person with a --

24   an extremity that is either missing or rendered useless,

25   paralyzed?

APP. 809

1   A.   Sure.  You have to take each of them, basically, as they

2   come.  For every student who is going to have the super short

3   fingers or the hand injury or partial or complete amputation,

4   you're going to have several who are my age.  The age is

5   getting along, you're seeing arthritis manifestations in the

6   hand, and they don't have the range of movement that they might

7   have had when they were 20 or 30 or 40.

8        I'm kind of losing track here -- repeat the question.

9   Q.   Sure.  I'm asking you to explain how the ability to reload

10  is adversely affected by a disability.

11  A.   Thank you.  Let's say that I had a shortened thumb, and we

12  are reloading the semiautomatic pistol.  With an average length

13  thumb, it's no problem for me, being right-handed, to simply

14  press this button inward and dump the magazine.  If my thumb

15  only came to where my median joint is, I would have to turn my

16  hand on the gun, bring the proximal joint of my index finger

17  under the grip tag, which would somewhat weaken my grasp of the

18  pistol, to get that part of the thumb -- where my median joint

19  is would be the tip of his stump, basically -- to make that

20  press.

21        Or we could simply have him do it with the other hand,

22  but that's going to slow him down too.  Because the

23  conventional reload, the shooting hand is dumping the magazine

24  simultaneously with the support hand grabbing a fresh magazine

25  to reload.  Now, with the left hand, in my case, doing the

1   right hand's job, that support hand is going to get much later

2   to the spare magazine and will slow down the reload and

3   lengthen that window of absolute helplessness.

4   Q.  You anticipated my next question.  I was going to ask why

5   time was a problem.  Thank you.  How can that be overcome, the

6   time element that you just described?

7   A.  The simplest and most logical way is to have that person

8   carry a gun, or have access to a gun if it's home defense, that

9   has that many more cartridges in it.  The more cartridges there

10  are, the less often he will have to reload.  The more

11  cartridges there are, the longer he can stay in the fight

12  before he has to reload.

13  Q.  How, then -- taking everything you just testified to into

14  account, how, then, did you arrive at your opinion that the

15  ability of a disabled, infirm, or injured person to protect

16  themselves will be adversely protected by a magazine capacity

17  limitation?

18  A.  Well, certainly, through a lifetime of study, through

19  observation.  When you look at the lower-capacity gun versus

20  the higher-capacity gun in fully skilled hands, it becomes

21  pretty stark.  There is an organization that conducts what you

22  might call simulated gunfighting, called IDPA, International

23  Defensive Pistol Association.

24         At their national championships last year, the top

25  revolver shooter in the world, a guy named Jerry Miculek,

1   M-I-C-U-L-E-K, was shooting against the top semiautomatic

2   pistol shooter in the world, Rob Vogel.  They're shooting the

3   exact same course of fire, the exact same number of hits

4   required.  The rules limit Miculek with the revolver to six

5   shots, then he has to reload again, six shots, then he has to

6   reload again, et cetera.  Their rules, to keep a level playing

7   field for semiautomatics in states that have ten-round magazine

8   limits, is ten in the magazine, one in the chamber.  So the

9   semiautomatic shooter in that case had eleven rounds to six the

10  other man had.

11          When you figure the time it takes to reload and the

12  number of times you have to reload, at the end, Vogel's score

13  was 28 percent faster than the revolver shooter.  So,

14  essentially, comparing like with like, the greatest world

15  champions in the sports at this time, it was a 28 percent

16  deficit to have the gun with less capacity.

17  Q.  We've already done this to a certain degree, so I want to

18  skip over anything that you have already covered in your

19  testimony.  Now is about the time I wanted to get into

20  particular disabilities that present specific problems for

21  handicapped or injured able-bodied shooters which adversely

22  affect their ability to address a threat due to a magazine

23  limitation.  And you had started to talk about shortened or

24  missing fingers, and you actually effected the demonstration of

25  some of the issues for the Court.

1          Are there any other points that you'd like the Court

2     to consider with regard to how individuals with missing or

3     shortened fingers are impacted by capacity limit on detachable

4     box magazines?

5     A.  Well, the missing or shortened fingers, if it reduces their

6     ability to shoot fast and straight, means that a shot that had

7     they had perfect hands and had lined up, might have struck

8     center and ended the fight, might hit off center, leave the

9     opponent up and running and trying to kill them and others and

10    require them to shoot again.  If you don't have any ammunition

11    left with which to shoot again, you're back in that window of

12    utter helplessness.

13    Q.  You mentioned possible design -- mechanical design

14    modifications to a firearm to address a problem associated with

15    missing or shortened fingers.

16    A.  One that has been suggested in some of the plaintiffs' --

17    I'm sorry, the defendant's reports and depositions that I've

18    read has been simply putting an extended magazine release on

19    the semiautomatic pistol.  That would work to some degree,

20    certainly, on the range.  Your problem with it is if the gun is

21    going to be carried.  The magazine button tends to extend --

22    it's going to be generally the same diameter, a bit larger, but

23    it will extend out away from the pistol.  That means we have a

24    protuberance that in a right-handed person's holster, coming

25    from the left side of the gun, is going to be pressing against

1    the left side.

2         Apart from discomfort, any time that person bumps into

3    a door or simply leans to the right side in a wheelchair when

4    the armchair hits it, the weight of the gun will now drive the

5    button against the body, it will press the release, and the

6    magazine will pop out.  This means the gun is no longer

7    functional.  On some guns, if they need to draw and fire in

8    self-defense, they will get one shot before the gun ceases to

9    fire.  Some others have a feature called a magazine

10   disconnector safety, which means that when a magazine drops out

11   of place, even the live round in the chamber cannot be fired.

12   In that situation, they'd be totally helpless.

13         Carrying on the left side, since most of the pistols

14   have the button protruding to the left, that would allow any

15   time the edge of the chair -- the wheelchair strikes the hip,

16   once again, the magazine is going to be released, and it will

17   turn the whatever-many-shot pistol into a one-shot pistol, or

18   if it has the disconnector safety, a nonfunctional,

19   nonshootable pistol.

20   Q.  All right.  I want to move on, if we've covered everything

21   dealing with adverse effects of missing or shortened fingers on

22   the mechanical operation of the firearm, and talk about either

23   a completely paralyzed arm or missing arm or hand and whether

24   or not, first of all, you've trained people with those

25   disabilities.

Massad Ayoob - Direct

1    A.   I have.

2    Q.   Secondly, when you're training those folks, is that similar

3    to teaching an able-bodied person how to shoot one-handed, for

4    example?

5    A.   It is.  It is very much the same, I'd say high 90th

6    percentile commonality.  What you've got there -- with only one

7    hand on the gun, you've literally lost 50 percent of the flesh

8    and bone that your opponent might have to control his gun.

9    You've got to remember with even a 6 1/2 pound trigger pull,

10   this is going to be only about a -- about a 2-pound gun once

11   it's loaded, give or take a few ounces.  Putting 6 1/2 pounds

12   pressure suddenly on something that weighs only 2 pounds,

13   something a third of its weight, it's very easy for that to be

14   tripped off target.  If you have a two-handed grasp, it's much

15   easier to keep it stable on target and make those shots.  So

16   if --

17   Q.   So just so I understand, what you're saying, it potentially

18   affects accuracy?

19   A.   Potentially affects accuracy.  It will also dramatically

20   affect recoil recovery.  That is, the speed -- the time it's

21   going to take from one accurate self-defense shot to the next

22   accurate self-defense shot.  Two hands could control the

23   recoil, which takes the form of what is colloquially called

24   kick, the gun coming back into your hand, and includes also

25   muscle rise or muscle jumps, as the muscle levers up against

Massad Ayoob - Direct

1   the axis of the wrist.

2   Q.  So one-handed shooting affects accuracy in two ways that

3   you just described?

4   A.  It affects accuracy, and it affects speed.

5   Q.  Let's talk about the speed component.  When you're talking

6   about speed, are you talking about the speed to reload or

7   replace a magazine?

8   A.  No, that would be the speed to get multiple hits.

9   Q.  All right.  Let's talk about that, and then we'll talk

10   about the other issue.  Tell me about the speed to get multiple

11   hits.

12   A.  Okay.  The speed of shooting is going to be the same one or

13   two hands, because the same index finger is controlling the

14   trigger.  The delivery of accurate hits is what changes.  Given

15   the fact that, again, we only have half the flesh and bone to

16   stabilize against the trigger pull weight against the

17   trigger's -- excuse me, to stabilize the gun against the weight

18   of the trigger pull, and we're going to have more muscle rise

19   between shots, it's going to take longer between shots to

20   align, hold and squeeze, bring the muscle back down from the

21   recoil of shot one to align it for shot two.

22        You could put -- one-handed, I could shoot as fast as

23   I can shoot two-handed.  One-handed, none of us are going to be

24   able to hit accurately as fast as we could two-handed.

25   Q.  So what's a work-around?  What -- what are ways that you

1   have developed to overcome the problem with hit potential here

2   that you've just described, or accuracy?

3   A.  We teach very hard grasp, very aggressive stances.

4           May I stand?

5           THE COURT:  You may.

6           THE WITNESS:  It's like throwing a punch.  If you're

7   standing upright, like, on the target range, and the pistol

8   recoil is one-handed, the gun comes up and toward your weak

9   hand side like a lever.  It's following the line of least

10  resistance.  It goes upward because the axis of the barrel is

11  above the wrist, and it goes inward because that's where the

12  hand is open and, therefore, the weakest.  That would be

13  happening much less if that side was closed.

14          By getting the upper body forward, we're getting body

15  weight into it, and we can recover faster.  These are fixes,

16  but they're not perfect fixes.

17          I referred a minute ago to IDPA, International

18  Defensive Pistol Association.  In their current rules, the

19  matches cannot put the target more than 7 yards away from the

20  shooter when he's firing non-dominant hand or weak hand only.

21  They cannot put the targets more than 10 yards away in a stage

22  that requires strong hand only shooting.  And the stages where

23  two-handed shooting is allowed, the distances go to three or

24  more times that distance.  That gives you an idea of how much

25  the one-handed versus two-handed shooting affects accuracy and

Massad Ayoob - Direct

```
 1   speed.

 2   BY MR. COLIN:

 3   Q.  What is the most effective way to address diminished

 4   accuracy?

 5   A.  Diminished accuracy means you're going to need more makeup

 6   shots.  If you get clumsy in the golf game, you're going to

 7   need more strokes.  If something has kept you from getting the

 8   bullet exactly where it needs to go, you're going to need a

 9   Mulligan, a do-over.  Given that that is highly predictable,

10   particularly for the physically handicapped individual, that

11   means you're going to need more cartridges in the firearm.

12   Q.  And then I had referenced time to reload.  Is there an

13   adverse effect on an individual who has been injured in a hand

14   or an arm or if the arm is disabled, the hand is disabled, is

15   there an adverse effect on their ability to reload?

16   A.  Yes.  The one-handed reload can be done; but it takes so

17   much longer.  It's not just increasing the time, it's literally

18   multiplying the time.

19          It would probably be best if I demonstrated the

20   mechanics really quick.

21          MR. COLIN:  Your Honor, may he demonstrate from the

22   witness stand?

23          THE COURT:  He may.

24          MR. COLIN:  Thank you.

25          THE WITNESS:  Okay.  We discussed before two-handed
```

1    with the revolver, simply open the cylinder, support hand slaps

2    out and grabs, loads go in, other hand closing cylinder, we're

3    back in business.

4         But now if, let's say, all I have is my left hand only

5    on this revolver, last shot has been fired.  I can't flip it

6    around like this without dropping it, so I've got to bring it

7    back to my chest and let the back of the butt touch here to

8    stabilize.  Now my left hand can go under the trigger guard,

9    and that's the only way this thumb can reach the cylinder.  The

10   fingers of this hand simultaneously have to push the cylinder

11   out of the frame.  At this point my fingers would go through

12   the now open frame, and the thumb would hit the ejector rod to

13   clear the shells.

14        I don't have another hand to hold it with, so I have

15   to put it somewhere.  If I had a holster on the left-hand side,

16   I'd stick it in the holster with the cylinder up.  If not, I'd

17   shove it in the waistband.  But either way, I would have to

18   remember to hold my thumb on that ejector star we talked about,

19   because when the ejector rod touched the clothing where the end

20   of the holster would come up, it blocks the insertion of any

21   fresh cartridges.

22        Once that's there, now this hand has to go to the

23   ammunition, one cartridge at a time, if we have a pouch or

24   maybe the speed loader.  If it's the most popular type of speed

25   loader, with a release knob that turns clockwise, as I turn

1    clockwise, the cylinder will turn with it.  So now I've got to

2    remember to hold the finger to stabilize the cylinder.  And

3    that's a whole lot of fine motor dexterity and a whole lot of

4    dancing going on.

5          Finally, the rounds are in the chamber, I've got to

6    draw the gun again, use the trigger finger now to close the

7    cylinder and come back.  It takes multiple times longer than

8    the two-hand reload.

9    BY MR. COLIN:

10   Q.  What is the most effective way to address that problem?

11   A.  The most effective way is not to have to reload because you

12   had enough cartridges in your pistol to end the fight.

13   Q.  Are you aware of any statistical data regarding the number

14   of rounds in which a defensive shooter has had to fire more

15   than 15 rounds under those circumstances?

16   A.  No.  To the best of my knowledge -- believe me, I've looked

17   for it -- no such data exists.  The reason being, there is no

18   central repository where that kind of empirical data is

19   gathered.  We don't even have it for police nationwide.  What

20   we do have is FBI's officers killed, several every year, but

21   that's only the officers who are murdered in the line of duty.

22   It's not at all applicable to all gunfights, which would

23   encompass the victory by the good guys that we hope we're

24   looking for.

25         What we do have on the police side is, there are a

APP. 820

1    couple of large departments that every year analyze and detail

2    every shooting involving their officers.  Now, if one accepts

3    the extrapolation, the private citizens are going to be

4    shooting in self-defense at the exact same people the police

5    are going to be shooting in self-defense, I think it's a

6    reasonable extrapolation.

7         Insofar as high round counts, the last year I can find

8    for the New York City Police Department, the largest in the

9    country, 3 percent of the shootings that year went over 16

10   shots fired by police.  On the West Coast, Los Angeles Police

11   Department, the third largest, it was 5 percent.

12   Q.  So if we're only talking about 3 to 5 percent, help me

13   understand why that's significant.

14   A.  It is significant because in a life-or-death issue,

15   Mr. Colin, it's not about the odds, it's about the stakes.  I

16   think the best analogy I could give is, probably everyone in

17   this room has fire insurance on their home.  If the judge would

18   ask for a show of hands, okay, how many of you have ever had

19   your house burn down, you probably wouldn't see more than one

20   or two hands go up.  Those people would be awfully glad they

21   have the fire insurance.  Would the rest of us look at each

22   other and say, darn, we've been cheated by the insurance

23   company and all of those premiums because our house didn't burn

24   down?

25        What we have for every premium, the value we got was

APP. 821

1    the peace of mind.  And that is, in essence, exactly what we're

2    looking at when police or civilians select the firearm they're

3    going to carry.  The odds say, none of us, even the police, are

4    ever going to need to shoot anyone during our career.  The odds

5    say, the cops should be able to be Andy of Mayberry and go out

6    and do their duty without a gun at all.  But in those moments

7    when you become the 3 percent, the 5 percent, it's like the

8    fire extinguisher -- it's like the fire insurance, the cost of

9    not being prepared for it is so absolutely catastrophic, it is

10   simply unacceptable.

11   Q.  Thank you.

12        I'd like to move on to your training of individuals

13   who, either due to age or some other infirmity, have

14   experienced, perhaps not the level of disabilities to which you

15   previously -- those profound disabilities, but nonetheless fall

16   into that other 5 to 10 percent of your category of your

17   students who you've had to develop work-arounds similar to the

18   work-around for an injured shooter.  Can you describe the

19   nature of the infirmities, if you will, caused by age or

20   illness that you've had to address in your instruction.

21   A.  I'm not sure if they're caused by age or just come with it,

22   but I'm at an age experiencing it.  Essentially, there, we see

23   more the tactical disability elements, the -- they can't move

24   to cover or get in behind cover as effectively.  The current

25   protocol that's being put forth by the authorities for active

1    murder attempt responses is run, hide, fight.  First try to run

2    and get away, get out of range.  Second, if you can't do that,

3    hide someplace and hope they can't see you or hope you're

4    hiding behind something so solid they can't shoot through it

5    and kill you.  And fight only as a last resort.  The person who

6    cannot move quickly, the run part and the hide part are off the

7    table from when the killer's first shot goes off.  Their only

8    chance is to fight.

9    Q.  Stop there.  So these folks with these lower-body problems

10   that you've just described, are those similar to folks with

11   lower-body disabilities that you've talked about, folks in

12   wheelchairs, missing legs?

13   A.  Correct.  It's a matter of degree.

14   Q.  Well, then, to save a little bit of time, let's combine

15   those discussions, if we could.  You talked about infirmities

16   that affect this run, hide, fight situation.  Same true of

17   lower-body disabilities?

18   A.  Yes.

19   Q.  All right.  And so can you describe to the Court the

20   adverse effect of being unable to run and hide and the methods

21   that you've developed to try to address those adverse effects.

22   A.  Basically, there, you become a sitting duck, once again,

23   that window of helplessness that we've been speaking of.  I can

24   teach them to shoot while they're moving.  One of the few

25   advantages of the slow-moving guy is he'll be able to hit

Massad Ayoob - Direct

 1  better than the fast-running guy when he shoots while he's

 2  moving.  But, in essence, if you cannot escape the line of fire

 3  with the opponent, if you cannot outrun the guy coming at you

 4  with a knife, the only chance you have left is to use your

 5  weapon to neutralize his threat.  And that means you need

 6  enough punches to be able to throw to finish the knockout blow

 7  to end the fight.

 8  Q.  I've heard the word in a different context in law

 9  enforcement called cover fire; is that what you're talking

10  about?

11  A.  No.  If you shoot -- the object you're shooting is to hit,

12  particularly in a crowd situation.  Again, we want -- don't

13  want to jump into that spray and pray.  The whole purpose of

14  the gun is to deliver accurate fire, perhaps rapid fire, if

15  necessary, that will stop the threat.  Shooting while you're

16  moving, you will have to slow down your rate of fire to get

17  accurate hits.

18  Q.  So the -- your ability to return cover fire -- or to

19  provide the kind of defensive fire that you're talking about,

20  is that impacted by the number of rounds that you have

21  available to you before you reload?

22  A.  Certainly, the more punches you have to throw, the more

23  likely you are to land the punch that ends the fight.  The

24  opponent very often is behind heavy cover.  You look at

25  situations like the Trolley Square Mall mass shooting in Salt

1  Lake City, Utah.  The killer was shooting people in the Von

2  Maur mall -- I'm sorry, I'm not sure if it was Von Maur or not

3  -- the Trolley Square Mall.  The first responder was an

4  off-duty police officer who only had a seven-shot pistol.

5        He sees the shooter, fires the shot at him.  The

6  shooter ducks in behind the cover of a store that everybody has

7  run out of.  And every time he ducks his head out, the officer

8  takes another shot.  Doesn't hit him, but comes close, and pins

9  him down.  Everyone is stampeding to the exits.  But during

10  those moments, the killer has been diverted.  He claims no more

11  victims from then on.

12        As the young officer is -- he either ran out of

13  ammunition or had one cartridge left, the accounts of that

14  vary.  At that moment, the second responding officer arrived,

15  joined in the fight, pinned the guy down until the SWAT team

16  arrived.  And it took the SWAT team 14 rounds of submachine

17  gunfire and M16 rifle fire to finally kill the killer.  But it

18  wasn't about posing, it was about sustaining fire that kept him

19  in position.  And I gather that's what you were talking about

20  when you spoke of cover fire.

21        We saw it earlier in the classic 20th century mass

22  murder, back in '66, the Texas tower.  Charles Whitman had

23  climbed that tower with literally a footlocker full of guns and

24  ammunition that he rolled up on a dolly on the elevator.  He

25  opens fire from the top of the tower, more than 330 feet up.

Massad Ayoob - Direct

1  The police with .38 caliber revolvers, short-range buckshot,

2  were helpless to stop him.  Once the people down on the streets

3  figured out what was going on and saw people falling around

4  them, hunting rifles started coming out of pickup trucks.

5      One of the guys who returned fire was a civilian rifle

6  competitor who had been issued a national match at 14.  And if

7  you look at the news cam footage of what happened then at the

8  tower, you see puffs of dust coming off the parapets behind

9  which Whitman was shooting.  At that point, the last civilian

10 victim had been killed, once he came under return fire.  The

11 ability of those multiple people from the ground to pin him

12 down stopped the killing until another citizen with a rifle

13 could lead two policemen to the roof and end the whole thing.

14      Those are examples of the appropriate use of cover

15 fire, not spray and pray, nothing that endangers the public,

16 but something that can hold -- if it can't neutralize the

17 threat, can at least contain the threat in one spot until

18 society's forces can be marshaled to close in on it and deal

19 with it.

20 Q.  Well, we heard at the outset of this case a list of four or

21 five indents in which I think -- we're calling the mass

22 shootings where multiple individuals were shot.  I'd like to

23 ask the reverse question, in the context that you've just been

24 talking about.  Are you aware of incidents where law

25 enforcement officers, as you've previously described, fired

**APP. 826**

 1   more than 15 rounds?  Did those involve multiple assailants, is

 2   that usually the case when law enforcement officer is firing

 3   more than 15 rounds?

 4   A.  Not necessarily.  There are any number of things that could

 5   make a law enforcement officer or, for that matter, the private

 6   citizen have to go to a high round count.

 7         Let's say the opponent is firing at you from a

 8   vehicle.  A solidly built automobile is pretty solid cover.

 9   Most pistol bullets are going to have difficulty getting

10   through a car door, particularly on an angle.  Heavy window

11   safety glass has the same effect.  So it's going to take a lot

12   of shots to chew into that car, make the killer inside stop

13   shooting from there.  He's not in a tank, it's only an

14   automobile, but we don't have bazookas or antitank rockets

15   either, so it kind of balances with small arms.

16         We see today probably more criminals wearing soft body

17   armor during their crimes than during the time of John

18   Dillinger in the 1930s.  It's very standard among the cocaine

19   cowboys.  You saw it here in Colorado at the Aurora theater

20   with Holmes.  The actual videotape exists from 1997 of the

21   North Hollywood bank robbery at the Bank of America.  The

22   suspects, Phillips and Matasareanu -- M-A-T-T-S-E-A-R-A-N-U, I

23   think -- had got old military surplus flak vests.  They had

24   disassembled them prior to their robberies with tape strips and

25   wrapped the bullet-resistant Kevlar around each other's upper

**APP. 827**

1    arms, forearms, leaving the joints uncovered so they could flex

2    their limbs, thighs and calves, and heavy armor around the

3    torsos.  They put on these big coveralls.

4         And if you look at the action news cam footage of the

5    44 minutes of that shooting, they look like the Michelin tire

6    men.

7         Police, once again, were limited to medium-caliber

8    pistols, 9 millimeter and .38 and shotguns with buckshot.  You

9    can see these guys jerking and flinching as the bullets hit

10   them, but they have absolutely no effect.  They are using

11   totally illegal machine guns, for which they have a four-figure

12   round count of ammunition with them.  They lay 13 good people,

13   cops and civilians, down on the street before the SWAT team

14   gets there and it's over.  I do not recall what the round count

15   was, but the round count was huge.

16        The running opponents or running and shooting, it's a

17   more difficult marksmanship problem.  It will take more shots

18   to hit them.  The guy who knows how to take cover, that is

19   going to take more shots to keep him there or maybe shoot

20   through the cover.

21        Multiple opponents.  We look at the typical hit ratio

22   on the street.  New York City Police tends to run in the mid

23   30th percentile.  That is about 34, 35 percent of the shots

24   they fire in actual combat will hit the suspect.  Let's, for

25   the sake of argument, assume the private citizen has the same

**APP. 828**

Massad Ayoob - Direct

1    hit potential, hits with the same ratio.  We have three home

2    invaders kick down the door.  You're going to need three shots

3    apiece to get one bullet into each of them.  And you ask

4    yourself, how many rounds do I have?  How many rounds will it

5    take to stop them?

6         We have cases, one out of Cook County, Illinois.  A

7    heroin addict doing a liquor store robbery.  Took 33 rounds, 33

8    hits from 9 millimeter pistols.  Stayed on his feet until

9    finally one or two shotgun blasts put him down.  We have case

10   after case where these guys just turn into bullet sponges.

11        The medical examiners tell us that since they are

12   going through the same fight-or-flight response as the

13   defenders, the -- the adrenaline release will leave no artifact

14   in the body.  There is no postmortem artifact to test for

15   adrenaline like you can test for cocaine or heroin.  If there

16   was, we could never tell how much that particular person was

17   affected by that particular internally generated substance.

18        Then you start looking at the drug use.  If your

19   assailant is on cocaine -- let's say, crack cocaine, which is

20   an intensified form of flake cocaine -- one of the ways cocaine

21   gives its rush is adrenaline release in the body.  So he is,

22   essentially, that much more supercharged, that much stronger,

23   that much more capable of absorbing pain and trauma before you

24   put him down.

25        So when you read about these situations where many,

Massad Ayoob - Direct

1   many shots were fired at the criminal before the criminal goes

2   down, you have to remember, that's not necessarily spray and

3   pray.  It may well be any number of any combination of

4   circumstances that kept him up and running.  Real life is not

5   like TV, where one shot is fired, and the bad guy goes flying

6   through a plate glass window like he's scooped up by an

7   invisible giant.

8   *Q.  Which he may have been on TV.*

9        You've talked about a number of events where multiple

10  rounds were fired.  I'd like you to focus just for a minute on

11  events of which you are aware in which multiple rounds, more

12  than 15 rounds, were necessary for a civilian defensive gun

13  use.  And I'd like you to tell us whether or not you are aware

14  of any such incidents.

15  *A.*  The largest one I'm aware of was a man I became friends

16  with, Harry Beckwith, in Micanopy, Florida, M-I-C-A-N-O-P-Y.

17       Harry ran a gun shop in Alachua County.  There had

18  been robberies, so he had a lot of security in place, and he

19  lived next door to the gun shop.  One night the alarm -- he

20  hears a crash, and, of course, the alarms are going off.  And

21  he looks out, and multiple carloads of perpetrators have driven

22  through the door and window to run in and scoop all the guns

23  and stuff.

24       Harry is not about to put up with that, and he figures

25  he will interject, yell at them, "stop or I'll shoot,"

1   something like that.  Harry has on a pistol.  He is a licensed

2   machine gun dealer, and he grabs a fully automatic M16 and a

3   fully automatic 9 millimeter submachine gun.  He also after the

4   stop sees a gun in their hand coming up toward him, and he

5   starts shooting.  By the time that was over, Harry had fired

6   more than 100 rounds.  One of the perpetrators was killed, one

7   or more wounded, all of them captured and convicted, and he was

8   cleared by the grand jury.

9          Others I'm aware of, there was a string of I think

10  five gunfights involving a man named Lance Thomas.  He owned a

11  watch shop and Rolex repair center in Los Angeles.  After the

12  first gunfight, he started staging multiple handguns.  He had a

13  very small workplace, not a heck of a lot bigger than this

14  witness stand, and he had barred doors.  And he would buzz in

15  people after he looked through the window and was comfortable

16  with their look.  And a few of them got through anyway.  He had

17  a pistol staged probably every 3 or 4 feet behind the counter.

18  It was safe in there because it was a secured workplace, and

19  there was no chance of little kids getting at them or anything.

20         In the course of five gunfights, at least one of his

21  went beyond 16.  It was either 17 or 19 shots before the last

22  of the multiple perpetrators was either down or had fled.

23         There was another where I debriefed the survivors.

24  Two brothers owned a jewelry store.  They called it the Beverly

25  Hills Jewelry Store, but it was located in Richmond, Virginia.

Massad Ayoob - Direct

1    They had done something very similar.  They had bought a large

2    number of five-shot .38 revolvers and staged them behind the

3    counter, so if there was a robbery at any point, the person

4    behind the counter would be within a few steps of a gun to

5    fight back with.

6         Their shootout was with two old gangster type guys,

7    both members of the Dixie Mafia.  They walked in, one with a

8    sawed-off shotgun, one with a .45.  And in the course of the

9    firefight, I actually lost count of how many guns one brother

10   emptied, pinning one of them down.  The other brother shot and

11   killed the perpetrator with the .45, then went to the shotgun.

12   And between the two, they were able to finally put both of them

13   down.

14   Q.  So these multiple staged firearms seem to be a fairly --

15   even low-capacity firearms, seem to be a fairly effective

16   method of home defense, then, would it not?

17   A.  No, not at all.  What you had, particularly in the Lance

18   Thomas case, and to a significant degree in the Beverly Hills

19   Jewelers case, is these were in secured areas.  Lance Thomas

20   worked alone.  He did not have employees, to my knowledge.  The

21   jewelry store, only trusted employees were allowed behind

22   there.

23        In the home, I think it would be madness staging a

24   loaded gun in instant reach every few feet.  Because what are

25   you going to do when the neighbors or the relatives come by

Massad Ayoob - Direct

1  unexpectedly with their little kids?  What are you going to do

2  when -- you know, when the burglar walks into the house while

3  you're gone and finds, there is ten guns laying around waiting

4  for, you know, quick draw?  I would consider it not only

5  totally impractical, but a little bit reckless to have that

6  many loaded guns staged in plain sight and easy reach in

7  anyone's home.

8  Q.  Does the law enforcement exemption in 18-12-302 provide law

9  enforcement officers with an advantage over armed criminals?

10  A.  Only if the armed criminals obey that law.

11  Q.  What about civilians, meaning, do --

12  A.  I'm not sure I understand --

13  Q.  Do criminals have an advantage over civilians with regard

14  to the capacity limitations of the magazine?

15       MS. MORRILL:  Objection, Your Honor.  Foundation.

16       THE COURT:  Sustained.

17  BY MR. COLIN:

18  Q.  Have you reviewed report of a Dr. Jeffrey Zax?

19  A.  I have.

20  Q.  And in his report, Dr. Zax opines, "The use" -- and I'm

21  quoting, "The use of firearms for purposes of assault seems to

22  far exceed the use for the purposes of self-defense."

23       Do you agree with that proposition?

24  A.  I do not.

25  Q.  Why not?

1  A.  As I read Dr. Zax's report, he is comparing all criminal

2  assaults with firearms to only justifiable homicides committed

3  by private citizens.  What is called in the trade DGUs,

4  defensive gun usages, by private citizens are very much like

5  the police.  Overwhelmingly, the great majority of the time,

6  when the gun comes out, the fight is over.  The criminals

7  submit to the officer, may even submit to a homeowner,

8  citizen's arrest, or runs away.

9       There are a number of cases where the victim shoots

10  the attacker, the attacker does not die, he either runs away

11  and is arrested later or collapses at the scene.  Of course,

12  when he stops attacking, the citizen stops shooting.  And none

13  of those figure into the report that I read by Dr. Zax.

14  Q.  Dr. Zax also opines that "mass shootings are more

15  lethal" -- more lethal -- "Mass shootings are more lethal when

16  executed using large-capacity magazines.  If these magazines

17  become less widely available, there is some chance that mass

18  shootings will become somewhat less horrific."

19       Do you agree with that proposition?

20       MS. MORRILL:  Objection, Your Honor.  Foundation.

21       THE COURT:  Response.

22       MR. COLIN:  Your Honor, the foundation for his

23  response to Dr. Zax's opinions has been, we believe, adequately

24  established throughout his testimony here.  He is an expert

25  in -- well, let me withdraw that.  Let me build a foundation.

Massad Ayoob - Direct

1         *THE COURT:*  Thank you.

2    *BY MR. COLIN:*

3    *Q.*  Do you know the basis upon which Dr. Zax rendered that

4    opinion?

5    *A.*  I would have to go back and review his report.  I do not

6    recall as I sit here.

7    *Q.*  Then let me move on to a different topic area.  Defendant

8    suggested that the delay associated with a suspect's need to

9    reload gives potential victims an opportunity to intervene.

10        My understanding is that you actually instruct

11   individuals on disarming suspects; is that right?

12   *A.*  I do.

13   *Q.*  Do you believe that intervention is an appropriate method

14   by virtue of which to deal with an armed suspect who has a

15   lower magazine capacity firearm.

16   *A.*  Well, first, let's clarify for the record, attempting to

17   disarm is something we would only recommend if the -- if it's

18   obvious the guy is going to kill somebody.  He's just said, I'm

19   going to kill this person, I'm going to do a countdown, or the

20   killing has already begun.  At that point, the -- any officer,

21   any armed citizen with a gun, their best recourse would be to

22   go to their own gun.

23        For the many who do not, it would be at that point

24   that it would make sense to attempt to intervene.  But to wait

25   until he has expended -- okay.  Let's say he's only got a

**APP. 835**

Massad Ayoob - Direct

1   15-shot magazine -- heck, let's say he's only got a ten-shot

2   magazine.  I'm standing behind him, I've heard a shot, I turn

3   around, here is this guy behind me shooting into the crowd.  Am

4   I supposed to wait and let him shoot nine more, let him shoot

5   fourteen more?  If you're going to disarm him, disarm him now.

6       The whole concept of disarming with a firearm, why

7   it's actually easier than with a knife, is the firearm only

8   directs its force in one very specific direction.  If you can

9   get in behind the muzzle of the gun and you know how to apply

10  leverage, you have a very good fighting chance of disarming him

11  now.  The recoiling slide of the pistol as he pulls the trigger

12  might give you minor cuts on your hands.  You could fix that

13  with a bandaid.  The very hot barrel of, let's say, a machine

14  gun, there is going to be a burn on your hand that is going to

15  heal.

16      The rationale of waiting until he runs dry allows him

17  to kill numerous victims.  And what's to say during that

18  period, he won't kill you.  If you're close enough to grab him

19  and disarm him, you're close enough to be one of the primary

20  targets.

21  Q.  Are you aware of circumstances where that's occurred?

22  A.  Yes.

23  Q.  Can you describe that, please.

24  A.  Let's look at one of the most recent.  Sparks, Nevada,

25  last year.  A 12-year-old kid brings a gun to school, starts

**APP. 836**

1   shooting.   The math teacher attempts to get the gun away from

2   him.   He didn't -- my reading of it is, he didn't jump him.   He

3   was approaching him and trying to talk to him down.   He never

4   got there.   The kid shot him in the chest and killed him, then

5   committed suicide.

6         Your classic sample, Sandy Hook.   You look at the

7   first victim, Dawn Hochsprung.   She's about 5 feet 2 inches

8   tall.   Lanza literally shoots his way through that front door.

9   She charged him.   She charged him, clearly going for an attempt

10   to disarm.   Going from the front on a guy who has got the gun

11   up is hopeless.   She was the first to die, and the dominoes

12   fall from there.

13         Where you'll see the successful disarm will be the

14   very physically strong person who is in a position.   The -- I

15   want to say it was the Barry Loukaitis mass shooting,

16   L-O-U-K-A-T-I-S.   Loukaitis was a 14-year-old boy who went to

17   school and opened fire.   A large male gym teacher jumps him,

18   diverts the muzzle of the gun, and wrestles him down and gets

19   the gun away.   If you can get onto the gun without being shot,

20   you're a large male gym teacher against an average-sized kid,

21   God bless that man for doing that.   But most people will not

22   have that physical advantage.

23         In New Hampshire, 1997, the Carl Drega murder spree.

24   Drega had murdered two state troopers.   He had hunted down the

25   local judge that he hated, Judge Vickie Bunnell, and shot her

 1   in the back.  A man named Dennis Joos, J-O-O-S, a physically

 2   small man, a newspaper publisher whose office was next door to

 3   Judge Bunnell's, jumped him and tried to get the gun away from

 4   him.  Drega, who was 6-foot 3, 240 pounds, and rock solid, just

 5   knocked him to the ground, said, Mind your own F-ing business,

 6   and shot him dead.

 7        What that tells us is, there are the occasional

 8   successful disarms.  If we tell the public, hey, we're going to

 9   try to give you a little opening here so it will be safe for

10   you to jump the guy and get the gun away, that means nobody is

11   going to try to disarm him until all of those rounds have been

12   fired and X number of those victims have been claimed.  So in

13   the end, I don't think there is going to be a whole lot of

14   change in the victim count based on round count, particularly

15   because the great majority of these things have involved guns

16   that were not the so-called high-capacity magazines under

17   discussion today.

18   Q.  Thank you.

19        I have no further questions of this witness.

20        THE COURT:  I think this might be a good time to take

21   our afternoon recess.  The court clock is showing about 2:40,

22   and we'll reconvene at 2:55.  We'll stand in recess until then.

23        (Recess at 2:39 p.m.)

24        (In open court at 3:04 p.m.)

25        THE COURT:  Are we ready for cross-examination?

1          *MS. MORRILL:*  Thank you, Your Honor.  We have no

2     cross-examination for this witness.

3          *THE COURT:*  Thank you.

4          Can this witness step down and be excused?

5          *MR. COLIN:*  He may.  I would ask to withdraw Exhibits

6     93 and 94, please.

7          *THE COURT:*  Any objection?

8          *MS. MORRILL:*  No objection.

9          *THE COURT:*  All right.  Then, thank you very much,

10    sir.  You may step down.  You are excused.

11         And Exhibits 93 and 94 are withdrawn.  I think that

12    means they go back into the briefcase.

13         *MR. COLIN:*  I'm hoping.  The person who brought them

14    is here to take them.

15         *THE COURT:*  Would you call your next witness, please.

16         *MR. COLIN:*  Sorry?

17         *THE COURT:*  Next witness.

18         *MR. FABIAN:*  Thank you, Your Honor.  Plaintiff would

19    call Dave Gill.

20         *THE COURT:*  Thank you.

21              (**DAVE GILL, PLAINTIFFS' WITNESS, SWORN**)

22         *COURTROOM DEPUTY:*  Please be seated.

23         Please state your name and spell your first and last

24    name for the record.

25         *THE WITNESS:*  Dave Gill, D-A-V-E, Gill, G-I-L-L.

Dave Gill – Direct

| 1 | *THE COURT:*  Ready to proceed? |
| 2 | *MR. FABIAN:*  Yes, Your Honor.  Thank you. |
| 3 | *THE COURT:*  Please do so. |
| 4 | **DIRECT EXAMINATION** |
| 5 | *BY MR. FABIAN:* |
| 6 | *Q.*  Mr. Gill, are you a Colorado resident? |
| 7 | *A.*  Yes, I am. |
| 8 | *Q.*  How long have you been a Colorado resident? |
| 9 | *A.*  Since 1983. |
| 10 | *Q.*  Where do you live? |
| 11 | *A.*  I live in unincorporated Douglas County. |
| 12 | *Q.*  Are you a member of the Colorado State Shooting |
| 13 | Association? |
| 14 | *A.*  I am. |
| 15 | *Q.*  For how long? |
| 16 | *A.*  Been a member since 2000. |
| 17 | *Q.*  What is the Colorado State Shooting Association, what does |
| 18 | it do? |
| 19 | *A.*  Well, its primary function is to provide shooting |
| 20 | opportunities to law-abiding Colorado citizens. |
| 21 | *Q.*  And is that the stated mission or purpose of the |
| 22 | association? |
| 23 | *A.*  Yes, it is.  We also do bring people together to provide a |
| 24 | uniform voice in governmental issues. |
| 25 | *Q.*  As a member of CSSA -- do you mind if I refer to the |

**APP. 840**

Dave Gill - Direct

 1 | shooting association as CSSA?

 2 | A.  Please do.

 3 | Q.  Is it safe to say you're a shooter and gun owner?

 4 | A.  Yes, I am.

 5 | Q.  Are you also a hunter?

 6 | A.  I am.

 7 | Q.  How long have you been shooting?

 8 | A.  Since 1959.

 9 | Q.  What types of shooting have you engaged in or currently

10 | engage in?

11 | A.  Trapshooting, sporting clay shooting, target shooting,

12 | variety, both with shotguns and rifles and handguns.

13 | Q.  And what type of hunting have you participated in?

14 | A.  In the past, I have participated in bow hunting, which I no

15 | longer do because of an injury.  But big game hunting for elk

16 | and deer.

17 | Q.  And does that big game hunting involve use of firearms?

18 | A.  Yes, it does.

19 | Q.  Is it fair to say you're well acquainted with firearms in

20 | general and a wide variety of firearms?

21 | A.  Yes, I have.

22 | Q.  Have you ever used firearms that accept detachable

23 | magazines with a capacity of more than 15 rounds?

24 | A.  I have.

25 | Q.  Have you ever owned any of these types of firearms?

APP. 841

Dave Gill - Direct

```
 1   A.  I have, several.

 2   Q.  Without getting into every single type of firearm you own

 3   and how many, do you own an AR-15 style rifle?

 4   A.  Yes, I do.

 5   Q.  What type or make model is it?

 6   A.  Well, there are three.  One is made by Colt, another is a

 7   Bushmaster target rifle that I received through the Civilian

 8   Marksmanship Program, and the other is a tactical AR.

 9   Q.  But they're all built on the AR-15 style platform; is that

10   correct?

11   A.  Yes, they are.

12   Q.  What type of magazines do you use in those rifles?

13   A.  The standard-capacity magazines.

14   Q.  Okay.  What is standard-capacity magazines?

15   A.  Twenty and thirty rounds.

16   Q.  And what do you use these rifles for?

17   A.  Different things.  Mostly for either varmint control, home

18   defense, and target shooting.

19   Q.  Are -- you mentioned varmint control.  What specifically

20   are you talking about?

21   A.  Cutting down the population of prairie dogs.

22   Q.  And have you seen other hunters or varmint controllers use

23   AR style rifles?

24   A.  They're very popular for that, yes.

25   Q.  Have you ever used a handgun while hunting?
```

APP. 842

1   A.  I've carried a handgun with me while hunting.

2   Q.  So was -- were you carrying the handgun to hunt with or for

3   another purpose?

4   A.  For self-defense.

5   Q.  Okay.  And defense against what?

6   A.  Two-legged and four-legged critters.

7   Q.  To be a little more specific for the record, are you

8   talking about both animals and people?

9   A.  Yes.  And when hunting in the East Coast, it is often

10  considered necessary.

11  Q.  So is there a time when you actually had to use or were

12  glad that you had a handgun for self-defense while you were

13  hunting?

14  A.  Personally, no.  I've never needed it.

15  Q.  Now, do you hold any leadership position in Colorado State

16  Shooting Association?

17  A.  I'm the vice president.

18  Q.  How long have you been vice president?

19  A.  Since 2001.

20  Q.  And what do you do as vice president of the association?

21  A.  Primary duties are to assist the president and to fill in

22  for him when he is not present.

23  Q.  So, essentially, you occupy the second highest position of

24  the association?

25  A.  Yes, I do.

1  Q.  And is it fair to say, then, you are familiar with CSSA and

2  its operation, at least in a general way?

3  A.  Yes, I am.

4  Q.  Is CSSA associated in any way with the National Rifle

5  Association of America?

6  A.  Yes, we are the official state association for NRA.

7  Q.  And is one of the functions that CSSA performs under the

8  auspices of the NRA the sanctioning of firearm competitions?

9  A.  Yes, it is.

10 Q.  Do some of those shooting competitions involve the use

11 firearms that use or accept magazines with the capacity of

12 greater than 15 rounds?

13 A.  Yes, they do.

14 Q.  Do shooting competitions involving the use of firearms that

15 use magazines of greater than 15 rounds have specific

16 limitations on magazine capacities?

17 A.  No, they don't.

18 Q.  Do any of these competitions, though, require that shooters

19 load more than 15 rounds at any single time?

20 A.  No.

21 Q.  That being -- that being established, do shooters in these

22 competitions still use magazines that have capacities of

23 greater than 15 rounds?

24 A.  Yes, they do.  The normal capacity magazines are the ones

25 that are commonly used.

Dave Gill - Direct

1  *Q.* And why is that?

2  *A.* They're more reliable.

3      *MS. SCOVILLE:* Objection.  I don't think that this

4  witness has established the personal knowledge on a non-hearsay

5  basis for this information.

6      *THE COURT:* Your objection is to foundation?

7      *MS. SCOVILLE:* Yes.

8      *THE COURT:* Response.

9      *MR. FABIAN:* Your Honor, I think he's already said

10 he's familiar with CSSA sanctioning.  If the Court is not

11 satisfied, I can lay further foundation.

12     *THE COURT:* I think the foundation is adequate.

13 *BY MR. FABIAN:*

14 *Q.* You can answer the question, Mr. Gill.  Do I need to reask

15 the question?

16 *A.* Would you please.

17 *Q.* You mentioned that shooters in competition still use

18 magazines of a capacity of greater than 15 rounds.  Why is

19 that?

20 *A.* Because they're more reliable in their function.

21 *Q.* Now, are you familiar with Colorado Revised Statute

22 18-12-301, *et sequentes*, commonly known as House Bill 1224?

23 *A.* Yes, I am.

24 *Q.* Even though the competitions you discussed don't require

25 loading more than 15 rounds at any specific time, does the

**APP. 845**

Dave Gill - Direct

 1   restriction of Colorado Revised Statute 18-12-301, 302, and 303

 2   have any adverse effect on shooters competing in those matches

 3   or competitions?

 4   A.  Yes, I think it will.

 5   Q.  What is that?

 6   A.  Well, it will give older shooters, current shooters, a

 7   tactical and significant advantage over new shooters that are

 8   coming in to the sport because the new shooters won't be able

 9   to have the normal-capacity magazines that those of us who have

10   been around a few years have in adequate supply.  If they --

11   Q.  I'm sorry.

12   A.  Go ahead.

13   Q.  If I understand you correctly, you're saying, shooters who

14   aren't in the sport now but who may enter the sport down the

15   road are not going to have the opportunity to obtain and use

16   the magazines that are the preferred type of magazine in the

17   competition?

18   A.  Yes, they'll be barred from ownership of them legally.

19   Q.  Have you, yourself, ever used a magazine that was modified

20   to accept fewer than its original full complement of rounds?

21   A.  I have used a ten-round magazine that came with a Colt

22   rifle, yes.

23   Q.  How did you find its reliability compared to

24   standard-capacity magazines?

25   A.  Substandard, and I discontinued using it rather quickly

APP. 846

Dave Gill - Direct

1   because of the lack of reliability.

2   Q.  Specifically, when you say "lack of reliability," what was

3   the specific problem that you encountered?

4   A.  Frequent failure to feed and occasional severe jams.

5   Q.  Is magazine reliability important to competitive shooters?

6   A.  It's critical.

7   Q.  Why?

8   A.  Well, they're timed events.  So that if you are fighting

9   with your rifle because it didn't feed properly or jammed,

10  you're losing time.  The jams can be so severe that, basically,

11  you're out of the competition if you don't have another rifle

12  with you and the match will not allow you to substitute.

13  Q.  Is CSSA affiliated in any way with the Civilian

14  Marksmanship Program?

15  A.  We're the official state organization in Colorado.

16  Q.  What is the Civilian Marksmanship Program?

17  A.  It's a program established by Congress to encourage safe

18  and accurate use of firearms, specifically, of military type

19  firearms.

20  Q.  And I'm going to refer to the Civilian Marksmanship Program

21  as CMP.  Is that all right?

22  A.  Please do.

23  Q.  Okay.  Does CMP sell magazines -- I'm sorry, does CMP sell

24  firearms that accept magazines with greater than 15-round

25  capacity?

Dave Gill - Direct

1    A.  Yes, they do.

2    Q.  What type of firearms would those be?

3    A.  The ones that come to mind immediately are the M1 carbine

4    and the AR.

5    Q.  The AR-15 type model that you previously discussed that

6    your -- the type of firearm that you own?

7    A.  Yes.

8    Q.  Has CSSA ever purchased any firearms from CMP?

9    A.  Yes, we have.  We've purchased both the AR target rifles

10   and M1.

11   Q.  For what purpose were those purchased?

12   A.  To facilitate our lending of firearms to new shooters,

13   people who are looking at the sport and trying to see if

14   they're interested in pursuing it, if so, what type of target

15   rifle they may be interested in purchasing.

16   Q.  So does CSSA make both the M1 Garands and the AR-15 type

17   rifles available for loan for individuals who wanted to use

18   them in shooting competitions?

19   A.  Yes, we have.

20   Q.  And do these loans frequently exceed 72 hours in length?

21   A.  Yes, they do.

22   Q.  What might -- what might be the longest period of time they

23   may be loaned for?

24   A.  The longest I am aware of is two years.  Generally, it's

25   one year; sometimes for a specific match.

Dave Gill - Direct

1    Q.  As we previously discussed, AR-15 type rifles accept

2    magazines with capacity of, standard, 20 and 30 rounds,

3    correct?

4    A.  Yes, they do.

5    Q.  Did CSSA provide these sized magazines with the AR-15

6    rifles that they loaned?

7    A.  We did.

8    Q.  Now, are you familiar with the Colorado Revised Statute

9    18-12-112, we've commonly referred to this in this lawsuit as

10   House Bill 1229?

11   A.  I am.

12   Q.  And what effect did this law have on the CSSA rifle loaner

13   program?

14   A.  It forced us to suspend it.

15   Q.  Why was the program suspended?

16   A.  The amount of time and work required to try to understand

17   and comply with the requirements of what I'm going to refer to

18   as 1229, if I may, were excessive and exceed our ability.

19   Q.  Okay.  Could you be a little more specific about -- with

20   respect to 1229, let me just ask the question this way:  Did

21   CSSA find it easy to conduct background checks every time these

22   rifles were transferred for possession?

23   A.  No, we did not.

24   Q.  Also, I think you've already testified that magazines of

25   greater than 15 rounds -- greater than 15-round capacity were

APP. 849

1   also usually provided with these rifles, correct?

2   *A.* Yes, they were.

3   *Q.* You previously testified that you were familiar with the

4   Colorado statute pertaining to magazine limitations, 18-12-301,

5   302, and 303, correct?

6   *A.* Yes.

7   *Q.* Does that have any effect on the CSSA loaner program?

8   *A.* It would have required that we either lend the rifles

9   without a magazine, which wouldn't have been particularly

10  useful for the individual borrowing it, or acquire magazines

11  that were compliant with that.

12  *Q.* With respect to the concerns with respect to these laws

13  affecting the CSSA loaner program, did you warrant this program

14  when you testified last year in opposition to these laws?

15  *A.* Excuse me I missed part of your statement.

16  *Q.* Did you testify in opposition to either of these statutes

17  that we've referred to in your testimony?

18  *A.* Yes, I did.

19  *Q.* Okay.  And in the course of that testimony, did you in fact

20  make it known to the legislators involved that these -- this

21  legislation would adversely affect the CSSA loaner program?

22  *A.* I did.

23      *MS. SCOVILLE:*  Objection, Your Honor.  The legislative

24  history has been stipulated and admitted as an exhibit, so this

25  is cumulative testimony.

1          *THE COURT:*  Response.

2          *MR. FABIAN:*  I'm just asking Mr. Gill to verify that

3    this information was made available to the legislature.

4          *THE COURT:*  It's cumulative.

5          *MR. FABIAN:*  I understand, Your Honor.

6    *BY MR. FABIAN:*

7    *Q.*  Mr. Gill, did CSSA ever provide background checks on

8    individuals who checked out these loaner rifles?

9    *A.*  No, they did not.

10   *Q.*  If the 14 years you've been a member, 13 years as vice

11   president, has there been any incident or episode involving the

12   criminal use, possession of one of the CSSA loaner rifles?

13   *A.*  No, there was not.

14   *Q.*  Was the purpose of the loaner rifle program, as you

15   previously explained, made clear to those who used the rifles?

16   *A.*  Yes, it was.

17   *Q.*  In other words, were the rifles offered for any other

18   purpose, such as hunting?

19   *A.*  No.

20         *MR. FABIAN:*  If I may have a moment, Your Honor?

21         *THE COURT:*  You may.

22         *MR. FABIAN:*  I have no further questions at this time,

23   Your Honor.

24         *THE COURT:*  Thank you.

25         Cross-examination.

**APP. 851**

1           **CROSS—EXAMINATION**

2    *BY MS. SCOVILLE:*

3    *Q.*  Good afternoon, Mr. Gill.

4    *A.*  Good afternoon.

5    *Q.*  You spoke this afternoon about the loans of CSSA rifles for

6    competition, correct?

7    *A.*  Correct.

8    *Q.*  And you don't know exactly how many rifles CSSA has for

9    loans, right?

10   *A.*  Not specifically at this moment, no.

11   *Q.*  CSSA lends M1 Garands, you mentioned?

12   *A.*  Yes.

13   *Q.*  And an M1 Garand has a capacity of eight rounds, correct?

14   *A.*  Correct.

15   *Q.*  So those rifles are not affected by 18-12-302 or House Bill

16   1224?

17   *A.*  No, they have not been.

18   *Q.*  The AR-15 style rifles that are available for loaning have

19   a detachable box magazine, you testified, correct?

20   *A.*  Yes, they do.

21   *Q.*  And the AR style platform rifles were made with

22   lower-capacity magazines during the federal assault weapons

23   ban, correct?

24   *A.*  Yes, they were.

25   *Q.*  And lower-capacity magazines are available for those rifles

**APP. 852**

1    at this time, right?

2    A.  I assume they are.

3    Q.  And it would be possible for CSSA to loan AR style rifles

4    with smaller magazines, right?

5            MR. FABIAN:  Objection, asked and answered on direct.

6            THE COURT:  Overruled.

7    BY MS. SCOVILLE:

8    Q.  You can go ahead and answer.

9    A.  I suspect it would be possible that we could do it, but it

10   would put those people at a competitive disadvantage.

11   Q.  It would also be possible to loan the AR style rifles

12   without any box magazine attached and permit competitors to

13   supply their own, correct?

14   A.  As far as 1224 goes, yes.  As far as 1229, I don't believe

15   that would be possible for us.

16   Q.  Well, certainly would be possible if the competitor went

17   through a background check, wouldn't it?

18   A.  Yes.

19           THE COURT:  Counsel, would you speak up a little bit,

20   please.  It's hard to hear you.

21           MS. SCOVILLE:  Certainly.  I think with these high

22   heels on, I'm taller than the microphone today.

23           THE COURT:  Well, feel free to take them off if you'd

24   like.

25   BY MS. SCOVILLE:

APP. 853

Dave Gill - Cross

 1   *Q.  You mentioned that CSSA has made loans of the rifles for up

 2   to a period of two years, correct?

 3   *A.  Correct.

 4   *Q.  I believe you just testified that CSSA has not done

 5   background checks on any of the competitors who borrowed the

 6   rifles?

 7   *A.  Correct.

 8   *Q.  So CSSA was not aware of whether any of these people had

 9   outstanding warrants, right?

10   *A.  I suppose anything is possible, but we've never had a

11   problem.

12   *Q.  It's not something you would know because you never did a

13   background check, right?

14            *MR. COLIN:*  Objection, argumentative.

15            *THE COURT:*  Overruled.

16   *BY MS. SCOVILLE:*

17   *Q.  You can go ahead and answer.

18   *A.  It's our experience that the people who are involved in the

19   shooting sports do not have these problems.  We've never had a

20   problem with it.

21   *Q.  My question was, I believe, you are not aware of whether

22   any of these people who borrowed the guns for competition had

23   outstanding warrants, right?

24   *A.  No, we're not aware of that.

25   *Q.  And you're not aware of whether any of the people who

APP. 854

Dave Gill - Cross

1  borrowed the firearm for competition had outstanding domestic

2  violence restraining orders?

3  A.  I suppose inasmuch as anything could be possible, I suppose

4  that could occur.  But, once again, there was never a problem

5  in all the years.

6  Q.  My question was, you are not aware of any instances of

7  people having domestic violence retraining orders, because you

8  didn't check, correct?

9  A.  No, we did not.

10  Q.  And you didn't check to see whether any of the people to

11  whom you had loaned guns for competition were felons?

12  A.  Excuse me.  I couldn't hear you.

13  Q.  Were felons?

14  A.  Well, once again, anything being possible, I suppose, yes,

15  it could be.  But we're not aware --

16  Q.  But you did not know?

17  A.  No.

18  Q.  You have read Section 18-12-122, or House Bill 1229,

19  haven't you?

20  A.  Yes, I have.

21  Q.  All right.  And you are aware that there is an exception to

22  the background check requirement in that bill for competition

23  that takes place at a shooting range, correct?

24  A.  Yes, if that shooting range is being operated by an

25  incorporated entity.

1   Q.  And CSSA-sanctioned events do take place at incorporated

2   rifle clubs, right?

3   A.  I believe they're all incorporated.  I've never checked.

4   Q.  And the legislation also includes an exception from the

5   background check requirement for competition -- for shooting

6   competitions, right?

7   A.  Under certain circumstances.  But to qualify for that, we

8   would have to deliver the firearms to the range at the

9   competition and then return with them.  Part of our program has

10  been that the people have to learn also not only to handle and

11  fire the firearm safely, but also to maintain and care for it.

12  And that would not be possible if we had to do all of the

13  cleaning, maintenance, and care of the rifles.

14  Q.  The Section 18-12-112 also includes an exception for

15  temporary transfers of up to 72 hours, correct?

16  A.  Yes.

17  Q.  And CSSA competitions are all under 72 hours, right?

18  A.  Frequently, the guns are not returned within 72 hours

19  because of the need to take them home, clean them, lubricate

20  them, et cetera.

21  Q.  Yes, but that wasn't my question.  My question was, you are

22  not aware of any CSSA-sanctioned shooting competitions that

23  last longer than 72 hours, correct?

24  A.  No, that's correct.

25  Q.  Now, there are no CSSA-sanctioned events that require a

Dave Gill - Cross

1  competitor to use a magazine or a firearm that has a capacity

2  of greater than 15 rounds, right?

3  A.   True.

4  Q.   In any of the CSSA sanctioned pistol events, the maximum

5  number of rounds that could be fired at any time -- strike

6  that.   Any of the CSSA sanctioned pistol events, the maximum

7  number of rounds that would be permitted to be loaded at any

8  time is ten, right?

9  A.   Yes.

10  Q.   And in any of the CSSA sanctioned rifle events, the maximum

11  number of rounds that would be permitted to be loaded at any

12  time is eight, correct?

13  A.   Yes.

14  Q.   You mentioned that competitors prefer large-capacity

15  magazines.   And when I use the term "large-capacity magazines,"

16  I mean those that are of 16 rounds or greater.   You have

17  testified that competitors prefer large-capacity magazines

18  because they're more dependable, right?

19  A.   I've testified that normal-capacity magazines are

20  preferred.

21  Q.   All right.   And "normal" in your definition is, for an AR

22  style rifle, 20 or 30 rounds, right?

23  A.   Yes, it is.

24  Q.   Okay.   And you have experienced problems with the Colt

25  ten-round magazine that you used on a Colt AR style rifle,

1    correct?

2    *A.*  Yes.

3    *Q.*  And you had problems with one magazine, right?

4    *A.*  Yes.

5    *Q.*  And that happened in the late 1990s, correct?

6    *A.*  Correct.

7    *Q.*  You are not aware of any data or studies showing that

8    lower-capacity magazines for AR style rifles are less reliable?

9          *MR. FABIAN:*  Objection, beyond the scope.

10         *THE COURT:*  Overrule.

11         *THE WITNESS:*  I'm not aware of any studies, but it is

12   generally believed and accepted by shooters who are

13   knowledgeable that they are less reliable.

14   *BY MS. SCOVILLE:*

15   *Q.*  And you know that only from your discussions with various

16   competitors, correct?

17   *A.*  Yes.

18         *MS. SCOVILLE:*  And, Your Honor, I would move to strike

19   his response as based on hearsay.

20         *THE COURT:*  Overruled.

21   *BY MS. SCOVILLE:*

22   *Q.*  And CSSA has not collected any data from its members about

23   the decreased reliability of lower-capacity magazines, correct?

24   *A.*  Correct.

25   *Q.*  CSSA is not aware of any competitive shooters who have yet

**APP. 858**

Dave Gill - Cross

1  been impacted by House Bill 1224, Section 18-12-302, right?

2  A.  Correct.

3  Q.  That's because current competitors with high-powered rifles

4  already own high-capacity magazines, right?

5  A.  Yes, they do.

6  Q.  Now, you testified that you owned several high-capacity

7  magazines, didn't you?

8  A.  I have quite a few.

9  Q.  I think you've told me in the past that you've been blessed

10  with a very large supply, right?

11  A.  Yes.  I have a lifetime supply.

12  Q.  You mentioned earlier that CSSA has suspended its loan

13  program as a result of the legislation that was passed, right?

14  A.  Yes, we have.

15  Q.  That's something that has happened since your deposition

16  was taken on November 1, 2013?

17  A.  I'm not sure of the exact date of when we suspended.

18  Q.  And part of the reason for that suspension, as I understand

19  your testimony, is that it is too difficult to conduct the

20  background checks that would be required to loan these firearms

21  to competitors?

22  A.  It would be difficult or impossible.

23  Q.  All right.  CSSA is not aware of any members who have had

24  difficulty finding a federally licensed firearms dealer to

25  perform a background check for private transfers since July 1,

Dave Gill - Cross

1    2013, right?

2    A.  We're aware of many dealers who are refusing to do it.

3    Q.  That wasn't my question.

4    A.  I've not had a member specifically tell me they have been

5    unable.

6    Q.  You mentioned the firearms that you own and the way that

7    you use them.  You also carry firearms for self-defense,

8    correct?

9    A.  I do.

10   Q.  And you've had, in fact, several experiences in which you

11   have at least displayed a weapon in self-defense, correct?

12   A.  There have been a couple, yes.

13   Q.  And in the two situations of which I'm a -- let me back up.

14   First of all, how many situations have you had where you had to

15   display a weapon?

16   A.  Two.

17   Q.  All right.  In each of those two situations, you had

18   weapons with you that had a capacity of 15 or less, correct?

19   A.  That is correct.

20   Q.  And in neither instance were you required to discharge your

21   firearm, right?

22   A.  That is true.

23   Q.  And you have never had to fire a weapon in self-defense?

24   A.  Correct.

25        MS. SCOVILLE:  If you would permit just a moment, Your

APP. 860

Dave Gill - Redirect

1   Honor.

2          I have no further questions, thank you.

3          THE COURT:  Redirect?

4          MR. FABIAN:  Briefly, Your Honor.

5                    **REDIRECT EXAMINATION**

6   BY MR. FABIAN:

7   Q.  Mr. Gill, counsel just asked you regarding incidents in

8   which you had to use your firearm in self-defense, I'd like to

9   turn your attention to one of those incidents.  I believe it

10  was the incident where you and your wife were both involved.

11  Do you recall that?

12  A.  Yes, I do.

13  Q.  Okay.  Would you briefly describe for the Court what that

14  incident involved.

15  A.  We were leaving our home, going for a hike in the national

16  forest.  We were both carrying.  Ann had her firearm concealed

17  in a fanny pack; mine was on my belt and was visible.  We saw

18  eight young men who were on a neighbor's property and drinking.

19  And we tend to look after each other's property.  We live on

20  acreage in rural Douglas County.  And we stopped and just

21  politely asked that they please move on, they don't have

22  permission to be there, they were on private property.  If they

23  were to go up the road a few miles, they'd be in the national

24  forest and could do whatever they chose there without a

25  problem.  Their response was to refuse to reply to us and come

**APP. 861**

1  out at us and attempt to encircle us.

2  *Q.*  And in addition to the multiple threats that you perceived,

3  was there anything that concerned you about the adequacy of the

4  firearm that you and your wife carry?

5  *A.*  Yes.  I had fifteen plus one rounds, and there were eight

6  of them.  This was obviously a high-stress situation.  One of

7  the unfortunate things that I've experienced was an accident

8  that left me 27 percent partially permanently disabled.  I

9  can't run.  So I was one of the people that Mr. Ayoob was

10  describing who does not have the alternative of running or

11  hiding effectively.  I'm going to stay pretty close to where I

12  am.

13       And I was not at all certain that the 16 rounds that I

14  had would have been adequate without reloading.  There were

15  eight of them, and they were coming at us fairly quickly.

16       *MR. FABIAN:*  I have nothing further, Your Honor.

17       *THE COURT:*  Thank you.

18       I have some questions for this witness.

19       Sir, if I understood your testimony correctly, you

20  defined reliability as being, essentially, no misfires and no

21  feeding jams, right?

22       *THE WITNESS:*  Correct.

23       *THE COURT:*  Why is it in your view that a

24  high-capacity magazine would have fewer misfires or feeding

25  jams than a lower-capacity magazine?

Dave Gill - Redirect

1          THE WITNESS:  Those were the magazines that the

2    firearm was originally designed for.  They're mil spec,

3    military specification, magazines.  And they seem to work

4    better with the rifle.  They were designed to function with

5    each other.  The reduced-capacity magazines tend to have

6    different length springs, and I suspect it's the spring that is

7    the primary cause of the problem.

8          THE COURT:  Now, the ten-round magazine for the Colt

9    that you had was manufactured by Colt to fit that particular

10   firearm, wasn't it?

11         THE WITNESS:  Yes, it was.

12         THE COURT:  But that was the one you had the problem

13   with, right?

14         THE WITNESS:  Yes, it was.

15         THE COURT:  So how is it that you conclude that is a

16   function of whether the magazines were manufactured for the

17   particular firearm or not?

18         THE WITNESS:  Well, when the firearm was designed, it

19   was designed to function with the 20- or 30-round magazine.

20   And I suspect maybe our manufacturers don't put the same care

21   in the manufacture of those that are designed to meet a law

22   governing the civilians.

23         THE COURT:  Or perhaps manufacturing standards have

24   declined over time and, therefore, this might be a problem with

25   future magazines?

Dave Gill – Examination

1           *THE WITNESS:*  Well, possibly.  But the current 20- or

2    30-round magazines being produced, for instance by Magpul, are

3    fine quality and fine performing magazines.  People are not

4    encountering the problem with them that we did with the

5    diminished-capacity magazines in past years.

6           *THE COURT:*  This problem that you've encountered with

7    diminished-capacity magazines, you've encountered with all

8    diminished-capacity magazines?

9           *THE WITNESS:*  I only had the one.

10          *THE COURT:*  Okay.  Thank you very much.

11          Does that prompt any more questions?

12          *MR. FABIAN:*  Yes, Your Honor.

13          *THE COURT:*  Okay.

14                            **EXAMINATION**

15   *BY MR. FABIAN:*

16   *Q.*  Mr. Gill, do you recall the 1994 federal legislation that

17   placed the limitation on magazine capacity?

18   *A.*  Yes.

19   *Q.*  Prior to 1994, were -- are you familiar with Colt AR-15

20   style rifles that were offered for sale?

21   *A.*  Yes, I was.

22   *Q.*  And what size -- were those rifles normally offered for

23   sale with any magazine size other than 20 rounds?

24   *A.*  No.

25   *Q.*  And when did the ten-round magazines become available for

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▸

SECOND AMENDMENT

## Bowie knife statutes 1837-1899

Bowies were regulated like other knives; knives were sometimes regulated like handguns

DAVID KOPEL | 11.20.2022 12:53 PM

This post describes and analyzes nineteenth century state statutes on Bowie knives. It is a companion to my post *The legal history of bans on firearms and Bowie knives before 1900,* which described case law.

As detailed in that article, the term "Bowie knife" because popular for knife marketing in America and Great Britain after Jim Bowie used a traditional knife at a famous "sandbar fight" on the lower Mississippi River in 1827. Statutes specifically regulating the "Bowie knife" began with Mississippi in 1837, and continued for the rest of the century.

Among the 220 state or territorial statutes with the words "Bowie knife" or "Bowie knives" only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other well-known knives that were well-suited for fighting against humans and animals—namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98% of statutes on "Bowie knives" treated them the same as other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many others were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade *concealed* carry. In the 19th century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the the U.S. Supreme Court affirmed in *New York State Rifle and Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022).

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 220 state or territorial statutes cited in this post, 114 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

**Glossary**

*Bowie knife.* This was marketing and newspaper term for old or new knives suitable for fighting, hunting, and utility. There was no common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length. *The legal history of bans on firearms and Bowie knives before 1900.*

*Arkansas toothpick.* A loose term for some Bowie knives popular in Arkansas. *The legal history of bans on firearms and Bowie knives before 1900.*

*Dagger.* A straight knife with two cutting edges and a handguard.

*Dirk.* Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to a Nov. 19, 2022, email to me from Mark Zalesky, publisher of *Knife Magazine,* "Dirks in America were small stabbing weapons, usually

APP. 865

*Slingshot.* A slingshot is a rope looped on both ends, with a lead weight or other small, dense item at one end. It helps sailors accurately cast mooring lines and other ropes. A slingshot rope that is shortened to forearm length and spun rapidly is an effective blunt force weapon.

*Colt.* Similar to a slingshot. 1 *Shorter Oxford English Dictionary* 444 ("4. A short piece of weighted rope used as a weapon").

*Knucks, knuckles.* Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon.

*Revolver.* A handgun in which the ammunition is held in a rotating cylinder.

*Pistol.* Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

**Methodology**

I started with the Appendix to Clayton E. Cramer, <u>Concealed Weapon Laws of Early Republic: Dueling, Southern Violence, and Moral Reform</u> (1999), plus the Appendix to Maryland Attorney General Brian Frosh's Fourth Circuit <u>supplemental brief</u> in *Bianchi v. Frosh*. The brief argues that 19th century laws about Bowie knives provide a historical analogy to justify the Maryland legislature's ban on many common modern rifles.

Then I searched the HeinOnline Sessions Law Library for occurrences of "bowie" within 5 words of "knife." After that, the same search, but with "knives." In some state databases, I searched for "bowie." Finally, I read the <u>Declaration of Robert Spitzer,</u> which is Exhibit E of the California Attorney General's <u>Supplemental Brief in Response to the Court's Order of September, 26, 2022,</u> *Duncan v. Bonta*, No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The case involves a challenge to a California statute to confiscate magazines over 10 rounds.

Reviewing the Spitzter Declaration led to finding three laws I had missed: an 1871 D.C. ordinance, an 1893 Rhode Island statute, and another enactment of a Montana anti-dueling statute. Spitzer also lists 16 municipal ordinances about Bowie knives in the 19th century, which are summarized below, after the state-by-state presentation.

*Citations*: Some session laws cites below exceed the information required by the Blue Book. I follow the convention of calling each separate enactment in annual session laws a "chapter." That is, "chap. 68" was the 68th law enacted by the state legislature that year. The official state session laws sometimes use other words, such as "Act 68" or "No. 68." Not all session laws provide a number for the bills enacted in a given session.

This post is part of a law review article I am writing, so it has not been cite-checked by journal editors; citations might have typos or similar errors. *Nemo sine vitiis est* (no one is without faults).

**Mississippi** (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."

It was forbidden to use such arms in a fight in a city, town, or other public place. It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence." Finally, if one of the arms were used in a duel and caused a death, the duelist would liable for the debts owed by the deceased. 1837 Miss. L. pp. 291-92. All these provisions were enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols." 1837 Miss. L. p. 294. Similar language appeared in the incorporation of towns in 1839 and 1840. 1839 Miss. L. chap. 168, p. 385 (Emery); 1840 Miss. L. chap. 111, p. 181 (Hernando).

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife." 1841 Miss. Chap. 1, p. 52; 1844 Miss. chapter 1, p. 58. The tax was cut to fifty cents in 1850. 1850 Miss. chap. 1, p. 43. But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane, duelling or pocket pistol." 1854 Miss. Chap. 1, p. 50. In the next legislature, pocket pistols were removed from the tax. 1856-57 Miss. L. chap. 1, p. 36 ("each bowie knife, dirk knife, or sword cane").

When the Civil War came, the legislature prohibited "any Sheriff or Tax-Collector to collect from any tax payer the tax heretofore or hereafter assessed upon any howie-knife, sword cane, or dirk-knife, and that hereafter the owner of any howie-knife, sword-cane or dirk-knife shall not be required to give in to the tax assessor either of the aforesaid articles as taxable property." 1861-62 Miss. L. chap. 125, p. 134 (Dec. 19, 1861). That was a  change for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

> [N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board or police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.

1865 Miss. L. chap. 23, pp. 165-66. As detailed in Justice Alito's opinion and Justice Thomas's concurrence _McDonald v. Chicago,_ laws such as these prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen. 561 U.S. 742 (2010).

After the war, handguns and knives were again subject to the state property tax. The Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."1871 Miss. L. chap. 33; 1871 Miss. L. pp. 819-20; 1876 Miss. L. chap. 104, pp. 131, 134; 1878 Miss. L. chap. 3, pp. 27, 29; 1880 Miss. L. chap. 6, p. 21; 1892 Miss. L. chap. 74, pp. 194, 198; 1894 Miss. L. chap. 32, p. 27; 1897 Miss. L. ch. 10, p. 10.

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description." There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack." Also excepted were travelers, but not "a tramp." Sales to minors or to intoxicated persons were outlawed. A father who permitted a son under 16 to carry concealed was criminally liable. Students at "any university, college, or school" could not carry concealed. 1878 Miss. L. chap. 46, p. 175-76.

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description." 1896 Miss. L. chap. 104, pp. 109-10. Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine. 1898 Miss. L. chap. 68, p. 86.

**Alabama** (1837).

The legislature imposed a $100 per knife tax on the sale, or transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today. (Fed. Reserve Bank of Minneapolis, _Consumer Price Index 1800-;_ 2022 = 884.6. 1837 = 34.)

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought." _Acts Passed at the Called Session of the General Assembly of the State of Alabama_, chap. 11, p. 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." _Acts Passed at the Annual Session of the General Assembly of the State of Alabama_, chap. 77, pp. 67-68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry. _New York State Rifle and Pistol Association v. Bruen_, 142 S. Ct. 2111 (2022).

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol." 1851-52 Ala. chap. 1, p. 3. Even that amount was hefty for a poor person. As the defense counsel in a 1859 Texas case had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for 50 cents. _Cockrum v. State_, 24 Tex. 394 (1859). As described next, the cost of manufacturing a high quality Bowie knife was a little less than $3, which approximately implies a retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. In just a few years, the cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was underarmed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

> Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops." 1861 Ala. L. chap. 22, pp. 214-15 (Nov. 27, 1861).

If the legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives. This works out to $3 manufacturing cost per knife, not counting the cost of the wooden shaft for the pikes, which was perhaps more expensive than the handle of a knife.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes, harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives." 1862 Ala. chap. 1, p. 8.

An 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun." "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."

Throughout the 19th century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment." To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.). 1880-81 Ala. L. chap. 44, pp. 38-39.

The state property tax continued, with variations on the tax amount and what arms were subject to taxation. Shortly after the end of the Civil War, the unreconstructed white supremacist legislature enacted a harsh tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale." For "all bowie-knives, or knives of the like description," the tax was $3. If the tax were not paid, the county assessor could seize the arms. To recover the arms, the owner had to pay the tax plus a 50% penalty. After 10 days, the assessor could sell the arms at auction. 1865-66 Ala. chap. 1, p. 7 (Feb. 22, 1866); 1866-67 Ala. L. chap. 260, p. 263.

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars." 1874-75 Ala. chap. 1, p. 6.

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ." The tax rate was 3/4 of 1% of the value. 1875-76 Ala. chap. 2, p. 46; 1876-77 Ala. L. chap. 2, p. 4.

The tax was cut in 1882 to 55 cents on the dollar for "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats." Ala. chap. 61, p. 71. Then it was raised to 60 cents on each 100 dollars of value, for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats." 1884 Ala. L. chap. 1, p. 6.

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars." 1874 Ala. L. ch. 1, p. 41. *See also* 1875-76 Ala. chap. 1, p. 82 ($50); 1886 Ala. L. chap. 4, p. 36 (adding "pistol cartridges"); 1892 Ala. L. chap. 95, p. 183 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section"). Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100. Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more. The wholesale license also authorized retail sales. 1898 Ala. chap. 9036, p. 190.

State legislative revisions to municipal charters gave a municipality the power "to license dealers in pistols, bowie-knives and dirk-knives." 1878 Ala. L. chap. 314, p. 437 (Uniontown); 1884 Ala. L. chap. 314, p. 552 (Uniontown) (adding dealer in "brass knuckles"; "the sums charged for such licenses" may "not exceed the sums established by the revenue laws of the State . . ."); 1884-85 Ala. chap. 197, p. 323 (Tuscaloosa) ("to license and regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. L. chap. 550, p. 965 (Faunsdale); 1890 Ala. chap. 357, p. 764 (Uniontown); 1890 Ala. L. chap. 573, p. 1317 (Decatur) (to license dealers in "pistols, or

("to license . . ." dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. chap. 549, p. 1048 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. chap. 566, p. 1102 (Uniontown) (same as previous Uniontown charter); 1898 Ala. 704, p. 1457 (Uniontown) (same).

**Georgia** (1837).

As described in the companion post, _The legal history of bans on firearms and Bowie knives before 1900,_ the legislature in 1837 declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

_Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837,_ pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry. _Nunn v. State,_ 1 Ga. 243 (1846).

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence." The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer." 1860 Ga. L. chap. 64, pp. 56-57.

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters. 1870 Ga. L. chap. 285, p. 421; 1879 Ga. L. chap. 266, p. 64 (creating law enforcement officer exception).

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for "horsemen's pistol." Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense." 1882-83 Ga. L. chap. 94, pp. 48-49. Any "kind of metal knucks" was added in 1898. 1898 Ga. L. chap. 103, p. 60.

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876. 1876 Ga. L. chap. 128 (O. no. 63), p. 112.

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives." 1882-833 Ga. L. chap. 18, p. 37. The tax was later raised to $100, adding dealers of "pistol or revolver cartridges." 1884-85 Ga. L. chap. 52, p. 23; 1886 Ga. L. chap. 54, p. 17. Then the tax was reduced to $25. 1888 Ga. L. chap. 123, p. 22. But raised back to $100 in 1890. 1890 Ga. L. chap. 131, p. 38. In 1892, "metal knucks" were added, and the ammunition expanded to "shooting cartridges." 1892 Ga. L. chap. 133. p. 25. The tax was cut to $25 in 1894. 1894 Ga. L. chap. 151, p. 21; 1896 Ga. L. chap. 132, p. 25; 1898 Ga. L. p. 25 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie knives and such articles."1884 Ga. L. chap. 457, p. 30; 1886 Ga. L. chap. 101, pp. 26, 28; 1888 Ga. L. chap. 103, p. 261; 1889 Ga. L. chap. 640, p. 993. The same question was included in the municipal charter for the town of Jessup. 1888 Ga. L. chap. 103, p. 261. And in the new charter for Cedartown. 1889 Ga. L. chap. 640, p. 993.

**South Carolina** (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee. 1838 S.C. L. (Journal to the Proceedings), pp. 29, 31.

The legislature did not act any law with the words "bowie knife" in 1838, or in the 19th century.

**Tennessee** (1838).

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after a nationally infamous crime. In December, two members of the Arkansas House of Representatives had fought with Bowie knives on the floor of House, and one had killed the other. _See The legal history of bans on firearms and Bowie knives before 1900._

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony. Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony." Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8*, chap. 137, pp. 200-201 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

The concealed carry ban was upheld against a state constitution challenge. *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840). The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia. *The legal history of bans on firearms and Bowie knives before 1900*.

The 1838 law against drawing a Bowie knife applied even against crime victims who had drawn in self-defense, such as when Richard Day drew a knife against a violent home invader. The state supreme court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns." *Day v. State*, 37 Tenn. (5 Sneed.) 496 (1857). Likewise, a post-Reconstruction statute, described in *The legal history of bans on firearms and Bowie knives before 1900*, allowed carrying only of Army or Navy type pistols. When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the victim carried a concealed pistol that was not an Army or Navy type. The conviction was upheld, citing *Day v. State. Coffee v. State*, 72 Tenn. (4 Lea.) 245 (1880)

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife." The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting." 1855-56 Tenn. L. chap. 81, p. 92.

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war. 1861 Tenn. L. chap. 23, pp. 16-17.

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." 1869-70 Tenn. L. chap. 22, pp. 23-24.

**Virginia** (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind." If a habitual concealed carrier was prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact. Even if the defendant was acquitted or discharged, he could be prosecuted within a year for the unlawful carry. Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor. *Acts of the General Assembly of Virginia, Passed at the Session of 1838*, chap. 101, pp. 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same." 1847 Va. L. p. 110; 1870 Va. L. chap. 349, p. 510.

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind." 1881 Va. L. chap. 219, p. 233; 1883-84 Va. L. chap. 144, p. 180 (1884); 1896 Va. L. chap. 745, p. 826 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869. So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause." 1875 Va. L. chap. 124, p. 102; 1877 Va. L. chap. 7, p. 305.

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind." There was an exception for arms issued by the state "to members of volunteer companies." 1874 Va. L. chap. 239, pp. 282-83; 1875 Va. L. chap. 162, p. 164; 1881 Va. L. chap. 119, p. 499; 1883 Va. L. chap. 450, p. 563; 1889 Va. L. chap. 19, p. 19; 1889 Va. L. chap. 244, p. 200; 1893 Va. L. chap. 797, p. 931.

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives." 1889-90 Va. L. chap. 152, p. 118; 1893-94 Va. L. chap. 366, pp. 425-26.

**Florida** (1838).

1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county." The applicant needed "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant." A person who informed about a violation could keep the arms. Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury." 1865 Fla. L. chap 1466, p. 25.

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors. I *Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One Inclusive* 873 (James F. McClellan, comp.) (1881) (Fla. chap. 174, § 24, item 14). The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives." Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."1889 Fla. chap. 3847, p. 6 (2d reg. sess.); 1891 Fla. L. chap. 4010, p. 9 (3d regular sess.). The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives." 1893 Fla. L. chap. 4115, p. 18 (4th regular sess.); 1895 Fla. L. chap 4322, p. 13 (5th regular sess.).

**North Carolina (1846).**

An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting." There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager." 1846 N.C. L. chap. 42.

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner . .

1850 N.C. L. chap. 121, p. 243. *See also* 1856-57 N.C. L. chap. 34, p. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. L. chap. 21, § 11, pp. 33-34 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

The Black Code continued to treat Bowie knives like firearms, in the arms licensing law for free people of color. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had been issued a one-year license from the court of pleas and quarter-sessions. 1856 N.C. L. chap. 107, § 66, p. 577. When the Civil War drew near, the legislature repealed the licensing law, and forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot." 1860-61 N.C. L. chap. 34, p. 68 (Feb. 23, 1861).

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879. 1877 N.C. L. ch. 54, pp. 162-63. The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slungshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like like kind," "except when upon his own premises." 1879 N.C. L. chap. 127, p. 231.

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot." 1893 N.C. L. chap. 514, pp. 468-69. A <u>loaded cane</u> had a hollowed section filled with lead. It was a powerful impact weapon.

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maximums. In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. L. chap. 180, pp. 219-20. Charlotte: $50 on "every pistol, bowie-knife, dirk, sword-cane, or other deadly weapons worn upon the person, except a pocket knife, without special permission of the board of aldermen." 1866 N.C. L. chap. 7, § 19, p. 63. Salisbury: "on all pistols, except when part of stock in trade, a tax not exceeding one dollar; on all dirks, bowie-knives and sword canes, if worn about the person at any time during the year, a tax not exceeding ten dollars." 1868 N.C. L. chap. 123, p. 202. Lincolnton: $5 for worn weapons. 1870 N.C. L. chap. 32, p. 73. Lumberton: Can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. L. chap. 7, p. 279; 1883 chap. 89, p. 791 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. L. chap. 111, p. 872. Waynesville: like Ashville, but $40. 1885 N.C. L. chap. 127, p. 1097. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. L. chap. 58, § 59, p. 885. Rockingham: to tax pistols, dirks, bowie

guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. L. chap. 26, p. 705. Columbus: same. 1891 N.C. L. chap. 101, p. 902. Buncombe: same. 1891 N.C. L. chap. 327, p. 1423. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. L. chap. 352, p. 611. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. L. chap. 71, pp. 115-16. Lilesville: same. 1897 N.C. L. chap. 130, p. 237. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. L. ch. 90, p. 154. Salisbury: same $500 as Asheville. 1899 N.C. L. chap. 186, p. 503. Monroe: Same, but $100. 1899 N.C. L. chap. 352, p. 968. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. L. chap. 260, p. 766.

**Washington territory** (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ." 1854 Wash. L. chap. 2, p. 80; 1859 Wash. L. chap. 2, p. 109; 1862 Wash. L. chap. 2, p. 284; 1869 Wash. L. chap. 2, pp. 203-04; 1873 Wash. L. chap. 2, p. 168.

**California** (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts. The duelist would also be liable to the decedent's family for liquidated damages. 1855 Cal. L. chap. 127, pp. 152-53.

**Louisiana** (1855).

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon." 1855 La. L. chap. 120, p. 148; 1898 La. L. ch. 112, p. 159 (same).

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days. 1870 La. L. chap. 100, p. 159; 1873 La. L. chap. 98, p. 27.

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden. 1890 La. L. chap. 46, p. 39.

**New Hampshire** (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas." Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

> Next comes the Remedy of Folly . . . from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this ? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment. Sir, the senator is venerable . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.

That wasn't even close to the worst that Sumner said about Brooks in "The Crime Against Kansas." Most notably, he compared Butler to Don Quixote:

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane. He nearly killed Sumner, who never fully recovered. The assault was widely applauded in the South. The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest it inspire slave revolt. Even in free states, even in free-thinking Boston, abolitionist speakers were attacked by mobs.

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital." As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense.

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall not be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.

1856 N.H. chap. 1870, pp. 1781-82.

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

**Texas** (1856).

If a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife." Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) in 1 *A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas* (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger") ; 1871 Tex. L. chap. 26, p. 20 (adding doubling if perpetrator "in disguise").

The Texas Supreme Court upheld the law in *Cockrum v. State*, 24 Tex. 394 (1859). Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." *Id.* at 402. However, extra punishment for a crime with a Bowie knife did not violate the right to arms. Discussed further in *The legal history of bans on firearms and Bowie knives before 1900.*

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open. 1870 Tex. L. chap. 73, p. 139; 1873 Tex. L. chap. 19, pp. 29-30; 1876 Tex. L. chap. 166, p. 311.

Then came the most repressive anti-carry law enacted by an American state until then. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." Both open and concealed carry were forbidden. The exceptions were "immediate and pressing" self-defense, or in a person's home or business, or travelers with arms in their baggage. Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering." The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians." 1871 Tex. L. chap. 34, pp. 25-26; 1887 Tex. L chap. 9, p. 7 (amending); 1889 Tex. L. chap. 37, p. 33; 1897 Tex. L. chap. 25, p. 24.

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons. The statute did not apply to long guns. 1887 Tex. L. chap. 155, pp. 221-22.

**New Mexico** (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms." 1856 N.M. L. chap. 26, p. 68. Slavery in New Mexico was usually in the form of peonage. The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races. *See* Andrés Reséndez, *The Other Slavery: The Uncovered Story of Indian Enslavement in America* (2016).

Concealed and open carry were prohibited in 1859. The scope was expansive:

**APP. 873**

1859 N.M. L. pp. 94-96; 1864-65 N.M. L. chap. 61, pp. 407-08 (miscited in the Spitzer declaration as 1855). Territorial statutes were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortifera de cualesquiera clase ó descripcion."

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms. It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes: as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted . . .

A person carrying a deadly weapon was not allowed to "insult or assault another." Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory." The statute defined a "settlement" as anyplace within 300 yards of any inhabited house. The exceptions to the carry ban were:

> except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family, or property, the same being then and there threatened with danger

Travelers could ride armed through a settlement. If they stopped, they had to disarm within 15 minutes, and not resume until eve of departure. Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . ." 1886-87 N.M. L. chap. 30, pp. 55-58.

**Ohio** (1859).

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon." The jury must acquit if it is proven that the defendant was "engaged in pursuit of any lawful business, calling, or employment, and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property, or family…" 1859 Ohio L. pp. 56-57.

**Kentucky** (1859).

"If any person, other than the parent or guardian, shall sell, give, or loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars." 1859 Ky. L. chap. 33, p. 245.

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50. 1885 Ky. L. chap. 1233, p. 154; 1891 Ky. L. chap. 103, p. 346 (Nov. 11, 1892); 1891-92 Ky. L. chap. 217, p. 1001 (June 9, 1893).

**Indiana** (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon." Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man." 1859 Ind. L. chap. 78, p. 129; 1881 Ind. L. chap. 37, p. 191.

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person." Or to give such person pistol ammunition. 1875 Ind. L. chap. 40, p. 59.

**Nevada** (1861).

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree. 1861 Nev. L. p. 61.

**Montana territory** (1864).

No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon." 1864-65 Mont. L. p. 335. Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder. 1879 Mont. Laws p. 359; 1887 Mont. L. p. 505.

**Colorado territory** (1867).

No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon." 1867 Colo. L. chap. 22, p. 229; 1876 Colo. L. chap. 24, p. 304; 1881 Colo. L. p. 74 (post-statehood); 1885 Colo. L. p. 170; 1891 Colo. L. p. 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").

**Arizona territory** (1867).

Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime. So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel." 1867 Ariz. L. p. 21; 1875 Ariz L. p. 101.

Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache and Graham, over the age of ten years." The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind." 1883 Ariz. L. chap. 19, pp. 21-22.

Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or town. 1883 Ariz. L. chap. 36, pp. 65-66. Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887. 1887 Ariz. L. chap. 11, p. 726. And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense." 1893 Ariz. chap. 2, p. 3.

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense." Arriving travelers could carry for the first half hour, or on the way out of town. Hotels had to post notices about the no carry rule. Carry was also forbidden at public events, and even at some private social gatherings. 1889 Ariz. chap. 13, pp. 30-31.

**Illinois** (1867).

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon." 1867 Ill. L. p. 650.

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character." 1881 Ill. L. p. 73.

**Kansas** (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States." 1868 Kan. L. p. 378.

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind" "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor." 1883 Kan. L. chap. 55, p. 159.

**West Virginia** (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind." *Code of West Virginia Comprising Legislation to the Year 1870*, chap. 148, p. 692. Justices of the Peace had a duty to enforce the statute W.V. Acts of 1872-73, chap. 226, p. 709, in *Constitution and Schedule Adopted in Convention at Charleston, April 9th, 1872* (Charleston, W.V.: John W. Gentry, 1874).

**APP. 875**

**Maryland** (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars. 1870 Md. L. chap. 473, p. 892. Reenactments, changes in the fine amount: 1874 Md. L. chap. 178; 1884 Md. L. chap. 187; 1890 Md. L. chap. 534; 1898 Md. L. p. 533.

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon." 1872 Md. L. chap. 42, pp. 56-57.

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)." 1886 Md. L. chap. 375, p. 602.

**District of Columbia** (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles." 1 *The Compiled Statutes in Force in the District of Columbia, including the Acts of the Second Session of the Fiftieth Congress, 1887-89* (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871). Hat tip to Prof. Spitzer for this.

In 1892, Congress enacted a similar statute for D.C., with additional provisions. It prohibited concealed carry of the same weapons as 1871, plus "blackjacks." A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.

Open carry was lawful, except "with intent to unlawfully use." The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.

Giving a deadly weapon to a minor was forbidden. Vendors had to be licensed by Commissioners of the District of Columbia. The license itself was "without fee," but the licensee could be required to post a bond. Sellers had to keep a written list of purchasers, which was subject to police inspection. Weekly sales reports to the police were required. 27 Stat. chap. 159, pp. 116-17 (July 13, 1892).

**Nebraska** (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon." As in Ohio, there was a "prudent man" defense. 1873 Neb. L. p. 724; 1875 Neb. L. p. 3; 1899 Neb. L. chap. 94, p. 349.

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind." The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him." 1895 Neb. L. pp. 209-10.

**Missouri** (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon...

1874 Mo. L. p. 43; 1875 Mo. L. pp. 50-51. This was similar to the 1873 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property." 1877 Mo. L. p. 240.

The exhibiting statute and the concealed carry statute were combined in 1885. The new law also forbade carrying the listed weapons when intoxicated or under the influence. Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed. 1885 Mo. L. p. 140.

**Arkansas** (1874).

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The next year, the state supreme court heard a case of a man who had been convicted of carrying a concealed pocket pistol. In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered

> Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane." The pocket pistol not being a war arm, the defendant's conviction was upheld. *Fife v. State*, 31 Ark. 455 (1876). Needless to say, *Fife*'s protection of "the rifle of all descriptions" makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed. "[T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms. . . . If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson v. State*, 33 Ark. 557 (1878).

The legislature responded in 1881 with a new statute against the sale or carry of "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy." 1881 Ark. Acts chap. 96, pp. 191-92.

As discussed in my companion post, *The legal history of bans on firearms and Bowie knives before 1900*, the 1881 Arkansas statute might arguably have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.

**Wisconsin** (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon." 1874 Wisc. L. chap. 4, p. 184 (Milwaukee); 1875 Wisc. L. chap. 262, p. 471 (Green Bay); 1876 Wisc. L. chap. 4, p. 218 (Platteville); 1876 Wisc. L. chap. 313, p. 737 (Racine); 1877 Wisc. L. chap. 5, p. 367 (New London); 1878 Wisc. L. chap. 112, pp. 119-20 (Beaver Dam); 1882 Wisc. L. chap. 92, p. 309 (Lancaster); 1882 Wisc. L. chap. 169, p. 524 (Green Bay); 1883 Wisc. L. chap. 183, p. 713 (Oshkosh); 1883 Wisc. L. chap. 341, p. 990 (La Crosse); 1883 Wisc. L. chap. 351, p. 1034 (Nicolet); 1885 Wisc. L. chap. 37, p. 26 (Kaukana); 1885 Wisc. L. chap. 159, p. 753 (Shawano); 1885 Wisc. L. chap. 227, p. 1109 (Whitewater); 1887 Wisc. L. chap. 124, p. 336 (Sheboygan); 1887 Wisc. L. chap. 161, p. 684 (Clintonville); 1887 Wisc. L. chap. 162, p. 754 (La Crosse); 1887 Wisc. L. chap. 409, p. 1308 (Berlin); 1891 Wisc. L. chap. 123, p. 699 (Menasha); 1891 Wisc. L. chap. 23, p. 61 (Sparta); 1891 Wisc. L. chap. 40, p. 186 (Racine).

**Wyoming** (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property." 1882 Wyo. chap. 81, p. 174; 1884 Wyo. chap. 67, p. 114.

**Oklahoma territory** (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense." Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns. Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon." Unlike section 1, section 2 applied to carry in general, not just concealed carry. Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was "any other offensive or defensive weapon." What the difference was unclear. Section 3 banned sales of the aforesaid items to minors. The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair. 1890 Okla. L. chap. 25, p. 495; 1893 Okla. L. chap. 25, p. 503.

**Iowa** (1887).

There was no state legislation on Bowie knives in the 19th century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887. See id., Ex. E at 24." *Defendant's Supplemental Brief in Response to the Court's Order of September, 26, 2022*, *Duncan v. Bonta*, at 41-42, Case No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The brief's cite is Declaration of Robert Spitzer, p. 24, electronic page no. 163 of 230, reproducing without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms"

home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

**Michigan** (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon." 1891 Mich. L. chap. 257, p. 409; 1897 Mich. L. chap. 465, p. 1030.

**Vermont** (1891).

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon." 1891 Vt. L. chap. 85, p. 95.

**Rhode Island** (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description." 1893 R.I. L. chap. 1180, p. 231. Hat tip to Prof. Spitzer's Declaration for this; Hein Online has the session law book, but it returns a null search result for "bowie."

**Local ordinances on Bowie knives**

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the Declaration of Robert Spitzer, above. The cities are in alphabetical order by state. The year is often the year of publication of municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield, Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of "any sword in a cane, or air-gun"); Memphis, Tennessee (1863);

No carrying: Nashville, Tennessee (1881); Provo City, Utah territory (1877)

Against hostile display: Independence, Kansas (1887).

Against carry with intent to do bodily harm: Syracuse, New York (1885).

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871); Denver, Colorado (1886).

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).

**Conclusion**

As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words "bowie knife" or variant. (This figure includes enactments by territories that had achieved statehood by 1899.) At the end of the 19th century, no state prohibited possession of Bowie knives. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.

Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century. The overwhelming majority of state statutes that addressed Bowie knives treated them exactly the same as comparable knives; many treated such knives like handguns. As with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives. Likewise, only a few jurisdictions forbade the open carry of Bowie knives, and in those that did, open carry of handguns was also outlawed.The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors. In a few states, taxes on knives and handguns were sometimes different.

In the Supreme Court's Heller and Bruen decisions, the few laws that banned acquisition or open carry of handguns laws of the 19th century were treated as eccentricities that did not establish a national tradition. The history of Bowie knife laws is no stronger in terms of creating historical precedents for bans on owning, acquiring, or carrying common knives. It would be implausible to claim that the 19th century laws on Bowie knives or handguns can be stretched by analogy to justify 21st century bans on common firearms or magazines.

**APP. 878**

Case 3:17-cv-02256-RC   Document 24-13   Filed 01/22/23   Page 1 of 4
Case 1:22-cv-04259-BEN-JLB   Document 93-11   Filed 04/09/18   PageID.3598   Page 16 of 103
USCA Case #23-7061   Document #2029097   Filed: 11/29/2023   Page 319 of 507

CHAP. 95.—An ACT to empower the councils of cities and towns to release the liability and liens for interest, penalties and accrued costs, or any part thereof, on unpaid taxes due such cities and towns for any year or years to and including 1933, provided such taxes are paid within one hundred and twenty days after this act is in force.                    [H B 48]

#### Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, That the councils of cities and towns are hereby empowered to release all persons, firms, associations and corporations from all liability, for interest, penalties and accrued costs on any taxes due such respective cities and towns for any year or years prior to and including the year nineteen hundred and thirty-three, that are unpaid at the time the ordinance relieving same goes into effect, provided such unpaid taxes are paid such cities or towns within one hundred and twenty days after the date this act shall be in force.

2. That nothing in this act contained shall empower any such council to release any liability for interest, penalties and accrued costs, or any part thereof, on such unpaid taxes as are not paid within the one hundred and twenty days aforesaid.

3. By reason of the necessity of immediately granting said councils power to grant taxpayers the above relief, an emergency is declared to exist, and this act shall be in force from its passage.

---

CHAP. 96.—An ACT to define the term "machine gun"; to declare the use and possession of a machine gun, for certain purposes, a crime and to prescribe the punishment therefor; to require manufacturers, dealers and other persons, with certain exemptions, in possession thereof, to register all machine guns with the Secretary of the Commonwealth; to keep records of and report transfers and sales to the said Secretary; to allow inspection of records and of machine guns by peace officers; to provide for seizures and search warrants; to prescribe rules of evidence and presumptions; to provide penalties, and to repeal all inconsistent acts.                    [S B 110]

#### Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, as follows: Section 1. Where used in this act:

(a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading.

(b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault with intent to maim,

Case 3:17-cv-02356-BC Document 24-13 Filed 01/23/23 Page 2 of 4
Case 1:23-cv-00256-RC Document 51-1 Filed 04/09/18 PageID 3509 Page 17 of 103
USCA Case #23-7061 Document #2029097 Filed: 11/29/2023 Page 320 of 507

138                         ACTS OF ASSEMBLY                         [VA.

disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term of not less than twenty years.

Section 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or

(d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be *prima facie* evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Nothing contained in this act shall prohibit or interfere with

First. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose. This act shall not apply to machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other States or Territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

Second. The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

Third. The possession of a machine gun other than one adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber, for a purpose manifestly not aggressive or offensive.

Case 3:17-cv-02256-BC  Document 24-13  Filed 04/09/18  Page 3 of 4
USCA Case #23-7061    Document #2029097    Filed: 11/29/2023    Page 321 of 507
Case 1:22-cv-02256-RC  Document 53-1  Filed 01/23/23  PageID 5800  Page 18 of 103

Section 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars nor more than one thousand dollars.

Section 8. Every machine gun now in this State adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber shall be registered in the office of the Secretary of the Commonwealth on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of the Commonwealth, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The Secretary of the Commonwealth shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer. Failure to keep or produce such certificate for inspection shall be a misdemeanor and punishable by a fine of not less than five nor more than one thousand dollars, and any peace officer may, without warrant, seize the machine gun and apply for its confiscation as provided in section nine of this act. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber possessed in violation of this act may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the Commonwealth's attorney, a police officer or conservator of the peace, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given

Case 3:17-cv-09101-BEN-JLB  Document 93-1  Filed 04/09/18  PageID.5801  Page 19 of 103
Case 1:22-cv-02256-RC  Document 24-13  Filed 01/23/23  Page 4 of 4
USCA Case #23-7061     Document #2029097     Filed: 11/29/2023     Page 322 of 507

140                          ACTS OF ASSEMBLY                          [VA.

effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. This act may be cited as the Uniform Machine Gun Act.

Section 13. All acts or parts of acts which are inconsistent with the provisions of this act are hereby repealed.

---

CHAP. 97.—An ACT to make effective the Constitutional provision to the effect that the General Assembly shall establish and maintain an efficient system of public free schools throughout the State, and to repeal all acts and parts of acts inconsistent with this act.                                    [S B 153]

Approved March 7, 1934

Whereas, section one hundred and twenty-nine of the Constitution of Virginia provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," now, therefore,

1. Be it enacted by the General Assembly of Virginia, as follows:

Section 1. The school board of each and every school division in the State is hereby empowered and required to maintain the public free schools of such division for a period of at least eight months or one hundred and sixty teaching days in each school year. In order that each school division may have the funds necessary to enable the school board to maintain the elementary and high schools thereof for such minimum terms, it is hereby provided that when any county, city or town has legally complied with the existing laws with reference to local school levies, such school division or divisions shall be allotted out of the public school funds held in the treasury of the State for each group of twenty-five to forty pupils in average daily attendance, a sum equal to the amount to be derived by dividing said public school fund by the number of groups of twenty-five to forty pupils in average daily attendance in the State, depending upon the density of population, to be apportioned by the State Board of Education, as provided in section one hundred and thirty-five of the Constitution and in conformity with the provisions of the Code and of the Acts of the Assembly under such rules and regulations as may be set up by said State Board of Education.

Section 2. That in addition the counties and cities shall provide, from local school taxes, as provided in section one hundred and thirty-six of the Constitution of Virginia, for the supplementing of their instructional programs such amounts as will insure the services of properly prepared and effective teaching personnel, and to the degree that financial ability and community interest in education will permit; provided further, that the counties and cities shall provide, in keeping with the laws already existing, such funds as may be necessary for debt service, capital outlay, transportation, general operation and maintenance.

1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
5  Telephone: (562) 216-4444
   Facsimile: (562) 216-4445
6  Email: abarvir@michellawyers.com

7  Attorneys for Plaintiffs

8

9          IN THE UNITED STATES DISTRICT COURT

10       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,              Case No:  17-cv-1017-BEN-JLB

12                      Plaintiffs,       **DECLARATION OF CLAYTON
                                          CRAMER IN SUPPORT OF
13              v.                        PLAINTIFFS' SUPPLEMENTAL
                                          BRIEF; EXHIBIT 42**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the State
    of California,
16
17                      Defendant.

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

"The Insanity Defense' and Diminished Capacity,"
   https://www.law.cornell.edu/background/insane/insanity.html...............................25

22 Killed In Hotel Fire In San Francisco, [Santa Cruz, Cal.] Santa Cruz Sentinel,
   Mar. 29, 1944, 1...................................................................................................20

3 Teamsters Charged in San Juan Hotel Fire, Chicago Tribune, Feb. 4, 1988,.........6, 22

A Decade On, Childers Remembers Hostel Fire Tragedy, Brisbane [Australia]
   Times, Jun. 23, 2010 ...........................................................................................22

A Triple Murder at Sleepy Hollow, Wilmington [N.C.] Journal, Jan. 14, 1870, 1 .......10

A Triple Murder, [Plymouth, Ind.] Marshall County Republican, Feb. 16, 1865, 1 .......9

A War in Wyoming, [Maysville, Ky.] Evening Bulletin, Apr. 13, 1892, 1. ....................3

Annie Sciacca, "It was a bloodbath": Orinda Halloween shooting investigation
   reveals gang connections, San Jose Mercury-News, Nov. 17, 2019. .........................6

Attempt Made To Wreck Soo Locks, EAST OREGONIAN, May 16, 1917, 1. ....................2

Bernard E. Harcourt, From the Asylum to the Prison: Rethinking the Incarceration
   Revolution, 84 Texas Law Review 1766-75 (2006)....................................................30

Black Hand Kills Four By Dynamite, Bluefield [W.Va.] Evening Leader, May 17,
   1909, 1.................................................................................................................14

Bomb Batters Wall Street; 31 Slain, 125 Hurt, The Sun and the New York Herald,
   Sep. 17, 1920, 1....................................................................................................16

Bomb Survivors Tell Of Explosion, [Washington, D.C.] Evening Star, Jan. 12,
   1930, 1 .................................................................................................................18

Bomb Wrecks Farmers Home Killing Three, [Salem, Ore.] Capital Journal, Nov.
   19, 1920, 1............................................................................................................16

Boy Admits Fire Fatal To 95, Miami News, January 16, 1962, 1. ...............................21

Burns Lodging House When Refused Room; 27 Homeless Men Died, [New York,
   N.Y.] Evening World, Dec. 3, 1913, 1..................................................................20

APP. 884

17cv1017

Candace Sutton, Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears, [U.K.] Daily Mail, Sep. 8, 2014. ................................................22

Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database ................................................................................................30

Christine Sarteschi. (2015). Severe Mental Illness, Somatic Delusions, and Attempted Mass Murder. Journal Of Forensic Sciences. 61. 10.1111/1556-4029.12876. ...........................................................................................................33

Clayton E. Cramer, Ethical Problems of Mass Murder Coverage in the Mass Media, 9:1 Journal of Mass Media Ethics 26-42 (Winter, 1993-94). ...................................7

Clayton E. Cramer, Mental Illness and the Second Amendment. 46 Connecticut Law Review 1301-6 (May 2014):(..........................................................................29

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012) .........................................................29

Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797,* https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england ..................................................................................................3

Day of Joy is One of Sorrow, [Valley City, N.D.] Weekly Times-Record, January 1, 1914, 6. .....................................................................................................................24

Drowned Her Six Children, Adams County News [Ritzville, Wash.] Feb. 27, 1901, 4 .............................................................................................................................8

Dynamite Kills Five In Spite Act, New-York Tribune, Nov. 16, 1914, 1. ....................15

Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb, Bemidji [Minn.] Daily Pioneer, Jan. 3, 1917, 1; ...............................................................15

Eight Are Killed In Blasted Homes, [Washington, D.C.] Evening Star, May 06, 1925, 1 ........................................................................................................................16

Elisabeth Dias with Jim Down, The Horror Upstairs, Time, Jul. 1, 2013 ...................22

Fate Saves Scores in Blast When Maniac's Plot Kills 43, [Washington, D.C.] Evening Star, May 19, 1927, 1 ..............................................................................17

iii

TABLE OF AUTHORITIES

FBI, Jack Gilbert Graham, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, ............................................................................................................19

FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008), ...........1

Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement, New York Times, Oct. 9, 1927, 1. ..........................................................................................17

Flowers And Flowers, Murders In The United States, 30-1 ........................................19

Flowers and Flowers, Murders in the United States, 56-7 ........................................19

Four Killed In Bomb Explosion In Tenement District Of New York, [Douglas, Ariz.] Douglas Daily Dispatch, Oct. 09, 1927, 1; ...................................17

Four People Wounded, Palestine [Tex.] Daily Herald, Feb. 4, 1909, 2 ......................3

From California and Oregon, [Washington, D.C.] Evening Star, Mar. 21, 1860, 2. .....26

Gift Package Bomb Kills Woman; 5 Hurt, [Washington, D.C.] Evening Star, Jan. 01, 1930, 1; ..........................................................................................18

He was a Rejected Lover, St. Paul Globe, Feb. 17, 1889, 1. .....................................10

Horrid Murder! At An Early Hour On Wednesday Morning Last, The Inhabitants Of This Town Were Alarmed With The Dreadful Information… 1 (1806). ..............8

Ill-Fated Plane Wrecked By Bomb US Prober Says, Indianapolis Times, Oct. 14, 1933, 1. .......................................................................................................19

Indian revenge, Muscatine [Iowa] Weekly Journal, Jan. 27, 1860, 1. ..........................9

Jean Isaac Rael and Virginia C. Armat, Madness In The Streets: How Psychiatry And The Law Abandoned The Mentally Ill (1990) ............................................29

Jos. Veltman, Do Workers Want War? [letter to the editor] [Chicago, Ill.] The Day Book, Jan. 17, 1916, 23. ..........................................................................4

Jury Verdict Not Guilty, Liberty [Tex.] Vindicator, Feb. 11, 1910, 1. ..........................3

Killed Her Children, Cottonwood [Ida.] Report, Mar. 1, 1901, 1 ................................8

Laurel Thatcher Ulrich, A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812 291-307 (1990),; ..........................................................8

TABLE OF AUTHORITIES

**APP. 886**
17cv1017

Laurie Goodstein and William Glaberson, The Well-Marked Roads to Homicidal
  Rage, New York Times, Apr. 10, 2000 ...................................................................31

Makiko Inoue, Motoko Rich and Hikari Hida, 24 Dead in Suspected Arson at
  Office Building in Japan, N.Y. Times, Dec. 16, 2021, ...........................................22

Maniac Shot Many People, Barre [Vt.] Daily Times, Jun. 20, 1913, 1 .......................10

Maniac Veteran Kills His Family, New Britain Herald, Jun. 23, 1930, 9. ...................31

Maniacal Unknown in Attempt to Exterminate Whole Family, Bisbee [Ariz.] Daily
  Review, Apr. 6, 1922, 1. .......................................................................................5

Michigan State Prison, Biennial Report of the Board of Control and Officers of the
  State House of Correction and Branch Prison of State Prison in Upper Peninsula...
  22, 41, 65 (1916) ................................................................................................4

Murders Whole Family and Then Kills Self, [Pendleton, Ore.] East Oregonian,
  Feb. 22, 1909, 8. ................................................................................................32

Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story,
  Brownsville Herald, Jan. 31, 1928, 1 ....................................................................18

National Fire Protection Association, Preliminary Report NFPA Fire Analysis
  Department Wincrest Nursing Home, 1, 4, ..............................................................23

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick
  Edward Purdy and the Cleveland School Killings, October, 1989, 19 .....................33

Nevada Mining Boss Besieged in His Office, Kalispell Bee, Jan. 09, 1903, 1 ...............3

Ore Miner Charged Eight-Seven Cents for Month's Labor, Omaha Daily Bee,
  Feb. 12, 1914, 1. ................................................................................................24

Our Lady of the Angels School fire ..........................................................................21

Plot to Kill Their Wives, [Maysville, Ky.] Evening Bulletin, Mar. 26, 1896, 1 ...........12

Preparedness Day Bombing,
  https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_
  investigations ....................................................................................................15

Principal Events of General and Local Interest During the Year 1857, Lewiston
  [Penn.] Gazette, Jan. 21, 1858, 1 ...........................................................................5

v
TABLE OF AUTHORITIES

R. Barri Flowers and H. Loraine Flowers, Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59 (2001). ...........................6

R.W. Bligh, comp., New York Herald Almanac: Financial, Commercial and Political Register 1874 87 (1874). ................................................................4

Ralph Blumenthal, Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911, New York Times, Mar. 26, 1990. ......................................................................................................22

Randolph Roth and Cornelia Hughes Dayton, comp., Homicide among Adults in Colonial and Revolutionary New England, 1630-1797, ...............................6

Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1. .............................................................................................2

Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017). ..........................2

Seven Detectives and Three Miners Dead, Seattle Star, Jul. 26, 1912, 1. ..............14

Shelby Lin Erdman and Greg Botelho, Timeline: A killer's rampage through a California college town, CNN, May 27, 2014, ...........................................11

Some Facts About Clayhole, [Lancaster, Ky.] Central Record, Jul. 20, 1922, 1 ...........3

Steven P. Segal, Civil Commitment Law, Mental Health Services, and US Homicide Rates, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011 .......31

Strike Breakers Taken to Mines at Point of Pistols, Omaha Daily Bee, Jan. 11, 1914, 1 .........................................................................................................24

Tenement House Fire, [Maysville, Ky.] Evening Bulletin, Nov. 2, 1903, 4. ..............20

Terrorism and Death Dominate Colorado, Saint Paul Globe, Jun. 7, 1904, 1. ...........14

Trial of Abel Clements, [Edinburgh, Scotland] Caledonian Mercury, Aug. 25, 1806, 4. ........................................................................................................7

*Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children 6-7, 9-10 (1841).* ........................................13

Trio Held In Wreck Accused Of Murder, [Washington, D.C.] Evening Star, Mar. 10, 1935, 1. ...............................................................................................12

vi
TABLE OF AUTHORITIES

Triple Murder, Suicide Apparent, [Parsons, Kansas] Parsons Sun, Apr. 04,
    1953, 7. ................................................................................................................32

Tulsa Race Riots, https://www.history.com/topics/roaring-twenties/tulsa-race-
    massacre, ...........................................................................................................21

U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020) .............1

Villisca Ax Murders to Be Discussed in Mass Meeting, Omaha Daily Bee, Jul.
    6, 1917, 1. ..........................................................................................................23

Washington Standard [Olympia, Wash.], Mar. 1, 1901, 3 ...............................................8

Whole Family Murdered, [St. Genevieve, Mo.] Fair Play, Oct. 20. 1900, 1. ................13

Woman Indicted in Chicago Blaze, New York Times, Feb. 4, 1976...........................23

Woman Shot. Tots Choked, Brownsville Herald, May 20, 1931, 1 ...........................11

Woman to Face Murder Charge, Waxahachie [Tex.] Daily Light, Feb. 8, 1909, 1 ........3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES

**APP. 889**

17cv1017

I, Clayton Cramer, declare as follows:

## I.     Purpose

1.      This Expert Declaration and Report identifies one gross error of fact in DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 26, 2022.  The claim: "From the colonial period into the early 20th century, mass murder occurred in the United States, but typically as a group activity, because technological limitations impaired the ability of a single person to commit mass murder."

2.      Even without Large Capacity Magazines (LCMs), mass murder was common and often individual in nature.

## II.    My Current Research Project

### A. Defining Mass Murder

3.      Since 2019, I have been researching the history of mass murder in the United States.  The definition of mass murder does not have a universal definition.  The FBI's definition of mass murder is four or more dead (including the killer) in one event, in one location.[1]  Other agencies, such as the U.S. Secret Service use the term "mass attacks" in which "three or more people are harmed."[2]

4.      For purposes of my research, I have adapted the Secret Service and FBI definitions to include at least two murder victims committed in multiple locations within 24 hours and the Secret Service's "three or more harmed."  The suicide or lawful killing of the mass murderer or murderers is not included in the total dead.

5.      I have excluded multiday mass murders committed in riots, such as the New York City Draft Riots of 1863, and many of the race riots of the 20th century because they were not in one location.  Determining when these murders took place

---

[1] FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008), distinguishing mass murder from serial murderers. "Generally, mass murder was described as a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders."
[2] U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020).

1

precludes easy classification. I also have excluded crimes such as the Colorado cannibalism murders in 1874, because it is unclear over what period the victims were murdered.

6.      There are deaths that might qualify as mass murder, but which have circumstances that might also qualify as lawful self-defense and are thus not included.[3] There are mass murders which appear to be gang-related; I have excluded many of those because determining if they were defensive in nature or not requires confidence in the integrity of the participants, who often have reason to lie.

7.      Obviously, mass murder does not include acts of war. Mass murders committed by governments as official policy are outside the legal definition of murder. Other horrifying mass killings outside our definition include those performed by non-state actors with the acquiescence, assistance, or encouragement of local, regional, or national governments. Example: the Armenian genocide in Turkey during and immediately following World War I. Also excluded are governmentally supported acts of mass murder committed outside the rules of land warfare. The bombing of the Soo Locks on the Great Lakes shortly after U.S. entry into World War I, which would otherwise meet the criteria of mass murder, smells suspiciously like German sabotage and I therefore excluded it.[4] This also excludes one of the earliest American mass murders: ten murdered by Lenape Indians at a school in 1764 Greencastle, Pennsylvania,[5] as well as the many thousands (at least) killed in various Indian wars (such as the hundreds killed during the Dakota War of 1862).

8.      I have excluded *most* mass murders of Indians by Indians because most were outside the civil society of America, and the records of such crimes are thus

---

[3] *Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act*, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1.
[4] *Attempt Made To Wreck Soo Locks,* EAST OREGONIAN, May 16, 1917, 1.
[5] Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017).

2

DECLARATION OF CLAYTON CRAMER

1  necessarily incomplete.  The Criminal Justice Research Center's data on Colonial and

2  Revolutionary New England murders contains examples that meet this definition.[6]  I

3  have included incidents where a mass murder (by white or Indian and regardless of the

4  victim's race) was clearly *not* a part of warfare, such as those motivated by robbery or

5  kidnapping with the goal of ransom.

6      9.      There are mass murders where the victim count includes people killed

7  because a felony was taking place.  Because of the felony-murder rule, I have included

8  people killed lawfully in the course of a felony as mass murder victims, such as

9  happened in the Johnson County War.[7]  I have excluded incidents in which all the

10  dead were felons.[8]

11      10.      There are incidents which might be best categorized as mutual combat,

12  where armed groups attacked each other with great loss of life but determining who

13  were the victims and who were the murderers is not easy from surviving news

14  coverage, such as the struggle between Democratic and Republican campaign workers

15  in Clayhole Voting Precinct in 1922.  The ensuing gunfight killed at least five people

16  and wounded ten to thirteen others.[9]

17      11.      I have excluded a small number of cases where trial found the killer not

18  guilty of what were clearly mass murders.  Example: Miss Verna Ware opened fire in

19  the Gatesville courthouse in 1909, killing the man she accused of seducing her, two

20  others not involved in the case and wounding a fourth.[10]

21

22

23

---

24      [6] Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797*,

25  https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england.

26      [7] *A War in Wyoming*, [Maysville, Ky.] EVENING BULLETIN, Apr. 13, 1892, 1.

27      [8] *Nevada Mining Boss Besieged in His Office*, KALISPELL BEE, Jan. 09, 1903, 1
    [9] *Some Facts About Clayhole*, [Lancaster, Ky.] CENTRAL RECORD, Jul. 20, 1922, 1.
    [10] *Woman to Face Murder Charge*, WAXAHACHIE [Tex.] DAILY LIGHT, Feb. 8,

28  1909, 1; *Four People Wounded*, PALESTINE [Tex.] DAILY HERALD, Feb. 4, 1909, 2;
    *Jury Verdict Not Guilty*, LIBERTY [Tex.] VINDICATOR, Feb. 11, 1910, 1.

1     **B. Finding Mass Murders**

2        12.    How do you find historical mass murders?  The phrase "mass murder" is

3     quite rare in historical documents.  Using the *ngram* tool in books.google.com for

4     books published 1600-2000 shows essentially zero matches until 1952,[11] and many of

5     the rare pre-1952 matches are actually abbreviations of Massachusetts such as "Mass.

6     Murder" or "Mass., murder."[12]  The abbreviation "Mass." causes similar problems

7     when searching the Library of Congress' collection of 1789-1963 newspapers for the

8     words "mass" and "murder" within five words of each other.[13]  An additional problem

9     is the use of the phrase to describe governmentally sanctioned and indeed government-

10    operated warfare.[14]

11       13.    Searching the Library of Congress' *Chronicling America* collection of

12    newspapers for the words "murders", "murdered", "killed", "slain", "dead" in

13    association with numbers found a sea of matches, most of which needed to be read

14    before discarding.  In many cases, similar or identical news stories appeared in

15    multiple newspapers.  If the same facts appeared repeatedly, and there were hundreds

16    of references to an event, I did not read every newspaper account of that event.

17       14.    There are several frustrating limitations of the *Chronicling America*

18    collection:

19

20

21    [11] https://books.google.com/ngrams/graph?content=%27mass+murder%27&year
      start=1600&year_end=2000&corpus=17&smoothing=3&share=&direct_url=t1%3B%
      2C%27%20mass%20murder%20%27%3B%2C0, last accessed June 12, 2018.

22    [12] Examples: Michigan State Prison, BIENNIAL REPORT OF THE BOARD OF CONTROL
      AND OFFICERS OF THE STATE HOUSE OF CORRECTION AND BRANCH PRISON OF STATE

23    PRISON IN UPPER PENINSULA… 22, 41, 65 (1916),; R.W. Bligh, comp., NEW YORK
      HERALD ALMANAC: FINANCIAL, COMMERCIAL AND POLITICAL REGISTER 1874 87

24    (1874).
      [13] https://chroniclingamerica.loc.gov/search/pages/results/?state=&dateFilterType

25    =yearRange&date1=1789&date2=1963&language=&ortext=&andtext=&phrasetext=&
      proxtext=mass+murder&proxdistance=5&rows=20&searchType=advanced;

26    Examples: *'Joe is a Good Boy,' Declares Ettor's Parents*, [Chicago, Ill.] THE DAY
      BOOK, Oct. 25, 1912; 14; *Queries Pour in on J. Frank Hickey*, [Chicago, Ill.] THE DAY

27    BOOK, Dec. 4, 1912, 28; *Written Authority to Walk in Your Own Town*, [Chicago, Ill.]
      THE DAY BOOK, Feb. 5, 1912.

28    [14] Jos. Veltman, *Do Workers Want War?* [letter to the editor] [Chicago, Ill.] THE
      DAY BOOK, Jan. 17, 1916, 23.

4

DECLARATION OF CLAYTON CRAMER   APP. 893

17cv1017

i.   Copyright restrictions make post-1922 newspaper collections incomplete.

ii.  Many of these mass murders, in addition to appearing in many different newspapers, sometimes appear in only one or two newspapers, far removed from the crime, both geographically and temporally.  One example is a mass murder of three in Tamworth, N.H. in 1857 which appeared only in an 1858 summary of the previous year's events, which was published in Pennsylvania.[15]  This made it difficult to gather additional data on the crime.

iii. Nineteenth century accounts often used the word "murders" rather far afield from its legal meaning, or in reference to general social problems such as alcohol.  This produced so many thousands of matches that I have often settled for detailed examination of the first 100 front page news stories.  Newspapers in the nineteenth century also published many foreign news accounts and fiction.  Limiting searches to the front pages thus reduced false positives which would have to be laboriously examined for location and fiction status. (If it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder.)

15.   Defining a mass murder by the number of dead can understate mass murders, if either police or civilian intervention interrupts the murderer.  (There are some examples in my list of mass murders cut short, although not soon enough, by such actions.)  In addition, some of the events gathered here list crimes in which the immediate coverage includes persons wounded so seriously that the coverage describes them as "probably fatally." [16]  When considering the nature of medical and surgical care available until my lifetime, it seems a good guess that those described as "probably fatally" wounded can be properly included among the dead.

---

[15] *Principal Events of General and Local Interest During the Year 1857*, LEWISTON [PENN.] GAZETTE, Jan. 21, 1858, 1.
[16] *Maniacal Unknown in Attempt to Exterminate Whole Family*, BISBEE [ARIZ.] DAILY REVIEW, Apr. 6, 1922, 1.

5

DECLARATION OF CLAYTON CRAMER    APP. 894

17cv1017

16.     Along with *Chronicling America*, I have made extensive use of the commercial site *Newspapers.com* and a few secondary sources.

17.     Another valuable source was the list of "Homicide among Adults in Colonial and Revolutionary New England, 1630-1797," compiled by Randolph Roth and Cornelia Hughes Dayton.[17]  While this is a list of *all* murders, not just mass murders, it provided an additional source of incidents.

**C. Group Activity**

18.     The State's claim is that earlier mass murders were "typically… a group activity, because technological limitations impaired the ability of a single person to commit mass murder."  The supposed distinction between modern individual mass murder and group mass murder of earlier centuries does not stand careful examination. Mass murder is *still* sometimes a group activity.  Such happened at Littleton, Colo. on Apr. 20, 1999[18] and the terrorist attacks of September 11, 2001.  Other recent group mass murders include one on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured."[19]  On Dec. 31, 1986, in San Juan, P.R. three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[20]

19.     As this declaration later shows, individual mass murder is neither particularly modern not dependent on technological advances.

---

[17] Randolph Roth and Cornelia Hughes Dayton, comp., *Homicide among Adults in Colonial and Revolutionary New England, 1630-1797*, Oct. 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england, last accessed June 12, 2018.

[18] R. Barri Flowers and H. Loraine Flowers, MURDERS IN THE UNITED STATES: CRIMES, KILLERS AND VICTIMS OF THE TWENTIETH CENTURY 59 (2001).

[19] Annie Sciacca, *"It was a bloodbath": Orinda Halloween shooting investigation reveals gang connections*, SAN JOSE MERCURY-NEWS, Nov. 17, 2019.

[20] *3 Teamsters Charged in San Juan Hotel Fire*, CHICAGO TRIBUNE, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

6

DECLARATION OF CLAYTON CRAMER

**D. Data Limitations**

20.   It would be very useful to be able to extract data identifying which were group mass murders and which were individual.  When I started this project, this seemed an unnecessary detail and so I did not gather it.  While I cannot provide that level of detail on group vs. individual mass murders, I can say with confidence that the mass murders in my collection are primarily individual, although there are a number that are group.  How can I be so sure?  Family mass murders are very common both historically and in the present.  They are usually by either the father or mother.  I cannot immediately recall an intra-family mass murder carried out by more than one person.

21.   Before 1960, these intra-family mass murders are 741 of 1796 incidents; 2,784 out of 12,730 dead. (To avoid giving fame to the infamous, which produces Herostratic mass murders,[21] my synopses consistently exclude the murderer's name.)

22.   When gathering this data, I only recorded if a particular weapon was used rather than counting deaths by weapon.  In older news accounts, there is no breakdown of deaths by weapon.  In many cases, the state of forensic medicine would make it impossible to determine if the ax to the head or the subsequent knife to the throat was the fatal injury.  It would make little difference which cause a victim's death: the murderer's punishment would be the same.

23.   A few examples of individual mass murders:

Clarksburg, Va.: Nov. 10, 1805: Man murdered his wife and eight children.  While found guilty, there was substantial evidence of mental illness.  Weapon: ax.[22]

---

[21] Clayton E. Cramer, *Ethical Problems of Mass Murder Coverage in the Mass Media*, 9:1 JOURNAL OF MASS MEDIA ETHICS 26-42 (Winter, 1993-94).
[22] *Trial of Abel Clements*, [Edinburgh, Scotland] CALEDONIAN MERCURY, Aug. 25, 1806, 4.

7

DECLARATION OF CLAYTON CRAMER

1    Hallowell, Me.: Jul. 9, 1806, James Purrington (or Purrinton), murdered

2    his wife and seven of his eight children with an axe or knife before killing

3    himself with a knife. The cause was unclear, but the murderer mentioned

4    poverty in a suicide note. Weapon: ax.[23]

5    Uniontown, Wash. Feb. 25, 1901: A woman threw her six children down a

6    30 foot deep well, "then jumped into the well, and, the belief is, held their heads

7    under water until all were drowned."[24]  "She is violently insane.  The woman's

8    husband died a year ago, and she has been supported by the county and charity

9    of neighbors."[25]  Reporter interview supports evidence of insanity: "[S]he gave

10   him incoherent reasons for slaying her little ones…. [s]he had read of the

11   Chinese war and the terrible atrocities committed in the Orient, and had warning

12   that the Chinese were coming today to burn her house and slay her children…

13   Mr. Rustemeyer… was well acquainted with the family… He said… Mrs.

14   Wurzer was never considered just right in her mind, and thinks she should have

15   been restrained of her liberty long ago." Weapon: drowning.[26]

16   24.    Through 1960, there were 797 non-firearm mass murders: 3,781 dead: an

17   average of 4.74 dead per incident; 840 exclusively firearms mass murders, 3,653 dead:

18   an average of 4.35 dead per incident.  Nonetheless, firearms mass murders were not

19   rare, even with "primitive" technology:

20

21

22

23

24

---

25   [23] Laurel Thatcher Ulrich, A MIDWIFE'S TALE: THE LIFE OF MARTHA BALLARD,
     BASED ON HER DIARY, 1785-1812 291-307 (1990),; HORRID MURDER! AT AN EARLY
26   HOUR ON WEDNESDAY MORNING LAST, THE INHABITANTS OF THIS TOWN WERE
     ALARMED WITH THE DREADFUL INFORMATION… 1 (1806).
27   [24] *Drowned Her Six Children*, ADAMS COUNTY NEWS [Ritzville, Wash.] Feb. 27,
     1901, 4.
28   [25] WASHINGTON STANDARD [Olympia, Wash.], Mar. 1, 1901, 3.
     [26] *Killed Her Children*, COTTONWOOD [Ida.] REPORT, Mar. 1, 1901, 1.

8

DECLARATION OF CLAYTON CRAMER   APP. 897

17cv1017

**Swan River, Minn. Terr. (1860)**

Early 1860 or late 1859: A very complex incident.  One Chippewa warrior ("A") murdered another Chippewa ("B").  A few days later, B's squaw ("C") saw A, and shot him.  A's brother ("D") shot C.  C's brother ("E") shot D.

Category: public

Suicide: no

Cause: revenge

Weapon: firearm[27]

**Coldwater, Mich. (1865)**

Jan. 30, 1865: Young man becomes engaged to a woman in Lorain Co., Ohio.  This is a problem, because his wife in Coldwater, Mich., is about to give birth, so he returns home, where his wife lives with the young man's parents.  In the midst of giving birth, the young man murdered his wife.  When the young man's father and mother showed up, he shot them to death.  (Other accounts identify the town as Woodstock, and that the murder of his wife and unborn child followed the murder of his parents.)  His behavior after arrest, as newspaper coverage described, "suggests the charitable conjecture that the man is insane."  He confessed the crime and signed autographs for the crowd around the jail that described himself as "murderer of his wife, father and mother."  He invited his friends in Lorain County to visit him in jail "where they would find him 'playing checkers with his nose, on the jail windows.'"

Category: family

Suicide: no

Cause: mental illness

---

[27] *Indian revenge*, MUSCATINE [Iowa] WEEKLY JOURNAL, Jan. 27, 1860, 1.

9

DECLARATION OF CLAYTON CRAMER

Weapon: firearm[28]

**Sleepy Hollow, N.Y. (1870)**

Jan. 1, 1870: Farmer murdered his wife, and two of his neighbors, father and son, who appear to have visited the murderer's wife in his absence. The murderer had a reputation for being too fond of rum.

Category: public

Suicide: no

Cause: jealousy?

Weapon: firearm[29]

**Glenville, Minn. (1889)**

Feb. 15, 1889: Murderer, relative of the victims, shot to death, "Mary Chemeieck, aged six, and her sister Rose, aged eleven…" Apparently, his niece, Rose, had spurned his advances. He then murdered their mother with a shotgun and committed suicide.

Suicide: yes

Cause: unknown

Weapon: pistol, shotgun[30]

25.    A mass murder that is not part of the database shows how "primitive" firearms technology is not a barrier to school mass murder.  A former teacher showed up at a Bremen, Germany, Catholic school "armed with six loaded revolvers."  He killed one teacher, two children, "three children were gravely injured and three other

---

[28] *A Triple Murder*, [Plymouth, Ind.] MARSHALL COUNTY REPUBLICAN, Feb. 16, 1865, 1.
[29] *A Triple Murder at Sleepy Hollow*, WILMINGTON [N.C.] JOURNAL, Jan. 14, 1870, 1.
[30] *He was a Rejected Lover*, ST. PAUL GLOBE, Feb. 17, 1889, 1.

1   children were slightly wounded." The article described him as "demented."[31]

2   Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still

3   common today) he could have fired 30, 36, or 54 shots without reloading. Of course,

4   reloading a revolver with speedloaders can be done by a skilled shooter in a second or

5   two at most.

6        26.    Firearms become more common weapons by the 1920s. Axes and

7   hatchets declined as wood stoves became less common. While I have not categorized

8   the poison mass murders as precisely as I might do if I were starting from scratch,

9   "illuminating gas" and "Rough on Rats" (both commonly used to wipe out your spouse

10  and children) declined as automobile exhaust poisoning rose.

11       27.    This should be no surprise; mass murderers use what is available. This

12  May 20, 1931, Mattoon, Ill. incident catches this improvisational nature well. A

13  former employee of her late husband attempted to burn to death the woman and her

14  two daughters with whom he had recently moved to Illinois. They escaped the burning

15  house. He then shot to death the mother, attempted to strangle the daughters, then shot

16  them and beat them to death with an automobile starter crank. Weapons: firearm,

17  strangle, blunt.[32] Even today's gun mass murders are not as narrowly focused as the

18  popular imagination sees them.

19       28.    May 24, 2014, Isla Vista, Cal.: College student, upset about his sex life (or

20  rather its absence) stabbed to death his three roommates, shot three women at a sorority

21  (two of whom died), shot another student, injured two bicyclists by ramming them with

22  his car, and shot and wounded four pedestrians

23       Category: public

24       Suicide: yes

25       Cause: mental illness

26

27

---

28  [31] *Maniac Shot Many People*, BARRE [Vt.] DAILY TIMES, Jun. 20, 1913, 1.
    [32] *Woman Shot, Tots Choked*, BROWNSVILLE HERALD, May 20, 1931, 1.

11

DECLARATION OF CLAYTON CRAMER   **APP. 900**

17cv1017

1  Weapon: knife, pistol, automobile[33]

2  29.  For the following table, some of these weapon types require explanation.

3  UNKNOWN means the weapon type was not identified in the article.

4  AIRCRAFT is for murders committed with an airplane (not all of which

5  took place on Sep. 11, 2001).  (Bombing of planes is in the EXPLOSIVE

6  weapon type.)

7  TRAIN involves intentional derailment of trains to cause loss of life.  The

8  motivation for most of these crimes in uncertain.  One was insurance fraud;

9  authorities alleged "that the men entered into the plot to get rid of their wives

10  and at the same time to collect damages from the railroad company."  One of the

11  murderers collected $500 from the railroad for injuries to his wife.[34]  Another,

12  on Dec. 27, 1934: Police charged three men with the intentional derailment of a

13  train, in the hopes that one of the train crew would lose his job, so that one of the

14  three would get that job.  The crash killed three employees and injured 16

15  passengers.[35]

16  Incident count by weapon type for mass murders before 1960 where only

17  one weapon type was used:

18  | UNKNOWN | 862 |
19  | AX | 646 |
   | HATCHET | 135 |
20  | KNIFE | 588 |
21  | OTHERSHARP | 215 |
   | BLUNT | 868 |
22  | EXPLOSIVE | 299 |
23  | POISON | 286 |
   | STRANGLE | 109 |

24

25
   [33] Shelby Lin Erdman and Greg Botelho, *Timeline: A killer's rampage through a*
26  *California college town*, CNN, May 27, 2014,
   https://www.cnn.com/2014/05/24/us/california-rampage-timeline/, last accessed
27  November 27, 2018.
   [34] *Plot to Kill Their Wives*, [Maysville, Ky.] EVENING BULLETIN, Mar. 26, 1896, 1.
28  [35] *Trio Held In Wreck Accused Of Murder*, [Washington, D.C.] EVENING STAR,
   Mar. 10, 1935, 1.

12

DECLARATION OF CLAYTON CRAMER      **APP. 901**

17cv1017

| | |
|---|---|
| DROWN | 139 |
| ARSON | 708 |
| HANG | 284 |
| OTHER | 157 |
| PERSONAL | 21 |
| FIREARM_UNKNOWN | 2571 |
| SHOTGUN | 504 |
| RIFLE | 570 |
| PISTOL | 933 |
| MACHINE_GUN | 61 |
| AIRCRAFT | |
| TRAIN | 76 |

30.   When grouped by incidents where *only* non-firearms were used, 3,809 died.  For firearms *only* mass murders, 2,068 died.

31.   Many mass murders involve multiple weapons.  Robert McConaughy, May 30, 1840, murdered his mother-in-law and her five children.  Cause: robbery. Weapon: strangulation; stone; axe, rifle; knife.  He confessed after the first hanging failed.[36]

**III.   Killing People Without Modern Firearms Technology**

32.   How do you kill lots of people without modern firearms technology?

**A. Explosives**

33.   One popular method was explosives.

**Sells, Ark. (1900)**

Oct. 15, 1900: "[F]ather, mother, and four young children blown to atoms" by dynamite explosion.  "It is believed that a dispute over a homestead claim prompted the outrage."

Category: family non-resident

---

[36] *Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children* 6-7, 9-10 (1841).

13

1    Suicide: no

2    Cause: greed

3    Weapon: explosives[37]

4

5    **Cripple Creek, Colo. (1904)**

6         Jun. 5, 1904: Someone set off a bomb under a train station platform where

7    non-union men were waiting for a train during a strike.  Twelve died "and a

8    score or more injured..."  Subsequently, "Forty shots were fired in a crowd in the

9    street.  Two men were killed and at least six persons wounded."  One of the dead

10   "by blow from revolver."  Then the National Guard troops showed up and

11   attempted to restore order.

12   Category: public

13   Suicide: no

14   Cause: labor

15   Weapon: explosives, firearm, blunt[38]

16

17   **Mullins, W.Va. (1909)**

18        5/16/1909: The Black Hand used dynamite to blow up an Italian boarding

19   house.  One of the victims broke faith with the Black Hand.  The explosion

20   killed four and injured three.

21   Category: residential

22   Suicide: no

23   Cause: gang

24   Weapon: explosives[39]

25

26   _____

27   [37] *Whole Family Murdered*, [St. Genevieve, Mo.] FAIR PLAY, Oct. 20. 1900, 1.
     [38] *Terrorism and Death Dominate Colorado*, SAINT PAUL GLOBE, Jun. 7, 1904, 1.
28   [39] *Black Hand Kills Four By Dynamite*, BLUEFIELD [W.Va.] EVENING LEADER, May
     17, 1909, 1.

                                    14

**Mudlow, W.Va. (1912)**

7/26/1912: Striking miners dynamited a machine gun operated by agents of the Baldwin detective agency, killing three miners and seven detectives.

Category: public

Suicide: no

Cause: labor

Weapon: explosives[40]

**Superior, Penn. (1914)**

11/15/1914: Someone blew up the Kanaza general store, which was also the Kanaza residence, with two separate dynamite bombs, killing Kanaza's three children and two other men. Five others suffered injuries. Mr. Kanaza believed the motive was revenge for a lawsuit.

Category: family

Suicide: no

Cause: revenge

Weapon: explosives[41]

**San Francisco, Cal. (1916)**

Feb. 1916: Someone set off a dynamite bomb, killing ten, during the "Preparedness Day Parade," in preparation for World War I. While the identity of the murderers is uncertain (California Governor Culbert Olson many years later pardoned those originally convicted as evidence of perjury at the trial accumulated), circumstances suggests that it was the work of anarchists, hostile to U.S. involvement in the war.

---

[40] *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1.
[41] *Dynamite Kills Five In Spite Act*, NEW-YORK TRIBUNE, Nov. 16, 1914, 1.

DECLARATION OF CLAYTON CRAMER    APP. 904
17cv1017

1    Category: public

2    Suicide: no

3    Cause: terrorism

4    Weapon: dynamite[42]

5

6    **New York, N.Y. (1920)**

7         09/16/1920: Anarchists set off a bomb in Wall Street, killing 31 and

8    injuring 125 others.

9    Category: public

10   Suicide: No

11   Cause: terrorism

12   Weapon: TNT[43]

13

14   **Germantown, Md. (1920)**

15        11/18/1920: Two neighbors had a longstanding feud.  On Election Day,

16   one shot the other in the neck.  The farmer shot in the neck took revenge with 50

17   pounds of dynamite, killing his neighbor, the housekeeper and her two children.

18   Category: family non-resident

19   Suicide: no

20   Cause: revenge

21   Weapon: explosives[44]

22

23

24   _____

25

26   [42] *Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb*, BEMIDJI [Minn.] DAILY PIONEER, Jan. 3, 1917, 1; *Preparedness Day Bombing*, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations.

27   [43] *Bomb Batters Wall Street; 31 Slain, 125 Hurt*, THE SUN AND THE NEW YORK HERALD, Sep. 17, 1920, 1.

28   [44] *Bomb Wrecks Farmers Home Killing Three*, [Salem, Ore.] CAPITAL JOURNAL, Nov. 19, 1920, 1.

DECLARATION OF CLAYTON CRAMER

**APP. 905**

17cv1017

**Pittsburgh, Penn. (1925)**

05/Jun. 1925: Two bombs destroyed three buildings, killing eight people immediately, and fatally injuring two others.  One of the buildings housed a grocer who had been the victim of extortion threats by a Black Hand society.

Category: residential

Suicide: no

Cause: extortion

Weapon: explosive[45]

**Bath, Michigan (1927)**

May 18, 1927: Treasurer of the local school board was angered by his property tax increase to pay for a new school building that he had opposed.  He placed a dynamite bomb in the basement of the school, by which method he murdered 37 children and six adults as well as seriously injuring 44 others.  Only a wiring mistake prevented other charges from taking down the rest of the building which would endangered 150 more students.  The murderer had already beaten his wife to death at their home before blowing up their house.  He blew himself up in his car in front of the school 30 minutes after the school explosion.

Category: public

Suicide: yes

Cause: revenge

Weapon: explosive, blunt object[46]

---

[45] *Eight Are Killed In Blasted Homes*, [Washington, D.C.] EVENING STAR, May 06, 1925, 1.
[46] *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1.

17

DECLARATION OF CLAYTON CRAMER

**New York, N.Y. (1927)**

Oct. 8, 1927: Someone set off a dynamite bomb demolishing a four-story apartment building, killing five and injuring eleven. Why did police assume a dynamite bomb? "Finding of 20-Pound Unexploded Bomb Leads Police to Suspect Infernal Machine."

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[47]

**Newton, Mass. (1928)**

01/31/1928: Someone used dynamite to destroy a building containing "extensive liquor making apparatus in the basement." Six people died.

Category: private

Suicide: no

Cause: gang?

Weapon: explosive[48]

**Seat Pleasant, Md. (1930)**

01/01/1930: A belated and misdelivered Christmas gift was dynamite and exploded as the family unwrapped it. The explosion killed an expectant mother and two siblings, her mother, and injured two other siblings. The family was new to the community with no known enemies.

Category: family non-resident

---

[47] *Four Killed In Bomb Explosion In Tenement District Of New York*, [Douglas, Ariz.] DOUGLAS DAILY DISPATCH, Oct. 09, 1927, 1; *Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement*, NEW YORK TIMES, Oct. 9, 1927, 1.
[48] *Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story*, BROWNSVILLE HERALD, Jan. 31, 1928, 1.

18

DECLARATION OF CLAYTON CRAMER

Suicide: no

Cause: unknown

Weapon: explosives[49]


**Chesterton, Ind. (1933)**

10/10/1933: A bomb explosion in the cargo compartment aboard a United Airlines flight ripped the plane apart, killing seven people. Motive remained uncertain.

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[50]


**Denver, Colo. (1955)**

11/1/1955: The 23-year-old son of passenger Daisie E. King eventually confessed that he placed a 25-stick dynamite bomb in her luggage, blowing up her airliner, killing 44 people. The murderer had taken out life insurance policies on his mother and was expecting to receive a "substantial inheritance" upon her death.

Category: public

Suicide: no

Cause: greed

---

[49] *Gift Package Bomb Kills Woman; 5 Hurt*, [Washington, D.C.] EVENING STAR, Jan. 01, 1930, 1; *Bomb Survivors Tell Of Explosion,* [Washington, D.C.] EVENING STAR, Jan. 12, 1930, 1.
[50] *Ill-Fated Plane Wrecked By Bomb US Prober Says*, INDIANAPOLIS TIMES, Oct. 14, 1933, 1.

DECLARATION OF CLAYTON CRAMER   **APP. 908**

17cv1017

1    Weapon: explosives[51]

2    Since 1960, this technology, despite attempts to regulates explosives, remain a

3    big dead per incident killer.  Using fertilizer, a  murderer on Apr. 20, 1995, set off a

4    truck bomb in front of the Oklahoma City Federal Building killing 168 people and

5    injuring hundreds more.

6    Category: public

7    Suicide: no

8    Cause: terrorism

9    Weapon: explosives[52]

10

11    **B. Arson**

12    33.    Arson is also a common and very low technology method to cause lots of

13    suffering.

14

15    **New York, N.Y. (1903)**

16    11/1/1903: Police and coroner believed that a tenement building fire that

17    killed 26 people was "of incendiary origin."

18    Category: residential

19    Suicide: no

20    Cause: unknown

21    Weapon: arson[53]

22

23

24

25

26

27

28

---

[51] Flowers And Flowers, MURDERS IN THE UNITED STATES, 30-1; FBI, *Jack Gilbert Graham*, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, last accessed October 5, 2022.
[52] Flowers and Flowers, MURDERS IN THE UNITED STATES, 56-7.
[53] *Tenement House Fire*, [Maysville, Ky.] EVENING BULLETIN, Nov. 2, 1903, 4.

20

DECLARATION OF CLAYTON CRAMER     **APP. 909**

17cv1017

**Boston, Mass. (1913)**

Feb. 3/1913: A lodging house refused a man a room "for want of 15 cents." He lit the structure on fire, killing 27 lodgers in a dangerously renovated structure.

Category: residential

Suicide: no

Cause: revenge

Weapon: arson[54]

**San Francisco, Cal. (1944)**

03/27/1944: Over a period of four hours, five San Francisco skid row hotels "burst into flames" following a previous weekend of 11 fires in Oakland hotels. The New Amsterdam Hotel fire killed 22 and injured 27. "Authorities noted an odor of kerosene or gasoline." One tenant, 33, showed injuries from the fire and was held in the "hospital psychopathic ward."

Category: public

Suicide: no

Cause: mental illness

Weapon: arson[55]

**Tulsa, Okla. (1921)**

05/01/1921: The police arrested a young black man for what later appears to have been an accidental touching of a white female elevator operator. Rumors spread that police charged him with sexual assault. A lynch mob

---

[54] *Burns Lodging House When Refused Room; 27 Homeless Men Died*, [New York, N.Y.,] EVENING WORLD, Dec. 3, 1913, 1.
[55] *22 Killed In Hotel Fire In San Francisco*, [Santa Cruz, Cal.] SANTA CRUZ SENTINEL, Mar. 29, 1944, 1.

21

DECLARATION OF CLAYTON CRAMER

arrived at the county jail. The sheriff and deputies prevented seizure of the young man. A group of armed black men offered to help the sheriff defend the jail. This display of arms by black men inflamed white public sentiment leading to the destruction of Greenwood, the black section of Tulsa. More than one thousand homes were burned and *at least* 36 dead. Newspapers and public officials removed news accounts and official records about the riot from files. The Tulsa Race Riot Commission in 2001 "concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921," with many bodies buried in unmarked mass graves.

Category: public

Suicide: no

Cause: racism

Weapon: firearms, arson, unknown?[56]

**Chicago, Ill. (1958)**

Dec. 1, 1958: Our Lady of the Angels school burned, killing 95.[57]  Several years later, a 13-year-old confessed while on a lie detector that he had started the fire: "because he hated school, rebelled at the authority of teachers, liked to hear the sound of fire sirens and to watch fire engines race along the street."[58]

34.    After 1960, of course, there have been several arson mass murders with equal or larger death counts, and this remains a common method of mass murder in other nations. In Australia, an arsonist burned the Childers, Queensland's Palace

---

[56] *Tulsa Race Riots,* https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, last accessed July 5, 2021.
[57] Our Lady of the Angels School fire, https://en.wikipedia.org/wiki/Our_Lady_of_the_Angels_School_fire
[58] *Boy Admits Fire Fatal To 95,* MIAMI NEWS, January 16, 1962, 1.

1  Backpackers Hostel in 2000, killing 15.[59]  The 2011 Quakers Hill Nursing Home fire

2  killed eleven, set by a nurse after police questioned him about drug abuse.[60]  Japan had

3  several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents.[61]

4  These required no advanced firearms technology or even firearms.  The previously

5  mentioned San Juan, P.R. arson mass murder killed 97.[62]  The March 25, 1990,

6  Happyland Social Club fire killed 87 people, leaving three survivors.  Angry at his

7  girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of

8  employment.[63]

9

10  **New Orleans, La. (1973)**

11          Jun. 24/1973: The murderer took revenge for being expelled from the

12          UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of

13          cigarette lighter fluid, killing 33 people.[64]

14

15

16

17

18

19

20

21  [59] *A Decade On, Childers Remembers Hostel Fire Tragedy,* BRISBANE [Australia]
TIMES, Jun. 23, 2010.

22  [60] Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed
At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's
23  Car, Inquest Hears,* [U.K.] DAILY MAIL, Sep. 8, 2014.
[61] Makiko Inoue, Motoko Rich and Hikari Hida, *24 Dead in Suspected Arson at
24  Office Building in Japan,* N.Y. TIMES, Dec. 16, 2021,
https://www.nytimes.com/2021/12/16/world/asia/japan-fire-osaka.html, last accessed
25  November 21, 2022.
[62] *3 Teamsters Charged in San Juan Hotel Fire,* CHICAGO TRIBUNE, Feb. 4, 1988,
26  https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html,
last accessed November 24, 2018.
27  [63] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police
Arrest Ejected Patron; Worst New York Fire Since 1911,* NEW YORK TIMES, Mar. 26,
28  1990.
[64] Elisabeth Dias with Jim Down, *The Horror Upstairs,* TIME, Jul. 1, 2013.

**Chicago, Ill. (1976)**

01/30/1976: An employee of Wincrest Nursing Home with a mental illness problem (pyromania) started a fire in a clothing wardrobe, which killed 22 residents. The employee was charged with arson.[65]

**E. Brutal Misuse of Tools**

35.   **Villisca, Ia. (1912)**

Sep. 9, 1912: It appears that a business competitor and member of the Iowa State Senate murdered Joseph Moore, his wife Sarah, their four children and two visiting children "with an ax." An "itinerant minister" was charged. The Iowa Attorney-General "sought to commit" the minister "to an insane asylum, a step that would bar the prosecution of any other person suspected of the crime." Relatives of the victims claimed that the Attorney-General blamed the wrong person; in response, the Iowa legislature passed a law prohibiting public discussion of the crime. This led to an "injunction against J.N. Wilkerson, a detective, whose four years' investigation of the murders cast suspicion on a prominent state senator." The public meeting by Villisca residents took place in Omaha, Neb., instead.

Category: greed

Suicide: no.

Cause: greed

Weapon: ax[66]

---

[65] National Fire Protection Association, *Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home*, 1, 4, https://oac.cdlib.org/view?docId=hb9v19p0sd&doc.view=frames&chunk.id=div00008&toc.id=0, last accessed November 27, 2022; *Woman Indicted in Chicago Blaze*, New York Times, Feb. 4, 1976.
[66] *Villisca Ax Murders to Be Discussed in Mass Meeting*, Omaha Daily Bee, Jul. 6, 1917, 1.

### F. Panic

36.   **Calumet, Mich. (1913)**

Dec. 24, 1913: A man shouted, "Fire! Fire! Everybody rush!" in the Italian Hall where striking miners and their families were meeting for a Christmas party. (There was no fire.) As the crowd attempted to exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[67] One account ascribed the false claim to "a drunken" man,[68] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[69] this seems unlikely as the cause.

Category: public

Suicide: no

Cause: labor

Weapon: mouth[70]


**Causes**

37.   The focus of the State on the *method* of mass murder might be better spent on solving the problem by solving underlying causes.

38.   The following table shows the proximate cause of all mass murders in my database before 1960. (After 1960, the data is not yet complete.) A breakdown of these abbreviations:

- **Rob** is a mass murder performed as part of a robbery or to eliminate witnesses to the robbery.

---

[67] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.
[68] *Day of Joy is One of Sorrow*, [Valley City, N.D.] WEEKLY TIMES-RECORD, January 1, 1914, 6.
[69] *Strike Breakers Taken to Mines at Point of Pistols*, OMAHA DAILY BEE, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).
[70] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

25

**DECLARATION OF CLAYTON CRAMER**   **APP. 914**

17cv1017

- **MI** (Severe mental illness, primarily psychoses and other illnesses that cut off the sufferer from reality) includes all crimes where either contemporary accounts describe the murderer as insane, or where the nature of the crime makes other explanations implausible (this is necessarily a judgment call, on which my experience with mentally ill relatives and friends informs my opinion). The legal definition of mental illness is much narrower than the medical definition. Through most of U.S. history, the McNaughton Rule (sometimes spelled M'Naughten) defined legal insanity as: "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know what he was doing was wrong."[71] A person who did not know he was doing wrong, was insane.

Persons who are medically mentally ill sometimes know that they are doing wrong and try to escape arrest and conviction (perhaps because the "aliens," or the CIA or KGB "agents" that they have just murdered are still after them). Such persons are legally sane, while in any conventional sense, they are as "mad as hatters."

- **MI?** are persons whose sanity seems questionable but for which contemporary accounts are less than persuasive.

- **PPD** (Postpartum Depression): Tragically, many of these mentally ill or possibly mentally ill incidents are mass murders by mothers with recently born babies. In cases where the murders are by recent mothers and where news accounts provide no other explanation, I have categorized these as **postpartum depression**. Some news accounts identified the mother as 'temporarily insane" with no previous history of mental illness. In a few cases the news accounts report on previous mental illness hospitalizations associated with previous births.

- Many cases I have listed as "**PPD?**" because this is a plausible explanation when no other seems more likely.

---

[71] *The insanity defense and Diminished Capacity,*
https://www.law.cornell.edu/background/insane/insanity.html

26

- **Resist** is a criminal resisting arrest.

- **Unknown** describes a very large number of crimes where either the motivation is unclear or the newspaper coverage is silent; this also includes some mass murders where the inability to identify the murderer makes cause impossible to determine.

- **Religion** is mass murders committed as part of religious persecution. (And yes, in America!)

- **Racism** is its frequent cousin. In some cases, these include revenge or retribution against Indians for crimes not, or at least not clearly committed by the victims.

- **Politics** are murders committed to advance a political cause.

- **Terror** are mass murders committed to cause mass fear for purposes of political change outside elections. Example: 9/11.

- **Revenge** are mass murders committed to take revenge for real or perceived injuries by the murderer, his family, or acquaintances.

- **Ind** are crimes between Indians and settlers that are not official acts of war, but that might have been seen that way by the murderers. I have classified all attacks against peaceful travelers, settlers, and Indians in this cause. (In some cases, the killers openly admitted that the victims were "peaceful," but were supplying guns to less friendly tribes.) [72]

- **Financial** is a strange subclass of family murders committed, usually by a parent concerned their family is about to become impoverished, who then "protect" them from that suffering by mass murder. In some cases, this seems to be a form of mental illness: at least one example involved a mass murderer who was in no danger of impoverishment.

---

[72] *From California and Oregon*, [Washington, D.C.] EVENING STAR, Mar. 21, 1860, 2.

27

DECLARATION OF CLAYTON CRAMER

- **Labor** are crimes committed during labor disputes, sometimes against strikebreakers, sometimes against labor unionists.

- **Quarrel** are incidents that start out as some relatively minor dispute before escalating into disproportionate response.

- **Cult** refers to mass murders committed by oddball religious cults; I was surprised how widespread these were in the early 20th century (the Church of the Sacrifice slaughtered entire families, often with the family's own ax).

- **Rape** are mass murders committed to eliminate witnesses to a rape.

- **Greed** are mass murders carried out to obtain wealth other than by robbery, often by inheritance from the deceased.

- **Divorce** is an alternative form of **Revenge**; divorce has been or is in the process and someone is seeking retribution. This includes separated spouses attempting reconciliation.

- **Adultery**: a variant of **Revenge**.

- **Jealousy**: should be obvious.

- **Intoxication** are crimes attributed to alcohol or drug-induced stupidity. The strong overlap between **mental illness** and **substance abuse** (one often causing the other) makes some of these hard to distinguish, especially 150 years after the crime.

- **Bullying** is a recent category, and one that I suspect reflects some deeper mental illness; I was bullied as a child, had access to low-grade explosives (nerds have peculiar hobbies), and never even *thought* of mass murder (or even low-intensity revenge).

- **Stalker**: someone did not get their attentions rewarded as they saw fit.

- **Witnesses**: Eliminating witnesses to some crime other than rape or robbery.

28

DECLARATION OF CLAYTON CRAMER

1
2

- **Lynch**: extralegal murders (and a surprising number had multiple victims).  These are always group mass murders.

3

**incidents by cause before 1960**

| Cause | incidents |
|---|---|
| ADULTERY | 3 |
| BULLYING | 2 |
| CULT | 10 |
| CULT? | 3 |
| DIVORCE | 73 |
| DRUG | 3 |
| EXTORTION | 6 |
| FINANCIAL | 51 |
| GANG | 33 |
| GREED | 43 |
| IND | 24 |
| INTOX | 53 |
| JEALOUSY | 37 |
| LABOR | 46 |
| LYNCH | 93 |
| MI | 211 |
| MI? | 97 |
| OTHER | 25 |
| POLITICS | 21 |
| PPD | 17 |
| PPD? | 58 |
| PRISON BREAK | 17 |
| QUAR | 176 |
| RACISM | 20 |
| RAPE | 18 |
| RELIGION | 3 |
| RESIST | 37 |
| REVENGE | 109 |
| REVENGE? | 1 |
| ROB | 153 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

29

DECLARATION OF CLAYTON CRAMER

| incidents by cause before 1960 | |
| --- | --- |
| Cause | incidents |
| SLAVERY | 1 |
| STALKER | 2 |
| TERROR | 19 |
| UNKNOWN | 447 |
| WITNESSES | 4 |

39.     Plotting the cause without UNKNOWN shows the high frequency causes:



incidents by cause before 1960

40.     It should surprise no one that mental illness and likely mental illness are a high frequency category.  While most mentally ill people are primarily a hazard to themselves, severely mentally ill people are overrepresented in murder and other violent crimes.[73]  Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[74]

_____

[73] See Clayton E. Cramer, *Mental Illness and the Second Amendment.* 46 Connecticut Law Review 1301-6 (May 2014):(collecting studies).
[74] See Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) and Jean Isaac Rael and Virginia C. Armat, MADNESS IN THE STREETS: HOW PSYCHIATRY AND THE LAW ABANDONED THE MENTALLY ILL (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

30

41.     Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s correlated with the change in the percentage of the population that was institutionalized: those who were confined to either a mental hospital or prison.  According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization: mental hospitals.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[75]

42.     Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[76] more access to beds is clearly quite important in reducing homicide rates; "poorly rated mental health systems" matter, but not as dramatically.)

43.     Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with

[75] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution,* 84 *Texas Law Review* 1766-75 (2006).
[76] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

31

DECLARATION OF CLAYTON CRAMER

1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[77]

44.    A 2000 *New York Times* examination of mass murderers concluded:

The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population. However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [78]

45.    A few representative cases from the period before 1960:

**New Haven, Conn. (1930)**

Jun. 21, 1930: The father had been involuntarily committed to a mental hospital.  He escaped, threw his four children and wife from a 400-foot cliff, then jumped.

Category: family

Suicide: yes

---

[77] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, SOCIAL PSYCHIATRY AND PSYCHIATRIC EPIDEMIOLOGY, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.
[78] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, NEW YORK TIMES, Apr. 10, 2000.

32

DECLARATION OF CLAYTON CRAMER

Cause: mental illness

Weapon: other[79]

**New York, N.Y. (1953)**

Apr. 01, 1953: A college professor, 52, under psychiatric care, strangled his wife and their two children, then stabbed himself to death.

Category: family

Suicide: yes

Cause: mental illness

Weapon: strangled[80]

**Eleva, Wisc. (1909)**

Feb. 2. 1909: The father stabbed to death his four children, then "stabbed himself and then jumped from the barn loft with a rope around his neck.  At the same time he hurled a fire brand into the stable, firing the barn."

Category: family

Suicide: Yes.

Cause: "[Father] was recently released from an insane asylum."

Weapon: knife[81]

**Summary**

46.     Mass murder is not particularly new, nor is historical mass murder a peculiarly group activity.  Almost everything can be, and has been, used to commit mass murder in America.  The mass murder at Cleveland School in 1989 that started

---

[79] *Maniac Veteran Kills His Family*, NEW BRITAIN HERALD, Jun. 23, 1930, 9.

[80] *Triple Murder, Suicide Apparent*, [Parsons, Kansas] PARSONS SUN, Apr. 04, 1953, 7.

[81] *Murders Whole Family and Then Kills Self*, [Pendleton, Ore.] EAST OREGONIAN, Feb. 22, 1909, 8.

33

DECLARATION OF CLAYTON CRAMER

California's legislative focus on LCMs involved a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment. As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[82]

47.    This is an especially painful paragraph for me.  My smarter, older brother's spiral down into schizophrenia resulted in brushes with the law but never with such a horrible ending.  It was still a life wasted by California's confused and irrational mental health policy.  Has more than 20 years of LCM laws, defenses of those laws, prison sentences for offenders, and dealing with other mass murders (not all with guns) *really* been cheaper than providing mental health care?

48.    The focus of the State on the *method* of mass murder might be better spent on solving the underlying *causes*.  This abstract closes with a chilling sentence:

> A case of an attempted mass shooting at a large psychiatric hospital in the United States by a 30-year-old male with severe mental illness, somatic delusions, and exceptional access to healthcare professionals is reported. Six persons were shot, one died at the scene, and the shooter was then killed by the police. Data were gathered from court documents and media accounts. An analysis of the shooter's psychiatric history, his interactions with healthcare professionals, and communications prior to the shooting suggest a rare form of mass murder, a random attack by a documented psychotic and delusional individual suffering with somatic delusions. Despite his being psychotic, the killer planned the attack and made a direct threat 1 month prior to the shootings. **This case highlights problems with the healthcare system, indicating that it**

---

[82] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

34

DECLARATION OF CLAYTON CRAMER

might be ill equipped to appropriately deal with severe mental illness.[83] [emphasis added]

49.   Confronting the extent which a shortage of mental health services and the difficult nature of involuntary mental health commitment in much of America would be a more effective strategy.  A severely mentally ill person without an LCM could follow in the footsteps of previous generations and use less regulated weapons: ax, hatchet, knife, poison, trail derailment.

**Background and Qualifications**

50.   A copy of my *curriculum vitae* is attached to this Declaration as Exhibit 42.

51.   I attended Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

52.   I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

53.   I am currently employed as an Adjunct Professor College of Western Idaho, Nampa, teaching Western Civilization I and U.S. History I.

54.   My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles'

---

[83] Christine Sarteschi. (2015). *Severe Mental Illness, Somatic Delusions, and Attempted Mass Murder.* JOURNAL OF FORENSIC SCIENCES. 61. 10.1111/1556-4029.12876.

1 | book contained quotations taken out of context, which completely reversed the
2 | author's original intent. Dates were altered and statutory text was changed to
3 | completely reverse the meaning of the law. The sheer volume of these errors, and their
4 | consistent direction, would seem to preclude honest error. Emory University conducted
5 | an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles
6 | resigned from his tenured position at Emory. Columbia University initially awarded
7 | Bellesiles the Bancroft prize for his book "Arming America", but revoked the award
8 | after my research proved that the book was fraudulent.

9 |       55.    My publications include:

10 | ·      *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press,
11 | 2018;

12 | ·      *Social Conservatism in An Age of Revolution: Legislating Christian Morality in*
13 | *Revolutionary America*, CreateSpace, 2016;

14 | ·      *Historical Evidence Concerning Climate Change: Archaeological and Historical*
15 | *Evidence That Man Is Not the Cause*, CreateSpace, 2016;

16 | ·      *My Brother Ron: A Personal and Social History of the Deinstitutionalization of*
17 | *the Mentally Ill*, CreateSpace, 2012;

18 | ·      "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal*
19 | *of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;

20 | ·      *Armed America: The Remarkable Story of How and Why Guns Became as*
21 | *American as Apple Pie*, Nelson Current, 2006;

22 | ·      *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and*
23 | *Moral Reform*, Praeger Press, 1999;

24 | ·      *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;

25 | ·      *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing,
26 | 1995;

27 | ·      *For The Defense of Themselves and the State: The Original Intent and Judicial*
28 | *Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;

36

DECLARATION OF CLAYTON CRAMER

1 · *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,*
2 Editor, Library Research Associates, Inc., 1990

3     56.    I was retained at a rate of $75/hour to prepare this declaration.

4     57.    My compensation is not in any way dependent on the outcome of this or
5 any related proceeding, or on the substance of my opinion.

7      I declare under penalty of perjury that the foregoing is true and correct. Executed
8 within the United States on December 1, 2022.

Clayton Cramer
Declarant

DECLARATION OF CLAYTON CRAMER    APP. 926

17cv1017

# EXHIBIT 42

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

|  | Sonoma State University, Rohnert Park, California |
|---|---|
| June, 1998 | M.A. in History |
|  | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
|  | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
|---|---|
|  | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

| Fall, 2017 – present | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
|---|---|
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | ***Adjunct Faculty***: College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | ***Adjunct Faculty***: ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | ***Adjunct Faculty***: Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

**APP. 928**

1996        *Teaching Assistant*: Assisted Professor Peter Mellini in his course
            "Twentieth Century World." I graded quizzes, exams, and answered
            weekly written questions from students. I also prepared and lectured
            about the rise of totalitarianism in the period between the world wars.


**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

**APP. 929**

**SELECTED PUBLICATIONS:**

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" Southern Illinois University Law Journal Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic." *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241. Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997. "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

**WORKS CITED IN COURT DECISIONS:**

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008). In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 42**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

    I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Facsimile: (562) 216-4445
   Email: abarvir@michellawyers.com
6
7  Attorneys for Plaintiffs

8

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,          Case No:  17-cv-1017-BEN-JLB

12                      Plaintiffs,   **DECLARATION OF GARY KLECK
                                       IN SUPPORT OF PLAINTIFFS'**
13                                     **SUPPLEMENTAL BRIEF;**
                 v.                    **EXHIBIT 43**
14
    XAVIER BECERRA, in his official
15  capacity as Attorney General of the
    State of California,
16
17                      Defendant.

18

19

20

21

22

23

24

25

26

27

28

                              1

I, Gary Kleck, declare as follows:

**Introduction**

1.       I am Dr. Gary Kleck, Emeritus Professor of Criminology & Criminal Justice at Florida State University. Counsel for plaintiffs have asked me to offer a rebuttal opinion regarding the supplemental reports filed by Lucy Allen and Louis Klarevas. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

**Background & Qualifications**

2.       I  am an emeritus Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I was, at the time of my retirement in May 2016, the David J. Bordua Professor of Criminology at Florida State University, where I served on the faculty from 1978 to 2016. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime." (William J. Vizzard, *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control* , 2003, p. 183).

3.       I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." I also authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001) - books that likewise addressed the topic of guns and violence.

4.       I have also published scholarly research articles in virtually all the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review*, *American Journal of Sociology*,

2

DECLARATION OF GARY KLECK

*Social Forces*, *Social Problems*, *Criminology*, *Journal of Criminal Law and Criminology*, *Law & Society Review*, *Journal of Research in Crime and Delinquency*, *Journal of Quantitative Criminology*, *Law & Contemporary Problems*, *Law and Human Behavior*, *Law & Policy Quarterly*, *Violence and Victims*, *Journal of the American Medical Association*, and other scholarly journals.

5.     I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs—Violence Task Force, and as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

6.     Finally, I have taught doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology.

7.     My current curriculum vitae, which includes a full list of my qualifications and publications, is attached hereto as **Exhibit 43.**

**Legal Cases in Which I Have Served as an Expert Witness**

8.     In the past ten years, I have been deposed and/or testified at trial in the following matters:

*Heller v. District of Columbia*, D.D.C. (deposed July 2, 2013).

*Cook et al. v. Hickenlooper*, D. Colo. (deposed and testified Mar. or April 2013).

*Wilson v. Cook County* (deposed Sept. 16, 2013).

*Kolbe v. O'Malley*, D. Md. (deposed Jan. 2, 2014).

*Barbra Schlifer Commemorative Clinic v. HMQ Canada* ("Cross-examined" [Canadian term for deposed] Feb. 24, 2014).

1   *Friedman v. City of Highland Park* (deposed May or June 2014).

2   *Tracy Rifle and Pistol v. Harris*, E.D. Cal. (deposed Nov. 2, 2016).

3
    *Flanagan v. Becerra*, U.S. District Court, Central District of
4        California.  Deposed July 25, 2017.

5   *Worman v. Baker*, U.S. District Court for the District of
6        Massachusetts.  Deposed October 25, 2017.

7   *Duncan v. Becerra*, U.S. District Court, Southern District of
8        California.  Deposed January 3, 2018.

9   *MSI v. Hogan*, U.S. District Court, District of Maryland.  Deposed
10       May 18, 2018.

11  *Association Of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Grewel
         et al.*, United States District Court  District Of New Jersey.
12       Deposed 8-2-18.  Trial testimony 8-17-18.

13  *Rupp v. Becerra.*, U. S. District Court, Central District of California.
14       Deposed 12-12-18.

15  *NRA v. Swearingen*, United States District Court for the Northern
16       District of Florida, Deposed via Zoom 8-13-20.

17  *Maryland Shall Issue v. Anne Arundel County.*  United States District
         Court for Maryland.  Deposed via Zoom on 9-29-22.
18

19  **Compensation**

20       9.      I am being compensated for my time in this case at an hourly rate of

21  $400 per hour. My compensation is not contingent on the results of my analysis or

22  the substance of my testimony.

23  **I.     Response to Supplemental Report of Lucy Allen**

24       A.     *Allen's Claims About the Use of Large-capacity Magazines in Mass
25              Shootings*

26       10.     Less than 2% of gun crimes known to the police involve offenders

27  firing over 10 rounds (Reedy and Koper 2xxx). Since ordinary crimes almost never

28  involve over 10 rounds fired, the rationale for banning large-capacity magazines

1   (LCMs) is focused almost entirely on mass shootings (commonly defined as

2   incidents in which 4 or more victims are killed), since they do involve many rounds

3   fired.  Lucy Allen's defense of the LCM ban is consequently based on two claims

4   about LCM use in mass shootings: (1) a large share of mass shootings involve use of

5   LCMs, (and the related proposition that mass shooters prefer LCMs over smaller

6   magazines), and that (2) use of LCMs in mass shootings causes a higher casualty

7   count.

8       11.    What share of mass shootings (4+ dead) *actually* involve the use of

9   large-capacity magazines (LCMs), defined herein as those with over 10-round

10  capacity?  Allen uses a miscellaneous set of four largely overlapping sources of data

11  to defend her assertion that LCMs are frequently used in mass shootings, concluding

12  that 60% involve an LCM.  Unfortunately, what all four of her datasets have in

13  common is that they all cover only a small minority of all mass shootings, and the

14  few incidents they do cover are clearly unrepresentative of the full set of mass

15  shootings.

16      12.    The most comprehensive compilation of mass shooting incidents is

17  contained in the Gun Violence Archive (GVA), publicly available at

18  https://www.gunviolencearchive.org/.  Significantly, Allen ignored this widely used

19  data source – available since 2013 - in favor of her four radically incomplete

20  compilations.  The earliest GVA figures are for 2013, and the most recent complete

21  year covered is 2021.

22      13.    The most comprehensive source on mass shootings involving LCMs

23  can be found on the Violence Policy Center (VPC) website, available at

24  https://vpc.org/fact_sht/VPCshootinglist.pdf.  VPC advocates bans on LCM, and its

25  staff searches hundreds of news sources for stories reporting LCM use in mass

26  shootings.  If even a single news story reports use of a magazine holding over 10

27  rounds, it is included in the VPC database.  Any given individual news source might

28  omit mention of LCM use from their account of a mass shooting that involved one,

5

DECLARATION OF GARY KLECK      APP. 939

17cv1017

1  but in order for an LCM-involved mass shooting to be missed in the VPC search,

2  mention of LCM involvement would have to be omitted from every single news

3  source searched – even those with editorial policies favoring bans on LCMs.  Such

4  an occurrence is highly unlikely, so it is correspondingly unlikely that the VPC

5  database excludes any significant number of LCM-involved mass shootings.

6       14.    I compiled counts from these two comprehensive sources to create the

7  following table.  It shows how often LCMs are involved in *all* mass shootings (4+

8  dead in a single incident), as distinct from Allen's tiny, arbitrarily selected subset of

9  mass shootings.

10

11  Table 1 – Prevalence of LCM Use in All Mass Shootings, 2013-2021

12

| Year | Mass Shootings | LCM-involved Mass Shootings |
|------|----------------|------------------------------|
| 2013 | 25 | 2 |
| 2014 | 20 | 0 |
| 2015 | 26 | 4 |
| 2016 | 25 | 4 |
| 2017 | 24 | 4 |
| 2018 | 22 | 3 |
| 2019 | 31 | 4 |
| 2020 | 21 | 0 |
| 2021 | 28 | 5 |
| | | |
| 2013-2021 | 222 | 26 |

21       15.    Thus, when one examines the full set of *all* mass shootings instead of

22  the tiny, arbitrarily selected subset examined by Allen, one finds that only **11.7%** of

23  all mass shootings (4+ dead) in the U.S. involve LCMs – a far cry from Allen's

24  claimed 60% (Allen, p. 19).  It would be more accurate to say that mass shooters

25  *rarely* use LCMs.

26       16.    Further, in terms of absolute frequency, it would also be fair to say that

27  mass shootings in which an LCM was known to have been used are freakishly rare,

28  occurring an average of just 2.9 times per year in the entire United States in 2013-

1  2021 (26/9 years=2.9).  Specifically regarding California, while it is a big state, it

2  still claims only about 12% of the U.S. population, so one could expect **0.35** LCM-

3  involved mass shootings in a typical year in California (12% of 2.9=0.35), or about 1

4  every 3 years.  Thus, the benefit of even a California LCM ban that somehow

5  managed to completely eliminate LCM-involved mass shootings would be close to

6  nonexistent.

7        B.   *Does Mass Shooter Use of LCMs Cause a Higher Casualty Count?*

8        17.   Allen correctly notes that mass shooters who used LCMs inflicted more

9  casualties than those who did not, but leaves the impression that LCM use must have

10  somehow *caused* the higher casualty count. She does not mention the obvious

11  alternative explanation for this statistical association—that shooters more intent on

12  hurting many people would prepare to do so by acquiring LCMs and bringing them

13  to the scene of their crime. That is, lethality of intent determines both the choice of

14  weaponry and ammunition and the outcome of the crime. If this completely accounts

15  for the association, it means that the association is spurious, i.e. non-causal. That is,

16  it means the LCM use has no effect of its own on the number of casualties inflicted.

17        18.   This alternative explanation entails two component assertions:

18  (1)   Greater lethality of offender intent causes shooters to fire more rounds

19        and inflict more casualties.

20  (2)   Greater lethality of intent makes it more likely that mass shooters will

21        use weaponry they believe is suited to their deadly intentions.

22  Regarding assertion (1), it is scarcely credible that the outcomes of mass shootings

23  are not even slightly affected by what the shooters intended. While the

24  correspondence between intent and outcome is not perfect, it surely is strong.  To my

25  knowledge, no proponent of LCM bans or scholarly student of LCM effects,

26  including Allen, has ever denied this assertion. Thus, assertion (1) is widely

27  accepted.

28

7

DECLARATION OF GARY KLECK

1     19.     Likewise, to my knowledge, no proponent of LCM bans or scholarly

2   student of LCM effects has ever denied that many mass shooters commonly plan

3   their attacks well in advance, and that this planning includes obtaining firearms and

4   ammunition. News accounts of mass shootings routinely describe the perpetrators of

5   mass shootings planning their attacks weeks or months in advance, acquiring guns

6   and magazines that they later use to kill and injure. Assertion (2) is completely

7   consistent with all evidence about mass shootings known to me or included in

8   Allen's report.

9     20.     Therefore, the association between (a) LCM use and (b) the numbers of

10  rounds fired and victims hurt in mass shootings, is at least partly (and possibly

11  entirely) spurious (not causal), and is instead attributable to the common effects of

12  (c) shooter lethality of intent on both (a) and (b). If propositions (1) and (2) are

13  correct, the only way to support the claim that the association between (a) and (b) is

14  *not* entirely spurious (and thus is at least partly causal in nature) is to measure and

15  control for (c). Allen has not done this, nor has anyone else, to my knowledge. Thus,

16  Allen has made no affirmative case for the claim that the association between (a) and

17  (b) is even partially causal, or the position that LCM use has any causal effect on the

18  number of casualties in mass shootings.

19        C.     *Allen does not Provide Any Reason <u>Why</u> LCM Use Would Affect the
20               Number Killed or Wounded in a Mass Shooting*

21     21.     Allen fails to provide even a speculative explanation of *why* use of

22  LCMs would increase the number of people killed or wounded in mass shootings –

23  even though such an hypothesized effect is the main rationale for banning LCMs.

24  Allen's implied position that LCM use actually affects the number of casualties

25  might have been strengthened if she had cited details of actual mass shootings that

26  indicate that LCMs were necessary for firing many rounds and inflicting many

27  casualties, or that fewer rounds would have been fired and fewer casualties inflicted,

28  had the shooter lacked LCMs.  For example, she might have tried to cite substantial

numbers of shootings in which the offender used an LCM, but had only one gun and one magazine, since, in such a situation, bystanders would have a better chance of tackling the shooter while he was reloading, and potential victims would have additional time to escape while the shooter was reloading. Allen did not do this. To my knowledge, she could not do this because there are no such known cases.

22.    All mass shooters use multiple guns or multiple magazines and therefore could, even if they did not have LCMs, fire many rounds without significant interruption, by either firing additional guns once the first one was emptied or by quickly changing magazines, something that takes only about 3-4 seconds (Kleck 2016).  Allen neither acknowledges nor denies this, and consequently fails to provide any explanation as to *why* LCM use would cause a mass shooter to kill or wound more people.  She appears to believe that merely citing the crude statistical association between LCM use and casualty county is sufficient to establish a case for cause-and- effect.  However, as even beginning statistics students know, correlation is not causation.  This is especially true in this case because close examination of how mass shootings occur does not reveals any causal mechanism by which LCM use by U.S. mass shooters could increase the number of people they killed or wounded.

23.    Advocates of LCM bans have hypothesized two possible mechanisms by which preventing LCM use by a mass shooter might decrease the casualty count, both based on the fact that shooters confined to smaller capacity magazines would have to reload more often.  First, more pauses to reload implies that bystanders would have more opportunities to tackle the shooter and stop him before he hurt more victims.  Second, the time the shooter devoted to reloading would give prospective victims additional time to escape or hide.

24.    Regarding the first possibility, there have been no mass shootings in the U.S. in the past 30 years in which the shooter was tackled while he was reloading. All cases purported to involve such a scenario turn out to be incidents in which the

9

DECLARATION OF GARY KLECK

1   shooter was tackled while struggling with a jam or a defective magazine (Kleck

2   2016). Since a ban on larger capacity magazines would not increase the frequency

3   of gun jamming or use of defective magazines in mass shootings, this kind of

4   opportunity for bystander intervention would not be increased by an LCM ban. For

5   example, the incident most frequently cited by LCM ban advocates to support the

6   claim of bystander intervention while the shooter was reloading is the Arizona

7   shooting involving an attack on Representative Gabriel Giffords in 2011. Some

8   bystanders claimed that the shooter was reloading when he was tackled, but

9   subsequent police investigation found that one of the magazines was defective

10  because its spring was broken. As far as can be determined from eye witness

11  testimony, the shooter was struggling with this defective magazine when he was

12  tackled, rather than reloading.

13       25.    The second mechanism by which additional reloading might reduce the

14  casualty count is that it purportedly provides additional time for victims to escape or

15  hide. To be sure, all mass shootings involve pauses between shots, whether because

16  the shooter was choosing his next victim, was reloading, or for other reasons. The

17  key issue is whether the additional reloads *add* to these pauses to an extent that

18  results in the shooter attacking fewer victims. The plausibility of the speculation

19  that reloads provide *additional* opportunity for victim evasion is dependent on just

20  how much time it takes to reload a semiautomatic firearm, and how this compares

21  with the length of the other pauses in shooting that occur when the offender is not

22  reloading.

23       26.    Analysis of mass shootings in which it was possible to determine the

24  offender's rate of fire reveals that mass shooters using semiautomatic guns fire at

25  relatively slow rates, invariably less rapid than the rate of which the weapons are

26  capable (3 or more rounds per second) (Kleck 2016) . Reloading a detachable

27  magazine takes ordinary shooters only about 3-4 seconds, and mass shooters who

28  rehearse their crimes by practicing rapid reloads could probably do still better. The

1   average interval between shots in mass shootings, however, is well over 3-4 seconds

2   (see Table 3 in Kleck 2016). This means that pauses in shooting due to reloading

3   are actually shorter in duration than the pauses between shots that mass shooters

4   routinely take whether or not they are reloading. Thus, it is implausible that

5   inducing mass shooters to reload more often provides any additional time sufficient

6   for more victims to escape or hide.

7   27.   In sum, there is no known mechanism by which bans on LCMs could

8   reduce the casualty count in mass shootings, and thus no empirical support for the

9   benefits that Allen claims would accrue from such a ban.

10   D.   *Allen's Claims About the Number of Rounds Fired in Defensive Gun*

11   *Uses*

12   28.   Allen asserts that very few defensive gun uses (DGUs) involve over 10

13   rounds being fired, implying that LCMs are unneeded for defensive purposes. As a

14   preliminary logical note, it is important to point out that the data used by Allen could

15   not tell her anything about incidents in which victims *needed* an LCM to carry out

16   effective self-defense, but did not have one. Thus, as far as Allen knows, there

17   could have been thousands of crime incidents in which crime victims needed to fire

18   more than 10 rounds and would have benefited from use of an LCM but not possess

19   one.

20   29.   In any case, Allen's claims about DGUs have no reliable foundation in

21   evidence. She cites data from the "Armed Citizen" column of the National Rifle

22   Association's (NRA) magazine, *American Rifleman*, and concludes that "it is rare

23   for a person, when using a firearm in self-defense, to fire more than ten rounds." She

24   does not confine this conclusion to persons whose defensive gun use (DGU) was

25   reported in the *American Rifleman*, but clearly intends it to apply to Americans in

26   general. The NRA's database of "armed citizen" stories is not a representative

27   sample of DGUs, nor does the NRA even claim it to be so. Indeed, Allen herself

28   does not claim that the NRA sample is representative. She acknowledges the

11

DECLARATION OF GARY KLECK

1  possibility of bias in selecting cases "in favor of stories that put use of guns in self-

2  defense in the best possible light." Therefore, there is no formal basis for

3  generalizing the results of any analysis of this sample to any larger population of

4  DGUs.

5       30.    The utility of the NRA sample is, however, even worse than merely

6  being unrepresentative of DGUs in a general way. More specifically, there is strong

7  reason to believe that the sample will largely exclude DGU incidents in which the

8  defender fired more than 10 rounds. NRA staff nonrandomly select these incidents

9  from news media-reported cases of DGU, most of them submitted by readers of the

10  "Armed Citizen" feature of *American Rifleman*.  Based on the content of these

11  stories published in the magazine, it is clear that they are selected to convey the

12  impression that DGU is an extremely legitimate and effective activity, engaged in by

13  responsible law-abiding persons, for clearly legally justifiable purposes, carried out

14  in clearly lawful ways. The reality of the full array of DGUs is considerably more

15  diverse, but the NRA has a political agenda to portray DGU in as positive a light as

16  possible.

17       31.    Thus, Allen is quite right to note that the selection practices of NRA

18  staff are likely to favor inclusion of DGU stories that put DGU "in the best possible

19  light." She does not, however, appear to understand how this bias would work

20  regarding stories in which defenders fired large numbers of rounds. It could not

21  serve the NRA's purposes to disseminate accounts of DGUs in which the defenders

22  appeared to use excessive force, indiscriminately firing arguably excessive numbers

23  of rounds at their adversaries. The more seemingly excessive the defender's use of

24  force appears to be, the less likely it is that his actions would appear to a reader to be

25  justifiable. Likewise, the NRA is unlikely to want to disseminate stories in which

26  effective self-defense was difficult and dangerous, requiring the firing of large

27  numbers of rounds to protect the defender. Instead, NRA staff would better serve

28  their political ends by selecting stories of DGUs in which the defenders used the

1  minimum amount of force needed to defend themselves, firing the fewest rounds

2  needed to serve that purpose. This would bias the sample of selected DGUs in the

3  direction of excluding cases in which many rounds were fired.

4      32.    Even though the NRA sample is not representative of DGUs in general,

5  Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in

6  which more than 10 rounds are fired *do* occur. Her analysis of the NRA sample

7  identified two incidents in which over 10 rounds were fired, a frequency that Allen

8  characterizes as "rare." This is indeed rare in absolute terms, but then so are mass

9  shootings in which LCMs are used, typically occurring less than three times a year

10  in the entire U.S. (see Table 1 herein). Indeed, detailed examination of the way

11  mass shootings actually occur indicates that the number of incidents in which use of

12  LCMs increased the number of victims killed or injured in a typical year may well

13  be *zero* (Kleck 2016).

14      33.    It is therefore worth considering the implications if 0.3% of all DGUs

15  involved over 10 rounds being fired, as Allen's results indicate. The numerous

16  national surveys that have specifically asked about DGUs have consistently

17  indicated 0.5-3.5 million DGUs per year, averaging about 2.2 million DGUs a year

18  (Kleck 2021). (Gun control advocates have speculated that these surveys

19  overestimate the frequency of DGUs, but nearly all known sources of error in

20  surveys tend to contribute to *under*estimation - Kleck 2018).

21      34.    If 0.3% of DGUs involved over 10 rounds fired, this would imply there

22  are about 6,600 such DGUs per year (0.003x2,200,000=6,600). Thus, the percentage

23  of DGUs in which over 10 rounds were fired does not have to be very large in order

24  for it to imply a number of DGU incidents many times the number of mass shootings

25  with LCM use, or crimes in which LCM use increased the harm inflicted on victims.

26  In short, Allen's own results from her "Armed Citizen" analysis, taken at face value,

27  imply that *there are far more DGUs each year in which the defender fires over 10*

28  *rounds than there are mass shootings involving LCM use.*

DECLARATION OF GARY KLECK    APP. 947

17cv1017

E.    *Allen's Analysis of DGUs Reported in the News*

35.    DGUs reported in news outlets are no more likely to be representative of all DGUs than the "Armed Citizen" sample. News outlets rarely find out about crimes on their own—they find out about crimes from the police. DGUs that victims are willing to report to the police, like the NRA-selected DGUs, are likely to be especially legitimate and justified.  Conversely, defenders are less likely to report their DGUs to the police if their actions are likely to appear to the police as involving excessive force or indiscriminate firing of a gun. This means that incidents in which defenders fired over 10 rounds are likely to be rare among DGUs reported to the police and consequently covered by news outlets, even if they were common among all DGUs.

36.    Allen uncovered 4,800 news stories of DGUs over a span of six years, but needlessly sampled just 200 of the stories for analysis. Her sample was selected randomly and may well be approximately representative of the full set of DGU *news stories*, but since the set of DGUs reported in the news is itself likely to be an unrepresentative sample of all DGUs, Allen's sampling procedures cannot produce a representative sample of DGUs. She therefore has no basis for generalizing the results of this analysis to the entire population of DGUs.

37.    To summarize, Lucy Allen's own results indicate the Americans use guns for defense and fire over 10 rounds thousands of times a year.  Further, the best available evidence indicates that, contrary to Allen's claims, (1) mass shootings rarely involve LCMs, and (2) LCM use does not cause a larger number of victims to be killed or wounded.

## II.    Response to Supplemental Report of Louis Klarevas

A.    *Klarevas' Claims About the Magnitude of the Threat of Mass Shootings*

38.    As he did in his first expert report (Klarevas 2017), Klarevas makes the extraordinary claim that "gun massacres presently pose the deadliest threat to the

1  safety and security of American society, and the problem is growing," adding that "I

2  continue to stand by the opinions and conclusions expressed in my 2018 Report"

3  (Klarevas 2022, p. 3),   The claim is as absurd now as it was then.

4       39.    Klarevas documented 113 "gun massacres" (which he defines as

5  incidents involving 6 or more dead), in which 1,009 people were killed, over the

6  period from 1968 through September 2017. This is a period of 49 and ¾ years, so his

7  own figures imply that an average of 20.3 Americans have been killed in "gun

8  massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250

9  Americans were killed in criminal homicides of all types in 2016 (FBI 2017). Thus,

10  only $1/10^{th}$ of 1% of all murder victims are killed in "gun massacres."

11       40.    Alternatively, we can state the seriousness of the threat to the safety of

12  Americans by computing the fraction who will be killed in a "gun massacre" in a

13  given year.  Since there were about 323,127,513 Americans in 2016, the annual

14  average of 20.3 deaths implies that the probability of an American dying in a "gun

15  massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9

16  million.  As a point of comparison, defense expert Lucy Allen has calculated that the

17  rate of Americans dying because they were struck by lightning is 0.09 per 100,000

18  population (Allen 2017, p. 16).  Thus, the risk of an American being killed in a "gun

19  massacre" is less than $1/14^{th}$ of the risk of being killed by a bolt of lightning—itself a

20  freakishly rare event. However horrific individual mass shootings may be, it is

21  absurd to describe their threat to the safety of Americans as "the greatest threat … to

22  the … safety of American society in the present era." This sort of overheated

23  rhetoric is appropriate to propagandists, not to serious scholars.

24       B.    *Klarevas' Claims About the Frequency of LCM Use in Mass Shootings*

25       41.    Like Lucy Allen, Louis Klarevas attempts to make the case that a large

26  share of mass shootings involve LCM use. His principle tactic to advance this claim

27  is to restrict his analyses to only the rarest kinds of mass shootings, those with a

28  huge number (10 or more) of fatalities (Klarevas 2022).  This represents his most

15

DECLARATION OF GARY KLECK

1   significant change from his initial expert report (Klarevas 2017)  He has changed the

2   cut-off of the minimum number of number of deaths for a mass shooting to be

3   included in his analysis from 6 to 10, making his conclusions even more trivial than

4   before because they pertain only to an even more freakishly rare subset ("double-

5   digit fatality" incidents) of a subset of violent crimes that was already freakishly rare

6   to begin with.  He shows that 23 of 30 of these extreme cases involved LCMs (his

7   Table 1), or 77% - an even higher share than the 48% share (53 of 111) he obtained

8   when he used a fatalities cut-off of six or more.  Of course, Klarevas could have

9   gone even further and analyzed only cases with over 50 deaths, since he then would

10  have been able to report that *100%* of this set involved LCM use.  There was just

11  one such incident and it did indeed involve LCM use (the Las Vegas shootings

12  included in his Table 1).  Such an "analysis" of a single cased would be perceived by

13  most scholars as pointless, but it is only marginally more pointless than analyzing

14  the most extreme 30 cases.

15      42.     Over the entire history of the United States, Klarevas was able to

16  identify just 30 mass shootings with 10 or more deaths – well under one per year

17  over that entire history.  Even over the most recent 10 years, when such incidents

18  became relatively more common, the average was just 1.6 per year.  In light of how

19  extremely rare these incidents are, the share of them that involved LCM use is trivial

20  and irrelevant to policy-making.

21      43.     This shift in the cut-off number of deaths Klarevas uses to define the set

22  of shootings to analyze also has another subtle effect.  It allows him to make a claim

23  that there is an upward trend in mass shootings that could not be sustained if he used

24  the cut-off of four deaths commonly used by other scholars.  If one uses the

25  conventional definition of four+ fatalities, there has been no trend in recent years.

26  Table 1 included in this report provides counts of such shootings for 2013-2021 (all

27  of the years for which complete data are available), based on the most

28  comprehensive source available, and it shows there have been only slight

16

DECLARATION OF GARY KLECK          APP. 950

1  fluctuations in the past decade around an average of 25 incidents per year.  Indeed, if

2  one were selective enough to focus only on the trends from 2015 to 2018, or from

3  2020 to 2021, one could even make it seem like there has been a *downward* trend in

4  mass shootings.  Taking the data as a whole, however, there has been no upward

5  trend in mass shootings.

6  44.    It was only when Klarevas limited his focus to "double-digit fatality

7  incidents" that the data would fit his claim of an increasing frequency of mass

8  shootings (Klarevas 2022, pp. 7-8).  Unfortunately, the more Klarevas' claims are

9  confined to increasingly tiny subsets of shooting incidents, the less relevant they

10  become to the likely benefits of a ban on LCMs.  As previously noted, in a typical

11  year California experiences *zero* "double-digit fatality incidents," with or without

12  LCMs used, and thus there are zero such shootings that could be prevented by an

13  LCM ban.

14  C.    *Klarevas' Claims About Long-0term Historical Trends in Mass*

15  *Shootings*

16  45.    Not satisfied with addressing recent trends in mass shootings, Klarevas

17  claims to have established trends going back to 1776, using the Newspaper Archive

18  (Klarevas 2022, pp. 3-6).  He describes this as a source that contains articles from

19  "local and major metropolitan newspapers dating back to 1607" (p. 4, fn. 6).  This is

20  a misleadingly incomplete description.  This archive includes *a few* local newspapers

21  going back that far.  Prior to the 20th century most of the nation was not covered by

22  these few local newspapers, so correspondingly few mass murders would be covered

23  by these sources.

24  46.    This not only results in a gross undercount of mass shootings, but it also

25  gives a misleading impression of trends over time.  Since the share of the population

26  covered by newspapers included in this archive increased over time, the share of

27  mass shootings covered in archive newspaper stories would also increase, even if

28  there was no actual increase in the national number of mass shootings.  Thus, the

17

DECLARATION OF GARY KLECK

1  appearance of increasing mass shooting prevalence in Klarevas' Table 1 is at least

2  partly just a reflection of historical increases in the share of the nation's events that

3  were covered by newspapers.  Consequently, Klarevas had no reliable information

4  on trends in mass shootings for any part of the nation's history up until this increase

5  in newspaper coverage levelled off sometime in the late 20th century.  His data can

6  tell us nothing about trends in mass shooting frequency for earlier periods..

7      47.    The scope of Klarevas' claims about historical trends is also extremely

8  constricted by the arbitrary limits he placed on what kinds of mass shootings he was

9  willing to count.  Those familiar with the history of firearm massacres of native

10  Americans in the 18th and 19th centuries might wonder why they do not show up in

11  Klarevas's data. His footnote 6 explains why: "Incidents of large-scale, inter-group

12  violence such as mob violence, rioting, combat or battle skirmishes, and attacks

13  initiated by authorities acting in their official capacity were excluded."  If these were

14  incidents in which large numbers of people were killed with firearms, what is the

15  justification for not defining them as mass shootings?  If nearly all the mass

16  shootings in these earlier periods fell into these excluded categories, Klarevas'

17  arbitrary definitional decisions had the effect of magically making it seem that mass

18  shootings are exclusively a product of very recent times - the impression clearly left

19  by his Table 1 and Figure 1.  The nation's extensive earlier history of mass shootings

20  simply vanishes.  This definitional maneuver, however, was necessary if Klarevas

21  was to create the impression that mass shootings became frequent only when LCM-

22  equipped firearms became common.  Earlier mass shootings may have differed from

23  our contemporary stereotypes of what a mass shooting is, but the relevant historical

24  reality is that Americans were able to carry out hundreds of mass shootings before

25  the late 20th century without benefit of LCM use (for example, see Brown 1970 for

26  examples of massacres of native Americans), just as is true today (see my Table 1).

27      48.    An even fundamental problem with Klarevas' analysis lies in the

28  narrow focus on mass murders committed *with firearms*.  Virtually all of the mass

18

**DECLARATION OF GARY KLECK**

1 murders with very high fatality counts in the U.S. have been committed by means
2 *other than shooting* (Duwe 2007). Most prominently, the 9-11 mass murders of
3 nearly 3,000 Americans were committed by crashing airliners. More commonly,
4 virtually all mass murders with very high fatality counts have been committed using
5 arson, or occasionally with explosives (Duwe 2007). Only two mass murders with
6 over 32 dead in the 20th century were committed with firearms (Klarevas 2022,
7 Table 1), while all others were committed with non-firearms methods, most
8 commonly arson (Duwe 2007). The obvious point is that it is not even necessary to
9 use firearms to murder large numbers of people, never mind firearms equipped with
10 LCMs.

11       D.   *Klarevas' Hinted Claim that LCM Use Causes Higher Fatality Counts*

12      49.   Klarevas does not explicitly state that LCM use by mass shooters
13 *causes* higher numbers of fatalities or woundings; rather he just leads readers up that
14 conclusion by presenting crude bivariate correlations between LCM use and casualty
15 counts (e.g., his p. 7 statement that "100 percent of mass shootings resulting in more
16 than 14 deaths involved LCMs holding more than 10 bullets"), without stating any
17 disclaimers that the correlations may be entirely spurious, i.e. not causal in nature.
18 His problem is the same one that afflicted Lucy Allen – he did nothing to rule out
19 the possibility that both the higher casualty counts and the shooter's choice to use
20 LCMs could be due to the common effect of offender lethality. That is, aggressors
21 determined to kill larger numbers of victims are more likely to actually do so
22 (lethality of intent affects fatality counts), and are also more likely to acquire and use
23 LCMs in their crime (lethality of intent affects weapon choice). Klarevas did not
24 control for *any* potentially confounding variables, including offender lethality, so he
25 had no legitimate foundation for concluding – or hinting to readers – that LCM use
26 caused higher casualty counts. And if there is no causal effect of LCM use on
27 casualty counts, there is no logical basis for believing that reducing LCM
28 availability and use will cause a reduction in mass shooting casualties.

DECLARATION OF GARY KLECK     APP. 953

1    50.    Further, like Lucy Allen, Klarevas can offer no coherent explanation of

2    *why* LCM use would increase casualty counts.  Three 10-round magazines of the sort

3    left legally available after LCMs are banned contain exactly as many rounds as a 30-

4    round magazine of the type prohibited by LCM bans. Therefore, LCM use does not

5    affect how many rounds a mass shooter can acquire or fire in an attack.  Reloading

6    creates a pause in firing that bystanders theoretically might use to tackle the shooter

7    and stop the killing, but there are no known cases of this actually happening in the

8    U.S. in the past 30 years.  Likewise, reloading does not slow the shooters rate of fire,

9    which might have allowed more prospective victims to escape or hide (Kleck 2016).

10   So how does use of an LCM by a mass shooter increase how many people he hurts?

11   Conversely, how would preventing LCM use through a law banning LCMs decrease

12   the number hurt?  Klarevas does not say.

13        E.    *Klarevas' Claims About Trends in LCM Availability*

14        51.    Another new element in Klarevas' Supplemental Declaration is his

15   attempt to document trends in "the availability of LCMs in the U.S. civilian firearm

16   marketplace" (Klarevas 2022, pp.7-9).  He uses data from *Gun Digest*, an annual

17   catalog of firearms that were available for sale new (i.e., not used) at the time of

18   publication.  His discussion of this analysis is misleading because of his slippery use

19   of the phrase "number of firearms."  From context, it can be determined that

20   Klarevas' numbers do not in fact pertain to numbers of firearms, but rather to

21   numbers of firearms *models.*  This distinction is critical because *Gun Digest* does not

22   report any figures on numbers of firearms equipped with LCMs – it merely lists

23   models of guns (e.g., the "Accu-tek Model HC-380SS Auto Pistol") and notes the

24   size of magazine with which they come equipped.  In short, Klarevas did not

25   actually have any data on how many firearms came factory equipped with LCMs.

26   For all he could tell from the *Gun Digest* catalog, there may have been very few of

27   the models that were equipped with LCMs manufactured and sold in a given year

28   (regardless of how many *models* of that type there were), and huge numbers of guns

1   manufactured and sold that were not so equipped.  In sum, Klarevas did not have

2   any data that actually measure the availability of LCMs or trends in that availability.

3

4        I declare under penalty of perjury that the foregoing is true and correct.

5   Executed within the United States on December 1, 2022.

6

7

8

9

10   Gary Kleck

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# References

Allen, 2017. *Expert Report of Lucy P. Allen in Duncan v. Becerra.*

Allen, 2022. *Supplemental Report of Dr. Lucy P. Allen in Duncan v. Becerra*

Brown, Dee. 1970. *Bury My Heart at Wounded Knee: An Indian History of the American West.* NY: Holt, Rinehart and Winston.

Duwe, Grant. 2007. *Mass Murder in the United States: A History.* NY: McFarland & Company.

Federal Bureau of Investigation (FBI) 2017. Crime in the United States, 2016. Washington, D,C,: U.S. Government Printing Office.

Klarevas, Louis. 2017. Expert Report of Dr. Louis Klarevas. United States District Court for the Southern District of California.

Klarevas, Louis. 2022. Supplemental Declaration of Louis Klarevas. United States District Court for the Southern District of California.

Kleck, Gary. 2016. "Large-capacity magazines and the casualty counts in mass shootings." *Justice Research and Policy* 17(1):28-47.

Kleck, Gary. 2018 "Response errors in survey estimates of defensive gun use." *Crime & Delinquency* 64(9):1119-1142.

Kleck, Gary. 2021. "What do CDC's surveys say about the prevalence of defensive gun use?" American Journal of Criminal Justice 46:401-421.

Reedy, D. C., and Christopher S. Koper, 2003. "Impact of Handgun Types on Gun Assault Outcomes, *Injury Prevention* 9:151-155.

# EXHIBIT 43

CURRICULUM VITAE

GARY KLECK

(Updated May 27, 2021)

PERSONAL

| | |
|---|---|
| Place of Birth: | Lombard, Illinois |
| Date of Birth: | March 2, 1951 |
| Address: | College of Criminology and Criminal Justice<br>The Florida State University<br>112 S. Copeland Street<br>Tallahassee, FL 32306-1273<br><br>Tallahassee, Florida 32306-1127 |
| Telephone Number: | Home: (850) 559-0922 |
| e-mail Address: | gkleck@fsu.edu |
| website: | http://criminology.fsu.edu/faculty-and-staff/college-faculty/gary-kleck/ |

CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

EDUCATION

| | | |
|---|---|---|
| A.B. | 1973 - University of Illinois, with High Honors and with Distinction in Sociology |
| A.M. | 1975 - University of Illinois at Urbana, in Sociology |

Ph.D.          1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
Criminology, for the book that made "the most outstanding contribution to
criminology"   (for Point Blank: Guns and Violence in America).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

Paper of the Year awarded by Criminal Justice Review for "Does Gun Control Reduce
Crime?," Volume 4, pp. 488-513 (2016).

TEACHING POSITIONS

Fall, 1991 to          Professor, College of Criminology and Criminal Justice,
May 2016                    Florida State University

Fall, 1984 to          Associate Professor, School of Criminology,
Spring, 1991                Florida State University.

Fall, 1979             Assistant Professor, School of Criminology,
to Spring, 1984             Florida State University.

Fall, 1978 to          Instructor, School of Criminology,
Spring, 1979               Florida State University.

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory
Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and
Causal Inference.

DISSERTATION

> Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991, 2005    Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American Society of Criminology.  Republished in 2005 in paperback by Transaction Publishers.

> Reviewed in Contemporary Sociology, American Journal of Sociology, Social Forces, Journal of Criminal Law and Criminology, The Criminologist, The Public Interest, Criminal Law Forum, Social Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and Law Enforcement, Newsletter of Public Policy Currents, Commonweal, Choice, and others.

1997    Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997    The Great American Gun Debate: Essays on Firearms and Violence (with Don B. Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001    (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.: Prometheus Books.

> Selected to Choice: Current Reviews for Academic Libraries' 39th annual "Outstanding Academic Title List," awarded for "excellence in scholarship and presentation, the significance of their contribution to their field, and their value as an important treatment of their topic."  Awarded to less than one percent of books.

2017    (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control. NY: Routledge.

RESEARCH MONOGRAPH

1979    Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforcement Commission, Springfield, Illinois.

## ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide."  American Journal of Sociology 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." American Sociological Review 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal behavior." American Sociological Review 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control."  Law and Policy Quarterly 5(3):271-298.

1985     "Life support for ailing hypotheses: modes of summarizing the evidence on racial discrimination in criminal sentencing."  Law and Human Behavior 9(3):271-285.

1986     "Evidence that 'Saturday Night Specials' not very important for crime." Sociology and Social Research 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." Sociological Inquiry 57(3):237-250.

1988    "Crime control through the private use of armed force."  Social Problems 35(1):1-21.

1988    "Miscounting suicides."  Suicide and Life-Threatening Behavior 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance."  Social Problems 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence."  Social Forces 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery."  Journal of Quantitative Criminology 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates."  Journal of Quantitative Criminology 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control."  Violence and Victims 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field."  Social Pathology 1(1):12-47.

1995    "Using speculation to meet evidence."  Journal of Quantitative Criminology
        11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
        defense with a gun."  Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level
        application of the General Social Surveys."  American Behavioral Scientist
        39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law:
        some cautionary notes on the use of interrupted time series designs for policy
        impact assessment."  Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding."
        Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the
        defensive gun use estimate down."  Journal of Criminal Law and Criminology
        87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful
        vigilante imagery vs. reality: results from the National Self-Defense Survey."
        Journal of Criminal Justice 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-
        Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?"  Journal of the
        American Medical Association 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of
        habitual offenders."  Criminology 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and
        gun ownership." Social Problems 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns
        to criminals."  St. Louis University Public Law Review 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?"
        Homicide Studies 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific
        assessment of  opportunity and motivation as mediating factors."

Criminology 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research."
        Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the
        outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general
        deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently
        used in research in criminology and criminal justice?" Journal of Criminal Justice
        34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?"
        Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the
        faculty of criminology and criminal justice doctoral programs, 2000-2005."
        Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime
        victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "Mass shootings in schools: the worst possible case for gun control."  American
         Behavioral Scientist 52:1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking and the
         overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic)  "City-level characteristics and individual handgun
        ownership: effects of collective security and homicide." Journal of Contemporary
        Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"
        Journal of Criminal Justice 37(5):496-504.

2011    (with James C. Barnes)  "Article productivity among the faculty of criminology
        and criminal justice doctoral programs, 2005-2009."  Journal of Criminal Justice
        Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of
        perceived risk and victimization on plans to purchase a gun for self-protection."
        Journal of  Criminal Justice 39(4):312-319.

2013   (with Will Hauser)  "Guns and fear: a one-way street?"  Crime and Delinquency 59:271-291.

2013   "Gun control after Heller and McDonald: what cannot be done and what ought to be done."  Fordham Urban Law Journal 39(5):1383-1420.

2013   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  Crime and Delinquency 59(7):1006-1035.

2013   (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach."  Journal of Quantitative Criminology 28(4):477-541.

2014   (with Jongyeon Tark)  "Resisting rape: the effects of victim self-protection on rape completion and injury."  Violence Against Women 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?"  Crime and Delinquency 60(5):716-738.

2015   "The impact of gun ownership rates on crime rates:  a methodological review of the evidence." Journal of  Criminal Justice 43(1):40-48.

2016   (with Tomislav Kovandzic and Jon Bellows)  "Does gun control reduce violent crime?"  Criminal Justice Review 41:488-513.

2016   "Objective risks and individual perceptions of those risks."  Criminology & Public Policy 15:767-775.

2016   (with Dylan Jackson)  "What kind of joblessness affects crime?  A national case-control study of serious property crime."  Journal of Quantitative Criminology 32:489-513.

2016   "Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages."  Justice Research and Policy 17:28-47.

2017   (with Will Hauser)  "The impact of police strength and arrest productivity on fear of crime and subjective assessments of the police."  American Journal of Criminal Justice 42:86-111.

2017   (with Dylan Jackson)  "Does crime cause punitiveness?"  Crime & Delinquency. 63(12):1572-1599.

2017   (with Bethany Mims)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Journal of Criminal Justice Education 28(4):467-487.

2018   (with Moonki Hong) "The short-term deterrent effect of executions: an analysis of daily homicide counts." Crime & Delinquency 64(7):939-970.

2018   "Response errors in survey estimates of defensive gun use." Crime & Delinquency 64(9):1119-1142.

2019   "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence." Social Science Quarterly 100(3):936-950.

2019   "Regulating guns among young adults." American Journal of Criminal Justice 44:689-704.

2021   "What do CDC's surveys say about the prevalence of defensive gun use?" American Journal of Criminal Justice 46:401-421.

2021   "The continuing vitality of bad research on guns and violence: a comment on Fridel." Justice Quarterly 38(5):916-924.

2021   "Compliance with universal background check gun laws." Journal of Crime and Justice (published online 9-2-20).

2021   Tomislav Kovandzic and Kleck.  "The impact of firearm levels on homicide rates: the effects of controlling for cultural differences in cross-national research." American Journal of Criminal Justice (published online 1-4-21).

2021   "The cross-national association of gun ownership rates and suicide rates: an analysis of 192 nations." Archives of Suicide Research (published online 5-12-21).

OTHER PUBLISHED ARTICLES

1985   "Policy lessons from recent gun control research." Law and Contemporary Problems 49(1):35-62.

1992   "Assault weapons aren't the problem." New York Times September 1, 1992, p. A15.  Invited Op-Ed page article.

1993   "The incidence of violence among young people." The Public Perspective 4:3-6.  Invited article.

1994   "Guns and self-protection." Journal of the Medical Association of Georgia 83:42. Invited editorial.

1998   "Using speculation to meet evidence: reply to Alba and Messner." Journal on Firearms and Public Policy 9:13-49.

1998   "Has the gun deterrence hypothesis been discredited?"  Journal on Firearms and Public Policy 10:65-75.

1999   "There are no lessons to be learned from Littleton."  Criminal Justice Ethics 18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  Journal of the American Medical Association 282(2):136-136.

1999   "The misfire that wounded Colt's."  New York Times October 23, 1999.  Invited Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."  Journal on Firearms and Public Policy 11:77-137.

2000   "Guns aren't ready to be smart."  New York Times March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using interrupted time series designs to evaluate social policy impact."  Journal on Firearms and Public Policy 12:197-247.

2001   "School lesson: armed self-defense works."  Wall Street Journal March 27, 2001.  Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth."  Journal of Quantitative Criminology 17:75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Journal on Firearms and Public Policy 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  Journal on Firearms and Public Policy 14:51-72.

2006   "Off target."  New York Sun January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  Journal on Firearms and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  Wall Street Journal January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011.  Invited opinion article.

2015    "Defensive gun ownership is not a myth: why my critics still have it wrong."
        Politico Magazine, February 17, 2015.  Online at Politico.Com.

2021    "The futility of non-response responses: a reply to Fridel." Justice Quarterly (in
        press).

## BOOK CHAPTERS

1984    (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in
        Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge,
        Mass.: Ballinger.

        (Also appeared in Federal Regulation of Firearms, report prepared by the
        Congressional Research Service, Library of Congress, for the Committee on
        the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S."
        Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in
        Kates, above.

1996    "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and
        Society, Volume III – Readings: Criminal Justice, edited by George Bridges,
        Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine
        Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in
        Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by
        Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and
        Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor
        & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
        What is Crime?: Controversy over the Nature of Crime and What to Do About It,
        edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
        Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
        Punishment and Social Control: Enlarged Second Edition, edited by Thomas G.
        Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in The
        Criminal Justice System: Politics and Policies, 9th edition, edited by George F.
        Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008   "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009   "Guns and crime." Invited chapter. Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012   Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias." Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and Steven F. Messner. Thousand Oaks, CA: Sage.

2012   (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?" Pp. 415-439 in Handbook of Survey Methodology for the Social Sciences, edited by Lior Gideon. NY: Springer.

2013   "An overview of gun control policy in the United States." Pp. 562-579 in The Criminal Justice System, 10th edition. Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2014   "Deterrence: actual vs. perceived risk of punishment. Article in Encyclopedia of Criminology and Criminal Justice. Berlin: Springer Verlag.

2019   "The effect of firearms on suicide." Pp. 309-329 in Gun Studies: Interdisciplinary Approaches to Politics, Policy, and Practice, edited by Jennifer Carlson, Kristin Goss, and Harel Shapira. NY: Routledge.

2019   "Gun control." Pp. 153-166 in The Handbook of Social Control, edited by Mattieu Deflem. Hoboken, NJ: Wiley-Blackwell.

2021   "Research on guns and crime." Chapter in The Encyclopedia of Research Methods and Statistical Techniques in Criminology and Criminal Justice, edited by J. C. Barnes and David R. Forde for Wiley Blackwell.

BOOK REVIEWS

1978   Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde. Contemporary Sociology 7:291-293.

1984   Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984   Review of Social Control, ed. by Jack Gibbs. Social Forces 63: 579-581.

1985    Review of <u>Armed and Considered Dangerous,</u> by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988    Review of <u>The Citizen's Guide to Gun Control,</u> by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989    Review of <u>Sociological Justice,</u> by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991    Review of <u>Equal Justice and the Death Penalty,</u> by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999    Review of <u>Crime is Not the Problem,</u> by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001    Review of <u>Gun Violence: the Real Costs,</u> by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010    Review of <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates,</u> by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities." <u>American Journal of Public Health</u> 77:513.

1992    "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime." <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership." <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." <u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)." <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005    "Firearms, violence, and self-protection." <u>Science</u> 309:1674. September 9, 2005.

UNPUBLISHED REPORT

1987   Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994   "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997   "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

PRESENTED PAPERS

1976   "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979   "The assumptions of gun control."  Presented at the annual meetings of the American Sociological Association, New York City.

1981   "Lethality comparisons between handguns and weapons which might be substituted in assault if handguns were prohibited."  Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1982   "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial discrimination."  Presented at the annual meetings of the American Society of Criminology, Toronto.

1984   "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985   "Policy lessons from recent gun control research." Presented at the annual meetings of the American Society of Criminology, San Diego.

1986   "Miscounting suicides."  Presented at the annual meetings of the American Sociological Association, Chicago.

1987   (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Presented at the annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the annual meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the annual meetings of the American Society of Criminology, Chicago.

1989    (with Karen McElrath)  "The impact of weaponry on human violence." Presented at the annual meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the annual meetings of the American Society of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the annual meetings of the American Political Science Association, Washington, D.C.

1991    "Victim resistance and weapons effects in robbery."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1991    "News media bias in covering gun control issues."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1992    "Interrupted time series designs: time for a re-evaluation."  Presented at the annual meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the annual meetings of the American Society of Criminology, Phoenix.

1993    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the annual meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the annual meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the annual meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the annual meetings of the American Society of Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
        Presented at the annual meetings of the Homicide Research Working Group,
        Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
        General Social Surveys."  Presented at the annual meetings of the American
        Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
        deterrence-based crime control policy."  Presented at the annual meetings of the
        American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the annual meetings
        of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?"
        Presented at the annual meetings of the American Society of Criminology,
        Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
        control movement."  Presented at the annual meetings of the American Society of
        Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime
        rates."  Presented at the annual meetings of the American Society of Criminology,
        Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented
        at the annual meetings of the American Society of Criminology, Atlanta.

2002    "The effects of gun ownership levels and gun control laws on urban crime rates."
        Presented at the annual meetings of the American Society of Criminology,
        Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends
        on who has them." Presented at the annual meetings of the American Society of
        Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
        Presented at the annual meetings of the American Society of
        Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in
        the community influence whether individuals own guns?"  Presented at the annual
        meetings of the American Society of Criminology, Nashville.

2004   (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004   (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004   (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the annual meetings of the American Society of Criminology, Nashville.

2005   (with Jongyeon Tark) "Who resists crime?" Presented at the annual meetings of the American Society of Criminology, Toronto.

2005   (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the annual meetings of the American Society of Criminology, Toronto.

2006   (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2006   "Are police officers more likely to kill black suspects?"  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2007   (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the annual meetings of the American Society of Criminology, Atlanta.

2007   (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the annual meetings of the American Society of Criminology, Atlanta.

2008   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the annual meetings of the American Society of Criminology,  St. Louis.

2008   "The myth of big-time gun trafficking."  Presented at UCLA Law Review Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009   (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the annual meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009   (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the annual meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010   (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010   (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010   "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010   (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011   (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011   (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual meetings of the American Society of Criminology, November 16, 2011, Washington, D.C.

2011   (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011   (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2011   (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2012    (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 15, 2012, Chicago, IL.

2013   (with Will Hauser) "Confidence in the police and fear of crime: Do police force

size and productivity matter?"  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2013.  (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2014  (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual meetings of the American Society of Criminology, November 20, 2014, San Francisco, CA.

2015  "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual meetings of the American Society of Criminology, November 18, 2015, Washington, D.C.

2015  (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual meetings of the American Society of Criminology, November 20, 2015, Washington, D.C.

2016  "Firearms and the lethality of suicide methods."  Presented at the annual meetings of the American Society of Criminology, November 16, 2016, New Orleans, L.A.

2017  "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence."  Presented at the annual meetings of the American Society of Criminology, November 15, 2017, Philadelphia, PA.

2018  "Interstate gun movement is almost entirely due to migration, not gun trafficking." Presented at the annual meetings of the American Society of Criminology, November 16,  2018, Atlanta, GA.

2019  "What do CDC's surveys say about the prevalence of defensive gun use?" Presented at the annual meetings of the American Society of Criminology, November 13, 2019, San Francisco, CA.

2020  "Compliance with universal background check requirements."  Accepted to be presented at the annual meetings of the American Society of Criminology which were to be held in Washington, D.C., November 18-21, 2020 but were cancelled due to Covid-19 issues.

2021  "Do mass shooters favor using large-capacity magazines?"  Presented in poster form at the Annual Meeting of the American Society of Criminology in Chicago, Illinois, November of 2021.

CHAIR

1983   Chair, session on Race and Crime.  annual meetings of the American Society of Criminology, Denver.

1989   Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  annual meetings of the American Society of Criminology, Reno.

1994   Chair, session on Interrupted Time Series Designs. annual meetings of the American Society of Criminology, New Orleans.

1993   Chair, session on Guns, Gun Control, and Violence. annual meetings of the American Society of Criminology, Phoenix.

1995   Chair, session on International Drug Enforcement. annual meetings of the American Society of Criminology, Boston.

1999   Chair, Author-Meets-Critics session, More Guns, Less Crime.  annual meetings of the American Society of Criminology, Toronto.

2000   Chair, session on Defensive Weapon and Gun Use.  annual meetings of the American Society of Criminology, San Francisco.

2002   Chair, session on the Causes of Gun Crime. annual  meetings of the American Society of Criminology, Chicago.

2004   Chair, session on Protecting the Victim.  annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981   Session on Gun Control Legislation, annual meetings of the American Society of Criminology, Washington, D.C.

1984   Session on Criminal Sentencing, annual meetings of the American Society of Criminology, Cincinnati.

1986   Session on Sentencing, annual meetings of the American Society of Criminology, Atlanta.

1988   Session on Gun Ownership and Self-protection, annual meetings of the Popular Culture Association, Montreal.

1991   Session on Gun Control, annual meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, annual meetings of the American
        Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, annual meetings of the American
        Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-
        American and Latino Youth, by Deanna Wilkinson.  annual meetings of the
        American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime &
        Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown
        MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On
        The Economics of Crime, March 26-28, 2009 .

2010    Panel discussion of news media coverage of high profile crimes
        Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the
        Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

        Editorial consultant -
                American Sociological Review
                American Journal of Sociology
                Social Forces
                Social Problems
                Law and Society Review
                Journal of Research in Crime and Delinquency
                Social Science Research
                Criminology
                Journal of Quantitative Criminology
                Justice Quarterly
                Journal of Criminal Justice
                Violence and Victims
                Violence Against Women
                Journal of the American Medical Association
                New England Journal of Medicine
                American Journal of Public Health
                Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene Carte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to 2016.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology, Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to 2000.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-2008t.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-2008.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-2010.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-?.

Member, University Promotion and Tenure Committee, Fall, 2003 to ?.

Member of University Graduate Policy Committee, Fall 2003 to 2011.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2015.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Served as major professor for doctoral students, Moonki Hong who defended his dissertation on April 14, 2016.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include <u>Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,    Harper's Bazaar, Playboy,</u> CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice

Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the Tallahassee Democrat.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

Public lecture, "Do Guns Cause Homicide?," Center for the Study of Liberal Democracy, University of Wisconsin-Madison, December 5, 2018.

OTHER ITEMS
    Listed in:
            Marquis Who's Who
            Marquis Who's Who in the South and Southwest
            Who's Who of Emerging Leaders in America
            Contemporary Authors
            Directory of American Scholars
            Writer's Directory

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed

through National Public Radio.  Further details are available at
http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges website (http://www.forensicscolleges.com/), 2014.

1
2
3

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

4
5

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

6

IT IS HEREBY CERTIFIED THAT:

7
8
9

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

10

    I have caused service of the following documents, described as:

11
12

**DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 43**

13
14
15

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

16
17
18
19
20
21

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

22
23

    I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

24
25
26

Laura Palmerin

27
28

1
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

2

Andrew Hanson, et al.,                ) Civil Action
3                                      ) No. 1:22-cv-02256-RC
                        Plaintiffs,    )
4                                      ) **Motion Hearing**
  vs.                                  )
5                                      )
  District of Columbia, et al.,        ) Washington, D.C.
6                                      ) **April 13, 2023**
                        Defendants.    ) Time:  10:00 a.m.
7     _____

8                 **Transcript of Motion Hearing**
                        **Held Before**
9               **The Honorable Rudolph Contreras**
                **United States District Judge**
10    _____

11

                    A P P E A R A N C E S
12

  For the Plaintiffs:    **George L. Lyon, Jr.**
13                       BERGSTROM ATTORNEYS
                         1929 Biltmore Street, Northwest
14                       Washington, D.C. 20009

15  For the Defendants:  **Richard P. Sobiecki**
                         **Mateya B. Kelley**
16                       **Helen M. Rave**
                         **Andrew J. Saindon**
17                       OFFICE OF THE ATTORNEY GENERAL
                         FOR THE DISTRICT OF COLUMBIA
18                       Civil Litigation Division
                         400 Sixth Street, Northwest
19                       Washington, D.C. 20001

20    _____

  Stenographic Official Court Reporter:
21                       Nancy J. Meyer
                         Registered Diplomate Reporter
22                       Certified Realtime Reporter
                         333 Constitution Avenue, Northwest
23                       Washington, D.C. 20001
                         202-354-3118
24

  Proceedings recorded by mechanical stenography.  Transcript
25  produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  This is Civil Action 22-2256,

 3      Andrew Hanson, et al. v. the District of Columbia, et al.

 4              Counsel, please approach the podium and state your

 5      appearances for the record.

 6              MR. LYON:  George Lyon for the plaintiffs,

 7      Your Honor.

 8              THE COURT:  Good morning.

 9              MR. SOBIECKI:  Good morning, Your Honor.

10          Rich Sobiecki for the defendants; along with me, Andrew

11      Saindon, Helen Rave, and Mateya Kelley.

12              THE COURT:  Good morning.

13          All right.  It's the plaintiffs' motion, so the

14      plaintiffs can start.  You know, I've read all the pleadings.

15      I think they're straightforward.  And I've read the opinions

16      that have been issued on the topic as well.  So I think I have

17      my arms around the issues.  So don't feel like you have to

18      repeat everything in your brief, but, you know, to the extent

19      you want to highlight certain things.  And then we can talk

20      about where we go from here, if anywhere.  I know the

21      plaintiffs and the defendants have different views about that.

22              But go ahead.  You can start.

23          MR. LYON:  Your Honor, I hope you find this case and

24      the legal analysis required as fascinating as I do, and I must

25      admit that it was, at times, confusing to me as to the
```

APP. 987

1    appropriate analysis.  But in the last few days, as I have

2    prepared for the argument, it's crystallized.  And if I can --

3    the real issue is what is the test to decide this case --

4    okay? -- as in almost all cases.

5        And we have the test -- we have a test in *Heller*.  We

6    have a test in *Bruen*.  And trying to reconcile those, I found

7    to be challenging.  But I think that I've done so with the help

8    of a statement from the former solicitor general, Mr. Clement,

9    where he says the irreducible minimum of the Second Amendment

10   is that the government may not ban arms that millions of

11   Americans possess for lawful purposes.

12       If we go back to *Heller*, *Heller* said that presumptively

13   the Second Amendment protects all bearable arms.  What arms

14   that are not protected are the ones that are not in common use,

15   the ones that *Heller* stated are rare or unusual in society at

16   large, and that test resolves this case.

17       As I read through the opinion of the court in Delaware,

18   the judge got many things right, but the one area that he got

19   wrong was he employed the common use test as the presumptive;

20   that is, that arms in common use are presumptively protected.

21   But that's not what *Heller* says.  That's not what *Bruen* says.

22   That's not what *Caetano* says.  What those cases all say is that

23   arms in common use are protected.  The ones that are not

24   protected are the ones that are unusual in society at large --

25   okay? -- machine guns, short-barreled shotguns, things like

1      that.

2              THE COURT:  What do you make of *Heller*'s reference to

3      weapons most suitable for military use?

4              MR. LYON:  Referring to -- referring, for example, to

5      machine guns?

6              THE COURT:  Uh-huh.

7              MR. LYON:  Well, if you look at machine guns and

8      short-barreled shotguns -- we'll take machine guns.  Machine

9      guns are not in common use, generally, for lawful purposes.

10     Yes, there are 175,000 civilian-owned machine guns on the NFA

11     registry.  And they're not banned, by the way.  They're not

12     banned in 37 states.  But they are highly -- they are highly

13     regulated.

14          But they are not the type of weapon that is generally

15     used or even suitable for personal defense.  Okay?  Full auto

16     fire is not something that I think anyone would recommend for

17     personal -- for personal defense.  Okay?  Controlling --

18     controlling a machine gun is exceedingly difficult.  I know

19     this.  I've shot many of them in training, and there are

20     particular ways to hold -- to hold and handle that gun that are

21     difficult to muster [sic].  The average citizen would not --

22     would not do well with them.  And the average citizen doesn't

23     possess machine guns.  They are possessed as rarities, as

24     collector's items, and so forth.  They're very expensive.

25     Okay?  But even a weapon such as a machine gun is not generally

1    banned in this country.

2         As the Kopel article that I provided the Court this

3    weekend indicates, there is not a historic tradition of banning

4    arms in this country.  Arms that are -- tend to be associated

5    with criminal use are regulated -- okay? -- but not banned.

6    Not -- they can be prohibited from concealed carry.  We saw in

7    the 19th century that handguns, Bowie knives, other

8    bludgeon-type weapons, there were prohibitions on concealed

9    carry, but there were, generally, not prohibitions in carrying

10   in general, and there were not prohibitions on possession in

11   the home.

12        In terms of these magazines, D.C. goes far beyond that

13   to prohibit possession in the home, possession of -- of arms

14   that are in common use.  In fact, the latest estimates in the

15   English survey that -- that is cited at -- I think it's

16   Footnote 952 of the Kopel article, indicates that there are

17   540 million plus-ten magazines in circulation; about evenly

18   divided between pistol magazines and -- and rifle magazines.  I

19   would contrast that with the 175,000 machine guns.  And, by the

20   way, in terms of machine guns, the overwhelming number of

21   machine guns in this country are possessed by law enforcement;

22   700,000 on the NFA registry.

23        So there is a massive difference between something like

24   a machine gun, a military weapon, and weapons in common use for

25   self -- for self-defense, such as firearms equipped with

1        plus-ten magazines.

2              Now, the question is -- and D.C. has raised it -- well,

3        these magazines are not arms.  Well, *Heller* says that --

4              THE COURT:  Don't spend a lot of time on that

5        argument.

6              MR. LYON:  Okay.  Then I won't.

7              Then the question -- then the question becomes are they

8        in common use for self-defense.  And D.C. -- D.C. says, well,

9        no, because no one ever fires more than ten shots in -- in

10       self-defense.  Well, we've shown in our papers that that's

11       wrong.  But beyond that, it's irrelevant because the question

12       is not are they -- how many shots are fired.  It is are they

13       possessed by the American public for self-defense.  And the

14       answer is overwhelmingly yes.

15             Again, if I go back to the English study cited by Kopel,

16       more than -- approximately half of firearm owners possess these

17       magazines.  And of those firearm owners, 48 percent use --

18       stated that they used these magazines for home defense,

19       62 percent said that they used them for defense outside the

20       home, and about 50 percent stated they used them for hunting or

21       for recreational shooting.

22             Now, again, D.C. would have you limit the protection

23       of these magazines to only self-defense use, and I don't

24       think that's a legitimate point under *Heller*, because *Heller*

25       talks about use of these magazines for lawful purposes; and

1      that would be self-defense, hunting, target shooting,

2      competition.

3            THE COURT:  Are there any cases that focus on those

4      other uses other than self-defense?

5            MR. LYON:  The Delaware case that they cited

6      rejected that -- that same argument.  Okay?  Generally, these

7      cases all cite self-defense because, after all, self-defense is

8      the -- the -- one of the primary purposes of -- of the

9      Second Amendment.  There are other purposes, of course; having

10      an armed citizen available to defend the -- defend the

11      homeland, defend themselves in the event of a tyrannical

12      government, and so forth.  But *Heller* focused on self-defense

13      and all the other cases as well.

14          But even if you were to accept that self-defense is the

15      only basis for protecting these magazines, the evidence is

16      substantial that these magazines are used for self-defense.  We

17      presented the affidavits -- or the declarations of five -- five

18      nationally recognized firearm instructors that say that,

19      overwhelmingly, in their classes their students use plus-ten

20      magazines.

21          In fact, Claude Werner, in his declaration -- Mr. Werner

22      ran the elite Rogers Shooting School in Georgia for many years.

23      In their introductory courses, they provided the firearms and

24      magazines for their students, and the magazines that they

25      provided were the plus-ten magazines.  Okay?

 1          There are many reasons why plus-ten magazines are useful

 2     for self-defense.  First of all, 50 percent of criminal violent

 3     attacks involve multiple adversaries.  If we go to three or

 4     more, then it becomes 20 percent.  Okay?  Having more than a

 5     few rounds in your firearm is vitally important in being able

 6     to handle that situation.

 7          We know that pistol rounds only drill holes.  Okay?

 8     I've given you examples in the -- in the papers of violent

 9     attacks where it was necessary for law enforcement or civilians

10     to fire multiple rounds, many in excess of ten in order to --

11     in order to stop a violent attack.  Okay?  Criminals, just like

12     police, just like civilians, can also wear body armor.  Okay?

13     Under those circumstances, multiple rounds are going to be

14     necessary to stop -- to stop the assailant.

15          Pistol shots do not immediately incapacitate an

16     assailant.  It can require multiple rounds.  In the Jared

17     Reston example that we gave you, Reston fired, I believe it

18     was, 14 rounds out of his service pistol.  Reston himself took

19     seven hits from the -- from the assailant, was able to keep

20     fighting, and stopped -- stopped the attack.  The assailant

21     took, I believe it was, seven or eight rounds as well.

22          So it's not like -- it's not like the movies or TV where

23     someone takes a single shot, they immediately stop.  Very

24     often, yeah, that's -- that happens.  The majority of

25     instances, however, it's not even necessary to fire a single

1    shot.  So if you take D.C.'s argument at face value, magazines

2    don't need to have any rounds in them because the overwhelming

3    number of defensive gun uses involve merely showing the gun,

4    saying that you have a gun, and not firing a single shot.  But

5    that's an absurd -- that's an absurd interpretation.

6        So these magazines are used for self-defense, and under

7    *Heller*, under *Caetano*, under *Bruen*, they're in common use.

8        I would point out Justice Kavanaugh's dissent in the

9    second *Heller* case, essentially, is a precursor to the *Bruen*

10   decision.  Justice Kavanaugh came to the conclusion that common

11   use equals protection.  Justice Thomas, Justice -- and Justice

12   Scalia in their dissent to the denial of cert in the *Friedman*

13   case out of Illinois stated the same thing.  Weapons that are

14   in common use are protected.  The ones that are not are the

15   ones that are highly unusual in society.

16        THE COURT:  Let me ask you, since you bring up

17   Justice Kavanaugh now.  In *Heller*, Justice Scalia kind of set

18   down some markers as to things he thought were presumptively

19   constitutional; and Justice Kavanaugh, in his concurrence,

20   seems to have done the same.  It's not clear to me that if you

21   faithfully apply Justice Thomas's standard that all of those

22   things that they set forth as presumably constitutional would

23   necessarily pass muster.  What do you think about that?

24        MR. LYON:  That's a very good point, Your Honor.

25   And -- and I agree with you, actually.

1          In *Bruen*, Justice Thomas did not go as broad as *Heller*

2     in terms of -- of government buildings and schools being

3     presumptively protected.  Justice Thomas said the ones that we

4     can identify from history are courts, legislative assemblies,

5     and polling places.

6          Now, personally, with respect to schools, I think that

7     we can say that traditionally students -- and we're talking

8     about colleges now.  Students have been banned from possessing

9     firearms in -- at college campuses.  Now, there's some that do

10    and some that don't right now.  But, historically, if you look

11    at it, the major colleges all ban them.  Now, that was not

12    government -- generally not government because many of them

13    were private.  But there is a tradition, at least in that view.

14    But faculty and administrators were not.  Obviously, this is

15    not the issue that's present in this case.

16          THE COURT:  Sure; no.  I know it's not, but it -- you

17    know, you advocate for a very straightforward interpretation of

18    Justice Thomas's opinion, which, obviously, is one most helpful

19    to your case.  But I'm not sure that either Justice Scalia --

20    and we can't know what he thought at this point.  But Justice

21    Kavanaugh, if you take his examples, I'm not sure that they

22    coincide with a very straightforward analysis under Justice

23    Thomas's standard.  So perhaps other justices don't think it's

24    quite as straightforward as you advocate.

25          MR. LYON:  The sensitive places question is -- is --

 1   is much more complex than this situation where we have a

 2   bright -- a bright-line test in *Heller* that's repeated in

 3   *Caetano* and repeated in *Bruen*.  So it's not like -- there is --

 4   there is nothing -- and -- and I admit that I confused the

 5   issue in my preliminary injunction motion.  But there is

 6   nothing in the Supreme Court's Second Amendment cases that

 7   indicates that the relative -- for example, relative

 8   dangerousness of an arm is a relevant consideration.

 9        All -- all weapons are dangerous.  The question is are

10   they unusual?  Are they not -- are -- are they rare -- rare in

11   society, such as machine guns and short-barreled shotguns.

12        I do want to make one -- I do want to make one other

13   point with -- with respect to *Bruen*, because this -- this was

14   something that -- that the light shined -- shined in my head;

15   that *Heller* sets forth the test for whether an arm is

16   protected.  And that's, again, echoed in *Caetano*.  It's echoed

17   in *Bruen*.  *Bruen* sets -- *Bruen*'s historic analysis -- which had

18   already been done in *Heller*.  *Bruen*'s historic analysis is with

19   respect to what people do with weapons.  Okay?

20        If the behavior, what people want to do with the weapon,

21   comes within the Second Amendment, then it is presumptively

22   protected.  And then the obligation is on the government to

23   show historically that it was not -- that it is not protected.

24   That is a distinctively different test from *Heller*'s test of

25   what arms are protected.  Because under *Heller*, again, it's

1    common use.

2        Now, I think *Heller* came to that conclusion after

3    reviewing the historical record.  And, again, if you review the

4    Kopel article, which I spent a lot of time going through that

5    160-some page article, it shows very clearly that there's not a

6    tradition in this country of banning completely both carry and

7    possession of bearable arms, even when we get to the 20th

8    century with the machine gun limitations.  It's not a complete

9    ban.  Highly regulated.  Taxed and so forth.

10       THE COURT:  Given the holiday -- and I've had a very

11   busy week -- I haven't gone through that whole article.  So if

12   there's something in particular you want to direct me to, I

13   would appreciate that.

14       MR. LYON:  I think the most important thing in

15   answering the District's claim is the article's exhausting

16   review of Bowie knife regulations.  The District implies that

17   Bowie knives were generally prohibited during the -- during the

18   19th century, and that is just completely not true.  Concealed

19   carry restrictions, exactly.  They were, essentially, treated

20   like pistols.

21       In fact, in the -- in the *Nunn* case cited in *Heller*,

22   *Nunn v. Georgia*, that was a complete prohibition on carriage of

23   pistols and Bowie knives and some other weapons.  And the

24   Georgia court, in what Justice Scalia said perfectly captures

25   the meaning of the Second Amendment, said that as to open carry

1    of these weapons, you can't prohibit it, but you can prohibit

2    concealed carry.

3         And that is, generally, what was done throughout the

4    19th century.  There are only a couple of states that purported

5    to completely ban the carriage of these weapons.  One of them,

6    Tennessee, taxed them very highly.  Okay?  But I think only

7    Texas and Arkansas had a complete prohibition on carry.  I

8    don't believe they had a prohibition on possession.

9         Here we're dealing with a complete ban on possession of

10   arms that number in excess of 500 million and that are

11   overwhelmingly chosen by citizens for their personal

12   protection.  *Bruen* says you don't give -- you don't give

13   deference to the government's choice in that regard.  You

14   give -- you give deference to the choice of the American

15   people.

16        THE COURT:  All right.  Let's talk a little bit

17   about -- I know you want me to fold in the merits into my

18   decision on the PI.  Is that position regardless of what side I

19   come out on?

20        MR. LYON:  Well, I don't think I -- I don't think

21   that you can come down against me on the merits without giving

22   me -- without giving me discovery.

23        THE COURT:  Okay.

24        MR. LYON:  But I think the question of -- the

25   question of common use has been thoroughly vetted in -- in this

1    case.  And the purported analogies of the District are not

2    going to get any -- are not going to get any -- any better.

3              THE COURT:  Sure.  But I -- you know, some of these

4    law review articles or pending law review articles come across

5    as expert reports, and they're not subject to any sort of

6    cross-examination or deposition, as you would have with a

7    traditional case with an expert.

8         So I'm just curious how -- I saw that in the Delaware

9    case, my friend Judge Andrews scheduled a trial date in the

10   fall.  I'm just curious how you see the case playing out from

11   here on out.

12             MR. LYON:  Well, as -- as Judge Moss mentioned in

13   another case that we're litigating, his decision and your

14   decision here is not going to be the last word.

15             THE COURT:  Of course.  Of course not.  And, frankly,

16   *Bruen* had virtually no district court record because everyone

17   was applying a different standard.  And rather than say you got

18   the wrong standard, take another shot, which is more common,

19   the issue was decided on what is, you know, essentially, a

20   record developed by amicus and the like at the Supreme Court.

21             MR. LYON:  I -- I -- I would contrast this case with

22   the Delaware case where the judge admittedly said that he's

23   really only heard from the defendants in terms of the factual

24   record.  I think we -- we presented a robust factual record to

25   refute the -- the allegations of the -- of the District's

1    exhibits.

2            THE COURT:  But you have indicated that to the extent

3    that I'm inclined to rule against you, that you do wish to have

4    discovery?

5            MR. LYON:  That is true.

6            THE COURT:  Okay.  That's helpful.

7        All right.  Any other points you want to make?

8            MR. LYON:  I think I -- I think I've covered

9    everything, Your Honor.

10           THE COURT:  Okay.  All right.  Thank you.

11           MR. LYON:  Thank you.

12           MR. SOBIECKI:  Good morning, Your Honor.

13           THE COURT:  Good morning.

14           MR. SOBIECKI:  Nineteen, Your Honor.  A little over a

15   year ago today, 19 large-capacity magazines were taken up to an

16   apartment in Van Ness and an individual rained gunfire, more

17   than 230 shots, on parents and children as they were leaving

18   school.

19       The District and 14 other states simply have common

20   sense reasonable restrictions on the amount of ammunition that

21   an individual could possess before reloading in an attempt to

22   prevent more horrific tragedies just like that.  This case is

23   not about an individual's right to defend themselves inside or

24   outside the home with a firearm.  This is about whether

25   individuals have a right to enhance their firepower far beyond

1   what is necessary for self-defense.

2       And that is one of the keys issues here on this

3   preliminary motion; is there evidence in the record connecting

4   possession of large-capacity magazines with their use.  Now,

5   plaintiffs would say, Your Honor, it's simply just a counting

6   exercise.  Just count it up.  There's 500 million.  That ends

7   the story.

8       But if that was the case, how did they reconcile that

9   with *Heller II*, which remains binding precedent on this Court.

10   The record in *Heller II* said the same.  The D.C. Circuit said

11   we see that there's millions and millions of these

12   large-capacity magazines.  But that did not end the inquiry.

13       They then proceed to say is there a nexus.  Has

14   plaintiff shown there's a connection between the common

15   possession of these large-capacity magazines and their use for

16   self-defense?  And what is the record in this case on that

17   point?  It's nonexistent.  Not to go too procedural, Your

18   Honor, but Local Rule 65.1 says your declarations have to come

19   with your motion.  You can't hold them for your reply and then

20   have the Court rely on them.  Your Honor made that point in

21   *John Doe v. CPFB [sic]*.  I have the cite, 235 F. Supp. 3d 194.

22       So that -- on the common use, Your Honor, first I would

23   say that not enough record- -- and the test does require a

24   connection between common possession and common use.

25   Plaintiffs, even if you look at their reply declarations, they

APP. 1001

1    have a number of firearms' instructors who are just asserting

2    ipso facto, I've taught firearms, I can assure you that, you

3    know, more than ten rounds would be useful.  Well, is it just

4    peace of mind?  Why?  Why are more than ten rounds necessary?

5    There's no evidence in the record.

6         Mr. Hanish has a survey.  He says look at this 2021

7    survey; that shows that LCMs are useful for self-defense.  And

8    if you go, there's a question that says, "Why do you

9    respondents think more than ten is necessary?"  And it's

10   all peace of mind, except for one individual, Your Honor.

11   One individual does say I have had occasion to use an LCM.  And

12   it was a farmer who was defending his livestock from

13   20 coyotes.

14        And if we look at *Wrenn*, *Wrenn* says no -- inconsistent

15   with *Heller I* -- it's not any firearm for any purpose.  It is a

16   common need held by the ordinary citizen.  Plaintiffs have

17   focused all of their anecdotes in their motion are about police

18   officers.  Police officers are not the common individual with a

19   common need.  And so that is what we should be focused on.  Why

20   does the ordinary citizen need magazines with more than ten

21   rounds in them?

22        THE COURT:  Let me ask you this question, kind of

23   flipping your example.  So if you come across -- if you're in

24   the apartment next to the guy with the 17 magazines, do you

25   have to wait until the police can come with magazines that are

APP. 1002

1    greater than ten?

2              MR. SOBIECKI:  You need to --

3              THE COURT:  To defend yourself and stop them.

4              MR. SOBIECKI:  Well, again, is -- is that an ordinary

5    need?  But why -- is ten or fewer?  Can you -- can you defend

6    yourself in that case?  Yes.  I think, certainly, again, in

7    this record there's no indication -- studies show that it's

8    usually two to three shots are fired in self-defense purposes.

9         Now, before we get there, I hear Your Honor on the arms

10   argument, but I just want to make clear, our argument is not

11   that one could ban all magazines consistent with the

12   Second Amendment.  Okay?  That's not -- there's a corollary

13   right.  You have a right to a firearm.  You have a right to use

14   it.  But that should not go -- silencers are not an arm.  I

15   don't think that's a controversial point.

16        And so here we're, specifically, talking about

17   large-capacity magazines.  Do they fall within the definition

18   of arms?  And two district courts -- *Ocean State Tactical* and

19   *Oregon Firearms Federation* -- based their holding on that;

20   large-capacity magazines are not arms.

21        So I do want to preserve and --

22             THE COURT:  Of course.

23             MR. SOBIECKI:  -- Your Honor on that.

24             THE COURT:  Of course.

25             MR. SOBIECKI:  But if we get in common use for

1    self-defense purposes, the machine gun -- again, what --

2    what -- counsel tried to avoid it.  There's hundreds of

3    thousands of machine guns.  Why does that not end the inquiry?

4    If more firepower is always more better in self-defense

5    situations and these are in common use, do machine guns receive

6    protection under the Second Amendment?  Everyone seems to say,

7    well, of course not.  But then LCMs also developed for military

8    use.  So why -- why not machine guns if -- if -- everything

9    fits with -- under arms, why not machine guns but why

10   large-capacity magazines?

11        So on the common use, that is -- that is our main point,

12   Your Honor.  You do need a nexus between large-capacity

13   magazines and self-defense.  On this record, nonexistent.  The

14   evidence does show that it's usually two to three shots in

15   defensive use.  And, certainly, even if Your Honor was leaning

16   that way, discovery is important.

17        As you noted, there's a lot of anecdotes from Mr. Ayoob

18   that plaintiffs cite.  We looked into those.  Some of those

19   don't seem to be as clear as he would have.  There is an

20   article they cite, *Lead and Diamonds*.  There's a shootout in

21   Richmond.  But if you go and read that article, it was a

22   collection of smaller -- of smaller-capacity guns.

23        We would want the opportunity to test that; opportunity

24   to develop a record on what is in common use for large-capacity

25   magazines.  Again, 15 states have restrictions, covering more

**APP. 1004**

1    than a third of the population.  So to say that there's all

2    these large-capacity magazines out there, I don't think,

3    completes the story.  I think we need to know more about why

4    they are out there.

5         But even assuming Your Honor says, okay, I'm skeptical

6    about arms, common use, under *Bruen* that doesn't end the

7    inquiry.  We still have to look at:  Are there historical

8    analogs?  And I think much of what plaintiffs here are doing is

9    exactly what the Supreme Court said you should not do.  They're

10   looking for historical twins, not relevantly similar analogs

11   and -- because in *Bruen*, the issue was public carry outside the

12   home.

13        Well, at the founding, Your Honor, we had firearms, and

14   we had outside the home, and so it was reasonable for the court

15   to say, well, if they -- the founders were concerned about

16   this, we would expect to see regulations on this, kind of,

17   throughout that whole period.

18        That's not the case here.  And if -- a closer look at

19   the evidence, high-capacity magazines really, until the turn of

20   the century -- 20th century, Justice Kavanaugh in his *Heller II*

21   dissent notes that it was not until 1903 that the first

22   semiautomatic rifle became commercially available.

23        And just to kind of briefly review, we have muskets in

24   the late 1700s, Your Honor.  30 seconds a shot.

25        Now we're talking about 30 shots in seconds.

APP. 1005

1          Colt invents the revolver in 1836.  That's our first

2     six-shot.  You have to load each chamber individually.  Colt

3     cannot give them away.  He went to the government repeatedly

4     saying, hey, I've got this great new revolver.  He went

5     bankrupt.

6          We come to the Civil War.  Again, in the Civil War, we

7     now have some introduction of repeating rifles with fixed

8     magazines that you're having to load individually.  But the

9     rate of fire still is small compared to what we're talking

10    about today.

11         It's really until you get to the Tommy gun in the 1920s

12    where the level of firepower that is at issue started to

13    emerge.

14         So to say, well, there's no regulations in the 1800s

15    concerning high-capacity firearms really doesn't tell us much.

16    So *Bruen* says what are our historical analogs.  And as we laid

17    out -- and I know plaintiffs don't find them similar enough.

18    I'll try to clear that up.

19         But we have gunpowder storage rules.  Yes, it's true

20    these were meant to present -- prevent fires, but the

21    similarities are that gunpowder was necessary for ammunition by

22    imposing regulations limiting individual's access to gunpowder.

23    It was a limitation on their ability how many times they could

24    fire.  In a sense, a limitation on their enhancement.

25         So too here we have -- we're not saying you can't have a

1   magazine for your gun.  We're not saying you can't have several

2   magazines for your gun.  All we're saying is that firing it one

3   time, you get ten shots, and then have you to reload, which,

4   again, relevantly similar to the gunpowder.

5          We have trap guns.  Again, a gun, perfectly legal in --

6   in -- just used in common.  But if you enhance it, if you

7   enable it to fire without being present, that posed a greater

8   threat to innocent bystanders and so it was regulated.

9          Just like here, we're not saying you can't have a

10  magazine in your gun.  We're saying that there's a greater risk

11  to innocent bystanders if you can load your gun with a magazine

12  that contains more than ten bullets.

13         Bowie knives.  Again, I acknowledge that there was not a

14  complete ban on Bowie knives, but that misses the point.  The

15  point is we have a perfectly legal weapon, a knife, that was

16  enhanced through its design to inflict greater harm.  It

17  presented a greater risk to the public.  So there were

18  restrictions placed on one's Second Amendment right to carry

19  around a Bowie knife.

20         So too here.  You can have your gun with its magazine.

21  You can take it around.  You just can't have one with more than

22  ten.

23         Pocket pistols, same is true there.  A firearm,

24  perfectly legal, but because of the way it had been enhanced --

25  it's shrunk in size -- it posed a greater threat to the public.

1    No, you can't carry those around.  If you want to carry a

2    larger pistol, an Army, Navy pistol around, you can do that.

3        And then that brings us into the 20th century and Tommy

4    guns.  Now, I recognize *Bruen* says tread carefully on looking

5    at 20th century regulations, unless they're consistent with

6    historical tradition.  And I think what we've laid out for

7    Your Honor is a consistent tradition from the founding through

8    the 20th century because -- let's be clear.  The magazines

9    we're talking about, the '50s, the '60s, Your Honor, in terms

10   of handguns, that's when we're getting our first, and we can

11   say, kind of, widespread penetration into the commercial

12   market.

13       And, again, we think, certainly, no likelihood of

14   success on this.  But these -- these are difficult issues, as

15   our expert, Dr. Rivas, noted.  She needs more time to conduct

16   research into the Tennessee and Arkansas laws concerning the

17   regulation of these -- the pocket pistols, Bowie knives.

18           THE COURT:  Let me ask you this question about the

19   experts because, clearly, the experts are never going to come

20   to agreement.  So everyone seems to be in agreement, to a

21   certain extent, on the need to discovery if they lose.  But

22   what happens after that?  Am I going to be able to decide those

23   disputes amongst the experts on summary judgment, or will a

24   trial be necessary?

25           MR. SOBIECKI:  I think that will depend on -- kind of

1    like the normal civil case, Your Honor.  It will be like the

2    interpretation of a statute.  You'll have -- you'll make

3    credibility determinations as to whose opinions provide --

4    should be given greater weight.  I would, respectfully, submit

5    that our -- the heft of our experts -- certainly, these are

6    academics who have performed a lot of research.  They're not

7    interested parties who are active in the industry -- should be

8    given more weight.

9        We should have the opportunity, as Your Honor noted, to

10   depose these individuals, to test their opinions.  They've got

11   several individuals that just say, well, of course, LCMs are

12   more useful in self-defense, but they never go and add why.  I

13   think that's entirely fair for us to ask that question.

14       And then, you know, because we are all in this emergency

15   posture, the preliminary injunction stage, the balance of

16   equities, public interest, heavily in favor of the District.

17   The District has had this ban going back, some limitations,

18   since the 1930s.  This particular one has been in place since

19   2019.  Again, we're not talking about anyone's ability to

20   defend themselves outside the home with a firearm.  That will

21   stay.  The status quo will remain.  But we take it away, then

22   we do have a risk of LCMs flooding into the District.

23       Lieutenant Amodeo submitted his declaration.  If

24   Your Honor flips to the end, the pictures of the large-capacity

25   magazines we're talking about, huge drums, and the police are

1    finding these everywhere.

2         So if we put this aside, there's a serious risk that

3    we're going to have just a ton of these coming in, huge risk to

4    innocent bystanders.

5         So we certainly think Your Honor should deny the

6    preliminary injunction.

7         THE COURT:  So let me ask you -- you know, let's say

8    we get past discovery; we get past summary judgment.  Is this a

9    jury trial?

10        MR. SOBIECKI:  That's an interesting question; one

11   I've pondered.  It does seem to be more of a legal question,

12   Your Honor.  So -- now, there are factual elements to it.

13   Frankly, I think we'd probably like the opportunity to do a

14   little more research on this.  You know, *Bruen* doesn't really

15   provide us a path forward.  So that is, kind of, my initial

16   reaction, Your Honor.

17        It's a legal question, in some sense, you know, what --

18   what does the Second Amendment cover.  However, there are

19   certainly -- I don't think a mixed question of fact and law.

20   But factual issues concerning, you know, how many LCMs.  But,

21   generally, I would go with more a legal question at this

22   moment.  But I would want the opportunity to consult with the

23   team.

24        THE COURT:  Of course.

25        I haven't looked at the complaint in a long time.  It's

APP. 1010

1    at least partially brought under 1983?

2            MR. SOBIECKI:  Yes, Your Honor.  I'll admit I have

3    not looked at the complaint recently, but I would certainly

4    presume so.

5            THE COURT:  So, then, assuming there are fact

6    questions, it would be a jury trial?

7            MR. SOBIECKI:  Yes, Your Honor.  Again, I would

8    reserve --

9            THE COURT:  Of course.

10           MR. SOBIECKI:  -- opining on that at this moment.

11           THE COURT:  Of course.  Any other issues you want to

12   highlight?

13           MR. SOBIECKI:  No, Your Honor.  If no other

14   questions, I thank you for your time.

15           THE COURT:  All right.  Thank you.

16       Go ahead, Mr. Lyon.

17       So, Mr. Lyon, on -- you know I've read the Oregon case

18   and the Rhode Island case and the Delaware case.  Are there any

19   cases on a PI footing that come out in your favor?

20           MR. LYON:  Well, there are -- prior to *Bruen*, there

21   is the *Duncan v. Bonta* case with Judge Benitez in California,

22   and the three-judge panel ruling sustaining the preliminary

23   injunction there.  That was vacated by the Ninth Circuit

24   en banc, which was, in turn, vacated by the Supreme Court

25   following *Bruen*.

1          We have -- there was -- there are a number of cases

2     pending.  I believe there is a New Jersey case that is -- that

3     is under briefing.  There is an Illinois case, the oral

4     argument of which was held yesterday.  I tried to monitor it

5     but I couldn't get through on the -- on the link.  And --

6          THE COURT:  That's a magazine case as well?

7          MR. LYON:  That's a magazine and an assault weapons

8     case and -- and some other issues.  I think there were four --

9     four cases that were consolidated before Judge McGlynn, I

10    think, is -- is the case.

11         And there is a Fourth Circuit case that is ripe for

12    decision; and the argument there is available on the Fourth

13    Circuit's website, and I think you would find that

14    illuminating.

15         So at this point, no.  I would -- I would suggest that

16    the Oregon case and the Rhode Island case are simply wrong

17    on -- on every point, inconsistent with the common use finding

18    by the judge in -- in Delaware.  And all of those cases were

19    decided on different records.  And, of course, the Delaware

20    case, the judge candidly admitted that he basically only heard

21    factual -- he only got factual argument -- or factual showings

22    from the defendant there.

23         Counsel made a -- a point that the D.C. Circuit had

24    raised in -- in the *Heller II* case, and -- which I think there

25    may be some merit to.  He points to big drum magazines and

1    hundred-round magazines and so forth.  And I will candidly

2    admit that if D.C. had written their law to limit handgun

3    magazines to 20 rounds and rifle magazines to 30 rounds, I

4    wouldn't be here because those are pretty much the limits of

5    the standard capacity magazines that come with these guns.

6        I probably couldn't make a factual showing that

7    hundred-round big drum magazines are commonly possessed for --

8    for lawful purposes.  But that's not the law that they wrote,

9    and they're stuck with ten.  And the record is overwhelming

10   that ten-round magazines are common -- plus-ten magazines are

11   commonly possessed by American citizens for law enforcement

12   purposes.

13       I have to strongly dissent to the District's so-called

14   analogs.  There is nothing remotely similar to a gunpowder

15   storage law -- for example, that required storage on the third

16   floor of a building -- equal to a ban on a total class of arms.

17   And *Bruen* makes it very clear that the -- and *Heller* that the

18   fact that there were concealed carry restrictions doesn't

19   equate to a ban on carry and doesn't equate to a ban on

20   possession.

21       So the District has simply not shown -- assuming we get

22   there -- and I suggest we don't.  But assuming we do get there,

23   they have not shown relevantly similar or substantially similar

24   restrictions in the historical record.

25       And what they have shown is that, yes, we can ban

1    concealed carry of weapons that we consider particularly

2    susceptible to criminal use.  We can -- we can limit the

3    distribution of weapons to minors.  We can regulate the misuse

4    of weapons.  Okay?  For example, the -- the spring gun laws,

5    they didn't ban the guns.  They banned a particular use of

6    those guns that is so dangerous that it had to be stopped.  And

7    it's in persons just opening a door by mistake gets shot

8    without -- without any -- without any indication of -- of

9    criminal intent, without meeting any of the elements of -- that

10   are required for -- for self-defense.

11       Those are reasonable and, I would suggest, ought to be

12   mandatory restrictions, but they are not a ban on carry, not a

13   ban on possession.  The District has not been able to point to

14   any ban on possession of a commonly used arm, and that dooms

15   them, Your Honor.

16          THE COURT:  All right.  Thank you.  Why don't you

17   answer, if you can, my question about whether we end up in a

18   jury trial in this case or not.

19          MR. LYON:  I'm sorry.  Could you repeat that.

20          THE COURT:  Sure.  Whether we end up in a jury trial

21   in this case or not.

22          MR. LYON:  I can't -- I can't see that this is a case

23   that requires a -- that requires a jury.  I think that -- I'm

24   not aware of any Second Amendment case that's ever gone to a

25   jury, and -- and -- and jury selection would be quite

1    entertaining.

2         THE COURT:  Okay.

3         MR. LYON:  I -- I -- I think that like *Wrenn*, like

4    *Heller*, like *Bruen*, these cases are -- these cases turn on

5    legal analysis.  They don't -- I don't think the District

6    really disputes that there are hundreds of millions of plus-ten

7    magazines out there.  If they do, I'd like -- I'd -- I'd like

8    to see it.

9         THE COURT:  Sure.  On the issue of discovery, I

10    assume -- I'm assuming whatever side loses is going to take it

11    up.  Do -- at that point do we start discovery?  Do we wait

12    until we get instruction from the Court of Appeals on my legal

13    reasoning?  What are your thoughts on that?

14         MR. LYON:  Well, I -- I will appeal if the

15    preliminary injunction is -- is denied.  I don't see that I

16    have any recourse but to do that.

17         THE COURT:  And I suspect that they have even

18    stronger reason to appeal if they lose.  So I think there's a

19    fair chance we're going to end up in the Court of Appeals,

20    which doesn't always move briskly.  So what happens next?

21         MR. LYON:  Well, in terms of the discovery that I

22    anticipate, it's probably going to be predominantly admissions.

23    I'm not sure that I even need to depose their so-called experts

24    because of the flaws in the submissions that they make.  I

25    mean, they make a lot of generalities.  But when you actually

1    look at the laws that they cite, they don't really say what

2    they say.

3            THE COURT:  You thought that the term high-capacity

4    magazine were pejorative.  So-called experts, I think, are well

5    beyond that.  But go ahead.

6            MR. LYON:  I'm guilty, Your Honor.  I'm sorry.

7            THE COURT:  All right.

8            MR. LYON:  So I definitely would -- would go for

9    admissions.  I'd have to evaluate whether it's -- it's

10   justified to -- and what I get out of going for depositions,

11   I am just -- just not sure at this point.  I'd have to think

12   and -- and probably consult with -- with my brethren on the

13   other side as to whether we would want to go to the -- the time

14   and expense of -- of conducting discovery until the Court of

15   Appeals makes its decision.

16           There's going to be -- there's going to be several other

17   Court of Appeals' decisions.  Certainly primed up for the

18   Fourth Circuit, and I expect that there'll be the -- that the

19   Third, Seventh, and Ninth, where there are cases pending --

20   will be -- will be percolating.  And, ultimately, the folks

21   over on -- I think it's Second Street, if I've got the address

22   right -- may come to bear on this before we even can get to

23   discovery.

24           THE COURT:  All right.  Thank you.

25           MR. SOBIECKI:  Just procedural point, Your Honor.

APP. 1016

```
 1            THE COURT:  Sure.

 2            MR. SOBIECKI:  I don't like entertaining the idea

 3     that we might lose, but if we did, we would preview that we

 4     would ask Your Honor to stay your ruling until we do get

 5     guidance on -- the Court of Appeals on this issue, given the

 6     consequences.

 7            Thank you.

 8            THE COURT:  All right.  Thank you.  You're excused.

 9            I'll take it under advisement.  I plan to rule

10     relatively quickly.

11            (Proceedings were concluded at 10:54 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 18th day of April, 2023.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ANDREW HANSON, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 22-2256 (RC) |
| | : | | |
| v. | : | Re Document No.: | 8 |
| | : | | |
| DISTRICT OF COLUMBIA, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

**ORDER**

**DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Plaintiff's Motion for a Preliminary Injunction (ECF No. 8) is

**DENIED**.

**SO ORDERED.**


Dated: April 20, 2023                                          RUDOLPH CONTRERAS
                                                              United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANDREW HANSON, *et al.*,                     :
                                             :
    Plaintiffs,                          :          Civil Action No.:     22-2256 (RC)
                                             :
    v.                                   :          Re Document No.:     8
                                             :
DISTRICT OF COLUMBIA, *et al.*,              :
                                             :
                                             :
    Defendants.                          :

## MEMORANDUM OPINION

### DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.  INTRODUCTION

Plaintiffs, four American citizens who reside in or spend time in the District of Columbia, challenge the constitutionality of D.C. law that bans possession of large-capacity magazines ("LCMs").  Plaintiffs own pistols and wish to equip them with LCMs for self-defense.  They claim this conduct is protected by the Second Amendment under the test set forth in the Supreme Court's recent decision, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  They now move for a preliminary (and permanent) injunction that enjoins Defendants, the District of Columbia and the Chief of the Metropolitan Police Department Robert J. Contee III (together, "the District"), from enforcing this law.  The Court held oral argument on the motion.  The matter is fully briefed and ripe for decision.  For the reasons described below, the Court concludes that the District's LCM ban is constitutional, and therefore Plaintiffs have not shown likelihood of success on the merits.  The Court will thus deny Plaintiffs' motion for a preliminary injunction.

## II. BACKGROUND

### A. Case Background

The sole object of Plaintiffs' constitutional challenge is D.C.'s LCM ban, which provides in full:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

D.C. Code § 7-2506.01(b). Violation of this provision carries a penalty of up to three years in prison and a fine of up to $12,500. D.C. Code §§ 7-2507.06(a)(4); 22-3571.01(b)(6).

Some context is in order to understand the gun law at issue. An ammunition feeding device, more commonly known as a magazine, "is a vehicle for carrying ammunition. It can be either integral to the gun or detachable." *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *4 (D.R.I. Dec. 14, 2022). "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines." *Id.* The magazine is simply "inserted into and removed from the frame of the firearm, much as an extra battery-pack gets swapped in and out of a battery-operated tool, like a leaf blower, for example." *Id.* Magazines come in different sizes and have different capacities. Under D.C. law, a large-capacity magazine, or LCM, is simply a magazine that can hold more than ten bullets. "When a multiple-round device like an LCM is attached, a handgun becomes a 'semiautomatic'

**APP. 1021**

weapon, meaning that it is capable of rapidly firing several bullets, one right after another.

However, the gun still requires a trigger-pull for each round fired." *Id.*[1]

Plaintiffs each hold a license to carry a concealed pistol issued by the D.C. Metropolitan

Police Department and they regularly carry firearms in D.C.  *See* Hanson Decl. ¶ 2, ECF No. 8-2;

Yzaguirre Decl. ¶ 2, ECF No. 8-3; Chaney Decl. ¶ 2, ECF No. 8-4; Klun Decl. ¶ 2, ECF No. 8-5.

Each Plaintiff possesses LCMs outside D.C., and each Plaintiff claims that, but for D.C. law

banning LCM possession in D.C., he would use LCMs for self-defense in D.C.  Hanson Decl. ¶¶

3–4; Yzaguirre Decl. ¶¶ 3–4; Chaney Decl. ¶¶ 3–4; Klun Decl. ¶¶ 3–4.  In October 2022,

Plaintiff Yzaguirre attempted to register a firearm with the Metropolitan Police Department but

was denied because his firearm came with a 12-round LCM, in violation of D.C. law.  Yzaguirre

2d Decl. ¶¶ 2–7, ECF No. 16-1.

Plaintiffs brought suit on August 1, 2022, seeking: a declaratory judgment that D.C.'s

LCM ban violates the Second and Fifth Amendments; a preliminary and permanent injunction

preventing the District from enforcing this ban; damages; and other costs.  *See* Compl. at 22–24,

ECF No. 1.  Plaintiffs then moved for a preliminary injunction on August 19, 2022.  Pls.' Appl.

for Prelim. Inj. ("Pls.' Mot."), ECF No. 8.  A few days later, the District moved for an extension

of time to respond and also to conduct limited discovery as to the facts underlying Plaintiffs'

motion for a preliminary injunction.  ECF Nos. 9, 10. The Court granted both motions on

---

[1] Both automatic and semi-automatic guns reload automatically; when fired, the force of
a shot ejects the spent bullet casing while simultaneously pulling a fresh bullet from the
magazine into the gun's chamber. *See* Tom Givens, *Concealed Carry Class* 113 (2019), Ex. C to
Defs.' Opp'n, ECF No. 17-5.  But whereas automatic guns fire continuously from a single pull of
the trigger, semi-automatic guns fire only one bullet per pull of the trigger. *Id.*; *see, e.g.*, 1933
Ohio Laws 189, 189 ("Automatically . . . means that class of firearms which, while the trigger on
the firearm is held back continues to fire successive shots.  Semi-automatically means that class
of firearm which discharges one shot only each time the trigger is pulled, no manual reloading
operation being necessary between shots.").

APP. 1022

September 7, 2022.  Min. Order (Sept. 7, 2022).  On October 31, 2022, Plaintiffs supplemented

their motion for a preliminary injunction with leave of Court.  Min. Order (Oct. 31, 2022).  On

December 1, 2022, the Court permitted three nonprofit organizations, Brady, Gifford Law Center

to Prevent Gun Violence, and March for our Lives to jointly submit an amicus brief in support of

the District.  Min. Order (Dec. 1, 2022); *see* Amicus Brief, ECF No. 18-1.  Plaintiffs' motion for

a preliminary injunction was fully briefed as of January 23, 2022.  The Court heard oral

argument on the motion on April 13, 2023.  The motion is now ripe for decision.

### B.  Legal Background

The Second Amendment to the United States Constitution provides: "A well regulated

Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms shall not be infringed."  U.S. Const. amend. II.  Although short, this text is anything but

simple.  To understand and interpret this constitutional text, the Court looks to caselaw that is

relevant to the specific question at hand.  As it turns out, Plaintiffs are not the first to raise a

Second Amendment challenge to the District's LCM ban: a group of plaintiffs challenged the

same law over a decade ago in *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244 (D.C.

Cir. 2011), which ultimately upheld the ban.  *Heller II* was decided in the wake of the Supreme

Court's seminal Second Amendment case, *District of Columbia v. Heller ("Heller")*, 554 U.S.

570 (2008).  The Supreme Court's decision in *Bruen* last year, however, soundly rejected how

the Courts of Appeals interpreted and applied *Heller*, and so calls into question the outcome of

*Heller II*.  Thus, although Plaintiffs' challenge to D.C.'s LCM ban is not entirely new, it

demands renewed analysis under the framework *Bruen* provides.

Understanding *Bruen* requires taking a few steps back, to *Heller*.  In *Heller*, the Supreme

Court held that the District's ban on handgun possession in the home violated the Second

**APP. 1023**

Amendment.  554 U.S. at 572.  At the time, the District prohibited handgun registration, made it

a crime to carry an unregistered firearm, and required residents to keep any lawfully owned

firearms unloaded and dissembled.  *Id.* at 574.  In ruling for the plaintiffs and striking down D.C.

law, *Heller* established that the Second Amendment confers "the individual right to possess and

carry weapons in case of confrontation."  *Id.* at 592.  The Supreme Court explained in this

landmark decision that "the inherent right of self-defense has been central to the Second

Amendment right."  *Id.* at 628.

     *Heller* also cautioned that "[l]ike most rights, the right secured by the Second

Amendment is not unlimited."  *Id.* at 626.  Quoting Blackstone and other sources, the Supreme

Court stated that "the right was not a right to keep and carry any weapon whatsoever in any

manner whatsoever and for whatever purpose."  *Id.*  Thus, the Second Amendment "does not

protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  *Id.*

at 625.  And the Court did not "cast doubt on longstanding prohibitions on the possession of

firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive

places such as schools and government buildings, or laws imposing conditions and qualifications

on the commercial sale of arms."  *Id.* at 626–27.

     In the wake of *Heller*, the District passed the Firearms Registration Amendment Act of

2008 ("FRA"), which updated D.C.'s gun laws.  Of relevance here, the FRA added a new

provision that bans LCM possession—the same provision at issue in this case.  *See* D.C. Law 17-

372 § 3(n), Firearms Control Amendment Act of 2008,

https://code.dccouncil.gov/us/dc/council/laws/docs/17-372.pdf (adding "new subsection (b)" to

D.C. Code § 7-2506.01).  A group of plaintiffs once again sued the District, this time challenging

the constitutionality of, *inter alia*, the District's ban on assault weapons (in particular, semi-

**APP. 1024**

automatic rifles) and its ban on LCM possession. *Heller II*, 670 F.3d at 1249. In assessing the plaintiffs' challenges to these laws, the D.C. Circuit followed the same framework that its sister Courts of Appeals employed in Second Amendment challenges post-*Heller*. Under this "two-step approach," a court must "ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then . . . go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Id.* at 1252.

As relevant here, *Heller II* applied this two-step approach to the plaintiffs' challenge to D.C.'s LCM ban. At the first step, the Circuit examined "whether the prohibited weapons are 'typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 1260 (quoting *Heller*, 554 U.S. at 625). The Circuit found it was "clear enough in the record" that LCMs are in common use and recognized that "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Id.* at 1261. Still, the Circuit was not "certain" "based upon the record as it st[ood]" whether LCMs were in common use *for lawful purposes*—that is, "whether these weapons are commonly used or are useful specifically for self-defense or hunting" and thus "whether the prohibitions . . . meaningfully affect the right to keep and bear arms." *Id.* Ultimately, the Circuit expressly declined to resolve the first step on the merits, instead assuming without deciding that the first step was satisfied. *Id.*

At the second step of the analysis, *Heller II* applied intermediate scrutiny. It stated that this was the proper standard because given that "the plaintiffs present hardly any evidence that semi-automatic rifles and magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport," it was "reasonably certain the prohibitions do not

**APP. 1025**

impose a substantial burden upon t[he] right" to keep and bear arms under the Second

Amendment. *Id.* at 1262. Under the intermediate scrutiny standard, the Circuit found that the

LCM ban was "substantially related" to the District's "important interests in protecting police

officers and controlling crime." *Id.* The Circuit credited testimony that "high-capacity

magazines are dangerous in self-defense situations because 'the tendency is for defenders to keep

firing until all bullets have been expended, which poses grave risks to others in the household,

passersby, and bystanders'" and studies showing that attacks with LCMs "result in more shots

fired, persons wounded, and wounds per victim than do other gun attacks." *Id.* at 1263–64.

Thus, the Circuit held that D.C.'s LCM ban "do[es] not violate the plaintiffs' constitutional right

to keep and bear arms." *Id.* at 1264.

   Then came *Bruen*. In *Bruen*, the Supreme Court reaffirmed *Heller* and held that the

Second Amendment "protect[s] an individual's right to carry a handgun for self-defense outside

the home." 142 S. Ct. at 2122. *Bruen*, however, rejected the Courts of Appeals' two-step

framework for assessing Second Amendment challenges and announced that this framework was

inconsistent with *Heller*. "*Heller*'s methodology centered on constitutional text and history" and

"did not invoke any means-end test." *Id.* at 2128–29. Thus, although "step one of the [Courts of

Appeals'] predominant framework [wa]s broadly consistent with *Heller*," step two "[wa]s one

step too many." *Id.* at 2126–27. *Bruen* declared that the proper analytical framework for

assessing Second Amendment challenges is as follows: "[1] When the Second Amendment's

plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

[2] The government must then justify its regulation by demonstrating that it is consistent with the

Nation's historical tradition of firearm regulation." *Id.* at 2129–30 (brackets added).

APP. 1026

With respect to the second part of *Bruen*'s test, the Supreme Court acknowledged that in

some cases the "historical inquiry" will not be "straightforward." *Id.* at 2131. For "cases

implicating unprecedented societal concerns or dramatic technological changes," courts should

take "a more nuanced approach." *Id.* at 2132. In those situations, courts must conduct a

"historical inquiry that . . . will often involve reasoning by analogy." *Id.* "Like all analogical

reasoning, determining whether a historical regulation is a proper analogue for a distinctly

modern firearm regulation requires a determination of whether the two regulations are

'relevantly similar.'" *Id. Bruen* provided two "metrics" for conducting this analysis: "how and

why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33.

"Therefore, whether modern and historical regulations impose a comparable burden on the right

of armed self-defense and whether that burden is comparably justified are '*central*'

considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original)

(citation omitted). Analogical reasoning "is neither a regulatory straightjacket nor a regulatory

blank check." *Id.* "[A]nalogical reasoning requires only that the government identify a well-

established and representative historical *analogue*, not a historical *twin*. So even if a modern-day

regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass

constitutional muster." *Id.* (emphases in original).

     *Bruen* then applied this standard to the facts of the case, which involved a challenge to

New York State's public-carry licensing regime that required an applicant to show "proper

cause" for self-defense. At the first step, the Supreme Court had "little difficulty" in concluding

that the plaintiffs' desire to "carry[] handguns publicly for self-defense" was covered by the text

of the Second Amendment. *Id.* at 2134. Thus, the Second Amendment "presumptively

guarantee[d]" the plaintiffs the right to do so. *Id.* at 2135. *Bruen* then turned to the next step of

**APP. 1027**

the inquiry, where New York State had the "burden" to "show that [its] proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation." *Id.* This New York could not do. After surveying history from the 12th through the 19th century, with particular emphasis on Founding-era regulations, *Bruen* concluded that "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 2156. Thus, *Bruen* concluded that New York's "proper cause" licensing regime was unconstitutional. *Id.*

### III.  LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. "A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell*, 391 F.3d at 261 (D.C. Cir. 2004).[2]

---

[2] At this stage, the Court will consider all of the many exhibits and sources upon which the parties rely. In addition to providing declarations from their own experts, Plaintiffs provided five expert declarations filed in *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.), an ongoing case involving a Second Amendment challenge to a California law that, like the D.C. law at issue here, bans LCM possession. *See* Pls.' Reply at 2 n.1, ECF No. 24.

## IV. ANALYSIS

The Court begins with standing. "[T]he D.C. Circuit has declared in unequivocal terms that [a] party seeking a preliminary injunction must show a substantial likelihood of standing." *Angelo v. District of Columbia*, No. 22-cv-1878, 2022 WL 17974434, at *3 (D.D.C. Dec. 28, 2022) (cleaned up) (quoting *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022)). Plaintiffs breezed through the issue of standing in their briefing, and the District did not even bother to address standing at all. Nonetheless, the Court finds that at least one Plaintiff, Tyler Yzaguirre, has demonstrated a substantial likelihood of standing because he was denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation of D.C.'s LCM ban. *See generally* 2d Yzaguirre Decl. That is a concrete injury, traceable to the allegedly unconstitutional law, which a court-issued injunction could redress. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *cf. Heller II*, 670 F.3d at 1249 (in recounting the plaintiffs' injuries, finding that "Plaintiff Heller was also denied registration of a pistol because the magazine had a capacity of 15 rounds"). And "because at least one Plaintiff has standing, the Court need not analyze whether other plaintiffs have standing." *Williams v. Walsh*, No. 21-cv-1150, 2022 WL 17904227, at *11 n.7 (D.D.C. Dec. 23, 2022).

On the merits, *Bruen* governs. Under *Bruen*, the Court must first determine whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2126. If so, "the Constitution presumptively protects that conduct," and "the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id.* Thus, the first question in this case is whether the Second Amendment covers LCM possession. If yes, the second question is whether the District's LCM ban is relevantly similar to a historical analogue. The Court holds that the answer to the first question is no. Although that alone

**APP. 1029**

resolves the case for the District, the Court will nonetheless proceed to analyze the second

question and hold that in the alternative, the District's LCM ban is also consistent with this

country's historical tradition of firearm regulation.[3]

### A. Whether LCMs Are Covered by the Second Amendment

Under *Bruen*'s first step, the Court must determine whether the scope of the Second

Amendment covers LCM possession.  Notably, this first step is consistent with the first step of

Courts of Appeals' decisions pre-*Bruen*.  In other words, *Bruen* did not disturb the analysis

Courts of Appeals conducted under the first step of their framework.  *See* 142 S. Ct. at 2127

("Step one of the [Courts of Appeals'] predominant framework is broadly consistent

with *Heller*[.]").  The Court will therefore still discuss these now-abrogated cases in this section

and accord their step-1 analysis persuasive weight to the extent they are instructive.  At the first

step in this case, the parties raise two primary disputes.  First, they disagree whether LCMs are

"arms" within the meaning of the Second Amendment.  Second, they disagree whether LCMs are

typically possessed by law-abiding citizens for lawful purposes.  The Court will examine each in

turn.

### 1. Whether LCMs Are "Arms" Under the Second Amendment

The parties dispute whether LCMs are "arms" under the Second Amendment.  Recall that

the Second Amendment protects an individual right to "keep and bear *Arms*" for self-defense.

U.S. Const. amend. II (emphasis added).  *Heller* interpreted this term as follows:

> The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons
> of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th
> ed.) (reprinted 1978) (hereinafter Johnson).  Timothy Cunningham's important

---

[3] Because the Court concludes that the District's LCM ban is constitutional and that
Plaintiffs have "little likelihood of succeeding on the merits," the Court "[h]as no need to address
the other preliminary injunction factors."  *Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249,
1253 (D.C. Cir. 2006) (citations omitted).

APP. 1030

> 1771 legal dictionary defined "arms" as "any thing that a man wears for his
> defence, or takes into his hands, or useth in wrath to cast at or strike another."  1
> A New and Complete Law Dictionary; *see also* N. Webster, American Dictionary
> of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

*Heller*, 554 U.S. at 581.

At least three Courts of Appeals have concluded that LCMs are "arms" within the

meaning of the Second Amendment.  *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y*

*Gen. New Jersey ("ANJRPC")*, 910 F.3d 106, 116 (3d Cir. 2018); *Kolbe v. Hogan*, 813 F.3d

160, 175 (4th Cir. 2016); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020).[4]  In

*ANJRPC*, the plaintiffs challenged the constitutionality of a New Jersey law that, as with the

D.C. law in this case, made it illegal to possess a magazine capable of holding more than ten

rounds of ammunition.  910 F.3d at 110.  The Third Circuit specifically addressed "the question

[of] whether a magazine is an arm under the Second Amendment" and concluded "[t]he answer

is yes." *Id.* at 116.  It reasoned that "[b]ecause magazines feed ammunition into certain guns,

and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within

the meaning of the Second Amendment." *Id.*

Likewise, a panel of the Fourth Circuit in *Kolbe* reasoned that because the Second

Amendment plainly covers firearms, "there must also be an ancillary right to possess the

magazines necessary to render those firearms operable." 813 F.3d at 175.  At issue in that case

was a Maryland law that banned assault weapons like the AR-15 as well as detachable LCMs.

*Id.* at 169–70.  The panel in *Kolbe* found "strong historical support" for the notion that

magazines constitute "arms" because "magazines and the rounds they contain are used to strike

---

[4] At least two Courts of Appeals have noted this question but declined to address it. *See*
*Worman v. Healey*, 922 F.3d 26, 33 n.3 (1st Cir. 2019); *New York State Rifle & Pistol Ass'n, Inc.*
*v. Cuomo*, 804 F.3d 242, 264 n.127 (2d Cir. 2015).

at another and inflict damages" and early American provisions protecting gun rights "suggest[]

'arms' should be read to protect all those items necessary to use the weapons effectively." *Id.* at

175 (citation omitted).

Finally, in *Duncan*, a panel of the Ninth Circuit considered the constitutionality of

California's ban on LCM possession and concluded at the outset that "[f]irearm magazines are

'arms' under the Second Amendment." 970 F.3d at 1146. The Ninth Circuit reasoned that

"[w]ithout a magazine, many weapons would be useless" and therefore "there must be some

corollary . . . right to possess the magazines necessary to render those firearms operable." *Id.*

(citation omitted).

*ANJRPC*, *Kolbe*, and *Duncan* all recognized that the Second Amendment covers not just

possession of a firearm, but the sorts of things that make a firearm operable. *See Bruen*, 142 S.

Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to

its historical understanding, that general definition covers modern instruments that *facilitate*

armed self-defense." (emphasis added)). The same logic prevails in other Second Amendment

contexts as well. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (finding

that city's ban on firing ranges implicated the Second Amendment because "[t]he right to possess

firearms for protection implies a corresponding right to acquire and maintain proficiency in their

use; the core right wouldn't mean much without the training and practice that make it

effective").[5]

---

[5] Although *Kolbe* and *Duncan* were both subsequently vacated by en banc decisions in
those circuits, the respective en banc decisions did not cast doubt on the panels' analysis of this
specific question. *See Kolbe v. Hogan*, 849 F.3d 114, 137 n.12 (4th Cir. 2017) (en banc)
(explaining that because it found LCMs "most useful in military service" and "not
constitutionally protected," it would not reach the question whether LCMs were "arms" under
the Second Amendment); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021) (en banc)

**APP. 1032**

The District, however, argues that LCMs are not "arms" but rather "accoutrements" (*i.e.*, accessories). Defs.' Opp'n to Pls.' Appl. for Prelim. Inj. ("Defs.' Opp'n") at 9–11, ECF No. 17. According to the District, the term "arms" at the Founding did not encompass accoutrements such as ammunition or cartridges that stored such ammunition. *Id.* at 10. And the District argues that even if the Second Amendment covers accessories which are integral to the operation of a firearm, LCMs are not one of them because Plaintiffs could still use their existing firearms with magazines that carry ten bullets or less, and in fact, currently carry these smaller magazines on their firearms. *Id.* at 11–12; *see also Ocean State Tactical*, 2022 WL 17721175, at *11 (finding similar arguments persuasive in holding that LCMs are not "arms" under the Second Amendment).

The Court is unpersuaded by the District's exacting standard. Its position contradicts the conclusions that *ANJRPC*, *Kolbe*, and *Duncan* reached on this question. In *ANJRPC*, for example, the Third Circuit found that LCMs are "arms" under the Second Amendment because "magazines *feed* ammunition into certain guns, and ammunition is necessary for such a gun to function as intended." 910 F.3d at 116 (emphasis added). The District's logic, by contrast, would allow it to ban *all* magazines (not just LCMs)—a result even the District does not endorse here—because a firearm technically does not require *any* magazine to operate; one could simply fire the single bullet in the firearm's chamber. *See Ocean State Tactical*, 2022 WL 17721175, at *12 (noting that "a firearm can fire bullets without a detachable magazine"). The Court will therefore follow the persuasive reasoning of *ANJRPC*, *Kolbe*, and *Duncan* in concluding that LCMs are "arms" within the meaning of the Second Amendment.

---

("assuming, without deciding, that California's law implicates the Second Amendment" and not discussing the question of whether LCMs are "arms" under the Second Amendment).

2.  Whether LCMs Are Typically Possessed by Law-Abiding Citizens for Lawful Purposes

Even though LCMs are "arms" within the meaning of the Second Amendment, they must still satisfy another inquiry to fall within the amendment's scope.  The next question under step one of *Bruen* is whether LCMs are "typically possessed by law-abiding citizens for lawful purposes."  *Heller II*, 670 F.3d at 1260 (quoting *Heller*, 554 U.S. at 625).  In *Heller II*, the D.C. Circuit noted in passing that the record in that case showed that "magazines holding more than ten rounds are indeed in 'common use.'"  *Id.* at 1261.  As evidence, it observed that "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000."  *Id.*; *see also New York State Rifle & Pistol Ass'n, Inc. v. Cuomo ("NYSRPA")*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*.").

Plaintiffs seize on this observation as if it alone decides the question of whether LCMs are covered by the Second Amendment.  It does not.  *Heller II*'s comment was dicta because the Circuit ultimately assumed, without deciding, that LCMs were covered by the Second Amendment.  670 F.3d at 1261.  More importantly, *Heller II* recognized that whether LCMs are "in common use" is merely the beginning of the analysis.  The full inquiry is "whether the prohibited weapons are 'typically possessed . . . *for lawful purposes.*'"  *Heller II*, 670 F.3d at 1260 (emphasis added) (quoting *Heller*, 554 U.S. at 625).  On *that* critical question, *Heller II* expressed uncertainty: "based upon the record as it stands, we cannot be certain whether these weapons are commonly used or are useful specifically *for self-defense*[.]"  *Id.* at 1261 (emphasis added).  That is the question this Court must now resolve.

The parties unsurprisingly stake divergent positions. Plaintiffs maintain that LCMs "are overwhelmingly used for lawful purposes" such as self-defense. Pls.' Mem. of P. & A. in Reply to Opp'n to Appl. for Prelim. Inj. ("Pls.' Reply") at 12, ECF No. 24.[6] The District disagrees; it argues that LCMs are not in common use for self-defense for two reasons. First, it claims that LCMs' military characteristics make them a poor fit for self-defense and take them outside the scope of the Second Amendment. Second, the District claims that law-abiding individuals do not use LCMs for self-defense because incidents where a civilian actually expends more than ten bullets in self-defense are "vanishingly rare." Defs.' Opp'n at 18. The Court agrees with the District on both arguments.

### a. Whether LCMs are Most Useful in Military Service

*Heller* specifically contemplated that "weapons that are most useful in military service" fall outside of Second Amendment protection. 554 U.S. at 627; *see NYSRPA*, 804 F.3d at 256 ("*Heller* expressly highlighted 'weapons that are most useful in military service,' such as the fully automatic M–16 rifle, as weapons that could be banned without implicating the Second Amendment."); *Duncan*, 19 F.4th at 1102 (en banc) (noting in dicta "significant merit" to the plaintiffs' argument that because "large-capacity magazines have limited lawful, civilian benefits, whereas they provide significant benefits in a military setting," they are not covered by Second Amendment). Plaintiffs counter that "the Supreme Court's precedents do not withhold

---

[6] Plaintiffs also argue that LCMs are commonly used for lawful purposes such as training and competition. Pls.' Reply at 11–12. But given that "individual self-defense is 'the *central component*' of the Second Amendment right," it is unclear whether a weapon that is *not* typically possessed for self-defense may nonetheless be covered by the Second Amendment on the ground that it is typically possessed for sporting. *Bruen*, 142 S. Ct. at 2118 (emphasis in original) (citation omitted). The Court has no occasion to address that novel question here, because the Complaint and the motion for a preliminary injunction focus on Plaintiffs' right of self-defense. *See* Compl. ¶¶ 27–36; Pls.' Mot. at 7–14. Indeed, Plaintiffs' counsel agreed at oral argument that *Heller* and its progeny focus on self-defense.

protection from arms merely because they are useful in militia service." Pls.' Reply at 15. That

may be true, but it is beside the point. *Heller* established that weapons that are "*most* useful in

military service" are excluded from Second Amendment protection. 554 U.S. at 627 (emphasis

added). "Most" is a superlative. A weapon may have *some* useful purposes in both civilian and

military contexts, but if it is *most* useful in military service, it is not protected by the Second

Amendment.

Here, in passing the LCM ban, D.C. lawmakers took the position that LCMs were not

suitable for civilian self-defense. The D.C. Council's Committee on Public Safety and the

Judiciary, which referred this legislation for approval, favorably referenced D.C. Chief of

Police's observation that "magazines holding[] over 10 rounds are more about firepower than

self-defense." Council of the District of Columbia Committee on Public Safety and the

Judiciary, Committee Report at 9, https://perma.cc/YN6H-2U9M. That view is shared by

judges, too. The Fourth Circuit's en banc decision in *Kolbe v. Hogan*, 849 F.3d 114, 131 (4th

Cir. 2017), held that LCMs are unprotected by the Second Amendment because they are most

useful in military service. In *Kolbe*, the plaintiffs challenged the constitutionality of a Maryland

law that banned assault weapons like the AR-15 as well as detachable LCMs. *Id.* at 120. After

describing the many "difficult questions" that *Heller* raised concerning what the Second

Amendment protects, the court remarked that *Heller* offers "a dispositive and relatively easy

inquiry: Are the banned assault weapons and large-capacity magazines 'like' 'M-16 rifles,' i.e.,

'weapons that are most useful in military service,' and thus outside the ambit of the Second

Amendment?" *Id.* at 136. The "line that *Heller* drew," the court stated, was "between weapons

that are most useful in military service and those that are not." *Id.* at 137. The court then found

that "[t]he answer to that dispositive and relatively easy inquiry is plainly in the affirmative." *Id.*

**APP. 1036**

at 136.  It held that "[w]hatever their other potential uses—including self-defense—the AR-15, other assault weapons, and large-capacity magazines prohibited . . . are unquestionably most useful in military service." *Id.* at 137.  Turning to LCMs in particular, the court found that they "are particularly designed and most suitable for military and law enforcement applications" because of their "ability to reload rapidly," "hit multiple human targets very rapidly," and "deliver extraordinary firepower." *Id.* (citations omitted). *Kolbe* did not limit its analysis of LCMs as they are used in assault weapons—to the contrary, it found that the "uniquely military feature[]" of LCMs' rapid-fire capacity also applied to "other firearms to which they may be attached"—for example, the handguns that Plaintiffs in this case carry.  *Id.*; *cf. Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("We know . . . that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines.").

Kolbe* is no outlier.  The en banc Ninth Circuit cited *Kolbe* approvingly for the proposition that "[large-capacity] magazines likely are 'most useful in military service,' at least in an ordinary understanding of that phrase." *Duncan*, 19 F.4th at 1102.  The Ninth Circuit found that "[e]vidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier: 'the use of large-capacity magazines results in more gunshots fired, results in more gunshot wounds per victim, and increases the lethality of gunshot injuries.'" *Id.* at 1105.  *Duncan* also cited two reports by the Bureau of Alcohol, Tobacco, Firearms and Explosives (a federal agency) which concluded that "large capacity magazines are indicative of military firearms," in part because they "provide[ ] the soldier with a fairly large ammunition supply" and that "detachable large capacity magazine[s] [were] originally designed and produced for . . . military assault rifles." *Id.* at 1105–06.  *See also Or.*

**APP. 1037**

*Firearms Fed'n, Inc. v. Brown*, No. 22-cv-01815, 2022 WL 17454829, at *10–11 (D. Or. Dec. 6, 2022) (favorably citing *Kolbe* and *Duncan* en banc decisions and finding that evidentiary record showed that LCMs "are often used in law enforcement and military situations").

If *Kolbe* and other courts are correct that LCMs are most useful in military service, one would expect to find support for this in history. Exactly so. The District's historical evidence in this case shows that LCMs' lethality was popular in military settings, and indeed many of them were designed specifically for military (and law enforcement) use. The District's expert, Brian DeLay, who has a Ph.D. in history and has extensively studied the history of firearms and arms trades, found that in the United States, "high-capacity firearms went almost exclusively to military buyers through the early 1870s and . . . very few were in the hands of private persons." Delay Decl. ¶ 23, ECF No. 17-9. Mr. DeLay further concluded that "in the 1860s and 1870s . . . [d]etachable magazines were still decades away from practical success, and would be produced for militaries long before they made their way into civilian markets in meaningful quantities." *Id.* ¶ 25. This trend continued into the 20th century. *See, e.g.*, Pauly Decl. ¶ 77, ECF No. 17-8 (expert with a Ph.D. in history explaining that the first Lugers, which were semiautomatic pistols with a pistol-grip magazine, "w[ere] adopted by the German army in 1908"); Paul M. Barrett, *Glock: The Rise of America's Gun* 6–11 (2012) (explaining that in 1980, Glock, the founder of the popular pistol many Americans own, designed a pistol for the Austrian military that could hold more than eight rounds); Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 270–75 (2003) (explaining that Switzerland firm SIG developed the SIG-Sauer P226 in 1983 which could accept a 15-round magazine, and was used by the U.S. Navy SEALs as well as police and military organizations in Europe, and that the 1989 SIG-Sauer P228 and P229, which contain 13 and 12 round-magazines, "earned universal reputations as

**APP. 1038**

highly reliable and accurate weapons for military and police use"); Roth Decl. ¶ 48, ECF No. 17-11 (observing that semi-automatic weapons with LCMs such as the M-16 rile "were designed for offensive military applications rather than individual self-defense" and "emerged from technologies developed for military use during the Cold War").

Even Plaintiffs' experts seem to believe that LCMs are best suited for military and law enforcement use. *See, e.g.*, Murphy Decl. ¶ 9, ECF No. 24-6 (acknowledging that "magazines holding more than 10 rounds are most useful in the military or in a law enforcement context"); Harnish Decl. ¶ 7, ECF No. 24-7 ("The Beretta M9 [which has a 15-round magazine] was adopted by the United States Armed Forces as the official service pistol in 1985."); *id.* ¶ 9 ("Pistols with the capacity to hold ten rounds, or more than ten rounds . . . [are] selected by law enforcement and military agencies in the United States for the practicality and performance they provide to the organization, but more importantly the capability they provide to the end user."). Thus, the Court concludes that LCMs are not covered by the Second Amendment because they are most useful in military service.

### b. Whether LCMs Are in Fact Used for Self-Defense

The District also argues that LCMs are not covered by the Second Amendment because they are not "in fact used for th[e] purpose" of self-defense. Defs.' Opp'n at 18. As support, it relies on a study of the National Rifle Association's ("NRA") "Armed Citizen Stories" website which concluded that law-abiding citizens on average fire only *two* bullets in self-defense situations and virtually never more than ten. *Id.* This study, which assessed data from the years 1997 – 2001, was actually conducted by one of Plaintiffs' experts, Claude Werner. Mr. Werner is a retired U.S. Army officer who has experience in competitive shooting, self-defense, and firearms instruction. Werner Decl. ¶¶ 2–5, 7, ECF No. 24-8. In his study, titled "Analysis of

Five Years of Armed Encounters (With Data Tables)," Mr. Werner explained that he reviewed a

total of 482 reports in that time period from the NRA's database.  *See* https://perma.cc/QTL7-

U8EM.  Upon collecting and organizing the data from these reports, Mr. Werner concluded that

the average number of shots a civilian fired in a self-defense incident in this time period was 2.2.

*Id.*

Courts and scholars alike have relied on the findings of this study, specifically the 2.2

bullets per incident figure.  *See, e.g.*, Robert J. Spitzer, *Gun Accessories and the Second

Amendment*, 83 J. L. & Contemp. Probs. 331, 244–45 (2020); *Kolbe*, 849 F.3d at 127 (en banc)

("[T]he State's evidence substantiates 'that it is rare for a person, when using a firearm in self-

defense, to fire more than ten rounds.'  Studies of 'armed citizen' stories collected by the

National Rifle Association, covering 1997-2001 and 2011-2013, found that the average number

of shots fired in self-defense was 2.2 and 2.1, respectively." (citations omitted)); *Duncan*, 19

F.4th at 1105 (en banc) ("[T]he record here, as in other cases, does not disclose whether the

added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid

succession—has *ever* been realized in self-defense in the home." (emphasis in original)); *cf.*

*Heller II*, 670 F.3d at 1262 ("[T]he plaintiffs present hardly any evidence that . . . magazines

holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or

sport.").

Plaintiffs raise primarily two arguments in response.  First, they try to back away from

the findings of the 1997 – 2001 study that their own expert conducted.  Mr. Werner claims that

his 1997 – 2001 timeframe is "dated."  Werner Decl. ¶ 7, ECF No. 24-8.  To the contrary, the 2.2

figure has remained exceptionally stable over time.  NERA Economic Consulting ("NERA"), a

reputable economic consulting firm, reviewed 736 reports from the same NRA Armed Citizen

**APP. 1040**

database in the *2011 – 2017 period* and concluded that the average number of shots a civilian

fired in a self-defense incident in this time period was 2.1. *See* Amicus Brief at 19 & n.70; Decl.

of Lucy P. Allen ("Allen Decl.") ¶ 8, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*,

No. 3:18-cv-10507, 2018 WL 4688345 (D.N.J. Sept. 28, 2018), ECF No. 31-2.  The NERA

study tracked essentially the same metrics from the NRA Armed Citizen database over a more

recent time period and arrived at a virtually identical data point.[7]  Tellingly, one of Plaintiffs'

other experts concedes that "the average amount of rounds fired in self-defense is usually less

than 10, generally only two or three."  Murphy Decl. ¶ 8.[8]

      Mr. Werner next argues that his study is flawed because it is heavily skewed toward

"positive outcomes"—that is, successful self-defense incidents that are reported.  Werner Decl.

¶ 8; Ellifritz Decl. ¶¶ 14–16, ECF No. 24-7 (same).  Selection bias is no doubt a legitimate

concern in any statistical inquiry.  The problem for Plaintiffs is that Mr. Werner does not provide

any studies, arguments, or even logic that remotely suggests that were the study able to properly

capture negative outcomes, the average number of bullets fired in self-defense would somehow

*skyrocket* to 11 or more bullets.  The best Mr. Werner can say is that "[w]e don't know how may

[bullets] have been fired in non-positive outcomes."  Werner Decl. ¶ 8.  But if no one knows,

how does this support the idea that LCMs are commonly used for self-defense?

---

[7] In addition to studying the NRA Armed Citizen database from 2011 – 2017, NERA performed another study of self-defense (in the home only) in the 2011 – 2017 timeframe based on "comprehensive search of published news stories" online and concluded that the average number of shots fired per incident was 2.34—again, a substantially similar figure. *See* Allen Decl. ¶¶ 12–17 (explaining methodology and findings).

[8] The Complaint attempts to describe six self-defense incidents in the country that involved firing more than ten rounds.  But amicus correctly points out that *five* out of these incidents were "officer involved" shootings, Compl. ¶¶ 28–33, and the sole example of civilian self-defense involved a "[f]amed Los Angeles watch shop owner," Compl. ¶ 30—hardly representative of ordinary civilian self-defense incidents.

Finally, Mr. Werner points out that his study had "very little data as to the ammunition capacity of the citizen employed firearm." *Id.* ¶ 9. He reasons that although "a substantial number of citizen defenders would have used plus 10 magazines" in these incidents, "i[f] we were doing the study today using current data, the percentage of citizens using plus 10 magazines would be even higher." *Id.* This argument actually undermines Plaintiffs' position. If civilians only fired a few bullets on average *despite* using an LCM-equipped firearm, it was not for a lack of ammunition. The data shows that they simply did not need the extra ammunition in the LCM for self-defense.

Perhaps realizing that their own expert's study has backfired, Plaintiffs try a different tack: they claim that a law-abiding citizen nonetheless "uses" a LCM for self-defense even when he does not necessarily expend double-digit bullets in a self-defense incident. *See* Pls.' Reply at 13 ("If a citizen fires two rounds out of a 15 round magazine to save his life, he nevertheless uses the 15 round magazine for self-defense."). That is a creative argument, but the Court is unconvinced. The dictionary defines "use" as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing *for the purpose for which it is adapted*, as distinguished from a possession and employment that is merely temporary or occasional." *Use*, Black's Law Dictionary (11th ed. 2019) (emphasis added); *cf. Voisine v. United States*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently define the noun 'use' to mean the 'act of employing' something."). Here, LCMs are best suited for a military "purpose" and are poorly "adapted" for self-defense. As the Ninth Circuit en banc put it, civilians do not "use" LCMs for self-defense, because "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has [virtually n]ever been realized in self-defense." *Duncan*, 19 F.4th at 1105 (en banc); *see* Allen Decl. ¶ 10 ("Out of 736 incidents [in

**APP. 1042**

the Armed Citizen database between 2011 – 2017], there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets."); *Or. Firearms Fed'n*, 2022 WL 17454829, at *11 (finding record showed that "large-capacity magazines are rarely used by civilians for self-defense").

Plaintiffs protest that the District's reasoning would allow it to "justify a ban on all firearms able to fire more than two or three shots" because "on average, only 2.2 shots are fired by defenders." Pls.' Reply at 13. But no such ban exists anywhere in the country, and the Court doubts that the District will see this as an invitation to go down Plaintiffs' slippery slope. Recall that the studies show that two bullets is merely the *average* amount of bullets fired in self-defense situations; thus, a law that restricts magazine capacity to say, five or six bullets, might meaningfully hinder the common and lawful usage of magazines for self-defense. In any event, this is not a case that requires the Court to delineate the constitutional limits of a hypothetical restriction. It suffices to say that the District's LCM ban, which limits magazine capacity to ten bullets, enables law-abiding people in D.C. to possess magazines with ample ammunition to defend themselves.[9]

In conclusion, the Court finds that the Second Amendment does not cover LCMs because they are not typically possessed for self-defense. LCMs fall outside of the Second Amendment's scope because they are most useful in military service and because they are not in fact commonly used for self-defense. Given that the District prevails at step one of *Bruen*'s framework, the

---

[9] The District's magazine capacity limit (10) also prevents civilians from maintaining greater firepower than law enforcement. Law enforcement in the District routinely carry 15- and 17-round magazines. Parsons Decl. ¶¶ 14–16, ECF No. 17-7. The District's LCM ban keeps the advantage police have over armed civilians who may be suspects or engaged in criminal activity. *Id.* ¶¶ 17–18.

**APP. 1043**

Court finds that D.C.'s LCM ban is constitutional.  Nonetheless, to round out the analysis, the

Court will consider *Bruen*'s second step in the alternative.

**B.  Whether the Ban Is Consistent with this Nation's Tradition of Firearm Regulation**

Even were LCMs covered by the scope of the Second Amendment, the Court finds that

D.C.'s ban is constitutional for the independent reason that the District has shown that it is

consistent with this country's historical tradition of firearm regulation.  "Like all analogical

reasoning, determining whether a historical regulation is a proper analogue for a distinctly

modern firearm regulation requires a determination of whether the two regulations are

'relevantly similar.'"  *Bruen*, 142 S. Ct. at 2132.  *Bruen* provides two "metrics" for conducting

this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-

defense."  *Id.* at 2132–33.  "Therefore, whether modern and historical regulations impose a

comparable burden on the right of armed self-defense and whether that burden is comparably

justified are '*central*' considerations when engaging in an analogical inquiry."  *Id.* at 2133

(emphasis in original).

Although the burden is on the government to identify a historical analogue, *Bruen*

stressed that this is not an impossible standard.  *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J.,

concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun

regulations.").  *Bruen* acknowledged that in today's world, centuries after the ratification of the

Second Amendment, it is not unusual to see "modern regulations that were unimaginable at the

founding."  *Id.* at 2132.  Thus, "cases implicating unprecedented societal concerns or dramatic

technological changes" require "nuanced" consideration.  *Id.* at 2131–32.  For that reason,

analogical reasoning is not "a regulatory straightjacket": it "requires only that the government

identify a well-established and representative historical *analogue*, not a historical *twin*."  *Id.* at

**APP. 1044**

2133 (emphases in original).  "So even if a modern-day regulation is not a dead ringer for

historical precursors, it still may be analogous enough to pass constitutional muster."  *Id*.  After

all, "the Constitution, can, and must, apply to circumstances beyond those the Founders

specifically anticipated."  *Id*. at 2132; *see id*. (quoting *McCulloch v. Maryland*, 4 Wheat. 316,

415 (1819), for the principle that the Second Amendment was "intended . . . to be adapted to the

various crises of human affairs").

                1.  Whether a Nuanced Approach to History Applies Here

       Although D.C.'s LCM ban has yet to be tested under step two of *Bruen*'s framework, the

Court is not the first in the country to apply *Bruen* to this kind of regulation.  In *Oregon*

*Firearms Federation*, a federal district court employed *Bruen*'s test to a substantially similar

challenge to Oregon's LCM ban.  2022 WL 17454829 (D. Or. Dec. 6, 2022).  That case analyzed

the constitutionality of Measure 114, a ballot initiative passed by Oregon voters in November

2022 which outlawed the use and sales of LCMs.  *Id*. at *2.  The ballot measure provided limited

exceptions, such as allowing existing owners of LCMs to continue to use them on their property

or for recreation, and giving firearms manufacturers a 180-day grace period to fulfill existing

contracts to out-of-state buyers.  *Id*. at *4.  The plaintiffs, gun owners and users of LCMs,

brought suit and sought a temporary restraining order "aimed primarily" at the LCM ban.  *Id*. at

*5.  The court first held that under *Bruen*, LCMs are not covered by the Second Amendment.  *Id*.

at *8–11.  Then, "[a]ssuming for the sake of argument that the Second Amendment's plain text

covers large-capacity magazines," the court "next consider[ed] whether Measure 114 is

consistent with the Nation's historical tradition of firearm regulation."  *Id*. at *12.

       *Oregon Firearms Federation* answered this second question in the affirmative.  The court

observed that LCMs are "a dramatic change in firearms technology" because although some

**APP. 1045**

multi-shot firearms existed before the Founding era, they were "experimental, designed for military use, rare, defective, or some combination of these features," and the evidence showed that "semi-automatic weapons did not become 'feasible and available' until the beginning of the twentieth century." *Id.* at *12 & n.17. The court also found that "large-capacity magazines implicate unprecedented societal concerns" because of their frequent use in recent mass shootings. *Id.* at *13. Turning to historical analogues, *Oregon Firearms Federation* observed that "in the 1800s, states often regulated certain types of weapon, such as Bowie knives, blunt weapons, slungshots, and trap guns because they were dangerous weapons commonly used for criminal behavior and not for self-defense." *Id.* The court also found a historical tradition of banning private military organizations as evidence that "demonstrates the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Id.* at *14. The court found that Oregon's LCM ban was "comparably justified" with these historical regulations because just as the historical regulations were rooted in public safety concerns, the LCM ban "consider[ed] the public safety concerns of today" in "the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines." *Id.* And Oregon's ban placed a "comparable burden" as the historical regulations on the right to self-defense: the burden was "minimal," the court explained, because "in over seven hundred self-defense incidents, less than one half of a percent involved more than ten shots." *Id.*

In this case, the District's evidence also shows that LCMs are the object of "dramatic technological changes" and implicate "unprecedented societal concerns," and thus its ban requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132. First, with respect to the technological pedigree of LCMs, Mr. DeLay explained that while "firearms with ammunition

**APP. 1046**

capacity in excess of 10 rounds date back to the 1500s," "such weapons amounted to little more than experimental curiosities" and that "[m]ost never advanced beyond proof of concept." DeLay Decl. ¶ 7. The airgun, "the only high-capacity weapons from the [founding] period that enjoyed even experimental military use" was "so rare that owners could charge people to see them." *Id.* ¶¶ 14–16; *see* "To the Curious," *The Weekly Museum* (New York, NY), Feb. 11, 1792 (Ex. B to DeLay Decl.). Based on his twelve years of studying the arms trade in the Founding era, Mr. DeLay found zero "evidence in primary sources that large-capacity firearms were anything other than exotic curios in this era." *Id.* ¶ 19; *cf.* Sweeney Decl. ¶¶ 15, 31, ECF No. 17-15 (expert with Ph.D. in history observing that review of 1,170 newspaper ads and reports in the 18th century shows that "repeating firearms in eighteenth-century America" "were extraordinarily rare"); *Friedman*, 784 F.3d at 410 (observing that assault weapons and LCMs, which city ordinance banned, "were not common in 1791" and that "[s]emi-automatic guns and large-capacity magazines are more recent developments"). Against this backdrop, statements such as "magazines of more than ten rounds are older than the United States" are misleading and grossly exaggerate the state of affairs at the Founding. *See* David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) (hereinafter "Kopel"); Pls.' Mot. at 14–15 (relying on Mr. Kopel's "heavy lifting" research). Even some of Plaintiffs' experts concede this point. *See, e.g.*, Helsley Decl. ¶ 8, ECF No. 24-2 (acknowledging that multi-shot weapons like the Giradoni air rifle were "complex, likely unreliable, and fragile" and only "a window into the future"); Hlebinsky Decl. ¶ 23, ECF No. 24-3 (acknowledging it is "typical" to find "one-off examples" of multi-shot weapons at the Founding era).

    High-capacity firearms became more common in military settings in the second half of the 19th century, but they were still rare. DeLay Decl. ¶ 22. The "Henry" rifle in 1860 could

**APP. 1047**

fire sixteen rounds without reloading, and the "Winchester Model 1866" also became an iconic

high-capacity rifle. *Id.* But these "high-capacity firearms went almost exclusively to military

buyers through the early 1870s," and "constituted less than 0.2% of all firearms in the United

States in the late 1860s and early 1870s." *Id.* ¶¶ 23–24 (describing production numbers); *see*

*also* Pauly Decl. ¶ 62 ("Henry rifles were developed by the start of the American Civil War but

were quite expensive—exorbitantly priced for regular rank-and-file troops—and did not see

much combat. By the end of the hostilities, the War Department had only officially bought

1,731 of the guns."). Moreover, these rifles did not resemble the semiautomatic weapons of

today: they had fixed magazines, and "[u]sers of these 'lever-action' weapons were still required

to pull a lever between shots, slowing the firing rate to about one shot every three seconds."

Defs.' Opp'n at 23 (citing Pauly Decl. ¶ 61); *see* Rivas Dec. ¶¶ 29–30, ECF No. 17-12 (same,

from expert with Ph.D. in history). Only near the "turn of the [20th] century" were "[t]he

semiautomatic firearm and its detachable box magazine . . . invented." Kopel at 857; *see* Rivas

Decl. ¶ 29 ("The semi-automatic weapons with which twenty-first century Americans associate

large capacity magazines were either not in existence or not manufactured in large numbers until

the twentieth century.").[10] It would take yet even more time for these inventions to "improve[]

and become more affordable." Pls.' Reply at 11 (citing Kopel at 857–64, which describes

firearms in the 20th century). "[T]he first handheld firearm that both (a) had a detachable

---

[10] Mr. Kopel nevertheless claims that weapons such as the multi-shot flintlock rifle,
"Pepperbox" pistols, Colt multi-shot revolver, and 1873 Winchester rifle were common in the
1800s. Kopel at 853–57. In view of the record, the Court joins *Oregon Firearms Federation* in
concluding that "those firearms were experimental, designed for military use, rare, defective, or
some combination of these features." 2022 WL 17454829 at 12 & n.17; *see also* Amicus Brief
at 12–15 (analyzing firearms Plaintiffs identified in this era and concluding that "no firearm
capable of firing more than ten rounds without reloading achieved widespread commercial
success prior to ratification of the Fourteenth Amendment" (emphasis omitted)).

APP. 1048

magazine holding more than ten rounds and (b) was commercially available to civilians in the

United States was the Thompson submachine gun, introduced to the market in the 1920s."

DeLay Decl. ¶ 25; *see also* Kopel at 851 ("Handgun magazines of more than ten rounds would

become popular in the 1930s."). As this history shows, LCMs reflect "dramatic technological

changes" in comparison to the weapons of the Founding era. *Bruen*, 142 S. Ct. at 2132.

     Second, the record also shows that LCMs implicate "unprecedented societal concerns."

*Id*. The District claims that "[t]he proliferation of modern semiautomatic arms, coupled with the

availability of LCMs, directly correlates with the contemporary problem of mass shootings in

America today." Defs.' Opp'n at 26. The District's expert, Randolph Roth, has a Ph.D. in

history and has spent decades studying homicide and mass violence data. Roth Decl. ¶¶ 9–10.

He found that "the development of semiautomatic rifles and handguns dramatically increased the

number killed and wounded in mass shootings from 1966 to the present." *Id*. ¶ 53.[11] Mr. Roth

claims that "with extended magazines, semiautomatic rifles [in this period] cause an average of

299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184

percent more than regular firearms." *Id*. ¶ 55. He concluded that "[i]n combination,

semiautomatic firearms and extended magazines are extraordinarily lethal." *Id*.; *see also* Amicus

Brief at 17 ("[A]s of July 2020, LCMs were used in the ten deadliest mass shootings of the prior

decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62 percent higher

---

    [11] Mr. Roth defined "mass shooting" as "a multiple homicide incident in which four or
more victims are murdered with firearms not including the offender(s) within one event, and at
least some of the murders occurred in a public location or locations in close geographical
proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not
attributable to any other underlying criminal activity or commonplace circumstance (armed
robbery, criminal competition, insurance fraud, argument, or romantic triangle)." *Id*. ¶ 53 n.103.
This is similar, although not identical, to the FBI's definition of "mass murder." Cramer Decl. ¶
3 n.1, ECF No. 24-14.

death toll compared to those that did not involve an LCM."); *Or. Firearms Fed'n*, 2022 WL

17454829, at *13 ("Every mass shooting since 2004 resulting in fourteen or more deaths

involved large-capacity magazines with ten or more bullets."); *Worman*, 922 F.3d at 39

(observing that semiautomatic rifles "equipped with LCMs have been the weapons of choice in

many of the deadliest mass shootings in recent history"); *Duncan*, 19 F.4th at 1096 (en banc)

("About three-quarters of mass shooters possess their weapons and large-capacity magazines

lawfully.  In the past half-century, large-capacity magazines have been used in about three-

quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or

more deaths, and more than twice as many people have been killed or injured in mass shootings

that involved a large-capacity magazine as compared with mass shootings that involved a

smaller-capacity magazine."); *NYSRPA*, 804 F.3d at 263–64 ("Large-capacity magazines are

disproportionately used in mass shootings, like the one in Newtown, in which the shooter used

multiple large-capacity magazines to fire 154 rounds in less than five minutes.  Like assault

weapons, large-capacity magazines result in 'more shots fired, persons wounded, and wounds

per victim than do other gun attacks'").[12]

Small wonder that in recent years, numerous state legislatures—at least nine so far—have

banned LCMs.  *See ANJRPC*, 910 F.3d at 110 & n.1 (citing regulations and observing that they

responded to the fact that "[a]ctive shooting and mass shooting incidents have dramatically

---

[12] Plaintiffs' expert, Clayton Cramer, claims that "individual mass murder" is not
"particularly modern" and gives examples of mass murders committed by axes or by drowning in
prior centuries.  Cramer Decl. ¶¶ 19, 23.  But this is consistent with the District's claim that
individual mass *shootings* and the lethality associated with LCMs are a uniquely contemporary
problem.  Furthermore, Plaintiffs' expert Gary Kleck concedes that "mass shooters who used
LCMs inflicted more casualties than those who did not."  Kleck Decl. ¶ 17, ECF No. 24-15.
Although Mr. Kleck challenges any inference of causality, the Court need not resolve that debate
here.  That this is a hotly contested issue only reinforces the fact that LCMs are the subject of
unprecedented societal concerns today.

**APP. 1050**

increased during recent years," and that "[i]n addition to becoming more frequent, these

shootings have also become more lethal"); *see also, e.g.*, *Kolbe*, 849 F.3d at 120 (en banc) ("In

response to Newtown and other mass shootings, the duly elected members of the General

Assembly of Maryland saw fit to enact the State's Firearm Safety Act of 2013 (the "FSA"),

which bans the AR-15 and other military-style rifles and shotguns (referred to as "assault

weapons") and detachable large-capacity magazines."); *Duncan*, 19 F.4th at 1095 (en banc) ("In

response to mass shootings throughout the nation and in California, the California legislature

enacted Senate Bill 1446, and California voters adopted Proposition 63.").

Because LCMs implicate "unprecedented societal concerns" and are the object of

"dramatic technological changes," the Court's analysis of historical analogues to modern LCM

bans requires "nuanced" consideration. *Bruen*, 142 S. Ct. at 2132. In what follows, the Court

examines one such historical analogue that the District has proffered: numerous states' high-

capacity weapon bans during the Prohibition Era.

2.  Whether Prohibition-Era Bans Are Historically Analogous

"Regulations concerning removable magazines and magazine capacity were in fact

common as early as the 1920s . . . these regulations were adopted by nearly half of all states,

representing approximately 58% of the American population at that time." Spitzer Decl. ¶ 22,

ECF No. 17-10 (expert with Ph.D. in government); Tbl. 1 to Spitzer Decl. (listing states). These

regulations largely banned the mere possession of a gun that was capable of holding a certain

number of rounds without reloading. Plaintiffs attempt to dismiss these regulations as

"restrictions on machine guns," and claim that what makes a machine gun worthy of regulation is

"its ability to fire automatically, not [its ability to] accept detachable magazines of more than 10

rounds." Pls.' Reply at 25 & n.17. But it is wrong to characterize these laws as only regulating

**APP. 1051**

automatic weapons and their magazine capacity.  At least five states in this era, plus the District

of Columbia, defined "machine gun" in their statutes *to include semi-automatic weapons* capable

of shooting a certain number of bullets without reloading.  *See* Act of July 8, 1932, ch. 465, §§ 1,

8, 47 Stat. 650, 650, 652 (District of Columbia); 1927 Mass. Acts 413, 413-14 (Massachusetts);

Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 (Minnesota); Act of Apr. 8, 1933, no.

64, 1933 Ohio Laws 189, 189 (Ohio); 1927 R.I. Pub. Laws 256, 256 (Rhode Island); Act of Mar.

7, 1934, ch. 96, 1934 Va. Acts 137, 137 (Virginia).[13]  Indeed, D.C.'s ban—which Congress

passed—was modeled heavily after the Uniform Act, "a model law" that the National Rifle

Association endorsed.  Spitzer Decl. ¶¶ 12–13; *compare* Act of July 8, 1932, ch. 465, §§ 1, 8, 47

Stat. 650, 650, 652, *with* Report of Firearms Committee, Handbook of the National Conference

on Uniform State Laws and Proceedings of the Thirty-Eighth Annual Meeting (1928) (attached

as Ex. P to Defs.' Opp'n).  The D.C. statute defined "machine gun" as "any firearm which shoots

automatically *or semiautomatically more than twelve shots without reloading*," and it prohibited

the possession of any machine gun within D.C.  *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat.

650, 650, 654 (emphasis added).  As these regulations demonstrate, "[r]estrictions on fully

automatic and semi-automatic firearms were closely tied to restrictions on ammunition

magazines or their equivalent."  Spitzer Decl. ¶ 19.  Like fully automatic weapons, semi-

automatic weapons "utilize the same fundamental firearms technology: an action that

---

[13] These statutes are reproduced in Appendix 3 to the Spitzer Decl.  In addition to these six jurisdictions, Michigan banned the possession of "any firearm which can be fired more than sixteen times without reloading" without specifying whether such a firearm was considered a machine gun.  Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929.
    These seven jurisdictions capped capacity as follows: D.C. (12); Massachusetts (any); Michigan (16); Minnesota (12); Ohio (18); Rhode Island (12); Virginia (16).  *See* App'x 3 to Spitzer Decl.

APP. 1052

automatically loads a new round into the chamber after each shot is fired . . . and is capable of firing numerous rounds without reloading." *Id.* ¶ 17. By defining "machine gun" broadly, these regulations revealed a widespread tradition dating back to the 1920s and 1930s of regulating high-capacity weapons that could fire rapidly without reloading.

These Prohibition-era bans closely resemble D.C.'s ban today. It is therefore no surprise that the "how" and "why" of D.C.'s LCM ban is analogous to that of the Prohibition-era regulations. Consider the "how," or the "comparable burden," first. *Bruen*, 142 S. Ct. at 2133. The District's LCM ban is similar to the Prohibition-era regulations in that the burden it places on an individual's right of self-defense is relatively light. Recall that studies show that an individual expends on average two bullets in a self-defense incident where she fires her weapon. *See supra* at subsection IV.A.2.b. Similar to the regulations from a century ago, the District's ban does *not* prohibit individuals from obtaining magazines with capacities of ten or less rounds. Magazines with capacities of ten or less are plentiful. *Cf. Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014) (citing evidence that LCMs make up minority of all magazines owned). And it appears that these smaller-capacity magazines can readily replace an LCM in a firearm: every Plaintiff in this case admits that the firearms he currently carries— "even those for which the standard magazine is an LCM"— "are all equipped with magazines that are not LCMs." Defs.' Opp'n at 12 (citing Plaintiffs' declarations and Ex. A, Pls.' Answers to Interrogs. at 7–10). Furthermore, like the regulations from a century ago, D.C. law does not prohibit an individual from possessing multiple guns, or multiple magazines. Thus, the burden that the District's ban imposes on ordinary individuals is commensurate to that of the Prohibition-era regulations, and not at all onerous.

Similarly, with respect to the "why," D.C.'s LCM ban is "comparably justified" with the

Prohibition-era regulations.  The Prohibition era witnessed the growth of gangster and criminal

organizations who availed themselves of the enhanced firing capacity of these new technologies.

Spitzer Decl. ¶¶ 12–18.  In response, numerous states enacted sweeping bans on high-capacity

semi-automatic and automatic weapons during this era that applied to *all individuals*, not just a

certain subset of the population such as gangsters or criminals.  *Id.*  This shows that the states

confronted the public safety issues of their time with vigor; indeed, these regulations were at the

time "obviously uncontroversial" from a constitutional perspective.  Robert J. Spitzer, *Gun Law*

*History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 69

(2017) (hereinafter "Spitzer, *Gun Law History*").  Likewise, the District's ban seeks to promote

public safety by limiting the number of rounds in one magazine that an individual may lawfully

carry for self-defense in an attempt to mitigate the carnage of mass shootings in this country.[14]

Just as states and the District enacted sweeping laws restricting possession of high-capacity

weapons in an attempt to reduce violence during the Prohibition era, so can the District now.  *See*

*supra* subsection IV.B.1 (describing mass shootings with LCMs as an "unprecedented societal

concern").

Plaintiffs raise three main counterarguments to this analysis, but none is persuasive.

First, Plaintiffs argue that under *Bruen*, "20th century laws do not establish a historical

tradition."  Pls.' Reply at 26.  But *Bruen* said no such thing.  *Bruen* merely stated that "when it

comes to interpreting the Constitution, not all history is created equal."  142 S. Ct. at 2136.

Because "[c]onstitutional rights are enshrined with the scope they were understood to have when

---

[14] Whether LCM bans empirically increase public safety is again not an issue for the
Court to resolve.  These policy decisions are appropriate for the legislature to consider.

**APP. 1054**

the people adopted them," the years leading up to 1791 (the adoption of the Second Amendment)

and 1868 (the adoption of the Fourteenth Amendment) are particularly important touchstones of

constitutional meaning. *Id.* at 2136 (emphasis omitted; citation omitted). Outside these

windows, "post-ratification adoption or acceptance of laws" are insignificant to the extent that

they are "*inconsistent* with the original meaning of the constitutional text." *Id.* at 2137

(emphasis added) (cleaned up). Thus, in *Bruen*, the Supreme Court paid little heed to 19th and

20th-century evidence because "it contradict[ed] earlier evidence" in that case. *Id.* at 2154 &

n.28. That result, however, is not a directive to discard 20th century history in *every* case. *Bruen*

left open the possibility that in an appropriate case, 20th century history that is not contradicted

by earlier evidence can illuminate a modern-day regulation's constitutional vitality. *Cf. Bruen*,

142 S. Ct. at 2136 (citing James Madison for the interpretive principle that "'a regular course of

practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in

the Constitution" (citation omitted)). The 20th century, after all, began over a hundred years

ago, and that is no inconsequential length of time. *Cf. Heller II*, 670 F.3d at 1253 ("*Heller* tells

us 'longstanding' regulations are 'presumptively lawful.'" (citation omitted)).

In this case, it is appropriate to apply 20th century history to the regulation at issue. The

historical tradition of high-capacity regulations in the 1920s and 1930s—over a hundred years

ago—does not contradict any earlier evidence, and it supports the constitutionality of the

District's LCM ban. To reiterate, *Bruen* had no occasion to consider 20th century history

because while "handguns . . . had gained a fairly secure footing in English culture" leading up to

the Founding era, there was no evidence that public carry was limited "only to those who

demonstrate some special need for self-protection" like New York's proper cause regime. 142 S.

Ct. at 2142. *Bruen* then ventured into the 18th century, where it found that "the history reveals a

consensus that States could *not* ban public carry altogether." *Id.* at 2146 (emphasis in original).

By contrast, in this case, the 1920s and 1930s regulations do not contradict any earlier evidence.

That is so because semiautomatic and high-capacity weapons were *not* technologically feasible

and commercially available in meaningful quantities until the early 1900s. *See supra* subsection

IV.B.1; Amicus Brief at 16 ("[C]rucially, when multi-shot firearms did begin to gain widespread

civilian use, states across the country passed laws limiting access to these weapons." (emphasis

omitted)).   Unlike the handguns at issue in *Bruen*, the weapons here did not gain a "secure

footing" in American society prior to the 1900s.  142 S. Ct. at 2142.  Accordingly, they did not

pose "a general societal problem that has persisted since the 18th century," and it would make no

sense to divine constitutional significance from non-existent legislation concerning non-existent

problems.  *Id.* at 2131.  States do not "regulate for problems that do not exist"; instead, they

"adopt laws to address the problems that confront them."  *McCullen v. Coakley*, 573 U.S. 464,

481 (2014); *see also McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) ("A legislative body

cannot legislate wisely or effectively in the absence of information respecting the conditions

which the legislation is intended to affect or change[.]").

   To flesh this principle out a little more, consider personal jetpacks, an "expensive and

experimental curiosity" that are unregulated today despite the obvious safety issues and dangers

they pose.  DeLay Decl. ¶ 21.  "A future historian (or jurist) discovering evidence that a patent

was taken out on a jetpack design as early as 1919 (it was); that militaries remained intrigued by

the technology throughout the century (indeed, they still are); and that the jetpack commanded

enduring popular interest, could conclude that the absence of public regulation reflected an

ideological disposition against regulating jetpacks.  But the simpler and more accurate

explanation would be that jetpacks remained too rare to attract regulatory attention in 2022."  *Id.*

APP. 1056

Second, Plaintiffs attempt to dismiss the Prohibition-era regulations as "irrelevant

outliers." Pls.' Reply at 25. But unlike "only three restrictions on public carry" that the

government could produce in *Bruen*, which the Supreme Court "doubt[ed] . . . could suffice to

show a tradition of public-carry regulation," 142 S. Ct. at 2142, the District here has pointed to

no less than *six states plus D.C.* that regulated semi-automatic and automatic weapons based on

their high firing capacity. *See supra* subsection IV.B.2.[15] Of particular significance, the D.C.

law that the Court has discussed above was passed by Congress (a nationwide body) and drew

heavily from the Uniform Act (a model law). Like D.C., Massachusetts, Michigan, Minnesota,

and Rhode Island all banned mere possession. *See* Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat.

650, 650, 652; 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts

887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933,

ch. 190, 1933 Minn. Laws 231, 232; 1927 R.I. Pub. Laws 256, 256. Plaintiffs try to distinguish

the Ohio and Virginia laws as outliers because the former permitted *licensed* carry and the latter

permitted defensive uses of these weapons. Pls.' Reply at 26. But Ohio's licensing law in 1933

required one to post $5,000 bond—today's equivalent of over $115,000—effectively

"prevent[ing] law-abiding citizens with ordinary self-defense needs from carrying" these

weapons. *Bruen*, 142 S. Ct. at 2150.[16] As for Virginia, although it prohibited possession of a

machine gun only "for offensive and aggressive purpose," it "*presumed*" this purpose whenever

the weapon was possessed outside the home. Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137,

---

[15] Actually, that number could be potentially as high as ten jurisdictions, if one reads three ambiguous state statutes in favor of the District. *See* Spitzer, *Gun Law History* at 69 (describing statutory ambiguity in machine gun bans from Illinois, Louisiana, and South Carolina).

[16] *See* U.S. Bureau of Labor Statistics, CPI Inflation Calculator, at https://www.bls.gov/data/inflation_calculator.htm (last visited April 20, 2023).

APP. 1057

137 (emphasis added).  In short, Plaintiffs cannot avoid the conclusion that there is a historical

tradition of severe restrictions, if not outright bans, on these high-capacity weapons.

Accordingly, the District's law is at the very least "analogous enough to pass constitutional

muster." *Bruen*, 142 S. Ct. at 2133.

Third, Plaintiffs argue that the subsequent repeal of some of these state regulations

undercuts the District's reliance on this history.  Pls.' Reply at 26.  But Plaintiffs do not explain

why the decision of some states to "devise solutions to social problems that suit local needs and

values" is anything more than permissible "experimentation with reasonable firearms

regulations . . . under the Second Amendment." *McDonald v. City of Chicago*, 561 U.S. 742,

785 (2010).  Take Rhode Island, for example.  Although it eventually repealed its 1927 statute

banning possession of machine guns (defined, by the way, to include "any weapon which shoots

more than twelve shots semiautomatically without reloading"), Rhode Island changed course in

2022 "[i]n the wake of recent mass shootings" and amended its law to "specifically ban LCMs,"

*Ocean State Tactical*, 2022 WL 17721175, at *4.  And other jurisdictions, like D.C., made

modifications to its law without ever repealing it.  *See* Kopel at 874 ("The District of Columbia

ban, with modifications, is still in effect.").  The Second Amendment gives states space to

experiment, and that is what Rhode Island and D.C. have done.  *Bruen* did contemplate that state

regulations that were "rejected on constitutional grounds" can "provide some probative evidence

of [a similar modern regulation's] unconstitutionality."  142 S. Ct. at 2131.  But Plaintiffs have

not suggested that any repeal was related to constitutional infirmity.  The Court has conducted

independent research on this question and did not find anything suggesting this was the reason,

**APP. 1058**

either.  Thus, the Court is satisfied that the District has met its burden to produce a historical

analogue justifying its LCM ban.[17]

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is

denied.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  April 20, 2023                                    RUDOLPH CONTRERAS
                                                         United States District Judge

_____

[17] The parties also dispute whether other potential historical analogues that the District
introduced are relevantly similar to the ban at issue here.  These include regulations on
gunpowder, trap guns, and dangerous weapons such as Bowie knives.  Defs.' Opp'n at 28–32,
35–39.  Because the Court holds that the District has adequately identified a historical analogue
in the Prohibition-era regulations, it has no occasion to consider additional examples.

APP. 1059

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-2256-RC** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## JOINT MOTION TO STAY PROCEEDINGS PENDING APPEAL

The Parties jointly move to stay proceedings pending Plaintiffs' appeal of the Court's denial of Plaintiffs' motion for a preliminary injunction. As discussed in the accompanying memorandum of points and authorities, a stay is warranted because it will preserve the Parties' resources, promote judicial efficiency, and no party will be prejudiced. A proposed order is attached.

Dated: May 3, 2023.

*/s/ George L. Lyon, Jr*
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033

Respectfully Submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Equity Section, Civil Litigation Division

*/s/ Andrew J. Saindon*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
MATEYA B. KELLEY [888219451]
RICHARD P. SOBIECKI [500163]

**APP. 1060**

HELEN M. RAVE [90003876]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 724-6643
Email: andy.saindon@dc.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ANDREW HANSON,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:22-cv-2256-RC** |
| **DISTRICT OF COLUMBIA,** *et al.,* | |
| **Defendants.** | |

## JOINT MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING APPEAL

The Parties seek to stay proceedings while Plaintiffs appeal this Court's denial of Plaintiffs' motion for a preliminary injunction.  Granting a stay will preserve the status quo while the D.C. Circuit decides legal issues that may alter the course of this litigation.  Balancing the interests here demonstrates that a stay of proceedings would preserve the Parties' resources and promote judicial economy.  Accordingly, the Court should grant a stay of proceedings pending appeal.

## BACKGROUND

On August 3, 2022, Plaintiffs filed the Complaint, alleging that D.C. Code § 7-2506.01(b) violates the Second and Fifth Amendments of the Constitution.  *See* Complaint at 22.  On August 19, 2022, Plaintiffs filed an application for a preliminary injunction.  Application for Preliminary Injunction [8].  After that application was fully briefed, the Court held oral argument on April 13, 2023.  On April 20, 2023, the Court issued a memorandum opinion and order denying Plaintiffs' application for a preliminary injunction.  Order Denying Plaintiffs' Motion

**APP. 1062**

for a Preliminary Injunction [27]; Memorandum Opinion Denying Plaintiff's Motion for a

Preliminary Injunction [28].  Plaintiffs intend to appeal this Court's decision.

## LEGAL STANDARD

A court has inherent, discretionary power to stay a case to control its own docket.  *Landis*

*v. North American Co.*, 299 U.S. 248, 254 (1936).  "In 'the exercise of its judgment,' the Court

must 'weigh competing interests and maintain an even balance' between the court's interests in

judicial economy and any possible hardship to the parties."  *Ctr. v. Biological Diversity v. Ross*,

419 F. Supp. 3d 16, 20 (D.D.C. 2019) (quoting *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d

724, 732–33 (D.C. Cir. 2012) (alterations omitted)).  Courts may also consider the public interest

in considering whether to grant a stay.  *See Feld Entm't, Inc. v. ASPCA*, 523 F. Supp. 2d 1, 5

(D.D.C. 2007).  Courts identifying and weighing competing interests must "make such

determinations in the light of the particular circumstances of the case."  *Hulley Enters. v. Russian*

*Fed'n*, Case No. 14-1996, 2020 U.S. Dist. LEXIS 219208, *14 (D.D.C. Nov. 20, 2020) (quoting

*SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980)).  Ultimately a district court's

authority to stay proceedings to control its own docket is "broad" and subject to review only as

an abuse of discretion.  *See Clinton v. Jones*, 520 U.S. 681, 706–07 (1997).

## ARGUMENT

The balance of interests, judicial economy, and the public interest each favor a stay

pending appeal in this case.  All Parties request that litigation in this case be stayed pending

appeal, and no Party will be harmed by a stay.  Instead, a stay will preserve the Parties' resources

and maintain the status quo while Plaintiffs' appeal of the denial of their application for

preliminary injunction is ongoing.

The resolution of Plaintiffs' requested preliminary injunction, and this case, largely turns

**APP. 1063**

on the interpretation and application of *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S.

Ct. 2111 (2022). *Bruen* is a recent and significant Second Amendment decision that the Circuit

has not yet applied or interpreted. Any decision on appeal is very likely to provide guidance on

the core legal issues of this case, thereby significantly impacting the course of the litigation and

discovery. As courts have repeatedly recognized, a stay pending appeal is particularly warranted

where the legal issue presented is novel or significant. *See Ctr. for Int'l Evntl. Law v. Office of*

*the United States Trade Representative*, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (granting stay

pending appeal party because the case presented an "issue of first impression" and the first to

involve application of a recent Supreme Court decision); *see also Al Maqaleh v. Gates*, 620 F.

Supp. 2d 51, 56 (D.D.C. 2009) (discussing that the "novel and weighty" issues presented favored

granting a stay pending appeal); *Philipp v. Fed. Rep. of Germany*, 436 F. Supp. 3d 61, 66

(D.D.C. 2020) ("so long as the other factors strongly favor a stay, [a stay of proceedings] is

appropriate if [a] 'serious legal question is presented'") (quoting *Loving v. IRS*, 920 F. Supp. 2d

108, 110 (D.D.C. 2013)). That is the case here.

  The Parties do not seek to stay an order of this Court from going into effect, but instead

"seek a decision to stay discovery [and further litigation], . . . pending a D.C. Circuit

determination that almost certainly will affect discovery [and future litigation]." *Loumiet v.*

*United States*, 315 F. Supp. 3d 349, 353 (D.D.C. 2018). Thus, a stay here "would avoid

potentially 'fractured and disorderly' and unnecessary litigation and best preserve judicial and

parties' resources . . . .'" *Hulley*, 2020 U.S. Dist. LEXIS 219208, at *19 (quoting *Seneca Nation*

*of Indians v. U.S. Dep't of Health & Hum. Servs.*, 144 F. Supp. 3d 115, 119 (D.D.C. 2015)). As

courts have recognized, "subjecting a party to duplicative and wasteful litigation exercises is a

significant harm." *In re Rail Freight Fuel Surcharge Antitrust Litigation*, 286 F.R.D. 88, 93

**APP. 1064**

(D.D.C. 2012).  Further, it is not in the public interest for the Parties or the Court to spend

resources on unnecessary or duplicative litigation.  Because any Circuit opinion on appeal is very

likely to impact the course of this litigation, it would preserve judicial and party resources and

promote the public interest to stay the litigation until the appeal is resolved.

## CONCLUSION

For the foregoing reasons, the Court should grant the Parties' Joint Motion to Stay

Proceedings Pending Appeal.

Dated: May 3, 2023.                                    Respectfully Submitted,

*/s/ George L. Lyon, Jr*                               BRIAN L. SCHWALB
George L. Lyon, Jr. (D.C. Bar No. 388678)              Attorney General for the District of Columbia
Arsenal Attorneys
4000 Legato Road, Suite 1100                           STEPHANIE E. LITOS
Fairfax, VA 22033                                      Deputy Attorney General
202-669-0442, fax 202-483-9267                         Civil Litigation Division
gll@arsenalattorneys.com
                                                       */s/ Matthew R. Blecher*
Matthew J. Bergstrom (D.C. Bar No. 989706)             MATTHEW R. BLECHER [1012957]
Arsenal Attorneys                                      Chief, Equity Section, Civil Litigation Division
4000 Legato Road, Suite 1100
Fairfax, VA 22033                                      */s/ Andrew J. Saindon*
800-819-0608                                           ANDREW J. SAINDON [456987]
mjb@arsenalattorneys.com                               Senior Assistant Attorney General
                                                       MATEYA B. KELLEY [888219451]
                                                       RICHARD P. SOBIECKI [500163]
*Attorneys for Plaintiffs*                             HELEN M. RAVE [90003876]
                                                       Assistant Attorneys General
                                                       400 6th Street, NW
                                                       Washington, D.C. 20001
                                                       Phone: (202) 724-6643
                                                       Email: andy.saindon@dc.gov

                                                       *Counsel for Defendants*

4

**APP. 1065**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ANDREW HANSON | ) | |
| | ) | |
| TYLER YZAGUIRRE | ) | |
| | ) | |
| NATHAN CHANEY | ) | |
| | ) | |
| ERIC KLUN | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-2256 RC |
| | ) | |
| DISTRICT OF COLUBIA | ) | |
| | ) | |
| ROBERT J. CONTEE, III, | ) | |
| | ) | |
| Appellees. | ) | |

**NOTICE OF APPEAL**

Plaintiffs Hanson, Yzaguirre, Chaney and Klun appeal to the United States

Court of Appeals for the District of Columbia Circuit from the District Court Order

(ECF 27) and Memorandum Opinion (ECF 28) denying a preliminary injunction in

this proceeding,  entered on April 20, 2023.

**APP. 1066**

Respectfully submitted,

/s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com
*Attorneys for Plaintiffs*

May 16, 2023

### CERTIFICATE OF SERVICE

I, George L. Lyon, Jr., a member of the bar of this court, certify that I served the foregoing document on all counsel of record in this proceeding via the Court's electronic filing system, this 16th day of May, 2023.

/s/ George L. Lyon, Jr., DC Bar 388678