NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

No. 23-7061

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

ANDREW HANSON, *et al.*,
APPELLANTS,

v.

DISTRICT OF COLUMBIA, *et al.*,
APPELLEES.

———————————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

SONYA L. LEBSACK
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5667
sonya.lebsack@dc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.    *Parties and amici.*—Plaintiffs below and appellants here are Andrew Hanson, Tyler Yzaguirre, Nathan Chaney, and Eric Klun.  Defendants below and appellees here are the District of Columbia and Metropolitan Police Department Chief of Police Pamela A. Smith, who has succeeded Ashan M. Benedict as Chief of the Metropolitan Police Department.  In the district court, Brady, Giffords Law Center to Prevent Gun Violence, and March for our Lives filed an amicus brief in support of the District.

B.    *Rulings under review.*—Appellants appeal the opinion and order denying them preliminary injunctive relief entered by U.S. District Judge Rudolph Contreras on April 20, 2023.  ECF Record Document ("RD") 27 & 28.

C.    *Related cases.*—This case has not previously been before this Court or any other court.  Counsel is unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

Cases involving restrictions on large capacity magazines are percolating through the federal courts. *See Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027 (D. Or. July 14, 2023) (denying permanent injunction), *appeal docketed*, Nos. 23-35478 (9th Cir. July 17, 2023), 23-35479 (9th Cir. July 17, 2023), 23-35539 (9th Cir. Aug. 15, 2023), 23-35540 (9th Cir. Aug. 15, 2023); *Brumback v. Ferguson*, 2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) (denying preliminary injunction); *Nat'l Ass'n*

*of Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) (same), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (same), *appeal docketed*, No. 23-1793 (7th Cir. Apr. 26, 2023); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 2023 WL 2655150 (D. Del. Mar. 27, 2023) (same), *appeal docketed*, No. 23-1634 (3d Cir. Apr. 7, 2023); *Bevis v. City of Naperville*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (same), *appeal docketed*, No. 23-1353 (7th Cir. Feb. 23, 2023); *Ocean State Tactical LLC v. Rhode Island*, 646 F. Supp.3d 368 (D.R.I. 2022) (same), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023); *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp.3d 782 (D. Or. 2022) (same), *appeal dismissed*, No. 22-36011 (9th Cir. Dec. 12, 2022); *Duncan v. Bonta*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) (granting permanent injunction), *appeal docketed*, No. 23-55805 (9th Cir. Sept. 22, 2023), *injunction stayed pending appeal* (9th Cir. Oct. 10, 2023) (en banc); *Barnett v. Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) (granting preliminary injunction), *appeal docketed*, No. 23-1825 (7th Cir. May 1, 2023), *injunction stayed pending appeal* (7th Cir. May 12, 2023).

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE....................................................................2

    1.    In Response To The Threat Posed By Enhanced Firepower, The District Prohibits Large Capacity Magazines ......................................2

    2.    This Court Upholds The District's Law Against A Second Amendment Challenge .........................................................................5

    3.    The U.S. Supreme Court Decides *New York State Rifle & Pistol Association v. Bruen*......................................................................6

    4.    The District Court Denies Plaintiffs A Preliminary Injunction ...........8

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT ..............................................................................................16

    I.    The District Court Correctly Determined That Plaintiffs Were Not Likely To Succeed On The Merits Because They Failed To Show That The Law Regulates Conduct Protected By The Second Amendment ..............................................................................17

        A.    Large capacity magazines are not "Arms" ...............................18

        B.    Large capacity magazines are not in common use for self-defense .................................................................................21

    II.    The District Court Correctly Determined That Plaintiffs Were Not Likely To Succeed On The Merits Because The District's Law Is Consistent With The Nation's Historical Tradition of Firearm Regulation......................................................................29

        A.    The district court properly found on the record before it that the more "nuanced" approach to analogical reasoning applies .......................................................................................30

B.    The district court properly concluded that, when compared to historical regulations, the District's Law imposes a comparable burden on the right of armed self-defense and is comparably justified ............................................................35

1.    There is an established tradition throughout American history of targeting dangerous and unusual weapons and accessories ...................................36

2.    Firearms with large capacities have always been regarded as dangerous and unusual ...............................39

3.    The District's Law imposes a comparable burden on the right of armed self-defense and is comparably justified .........................................................45

III.   In The Alternative, Plaintiffs Have Not Met Their Burden On The Remaining Preliminary Injunction Factors ................................47

A.    Plaintiffs have not shown that they will suffer irreparable harm...........................................................................48

B.    Plaintiffs have not shown that the equities balance in their favor .........................................................................50

CONCLUSION .......................................................................54

# TABLE OF AUTHORITIES*

## *Cases*

*Ambach v. Bell*,
 686 F.2d 974 (D.C. Cir. 1982) .......................................................... 17

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
 910 F.3d 106 (3d Cir. 2018) ....................................................... 20, 21

*Atkinson v. Garland*,
 70 F.4th 1018 (7th Cir. 2023) ........................................................... 52

*Barnett v. Raoul*,
 No. 23-1825, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ............................... 52

*Benisek v. Lamone*,
 138 S. Ct. 1942 (2018) .................................................. 16, 47, 49, 52

*Brown v. Maryland*,
 25 U.S. 419 (1827) ........................................................................ 38

*Caetano v. Massachusetts*,
 577 U.S. 411 (2016) .................................................................. 22, 23

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ...................................................................... 53

*Chaplaincy of Full Gospel Churches (CFGC) v. England*,
 454 F.3d 290 (D.C. Cir. 2006) ..................................................... 48, 50

*CityFed Fin. Corp. v. Off. of Thrift Supervision*,
 58 F.3d 738 (D.C. Cir. 1995) ........................................................... 47

*Cobell v. Norton*,
 391 F.3d 251 (D.C. Cir. 2004) ......................................................... 53

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

v

*CTS Corp. v. EPA*,
    759 F.3d 52 (D.C. Cir. 2014) ............................................................. 22

*District of Columbia v. Air Fla., Inc.*,
    750 F.2d 1077 (D.C. Cir. 1984) ....................................................... 18

\*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ........................................... 5, 6, 7, 8, 12, 15, 17, 18, 19, 21,
                        22, 23, 24, 25, 27, 36, 37, 38, 45, 46

*Duncan v. Bonta*,
    No. 23-55805, 2023 WL 6588623 (9th Cir. Oct. 10, 2023) ............... 52

*Duncan v. Bonta*,
    No. 17-CV-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) .................... 10

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ....................................................... 48, 49

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ....................................................... 24, 26

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ............................................................. 49

*Gov't of Manitoba v. Bernhardt*,
    923 F.3d 173 (D.C. Cir. 2019) ....................................................... 18

\*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) .................... 5, 6, 7, 8, 10, 12, 15, 24, 25, 40, 47

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ............................................... 12-13, 26

*Lomont v. O'Neill*,
    285 F.3d 9 (D.C. Cir. 2002) ............................................................. 43

*Maryland v. King*,
    567 U.S. 1301 (2012) ....................................................................... 50

*McCullen v. Coakley*,
  573 U.S. 464 (2014)..................................................................... 35

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)................................................................. 5, 21

*New York State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022)............................ 1, 6, 7, 8, 15, 17, 18, 19, 20, 21, 25, 29,
                                          30, 34, 35, 36, 37, 39, 43, 44, 45, 46

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................... 50

*Ocean State Tactical LLC v. Rhode Island*,
  646 F. Supp.3d 368 (D.R.I. 2022) ................................................ 40

*Or. Firearms Fed'n v. Kotek*,
  No. 22-CV-1815, 2023 WL 4541027 (D. Or. July 14, 2023) .................... 27, 53

*Or. Firearms Fed'n, Inc. v. Brown*,
  644 F. Supp.3d 782 (D. Or. 2022) ................................................ 6

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007)...................................................... 23

*People v. Brown*,
  235 N.W. 245 (Mich. 1931)......................................................... 42

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022)................................................ 16, 17, 50

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ...................................................... 18

*United States v. Cox*,
  906 F.3d 1170 (10th Cir. 2018) .................................................... 19

*United States v. Daniels*,
  77 F.4th 337 (5th Cir. 2023) ....................................................... 52

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ................................................... 23

*United States v. Miller*,
    307 U.S. 174 (1939) ............................................................ 24

*United States v. Sitladeen*,
    64 F.4th 978 (8th Cir. 2023) ................................................. 7

*United States v. Woodfolk*,
    656 A.2d 1145 (D.C. 1995) .................................................. 3

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ............................................................ 53

*Winter v. NRDC*,
    555 U.S. 7 (2008) ................................................................ 16

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................. 48

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ..................................................26

## Constitutional Provisions

U.S. Const. amend. II ................................. 8, 14, 17, 18, 20, 21, 24-25, 29

U.S. Const. amend. V ................................................................8

## Statutes and Rules

D.C. Code § 7-2501.01 ............................................................ 3

D.C. Code § 7-2506.01 ...................................................... 3, 4, 9

D.C. Code § 22-4514 .............................................................. 3

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650 (1932)...................... 3, 41, 42

Pub. L. No. 73-474, 48 Stat. 1236 (1934).................................................. 43

1686 N.J. 289 ch. 9 .................................................................... 37

1763-1775 N.J. Laws 346, ch. 539 (1771)................................... 37

1784 Laws of N.Y. 627, ch. 28 .................................................. 38

1927 Mass. Acts 413, ch. 326 ............................................... 41, 42

1927 Mich. Pub. Acts 888 .................................................... 41, 42

1927 R.I. Pub. Laws 256, ch. 1052 ...................................... 41, 42

1933 Minn. Laws 231, ch. 190 ............................................. 41, 42

1933 Ohio Laws 189 ............................................................ 41, 42

1934 Va. Acts 137, ch. 96.................................................... 41, 42

1 Wm. & Mary 2d. Sess. ch. 2 (1689) ...................................... 36

7 Rich. 2, ch. 13 (1383).............................................................. 36

33 Hen. 8, ch. 6 (1541).............................................................. 36

D.D.C. R. 65.1 ........................................................................... 10

## Legislative History

Comm. on Pub. Safety and the Judiciary, D.C. Council, Report on Bill 17-843 (2008).................................................................................4

H.R. 9066, 3d Cong., 2d Sess. (1934) .......................................43

*National Firearms Act: Hearings on H.R. 9066 Before the House Comm. on Ways and Means*, 73d Cong., 2d Sess. (1934) ...................................43

S. Rep. No. 72-575 (1932) ....................................................3, 42

## Other Authorities

ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021* (2021)............................................................................... 23

Black's Law Dictionary (11th ed. 2019) ................................................ 27

Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public:
Safety in Early America*, 44 Willamette L. Rev. 699 (2008) ........................... 31

David B. Kopel, *The History of Firearm Magazines and Magazine
Prohibitions*, 78 Alb. L. Rev. 849 (2015) .............................................. 30, 31, 34

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence &
Nature of Self-Defense with a Gun*,
86 J. Crim. L. & Criminology 150 (1995) ............................................ 23

John L. Plaster, *The History of Sniping and Sharpshooting* (2008) .................... 31

Lewis Winant, *Firearms Curiosa* (2009) ................................................ 32

Matthew Green, *Gun Groups: More Than a Million High-Capacity
Magazines Flooded California During Weeklong Ban Suspension*, KQED
(Apr. 12, 2019) ...................................................................... 51

NRA Museums, *Bennett & Haviland Many Chambered Revolving Rifle* ............. 32

Robert J. Spitzer, *Gun Law History in the United States and Second
Amendment Rights*, 80 J. L. & Contemp. Probs. 55 (2017) ........................ 40, 42

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual":
Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016) ........................... 36

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early
American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ................ 38

William English, *2021 National Firearms Survey: Updated Analysis
Including Types of Firearms Owned* (May 13, 2022) ........................................ 28

# GLOSSARY

LCM                Large Capacity Magazine, specifically a "large capacity ammunition feeding device" as defined in D.C. Code § 7-2506.01(b)

RD                ECF Record Document

## INTRODUCTION

The District of Columbia prohibits the possession of large capacity magazines ("LCMs"). While firearms and magazines permitted in the District together require a user to reload after firing 11 rounds, LCMs enable a user to continuously fire between 12 and 100 rounds without reloading. This feature allows a lone person to quickly kill or wound swaths of people without pause. It is therefore little surprise that LCMs have enabled some of the deadliest mass shootings in history.

Plaintiffs are four concealed-carry licensees who lawfully carry semi-automatic pistols with magazines of 10 or fewer rounds for personal protection while in the District, and who lawfully keep other firearms for home- and self-defense. Nevertheless, they ask this Court to strike down the District's prohibition on LCMs and newly declare a constitutional right to possess LCMs under the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). Under plaintiffs' theory, *Bruen* prevents governments from prohibiting any weapon configuration that is "commonly possessed," no matter how lethal or unrelated to self-defense. That proposition is as extreme as it is wrong. The District's prohibition on LCMs, which this Court upheld more than a decade ago, satisfies *Bruen*'s text-and-history framework. The district court properly weighed the evidence when it determined that plaintiffs' undoubted right to engage in armed self-defense did not stretch to encompass LCMs.

What is more, plaintiffs ask this Court to break new legal ground prematurely, through the drastic remedy of a preliminary injunction. But even if there were any doubt on the merits, plaintiffs will not suffer irreparable harm in the absence of such an injunction, as evidenced by their consent to a stay in the district court pending this appeal. And were this Court to preliminarily enjoin the District's prohibition, it would work an immediate, practical, and severe reversal of the status quo, allowing LCMs to surge into the District with their augmented firepower endangering residents and law enforcement officers alike. For all these reasons, this Court should affirm the district court's order and plaintiffs' challenge should be litigated on the merits in the ordinary course.

## STATEMENT OF THE ISSUES

The question presented is whether the district court properly refused to preliminarily enjoin the District's prohibition on large capacity magazines because plaintiffs are unlikely to succeed on their Second Amendment claim, they have failed to show any irreparable injury, and the equities do not favor preliminary relief.

## STATEMENT OF THE CASE

**1.  In Response To The Threat Posed By Enhanced Firepower, The District Prohibits Large Capacity Magazines.**

The District of Columbia and 14 states—which represent more than one third of the U.S. population—currently limit the capacity of ammunition magazines in order to avert the use of augmented firepower that is best suited for, and results in,

mass casualties. *See* Multistate Amicus Br. at 5 & tbl. 1 (collecting statutes). As just one example, these limits prevent a standard semiautomatic handgun, which can be bought for less than $200, from firing 30 rounds *in five seconds*. App.474 (Roth ¶49).

The District's prohibition on this uniquely dangerous firearm enhancement (the "Law"), D.C. Code § 7-2506.01(b), has been in effect since 2009.[1] The Law bars the possession, sale, or transfer of any "large capacity ammunition feeding device," commonly known as a large capacity magazine ("LCM"):

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.

*Id*. When fully loaded with ammunition and inserted into a compatible firearm, an LCM makes a firearm that was previously capable of continuously firing up to 11

---

[1]    Prior to 2009, the District prohibited the possession of any "firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654 (1932), *previously codified at* D.C. Code §§ 7-2501.01(10)(B), 22-4514(a) (2008). The purpose of the law was to "[p]rohibit[] . . . weapons for which there is no legitimate use," and the National Rifle Association was "in thorough accord with [its] provisions." S. Rep. No. 72-575, at 2, 5-6 (1932); *see United States v. Woodfolk*, 656 A.2d 1145, 1148 (D.C. 1995) (citing Congress's intent to "prohibit[] . . . carrying particularly dangerous weapons within the District of Columbia" (cleaned up)).

rounds (10 in the magazine plus one in the chamber) before reloading into a firearm capable of continuously firing between 12 and 100 rounds before reloading.

The Law was intended "to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload." Comm. on Pub. Safety and the Judiciary, D.C. Council, Report on Bill 17-843, at 2 (2008). In recommending the Law, the Committee explained that "magazines holding[] over 10 rounds are more about firepower than self-defense" and that "[l]imiting fire power" can provide a "critical benefit to law enforcement" and is particularly warranted "given homeland security issues in the District." *Id*. at 9.

The Law exempts large capacity tubular magazines with rimfire ammunition typically used for target shooting. D.C. Code § 7-2506.01(b). And it imposes no limit on the type or number of magazines that a person can possess. *See id*. There is also no dispute that most firearms—and all of the firearms possessed by plaintiffs—operate with magazines that hold 10 or fewer rounds. *See* App.185 (Amodeo ¶27 ("Each of [plaintiffs'] firearms is fully functional when used with a magazine with a capacity of 10 rounds or less.")); App.131-34 (Pls.' Answers and Objections to Defs.' First Set of Interrogs. (same)); App.1053 (acknowledging plaintiffs' admission that their firearms are "all equipped with magazines that are not LCMs" (citation omitted)).

4

**2.    This Court Upholds The District's Law Against A Second Amendment Challenge.**

In 2011, this Court upheld the Law under the Second Amendment. *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1262 (D.C. Cir. 2011). Applying the two-step framework then in use throughout the federal courts of appeals, the Court first sought to determine "whether [the Law] impinges upon a right protected by the Second Amendment." *Id*. at 1252. "[P]rohibiting certain arms might not meaningfully 'affect individual self-defense, which is the central component of the Second Amendment right,'" the Court explained, because a recognized "limitation on the right to keep and carry arms" is that it protects only the "sorts of weapons . . . in common use at the time for lawful purposes like self-defense." *Id*. at 1260 (cleaned up) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), and *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008)).

Ultimately, however, this Court assumed without deciding that the Law satisfied this first step because, while the record before it indicated that millions of LCMs were *possessed*, the Court could not "be certain whether [LCMs] are commonly used or are useful specifically *for self-defense*." *Id*. at 1261 (emphasis added). If the prohibited weapons are not "typically possessed by law-abiding citizens for lawful purposes," the Court stated, "then they are not the sorts of 'Arms' protected by the Second Amendment." *Id*. at 1260 (quoting *Heller*, 554 U.S. at 625); *see id*. at 1296 n.20 (Kavanaugh, J., dissenting) (agreeing that "[i]n order to apply

*Heller*'s test . . . , we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use" and stating that he would have "remand[ed] . . . for analysis of that issue"). The Court therefore moved to the second step of the framework and, applying intermediate scrutiny, held that the Law "[did] not violate the plaintiffs' constitutional right to keep and bear arms." *Id*. at 1264. Ultimately, six other courts of appeals upheld similar restrictions. *See Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 796 (D. Or. 2022) (collecting cases).

**3.    The U.S. Supreme Court Decides *New York State Rifle & Pistol Association v. Bruen*.**

A decade later, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*. The Court in *Bruen* rejected as "one step too many" the courts of appeals' reliance on means-end scrutiny, but it preserved the first step of the framework as "broadly consistent with *Heller*." 142 S. Ct. at 2127. Specifically, the Court underlined that whether the challenged law regulates conduct covered by "the Second Amendment's plain text," *id*. at 2129, involves both textual and historical showings given that "the right secured by the Second Amendment is not unlimited," and that "the historical understanding of the Amendment" serves "to demark the limits on the exercise of that right." *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626). Applying the "plain text" inquiry, the Court held that the "handguns"

6

the prospective licensees wished to carry were "weapons 'in common use' today for self-defense." *Id.* at 2134 (quoting *Heller*, 554 U.S. at 627).

If the challenged law regulates covered conduct, the Court continued, "the Constitution presumptively protects [it]," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130.[2]  To demonstrate such a tradition, however, the challenged law need not be either a "historical *twin*" or "a dead ringer for historical precursors." *Id*. at 2133.  This is because some "regulatory challenges posed by firearms today" differ from those that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and thus "require a more nuanced approach." *Id*. at 2132.  In those circumstances, a court should ask whether the law "impose[s] a comparable burden on the right of armed self-defense" and is as "comparably justified" as a "well-established and representative historical *analogue*." *Id*. at 2133.  And in conducting this analysis, the Court instructed lower

_____

[2]    The Court's rejection of means-end scrutiny abrogated many decisions upholding LCM prohibitions, including this Court's holding in *Heller II*.  But to the extent that these courts "summarize[d] *Heller*'s methodological approach," *id*. at 2127—as this Court did in *Heller II*—the decisions retain "persuasive weight." App.1030; *cf. United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) ("[W]e did not reach our conclusion . . . by engaging in means-end scrutiny. . . . Therefore, we remain bound by [our pre-*Bruen* decision].").  In addition, these courts' surveys of the historical record and their factual findings are consistent with the *Bruen* framework.  The District cites these decisions for these limited purposes—as do plaintiffs.  *See* Br. 5, 22.

courts to rely on "various evidentiary principles and default rules to resolve uncertainties." *Id.* at 2130 n.6 (internal quotation marks omitted).

The Court emphasized that, under this newly annunciated framework, there is still no "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). And Justice Kavanaugh, joined by Chief Justice Roberts, wrote separately to underline the "limits of the Court's decision" and to reiterate *Heller*'s recognition that an "important limitation on the right to keep and carry arms" includes "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* at 2161-62 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 627).

## 4.  The District Court Denies Plaintiffs A Preliminary Injunction.

Two months after the Court's decision in *Bruen*, four residents of the Washington metropolitan area brought this action claiming that, under *Bruen*, the District's Law violated the Second Amendment and the Due Process Clause. *See* App.30 (Compl. ¶¶59-61).[3]   Plaintiffs asserted that they had licenses to carry concealed handguns and wanted to "possess and use" LCMs with their handguns and with other firearms within the District of Columbia for lawful purposes,

---

[3]    The District does not dispute the district court's conclusion that Plaintiff Tyler Yzaguirre has "demonstrated a substantial likelihood of standing because he was denied registration for a firearm on the ground that its magazine had a 12-round capacity." App.1029 (citing *Heller II*, 670 F.3d at 1249); *see* ECF Record Document ("RD") 16-1 (Yzaguirre Decl.).

including for self-defense.  *See* App.10-11 (Compl. ¶¶1-4).  Plaintiffs made no effort to differentiate among LCMs, which can range in size from 11 to 100 rounds. Notably, outside the District, plaintiffs themselves possess LCMs with a maximum capacity of 21 rounds or less.  App.131-34.[4]

Plaintiffs moved to preliminarily enjoin the Law based solely on their Second Amendment claim.  App.35-69.  In support of their request for this extraordinary relief, plaintiffs attached no evidence to their memorandum and made only a few points in support of their likelihood of prevailing on the merits.  They claimed that a "necessary component" of their Second Amendment right was "the right to possess and carry ammunition."  App.46.  They also asserted that LCMs are "commonly owned" because "[l]aw-abiding citizens own tens of millions of [them]." App.46-47.  And they contended that, because "no regulations from around the time of the adoption of the Second or for that matter the 14th Amendments limited the ammunition capacity of a firearm," App.60, the District's Law was not part of any "historic tradition in this nation of *limiting firearm magazine capacity*," App.62 (emphasis added).  As for the remaining preliminary injunction factors, plaintiffs relied on their purported likelihood of success.  App.62-65; *see* ECF Record

---

[4]     Despite passing remarks that they were facially challenging the District's Law, *see* App.15, 30 (Compl. ¶¶22, 60); App.48, plaintiffs have not attempted to establish standing for, or to support any argument related to, the District's prohibition on the "sell[ing]" or "transfer" of LCMs, D.C. Code § 7-2506.01(b).

Document ("RD") 24 at 9 ("Since Plaintiffs are likely to prevail on the merits [of] their constitutional claim, the remaining preliminary injunction factors necessarily fall in their favor."). They also urged the court to enter a permanent injunction. App.67-68; *see* RD 24 at 42-43.[5]

Attaching 10 expert declarations in support, the District responded that plaintiffs were unlikely to succeed on the merits, and, in any event, no injunction should issue. To start, plaintiffs had failed to show that the Second Amendment protected their possession of LCMs because an LCM is neither an "Arm[]," nor is its *large capacity* integral to a firearm's operation. App.87-90 (citing App.142-43, 150, 155-56, 160 (Baron); App.181-85 (Amodeo)). And anyway, this Court in *Heller II*, relying on the Supreme Court's decision in *Heller*, had already rejected that common possession was sufficient to establish that LCMs are protected by the Second Amendment. On the relevant question—whether LCMs are "'commonly used or are useful specifically for self-defense'"—plaintiffs had built no record. App.93 (quoting *Heller II*, 670 F.3d at 1261). Moreover, evidence submitted by the District showed that "examples of a civilian firing more than ten rounds in self-

---

[5]     Plaintiffs attached to their reply five declarations filed in *Duncan v. Bonta*, No. 17-CV-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023), as well as other declarations and exhibits. *See* App.564-985. Despite the clear violation of the court's rules, *see* D.D.C. R. 65.1(c), the district court considered "all" of this material, App.1028. Even if that consideration were error, plaintiffs now cite this material just twice, *see* Br. 12 n.8, 13—rendering any error insignificant.

defense (let alone needing to do so without pause) are vanishingly rare," App.96 (citing cases and studies), and that continuous rapid fire was developed and suited for military use, App.93-94 (citing App.238-39 (Pauly), App.258-59 (DeLay), App.268-69 (Spitzer), App.470-73 (Roth), App.498-99 (Rivas)).

Similarly misplaced, the District argued, was Plaintiffs' reliance on the absence of limits on "the ammunition capacity of a firearm" at the Founding and Reconstruction.  App.60.  Through the end of the Civil War, *single-shot* firearms were ubiquitous.  *See* App.100-03 (citing App.252, 255, 258 (DeLay); App.523-24, 527-30, 539 (Sweeney); App.268-69, 277-83 (Spitzer); App.453-54 (Roth); App.221-22, 231-32 (Pauly); App.494-95 (Rivas)).  Only once this changed through dramatic developments in firearms technology, which "dramatically increased the number of persons who could be killed or wounded by a lone person," App.104, did legislatures "adopt laws to address the problems [of mass shootings] that confront[ed] them," App.104-05 (citation omitted).  Moreover, those laws, the District explained, of which its Law is a part, are all cut from the same cloth: Legislatures from at least the Founding era onward have always regulated particular weapons, weapons accessories, and weapons configurations thought to be unusually dangerous—from gunpowder storage and trap gun laws in the 18th century, to knives and pistols in the 19th century, to restrictions on automatic and semiautomatic firing capacity in the early 20th century.  *See* App.105-17.

Finally, the District argued, plaintiffs had offered no support—independent of their claimed likelihood of success of the merits—for the remaining preliminary injunction factors. App.117-20. Their motion thus failed. As did their request for a *permanent* injunction. App.121-23.

After hearing argument on the motion, *see* App.986-1018, the district court denied plaintiffs all of the injunctive relief they had sought because they had failed to show a likelihood of success on the merits. App.1029-30. Although the court concluded that an LCM is an "[A]rm[]" because a *magazine* is necessary for the firearm to function, App.1030-33, the court held that LCMs are not "typically possessed for self-defense," App.1043 (paraphrasing *Heller*), because they are not "commonly used or . . . useful specifically for" that purpose, App.1034 (quoting *Heller II*, 670 F.3d at 1261). "[C]ivilians do not 'use' LCMs for self-defense," the district court determined, because "the added benefit of [an LCM]—being able to fire more than ten bullets in rapid succession—has virtually never been realized." App.1042 (cleaned up); *see* App.1039-43 (citing cases, studies, and declarations). Rather, the court reasoned, crediting the record built by the District, LCMs are "*most useful in military service*," App.1036 (emphasis in original) (quoting *Heller*, 554 U.S. at 627), because of their "'ability to reload rapidly,' 'hit multiple human targets very rapidly,' and 'deliver extraordinary firepower,'" App.1037 (quoting *Kolbe v.*

*Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc)); *see* App.1038-39 (citing App.257-59 (DeLay); App.237 (Pauly); App.473-74 (Roth)).

"Although that alone resolves the case," the district court held, App.1029-30, plaintiffs were also unlikely to succeed on the merits of their claim because the District demonstrated that its Law "is consistent with this country's historical tradition of firearm regulation."  App.1044.  The lack of laws limiting firearm magazine capacity at the Founding was not dispositive, the court determined, because the District had demonstrated that prior to the ratification of the Fourteenth Amendment, firearms with an ammunition capacity in excess of 10 rounds "were experimental, designed for military use, rare, defective, or some combination of these features."  App.1048 (citation omitted); *see* App.1046-49 (citing App.249, 252-58 (DeLay); App.529-30, 538-39 (Sweeney); App.232 (Pauly); App.494-95 (Rivas)).  "[I]t would make no sense," the court concluded, "to divine constitutional significance from non-existent legislation concerning non-existent problems." App.1056.  Thus, a more "nuanced" approach to identify relevantly similar analogues was warranted.  App.1044, 1051 (citation omitted).

The court then examined "one such historical analogue" from among those the District had proffered: numerous states' Prohibition-era restrictions on high-capacity weapons that could fire rapidly without reloading.  App.1051-54.  Noting that *Bruen* had "left open the possibility that in an appropriate case, 20th century

13

history that is not contradicted by earlier evidence can illuminate a modern-day regulation's constitutional vitality," App.1055, the court determined that these laws were analogous to the District's Law.  In restricting "enhanced firing capacity" not used by "ordinary individuals" in defensive gun use, the laws imposed a comparably "light" burden on the right of armed self-defense, and in protecting the public against a particular criminal threat, were comparably justified.  App.1053-54.

The district court thus denied plaintiffs a preliminary injunction.  App.1059; *see* App.1019.[6]  On the parties' joint motion, the court also stayed proceedings until the court's further order.  Minute Order (May 4, 2023); *see* App.1063 ("All Parties request that litigation in this case be stayed pending appeal, *and no Party will be harmed by a stay*." (emphasis added)).  This appeal followed.  App.1066.

## SUMMARY OF ARGUMENT

Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction.  To start, plaintiffs are unlikely to succeed on the merits, for multiple reasons.  They failed to—and cannot—show either that LCMs are "Arms" within the meaning of the Second Amendment or that their large capacity, which only boosts a shooter's continuous firepower *beyond 11 rounds*, is a feature that is "necessary" for the firearm to "function."  In any event, as the district court

---

[6]     Seven other federal district courts examining LCM restrictions after *Bruen* have either upheld the challenged laws or concluded that they withstood a challenge for preliminary relief.  *See supra* pp. i-ii.

determined by weighing the record before it, the ability to fire between 12 and 100 rounds without pausing to reload is not "in common use for self-defense today," as almost no civilian ever fires more than a few rounds in self-defense. Plaintiffs' sole argument—that the test should instead start and stop at common *possession* of LCMs—flouts the language and reasoning in *Heller* and *Bruen*. It also contravenes this Court's decision in *Heller II*, which correctly and unanimously understood *Heller* to require more than possession for constitutional protection: LCMs must be "commonly used or . . . useful specifically for self-defense." 670 F.3d at 1261. And plaintiffs' theory makes no sense on its own terms. Under it, a law's constitutionality would hinge on arbitrary factors such as whether the law happened to be enacted *before* possession became common. That is not how any constitutional right should work.

Plaintiffs are also unlikely to succeed on the merits for the independent reason that the District's Law is consistent with the country's historical tradition of regulating dangerous and unusual weapons. As the district court correctly concluded, again weighing the record before it, the District did not need to produce a "historical *twin*" for its Law. The enhanced firepower enabled by LCMs—and its societal consequences—pose regulatory challenges unimaginable until well into the 20th century. Rather, applying the "nuanced" consideration that *Bruen* requires, the District properly identified "historical *analogues*"—indeed a whole historical

15

tradition—in which weapons that pose a heightened danger to the public in relation to ordinary weapons of self-defense are restricted, and even prohibited, to protect public safety. Measured against this tradition, the district court properly concluded that the District's Law passes constitutional muster.

Plaintiffs have also failed to demonstrate that the remaining preliminary injunction factors entitle them to relief. The irreparable harm they *presume* is unsupported by fact or argument and is defied by their own litigation conduct. The balance of equities also tips decisively against plaintiffs, given their continued ability to bear arms for self-defense, the threat that LCMs pose to the public and law enforcement officers, and the difficulty of restoring the status quo in the event of a reversal. For these reasons too, the Court should affirm the district court's order.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. NRDC*, 555 U.S. 7, 24 (2008)). Indeed, a preliminary injunction is "generally a stopgap measure meant only to preserve the relative positions of the parties until trial." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022) (cleaned up). To receive such a remedy, the moving party must "make a clear showing that (1) [they have] a likelihood of success on the merits, (2) the balance of equities favors preliminary relief, (3) an injunction is in the public interest, and (4) [they] will likely suffer irreparable harm

before the district court can resolve the merits of the case." *Id.* (internal quotation marks omitted). Moreover, the moving party faces "additional headwinds" where, as here, "the public consequences of employing the extraordinary remedy . . . will cause unusual disruption if granted in error, for example by disturbing the status quo in a way that cannot readily be undone." *Id.* at 97 (cleaned up).

Unless the district court relied on an "erroneous premise as to the pertinent law," this Court "will not ordinarily disturb the order . . . denying a preliminary injunction except for abuse of discretion or clear error" in finding the facts. *Ambach v. Bell*, 686 F.2d 974, 979 (D.C. Cir. 1982). Here, in denying plaintiffs a preliminary injunction, the district court did not rest its analysis on any erroneous premise and was not clearly wrong in the conclusions it reached.

## I.     The District Court Correctly Determined That Plaintiffs Were Not Likely To Succeed On The Merits Because They Failed To Show That The Law Regulates Conduct Protected By The Second Amendment.

The district court correctly determined that plaintiffs have no likelihood of success on the merits because they cannot meet their burden of demonstrating that their possession of LCMs is covered by the plain text of the Second Amendment. To meet that burden, plaintiffs must show that each of the "textual elements" of the Second Amendment's operative clause—a right of the "people" to "keep and bear" protected "Arms," U.S. Const. amend. II—is met. *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592); *see* Everytown Amicus Br. 2-5. In *Bruen*, only once the

17

Court was satisfied that "the plain text of the Second Amendment protect[ed]" plaintiffs' desired conduct—that the prospective licensees were both (1) "part of 'the people' whom the Second Amendment protects" and (2) that the "handguns" they wished to carry "are weapons 'in common use' today for self-defense," 142 S. Ct. at 2134—did the Court turn to whether *the government* had "justif[ied] its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," *id.* at 2129-30; *see United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (same). Here, plaintiffs have not shown that LCMs are "Arms" at all, let alone that they are in common use for self-defense.[7]

### A.    Large capacity magazines are not "Arms."

To begin, an LCM is not an "Arm[]" within the scope of the Second Amendment. As the Supreme Court explained in *Heller*, the "most natural reading" of the Second Amendment's right to "keep and bear Arms" is the right to "have *weapons*." 554 U.S. at 582 (emphasis added); *see id.* at 592 (The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case

---

[7]    In the district court, plaintiffs did not dispute that they had the burden of demonstrating that "the Second Amendment's plain text" protects their possession of LCMs or that "common use" is part of that textual inquiry. *Bruen*, 142 S. Ct. at 2128-30. In this Court, plaintiffs arguably dispute in passing their burden as to common use, Br. 22-23, 24, which is unpersuasive and insufficient. *See District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984); *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019). In any event, even if the burden *were* the District's, the District has carried it.

of confrontation."). "[P]rima facie," that term covers "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. at 581 (cleaned up); *id*. at 628 ("handguns" are "arms").

As plaintiffs nowhere dispute, an LCM is none of those things. Typically little more than a box-like shell and a spring, an LCM has no use for armed self-defense independent of being loaded with ammunition *and* attached to a compatible weapon. Thus, similar to a silencer, an LCM is "a firearm accessory . . . not a weapon in itself." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Indeed, consistent with *Heller*, those in the Founding era recognized that the word "Arms" was only a general term for swords, knives, rifles, and pistols; it did not include ammunition containers like cartridge boxes, of which LCMs are a clear descendent. App.142-60 (Baron ¶¶10-11, 26-29, 43, 46, 64) (explaining how patterns in the meaning and usage of words from the Founding and Reconstruction eras distinguish between "Arms" and "accoutrements" with each being a distinct category and used in contrast with one another). This is dispositive: "[T]he Second Amendment's definition of 'arms' is fixed according to its historical understanding," and it applies no differently to a "modern form[] of" ammunition container. *Bruen*, 142 S. Ct. at 2132; *see Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.").

19

The district court acknowledged this unrebutted textual analysis, App.1033, but it still concluded that "LCMs are 'arms'" because "magazines feed ammunition into certain guns and ammunition is necessary for such a gun to function as intended," App.1031 (quoting *Ass'n of N.J. Rifle & Pistol Clubs, Inc.* (*ANJRPC*) *v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018)).  This reasoning is mistaken.  Even assuming both that the original meaning of "Arms" includes a "corollary right to possess the tools needed to use [a weapon]," Br. 19, and that magazines are necessary to use some weapons, the operative question is whether *LCMs* are necessary, not whether magazines *as a category* are.  Were it otherwise, the fact that this is a "corollary" principle—established only when accessories are "necessary" for the firearm to "function"—would be swallowed whole.  More fundamentally, as the Court specified in *Bruen*, it is plaintiffs' "proposed course of conduct" that must satisfy all the "textual elements" of the Second Amendment's operative clause.  142 S. Ct. at 2134 (citation omitted).  And here, plaintiffs wish to possess and use LCMs as defined by the District's Law.

Applying the principle correctly, LCMs cannot possibly be "necessary" accessories.  Their "large capacity" serves only to boost a shooter's continuous firepower beyond 11 rounds.  The District's unrebutted evidence demonstrates that all of plaintiffs' firearms (and every LCM-compatible firearm of which the District is aware) can safely, effectively, and continually fire up to 11 rounds and, on

20

reloading, fire 10 more, repeated indefinitely, using available and lawful magazines. *See supra* p. 4.  To state the obvious, such firearms are not "virtually inoperable." Br. 20.  Indeed, they are both practically and constitutionally fully "bearable arms" because—even without an LCM—they are ready for self-defense "in case of confrontation." *Heller*, 554 U.S. at 582, 592; *see Bruen*, 142 S. Ct. at 2156 (looking to whether the challenged law "prevents law-abiding citizens *with ordinary self-defense needs* from exercising their right to keep and bear arms" (emphasis added)); *McDonald*, 561 U.S. at 786-87 (plurality op.) (noting that the right to keep and bear arms is not an "intrinsic" right, valued for its own sake, but "instrumental"—a means to the end of enabling armed self-defense).  Finally, nothing about this "logic" could lead to a "ban [on] *all* magazines (not just LCMs)." App.1033.  Such a categorical prohibition (unlike the District's Law) *would* make it "impossible to use firearms for their core purpose."  *ANJRPC*, 910 F.3d at 116 (internal quotation marks omitted).

**B.     Large capacity magazines are not in common use for self-defense.**

In any event, even assuming LCMs are somehow "Arms," the Second Amendment only protects "Arms" that are "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  As such, the test is

whether LCMs are in common use for self-defense today.[8]  Plaintiffs are wrong to contend that "common[] possess[ion]" of LCMs is dispositive and "should end the *Bruen* inquiry."  Br. 22; *see* Br. 22 (asserting that once "200,000" of something are owned "little more needs to be shown" (*citing Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring))).  Their contention fails under Supreme Court and this Court's precedents, and it leads to illogical, if not absurd, results.

As the ordinary meaning of the phrase "in common use for self-defense" suggests, both the Supreme Court and this Court have looked to the suitability of the weapon for self-defense and whether it is actually used for that purpose.  Start with *Heller*.  In determining that handguns were the "quintessential self-defense weapon," the Court examined the handgun's distinguishing functionality—the practical "*reasons* that a citizen may prefer [one] for home defense," including that handguns are easier to access in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police."  554 U.S. at

---

[8]    To the extent that plaintiffs argue in passing (Br. 12 & n.8) that weapons can be constitutionally protected if they are in common use for "lawful purposes" *other than* self-defense, they have failed to preserve that argument on appeal.  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) (conclusory arguments in footnotes "result[] in forfeiture").  In any event, the district court properly concluded that it had "no occasion to address that novel question" at the preliminary injunction stage because plaintiffs' counsel had "agreed at oral argument" that the "focus" was on "self-defense," and plaintiffs did not address the argument until their reply brief. App.1035.

629 (emphasis added); *see United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010) ("*Heller* distinguished handguns . . . by looking to their functionality."). The Court then noted, quoting from a decision of this Court, that handguns are, in fact, "the most preferred firearm in the nation to 'keep' *and use* for protection of one's home and family." *Heller*, 554 U.S. at 628-29 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)) (emphasis added). That quoted passage, in turn, cites a study that concluded, among other things, that almost 80% of all defensive gun uses involved handguns. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 175, 182-83, 185-86 (1995).

The Court in *Heller* also made clear that there is no Second Amendment protection for weapons that are "most useful in military service" even if they are sufficiently popular. 554 U.S. at 627. Machine guns—"M-16 rifles and the like," which can fire a continuous stream of bullets while the trigger is depressed until the magazine is empty—are such weapons. *Id*. Even though there are more registered machine guns (upward of 700,000)[9] than, for example, the 200,000 civilian-owned stun guns mentioned in Justice Alito's concurrence in *Caetano*, the Court in *Heller* explained that the Second Amendment does not protect such weapons because they

---

[9]    *See* ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021*, at 16 (2021), https://tinyurl.com/3aff4bft.

are "not typically possessed by law-abiding citizens for lawful purposes," 554 U.S. at 625. Indeed, the Court labelled "startling" the idea that "restrictions on machine guns . . . might be unconstitutional." *Id*. at 624; *see Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (noting that the Thompson submachine gun was also "all too common" before being federally prohibited).[10]

Relying on *Heller*, this Court in *Heller II*, unanimously rejected the idea that common possession was determinative. *See* 670 F.3d at 1261; *id*. at 1296 n.20 (Kavanaugh, J., dissenting). Specifically, after crediting record evidence indicating that magazines with capacities of more than 10 rounds were commonly "owned"— and were thus "in 'common use'" *in that respect*[11]—the Court declined to resolve whether LCMs are "among the 'Arms' protected by the Second Amendment" because, on the record before it, it could not "be certain whether [LCMs] are

---

[10]    The Court in *Heller* nowhere "held" that "weapons that are most useful in military service" can be banned only if they are "highly unusual in society at large." Br. 27-28 (quoting *Heller*, 554 U.S. at 627). To the contrary, the Court distinguished between weapons that are (1) most useful in the militia or military, and (2) "possessed at home" and are in "common use at the time." 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The Court's observation that an effective militia today might require "sophisticated arms that are highly unusual in society at large" was a comment on how, although "modern developments have limited the degree of fit between the prefatory clause [of the Second Amendment] and the protected right," some of today's weapons still lack constitutional protection because they are "most useful in military service." *Id.* at 627-28.

[11]    The district court acknowledged (as has the District, App.87) this Court's determination that LCMs are commonly possessed. App.1034 (quoting *Heller II*, 670 F.3d at 1261).

commonly used or are useful specifically for self-defense." *Id*. at 1261. Even then-Judge Kavanaugh, who otherwise dissented from the majority's means-end analysis, rejected that mere statistics on possession sufficed. He would have remanded to the district court because "[i]n order to apply *Heller*'s test to [the District's] prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned *and are not in common use*." *Id*. at 1296 n.20 (Kavanaugh, J., dissenting) (emphasis added).

*Bruen* does not call this analysis—or *Heller*'s—into question. The Court in *Bruen* endorsed as "broadly consistent with *Heller*" step one of the "predominant framework" then in use throughout the courts of appeals, "which demands a test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. The Court also underlined that *Heller* controlled what types of weapons the Second Amendment protects, and that the Second Amendment right is not one "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 2128 (quoting *Heller*, 554 U.S. at 626). In *Bruen*, as well as *Heller*, the Court looked to and credited how "law-abiding citizens with ordinary self-defense needs" defend themselves *in the real world*. *Id.* at 2156; *see Heller*, 554 U.S. at 594 (explaining the right as one of practical "self-preservation"). Plaintiffs' assertion (Br. 22) that common *possession* should "end the *Bruen* inquiry" is thus unpersuasive, if not foreclosed.

25

Even if this Court were writing on a blank slate—and it is not—relying on how common a weapon is at the time of the litigation is hopelessly "circular" as other courts of appeals, relying on *Heller*, have already determined. *Friedman*, 784 F.3d at 409; *see Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (such a test is "somewhat illogical"); *cf. Kolbe*, 849 F.3d at 142 ("[T]he *Heller* majority said nothing to confirm that it was sponsoring [a] popularity test."). For example, that test means that the Second Amendment would authorize the regulation of weapons simply because the government regulated those weapons before they became commonly possessed. Conversely, gun manufacturers and retailers would only need to race to make their products commonly possessed before any limitations could be enacted to forever prohibit such limitations under the Second Amendment. Plaintiffs candidly admit this reality. So long as a firearm or firearm accessory is owned by 200,000 Americans—which is 0.0006 percent of the overall U.S. population—plaintiffs would deem it constitutionally protected across the nation: "Full stop." Br. 22-23.

That is indefensible. A law prohibiting certain weapons or weapons features or accessories—and thus rendering them uncommon—would be "the source of its own constitutional validity." *Friedman*, 784 F.3d at 409. Even worse, a weapon's constitutionality would be severed from *any* analysis of whether it had ever been—or will ever be—used for lawful self-defense, which purpose is "an[] important

limitation on" the weapons that fall within the amendment's protections. *Heller*, 554 U.S. at 627.  The district court thus properly rejected plaintiffs' argument that the Supreme Court or this Court determine whether something is in common use for self-defense today by looking to whether it is commonly possessed.  Br. 22-23.

Plaintiffs fare no better when they attempt to factually equate whether LCMs are in common use for self-defense today with whether they are commonly possessed.  To start, the dictionary definition of "use" does not help them.  Br. 29.  An LCM is "used" when it is "employ[ed] . . . for the purpose for which it is adapted": the continuous firing of between 12 and 100 bullets without pause.  *Use*, Black's Law Dictionary (11th ed. 2019).  Yet, in the thousands of instances of defensive gun use every year, LCMs are almost never—and certainly not "commonly"—*used* because "law-abiding citizens on average fire only two bullets in self-defense situations and virtually never more than ten."  App.1039; *see* App.1039-43 (citing many cases and studies arriving at similar conclusions).  By contrast, "the average number of shots fired . . . in a mass shooting involving an LCM . . . *is ninety-nine*."  *Or. Firearms Fed'n v. Kotek*, No. 22-CV-1815, 2023 WL 4541027, at *34 (D. Or. July 14, 2023) (emphasis added); *see* App.1037-39 (listing reasons that LCMs are suitable for offensive purposes).

Indeed, plaintiffs' objection reduces to two sets of anecdotes.  Plaintiffs first refer in passing to "various instances," Br. 13, where it is "[l]ikely" that "[m]ore

27

[t]han 10" rounds were fired, *see* App.760-65. However, in addition to their paltry number, these anecdotes do not even specify whether the defender used an LCM. Perhaps sensing this is not enough, plaintiffs next point to more anecdotes included in an unpublished, non-peer-reviewed survey that they did not directly present to the district court. Br. 21-22 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 27 (May 13, 2022), https://ssrn.com/abstract=4109494); *see* RD 26 at 3.[12] But of the 31 responses the author reprinted, only two involved the discharge of a firearm, and neither involved defensive gun use in the context of a criminal threat. English, *Survey*, at 28-33. Even altogether, this is not remotely persuasive evidence that LCMs are in common use for self-defense. At a minimum, the district court exercised permissible discretion in determining that these questionable anecdotes did not outweigh the empirical studies and other evidence in the record. *See* App.1039-43.

Plaintiffs' remaining arguments and analogies all start from the false premise that a prohibition on LCMs—a firearm *enhancement* that is irrelevant until after an

---

[12] This survey has been criticized as methodologically unreliable when presented in time for cross-examination in the trial courts. *See, e.g.*, Deposition of Gary D. Kleck, *Or. Firearms Fed'n*, No. 22-CV-1815 (D. Or.), ECF No. 175-7 at 12-13 (Kleck "would not rely" on the survey "for any purpose"); Rebuttal Declaration of Dr. Louis Klarevas, *NAGR v. Campell*, No. 22-CV-11431 (D. Mass.), ECF No. 53-2 at 9 (English's survey "cannot be deemed reliable"). These criticisms also apply to plaintiffs' use of the survey to claim that "there are some 542 million [LCMs] currently in circulation in this Nation," Br. 21.

11th bullet has been fired—amounts to a prohibition *on possessing the firearm*. For example, plaintiffs speciously equate the use of an LCM with the use of a firearm. Br. 25-27, 31. They also argue that, because they possess handguns that are in common use for self-defense, LCMs must be in common use for self-defense also because manufacturers include LCMs with handguns at the point of sale. Br. 22, 27. But if plaintiffs were correct that everything in this case turned on the "handgun" being a staple of self-defense, *any* accessory that could be sold with or attached to it—including silencers, bump stocks, and other devices used to enhance the rate of fire—would also be constitutionally protected. That result would be even more "startling" than the one the Court in *Heller* rejected.

## II.   The District Court Correctly Determined That Plaintiffs Were Not Likely To Succeed On The Merits Because The District's Law Is Consistent With The Nation's Historical Tradition of Firearm Regulation.

The Court's analysis can and should end with the conclusion that plaintiffs have failed to demonstrate that LCMs are "Arms" or that they are in common use for self-defense today. But the Court can also affirm because the District has shown that its Law "is consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, and specifically, its tradition regulating dangerous and unusual weapons. Contrary to plaintiffs' suggestion (Br. 32), nothing permits this Court to disregard half of *Bruen*'s framework: In *Bruen*, even an agreement that handguns were in common use for self-defense did not prevent the

Court from reaching whether New York had otherwise "justif[ied] its regulation" based on historical analogues. *Id*. at 2129-30. And in any event, limiting a weapon's continuous firepower to 11 rounds is not tantamount to "a ban on common arms," Br. 33. Applying *Bruen*'s framework, the District's Law "pass[es] constitutional muster." *Id*. at 2133.

### A.  The district court properly found on the record before it that the more "nuanced" approach to analogical reasoning applies.

Plaintiffs start out by arguing that, because firearms capable of firing more than 10 rounds existed even before the Founding, the district court erred by not requiring the District to produce "a historical *twin*" for its Law, *Bruen*, 142 S. Ct. at 2133—specifically, "a long-standing, historical tradition of prohibiting" LCMs, Br. 52. *See* Br. 36 ("The key point is that [such firearms] existed."). This contention fails on multiple fronts.

To begin, "[i]n view of the record" before it, App.1048, the district court properly rejected as "misleading" and a "gross[] exaggerat[ion]" plaintiffs' claims about the prevalence of firearms or magazines capable of shooting more than 10 rounds both at and after the Founding. App.1047.[13] Such capacity may have *existed*,

---

[13]     Apart from superficial differences, that record is also the one before this Court. In the district court, plaintiffs acknowledged their reliance on a single law review article and credited "Professor David Kopel [with] the heavy lifting." App.55-56; *see* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015). Now, plaintiffs paraphrase the article but

but the weapons were "experimental, designed for military use, rare, defective, or some combination of these features" before the adoption of the Fourteenth Amendment.  App.1048 (citation omitted); *see* App.1047-49 (citing record evidence).

Several examples—focused on these periods—are demonstrative.  Plaintiffs tout the 11-charge "Puckle Gun" as "[o]ne of the more successful" 17th-century designs and compare it to "a modern revolver."  Br. 35.  But even the source on which they rely reveals that this gun was mounted on a tripod and only "[s]everal examples were manufactured."  Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 716-17 (2008); *see* App.279-80 (Spitzer ¶¶27-28).  Plaintiffs hail the "Girandoni air rifle" as being "used outside the military context" in the "early nineteenth century."  Br. 35.  But again, plaintiffs' source admits that only "[a] few [such] rifles made their way to America," John L. Plaster, *The History of Sniping and Sharpshooting* 70 (2008), and they were "so rare that owners could charge people to see them," App.1047 (quoting App.252-54 (DeLay ¶¶14-16)); *see* App.254-55 (DeLay ¶¶17-18); App.281-82 (Spitzer ¶30).  Similarly, the 12-chamber "Bennet &

---

cite directly and without attribution to the sources cited by Kopel.  *Compare* Kopel, *Magazines*, at 852-62, 866-67, *with* App.56-60 (paraphrasing and citing Kopel's article directly), *and* Br. 34-43, 50-51 (paraphrasing Kopel's article and citing his sources without attribution).

Haviland Rifle," Br. 36, was only *patented* in 1838, and "[f]ewer than ten examples [of the firearm] were produced." NRA Museums, *Bennett & Haviland Many Chambered Revolving Rifle*, http://tinyurl.com/mdejetmd. And "pin-fire revolvers," which plaintiffs describe as "popular" in the mid-19th century, Br. 39, were exported to the United States only in "small" numbers, as transporting the cartridges was "thought risky" and "severely restricted." Lewis Winant, *Firearms Curiosa* 60 (2009); *see* App.518 ("[P]infire cartridge[s] proved liable to accidental detonation and reached obsolescence by the 1870s."). Even to the extent repeating firearms "became more common in military settings in the second half of the 19th century," they were still "rare." App.1047. Such firearms, including the Winchester Model 1866, were sold "almost exclusively to military buyers" and, in any event, "constituted less than 0.2% of all firearms in the United States in the late 1860s and early 1870s." App.1047-48 (quoting App.257-58 (DeLay ¶¶23-24)); *see* App.285-86 (Spitzer ¶¶36-37).

The list could go on. But suffice to say, plaintiffs cite nothing that shows that these firearms were common in any constitutionally relevant sense. *See* App.1047-48 (district court rejecting based on record evidence that these firearms were "widespread" in the 1800s or anything but "exotic curios" at the Founding (citations omitted)). To the contrary, the historical consensus, reflected in the record before the district court, is that the only firearm "the vast majority of people ever

owned, used or encountered" at the Founding was a flintlock muzzleloader capable of firing a single lead ball. App.255 (DeLay ¶19); *see* App.523-24, 527-29 (Sweeney ¶¶4-5, 12-13); App.221-22 (Pauly ¶¶29-30, 32); App.453-54 (Roth ¶17). Similarly, "single shot guns were the ubiquitous firearm" for civilians as well as the "standard infantry weapon" for soldiers until after the Civil War. App.283-84 (Spitzer ¶34 (citation omitted)). "Even in World War I, soldiers primarily used bolt-action one-shot rifles that could fire about twelve rounds per minute." App.286 (Spitzer ¶36).

Moreover, and apart from their rarity, these firearms' repeating power "did not resemble the semiautomatic weapons of today." App.1048 (citing sources). The Roman-candle charges of the "sixteen-shooter created around 1580," the tripod-based crank operation of the Puckle Gun, and the 1,500 hand strokes needed to prime the Girandoni air rifle—to single out just a few—reflect dramatically different and inferior repeating technologies. *Compare* Br. 34-36 (identifying these firearms), *with* App.278-82 (Spitzer ¶¶26-28, 30 (describing their respective firing mechanisms)). Even the late 19th-century "users of . . . lever-action weapons were still required to pull a lever between shots, slowing the firing rate to about one shot every three seconds." App.1048 (cleaned up). And once the rifle was empty, it had to be reloaded by hand, round by round. *See* App.494-95 (Rivas ¶30). As plaintiffs' chief source acknowledges, not until near the "'turn of the 20th century' were 'the

semiautomatic firearm and its detachable box magazine [even] *invented*.'"
App.1048 (emphasis added) (cleaned up) (quoting Kopel, *Magazines*, at 857). And
the first handheld firearm with a detachable LCM commercially available to
civilians was the Thompson submachine gun in the 1920s. App.258-59 (DeLay
¶25). Handguns capable of accepting LCMs did not penetrate the U.S. market or
society *until the 1980s*. App.300-01 (Spitzer ¶¶61-62); *see* App.474-75 (Roth ¶50);
App.499-500 (Rivas ¶¶41-43); App.237 (Pauly ¶78).

The district court thus properly concluded by weighing the record before it
that LCMs "did not gain a 'secure footing' in American society prior to the 1900s"
and thus their continuous firepower "did not pose 'a general societal problem that
has persisted since the 18th century.'" App.1056 (quoting *Bruen*, 142 S. Ct. at 2131,
2142); *see* App.255, 259 (DeLay ¶¶20, 26). Indeed, *Bruen* explains that the reason
"dramatic technological changes may require a more nuanced approach" is that
"[t]he regulatory challenges posed by firearms today" may not be the same as those
that "preoccupied the Founders in 1791 or the Reconstruction generation in 1868."
142 S. Ct. at 2132. That reasoning fits like a glove here. As plaintiffs nowhere
dispute, an LCM's enhanced firepower has wrought both unprecedented societal
concerns and regulatory challenges as individuals' access to "extraordinarily lethal"
firepower has "dramatically increased the number killed and wounded in mass
shootings from 1966 to the present." App.1049 (quoting App.475-77

(Roth ¶¶53, 55)).  Before the advent of such events, governments had no reason to act.  More to the point, *the Constitution* "does not require States to regulate for problems that do not exist."  *McCullen v. Coakley*, 573 U.S. 464, 481-82 (2014) (citation omitted).  "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated."  *Bruen*, 142 S. Ct. at 2132. Indeed, *Bruen* itself rejected the "regulatory straightjacket" on which plaintiffs depend.  *Id*. at 2133.  This Court should as well.

>    **B.**    **The district court properly concluded that, when compared to historical regulations, the District's Law imposes a comparable burden on the right of armed self-defense and is comparably justified.**

Applying the "more nuanced approach" set out in *Bruen*, *id*. at 2132, the district court properly found that the District's Law is part of a historical tradition whereby governments, from pre-Founding English history to the early 20th century, have restricted, and even prohibited, dangerous and unusual weapons and accessories when they have threatened public safety.  Though these restrictions may name different weapons and address contemporary concerns, there is a clear through-line: Each "historical *analogue*" targets weapons or weapon enhancements that are susceptible to criminal misuse or that pose special dangers to the public, while placing a minimal burden on armed self-defense.  *Id.* at 2133 (holding that a regulation is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors and is "comparably justified").

1.   There is an established tradition throughout American history of targeting dangerous and unusual weapons and accessories.

As the Court recognized in *Heller* and affirmed in *Bruen*, there is a historical tradition of regulating dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2128. The Supreme Court has not defined the phrase "dangerous and unusual." But the phrase may best be understood as a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper"—which involves "two terms, separated by a conjunction, [that] are melded together to form a single complex expression." Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016). So viewed, "dangerous and unusual" means "unusually dangerous."

The origins of the tradition of regulating these sorts of weapons pre-date the Founding era. The English Bill of Rights—the "predecessor to our Second Amendment"—recognized the right to keep and bear arms, but only "'as allowed by law.'" *Heller*, 554 U.S. at 593 (quoting 1 Wm. & Mary 2d. Sess. ch. 2, § 7 (1689)); *see Bruen*, 142 S. Ct. at 2141-42 (similar). Consistent with that right, and without posing a general "obstacle to public carry for self-defense," *Bruen*, 142 S. Ct. at 2142, the Crown prohibited certain weapons, like launcegays, 7 Rich. 2, ch. 13 (1383), crossbows, handguns, hagbuts, and demy hakes, 33 Hen. 8, ch. 6 §§ 1, 18 (1541).

Similar regulations, to similar effect, were enacted in the early colonial and Founding eras. *See id.* at 2143 ("[C]olonial legislatures sometimes prohibited the 'carrying of dangerous and unusual weapons'" (quoting *Heller,* 554 U.S. at 627)). For example, after "strife and excitement" caused an outbreak of civilian violence in East New Jersey, *id.* at 2144 (citation omitted), the colony prohibited the concealed carrying of certain "pocket pistol[s], skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." 1686 N.J. 289, 289-90, ch. 9; *see also Bruen*, 142 S. Ct. at 2143 (noting that the law did not "apply to all pistols, let alone all firearms," which, as noted above, were almost all single-shot muzzle-loading long guns).

Other colonies, too, targeted pistols and regulated dangerous and unusual weapons like trap guns, clubs, and blunt weapons. *See* App.293-95, 297-300, 303-09, 346-441 (Spitzer ¶¶48-51, 56-60 & appx. 1, 2, 4, 5). Trap guns in particular—an ordinary firearm configured to fire remotely—were often used to protect personal and commercial property, yet governments recognized that this "most dangerous method of setting guns" raised to unacceptable levels the risk of harm to innocent bystanders. 1763-1775 N.J. Laws 346, ch. 539, § 10 (1771); App.298-99 (Spitzer ¶¶57-58). These restrictions are particularly analogous to the District's Law because they prohibited a dangerous firearm enhancement without prohibiting possession of the underlying firearm, as plaintiffs themselves seemingly admit, Br. 44-45 n.23.

Restrictions on gunpowder storage, too, were prevalent throughout the colonies. *See, e.g.*, 1784 Laws of N.Y. 627, ch. 28 (requiring that gunpowder be divided into stone or tin containers of not more than seven pounds each and that gunpowder in excess of 28 pounds be stored in a communal magazine); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 510-12 (2004) (collecting laws). Though these laws restricted gunpowder storage in the home, and effectively imposed an overall cap on the number of shots that could be fired, they were regarded as a quotidian use "of the police power." *Brown v. Maryland*, 25 U.S. 419, 443 (1827) (Marshall, C.J.). Specifically, while the laws protected the public by quelling the risk of catastrophic fire and explosion inherent to the possession of gunpowder in large quantities, they did not "remotely burden the right of self-defense as [would] an absolute ban on [the underlying arms]." *Heller*, 554 U.S. at 632.

When the Fourteenth Amendment was adopted, a growing number of states, in response to a rise in violence, restricted weapons considered particularly dangerous or susceptible to criminal misuse, meaning that several were enacted "during the lifetimes of Jefferson, Adams, Marshall, and Madison." App.458-59 (Roth ¶¶26-27). Ultimately nearly every state in the Union restricted Bowie (or similar long-bladed) knives in some manner, whether by outlawing their possession, carry, sale, enhancing criminal penalties, or taxing their ownership. App.292-93,

306-09, 346-442 (Spitzer ¶47 & appx. 2, 4). And as certain pistols became more popular and associated with criminal activity, more states moved to restrict them, while leaving other arms available for self-defense. App.489-92, 500-01 (Rivas ¶¶21-26, 44); *see* App.463-68 (Roth ¶¶34-39). For example, although both Tennessee and Arkansas restricted the carry of pocket pistols, they continued to allow the carry of larger "army and navy" pistols "in the hand." App.487 (Rivas ¶18); *see Bruen*, 142 S. Ct. at 2147 n.20 (noting that both states "tolerated the prohibition of all public carry of handguns except for military-style revolvers"). As before, subjecting "the *manner* of public carry . . . to reasonable regulation" did not "prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public." *Bruen*, 142 S. Ct. at 2150.

Altogether, these measures, and their corresponding judicial approval, reveal an established tradition of targeting dangerous and unusual weapons and accessories when they have contributed to violence and other crime, while minimally burdening the right to armed self-defense.

        2.    Firearms with large capacities have always been regarded as dangerous and unusual.

Restrictions on firearms with large capacities—those that can fire many rounds without pauses to reload—are also cut from this cloth. Many of the earliest prototypes were obviously dangerous and unusual, as they were prone to accidental or explosive discharge. *See supra* pp. 31-32. But even as these firearms began to

appear in military service around the time of the adoption of the Fourteenth Amendment, they "were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense." *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 389 (D.R.I. 2022) (citation omitted). Indeed, as plaintiffs have acknowledged, these weapons were also not considered suitable for hunting—and many states passed laws "restrict[ing] the number of shotgun shells or rifle rounds allowable in a hunting firearm" without apparent constitutional concern. App.60-61; *see* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. L. & Contemp. Probs. 55, 58-60, 73-74 & tbl. 1 (2017) (collecting laws).

As soon as large capacity firearms began to circulate in society in the early 20th century and became associated with criminal activity, states began to restrict that capacity, typically in the same legislation that established the now widely accepted tradition of banning machine guns. *See* App.269-73 (Spitzer ¶¶12-18); *Heller II*, 670 F.3d at 1270 (Kavanaugh, J., dissenting) (justifying the ban on machine guns because they "have traditionally been banned"). This confluence is unsurprising given that their technology is similar. With most modern firearms, after each shot is fired, a mechanical action automatically loads a new round into the chamber, enabling the firearm to fire continuously at length when used with an LCM. *See* App.236-37 (Pauly ¶¶75-78). The only difference is that automatic guns fire

continuously while the trigger is depressed, while semiautomatics fire only each time the trigger is pulled.  App.177.  In both, magazine capacity is crucial to the arm's continuous firepower.

Thus, for example, Rhode Island in 1927 prohibited as a "Machine gun" the manufacture, sale, or possession of "any weapon which shoots automatically *and* any weapon which shoots more than twelve shots semiautomatically"; Congress, for the District of Columbia, in 1932 similarly prohibited as a "Machine gun" the possession of "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading"; Michigan in 1927 prohibited the manufacture, sale, or possession of "any machine gun *or* firearm which can be fired more than sixteen times without reloading"; Minnesota in 1933 prohibited as a "machine gun" the sale or possession of "[a]ny firearm capable of *loading or* firing automatically, the magazine of which is capable of holding more than twelve cartridges"; Virginia in 1934 restricted the public carry of "weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, *semi-automatically* or otherwise discharged without reloading"; and Ohio and Massachusetts required the licensing of "machine gun[s]" that shoot automatically or semi-automatically

more than eighteen and one shots without reloading, respectively.[14]    Altogether, "nearly half of all states" adopted some form of restriction on enhanced firing capacity between 1917 and 1934.  App.273-76 (Spitzer ¶¶19-22 & tbl. 1).  These laws were considered "obviously uncontroversial" exercises of states' police powers—as plaintiffs appear to acknowledge.  Spitzer, *Gun Law History*, at 69; *see* Br. 45 (citing *People v. Brown*, 235 N.W. 245, 247 (Mich. 1931), which determined that Michigan's law did not prohibit "ordinary guns . . . or other weapons usually relied upon by good citizens for defense or pleasure").

Restricting enhanced firing capacity was so well-accepted that, in 1928, the National Conference of Commissioners on Uniform State Laws promulgated a model law that prohibited as a "Machine gun" "any firearm which shoots automatically and any firearm which shoots more than twelve shots semi-automatically without reloading."  App.556, 562 (§§ 1, 17).  This law was the template for the District's prohibition.  *See* S. Rep. No. 72-575, at 2 (1932).  And an early version of the National Firearms Act of 1934—"the first major federal attempt to regulate firearms, . . . [and which] concentrated on particularly dangerous

---

[14]     1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1, 4 (emphasis added); Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 14, 47 Stat. 650, 654 (1932); 1927 Mich. Pub. Acts 888-89, § 3 (emphasis added); 1933 Minn. Laws 231, 232-33, ch. 190 §§ 1, 3 (emphasis added); 1934 Va. Acts 137-40, ch. 96 (emphasis added); 1933 Ohio Laws 189, 189-90; 1927 Mass. Acts 413, 413-15, ch. 326, §§ 1-2.

weapons and devices such as machine guns, sawed-off shotguns and silencers," *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002)—similarly defined a machine gun as "any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading." H.R. 9066, 3d Cong., 2d Sess. (1934), *reprinted in National Firearms Act: Hearings on H.R. 9066 Before the House Comm. on Ways and Means*, 73d Cong., 2d Sess., at 1-3 (1934) ("House NFA Hearing")); *see* App.269-72 (Spitzer ¶¶12-16).[15]

Plaintiffs raise several challenges to the identification of these laws as appropriate analogues, but none have merit. First, they object that these laws are "of too recent vintage." Br. 44. But unlike in *Bruen*, where the Court discounted the probative value of 20th century analogues because they "contradict[ed] earlier evidence" of the public understanding during the Founding and Reconstruction eras, *Bruen*, 142 S. Ct. at 2154 & n.28, "[t]he historical tradition of high-capacity regulations in the 1920s and 1930s—over a hundred years ago" is *consistent with*

---

[15]     When enacted, the Act's definition of "machine gun" included only weapons that fire "more than one shot, without manual reloading, by a single function of the trigger." Pub. L. No. 73-474, §1(b), 48 Stat. 1236, 1236 (1934). Ironically, the definition was revised after the National Rifle Association's then-President, Karl T. Frederick, expressed concern that the Act could be bypassed if manufacturers limited an automatic weapon's magazine to hold 11 rounds or fewer. *See* House NFA Hearing, at 39-40.

"earlier evidence, and . . . supports the constitutionality of the District's [Law]."
App.1055.

Next, plaintiffs try to differentiate among different types of regulations to
argue, for example, that a "licensing statute . . . cannot support the District's"
prohibition on possession. Br. 46-47. But *Bruen* itself explained that the relevant
question is not the specific means by which the regulation burdens the Second
Amendment right, but rather the regulation's relative "burden *on the right of armed
self-defense*." *Bruen*, 142 S. Ct. at 2133 (emphasis added). And here all of the laws
described above—from licensing restrictions to outright prohibitions—were never
thought to impose more than an insignificant burden on that right. *Cf. id*. at 2150
(distinguishing historical limitations where "none operated to prevent law-abiding
citizens with ordinary self-defense needs from carrying arms in public for that
purpose").

Finally, plaintiffs claim (Br. 46-48) that these laws evolved or, even, were
repealed, over the course of the 20th century. This is unavailing. The Court in *Bruen*
explained that the rejection of laws is "probative" when it occurs "*on constitutional
grounds.*" *Id*. at 2131 (emphasis added). But, as in the district court, "[p]laintiffs
have not suggested that any repeal was related to constitutional infirmity."
App.1058. Where, as here, a regulation is consistent with historical tradition,
legislatures are free to experiment to strike the right balance between effective

44

intervention and the preference of the people.  *Cf. Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting *Heller*, 554 U.S. at 636)).

> 3.    The District's Law imposes a comparable burden on the right of armed self-defense and is comparably justified.

The District's Law is "relevantly similar" to historical regulations of dangerous and unusual weapons both in its "burden on the right of armed self-defense" and the justifications for that burden.  *Bruen*, 142 S. Ct. at 2132-33.

As just discussed, there is a longstanding American tradition—from the colonial era to the early 20th century—whereby a weapon is introduced into society, proliferates to the point where its use threatens public safety, and is then regulated by the government to curb violence and protect the public.  In the 18th and 19th centuries, *supra* pp. 37-39, governments often responded to the violence plaguing their communities by restricting the ability to carry certain weapons in public.  The scope of these regulations—which the Court recognized as permissible restrictions on "dangerous and unusual" weapons, *Bruen*, 142 S. Ct. at 2128 (citation omitted)— responded to the problem at hand: the misuse of weapons like clubs, knives, and pistols that could be concealed and then brandished in a violent attack or other criminal undertaking.  In the early 20th century, *supra* pp. 40-43, States and the federal government responded to the new threat presented by large-capacity

45

firearms—the danger of which went well beyond their concealable nature—by, in addition to other regulatory measures, prohibiting them outright.

Plaintiffs complain that the emergence of these prohibitions is inconsistent with American tradition. Br. 49. But the Supreme Court settled this question in *Heller* when it explained that the "historical tradition of prohibiting the *carrying* of 'dangerous and unusual weapons'"—a tradition reflected by many dangerous weapons laws, *see supra* pp. 36-39—"fairly support[s]" limitations "on the right to *keep* and [not just] carry" weapons. 554 U.S. at 626-27 (emphases added) (citation omitted). In other words, the historical tradition of prohibitions on "going armed," *id.* at 610, supports that dangerous and unusual weapons can be "banned," *id.* at 627. Thus, to the extent that there was ever any ambiguity about whether laws precluding civilians from possessing dangerous and unusual weapons are consistent with the public understanding of the Second Amendment, that question has been "liquidate[d] & settle[d]" by this regular course of practice and subsequent judicial approval. *Bruen*, 142 S. Ct. at 2136 (cleaned up).

Like its regulatory predecessors, the District's Law also responds to a particularly dangerous threat to public safety and homeland security—the growing use of LCMs to facilitate crime and, specifically, to perpetrate mass shootings. App.1049-50 (citing evidence). And like its regulatory predecessors, it restricts firepower not actually used in defensive gun use, thereby imposing a minimal burden

on the right to armed self-defense. *Cf. Heller II*, 670 F.3d at 1262 ("[T]he prohibition of . . . [LCMs] does not effectively disarm individuals or substantially affect their ability to defend themselves.").

## III.  In The Alternative, Plaintiffs Have Not Met Their Burden On The Remaining Preliminary Injunction Factors.

In the district court, plaintiffs gave short shrift to the remaining preliminary injunction factors.  App.62-65; RD 24 at 40-42.  In this Court, they do the same, devoting less than a page to the matter.  Br. 53.  But to grant a preliminary injunction—even in cases alleging constitutional harm—courts must still consider whether the plaintiffs "[are] likely to suffer irreparable harm in the absence of preliminary relief, [whether] the balance of equities tips in [their] favor, and [whether] an injunction is in the public interest." *Benisek*, 138 S. Ct. at 1944 (citation omitted); *see id.* at 1944-45 (assuming that plaintiffs were likely to succeed on the merits of a First Amendment challenge to partisan gerrymandering, but affirming the denial of a preliminary injunction based on the balance of the equities and the public interest).  Plaintiffs' failure to satisfy their burden on these factors provides support for, if not also alternative grounds in support of, the judgment.  *See id.* at 1943-45; *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (plaintiffs' failure to demonstrate an irreparable injury "alone is sufficient" to affirm denial of a preliminary injunction).

47

A.     **Plaintiffs have not shown that they will suffer irreparable harm.**

"This Court has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches* (*CFGC*) *v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In the district court, plaintiffs did not attempt to substantiate any practical, likely injury in the absence of a preliminary injunction. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (requiring affirmative "proof" not "[b]are allegations"). In this Court, plaintiffs abandon that pretense entirely.

Plaintiffs' sole claim is that "for violations of Second Amendment rights, as for violations of First Amendment rights, 'irreparable harm is presumed.'" App.63 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011)); *see* Br. 53. But neither the Supreme Court nor this Court has held this. To the contrary, in the First Amendment context, this Court has concluded both that "there is no per se rule that a violation of freedom of expression automatically constitutes irreparable harm," *CFGC*, 454 F.3d at 301, and that the presumption should not be "axiomatically appl[ied]," *id*. at 302.

Nor can plaintiffs simply point to the Seventh Circuit's decision in *Ezell*. App.63; *see* RD 24 at 41. In *Ezell*, the challenged city ordinance required firing range training "as a prerequisite to lawful gun ownership, yet at the same time prohibit[ed] all firing ranges in the city." 651 F.3d at 689-90 (citation omitted). Because the ordinance made it "impossible" to qualify for gun ownership of any

kind without leaving the jurisdiction, it burdened the Second Amendment's "central component"—the right to "possess firearms for protection"—and the court thus presumed that the resulting harm was irreparable. *Id*. at 698-99. The District's Law is readily distinguishable: It does not prevent plaintiffs from possessing or using their firearms or any amount of ammunition. All it does is require an individual to reload after firing 11 rounds.

Plaintiffs also have shown no urgency in pressing their challenge, most notably by pursuing a stay of the district court proceeding while this appeal progresses. *See* App.1016 (4/13/23 Arg. Tr. (volunteering that plaintiffs may not "want to go [through] the time and expense [of] conducting discovery until the Court of Appeals makes its decision")); App.1063 (representing in a consent motion that "no Party will be harmed by a stay"). This cuts strongly against any claim to an injury that must be preliminarily and urgently resolved. *See Benisek*, 138 S. Ct. at 1944 ("[A] party requesting a preliminary injunction must generally show reasonable diligence."); *Fyock v. Sunnyvale*, 779 F.3d 991, 996 n.2 (9th Cir. 2015) (finding it "unlikely" that a plaintiff who had "stipulated to a stay of the underlying merits action . . . could make the requisite showing of irreparable harm"). The Court could affirm the district court's denial of a preliminary injunction on this factor alone.

**B.    Plaintiffs have not shown that the equities balance in their favor.**

Even where an alleged constitutional violation is presumed to satisfy the irreparable injury prong, courts must still assess the balance of the equities and the impact on the public interest.  *CFGC*, 454 F.3d at 304.  These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, particularly considering the "additional headwinds" plaintiffs face in their attempt to alter the status quo, *Singh*, 56 F.4th at 97, the equities tip decisively in favor of the District.

As a general matter, "any time [the District] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).  But the irreparable injury to the District and its residents is also practical and severe.  Preliminarily enjoining the District's Law during the course of this litigation, and thereby disrupting the status quo in place for nearly a century, exposes the District, its residents, and its law enforcement officers to a particularly dangerous form of firepower that "significantly increase[s] a shooter's ability to quickly injure or kill large numbers of people, and further reduce[s] opportunities for law enforcement or the public to intervene to save lives." App.192-93 (Parsons ¶24).  Indeed, District police officers, who both "pursue armed

50

suspects" and "directly confront" active shooters, routinely carry only 15- and 17-round magazines.  App.190-91 (Parsons ¶¶14-18).

Preliminarily enjoining the District's Law would also allow long-prohibited LCMs to surge into the District.  Far from a hypothetical, over a million LCMs flooded into California in the brief period *after* its LCM prohibition was enjoined but *before* the ruling was stayed by the district court.  *See* Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED (Apr. 12, 2019), https://tinyurl.com/586mj8fa. Avoiding this potentially irreversible event, and the burdens to all parties inherent to regulatory confusion and checkered enforcement, also tips the balance of equities toward the District.

On the other side of the ledger, plaintiffs will incur, at most, a *presumed* harm while litigation continues.  Even granting this harm full constitutional status, it emanates from a prohibition on firepower not used in armed self-defense.  As explained above, the advantage offered by an LCM is simply the ability to fire between 12 and 100 rounds without pausing to reload.  This cannot outweigh the immediate practical harms to the District.  And plaintiffs' sole argument to the contrary, *see* RD 24 at 42; Br. 53, relies on the claimed scope of the Second Amendment right, not whether a preliminary injunction should issue while litigation proceeds.

The balance of equities thus tips sharply in favor of the District.  And if there were any doubt, it would be removed by how palpable the risk of an ultimate reversal is—whether after further consideration of this case on the merits or further instruction by the Supreme Court.  "[T]he historical analysis required by *Bruen* [is] difficult," *Atkinson v. Garland*, 70 F.4th 1018, 1024 (7th Cir. 2023), and "courts, operating in good faith, are struggling at every stage of the *Bruen* inquiry," *United States v. Daniels*, 77 F.4th 337, 358 (5th Cir. 2023) (Higginson, J., concurring).  Therefore, even if plaintiffs could persuade this Court that they have met the other preliminary injunction factors (and they have not), the Court should still deny preliminary injunctive relief.  *See Benisek*, 138 S. Ct. at 1945 (citing "legal uncertainty" as a reason to affirm the denial of a preliminary injunction).  Other federal courts of appeals reviewing LCM prohibitions have also declined to alter the status quo to avoid potentially devastating results.  *See, e.g.*, *Barnett v. Raoul*, No. 23-1825 (7th Cir. May 12, 2023), ECF No. 30 (staying injunction pending appeal); *Duncan v. Bonta*, No. 23-55805, 2023 WL 6588623 (9th Cir. Oct. 10, 2023) (en banc) (same).  And no Circuit has granted the preliminary relief plaintiffs seek.

\* \* \*

Two final points: First, if the Court decides to grant a preliminary injunction, any such relief should be limited to plaintiffs and the magazines of 21 rounds or fewer that they have said they would use.  *See supra* pp. 8-9.  Plaintiffs did not object

52

when the District made this point in the court below.  *Compare* App.121 (making this point), *with* RD 24.  And such a tailored injunction would fully protect plaintiffs from the injuries they alleged.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (an injunction's scope is "dictated by the extent of the violation established").

Second, plaintiffs lack any basis to request a "generally inappropriate" permanent injunction.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Entering such an injunction on a preliminarily compiled record would significantly prejudice the District.  *See Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (A preliminary injunction "does not substitute for a trial[;] the proceedings are streamlined, intentionally, because the fuse is often so short.").  A determination on the constitutionality of the District's Law should be made after full development in the district court, including discovery, expert testimony, and briefing.  *See, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027 (entering judgment in an LCM case following a bench trial).

## CONCLUSION

The Court should affirm the denial of preliminary injunctive relief.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Sonya L. Lebsack
SONYA L. LEBSACK
Assistant Attorney General
Bar Number 1000746
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-5667
(202) 730-1450 (fax)
October 2023                    sonya.lebsack@dc.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,980 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Sonya L. Lebsack
SONYA L. LEBSACK