

**ATTORNEY GENERAL**
**BRIAN L. SCHWALB**

**Office of the Solicitor General**

July 16, 2024

Via CM/ECF

Mark J. Langer, Clerk of the Court
United States Court of Appeals
  for the District of Columbia Circuit
333 Constitution Avenue, NW
Washington, D.C. 20001

Re:     *Hanson v. District of Columbia*, No. 23-7061 (case submitted Feb. 13, 2024)
         Appellees' Citation of Supplemental Authority Pursuant to Rule 28(j)

Dear Mr. Langer:

Appellees bring to the Court's attention *Delaware State Sportsmen's Association v. Delaware Department of Safety & Homeland Security*, Nos. 23-1633, 23-1634 & 23-1641 (3d Cir. July 15, 2024), which unanimously affirmed the district court's determination not to preliminarily enjoin Delaware's prohibition on assault weapons and large-capacity magazines (LCMs) on Second Amendment grounds.

The Third Circuit's decision (Bibas, J.) was based on its refusal "to treat a preliminary injunction as rising and falling with [the likelihood of success on] the merits." Slip op. 18. Like the appellants here, the challengers to the Delaware prohibition rested their right to relief on the presumption that "[i]f they [were] right on [the merits], . . . they should get an injunction because all constitutional harm is supposedly irreparable and the equities and public interest track the merits." Slip op. 9-10; *see* Hanson Br. 53 (same). The court rejected that argument as contrary to both "tradition and precedent." Slip op. 10 ("[T]hat is not how equity works."). Surveying both, the court found no support for "collaps[ing] the four factors into one." Slip op. 17-19, 20-22 (distinguishing First Amendment precedents). Rather, before granting a preliminary injunction, courts must "weigh all the factors." Slip op. 19; *see* District Br. 47-52 (same).

The court found that "[w]ithout a presumption in their favor," Slip op. 22, the challengers failed to demonstrate the remaining factors. Their "wish to obtain" the prohibited weapons, their "generalized claim of harm," and no indication that a preliminary injunction was "required to preserve" the status quo "hardly shows that [their] harm is [irreparable]." Slip op. 22-24; *contra* Hanson Reply 25-26. Nor did the equities balance in the challengers' favor: they were seeking to

"enjoin . . . democratically enacted state laws" and they had not "move[d] quickly" to pursue relief, instead "put[ting] the District Court proceedings on hold" while they took an appeal. Slip op. 9, 24-25; *see* District Br. 49-50 (making the same points).

Judge Roth concurred and explained that "*none* of the assault weapons and LCMs at issue are 'Arms' protected by the Second Amendment." Concur. op. 1-2.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General

By:     /s/ Ashwin P. Phatak
        ASHWIN P. PHATAK
        Principal Deputy Solicitor General

Cc: Counsel of Record (via CM/ECF)

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1633, 23-1634 & 23-1641
_____

DELAWARE STATE SPORTSMEN'S ASSOCIATION,
INC.; BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.;
DELAWARE RIFLE & PISTOL CLUB; DELAWARE
ASSOCIATION OF FEDERAL FIREARMS LICENSEES;
MADONNA M. NEDZA; CECIL CURTIS CLEMENTS;
JAMES E. HOSFELT, JR.; BRUCE C. SMITH; VICKIE
LYNN PRICKETT; FRANK M. NEDZA,
                          Appellants in No. 23-1641

v.

DELAWARE DEPARTMENT OF SAFETY & HOMELAND
SECURITY; CABINET SECRETARY, DELAWARE
DEPARTMENT OF SAFETY & HOMELAND SECURITY;
SUPERINTENDENT, DELAWARE STATE POLICE

.

GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC;
FIREARMS POLICY COALITION, INC.;
SECOND AMENDMENT FOUNDATION,
                          Appellants in No. 23-1633

v.

ATTORNEY GENERAL OF DELAWARE

.

CHRISTOPHER GRAHAM; OWEN STEVENS;
FIREARMS POLICY COALITION, INC.;
SECOND AMENDMENT FOUNDATION,
Appellants in No. 23-1634

v.

ATTORNEY GENERAL OF DELAWARE
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 1:22-cv-00951; 1:22-cv-01500; 1:23-cv-00033)
District Judge: Honorable Richard G. Andrews
_____

Argued: March 11, 2024

Before: BIBAS, MONTGOMERY-REEVES, and ROTH,
*Circuit Judges*

(Filed: July 15, 2024)

Erin E. Murphy                    **[ARGUED]**
CLEMENT & MURPHY
706 Duke Street
Alexandria, VA 22314

Francis G.X. Pileggi
LEWIS BRISBOIS BISGAARD & SMITH
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
    *Counsel for Appellants Delaware State Sportsmen's Associ-
    ation Inc.; Bridgeville Rifle & Pistol Club Ltd.; Delaware
    Rifle & Pistol Club; Delaware Association of Federal
    Firearms Licensees; Madonna M. Nedza; Cecil Curtis
    Clements; James E. Hosfelt, Jr.; Bruce C. Smith; Vickie
    Lynn Prickett; and Frank M. Nedza*

Paul D. Clement
Erin E. Murphy                    **[ARGUED]**
Mariel A. Brookins
Matthew Rowen
CLEMENT & MURPHY
706 Duke Street
Alexandria, VA 22314
    *Counsel for Amicus Appellant National Shooting Sports
    Foundation*

William V. Bergstrom
John D. Ohlendorf                 **[ARGUED]**
Peter A. Patterson
David H. Thompson

COOPER & KIRK
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

Bradley Lehman
GELLERT SCALI BUSENKELL & BROWN
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
    *Counsel for Appellants Gabriel Gray; William Taylor;*
    *DJJams LLC; Firearms Policy Coalition, Inc.; Second*
    *Amendment Foundation, Inc.; Christopher Graham; and*
    *Owen Stevens*

Stephen P. Halbrook
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
    *Counsel for Amicus Appellant Delaware Association of*
    *Second Amendment Lawyers II*

David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, CO 80203
    *Counsel for Amicus Appellants National Association of*
    *Chiefs of Police, International Law Enforcement Educa-*
    *tors & Trainers Association, Law Enforcement Legal*
    *Defense Fund, Randy Barnett, Robert Cottrol, Lee Fran-*
    *cis, Nicholas Johnson, Donald Kilmer, George Mocsary,*
    *Joseph Muha, Joseph Olson, Michael O'Shea, Glenn*
    *Reynolds, and Independence Institute*

Anna M. Barvir
Carl D. Michel
MICHEL & ASSOCIATES
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
   *Counsel for Amicus Appellants Gun Owners of America,
   Inc.; Second Amendment Law Center; California Rifle &
   Pistol Association, Inc.; Gun Owners of California, Inc.;
   Second Amendment Defense & Education Coalition; Guns
   Save Life; Federal Firearms Licensees of Illinois; and
   Gun Owners Foundation*

Peter M. Torstensen, Jr.
MONTANA ATTORNEY GENERAL'S OFFICE
SOLICITOR GENERAL'S OFFICE
215 N. Sanders Street, P.O. Box 201401
Helena, MT 59620
   *Counsel for Amicus Appellants Montana, Alabama, Geor-
   gia, Idaho, Indiana, Iowa, Kentucky, Louisiana, Missis-
   sippi, Missouri, Nebraska, New Hampshire, North
   Dakota, South Carolina, South Dakota, Utah, Virginia,
   West Virginia, and Wyoming*

Garrett B. Moritz
David E. Ross                    **[ARGUED]**
ROSS ARONSTAM & MORITZ
1313 N. Market Street, Suite 1001
Wilmington, DE 19801

Kenneth L. Wan
DELAWARE ATTORNEY GENERAL'S OFFICE

DELAWARE DEPARTMENT OF JUSTICE
Carvel Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
    *Counsel for Appellees Delaware Department of Safety &
    Homeland Security; Cabinet Secretary, Delaware Depart-
    ment of Safety & Homeland Security; Superintendent,
    Delaware State Police; and Attorney General of Delaware*

Jeremy Feigenbaum          **[ARGUED]**
Angela Cai
NEW JERSEY ATTORNEY GENERAL'S OFFICE
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625
    *Counsel for Amicus Appellees New Jersey, Massachusetts,
    California, Colorado, Connecticut, District of Columbia,
    Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota,
    New York, Oregon, Pennsylvania, Rhode Island, Vermont,
    and Washington*

Janet Carter
EVERYTOWN LAW
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
    *Counsel for Amicus Appellee Everytown for Gun Safety*

Scott A. Eisman
FRESHFIELDS BRUCKHAUS & DERINGER U.S.
3 World Trade Center

175 Greenwich Street, 51st Floor
New York, NY 10007

*Counsel for Amicus Appellees Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for our Lives*

---

OPINION OF THE COURT

---

BIBAS, *Circuit Judge*.

A preliminary injunction is not a shortcut to the merits. Before granting one, a district court must also weigh the equities, the public interest, and the threat of irreparable harm. Yet the challengers here urge us to leapfrog these careful considerations and just resolve the case. They argue that, if a plaintiff will likely succeed on the merits of a constitutional claim, a court *must* grant a preliminary injunction. Not so. This equitable remedy is never automatic: It always involves a district court's sound discretion. Key to that discretion is whether an alleged injury jeopardizes the court's ability to see a case through.

Delaware residents and organizations challenged a pair of new state gun laws in federal court. Then they moved to preliminarily enjoin enforcement of those laws. But the injury they allege does not threaten the court's ability to decide the case or to give meaningful relief later on. We will thus affirm the District Court's order denying a preliminary injunction.

# I. APPELLANTS CHALLENGE TWO
## DELAWARE GUN RESTRICTIONS

In mid-2022, Delaware passed a package of gun laws. One law bans having, making, buying, selling, transporting, or receiving an "assault weapon." Del. Code Ann. tit. 11, § 1466(a). "[A]ssault weapon[s]" include dozens of specific semiautomatic long guns and pistols, plus certain types of "copycat weapon[s]." § 1465(2)–(6). Another law bans having, making, buying, selling, or receiving a magazine that can hold more than seventeen rounds. §§ 1468(2), 1469(a). The assault-weapon ban (though not the large-magazine ban) grandfathers in guns already owned but limits carrying them publicly. § 1466(c)(3). Neither ban applies to members of the military or law enforcement. §§ 1466(b)(1), 1469(c)(1)–(4).

Soon after these bans became law, the Delaware State Sportsmen's Association challenged them in federal court. Four months later, it sought a preliminary injunction based on the Second and Fourteenth Amendments. The next day, Gabriel Gray filed a similar suit and soon sought a preliminary injunction. Two months after that, Christopher Graham challenged only the large-magazine ban.

After consolidating these three cases, the District Court held a preliminary-injunction hearing. The challengers put on no live witnesses, nor did they offer any evidence that Delaware had tried to enforce these laws or take away their magazines. All they submitted were declarations from three Delaware residents and one Delaware gun dealer who want to buy or sell assault weapons and large magazines. They offered no details about how they would be harmed.

In March 2023, on that limited "evidentiary record," the District Court denied the preliminary injunction. JA 8 & n.2. It found that the challengers were not likely to succeed on the merits because both bans "are consistent with the Nation's historical tradition of firearm regulation." JA 34. It also refused to presume that all Second Amendment harms are irreparable. Rather, because Delaware's laws "regulate[ ] only a subset of semi-automatic weapons," the challengers "retain ample effective alternatives" to defend themselves. JA 35. Because the challengers had not borne their burden of showing a likelihood of success or irreparable harm, the District Court did not reach the other preliminary-injunction factors.

After denying the preliminary injunction, the District Court started preparing for a November 2023 trial. Instead of proceeding to trial, the challengers chose to appeal and put the District Court proceedings on hold. We heard argument in March 2024.

We review the District Court's factual findings for clear error, its legal rulings de novo, and its ultimate decision for abuse of discretion. *Del. Strong Fams. v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015). At this early stage, we review deferentially because the "denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge." *Marxe v. Jackson*, 833 F.2d 1121, 1125 (3d Cir. 1987) (cleaned up).

The challengers focus on the merits. If they are right on those, they argue, they should get an injunction because all constitutional harm is supposedly irreparable and the equities

and public interest track the merits. But that is not how equity works. Preliminary injunctions are not automatic. Rather, tradition and precedent have long reserved them for extraordinary situations. We see nothing extraordinary here.

## II. PRELIMINARY INJUNCTIONS ARE EXTRAORDINARY REMEDIES

### A. Chancery's limits at the Founding still cabin equitable relief

The judicial power extends to cases in equity. U.S. Const. art. III, § 2, cl. 1. During the debates over ratifying the Constitution, Anti-Federalists worried that equitable jurisdiction would give federal judges unchecked discretion. Brutus, *No. XI*, N.Y. J., Jan. 31, 1788, *reprinted in* 2 *The Complete Anti-Federalist* 417, 419–20 (Storing ed., 1981) (¶¶ 2.9.137–38). The Federal Farmer thought it "very dangerous" to give the same judge both legal and equitable power, because "if the law restrain him, he is only to step into his shoes of equity, and give what judgment his reason or opinion may dictate." Letter No. 3 (Oct. 10, 1787), *reprinted in id.* at 234, 244 (¶ 2.8.42). As equity was a royal power to absolve violations of law, they worried that granting the courts equitable power would leave them unbounded by law.

In response, Alexander Hamilton assuaged those legitimate concerns. He explained that "[t]he great and primary use of a court of equity is to give relief *in extraordinary cases,* which are *exceptions* to general rules." *The Federalist No. 83*, at 505 (Rossiter ed., 1961) (footnote omitted). Looking to Blackstone's *Commentaries*, Hamilton insisted "that the principles by which that relief is governed are now reduced to a regular

system." *Id.* at 505 n.*. By the Founding, that system had stabilized into "the practice of the Court of Chancery in England." Letter from Timothy Pickering to Charles Tillinghast (Dec. 24, 1787), *in* 4 *The Founders' Constitution* 231 (Kurland & Lerner eds., 1987).

Hamilton's understanding of equity prevailed. Congress gave Article III courts concurrent jurisdiction with state courts over civil suits in equity. Judiciary Act of 1789, ch. XX, § 11, 1 Stat. 73, 78. The Supreme Court later described this equitable jurisdiction as constrained by the "body of doctrine" that Chancery applied to "suits in equity" at the Founding. *Atlas Life Ins. Co. v. W.I.S., Inc.*, 306 U.S. 563, 568 (1939). Even after the merger of law and equity, "the substantive principles of Courts of Chancery remain unaffected" to this day. *Stainback v. Mo Hock Ke Lock Po*, 336 U.S. 368, 382 n.26 (1949); *see also Petrella v. MGM, Inc.*, 572 U.S. 663, 678 (2014). "[W]hether the authority comes from a statute or the Constitution, district courts' authority to provide equitable relief is meaningfully constrained. This authority must comply with longstanding principles of equity that predate this country's founding." *Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring).

## B. For good reason, injunctions were and still are extraordinary relief

Injunctions fall within this equitable framework. The English Court of Chancery enjoined parties sparingly. When a plaintiff's claim did not fit within one of the narrow common-law writs, he could petition the King for relief through his chancellor. *See* Douglas Laycock, *The Death of the*

*Irreparable Injury Rule* 19–20 (1991). Over time, the chancellor's power developed into the Court of Chancery. *Id.* To keep equity from swallowing up the common-law courts, Chancery could enjoin parties only when there was no adequate remedy at law. *Id.*

Following Chancery's supplemental role, early American law reserved injunctions for exceptional cases. Justice Joseph Story, for instance, feared that because injunction procedure is "summary," it is "liab[le] to abuse." 2 *Commentaries on Equity Jurisprudence as Administered in England and America* §959a, at 227 (2d ed. 1839). Courts must use "extreme caution" and "appl[y] [injunctions] only in very clear cases." *Id.* Professor James P. Holcombe took an even narrower view. Because injunctions can irreparably injure parties, courts must use "great caution," granting them "only in cases[] where [they are] *clearly indispensable* to the ends of justice." *An Introduction to Equity Jurisprudence, on the Basis of Story's Commentaries* 150 (1846) (emphasis added).

The Supreme Court largely agreed with Holcombe's narrow view. As it explained, "issuing an injunction" requires "great[] caution, deliberation, and sound discretion." *Truly v. Wanzer*, 46 U.S. (5 How.) 141, 142 (1847) (quoting *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 827 (C.C.D.N.J. 1830)). Injunctions themselves can inflict harm. Thus, a court should not grant an injunction unless the plaintiff's right is clear, his impending injury is great, and only an injunction can avert that injury. *Id.* at 142–43.

Preliminary injunctions raise further problems. For one, "many preliminary injunctions [are] granted hurriedly and on

the basis of very limited evidence." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1015 (10th Cir. 2004) (en banc) (McConnell, J., concurring). Time pressures limit adversarial testing. Affidavits drafted by lawyers are poor substitutes for discovery, live testimony, and cross-examination. And when challengers sue to enjoin enforcement of a new law, courts must forecast how the law will work.

Plus, this hasty process makes the district court jump to conclusions. A preliminary injunction "forces a party to act or desist from acting, not because the law requires it, but because the law *might* require it." *Id.* at 1014–15. In this sense, it is like "judgment and execution before trial." *Herman v. Dixon*, 141 A.2d 576, 577 (Pa. 1958).

Finally, forecasting the merits risks prejudging them. The trial process forces judges to keep open minds, considering questions from every angle before deciding. Preliminary relief short-circuits that process, freezing first impressions in place. True, judges will not always stick with those impressions—and the system trusts judges to update them as a case proceeds—but this flexibility becomes harder when an impression solidifies into a preliminary ruling. Even if judges keep an open mind, the parties and the public may see their tentative forecasts as the writing on the wall.

For all these reasons, a preliminary injunction "is an extraordinary remedy[ ] [that] should be granted only in limited circumstances." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 391 (3d Cir. 2021) (internal quotation marks omitted). Unless the need for one in a particular case outweighs these risks, the court should not grant one.

### III. PRELIMINARY INJUNCTIONS PROTECT COURTS' POWER TO ADJUDICATE

#### A. Preliminary injunctions' primary purpose is to keep cases alive until trial

Despite these inherent risks, preliminary injunctions are occasionally warranted. At this stage, "before there has been a trial on the merits, the function of the court is *not* to take whatever steps are necessary to prevent irreparable harm, but primarily to keep things as they were, until the court is able to determine the parties' respective legal rights." *O Centro*, 389 F.3d at 1012 (McConnell, J., concurring) (emphasis added). "Traditional equity practice held that the *sole* purpose of a preliminary injunction was to preserve the status quo during the pendency of litigation." *Id.* (collecting mid-nineteenth- through mid-twentieth-century cases).

The Supreme Court has recognized this limited purpose, as have we. The "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813–14 (3d Cir. 1989); *Warner Bros. Pictures v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam). The goal is to ensure that, at the end of the case, the court can still grant an adequate remedy.

Our sister circuits concur. Preliminary injunctions exist "ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other*

*grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); *accord Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975). That relief is proper only in "the rare case when a preliminary injunction is necessary to preserve the effectiveness of the ordinary adjudicatory process." *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1124 (8th Cir. 2015). In short, "the most compelling reason" to grant a preliminary injunction is "to preserve the court's power to render a meaningful decision after a trial on the merits." 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2947, at 112, 114 (3d ed. 2013).

## B. Preventing interim harm is at the service of preserving the case

Though courts recognize this primary purpose, they have strayed from it and started using preliminary injunctions just to prevent harm. To be sure, harm prevention has become a valid reason to grant a preliminary injunction. *See id.* §§ 2948, 2948.1. But that "is not [its] paramount purpose." *O Centro*, 389 F.3d at 977 (Murphy, J., concurring) (citing 11A Wright & Miller § 2947). "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440 (1944). "Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief." 11A Wright & Miller § 2948.1, at 129.

Thus, the threat of irreparable harm does not automatically trigger a preliminary injunction. Sometimes, harm threatens to moot a case, as when one party's conduct could destroy the

property under dispute, kill the other party, or drive it into bankruptcy, "for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). Much more often, though, even nonpecuniary injury does not rise to that level.

The recent drift from preserving cases to preventing interim harm can stunt litigation. This extraordinary remedy has become ordinary. All too often, "the preliminary injunction [becomes] the whole ball game." *Winter v. NRDC*, 555 U.S. 7, 33 (2008) (internal quotation marks omitted). That shortcut exceeds injunctions' limits. The "purpose of such interim equitable relief is not to conclusively determine the rights of the parties." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (citing *Camenisch*, 451 U.S. at 395). Rather, it is supposed to be "only a prediction about the merits of the case." *United States v. Loc. 560 (I.B.T.)*, 974 F.2d 315, 330 (3d Cir. 1992).

Case preservation is thus the main reason that the benefits of a preliminary injunction may outweigh its risks. Courts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case. That approach is often, perhaps usually, the wiser course.

## IV. THE DISTRICT COURT PROPERLY DENIED THE PRELIMINARY INJUNCTION

Though district courts have sound discretion to grant or deny preliminary injunctions, precedent guides this discretion. Four canonical guideposts are (1) the likelihood of success on the merits; (2) the risk of irreparable injury absent preliminary relief; (3) the balance of equities; and (4) the public interest. *Winter*, 555 U.S. at 20. The first two factors are the "most

critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). If both are present, a court then balances all four factors. *Id.* Because "a preliminary injunction is an extraordinary and drastic remedy," the movant bears the burden of making "*a clear showing*." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting and emphasizing 11A Wright & Miller § 2948).

Yet the challengers try to sidestep this framework. They argue that in constitutional cases, a likelihood of success on the merits is enough. It is not.

### A. Likely success on the merits is not enough for a preliminary injunction

The challengers and their amici argue that if they win on the first factor, then the District Court abused its discretion by denying a preliminary injunction. After all, they reason, constitutional rights are priceless, and the government has no interest in enforcing unconstitutional laws. As they readily admit, their argument collapses the four factors into one. The Ninth Circuit has followed that siren. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (reasoning that when a party shows the first factor, it "almost always" shows irreparable harm and "the merged third and fourth factors [tip] decisively in [its] favor"). For five reasons, though, we plug our ears to that siren song.

*First*, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Instead, it "is a matter of equitable discretion" that "does not follow from success on the merits as a matter of course." *Id.* at 32. Contrary to the challengers' position, success on the first factor is not enough.

*Second*, "no test for considering preliminary equitable relief should be so rigid as to diminish, let alone disbar, discretion." *Reilly v. City of Harrisburg*, 858 F.3d 173, 178 (3d Cir. 2017). Yet the challengers' test would do just that, forcing judges to grant preliminary equitable relief based on only a likelihood of success on the merits. That cannot be right: "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Judges are not robots, especially in equity.

*Third*, "[c]rafting a preliminary injunction … often depend[s] as much on the equities of a given case as the substance of the legal issues it presents." *Int'l Refugee Assistance Project*, 582 U.S. at 579. The challengers ask us to treat a preliminary injunction as rising and falling with the merits. But the merits are just one piece of the puzzle. This equitable remedy calls for courts to weigh the equities, the public interest, and irreparable harm too.

*Fourth*, if the challengers were right, whenever someone sought a preliminary injunction, courts would always have to prejudge the merits; but they need not. Even assuming irreparable injury, the Supreme Court has overturned an injunction based solely on the balance of equities and the public interest. *Winter*, 555 U.S. at 26, 32. In doing so, it "d[id] not address the underlying merits of plaintiffs' claims." *Id.* at 31. We have taken this approach too. *See Weissbard v. Coty, Inc.*, 66 F.2d 559, 560 (3d Cir. 1933) (not opining on the merits because the District Court would be better placed to rule on them after a "final hearing"). The other factors are independent grounds to deny relief.

*Fifth*, the challengers' automatic approach presumes clarity early on. They perceive a finished drawing, while we see only the initial sketch. Early in a case, the merits are seldom clear, even when they seem black and white. The litigation process gradually adds hues to this monochrome sketch, sharpening the issues until the trial provides full color. Jumping to conclusions this early is like finding guilt right after hearing each side's key witness, without keeping an open mind long enough to reflect on their weaknesses. A rushed judgment is a dangerous one; judges must be humble enough to stay their hands.

Given the background of the rules of equity, we should not treat the four-factor test as a mechanical algorithm. Law sometimes uses such strict formulae, but equity sees tests as guideposts only. They help the court balance the risks of mootness against the perils of injunctions. Though not all four factors must weigh heavily in every case, any one factor may give a district court reason enough to exercise its sound discretion by denying an injunction. *Reilly*, 858 F.3d at 177–79 (not all factors required). "When one factor is dispositive, a district court need not consider the others." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Because we must weigh all the factors before *granting* relief, we may take the factors out of order, as *Winter* and *Weissbard* did. We start by considering whether the alleged harm is irreparable. We see no evidence that it is. Plus, failing to grant interim relief would not moot this case.

## B. Except in First Amendment cases, we do not presume constitutional harms irreparable

The challengers bear the burden of proving irreparable injury; yet they ask us to lift that burden from their shoulders by presuming all constitutional harms irreparable. We will not. Presuming irreparable harm is the exception, not the rule. Plus, the presumption they propose would trample on traditional principles of equity.

Equity is contextual. It turns on the facts, and it supplements remedies at law only when needed. When lower courts have tried to harden equitable standards into rules, the Supreme Court has rebuked them. For example, a district court presumed that patent holders who do not practice their patents and are willing to license them cannot suffer irreparable injury. *eBay*, 547 U.S. at 393. In response, the Federal Circuit tilted to the other extreme, adopting a rule that made patent-infringement injunctions all but automatic. *Id.* at 393–94. The Supreme Court, however, rejected both such "broad classifications" as foreign to equity. *Id.* at 393. Rather, it held that district courts must apply their equitable discretion to the facts of each case, guided by "traditional principles of equity." *Id.* at 394.

True, our sister circuits have presumed harm in various settings. *See Baird*, 81 F.4th at 1042 (Second Amendment); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (Fourth Amendment); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (Eighth Amendment).

We respectfully decline to do the same. As we have explained, "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary

injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989). We explicitly refused to presume that an alleged equal-protection violation irreparably injured the plaintiff. *Constructors Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 819–20 (3d Cir. 1978). Even as some courts presumed constitutional harms irreparable, we still favored "traditional prerequisites for injunctive relief" over categorical presumptions. *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997).

The challengers suggest that we applied such a presumption to Fourth Amendment violations in *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971). We did not. That case did deal with an unreasonable search and seizure. *Id.* at 1344. But the irreparable harm there came because the plaintiffs had "alleged that First Amendment rights have been chilled as a result of government action*." Id*. at 1350 n.12 (capitalization added).

That case highlights the exception to our rule: we presume that First Amendment harms are irreparable. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 300 (D.C. Cir. 2006) (collecting cases).

Unique First Amendment doctrines warrant that exception. Take the "heavy presumption" against prior restraints on speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). First Amendment activity, like weekly worship and political speech, can be especially time-sensitive. *See Roman Cath. Diocese*, 592 U.S. at 19; *Elrod v. Burns*, 427 U.S. 347, 374 n.29 (1976) (plurality opinion). We thus presume that prior restraints

are unconstitutional because we fear "communication will be suppressed … before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973). As a rule, then, the government may not preliminarily enjoin speech. Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 169–72 (1998).

Or take courts' deference to sincere religious belief. Courts are ill-suited to weigh religious harms, much less assess whether they would be irreparable. If a believer's religious scruples are sincere, courts will not second-guess their centrality. *See Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015); *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981). This deference comes from the longstanding principle that "the judges of the civil courts" are not as "competent in the ecclesiastical law and religious faith." *Watson v. Jones*, 80 U.S. 679, 729 (1871). This history, though, limits the principle to the First Amendment.

Thus, when weighing preliminary injunctions, courts may presume that suppressing speech or worship inflicts irreparable injury. But this presumption is the exception, not the rule. We will not extend it.

### C. At this early stage, the challengers have failed to show irreparable harm

Without a presumption in their favor, the challengers' claim of irreparable harm collapses. They must show that, without a preliminary injunction, they will more likely than not suffer irreparable injury while proceedings are pending. *Reilly*, 858

F.3d at 179. To satisfy that burden, they submitted only four declarations from Delaware residents who "wish to obtain these firearms and magazines." Oral Arg. Tr. 5:9–10. They do not even allege that Delaware has tried to enforce the disputed laws against them or to seize the guns or magazines that they already own. Nor do they allege a time-sensitive need for such guns or magazines. This status quo shows no signs of changing. Thus, the challengers have not shown that a preliminary "injunction is required to preserve the status quo" while litigation is pending. *Warner Bros.*, 110 F.2d at 293.

Plus, given preliminary injunctions' inherent risks, the challengers' generalized claim of harm is hardly enough to call for this "extraordinary and drastic remedy." *Mazurek*, 520 U.S. at 972. The harm they allege is a far cry from "media companies hav[ing] to alter their editorial policies and posting practices to comply with [a] new speech law" or "businesses hav[ing] to restructure their operations or build new facilities to comply with the new [environmental] regulations" for years while they challenge these regulations. *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring). What is more, the challengers offered no evidence that without a preliminary injunction, the District Court will be unable to decide the case or give them meaningful relief. Thus, the court properly found no irreparable harm.

We rule only on the record before us. The challengers have shown no harms beyond ones that can be cured after final judgment. That finding alone suffices to support the District Court's denial of a preliminary injunction. *Pennsylvania ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam). We do not hold that Second Amendment

harms, or constitutional harms generally, cannot be irreparable. Still, the scant evidence before us here hardly shows that the challengers' harm is.

We also limit our analysis of irreparable injury to this preliminary injunction. For permanent injunctions, courts focus not on preserving the case and avoiding interim harms, but on whether the remedy at law is adequate. Emily Sherwin & Samuel L. Bray, *Ames, Chafee, and Re on Remedies* 653 (3d ed. 2020). We do not decide here whether the challengers should get a permanent injunction if they win on the merits.

### D. The other factors also support denying the injunction

Even if the challengers had shown an irreparable injury, the third and fourth factors would weigh against a preliminary injunction, as in *Winter*. Those factors, harm to the opposing party and the public interest, "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. They call for caution because this injunction threatens federalism and the separation of powers—"[t]wo clear restraints on the use of the equity power." *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring).

The challengers seek to enjoin enforcement of two democratically enacted state laws. Courts rightly hesitate to interfere with exercises of executive or legislative authority. *Rathke v. MacFarlane*, 648 P.2d 648, 651 (Colo. 1982) (en banc); *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635–38 (1952) (Jackson, J., concurring). "There is always a public interest in prompt execution" of the laws. *Nken*, 556 U.S. at 436.

That is doubly true when federal courts are asked to block states from enforcing their laws. *See, e.g.*, *Younger v. Harris*, 401 U.S. 37, 53–54 (1971). A federal court must weigh how best to deal with state laboratories of democracy. On a complete record, the duty of the federal court sometimes includes correcting a state that goes beyond the U.S. Constitution's bounds. Without the clarity of a full trial on the merits, though, we must err on the side of respecting state sovereignty. Delaware's legislature passed these bills, and Delaware's governor signed them into law. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (brackets and internal quotation marks omitted).

Plus, Delaware Sportsmen delayed seeking a preliminary injunction. A classic maxim of equity is that it "assists the diligent, not the tardy." Sherwin & Bray 441. The logic behind preliminary injunctions follows the general logic of equity: "[T]here is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Delaware Sportsmen's four-month delay suggests that it felt little need to move quickly. Its continuing delay as it chooses not to hasten to trial does not help its case. Thus, the final two factors support denying a preliminary injunction as well.

## V. The Challengers Had Other Ways
## to Get Relief Promptly

Our decision today leaves open several ways to vindicate constitutional rights promptly. First, a district court may move up the trial to consolidate it with the preliminary-injunction hearing. Fed. R. Civ. P. 65(a)(2). Second, the court may convert a preliminary-injunction motion into a summary-judgment motion if they first give the parties enough notice. *See Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 n.4 (9th Cir. 1990). Third, rather than move for a preliminary injunction, the parties may agree to an accelerated trial. *See* 11A Wright & Miller § 2948.1 & n.1.

Those approaches have many advantages. Often, "it would be more efficient to consolidate the trial on the merits with the motion for a preliminary injunction under Rule 65(a)(2)." Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard*, 22 Rev. Litig. 495, 534 (2003). Here, for instance, the trial would have happened in November 2023. Final rulings on the merits would resolve issues definitively and let us review legal rulings de novo on fully developed records. This preliminary posture, by contrast, just encourages snap judgments in the abstract.

\* \* \* \* \*

A preliminary injunction is not a first bite at the merits. Rather, it is an extraordinary, equitable remedy designed to protect the court's ability to see the case through. It risks cementing hasty first impressions. We trust district courts to reserve this drastic remedy for drastic circumstances. Because the District

Court did so here, we affirm its order denying a preliminary injunction. We express no view of the merits.

ROTH, <u>Circuit Judge</u>, concurrence

Although I concur with the result reached by the Majority, I write separately to address the plaintiffs' likelihood of success on the merits and, briefly, the balance of the equities and public interest. These additional thoughts may guide future litigants in formulating any steps that they may take following this decision.

As the Majority observes, a court may deny a preliminary injunction under "any one" of the four factors.[1] The District Court did so because plaintiffs failed to establish a likelihood of success on the merits[2]—the first of the two "most critical"[3] factors—and addressed irreparable harm "for thoroughness only."[4] By contrast, the Majority affirms the denial of injunctive relief solely based on a lack of irreparable harm.[5] While I agree that plaintiffs failed to demonstrate irreparable harm, I believe it would be helpful to future litigants to present a full discussion. As the District Court held, I believe that plaintiffs are not likely to succeed on the merits of their constitutional claim.

Moreover, because I also believe that *none* of the assault weapons and LCMs at issue are "Arms" protected by the

---

[1] Maj. Op. 19.

[2] *See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 590-603 (D. Del. 2023).

[3] Maj. Op. 16-17 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

[4] *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 603 n.17.

[5] Maj. Op. 26-27.

Second Amendment, I would hold that plaintiffs' challenge to Delaware's laws fails at *Bruen*'s first step, not its second.[6]

## I.     Governing Law

"In a crisp, if not enigmatic, way,"[7] the Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."[8]  In interpreting its meaning, we are guided by the principle that "the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning."[9]  "Normal and ordinary meaning" is that which would "have been known to ordinary citizens in the founding generation."[10]  Therefore, our interpretation of the Second Amendment—and our understanding of the "Arms" it protects in the present moment—is necessarily informed and cabined by history and Supreme Court precedent discussing the same.[11]

_____

[6] The District Court determined that assault long guns and LCMs are "Arms" protected by the Second Amendment, but assault pistols and copycat weapons are not.  *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 593-97.

[7] *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023).

[8] U.S. Const. amend. II.

[9] *D.C. v. Heller*, 554 U.S. 570, 576 (2008) (cleaned up).

[10] *Id*. at 577.

[11] *See, e.g.*, *id.* at 595 ("There seems to us no doubt, *on the basis of both text and history*, that the Second Amendment conferred an individual right to keep and bear arms.") (emphasis added).  As used herein, the term "Arms" refers to

We thus turn to the "normal and ordinary" meaning of the phrase "keep and bear Arms" as it is used in the Second Amendment.[12]   The Supreme Court's decision in *District of Columbia v. Heller* is our north star.[13]   In *Heller*, the Court instructed that the founding-era meaning of the word "Arms" "is no different from the meaning today."[14]   Contemporaneous dictionaries defined "arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."[15]   Most importantly, the term was applied "to weapons that were not specifically designed for military use and were not employed in a military capacity."[16]   The Court then went on to explain that the most natural reading of "keep Arms" is simply to have or possess weapons.[17]   By contrast, "bear Arms" means something else.  By itself, to "bear" meant, then as now, to "carry."[18]   But when used with "Arms," "bear" referred    "to    carrying    for    a    particular    purpose—

---

weapons that are protected under the Second Amendment while "arms" refers to weapons generally.

[12] *Id*. at 576.

[13] 554 U.S. 570 (2008).

[14] *Id*. at 581.

[15] *Id.* (alterations omitted) (citing definitions of "arms" from "[t]he 1773 edition of Samuel Johnson's dictionary" and "Timothy Cunningham's important 1771 legal dictionary").

[16] *Id.* ("Cunningham's legal dictionary gave us as an example of usage:  'Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms.'") (emphasis in original).

[17] *Id.* at 582-83 (confirming this reading by consulting historical sources).

[18] *Id.* at 584.

confrontation."[19]  Accordingly, to "bear Arms" means to carry weapons "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."[20]

At first blush—especially in light of the prefatory clause's reference to "[a] well-regulated Militia"—it might seem nonsensical that the Arms referred to in the Second Amendment do not include those "specifically designed for military use."[21]  The Court's discussions of founding-era history in *United States v. Miller* and *Heller* clear things up.[22] When the Second Amendment was ratified, the term "Militia" referred to "all males physically capable of acting in concert for the common defense."[23]  At that time, the "Militia" was "set in contrast with Troops which [States] were forbidden to keep without the consent of Congress."[24]  "Troops" were "standing

---

[19] *Id.*

[20] *Id. Heller* expressly endorsed the definition Justice Ginsburg set forth in her dissent in *Muscarello v. United States*, 524 U.S. 125 (1998).  In analyzing the meaning of the phrase "carries a firearm" as it was used in a federal criminal statute, Justice Ginsburg observed that "[s]urely a most familiar meaning is, as the Constitution's Second Amendment ("keep and *bear* Arms") . . . indicate[s]: 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Muscarello*, 524 U.S. at 143 (quoting Black's Law Dictionary 214 (6th ed. 1990)).

[21] *Heller*, 554 U.S. at 581.

[22] *U.S. v. Miller*, 307 U.S. 174 (1939); *Heller*, 554 U.S. 570.

[23] *Miller*, 307 U.S. at 179.

[24] *Id.* at 178-79.

armies" made up of soldiers, while the "Militia" was made up of ordinary citizens who would "appear bearing arms supplied by themselves and of the kind in common use at the time" when called to serve.[25]  As a result, the "small-arms weapons" used by the "Militia" and the weapons "used in defense of person and home were one and the same."[26]

Heller held that the Second Amendment confers an individual right to keep and bear "Arms" for self-defense—weapons akin to those to those that ordinary citizen-militiamen would keep at home and bring when called to duty—and thus protected respondent's right to keep and bear a handgun. However, Heller also made clear that "the right [is] not a right to keep and carry any weapon whatsoever and for whatever purpose."[27]  Most importantly for our purposes, Heller recognized that right "extends only to certain types of weapons."[28]  While "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms," it does not protect "dangerous and unusual weapons."[29]  Among the "dangerous and unusual weapons" outside its scope are (1)

---

[25] Id.; see also id. at 179 ("In a militia, the character of the labourer, artificer, or tradesman, predominates over that of the soldier:  in a standing army, that of the soldier predominates over every other character; and in this distinction seems to consist the essential difference between those two different species of military force.") (quoting Adam Smith, Wealth of Nations, Book V. Ch. 1).

[26] Heller, 554 U.S. at 625 (quoting State v. Kessler, 614 P.2d 94, 98 (Or. 1980)).

[27] Id. at 626.

[28] Id. at 623 (discussing Miller, 307 U.S. 174).

[29] Id. at 582, 627.

weapons that are "not typically possessed by law-abiding citizens for lawful purposes," such as short-barreled shotguns;[30] and (2) weapons that are "most useful in military service," such as "M-16 rifles and the like."[31]  *Heller*'s discussion of the latter is worth revisiting in full:

> It may be objected that if weapons that are most useful in military service—M–16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause.  But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that

---

[30] *Id.* at 625.  In *Miller*, the Supreme Court held that the Second Amendment does not protect the right to keep and bear short-barreled shotguns "[i]n the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well-regulated militia[.]"  *Miller*, 307 U.S. at 178.  *See also Heller*, 554 U.S. at 622-23 (explaining that *Miller*'s "basis for saying that the Second Amendment did not apply was *not* that the defendants were 'bear[ing] arms' not 'for . . . military purposes' but for 'nonmilitary use' . . . Rather, it was that the *type of weapon* at issue was not eligible for Second Amendment protection[.]") (emphases and alterations in original) (internal citation omitted).

[31] *Heller*, 554 U.S. at 627.

they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.[32]

In other words, the fact that a militia member no longer brings along his or her own weapon to militia duty, does not prevent us from recognizing the significance of the words used in the 18th century to create the Second Amendment.

Two years after *Heller*, the Court in *McDonald v. Chicago* expanded *Heller's* scope by confirming that the Second Amendment applies to the states through incorporation under the Fourteenth Amendment.[33] *McDonald* said nothing new about the kinds of Arms protected by the Second Amendment; as in *Heller*, the weapons at issue in *McDonald* were handguns.[34] *McDonald* reiterated that self-defense is the "central component" of the Second Amendment right and the

---

[32] *Id*. at 627-28.
[33] *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).
[34] *Id.* at 750.

"core lawful purpose" for which the weapons it protects are used.[35]

Twelve years after *McDonald*, the Court made "more explicit" a two-step analytical approach for evaluating Second Amendment claims in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.[36] At step one, the court determines whether the Second Amendment's "plain text" covers the "conduct" at issue.[37] If it does, the court proceeds to step two to determine whether the challenged laws are "consistent with the Nation's historical tradition of firearm regulation."[38] At step two, the government must show that that the modern regulation is

---

[35] *Id*. at 767-68 (quoting *Heller*, 554 U.S. at 599, 630).

[36] 597 U.S. 1, 31 (2022).

[37] *Id.* at 17. Although *Bruen* does not expressly hold that plaintiffs bear the burden at step one, it necessarily implies that they do. In disposing of the means-ends scrutiny that courts previously applied to Second Amendment claims, the Court explained that its new two-step analysis "accords with how we protect other constitutional rights," such as those guaranteed by the First Amendment. *Bruen*, 597 U.S. at 24. If a plaintiff alleging a violation of their First Amendment rights must "bear[] certain burdens," only after which "the focus then shifts to the defendant to show that its actions were nonetheless justified[,]" then the same must be true here. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022); *see also Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1194 (7th Cir. 2023) ("In order to show a likelihood of success on the merits, the plaintiffs in each of the cases before us have the burden of showing that the weapons addressed in the pertinent legislation are Arms").).

[38] *Bruen*, 597 U.S. at 24.

"relevantly similar" to historical regulation in "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[39]

## II.    Discussion

### A.    Plaintiffs failed to establish a likelihood of success on the merits.

The laws challenged here restrict having, making, buying, selling, and receiving "assault weapons" and "large capacity magazines."[40] "Assault weapons" include: (1) forty-four semi-automatic "assault long guns," including the AR-15, AK-47, and Uzi; (2) nineteen semi-automatic "assault pistols"; and (3) "copycat weapons."[41] "Large capacity magazines" (LCMs), are magazines "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition."[42]

We must first decide whether these assault weapons and LCMs are "Arms" that individuals are entitled to "keep and bear" under the plain text of the Second Amendment. If they are not properly characterized as "Arms," then Delaware is free to regulate them as it chooses. If they are properly characterized as "Arms," we proceed to *Bruen*'s second step

---

[39] *Id.* at 29.

[40] *See* Del. Code Ann. tit. 11, §§ 1464-69; *id*. § 1465(4) (assault weapons); *id*. § 1468(2) (LCMs).

[41] *Id.* § 1465(2) (assault long guns); *Id.* § 1465(3) (assault pistols); *Id*. § 1465(6) (copycat weapons).

[42] *Id*. § 1468(2).

and determine whether the laws are "consistent with the Nation's historical tradition of firearm regulation."[43]

Three principles, the contours of which are disputed by the parties, guide our analysis at *Bruen* step one. First, the Second Amendment extends to "all instruments that constitute bearable arms,"[44] meaning weapons that "are in common use for self-defense today."[45] Second, for purposes of assessing whether a given weapon is in common use for self-defense, what matters is whether the weapon in question is suitable for, owned for, and actually used in self-defense. Third, the Second Amendment does not protect "dangerous and unusual weapons," meaning those weapons that are "not typically possessed by law-abiding citizens for lawful purposes"[46] or are "most useful" as weapons of war.[47]

> **i. "Bearable arms" are those that are commonly used for self-defense.**

The parties disagree about the kinds of "bearable arms" presumptively protected by the Second Amendment. Plaintiffs contend that weapons used for *any* lawful purpose *including* self-defense are protected, while Delaware argues that *only* weapons that are commonly used for self-defense are protected. Delaware's argument proves stronger.

---

[43] 597 U.S. at 24.

[44] *Heller*, 554 U.S. at 582.

[45] *Bruen*, 597 U.S. at 47 (internal quotations omitted).

[46] *Id.* at 625.

[47] *Heller*, 554 U.S. at 627.

Limiting the scope of "bearable arms" to those that are used for self-defense comports with the "normal and ordinary" meaning of "bear arms."[48] *Heller* made clear that to "bear arms" means to carry weapons "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." Thus, the phrase "bearable arms" necessarily refers to weapons that are carried for that same express purpose.[49]

To be sure, weapons can be (and are) used for lawful purposes besides self-defense. Recreational target shooting, hunting, and pest-control all come to mind.[50] But *Heller* holds, and its progeny affirms, that self-defense is "*the* core lawful purpose" protected by the Second Amendment.[51] While these other uses may be lawful, the Supreme Court has never recognized them as "core" purposes protected by the Second Amendment.[52] Until it might do so, the "bearable arms"

---

[48] *Heller*, 554 U.S. at 576.

[49] *Id.* at 584.

[50] *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 594; *Ass'n of New Jersey Rifle and Pistol Clubs, Inc. v. Att'y Gen. New Jersey (ANJRPC)*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1 (2022).; *Bevis*, 85 F.4th at 1192.

[51] *Heller*, 554 U.S. at 630 (emphasis added); *see also Bruen*, 597 U.S. at 29 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is 'the *central component*' of the Second Amendment right.'") (emphasis in original) (quoting *McDonald*, 561 U.S. at 767)).

[52] *Heller*, 554 U.S. at 630.

presumptively protected by the Second Amendment are limited to weapons used explicitly for self-defense.[53]

> ### ii. Whether a weapon is "in common use for self-defense" hinges on more than its popularity.

The parties dispute (1) when common use should be assessed (at *Bruen* step one or two), (2) what type of common use matters, and (3) how common use should be measured.

"When" is a question easily answered. *Bruen* acknowledged that the handguns at issue were "'in common use' today for self-defense" before conducting its historical analysis, thereby indicating that "common use" comes into play at step one.[54]

"What type" can also be resolved by reference to *Bruen*. As the latest in a line of decisions holding that "individual self-defense is 'the *central component*' of the Second Amendment right," *Bruen* confirms that the only weapons protected by the right are those that are commonly used for self-defense--not for any lawful purpose *like* self-defense.[55]

"How" is more complicated. The Supreme Court has yet to address exactly how we should assess whether a weapon is "in common use today for self-defense."[56] The District

---

[53] *Id.*

[54] *See Bruen*, 597 U.S. at 32.

[55] *Id.* at 29 (quoting *McDonald*, 561 U.S. at 767).

[56] *Id.* (internal quotations omitted).

Court did so only by considering whether the assault weapons and LCMs were popular.[57]  But the plain meaning of "common use," the frameworks of other constitutional rights, and the problems that might flow from the District Court's approach all point toward additional metrics:  a weapon's objective suitability for self-defense and whether it is commonly used in self-defense.

Consider the plain meaning of "common use." "Common" is defined as "occurring, found, or done often; in general use; usual, prevalent."[58]  "Use" is defined as "a long-continued possession and employment of a thing for the purpose for which it is adapted[.]"[59]  Read together, a weapon is in common use for self-defense if evidence shows it is (1) well adapted for self-defense and (2) widely possessed and employed for self-defense.  However, evidence that a weapon is widely possessed or that a widely possessed weapon is occasionally used in self-defense is not, alone, enough to show it is in common use for self-defense—not if we want to heed the phrase's plain meaning.

---

[57] *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

[58] *Common, Adj., Sense II.9.a*, Oxford English Dictionary (Feb. 2024) (online ed.), https://doi.org/10.1093/OED/1740514823.

[59] *Use*, Black's Law Dictionary (11th ed. 2019).  The complete definition reads:  "The application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional."  *Id.*; *see also Voisine v. United States*, 579 U.S. 686, 692 (2016) ("Dictionaries consistently define the noun 'use' to mean 'the act of employing' something.").

Beyond plain meaning, *Bruen* says that its two-step standard "accords with how we protect other constitutional rights."[60] We frequently define the boundaries of these rights with objective standards.[61] There is no reason not to do the same in the Second Amendment context.[62] By taking into account whether a weapon is objectively suitable for self-defense, we ensure that the Second Amendment right to self-defense is not "subject to an entirely different body of rules than the other Bill of Rights guarantees."[63]

---

[60] *Bruen*, 597 U.S. at 24.

[61] *Id.* For example, in the Fourth Amendment context, we assess the constitutionality of an arrest by determining whether "the circumstances, viewed objectively, justify [the challenged] action." *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (alterations in original). In determining whether an individual was subject to an unreasonable search, we consider whether the person being searched had an objectively reasonable expectation of privacy and the objective effect of the officer's actions. *Bond v. United States,* 529 U.S 334, 338, 338 n.2 (2000). In the Sixth Amendment context, a criminal defendant claiming ineffective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 US. 668, 688 (1984).

[62] Indeed, even *Bruen* suggests that an objective standard is relevant for judging whether a Second Amendment violation has occurred. The Court specifically held that New York's proper-cause requirement was unconstitutional "in that it prevents law-abiding citizens with *ordinary self-defense needs* from exercising their right to keep and bear arms." *Bruen*, 597 U.S. at 71 (emphasis added).

[63] *Id.* at 70 (quoting *McDonald*, 561 U.S. at 780).

Finally, a "common use" analysis that hinges solely on a weapon's popularity produces absurd results. Take, for example, the AR-15 and the Federal Assault Weapons Ban, which made civilian possession of AR-15s unlawful.[64] When the Ban first went into effect in 1994, few civilians owned AR-15s.[65] When it expired in 2004, AR-15s "began to occupy a more significant share of the market."[66] Today, plaintiffs describe the AR-15 as "America's most popular semi-automatic rifle" and "the second-most common type of firearm sold[.]"[67] If we looked to evidence of the AR-15's popularity alone, the Ban would have been constitutional before 2004 but unconstitutional thereafter.[68] A law's constitutionality cannot be contingent on the results of a popularity contest.[69]

> ### iii. "Dangerous and unusual weapons" is a category, not a test.

Though the Second Amendment presumptively protects "Arms" that are in common use for self-defense, it does not

---

[64] Pub. L. No. 103-322 § 110102, 108 Stat. 1796.

[65] *Bevis*, 85 F.4th at 1199.

[66] *Id.*

[67] Gray Br. 19-20.

[68] *See Bevis*, 85 F. 4th at 1199.

[69] *See also Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 102 (D. Conn. 2023) ("[W]hile constitutional protections adapt to the constant evolution of societal norms and technology, no other constitutional right waxes and wanes based solely on what manufacturers choose to sell and how Congress chooses to regulate what is sold, and the Second Amendment should be no exception.").

extend to "dangerous and unusual weapons."[70]  The District Court likened this to a "test," and concluded that a weapon must "check both boxes" to qualify as "dangerous and unusual."[71]  But *Heller* instructs that "dangerous and unusual" is best understood as a two-part category unto itself. [72]  As discussed above, "dangerous and unusual weapons" are either (1) weapons that are "not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," or (2) weapons that "are most useful in military service," such as "M-16 rifles and the like."[73]  For the latter, it is worth noting that "most" is a superlative descriptor.[74]  Therefore, even though a weapon might be useful in civilian and military contexts, a weapon that is "most" suited for military use falls outside the scope of "Arms" protected by the Second Amendment.[75]

---

[70] *Heller*, 554 U.S. at 627.

[71] *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

[72] We are bound by *Heller* and its progeny, not Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411, 417 (per curiam) (Alito, J., concurring) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.").  Moreover, and as discussed in greater detail below, affording "great weight" to the *Caetano* concurrence is unwarranted.  *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 595.

[73] *Heller*, 554 U.S. at 625, 627.

[74] *Hanson v. D.C.*, 671 F. Supp. 3d 1, 12 (D.D.C. 2023) (citing *Heller*, 554 U.S. at 627).

[75] Even Delaware acknowledges that each of the assault weapons it seeks to regulate may "potential[l]y function as a sports or recreational firearm"; however, that potential is

While the District Court concluded that the assault weapons and LCMs at issue *are* typically possessed by law-abiding citizens for lawful purposes, it did not consider whether any of the assault weapons and LCMs at issue "are most useful in military service" and therefore "may be banned" without infringing the Second Amendment right (as *Heller* tells us).[76] That was error.

### iv. None of the assault weapons and LCMs are "Arms" protected by the Second Amendment.

The District Court concluded that assault long guns and LCMs are fairly characterized as "Arms," but assault pistols and copycat weapons are not.[77] However, its analysis rested on an incomplete assessment of "common use" and a misunderstanding of what makes a weapon "dangerous and unusual." Analyzed correctly, the record shows that *none* of the assault weapons and LCMs are "Arms" protected by the Second Amendment.

***Assault long guns:*** The assault long guns set forth at § 1465(2) may be commonly owned, but they are nonetheless best categorized as weapons that are most useful in military service and are therefore unprotected by the Second

---

"substantially outweighed by the danger that it can be used to kill and injure human beings." Del. Code Ann. tit. 11, § 1464.
[76] *Heller*, 554 U.S. at 627.
[77] *See Delaware State Sportsmen's Ass'n,* 664 F. Supp. 3d at 595-96 (addressing assault long guns); *Id.* at 596-97 (addressing LCMs); *Id.* at 593 (addressing assault pistols and copycat weapons).

Amendment.[78]  Generally speaking, assault long guns derive from weapons of war and retain nearly all of the features of their military counterparts.[79]  These "famed" military features—designed to increase lethality and allow shooters to inflict severe damage over great distances—serve as civilian selling points.[80]  But while these features may be useful in

---

[78] Del. Code Ann. tit. 11, § 1465(2).

[79] The only meaningful distinction between the assault long guns sold to civilians and the assault long guns reserved for military use appears to be firing capability:  civilian versions are only capable of semi-automatic operation while military versions can operate both ways.  However, the ease with which semi-automatic rifles can be modified to fire at rates approaching that of their fully automatic counterparts reinforces the concept that the design of an assault long gun is a design for a weapon of war.  *Cf. Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600 (citing evidence of "numerous inexpensive products, available for purchase in most states, that allow AR-style rifles to fire at rates comparable to fully automatic weapons."); *Garland v. Cargill*, 602 U.S. 406, 410-12 (2024) (describing the ease with which a semi-automatic rifle can be converted to fire at a rate approaching that of a machine gun).

[80] *See, e.g.,* SA 680 (advertising AR-15s as follows:  "Out of the jungles of Vietnam comes a powerful, battle-proven rifle ready for sale to civilians for hunting and target use.  It's the Army's rakish AR-15, famed for its success in guerilla fighting.  The sport version is an exact duplicate of the military weapon . . ."); SA 455-56 ¶¶ 57-58 ("Colt sought to capitalize on the military acceptance of the AR-15 / M16 and [] proposed production of these rifles for sale to the civilian market . . . The sole difference between the military and civilian versions was

military contexts, they make assault long guns ill-suited for self-defense.[81]   Unlike wartime offensives, home and self-defense scenarios rarely, if ever, involve lengthy shootouts at long ranges or extensive exchanges of gunfire.   Moreover, projectiles traveling at velocities as high as a 5.66 mm or .223 caliber cartridge can easily penetrate most home construction materials, posing a serious risk of harm to bystanders in adjacent rooms or even outside the home entirely.[82]

The lethality of an assault long gun is best illustrated by way of comparison.   Take the damage inflicted by a handgun (*Heller's* "quintessential self-defense weapon") and the damage inflicted by an assault rifle.[83]   A common caliber handgun cartridge (9 mm or .38) travels at a muzzle velocity

---

removal of fully automatic capability . . . All of the other features on these rifles that enhanced their capability as combat military firearms remained.").

[81] These features also make assault weapons "a counterintuitive choice" for other lawful purposes like hunting and target shooting.  SA 474-75 ¶ 88.

[82] SA 472-73 ¶¶ 83-84 (discussing results of penetration tests wherein nine different types of .223 / 5.56 mm ammunition were fired through simulated wall sections made of gypsum board, sheet rock, and wooden 2x4 studs, and noting that "all nine (including "frangible" rounds designed to disintegrate when hitting a hard surface) easily penetrated the wall section as well as water jugs placed three feet behind.").  In addition to materials commonly used in home construction, .223 caliber ammunition can penetrate 3/8" hardened steel from 350 yards away, while 5.56 mm can penetrate up to 3mm of non-hardened steel.

[83] *Heller*, 554 U.S. at 629.

of roughly 1,600 feet per second.  When it hits tissue, it strikes directly, producing "a small temporary cavity" in tissue that "plays little or no role in the extent of wounding."[84]  By contrast, a 5.66 mm or .223 caliber cartridge—the kind typically used in assault weapons—travels at double the speed.[85]  And unlike a handgun cartridge, it turns sideways when it hits tissue, creating a cavity over ten times larger than the cartridge itself and resulting in "catastrophic" wounding.[86]  Doctors who have treated people shot by assault rifles have witnessed "multiple organs shattered, bones exploded, soft tissue absolutely destroyed, and exit wounds a foot wide."[87]

The record is clear:  the assault long guns at issue are most useful as weapons of war.  As such, they fall outside the scope of "Arms" presumptively protected by the Second Amendment.

**LCMs:**  The District Court explained it was "bound" by our pre-*Bruen* decision in *ANJRPC* in two ways.[88]  First, because *ANJRPC* "broadly held that 'magazines are arms,'" the District Court assumed the LCMs at issue here must also be "arms."[89]  Second, because plaintiffs in both cases proffered similar "common use" evidence, the District Court determined that these LCMs must also be "in common use for self-defense

---

[84] *Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600.
[85] SA 472 ¶ 83.
[86] *Id.*
[87] *Id.*
[88] *Delaware State Sportsmen's Ass'n,* 664 F. Supp. 3d at 596 (discussing *ANJRPC*, 910 F.3d at 106).
[89] *Id.* (quoting *ANJRPC*, 910 F.3d at 106).

today."[90]  As a result, the District Court held that the LCMs Delaware seeks to regulate are "Arms" presumptively protected by the Second Amendment.  While the District Court's reliance on *ANJRPC* was understandable, it read our decision too broadly.

In *ANJRPC*, we held that "magazines are 'arms'" insofar as they "feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended[.]"[91]  But *ANJRPC* does not stand for the proposition that *all* magazines are categorically protected Arms under the Second Amendment.  Indeed, we expressly assumed without deciding that the LCMs at issue (those with 10 or more rounds of ammunition) were "commonly owned and typically possessed by law-abiding citizens for lawful purposes."[92]  Other courts took a similar approach pre-*Bruen*.[93]  But we now have the benefit of *Bruen*, which confirms that only "weapons 'in common use' today for self-defense," as opposed to generally "lawful purposes," are protected by the Second Amendment.[94]  As a result, the evidence that sufficed for the sake of argument in *ANJRPC*—evidence showing magazines are "typically possessed by law-abiding citizens for hunting, pest-control, and *occasionally* self-defense"—does not suffice

---

[90] *Id.* at 596-97.

[91] *ANJRPC*, 910 F.3d at 116.

[92] *Id.* (internal citations omitted).

[93] *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 256-57 (2d Cir. 2015); *Worman v. Healey*, 922 F.3d 26, 30 n.12 (1st Cir. 2019).

[94] *Bruen*, 597 U.S. at 48.

here.[95]   Not all guns are "Arms" protected under the Second Amendment, nor are all magazines.

Plaintiffs show that LCMs are widely owned but otherwise offer no evidence that the LCMs at issue here—magazines that can hold seventeen or more rounds—are suitable for or actually used in self-defense.   By contrast, Delaware offered evidence showing that LCMs are most useful as weapons of war.   Like assault long guns, LCMs were designed for military use to allow a soldier to "fire an increased quantity of cartridges without reloading."[96] They are marketed to civilians for the same express purpose ("Twice the violence of action.   Half the reloads.   Win-win"), but that purpose is plainly most useful in combat.[97]   The record shows it is "extremely rare" for a person to fire even ten rounds, let alone more than seventeen, in self-defense.[98]   Quite the opposite.   A study of "armed citizen" stories collected by the National Rifle Association from 2011 to 2017 found that the average number of shots fired in self-defense was 2.2.[99]

Based on the record presented, the LCMs Delaware seeks to regulate are most useful as military weapons and thus are not "Arms" protected by the Second Amendment.

***Assault pistols:***   Plaintiffs offered no evidence that the nineteen types of assault pistols listed at § 1465(3) are best adapted for self-defense, commonly owned for self-defense, or

---

[95] *ANJRPC*, 910 F.3d at 116 (emphasis added).

[96] SA 454-55 ¶ 55.

[97] SA 96 (advertisement for 60-cartridge magazine) (cleaned up).

[98] SA 331 ¶ 9.

[99] *Id.*

commonly used for self-defense. Plaintiffs' sole argument is that that the Supreme Court has already "clarifi[ed]" that assault pistols listed "are in common use," citing Justice Alito's concurrence in *Caetano v. Massachusetts*.[100] Not so. Although Justice Alito observed that "revolvers and semiautomatic pistols" are "the weapons most commonly used today for self-defense," the Court's *per curiam* opinion pertained only to stun guns and simply affirmed *Heller*'s holding that a weapon need not have existed at the time of the founding to receive Second Amendment protection.[101] Moreover, Justice Alito's broad observation about "revolvers and semiautomatic pistols" tells us nothing about the nineteen specific assault pistols Delaware seeks to regulate.[102]

Dictum from Justice Alito's *Caetano's* concurrence notwithstanding, and based on the record presented, the assault pistols at issue are not "Arms" presumptively protected by the Second Amendment.

**Copycat weapons:** Plaintiffs claim that the assault long guns and assault pistols listed at §§ 1465(2) and (3) are no different from the copycat weapons listed at § 1465(6). According to plaintiffs, because assault long guns and assault pistols are widely owned and therefore protected under the

---

[100] Delaware State Br. 12 (citing *Caetano*, 577 U.S. at 416-17 (Alito, J., concurring), *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), and *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242, 255 (2d Cir. 2015)); Del. Code Ann. tit. 11, § 1465(3).
[101] *Caetano*, 577 U.S. at 416-17 (Alito, J., concurring); *see id.* at 411-12.
[102] *Id*. at 416-17 (Alito, J., concurring).

Second Amendment, the same is true for copycat weapons. However, as discussed above, plaintiffs failed to demonstrate that assault long guns and assault pistols are in common use for self-defense. By plaintiffs' own logic, our analysis of copycat weapons ends there. Moreover, the only evidence plaintiffs submitted was a survey regarding the ownership and use of the "AR-15 or similarly styled rifles."[103] These statistics, by themselves, do not establish that copycat weapons are commonly used for self-defense. Accordingly, copycat weapons are not "Arms" protected by the Second Amendment.

Because I would hold that none of the assault weapons or LCMs Delaware seeks to regulate are "Arms" at *Bruen* step one, it is unnecessary to consider whether Delaware met its burden at *Bruen* step two. But even assuming that the assault weapons and LCMs at issue fall within the ambit of Arms protected by the Second Amendment, the District Court's careful analysis leaves no doubt that Delaware's laws are consistent with the nation's historical traditional of firearm regulation.[104] Either way, plaintiffs failed to demonstrate a likelihood of success on the merits of their Second Amendment claim, and the District Court correctly denied injunctive relief.

---

[103] William English, 2021 Nat'l Firearms Survey: Updated Analysis Including Types of Firearms Owned 33 (May 13, 2022) (Georgetown McDonough School of Business Research Paper No. 4109494), https://bit.ly/3yPfoHw.

[104] *See Delaware State Sportsmen's Ass'n*, 664 F. Supp. 3d at 597-603. Based on a record "almost entirely supplied by" Delaware, the District Court decided that Delaware met its *Bruen* step two burden. *Id.* at 597 n.13. Rightly so.

## B. The balance of the equities and the public interest also weigh in favor of denying the preliminary injunction.

Finally, I turn briefly to the balance of the equities and the public interest.[105]    I agree with the Majority that neither factor weighs in plaintiffs' favor.    However, I believe the Majority construes the state's interest in this case too narrowly. While the Majority rightly identifies Delaware's interest in the execution of its democratically enacted laws,[106] the state has an equally important interest in the safety of its citizens.

In recent years, the United States has experienced an exponential increase in the frequency of mass shootings. Scholars estimate that only twenty-five mass shootings occurred between 1900 and 1965.[107]    By contrast, the United

---

[105] *See Winter v. NRDC*, 555 U.S. 7, 26, 32 (2008); *Reilly*, 858 F.3d at 177-79.  There is no tension between our consideration of the public interest and *Bruen*'s disavowal of means-end scrutiny.  597 U.S. at 19.  The former is a threshold inquiry that cabins our use of preliminary injunctions, while the latter concerns the merits of the constitutional claim.  These inquiries are also substantively different:  means-end scrutiny concerns the tailoring of a law to advance a government objective, while the final two preliminary injunction factors consider the consequences for the parties and the public.  *Cf. Bevis*, 85 F.4th at 1203-04.

[106] Maj. Op. 24-25.

[107] *See* Bonnie Berkowitz & Chris Alcantara, *Mass Shooting Statistics in the United States*, Wash. Post (May 9, 2021), https://tinyurl.com/537ww9z4.    As used here, a "mass shooting" is a shooting in which four or more people, not including the perpetrator, are injured or killed, where victims

States now endures more than 600 mass shootings per year—nearly two per day. Assault weapons and LCMs have been the weapons of choice in many of these mass shootings, and unsurprisingly, mass shootings involving assault weapons and LCMs result in far more fatalities and injuries than those that do not.[108] The Delaware legislature recognized that assault weapons and LCMs pose a grave "threat to the health, safety, and security" of Delawareans and acted accordingly.[109]

Confronted with unprecedented violence, Delaware determined it was in the public interest to address the proliferation of assault weapons and LCMs—instruments that were purpose-built to kill as many people as quickly as possible. It is clear to me that the Second Amendment does not

---

are selected indiscriminately, and where the shootings are not attributable to any other underlying criminal activity or circumstance.

[108] For example, Delaware submitted a study of 179 mass shootings that have occurred between 1982 and October 2022. Of the mass shootings where the weapon type (153) and magazine capacity (115) were known, 24% involved assault weapons and 63% involved LCMs capable of holding ten or more rounds. Mass shootings involving assault weapons had an average of 36 fatalities or injuries per shooting, while those that did not involve assault weapons had an average number of 10. Similarly, mass shootings involving LCMs had an average of 25 fatalities or injuries per shooting, whereas those that did not involve LCMs had an average of 9. Shooters fired more than 17 rounds in 92% of mass shootings known to have been committed with an assault weapon and an average of 116 shots in mass shootings involving LCMs.

[109] Del. Code Ann. tit. 11, § 1464.

compel Delaware to turn a blind eye to the safety of its citizens. Moreover, Delaware's interest in public safety is relevant to the propriety of denying injunctive relief.

* * * * *

For the above reasons, I agree that we should affirm the District Court's order denying injunctive relief, but I urge that these other relevant factors be kept in mind by future courts in future cases.